# IN THE UNITED STATES DISTRICT COURT

## FOR THE DISTRICT OF DELAWARE

|  |  |
|---|---|
| TOLANO ANDERSON, et al., | ) |
| | ) |
| Plaintiffs, | )  C.A. No. 06 CV 00567 (SLR) |
| | ) |
| v. | ) |
| | ) |
| WACHOVIA MORTGAGE CORPORATION | ) |
| *and* WACHOVIA CORPORATION, | ) |
| | ) |
| Defendants. | ) |
| | ) |

---

**APPENDIX OF EXHIBITS TO THE OPENING BRIEF OF DEFENDANTS WACHOVIA MORTGAGE CORPORATION AND WACHOVIA CORPORATION IN SUPPORT OF THEIR MOTION TO DISMISS PLAINTIFFS' COMPLAINT PURSUANT TO FEDERAL RULE OF CIVIL PROCEDURE 12(b)(6)**

---

*Of Counsel*
Elizabeth K. Ainslie
Stephen A. Fogdall
Schnader Harrison Segal & Lewis LLP
1600 Market Street, Suite 3600
Philadelphia, PA 19103
(215) 751-2000

Michael J. Barrie
Schnader Harrison Segal & Lewis LLP
824 N. Market Street
10th Floor, Suite 1001
Wilmington, DE 19801-3011
(302) 888-4554

*Counsel for Defendants Wachovia Mortgage Corporation
and Wachovia Corporation*

September 20, 2006

## TABLE OF CONTENTS

| Exhibit | Page |
|---|---|
| Complaint | A-01 |
| Mortgage of Tolano and Cathy Anderson | A-16 |
| Mortgage of Richard and Brenda Wilkins | A-34 |
| Mortgage of Lloyd and Audria Wheatley | A-52 |

EFiled: Aug 11 2006  2:24 EDT
Transaction ID 12054556

. IN THE SUPERIOR COURT OF THE STATE OF DELAWARE

IN AND FOR KENT COUNTY

| | | |
|---|---|---|
| TOLANO ANDERSON, CATHY ANDERSON, | ) | |
| RICHARD WILKINS, BRENDA WILKINS, | ) | |
| LLOYD WHEATLEY, and | ) | |
| AUDRIA WHEATLEY, | ) | |
| | ) | |
| Plaintiffs, | ) | C. A. No. |
| | ) | |
| v. | ) | NON-ARBITRATION |
| | ) | |
| | ) | JURY TRIAL DEMANDED |
| WACHOVIA MORTGAGE CORPORATION | ) | |
| and WACHOVIA CORPORATION, | ) | |
| | ) | |
| Defendants. | ) | |

06 AUG 15 PM 2:58
KENT COUNTY
PROTHONOTARY

RECEIVED
AND
FILED

## COMPLAINT

1.    Plaintiffs are all African Americans.

2.    At all times pertinent and for several years previous, Plaintiffs Tolano Anderson, Cathy Anderson, Lloyd Wheatley, and Audria Wheatley all had bank accounts at Wachovia Bank.

3.    Prior to June 2004, Plaintiffs Tolano Anderson,(hereafter referred to as Anderson) Cathy Anderson, Lloyd Wheatley (hereafter referred to as Wheatley), and Audria Wheatley  between them had approximately six (6) mortgages and at least six (6) banking additional accounts all with Wachovia Bank.

4.    On or about June 2004, Plaintiff Tolano Anderson contacted J. D. Hogsten, (hereafter referred to as Hogsten) a loan officer for Defendants Wachovia, and told him that the Andersons, Wilkins, and Wheatleys planned to purchase three (3) homes located on Silver Lake whose addresses are 580 North DuPont Highway, 584 DuPont North Highway, 592 DuPont Highway from Mr. Jack Aigner.

**A - 01**

5.    The Andersons and the Wheatleys intended to use their purchased homes as a primary residence; the Wilkins intended to us their purchased home as a secondary residence.

6.    Anderson explained to Hogsten that all three (3) homes had to be purchased. And that if one home was not purchased, all of them would collectively lose the $40,000.00 non refundable deposit, of which each had put in $13,333.33.

7.    With that in mind, Hogsten advised Anderson how to proceed with the purchases and assured him that the bank understood that the sale was an individual sale, although the Andersons, Wilkins, and Wheatleys would all take title separately to three (3) different properties.

8.    Shortly thereafter, Anderson contacted Hogsten to discuss further financial plans, however, Hogsten was unavailable. So, Anderson spoke to Ms. Deanne Wilks and asked that she give the information to Hogsten.

9.    Wachovia Corporation is a large institutional bank which provides, among other things, mortgage services to its customers and to its applicants. The Andersons and Wheatleys were ongoing customers of the bank. Wachovia Mortgage Corporation is a subsidiary of Wachovia Corporation.

10.   Anderson explained to Hogsten that throughout the transaction he would be the key person to receive all the information for the Anderson, Wilkins, and Wheatleys.

11.   After the agreement of sale was signed and a deposit was put down, Hogsten advised Anderson that an appraisal will be needed for all the properties.

12.   Shortly thereafter, Anderson met with an appraiser assigned to appraise his home sent by Hogsten.

13.    At the time, it appeared to Anderson that Hogsten and the appraiser appeared to know each other well.  In fact, after the meeting the appraiser and Hogsten went out to lunch.

14.    Almost immediately upon meeting with the appraiser, Anderson was told by the appraiser that he could not appraise the house because there was some damage to the basement.

15.    Upon information of belief, the appraiser at that time refused to appraise the house upon the request of Hogsten, who had his own undisclosed reasons for undermining the aforesaid purchase.

16.    Hogsten then told Anderson that it would be impossible to have an appraisal because it was impossible to find comparable homes and, as a result, the bank would not be able to make the loan.

17.    Upon information of belief, Hogsten's comment that it was impossible to find other comparables was, in fact, a ruse and a second attempt to undermine the transaction of the Plaintiffs.

18.    Anderson thereafter contacted Carl Kaplin, another appraiser, who advised him that there were other comparables and, in fact, approximately ten (10) minutes time faxed him several other comparable homes.

19.    Thereafter, Anderson advised J. D. Hogsten that there were comparables and faxed them to him.

20.    Thereafter, Anderson asked Hogsten for another impartial appraiser for his property.

3

21.    Another independent appraiser did come out to appraise the property adjacent to DuPont Highway for $267,000 which was the purchase price.

22.    Shortly thereafter, a commitment letter was provided to Wilkins and Anderson.

23.    Hogsten had advised Anderson that he was not going to make enough money on this transaction because Anderson had contacted to Deanne Wilks on one occasion and because of that contact with Anderson, he had to split his commission with her.

24.    Upon information of belief, Hogsten had no intention of permitting the transaction to be completed, knowing at the time that it would cost Plaintiffs $40,000 in the loss of the deposit.

25.    After the appraisals were approved, Hogsten told Anderson that in order for the sale to be completed, he would require Anderson's home to be put into "move in" condition, even though it had been appraised for a total purchase price in the condition that it was in.

26.    On or about July 2, 2004, Dr. and Mrs. Wilkins met with Hogsten in his Wachovia office. In the conversation, Hogsten informed the couple that the home being purchased by the Andersons was "nothing more than a pile of sticks and bricks and he could assign no value to it at all".

27.    The statement by Hogsten was further evidence of his seeking to undermine the entire transaction.

28.    Shortly thereafter, Hogsten informed Anderson that the property had significant value as a potential commercial property. Hogsten asked Anderson if he would change the transaction from residential to commercial and Anderson said he did not wish to do so.

4

29.    Shortly thereafter, the Wilkins home appraisal was completed.    The home appraised at a value exceeding the sales price.

30.    After Mr. Hogsten informed Dr. Wilkins that he was now required to prove that the funds used for the deposit was his money and show its source.

31.    This is not normal customary practice of the bank.

32.    On or about July 23, 2004, Hogsten informed Dr. Wilkins that he was required to provide documentation proving that his deposit on the home was his own money.  This again, is not customary procedure of the bank.

33.    On or about July 23, 2004, Hogsten informed Anderson that the purchase of his property could not go though.  He said that there was not enough value in the property.  At that time, Anderson advised Mr. Hogsten that the required work was nearly complete and was ready for an impartial appraiser's assessment.  On that same day, Hogsten made additional negative comments about the pending transactions to Mr. & Mrs. Anthony Wallace, who were there at the bank on another matter.

34.    After the appraisal for the Anderson property was completed, the appraisal value was the same as the sales price.

35.    On or about July 2004, the appraisal for the Wheatley property was completed. The value of the appraisal exceeded the sales price.

36.    Despite the fact that the Wheatley property appraised above the sales price, Hogsten informed Wheatley that he was now required to complete upgrades on the property to ensure that everything was in move in condition prior to settlement.

37.    Wheatley explained that as a buyer he did not want to waste thousands of dollars upgrading the house prior to settlement because he is planning custom upgrades

after the settlement. He also explained that he did not have access to the home and was not able to complete upgrades to sell his house prior to settlement. Despite the request by Wheatley, Hogsten refused to lift the bank's requirement.

38. This was another attempt by Hogsten to undermine the sale of the properties.

39. In order to assist Wheatley, Anderson intervened in the matter.

40. Anderson questioned Hogsten about the bank's policy concerning appraisals, repairs, warranties, and such matters. Hogsten refused to answer his questions. Hogsten referred Anderson to a female loan officer to answer his question about the bank's policy.

41. Anderson contacted the loan officer who told him that the bank's policies on issues of appraisals, repairs and warranties are confidential and are not available to the public. She said that the criteria used by Wachovia in such matters are for internal office use only and she could not discuss the matter.

42. Wheatley thereafter requested of the owner access to the house so that upgrades demanded by the bank could be completed. The owner agreed.

43. Wheatley then informed Hogsten that the required work had been completed.

44. Hogsten sent the appraiser back to the house to conduct another appraisal. Once again, the appraisal said that the house was valued in excess of the sales price.

45. All three (3) homes were finally scheduled for settlement on or about August, 2004.

46. The Anderson and Wilkins settlements were completed. However, the Wheatley documents were not forwarded to the closing attorney by Wachovia.

47.    Even though the settlements of Anderson and Wilkins had been completed, Anderson and Wilkins were concerned because, unless the third property was settled, as per the agreement of sale, Plaintiffs could still lose the nonrefundable deposit of $40,000.

48.    When Anderson learned that the settlement papers had not been sent to the office of the closing attorney, he immediately contact Hogsten and was informed that Wachovia could not send the closing papers because it needed a letter from a certified contractor saying that the roof on the Wheatley home did not have any leaks.  This was another attempt to undermine the transactions.

49.    Anderson reminded Hogsten that if all three (3) properties did not settle that day, all the sales would be voided and they would lose over $40,000 in nonrefundable deposits.  Hogsten did not care.

50.    Anderson informed Hogsten that this new requirement about the certified letter from the contractor was unacceptable.

51.    Mr. Hogsten then stated that without the letter there would be no settlement and that it appeared the whole deal was off.

52.    The Seller, angered by the banks' actions, made a phone call to arrange for his personal contractor to fax a letter per Hogsten's request.

53.    When Anderson informed Hogsten that the letter was in route, Hogsten stated that the bank also wanted an additional fifteen percent (15%) down payment from Wheatley before it would be sending the closing documents.  This was another attempt by Hogsten to undermine the transactions.

54.    Anderson told Hogsten that this was an unexpected surprise and Wheatley was not prepared for the change.

7

A - 07

55.     Hogsten suggested that the Seller reduce the sale price. The Seller declined.

56.     Hogsten then said that Wheatley would have to come up with the twenty percent (20%) of the purchase or the deal was off. This transaction all took place at the settlement office of the attorney

57.     At that point, the Seller, in view of what he perceived as improper conduct by the bank, agreed not to void the entire transactions because he felt that the bank's actions were unreasonable.

58.     At that point, the Plaintiffs nevertheless, would still be subject to a $40,000 loss of their deposit, if all three (3) transactions did not go forward.

59.     Thereafter, Wheatley did obtain the twenty percent (20%) down payment from joint accounts. By doing so, he was informed by Hogsten that if they pay the twenty percent (20%) they would not have enough cash resolve to qualify for the loan. This was another attempt by Hogsten to undermine the transactions.

60.     The settlement date was scheduled for Wheatley was cancelled.

61.     On August 12, 2004, Destefano informed Wheatley that Wachovia was unable to obtain the PMI for his home and that the only way around that situation was to pay twenty percent (20%) down and eliminate the PMI requirement.

62.     Anderson attempted to contact a Mr. Skowronski and Mr. Destefano from Wachovia about the reasons for denying the PMI. This was another attempt to undermine the transaction.

63.     Settlement was now scheduled for August 13, 2004.

64.     Wachovia now stated that a twenty percent (20%) down payment was required; however, at this time, Hogsten was on vacation at the Outer Banks.

8

65.    Mr. Aigner, the Seller, called Mr. Destefano at Wachovia and informed him that he was aware of the bank's inappropriate conduct and that the scheduled settlement was being sabotaged.  Mr. Skowronski intervened and approved the release of the loan documents and the settlement was finally completed.

66.    Upon information of belief, the numerous requests for appraisals, house improvements, and changes in developments, and other last-minute requirements imposed upon the Andersons and the Wheatleys were a violation of internal rules and regulations of the Defendants.

67.    Similarly situated whites were not required to meet all the requirements imposed upon the Plaintiffs to be eligible for a mortgage.

68.    A week or two before the August 6, 2004, settlement, Hogsten told Wheatley that he would be watched.  During the week of August 16, 2004, Hogsten contacted Anderson and told he had better be careful because the Bank would be watching him. Anderson interpreted this as a veiled threat by the Bank that the Andersons would be subject to an unusually high degree of scrutiny.

## COUNT ONE

### The Andersons

69.    Plaintiff Anderson incorporates by reference, paragraphs 1 through 68.

70.    Requirements made upon all the Plaintiffs to complete the settlement were designed to discourage and undermine the settlement and stop the purchase of the aforesaid homes, and interfere with the agreement of sale between the Andersons and the Sellers.

71.   In similar situations, whites are not required to go through all of the appraisals, home improvements, and financial requirements imposed upon the Andersons.

72.   The conduct of the bank violated 42 U.S.C. §1981 which prohibits racial discrimination in contractual matters.

73.   The conduct of the Defendants constituted a tortuous interference with the contractual rights and business opportunities of the Andersons with the Sellers.

74.   The conduct of the Defendants constituted a breach of contract for a mortgage and the covenant of good faith and fair dealing in the contract to provide financing.

75.   The conduct of the Defendants constituted a violation of Plaintiff's rights pursuant to 15 U.S.C. §1691 and 12 C.F.R. Part 202 in that Defendants was discriminating against Plaintiffs.

76.   As a result of the Defendants' conduct, the Andersons suffered the following damage.

    a. The humiliation, inconvenience and aggravation throughout the transactions.

    b. The cost of approximately $15,000.00 plus numerous man hours to refinish their home in a manner which  they would not have done except for the unreasonable requirement of the Bank even after the home had already been appraised for the value of the property.

WHEREFORE, the Andersons request that this Court award them general compensatory damages, for the inconvenience, humiliation, contractual damages for $15,000.00 plus additional labor that was put in the house that would not have otherwise been necessary and which was of no value to the Andersons, plus punitive damages, and attorney's fees and costs.

## COUNT TWO

### The Wheatleys

77.    Plaintiffs Wheatley incorporate by reference paragraphs 1 through 68.

78.    The requirement of the refurbishing of the home and the additional down payment put a strain on the Wheatley's other business transactions which Hogsten was aware of.  After six (6) months, the Wheatleys were forced to sell which cost them approximately $3,500.00 in transfer taxes.

79.    The Wheatley's did meet the home improvement requirements and spent approximately $50,000.00, which they could not afford and which they did not intend to do, to improve their house.

80.    Because of all the unanticipated funds Wheatley had to put into the house, he did not have those funds available for his business.  Wheatley estimates that he lost another $50,000.00 because of the unreasonable requirements of the bank.

81.    The conduct of the bank violated 42 U.S.C. §1981 which prohibits racial discrimination in contractual matters.

82.    The conduct of the Defendants constituted a tortuous interference with the contractual rights and business opportunities of the Wheatleys with the Seller.

83.    The conduct of the Defendants constituted a breach of the contract for a mortgage and the covenant of good faith and fair dealing in the contract to provide financing.

84.    The conduct of the Defendants constituted a violation of Wheatley's rights pursuant to 15 U.S.C. §1691 and 12 C.F.R. Part 202 in that Defendants was discriminating against the Wheatleys.

11

WHEREFORE, the Wheatleys request this Court award them general compensatory damages for:

a. The humiliation and inconvenience and aggravation throughout the transactions.

b. To compensate them for the damages incurred which will remain necessary for making repairs which were not needed and should not have been required by the appraisal in the amount of $50,000 plus the additional cost of prematurely selling their property which cost them $3,500.00, plus at least $50,000.00 in loss of business opportunities, plus the loss of the increase in value of their home had they been able to keep it, plus the loss of the use of $40,000.00 which was required as a down payment, plus punitive damages and attorney's fees.

## COUNT THREE

### The Wilkins

85. Plaintiffs Richard Wilkins and Brenda Wilkins incorporate by reference, paragraphs 1 through 68.

86. The Wilkins entered into an agreement of sale for the purchase of three (3) homes with their friends, the Andersons and the Wheatleys, in order to own waterfront property on Silver Lake.

87. The transaction was a joint effort depending upon all three individuals obtaining mortgage approval for the purchase of these properties.

88. Upon the signing of the original contract, the Wilkins were confident that all three would be able to obtain financing from a reasonable lender.

89. The conduct and treatment of the Andersons and the Wheatleys up until August 13, 2004 subjected them to possible loss of the funds.

90. They also experienced aggravation, inconvenience and humiliation in dealing with Wachovia Bank.

91. The conduct of the bank violated 42 U.S.C. §1981 which prohibits racial discrimination in contractual matters.

92. The conduct of the Defendants constituted a tortuous interference with the contractual rights and business opportunities of the Wilkins with the Sellers.

93. The conduct of the Defendants constituted a breach of contract for a mortgage and the covenant of good faith and fair dealing in the contract to provide financing.

94. The conduct of the Defendants constituted a violation of Plaintiff's rights pursuant to 15 U.S.C. §1691 and 12 C.F.R. Part 202 in that Defendants was discriminating against Plaintiffs.

95. As a result of the conduct of the Defendants, the Wilkins the humiliation, inconvenience and aggravation of being treated in an inferior manner in connection with the mortgage application.

a. The humiliation, inconvenience and aggravation of being treated in an inferior manner in connection with the mortgage application.

WHEREFORE, the Wilkins demand general compensatory damages for the humiliation, aggravation and inconvenience, punitive damages and attorney fees and costs.

GRADY & HAMPTON, LLC

_____ /S/ ___ John S. Grady _____
John S. Grady (I.D. 009)

13

A - 13

6 North Bradford St.
Dover, DE 19904
(302) 678-1265
*Attorneys for Plaintiffs*

DATE:     August 10, 2006

IN THE SUPERIOR COURT OF THE STATE OF DELAWARE

IN AND FOR KENT COUNTY

TOLANO ANDERSON, CATHY ANDERSON,    )
RICHARD WILKINS, BRENDA WILKINS,    )
LLOYD WHEATLEY, and                 )
AUDRIA WHEATLEY,                    )
                                    )
                 Plaintiffs,        )          C. A. No.  06C-08-022 JTV
                                    )
v.                                  )          NON-ARBITRATION
                                    )
                                    )
WACHOVIA MORTGAGE CORPORATION       )          JURY TRIAL DEMANDED
and WACHOVIA CORPORATION,           )
                                    )
                 Defendants.        )

## CERTIFICATE OF VALUE

Plaintiffs hereby certify that the value of this case is exceeds of $100,000.00.

GRADY & HAMPTON, LLC

_____/S/_____John S. Grady_____
John S. Grady (I.D. 009)
6 North Bradford St.
Dover, DE 19904
(302) 678-1265
*Attorneys for Plaintiffs*

DATE:        August 11, 2006

A - 15

MS541PG305

ANDERSON

RECEIVED FOR RECORD
Aug 12 A.D. 2004
TIME 12:43 pm
Betty Lou McKenna
RECORDER

022265

STATE DOCUMENT FEE PAID

Parcel Number: ED-05-068.09-01-20.00-000

Prepared By:   **ELIZABETH ZAPPONE**

Return To:   **WACHOVIA MORTGAGE CORPORATION**
**1100 CORPORATE CENTER DRIVE - NC4723**
**RALEIGH, NC 27607-5066**

_____ [Space Above This Line For Recording Data] _____

# MORTGAGE

MIN   **100013700069957999**

## DEFINITIONS

Words used in multiple sections of this document are defined below and other words are defined in Sections 3, 11, 13, 18, 20 and 21. Certain rules regarding the usage of words used in this document are also provided in Section 16.

**(A) "Security Instrument"** means this document, which is dated   **August        6   2004** , together with all Riders to this document.
**(B) "Borrower"** is

**TOLANO ANDERSON**
**CATHY ANDERSON**

Borrower is the mortgagor under this Security Instrument.
**(C) "MERS"** is Mortgage Electronic Registration Systems, Inc. MERS is a separate corporation that is acting solely as a nominee for Lender and Lender's successors and assigns. **MERS is the mortgagee under this Security Instrument.** MERS is organized and existing under the laws of Delaware, and has an address and telephone of P.O. Box 2026, Flint, MI 48501-2026, tel. (888) 679-MERS.

DELAWARE - Single Family – Fannie Mae/Freddie Mac UNIFORM INSTRUMENT WITH MERS          Form 3008 1/01

241441  (rev06 11/00) [14411]                    Page 1 of 17

ECZ

A - 16

HS541PG306

**(D) "Lender" is    WACHOVIA MORTGAGE CORPORATION**

Lender is a    **CORPORATION**
organized and existing under the laws of    **NORTH CAROLINA**
Lender's address is    **1100 CORPORATE CENTER DRIVE**
**RALEIGH, NC 27607-5066**

**(E) "Note"** means the promissory note signed by Borrower and dated
**August       6      2004**       . The Note states that Borrower owes Lender
**Two Hundred Fifty Three Thousand Three Hundred and no/100**       Dollars
(U.S. $     **253,300.00**       ) plus interest. Borrower has promised to pay this
debt in regular Periodic Payments and to pay the debt in full not later than
**September     1     2034**       .

**(F) "Property"** means the property that is described below under the heading "Transfer of
Rights in the Property."

**(G) "Loan"** means the debt evidenced by the Note, plus interest, any prepayment charges and
late charges due under the Note, and all sums due under this Security Instrument, plus
interest.

**(H) "Riders"** means all Riders to this Security Instrument that are executed by Borrower. The
following Riders are to be executed by Borrower [check box as applicable]:

| | | |
|---|---|---|
| [X] Adjustable Rate Rider | [ ] Condominium Rider | [ ] Second Home Rider |
| [ ] Balloon Rider | [ ] Planned Unit Development Rider | [ ] 1-4 Family Rider |
| [ ] VA Rider | [ ] Biweekly Payment Rider | [X] Other(s) [specify] * |

\* LEGAL

**(I) "Applicable Law"** means all controlling applicable federal, state and local statutes,
regulations, ordinances and administrative rules and orders (that have the effect of law) as
well as all applicable final, non-appealable judicial opinions.

**(J) "Community Association Dues, Fees, and Assessments"** means all dues, fees,
assessments and other charges that are imposed on Borrower or the Property by a
condominium association, homeowners association or similar organization.

**(K) "Electronic Funds Transfer"** means any transfer of funds, other than a transaction
originated by check, draft, or similar paper instrument, which is initiated through an electronic
terminal, telephonic instrument, computer, or magnetic tape so as to order, instruct, or
authorize a financial institution to debit or credit an account. Such term includes, but is not
limited to, point-of-sale transfers, automated teller machine transactions, transfers initiated by
telephone, wire transfers, and automated clearinghouse transfers.

**(L) "Escrow Items"** means those items that are described in Section 3.

**(M) "Miscellaneous Proceeds"** means any compensation, settlement, award of damages, or
proceeds paid by any third party (other than insurance proceeds paid under the coverages
described in Section 5) for (i) damage to, or destruction of, the Property; (ii) condemnation or
other taking of all or any part of the Property; (iii) conveyance in lieu of condemnation; or (iv)
misrepresentations of, or omissions as to, the value and/or condition of the Property.

**(N) "Mortgage Insurance"** means insurance protecting Lender against the nonpayment of, or
default on, the Loan.

**MS541PG307**

**(O)** "**Periodic Payment**" means the regularly scheduled amount due for (i) principal and interest under the Note, plus (ii) any amounts under Section 3 of this Security Instrument.

**(P)** "**RESPA**" means the Real Estate Settlement Procedures Act (12 U.S.C. Section 2601 et seq.) and its implementing regulation, Regulation X (24 C.F.R. Part 3500), as they might be amended from time to time, or any additional or successor legislation or regulation that governs the same subject matter. As used in this Security Instrument, "RESPA" refers to all requirements and restrictions that are imposed in regard to a "federally related mortgage loan" even if the Loan does not qualify as a "federally related mortgage loan" under RESPA.

**(Q)** "**Successor in Interest of Borrower**" means any party that has taken title to the Property, whether or not that party has assumed Borrower's obligations under the Note and/or this Security Instrument.

TRANSFER OF RIGHTS IN THE PROPERTY

This Security Instrument secures to Lender: (i) the repayment of the Loan, and all renewals, extensions and modifications of the Note; and (ii) the performance of Borrower's covenants and agreements under this Security Instrument and the Note. For this purpose, Borrower does hereby mortgage, grant and convey to MERS (solely as nominee for Lender and Lender's successors and assigns) and to the successors and assigns of MERS the following described property located in the     **COUNTY**                      [Type of Recording Jurisdiction]
of **KENT**                                              [Name of Recording Jurisdiction]:

**SEE LEGAL DESCRIPTION ATTACHED**

which currently has the address of        **580 NORTH DUPONT HIGHWAY**

                                                                                                [Street]

                                                        **DOVER**                        [City],

Delaware    **19901**              [Zip Code] ("Property Address"):

TOGETHER WITH all the improvements now or hereafter erected on the property, and all easements, appurtenances, and fixtures now or hereafter a part of the property. All replacements and additions shall also be covered by this Security Instrument. All of the foregoing is referred to in this Security Instrument as the "Property." Borrower understands and agrees that MERS holds only legal title to the interests granted by Borrower in this Security Instrument, but, if necessary to comply with law or custom, MERS (as nominee for

241441  (rev06  11/00)  [14413]                    Page 3 of 17                         Form 3008 1/01

                                                                                                            **ECZ**

**A - 18**

HS541PG308

Lender and Lender's successors and assigns) has the right: to exercise any or all of those interests, including, but not limited to, the right to foreclose and sell the Property; and to take any action required of Lender including, but not limited to, releasing and canceling this Security Instrument.

BORROWER COVENANTS that Borrower is lawfully seised of the estate hereby conveyed and has the right to mortgage, grant and convey the Property and that the Property is unencumbered, except for encumbrances of record. Borrower warrants and will defend generally the title to the Property against all claims and demands, subject to any encumbrances of record.

THIS SECURITY INSTRUMENT combines uniform covenants for national use and non-uniform covenants with limited variations by jurisdiction to constitute a uniform security instrument covering real property.

UNIFORM COVENANTS. Borrower and Lender covenant and agree as follows:

**1. Payment of Principal, Interest, Escrow Items, Prepayment Charges, and Late Charges.** Borrower shall pay when due the principal of, and interest on, the debt evidenced by the Note and any prepayment charges and late charges due under the Note. Borrower shall also pay funds for Escrow Items pursuant to Section 3. Payments due under the Note and this Security Instrument shall be made in U.S. currency. However, if any check or other instrument received by Lender as payment under the Note or this Security Instrument is returned to Lender unpaid, Lender may require that any or all subsequent payments due under the Note and this Security Instrument be made in one or more of the following forms, as selected by Lender: (a) cash; (b) money order; (c) certified check, bank check, treasurer's check or cashier's check, provided any such check is drawn upon an institution whose deposits are insured by a federal agency, instrumentality, or entity; or (d) Electronic Funds Transfer.

Payments are deemed received by Lender when received at the location designated in the Note or at such other location as may be designated by Lender in accordance with the notice provisions in Section 15. Lender may return any payment or partial payment if the payment or partial payments are insufficient to bring the Loan current. Lender may accept any payment or partial payment insufficient to bring the Loan current, without waiver of any rights hereunder or prejudice to its rights to refuse such payment or partial payments in the future, but Lender is not obligated to apply such payments at the time such payments are accepted. If each Periodic Payment is applied as of its scheduled due date, then Lender need not pay interest on unapplied funds. Lender may hold such unapplied funds until Borrower makes payment to bring the Loan current. If Borrower does not do so within a reasonable period of time, Lender shall either apply such funds or return them to Borrower. If not applied earlier, such funds will be applied to the outstanding principal balance under the Note immediately prior to foreclosure. No offset or claim which Borrower might have now or in the future against Lender shall relieve Borrower from making payments due under the Note and this Security Instrument or performing the covenants and agreements secured by this Security Instrument.

**2. Application of Payments or Proceeds.** Except as otherwise described in this Section 2, all payments accepted and applied by Lender shall be applied in the following order of priority: (a) interest due under the Note; (b) principal due under the Note; (c) amounts due under Section 3. Such payments shall be applied to each Periodic Payment in the order in which it became due. Any remaining amounts shall be applied first to late charges, second to any other amounts due under this Security Instrument, and then to reduce the principal balance of the Note.

If Lender receives a payment from Borrower for a delinquent Periodic Payment which includes a sufficient amount to pay any late charge due, the payment may be applied to the delinquent payment and the late charge. If more than one Periodic Payment is outstanding, Lender may apply any payment received from Borrower to the repayment of the Periodic Payments if, and to the extent that, each payment can be paid in full. To the extent that any excess exists after the payment is applied to the full payment of one or more Periodic

6905799
ANDERSON

MS541PG309

Payments, such excess may be applied to any late charges due. Voluntary prepayments shall be applied first to any prepayment charges and then as described in the Note.

Any application of payments, insurance proceeds, or Miscellaneous Proceeds to principal due under the Note shall not extend or postpone the due date, or change the amount, of the Periodic Payments.

**3. Funds for Escrow Items.** Borrower shall pay to Lender on the day Periodic Payments are due under the Note, until the Note is paid in full, a sum (the "Funds") to provide for payment of amounts due for: (a) taxes and assessments and other items which can attain priority over this Security Instrument as a lien or encumbrance on the Property; (b) leasehold payments or ground rents on the Property, if any; (c) premiums for any and all insurance required by Lender under Section 5; and (d) Mortgage Insurance premiums, if any, or any sums payable by Borrower to Lender in lieu of the payment of Mortgage Insurance premiums in accordance with the provisions of Section 10. These items are called "Escrow Items." At origination or at any time during the term of the Loan, Lender may require that Community Association Dues, Fees, and Assessments, if any, be escrowed by Borrower, and such dues, fees and assessments shall be an Escrow Item. Borrower shall promptly furnish to Lender all notices of amounts to be paid under this Section. Borrower shall pay Lender the Funds for Escrow Items unless Lender waives Borrower's obligation to pay the Funds for any or all Escrow Items. Lender may waive Borrower's obligation to pay to Lender Funds for any or all Escrow Items at any time. Any such waiver may only be in writing. In the event of such waiver, Borrower shall pay directly, when and where payable, the amounts due for any Escrow Items for which payment of Funds has been waived by Lender and, if Lender requires, shall furnish to Lender receipts evidencing such payment within such time period as Lender may require. Borrower's obligation to make such payments and to provide receipts shall for all purposes be deemed to be a covenant and agreement contained in this Security Instrument, as the phrase "covenant and agreement" is used in Section 9. If Borrower is obligated to pay Escrow Items directly, pursuant to a waiver, and Borrower fails to pay the amount due for an Escrow Item, Lender may exercise its rights under Section 9 and pay such amount and Borrower shall then be obligated under Section 9 to repay to Lender any such amount. Lender may revoke the waiver as to any or all Escrow Items at any time by a notice given in accordance with Section 15 and, upon such revocation, Borrower shall pay to Lender all Funds, and in such amounts, that are then required under this Section 3.

Lender may, at any time, collect and hold Funds in an amount (a) sufficient to permit Lender to apply the Funds at the time specified under RESPA and (b) not to exceed the maximum amount a lender can require under RESPA. Lender shall estimate the amount of Funds due on the basis of current data and reasonable estimates of expenditures of future Escrow Items or otherwise in accordance with Applicable Law.

The Funds shall be held in an institution whose deposits are insured by a federal agency, instrumentality, or entity (including Lender, if Lender is an institution whose deposits are so insured) or in any Federal Home Loan Bank. Lender shall apply the Funds to pay the Escrow Items no later than the time specified under RESPA. Lender shall not charge Borrower for holding and applying the Funds, annually analyzing the escrow account, or verifying the Escrow Items, unless Lender pays Borrower interest on the Funds and Applicable Law permits Lender to make such a charge. Unless an agreement is made in writing or Applicable Law requires interest to be paid on the Funds, Lender shall not be required to pay Borrower any interest or earnings on the Funds. Borrower and Lender can agree in writing, however, that interest shall be paid on the Funds. Lender shall give to Borrower, without charge, an annual accounting of the Funds as required by RESPA.

If there is a surplus of Funds held in escrow, as defined under RESPA, Lender shall account to Borrower for the excess funds in accordance with RESPA. If there is a shortage of Funds held in escrow, as defined under RESPA, Lender shall notify Borrower as required by

6935799
ANDERSON

MS541PG310

RESPA, and Borrower shall pay to Lender the amount necessary to make up the shortage in accordance with RESPA, but in no more than 12 monthly payments. If there is a deficiency of Funds held in escrow, as defined under RESPA, Lender shall notify Borrower as required by RESPA, and Borrower shall pay to Lender the amount necessary to make up the deficiency in accordance with RESPA, but in no more than 12 monthly payments.

Upon payment in full of all sums secured by this Security Instrument, Lender shall promptly refund to Borrower any Funds held by Lender.

**4. Charges; Liens.** Borrower shall pay all taxes, assessments, charges, fines, and impositions attributable to the Property which can attain priority over this Security Instrument, leasehold payments or ground rents on the Property, if any, and Community Association Dues, Fees, and Assessments, if any. To the extent that these items are Escrow Items, Borrower shall pay them in the manner provided in Section 3.

Borrower shall promptly discharge any lien which has priority over this Security Instrument unless Borrower: (a) agrees in writing to the payment of the obligation secured by the lien in a manner acceptable to Lender, but only so long as Borrower is performing such agreement; (b) contests the lien in good faith by, or defends against enforcement of the lien in, legal proceedings which in Lender's opinion operate to prevent the enforcement of the lien while those proceedings are pending, but only until such proceedings are concluded; or (c) secures from the holder of the lien an agreement satisfactory to Lender subordinating the lien to this Security Instrument. If Lender determines that any part of the Property is subject to a lien which can attain priority over this Security Instrument, Lender may give Borrower a notice identifying the lien. Within 10 days of the date on which that notice is given, Borrower shall satisfy the lien or take one or more of the actions set forth above in this Section 4.

Lender may require Borrower to pay a one-time charge for a real estate tax verification and/or reporting service used by Lender in connection with this Loan.

**5. Property Insurance.** Borrower shall keep the improvements now existing or hereafter erected on the Property insured against loss by fire, hazards included within the term "extended coverage," and any other hazards including, but not limited to, earthquakes and floods, for which Lender requires insurance. This insurance shall be maintained in the amounts (including deductible levels) and for the periods that Lender requires. What Lender requires pursuant to the preceding sentences can change during the term of the Loan. The insurance carrier providing the insurance shall be chosen by Borrower subject to Lender's right to disapprove Borrower's choice, which right shall not be exercised unreasonably. Lender may require Borrower to pay, in connection with this Loan, either: (a) a one-time charge for flood zone determination, certification and tracking services; or (b) a one-time charge for flood zone determination and certification services and subsequent charges each time remappings or similar changes occur which reasonably might affect such determination or certification. Borrower shall also be responsible for the payment of any fees imposed by the Federal Emergency Management Agency in connection with the review of any flood zone determination resulting from an objection by Borrower.

If Borrower fails to maintain any of the coverages described above, Lender may obtain insurance coverage, at Lender's option and Borrower's expense. Lender is under no obligation to purchase any particular type or amount of coverage. Therefore, such coverage shall cover Lender, but might or might not protect Borrower, Borrower's equity in the Property, or the contents of the Property, against any risk, hazard or liability and might provide greater or lesser coverage than was previously in effect. Borrower acknowledges that the cost of the

6995799
ANDERSON

MS541PG311

insurance coverage so obtained might significantly exceed the cost of insurance that Borrower could have obtained. Any amounts disbursed by Lender under this Section 5 shall become additional debt of Borrower secured by this Security Instrument. These amounts shall bear interest at the Note rate from the date of disbursement and shall be payable, with such interest, upon notice from Lender to Borrower requesting payment.

All insurance policies required by Lender and renewals of such policies shall be subject to Lender's right to disapprove such policies, shall include a standard mortgage clause, and shall name Lender as mortgagee and/or as an additional loss payee. Lender shall have the right to hold the policies and renewal certificates. If Lender requires, Borrower shall promptly give to Lender all receipts of paid premiums and renewal notices. If Borrower obtains any form of insurance coverage, not otherwise required by Lender, for damage to, or destruction of, the Property, such policy shall include a standard mortgage clause and shall name Lender as mortgagee and/or as an additional loss payee.

In the event of loss, Borrower shall give prompt notice to the insurance carrier and Lender. Lender may make proof of loss if not made promptly by Borrower. Unless Lender and Borrower otherwise agree in writing, any insurance proceeds, whether or not the underlying insurance was required by Lender, shall be applied to restoration or repair of the Property, if the restoration or repair is economically feasible and Lender's security is not lessened. During such repair and restoration period, Lender shall have the right to hold such insurance proceeds until Lender has had an opportunity to inspect such Property to ensure the work has been completed to Lender's satisfaction, provided that such inspection shall be undertaken promptly. Lender may disburse proceeds for the repairs and restoration in a single payment or in a series of progress payments as the work is completed. Unless an agreement is made in writing or Applicable Law requires interest to be paid on such insurance proceeds, Lender shall not be required to pay Borrower any interest or earnings on such proceeds. Fees for public adjusters, or other third parties, retained by Borrower shall not be paid out of the insurance proceeds and shall be the sole obligation of Borrower. If the restoration or repair is not economically feasible or Lender's security would be lessened, the insurance proceeds shall be applied to the sums secured by this Security Instrument, whether or not then due, with the excess, if any, paid to Borrower. Such insurance proceeds shall be applied in the order provided for in Section 2.

If Borrower abandons the Property, Lender may file, negotiate and settle any available insurance claim and related matters. If Borrower does not respond within 30 days to a notice from Lender that the insurance carrier has offered to settle a claim, then Lender may negotiate and settle the claim. The 30-day period will begin when the notice is given. In either event, or if Lender acquires the Property under Section 22 or otherwise, Borrower hereby assigns to Lender (a) Borrower's rights to any insurance proceeds in an amount not to exceed the amounts unpaid under the Note or this Security Instrument, and (b) any other of Borrower's rights (other than the right to any refund of unearned premiums paid by Borrower) under all insurance policies covering the Property, insofar as such rights are applicable to the coverage of the Property. Lender may use the insurance proceeds either to repair or restore the Property or to pay amounts unpaid under the Note or this Security Instrument, whether or not then due.

6. **Occupancy.** Borrower shall occupy, establish, and use the Property as Borrower's principal residence within 60 days after the execution of this Security Instrument and shall continue to occupy the Property as Borrower's principal residence for at least one year after

ECZ

MS541PG312

5998799
ANDERSON

the date of occupancy, unless Lender otherwise agrees in writing, which consent shall not be unreasonably withheld, or unless extenuating circumstances exist which are beyond Borrower's control.

**7. Preservation, Maintenance and Protection of the Property; Inspections.** Borrower shall not destroy, damage or impair the Property, allow the Property to deteriorate or commit waste on the Property. Whether or not Borrower is residing in the Property, Borrower shall maintain the Property in order to prevent the Property from deteriorating or decreasing in value due to its condition. Unless it is determined pursuant to Section 5 that repair or restoration is not economically feasible, Borrower shall promptly repair the Property if damaged to avoid further deterioration or damage. If insurance or condemnation proceeds are paid in connection with damage to, or the taking of, the Property, Borrower shall be responsible for repairing or restoring the Property only if Lender has released proceeds for such purposes. Lender may disburse proceeds for the repairs and restoration in a single payment or in a series of progress payments as the work is completed. If the insurance or condemnation proceeds are not sufficient to repair or restore the Property, Borrower is not relieved of Borrower's obligation for the completion of such repair or restoration.

Lender or its agent may make reasonable entries upon and inspections of the Property. If it has reasonable cause, Lender may inspect the interior of the improvements on the Property. Lender shall give Borrower notice at the time of or prior to such an interior inspection specifying such reasonable cause.

**8. Borrower's Loan Application.** Borrower shall be in default if, during the Loan application process, Borrower or any persons or entities acting at the direction of Borrower or with Borrower's knowledge or consent gave materially false, misleading, or inaccurate information or statements to Lender (or failed to provide Lender with material information) in connection with the Loan. Material representations include, but are not limited to, representations concerning Borrower's occupancy of the Property as Borrower's principal residence.

**9. Protection of Lender's Interest in the Property and Rights Under this Security Instrument.** If (a) Borrower fails to perform the covenants and agreements contained in this Security Instrument, (b) there is a legal proceeding that might significantly affect Lender's interest in the Property and/or rights under this Security Instrument (such as a proceeding in bankruptcy, probate, for condemnation or forfeiture, for enforcement of a lien which may attain priority over this Security Instrument or to enforce laws or regulations), or (c) Borrower has abandoned the Property, then Lender may do and pay for whatever is reasonable or appropriate to protect Lender's interest in the Property and rights under this Security Instrument, including protecting and/or assessing the value of the Property, and securing and/or repairing the Property. Lender's actions can include, but are not limited to: (a) paying any sums secured by a lien which has priority over this Security Instrument; (b) appearing in court; and (c) paying reasonable attorneys' fees to protect its interest in the Property and/or rights under this Security Instrument, including its secured position in a bankruptcy proceeding. Securing the Property includes, but is not limited to, entering the Property to make repairs, change locks, replace or board up doors and windows, drain water from pipes, eliminate building or other code violations or dangerous conditions, and have utilities turned on or off. Although Lender may take action under this Section 9, Lender does not have to do so and is not under any duty or obligation to do so. It is agreed that Lender incurs no liability for not taking any or all actions authorized under this Section 9.

MS541PG313

Any amounts disbursed by Lender under this Section 9 shall become additional debt of Borrower secured by this Security Instrument. These amounts shall bear interest at the Note rate from the date of disbursement and shall be payable, with such interest, upon notice from Lender to Borrower requesting payment.

If this Security Instrument is on a leasehold, Borrower shall comply with all the provisions of the lease. If Borrower acquires fee title to the Property, the leasehold and the fee title shall not merge unless Lender agrees to the merger in writing.

**10. Mortgage Insurance.** If Lender required Mortgage Insurance as a condition of making the Loan, Borrower shall pay the premiums required to maintain the Mortgage Insurance in effect. If, for any reason, the Mortgage Insurance coverage required by Lender ceases to be available from the mortgage insurer that previously provided such insurance and Borrower was required to make separately designated payments toward the premiums for Mortgage Insurance, Borrower shall pay the premiums required to obtain coverage substantially equivalent to the Mortgage Insurance previously in effect, at a cost substantially equivalent to the cost to Borrower of the Mortgage Insurance previously in effect, from an alternate mortgage insurer selected by Lender. If substantially equivalent Mortgage Insurance coverage is not available, Borrower shall continue to pay to Lender the amount of the separately designated payments that were due when the insurance coverage ceased to be in effect. Lender will accept, use and retain these payments as a non-refundable loss reserve in lieu of Mortgage Insurance. Such loss reserve shall be non-refundable, notwithstanding the fact that the Loan is ultimately paid in full, and Lender shall not be required to pay Borrower any interest or earnings on such loss reserve. Lender can no longer require loss reserve payments if Mortgage Insurance coverage (in the amount and for the period that Lender requires) provided by an insurer selected by Lender again becomes available, is obtained, and Lender requires separately designated payments toward the premiums for Mortgage Insurance. If Lender required Mortgage Insurance as a condition of making the Loan and Borrower was required to make separately designated payments toward the premiums for Mortgage Insurance, Borrower shall pay the premiums required to maintain Mortgage Insurance in effect, or to provide a non-refundable loss reserve, until Lender's requirement for Mortgage Insurance ends in accordance with any written agreement between Borrower and Lender providing for such termination or until termination is required by Applicable Law. Nothing in this Section 10 affects Borrower's obligation to pay interest at the rate provided in the Note.

Mortgage Insurance reimburses Lender (or any entity that purchases the Note) for certain losses it may incur if Borrower does not repay the Loan as agreed. Borrower is not a party to the Mortgage Insurance.

Mortgage insurers evaluate their total risk on all such insurance in force from time to time, and may enter into agreements with other parties that share or modify their risk, or reduce losses. These agreements are on terms and conditions that are satisfactory to the mortgage insurer and the other party (or parties) to these agreements. These agreements may require the mortgage insurer to make payments using any source of funds that the mortgage insurer may have available (which may include funds obtained from Mortgage Insurance premiums).

As a result of these agreements, Lender, any purchaser of the Note, another insurer, any reinsurer, any other entity, or any affiliate of any of the foregoing, may receive (directly or indirectly) amounts that derive from (or might be characterized as ) a portion of Borrower's payments for Mortgage Insurance, in exchange for sharing or modifying the mortgage insurer's risk, or reducing losses. If such agreement provides that an affiliate of Lender takes a share of

241441 (rev06 11/00) [14419]                Page 9 of 17                Form 3008 1/01

ECZ

A - 24

6985799
ANDERSON

MS541PG314

the insurer's risk in exchange for a share of the premiums paid to the insurer, the arrangement is often termed "captive reinsurance." Further:

(a) Any such agreements will not affect the amounts that Borrower has agreed to pay for Mortgage Insurance, or any other terms of the Loan. Such agreements will not increase the amount Borrower will owe for Mortgage Insurance, and they will not entitle Borrower to any refund.

(b) Any such agreements will not affect the rights Borrower has - if any - with respect to the Mortgage Insurance under the Homeowners Protection Act of 1998 or any other law. These rights may include the right to receive certain disclosures, to request and obtain cancellation of the Mortgage Insurance, to have the Mortgage Insurance terminated automatically, and/or to receive a refund of any Mortgage Insurance premiums that were unearned at the time of such cancellation or termination.

11. Assignment of Miscellaneous Proceeds; Forfeiture. All Miscellaneous Proceeds are hereby assigned to and shall be paid to Lender.

If the Property is damaged, such Miscellaneous Proceeds shall be applied to restoration or repair of the Property, if the restoration or repair is economically feasible and Lender's security is not lessened. During such repair and restoration period, Lender shall have the right to hold such Miscellaneous Proceeds until Lender has had an opportunity to inspect such Property to ensure the work has been completed to Lender's satisfaction, provided that such inspection shall be undertaken promptly. Lender may pay for the repairs and restoration in a single disbursement or in a series of progress payments as the work is completed. Unless an agreement is made in writing or Applicable Law requires interest to be paid on such Miscellaneous Proceeds, Lender shall not be required to pay Borrower any interest or earnings on such Miscellaneous Proceeds. If the restoration or repair is not economically feasible or Lender's security would be lessened, the Miscellaneous Proceeds shall be applied to the sums secured by this Security Instrument, whether or not then due, with the excess, if any, paid to Borrower. Such Miscellaneous Proceeds shall be applied in the order provided for in Section 2.

In the event of a total taking, destruction, or loss in value of the Property, the Miscellaneous Proceeds shall be applied to the sums secured by this Security Instrument, whether or not then due, with the excess, if any, paid to Borrower.

In the event of a partial taking, destruction, or loss in value of the Property in which the fair market value of the Property immediately before the partial taking, destruction, or loss in value is equal to or greater than the amount of the sums secured by this Security Instrument immediately before the partial taking, destruction, or loss in value, unless Borrower and Lender otherwise agree in writing, the sums secured by this Security Instrument shall be reduced by the amount of the Miscellaneous Proceeds multiplied by the following fraction: (a) the total amount of the sums secured immediately before the partial taking, destruction, or loss in value divided by (b) the fair market value of the Property immediately before the partial taking, destruction, or loss in value. Any balance shall be paid to Borrower.

In the event of a partial taking, destruction, or loss in value of the Property in which the fair market value of the Property immediately before the partial taking, destruction, or loss in value is less than the amount of the sums secured immediately before the partial taking, destruction, or loss in value, unless Borrower and Lender otherwise agree in writing, the Miscellaneous Proceeds shall be applied to the sums secured by this Security Instrument whether or not the sums are then due.

If the Property is abandoned by Borrower, or if, after notice by Lender to Borrower that the Opposing Party (as defined in the next sentence) offers to make an award to settle a claim

241441 (rev06 11/00) [144110]                Page 10 of 17                    Form 3008 1/01

ECZ

A - 25

## MS541PG315

for damages, Borrower fails to respond to Lender within 30 days after the date the notice is given, Lender is authorized to collect and apply the Miscellaneous Proceeds either to restoration or repair of the Property or to the sums secured by this Security Instrument, whether or not then due. "Opposing Party" means the third party that owes Borrower Miscellaneous Proceeds or the party against whom Borrower has a right of action in regard to Miscellaneous Proceeds.

Borrower shall be in default if any action or proceeding, whether civil or criminal, is begun that, in Lender's judgment, could result in forfeiture of the Property or other material impairment of Lender's interest in the Property or rights under this Security Instrument. Borrower can cure such a default and, if acceleration has occurred, reinstate as provided in Section 19, by causing the action or proceeding to be dismissed with a ruling that, in Lender's judgment, precludes forfeiture of the Property or other material impairment of Lender's interest in the Property or rights under this Security Instrument. The proceeds of any award or claim for damages that are attributable to the impairment of Lender's interest in the Property are hereby assigned and shall be paid to Lender.

All Miscellaneous Proceeds that are not applied to restoration or repair of the Property shall be applied in the order provided for in Section 2.

**12. Borrower Not Released; Forbearance By Lender Not a Waiver.** Extension of the time for payment or modification of amortization of the sums secured by this Security Instrument granted by Lender to Borrower or any Successor in Interest of Borrower shall not operate to release the liability of Borrower or any Successors in Interest of Borrower. Lender shall not be required to commence proceedings against any Successor in Interest of Borrower or to refuse to extend time for payment or otherwise modify amortization of the sums secured by this Security Instrument by reason of any demand made by the original Borrower or any Successors in Interest of Borrower. Any forbearance by Lender in exercising any right or remedy including, without limitation, Lender's acceptance of payments from third persons, entities or Successors in Interest of Borrower or in amounts less than the amount then due, shall not be a waiver of or preclude the exercise of any right or remedy.

**13. Joint and Several Liability; Co-signers; Successors and Assigns Bound.** Borrower covenants and agrees that Borrower's obligations and liability shall be joint and several. However, any Borrower who co-signs this Security Instrument but does not execute the Note (a "co-signer"): (a) is co-signing this Security Instrument only to mortgage, grant and convey the co-signer's interest in the Property under the terms of this Security Instrument; (b) is not personally obligated to pay the sums secured by this Security Instrument; and (c) agrees that Lender and any other Borrower can agree to extend, modify, forbear or make any accommodations with regard to the terms of this Security Instrument or the Note without the co-signer's consent.

Subject to the provisions of Section 18, any Successor in Interest of Borrower who assumes Borrower's obligations under this Security Instrument in writing, and is approved by Lender, shall obtain all of Borrower's rights and benefits under this Security Instrument. Borrower shall not be released from Borrower's obligations and liability under this Security Instrument unless Lender agrees to such release in writing. The covenants and agreements of this Security Instrument shall bind (except as provided in Section 20) and benefit the successors and assigns of Lender.

**14. Loan Charges.** Lender may charge Borrower fees for services performed in connection with Borrower's default, for the purpose of protecting Lender's interest in the Property and rights under this Security Instrument, including, but not limited to, attorneys' fees, property inspection and valuation fees. In regard to any other fees, the absence of express authority in

ECZ

698799
ANDERSON

MS541PG316

this Security Instrument to charge a specific fee to Borrower shall not be construed as a prohibition on the charging of such fee. Lender may not charge fees that are expressly prohibited by this Security Instrument or by Applicable Law.

If the Loan is subject to a law which sets maximum loan charges, and that law is finally interpreted so that the interest or other loan charges collected or to be collected in connection with the Loan exceed the permitted limits, then: (a) any such loan charge shall be reduced by the amount necessary to reduce the charge to the permitted limit; and (b) any sums already collected from Borrower which exceeded permitted limits will be refunded to Borrower. Lender may choose to make this refund by reducing the principal owed under the Note or by making a direct payment to Borrower. If a refund reduces principal, the reduction will be treated as a partial prepayment without any prepayment charge (whether or not a prepayment charge is provided for under the Note). Borrower's acceptance of any such refund made by direct payment to Borrower will constitute a waiver of any right of action Borrower might have arising out of such overcharge.

**15. Notices.** All notices given by Borrower or Lender in connection with this Security Instrument must be in writing. Any notice to Borrower in connection with this Security Instrument shall be deemed to have been given to Borrower when mailed by first class mail or when actually delivered to Borrower's notice address if sent by other means. Notice to any one Borrower shall constitute notice to all Borrowers unless Applicable Law expressly requires otherwise. The notice address shall be the Property Address unless Borrower has designated a substitute notice address by notice to Lender. Borrower shall promptly notify Lender of Borrower's change of address. If Lender specifies a procedure for reporting Borrower's change of address, then Borrower shall only report a change of address through that specified procedure. There may be only one designated notice address under this Security Instrument at any one time. Any notice to Lender shall be given by delivering it or by mailing it by first class mail to Lender's address stated herein unless Lender has designated another address by notice to Borrower. Any notice in connection with this Security Instrument shall not be deemed to have been given to Lender until actually received by Lender. If any notice required by this Security Instrument is also required under Applicable Law, the Applicable Law requirement will satisfy the corresponding requirement under this Security Instrument.

**16. Governing Law; Severability; Rules of Construction.** This Security Instrument shall be governed by federal law and the law of the jurisdiction in which the Property is located. All rights and obligations contained in this Security Instrument are subject to any requirements and limitations of Applicable Law. Applicable Law might explicitly or implicitly allow the parties to agree by contract or it might be silent, but such silence shall not be construed as a prohibition against agreement by contract. In the event that any provision or clause of this Security Instrument or the Note conflicts with Applicable Law, such conflict shall not affect other provisions of this Security Instrument or the Note which can be given effect without the conflicting provision.

As used in this Security Instrument: (a) words of the masculine gender shall mean and include corresponding neuter words or words of the feminine gender; (b) words in the singular shall mean and include the plural and vice versa; and (c) the word "may" gives sole discretion without any obligation to take any action.

**17. Borrower's Copy.** Borrower shall be given one copy of the Note and of this Security Instrument.

ECZ

A - 27

MS541PG317

**18. Transfer of the Property or a Beneficial Interest in Borrower.** As used in this Section 18, "Interest in the Property" means any legal or beneficial interest in the Property, including, but not limited to, those beneficial interests transferred in a bond for deed, contract for deed, installment sales contract or escrow agreement, the intent of which is the transfer of title by Borrower at a future date to a purchaser.

If all or any part of the Property or any Interest in the Property is sold or transferred (or if Borrower is not a natural person and a beneficial interest in Borrower is sold or transferred) without Lender's prior written consent, Lender may require immediate payment in full of all sums secured by this Security Instrument. However, this option shall not be exercised by Lender if such exercise is prohibited by Applicable Law.

If Lender exercises this option, Lender shall give Borrower notice of acceleration. The notice shall provide a period of not less than 30 days from the date the notice is given in accordance with Section 15 within which Borrower must pay all sums secured by this Security Instrument. If Borrower fails to pay these sums prior to the expiration of this period, Lender may invoke any remedies permitted by this Security Instrument without further notice or demand on Borrower.

**19. Borrower's Right to Reinstate After Acceleration.** If Borrower meets certain conditions, Borrower shall have the right to have enforcement of this Security Instrument discontinued at any time prior to the earliest of: (a) five days before sale of the Property pursuant to any power of sale contained in this Security Instrument; (b) such other period as Applicable Law might specify for the termination of Borrower's right to reinstate; or (c) entry of a judgment enforcing this Security Instrument. Those conditions are that Borrower: (a) pays Lender all sums which then would be due under this Security Instrument and the Note as if no acceleration had occurred; (b) cures any default of any other covenants or agreements; (c) pays all expenses incurred in enforcing this Security Instrument, including, but not limited to, reasonable attorneys' fees, property inspection and valuation fees, and other fees incurred for the purpose of protecting Lender's interest in the Property and rights under this Security Instrument; and (d) takes such action as Lender may reasonably require to assure that Lender's interest in the Property and rights under this Security Instrument, and Borrower's obligation to pay the sums secured by this Security Instrument, shall continue unchanged. Lender may require that Borrower pay such reinstatement sums and expenses in one or more of the following forms, as selected by Lender: (a) cash; (b) money order; (c) certified check, bank check, treasurer's check or cashier's check, provided any such check is drawn upon an institution whose deposits are insured by a federal agency, instrumentality or entity; or (d) Electronic Funds Transfer. Upon reinstatement by Borrower, this Security Instrument and obligations secured hereby shall remain fully effective as if no acceleration had occurred. However, this right to reinstate shall not apply in the case of acceleration under Section 18.

**20. Sale of Note; Change of Loan Servicer; Notice of Grievance.** The Note or a partial interest in the Note (together with this Security Instrument) can be sold one or more times without prior notice to Borrower. A sale might result in a change in the entity (known as the "Loan Servicer") that collects Periodic Payments due under the Note and this Security Instrument and performs other mortgage loan servicing obligations under the Note, this Security Instrument, and Applicable Law. There also might be one or more changes of the Loan Servicer unrelated to a sale of the Note. If there is a change of the Loan Servicer, Borrower will be given written notice of the change which will state the name and address of the new Loan Servicer, the address to which payments should be made and any other information RESPA requires in connection with a notice of transfer of servicing. If the Note is

241441 (rev06 11/00) [144113]              Page 13 of 17                Form 3008 1/01

ECZ

MS541PG318

sold and thereafter the Loan is serviced by a Loan Servicer other than the purchaser of the Note, the mortgage loan servicing obligations to Borrower will remain with the Loan Servicer or be transferred to a successor Loan Servicer and are not assumed by the Note purchaser unless otherwise provided by the Note purchaser.

Neither Borrower nor Lender may commence, join, or be joined to any judicial action (as either an individual litigant or the member of a class) that arises from the other party's actions pursuant to this Security Instrument or that alleges that the other party has breached any provision of, or any duty owed by reason of, this Security Instrument, until such Borrower or Lender has notified the other party (with such notice given in compliance with the requirements of Section 15) of such alleged breach and afforded the other party hereto a reasonable period after the giving of such notice to take corrective action. If Applicable Law provides a time period which must elapse before certain action can be taken, that time period will be deemed to be reasonable for purposes of this paragraph. The notice of acceleration and opportunity to cure given to Borrower pursuant to Section 22 and the notice of acceleration given to Borrower pursuant to Section 18 shall be deemed to satisfy the notice and opportunity to take corrective action provisions of this Section 20.

21. Hazardous Substances. As used in this Section 21: (a) "Hazardous Substances" are those substances defined as toxic or hazardous substances, pollutants, or wastes by Environmental Law and the following substances: gasoline, kerosene, other flammable or toxic petroleum products, toxic pesticides and herbicides, volatile solvents, materials containing asbestos or formaldehyde, and radioactive materials; (b) "Environmental Law" means federal laws and laws of the jurisdiction where the Property is located that relate to health, safety or environmental protection; (c) "Environmental Cleanup" includes any response action, remedial action, or removal action, as defined in Environmental Law; and (d) an "Environmental Condition" means a condition that can cause, contribute to, or otherwise trigger an Environmental Cleanup.

Borrower shall not cause or permit the presence, use, disposal, storage, or release of any Hazardous Substances, or threaten to release any Hazardous Substances, on or in the Property. Borrower shall not do, nor allow anyone else to do, anything affecting the Property (a) that is in violation of any Environmental Law, (b) which creates an Environmental Condition, or (c) which, due to the presence, use, or release of a Hazardous Substance, creates a condition that adversely affects the value of the Property. The preceding two sentences shall not apply to the presence, use, or storage on the Property of small quantities of Hazardous Substances that are generally recognized to be appropriate to normal residential uses and to maintenance of the Property (including, but not limited to, hazardous substances in consumer products).

Borrower shall promptly give Lender written notice of (a) any investigation, claim, demand, lawsuit or other action by any governmental or regulatory agency or private party involving the Property and any Hazardous Substance or Environmental Law of which Borrower has actual knowledge, (b) any Environmental Condition, including but not limited to, any spilling, leaking, discharge, release or threat of release of any Hazardous Substance, and (c) any condition caused by the presence, use or release of a Hazardous Substance which adversely affects the value of the Property. If Borrower learns, or is notified by any governmental or regulatory authority, or any private party, that any removal or other remediation of any Hazardous Substance affecting the Property is necessary, Borrower shall promptly take all necessary remedial actions in accordance with Environmental Law. Nothing herein shall create any obligation on Lender for an Environmental Cleanup.

ANDERSON

**MS541PG319**

NON-UNIFORM COVENANTS. Borrower and Lender further covenant and agree as follows:

**22. Acceleration; Remedies.** Lender shall give notice to Borrower prior to acceleration following Borrower's breach of any covenant or agreement in this Security Instrument (but not prior to acceleration under Section 18 unless Applicable Law provides otherwise). The notice shall specify: (a) the default; (b) the action required to cure the default; (c) a date, not less than 30 days from the date the notice is given to Borrower, by which the default must be cured; and (d) that failure to cure the default on or before the date specified in the notice may result in acceleration of the sums secured by this Security Instrument, foreclosure by judicial proceeding and sale of the Property. The notice shall further inform Borrower of the right to reinstate after acceleration and the right to assert in the foreclosure proceeding the non-existence of a default or any other defense of Borrower to acceleration and foreclosure. If the default is not cured on or before the date specified in the notice, Lender at its option may require immediate payment in full of all sums secured by this Security Instrument without further demand and may foreclose this Security Instrument by judicial proceeding. Lender shall be entitled to collect all expenses incurred in pursuing the remedies provided in this Section 22, including, but not limited to, attorneys' fees of          5.000          % of the amount decreed for principal and interest (which fees shall be allowed and paid as part of the decree of judgment) and costs of title evidence.

**23. Satisfaction.** Upon payment of all sums secured by this Security Instrument, this Security Instrument shall cease and become void and of no effect and Lender shall cause the entry of satisfaction to be made upon the records of this Security Instrument. Borrower shall pay all costs and fees for entering the satisfaction upon the records of this Security Instrument. Lender may charge Borrower a fee for entering the satisfaction, but only if the fee is paid to a third party for services rendered and the charging of the fee is permitted under Applicable Law.

**24. Future Advances.** This Security Instrument secures a maximum amount of up to 150% of the amount of the Note. This Security Instrument shall secure any additional loans as well as any and all present or future advances and readvances under the Note made by Lender to or for the benefit of Borrower or the Property, all of which shall be entitled to the benefits of this Security Instrument under 25 Del. Code Section 2118 and shall have the same lien priority as if the future loans, advances or readvances were made as of the date hereof including, without limitation: (a) principal, interest, late charges, fees and other amounts due under the Note or this Security Instrument; (b) all advances by Lender to Borrower or any other person to pay costs of erection, construction, alteration, repair, restoration, maintenance and completion of any improvements on the Property; (c) all advances made or costs incurred by Borrower for the payment of real estate taxes, assessments or other governmental charges, maintenance charges, insurance premiums, appraisals charges, environmental inspection, audit, testing or compliance costs, and costs incurred by Lender for the enforcement and protection of the Property or the lien of this Security Instrument; and (d) all legal fees, costs and other expenses incurred by Lender by reason of any default or otherwise in connection with the Note. Borrower agrees that if, at any time during the term of this Security Instrument or following a foreclosure hereof, Borrower fails to perform or observe any covenant or obligation under this Security Instrument including, without limitation, payment of any of the foregoing, Lender may (but shall not be obligated to) take such steps as are reasonably necessary to remedy any such nonperformance or nonobservance and provide

ECZ

A - 30

HS541PG320

ANDERSON

6995799

payment thereof. All amounts advanced by Lender shall be added to the amount secured by this Security Instrument and shall be due and payable promptly after demand, together with interest at the rate of interest in effect under the Note, such interest to be calculated from the date of such advance to the date of repayment thereof. Borrower's obligations hereunder shall be continuing and shall survive notwithstanding a foreclosure of this Security Instrument.

BY SIGNING BELOW, Borrower accepts and agrees to the terms and covenants contained in this Security Instrument and in any Rider executed by Borrower and recorded with it.

Signed, sealed and delivered in the presence of:

_____          _____ (Seal)
                                          TOLANO ANDERSON          -Borrower

as to both                                _____ (Seal)
                                          CATHY ANDERSON          -Borrower

_____ (Seal)   _____ (Seal)
                    -Borrower                                 -Borrower

_____ (Seal)   _____ (Seal)
                    -Borrower                                 -Borrower

_____ (Seal)   _____ (Seal)
                    -Borrower                                 -Borrower

241441 (rev06 11/00) [144116]          Page 16 of 17          Form 3008 1/01

ECZ

A - 31

6995799
ANDERSON

MS541 PG321

STATE OF DELAWARE,

Kent County ss:

This instrument was acknowledged before me on August 6, 2004 by

Tolano Anderson & Cathy Anderson

My Commission Expires:

_____
Notary Public

JOHN I. ELLIS
AUTHORIZED TO PERFORM
NOTARIAL ACTS PURSUANT
TO DELAWARE LAW
TITLE 29§ 4323 (a) (3)

MS541PG322

ALL that certain lot, piece or parcel of land situated in the City of Dover, Kent County, State of Delaware, lying on the westerly side of U.S. Route 13, being bounded as follows; on the North by Silver Lake and by lands now or late of Peter Aigner, on the East by U.S. Route 13, also known as "North Dupont Highway" and by lands now or late of Richard F. Larrimer Jr. & Mary Ellen Larimer, on the South by said lands of Larrimer and by lands now or late of Chatham Cove, Inc., on the West by said lands of Chatham Cove, as shown on a survey plan prepared by McClure Associates Inc., dated 7/6/04, file#MA:06-40-04 and more particularly described as follows:

BEGINNING at a point, a found iron pipe, in the westerly line of U.S. Route 13, a corner for this lot and for said lands of Larrimer, said point located a distance of 464.3 feet, as measured in a northwesterly direction, from a found concrete monument at the intersection of the westerly line of U.S. Route 13 with the northerly line of Garden Lane, thence from said beginning point the following twelve (12) courses and distances;

(1)  with said lands of Larrimer, South 58 deg. 17 min. 40 sec. West a distance of 183.10 feet to a point,

(2)  thence continuing with said lands of Larrimer, South 29 deg. 03 min. East a distance of 30.00 feet to a point in line of said Larrimer lands, a corner for said lands of Chatham Cove, Inc.,

(3)  thence with said lands of Chatham Cove for the next three courses and distances, North 75 deg. 08 min. 38 sec. West a distance of 27.73 feet to a point,

(4)  thence, South 58 deg. 45 min. 45 sec. West a distance of 86.64 feet to a point,

(5)  thence, North 57 deg. 45 min. 18 sec. West a distance of 48.66 feet to a point at the waters edge of Silver Lake,

(6)  thence with the same for the next three courses and distances, North 46 deg. 35 min. 42 sec. East a distance of 80.98 feet to a point,

(7)  thence, North 80 deg. 41 min. 19 sec. East a distance of 18.43 feet to a point,

(8)  thence, North 13 deg. 29 min. 08 sec. East a distance of 22.65 feet to a point, a corner for said lands of Aigner,

(9)  thence leaving said waters edge, with said lands of Aigner for the next three courses and distances, North 58 deg. 17 min. 40 sec. East a distance of 111.50 feet to a found re-bar,

(10)  thence, South 29 deg. 27 min. 55 sec. East a distance of 10.00 feet to a found re-bar,

(11)  thence, North 58 deg. 17 min. 40 sec. East a distance of 90.00 feet to a point in the westerly line of U.S. Route 13,

(12)  thence with the same, South 29 deg. 27 min. 55 sec. East a distance of 50.00 feet to a point, the point of beginning.

Containing within said metes and bounds 0.3925 acre of land, more or less., known as #580 North Dupont Highway.

6996981
WILKINS

MS559PG228

023759

Parcel Number: *ED-05-068.09-01-19.00-000*

Prepared By:     JOANNE G. MILLER

Return To:     **WACHOVIA MORTGAGE CORPORATION**
**1100 CORPORATE CENTER DRIVE - NC4723**
**RALEIGH, NC  27607-5066**

_____ [Space Above This Line For Recording Data] _____

# MORTGAGE

MIN     **100013700069969812**

## DEFINITIONS

Words used in multiple sections of this document are defined below and other words are defined in Sections 3, 11, 13, 18, 20 and 21. Certain rules regarding the usage of words used in this document are also provided in Section 16.

**(A) "Security Instrument"** means this document, which is dated  **August     6    2004**
together with all Riders to this document.
**(B) "Borrower"** is

**RICHARD H WILKINS**
**BRENDA F WILKINS**

Borrower is the mortgagor under this Security Instrument.
**(C) "MERS"** is Mortgage Electronic Registration Systems, Inc. MERS is a separate corporation that is acting solely as a nominee for Lender and Lender's successors and assigns. **MERS is the mortgagee under this Security Instrument.** MERS is organized and existing under the laws of Delaware, and has an address and telephone of P.O. Box 2026, Flint, MI 48501-2026, tel. (888) 679-MERS.

DELAWARE - Single Family – Fannie Mae/Freddie Mac UNIFORM INSTRUMENT WITH MERS        Form 3008 1/01

241441 (rev06 11/00) [14411]            Page 1 of 17

JGM

A - 34

## MS559PG229

**(D) "Lender" is  WACHOVIA MORTGAGE CORPORATION**

Lender is a  **CORPORATION**
organized and existing under the laws of  **NORTH CAROLINA**
Lender's address is  **1100 CORPORATE CENTER DRIVE**
**RALEIGH, NC 27607-5066**
**(E) "Note"** means the promissory note signed by Borrower and dated
**August    6    2004**               . The Note states that Borrower owes Lender
**Two Hundred Thirteen Thousand Three Hundred and no/100**                 Dollars
(U.S. $    **213,300.00**           ) plus interest. Borrower has promised to pay this
debt in regular Periodic Payments and to pay the debt in full not later than
**September    1    2034**
**(F) "Property"** means the property that is described below under the heading "Transfer of
Rights in the Property."
**(G) "Loan"** means the debt evidenced by the Note, plus interest, any prepayment charges and
late charges due under the Note, and all sums due under this Security Instrument, plus
interest.
**(H) "Riders"** means all Riders to this Security Instrument that are executed by Borrower. The
following Riders are to be executed by Borrower [check box as applicable]:

| | | |
|---|---|---|
| [X] Adjustable Rate Rider | [ ] Condominium Rider | [X] Second Home Rider |
| [ ] Balloon Rider | [ ] Planned Unit Development Rider | [ ] 1-4 Family Rider |
| [ ] VA Rider | [ ] Biweekly Payment Rider | [X] Other(s) [specify] * |
| | * LEGAL DESCRIPTION | |

**(I) "Applicable Law"** means all controlling applicable federal, state and local statutes,
regulations, ordinances and administrative rules and orders (that have the effect of law) as
well as all applicable final, non-appealable judicial opinions.
**(J) "Community Association Dues, Fees, and Assessments"** means all dues, fees,
assessments and other charges that are imposed on Borrower or the Property by a
condominium association, homeowners association or similar organization.
**(K) "Electronic Funds Transfer"** means any transfer of funds, other than a transaction
originated by check, draft, or similar paper instrument, which is initiated through an electronic
terminal, telephonic instrument, computer, or magnetic tape so as to order, instruct, or
authorize a financial institution to debit or credit an account. Such term includes, but is not
limited to, point-of-sale transfers, automated teller machine transactions, transfers initiated by
telephone, wire transfers, and automated clearinghouse transfers.
**(L) "Escrow Items"** means those items that are described in Section 3.
**(M) "Miscellaneous Proceeds"** means any compensation, settlement, award of damages, or
proceeds paid by any third party (other than insurance proceeds paid under the coverages
described in Section 5) for (i) damage to, or destruction of, the Property; (ii) condemnation or
other taking of all or any part of the Property; (iii) conveyance in lieu of condemnation; or (iv)
misrepresentations of, or omissions as to, the value and/or condition of the Property.
**(N) "Mortgage Insurance"** means insurance protecting Lender against the nonpayment of, or
default on, the Loan.

241441  (rev06  11/00)  [14412]          Page 2 of 17          Form 3008 1/01

JGM

## MS559PG230

**(O) "Periodic Payment"** means the regularly scheduled amount due for (i) principal and interest under the Note, plus (ii) any amounts under Section 3 of this Security Instrument.

**(P) "RESPA"** means the Real Estate Settlement Procedures Act (12 U.S.C. Section 2601 et seq.) and its implementing regulation, Regulation X (24 C.F.R. Part 3500), as they might be amended from time to time, or any additional or successor legislation or regulation that governs the same subject matter. As used in this Security Instrument, "RESPA" refers to all requirements and restrictions that are imposed in regard to a "federally related mortgage loan" even if the Loan does not qualify as a "federally related mortgage loan" under RESPA.

**(Q) "Successor in Interest of Borrower"** means any party that has taken title to the Property, whether or not that party has assumed Borrower's obligations under the Note and/or this Security Instrument.

TRANSFER OF RIGHTS IN THE PROPERTY

This Security Instrument secures to Lender: (i) the repayment of the Loan, and all renewals, extensions and modifications of the Note; and (ii) the performance of Borrower's covenants and agreements under this Security Instrument and the Note. For this purpose, Borrower does hereby mortgage, grant and convey to MERS (solely as nominee for Lender and Lender's successors and assigns) and to the successors and assigns of MERS the following described property located in the        **COUNTY**                    [Type of Recording Jurisdiction]
of **KENT**                                                [Name of Recording Jurisdiction]:

**SEE SCHEDULE ATTACHED HERETO; MADE A PART HEREOF**

which currently has the address of          **592 NORTH DUPONT HIGHWAY**
                                                                                          [Street]

                                                            **DOVER**                        [City],

Delaware   **19901**              [Zip Code] ("Property Address"):

TOGETHER WITH all the improvements now or hereafter erected on the property,  and all easements, appurtenances, and fixtures now or hereafter a part of the property. All replacements and additions shall also be covered by this Security Instrument. All of the foregoing is referred to in this Security Instrument as the "Property." Borrower understands and agrees that MERS holds only legal title to the interests granted by Borrower in this Security Instrument, but, if necessary to comply with law or custom, MERS (as nominee for

HS559PG231

Lender and Lender's successors and assigns) has the right: to exercise any or all of those interests, including, but not limited to, the right to foreclose and sell the Property; and to take any action required of Lender including, but not limited to, releasing and canceling this Security Instrument.

BORROWER COVENANTS that Borrower is lawfully seised of the estate hereby conveyed and has the right to mortgage, grant and convey the Property and that the Property is unencumbered, except for encumbrances of record. Borrower warrants and will defend generally the title to the Property against all claims and demands, subject to any encumbrances of record.

THIS SECURITY INSTRUMENT combines uniform covenants for national use and non-uniform covenants with limited variations by jurisdiction to constitute a uniform security instrument covering real property.

UNIFORM COVENANTS. Borrower and Lender covenant and agree as follows:

**1. Payment of Principal, Interest, Escrow Items, Prepayment Charges, and Late Charges.** Borrower shall pay when due the principal of, and interest on, the debt evidenced by the Note and any prepayment charges and late charges due under the Note. Borrower shall also pay funds for Escrow Items pursuant to Section 3. Payments due under the Note and this Security Instrument shall be made in U.S. currency. However, if any check or other instrument received by Lender as payment under the Note or this Security Instrument is returned to Lender unpaid, Lender may require that any or all subsequent payments due under the Note and this Security Instrument be made in one or more of the following forms, as selected by Lender: (a) cash; (b) money order; (c) certified check, bank check, treasurer's check or cashier's check, provided any such check is drawn upon an institution whose deposits are insured by a federal agency, instrumentality, or entity; or (d) Electronic Funds Transfer.

Payments are deemed received by Lender when received at the location designated in the Note or at such other location as may be designated by Lender in accordance with the notice provisions in Section 15. Lender may return any payment or partial payment if the payment or partial payments are insufficient to bring the Loan current. Lender may accept any payment or partial payment insufficient to bring the Loan current, without waiver of any rights hereunder or prejudice to its rights to refuse such payment or partial payments in the future, but Lender is not obligated to apply such payments at the time such payments are accepted. If each Periodic Payment is applied as of its scheduled due date, then Lender need not pay interest on unapplied funds. Lender may hold such unapplied funds until Borrower makes payment to bring the Loan current. If Borrower does not do so within a reasonable period of time, Lender shall either apply such funds or return them to Borrower. If not applied earlier, such funds will be applied to the outstanding principal balance under the Note immediately prior to foreclosure. No offset or claim which Borrower might have now or in the future against Lender shall relieve Borrower from making payments due under the Note and this Security Instrument or performing the covenants and agreements secured by this Security Instrument.

**2. Application of Payments or Proceeds.** Except as otherwise described in this Section 2, all payments accepted and applied by Lender shall be applied in the following order of priority: (a) interest due under the Note; (b) principal due under the Note; (c) amounts due under Section 3. Such payments shall be applied to each Periodic Payment in the order in which it became due. Any remaining amounts shall be applied first to late charges, second to any other amounts due under this Security Instrument, and then to reduce the principal balance of the Note.

If Lender receives a payment from Borrower for a delinquent Periodic Payment which includes a sufficient amount to pay any late charge due, the payment may be applied to the delinquent payment and the late charge. If more than one Periodic Payment is outstanding, Lender may apply any payment received from Borrower to the repayment of the Periodic Payments if, and to the extent that, each payment can be paid in full. To the extent that any excess exists after the payment is applied to the full payment of one or more Periodic

JGM

A - 37

## HS559PG232

Payments, such excess may be applied to any late charges due. Voluntary prepayments shall be applied first to any prepayment charges and then as described in the Note.

Any application of payments, insurance proceeds, or Miscellaneous Proceeds to principal due under the Note shall not extend or postpone the due date, or change the amount, of the Periodic Payments.

**3. Funds for Escrow Items.** Borrower shall pay to Lender on the day Periodic Payments are due under the Note, until the Note is paid in full, a sum (the "Funds") to provide for payment of amounts due for: (a) taxes and assessments and other items which can attain priority over this Security Instrument as a lien or encumbrance on the Property; (b) leasehold payments or ground rents on the Property, if any; (c) premiums for any and all insurance required by Lender under Section 5; and (d) Mortgage Insurance premiums, if any, or any sums payable by Borrower to Lender in lieu of the payment of Mortgage Insurance premiums in accordance with the provisions of Section 10. These items are called "Escrow Items." At origination or at any time during the term of the Loan, Lender may require that Community Association Dues, Fees, and Assessments, if any, be escrowed by Borrower, and such dues, fees and assessments shall be an Escrow Item. Borrower shall promptly furnish to Lender all notices of amounts to be paid under this Section. Borrower shall pay Lender the Funds for Escrow Items unless Lender waives Borrower's obligation to pay the Funds for any or all Escrow Items. Lender may waive Borrower's obligation to pay to Lender Funds for any or all Escrow Items at any time. Any such waiver may only be in writing. In the event of such waiver, Borrower shall pay directly, when and where payable, the amounts due for any Escrow Items for which payment of Funds has been waived by Lender and, if Lender requires, shall furnish to Lender receipts evidencing such payment within such time period as Lender may require. Borrower's obligation to make such payments and to provide receipts shall for all purposes be deemed to be a covenant and agreement contained in this Security Instrument, as the phrase "covenant and agreement" is used in Section 9. If Borrower is obligated to pay Escrow Items directly, pursuant to a waiver, and Borrower fails to pay the amount due for an Escrow Item, Lender may exercise its rights under Section 9 and pay such amount and Borrower shall then be obligated under Section 9 to repay to Lender any such amount. Lender may revoke the waiver as to any or all Escrow Items at any time by a notice given in accordance with Section 15 and, upon such revocation, Borrower shall pay to Lender all Funds, and in such amounts, that are then required under this Section 3.

Lender may, at any time, collect and hold Funds in an amount (a) sufficient to permit Lender to apply the Funds at the time specified under RESPA and (b) not to exceed the maximum amount a lender can require under RESPA. Lender shall estimate the amount of Funds due on the basis of current data and reasonable estimates of expenditures of future Escrow Items or otherwise in accordance with Applicable Law.

The Funds shall be held in an institution whose deposits are insured by a federal agency, instrumentality, or entity (including Lender, if Lender is an institution whose deposits are so insured) or in any Federal Home Loan Bank. Lender shall apply the Funds to pay the Escrow Items no later than the time specified under RESPA. Lender shall not charge Borrower for holding and applying the Funds, annually analyzing the escrow account, or verifying the Escrow Items, unless Lender pays Borrower interest on the Funds and Applicable Law permits Lender to make such a charge. Unless an agreement is made in writing or Applicable Law requires interest to be paid on the Funds, Lender shall not be required to pay Borrower any interest or earnings on the Funds. Borrower and Lender can agree in writing, however, that interest shall be paid on the Funds. Lender shall give to Borrower, without charge, an annual accounting of the Funds as required by RESPA.

If there is a surplus of Funds held in escrow, as defined under RESPA, Lender shall account to Borrower for the excess funds in accordance with RESPA. If there is a shortage of Funds held in escrow, as defined under RESPA, Lender shall notify Borrower as required by

## MS559PG233

RESPA, and Borrower shall pay to Lender the amount necessary to make up the shortage in accordance with RESPA, but in no more than 12 monthly payments. If there is a deficiency of Funds held in escrow, as defined under RESPA, Lender shall notify Borrower as required by RESPA, and Borrower shall pay to Lender the amount necessary to make up the deficiency in accordance with RESPA, but in no more than 12 monthly payments.

Upon payment in full of all sums secured by this Security Instrument, Lender shall promptly refund to Borrower any Funds held by Lender.

**4. Charges; Liens.** Borrower shall pay all taxes, assessments, charges, fines, and impositions attributable to the Property which can attain priority over this Security Instrument, leasehold payments or ground rents on the Property, if any, and Community Association Dues, Fees, and Assessments, if any. To the extent that these items are Escrow Items, Borrower shall pay them in the manner provided in Section 3.

Borrower shall promptly discharge any lien which has priority over this Security Instrument unless Borrower: (a) agrees in writing to the payment of the obligation secured by the lien in a manner acceptable to Lender, but only so long as Borrower is performing such agreement; (b) contests the lien in good faith by, or defends against enforcement of the lien in, legal proceedings which in Lender's opinion operate to prevent the enforcement of the lien while those proceedings are pending, but only until such proceedings are concluded; or (c) secures from the holder of the lien an agreement satisfactory to Lender subordinating the lien to this Security Instrument. If Lender determines that any part of the Property is subject to a lien which can attain priority over this Security Instrument, Lender may give Borrower a notice identifying the lien. Within 10 days of the date on which that notice is given, Borrower shall satisfy the lien or take one or more of the actions set forth above in this Section 4.

Lender may require Borrower to pay a one-time charge for a real estate tax verification and/or reporting service used by Lender in connection with this Loan.

**5. Property Insurance.** Borrower shall keep the improvements now existing or hereafter erected on the Property insured against loss by fire, hazards included within the term "extended coverage," and any other hazards including, but not limited to, earthquakes and floods, for which Lender requires insurance. This insurance shall be maintained in the amounts (including deductible levels) and for the periods that Lender requires. What Lender requires pursuant to the preceding sentences can change during the term of the Loan. The insurance carrier providing the insurance shall be chosen by Borrower subject to Lender's right to disapprove Borrower's choice, which right shall not be exercised unreasonably. Lender may require Borrower to pay, in connection with this Loan, either: (a) a one-time charge for flood zone determination, certification and tracking services; or (b) a one-time charge for flood zone determination and certification services and subsequent charges each time remappings or similar changes occur which reasonably might affect such determination or certification. Borrower shall also be responsible for the payment of any fees imposed by the Federal Emergency Management Agency in connection with the review of any flood zone determination resulting from an objection by Borrower.

If Borrower fails to maintain any of the coverages described above, Lender may obtain insurance coverage, at Lender's option and Borrower's expense. Lender is under no obligation to purchase any particular type or amount of coverage. Therefore, such coverage shall cover Lender, but might or might not protect Borrower, Borrower's equity in the Property, or the contents of the Property, against any risk, hazard or liability and might provide greater or lesser coverage than was previously in effect. Borrower acknowledges that the cost of the

## MS559PG234

insurance coverage so obtained might significantly exceed the cost of insurance that Borrower could have obtained. Any amounts disbursed by Lender under this Section 5 shall become additional debt of Borrower secured by this Security Instrument. These amounts shall bear interest at the Note rate from the date of disbursement and shall be payable, with such interest, upon notice from Lender to Borrower requesting payment.

All insurance policies required by Lender and renewals of such policies shall be subject to Lender's right to disapprove such policies, shall include a standard mortgage clause, and shall name Lender as mortgagee and/or as an additional loss payee. Lender shall have the right to hold the policies and renewal certificates. If Lender requires, Borrower shall promptly give to Lender all receipts of paid premiums and renewal notices. If Borrower obtains any form of insurance coverage, not otherwise required by Lender, for damage to, or destruction of, the Property, such policy shall include a standard mortgage clause and shall name Lender as mortgagee and/or as an additional loss payee.

In the event of loss, Borrower shall give prompt notice to the insurance carrier and Lender. Lender may make proof of loss if not made promptly by Borrower. Unless Lender and Borrower otherwise agree in writing, any insurance proceeds, whether or not the underlying insurance was required by Lender, shall be applied to restoration or repair of the Property, if the restoration or repair is economically feasible and Lender's security is not lessened. During such repair and restoration period, Lender shall have the right to hold such insurance proceeds until Lender has had an opportunity to inspect such Property to ensure the work has been completed to Lender's satisfaction, provided that such inspection shall be undertaken promptly. Lender may disburse proceeds for the repairs and restoration in a single payment or in a series of progress payments as the work is completed. Unless an agreement is made in writing or Applicable Law requires interest to be paid on such insurance proceeds, Lender shall not be required to pay Borrower any interest or earnings on such proceeds. Fees for public adjusters, or other third parties, retained by Borrower shall not be paid out of the insurance proceeds and shall be the sole obligation of Borrower. If the restoration or repair is not economically feasible or Lender's security would be lessened, the insurance proceeds shall be applied to the sums secured by this Security Instrument, whether or not then due, with the excess, if any, paid to Borrower. Such insurance proceeds shall be applied in the order provided for in Section 2.

If Borrower abandons the Property, Lender may file, negotiate and settle any available insurance claim and related matters. If Borrower does not respond within 30 days to a notice from Lender that the insurance carrier has offered to settle a claim, then Lender may negotiate and settle the claim. The 30-day period will begin when the notice is given. In either event, or if Lender acquires the Property under Section 22 or otherwise, Borrower hereby assigns to Lender (a) Borrower's rights to any insurance proceeds in an amount not to exceed the amounts unpaid under the Note or this Security Instrument, and (b) any other of Borrower's rights (other than the right to any refund of unearned premiums paid by Borrower) under all insurance policies covering the Property, insofar as such rights are applicable to the coverage of the Property. Lender may use the insurance proceeds either to repair or restore the Property or to pay amounts unpaid under the Note or this Security Instrument, whether or not then due.

6. **Occupancy.** Borrower shall occupy, establish, and use the Property as Borrower's principal residence within 60 days after the execution of this Security Instrument and shall continue to occupy the Property as Borrower's principal residence for at least one year after

6996981
WILKINS

MS559PG235

the date of occupancy, unless Lender otherwise agrees in writing, which consent shall not be unreasonably withheld, or unless extenuating circumstances exist which are beyond Borrower's control.

**7. Preservation, Maintenance and Protection of the Property; Inspections.** Borrower shall not destroy, damage or impair the Property, allow the Property to deteriorate or commit waste on the Property. Whether or not Borrower is residing in the Property, Borrower shall maintain the Property in order to prevent the Property from deteriorating or decreasing in value due to its condition. Unless it is determined pursuant to Section 5 that repair or restoration is not economically feasible, Borrower shall promptly repair the Property if damaged to avoid further deterioration or damage. If insurance or condemnation proceeds are paid in connection with damage to, or the taking of, the Property, Borrower shall be responsible for repairing or restoring the Property only if Lender has released proceeds for such purposes. Lender may disburse proceeds for the repairs and restoration in a single payment or in a series of progress payments as the work is completed. If the insurance or condemnation proceeds are not sufficient to repair or restore the Property, Borrower is not relieved of Borrower's obligation for the completion of such repair or restoration.

Lender or its agent may make reasonable entries upon and inspections of the Property. If it has reasonable cause, Lender may inspect the interior of the improvements on the Property. Lender shall give Borrower notice at the time of or prior to such an interior inspection specifying such reasonable cause.

**8. Borrower's Loan Application.** Borrower shall be in default if, during the Loan application process, Borrower or any persons or entities acting at the direction of Borrower or with Borrower's knowledge or consent gave materially false, misleading, or inaccurate information or statements to Lender (or failed to provide Lender with material information) in connection with the Loan. Material representations include, but are not limited to, representations concerning Borrower's occupancy of the Property as Borrower's principal residence.

**9. Protection of Lender's Interest in the Property and Rights Under this Security Instrument.** If (a) Borrower fails to perform the covenants and agreements contained in this Security Instrument, (b) there is a legal proceeding that might significantly affect Lender's interest in the Property and/or rights under this Security Instrument (such as a proceeding in bankruptcy, probate, for condemnation or forfeiture, for enforcement of a lien which may attain priority over this Security Instrument or to enforce laws or regulations), or (c) Borrower has abandoned the Property, then Lender may do and pay for whatever is reasonable or appropriate to protect Lender's interest in the Property and rights under this Security Instrument, including protecting and/or assessing the value of the Property, and securing and/or repairing the Property. Lender's actions can include, but are not limited to: (a) paying any sums secured by a lien which has priority over this Security Instrument; (b) appearing in court; and (c) paying reasonable attorneys' fees to protect its interest in the Property and/or rights under this Security Instrument, including its secured position in a bankruptcy proceeding. Securing the Property includes, but is not limited to, entering the Property to make repairs, change locks, replace or board up doors and windows, drain water from pipes, eliminate building or other code violations or dangerous conditions, and have utilities turned on or off. Although Lender may take action under this Section 9, Lender does not have to do so and is not under any duty or obligation to do so. It is agreed that Lender incurs no liability for not taking any or all actions authorized under this Section 9.

## MS559PG236

Any amounts disbursed by Lender under this Section 9 shall become additional debt of Borrower secured by this Security Instrument. These amounts shall bear interest at the Note rate from the date of disbursement and shall be payable, with such interest, upon notice from Lender to Borrower requesting payment.

If this Security Instrument is on a leasehold, Borrower shall comply with all the provisions of the lease. If Borrower acquires fee title to the Property, the leasehold and the fee title shall not merge unless Lender agrees to the merger in writing.

**10. Mortgage Insurance.** If Lender required Mortgage Insurance as a condition of making the Loan, Borrower shall pay the premiums required to maintain the Mortgage Insurance in effect. If, for any reason, the Mortgage Insurance coverage required by Lender ceases to be available from the mortgage insurer that previously provided such insurance and Borrower was required to make separately designated payments toward the premiums for Mortgage Insurance, Borrower shall pay the premiums required to obtain coverage substantially equivalent to the Mortgage Insurance previously in effect, at a cost substantially equivalent to the cost to Borrower of the Mortgage Insurance previously in effect, from an alternate mortgage insurer selected by Lender. If substantially equivalent Mortgage Insurance coverage is not available, Borrower shall continue to pay to Lender the amount of the separately designated payments that were due when the insurance coverage ceased to be in effect. Lender will accept, use and retain these payments as a non-refundable loss reserve in lieu of Mortgage Insurance. Such loss reserve shall be non-refundable, notwithstanding the fact that the Loan is ultimately paid in full, and Lender shall not be required to pay Borrower any interest or earnings on such loss reserve. Lender can no longer require loss reserve payments if Mortgage Insurance coverage (in the amount and for the period that Lender requires) provided by an insurer selected by Lender again becomes available, is obtained, and Lender requires separately designated payments toward the premiums for Mortgage Insurance. If Lender required Mortgage Insurance as a condition of making the Loan and Borrower was required to make separately designated payments toward the premiums for Mortgage Insurance, Borrower shall pay the premiums required to maintain Mortgage Insurance in effect, or to provide a non-refundable loss reserve, until Lender's requirement for Mortgage Insurance ends in accordance with any written agreement between Borrower and Lender providing for such termination or until termination is required by Applicable Law. Nothing in this Section 10 affects Borrower's obligation to pay interest at the rate provided in the Note.

Mortgage Insurance reimburses Lender (or any entity that purchases the Note) for certain losses it may incur if Borrower does not repay the Loan as agreed. Borrower is not a party to the Mortgage Insurance.

Mortgage insurers evaluate their total risk on all such insurance in force from time to time, and may enter into agreements with other parties that share or modify their risk, or reduce losses. These agreements are on terms and conditions that are satisfactory to the mortgage insurer and the other party (or parties) to these agreements. These agreements may require the mortgage insurer to make payments using any source of funds that the mortgage insurer may have available (which may include funds obtained from Mortgage Insurance premiums).

As a result of these agreements, Lender, any purchaser of the Note, another insurer, any reinsurer, any other entity, or any affiliate of any of the foregoing, may receive (directly or indirectly) amounts that derive from (or might be characterized as ) a portion of Borrower's payments for Mortgage Insurance, in exchange for sharing or modifying the mortgage insurer's risk, or reducing losses. If such agreement provides that an affiliate of Lender takes a share of

MS559PG237

the insurer's risk in exchange for a share of the premiums paid to the insurer, the arrangement is often termed "captive reinsurance." Further:

(a) Any such agreements will not affect the amounts that Borrower has agreed to pay for Mortgage Insurance, or any other terms of the Loan. Such agreements will not increase the amount Borrower will owe for Mortgage Insurance, and they will not entitle Borrower to any refund.

(b) Any such agreements will not affect the rights Borrower has - if any - with respect to the Mortgage Insurance under the Homeowners Protection Act of 1998 or any other law. These rights may include the right to receive certain disclosures, to request and obtain cancellation of the Mortgage Insurance, to have the Mortgage Insurance terminated automatically, and/or to receive a refund of any Mortgage Insurance premiums that were unearned at the time of such cancellation or termination.

11. **Assignment of Miscellaneous Proceeds; Forfeiture.** All Miscellaneous Proceeds are hereby assigned to and shall be paid to Lender.

If the Property is damaged, such Miscellaneous Proceeds shall be applied to restoration or repair of the Property, if the restoration or repair is economically feasible and Lender's security is not lessened. During such repair and restoration period, Lender shall have the right to hold such Miscellaneous Proceeds until Lender has had an opportunity to inspect such Property to ensure the work has been completed to Lender's satisfaction, provided that such inspection shall be undertaken promptly. Lender may pay for the repairs and restoration in a single disbursement or in a series of progress payments as the work is completed. Unless an agreement is made in writing or Applicable Law requires interest to be paid on such Miscellaneous Proceeds, Lender shall not be required to pay Borrower any interest or earnings on such Miscellaneous Proceeds. If the restoration or repair is not economically feasible or Lender's security would be lessened, the Miscellaneous Proceeds shall be applied to the sums secured by this Security Instrument, whether or not then due, with the excess, if any, paid to Borrower. Such Miscellaneous Proceeds shall be applied in the order provided for in Section 2.

In the event of a total taking, destruction, or loss in value of the Property, the Miscellaneous Proceeds shall be applied to the sums secured by this Security Instrument, whether or not then due, with the excess, if any, paid to Borrower.

In the event of a partial taking, destruction, or loss in value of the Property in which the fair market value of the Property immediately before the partial taking, destruction, or loss in value is equal to or greater than the amount of the sums secured by this Security Instrument immediately before the partial taking, destruction, or loss in value, unless Borrower and Lender otherwise agree in writing, the sums secured by this Security Instrument shall be reduced by the amount of the Miscellaneous Proceeds multiplied by the following fraction: (a) the total amount of the sums secured immediately before the partial taking, destruction, or loss in value divided by (b) the fair market value of the Property immediately before the partial taking, destruction, or loss in value. Any balance shall be paid to Borrower.

In the event of a partial taking, destruction, or loss in value of the Property in which the fair market value of the Property immediately before the partial taking, destruction, or loss in value is less than the amount of the sums secured immediately before the partial taking, destruction, or loss in value, unless Borrower and Lender otherwise agree in writing, the Miscellaneous Proceeds shall be applied to the sums secured by this Security Instrument whether or not the sums are then due.

If the Property is abandoned by Borrower, or if, after notice by Lender to Borrower that the Opposing Party (as defined in the next sentence) offers to make an award to settle a claim

**MS559PG238**

for damages, Borrower fails to respond to Lender within 30 days after the date the notice is given, Lender is authorized to collect and apply the Miscellaneous Proceeds either to restoration or repair of the Property or to the sums secured by this Security Instrument, whether or not then due. "Opposing Party" means the third party that owes Borrower Miscellaneous Proceeds or the party against whom Borrower has a right of action in regard to Miscellaneous Proceeds.

Borrower shall be in default if any action or proceeding, whether civil or criminal, is begun that, in Lender's judgment, could result in forfeiture of the Property or other material impairment of Lender's interest in the Property or rights under this Security Instrument. Borrower can cure such a default and, if acceleration has occurred, reinstate as provided in Section 19, by causing the action or proceeding to be dismissed with a ruling that, in Lender's judgment, precludes forfeiture of the Property or other material impairment of Lender's interest in the Property or rights under this Security Instrument. The proceeds of any award or claim for damages that are attributable to the impairment of Lender's interest in the Property are hereby assigned and shall be paid to Lender.

All Miscellaneous Proceeds that are not applied to restoration or repair of the Property shall be applied in the order provided for in Section 2.

**12. Borrower Not Released; Forbearance By Lender Not a Waiver.** Extension of the time for payment or modification of amortization of the sums secured by this Security Instrument granted by Lender to Borrower or any Successor in Interest of Borrower shall not operate to release the liability of Borrower or any Successors in Interest of Borrower. Lender shall not be required to commence proceedings against any Successor in Interest of Borrower or to refuse to extend time for payment or otherwise modify amortization of the sums secured by this Security Instrument by reason of any demand made by the original Borrower or any Successors in Interest of Borrower. Any forbearance by Lender in exercising any right or remedy including, without limitation, Lender's acceptance of payments from third persons, entities or Successors in Interest of Borrower or in amounts less than the amount then due, shall not be a waiver of or preclude the exercise of any right or remedy.

**13. Joint and Several Liability; Co-signers; Successors and Assigns Bound.** Borrower covenants and agrees that Borrower's obligations and liability shall be joint and several. However, any Borrower who co-signs this Security Instrument but does not execute the Note (a "co-signer"): (a) is co-signing this Security Instrument only to mortgage, grant and convey the co-signer's interest in the Property under the terms of this Security Instrument; (b) is not personally obligated to pay the sums secured by this Security Instrument; and (c) agrees that Lender and any other Borrower can agree to extend, modify, forbear or make any accommodations with regard to the terms of this Security Instrument or the Note without the co-signer's consent.

Subject to the provisions of Section 18, any Successor in Interest of Borrower who assumes Borrower's obligations under this Security Instrument in writing, and is approved by Lender, shall obtain all of Borrower's rights and benefits under this Security Instrument. Borrower shall not be released from Borrower's obligations and liability under this Security Instrument unless Lender agrees to such release in writing. The covenants and agreements of this Security Instrument shall bind (except as provided in Section 20) and benefit the successors and assigns of Lender.

**14. Loan Charges.** Lender may charge Borrower fees for services performed in connection with Borrower's default, for the purpose of protecting Lender's interest in the Property and rights under this Security Instrument, including, but not limited to, attorneys' fees, property inspection and valuation fees. In regard to any other fees, the absence of express authority in

## HS559PG239

this Security Instrument to charge a specific fee to Borrower shall not be construed as a prohibition on the charging of such fee. Lender may not charge fees that are expressly prohibited by this Security Instrument or by Applicable Law.

If the Loan is subject to a law which sets maximum loan charges, and that law is finally interpreted so that the interest or other loan charges collected or to be collected in connection with the Loan exceed the permitted limits, then: (a) any such loan charge shall be reduced by the amount necessary to reduce the charge to the permitted limit; and (b) any sums already collected from Borrower which exceeded permitted limits will be refunded to Borrower. Lender may choose to make this refund by reducing the principal owed under the Note or by making a direct payment to Borrower. If a refund reduces principal, the reduction will be treated as a partial prepayment without any prepayment charge (whether or not a prepayment charge is provided for under the Note). Borrower's acceptance of any such refund made by direct payment to Borrower will constitute a waiver of any right of action Borrower might have arising out of such overcharge.

**15. Notices.** All notices given by Borrower or Lender in connection with this Security Instrument must be in writing. Any notice to Borrower in connection with this Security Instrument shall be deemed to have been given to Borrower when mailed by first class mail or when actually delivered to Borrower's notice address if sent by other means. Notice to any one Borrower shall constitute notice to all Borrowers unless Applicable Law expressly requires otherwise. The notice address shall be the Property Address unless Borrower has designated a substitute notice address by notice to Lender. Borrower shall promptly notify Lender of Borrower's change of address. If Lender specifies a procedure for reporting Borrower's change of address, then Borrower shall only report a change of address through that specified procedure. There may be only one designated notice address under this Security Instrument at any one time. Any notice to Lender shall be given by delivering it or by mailing it by first class mail to Lender's address stated herein unless Lender has designated another address by notice to Borrower. Any notice in connection with this Security Instrument shall not be deemed to have been given to Lender until actually received by Lender. If any notice required by this Security Instrument is also required under Applicable Law, the Applicable Law requirement will satisfy the corresponding requirement under this Security Instrument.

**16. Governing Law; Severability; Rules of Construction.** This Security Instrument shall be governed by federal law and the law of the jurisdiction in which the Property is located. All rights and obligations contained in this Security Instrument are subject to any requirements and limitations of Applicable Law. Applicable Law might explicitly or implicitly allow the parties to agree by contract or it might be silent, but such silence shall not be construed as a prohibition against agreement by contract. In the event that any provision or clause of this Security Instrument or the Note conflicts with Applicable Law, such conflict shall not affect other provisions of this Security Instrument or the Note which can be given effect without the conflicting provision.

As used in this Security Instrument: (a) words of the masculine gender shall mean and include corresponding neuter words or words of the feminine gender; (b) words in the singular shall mean and include the plural and vice versa; and (c) the word "may" gives sole discretion without any obligation to take any action.

**17. Borrower's Copy.** Borrower shall be given one copy of the Note and of this Security Instrument.

6996981
WILKINS

MS559PG240

**18. Transfer of the Property or a Beneficial Interest in Borrower.** As used in this Section 18, "Interest in the Property" means any legal or beneficial interest in the Property, including, but not limited to, those beneficial interests transferred in a bond for deed, contract for deed, installment sales contract or escrow agreement, the intent of which is the transfer of title by Borrower at a future date to a purchaser.

If all or any part of the Property or any Interest in the Property is sold or transferred (or if Borrower is not a natural person and a beneficial interest in Borrower is sold or transferred) without Lender's prior written consent, Lender may require immediate payment in full of all sums secured by this Security Instrument. However, this option shall not be exercised by Lender if such exercise is prohibited by Applicable Law.

If Lender exercises this option, Lender shall give Borrower notice of acceleration. The notice shall provide a period of not less than 30 days from the date the notice is given in accordance with Section 15 within which Borrower must pay all sums secured by this Security Instrument. If Borrower fails to pay these sums prior to the expiration of this period, Lender may invoke any remedies permitted by this Security Instrument without further notice or demand on Borrower.

**19. Borrower's Right to Reinstate After Acceleration.** If Borrower meets certain conditions, Borrower shall have the right to have enforcement of this Security Instrument discontinued at any time prior to the earliest of: (a) five days before sale of the Property pursuant to any power of sale contained in this Security Instrument; (b) such other period as Applicable Law might specify for the termination of Borrower's right to reinstate; or (c) entry of a judgment enforcing this Security Instrument. Those conditions are that Borrower: (a) pays Lender all sums which then would be due under this Security Instrument and the Note as if no acceleration had occurred; (b) cures any default of any other covenants or agreements; (c) pays all expenses incurred in enforcing this Security Instrument, including, but not limited to, reasonable attorneys' fees, property inspection and valuation fees, and other fees incurred for the purpose of protecting Lender's interest in the Property and rights under this Security Instrument; and (d) takes such action as Lender may reasonably require to assure that Lender's interest in the Property and rights under this Security Instrument, and Borrower's obligation to pay the sums secured by this Security Instrument, shall continue unchanged. Lender may require that Borrower pay such reinstatement sums and expenses in one or more of the following forms, as selected by Lender: (a) cash; (b) money order; (c) certified check, bank check, treasurer's check or cashier's check, provided any such check is drawn upon an institution whose deposits are insured by a federal agency, instrumentality or entity; or (d) Electronic Funds Transfer. Upon reinstatement by Borrower, this Security Instrument and obligations secured hereby shall remain fully effective as if no acceleration had occurred. However, this right to reinstate shall not apply in the case of acceleration under Section 18.

**20. Sale of Note; Change of Loan Servicer; Notice of Grievance.** The Note or a partial interest in the Note (together with this Security Instrument) can be sold one or more times without prior notice to Borrower. A sale might result in a change in the entity (known as the "Loan Servicer") that collects Periodic Payments due under the Note and this Security Instrument and performs other mortgage loan servicing obligations under the Note, this Security Instrument, and Applicable Law. There also might be one or more changes of the Loan Servicer unrelated to a sale of the Note. If there is a change of the Loan Servicer, Borrower will be given written notice of the change which will state the name and address of the new Loan Servicer, the address to which payments should be made and any other information RESPA requires in connection with a notice of transfer of servicing. If the Note is

MS559PG241

sold and thereafter the Loan is serviced by a Loan Servicer other than the purchaser of the Note, the mortgage loan servicing obligations to Borrower will remain with the Loan Servicer or be transferred to a successor Loan Servicer and are not assumed by the Note purchaser unless otherwise provided by the Note purchaser.

Neither Borrower nor Lender may commence, join, or be joined to any judicial action (as either an individual litigant or the member of a class) that arises from the other party's actions pursuant to this Security Instrument or that alleges that the other party has breached any provision of, or any duty owed by reason of, this Security Instrument, until such Borrower or Lender has notified the other party (with such notice given in compliance with the requirements of Section 15) of such alleged breach and afforded the other party hereto a reasonable period after the giving of such notice to take corrective action. If Applicable Law provides a time period which must elapse before certain action can be taken, that time period will be deemed to be reasonable for purposes of this paragraph. The notice of acceleration and opportunity to cure given to Borrower pursuant to Section 22 and the notice of acceleration given to Borrower pursuant to Section 18 shall be deemed to satisfy the notice and opportunity to take corrective action provisions of this Section 20.

21. **Hazardous Substances.** As used in this Section 21: (a) "Hazardous Substances" are those substances defined as toxic or hazardous substances, pollutants, or wastes by Environmental Law and the following substances: gasoline, kerosene, other flammable or toxic petroleum products, toxic pesticides and herbicides, volatile solvents, materials containing asbestos or formaldehyde, and radioactive materials; (b) "Environmental Law" means federal laws and laws of the jurisdiction where the Property is located that relate to health, safety or environmental protection; (c) "Environmental Cleanup" includes any response action, remedial action, or removal action, as defined in Environmental Law; and (d) an "Environmental Condition" means a condition that can cause, contribute to, or otherwise trigger an Environmental Cleanup.

Borrower shall not cause or permit the presence, use, disposal, storage, or release of any Hazardous Substances, or threaten to release any Hazardous Substances, on or in the Property. Borrower shall not do, nor allow anyone else to do, anything affecting the Property (a) that is in violation of any Environmental Law, (b) which creates an Environmental Condition, or (c) which, due to the presence, use, or release of a Hazardous Substance, creates a condition that adversely affects the value of the Property. The preceding two sentences shall not apply to the presence, use, or storage on the Property of small quantities of Hazardous Substances that are generally recognized to be appropriate to normal residential uses and to maintenance of the Property (including, but not limited to, hazardous substances in consumer products).

Borrower shall promptly give Lender written notice of (a) any investigation, claim, demand, lawsuit or other action by any governmental or regulatory agency or private party involving the Property and any Hazardous Substance or Environmental Law of which Borrower has actual knowledge, (b) any Environmental Condition, including but not limited to, any spilling, leaking, discharge, release or threat of release of any Hazardous Substance, and (c) any condition caused by the presence, use or release of a Hazardous Substance which adversely affects the value of the Property. If Borrower learns, or is notified by any governmental or regulatory authority, or any private party, that any removal or other remediation of any Hazardous Substance affecting the Property is necessary, Borrower shall promptly take all necessary remedial actions in accordance with Environmental Law. Nothing herein shall create any obligation on Lender for an Environmental Cleanup.

MS559PG242

NON-UNIFORM COVENANTS. Borrower and Lender further covenant and agree as follows:

22. **Acceleration; Remedies.** Lender shall give notice to Borrower prior to acceleration following Borrower's breach of any covenant or agreement in this Security Instrument (but not prior to acceleration under Section 18 unless Applicable Law provides otherwise). The notice shall specify: (a) the default; (b) the action required to cure the default; (c) a date, not less than 30 days from the date the notice is given to Borrower, by which the default must be cured; and (d) that failure to cure the default on or before the date specified in the notice may result in acceleration of the sums secured by this Security Instrument, foreclosure by judicial proceeding and sale of the Property. The notice shall further inform Borrower of the right to reinstate after acceleration and the right to assert in the foreclosure proceeding the non-existence of a default or any other defense of Borrower to acceleration and foreclosure. If the default is not cured on or before the date specified in the notice, Lender at its option may require immediate payment in full of all sums secured by this Security Instrument without further demand and may foreclose this Security Instrument by judicial proceeding. Lender shall be entitled to collect all expenses incurred in pursuing the remedies provided in this Section 22, including, but not limited to, attorneys' fees of          5.000          % of the amount decreed for principal and interest (which fees shall be allowed and paid as part of the decree of judgment) and costs of title evidence.

23. **Satisfaction.** Upon payment of all sums secured by this Security Instrument, this Security Instrument shall cease and become void and of no effect and Lender shall cause the entry of satisfaction to be made upon the records of this Security Instrument. Borrower shall pay all costs and fees for entering the satisfaction upon the records of this Security Instrument. Lender may charge Borrower a fee for entering the satisfaction, but only if the fee is paid to a third party for services rendered and the charging of the fee is permitted under Applicable Law.

24. **Future Advances.** This Security Instrument secures a maximum amount of up to 150% of the amount of the Note. This Security Instrument shall secure any additional loans as well as any and all present or future advances and readvances under the Note made by Lender to or for the benefit of Borrower or the Property, all of which shall be entitled to the benefits of this Security Instrument under 25 Del. Code Section 2118 and shall have the same lien priority as if the future loans, advances or readvances were made as of the date hereof including, without limitation: (a) principal, interest, late charges, fees and other amounts due under the Note or this Security Instrument; (b) all advances by Lender to Borrower or any other person to pay costs of erection, construction, alteration, repair, restoration, maintenance and completion of any improvements on the Property; (c) all advances made or costs incurred by Borrower for the payment of real estate taxes, assessments or other governmental charges, maintenance charges, insurance premiums, appraisals charges, environmental inspection, audit, testing or compliance costs, and costs incurred by Lender for the enforcement and protection of the Property or the lien of this Security Instrument; and (d) all legal fees, costs and other expenses incurred by Lender by reason of any default or otherwise in connection with the Note. Borrower agrees that if, at any time during the term of this Security Instrument or following a foreclosure hereof, Borrower fails to perform or observe any covenant or obligation under this Security Instrument including, without limitation, payment of any of the foregoing, Lender may (but shall not be obligated to) take such steps as are reasonably necessary to remedy any such nonperformance or nonobservance and provide

**6996981
WILKINS**

**MS559PG243**

payment thereof. All amounts advanced by Lender shall be added to the amount secured by this Security Instrument and shall be due and payable promptly after demand, together with interest at the rate of interest in effect under the Note, such interest to be calculated from the date of such advance to the date of repayment thereof. Borrower's obligations hereunder shall be continuing and shall survive notwithstanding a foreclosure of this Security Instrument.

    BY SIGNING BELOW, Borrower accepts and agrees to the terms and covenants contained in this Security Instrument and in any Rider executed by Borrower and recorded with it.

Signed, sealed and delivered in the presence of:

_____     _____ (Seal)
        **RICHARD H WILKINS** *by* _____ Atty at fact
                  -Borrower
             *Tolano D. Anderson*

_as to both_    _____ (Seal)
        **BRENDA F WILKINS** *by* _____ Atty in fact
                  -Borrower
             *Tolano D. Anderson*

_____ (Seal)     _____ (Seal)
           -Borrower                     -Borrower

_____ (Seal)     _____ (Seal)
           -Borrower                     -Borrower

_____ (Seal)     _____ (Seal)
           -Borrower                     -Borrower

MS559PG244

STATE OF DELAWARE,                                        *Kent* County ss:

This instrument was acknowledged before me on   *August 6, 2004*   by

*Tolano D Anderson attorney in fact for Richard H. Wilkins*
*and Brenda F. Wilkins.*

My Commission Expires:

_____
Notary Public                    **Attorney-At-Law**

JOHN I. ELLIS
AUTHORIZED TO PERFORM
NOTARIAL ACTS PURSUANT
TO DELAWARE LAW
TITLE 29§ 4323 (a) (3)

MS559PG245

ALL that certain lot, piece or parcel of land situated in the City of Dover, Kent County, State of Delaware, lying on the westerly side of U.S. Route 13, being bounded as follows; on the North by Silver Lake and by lands now or late of Peter Aigner, on the East by U.S. Route 13, also known as "North Dupont Highway" and by lands now or late of Richard F. Larrimer Jr. & Mary Ellen Larimer, on the South by said lands of Larrimer and by lands now or late of Chatham Cove, Inc., on the West by said lands of Chatham Cove, as shown on a survey plan prepared by McClure Associates Inc., dated 7/6/04, file#MA:06-40-04 and more particularly described as follows:

BEGINNING at a point, a found iron pipe, in the westerly line of U.S. Route 13, a corner for this lot and for said lands of Larrimer, said point located a distance of 464.3 feet, as measured in a northwesterly direction, from a found concrete monument at the intersection of the westerly line of U.S. Route 13 with the northerly line of Garden Lane, thence from said beginning point the following twelve (12) courses and distances;

(1)  with said lands of Larrimer, South 58 deg. 17 min. 40 sec. West a distance of 183.10 feet to a point,

(2)  thence continuing with said lands of Larrimer, South 29 deg. 03 min. East a distance of 30.00 feet to a point in line of said Larrimer lands, a corner for said lands of Chatham Cove, Inc.,

(3)  thence with said lands of Chatham Cove for the next three courses and distances, North 75 deg. 08 min. 38 sec. West a distance of 27.73 feet to a point,

(4)  thence, South 58 deg. 45 min. 45 sec. West a distance of 86.64 feet to a point,

(5)  thence, North 57 deg. 45 min. 18 sec. West a distance of 48.66 feet to a point at the waters edge of Silver Lake,

(6)  thence with the same for the next three courses and distances, North 46 deg. 35 min. 42 sec. East a distance of 80.98 feet to a point,

(7)  thence, North 80 deg. 41 min. 19 sec. East a distance of 18.43 feet to a point,

(8)  thence, North 13 deg. 29 min. 08 sec. East a distance of 22.65 feet to a point, a corner for said lands of Aigner,

(9)  thence leaving said waters edge, with said lands of Aigner for the next three courses and distances, North 58 deg. 17 min. 40 sec. East a distance of 111.50 feet to a found re-bar,

(10) thence, South 29 deg. 27 min. 55 sec. East a distance of 10.00 feet to a found re-bar,

(11) thence, North 58 deg. 17 min. 40 sec. East a distance of 90.00 feet to a point in the westerly line of U.S. Route 13,

(12) thence with the same, South 29 deg. 27 min. 55 sec. East a distance of 50.00 feet to a point, the point of beginning.

Containing within said metes and bounds 0.3925 acre of land, more or less., known as #580 North Dupont Highway.

A - 51

MS551PG235

6940176
WHEATLEY

023088

'04 AU 19 ℗ 1:53.4

Parcel Number: *ED-05-06 8.09-01-19.01-000*

Prepared By:    JOANNE G. MILLER

Return To:    WACHOVIA MORTGAGE CORPORATION
1100 CORPORATE CENTER DRIVE - NC4723
RALEIGH, NC  27607-5066

_____ [Space Above This Line For Recording Data] _____

# MORTGAGE

MIN   100013700069401766

## DEFINITIONS

Words used in multiple sections of this document are defined below and other words are defined in Sections 3, 11, 13, 18, 20 and 21. Certain rules regarding the usage of words used in this document are also provided in Section 16.

(A) "Security Instrument" means this document, which is dated  August      13  2004  ,
together with all Riders to this document.
(B) "Borrower" is

LLOYD J WHEATLEY
AUDRIA L WHEATLEY

Borrower is the mortgagor under this Security Instrument.
(C) "MERS" is Mortgage Electronic Registration Systems, Inc. MERS is a separate corporation that is acting solely as a nominee for Lender and Lender's successors and assigns. MERS is the mortgagee under this Security Instrument. MERS is organized and existing under the laws of Delaware, and has an address and telephone of P.O. Box 2026, Flint, MI 48501-2026, tel. (888) 679-MERS.

DELAWARE - Single Family – Fannie Mae/Freddie Mac UNIFORM INSTRUMENT WITH MERS        Form 3008 1/01

241441 (rev06 11/00) [14411]              Page 1 of 17                                      JGM

A - 52

MS551PG236

**(D) "Lender" is  WACHOVIA MORTGAGE CORPORATION**

Lender is a   **CORPORATION**
organized and existing under the laws of   **NORTH CAROLINA**
Lender's address is   **1100 CORPORATE CENTER DRIVE
RALEIGH, NC 27607-5066**
**(E) "Note"** means the promissory note signed by Borrower and dated
**August     13     2004**              . The Note states that Borrower owes Lender
**Two Hundred Thirteen Thousand Three Hundred Thirty and no/10**              Dollars
**(U.S. $     213,330.00**              ) plus interest. Borrower has promised to pay this
debt in regular Periodic Payments and to pay the debt in full not later than
**September     1     2034**
**(F) "Property"** means the property that is described below under the heading "Transfer of
Rights in the Property."

**(G) "Loan"** means the debt evidenced by the Note, plus interest, any prepayment charges and
late charges due under the Note, and all sums due under this Security Instrument, plus
interest.

**(H) "Riders"** means all Riders to this Security Instrument that are executed by Borrower. The
following Riders are to be executed by Borrower [check box as applicable]:

| | | |
|---|---|---|
| ☐ Adjustable Rate Rider | ☐ Condominium Rider | ☐ Second Home Rider |
| ☐ Balloon Rider | ☐ Planned Unit Development Rider | ☐ 1-4 Family Rider |
| ☐ VA Rider | ☐ Biweekly Payment Rider | ☒ Other(s) [specify] * |

**\* LEGAL DESCRIPTION**

**(I) "Applicable Law"** means all controlling applicable federal, state and local statutes,
regulations, ordinances and administrative rules and orders (that have the effect of law) as
well as all applicable final, non-appealable judicial opinions.

**(J) "Community Association Dues, Fees, and Assessments"** means all dues, fees,
assessments and other charges that are imposed on Borrower or the Property by a
condominium association, homeowners association or similar organization.

**(K) "Electronic Funds Transfer"** means any transfer of funds, other than a transaction
originated by check, draft, or similar paper instrument, which is initiated through an electronic
terminal, telephonic instrument, computer, or magnetic tape so as to order, instruct, or
authorize a financial institution to debit or credit an account. Such term includes, but is not
limited to, point-of-sale transfers, automated teller machine transactions, transfers initiated by
telephone, wire transfers, and automated clearinghouse transfers.

**(L) "Escrow Items"** means those items that are described in Section 3.

**(M) "Miscellaneous Proceeds"** means any compensation, settlement, award of damages, or
proceeds paid by any third party (other than insurance proceeds paid under the coverages
described in Section 5) for (i) damage to, or destruction of, the Property; (ii) condemnation or
other taking of all or any part of the Property; (iii) conveyance in lieu of condemnation; or (iv)
misrepresentations of, or omissions as to, the value and/or condition of the Property.

**(N) "Mortgage Insurance"** means insurance protecting Lender against the nonpayment of, or
default on, the Loan.

MS551PG237

(O) **"Periodic Payment"** means the regularly scheduled amount due for (i) principal and interest under the Note, plus (ii) any amounts under Section 3 of this Security Instrument.

(P) **"RESPA"** means the Real Estate Settlement Procedures Act (12 U.S.C. Section 2601 et seq.) and its implementing regulation, Regulation X (24 C.F.R. Part 3500), as they might be amended from time to time, or any additional or successor legislation or regulation that governs the same subject matter. As used in this Security Instrument, "RESPA" refers to all requirements and restrictions that are imposed in regard to a "federally related mortgage loan" even if the Loan does not qualify as a "federally related mortgage loan" under RESPA.

(Q) **"Successor in Interest of Borrower"** means any party that has taken title to the Property, whether or not that party has assumed Borrower's obligations under the Note and/or this Security Instrument.

TRANSFER OF RIGHTS IN THE PROPERTY

This Security Instrument secures to Lender: (i) the repayment of the Loan, and all renewals, extensions and modifications of the Note; and (ii) the performance of Borrower's covenants and agreements under this Security Instrument and the Note. For this purpose, Borrower does hereby mortgage, grant and convey to MERS (solely as nominee for Lender and Lender's successors and assigns) and to the successors and assigns of MERS the following described property located in the       **COUNTY**                    [Type of Recording Jurisdiction]
of **KENT**                                                   [Name of Recording Jurisdiction]:

**SEE SCHEDULE ATTACHED HERETO; MADE A PART HEREOF**

which currently has the address of          **584 NORTH DUPONT HWY**
                                                                                          [Street]
                                                            **DOVER**                    [City],
Delaware    **19901**              [Zip Code] ("Property Address"):

     TOGETHER WITH all the improvements now or hereafter erected on the property,  and all easements, appurtenances, and fixtures now or hereafter a part of the property. All replacements and additions shall also be covered by this Security Instrument. All of the foregoing is referred to in this Security Instrument as the "Property." Borrower understands and agrees that MERS holds only legal title to the interests granted by Borrower in this Security Instrument, but, if necessary to comply with law or custom, MERS (as nominee for

JGM

Lender and Lender's successors and assigns) has the right: to exercise any or all of those interests, including, but not limited to, the right to foreclose and sell the Property; and to take any action required of Lender including, but not limited to, releasing and canceling this Security Instrument.

BORROWER COVENANTS that Borrower is lawfully seised of the estate hereby conveyed and has the right to mortgage, grant and convey the Property and that the Property is unencumbered, except for encumbrances of record. Borrower warrants and will defend generally the title to the Property against all claims and demands, subject to any encumbrances of record.

THIS SECURITY INSTRUMENT combines uniform covenants for national use and non-uniform covenants with limited variations by jurisdiction to constitute a uniform security instrument covering real property.

UNIFORM COVENANTS. Borrower and Lender covenant and agree as follows:

**1. Payment of Principal, Interest, Escrow Items, Prepayment Charges, and Late Charges.** Borrower shall pay when due the principal of, and interest on, the debt evidenced by the Note and any prepayment charges and late charges due under the Note. Borrower shall also pay funds for Escrow Items pursuant to Section 3. Payments due under the Note and this Security Instrument shall be made in U.S. currency. However, if any check or other instrument received by Lender as payment under the Note or this Security Instrument is returned to Lender unpaid, Lender may require that any or all subsequent payments due under the Note and this Security Instrument be made in one or more of the following forms, as selected by Lender: (a) cash; (b) money order; (c) certified check, bank check, treasurer's check or cashier's check, provided any such check is drawn upon an institution whose deposits are insured by a federal agency, instrumentality, or entity; or (d) Electronic Funds Transfer.

Payments are deemed received by Lender when received at the location designated in the Note or at such other location as may be designated by Lender in accordance with the notice provisions in Section 15. Lender may return any payment or partial payment if the payment or partial payments are insufficient to bring the Loan current. Lender may accept any payment or partial payment insufficient to bring the Loan current, without waiver of any rights hereunder or prejudice to its rights to refuse such payment or partial payments in the future, but Lender is not obligated to apply such payments at the time such payments are accepted. If each Periodic Payment is applied as of its scheduled due date, then Lender need not pay interest on unapplied funds. Lender may hold such unapplied funds until Borrower makes payment to bring the Loan current. If Borrower does not do so within a reasonable period of time, Lender shall either apply such funds or return them to Borrower. If not applied earlier, such funds will be applied to the outstanding principal balance under the Note immediately prior to foreclosure. No offset or claim which Borrower might have now or in the future against Lender shall relieve Borrower from making payments due under the Note and this Security Instrument or performing the covenants and agreements secured by this Security Instrument.

**2. Application of Payments or Proceeds.** Except as otherwise described in this Section 2, all payments accepted and applied by Lender shall be applied in the following order of priority: (a) interest due under the Note; (b) principal due under the Note; (c) amounts due under Section 3. Such payments shall be applied to each Periodic Payment in the order in which it became due. Any remaining amounts shall be applied first to late charges, second to any other amounts due under this Security Instrument, and then to reduce the principal balance of the Note.

If Lender receives a payment from Borrower for a delinquent Periodic Payment which includes a sufficient amount to pay any late charge due, the payment may be applied to the delinquent payment and the late charge. If more than one Periodic Payment is outstanding, Lender may apply any payment received from Borrower to the repayment of the Periodic Payments if, and to the extent that, each payment can be paid in full. To the extent that any excess exists after the payment is applied to the full payment of one or more Periodic

**HS551 PG239**

Payments, such excess may be applied to any late charges due. Voluntary prepayments shall be applied first to any prepayment charges and then as described in the Note.

Any application of payments, insurance proceeds, or Miscellaneous Proceeds to principal due under the Note shall not extend or postpone the due date, or change the amount, of the Periodic Payments.

**3. Funds for Escrow Items.** Borrower shall pay to Lender on the day Periodic Payments are due under the Note, until the Note is paid in full, a sum (the "Funds") to provide for payment of amounts due for: (a) taxes and assessments and other items which can attain priority over this Security Instrument as a lien or encumbrance on the Property; (b) leasehold payments or ground rents on the Property, if any; (c) premiums for any and all insurance required by Lender under Section 5; and (d) Mortgage Insurance premiums, if any, or any sums payable by Borrower to Lender in lieu of the payment of Mortgage Insurance premiums in accordance with the provisions of Section 10. These items are called "Escrow Items." At origination or at any time during the term of the Loan, Lender may require that Community Association Dues, Fees, and Assessments, if any, be escrowed by Borrower, and such dues, fees and assessments shall be an Escrow Item. Borrower shall promptly furnish to Lender all notices of amounts to be paid under this Section. Borrower shall pay Lender the Funds for Escrow Items unless Lender waives Borrower's obligation to pay the Funds for any or all Escrow Items. Lender may waive Borrower's obligation to pay to Lender Funds for any or all Escrow Items at any time. Any such waiver may only be in writing. In the event of such waiver, Borrower shall pay directly, when and where payable, the amounts due for any Escrow Items for which payment of Funds has been waived by Lender and, if Lender requires, shall furnish to Lender receipts evidencing such payment within such time period as Lender may require. Borrower's obligation to make such payments and to provide receipts shall for all purposes be deemed to be a covenant and agreement contained in this Security Instrument, as the phrase "covenant and agreement" is used in Section 9. If Borrower is obligated to pay Escrow Items directly, pursuant to a waiver, and Borrower fails to pay the amount due for an Escrow Item, Lender may exercise its rights under Section 9 and pay such amount and Borrower shall then be obligated under Section 9 to repay to Lender any such amount. Lender may revoke the waiver as to any or all Escrow Items at any time by a notice given in accordance with Section 15 and, upon such revocation, Borrower shall pay to Lender all Funds, and in such amounts, that are then required under this Section 3.

Lender may, at any time, collect and hold Funds in an amount (a) sufficient to permit Lender to apply the Funds at the time specified under RESPA and (b) not to exceed the maximum amount a lender can require under RESPA. Lender shall estimate the amount of Funds due on the basis of current data and reasonable estimates of expenditures of future Escrow Items or otherwise in accordance with Applicable Law.

The Funds shall be held in an institution whose deposits are insured by a federal agency, instrumentality, or entity (including Lender, if Lender is an institution whose deposits are so insured) or in any Federal Home Loan Bank. Lender shall apply the Funds to pay the Escrow Items no later than the time specified under RESPA. Lender shall not charge Borrower for holding and applying the Funds, annually analyzing the escrow account, or verifying the Escrow Items, unless Lender pays Borrower interest on the Funds and Applicable Law permits Lender to make such a charge. Unless an agreement is made in writing or Applicable Law requires interest to be paid on the Funds, Lender shall not be required to pay Borrower any interest or earnings on the Funds. Borrower and Lender can agree in writing, however, that interest shall be paid on the Funds. Lender shall give to Borrower, without charge, an annual accounting of the Funds as required by RESPA.

If there is a surplus of Funds held in escrow, as defined under RESPA, Lender shall account to Borrower for the excess funds in accordance with RESPA. If there is a shortage of Funds held in escrow, as defined under RESPA, Lender shall notify Borrower as required by

**MS551PG240**

RESPA, and Borrower shall pay to Lender the amount necessary to make up the shortage in accordance with RESPA, but in no more than 12 monthly payments. If there is a deficiency of Funds held in escrow, as defined under RESPA, Lender shall notify Borrower as required by RESPA, and Borrower shall pay to Lender the amount necessary to make up the deficiency in accordance with RESPA, but in no more than 12 monthly payments.

Upon payment in full of all sums secured by this Security Instrument, Lender shall promptly refund to Borrower any Funds held by Lender.

**4. Charges; Liens.** Borrower shall pay all taxes, assessments, charges, fines, and impositions attributable to the Property which can attain priority over this Security Instrument, leasehold payments or ground rents on the Property, if any, and Community Association Dues, Fees, and Assessments, if any. To the extent that these items are Escrow Items, Borrower shall pay them in the manner provided in Section 3.

Borrower shall promptly discharge any lien which has priority over this Security Instrument unless Borrower: (a) agrees in writing to the payment of the obligation secured by the lien in a manner acceptable to Lender, but only so long as Borrower is performing such agreement; (b) contests the lien in good faith by, or defends against enforcement of the lien in, legal proceedings which in Lender's opinion operate to prevent the enforcement of the lien while those proceedings are pending, but only until such proceedings are concluded; or (c) secures from the holder of the lien an agreement satisfactory to Lender subordinating the lien to this Security Instrument. If Lender determines that any part of the Property is subject to a lien which can attain priority over this Security Instrument, Lender may give Borrower a notice identifying the lien. Within 10 days of the date on which that notice is given, Borrower shall satisfy the lien or take one or more of the actions set forth above in this Section 4.

Lender may require Borrower to pay a one-time charge for a real estate tax verification and/or reporting service used by Lender in connection with this Loan.

**5. Property Insurance.** Borrower shall keep the improvements now existing or hereafter erected on the Property insured against loss by fire, hazards included within the term "extended coverage," and any other hazards including, but not limited to, earthquakes and floods, for which Lender requires insurance. This insurance shall be maintained in the amounts (including deductible levels) and for the periods that Lender requires. What Lender requires pursuant to the preceding sentences can change during the term of the Loan. The insurance carrier providing the insurance shall be chosen by Borrower subject to Lender's right to disapprove Borrower's choice, which right shall not be exercised unreasonably. Lender may require Borrower to pay, in connection with this Loan, either: (a) a one-time charge for flood zone determination, certification and tracking services; or (b) a one-time charge for flood zone determination and certification services and subsequent charges each time remappings or similar changes occur which reasonably might affect such determination or certification. Borrower shall also be responsible for the payment of any fees imposed by the Federal Emergency Management Agency in connection with the review of any flood zone determination resulting from an objection by Borrower.

If Borrower fails to maintain any of the coverages described above, Lender may obtain insurance coverage, at Lender's option and Borrower's expense. Lender is under no obligation to purchase any particular type or amount of coverage. Therefore, such coverage shall cover Lender, but might or might not protect Borrower, Borrower's equity in the Property, or the contents of the Property, against any risk, hazard or liability and might provide greater or lesser coverage than was previously in effect. Borrower acknowledges that the cost of the

MS551PG241

insurance coverage so obtained might significantly exceed the cost of insurance that Borrower could have obtained. Any amounts disbursed by Lender under this Section 5 shall become additional debt of Borrower secured by this Security Instrument. These amounts shall bear interest at the Note rate from the date of disbursement and shall be payable, with such interest, upon notice from Lender to Borrower requesting payment.

All insurance policies required by Lender and renewals of such policies shall be subject to Lender's right to disapprove such policies, shall include a standard mortgage clause, and shall name Lender as mortgagee and/or as an additional loss payee. Lender shall have the right to hold the policies and renewal certificates. If Lender requires, Borrower shall promptly give to Lender all receipts of paid premiums and renewal notices. If Borrower obtains any form of insurance coverage, not otherwise required by Lender, for damage to, or destruction of, the Property, such policy shall include a standard mortgage clause and shall name Lender as mortgagee and/or as an additional loss payee.

In the event of loss, Borrower shall give prompt notice to the insurance carrier and Lender. Lender may make proof of loss if not made promptly by Borrower. Unless Lender and Borrower otherwise agree in writing, any insurance proceeds, whether or not the underlying insurance was required by Lender, shall be applied to restoration or repair of the Property, if the restoration or repair is economically feasible and Lender's security is not lessened. During such repair and restoration period, Lender shall have the right to hold such insurance proceeds until Lender has had an opportunity to inspect such Property to ensure the work has been completed to Lender's satisfaction, provided that such inspection shall be undertaken promptly. Lender may disburse proceeds for the repairs and restoration in a single payment or in a series of progress payments as the work is completed. Unless an agreement is made in writing or Applicable Law requires interest to be paid on such insurance proceeds, Lender shall not be required to pay Borrower any interest or earnings on such proceeds. Fees for public adjusters, or other third parties, retained by Borrower shall not be paid out of the insurance proceeds and shall be the sole obligation of Borrower. If the restoration or repair is not economically feasible or Lender's security would be lessened, the insurance proceeds shall be applied to the sums secured by this Security Instrument, whether or not then due, with the excess, if any, paid to Borrower. Such insurance proceeds shall be applied in the order provided for in Section 2.

If Borrower abandons the Property, Lender may file, negotiate and settle any available insurance claim and related matters. If Borrower does not respond within 30 days to a notice from Lender that the insurance carrier has offered to settle a claim, then Lender may negotiate and settle the claim. The 30-day period will begin when the notice is given. In either event, or if Lender acquires the Property under Section 22 or otherwise, Borrower hereby assigns to Lender (a) Borrower's rights to any insurance proceeds in an amount not to exceed the amounts unpaid under the Note or this Security Instrument, and (b) any other of Borrower's rights (other than the right to any refund of unearned premiums paid by Borrower) under all insurance policies covering the Property, insofar as such rights are applicable to the coverage of the Property. Lender may use the insurance proceeds either to repair or restore the Property or to pay amounts unpaid under the Note or this Security Instrument, whether or not then due.

   6. **Occupancy.** Borrower shall occupy, establish, and use the Property as Borrower's principal residence within 60 days after the execution of this Security Instrument and shall continue to occupy the Property as Borrower's principal residence for at least one year after

HS551PG242    WHEATLEY

the date of occupancy, unless Lender otherwise agrees in writing, which consent shall not be unreasonably withheld, or unless extenuating circumstances exist which are beyond Borrower's control.

**7. Preservation, Maintenance and Protection of the Property; Inspections.** Borrower shall not destroy, damage or impair the Property, allow the Property to deteriorate or commit waste on the Property. Whether or not Borrower is residing in the Property, Borrower shall maintain the Property in order to prevent the Property from deteriorating or decreasing in value due to its condition. Unless it is determined pursuant to Section 5 that repair or restoration is not economically feasible, Borrower shall promptly repair the Property if damaged to avoid further deterioration or damage. If insurance or condemnation proceeds are paid in connection with damage to, or the taking of, the Property, Borrower shall be responsible for repairing or restoring the Property only if Lender has released proceeds for such purposes. Lender may disburse proceeds for the repairs and restoration in a single payment or in a series of progress payments as the work is completed. If the insurance or condemnation proceeds are not sufficient to repair or restore the Property, Borrower is not relieved of Borrower's obligation for the completion of such repair or restoration.

Lender or its agent may make reasonable entries upon and inspections of the Property. If it has reasonable cause, Lender may inspect the interior of the improvements on the Property. Lender shall give Borrower notice at the time of or prior to such an interior inspection specifying such reasonable cause.

**8. Borrower's Loan Application.** Borrower shall be in default if, during the Loan application process, Borrower or any persons or entities acting at the direction of Borrower or with Borrower's knowledge or consent gave materially false, misleading, or inaccurate information or statements to Lender (or failed to provide Lender with material information) in connection with the Loan. Material representations include, but are not limited to, representations concerning Borrower's occupancy of the Property as Borrower's principal residence.

**9. Protection of Lender's Interest in the Property and Rights Under this Security Instrument.** If (a) Borrower fails to perform the covenants and agreements contained in this Security Instrument, (b) there is a legal proceeding that might significantly affect Lender's interest in the Property and/or rights under this Security Instrument (such as a proceeding in bankruptcy, probate, for condemnation or forfeiture, for enforcement of a lien which may attain priority over this Security Instrument or to enforce laws or regulations), or (c) Borrower has abandoned the Property, then Lender may do and pay for whatever is reasonable or appropriate to protect Lender's interest in the Property and rights under this Security Instrument, including protecting and/or assessing the value of the Property, and securing and/or repairing the Property. Lender's actions can include, but are not limited to: (a) paying any sums secured by a lien which has priority over this Security Instrument; (b) appearing in court; and (c) paying reasonable attorneys' fees to protect its interest in the Property and/or rights under this Security Instrument, including its secured position in a bankruptcy proceeding. Securing the Property includes, but is not limited to, entering the Property to make repairs, change locks, replace or board up doors and windows, drain water from pipes, eliminate building or other code violations or dangerous conditions, and have utilities turned on or off. Although Lender may take action under this Section 9, Lender does not have to do so and is not under any duty or obligation to do so. It is agreed that Lender incurs no liability for not taking any or all actions authorized under this Section 9.

## MS551PG243

Any amounts disbursed by Lender under this Section 9 shall become additional debt of Borrower secured by this Security Instrument. These amounts shall bear interest at the Note rate from the date of disbursement and shall be payable, with such interest, upon notice from Lender to Borrower requesting payment.

If this Security Instrument is on a leasehold, Borrower shall comply with all the provisions of the lease. If Borrower acquires fee title to the Property, the leasehold and the fee title shall not merge unless Lender agrees to the merger in writing.

**10. Mortgage Insurance.** If Lender required Mortgage Insurance as a condition of making the Loan, Borrower shall pay the premiums required to maintain the Mortgage Insurance in effect. If, for any reason, the Mortgage Insurance coverage required by Lender ceases to be available from the mortgage insurer that previously provided such insurance and Borrower was required to make separately designated payments toward the premiums for Mortgage Insurance, Borrower shall pay the premiums required to obtain coverage substantially equivalent to the Mortgage Insurance previously in effect, at a cost substantially equivalent to the cost to Borrower of the Mortgage Insurance previously in effect, from an alternate mortgage insurer selected by Lender. If substantially equivalent Mortgage Insurance coverage is not available, Borrower shall continue to pay to Lender the amount of the separately designated payments that were due when the insurance coverage ceased to be in effect. Lender will accept, use and retain these payments as a non-refundable loss reserve in lieu of Mortgage Insurance. Such loss reserve shall be non-refundable, notwithstanding the fact that the Loan is ultimately paid in full, and Lender shall not be required to pay Borrower any interest or earnings on such loss reserve. Lender can no longer require loss reserve payments if Mortgage Insurance coverage (in the amount and for the period that Lender requires) provided by an insurer selected by Lender again becomes available, is obtained, and Lender requires separately designated payments toward the premiums for Mortgage Insurance. If Lender required Mortgage Insurance as a condition of making the Loan and Borrower was required to make separately designated payments toward the premiums for Mortgage Insurance, Borrower shall pay the premiums required to maintain Mortgage Insurance in effect, or to provide a non-refundable loss reserve, until Lender's requirement for Mortgage Insurance ends in accordance with any written agreement between Borrower and Lender providing for such termination or until termination is required by Applicable Law. Nothing in this Section 10 affects Borrower's obligation to pay interest at the rate provided in the Note.

Mortgage Insurance reimburses Lender (or any entity that purchases the Note) for certain losses it may incur if Borrower does not repay the Loan as agreed. Borrower is not a party to the Mortgage Insurance.

Mortgage insurers evaluate their total risk on all such insurance in force from time to time, and may enter into agreements with other parties that share or modify their risk, or reduce losses. These agreements are on terms and conditions that are satisfactory to the mortgage insurer and the other party (or parties) to these agreements. These agreements may require the mortgage insurer to make payments using any source of funds that the mortgage insurer may have available (which may include funds obtained from Mortgage Insurance premiums).

As a result of these agreements, Lender, any purchaser of the Note, another insurer, any reinsurer, any other entity, or any affiliate of any of the foregoing, may receive (directly or indirectly) amounts that derive from (or might be characterized as ) a portion of Borrower's payments for Mortgage Insurance, in exchange for sharing or modifying the mortgage insurer's risk, or reducing losses. If such agreement provides that an affiliate of Lender takes a share of

MS551PG244

the insurer's risk in exchange for a share of the premiums paid to the insurer, the arrangement is often termed "captive reinsurance." Further:

(a) Any such agreements will not affect the amounts that Borrower has agreed to pay for Mortgage Insurance, or any other terms of the Loan. Such agreements will not increase the amount Borrower will owe for Mortgage Insurance, and they will not entitle Borrower to any refund.

(b) Any such agreements will not affect the rights Borrower has - if any - with respect to the Mortgage Insurance under the Homeowners Protection Act of 1998 or any other law. These rights may include the right to receive certain disclosures, to request and obtain cancellation of the Mortgage Insurance, to have the Mortgage Insurance terminated automatically, and/or to receive a refund of any Mortgage Insurance premiums that were unearned at the time of such cancellation or termination.

11. **Assignment of Miscellaneous Proceeds; Forfeiture.** All Miscellaneous Proceeds are hereby assigned to and shall be paid to Lender.

If the Property is damaged, such Miscellaneous Proceeds shall be applied to restoration or repair of the Property, if the restoration or repair is economically feasible and Lender's security is not lessened. During such repair and restoration period, Lender shall have the right to hold such Miscellaneous Proceeds until Lender has had an opportunity to inspect such Property to ensure the work has been completed to Lender's satisfaction, provided that such inspection shall be undertaken promptly. Lender may pay for the repairs and restoration in a single disbursement or in a series of progress payments as the work is completed. Unless an agreement is made in writing or Applicable Law requires interest to be paid on such Miscellaneous Proceeds, Lender shall not be required to pay Borrower any interest or earnings on such Miscellaneous Proceeds. If the restoration or repair is not economically feasible or Lender's security would be lessened, the Miscellaneous Proceeds shall be applied to the sums secured by this Security Instrument, whether or not then due, with the excess, if any, paid to Borrower. Such Miscellaneous Proceeds shall be applied in the order provided for in Section 2.

In the event of a total taking, destruction, or loss in value of the Property, the Miscellaneous Proceeds shall be applied to the sums secured by this Security Instrument, whether or not then due, with the excess, if any, paid to Borrower.

In the event of a partial taking, destruction, or loss in value of the Property in which the fair market value of the Property immediately before the partial taking, destruction, or loss in value is equal to or greater than the amount of the sums secured by this Security Instrument immediately before the partial taking, destruction, or loss in value, unless Borrower and Lender otherwise agree in writing, the sums secured by this Security Instrument shall be reduced by the amount of the Miscellaneous Proceeds multiplied by the following fraction: (a) the total amount of the sums secured immediately before the partial taking, destruction, or loss in value divided by (b) the fair market value of the Property immediately before the partial taking, destruction, or loss in value. Any balance shall be paid to Borrower.

In the event of a partial taking, destruction, or loss in value of the Property in which the fair market value of the Property immediately before the partial taking, destruction, or loss in value is less than the amount of the sums secured immediately before the partial taking, destruction, or loss in value, unless Borrower and Lender otherwise agree in writing, the Miscellaneous Proceeds shall be applied to the sums secured by this Security Instrument whether or not the sums are then due.

If the Property is abandoned by Borrower, or if, after notice by Lender to Borrower that the Opposing Party (as defined in the next sentence) offers to make an award to settle a claim

0340176
WHEATLEY

# HS551PG245

for damages, Borrower fails to respond to Lender within 30 days after the date the notice is given, Lender is authorized to collect and apply the Miscellaneous Proceeds either to restoration or repair of the Property or to the sums secured by this Security Instrument, whether or not then due. "Opposing Party" means the third party that owes Borrower Miscellaneous Proceeds or the party against whom Borrower has a right of action in regard to Miscellaneous Proceeds.

Borrower shall be in default if any action or proceeding, whether civil or criminal, is begun that, in Lender's judgment, could result in forfeiture of the Property or other material impairment of Lender's interest in the Property or rights under this Security Instrument. Borrower can cure such a default and, if acceleration has occurred, reinstate as provided in Section 19, by causing the action or proceeding to be dismissed with a ruling that, in Lender's judgment, precludes forfeiture of the Property or other material impairment of Lender's interest in the Property or rights under this Security Instrument. The proceeds of any award or claim for damages that are attributable to the impairment of Lender's interest in the Property are hereby assigned and shall be paid to Lender.

All Miscellaneous Proceeds that are not applied to restoration or repair of the Property shall be applied in the order provided for in Section 2.

**12. Borrower Not Released; Forbearance By Lender Not a Waiver.** Extension of the time for payment or modification of amortization of the sums secured by this Security Instrument granted by Lender to Borrower or any Successor in Interest of Borrower shall not operate to release the liability of Borrower or any Successors in Interest of Borrower. Lender shall not be required to commence proceedings against any Successor in Interest of Borrower or to refuse to extend time for payment or otherwise modify amortization of the sums secured by this Security Instrument by reason of any demand made by the original Borrower or any Successors in Interest of Borrower. Any forbearance by Lender in exercising any right or remedy including, without limitation, Lender's acceptance of payments from third persons, entities or Successors in Interest of Borrower or in amounts less than the amount then due, shall not be a waiver of or preclude the exercise of any right or remedy.

**13. Joint and Several Liability; Co-signers; Successors and Assigns Bound.** Borrower covenants and agrees that Borrower's obligations and liability shall be joint and several. However, any Borrower who co-signs this Security Instrument but does not execute the Note (a "co-signer"): (a) is co-signing this Security Instrument only to mortgage, grant and convey the co-signer's interest in the Property under the terms of this Security Instrument; (b) is not personally obligated to pay the sums secured by this Security Instrument; and (c) agrees that Lender and any other Borrower can agree to extend, modify, forbear or make any accommodations with regard to the terms of this Security Instrument or the Note without the co-signer's consent.

Subject to the provisions of Section 18, any Successor in Interest of Borrower who assumes Borrower's obligations under this Security Instrument in writing, and is approved by Lender, shall obtain all of Borrower's rights and benefits under this Security Instrument. Borrower shall not be released from Borrower's obligations and liability under this Security Instrument unless Lender agrees to such release in writing. The covenants and agreements of this Security Instrument shall bind (except as provided in Section 20) and benefit the successors and assigns of Lender.

**14. Loan Charges.** Lender may charge Borrower fees for services performed in connection with Borrower's default, for the purpose of protecting Lender's interest in the Property and rights under this Security Instrument, including, but not limited to, attorneys' fees, property inspection and valuation fees. In regard to any other fees, the absence of express authority in

6840176
WHEATLEY

## MS551PG246

this Security Instrument to charge a specific fee to Borrower shall not be construed as a prohibition on the charging of such fee. Lender may not charge fees that are expressly prohibited by this Security Instrument or by Applicable Law.

If the Loan is subject to a law which sets maximum loan charges, and that law is finally interpreted so that the interest or other loan charges collected or to be collected in connection with the Loan exceed the permitted limits, then: (a) any such loan charge shall be reduced by the amount necessary to reduce the charge to the permitted limit; and (b) any sums already collected from Borrower which exceeded permitted limits will be refunded to Borrower. Lender may choose to make this refund by reducing the principal owed under the Note or by making a direct payment to Borrower. If a refund reduces principal, the reduction will be treated as a partial prepayment without any prepayment charge (whether or not a prepayment charge is provided for under the Note). Borrower's acceptance of any such refund made by direct payment to Borrower will constitute a waiver of any right of action Borrower might have arising out of such overcharge.

**15. Notices.** All notices given by Borrower or Lender in connection with this Security Instrument must be in writing. Any notice to Borrower in connection with this Security Instrument shall be deemed to have been given to Borrower when mailed by first class mail or when actually delivered to Borrower's notice address if sent by other means. Notice to any one Borrower shall constitute notice to all Borrowers unless Applicable Law expressly requires otherwise. The notice address shall be the Property Address unless Borrower has designated a substitute notice address by notice to Lender. Borrower shall promptly notify Lender of Borrower's change of address. If Lender specifies a procedure for reporting Borrower's change of address, then Borrower shall only report a change of address through that specified procedure. There may be only one designated notice address under this Security Instrument at any one time. Any notice to Lender shall be given by delivering it or by mailing it by first class mail to Lender's address stated herein unless Lender has designated another address by notice to Borrower. Any notice in connection with this Security Instrument shall not be deemed to have been given to Lender until actually received by Lender. If any notice required by this Security Instrument is also required under Applicable Law, the Applicable Law requirement will satisfy the corresponding requirement under this Security Instrument.

**16. Governing Law; Severability; Rules of Construction.** This Security Instrument shall be governed by federal law and the law of the jurisdiction in which the Property is located. All rights and obligations contained in this Security Instrument are subject to any requirements and limitations of Applicable Law. Applicable Law might explicitly or implicitly allow the parties to agree by contract or it might be silent, but such silence shall not be construed as a prohibition against agreement by contract. In the event that any provision or clause of this Security Instrument or the Note conflicts with Applicable Law, such conflict shall not affect other provisions of this Security Instrument or the Note which can be given effect without the conflicting provision.

As used in this Security Instrument: (a) words of the masculine gender shall mean and include corresponding neuter words or words of the feminine gender; (b) words in the singular shall mean and include the plural and vice versa; and (c) the word "may" gives sole discretion without any obligation to take any action.

**17. Borrower's Copy.** Borrower shall be given one copy of the Note and of this Security Instrument.

**18. Transfer of the Property or a Beneficial Interest in Borrower.** As used in this Section 18, "Interest in the Property" means any legal or beneficial interest in the Property, including, but not limited to, those beneficial interests transferred in a bond for deed, contract for deed, installment sales contract or escrow agreement, the intent of which is the transfer of title by Borrower at a future date to a purchaser.

If all or any part of the Property or any Interest in the Property is sold or transferred (or if Borrower is not a natural person and a beneficial interest in Borrower is sold or transferred) without Lender's prior written consent, Lender may require immediate payment in full of all sums secured by this Security Instrument. However, this option shall not be exercised by Lender if such exercise is prohibited by Applicable Law.

If Lender exercises this option, Lender shall give Borrower notice of acceleration. The notice shall provide a period of not less than 30 days from the date the notice is given in accordance with Section 15 within which Borrower must pay all sums secured by this Security Instrument. If Borrower fails to pay these sums prior to the expiration of this period, Lender may invoke any remedies permitted by this Security Instrument without further notice or demand on Borrower.

**19. Borrower's Right to Reinstate After Acceleration.** If Borrower meets certain conditions, Borrower shall have the right to have enforcement of this Security Instrument discontinued at any time prior to the earliest of: (a) five days before sale of the Property pursuant to any power of sale contained in this Security Instrument; (b) such other period as Applicable Law might specify for the termination of Borrower's right to reinstate; or (c) entry of a judgment enforcing this Security Instrument. Those conditions are that Borrower: (a) pays Lender all sums which then would be due under this Security Instrument and the Note as if no acceleration had occurred; (b) cures any default of any other covenants or agreements; (c) pays all expenses incurred in enforcing this Security Instrument, including, but not limited to, reasonable attorneys' fees, property inspection and valuation fees, and other fees incurred for the purpose of protecting Lender's interest in the Property and rights under this Security Instrument; and (d) takes such action as Lender may reasonably require to assure that Lender's interest in the Property and rights under this Security Instrument, and Borrower's obligation to pay the sums secured by this Security Instrument, shall continue unchanged. Lender may require that Borrower pay such reinstatement sums and expenses in one or more of the following forms, as selected by Lender: (a) cash; (b) money order; (c) certified check, bank check, treasurer's check or cashier's check, provided any such check is drawn upon an institution whose deposits are insured by a federal agency, instrumentality or entity; or (d) Electronic Funds Transfer. Upon reinstatement by Borrower, this Security Instrument and obligations secured hereby shall remain fully effective as if no acceleration had occurred. However, this right to reinstate shall not apply in the case of acceleration under Section 18.

**20. Sale of Note; Change of Loan Servicer; Notice of Grievance.** The Note or a partial interest in the Note (together with this Security Instrument) can be sold one or more times without prior notice to Borrower. A sale might result in a change in the entity (known as the "Loan Servicer") that collects Periodic Payments due under the Note and this Security Instrument and performs other mortgage loan servicing obligations under the Note, this Security Instrument, and Applicable Law. There also might be one or more changes of the Loan Servicer unrelated to a sale of the Note. If there is a change of the Loan Servicer, Borrower will be given written notice of the change which will state the name and address of the new Loan Servicer, the address to which payments should be made and any other information RESPA requires in connection with a notice of transfer of servicing. If the Note is

6940176
WHEATLEY

MS551PG248

sold and thereafter the Loan is serviced by a Loan Servicer other than the purchaser of the Note, the mortgage loan servicing obligations to Borrower will remain with the Loan Servicer or be transferred to a successor Loan Servicer and are not assumed by the Note purchaser unless otherwise provided by the Note purchaser.

Neither Borrower nor Lender may commence, join, or be joined to any judicial action (as either an individual litigant or the member of a class) that arises from the other party's actions pursuant to this Security Instrument or that alleges that the other party has breached any provision of, or any duty owed by reason of, this Security Instrument, until such Borrower or Lender has notified the other party (with such notice given in compliance with the requirements of Section 15) of such alleged breach and afforded the other party hereto a reasonable period after the giving of such notice to take corrective action. If Applicable Law provides a time period which must elapse before certain action can be taken, that time period will be deemed to be reasonable for purposes of this paragraph. The notice of acceleration and opportunity to cure given to Borrower pursuant to Section 22 and the notice of acceleration given to Borrower pursuant to Section 18 shall be deemed to satisfy the notice and opportunity to take corrective action provisions of this Section 20.

**21. Hazardous Substances.** As used in this Section 21: (a) "Hazardous Substances" are those substances defined as toxic or hazardous substances, pollutants, or wastes by Environmental Law and the following substances: gasoline, kerosene, other flammable or toxic petroleum products, toxic pesticides and herbicides, volatile solvents, materials containing asbestos or formaldehyde, and radioactive materials; (b) "Environmental Law" means federal laws and laws of the jurisdiction where the Property is located that relate to health, safety or environmental protection; (c) "Environmental Cleanup" includes any response action, remedial action, or removal action, as defined in Environmental Law; and (d) an "Environmental Condition" means a condition that can cause, contribute to, or otherwise trigger an Environmental Cleanup.

Borrower shall not cause or permit the presence, use, disposal, storage, or release of any Hazardous Substances, or threaten to release any Hazardous Substances, on or in the Property. Borrower shall not do, nor allow anyone else to do, anything affecting the Property (a) that is in violation of any Environmental Law, (b) which creates an Environmental Condition, or (c) which, due to the presence, use, or release of a Hazardous Substance, creates a condition that adversely affects the value of the Property. The preceding two sentences shall not apply to the presence, use, or storage on the Property of small quantities of Hazardous Substances that are generally recognized to be appropriate to normal residential uses and to maintenance of the Property (including, but not limited to, hazardous substances in consumer products).

Borrower shall promptly give Lender written notice of (a) any investigation, claim, demand, lawsuit or other action by any governmental or regulatory agency or private party involving the Property and any Hazardous Substance or Environmental Law of which Borrower has actual knowledge, (b) any Environmental Condition, including but not limited to, any spilling, leaking, discharge, release or threat of release of any Hazardous Substance, and (c) any condition caused by the presence, use or release of a Hazardous Substance which adversely affects the value of the Property. If Borrower learns, or is notified by any governmental or regulatory authority, or any private party, that any removal or other remediation of any Hazardous Substance affecting the Property is necessary, Borrower shall promptly take all necessary remedial actions in accordance with Environmental Law. Nothing herein shall create any obligation on Lender for an Environmental Cleanup.

**MS551PG249**

NON-UNIFORM COVENANTS. Borrower and Lender further covenant and agree as follows:

**22. Acceleration; Remedies.** Lender shall give notice to Borrower prior to acceleration following Borrower's breach of any covenant or agreement in this Security Instrument (but not prior to acceleration under Section 18 unless Applicable Law provides otherwise). The notice shall specify: (a) the default; (b) the action required to cure the default; (c) a date, not less than 30 days from the date the notice is given to Borrower, by which the default must be cured; and (d) that failure to cure the default on or before the date specified in the notice may result in acceleration of the sums secured by this Security Instrument, foreclosure by judicial proceeding and sale of the Property. The notice shall further inform Borrower of the right to reinstate after acceleration and the right to assert in the foreclosure proceeding the non-existence of a default or any other defense of Borrower to acceleration and foreclosure. If the default is not cured on or before the date specified in the notice, Lender at its option may require immediate payment in full of all sums secured by this Security Instrument without further demand and may foreclose this Security Instrument by judicial proceeding. Lender shall be entitled to collect all expenses incurred in pursuing the remedies provided in this Section 22, including, but not limited to, attorneys' fees of          5.000          % of the amount decreed for principal and interest (which fees shall be allowed and paid as part of the decree of judgment) and costs of title evidence.

**23. Satisfaction.** Upon payment of all sums secured by this Security Instrument, this Security Instrument shall cease and become void and of no effect and Lender shall cause the entry of satisfaction to be made upon the records of this Security Instrument. Borrower shall pay all costs and fees for entering the satisfaction upon the records of this Security Instrument. Lender may charge Borrower a fee for entering the satisfaction, but only if the fee is paid to a third party for services rendered and the charging of the fee is permitted under Applicable Law.

**24. Future Advances.** This Security Instrument secures a maximum amount of up to 150% of the amount of the Note. This Security Instrument shall secure any additional loans as well as any and all present or future advances and readvances under the Note made by Lender to or for the benefit of Borrower or the Property, all of which shall be entitled to the benefits of this Security Instrument under 25 Del. Code Section 2118 and shall have the same lien priority as if the future loans, advances or readvances were made as of the date hereof including, without limitation: (a) principal, interest, late charges, fees and other amounts due under the Note or this Security Instrument; (b) all advances by Lender to Borrower or any other person to pay costs of erection, construction, alteration, repair, restoration, maintenance and completion of any improvements on the Property; (c) all advances made or costs incurred by Borrower for the payment of real estate taxes, assessments or other governmental charges, maintenance charges, insurance premiums, appraisals charges, environmental inspection, audit, testing or compliance costs, and costs incurred by Lender for the enforcement and protection of the Property or the lien of this Security Instrument; and (d) all legal fees, costs and other expenses incurred by Lender by reason of any default or otherwise in connection with the Note. Borrower agrees that if, at any time during the term of this Security Instrument or following a foreclosure hereof, Borrower fails to perform or observe any covenant or obligation under this Security Instrument including, without limitation, payment of any of the foregoing, Lender may (but shall not be obligated to) take such steps as are reasonably necessary to remedy any such nonperformance or nonobservance and provide

MS551PG250

payment thereof. All amounts advanced by Lender shall be added to the amount secured by this Security Instrument and shall be due and payable promptly after demand, together with interest at the rate of interest in effect under the Note, such interest to be calculated from the date of such advance to the date of repayment thereof. Borrower's obligations hereunder shall be continuing and shall survive notwithstanding a foreclosure of this Security Instrument.

BY SIGNING BELOW, Borrower accepts and agrees to the terms and covenants contained in this Security Instrument and in any Rider executed by Borrower and recorded with it.

Signed, sealed and delivered in the presence of:

_____            _____ (Seal)
                                             LLOYD J WHEATLEY              -Borrower

_____            _____ (Seal)
        as to both                           AUDRIA L WHEATLEY            -Borrower


_____ (Seal)     _____ (Seal)
                   -Borrower                                    -Borrower


_____ (Seal)     _____ (Seal)
                   -Borrower                                    -Borrower


_____ (Seal)     _____ (Seal)
                   -Borrower                                    -Borrower


241441 (rev06 11/00) [144116]          Page 16 of 17              Form 3008 1/01

                                                                          JGM

A - 67

MS551PG251

STATE OF DELAWARE,                          *Kent*  County ss:

This instrument was acknowledged before me on     8/13/04        by

*Lloyd J. Wheatley & Audria L. Wheatley*


My Commission Expires:



_____ ~~~~~~~~~
                          Notary Public

JOHN I. ELLIS
AUTHORIZED TO PERFORM
NOTARIAL ACTS PURSUANT
TO DELAWARE LAW
TITLE 29§ 4323 (a) (3)

HS551PG252

Lloyd & Audria Wheatley
584 North Dupont Highway

ALL that certain lot, piece or parcel of land situated in the City of Dover, Kent County, State of Delaware, lying on the westerly side of U.S. Route 13, being bounded as follows; on the North and South by lands now or late of Peter Aigner, on the East by U.S. Route 13, also known as "North Dupont Highway", on the West by Silver Lake, as shown on a survey plan prepared by McClure Associates Inc., dated 7/6/04, file#MA:06-42-04 and more particularly described as follows:

BEGINNING at a point in the westerly line of U.S. Route 13, a corner for this lot and for said lands of Aigner, said point located a distance of 514.3 feet from a found concrete monument at the intersection of the westerly line of U.S. Route 13 with the northerly line of Garden Lane, thence from said beginning point the following six (6) courses and distances;

(1) with said lands of Aigner for the first three courses and distances, South 58 deg. 17 min. 40 sec. West a distance of 90.00 feet to a found re-bar,

(2) thence, North 29 deg. 27 min. 55 sec. West a distance of 10.00 feet to a found re-bar,

(3) thence, South 58 deg. 17 min. 40 sec. West a distance of 111.50 feet to a point at the waters edge of Silver Lane,

(4) thence with the same, North 14 deg. 39 min. 13 sec. West a distance of 94.63 feet to a point, a corner for said lands of Aigner,

(5) thence with said Aigner lands, North 60 deg. 05 min. 05 sec. East a distance of 177.16 feet to a point in the westerly line of U.S. Route 13, said point also located South 65 deg. 59 min. East a distance of 0.6 feet from a found iron pipe,

(6) thence with said line of U.S. Route 13, South 29 deg. 27 min. 55 sec. East a distance of 95 feet to a point, the point of beginning.

Containing within said metes and bounds 0.403 acre of land, more or less, known as #584 North Dupont Highway.

A - 69

## CERTIFICATE OF SERVICE

I, Michael J. Barrie, certify that the forgoing Appendix of Exhibits to the Opening Brief of Defendants Wachovia Mortgage Corporation and Wachovia Corporation In Support of Dismiss Plaintiffs' Complaint Pursuant to Federal Rule of Civil Procedure 12(b)(6) has been electronically filed and is available to be viewed and downloaded on the Court's ECF website. I further certify that I have served a copy of this Appendix upon the following by overnight mail:

John S. Grady, Esquire
Grady & Hampton, LLC
6 North Bradford Street
Dover, DE 19904

/s/ Michael J. Barrie

September 20, 2006