# IN THE UNITED STATES DISTRICT COURT

# FOR THE DISTRICT OF DELAWARE

|  |  |  |
|---|---|---|
| TOLANO ANDERSON, et al., | ) | |
| | ) | |
| Plaintiffs, | ) | C.A. No. 06 CV 00567 (SLR) |
| | ) | |
| v. | ) | |
| | ) | |
| WACHOVIA MORTGAGE CORPORATION | ) | |
| *and* WACHOVIA CORPORATION, | ) | |
| | ) | |
| Defendants. | ) | |
| | ) | |

---

## OPENING BRIEF OF DEFENDANTS WACHOVIA MORTGAGE CORPORATION AND WACHOVIA CORPORATION IN SUPPORT OF THEIR MOTION TO DISMISS PLAINTIFFS' AMENDED COMPLAINT PURSUANT TO FEDERAL RULE OF CIVIL PROCEDURE 12(b)(6)

---

*Of Counsel*
Elizabeth K. Ainslie
Stephen A. Fogdall
Schnader Harrison Segal & Lewis LLP
1600 Market Street, Suite 3600
Philadelphia, PA 19103
(215) 751-2000

Michael J. Barrie
Schnader Harrison Segal & Lewis LLP
824 N. Market Street
10th Floor, Suite 1001
Wilmington, DE 19801-3011
(302) 888-4554

*Counsel for Defendants Wachovia Mortgage Corporation*
*and Wachovia Corporation*

October 23, 2006

# TABLE OF CONTENTS

TABLE OF AUTHORITIES ............................................................................. ii

STATEMENT OF THE NATURE AND STAGE OF THE PROCEEDING .................... 1

SUMMARY OF ARGUMENT .......................................................................... 4

CONCISE STATEMENT OF FACTS ............................................................... 6

ARGUMENT ............................................................................................ 12

I.      Plaintiffs' Claims Under ECOA And Section 1981 Are Time Barred ................. 12

II.     Plaintiffs Fail To State A Claim Under ECOA Or Under Section 1981 ............. 15

III.    Plaintiffs Fail To State A Claim Under Delaware Contract Law ......................... 18

CONCLUSION .......................................................................................... 25

CERTIFICATE OF SERVICE

# TABLE OF AUTHORITIES

## FEDERAL CASES

*Andrews v. Abbott Labs.*, 2002 U.S. Dist. LEXIS 6832 (D. Del. Apr. 18, 2002)....... 13, 14

*Brown v. Interbay Funding, LLC*, 417 F. Supp. 2d 573 (D. Del. 2006) .......................... 18

*Floyd v. Saturn of Newark*, 2006 U.S. Dist. LEXIS 2466 (D. Del. Jan. 24, 2006) .... 13, 18

*Gemini Phys. Therapy & Rehab., Inc. v. State Farm Mut. Auto. Ins. Co.,*
    40 F.3d 63 (3d Cir. 1994)........................................................................................ 20

*General Bldg. Contractors Ass'n v. Pennsylvania,* 458 U.S. 375 (1982)......................... 15

*Jones v. R.R. Donnelly & Sons Co.,* 511 U.S. 369 (2004)...................................... 5, 14, 15

*Latimore v. Citibank Federal Sav. Bank*, 151 F.3d 712 (7ᵗʰ Cir. 1998)..................... 16, 18

*McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973) .................................. 16, 17, 18

*Monahan v. City of Wilmington*, 2004 U.S. Dist. LEXIS 1322 (D. Del. Jan. 30,
    2004) ....................................................................................................................... 13

*Patterson v. McLean Credit Union,* 491 U.S. 164 (1989) ............................................... 15

*Pension Benefit Guaranty Corp. v. White Consolidated Industrial, Inc.*, 998 F.2d
    1192 (3d Cir. 1993)................................................................................................. 10

*Powell v. American General Finance, Inc.*, 310 F. Supp. 2d 481 (N.D.N.Y. 2004) ........ 16

*Swierkiewicz v. Sorema, N.A.,* 534 U.S. 506 (2002).......................................................... 17

*Wright v. Pepsi Cola Co.*, 243 F. Supp. 2d 117 (D. Del. 2003)........................................ 12

## STATE CASES

*American Homepatient, Inc. v. Collier*, 2006 Del. Ch. LEXIS 79 (Apr. 19, 2006) ......... 19

*Daystar Constr. Mgmt., Inc. v. Mitchell,* 2006 Del. Super. LEXIS 286 (Del.
    Super. Ct. July 12, 2006) ........................................................................................ 23

*Little Peoples, Inc. v. Robin's Nest Child Care, Inc.*, 1996 Del. Super. LEXIS 266
    (July 18, 1996) ........................................................................................................ 19

*Pierce v. International Insurance Co. of Illinois*, 671 A.2d 1361 (Del. 1996) ................. 21

*Wallace v. Wood*, 752 A.2d 1175 (Del. Ch. 1999) .......................................................... 23

## FEDERAL AND STATE STATUTES

42 U.S.C. § 1981 ...................................................................................*passim*

15 U.S.C. § 1691 ........................................................................................ 2

15 U.S.C. § 1691e .................................................................................. 4, 13

10 Del. C. § 8119 ................................................................................ 4, 5, 14

## MISCELLANEOUS

Restatement (Second) of Torts § 766A ............................................................ 20

## STATEMENT OF THE NATURE AND STAGE OF THE PROCEEDING

### A.    Nature Of The Proceeding

Plaintiffs are three African-American couples who purchased three residential properties located in Dover, Delaware.  To make these purchases, each couple obtained a loan from Wachovia.  Plaintiffs allege that as a condition of their loans, Wachovia required them to make repairs to the properties they were seeking to buy and, in one case, to increase their down payment.  Plaintiffs do not deny that the properties needed to be repaired and do not deny that the increased down payment was necessary because Wachovia could not obtain primary mortgage insurance ("PMI") for one of the loans.  Plaintiffs merely assert in retrospect that they did not want to make these expenditures.  Out of these allegations, plaintiffs attempt to manufacture claims against Wachovia for breach of contract, tortious interference with contractual relations, and race discrimination.

Plaintiffs do not allege that these purportedly unreasonable loan conditions were purposefully imposed because of their race.  Nor do they allege that other African-Americans were required to comply with such conditions.  The sole basis of plaintiffs' claim of race discrimination is that the properties they purchased allegedly were "in a white neighborhood" and "similarly situated whites" supposedly were not required to comply with these conditions.  As discussed below, this allegation is insufficient as a matter of law to state a claim for purposeful race discrimination in this context.

Plaintiffs' tortious interference and breach of contract claims also fail.  Plaintiffs' core contention is that they agreed to conditions of their loans that they now

regret.  No court ever has permitted a plaintiff to bring such claims on such allegations, and this Court should refuse to do so here.

**B.     Stage Of The Proceeding**

On August 11, 2006, plaintiffs filed a complaint in Kent County Superior Court, asserting four claims:

First, plaintiffs alleged that by requiring them to make repairs to the properties and comply with other standard loan conditions, Wachovia violated the Equal Credit Opportunity Act ("ECOA"), 15 U.S.C. § 1691(a), which forbids "any creditor to discriminate against any applicant, with respect to any aspect of a credit transaction . . . on the basis of race [or] color . . . ."  Complaint ¶¶ 75, 84, 94.

Second, plaintiffs alleged that by requiring them to comply with these loan conditions, Wachovia violated 42 U.S.C. § 1981(a), which provides that "[a]ll persons within the jurisdiction of the United States shall have the same right in every State and territory to make and enforce contracts . . . as is enjoyed by white citizens . . . ."  Complaint ¶¶ 72, 81, 91.

Third, plaintiffs alleged that by requiring them to comply with these loan conditions, Wachovia "tort[i]ous[ly] interfere[d]" with plaintiffs' contract of sale with the seller of the properties.  Complaint ¶¶ 73, 82, 92.

Fourth, plaintiffs alleged that by requiring them to comply with these loan conditions, Wachovia "breach[ed] [the] contract for a mortgage and the covenant of good faith and fair dealing in the contract to provide financing."  Complaint ¶¶ 74, 83, 93.

On September 13, 2006, Wachovia removed the action to this Court.  On September 20, 2006, Wachovia filed a motion to dismiss plaintiffs' complaint.

In its motion to dismiss, Wachovia demonstrated that all of plaintiffs' claims were subject to a two-year statute of limitations, which expired on August 6, 2006, five days before plaintiffs' filed their complaint.  Wachovia further demonstrated that plaintiffs failed to state a claim upon which relief could be granted both as to their putative discrimination claims under Section 1981 and ECOA and their contract claims under Delaware law.  Plaintiffs' claims under federal law failed because they could not allege purposeful discrimination.  Plaintiffs' claims under Delaware law failed because they could not allege any breach of contract or tortious interference with contractual relations.  At most plaintiffs' alleged that they agreed to conditions of their loans that they later wished they had not accepted.  But such allegations do not begin to support plaintiffs' contract claims.

Plaintiffs' filed an amended complaint and a brief in response to Wachovia's motion to dismiss on October 3, 2006.[1]  The amended complaint asserts the same four claims as plaintiffs' original complaint.  However, plaintiffs have withdrawn their previous allegations of emotional harm with respect to their contract claims and thus these claims no longer are subject to Delaware's two-year personal injury statute of limitations.  Accordingly, Wachovia withdraws its argument that these claims are time

---

[1]     Plaintiffs' amended complaint is attached hereto as Exhibit A.  From this point onward, unless otherwise specified, "complaint" will refer to the amended complaint.  Citations to the amended complaint are to "Am. Compl. ¶ __ ."

barred.  Wachovia's remaining arguments in its original motion to dismiss are unaffected by the amendments to plaintiffs' complaint.  Specifically, plaintiffs' claims under Section 1981 and ECOA remain subject to a two-year limitations period that expired, at the latest, five days before plaintiffs filed their complaint.  Plaintiffs still fail to allege intentional discrimination.  And, lastly, plaintiffs still fail to adequately allege claims for tortious interference or breach of contract.

On October 14, 2006, Wachovia filed a notice withdrawing its motion to dismiss plaintiffs' original complaint, and now moves to dismiss plaintiffs' amended complaint.

## SUMMARY OF ARGUMENT

1.      Plaintiffs' claims under Section 1981 and ECOA are time barred. Plaintiffs' claim under ECOA is subject to a two-year statute of limitations under 15 U.S.C. § 1691e(f).  Plaintiffs' Section 1981 claim is subject to Delaware's two-year statute of limitations for personal injury actions under 10 Del. C. § 8119.  The two-year limitations period expired five days before plaintiffs filed their complaint.

2.      Plaintiffs' claims under ECOA and Section 1981 accrued no later than August 6, 2004.  By this date, plaintiffs either had complied with or were on notice of all of the allegedly unreasonable loan conditions at issue.  Yet plaintiffs did not file their complaint until August 11, 2006.

3.      In their brief in response to Wachovia's original motion to dismiss, plaintiffs erroneously argued that their claim under Section 1981 is subject to a four-year

statute of limitations under 28 U.S.C. § 1658(a). This longer statute of limitations applies only to claims that arise under certain amendments to Section 1981 adopted in 1991. *See Jones v. R.R. Donnelly & Sons Co.,* 511 U.S. 369, 382-83 (2004). Claims that could have been brought under the pre-1991 version of the statute -- such as the claim at issue here -- still are subject to the applicable state statute of limitations for personal injury actions, *i.e.,* Delaware's two-year statute of limitations under 10 Del. C. § 8119.

4.    Plaintiffs' claims under ECOA and Section 1981 should be dismissed for the separate and independent reason that plaintiffs do not -- and cannot -- allege purposeful discrimination. Nowhere in plaintiffs' complaint do they assert that plaintiffs were required to make repairs to the properties and comply with other such standard conditions because of their race. Instead, they assert only that "similarly situated whites" were not required to comply with these conditions. Am. Compl. ¶ 67. While in certain contexts such an allegation may be sufficient to state a *prima facie* case of race discrimination, this is not one of those contexts. Moreover, plaintiffs have no claim for discrimination when, on their own allegations, they did receive the loans from Wachovia and successfully purchased the properties.

5.    Plaintiffs' claims under Delaware law for tortious interference and breach of contract also should be dismissed. Plaintiffs' tortious interference claim fails because Wachovia could not have interfered with plaintiffs' contract with the seller of the properties when that contract never was breached. On plaintiffs' own allegations, they did receive their loans and did in fact purchase the properties. In their brief in opposition to Wachovia's motion to dismiss plaintiff's original complaint, plaintiffs asserted that their claim in this case is not that Wachovia interfered with the *seller's* performance of

the contract but with *plaintiffs'* performance.  Such a theory never has been recognized by Delaware courts and has been rejected by the Third Circuit.  This Court should reject it as well.

6.     As to plaintiffs' breach of contract claim, plaintiffs cannot complain that they had to make repairs to the properties when, on their own allegations, they would have made these repairs in any event, and signed mortgage contracts in which they expressly promised to do so.  Nor can they complain that they had to increase the down payment on one of the properties when Wachovia could not obtain PMI for one of the loans.  Plaintiffs voluntarily chose to purchase these properties and chose to accept the standard conditions that these purchases entailed.  As a matter of law, plaintiffs can have no claim for breach of contract or breach of the implied covenant of good faith and fair dealing based on their voluntary acceptance of loan conditions that they now regret.

## CONCISE STATEMENT OF FACTS

### A.     Anderson's Initial Meeting With Hogsten

Plaintiffs in this action are three African-American couples:  Tolano and Cathy Anderson, Richard and Brenda Wilkins, and Dr. Lloyd and Audria Wheatley.

According to plaintiffs, in June 2004, Tolano Anderson contacted J.D. Hogsten at Wachovia about plaintiffs' plans to purchase three properties located on North DuPont Highway from a Mr. Jack Aigner.  Am. Compl. ¶ 4.  Anderson allegedly told Hogsten that "all three (3) homes had to be purchased.  And if one home was not

purchased, all of them would collectively lose [their] $40,000.00 nonrefundable deposit." Am. Compl. ¶ 6.

Plaintiffs allege that these three homes were in an "all white neighborhood." Am. Compl. ¶ 6. Plaintiffs assert that previous mortgages they obtained through Wachovia were in "predominantly minority or racially-mixed neighborhoods." Am. Compl. ¶ 3.

Hogsten informed Anderson that their loans would be subject to the satisfaction of certain conditions, including an approved appraisal of the properties. Am. Compl. ¶ 11.

## B.    The Andersons' Property

The property the Andersons intended to purchase was scheduled to be appraised shortly after Anderson's initial meeting with Hogsten. Am. Compl. ¶ 12. But, according to plaintiffs, the appraiser told Anderson that he could not appraise the house because there was damage to the basement. Am. Compl. ¶ 14. Plaintiffs do not deny that the property was damaged. Nevertheless, they assert that the appraiser refused to do the appraisal on instructions from Hogsten, "who had his own undisclosed reasons for undermining the aforesaid purchase." Am. Compl. ¶ 15.

Notably, plaintiffs do not allege that the appraiser refused to appraise the property because of their race. Nor do they allege that Hogsten acted out of racial animus in supposedly telling the appraiser not to complete the appraisal. Plaintiffs merely assert that Hogsten had "his own undisclosed reasons" for blocking the transaction.

As further evidence of Hogsten's "undisclosed reasons for undermining" plaintiffs' purchases, plaintiffs allege that Hogsten later told Anderson that he was "not going to make enough money on this transaction" because he would have to split his commission with another Wachovia loan officer who had spoken with plaintiffs. Am. Compl. ¶ 23. Plaintiffs assert that this statement showed that "Hogsten had no intention of permitting the transaction to be completed, knowing at the time that it would cost Plaintiffs $40,000 in the loss of the deposit." Am. Compl. ¶ 24.[2]

According to plaintiffs, Anderson eventually obtained an approved appraisal for the property and received a commitment letter from Wachovia for a loan. Am. Compl. ¶¶ 21, 22. Hogsten then told Anderson that his home would have to be "put into 'move in' condition" before he could obtain the loan. Am. Compl. ¶ 25. According to plaintiffs, Anderson accepted this condition and performed the necessary work to put the home into "move in" condition. Am. Compl. ¶ 33.

C.    **The Wheatleys' Property**

The property the Wheatleys intended to purchase was appraised in July 2004. Am. Compl. ¶ 35. Plaintiffs allege that the appraisal exceeded the sales price of the property. Am. Compl. ¶ 35. Nevertheless, according to plaintiffs, Hogsten informed

---

[2]    Plaintiffs' complaint leaves it a complete mystery why a Wachovia loan officer would want to intentionally undermine a loan transaction, depriving his employer of potential profits and himself of a commission, simply to cause plaintiffs the loss of $40,000. Nor do plaintiffs suggest why Hogsten would be motivated to do this simply because his commission would not be "enough money." In any event, even if this allegation were true, on its face it is not a discriminatory reason for attempting to undermine the transaction.

Wheatley that he would be "required to complete upgrades on the property to ensure that everything was in move in condition." Am. Compl. ¶ 36. Wheatley allegedly responded that he "did not want to waste thousands of dollars upgrading the house prior to settlement because he is planning custom upgrades after the settlement." Am. Compl. ¶ 37.[3] However, the Wheatleys accepted this condition and made the allegedly required upgrades. Am. Compl. ¶ 43.

### D. The Wilkins' Loan Application

Plaintiffs allege that when Dr. Wilkins applied for the Wilkins' loan, Hogsten informed him that he would have to "prove that the funds used for the deposit were his money and show its source." Am. Compl. ¶ 30. Plaintiffs assert that "[t]his is not normal customary practice of the bank," Am. Compl. ¶ 31.[4]

Plaintiffs also allege that "because of the problems incurred in the financing of the three houses," the Wilkins made "unnecessary trips" to Dover from their home in Kansas "to deal directly with Hogsten and Wachovia." Am. Compl. ¶ 89. These trips allegedly cost the Wilkins $5,400.00.

---

[3]     Plaintiffs make no attempt to explain why it would be a "waste" to make upgrades to the house, particularly when the Wilkins already were planning to make "custom upgrades."

[4]     In fact it is a standard procedure in loan underwriting known as "sourcing and seasoning" the borrower's funds. *See, e.g*, http://www.mortgageunderwriters.com/prepare.html (advising home buyers that "[l]enders must see that you have had the [funds to close] for three months, [and] they must see where it came from.").

**E.      Settlement Of The Properties**

The Anderson and Wilkins settlements were completed on August 6, 2004.  Am. Compl. ¶ 46, 68.  At the closing, both the Andersons and the Wilkins signed mortgage contracts in which they expressly promised to "promptly repair the Property if damaged."[5]

Plaintiffs allege that the settlement for the Wheatley property could not be completed on August 6, 2004 because "Wachovia was unable to obtain the PMI" for the Wheatley home.  Am. Compl. ¶ 61.  Hogsten informed plaintiffs that, as a result, the Wheatleys would need to put down an additional 15% on the home (to bring their down payment up to 20%).  Am. Compl. ¶ 53, 56.  According to plaintiffs, this was "an unexpected surprise and Wheatley was not prepared for the charge."  Am. Compl. ¶ 54.

Plaintiffs assert that at this point "the Seller, in view of what he perceived as improper conduct by the bank, agreed not to void the entire transactions."  Am. Compl. ¶ 57.  But plaintiffs allegedly still would lose the $40,000.00 deposit if the sale of the Wheatley property was not completed.  Am. Compl. ¶ 58.

The settlement of the Wheatley property was rescheduled for August 13, 2004.  Am. Compl. ¶ 63.

---

[5]      Exhibit B at 8, Exhibit C at 8.  The Court properly may consider these mortgage contracts without converting this motion into one for summary judgment.  *See, e.g., Pension Benefit Guar. Corp. v. White Consolidated Indus., Inc.,* 998 F.2d 1192, 1196 (3d Cir. 1993).

When Wachovia reiterated that the Wheatleys would be required to increase their down payment to 20%, Aigner allegedly called Wachovia and stated that "he was aware of the bank's inappropriate conduct and that the scheduled settlement was being sabotaged."  Am. Compl. ¶ 65.  At that point, allegedly, a "Mr. Skowronski intervened and approved the release of the loan documents."  Am. Compl. ¶ 65.

Upon release of the loan documents, the Wheatleys agreed to make the additional down payment and, like the Andersons and the Wilkins, signed a mortgage contract in which they expressly promised to "promptly repair the Property if damaged."[6]

At no point in any of these events do plaintiffs assert that Hogsten or any other Wachovia employee purposefully discriminated against them.  Plaintiffs do not allege that anyone at Wachovia ever commented on plaintiffs' race, or expressed any discriminatory motive or racial animus.  Plaintiffs do not allege that Wachovia imposed "unreasonable" loan conditions on other African-Americans.  Plaintiffs merely allege that "[s]imilarly situated whites were not required to meet all the requirements imposed upon the Plaintiffs to be eligible for a mortgage."  Am. Compl. ¶ 67.

Plaintiffs allege that "a week or two" before the August 6, 2004 settlement of the Andersons' and Wilkins' properties, "Hogsten told Wheatley that he would be watched."  Am. Compl. ¶ 68.  Plaintiffs give no indication why Hogsten would have

---

[6]    *See* Exhibit D at 8.  The Wheatleys' mortgage contract shows that their loan was for $213,330.00, which is 79.9% of the $267,000 purchase price of the property. *See* Exhibit D at 2.

needed to "watch" Wheatley, and they make no allegation that Wheatley would be "watched" because of his race.

Similarly, plaintiffs allege that Hogsten told Anderson he "had better be careful because the Bank would be watching him." Am. Compl. ¶ 68. Plaintiffs allege that Anderson "interpreted this as a veiled threat by the Bank that the Andersons would be subject to an unusually high degree of scrutiny." Am. Compl. ¶ 68. Again, plaintiffs do not allege why Wachovia would be "watching" the Andersons, and plaintiffs make no allegation that the Andersons would be "subject to an unusually high degree of scrutiny" because of their race.

## ARGUMENT

In resolving this motion, the Court applies the familiar standard of accepting all of plaintiffs' factual allegations as true and drawing all *reasonable* inferences in plaintiffs' favor. *Wright v. Pepsi Cola Co.,* 243 F. Supp. 2d 117, 120 (D. Del. 2003). Here there is no reasonable inference that Wachovia purposefully discriminated against plaintiffs, given the bare assertion that they purchased properties "in a white neighborhood" and "similarly situated whites" were not required to comply with comparable loan conditions. Plaintiffs' may not use the Rule 12(b)(6) standard to boot-strap an inference of racial animus.

## I.     Plaintiffs' Claims Under ECOA and Section 1981 Are Time Barred.

Plaintiffs' race discrimination claims under ECOA and Section 1981 are subject to a two-year statute of limitations. On plaintiffs' allegations, any actionable

conduct by Wachovia occurred on or before August 6, 2004, when the Andersons' and

Wilkins' transactions closed. Am. Compl. ¶ 68. By that date, the Andersons and the

Wheatleys had made the required repairs to their homes, and the Wheatleys had been

informed that an additional down payment would be necessary. Am. Compl. ¶ 53, 56.

Plaintiffs did not file their complaint until August 11, 2006. *See* Exhibit A at 1. Thus,

plaintiffs' race discrimination claims were filed five days too late.

### A.    Plaintiffs' ECOA Claim Is Untimely.

An action under ECOA "shall be brought within two years from the date

of the occurrence of the violation." 15 U.S.C. § 1691e(f); *see also Floyd v. Saturn of

Newark,* 2006 U.S. Dist. LEXIS 2466, *13 (D. Del. Jan. 24, 2006) ("Affirmative claims

under the ECOA are subject to a two year statute of limitations.").

On plaintiffs' own allegations, any actionable race discrimination that

plaintiffs could have experienced occurred on or prior to August 6, 2004. All of the

allegedly discriminatory terms of plaintiffs' loans had been imposed by this date:  the

repairs to the Anderson and Wheatley homes were complete and the Wheatleys had been

informed that they would need to increase their down payment. Plaintiffs' complaint was

not filed until August 11, 2006. Hence, plaintiffs' claims under ECOA are time barred.

### B.    Plaintiffs' Section 1981 Claim Is Untimely.

Claims under Section 1981 "are characterized as personal injury claims,"

subject to Delaware's two year statute of limitations for such actions. *Monahan v. City of

Wilmington,* 2004 U.S. Dist. LEXIS 1322, *8 (D. Del. Jan. 30, 2004); *see also Andrews*

*v. Abbott Labs.,* 2002 U.S. Dist. LEXIS 6832, *16 (D. Del. Apr. 18, 2002) ("The statute

of limitations applicable to Section 1981 claims is the Delaware two-year personal injury

statute of limitations.");   10 Del. C. § 8119 ("No action brought for the recovery of

damages upon a claim for alleged personal injuries shall be brought after the expiration of

2 years from the date upon which it is claimed that such alleged injuries were

sustained.").

       Thus, as with plaintiffs' claims under ECOA, plaintiffs' Section 1981

claims are time barred.  Plaintiffs' claim is that Wachovia insisted on conditions to their

loans that Wachovia allegedly does not impose on white borrowers.  If plaintiffs ever had

a cause of action -- which they did not -- it accrued, at the latest, on August 6, 2004, the

date the Andersons' and Wilkins' transactions closed, and the Wheatleys were told they

would have to increase their down payment.  Am. Compl. ¶ 53, 56.  Because plaintiffs'

complaint was not filed until August 11, 2006, their Section 1981 claims are barred by

Delaware's two-year personal injury statute of limitations.

       In their brief in opposition to Wachovia's motion to dismiss their initial

complaint, plaintiffs erroneously argued that their Section 1981 claim is subject to a four-

year statute of limitations under 28 U.S.C. § 1658.  *See* Plaintiffs' Answering Brief in

Opposition to Defendants' Motion to Dismiss Pursuant to Rule 12(b)(6) ("Pls. Brf.") at

19-20.  This argument is based on a misreading of *Jones v. R.R. Donnelly & Sons Co,* 541

U.S. 369 (2004).

       As the Supreme Court made clear in *Jones,* the new four-year statute of

limitations applies only to claims under Section 1981 that were made possible by the

1991 amendments to the statute. Prior to 1991, Section 1981 permitted claims, such as the claim asserted here, based on "the offer to make a contract only on discriminatory terms." *Patterson v. McLean Credit Union,* 491 U.S. 164, 177 (1989). In 1991, Section 1981 was amended to permit hostile work environment claims and other claims for discrimination within an ongoing employment relationship. *Jones,* 541 U.S. at 373. Only claims made possible by these amendments are governed by the longer four-year limitations period. *Id.* at 382-83. Claims that were cognizable under Section 1981 prior to the 1991 amendments -- such as claims based, as here, on a refusal to contract except on discriminatory terms -- still are governed by the applicable state statute of limitations for personal injury actions. *Id.*; *see also Jones v. GPU, Inc.,* 234 F.R.D. 82, 87 (E.D. Pa. 2005) ("Because plaintiffs' allegation that starting salaries were set in a racially discriminatory fashion was actionable under the original § 1981, it is not affected by § 1658, and a two-year statute of limitations, borrowed from state law, applies.").

On plaintiffs' own characterization of their claim, Wachovia "created unreasonable conditions for the approval of the loans," conditions that allegedly were not imposed on whites. Pls. Brf. at 13. Such a claim squarely falls under the pre-1991 version of Section 1981, *see Patterson,* 491 U.S. at 177, and therefore is subject to the shorter two-year statute of limitations. Plaintiffs' Section 1981 claim is time barred.

## II.    Plaintiffs Fail To State A Claim Under ECOA Or Under Section 1981.

Plaintiffs' discrimination claims cannot survive without allegations that Wachovia's acts were purposefully discriminatory. *See, e.g., General Bldg. Contractors Ass'n v. Pennsylvania,* 458 U.S. 375, 391 (1982) ("[Section] 1981 . . . can be violated

15

only by purposeful discrimination.").[7]  Plaintiffs make no such allegations here.  They

simply assert that they purchased properties "in a white neighborhood" and "[s]imilarly

situated whites were not required to meet all the requirements imposed upon the Plaintiffs

to be eligible for a mortgage."  Am. Compl. ¶ 67.  These are not allegations of purposeful

discrimination.

Plaintiffs appear to assume (erroneously) that they may rely at the

*pleading* stage on a "burden-shifting" framework such as courts frequently apply at the

*summary judgment stage* in cases of alleged employment discrimination.  This

framework, first adopted by the Supreme Court in *McDonnell Douglas Corp. v. Green,*

411 U.S. 792 (1973), has been aptly explained by the Seventh Circuit as follows:

> Under [the *McDonnell Douglas*] standard, in a typical case of
> employment discrimination, involving say the denial of a
> promotion to a black employee, the plaintiff would have to show
> only that he was qualified for the promotion and that a white got it
> instead, and the burden would then be on the employer to come
> forth with a noninvidious reason for why the white rather than the
> black got the promotion.

*Latimore v. Citibank Fed. Sav. Bank,* 151 F.3d 712, 713 (7th Cir. 1998).

---

[7]     Under ECOA, though not under Section 1981, some courts have recognized
"disparate impact" theories that do not depend on an allegation of purposeful
discrimination.  Plaintiffs make no attempt to employ such a theory here.  Under
this approach, "a plaintiff must identify a specific policy or practice which the
defendant has used to discriminate and must also demonstrate with statistical
evidence that the practice or policy has an adverse effect on the protected group."
*Powell v. American Gen. Fin., Inc.,* 310 F. Supp. 2d 481, 487 (N.D.N.Y. 2004).
Plaintiffs do not -- and cannot -- allege that Wachovia engages in a "policy or
practice" of discrimination.  Nor do they allege a statistically significant adverse
effect on a protected group.  Thus, in this case plaintiffs must allege purposeful
discrimination to state an ECOA claim.

There are two fatal flaws in plaintiffs' attempt to apply such a framework here. First, the Supreme Court has made clear that the *McDonnell Douglas* framework is an *evidentiary,* not a *pleading,* standard. *Swierkiewicz v. Sorema, N.A.,* 534 U.S. 506, 510 (2002). Thus, this framework may not be invoked a substitute for the necessary allegations of purposeful discrimination that claims under either Section 1981 or ECOA must contain. Plaintiffs' complaint does not contain such allegations and therefore fails to state a claim for race discrimination under either Section 1981 or ECOA.

Second, even assuming it were appropriate for a discrimination complaint to plead the elements of the *McDonnell Douglas* standard rather than plead purposeful discrimination, that framework does not apply in a case of alleged credit discrimination such as this.

To begin with, plaintiffs were never denied credit. No case ever has suggested that a plaintiff may be entitled to an inference of *purposeful* discrimination because he alleges not that a lender refused to extend him credit, but merely that a lender required him to satisfy a condition before making the loan. As Courts in this District have explained:

> [T]here is nothing demonstrating that [plaintiffs] were denied credit based on a discriminatory action. *In fact, plaintiffs were not denied credit at all.* Instead, [defendant] changed the terms originally proposed after the appraisal was submitted. Plaintiffs, however, were still qualified for a loan from [defendant] . . . albeit at a less favorable rate. Therefore, plaintiffs have failed to carry their burden to prove a prima facie case . . . .

*Brown v. Interbay Funding, LLC,* 417 F. Supp. 2d 573, 578 (D. Del. 2006) (emphasis added); *see also Floyd v. Saturn of Newark,* 2006 U.S. Dist. LEXIS 2466, *14 (D. Del.

Jan. 24, 2006) (dismissing ECOA claim where "Plaintiff does not allege that Defendant denied him credit").

Furthermore, as the Seventh Circuit explained in *Latimore*, any analogy to employment discrimination that might support application of the *McDonnell Douglas* framework fails in the context of alleged credit discrimination. In the employment discrimination context, the plaintiff alleges that he is a minority and that a non-minority was given the *same* job for which he himself applied. But in no sense does a lender give to a white person the *same* loan that it declined to give a minority. As *Latimore* explains:

> The fact that a qualified black is passed over for promotion in favor of a white has been thought sufficiently suspicious to place on the defendant the minimum burden of presenting a noninvidious reason why the black lost out. But it is the competitive situation -- the black facing off as it were against the white -- that creates the (minimal) suspicion and there is no comparable competitive situation in the usual allegation of credit discrimination. Latimore was not competing with a white person for a $51,000 loan. A bank does not announce, "We are making a $51,000 real estate loan today; please submit your applications, and we'll choose the applicant that we like best and give that applicant the loan."

*Latimore,* 151 F.3d at 714.

In short, because plaintiffs may not utilize the burden shifting framework of *McDonnell Douglas* as a substitute for alleging purposeful discrimination, their claims under ECOA and Section 1981 should be dismissed.

## III.    Plaintiffs Fail To State A Claim Under Delaware Contract Law.

Plaintiffs purport to assert two claims under Delaware law: (1) that Wachovia "tortious[ly] interfere[d] with the contractual rights and business opportunities

of the [plaintiffs] with the Sellers," Am. Compl. ¶ 73, 82, 92; and (2) that Wachovia

"breach[ed] [their] contract for a mortgage and the covenant of good faith and fair

dealing in the contract to provide financing," Am. Compl. ¶ 74, 83, 93.  Plaintiffs fail to

state a claim upon which relief can be granted as to both of these theories.

**A.    Plaintiffs Cannot Allege Tortious Interference With Contractual Relations.**

Under Delaware law, "[i]n order to recover for the intentional interference

with a contract there must be:  (1) a contract, (2) about which defendant knew and (3) an

intentional act that is a significant factor in causing the breach of such contract (4)

without justification (5) which causes injury."  *Little Peoples, Inc. v. Robin's Nest Child*

*Care, Inc.,* 1996 Del. Super. LEXIS 266, *10 (July 18, 1996).  Crucially important here is

the allegation that the defendant "caus[ed] the *breach*" of the contract.  "Without a

breach, there can be no tortious interference."  *American Homepatient, Inc. v. Collier,*

2006 Del Ch. LEXIS 79, *11 (Apr. 19, 2006).

On plaintiffs' own allegations, Aigner never breached the contract of sale

with plaintiffs.  Plaintiffs received their loans and the sales of all three properties were

successfully completed.  Hence, plaintiffs' claim that Wachovia tortiously interfered with

their contract with Aigner fails as a matter of law.

In their brief in opposition to Wachovia's motion to dismiss plaintiffs'

original complaint, plaintiffs asserted that the claim they are attempting to bring is not in

fact a claim for tortious interference with the *seller's* performance of the contract.

Pls. Brf. at 15-16.  Rather, plaintiffs are seeking to assert a cause of action unrecognized

in Delaware, and in most other states:  "intentional interference with another's performance of *his own* contract."  Restatement (Second) of Torts § 766A (emphasis added).  Under this exotic theory, a plaintiff alleges that the defendant "prevent[ed] the [*plaintiff*] from performing the contact or caus[ed] his performance to be more expensive or burdensome."  *Id.*

This theory has never been adopted by any Delaware state court, nor have Delaware courts given any indication that they would be inclined to treat it favorably. Moreover, the Third Circuit has rejected this theory of liability, holding that "causing the performance of a contract to be more costly 'as an element of proof is too speculative and subject to abuse to provide a meaningful basis for a cause of action.'"  *Gemini Phys. Therapy & Rehab., Inc. v. State Farm Mut. Auto. Ins. Co.,* 40 F.3d 63, 66 (3d Cir. 1994) (quoting *Price v. Sorrell,* 784 P.2d 614, 616 (Wyo. 1989)).

The Third Circuit's reasoning in *Gemini* applies perfectly here.  Plaintiffs' assertion that they were harmed by making repairs to their property is speculative at best, when the most likely effect of these repairs was to increase the value of their homes.  At worst, it invites just the sort of abuse the Third Circuit referred to in *Gemini* by permitting plaintiffs to capture the increase in value resulting from these repairs, while forcing Wachovia to pay for them.

Similarly, to permit plaintiffs to recover for the Wheatleys' increased down payment because this putatively made their performance of the contract of sale with Aigner more "expensive or burdensome" would permit the Wheatleys to retain the benefit of the increased equity from the down payment at no cost.

In short, plaintiffs' theory of tortious interference is unrecognized in Delaware and deeply flawed as a matter of policy.  This claim should be dismissed.

**B.    Plaintiffs Cannot Allege Breach Of Contract Or Breach Of The Implied Covenant Of Good Faith And Fair Dealing.**

Plaintiffs' sole basis for alleging that Wachovia breached "the contract for a mortgage" or breached the implied covenant of good faith and fair dealing "in the contract to provide financing" is that two of the families (the Andersons and the Wheatleys) purportedly had to comply with certain conditions before Wachovia would agree to give them loans.[8]

As to the Andersons, the only concrete allegation made is that they had to spend "$15,000 plus numerous man hours" putting their home in "move in" condition. Am. Compl. ¶ 76.  They assert that they "would not have done" this, Am. Compl. ¶ 76, despite that, on their own allegations, they were intending to *move in* to the house, Am. Compl. ¶ 5.  Similarly, as to the Wheatleys, the only concrete allegation is that they had

---

[8]    The only allegations plaintiffs make with respect to the Wilkins are that:  (1) they had to prove the source of the funds used to make their deposit; (2) they had to make unnecessary trips to Dover from Kansas; and (3) they eventually purchased the Wheatleys' home and incurred out of pocket expenses as a result.  As to (1), plaintiffs do not explain how this standard underwriting procedure could constitute a breach of contract or how, even if it did, the Wilkins suffered damages cognizable in contract as a result.  The Wilkins' allegation that they suffered "aggravation, inconvenience and humiliation," Am. Compl. ¶ 91, does not state a ground for recovery in contract.  *Cf. Pierce v. Int'l Ins. Co. of Illinois,* 671 A.2d 1361, 1367 (Del. 1996) ("Any recovery for emotional distress without accompanying physical injury must be based in tort law").  As to (2) and (3), these allegations at most would be relevant to alleged consequential damages, if plaintiffs could establish that Wachovia is liable on their contract claims.  These allegations have no relevance on the underlying issue whether Wachovia breached its contract with plaintiffs or breached the covenant of good faith and fair dealing.

to "waste" money "upgrading" the house prior to settlement, despite that, on their own allegations, they were "planning custom upgrades after the settlement."  Am. Compl. ¶ 37.[9]

These allegations do not state a claim either for breach of contract or for breach of the implied covenant of good faith and fair dealing.  First, plaintiffs can have no claim for breach of contract or breach of the covenant of good faith and fair dealing based on repairs they made to the properties because all of them signed mortgages in which they expressly promised to "promptly repair the Property if damaged."[10]  Notably, plaintiffs do not dispute in their complaint that the properties needed repairs.  They merely assert that they did not wish to make them.  But whether they wished to or not is beside the point:  making these repairs was a condition of the loans that plaintiffs voluntarily accepted when they signed their mortgage contracts.

Likewise, the Wheatleys' allegation that they were forced to increase their down payment when Wachovia could not obtain PMI for their loan fails to support a claim for breach of contract or for breach of the implied covenant of good faith and fair dealing.  Again, the Wheatleys voluntarily accepted this increased down payment when they signed their mortgage contract.[11]

---

[9]    Plaintiffs also allege that they had to get multiple appraisals for their properties.  Am. Compl. ¶¶ 20, 21, 44.  But plaintiffs make no allegation that these appraisals caused them damages cognizable in contract.

[10]    Exhibit B at 8, Exhibit C at 8, Exhibit D at 8.

[11]    *See* Exhibit D at 2.

The theory of "breach" plaintiffs are attempting to assert is unheard of. Plaintiffs' core claim is that they accepted loan conditions that they now regret accepting. But even assuming that the conditions at issue were "unreasonable," Am. Compl. ¶ 76 -- which they were not -- that would not state a claim for breach of contract. A plaintiff never is entitled to damages for accepting an unreasonable contract term.

Nor can plaintiffs state a claim for breach of contract simply by repeating the assertion that Wachovia sought to "undermine the settlement," Am. Compl. ¶ 70, or "undermine the entire transaction," Am. Compl. ¶ 27. There is no such thing as a cause of action based on a defendant's alleged attempt to undermine its own contract. *Cf. Wallace v. Wood,* 752 A.2d 1175, 1183 (Del. Ch. 1999) ("[A]n entity cannot be liable for interfering with the performance of its own contract.").

Plaintiffs also cannot argue that they were "coerced" into meeting these conditions because they did not want to lose their $40,000 deposit. Plaintiffs made a separate voluntary decision to give Aigner a nonrefundable deposit. As a matter of law, a lender is entitled to conditions to protect the collateral of the loan, without having to worry that this insistence may impose costs on the borrower that the borrower voluntarily assumed under a separate contract with a third party.[12] "The fact that the exercise of a good-faith business decision might incidentally harm the other party to the contract is of little moment in the breach analysis." *Daystar Constr. Mgmt., Inc. v. Mitchell,* 2006 Del. Super. LEXIS 286, *34-*35 (Del. Super. Ct. July 12, 2006).

---

[12] Furthermore, there simply is no credible basis to infer bad faith on Wachovia's part. There is no rational reason to suspect that Wachovia would seek to sabotage its own loan transactions simply to deprive plaintiffs of a $40,000 deposit.

Lastly, plaintiffs fail to allege any damages. On their own allegations, the Wheatleys were "planning custom upgrades" to their property in any event, and the Andersons would indeed be "mov[ing] in" to their property as their primary residence. Plaintiffs cannot seriously maintain that the repairs and upgrades, or the increased down payment, were a "waste."

In sum, plaintiffs have no claim for breach of contract or for breach of the implied covenant of good faith and fair dealing. Their real contention is that they regret accepting certain conditions of their loans. As a matter of law, this cannot support a claim for damages. Plaintiffs' contract claims should be dismissed.

## CONCLUSION

For these reasons, defendants Wachovia Mortgage Corporation and Wachovia Corporation hereby respectfully ask that the Court grant this motion and dismiss plaintiffs' amended complaint in this action for failure to state a claim upon which relief can be granted.

Respectfully submitted,

/s/ Michael J. Barrie

*Of Counsel*                          Michael J. Barrie
Elizabeth K. Ainslie                  Schnader Harrison Segal & Lewis LLP
Stephen A. Fogdall                    824 N. Market Street
Schnader Harrison Segal & Lewis LLP   10th Floor, Suite 1001
1600 Market Street, Suite 3600        Wilmington, DE 19801-3011
Philadelphia, PA 19103                (302) 888-4554
(215) 751-2000

*Counsel for Defendants Wachovia Mortgage Corporation*
*and Wachovia Corporation*

Dated:  October 23, 2006

# EXHIBIT A

**IN THE UNITED STATES DISTRICT COURT**

**FOR THE DISTRICT OF DELAWARE**

| | |
|---|---|
| TOLANO ANDERSON, et al., | ) |
| | ) |
| Plaintiffs, | ) C. A. No. 06 CV 00567 (SLR) |
| | ) |
| v. | ) |
| | ) |
| WACHOVIA MORTGAGE CORPORATION | ) |
| and WACHOVIA CORPORATION, | ) |
| | ) |
| Defendants. | ) |

**AMENDED COMPLAINT**

1.      Plaintiffs are all African Americans.

2.      At all times pertinent and for several years previous, Plaintiffs Tolano Anderson, Cathy Anderson, Lloyd Wheatley, and Audria Wheatley all had bank accounts at Wachovia Bank.

3.      Prior to June 2004, Plaintiffs Tolano Anderson,(hereafter referred to as Anderson) Cathy Anderson, Lloyd Wheatley (hereafter referred to as Wheatley), and Audria Wheatley  between them had approximately <u>eight (8)</u> mortgages <u>at Wachovia Bank.  The previous mortgages were all in predominantly minority or racially-mixed neighborhoods.</u>

4.      On or about June 2004, Plaintiff Tolano Anderson contacted J. D. Hogsten, (hereafter referred to as Hogsten) a loan officer for Defendants Wachovia, and told him that the Andersons, Wilkins, and Wheatleys planned to purchase three (3) homes located on Silver Lake whose addresses are 580 North DuPont Highway, 584 [DuPont North] <u>North Dupont</u> Highway, 592 <u>North</u> DuPont Highway from Mr. Jack Aigner. <u>The homes</u>

in question were all adjacent to each other and were all in a white neighborhood in Dover, Delaware. The homes backed up to Silver Lake in Dover, Delaware.

5.    The Andersons and the Wheatleys intended to use their purchased homes as a primary residence; the Wilkins intended to use their purchased home as a secondary residence.

6.    Anderson explained to Hogsten that all three (3) homes had to be purchased. And that if one home was not purchased, all of them would collectively lose the $40,000.00 non refundable deposit, of which each had put in $13,333.33. The seller was planning to use the funds from the proceeds to invest in a 1031 exchange and for this reason it was important for him that all three properties be sold at the same time.

7.    With that in mind, Hogsten advised Anderson how to proceed with the purchases and assured him that the bank understood that the sale was an individual sale, although the Andersons, Wilkins, and Wheatleys would all take title separately to three (3) different properties.

8.    Shortly thereafter, Anderson contacted Hogsten to discuss further financial plans, however, Hogsten was unavailable. So, Anderson spoke to Ms. Deanne Wilks and asked that she give the information to Hogsten.

9.    Wachovia Corporation is a large institutional bank which provides, among other things, mortgage services to its customers and to its applicants. The Andersons and Wheatleys were ongoing customers of the bank. Wachovia Mortgage Corporation is a subsidiary of Wachovia Corporation.

10.    Anderson explained to Hogsten that throughout the transaction he would be the key person to receive all the information for the Andersons, Wilkins, and Wheatleys.

2

11.    After the agreement of sale was signed and a deposit was put down, Hogsten advised Anderson that an appraisal will be needed for all the properties.

12.    Shortly thereafter, Anderson met with an appraiser assigned to appraise his home sent by Hogsten.

13.    At the time, it appeared to Anderson that Hogsten and the appraiser appeared to know each other well. In fact, after the meeting the appraiser and Hogsten went out to lunch.

14.    Almost immediately upon meeting with the appraiser, Anderson was told by the appraiser that he could not appraise the house because there was some damage to the basement.

15.    Upon information of belief, the appraiser at that time refused to appraise the house upon the request of Hogsten, who had his own undisclosed reasons for undermining the aforesaid purchase.

16.    Hogsten then told Anderson that it would be impossible to have an appraisal because it was impossible to find comparable homes and, as a result, the bank would not be able to make the loan.

17.    Upon information of belief, Hogsten's comment that it was impossible to find other comparables was, in fact, a ruse and a second attempt to undermine the transaction of the Plaintiffs.

18.    Anderson thereafter contacted Carl Kaplin, another appraiser, who advised him that there were other comparables and, in [fact,] approximately ten (10) minutes time, faxed him several other comparable homes.

3

19.    Thereafter, Anderson advised J. D. Hogsten that there were comparables [and faxed them to him].

20.    Thereafter, Anderson asked Hogsten for another impartial appraiser for his property.

21.    Another independent appraiser did come out to appraise the property adjacent to DuPont Highway for $267,000 which was the purchase price.

22.    Shortly thereafter, a commitment letter was provided to Wilkins and Anderson.

23.    Hogsten had advised Anderson that he was not going to make enough money on this transaction because Anderson had contacted to Deanne Wilks on one occasion and because of that contact with Anderson, he had to split his commission with her.

24.    Upon information of belief, Hogsten had no intention of permitting the transaction to be completed, knowing at the time that it would cost Plaintiffs $40,000 in the loss of the deposit.

25.    After the appraisals were approved, Hogsten told Anderson that in order for the sale to be completed, he would require Anderson's home to be put into "move in" condition, even though it had been appraised for a total purchase price in the condition that it was in.

26.    On or about July 2, 2004, Dr. and Mrs. Wilkins met with Hogsten in his Wachovia office. In the conversation, Hogsten informed the couple that the home being purchased by the Andersons was "nothing more than a pile of sticks and bricks and he could assign no value to it at all".

27.    The statement by Hogsten was further evidence of his seeking to undermine the entire transaction.

4

28.    Shortly thereafter, Hogsten informed Anderson that the property had significant value as a potential commercial property.  Hogsten asked Anderson if he would change the transaction from residential to commercial and Anderson said he did not wish to do so.

29.    Shortly thereafter, the Wilkins home appraisal was completed.  The home appraised at a value exceeding the sales price.

30.    After Mr. Hogsten informed Dr. Wilkins that he was now required to prove that the funds used for the deposit was his money and show its source.

31.    This is not normal customary practice of the bank.

32.    On or about July 23, 2004, Hogsten informed Dr. Wilkins that he was required to provide documentation proving that his deposit on the home was his own money.  This again, is not customary procedure of the bank.

33.    On or about July 23, 2004, Hogsten informed Anderson that the purchase of his property could not go through.  He said that there was not enough value in the property.  At that time, Anderson advised Mr. Hogsten that the required work was nearly complete and was ready for an impartial appraiser's assessment.  On that same day, Hogsten made additional negative comments about the pending transactions to Mr. & Mrs. Anthony Wallace, who were there at the bank on another matter.

34.    After the second appraisal for the Anderson property was completed, the appraisal value was still the same as the sales price.

35.    On or about July 2004, the appraisal for the Wheatley property was completed.  The value of the appraisal exceeded the sales price.

5

36.    Despite the fact that the Wheatley property appraised above the sales price, Hogsten informed Wheatley that he was now required to complete upgrades on the property to ensure that everything was in move in condition prior to settlement.

37.    Wheatley explained that as a buyer he did not want to waste thousands of dollars upgrading the house prior to settlement because he is planning custom upgrades after the settlement. He also explained that he did not have access to the home and was not able to complete upgrades to sell his house prior to settlement. Despite the request by Wheatley, Hogsten refused to lift the bank's requirement.

38.    This was another attempt by Hogsten to undermine the sale of the properties.

39.    In order to assist Wheatley, Anderson intervened in the matter.

40.    Anderson questioned Hogsten about the bank's policy concerning appraisals, repairs, warranties, and such matters. Hogsten refused to answer his questions. Hogsten referred Anderson to a female loan officer to answer his question about the bank's policy.

41.    Anderson contacted the loan officer who told him that the bank's policies on issues of appraisals, repairs and warranties are confidential and are not available to the public. She said that the criteria used by Wachovia in such matters are for internal office use only and she could not discuss the matter.

42.    Wheatley thereafter requested of the owner access to the house so that upgrades demanded by the bank could be completed. The owner agreed.

43.    Wheatley then informed Hogsten that the required work had been completed.

44.    Hogsten sent the appraiser back to the house to conduct another appraisal. Once again, the appraisal said that the house was valued in excess of the sales price.

6

45.    All three (3) homes were finally scheduled for settlement on or about August, 2004.

46.    The Anderson and Wilkins settlements were completed.    However, the Wheatley documents were not forwarded to the closing attorney by Wachovia.

47.    Even though the settlements of Anderson and Wilkins had been completed, Anderson and Wilkins were concerned because, unless the third property was settled, as per the agreement of sale, Plaintiffs could still lose the nonrefundable deposit of $40,000 and their original plan of owning and controlling the three properties would be threatened.

48.    When Anderson learned that the settlement papers had not been sent to the office of the closing attorney, he immediately contact Hogsten and was informed that Wachovia could not send the closing papers because it needed a letter from a certified contractor saying that the roof on the Wheatley home did not have any leaks.  This was another attempt to undermine the transactions.

49.    Anderson reminded Hogsten that if all three (3) properties did not settle that day, all the sales would be voided and they would lose over $40,000 in nonrefundable deposits.  Hogsten did not care.

50.    Anderson informed Hogsten that this new requirement about the certified letter from the contractor was unacceptable.

51.    Mr. Hogsten then stated that without the letter there would be no settlement and that it appeared the whole deal was off.

52.    The Seller, angered by the banks' actions, made a phone call to arrange for his personal contractor to fax a letter per Hogsten's request.

7

53.    When Anderson informed Hogsten that the letter was in route, Hogsten stated that the bank also wanted an additional fifteen percent (15%) down payment from Wheatley before it would be sending the closing documents.  This was another attempt by Hogsten to undermine the transactions.

54.    Anderson told Hogsten that this was an unexpected surprise and Wheatley was not prepared for the change.

55.    Hogsten suggested that the Seller reduce the sale price. The Seller declined.

56.    Hogsten then said that Wheatley would have to come up with the twenty percent (20%) of the purchase or the deal was off.  This transaction all took place at the settlement office of the attorney

57.    At that point, the Seller, in view of what he perceived as improper conduct by the bank, agreed not to void the entire transactions because he felt that the bank's actions were unreasonable.

58.    At that point, the Plaintiffs nevertheless, would still be subject to a $40,000 loss of their deposit, if all three (3) transactions did not go forward.

59.    Thereafter, Wheatley did obtain the twenty percent (20%) down payment from joint accounts.  By doing so, he was informed by Hogsten that if they pay the twenty percent (20%) they would not have enough cash resolve to qualify for the loan.  This was another attempt by Hogsten to undermine the transactions.

60.    The settlement date was scheduled for Wheatley was cancelled <u>by Wachovia</u>.

61.    On August 12, 2004, Destefano informed Wheatley that Wachovia was unable to obtain the PMI for his home and that the only way around that situation was to pay twenty percent (20%) down and eliminate the PMI requirement.

62.     Anderson [attempted to contact] contacted without any success a Mr. Skowronski and Mr. Destefano from Wachovia about the reasons for denying the PMI. [This was another attempt to undermine the transaction.]

63.     Settlement was now scheduled for August 13, 2004.

64.     Wachovia now stated that a twenty percent (20%) down payment was required; however, at this time, Hogsten was on vacation at the Outer Banks.

65.     Mr. Aigner, the Seller, called Mr. Destefano at Wachovia and informed him that he was aware of the bank's inappropriate conduct and that the scheduled settlement was being sabotaged. Mr. Skowronski intervened and approved the release of the loan documents and the settlement was finally completed on August 13, 2004.

66.     Upon information of belief, the numerous requests for appraisals, house improvements, and changes in developments, and other last-minute requirements imposed upon the Andersons and the Wheatleys were a violation of internal rules and regulations of the Defendants.

67.     Similarly situated whites were not required to meet all the requirements imposed upon the Plaintiffs to be eligible for a mortgage.

68.     A week or two before the August 6, 2004, settlement, Hogsten told Wheatley that he would be watched. During the week of August 16, 2004, Hogsten contacted Anderson and told he had better be careful because the Bank would be watching him. Anderson interpreted this as a veiled threat by the Bank that the Andersons would be subject to an unusually high degree of scrutiny.

9

## COUNT ONE

### The Andersons

69.    Plaintiff Anderson incorporates by reference, paragraphs 1 through 68.

70.    Requirements made upon all the Plaintiffs to complete the settlement were designed to discourage and undermine the settlement and stop the purchase of the aforesaid homes, and interfere with the agreement of sale between the Andersons and the Sellers.

71.    In similar situations, whites are not required to go through all of the appraisals, home improvements, and financial requirements imposed upon the Andersons.

72.    The conduct of the bank violated 42 U.S.C. §1981 which prohibits racial discrimination in [contractual matters] the terms and conditions of a contract.

73.    The conduct of the Defendants constituted a [tortuous] tortious interference with the contractual rights and business opportunities of the Andersons with the Seller[s].

74.    The conduct of the Defendants constituted a breach of contract for a mortgage and the covenant of good faith and fair dealing in the contract to provide financing.

75.    The conduct of the Defendants constituted a violation of Plaintiff's rights pursuant to 15 U.S.C. §1691 and 12 C.F.R. Part 202 in that Defendants was discriminating against Plaintiffs.

76.    As a result of the Defendants' conduct, the Andersons suffered the following damage.

a. The humiliation, inconvenience and aggravation throughout the transactions.

b. The cost of approximately $15,000.00 plus numerous man hours to refinish their home in a manner which   they would not have done except for the

10

unreasonable requirement of the Bank even after the home had already been appraised for the value of the property.

[WHEREFORE, the Andersons request that this Court award them general compensatory damages, for the inconvenience, humiliation, contractual damages for $15,000.00 plus additional labor that was put in the house that would not have otherwise been necessary and which was of no value to the Andersons, plus punitive damages, and attorney's fees and costs.]

WHEREFORE, the Andersons request compensation for the following cause of actions:

1.    42 U.S.C. §1981:    Humiliation, inconvenience, and aggravation throughout the transactions, the costs of approximately $15,000.00, plus numerous man hours to refinish the home in a manner which they would not have done except for the unreasonable requirement of the bank even after the home had already been appraised for the value of the property plus attorney's fees and punitive damages and costs.

2.    Tortious interference with contractual rights and business opportunities, the costs of approximately $15,000.00, plus the value of numerous man hours to refinish the home in a manner which they would not have done except for the unreasonable requirement of the bank even after the home had already been appraised for the value of the property and punitive damages and costs.

3.    Breach of contract for a mortgage and the covenant of good faith and fair dealings, the costs of approximately $15,000.00 plus the value of numerous man hours to refinish the home in a manner which they would not have done except for the

11

unreasonable requirement of the bank even after the home had already been appraised for the value of the property and punitive damages and costs.

4.    Rights pursuant to 15 U.S.C. §1691:    The costs of approximately $15,000.00 plus the value of numerous man hours to refinish the home in a manner which they would not have done except for the unreasonable requirement of the bank even after the home had already been appraised for the value of the property plus the statutory compensation of $10,000.00 pursuant to 15 U.S.C. §1691e(d) and attorney's fees and costs.

## COUNT TWO

### The Wheatleys

77.    Plaintiffs Wheatley incorporate by reference paragraphs 1 through 68.

78.    The requirement of the refurbishing of the home and the additional down payment put a strain on the Wheatley's other business transactions which Hogsten was aware of.    After six (6) months, the Wheatleys were forced to sell which cost them approximately $3,500.00 in transfer taxes.

79.    The Wheatley's did meet the home improvement requirements and spent approximately $50,000.00, which they could not afford and which they did not intend to do, to improve their house and which they would not have otherwise spent.

80.    Because of all the unanticipated funds Wheatley had to put into the house, he did not have those funds available for his business.    Wheatley estimates that he lost another $50,000.00 in his business because of the unreasonable requirements of the bank.

81.    The conduct of the bank violated 42 U.S.C. §1981 which prohibits racial discrimination in [contractual matters] the terms and conditions of a contract.

82.    The conduct of the Defendants constituted a [tortuous] <u>tortious</u> interference with the contractual rights and business opportunities of the Wheatleys with the Seller.

83.    The conduct of the Defendants constituted a breach of the contract for a mortgage and the covenant of good faith and fair dealing in the contract to provide financing.

84.    The conduct of the Defendants constituted a violation of Wheatley's rights pursuant to 15 U.S.C. §1691 and 12 C.F.R. Part 202 in that Defendants [was] were discriminating against the Wheatleys.

[WHEREFORE, the Wheatleys request this Court award them general compensatory damages for:

a. The humiliation and inconvenience and aggravation throughout the transactions.

b. To compensate them for the damages incurred which will remain necessary for making repairs which were not needed and should not have been required by the appraisal in the amount of $50,000 plus the additional cost of prematurely selling their property which cost them $3,500.00, plus at least $50,000.00 in loss of business opportunities, plus the loss of the increase in value of their home had they been able to keep it, plus the loss of the use of $40,000.00 which was required as a down payment, plus punitive damages and attorney's fees.]

<u>WHEREFORE, the Wheatleys request this Court award them compensation for the following cause of actions:</u>

13

1.     42 U.S.C. §1981:    Humiliation,    inconvenience,    and    aggravation throughout the transactions.  The cost for making repairs which were not needed and should not have been required by the appraisal in the amount of $50,000 plus the additional cost of prematurely selling their property which cost them $3,500.00, plus at least $50,000.00 in loss of business opportunities, plus the loss of the increase in value of their home had they been able to keep it, plus the loss of the use of approximately $40,000.00 which was required as a down payment, plus punitive damages and attorney's fees and costs.

2.     Tortious interference with contractual rights and business opportunities. The cost for making repairs which were not needed and should not have been required by the appraisal in the amount of $50,000 plus the additional cost of prematurely selling their property which cost them $3,500.00, plus at least $50,000.00 in loss of business opportunities, plus the loss of the increase in value of their home had they been able to keep it, plus the loss of the use of approximately $40,000.00 which was required as a down payment, plus punitive damages and costs.

3.     Breach of contract for a mortgage and the covenant of good faith and fair dealings, plus the cost for making repairs which were not needed and should not have been required by the appraisal in the amount of $50,000 plus the additional cost of prematurely selling their property which cost them $3,500.00, plus at least $50,000.00 in loss of business opportunities, plus the loss of the increase in value of their home had they been able to keep it, plus the loss of the use of approximately $40,000.00 which was required as a down payment, plus punitive damages and costs.

14

    <u>4.</u>   <u>Rights pursuant to 15 U.S.C. §1691</u>: <u>The cost for making repairs which were not needed and should not have been required by the appraisal in the amount of $50,000 plus the additional cost of prematurely selling their property which cost them $3,500.00, plus at least $50,000.00 in loss of business opportunities, plus the loss of the increase in value of their home had they been able to keep it, plus the loss of the use of approximately $40,000.00 which was required as a down payment, plus punitive damages, plus the statutory compensation of $10,000.00 pursuant to 15 U.S.C. §1691e(d) and attorney's fees and costs.</u>

## COUNT THREE

### The Wilkins

85.   Plaintiffs Richard Wilkins and Brenda Wilkins incorporate by reference, paragraphs 1 through 68.

86.   The Wilkins entered into an agreement of sale for the purchase of three (3) homes with their friends, the Andersons and the Wheatleys, in order to own waterfront property on Silver Lake.

87.   The transaction was a joint effort depending upon all three individuals obtaining mortgage approval for the purchase of these properties.

88.   Upon the signing of the original contract, the Wilkins were confident that all three would be able to obtain financing from a reasonable lender.

[89.   The conduct and treatment of the Andersons and the Wheatleys up until August 13, 2004 subjected them to possible loss of the funds.]

89.   <u>Because of the problems incurred in the financing of the three house, it was necessary for the Wilkins to take at least three trips from their home in Kansas to</u>

Delaware in order to deal directly with Hogsten and Wachovia. The cost of these unnecessary trips was approximately $5,400.00.

90.    Furthermore, within a period of 6 months' time, because Wheatley was unable to continue to run his business and maintain his mortgage payments (because his funds had been significantly depleted by the requirements of the bank), the Wilkins purchased the Wheatley home, which cost them approximately $36,000.00 in out-of-pocket funds, some for transfer taxes, attorney's fees, and some for a necessary down payment. Had the Wilkins not been treated the way they had been and had the Wilkins been permitted to have a smaller down payment, the Wilkins would not have felt required to purchase the Wheatley home. The Wilkins were also concerned that if another individual purchased the Wheatley home the property might have been used for commercial purposes, thereby devaluing the Wilkins' home and the Andersons' home.

91.    They also experienced aggravation, inconvenience and humiliation in dealing with Wachovia Bank.

92.    The conduct of the bank violated 42 U.S.C. §1981 which prohibits racial discrimination in [contractual matters] the terms and conditions of a contract.

93.    The conduct of the Defendants constituted a [tortuous] tortious interference with the contractual rights and business opportunities of the Wilkins with the Seller[s].

94.    The conduct of the Defendants constituted a breach of contract for a mortgage and the covenant of good faith and fair dealing in the contract to provide financing.

95.    The conduct of the Defendants constituted a violation of Plaintiff's rights pursuant to 15 U.S.C. §1691 and 12 C.F.R. Part 202 in that Defendants was discriminating against Plaintiffs.

[95.   As a result of the conduct of the Defendants, the Wilkins the humiliation, inconvenience and aggravation of being treated in an inferior manner in connection with the mortgage application.

    a.   The humiliation, inconvenience and aggravation of being treated in an inferior manner in connection with the mortgage application.]

WHEREFORE, the Wilkins request compensation for the following causes of action:

    1.    42 U.S.C. §1981:   Humiliation,   inconvenience,   and   aggravation throughout the transactions, the costs of approximately $5,400.00 for 3 unnecessary trips to Delaware, plus the additional costs to purchase the Wheatleys' home, plus attorney's fees and costs.

    2.    Tortious interference with contractual rights and business opportunities. the costs of approximately $5,400.00 for three unnecessary trips to Delaware, plus the additional costs to purchase the Wheatleys' home, plus punitive damages and costs.

    3.    Breach of contract for a mortgage and the covenant of good faith and fair dealings, the costs of approximately $5,400.00 for three unnecessary trips to Delaware, plus the additional costs to purchase the Wheatleys' home, plus punitive damages and costs.

    4.    Rights pursuant to 15 U.S.C. §1691: The   costs   of   approximately $5,400.00 for three unnecessary trips to Delaware, plus the additional costs to purchase the Wheatleys' home, plus the statutory compensation of $10,000.00 pursuant to 15 U.S.C. §1691e(d) and attorney's fees and costs.

GRADY & HAMPTON, LLC

_____/S/_____John S. Grady_____
John S. Grady (I.D. 009)
6 North Bradford St.
Dover, DE 19904
(302) 678-1265
*Attorneys for Plaintiffs*

DATED:    October 3, 2006

18

# EXHIBIT B

MS54 1PG305

ANDERSON

RECEIVED FOR RECORD
Aug 12 A.D. 2004
TIME 12:43 pm
Betty Lou McKinна
RECORDER

022265

STATE DOCUMENT FEE PAID

Parcel Number: ED-05-068.09-01-20.00-000

Prepared By:     ELIZABETH ZAPPONE

Return To:     WACHOVIA MORTGAGE CORPORATION
1100 CORPORATE CENTER DRIVE - NC4723
RALEIGH, NC 27607-5066

_____ [Space Above This Line For Recording Data] _____

# MORTGAGE

MIN   100013700069957999

## DEFINITIONS

Words used in multiple sections of this document are defined below and other words are defined in Sections 3, 11, 13, 18, 20 and 21. Certain rules regarding the usage of words used in this document are also provided in Section 16.

**(A) "Security Instrument"** means this document, which is dated **August     6   2004** , together with all Riders to this document.
**(B) "Borrower"** is

**TOLANO ANDERSON**
**CATHY ANDERSON**

Borrower is the mortgagor under this Security Instrument.
**(C) "MERS"** is Mortgage Electronic Registration Systems, Inc. MERS is a separate corporation that is acting solely as a nominee for Lender and Lender's successors and assigns. **MERS is the mortgagee under this Security Instrument.** MERS is organized and existing under the laws of Delaware, and has an address and telephone of P.O. Box 2026, Flint, MI 48501-2026, tel. (888) 679-MERS.

DELAWARE - Single Family – Fannie Mae/Freddie Mac UNIFORM INSTRUMENT WITH MERS     Form 3008 1/01

241441 (rev06 11/00) [14411]     Page 1 of 17

ECZ

MS541PG306

**(D)** "Lender" is  WACHOVIA MORTGAGE CORPORATION

Lender is a  CORPORATION
organized and existing under the laws of  NORTH CAROLINA
Lender's address is  1100 CORPORATE CENTER DRIVE
RALEIGH, NC 27607-5066

**(E)** "Note" means the promissory note signed by Borrower and dated
**August      6      2004**              . The Note states that Borrower owes Lender
**Two Hundred Fifty Three Thousand Three Hundred and no/100**                        Dollars
(U.S. $  **253,300.00**                    ) plus interest. Borrower has promised to pay this
debt in regular Periodic Payments and to pay the debt in full not later than
**September      1      2034**                  .

**(F)** "Property" means the property that is described below under the heading "Transfer of
Rights in the Property."

**(G)** "Loan" means the debt evidenced by the Note, plus interest, any prepayment charges and
late charges due under the Note, and all sums due under this Security Instrument, plus
interest.

**(H)** "Riders" means all Riders to this Security Instrument that are executed by Borrower. The
following Riders are to be executed by Borrower [check box as applicable]:

| | | |
|---|---|---|
| [X] Adjustable Rate Rider | [ ] Condominium Rider | [ ] Second Home Rider |
| [ ] Balloon Rider | [ ] Planned Unit Development Rider | [ ] 1-4 Family Rider |
| [ ] VA Rider | [ ] Biweekly Payment Rider | [X] Other(s) [specify] * |
| | * LEGAL | |

**(I)** "Applicable Law" means all controlling applicable federal, state and local statutes,
regulations, ordinances and administrative rules and orders (that have the effect of law) as
well as all applicable final, non-appealable judicial opinions.

**(J)** "Community Association Dues, Fees, and Assessments" means all dues, fees,
assessments and other charges that are imposed on Borrower or the Property by a
condominium association, homeowners association or similar organization.

**(K)** "Electronic Funds Transfer" means any transfer of funds, other than a transaction
originated by check, draft, or similar paper instrument, which is initiated through an electronic
terminal, telephonic instrument, computer, or magnetic tape so as to order, instruct, or
authorize a financial institution to debit or credit an account. Such term includes, but is not
limited to, point-of-sale transfers, automated teller machine transactions, transfers initiated by
telephone, wire transfers, and automated clearinghouse transfers.

**(L)** "Escrow Items" means those items that are described in Section 3.

**(M)** "Miscellaneous Proceeds" means any compensation, settlement, award of damages, or
proceeds paid by any third party (other than insurance proceeds paid under the coverages
described in Section 5) for (i) damage to, or destruction of, the Property; (ii) condemnation or
other taking of all or any part of the Property; (iii) conveyance in lieu of condemnation; or (iv)
misrepresentations of, or omissions as to, the value and/or condition of the Property.

**(N)** "Mortgage Insurance" means insurance protecting Lender against the nonpayment of, or
default on, the Loan.

241441 (rev06 11/00) [14412]          Page 2 of 17                    Form 3008 1/01

ECZ

**(O)** "**Periodic Payment**" means the regularly scheduled amount due for (i) principal and interest under the Note, plus (ii) any amounts under Section 3 of this Security Instrument.

**(P)** "**RESPA**" means the Real Estate Settlement Procedures Act (12 U.S.C. Section 2601 et seq.) and its implementing regulation, Regulation X (24 C.F.R. Part 3500), as they might be amended from time to time, or any additional or successor legislation or regulation that governs the same subject matter. As used in this Security Instrument, "RESPA" refers to all requirements and restrictions that are imposed in regard to a "federally related mortgage loan" even if the Loan does not qualify as a "federally related mortgage loan" under RESPA.

**(Q)** "**Successor in Interest of Borrower**" means any party that has taken title to the Property, whether or not that party has assumed Borrower's obligations under the Note and/or this Security Instrument.

TRANSFER OF RIGHTS IN THE PROPERTY

This Security Instrument secures to Lender: (i) the repayment of the Loan, and all renewals, extensions and modifications of the Note; and (ii) the performance of Borrower's covenants and agreements under this Security Instrument and the Note. For this purpose, Borrower does hereby mortgage, grant and convey to MERS (solely as nominee for Lender and Lender's successors and assigns) and to the successors and assigns of MERS the following described property located in the          COUNTY                    [Type of Recording Jurisdiction]
of KENT                                          [Name of Recording Jurisdiction]:

**SEE LEGAL DESCRIPTION ATTACHED**

which currently has the address of          **580 NORTH DUPONT HIGHWAY**

[Street]

**DOVER**                                          [City],

Delaware    **19901**          [Zip Code] ("Property Address"):

TOGETHER WITH all the improvements now or hereafter erected on the property, and all easements, appurtenances, and fixtures now or hereafter a part of the property. All replacements and additions shall also be covered by this Security Instrument. All of the foregoing is referred to in this Security Instrument as the "Property." Borrower understands and agrees that MERS holds only legal title to the interests granted by Borrower in this Security Instrument, but, if necessary to comply with law or custom, MERS (as nominee for

241441 (rev06 11/00) [14413]                    Page 3 of 17                    Form 3008 1/01

ECZ

MS541PG308

Lender and Lender's successors and assigns) has the right: to exercise any or all of those interests, including, but not limited to, the right to foreclose and sell the Property; and to take any action required of Lender including, but not limited to, releasing and canceling this Security Instrument.

BORROWER COVENANTS that Borrower is lawfully seised of the estate hereby conveyed and has the right to mortgage, grant and convey the Property and that the Property is unencumbered, except for encumbrances of record. Borrower warrants and will defend generally the title to the Property against all claims and demands, subject to any encumbrances of record.

THIS SECURITY INSTRUMENT combines uniform covenants for national use and non-uniform covenants with limited variations by jurisdiction to constitute a uniform security instrument covering real property.

UNIFORM COVENANTS. Borrower and Lender covenant and agree as follows:

**1. Payment of Principal, Interest, Escrow Items, Prepayment Charges, and Late Charges.** Borrower shall pay when due the principal of, and interest on, the debt evidenced by the Note and any prepayment charges and late charges due under the Note. Borrower shall also pay funds for Escrow Items pursuant to Section 3. Payments due under the Note and this Security Instrument shall be made in U.S. currency. However, if any check or other instrument received by Lender as payment under the Note or this Security Instrument is returned to Lender unpaid, Lender may require that any or all subsequent payments due under the Note and this Security Instrument be made in one or more of the following forms, as selected by Lender: (a) cash; (b) money order; (c) certified check, bank check, treasurer's check or cashier's check, provided any such check is drawn upon an institution whose deposits are insured by a federal agency, instrumentality, or entity; or (d) Electronic Funds Transfer.

Payments are deemed received by Lender when received at the location designated in the Note or at such other location as may be designated by Lender in accordance with the notice provisions in Section 15. Lender may return any payment or partial payment if the payment or partial payments are insufficient to bring the Loan current. Lender may accept any payment or partial payment insufficient to bring the Loan current, without waiver of any rights hereunder or prejudice to its rights to refuse such payment or partial payments in the future, but Lender is not obligated to apply such payments at the time such payments are accepted. If each Periodic Payment is applied as of its scheduled due date, then Lender need not pay interest on unapplied funds. Lender may hold such unapplied funds until Borrower makes payment to bring the Loan current. If Borrower does not do so within a reasonable period of time, Lender shall either apply such funds or return them to Borrower. If not applied earlier, such funds will be applied to the outstanding principal balance under the Note immediately prior to foreclosure. No offset or claim which Borrower might have now or in the future against Lender shall relieve Borrower from making payments due under the Note and this Security Instrument or performing the covenants and agreements secured by this Security Instrument.

**2. Application of Payments or Proceeds.** Except as otherwise described in this Section 2, all payments accepted and applied by Lender shall be applied in the following order of priority: (a) interest due under the Note; (b) principal due under the Note; (c) amounts due under Section 3. Such payments shall be applied to each Periodic Payment in the order in which it became due. Any remaining amounts shall be applied first to late charges, second to any other amounts due under this Security Instrument, and then to reduce the principal balance of the Note.

If Lender receives a payment from Borrower for a delinquent Periodic Payment which includes a sufficient amount to pay any late charge due, the payment may be applied to the delinquent payment and the late charge. If more than one Periodic Payment is outstanding, Lender may apply any payment received from Borrower to the repayment of the Periodic Payments if, and to the extent that, each payment can be paid in full. To the extent that any excess exists after the payment is applied to the full payment of one or more Periodic

ECZ

ANDERSON

MS541PG309

Payments, such excess may be applied to any late charges due. Voluntary prepayments shall be applied first to any prepayment charges and then as described in the Note.

Any application of payments, insurance proceeds, or Miscellaneous Proceeds to principal due under the Note shall not extend or postpone the due date, or change the amount, of the Periodic Payments.

**3. Funds for Escrow Items.** Borrower shall pay to Lender on the day Periodic Payments are due under the Note, until the Note is paid in full, a sum (the "Funds") to provide for payment of amounts due for: (a) taxes and assessments and other items which can attain priority over this Security Instrument as a lien or encumbrance on the Property; (b) leasehold payments or ground rents on the Property, if any; (c) premiums for any and all insurance required by Lender under Section 5; and (d) Mortgage Insurance premiums, if any, or any sums payable by Borrower to Lender in lieu of the payment of Mortgage Insurance premiums in accordance with the provisions of Section 10. These items are called "Escrow Items." At origination or at any time during the term of the Loan, Lender may require that Community Association Dues, Fees, and Assessments, if any, be escrowed by Borrower, and such dues, fees and assessments shall be an Escrow Item. Borrower shall promptly furnish to Lender all notices of amounts to be paid under this Section. Borrower shall pay Lender the Funds for Escrow Items unless Lender waives Borrower's obligation to pay the Funds for any or all Escrow Items. Lender may waive Borrower's obligation to pay to Lender Funds for any or all Escrow Items at any time. Any such waiver may only be in writing. In the event of such waiver, Borrower shall pay directly, when and where payable, the amounts due for any Escrow Items for which payment of Funds has been waived by Lender and, if Lender requires, shall furnish to Lender receipts evidencing such payment within such time period as Lender may require. Borrower's obligation to make such payments and to provide receipts shall for all purposes be deemed to be a covenant and agreement contained in this Security Instrument, as the phrase "covenant and agreement" is used in Section 9. If Borrower is obligated to pay Escrow Items directly, pursuant to a waiver, and Borrower fails to pay the amount due for an Escrow Item, Lender may exercise its rights under Section 9 and pay such amount and Borrower shall then be obligated under Section 9 to repay to Lender any such amount. Lender may revoke the waiver as to any or all Escrow Items at any time by a notice given in accordance with Section 15 and, upon such revocation, Borrower shall pay to Lender all Funds, and in such amounts, that are then required under this Section 3.

Lender may, at any time, collect and hold Funds in an amount (a) sufficient to permit Lender to apply the Funds at the time specified under RESPA and (b) not to exceed the maximum amount a lender can require under RESPA. Lender shall estimate the amount of Funds due on the basis of current data and reasonable estimates of expenditures of future Escrow Items or otherwise in accordance with Applicable Law.

The Funds shall be held in an institution whose deposits are insured by a federal agency, instrumentality, or entity (including Lender, if Lender is an institution whose deposits are so insured) or in any Federal Home Loan Bank. Lender shall apply the Funds to pay the Escrow Items no later than the time specified under RESPA. Lender shall not charge Borrower for holding and applying the Funds, annually analyzing the escrow account, or verifying the Escrow Items, unless Lender pays Borrower interest on the Funds and Applicable Law permits Lender to make such a charge. Unless an agreement is made in writing or Applicable Law requires interest to be paid on the Funds, Lender shall not be required to pay Borrower any interest or earnings on the Funds. Borrower and Lender can agree in writing, however, that interest shall be paid on the Funds. Lender shall give to Borrower, without charge, an annual accounting of the Funds as required by RESPA.

If there is a surplus of Funds held in escrow, as defined under RESPA, Lender shall account to Borrower for the excess funds in accordance with RESPA. If there is a shortage of Funds held in escrow, as defined under RESPA, Lender shall notify Borrower as required by

ECZ

**MS541PG310**

RESPA, and Borrower shall pay to Lender the amount necessary to make up the shortage in accordance with RESPA, but in no more than 12 monthly payments. If there is a deficiency of Funds held in escrow, as defined under RESPA, Lender shall notify Borrower as required by RESPA, and Borrower shall pay to Lender the amount necessary to make up the deficiency in accordance with RESPA, but in no more than 12 monthly payments.

Upon payment in full of all sums secured by this Security Instrument, Lender shall promptly refund to Borrower any Funds held by Lender.

**4. Charges; Liens.** Borrower shall pay all taxes, assessments, charges, fines, and impositions attributable to the Property which can attain priority over this Security Instrument, leasehold payments or ground rents on the Property, if any, and Community Association Dues, Fees, and Assessments, if any. To the extent that these items are Escrow Items, Borrower shall pay them in the manner provided in Section 3.

Borrower shall promptly discharge any lien which has priority over this Security Instrument unless Borrower: (a) agrees in writing to the payment of the obligation secured by the lien in a manner acceptable to Lender, but only so long as Borrower is performing such agreement; (b) contests the lien in good faith by, or defends against enforcement of the lien in, legal proceedings which in Lender's opinion operate to prevent the enforcement of the lien while those proceedings are pending, but only until such proceedings are concluded; or (c) secures from the holder of the lien an agreement satisfactory to Lender subordinating the lien to this Security Instrument. If Lender determines that any part of the Property is subject to a lien which can attain priority over this Security Instrument, Lender may give Borrower a notice identifying the lien. Within 10 days of the date on which that notice is given, Borrower shall satisfy the lien or take one or more of the actions set forth above in this Section 4.

Lender may require Borrower to pay a one-time charge for a real estate tax verification and/or reporting service used by Lender in connection with this Loan.

**5. Property Insurance.** Borrower shall keep the improvements now existing or hereafter erected on the Property insured against loss by fire, hazards included within the term "extended coverage," and any other hazards including, but not limited to, earthquakes and floods, for which Lender requires insurance. This insurance shall be maintained in the amounts (including deductible levels) and for the periods that Lender requires. What Lender requires pursuant to the preceding sentences can change during the term of the Loan. The insurance carrier providing the insurance shall be chosen by Borrower subject to Lender's right to disapprove Borrower's choice, which right shall not be exercised unreasonably. Lender may require Borrower to pay, in connection with this Loan, either: (a) a one-time charge for flood zone determination, certification and tracking services; or (b) a one-time charge for flood zone determination and certification services and subsequent charges each time remappings or similar changes occur which reasonably might affect such determination or certification. Borrower shall also be responsible for the payment of any fees imposed by the Federal Emergency Management Agency in connection with the review of any flood zone determination resulting from an objection by Borrower.

If Borrower fails to maintain any of the coverages described above, Lender may obtain insurance coverage, at Lender's option and Borrower's expense. Lender is under no obligation to purchase any particular type or amount of coverage. Therefore, such coverage shall cover Lender, but might or might not protect Borrower, Borrower's equity in the Property, or the contents of the Property, against any risk, hazard or liability and might provide greater or lesser coverage than was previously in effect. Borrower acknowledges that the cost of the

ECZ

MS541PG311

insurance coverage so obtained might significantly exceed the cost of insurance that Borrower could have obtained. Any amounts disbursed by Lender under this Section 5 shall become additional debt of Borrower secured by this Security Instrument. These amounts shall bear interest at the Note rate from the date of disbursement and shall be payable, with such interest, upon notice from Lender to Borrower requesting payment.

All insurance policies required by Lender and renewals of such policies, shall be subject to Lender's right to disapprove such policies, shall include a standard mortgage clause, and shall name Lender as mortgagee and/or as an additional loss payee. Lender shall have the right to hold the policies and renewal certificates. If Lender requires, Borrower shall promptly give to Lender all receipts of paid premiums and renewal notices. If Borrower obtains any form of insurance coverage, not otherwise required by Lender, for damage to, or destruction of, the Property, such policy shall include a standard mortgage clause and shall name Lender as mortgagee and/or as an additional loss payee.

In the event of loss, Borrower shall give prompt notice to the insurance carrier and Lender. Lender may make proof of loss if not made promptly by Borrower. Unless Lender and Borrower otherwise agree in writing, any insurance proceeds, whether or not the underlying insurance was required by Lender, shall be applied to restoration or repair of the Property, if the restoration or repair is economically feasible and Lender's security is not lessened. During such repair and restoration period, Lender shall have the right to hold such insurance proceeds until Lender has had an opportunity to inspect such Property to ensure the work has been completed to Lender's satisfaction, provided that such inspection shall be undertaken promptly. Lender may disburse proceeds for the repairs and restoration in a single payment or in a series of progress payments as the work is completed. Unless an agreement is made in writing or Applicable Law requires interest to be paid on such insurance proceeds, Lender shall not be required to pay Borrower any interest or earnings on such proceeds. Fees for public adjusters, or other third parties, retained by Borrower shall not be paid out of the insurance proceeds and shall be the sole obligation of Borrower. If the restoration or repair is not economically feasible or Lender's security would be lessened, the insurance proceeds shall be applied to the sums secured by this Security Instrument, whether or not then due, with the excess, if any, paid to Borrower. Such insurance proceeds shall be applied in the order provided for in Section 2.

If Borrower abandons the Property, Lender may file, negotiate and settle any available insurance claim and related matters. If Borrower does not respond within 30 days to a notice from Lender that the insurance carrier has offered to settle a claim, then Lender may negotiate and settle the claim. The 30-day period will begin when the notice is given. In either event, or if Lender acquires the Property under Section 22 or otherwise, Borrower hereby assigns to Lender (a) Borrower's rights to any insurance proceeds in an amount not to exceed the amounts unpaid under the Note or this Security Instrument, and (b) any other of Borrower's rights (other than the right to any refund of unearned premiums paid by Borrower) under all insurance policies covering the Property, insofar as such rights are applicable to the coverage of the Property. Lender may use the insurance proceeds either to repair or restore the Property or to pay amounts unpaid under the Note or this Security Instrument, whether or not then due.

**6. Occupancy.** Borrower shall occupy, establish, and use the Property as Borrower's principal residence within 60 days after the execution of this Security Instrument and shall continue to occupy the Property as Borrower's principal residence for at least one year after

ECZ

MS541PG312

6995799
ANDERSON

the date of occupancy, unless Lender otherwise agrees in writing, which consent shall not be unreasonably withheld, or unless extenuating circumstances exist which are beyond Borrower's control.

**7. Preservation, Maintenance and Protection of the Property; Inspections.** Borrower shall not destroy, damage or impair the Property, allow the Property to deteriorate or commit waste on the Property. Whether or not Borrower is residing in the Property, Borrower shall maintain the Property in order to prevent the Property from deteriorating or decreasing in value due to its condition. Unless it is determined pursuant to Section 5 that repair or restoration is not economically feasible, Borrower shall promptly repair the Property if damaged to avoid further deterioration or damage. If insurance or condemnation proceeds are paid in connection with damage to, or the taking of, the Property, Borrower shall be responsible for repairing or restoring the Property only if Lender has released proceeds for such purposes. Lender may disburse proceeds for the repairs and restoration in a single payment or in a series of progress payments as the work is completed. If the insurance or condemnation proceeds are not sufficient to repair or restore the Property, Borrower is not relieved of Borrower's obligation for the completion of such repair or restoration.

Lender or its agent may make reasonable entries upon and inspections of the Property. If it has reasonable cause, Lender may inspect the interior of the improvements on the Property. Lender shall give Borrower notice at the time of or prior to such an interior inspection specifying such reasonable cause.

**8. Borrower's Loan Application.** Borrower shall be in default if, during the Loan application process, Borrower or any persons or entities acting at the direction of Borrower or with Borrower's knowledge or consent gave materially false, misleading, or inaccurate information or statements to Lender (or failed to provide Lender with material information) in connection with the Loan. Material representations include, but are not limited to, representations concerning Borrower's occupancy of the Property as Borrower's principal residence.

**9. Protection of Lender's Interest in the Property and Rights Under this Security Instrument.** If (a) Borrower fails to perform the covenants and agreements contained in this Security Instrument, (b) there is a legal proceeding that might significantly affect Lender's interest in the Property and/or rights under this Security Instrument (such as a proceeding in bankruptcy, probate, for condemnation or forfeiture, for enforcement of a lien which may attain priority over this Security Instrument or to enforce laws or regulations), or (c) Borrower has abandoned the Property, then Lender may do and pay for whatever is reasonable or appropriate to protect Lender's interest in the Property and rights under this Security Instrument, including protecting and/or assessing the value of the Property, and securing and/or repairing the Property. Lender's actions can include, but are not limited to: (a) paying any sums secured by a lien which has priority over this Security Instrument; (b) appearing in court; and (c) paying reasonable attorneys' fees to protect its interest in the Property and/or rights under this Security Instrument, including its secured position in a bankruptcy proceeding. Securing the Property includes, but is not limited to, entering the Property to make repairs, change locks, replace or board up doors and windows, drain water from pipes, eliminate building or other code violations or dangerous conditions, and have utilities turned on or off. Although Lender may take action under this Section 9, Lender does not have to do so and is not under any duty or obligation to do so. It is agreed that Lender incurs no liability for not taking any or all actions authorized under this Section 9.

Any amounts disbursed by Lender under this Section 9 shall become additional debt of Borrower secured by this Security Instrument. These amounts shall bear interest at the Note rate from the date of disbursement and shall be payable, with such interest, upon notice from Lender to Borrower requesting payment.

If this Security Instrument is on a leasehold, Borrower shall comply with all the provisions of the lease. If Borrower acquires fee title to the Property, the leasehold and the fee title shall not merge unless Lender agrees to the merger in writing.

**10. Mortgage Insurance.** If Lender required Mortgage Insurance as a condition of making the Loan, Borrower shall pay the premiums required to maintain the Mortgage Insurance in effect. If, for any reason, the Mortgage Insurance coverage required by Lender ceases to be available from the mortgage insurer that previously provided such insurance and Borrower was required to make separately designated payments toward the premiums for Mortgage Insurance, Borrower shall pay the premiums required to obtain coverage substantially equivalent to the Mortgage Insurance previously in effect, at a cost substantially equivalent to the cost to Borrower of the Mortgage Insurance previously in effect, from an alternate mortgage insurer selected by Lender. If substantially equivalent Mortgage Insurance coverage is not available, Borrower shall continue to pay to Lender the amount of the separately designated payments that were due when the insurance coverage ceased to be in effect. Lender will accept, use and retain these payments as a non-refundable loss reserve in lieu of Mortgage Insurance. Such loss reserve shall be non-refundable, notwithstanding the fact that the Loan is ultimately paid in full, and Lender shall not be required to pay Borrower any interest or earnings on such loss reserve. Lender can no longer require loss reserve payments if Mortgage Insurance coverage (in the amount and for the period that Lender requires) provided by an insurer selected by Lender again becomes available, is obtained, and Lender requires separately designated payments toward the premiums for Mortgage Insurance. If Lender required Mortgage Insurance as a condition of making the Loan and Borrower was required to make separately designated payments toward the premiums for Mortgage Insurance, Borrower shall pay the premiums required to maintain Mortgage Insurance in effect, or to provide a non-refundable loss reserve, until Lender's requirement for Mortgage Insurance ends in accordance with any written agreement between Borrower and Lender providing for such termination or until termination is required by Applicable Law. Nothing in this Section 10 affects Borrower's obligation to pay interest at the rate provided in the Note.

Mortgage Insurance reimburses Lender (or any entity that purchases the Note) for certain losses it may incur if Borrower does not repay the Loan as agreed. Borrower is not a party to the Mortgage Insurance.

Mortgage insurers evaluate their total risk on all such insurance in force from time to time, and may enter into agreements with other parties that share or modify their risk, or reduce losses. These agreements are on terms and conditions that are satisfactory to the mortgage insurer and the other party (or parties) to these agreements. These agreements may require the mortgage insurer to make payments using any source of funds that the mortgage insurer may have available (which may include funds obtained from Mortgage Insurance premiums).

As a result of these agreements, Lender, any purchaser of the Note, another insurer, any reinsurer, any other entity, or any affiliate of any of the foregoing, may receive (directly or indirectly) amounts that derive from (or might be characterized as ) a portion of Borrower's payments for Mortgage Insurance, in exchange for sharing or modifying the mortgage insurer's risk, or reducing losses. If such agreement provides that an affiliate of Lender takes a share of

6865799
ANDERSON

MS541PG314

the insurer's risk in exchange for a share of the premiums paid to the insurer, the arrangement is often termed "captive reinsurance." Further:

(a) Any such agreements will not affect the amounts that Borrower has agreed to pay for Mortgage Insurance, or any other terms of the Loan. Such agreements will not increase the amount Borrower will owe for Mortgage Insurance, and they will not entitle Borrower to any refund.

(b) Any such agreements will not affect the rights Borrower has - if any - with respect to the Mortgage Insurance under the Homeowners Protection Act of 1998 or any other law. These rights may include the right to receive certain disclosures, to request and obtain cancellation of the Mortgage Insurance, to have the Mortgage Insurance terminated automatically, and/or to receive a refund of any Mortgage Insurance premiums that were unearned at the time of such cancellation or termination.

11. Assignment of Miscellaneous Proceeds; Forfeiture. All Miscellaneous Proceeds are hereby assigned to and shall be paid to Lender.

If the Property is damaged, such Miscellaneous Proceeds shall be applied to restoration or repair of the Property, if the restoration or repair is economically feasible and Lender's security is not lessened. During such repair and restoration period, Lender shall have the right to hold such Miscellaneous Proceeds until Lender has had an opportunity to inspect such Property to ensure the work has been completed to Lender's satisfaction, provided that such inspection shall be undertaken promptly. Lender may pay for the repairs and restoration in a single disbursement or in a series of progress payments as the work is completed. Unless an agreement is made in writing or Applicable Law requires interest to be paid on such Miscellaneous Proceeds, Lender shall not be required to pay Borrower any interest or earnings on such Miscellaneous Proceeds. If the restoration or repair is not economically feasible or Lender's security would be lessened, the Miscellaneous Proceeds shall be applied to the sums secured by this Security Instrument, whether or not then due, with the excess, if any, paid to Borrower. Such Miscellaneous Proceeds shall be applied in the order provided for in Section 2.

In the event of a total taking, destruction, or loss in value of the Property, the Miscellaneous Proceeds shall be applied to the sums secured by this Security Instrument, whether or not then due, with the excess, if any, paid to Borrower.

In the event of a partial taking, destruction, or loss in value of the Property in which the fair market value of the Property immediately before the partial taking, destruction, or loss in value is equal to or greater than the amount of the sums secured by this Security Instrument immediately before the partial taking, destruction, or loss in value, unless Borrower and Lender otherwise agree in writing, the sums secured by this Security Instrument shall be reduced by the amount of the Miscellaneous Proceeds multiplied by the following fraction: (a) the total amount of the sums secured immediately before the partial taking, destruction, or loss in value divided by (b) the fair market value of the Property immediately before the partial taking, destruction, or loss in value. Any balance shall be paid to Borrower.

In the event of a partial taking, destruction, or loss in value of the Property in which the fair market value of the Property immediately before the partial taking, destruction, or loss in value is less than the amount of the sums secured immediately before the partial taking, destruction, or loss in value, unless Borrower and Lender otherwise agree in writing, the Miscellaneous Proceeds shall be applied to the sums secured by this Security Instrument whether or not the sums are then due.

If the Property is abandoned by Borrower, or if, after notice by Lender to Borrower that the Opposing Party (as defined in the next sentence) offers to make an award to settle a claim

241441 (rev06 11/00) [144110]          Page 10 of 17                    Form 3008 1/01

ECZ

ANDERSON

## MS541PG315

for damages, Borrower fails to respond to Lender within 30 days after the date the notice is given, Lender is authorized to collect and apply the Miscellaneous Proceeds either to restoration or repair of the Property or to the sums secured by this Security Instrument, whether or not then due. "Opposing Party" means the third party that owes Borrower Miscellaneous Proceeds or the party against whom Borrower has a right of action in regard to Miscellaneous Proceeds.

Borrower shall be in default if any action or proceeding, whether civil or criminal, is begun that, in Lender's judgment, could result in forfeiture of the Property or other material impairment of Lender's interest in the Property or rights under this Security Instrument. Borrower can cure such a default and, if acceleration has occurred, reinstate as provided in Section 19, by causing the action or proceeding to be dismissed with a ruling that, in Lender's judgment, precludes forfeiture of the Property or other material impairment of Lender's interest in the Property or rights under this Security Instrument. The proceeds of any award or claim for damages that are attributable to the impairment of Lender's interest in the Property are hereby assigned and shall be paid to Lender.

All Miscellaneous Proceeds that are not applied to restoration or repair of the Property shall be applied in the order provided for in Section 2.

**12. Borrower Not Released; Forbearance By Lender Not a Waiver.** Extension of the time for payment or modification of amortization of the sums secured by this Security Instrument granted by Lender to Borrower or any Successor in Interest of Borrower shall not operate to release the liability of Borrower or any Successors in Interest of Borrower. Lender shall not be required to commence proceedings against any Successor in Interest of Borrower or to refuse to extend time for payment or otherwise modify amortization of the sums secured by this Security Instrument by reason of any demand made by the original Borrower or any Successors in Interest of Borrower. Any forbearance by Lender in exercising any right or remedy including, without limitation, Lender's acceptance of payments from third persons, entities or Successors in Interest of Borrower or in amounts less than the amount then due, shall not be a waiver of or preclude the exercise of any right or remedy.

**13. Joint and Several Liability; Co-signers; Successors and Assigns Bound.** Borrower covenants and agrees that Borrower's obligations and liability shall be joint and several. However, any Borrower who co-signs this Security Instrument but does not execute the Note (a "co-signer"): (a) is co-signing this Security Instrument only to mortgage, grant and convey the co-signer's interest in the Property under the terms of this Security Instrument; (b) is not personally obligated to pay the sums secured by this Security Instrument; and (c) agrees that Lender and any other Borrower can agree to extend, modify, forbear or make any accommodations with regard to the terms of this Security Instrument or the Note without the co-signer's consent.

Subject to the provisions of Section 18, any Successor in Interest of Borrower who assumes Borrower's obligations under this Security Instrument in writing, and is approved by Lender, shall obtain all of Borrower's rights and benefits under this Security Instrument. Borrower shall not be released from Borrower's obligations and liability under this Security Instrument unless Lender agrees to such release in writing. The covenants and agreements of this Security Instrument shall bind (except as provided in Section 20) and benefit the successors and assigns of Lender.

**14. Loan Charges.** Lender may charge Borrower fees for services performed in connection with Borrower's default, for the purpose of protecting Lender's interest in the Property and rights under this Security Instrument, including, but not limited to, attorneys' fees, property inspection and valuation fees. In regard to any other fees, the absence of express authority in

ECZ

MS541PG316

this Security Instrument to charge a specific fee to Borrower shall not be construed as a prohibition on the charging of such fee. Lender may not charge fees that are expressly prohibited by this Security Instrument or by Applicable Law.

If the Loan is subject to a law which sets maximum loan charges, and that law is finally interpreted so that the interest or other loan charges collected or to be collected in connection with the Loan exceed the permitted limits, then: (a) any such loan charge shall be reduced by the amount necessary to reduce the charge to the permitted limit; and (b) any sums already collected from Borrower which exceeded permitted limits will be refunded to Borrower. Lender may choose to make this refund by reducing the principal owed under the Note or by making a direct payment to Borrower. If a refund reduces principal, the reduction will be treated as a partial prepayment without any prepayment charge (whether or not a prepayment charge is provided for under the Note). Borrower's acceptance of any such refund made by direct payment to Borrower will constitute a waiver of any right of action Borrower might have arising out of such overcharge.

**15. Notices.** All notices given by Borrower or Lender in connection with this Security Instrument must be in writing. Any notice to Borrower in connection with this Security Instrument shall be deemed to have been given to Borrower when mailed by first class mail or when actually delivered to Borrower's notice address if sent by other means. Notice to any one Borrower shall constitute notice to all Borrowers unless Applicable Law expressly requires otherwise. The notice address shall be the Property Address unless Borrower has designated a substitute notice address by notice to Lender. Borrower shall promptly notify Lender of Borrower's change of address. If Lender specifies a procedure for reporting Borrower's change of address, then Borrower shall only report a change of address through that specified procedure. There may be only one designated notice address under this Security Instrument at any one time. Any notice to Lender shall be given by delivering it or by mailing it by first class mail to Lender's address stated herein unless Lender has designated another address by notice to Borrower. Any notice in connection with this Security Instrument shall not be deemed to have been given to Lender until actually received by Lender. If any notice required by this Security Instrument is also required under Applicable Law, the Applicable Law requirement will satisfy the corresponding requirement under this Security Instrument.

**16. Governing Law; Severability; Rules of Construction.** This Security Instrument shall be governed by federal law and the law of the jurisdiction in which the Property is located. All rights and obligations contained in this Security Instrument are subject to any requirements and limitations of Applicable Law. Applicable Law might explicitly or implicitly allow the parties to agree by contract or it might be silent, but such silence shall not be construed as a prohibition against agreement by contract. In the event that any provision or clause of this Security Instrument or the Note conflicts with Applicable Law, such conflict shall not affect other provisions of this Security Instrument or the Note which can be given effect without the conflicting provision.

As used in this Security Instrument: (a) words of the masculine gender shall mean and include corresponding neuter words or words of the feminine gender; (b) words in the singular shall mean and include the plural and vice versa; and (c) the word "may" gives sole discretion without any obligation to take any action.

**17. Borrower's Copy.** Borrower shall be given one copy of the Note and of this Security Instrument.

MS541PG317

**18. Transfer of the Property or a Beneficial Interest in Borrower.** As used in this Section 18, "Interest in the Property" means any legal or beneficial interest in the Property, including, but not limited to, those beneficial interests transferred in a bond for deed, contract for deed, installment sales contract or escrow agreement, the intent of which is the transfer of title by Borrower at a future date to a purchaser.

If all or any part of the Property or any Interest in the Property is sold or transferred (or if Borrower is not a natural person and a beneficial interest in Borrower is sold or transferred) without Lender's prior written consent, Lender may require immediate payment in full of all sums secured by this Security Instrument. However, this option shall not be exercised by Lender if such exercise is prohibited by Applicable Law.

If Lender exercises this option, Lender shall give Borrower notice of acceleration. The notice shall provide a period of not less than 30 days from the date the notice is given in accordance with Section 15 within which Borrower must pay all sums secured by this Security Instrument. If Borrower fails to pay these sums prior to the expiration of this period, Lender may invoke any remedies permitted by this Security Instrument without further notice or demand on Borrower.

**19. Borrower's Right to Reinstate After Acceleration.** If Borrower meets certain conditions, Borrower shall have the right to have enforcement of this Security Instrument discontinued at any time prior to the earliest of: (a) five days before sale of the Property pursuant to any power of sale contained in this Security Instrument; (b) such other period as Applicable Law might specify for the termination of Borrower's right to reinstate; or (c) entry of a judgment enforcing this Security Instrument. Those conditions are that Borrower: (a) pays Lender all sums which then would be due under this Security Instrument and the Note as if no acceleration had occurred; (b) cures any default of any other covenants or agreements; (c) pays all expenses incurred in enforcing this Security Instrument, including, but not limited to, reasonable attorneys' fees, property inspection and valuation fees, and other fees incurred for the purpose of protecting Lender's interest in the Property and rights under this Security Instrument; and (d) takes such action as Lender may reasonably require to assure that Lender's interest in the Property and rights under this Security Instrument, and Borrower's obligation to pay the sums secured by this Security Instrument, shall continue unchanged. Lender may require that Borrower pay such reinstatement sums and expenses in one or more of the following forms, as selected by Lender: (a) cash; (b) money order; (c) certified check, bank check, treasurer's check or cashier's check, provided any such check is drawn upon an institution whose deposits are insured by a federal agency, instrumentality or entity; or (d) Electronic Funds Transfer. Upon reinstatement by Borrower, this Security Instrument and obligations secured hereby shall remain fully effective as if no acceleration had occurred. However, this right to reinstate shall not apply in the case of acceleration under Section 18.

**20. Sale of Note; Change of Loan Servicer; Notice of Grievance.** The Note or a partial interest in the Note (together with this Security Instrument) can be sold one or more times without prior notice to Borrower. A sale might result in a change in the entity (known as the "Loan Servicer") that collects Periodic Payments due under the Note and this Security Instrument and performs other mortgage loan servicing obligations under the Note, this Security Instrument, and Applicable Law. There also might be one or more changes of the Loan Servicer unrelated to a sale of the Note. If there is a change of the Loan Servicer, Borrower will be given written notice of the change which will state the name and address of the new Loan Servicer, the address to which payments should be made and any other information RESPA requires in connection with a notice of transfer of servicing. If the Note is

MS541PG318

sold and thereafter the Loan is serviced by a Loan Servicer other than the purchaser of the Note, the mortgage loan servicing obligations to Borrower will remain with the Loan Servicer or be transferred to a successor Loan Servicer and are not assumed by the Note purchaser unless otherwise provided by the Note purchaser.

Neither Borrower nor Lender may commence, join, or be joined to any judicial action (as either an individual litigant or the member of a class) that arises from the other party's actions pursuant to this Security Instrument or that alleges that the other party has breached any provision of, or any duty owed by reason of, this Security Instrument, until such Borrower or Lender has notified the other party (with such notice given in compliance with the requirements of Section 15) of such alleged breach and afforded the other party hereto a reasonable period after the giving of such notice to take corrective action. If Applicable Law provides a time period which must elapse before certain action can be taken, that time period will be deemed to be reasonable for purposes of this paragraph. The notice of acceleration and opportunity to cure given to Borrower pursuant to Section 22 and the notice of acceleration given to Borrower pursuant to Section 18 shall be deemed to satisfy the notice and opportunity to take corrective action provisions of this Section 20.

21. **Hazardous Substances.** As used in this Section 21: (a) "Hazardous Substances" are those substances defined as toxic or hazardous substances, pollutants, or wastes by Environmental Law and the following substances: gasoline, kerosene, other flammable or toxic petroleum products, toxic pesticides and herbicides, volatile solvents, materials containing asbestos or formaldehyde, and radioactive materials; (b) "Environmental Law" means federal laws and laws of the jurisdiction where the Property is located that relate to health, safety or environmental protection; (c) "Environmental Cleanup" includes any response action, remedial action, or removal action, as defined in Environmental Law; and (d) an "Environmental Condition" means a condition that can cause, contribute to, or otherwise trigger an Environmental Cleanup.

Borrower shall not cause or permit the presence, use, disposal, storage, or release of any Hazardous Substances, or threaten to release any Hazardous Substances, on or in the Property. Borrower shall not do, nor allow anyone else to do, anything affecting the Property (a) that is in violation of any Environmental Law, (b) which creates an Environmental Condition, or (c) which, due to the presence, use, or release of a Hazardous Substance, creates a condition that adversely affects the value of the Property. The preceding two sentences shall not apply to the presence, use, or storage on the Property of small quantities of Hazardous Substances that are generally recognized to be appropriate to normal residential uses and to maintenance of the Property (including, but not limited to, hazardous substances in consumer products).

Borrower shall promptly give Lender written notice of (a) any investigation, claim, demand, lawsuit or other action by any governmental or regulatory agency or private party involving the Property and any Hazardous Substance or Environmental Law of which Borrower has actual knowledge, (b) any Environmental Condition, including but not limited to, any spilling, leaking, discharge, release or threat of release of any Hazardous Substance, and (c) any condition caused by the presence, use or release of a Hazardous Substance which adversely affects the value of the Property. If Borrower learns, or is notified by any governmental or regulatory authority, or any private party, that any removal or other remediation of any Hazardous Substance affecting the Property is necessary, Borrower shall promptly take all necessary remedial actions in accordance with Environmental Law. Nothing herein shall create any obligation on Lender for an Environmental Cleanup.

ECZ

H S 5 4 1 P G 3 1 9

NON-UNIFORM COVENANTS. Borrower and Lender further covenant and agree as follows:

22. Acceleration; Remedies. Lender shall give notice to Borrower prior to acceleration following Borrower's breach of any covenant or agreement in this Security Instrument (but not prior to acceleration under Section 18 unless Applicable Law provides otherwise). The notice shall specify: (a) the default; (b) the action required to cure the default; (c) a date, not less than 30 days from the date the notice is given to Borrower, by which the default must be cured; and (d) that failure to cure the default on or before the date specified in the notice may result in acceleration of the sums secured by this Security Instrument, foreclosure by judicial proceeding and sale of the Property. The notice shall further inform Borrower of the right to reinstate after acceleration and the right to assert in the foreclosure proceeding the non-existence of a default or any other defense of Borrower to acceleration and foreclosure. If the default is not cured on or before the date specified in the notice, Lender at its option may require immediate payment in full of all sums secured by this Security Instrument without further demand and may foreclose this Security Instrument by judicial proceeding. Lender shall be entitled to collect all expenses incurred in pursuing the remedies provided in this Section 22, including, but not limited to, attorneys' fees of          5.000          % of the amount decreed for principal and interest (which fees shall be allowed and paid as part of the decree of judgment) and costs of title evidence.

23. Satisfaction. Upon payment of all sums secured by this Security Instrument, this Security Instrument shall cease and become void and of no effect and Lender shall cause the entry of satisfaction to be made upon the records of this Security Instrument. Borrower shall pay all costs and fees for entering the satisfaction upon the records of this Security Instrument. Lender may charge Borrower a fee for entering the satisfaction, but only if the fee is paid to a third party for services rendered and the charging of the fee is permitted under Applicable Law.

24. Future Advances. This Security Instrument secures a maximum amount of up to 150% of the amount of the Note. This Security Instrument shall secure any additional loans as well as any and all present or future advances and readvances under the Note made by Lender to or for the benefit of Borrower or the Property, all of which shall be entitled to the benefits of this Security Instrument under 25 Del. Code Section 2118 and shall have the same lien priority as if the future loans, advances or readvances were made as of the date hereof including, without limitation: (a) principal, interest, late charges, fees and other amounts due under the Note or this Security Instrument; (b) all advances by Lender to Borrower or any other person to pay costs of erection, construction, alteration, repair, restoration, maintenance and completion of any improvements on the Property; (c) all advances made or costs incurred by Borrower for the payment of real estate taxes, assessments or other governmental charges, maintenance charges, insurance premiums, appraisals charges, environmental inspection, audit, testing or compliance costs, and costs incurred by Lender for the enforcement and protection of the Property or the lien of this Security Instrument; and (d) all legal fees, costs and other expenses incurred by Lender by reason of any default or otherwise in connection with the Note. Borrower agrees that if, at any time during the term of this Security Instrument or following a foreclosure hereof, Borrower fails to perform or observe any covenant or obligation under this Security Instrument including, without limitation, payment of any of the foregoing, Lender may (but shall not be obligated to) take such steps as are reasonably necessary to remedy any such nonperformance or nonobservance and provide

241441 (rev06 11/00) [144115]          Page 15 of 17          Form 3008 1/01

ECZ

HS541PG320

payment thereof. All amounts advanced by Lender shall be added to the amount secured by this Security Instrument and shall be due and payable promptly after demand, together with interest at the rate of interest in effect under the Note, such interest to be calculated from the date of such advance to the date of repayment thereof. Borrower's obligations hereunder shall be continuing and shall survive notwithstanding a foreclosure of this Security Instrument.

BY SIGNING BELOW, Borrower accepts and agrees to the terms and covenants contained in this Security Instrument and in any Rider executed by Borrower and recorded with it.

Signed, sealed and delivered in the presence of:

_____            _____ (Seal)
                                     TOLANO ANDERSON            -Borrower

_as to both_                         _____ (Seal)
                                     CATHY ANDERSON             -Borrower

_____ (Seal)    _____ (Seal)
                   -Borrower                            -Borrower

_____ (Seal)    _____ (Seal)
                   -Borrower                            -Borrower

_____ (Seal)    _____ (Seal)
                   -Borrower                            -Borrower

MS541PG321

STATE OF DELAWARE,                                    Kent    County ss:

This instrument was acknowledged before me on    August 6, 2004    by

Tolano Anderson & Cathy Anderson

My Commission Expires:

_____
Notary Public

JOHN I. ELLIS
AUTHORIZED TO PERFORM
NOTARIAL ACTS PURSUANT
TO DELAWARE LAW
TITLE 29§ 4323 (a) (3)

MS541PG322

ALL that certain lot, piece or parcel of land situated in the City of Dover, Kent County, State of Delaware, lying on the westerly side of U.S. Route 13, being bounded as follows; on the North by Silver Lake and by lands now or late of Peter Aigner, on the East by U.S. Route 13, also known as "North Dupont Highway" and by lands now or late of Richard F. Larrimer Jr. & Mary Ellen Larimer, on the South by said lands of Larrimer and by lands now or late of Chatham Cove, Inc., on the West by said lands of Chatham Cove, as shown on a survey plan prepared by McClure Associates Inc., dated 7/6/04, file#MA:06-40-04 and more particularly described as follows:

BEGINNING at a point, a found iron pipe, in the westerly line of U.S. Route 13, a corner for this lot and for said lands of Larrimer, said point located a distance of 464.3 feet, as measured in a northwesterly direction, from a found concrete monument at the intersection of the westerly line of U.S. Route 13 with the northerly line of Garden Lane, thence from said beginning point the following twelve (12) courses and distances;

(1) with said lands of Larrimer, South 58 deg. 17 min. 40 sec. West a distance of 183.10 feet to a point,

(2) thence continuing with said lands of Larrimer, South 29 deg. 03 min. East a distance of 30.00 feet to a point in line of said Larrimer lands, a corner for said lands of Chatham Cove, Inc.,

(3) thence with said lands of Chatham Cove for the next three courses and distances, North 75 deg. 08 min. 38 sec. West a distance of 27.73 feet to a point,

(4) thence, South 58 deg. 45 min. 45 sec. West a distance of 86.64 feet to a point,

(5) thence, North 57 deg. 45 min. 18 sec. West a distance of 48.66 feet to a point at the waters edge of Silver Lake,

(6) thence with the same for the next three courses and distances, North 46 deg. 35 min. 42 sec. East a distance of 80.98 feet to a point,

(7) thence, North 80 deg. 41 min. 19 sec. East a distance of 18.43 feet to a point,

(8) thence, North 13 deg. 29 min. 08 sec. East a distance of 22.65 feet to a point, a corner for said lands of Aigner,

(9) thence leaving said waters edge, with said lands of Aigner for the next three courses and distances, North 58 deg. 17 min. 40 sec. East a distance of 111.50 feet to a found re-bar,

(10) thence, South 29 deg. 27 min. 55 sec. East a distance of 10.00 feet to a found re-bar,

(11) thence, North 58 deg. 17 min. 40 sec. East a distance of 90.00 feet to a point in the westerly line of U.S. Route 13,

(12) thence with the same, South 29 deg. 27 min. 55 sec. East a distance of 50.00 feet to a point, the point of beginning.

Containing within said metes and bounds 0.3925 acre of land, more or less., known as #580 North Dupont Highway.

# EXHIBIT C

6996981
WILKINS

HS559PG228

023759

04 AU 26  A 9 38 0

NOT OFFICIAL
COPY RECORDED
NO FEES PAID

Parcel Number: *ED-05-068.09-01-19.00-000*

Prepared By:     JOANNE G. MILLER

Return To:       **WACHOVIA MORTGAGE CORPORATION**
                 **1100 CORPORATE CENTER DRIVE - NC4723**
                 **RALEIGH, NC  27607-5066**

_____ [Space Above This Line For Recording Data] _____

# MORTGAGE

MIN    100013700069969812

## DEFINITIONS

Words used in multiple sections of this document are defined below and other words are defined in Sections 3, 11, 13, 18, 20 and 21. Certain rules regarding the usage of words used in this document are also provided in Section 16.

**(A) "Security Instrument"** means this document, which is dated  **August**        **6    2004** , together with all Riders to this document.
**(B) "Borrower"** is

    **RICHARD H WILKINS**
    **BRENDA F WILKINS**

Borrower is the mortgagor under this Security Instrument.
**(C) "MERS"** is Mortgage Electronic Registration Systems, Inc. MERS is a separate corporation that is acting solely as a nominee for Lender and Lender's successors and assigns. **MERS is the mortgagee under this Security Instrument.** MERS is organized and existing under the laws of Delaware, and has an address and telephone of P.O. Box 2026, Flint, MI 48501-2026, tel. (888) 679-MERS.

DELAWARE - Single Family – Fannie Mae/Freddie Mac UNIFORM INSTRUMENT WITH MERS        Form 3008 1/01

241441  (rev06 11/00)  [14411]                Page 1 of 17

JGM

**(D) "Lender" is WACHOVIA MORTGAGE CORPORATION**

Lender is a **CORPORATION**
organized and existing under the laws of **NORTH CAROLINA**
Lender's address is **1100 CORPORATE CENTER DRIVE**
**RALEIGH, NC 27607-5066**
**(E) "Note"** means the promissory note signed by Borrower and dated
**August      6     2004** . The Note states that Borrower owes Lender
**Two Hundred Thirteen Thousand Three Hundred and no/100** Dollars
(U.S. $   **213,300.00** ) plus interest. Borrower has promised to pay this
debt in regular Periodic Payments and to pay the debt in full not later than
**September    1     2034** .
**(F) "Property"** means the property that is described below under the heading "Transfer of
Rights in the Property."
**(G) "Loan"** means the debt evidenced by the Note, plus interest, any prepayment charges and
late charges due under the Note, and all sums due under this Security Instrument, plus
interest.
**(H) "Riders"** means all Riders to this Security Instrument that are executed by Borrower. The
following Riders are to be executed by Borrower [check box as applicable]:

| | | |
|---|---|---|
| [X] Adjustable Rate Rider | [ ] Condominium Rider | [X] Second Home Rider |
| [ ] Balloon Rider | [ ] Planned Unit Development Rider | [ ] 1-4 Family Rider |
| [ ] VA Rider | [ ] Biweekly Payment Rider | [X] Other(s) [specify] * |

**\* LEGAL DESCRIPTION**

**(I) "Applicable Law"** means all controlling applicable federal, state and local statutes,
regulations, ordinances and administrative rules and orders (that have the effect of law) as
well as all applicable final, non-appealable judicial opinions.
**(J) "Community Association Dues, Fees, and Assessments"** means all dues, fees,
assessments and other charges that are imposed on Borrower or the Property by a
condominium association, homeowners association or similar organization.
**(K) "Electronic Funds Transfer"** means any transfer of funds, other than a transaction
originated by check, draft, or similar paper instrument, which is initiated through an electronic
terminal, telephonic instrument, computer, or magnetic tape so as to order, instruct, or
authorize a financial institution to debit or credit an account. Such term includes, but is not
limited to, point-of-sale transfers, automated teller machine transactions, transfers initiated by
telephone, wire transfers, and automated clearinghouse transfers.
**(L) "Escrow Items"** means those items that are described in Section 3.
**(M) "Miscellaneous Proceeds"** means any compensation, settlement, award of damages, or
proceeds paid by any third party (other than insurance proceeds paid under the coverages
described in Section 5) for (i) damage to, or destruction of, the Property; (ii) condemnation or
other taking of all or any part of the Property; (iii) conveyance in lieu of condemnation; or (iv)
misrepresentations of, or omissions as to, the value and/or condition of the Property.
**(N) "Mortgage Insurance"** means insurance protecting Lender against the nonpayment of, or
default on, the Loan.

MS559PG230

(O) "**Periodic Payment**" means the regularly scheduled amount due for (i) principal and interest under the Note, plus (ii) any amounts under Section 3 of this Security Instrument.

(P) "**RESPA**" means the Real Estate Settlement Procedures Act (12 U.S.C. Section 2601 et seq.) and its implementing regulation, Regulation X (24 C.F.R. Part 3500), as they might be amended from time to time, or any additional or successor legislation or regulation that governs the same subject matter. As used in this Security Instrument, "RESPA" refers to all requirements and restrictions that are imposed in regard to a "federally related mortgage loan" even if the Loan does not qualify as a "federally related mortgage loan" under RESPA.

(Q) "**Successor in Interest of Borrower**" means any party that has taken title to the Property, whether or not that party has assumed Borrower's obligations under the Note and/or this Security Instrument.

TRANSFER OF RIGHTS IN THE PROPERTY

This Security Instrument secures to Lender: (i) the repayment of the Loan, and all renewals, extensions and modifications of the Note; and (ii) the performance of Borrower's covenants and agreements under this Security Instrument and the Note. For this purpose, Borrower does hereby mortgage, grant and convey to MERS (solely as nominee for Lender and Lender's successors and assigns) and to the successors and assigns of MERS the following described property located in the     **COUNTY**                          [Type of Recording Jurisdiction]
of **KENT**                                             [Name of Recording Jurisdiction]:

**SEE SCHEDULE ATTACHED HERETO; MADE A PART HEREOF**

which currently has the address of     **592 NORTH DUPONT HIGHWAY**
                                                                                          [Street]
                                            **DOVER**                                   [City],
Delaware    **19901**          [Zip Code] ("Property Address"):

TOGETHER WITH all the improvements now or hereafter erected on the property, and all easements, appurtenances, and fixtures now or hereafter a part of the property. All replacements and additions shall also be covered by this Security Instrument. All of the foregoing is referred to in this Security Instrument as the "Property." Borrower understands and agrees that MERS holds only legal title to the interests granted by Borrower in this Security Instrument, but, if necessary to comply with law or custom, MERS (as nominee for

HS559PG231

Lender and Lender's successors and assigns) has the right: to exercise any or all of those interests, including, but not limited to, the right to foreclose and sell the Property; and to take any action required of Lender including, but not limited to, releasing and canceling this Security Instrument.

BORROWER COVENANTS that Borrower is lawfully seised of the estate hereby conveyed and has the right to mortgage, grant and convey the Property and that the Property is unencumbered, except for encumbrances of record. Borrower warrants and will defend generally the title to the Property against all claims and demands, subject to any encumbrances of record.

THIS SECURITY INSTRUMENT combines uniform covenants for national use and non-uniform covenants with limited variations by jurisdiction to constitute a uniform security instrument covering real property.

UNIFORM COVENANTS. Borrower and Lender covenant and agree as follows:

1. **Payment of Principal, Interest, Escrow Items, Prepayment Charges, and Late Charges.** Borrower shall pay when due the principal of, and interest on, the debt evidenced by the Note and any prepayment charges and late charges due under the Note. Borrower shall also pay funds for Escrow Items pursuant to Section 3. Payments due under the Note and this Security Instrument shall be made in U.S. currency. However, if any check or other instrument received by Lender as payment under the Note or this Security Instrument is returned to Lender unpaid, Lender may require that any or all subsequent payments due under the Note and this Security Instrument be made in one or more of the following forms, as selected by Lender: (a) cash; (b) money order; (c) certified check, bank check, treasurer's check or cashier's check, provided any such check is drawn upon an institution whose deposits are insured by a federal agency, instrumentality, or entity; or (d) Electronic Funds Transfer.

Payments are deemed received by Lender when received at the location designated in the Note or at such other location as may be designated by Lender in accordance with the notice provisions in Section 15. Lender may return any payment or partial payment if the payment or partial payments are insufficient to bring the Loan current. Lender may accept any payment or partial payment insufficient to bring the Loan current, without waiver of any rights hereunder or prejudice to its rights to refuse such payment or partial payments in the future, but Lender is not obligated to apply such payments at the time such payments are accepted. If each Periodic Payment is applied as of its scheduled due date, then Lender need not pay interest on unapplied funds. Lender may hold such unapplied funds until Borrower makes payment to bring the Loan current. If Borrower does not do so within a reasonable period of time, Lender shall either apply such funds or return them to Borrower. If not applied earlier, such funds will be applied to the outstanding principal balance under the Note immediately prior to foreclosure. No offset or claim which Borrower might have now or in the future against Lender shall relieve Borrower from making payments due under the Note and this Security Instrument or performing the covenants and agreements secured by this Security Instrument.

2. **Application of Payments or Proceeds.** Except as otherwise described in this Section 2, all payments accepted and applied by Lender shall be applied in the following order of priority: (a) interest due under the Note; (b) principal due under the Note; (c) amounts due under Section 3. Such payments shall be applied to each Periodic Payment in the order in which it became due. Any remaining amounts shall be applied first to late charges, second to any other amounts due under this Security Instrument, and then to reduce the principal balance of the Note.

If Lender receives a payment from Borrower for a delinquent Periodic Payment which includes a sufficient amount to pay any late charge due, the payment may be applied to the delinquent payment and the late charge. If more than one Periodic Payment is outstanding, Lender may apply any payment received from Borrower to the repayment of the Periodic Payments if, and to the extent that, each payment can be paid in full. To the extent that any excess exists after the payment is applied to the full payment of one or more Periodic

JGM

6996981
WILKINS

MS559PG232

Payments, such excess may be applied to any late charges due. Voluntary prepayments shall be applied first to any prepayment charges and then as described in the Note.

Any application of payments, insurance proceeds, or Miscellaneous Proceeds to principal due under the Note shall not extend or postpone the due date, or change the amount, of the Periodic Payments.

**3. Funds for Escrow Items.** Borrower shall pay to Lender on the day Periodic Payments are due under the Note, until the Note is paid in full, a sum (the "Funds") to provide for payment of amounts due for: (a) taxes and assessments and other items which can attain priority over this Security Instrument as a lien or encumbrance on the Property; (b) leasehold payments or ground rents on the Property, if any; (c) premiums for any and all insurance required by Lender under Section 5; and (d) Mortgage Insurance premiums, if any, or any sums payable by Borrower to Lender in lieu of the payment of Mortgage Insurance premiums in accordance with the provisions of Section 10. These items are called "Escrow Items." At origination or at any time during the term of the Loan, Lender may require that Community Association Dues, Fees, and Assessments, if any, be escrowed by Borrower, and such dues, fees and assessments shall be an Escrow Item. Borrower shall promptly furnish to Lender all notices of amounts to be paid under this Section. Borrower shall pay Lender the Funds for Escrow Items unless Lender waives Borrower's obligation to pay the Funds for any or all Escrow Items. Lender may waive Borrower's obligation to pay to Lender Funds for any or all Escrow Items at any time. Any such waiver may only be in writing. In the event of such waiver, Borrower shall pay directly, when and where payable, the amounts due for any Escrow Items for which payment of Funds has been waived by Lender and, if Lender requires, shall furnish to Lender receipts evidencing such payment within such time period as Lender may require. Borrower's obligation to make such payments and to provide receipts shall for all purposes be deemed to be a covenant and agreement contained in this Security Instrument, as the phrase "covenant and agreement" is used in Section 9. If Borrower is obligated to pay Escrow Items directly, pursuant to a waiver, and Borrower fails to pay the amount due for an Escrow Item, Lender may exercise its rights under Section 9 and pay such amount and Borrower shall then be obligated under Section 9 to repay to Lender any such amount. Lender may revoke the waiver as to any or all Escrow Items at any time by a notice given in accordance with Section 15 and, upon such revocation, Borrower shall pay to Lender all Funds, and in such amounts, that are then required under this Section 3.

Lender may, at any time, collect and hold Funds in an amount (a) sufficient to permit Lender to apply the Funds at the time specified under RESPA and (b) not to exceed the maximum amount a lender can require under RESPA. Lender shall estimate the amount of Funds due on the basis of current data and reasonable estimates of expenditures of future Escrow Items or otherwise in accordance with Applicable Law.

The Funds shall be held in an institution whose deposits are insured by a federal agency, instrumentality, or entity (including Lender, if Lender is an institution whose deposits are so insured) or in any Federal Home Loan Bank. Lender shall apply the Funds to pay the Escrow Items no later than the time specified under RESPA. Lender shall not charge Borrower for holding and applying the Funds, annually analyzing the escrow account, or verifying the Escrow Items, unless Lender pays Borrower interest on the Funds and Applicable Law permits Lender to make such a charge. Unless an agreement is made in writing or Applicable Law requires interest to be paid on the Funds, Lender shall not be required to pay Borrower any interest or earnings on the Funds. Borrower and Lender can agree in writing, however, that interest shall be paid on the Funds. Lender shall give to Borrower, without charge, an annual accounting of the Funds as required by RESPA.

If there is a surplus of Funds held in escrow, as defined under RESPA, Lender shall account to Borrower for the excess funds in accordance with RESPA. If there is a shortage of Funds held in escrow, as defined under RESPA, Lender shall notify Borrower as required by

JGM

## MS559PG233

RESPA, and Borrower shall pay to Lender the amount necessary to make up the shortage in accordance with RESPA, but in no more than 12 monthly payments. If there is a deficiency of Funds held in escrow, as defined under RESPA, Lender shall notify Borrower as required by RESPA, and Borrower shall pay to Lender the amount necessary to make up the deficiency in accordance with RESPA, but in no more than 12 monthly payments.

Upon payment in full of all sums secured by this Security Instrument, Lender shall promptly refund to Borrower any Funds held by Lender.

**4. Charges; Liens.** Borrower shall pay all taxes, assessments, charges, fines, and impositions attributable to the Property which can attain priority over this Security Instrument, leasehold payments or ground rents on the Property, if any, and Community Association Dues, Fees, and Assessments, if any. To the extent that these items are Escrow Items, Borrower shall pay them in the manner provided in Section 3.

Borrower shall promptly discharge any lien which has priority over this Security Instrument unless Borrower: (a) agrees in writing to the payment of the obligation secured by the lien in a manner acceptable to Lender, but only so long as Borrower is performing such agreement; (b) contests the lien in good faith by, or defends against enforcement of the lien in, legal proceedings which in Lender's opinion operate to prevent the enforcement of the lien while those proceedings are pending, but only until such proceedings are concluded; or (c) secures from the holder of the lien an agreement satisfactory to Lender subordinating the lien to this Security Instrument. If Lender determines that any part of the Property is subject to a lien which can attain priority over this Security Instrument, Lender may give Borrower a notice identifying the lien. Within 10 days of the date on which that notice is given, Borrower shall satisfy the lien or take one or more of the actions set forth above in this Section 4.

Lender may require Borrower to pay a one-time charge for a real estate tax verification and/or reporting service used by Lender in connection with this Loan.

**5. Property Insurance.** Borrower shall keep the improvements now existing or hereafter erected on the Property insured against loss by fire, hazards included within the term "extended coverage," and any other hazards including, but not limited to, earthquakes and floods, for which Lender requires insurance. This insurance shall be maintained in the amounts (including deductible levels) and for the periods that Lender requires. What Lender requires pursuant to the preceding sentences can change during the term of the Loan. The insurance carrier providing the insurance shall be chosen by Borrower subject to Lender's right to disapprove Borrower's choice, which right shall not be exercised unreasonably. Lender may require Borrower to pay, in connection with this Loan, either: (a) a one-time charge for flood zone determination, certification and tracking services; or (b) a one-time charge for flood zone determination and certification services and subsequent charges each time remappings or similar changes occur which reasonably might affect such determination or certification. Borrower shall also be responsible for the payment of any fees imposed by the Federal Emergency Management Agency in connection with the review of any flood zone determination resulting from an objection by Borrower.

If Borrower fails to maintain any of the coverages described above, Lender may obtain insurance coverage, at Lender's option and Borrower's expense. Lender is under no obligation to purchase any particular type or amount of coverage. Therefore, such coverage shall cover Lender, but might or might not protect Borrower, Borrower's equity in the Property, or the contents of the Property, against any risk, hazard or liability and might provide greater or lesser coverage than was previously in effect. Borrower acknowledges that the cost of the

MS559PG234

insurance coverage so obtained might significantly exceed the cost of insurance that Borrower could have obtained. Any amounts disbursed by Lender under this Section 5 shall become additional debt of Borrower secured by this Security Instrument. These amounts shall bear interest at the Note rate from the date of disbursement and shall be payable, with such interest, upon notice from Lender to Borrower requesting payment.

All insurance policies required by Lender and renewals of such policies shall be subject to Lender's right to disapprove such policies, shall include a standard mortgage clause, and shall name Lender as mortgagee and/or as an additional loss payee. Lender shall have the right to hold the policies and renewal certificates. If Lender requires, Borrower shall promptly give to Lender all receipts of paid premiums and renewal notices. If Borrower obtains any form of insurance coverage, not otherwise required by Lender, for damage to, or destruction of, the Property, such policy shall include a standard mortgage clause and shall name Lender as mortgagee and/or as an additional loss payee.

In the event of loss, Borrower shall give prompt notice to the insurance carrier and Lender. Lender may make proof of loss if not made promptly by Borrower. Unless Lender and Borrower otherwise agree in writing, any insurance proceeds, whether or not the underlying insurance was required by Lender, shall be applied to restoration or repair of the Property, if the restoration or repair is economically feasible and Lender's security is not lessened. During such repair and restoration period, Lender shall have the right to hold such insurance proceeds until Lender has had an opportunity to inspect such Property to ensure the work has been completed to Lender's satisfaction, provided that such inspection shall be undertaken promptly. Lender may disburse proceeds for the repairs and restoration in a single payment or in a series of progress payments as the work is completed. Unless an agreement is made in writing or Applicable Law requires interest to be paid on such insurance proceeds, Lender shall not be required to pay Borrower any interest or earnings on such proceeds. Fees for public adjusters, or other third parties, retained by Borrower shall not be paid out of the insurance proceeds and shall be the sole obligation of Borrower. If the restoration or repair is not economically feasible or Lender's security would be lessened, the insurance proceeds shall be applied to the sums secured by this Security Instrument, whether or not then due, with the excess, if any, paid to Borrower. Such insurance proceeds shall be applied in the order provided for in Section 2.

If Borrower abandons the Property, Lender may file, negotiate and settle any available insurance claim and related matters. If Borrower does not respond within 30 days to a notice from Lender that the insurance carrier has offered to settle a claim, then Lender may negotiate and settle the claim. The 30-day period will begin when the notice is given. In either event, or if Lender acquires the Property under Section 22 or otherwise, Borrower hereby assigns to Lender (a) Borrower's rights to any insurance proceeds in an amount not to exceed the amounts unpaid under the Note or this Security Instrument, and (b) any other of Borrower's rights (other than the right to any refund of unearned premiums paid by Borrower) under all insurance policies covering the Property, insofar as such rights are applicable to the coverage of the Property. Lender may use the insurance proceeds either to repair or restore the Property or to pay amounts unpaid under the Note or this Security Instrument, whether or not then due.

**6. Occupancy.** Borrower shall occupy, establish, and use the Property as Borrower's principal residence within 60 days after the execution of this Security Instrument and shall continue to occupy the Property as Borrower's principal residence for at least one year after

MS559PG235

the date of occupancy, unless Lender otherwise agrees in writing, which consent shall not be unreasonably withheld, or unless extenuating circumstances exist which are beyond Borrower's control.

**7. Preservation, Maintenance and Protection of the Property; Inspections.** Borrower shall not destroy, damage or impair the Property, allow the Property to deteriorate or commit waste on the Property. Whether or not Borrower is residing in the Property, Borrower shall maintain the Property in order to prevent the Property from deteriorating or decreasing in value due to its condition. Unless it is determined pursuant to Section 5 that repair or restoration is not economically feasible, Borrower shall promptly repair the Property if damaged to avoid further deterioration or damage. If insurance or condemnation proceeds are paid in connection with damage to, or the taking of, the Property, Borrower shall be responsible for repairing or restoring the Property only if Lender has released proceeds for such purposes. Lender may disburse proceeds for the repairs and restoration in a single payment or in a series of progress payments as the work is completed. If the insurance or condemnation proceeds are not sufficient to repair or restore the Property, Borrower is not relieved of Borrower's obligation for the completion of such repair or restoration.

Lender or its agent may make reasonable entries upon and inspections of the Property. If it has reasonable cause, Lender may inspect the interior of the improvements on the Property. Lender shall give Borrower notice at the time of or prior to such an interior inspection specifying such reasonable cause.

**8. Borrower's Loan Application.** Borrower shall be in default if, during the Loan application process, Borrower or any persons or entities acting at the direction of Borrower or with Borrower's knowledge or consent gave materially false, misleading, or inaccurate information or statements to Lender (or failed to provide Lender with material information) in connection with the Loan. Material representations include, but are not limited to, representations concerning Borrower's occupancy of the Property as Borrower's principal residence.

**9. Protection of Lender's Interest in the Property and Rights Under this Security Instrument.** If (a) Borrower fails to perform the covenants and agreements contained in this Security Instrument, (b) there is a legal proceeding that might significantly affect Lender's interest in the Property and/or rights under this Security Instrument (such as a proceeding in bankruptcy, probate, for condemnation or forfeiture, for enforcement of a lien which may attain priority over this Security Instrument or to enforce laws or regulations), or (c) Borrower has abandoned the Property, then Lender may do and pay for whatever is reasonable or appropriate to protect Lender's interest in the Property and rights under this Security Instrument, including protecting and/or assessing the value of the Property, and securing and/or repairing the Property. Lender's actions can include, but are not limited to: (a) paying any sums secured by a lien which has priority over this Security Instrument; (b) appearing in court; and (c) paying reasonable attorneys' fees to protect its interest in the Property and/or rights under this Security Instrument, including its secured position in a bankruptcy proceeding. Securing the Property includes, but is not limited to, entering the Property to make repairs, change locks, replace or board up doors and windows, drain water from pipes, eliminate building or other code violations or dangerous conditions, and have utilities turned on or off. Although Lender may take action under this Section 9, Lender does not have to do so and is not under any duty or obligation to do so. It is agreed that Lender incurs no liability for not taking any or all actions authorized under this Section 9.

MS559PG236

Any amounts disbursed by Lender under this Section 9 shall become additional debt of Borrower secured by this Security Instrument. These amounts shall bear interest at the Note rate from the date of disbursement and shall be payable, with such interest, upon notice from Lender to Borrower requesting payment.

If this Security Instrument is on a leasehold, Borrower shall comply with all the provisions of the lease. If Borrower acquires fee title to the Property, the leasehold and the fee title shall not merge unless Lender agrees to the merger in writing.

10. Mortgage Insurance. If Lender required Mortgage Insurance as a condition of making the Loan, Borrower shall pay the premiums required to maintain the Mortgage Insurance in effect. If, for any reason, the Mortgage Insurance coverage required by Lender ceases to be available from the mortgage insurer that previously provided such insurance and Borrower was required to make separately designated payments toward the premiums for Mortgage Insurance, Borrower shall pay the premiums required to obtain coverage substantially equivalent to the Mortgage Insurance previously in effect, at a cost substantially equivalent to the cost to Borrower of the Mortgage Insurance previously in effect, from an alternate mortgage insurer selected by Lender. If substantially equivalent Mortgage Insurance coverage is not available, Borrower shall continue to pay to Lender the amount of the separately designated payments that were due when the insurance coverage ceased to be in effect. Lender will accept, use and retain these payments as a non-refundable loss reserve in lieu of Mortgage Insurance. Such loss reserve shall be non-refundable, notwithstanding the fact that the Loan is ultimately paid in full, and Lender shall not be required to pay Borrower any interest or earnings on such loss reserve. Lender can no longer require loss reserve payments if Mortgage Insurance coverage (in the amount and for the period that Lender requires) provided by an insurer selected by Lender again becomes available, is obtained, and Lender requires separately designated payments toward the premiums for Mortgage Insurance. If Lender required Mortgage Insurance as a condition of making the Loan and Borrower was required to make separately designated payments toward the premiums for Mortgage Insurance, Borrower shall pay the premiums required to maintain Mortgage Insurance in effect, or to provide a non-refundable loss reserve, until Lender's requirement for Mortgage Insurance ends in accordance with any written agreement between Borrower and Lender providing for such termination or until termination is required by Applicable Law. Nothing in this Section 10 affects Borrower's obligation to pay interest at the rate provided in the Note.

Mortgage Insurance reimburses Lender (or any entity that purchases the Note) for certain losses it may incur if Borrower does not repay the Loan as agreed. Borrower is not a party to the Mortgage Insurance.

Mortgage insurers evaluate their total risk on all such insurance in force from time to time, and may enter into agreements with other parties that share or modify their risk, or reduce losses. These agreements are on terms and conditions that are satisfactory to the mortgage insurer and the other party (or parties) to these agreements. These agreements may require the mortgage insurer to make payments using any source of funds that the mortgage insurer may have available (which may include funds obtained from Mortgage Insurance premiums).

As a result of these agreements, Lender, any purchaser of the Note, another insurer, any reinsurer, any other entity, or any affiliate of any of the foregoing, may receive (directly or indirectly) amounts that derive from (or might be characterized as ) a portion of Borrower's payments for Mortgage Insurance, in exchange for sharing or modifying the mortgage insurer's risk, or reducing losses. If such agreement provides that an affiliate of Lender takes a share of

MS559PG237

the insurer's risk in exchange for a share of the premiums paid to the insurer, the arrangement is often termed "captive reinsurance." Further:

(a) Any such agreements will not affect the amounts that Borrower has agreed to pay for Mortgage Insurance, or any other terms of the Loan. Such agreements will not increase the amount Borrower will owe for Mortgage Insurance, and they will not entitle Borrower to any refund.

(b) Any such agreements will not affect the rights Borrower has - if any - with respect to the Mortgage Insurance under the Homeowners Protection Act of 1998 or any other law. These rights may include the right to receive certain disclosures, to request and obtain cancellation of the Mortgage Insurance, to have the Mortgage Insurance terminated automatically, and/or to receive a refund of any Mortgage Insurance premiums that were unearned at the time of such cancellation or termination.

11. Assignment of Miscellaneous Proceeds; Forfeiture. All Miscellaneous Proceeds are hereby assigned to and shall be paid to Lender.

If the Property is damaged, such Miscellaneous Proceeds shall be applied to restoration or repair of the Property, if the restoration or repair is economically feasible and Lender's security is not lessened. During such repair and restoration period, Lender shall have the right to hold such Miscellaneous Proceeds until Lender has had an opportunity to inspect such Property to ensure the work has been completed to Lender's satisfaction, provided that such inspection shall be undertaken promptly. Lender may pay for the repairs and restoration in a single disbursement or in a series of progress payments as the work is completed. Unless an agreement is made in writing or Applicable Law requires interest to be paid on such Miscellaneous Proceeds, Lender shall not be required to pay Borrower any interest or earnings on such Miscellaneous Proceeds. If the restoration or repair is not economically feasible or Lender's security would be lessened, the Miscellaneous Proceeds shall be applied to the sums secured by this Security Instrument, whether or not then due, with the excess, if any, paid to Borrower. Such Miscellaneous Proceeds shall be applied in the order provided for in Section 2.

In the event of a total taking, destruction, or loss in value of the Property, the Miscellaneous Proceeds shall be applied to the sums secured by this Security Instrument, whether or not then due, with the excess, if any, paid to Borrower.

In the event of a partial taking, destruction, or loss in value of the Property in which the fair market value of the Property immediately before the partial taking, destruction, or loss in value is equal to or greater than the amount of the sums secured by this Security Instrument immediately before the partial taking, destruction, or loss in value, unless Borrower and Lender otherwise agree in writing, the sums secured by this Security Instrument shall be reduced by the amount of the Miscellaneous Proceeds multiplied by the following fraction: (a) the total amount of the sums secured immediately before the partial taking, destruction, or loss in value divided by (b) the fair market value of the Property immediately before the partial taking, destruction, or loss in value. Any balance shall be paid to Borrower.

In the event of a partial taking, destruction, or loss in value of the Property in which the fair market value of the Property immediately before the partial taking, destruction, or loss in value is less than the amount of the sums secured immediately before the partial taking, destruction, or loss in value, unless Borrower and Lender otherwise agree in writing, the Miscellaneous Proceeds shall be applied to the sums secured by this Security Instrument whether or not the sums are then due.

If the Property is abandoned by Borrower, or if, after notice by Lender to Borrower that the Opposing Party (as defined in the next sentence) offers to make an award to settle a claim

6996981
WILKINS

HS559PG238

for damages, Borrower fails to respond to Lender within 30 days after the date the notice is given, Lender is authorized to collect and apply the Miscellaneous Proceeds either to restoration or repair of the Property or to the sums secured by this Security Instrument, whether or not then due. "Opposing Party" means the third party that owes Borrower Miscellaneous Proceeds or the party against whom Borrower has a right of action in regard to Miscellaneous Proceeds.

Borrower shall be in default if any action or proceeding, whether civil or criminal, is begun that, in Lender's judgment, could result in forfeiture of the Property or other material impairment of Lender's interest in the Property or rights under this Security Instrument. Borrower can cure such a default and, if acceleration has occurred, reinstate as provided in Section 19, by causing the action or proceeding to be dismissed with a ruling that, in Lender's judgment, precludes forfeiture of the Property or other material impairment of Lender's interest in the Property or rights under this Security Instrument. The proceeds of any award or claim for damages that are attributable to the impairment of Lender's interest in the Property are hereby assigned and shall be paid to Lender.

All Miscellaneous Proceeds that are not applied to restoration or repair of the Property shall be applied in the order provided for in Section 2.

**12. Borrower Not Released; Forbearance By Lender Not a Waiver.** Extension of the time for payment or modification of amortization of the sums secured by this Security Instrument granted by Lender to Borrower or any Successor in Interest of Borrower shall not operate to release the liability of Borrower or any Successors in Interest of Borrower. Lender shall not be required to commence proceedings against any Successor in Interest of Borrower or to refuse to extend time for payment or otherwise modify amortization of the sums secured by this Security Instrument by reason of any demand made by the original Borrower or any Successors in Interest of Borrower. Any forbearance by Lender in exercising any right or remedy including, without limitation, Lender's acceptance of payments from third persons, entities or Successors in Interest of Borrower or in amounts less than the amount then due, shall not be a waiver of or preclude the exercise of any right or remedy.

**13. Joint and Several Liability; Co-signers; Successors and Assigns Bound.** Borrower covenants and agrees that Borrower's obligations and liability shall be joint and several. However, any Borrower who co-signs this Security Instrument but does not execute the Note (a "co-signer"): (a) is co-signing this Security Instrument only to mortgage, grant and convey the co-signer's interest in the Property under the terms of this Security Instrument; (b) is not personally obligated to pay the sums secured by this Security Instrument; and (c) agrees that Lender and any other Borrower can agree to extend, modify, forbear or make any accommodations with regard to the terms of this Security Instrument or the Note without the co-signer's consent.

Subject to the provisions of Section 18, any Successor in Interest of Borrower who assumes Borrower's obligations under this Security Instrument in writing, and is approved by Lender, shall obtain all of Borrower's rights and benefits under this Security Instrument. Borrower shall not be released from Borrower's obligations and liability under this Security Instrument unless Lender agrees to such release in writing. The covenants and agreements of this Security Instrument shall bind (except as provided in Section 20) and benefit the successors and assigns of Lender.

**14. Loan Charges.** Lender may charge Borrower fees for services performed in connection with Borrower's default, for the purpose of protecting Lender's interest in the Property and rights under this Security Instrument, including, but not limited to, attorneys' fees, property inspection and valuation fees. In regard to any other fees, the absence of express authority in

6996981
WILKINS

HS559PG239

this Security Instrument to charge a specific fee to Borrower shall not be construed as a prohibition on the charging of such fee. Lender may not charge fees that are expressly prohibited by this Security Instrument or by Applicable Law.

If the Loan is subject to a law which sets maximum loan charges, and that law is finally interpreted so that the interest or other loan charges collected or to be collected in connection with the Loan exceed the permitted limits, then: (a) any such loan charge shall be reduced by the amount necessary to reduce the charge to the permitted limit; and (b) any sums already collected from Borrower which exceeded permitted limits will be refunded to Borrower. Lender may choose to make this refund by reducing the principal owed under the Note or by making a direct payment to Borrower. If a refund reduces principal, the reduction will be treated as a partial prepayment without any prepayment charge (whether or not a prepayment charge is provided for under the Note). Borrower's acceptance of any such refund made by direct payment to Borrower will constitute a waiver of any right of action Borrower might have arising out of such overcharge.

**15. Notices.** All notices given by Borrower or Lender in connection with this Security Instrument must be in writing. Any notice to Borrower in connection with this Security Instrument shall be deemed to have been given to Borrower when mailed by first class mail or when actually delivered to Borrower's notice address if sent by other means. Notice to any one Borrower shall constitute notice to all Borrowers unless Applicable Law expressly requires otherwise. The notice address shall be the Property Address unless Borrower has designated a substitute notice address by notice to Lender. Borrower shall promptly notify Lender of Borrower's change of address. If Lender specifies a procedure for reporting Borrower's change of address, then Borrower shall only report a change of address through that specified procedure. There may be only one designated notice address under this Security Instrument at any one time. Any notice to Lender shall be given by delivering it or by mailing it by first class mail to Lender's address stated herein unless Lender has designated another address by notice to Borrower. Any notice in connection with this Security Instrument shall not be deemed to have been given to Lender until actually received by Lender. If any notice required by this Security Instrument is also required under Applicable Law, the Applicable Law requirement will satisfy the corresponding requirement under this Security Instrument.

**16. Governing Law; Severability; Rules of Construction.** This Security Instrument shall be governed by federal law and the law of the jurisdiction in which the Property is located. All rights and obligations contained in this Security Instrument are subject to any requirements and limitations of Applicable Law. Applicable Law might explicitly or implicitly allow the parties to agree by contract or it might be silent, but such silence shall not be construed as a prohibition against agreement by contract. In the event that any provision or clause of this Security Instrument or the Note conflicts with Applicable Law, such conflict shall not affect other provisions of this Security Instrument or the Note which can be given effect without the conflicting provision.

As used in this Security Instrument: (a) words of the masculine gender shall mean and include corresponding neuter words or words of the feminine gender; (b) words in the singular shall mean and include the plural and vice versa; and (c) the word "may" gives sole discretion without any obligation to take any action.

**17. Borrower's Copy.** Borrower shall be given one copy of the Note and of this Security Instrument.

HS559PG240

**18. Transfer of the Property or a Beneficial Interest in Borrower.** As used in this Section 18, "Interest in the Property" means any legal or beneficial interest in the Property, including, but not limited to, those beneficial interests transferred in a bond for deed, contract for deed, installment sales contract or escrow agreement, the intent of which is the transfer of title by Borrower at a future date to a purchaser.

If all or any part of the Property or any Interest in the Property is sold or transferred (or if Borrower is not a natural person and a beneficial interest in Borrower is sold or transferred) without Lender's prior written consent, Lender may require immediate payment in full of all sums secured by this Security Instrument. However, this option shall not be exercised by Lender if such exercise is prohibited by Applicable Law.

If Lender exercises this option, Lender shall give Borrower notice of acceleration. The notice shall provide a period of not less than 30 days from the date the notice is given in accordance with Section 15 within which Borrower must pay all sums secured by this Security Instrument. If Borrower fails to pay these sums prior to the expiration of this period, Lender may invoke any remedies permitted by this Security Instrument without further notice or demand on Borrower.

**19. Borrower's Right to Reinstate After Acceleration.** If Borrower meets certain conditions, Borrower shall have the right to have enforcement of this Security Instrument discontinued at any time prior to the earliest of: (a) five days before sale of the Property pursuant to any power of sale contained in this Security Instrument; (b) such other period as Applicable Law might specify for the termination of Borrower's right to reinstate; or (c) entry of a judgment enforcing this Security Instrument. Those conditions are that Borrower: (a) pays Lender all sums which then would be due under this Security Instrument and the Note as if no acceleration had occurred; (b) cures any default of any other covenants or agreements; (c) pays all expenses incurred in enforcing this Security Instrument, including, but not limited to, reasonable attorneys' fees, property inspection and valuation fees, and other fees incurred for the purpose of protecting Lender's interest in the Property and rights under this Security Instrument; and (d) takes such action as Lender may reasonably require to assure that Lender's interest in the Property and rights under this Security Instrument, and Borrower's obligation to pay the sums secured by this Security Instrument, shall continue unchanged. Lender may require that Borrower pay such reinstatement sums and expenses in one or more of the following forms, as selected by Lender: (a) cash; (b) money order; (c) certified check, bank check, treasurer's check or cashier's check, provided any such check is drawn upon an institution whose deposits are insured by a federal agency, instrumentality or entity; or (d) Electronic Funds Transfer. Upon reinstatement by Borrower, this Security Instrument and obligations secured hereby shall remain fully effective as if no acceleration had occurred. However, this right to reinstate shall not apply in the case of acceleration under Section 18.

**20. Sale of Note; Change of Loan Servicer; Notice of Grievance.** The Note or a partial interest in the Note (together with this Security Instrument) can be sold one or more times without prior notice to Borrower. A sale might result in a change in the entity (known as the "Loan Servicer") that collects Periodic Payments due under the Note and this Security Instrument and performs other mortgage loan servicing obligations under the Note, this Security Instrument, and Applicable Law. There also might be one or more changes of the Loan Servicer unrelated to a sale of the Note. If there is a change of the Loan Servicer, Borrower will be given written notice of the change which will state the name and address of the new Loan Servicer, the address to which payments should be made and any other information RESPA requires in connection with a notice of transfer of servicing. If the Note is

HS559PG241

sold and thereafter the Loan is serviced by a Loan Servicer other than the purchaser of the Note, the mortgage loan servicing obligations to Borrower will remain with the Loan Servicer or be transferred to a successor Loan Servicer and are not assumed by the Note purchaser unless otherwise provided by the Note purchaser.

Neither Borrower nor Lender may commence, join, or be joined to any judicial action (as either an individual litigant or the member of a class) that arises from the other party's actions pursuant to this Security Instrument or that alleges that the other party has breached any provision of, or any duty owed by reason of, this Security Instrument, until such Borrower or Lender has notified the other party (with such notice given in compliance with the requirements of Section 15) of such alleged breach and afforded the other party hereto a reasonable period after the giving of such notice to take corrective action. If Applicable Law provides a time period which must elapse before certain action can be taken, that time period will be deemed to be reasonable for purposes of this paragraph. The notice of acceleration and opportunity to cure given to Borrower pursuant to Section 22 and the notice of acceleration given to Borrower pursuant to Section 18 shall be deemed to satisfy the notice and opportunity to take corrective action provisions of this Section 20.

21. **Hazardous Substances.** As used in this Section 21: (a) "Hazardous Substances" are those substances defined as toxic or hazardous substances, pollutants, or wastes by Environmental Law and the following substances: gasoline, kerosene, other flammable or toxic petroleum products, toxic pesticides and herbicides, volatile solvents, materials containing asbestos or formaldehyde, and radioactive materials; (b) "Environmental Law" means federal laws and laws of the jurisdiction where the Property is located that relate to health, safety or environmental protection; (c) "Environmental Cleanup" includes any response action, remedial action, or removal action, as defined in Environmental Law; and (d) an "Environmental Condition" means a condition that can cause, contribute to, or otherwise trigger an Environmental Cleanup.

Borrower shall not cause or permit the presence, use, disposal, storage, or release of any Hazardous Substances, or threaten to release any Hazardous Substances, on or in the Property. Borrower shall not do, nor allow anyone else to do, anything affecting the Property (a) that is in violation of any Environmental Law, (b) which creates an Environmental Condition, or (c) which, due to the presence, use, or release of a Hazardous Substance, creates a condition that adversely affects the value of the Property. The preceding two sentences shall not apply to the presence, use, or storage on the Property of small quantities of Hazardous Substances that are generally recognized to be appropriate to normal residential uses and to maintenance of the Property (including, but not limited to, hazardous substances in consumer products).

Borrower shall promptly give Lender written notice of (a) any investigation, claim, demand, lawsuit or other action by any governmental or regulatory agency or private party involving the Property and any Hazardous Substance or Environmental Law of which Borrower has actual knowledge, (b) any Environmental Condition, including but not limited to, any spilling, leaking, discharge, release or threat of release of any Hazardous Substance, and (c) any condition caused by the presence, use or release of a Hazardous Substance which adversely affects the value of the Property. If Borrower learns, or is notified by any governmental or regulatory authority, or any private party, that any removal or other remediation of any Hazardous Substance affecting the Property is necessary, Borrower shall promptly take all necessary remedial actions in accordance with Environmental Law. Nothing herein shall create any obligation on Lender for an Environmental Cleanup.

MS559PG242

NON-UNIFORM COVENANTS. Borrower and Lender further covenant and agree as follows:

22. Acceleration; Remedies. Lender shall give notice to Borrower prior to acceleration following Borrower's breach of any covenant or agreement in this Security Instrument (but not prior to acceleration under Section 18 unless Applicable Law provides otherwise). The notice shall specify: (a) the default; (b) the action required to cure the default; (c) a date, not less than 30 days from the date the notice is given to Borrower, by which the default must be cured; and (d) that failure to cure the default on or before the date specified in the notice may result in acceleration of the sums secured by this Security Instrument, foreclosure by judicial proceeding and sale of the Property. The notice shall further inform Borrower of the right to reinstate after acceleration and the right to assert in the foreclosure proceeding the non-existence of a default or any other defense of Borrower to acceleration and foreclosure. If the default is not cured on or before the date specified in the notice, Lender at its option may require immediate payment in full of all sums secured by this Security Instrument without further demand and may foreclose this Security Instrument by judicial proceeding. Lender shall be entitled to collect all expenses incurred in pursuing the remedies provided in this Section 22, including, but not limited to, attorneys' fees of            5.000            % of the amount decreed for principal and interest (which fees shall be allowed and paid as part of the decree of judgment) and costs of title evidence.

23. Satisfaction. Upon payment of all sums secured by this Security Instrument, this Security Instrument shall cease and become void and of no effect and Lender shall cause the entry of satisfaction to be made upon the records of this Security Instrument. Borrower shall pay all costs and fees for entering the satisfaction upon the records of this Security Instrument. Lender may charge Borrower a fee for entering the satisfaction, but only if the fee is paid to a third party for services rendered and the charging of the fee is permitted under Applicable Law.

24. Future Advances. This Security Instrument secures a maximum amount of up to 150% of the amount of the Note. This Security Instrument shall secure any additional loans as well as any and all present or future advances and readvances under the Note made by Lender to or for the benefit of Borrower or the Property, all of which shall be entitled to the benefits of this Security Instrument under 25 Del. Code Section 2118 and shall have the same lien priority as if the future loans, advances or readvances were made as of the date hereof including, without limitation: (a) principal, interest, late charges, fees and other amounts due under the Note or this Security Instrument; (b) all advances by Lender to Borrower or any other person to pay costs of erection, construction, alteration, repair, restoration, maintenance and completion of any improvements on the Property; (c) all advances made or costs incurred by Borrower for the payment of real estate taxes, assessments or other governmental charges, maintenance charges, insurance premiums, appraisals charges, environmental inspection, audit, testing or compliance costs, and costs incurred by Lender for the enforcement and protection of the Property or the lien of this Security Instrument; and (d) all legal fees, costs and other expenses incurred by Lender by reason of any default or otherwise in connection with the Note. Borrower agrees that if, at any time during the term of this Security Instrument or following a foreclosure hereof, Borrower fails to perform or observe any covenant or obligation under this Security Instrument including, without limitation, payment of any of the foregoing, Lender may (but shall not be obligated to) take such steps as are reasonably necessary to remedy any such nonperformance or nonobservance and provide

MS559PG243

payment thereof. All amounts advanced by Lender shall be added to the amount secured by this Security Instrument and shall be due and payable promptly after demand, together with interest at the rate of interest in effect under the Note, such interest to be calculated from the date of such advance to the date of repayment thereof. Borrower's obligations hereunder shall be continuing and shall survive notwithstanding a foreclosure of this Security Instrument.

  BY SIGNING BELOW, Borrower accepts and agrees to the terms and covenants contained in this Security Instrument and in any Rider executed by Borrower and recorded with it.

Signed, sealed and delivered in the presence of:

_____         _____ Atty at fact
                                      RICHARD H WILKINS      Tolano D. Anderson   -Borrower

as to both                            _____ Atty in fact
                                      BRENDA F WILKINS       Tolano D. Anderson   -Borrower

_____ (Seal)   _____ (Seal)
                        -Borrower                              -Borrower

_____ (Seal)   _____ (Seal)
                        -Borrower                              -Borrower

_____ (Seal)   _____ (Seal)
                        -Borrower                              -Borrower

241441 (rev06 11/00) [144116]          Page 16 of 17          Form 3008 1/01

                                                                    JGM

MS559PG244

STATE OF DELAWARE,                            *Kent*   County ss:

This instrument was acknowledged before me on    *August 6, 2004*   by

*Tolano D Anderson attorney in fact for Richard H. Wilkins and Brenda F. Wilkins.*

My Commission Expires:

_____
Notary Public            Attorney-At-Law

JOHN I. ELLIS
AUTHORIZED TO PERFORM
NOTARIAL ACTS PURSUANT
TO DELAWARE LAW
TITLE 29§ 4323 (a) (3)

MS559PG245

ALL that certain lot, piece or parcel of land situated in the City of Dover, Kent County, State of Delaware, lying on the westerly side of U.S. Route 13, being bounded as follows; on the North by Silver Lake and by lands now or late of Peter Aigner, on the East by U.S. Route 13, also known as "North Dupont Highway" and by lands now or late of Richard F. Larrimer Jr. & Mary Ellen Larimer, on the South by said lands of Larrimer and by lands now or late of Chatham Cove, Inc., on the West by said lands of Chatham Cove, as shown on a survey plan prepared by McClure Associates Inc., dated 7/6/04, file#MA:06-40-04 and more particularly described as follows:

BEGINNING at a point, a found iron pipe, in the westerly line of U.S. Route 13, a corner for this lot and for said lands of Larrimer, said point located a distance of 464.3 feet, as measured in a northwesterly direction, from a found concrete monument at the intersection of the westerly line of U.S. Route 13 with the northerly line of Garden Lane, thence from said beginning point the following twelve (12) courses and distances;

(1) with said lands of Larrimer, South 58 deg. 17 min. 40 sec. West a distance of 183.10 feet to a point,

(2) thence continuing with said lands of Larrimer, South 29 deg. 03 min. East a distance of 30.00 feet to a point in line of said Larrimer lands, a corner for said lands of Chatham Cove, Inc.,

(3) thence with said lands of Chatham Cove for the next three courses and distances, North 75 deg. 08 min. 38 sec. West a distance of 27.73 feet to a point,

(4) thence, South 58 deg. 45 min. 45 sec. West a distance of 86.64 feet to a point,

(5) thence, North 57 deg. 45 min. 18 sec. West a distance of 48.66 feet to a point at the waters edge of Silver Lake,

(6) thence with the same for the next three courses and distances, North 46 deg. 35 min. 42 sec. East a distance of 80.98 feet to a point,

(7) thence, North 80 deg. 41 min. 19 sec. East a distance of 18.43 feet to a point,

(8) thence, North 13 deg. 29 min. 08 sec. East a distance of 22.65 feet to a point, a corner for said lands of Aigner,

(9) thence leaving said waters edge, with said lands of Aigner for the next three courses and distances, North 58 deg. 17 min. 40 sec. East a distance of 111.50 feet to a found re-bar,

(10) thence, South 29 deg. 27 min. 55 sec. East a distance of 10.00 feet to a found re-bar,

(11) thence, North 58 deg. 17 min. 40 sec. East a distance of 90.00 feet to a point in the westerly line of U.S. Route 13,

(12) thence with the same, South 29 deg. 27 min. 55 sec. East a distance of 50.00 feet to a point, the point of beginning.

Containing within said metes and bounds 0.3925 acre of land, more or less., known as #580 North Dupont Highway.

# EXHIBIT D

**HS551PG235**

6940176
WHEATLEY

**023088**

'04 AU 19 P 1:53.4

Parcel Number: *ED-05-06 8.09-01-19.01-000*

Prepared By:    **JOANNE G. MILLER**

Return To:    **WACHOVIA MORTGAGE CORPORATION**
**1100 CORPORATE CENTER DRIVE - NC4723**
**RALEIGH, NC 27607-5066**

_____ [Space Above This Line For Recording Data] _____

# MORTGAGE

MIN    **100013700069401766**

## DEFINITIONS

Words used in multiple sections of this document are defined below and other words are defined in Sections 3, 11, 13, 18, 20 and 21. Certain rules regarding the usage of words used in this document are also provided in Section 16.

(A) "Security Instrument" means this document, which is dated **August**    **13 2004**  ,
together with all Riders to this document.
(B) "Borrower" is

**LLOYD J WHEATLEY**
**AUDRIA L WHEATLEY**

Borrower is the mortgagor under this Security Instrument.
(C) "MERS" is Mortgage Electronic Registration Systems, Inc. MERS is a separate corporation that is acting solely as a nominee for Lender and Lender's successors and assigns. **MERS is the mortgagee under this Security Instrument.** MERS is organized and existing under the laws of Delaware, and has an address and telephone of P.O. Box 2026, Flint, MI 48501-2026, tel. (888) 679-MERS.

DELAWARE - Single Family – Fannie Mae/Freddie Mac UNIFORM INSTRUMENT WITH MERS    Form 3008 1/01

241441 (rev06 11/00) [14411]    Page 1 of 17

JGM

**(D) "Lender"** is  **WACHOVIA MORTGAGE CORPORATION**

Lender is a  **CORPORATION**
organized and existing under the laws of  **NORTH CAROLINA**
Lender's address is  **1100 CORPORATE CENTER DRIVE**
**RALEIGH, NC 27607-5066**
**(E) "Note"**  means  the promissory  note  signed  by  Borrower  and  dated
**August     13     2004**                 . The Note states that Borrower owes Lender
**Two Hundred Thirteen Thousand Three Hundred Thirty and no/10**                  Dollars
(U.S. $    **213,330.00**                        ) plus interest. Borrower has promised to pay this
debt  in  regular  Periodic  Payments  and  to  pay  the  debt  in  full  not  later  than
**September     1     2034**             .
**(F) "Property"** means the property that is described below under the heading "Transfer of
Rights in the Property."

**(G) "Loan"** means the debt evidenced by the Note, plus interest, any prepayment charges and
late charges due under the Note, and all sums due under this Security Instrument, plus
interest.

**(H) "Riders"** means all Riders to this Security Instrument that are executed by Borrower. The
following Riders are to be executed by Borrower [check box as applicable]:

| | | |
|---|---|---|
| ☐ Adjustable Rate Rider | ☐ Condominium Rider | ☐ Second Home Rider |
| ☐ Balloon Rider | ☐ Planned Unit Development Rider | ☐ 1-4 Family Rider |
| ☐ VA Rider | ☐ Biweekly Payment Rider | ☒ Other(s) [specify] * |

**\* LEGAL DESCRIPTION**

**(I) "Applicable Law"** means all controlling applicable federal, state and local statutes,
regulations, ordinances and administrative rules and orders (that have the effect of law) as
well as all applicable final, non-appealable judicial opinions.

**(J) "Community Association Dues, Fees, and Assessments"** means all dues, fees,
assessments and other charges that are imposed on Borrower or the Property by a
condominium association, homeowners association or similar organization.

**(K) "Electronic Funds Transfer"** means any transfer of funds, other than a transaction
originated by check, draft, or similar paper instrument, which is initiated through an electronic
terminal, telephonic instrument, computer, or magnetic tape so as to order, instruct, or
authorize a financial institution to debit or credit an account. Such term includes, but is not
limited to, point-of-sale transfers, automated teller machine transactions, transfers initiated by
telephone, wire transfers, and automated clearinghouse transfers.

**(L) "Escrow Items"** means those items that are described in Section 3.

**(M) "Miscellaneous Proceeds"** means any compensation, settlement, award of damages, or
proceeds paid by any third party (other than insurance proceeds paid under the coverages
described in Section 5) for (i) damage to, or destruction of, the Property; (ii) condemnation or
other taking of all or any part of the Property; (iii) conveyance in lieu of condemnation; or (iv)
misrepresentations of, or omissions as to, the value and/or condition of the Property.

**(N) "Mortgage Insurance"** means insurance protecting Lender against the nonpayment of, or
default on, the Loan.

241441 (rev06 11/00) [14412]              Page 2 of 17              Form 3008 1/01

JGM

MS551PG237

**(O) "Periodic Payment"** means the regularly scheduled amount due for (i) principal and interest under the Note, plus (ii) any amounts under Section 3 of this Security Instrument.

**(P) "RESPA"** means the Real Estate Settlement Procedures Act (12 U.S.C. Section 2601 et seq.) and its implementing regulation, Regulation X (24 C.F.R. Part 3500), as they might be amended from time to time, or any additional or successor legislation or regulation that governs the same subject matter. As used in this Security Instrument, "RESPA" refers to all requirements and restrictions that are imposed in regard to a "federally related mortgage loan" even if the Loan does not qualify as a "federally related mortgage loan" under RESPA.

**(Q) "Successor in Interest of Borrower"** means any party that has taken title to the Property, whether or not that party has assumed Borrower's obligations under the Note and/or this Security Instrument.

TRANSFER OF RIGHTS IN THE PROPERTY

This Security Instrument secures to Lender: (i) the repayment of the Loan, and all renewals, extensions and modifications of the Note; and (ii) the performance of Borrower's covenants and agreements under this Security Instrument and the Note. For this purpose, Borrower does hereby mortgage, grant and convey to MERS (solely as nominee for Lender and Lender's successors and assigns) and to the successors and assigns of MERS the following described property located in the      **COUNTY**                      [Type of Recording Jurisdiction]
of **KENT**                                    [Name of Recording Jurisdiction]:

**SEE SCHEDULE ATTACHED HERETO; MADE A PART HEREOF**

which currently has the address of          **584 NORTH DUPONT HWY**

                                                                    [Street]
                                        **DOVER**                          [City],
Delaware    **19901**          [Zip Code] ("Property Address"):

TOGETHER WITH all the improvements now or hereafter erected on the property, and all easements, appurtenances, and fixtures now or hereafter a part of the property. All replacements and additions shall also be covered by this Security Instrument. All of the foregoing is referred to in this Security Instrument as the "Property." Borrower understands and agrees that MERS holds only legal title to the interests granted by Borrower in this Security Instrument, but, if necessary to comply with law or custom, MERS (as nominee for

**MS551PG238**

Lender and Lender's successors and assigns) has the right: to exercise any or all of those interests, including, but not limited to, the right to foreclose and sell the Property; and to take any action required of Lender including, but not limited to, releasing and canceling this Security Instrument.

BORROWER COVENANTS that Borrower is lawfully seised of the estate hereby conveyed and has the right to mortgage, grant and convey the Property and that the Property is unencumbered, except for encumbrances of record. Borrower warrants and will defend generally the title to the Property against all claims and demands, subject to any encumbrances of record.

THIS SECURITY INSTRUMENT combines uniform covenants for national use and non-uniform covenants with limited variations by jurisdiction to constitute a uniform security instrument covering real property.

UNIFORM COVENANTS. Borrower and Lender covenant and agree as follows:

**1. Payment of Principal, Interest, Escrow Items, Prepayment Charges, and Late Charges.** Borrower shall pay when due the principal of, and interest on, the debt evidenced by the Note and any prepayment charges and late charges due under the Note. Borrower shall also pay funds for Escrow Items pursuant to Section 3. Payments due under the Note and this Security Instrument shall be made in U.S. currency. However, if any check or other instrument received by Lender as payment under the Note or this Security Instrument is returned to Lender unpaid, Lender may require that any or all subsequent payments due under the Note and this Security Instrument be made in one or more of the following forms, as selected by Lender: (a) cash; (b) money order; (c) certified check, bank check, treasurer's check or cashier's check, provided any such check is drawn upon an institution whose deposits are insured by a federal agency, instrumentality, or entity; or (d) Electronic Funds Transfer.

Payments are deemed received by Lender when received at the location designated in the Note or at such other location as may be designated by Lender in accordance with the notice provisions in Section 15. Lender may return any payment or partial payment if the payment or partial payments are insufficient to bring the Loan current. Lender may accept any payment or partial payment insufficient to bring the Loan current, without waiver of any rights hereunder or prejudice to its rights to refuse such payment or partial payments in the future, but Lender is not obligated to apply such payments at the time such payments are accepted. If each Periodic Payment is applied as of its scheduled due date, then Lender need not pay interest on unapplied funds. Lender may hold such unapplied funds until Borrower makes payment to bring the Loan current. If Borrower does not do so within a reasonable period of time, Lender shall either apply such funds or return them to Borrower. If not applied earlier, such funds will be applied to the outstanding principal balance under the Note immediately prior to foreclosure. No offset or claim which Borrower might have now or in the future against Lender shall relieve Borrower from making payments due under the Note and this Security Instrument or performing the covenants and agreements secured by this Security Instrument.

**2. Application of Payments or Proceeds.** Except as otherwise described in this Section 2, all payments accepted and applied by Lender shall be applied in the following order of priority: (a) interest due under the Note; (b) principal due under the Note; (c) amounts due under Section 3. Such payments shall be applied to each Periodic Payment in the order in which it became due. Any remaining amounts shall be applied first to late charges, second to any other amounts due under this Security Instrument, and then to reduce the principal balance of the Note.

If Lender receives a payment from Borrower for a delinquent Periodic Payment which includes a sufficient amount to pay any late charge due, the payment may be applied to the delinquent payment and the late charge. If more than one Periodic Payment is outstanding, Lender may apply any payment received from Borrower to the repayment of the Periodic Payments if, and to the extent that, each payment can be paid in full. To the extent that any excess exists after the payment is applied to the full payment of one or more Periodic

**JGM**

Payments, such excess may be applied to any late charges due. Voluntary prepayments shall be applied first to any prepayment charges and then as described in the Note.

Any application of payments, insurance proceeds, or Miscellaneous Proceeds to principal due under the Note shall not extend or postpone the due date, or change the amount, of the Periodic Payments.

**3. Funds for Escrow Items.** Borrower shall pay to Lender on the day Periodic Payments are due under the Note, until the Note is paid in full, a sum (the "Funds") to provide for payment of amounts due for: (a) taxes and assessments and other items which can attain priority over this Security Instrument as a lien or encumbrance on the Property; (b) leasehold payments or ground rents on the Property, if any; (c) premiums for any and all insurance required by Lender under Section 5; and (d) Mortgage Insurance premiums, if any, or any sums payable by Borrower to Lender in lieu of the payment of Mortgage Insurance premiums in accordance with the provisions of Section 10. These items are called "Escrow Items." At origination or at any time during the term of the Loan, Lender may require that Community Association Dues, Fees, and Assessments, if any, be escrowed by Borrower, and such dues, fees and assessments shall be an Escrow Item. Borrower shall promptly furnish to Lender all notices of amounts to be paid under this Section. Borrower shall pay Lender the Funds for Escrow Items unless Lender waives Borrower's obligation to pay the Funds for any or all Escrow Items. Lender may waive Borrower's obligation to pay to Lender Funds for any or all Escrow Items at any time. Any such waiver may only be in writing. In the event of such waiver, Borrower shall pay directly, when and where payable, the amounts due for any Escrow Items for which payment of Funds has been waived by Lender and, if Lender requires, shall furnish to Lender receipts evidencing such payment within such time period as Lender may require. Borrower's obligation to make such payments and to provide receipts shall for all purposes be deemed to be a covenant and agreement contained in this Security Instrument, as the phrase "covenant and agreement" is used in Section 9. If Borrower is obligated to pay Escrow Items directly, pursuant to a waiver, and Borrower fails to pay the amount due for an Escrow Item, Lender may exercise its rights under Section 9 and pay such amount and Borrower shall then be obligated under Section 9 to repay to Lender any such amount. Lender may revoke the waiver as to any or all Escrow Items at any time by a notice given in accordance with Section 15 and, upon such revocation, Borrower shall pay to Lender all Funds, and in such amounts, that are then required under this Section 3.

Lender may, at any time, collect and hold Funds in an amount (a) sufficient to permit Lender to apply the Funds at the time specified under RESPA, and (b) not to exceed the maximum amount a lender can require under RESPA. Lender shall estimate the amount of Funds due on the basis of current data and reasonable estimates of expenditures of future Escrow Items or otherwise in accordance with Applicable Law.

The Funds shall be held in an institution whose deposits are insured by a federal agency, instrumentality, or entity (including Lender, if Lender is an institution whose deposits are so insured) or in any Federal Home Loan Bank. Lender shall apply the Funds to pay the Escrow Items no later than the time specified under RESPA. Lender shall not charge Borrower for holding and applying the Funds, annually analyzing the escrow account, or verifying the Escrow Items, unless Lender pays Borrower interest on the Funds and Applicable Law permits Lender to make such a charge. Unless an agreement is made in writing or Applicable Law requires interest to be paid on the Funds, Lender shall not be required to pay Borrower any interest or earnings on the Funds. Borrower and Lender can agree in writing, however, that interest shall be paid on the Funds. Lender shall give to Borrower, without charge, an annual accounting of the Funds as required by RESPA.

If there is a surplus of Funds held in escrow, as defined under RESPA, Lender shall account to Borrower for the excess funds in accordance with RESPA. If there is a shortage of Funds held in escrow, as defined under RESPA, Lender shall notify Borrower as required by

RESPA, and Borrower shall pay to Lender the amount necessary to make up the shortage in accordance with RESPA, but in no more than 12 monthly payments. If there is a deficiency of Funds held in escrow, as defined under RESPA, Lender shall notify Borrower as required by RESPA, and Borrower shall pay to Lender the amount necessary to make up the deficiency in accordance with RESPA, but in no more than 12 monthly payments.

Upon payment in full of all sums secured by this Security Instrument, Lender shall promptly refund to Borrower any Funds held by Lender.

**4. Charges; Liens.** Borrower shall pay all taxes, assessments, charges, fines, and impositions attributable to the Property which can attain priority over this Security Instrument, leasehold payments or ground rents on the Property, if any, and Community Association Dues, Fees, and Assessments, if any. To the extent that these items are Escrow Items, Borrower shall pay them in the manner provided in Section 3.

Borrower shall promptly discharge any lien which has priority over this Security Instrument unless Borrower: (a) agrees in writing to the payment of the obligation secured by the lien in a manner acceptable to Lender, but only so long as Borrower is performing such agreement; (b) contests the lien in good faith by, or defends against enforcement of the lien in, legal proceedings which in Lender's opinion operate to prevent the enforcement of the lien while those proceedings are pending, but only until such proceedings are concluded; or (c) secures from the holder of the lien an agreement satisfactory to Lender subordinating the lien to this Security Instrument. If Lender determines that any part of the Property is subject to a lien which can attain priority over this Security Instrument, Lender may give Borrower a notice identifying the lien. Within 10 days of the date on which that notice is given, Borrower shall satisfy the lien or take one or more of the actions set forth above in this Section 4.

Lender may require Borrower to pay a one-time charge for a real estate tax verification and/or reporting service used by Lender in connection with this Loan.

**5. Property Insurance.** Borrower shall keep the improvements now existing or hereafter erected on the Property insured against loss by fire, hazards included within the term "extended coverage," and any other hazards including, but not limited to, earthquakes and floods, for which Lender requires insurance. This insurance shall be maintained in the amounts (including deductible levels) and for the periods that Lender requires. What Lender requires pursuant to the preceding sentences can change during the term of the Loan. The insurance carrier providing the insurance shall be chosen by Borrower subject to Lender's right to disapprove Borrower's choice, which right shall not be exercised unreasonably. Lender may require Borrower to pay, in connection with this Loan, either: (a) a one-time charge for flood zone determination, certification and tracking services; or (b) a one-time charge for flood zone determination and certification services and subsequent charges each time remappings or similar changes occur which reasonably might affect such determination or certification. Borrower shall also be responsible for the payment of any fees imposed by the Federal Emergency Management Agency in connection with the review of any flood zone determination resulting from an objection by Borrower.

If Borrower fails to maintain any of the coverages described above, Lender may obtain insurance coverage, at Lender's option and Borrower's expense. Lender is under no obligation to purchase any particular type or amount of coverage. Therefore, such coverage shall cover Lender, but might or might not protect Borrower, Borrower's equity in the Property, or the contents of the Property, against any risk, hazard or liability and might provide greater or lesser coverage than was previously in effect. Borrower acknowledges that the cost of the

insurance coverage so obtained might significantly exceed the cost of insurance that Borrower could have obtained. Any amounts disbursed by Lender under this Section 5 shall become additional debt of Borrower secured by this Security Instrument. These amounts shall bear interest at the Note rate from the date of disbursement and shall be payable, with such interest, upon notice from Lender to Borrower requesting payment.

All insurance policies required by Lender and renewals of such policies shall be subject to Lender's right to disapprove such policies, shall include a standard mortgage clause, and shall name Lender as mortgagee and/or as an additional loss payee. Lender shall have the right to hold the policies and renewal certificates. If Lender requires, Borrower shall promptly give to Lender all receipts of paid premiums and renewal notices. If Borrower obtains any form of insurance coverage, not otherwise required by Lender, for damage to, or destruction of, the Property, such policy shall include a standard mortgage clause and shall name Lender as mortgagee and/or as an additional loss payee.

In the event of loss, Borrower shall give prompt notice to the insurance carrier and Lender. Lender may make proof of loss if not made promptly by Borrower. Unless Lender and Borrower otherwise agree in writing, any insurance proceeds, whether or not the underlying insurance was required by Lender, shall be applied to restoration or repair of the Property, if the restoration or repair is economically feasible and Lender's security is not lessened. During such repair and restoration period, Lender shall have the right to hold such insurance proceeds until Lender has had an opportunity to inspect such Property to ensure the work has been completed to Lender's satisfaction, provided that such inspection shall be undertaken promptly. Lender may disburse proceeds for the repairs and restoration in a single payment or in a series of progress payments as the work is completed. Unless an agreement is made in writing or Applicable Law requires interest to be paid on such insurance proceeds, Lender shall not be required to pay Borrower any interest or earnings on such proceeds. Fees for public adjusters, or other third parties, retained by Borrower shall not be paid out of the insurance proceeds and shall be the sole obligation of Borrower. If the restoration or repair is not economically feasible or Lender's security would be lessened, the insurance proceeds shall be applied to the sums secured by this Security Instrument, whether or not then due, with the excess, if any, paid to Borrower. Such insurance proceeds shall be applied in the order provided for in Section 2.

If Borrower abandons the Property, Lender may file, negotiate and settle any available insurance claim and related matters. If Borrower does not respond within 30 days to a notice from Lender that the insurance carrier has offered to settle a claim, then Lender may negotiate and settle the claim. The 30-day period will begin when the notice is given. In either event, or if Lender acquires the Property under Section 22 or otherwise, Borrower hereby assigns to Lender (a) Borrower's rights to any insurance proceeds in an amount not to exceed the amounts unpaid under the Note or this Security Instrument, and (b) any other of Borrower's rights (other than the right to any refund of unearned premiums paid by Borrower) under all insurance policies covering the Property, insofar as such rights are applicable to the coverage of the Property. Lender may use the insurance proceeds either to repair or restore the Property or to pay amounts unpaid under the Note or this Security Instrument, whether or not then due.

**6. Occupancy.** Borrower shall occupy, establish, and use the Property as Borrower's principal residence within 60 days after the execution of this Security Instrument and shall continue to occupy the Property as Borrower's principal residence for at least one year after

241441 (rev06 11/00) [14417]                Page 7 of 17                         Form 3008 1/01

JGM

**HS551PG242**

the date of occupancy, unless Lender otherwise agrees in writing, which consent shall not be unreasonably withheld, or unless extenuating circumstances exist which are beyond Borrower's control.

**7. Preservation, Maintenance and Protection of the Property; Inspections.** Borrower shall not destroy, damage or impair the Property, allow the Property to deteriorate or commit waste on the Property. Whether or not Borrower is residing in the Property, Borrower shall maintain the Property in order to prevent the Property from deteriorating or decreasing in value due to its condition. Unless it is determined pursuant to Section 5 that repair or restoration is not economically feasible, Borrower shall promptly repair the Property if damaged to avoid further deterioration or damage. If insurance or condemnation proceeds are paid in connection with damage to, or the taking of, the Property, Borrower shall be responsible for repairing or restoring the Property only if Lender has released proceeds for such purposes. Lender may disburse proceeds for the repairs and restoration in a single payment or in a series of progress payments as the work is completed. If the insurance or condemnation proceeds are not sufficient to repair or restore the Property, Borrower is not relieved of Borrower's obligation for the completion of such repair or restoration.

Lender or its agent may make reasonable entries upon and inspections of the Property. If it has reasonable cause, Lender may inspect the interior of the improvements on the Property. Lender shall give Borrower notice at the time of or prior to such an interior inspection specifying such reasonable cause.

**8. Borrower's Loan Application.** Borrower shall be in default if, during the Loan application process, Borrower or any persons or entities acting at the direction of Borrower or with Borrower's knowledge or consent gave materially false, misleading, or inaccurate information or statements to Lender (or failed to provide Lender with material information) in connection with the Loan. Material representations include, but are not limited to, representations concerning Borrower's occupancy of the Property as Borrower's principal residence.

**9. Protection of Lender's Interest in the Property and Rights Under this Security Instrument.** If (a) Borrower fails to perform the covenants and agreements contained in this Security Instrument, (b) there is a legal proceeding that might significantly affect Lender's interest in the Property and/or rights under this Security Instrument (such as a proceeding in bankruptcy, probate, for condemnation or forfeiture, for enforcement of a lien which may attain priority over this Security Instrument or to enforce laws or regulations), or (c) Borrower has abandoned the Property, then Lender may do and pay for whatever is reasonable or appropriate to protect Lender's interest in the Property and rights under this Security Instrument, including protecting and/or assessing the value of the Property, and securing and/or repairing the Property. Lender's actions can include, but are not limited to: (a) paying any sums secured by a lien which has priority over this Security Instrument; (b) appearing in court; and (c) paying reasonable attorneys' fees to protect its interest in the Property and/or rights under this Security Instrument, including its secured position in a bankruptcy proceeding. Securing the Property includes, but is not limited to, entering the Property to make repairs, change locks, replace or board up doors and windows, drain water from pipes, eliminate building or other code violations or dangerous conditions, and have utilities turned on or off. Although Lender may take action under this Section 9, Lender does not have to do so and is not under any duty or obligation to do so. It is agreed that Lender incurs no liability for not taking any or all actions authorized under this Section 9.

**MS551 PG243**

Any amounts disbursed by Lender under this Section 9 shall become additional debt of Borrower secured by this Security Instrument. These amounts shall bear interest at the Note rate from the date of disbursement and shall be payable, with such interest, upon notice from Lender to Borrower requesting payment.

If this Security Instrument is on a leasehold, Borrower shall comply with all the provisions of the lease. If Borrower acquires fee title to the Property, the leasehold and the fee title shall not merge unless Lender agrees to the merger in writing.

**10. Mortgage Insurance.** If Lender required Mortgage Insurance as a condition of making the Loan, Borrower shall pay the premiums required to maintain the Mortgage Insurance in effect. If, for any reason, the Mortgage Insurance coverage required by Lender ceases to be available from the mortgage insurer that previously provided such insurance and Borrower was required to make separately designated payments toward the premiums for Mortgage Insurance, Borrower shall pay the premiums required to obtain coverage substantially equivalent to the Mortgage Insurance previously in effect, at a cost substantially equivalent to the cost to Borrower of the Mortgage Insurance previously in effect, from an alternate mortgage insurer selected by Lender. If substantially equivalent Mortgage Insurance coverage is not available, Borrower shall continue to pay to Lender the amount of the separately designated payments that were due when the insurance coverage ceased to be in effect. Lender will accept, use and retain these payments as a non-refundable loss reserve in lieu of Mortgage Insurance. Such loss reserve shall be non-refundable, notwithstanding the fact that the Loan is ultimately paid in full, and Lender shall not be required to pay Borrower any interest or earnings on such loss reserve. Lender can no longer require loss reserve payments if Mortgage Insurance coverage (in the amount and for the period that Lender requires) provided by an insurer selected by Lender again becomes available, is obtained, and Lender requires separately designated payments toward the premiums for Mortgage Insurance. If Lender required Mortgage Insurance as a condition of making the Loan and Borrower was required to make separately designated payments toward the premiums for Mortgage Insurance, Borrower shall pay the premiums required to maintain Mortgage Insurance in effect, or to provide a non-refundable loss reserve, until Lender's requirement for Mortgage Insurance ends in accordance with any written agreement between Borrower and Lender providing for such termination or until termination is required by Applicable Law. Nothing in this Section 10 affects Borrower's obligation to pay interest at the rate provided in the Note.

Mortgage Insurance reimburses Lender (or any entity that purchases the Note) for certain losses it may incur if Borrower does not repay the Loan as agreed. Borrower is not a party to the Mortgage Insurance.

Mortgage insurers evaluate their total risk on all such insurance in force from time to time, and may enter into agreements with other parties that share or modify their risk, or reduce losses. These agreements are on terms and conditions that are satisfactory to the mortgage insurer and the other party (or parties) to these agreements. These agreements may require the mortgage insurer to make payments using any source of funds that the mortgage insurer may have available (which may include funds obtained from Mortgage Insurance premiums).

As a result of these agreements, Lender, any purchaser of the Note, another insurer, any reinsurer, any other entity, or any affiliate of any of the foregoing, may receive (directly or indirectly) amounts that derive from (or might be characterized as ) a portion of Borrower's payments for Mortgage Insurance, in exchange for sharing or modifying the mortgage insurer's risk, or reducing losses. If such agreement provides that an affiliate of Lender takes a share of

the insurer's risk in exchange for a share of the premiums paid to the insurer, the arrangement is often termed "captive reinsurance." Further:

(a) Any such agreements will not affect the amounts that Borrower has agreed to pay for Mortgage Insurance, or any other terms of the Loan. Such agreements will not increase the amount Borrower will owe for Mortgage Insurance, and they will not entitle Borrower to any refund.

(b) Any such agreements will not affect the rights Borrower has - if any - with respect to the Mortgage Insurance under the Homeowners Protection Act of 1998 or any other law. These rights may include the right to receive certain disclosures, to request and obtain cancellation of the Mortgage Insurance, to have the Mortgage Insurance terminated automatically, and/or to receive a refund of any Mortgage Insurance premiums that were unearned at the time of such cancellation or termination.

11. Assignment of Miscellaneous Proceeds; Forfeiture. All Miscellaneous Proceeds are hereby assigned to and shall be paid to Lender.

If the Property is damaged, such Miscellaneous Proceeds shall be applied to restoration or repair of the Property, if the restoration or repair is economically feasible and Lender's security is not lessened. During such repair and restoration period, Lender shall have the right to hold such Miscellaneous Proceeds until Lender has had an opportunity to inspect such Property to ensure the work has been completed to Lender's satisfaction, provided that such inspection shall be undertaken promptly. Lender may pay for the repairs and restoration in a single disbursement or in a series of progress payments as the work is completed. Unless an agreement is made in writing or Applicable Law requires interest to be paid on such Miscellaneous Proceeds, Lender shall not be required to pay Borrower any interest or earnings on such Miscellaneous Proceeds. If the restoration or repair is not economically feasible or Lender's security would be lessened, the Miscellaneous Proceeds shall be applied to the sums secured by this Security Instrument, whether or not then due, with the excess, if any, paid to Borrower. Such Miscellaneous Proceeds shall be applied in the order provided for in Section 2.

In the event of a total taking, destruction, or loss in value of the Property, the Miscellaneous Proceeds shall be applied to the sums secured by this Security Instrument, whether or not then due, with the excess, if any, paid to Borrower.

In the event of a partial taking, destruction, or loss in value of the Property in which the fair market value of the Property immediately before the partial taking, destruction, or loss in value is equal to or greater than the amount of the sums secured by this Security Instrument immediately before the partial taking, destruction, or loss in value, unless Borrower and Lender otherwise agree in writing, the sums secured by this Security Instrument shall be reduced by the amount of the Miscellaneous Proceeds multiplied by the following fraction: (a) the total amount of the sums secured immediately before the partial taking, destruction, or loss in value divided by (b) the fair market value of the Property immediately before the partial taking, destruction, or loss in value. Any balance shall be paid to Borrower.

In the event of a partial taking, destruction, or loss in value of the Property in which the fair market value of the Property immediately before the partial taking, destruction, or loss in value is less than the amount of the sums secured immediately before the partial taking, destruction, or loss in value, unless Borrower and Lender otherwise agree in writing, the Miscellaneous Proceeds shall be applied to the sums secured by this Security Instrument whether or not the sums are then due.

If the Property is abandoned by Borrower, or if, after notice by Lender to Borrower that the Opposing Party (as defined in the next sentence) offers to make an award to settle a claim

# MS551 PG245

for damages, Borrower fails to respond to Lender within 30 days after the date the notice is given, Lender is authorized to collect and apply the Miscellaneous Proceeds either to restoration or repair of the Property or to the sums secured by this Security Instrument, whether or not then due. "Opposing Party" means the third party that owes Borrower Miscellaneous Proceeds or the party against whom Borrower has a right of action in regard to Miscellaneous Proceeds.

Borrower shall be in default if any action or proceeding, whether civil or criminal, is begun that, in Lender's judgment, could result in forfeiture of the Property or other material impairment of Lender's interest in the Property or rights under this Security Instrument. Borrower can cure such a default and, if acceleration has occurred, reinstate as provided in Section 19, by causing the action or proceeding to be dismissed with a ruling that, in Lender's judgment, precludes forfeiture of the Property or other material impairment of Lender's interest in the Property or rights under this Security Instrument. The proceeds of any award or claim for damages that are attributable to the impairment of Lender's interest in the Property are hereby assigned and shall be paid to Lender.

All Miscellaneous Proceeds that are not applied to restoration or repair of the Property shall be applied in the order provided for in Section 2.

**12. Borrower Not Released; Forbearance By Lender Not a Waiver.** Extension of the time for payment or modification of amortization of the sums secured by this Security Instrument granted by Lender to Borrower or any Successor in Interest of Borrower shall not operate to release the liability of Borrower or any Successors in Interest of Borrower. Lender shall not be required to commence proceedings against any Successor in Interest of Borrower or to refuse to extend time for payment or otherwise modify amortization of the sums secured by this Security Instrument by reason of any demand made by the original Borrower or any Successors in Interest of Borrower. Any forbearance by Lender in exercising any right or remedy including, without limitation, Lender's acceptance of payments from third persons, entities or Successors in Interest of Borrower or in amounts less than the amount then due, shall not be a waiver of or preclude the exercise of any right or remedy.

**13. Joint and Several Liability; Co-signers; Successors and Assigns Bound.** Borrower covenants and agrees that Borrower's obligations and liability shall be joint and several. However, any Borrower who co-signs this Security Instrument but does not execute the Note (a "co-signer"): (a) is co-signing this Security Instrument only to mortgage, grant and convey the co-signer's interest in the Property under the terms of this Security Instrument; (b) is not personally obligated to pay the sums secured by this Security Instrument; and (c) agrees that Lender and any other Borrower can agree to extend, modify, forbear or make any accommodations with regard to the terms of this Security Instrument or the Note without the co-signer's consent.

Subject to the provisions of Section 18, any Successor in Interest of Borrower who assumes Borrower's obligations under this Security Instrument in writing, and is approved by Lender, shall obtain all of Borrower's rights and benefits under this Security Instrument. Borrower shall not be released from Borrower's obligations and liability under this Security Instrument unless Lender agrees to such release in writing. The covenants and agreements of this Security Instrument shall bind (except as provided in Section 20) and benefit the successors and assigns of Lender.

**14. Loan Charges.** Lender may charge Borrower fees for services performed in connection with Borrower's default, for the purpose of protecting Lender's interest in the Property and rights under this Security Instrument, including, but not limited to, attorneys' fees, property inspection and valuation fees. In regard to any other fees, the absence of express authority in

241441 (rev06 11/00) [144111]          Page 11 of 17          Form 3008 1/01

this Security Instrument to charge a specific fee to Borrower shall not be construed as a prohibition on the charging of such fee. Lender may not charge fees that are expressly prohibited by this Security Instrument or by Applicable Law.

If the Loan is subject to a law which sets maximum loan charges, and that law is finally interpreted so that the interest or other loan charges collected or to be collected in connection with the Loan exceed the permitted limits, then: (a) any such loan charge shall be reduced by the amount necessary to reduce the charge to the permitted limit; and (b) any sums already collected from Borrower which exceeded permitted limits will be refunded to Borrower. Lender may choose to make this refund by reducing the principal owed under the Note or by making a direct payment to Borrower. If a refund reduces principal, the reduction will be treated as a partial prepayment without any prepayment charge (whether or not a prepayment charge is provided for under the Note). Borrower's acceptance of any such refund made by direct payment to Borrower will constitute a waiver of any right of action Borrower might have arising out of such overcharge.

**15. Notices.** All notices given by Borrower or Lender in connection with this Security Instrument must be in writing. Any notice to Borrower in connection with this Security Instrument shall be deemed to have been given to Borrower when mailed by first class mail or when actually delivered to Borrower's notice address if sent by other means. Notice to any one Borrower shall constitute notice to all Borrowers unless Applicable Law expressly requires otherwise. The notice address shall be the Property Address unless Borrower has designated a substitute notice address by notice to Lender. Borrower shall promptly notify Lender of Borrower's change of address. If Lender specifies a procedure for reporting Borrower's change of address, then Borrower shall only report a change of address through that specified procedure. There may be only one designated notice address under this Security Instrument at any one time. Any notice to Lender shall be given by delivering it or by mailing it by first class mail to Lender's address stated herein unless Lender has designated another address by notice to Borrower. Any notice in connection with this Security Instrument shall not be deemed to have been given to Lender until actually received by Lender. If any notice required by this Security Instrument is also required under Applicable Law, the Applicable Law requirement will satisfy the corresponding requirement under this Security Instrument.

**16. Governing Law; Severability; Rules of Construction.** This Security Instrument shall be governed by federal law and the law of the jurisdiction in which the Property is located. All rights and obligations contained in this Security Instrument are subject to any requirements and limitations of Applicable Law. Applicable Law might explicitly or implicitly allow the parties to agree by contract or it might be silent, but such silence shall not be construed as a prohibition against agreement by contract. In the event that any provision or clause of this Security Instrument or the Note conflicts with Applicable Law, such conflict shall not affect other provisions of this Security Instrument or the Note which can be given effect without the conflicting provision.

As used in this Security Instrument: (a) words of the masculine gender shall mean and include corresponding neuter words or words of the feminine gender; (b) words in the singular shall mean and include the plural and vice versa; and (c) the word "may" gives sole discretion without any obligation to take any action.

**17. Borrower's Copy.** Borrower shall be given one copy of the Note and of this Security Instrument.

HS551PG247

**18. Transfer of the Property or a Beneficial Interest in Borrower.** As used in this Section 18, "Interest in the Property" means any legal or beneficial interest in the Property, including, but not limited to, those beneficial interests transferred in a bond for deed, contract for deed, installment sales contract or escrow agreement, the intent of which is the transfer of title by Borrower at a future date to a purchaser.

If all or any part of the Property or any Interest in the Property is sold or transferred (or if Borrower is not a natural person and a beneficial interest in Borrower is sold or transferred) without Lender's prior written consent, Lender may require immediate payment in full of all sums secured by this Security Instrument. However, this option shall not be exercised by Lender if such exercise is prohibited by Applicable Law.

If Lender exercises this option, Lender shall give Borrower notice of acceleration. The notice shall provide a period of not less than 30 days from the date the notice is given in accordance with Section 15 within which Borrower must pay all sums secured by this Security Instrument. If Borrower fails to pay these sums prior to the expiration of this period, Lender may invoke any remedies permitted by this Security Instrument without further notice or demand on Borrower.

**19. Borrower's Right to Reinstate After Acceleration.** If Borrower meets certain conditions, Borrower shall have the right to have enforcement of this Security Instrument discontinued at any time prior to the earliest of: (a) five days before sale of the Property pursuant to any power of sale contained in this Security Instrument; (b) such other period as Applicable Law might specify for the termination of Borrower's right to reinstate; or (c) entry of a judgment enforcing this Security Instrument. Those conditions are that Borrower: (a) pays Lender all sums which then would be due under this Security Instrument and the Note as if no acceleration had occurred; (b) cures any default of any other covenants or agreements; (c) pays all expenses incurred in enforcing this Security Instrument, including, but not limited to, reasonable attorneys' fees, property inspection and valuation fees, and other fees incurred for the purpose of protecting Lender's interest in the Property and rights under this Security Instrument; and (d) takes such action as Lender may reasonably require to assure that Lender's interest in the Property and rights under this Security Instrument, and Borrower's obligation to pay the sums secured by this Security Instrument, shall continue unchanged. Lender may require that Borrower pay such reinstatement sums and expenses in one or more of the following forms, as selected by Lender: (a) cash; (b) money order; (c) certified check, bank check, treasurer's check or cashier's check, provided any such check is drawn upon an institution whose deposits are insured by a federal agency, instrumentality or entity; or (d) Electronic Funds Transfer. Upon reinstatement by Borrower, this Security Instrument and obligations secured hereby shall remain fully effective as if no acceleration had occurred. However, this right to reinstate shall not apply in the case of acceleration under Section 18.

**20. Sale of Note; Change of Loan Servicer; Notice of Grievance.** The Note or a partial interest in the Note (together with this Security Instrument) can be sold one or more times without prior notice to Borrower. A sale might result in a change in the entity (known as the "Loan Servicer") that collects Periodic Payments due under the Note and this Security Instrument and performs other mortgage loan servicing obligations under the Note, this Security Instrument, and Applicable Law. There also might be one or more changes of the Loan Servicer unrelated to a sale of the Note. If there is a change of the Loan Servicer, Borrower will be given written notice of the change which will state the name and address of the new Loan Servicer, the address to which payments should be made and any other information RESPA requires in connection with a notice of transfer of servicing. If the Note is

**MS551PG248**

sold and thereafter the Loan is serviced by a Loan Servicer other than the purchaser of the Note, the mortgage loan servicing obligations to Borrower will remain with the Loan Servicer or be transferred to a successor Loan Servicer and are not assumed by the Note purchaser unless otherwise provided by the Note purchaser.

Neither Borrower nor Lender may commence, join, or be joined to any judicial action (as either an individual litigant or the member of a class) that arises from the other party's actions pursuant to this Security Instrument or that alleges that the other party has breached any provision of, or any duty owed by reason of, this Security Instrument, until such Borrower or Lender has notified the other party (with such notice given in compliance with the requirements of Section 15) of such alleged breach and afforded the other party hereto a reasonable period after the giving of such notice to take corrective action. If Applicable Law provides a time period which must elapse before certain action can be taken, that time period will be deemed to be reasonable for purposes of this paragraph. The notice of acceleration and opportunity to cure given to Borrower pursuant to Section 22 and the notice of acceleration given to Borrower pursuant to Section 18 shall be deemed to satisfy the notice and opportunity to take corrective action provisions of this Section 20.

**21. Hazardous Substances.** As used in this Section 21: (a) "Hazardous Substances" are those substances defined as toxic or hazardous substances, pollutants, or wastes by Environmental Law and the following substances: gasoline, kerosene, other flammable or toxic petroleum products, toxic pesticides and herbicides, volatile solvents, materials containing asbestos or formaldehyde, and radioactive materials; (b) "Environmental Law" means federal laws and laws of the jurisdiction where the Property is located that relate to health, safety or environmental protection; (c) "Environmental Cleanup" includes any response action, remedial action, or removal action, as defined in Environmental Law; and (d) an "Environmental Condition" means a condition that can cause, contribute to, or otherwise trigger an Environmental Cleanup.

Borrower shall not cause or permit the presence, use, disposal, storage, or release of any Hazardous Substances, or threaten to release any Hazardous Substances, on or in the Property. Borrower shall not do, nor allow anyone else to do, anything affecting the Property (a) that is in violation of any Environmental Law, (b) which creates an Environmental Condition, or (c) which, due to the presence, use, or release of a Hazardous Substance, creates a condition that adversely affects the value of the Property. The preceding two sentences shall not apply to the presence, use, or storage on the Property of small quantities of Hazardous Substances that are generally recognized to be appropriate to normal residential uses and to maintenance of the Property (including, but not limited to, hazardous substances in consumer products).

Borrower shall promptly give Lender written notice of (a) any investigation, claim, demand, lawsuit or other action by any governmental or regulatory agency or private party involving the Property and any Hazardous Substance or Environmental Law of which Borrower has actual knowledge, (b) any Environmental Condition, including but not limited to, any spilling, leaking, discharge, release or threat of release of any Hazardous Substance, and (c) any condition caused by the presence, use or release of a Hazardous Substance which adversely affects the value of the Property. If Borrower learns, or is notified by any governmental or regulatory authority, or any private party, that any removal or other remediation of any Hazardous Substance affecting the Property is necessary, Borrower shall promptly take all necessary remedial actions in accordance with Environmental Law. Nothing herein shall create any obligation on Lender for an Environmental Cleanup.

**MS551PG249**

NON-UNIFORM COVENANTS. Borrower and Lender further covenant and agree as follows:

**22. Acceleration; Remedies.** Lender shall give notice to Borrower prior to acceleration following Borrower's breach of any covenant or agreement in this Security Instrument (but not prior to acceleration under Section 18 unless Applicable Law provides otherwise). The notice shall specify: (a) the default; (b) the action required to cure the default; (c) a date, not less than 30 days from the date the notice is given to Borrower, by which the default must be cured; and (d) that failure to cure the default on or before the date specified in the notice may result in acceleration of the sums secured by this Security Instrument, foreclosure by judicial proceeding and sale of the Property. The notice shall further inform Borrower of the right to reinstate after acceleration and the right to assert in the foreclosure proceeding the non-existence of a default or any other defense of Borrower to acceleration and foreclosure. If the default is not cured on or before the date specified in the notice, Lender at its option may require immediate payment in full of all sums secured by this Security Instrument without further demand and may foreclose this Security Instrument by judicial proceeding. Lender shall be entitled to collect all expenses incurred in pursuing the remedies provided in this Section 22, including, but not limited to, attorneys' fees of         5.000          % of the amount decreed for principal and interest (which fees shall be allowed and paid as part of the decree of judgment) and costs of title evidence.

**23. Satisfaction.** Upon payment of all sums secured by this Security Instrument, this Security Instrument shall cease and become void and of no effect and Lender shall cause the entry of satisfaction to be made upon the records of this Security Instrument. Borrower shall pay all costs and fees for entering the satisfaction upon the records of this Security Instrument. Lender may charge Borrower a fee for entering the satisfaction, but only if the fee is paid to a third party for services rendered and the charging of the fee is permitted under Applicable Law.

**24. Future Advances.** This Security Instrument secures a maximum amount of up to 150% of the amount of the Note. This Security Instrument shall secure any additional loans as well as any and all present or future advances and readvances under the Note made by Lender to or for the benefit of Borrower or the Property, all of which shall be entitled to the benefits of this Security Instrument under 25 Del. Code Section 2118 and shall have the same lien priority as if the future loans, advances or readvances were made as of the date hereof including, without limitation: (a) principal, interest, late charges, fees and other amounts due under the Note or this Security Instrument; (b) all advances by Lender to Borrower or any other person to pay costs of erection, construction, alteration, repair, restoration, maintenance and completion of any improvements on the Property; (c) all advances made or costs incurred by Borrower for the payment of real estate taxes, assessments or other governmental charges, maintenance charges, insurance premiums, appraisals charges, environmental inspection, audit, testing or compliance costs, and costs incurred by Lender for the enforcement and protection of the Property or the lien of this Security Instrument; and (d) all legal fees, costs and other expenses incurred by Lender by reason of any default or otherwise in connection with the Note. Borrower agrees that if, at any time during the term of this Security Instrument or following a foreclosure hereof, Borrower fails to perform or observe any covenant or obligation under this Security Instrument including, without limitation, payment of any of the foregoing, Lender may (but shall not be obligated to) take such steps as are reasonably necessary to remedy any such nonperformance or nonobservance and provide

JGM

0840176
WHEATLEY

**MS551PG250**

payment thereof. All amounts advanced by Lender shall be added to the amount secured by this Security Instrument and shall be due and payable promptly after demand, together with interest at the rate of interest in effect under the Note, such interest to be calculated from the date of such advance to the date of repayment thereof. Borrower's obligations hereunder shall be continuing and shall survive notwithstanding a foreclosure of this Security Instrument.

BY SIGNING BELOW, Borrower accepts and agrees to the terms and covenants contained in this Security Instrument and in any Rider executed by Borrower and recorded with it.

Signed, sealed and delivered in the presence of:

_____          _____ (Seal)
                                          LLOYD J WHEATLEY              -Borrower

_____          _____ (Seal)
as to both                                AUDRIA L WHEATLEY            -Borrower

_____ (Seal)   _____ (Seal)
                        -Borrower                                -Borrower

_____ (Seal)   _____ (Seal)
                        -Borrower                                -Borrower

_____ (Seal)   _____ (Seal)
                        -Borrower                                -Borrower

241441 (rev06 11/00) [144116]          Page 16 of 17                Form 3008 1/01

JGM

MS551PG251

STATE OF DELAWARE,                              *Kent* County ss:

This instrument was acknowledged before me on   8/13/04        by

*Lloyd J. Wheatley & Audria L. Wheatley*

My Commission Expires:

_____
Notary Public

JOHN I. ELLIS
AUTHORIZED TO PERFORM
NOTARIAL ACTS PURSUANT
TO DELAWARE LAW
TITLE 29§ 4323 (a) (3)

241441  (rev06  11/00)  [144117]              Page 17 of 17                     Form 3008 1/01

JGM

MS55IPG252

Lloyd & Audria Wheatley
584 North Dupont Highway

ALL that certain lot, piece or parcel of land situated in the City of Dover, Kent County, State of Delaware, lying on the westerly side of U.S. Route 13, being bounded as follows; on the North and South by lands now or late of Peter Aigner, on the East by U.S. Route 13, also known as "North Dupont Highway", on the West by Silver Lake, as shown on a survey plan prepared by McClure Associates Inc., dated 7/6/04, file#MA:06-42-04 and more particularly described as follows:

BEGINNING at a point in the westerly line of U.S. Route 13, a corner for this lot and for said lands of Aigner, said point located a distance of 514.3 feet from a found concrete monument at the intersection of the westerly line of U.S. Route 13 with the northerly line of Garden Lane, thence from said beginning point the following six (6) courses and distances;

(1) with said lands of Aigner for the first three courses and distances, South 58 deg. 17 min. 40 sec. West a distance of 90.00 feet to a found re-bar,

(2) thence, North 29 deg. 27 min. 55 sec. West a distance of 10.00 feet to a found re-bar,

(3) thence, South 58 deg. 17 min. 40 sec. West a distance of 111.50 feet to a point at the waters edge of Silver Lane,

(4) thence with the same, North 14 deg. 39 min. 13 sec. West a distance of 94.63 feet to a point, a corner for said lands of Aigner,

(5) thence with said Aigner lands, North 60 deg. 05 min. 05 sec. East a distance of 177.16 feet to a point in the westerly line of U.S. Route 13, said point also located South 65 deg. 59 min. East a distance of 0.6 feet from a found iron pipe,

(6) thence with said line of U.S. Route 13, South 29 deg. 27 min. 55 sec. East a distance of 95 feet to a point, the point of beginning.

Containing within said metes and bounds 0.403 acre of land, more or less, known as #584 North Dupont Highway.

# IN THE UNITED STATES DISTRICT COURT

# FOR THE DISTRICT OF DELAWARE

|  |  |  |
|---|---|---|
| TOLANO ANDERSON, et al., | ) | |
| | ) | |
| Plaintiffs, | ) | C.A. No. 06 CV 00567 (SLR) |
| | ) | |
| v. | ) | |
| | ) | |
| WACHOVIA MORTGAGE CORPORATION | ) | |
| *and* WACHOVIA CORPORATION, | ) | |
| | ) | |
| Defendants. | ) | |
| | ) | |

_____

## ORDER

_____

AND NOW, this ___ day of _____ , 2006, upon consideration of the motion of defendants Wachovia Mortgage Corporation and Wachovia Corporation to dismiss plaintiffs' amended complaint in this action pursuant to Federal Rule of Civil Procedure 12(b)(6), it is HEREBY ORDERED that defendants' motion is GRANTED, and plaintiffs' amended complaint is DISMISSED WITH PREJUDICE for failure to state a claim upon which relief can be granted.

_____

Sue L. Robinson, C.U.S.D.J

## CERTIFICATE OF SERVICE

I, Michael J. Barrie, certify that the forgoing Motion and Opening Brief of Defendants Wachovia Mortgage Corporation and Wachovia Corporation to Dismiss Plaintiffs' Amended Complaint Pursuant to Federal Rule of Civil Procedure 12(b)(6) has been electronically filed and is available to be viewed and downloaded on the Court's ECF website.  I further certify that I have served a copy of the Motion and Brief upon the following by overnight mail:

John S. Grady, Esquire
Grady & Hampton, LLC
6 North Bradford Street
Dover, DE 19904

/s/ Michael J. Barrie

October 23, 2006