IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| TOLANO ANDERSON, CATHY ANDERSON, RICHARD WILKINS, BRENDA WILKINS, LLOYD WHEATLEY, and AUDRIA WHEATLEY, | ) ) ) ) ) ) |
| Plaintiffs, | ) ) |
| v. | ) Civ. No. 06-567-SLR ) |
| WACHOVIA MORTGAGE CORPORATION, and WACHOVIA CORPORATION, | ) ) ) ) |
| Defendants. | ) ) |

---

John S. Grady, Esquire, Grady & Hampton, LLC, Dover, Delaware. Counsel for Plaintiffs.

Michael J. Barrie, Esquire, Schnader Harrison Segal & Lewis LLP, Wilmington, Delaware. Counsel for Defendants. Of Counsel: Elizabeth K. Ainslie, Esquire, and Stephen A. Fogdall, Esquire, Schnader Harrison Segal & Lewis LLP, Philadelphia, Pennsylvania.

---

**MEMORANDUM OPINION**

Dated: July 18, 2007
Wilmington, Delaware



ROBINSON, Judge

## I. INTRODUCTION

Plaintiffs Tolano and Cathy Anderson ("the Andersons"), Richard and Brenda Wilkins ("the Wilkinses"), and Dr. Lloyd and Audria Wheatley ("the Wheatleys") (collectively, "plaintiffs") filed the action at bar on August 11, 2006, in the Superior Court of the State of Delaware. (D.I. 1, ex. A)  Defendants Wachovia Mortgage Corporation and Wachovia Corporation (collectively, "Wachovia" or "defendants") removed this suit to federal court on September 13, 2006. (D.I. 1)  Seven days later, defendants filed a motion to dismiss the complaint. (D.I. 4)

Plaintiffs' amended complaint, filed on October 3, 2006, alleges that defendants are liable for racial discrimination under 42 U.S.C. § 1981 and tortious interference with contractual relations, breach of contract, and breach of the covenant of good faith and fair dealing pursuant to the laws of the State of Delaware.[1]  (D.I. 8)  After plaintiffs filed the amended complaint, defendants withdrew their first motion to dismiss and, on October 23, 2006, filed a new motion to dismiss on the grounds that the amended complaint fails to state a claim under Fed. R. Civ. P. 12(b)(6) and that plaintiffs' § 1981 claim is time-barred. (D.I. 10, 11)  The court has jurisdiction over this matter pursuant to 28 U.S.C. § 1331, and has supplemental jurisdiction over plaintiffs' state law claims under 28 U.S.C. § 1367.  For the reasons stated above, defendants' motion to dismiss is granted in part and denied in part.

---

[1] Plaintiffs have withdrawn with prejudice their claims of racial discrimination under 15 U.S.C. § 1691. (D.I. 13 at 22)

## II. BACKGROUND[2]

Plaintiffs are three African American couples who each purchased one of three adjoining residential properties in Dover, Delaware. Plaintiffs claim that defendants discriminated against them on the basis of race by adding terms and conditions to their mortgage contracts that were not applied to similarly-situated white applicants. Prior to June 2004, plaintiffs had collectively obtained eight mortgages from defendants for properties in predominantly minority or racially-mixed neighborhoods; plaintiffs had also held bank accounts with Wachovia Bank in the past. (D.I. 8 at ¶¶ 2-3) In June 2004, Tolano Anderson contacted J.D. Hogsten ("Hogsten"), a loan officer for defendants, and informed him of plaintiffs' plan to purchase three adjoining properties in Dover from a seller named Jack Aigner ("Aigner"). (Id. at ¶ 4) The properties were located in what plaintiffs describe as a "white neighborhood." (Id.) Tolano Anderson told Hogsten that plaintiffs had entered into a single contract to purchase all three properties simultaneously and that, if any of the three homes were not purchased, plaintiffs would lose their entire deposit of $40,000. (Id. at ¶¶ 6-7)

After plaintiffs signed the agreement of sale with Aigner and submitted their deposit, Hogsten informed Tolano Anderson that an appraisal was needed for the properties. (Id. at ¶ 11) Plaintiffs allege that Hogsten and the appraiser who was sent to value the Andersons' home "appeared to know each other well"; when the appraiser

---

[2] In analyzing a motion to dismiss pursuant to Rule 12(b)(6), the court must accept as true all material allegations of the complaint and it must construe the complaint in favor of the plaintiff. See Trump Hotels & Casino Resorts, Inc. v. Mirage Resorts, Inc., 140 F.3d 478, 483 (3d Cir. 1998). The following facts, therefore, are taken from plaintiffs' amended complaint.

2

arrived, he indicated that the house could not be valued because there was damage to the basement.[3]  (Id. at ¶¶ 13, 14)  Hogsten informed Tolano Anderson that, because a comparable house could not be found, the appraisal could not be conducted and the Andersons' mortgage could not be completed.[4]  (Id. at ¶ 16)  Tolano Anderson subsequently contacted another appraiser, Carl Kaplin, who provided him with a list of comparable homes.  (Id. at ¶ 18)  After sharing this list with Hogsten, Tolano Anderson requested an independent appraiser, who valued the property at $267,000 (the purchase price).  (Id. at ¶¶ 18-21)  Shortly thereafter, defendants issued a commitment letter to the Andersons and the Wilkinses.[5]  (Id. at ¶ 22)

After the Andersons' appraisal was approved, Hogsten told Tolano Anderson that the sale of the property could not be completed until the home was put into "move in" condition, even though it already had been appraised at the purchase price in its current condition.  (Id. at ¶ 25)  On or about July 2, 2004, Hogsten told the Wilkinses that the Andersons' house was "nothing more than a pile of sticks and bricks and he could assign no value to it at all."[6]  (Id. at ¶ 26)  Not long after this conversation, Hogsten asked Tolano Anderson if he would change the nature of the transaction from

---

[3] Plaintiffs allege that, as a result of his own "undisclosed reasons for undermining the purchase," Hogsten had instructed the appraiser not to appraise the Andersons' house.  (D.I. 8 at ¶ 15)

[4] According to plaintiffs, this was "a ruse and a second attempt to undermine the transaction of the plaintiffs."  (D.I. 8 at ¶ 17)

[5] The amended complaint does not disclose the terms of this commitment letter.

[6] Plaintiffs aver that "[this] statement by Hogsten was further evidence of his seeking to undermine the entire transaction."  (D.I. 8 at ¶ 27)

3

residential to commercial, since the land would have significant value as commercial property; Anderson turned Hogsten down. (Id. at ¶ 28)

Soon thereafter, the Wilkinses' property was appraised at a value exceeding its sale price. (Id. at ¶ 29) On July 23, 2004, Hogsten informed Richard Wilkins that he and his wife would have to show how they were planning to pay the deposit on their home and prove that the funds were their own.[7] (Id. at ¶¶ 30, 32) That same day, Hogsten informed the Andersons that the purchase of their desired property could not be completed because the property was not valuable enough. Tolano Anderson informed Hogsten that the required "move in" construction was nearly complete and that the house was ready for its second appraisal. (Id. at ¶ 33) The second appraisal again valued the Andersons' house at the purchase price. (Id. at ¶ 34)

During July 2004, the Wheatley property was appraised at a value exceeding its sales price. (Id. at ¶ 35) Hogsten informed Lloyd Wheatley that he would also have to upgrade his house to "move in" condition prior to settlement. (Id. at ¶ 36) Lloyd Wheatley responded that he did not want to complete the upgrades before settlement, as he was planning to do custom work on the house after the property was purchased. Wheatley also explained that he had no access to the home and, therefore, could not bring it to "move in" condition; likewise, he stated that he would not be able to complete upgrades on his current home prior to selling it if he had to work on the new property.

_____

[7] Plaintiffs contend that a request such as this was "not [the] normal customary practice of [Wachovia]." (D.I. 8 at ¶¶ 31, 32)

4

(Id. at ¶ 37) Despite this, Hogsten did not lift the requirement.[8] (Id.) Thereafter, Lloyd

Wheatley was given access to the property by Aigner and completed the work required

by Hogsten. (Id. at ¶¶ 42-43) Hogsten then sent an appraiser to the Wheatleys' house,

which was again valued at an amount higher than the sales price. (Id. at ¶ 44)

All three properties were scheduled for settlement in August 2004. The

Andersons' and Wilkinses' settlements were completed on August 6, 2004. The

Wheatleys' settlement was postponed, however, because defendants failed to forward

to the closing attorney the documents necessary to complete the transaction. (Id. at ¶¶

45-46) Upon inquiry, Hogsten stated that defendants did not send the Wheatleys'

paperwork because they needed a letter from a certified contractor confirming that the

roof of the Wheatley home did not have any leaks.[9] (Id. at ¶ 48) In order to expedite

the sale, Aigner arranged for his personal contractor to fax the required letter to

defendants as per Hogsten's demand. (Id. at ¶ 52)

When informed that the letter was en route, Hogsten stated that the Wheatleys

would need to pay an additional 15% down payment on their home, bringing the total to

---

[8] When Tolano Anderson questioned Hogsten about defendants' policies concerning appraisals, repairs, warranties and "such matters," he was referred to a loan officer who told him that these policies were confidential. (D.I. 8 at ¶¶ 40-41)

[9] Plaintiffs allege that this was another attempt by defendants to undermine their contract with Aigner since, as Hogsten was aware, all three of plaintiffs' homes had to be settled before the sale could go through. (D.I. 8 at ¶ 48) Plaintiffs also allege that, "a week or two" before the first two houses settled on August 6, 2004, "Hogsten told Wheatley that he would be watched" and that, during the week of August 16, 2004, Hogsten told Tolano Anderson that "he better be careful because [defendants] would be watching him." (Id. at ¶ 68) According to plaintiffs, "Anderson interpreted this as a veiled threat by [defendants] that the Andersons would be subject to an unusually high degree of scrutiny." (Id.)

5

20% of the purchase price, before defendants would send the required closing documents. (Id. at ¶ 53, 56) "[Tolano] Anderson told Hogsten that this was an unexpected surprise and [that] [Lloyd] Wheatley was not prepared for the change." (Id. at ¶ 54) Aigner refused Hogsten's suggestion to lower the sale price, but agreed not to void the entire transaction because "he felt that the bank's actions were unreasonable." (Id. at ¶¶ 55, 57) Although the Wheatleys managed to obtain funds for the 20% down payment from joint accounts, Hogsten informed them that they were now unable to qualify for the mortgage because they no longer had sufficient reserves of cash.[10] (Id. at ¶ 59) The Wheatleys' rescheduled settlement date was again cancelled by defendants. (Id. at ¶ 60) On August 12, 2004, a Mr. Destefano ("Destefano") informed the Wheatleys that defendants were unable to obtain primary mortgage insurance ("PMI") for their house and that the only way to circumvent this problem was to submit a 20% down payment and "eliminate the PMI requirement." (Id. at ¶ 61) Tolano Anderson attempted to contact Destefano and a Mr. Skowronski ("Skowronski") from Wachovia about defendants' reasons for denying the Wheatleys' PMI, but was unsuccessful. (Id. at ¶ 62)

The Wheatleys' settlement was rescheduled again, this time for August 13, 2004. (Id. at ¶ 63) Before that date, Aigner called Destefano and informed him that "[Aigner] was aware of the [defendants'] inappropriate conduct and that the scheduled settlement was being sabotaged." (Id. at ¶ 65) At that point, Skowronski "intervened

---

[10] Plaintiffs allege that this last minute increase in the Wheatleys' required down payment was another attempt by Hogsten to undermine the success of their contract with Aigner. (D.I. 8 at ¶ 59)

6

and approved the release of the loan documents"; the Wheatleys' settlement was then completed, as scheduled, on August 13, 2004. (Id.)

In order to meet defendants' requirements and finalize their contract with Aigner, the Andersons spent approximately $15,000 plus "numerous man hours." (Id. at ¶ 76) According to plaintiffs, Hogsten was aware that, by requiring the Wheatleys to upgrade their house to "move in" condition and increase their down payment, it would put "a strain on the Wheatleys' other business transactions"; six months after the closing, the Wheatleys "were forced to sell [their property to the Wilkinses,] which cost them approximately $3,500.00 in transfer taxes." (Id. at ¶ 78) The Wheatleys claim to have spent $50,000 in order to bring their home up to "move in" condition. (Id. at ¶ 79) The Wheatleys also estimate that they "lost another $50,000.00 in . . . business" due to a lack of funds caused by defendants' "unreasonable requirements." (Id. at ¶ 80) The Wilkinses spent $5,400 to travel from Kansas to Delaware three times in order to resolve problems related to the financing of their new home. (Id. at ¶ 89) Within six months of purchasing their home from Aigner, the Wheatleys sold it to the Wilkinses for $36,000 because they were financially unable to maintain both their business and their residential mortgage payments. (Id. at ¶ 90) The Wilkinses bought the Wheatleys' home because they were concerned that another buyer would come along and convert the Wheatley property into a commercial lot, which would devalue their own property. (Id.) Plaintiffs allege that, "[h]ad the [Wheatleys] not been treated the way they had been [by defendants] and had the [Wheatleys] been permitted to have a smaller down payment, the Wilkins[es] would not have felt required to purchase the Wheatley home." (Id.) Plaintiffs filed the suit at bar because, they allege, "the numerous requests for

7

appraisals, house improvements, and changes in developments, and other last-minute requirements imposed upon the Andersons and the Wheatleys were a violation of internal rules and regulations of the [d]efendants," and "[s]imilarly situated whites were not required to meet all the requirements imposed upon the [p]laintiffs to be eligible for a mortgage." (Id. at ¶¶ 66, 67)

## III. STANDARD OF REVIEW

The court must accept all factual allegations in a complaint as true and take them in the light most favorable to plaintiff. See Erickson v. Pardus, --- U.S. ----, 127 S. Ct. 2197, 2200 (2007) (citations omitted); Christopher v. Harbury, 536 U.S. 403, 406 (2002). Additionally, a complaint must contain "'a short and plain statement of the claim showing that the pleader is entitled to relief,' in order to 'give the defendant fair notice of what the . . . claim is and the grounds upon which it rests.'" Bell Atl. Corp. v. Twombly, --- U.S. ----, 127 S. Ct. 1955, 1964 (2007) (omission in original) (quoting Conley v. Gibson, 355 U.S. 41, 47 (1957)). A complaint does not need detailed factual allegations; however, "a plaintiff's obligation to provide the 'grounds' of his 'entitle[ment] to relief' requires more than labels and conclusions, and a formulaic recitation of the elements of a cause of action will not do." Id. at 1964-65 (alteration in original) (citations omitted). The "[f]actual allegations must be enough to raise a right to relief above the speculative level on the assumption that all of the allegations in the complaint are true (even if doubtful in fact)." Id. at 1965 (citations omitted).

8

## IV. DISCUSSION

### A. 42 U.S.C. § 1981[11]

#### 1. Statute of limitations

In their brief supporting the motion to dismiss, defendants argue that "[c]laims under [s]ection 1981 'are characterized as personal injury claims,' subject to Delaware's two year statute of limitations for such actions." (D.I. 12 at 13-14, citing Monahan v. City of Wilmington, Civ. A. No. 00-505-JJF, 2004 U.S. Dist. LEXIS 1322, at *8 (D. Del. Jan. 30, 2004)) Defendants aver that plaintiffs' cause of action "accrued, at the latest, on August 6, 2004," the date of the Andersons' and Wilkinses' closings (and the date on which the Wheatleys were informed that they would have to increase their down payment). (Id. at 12-13) Since the complaint was not filed until August 11, 2006, two years and five days after the statute of limitations supposedly began to run, defendants contend that plaintiffs' § 1981 claims are barred by Delaware's two-year personal injury statute of limitations. (Id. at 12-13) Plaintiffs, however, argue that, as a result of a 1991 amendment to § 1981, their particular § 1981 claims are governed by a four-year statute of limitations that applies regardless of the State's personal injury statute. (D.I. 13 at 19)

---

[11] "All persons within the jurisdiction of the United States shall have the same right in every State and Territory to make and enforce contracts, to sue, be parties, give evidence, and to the full and equal benefit of all laws and proceedings for the security of persons and property as is enjoyed by white citizens, and shall be subject to like punishment, pains, penalties, taxes, licenses, and exactions of every kind, and to no other." 42 U.S.C. § 1981(a). In 1991, § 1981 was amended to add the following: "For purposes of this section, the term make and enforce contracts includes the making, performance, modification, and termination of contracts, and the enjoyment of all benefits, privileges, terms, and conditions of the contractual relationship." Id. § 1981(b).

9

In 2004, the United States Supreme Court recognized that, "[l]ike many federal statutes, [§ 1981] does not contain a statute of limitations. [The Court] held in Goodman v. Lukens Steel Co., 482 U.S. 656, 660 (1987), that federal courts should apply 'the most appropriate or analogous state statute of limitations' to claims based on asserted violations of § 1981."[12] Jones v. R.R. Donnelly & Sons Co., 541 U.S. 369, 371 (2004) (internal parallel citation omitted). "Three years after [the Court's] decision in Goodman, [however,] Congress enacted a catchall 4-year statute of limitations for actions arising under federal statutes enacted after December 1, 1990." Id. (citing 28 U.S.C. § 1658[13]). The Court in Jones, therefore, was tasked with determining whether causes of action "alleg[ing] violations of § 1981, as amended [in 1991], . . . are governed by § 1658 or by the personal injury statute of limitations of the forum State." Id. The Court "conclude[d] that a cause of action 'aris[es] under an Act of Congress enacted' after December 1, 1990 – and therefore is governed by § 1658's 4-year statute of limitations – if the plaintiff's claim against the defendant was made possible by a post-1990 amendment." Id. at 382 (second alteration in original). The Court in Jones likewise determined that the 1991 amendment to § 1981 "fully qualifies as 'an Act of Congress enacted after [December 1, 1990] within the meaning of § 1658." Id. at 383 (alteration in original). In the case at bar, therefore, the court must determine

---

[12] For statute of limitations purposes, § 1981 claims are controlled by the appropriate State's limitations period for personal injury actions, see Goodman, 482 U.S. at 661 62, which in Delaware is two years, see 10 Del. C. § 8119.

[13] "Except as otherwise provided by law, a civil action arising under an Act of Congress enacted after the date of the enactment of this section may not be commenced later than 4 years after the cause of action accrues." 28 U.S.C. § 1658(a) (enacted Dec. 1, 1990).

10

whether plaintiffs' § 1981 claims were made possible only by the 1991 amendment to §

1981.

Prior to the 1991 amendment, § 1981 did not protect parties from conduct that

took place once the contract at issue had been formed. See Jones, 541 U.S. at 372

(citing Patterson v. McLean Credit Union, 491 U.S. 164 (1989)). The 1991 amendment

changed this by expanding the definition of the phrase "make and enforce contracts" to

include the "termination of contracts, and the enjoyment of all benefits, privileges,

terms, and conditions of the contractual relationship." Id. at 383 (citing 42 U.S.C. §

1981(b)). This addition permitted claimants to pursue § 1981 claims for discrimination

arising out of ongoing contractual relationships.

The claims at bar would fall under the pre-amendment version of § 1981 only if

defendants racially discriminated against plaintiffs in the actual **formation** of the

contracts at bar. In such a scenario, Delaware's two-year statute of limitations for

personal injury actions would apply, and plaintiffs' § 1981 claims could potentially be

time barred, depending on when their claims actually accrued.[14]  If, however,

defendants discriminated against plaintiffs **after** their contracts had been formed, by

imposing terms and conditions different from those in analogous agreements between

_____

[14] Plaintiffs contend that their § 1981 claims arose as the result of "a series of
events which terminated on August 13, 2004," the day the Wheatleys closed on their
home. (D.I. 13 at 19) "[Plaintiffs'] allegations are that the conduct of [defendants] was
continuing through August 13, 2004, even though the Andersons and Wilkins[es] went
to settlement on August 6, 2004, because all three of the [p]laintiffs' families had
entered an agreement with Aigner for the purchase of the three properties," and
"[f]ailure by one would subject all of them to the loss of their deal." (Id.)  Therefore,
plaintiffs argue that, even if the two-year statute of limitations applies to their claims,
their August 11, 2004 complaint was filed two days before that two-year period ran. (Id.
at 20-21)

11

defendants and similarly-situated, non-minority customers, then plaintiffs' cause of action would only have been made possible by the amended version of § 1981. Were this the case, § 1658's four-year statute of limitations would apply, and plaintiffs' claims would not be time-barred.

At this stage in the proceedings, the court lacks sufficient information to determine the precise nature of the contracts in issue at bar, a factor essential to its determination of the appropriate statute of limitations for plaintiffs' § 1981 claims.[15] The court, therefore, will deny defendants' motion to dismiss plaintiffs' § 1981 claims as time-barred.

### 2. Racial discrimination under § 1981

The crux of plaintiffs' claims of racial discrimination is their allegation that "[s]imilarly situated whites were not required [by defendants] to meet all the requirements imposed upon the [p]laintiffs to be eligible for a mortgage." (D.I. 8 at ¶ 67) Defendants' conduct, plaintiffs claim, "violated 42 U.S.C. § 1981, which prohibits racial discrimination in the terms and conditions of a contract." (Id. at ¶ 72) The United States Court of Appeals for the Third Circuit has held that,

> [i]n order to state a claim under § 1981, a plaintiff must "allege facts in
> support of the following elements: (1) [that plaintiff] is a member of a

---

[15] Specifically, although the amended complaint mentions the issuance by defendants of a "commitment letter" (D.I. 8 at ¶ 22), it is unclear to the court whether that letter (the contents of which have not yet been submitted for the record) was relevant to plaintiffs' and defendants' agreement. Although defendants have submitted the mortgage contracts themselves, those contracts were not signed until plaintiffs' transactions with Aigner closed, and do not provide the court with sufficient information to analyze plaintiffs' and defendants' contractual relationship for statute of limitations purposes.

racial minority; (2) intent to discriminate on the basis of race by the defendant; and (3) discrimination concerning one or more of the activities enumerated in the statute[,] which includes the right to make and enforce contracts . . . ."

Brown v. Philip Morris, Inc., 250 F.3d 789, 797 (3d Cir. 2001) (second and third alterations in original) (omission in original) (quoting Yelverton v. Lehman, No. Civ. A. 94-6114, 1996 WL 296551, at *7 (E.D. Pa. June 3, 1996), aff'd, 175 F.3d 1012 (3d Cir. 1999)). See also Azubuko v. Riordan, No. Civ. A. 05-095-SLR, 2005 WL 914778, at *3 (D. Del. Apr. 4, 2005). Accepting as true the material allegations set forth in the complaint (and assuming for purposes of this analysis that plaintiffs' § 1981 claims are not time-barred), the court finds that plaintiffs have satisfied the first and third elements. To make a prima facie case of racial discrimination under §1981, therefore, plaintiffs need only show that defendants intentionally treated them differently than similarly-situated, non-African American individuals because of their race.

According to the complaint, plaintiffs at bar are African American home buyers who wanted to acquire mortgages for houses in what they characterize as a "white" neighborhood. The couples had previously successfully obtained mortgages from defendants for other houses in predominantly minority or mixed race neighborhoods. In order to secure mortgages from defendants, plaintiffs were required to meet different appraisal, home improvement, and financial requirements than they expected; plaintiffs allege that such conditions ran contrary to defendants' policies and procedures, and that "[s]imilarly situated whites were not required to meet all the requirements imposed upon the [p]laintiffs to be eligible for a mortgage."

13

The court must "[accept] as true all of the facts alleged in the complaint, and [draw] all reasonable inferences in plaintiff[s'] favor." Trump Hotels, 140 F.3d at 483. The court, therefore, finds that the allegations in plaintiffs' complaint are sufficient to draw a reasonable inference of intentional racial discrimination, satisfying the second element of a § 1981 claim. As a result, the court will deny defendants' motion to dismiss plaintiffs' § 1981 claims under Rule 12(b)(6).

## B. Plaintiffs' State Law Claims

### 1. Breach of contract[16]

"In order to survive a motion to dismiss for failure to state a breach of contract claim, [a] plaintiff must demonstrate: first, the existence of the contract, whether express or implied; second, the breach of an obligation imposed by that contract; and third, the resultant damage to the plaintiff." VLIW Tech., LLC v. Hewlett-Packard Co., 840 A.2d 606, 612 (Del. 2003) (citations omitted). "Clear and unambiguous language found in a contract is to be given its ordinary and usual meaning." Iacono v. Barici, Civ. A. No. 06C-02-021RFS, 2006 WL 3844208, at *2 (Del. Super. Dec. 29, 2006) (citing Lorillard Tobacco Co. v. Am. Legacy Found., 903 A.2d 728, 739 (Del. 2006)).

---

[16]Plaintiffs' amended complaint, which is not a model of clarity, alleges that defendants' conduct "constituted a breach of the contract for a mortgage and the covenant of good faith and fair dealing in the contract to provide financing." (D.I. 8 at ¶¶ 74, 83, 94) This suggests to the court that plaintiffs' claims might be based on two separate contracts: an initial agreement by plaintiffs and defendants to enter into mortgage contracts upon the completion of certain predetermined requirements (i.e., a "contract to provide financing"), and the mortgage contracts themselves, which were not signed until August 2004. Plaintiffs, however, have not articulated this argument, forcing the court to proceed with its analysis under the assumption that when plaintiffs mention "contracts," they are referring to the mortgage contracts from August 2004.

14

It is undisputed that plaintiffs and defendants entered into mortgage contracts.

(D.I. 12, exs. B-D) Plaintiffs allege that defendants' conduct breached these contracts;

however, plaintiffs "[have] not identified any express contract provision that was

breached," Wal-Mart Stores, Inc. v. AIG Life Ins. Co., 901 A.2d 106, 116 (Del. 2006).[17]

As a result, the court finds that plaintiffs have failed to satisfy the second prong of the

breach of contract analysis and will grant defendants' motion to dismiss as to that

count.

### 2. Breach of implied covenant of good faith and fair dealing

Under Delaware law, an implied duty of good faith and fair dealing is interwoven

into every contract. See Chamison v. Healthtrust, Inc., 735 A.2d 912, 920 (Del. Ch.

1999) (citing Wilgus v. Salt Pond Inv. Co., 498 A.2d 151, 159 (Del. Ch. 1985)

(superceded by statute on other grounds)), aff'd, 748 A.2d 407 (Del. 2000). The

Delaware Supreme Court

> "has recognized the occasional necessity of implying contract terms to
> ensure the parties' reasonable expectations are fulfilled. This
> quasi-reformation, however, should be [a] rare and fact-intensive exercise,
> governed solely by issues of compelling fairness. Only when it is clear
> from the writing that the contracting parties would have agreed to
> proscribe the act later complained of . . . had they thought to negotiate
> with respect to that matter may a party invoke the covenant's protections."

Wal-Mart Stores, Inc. v. AIG Life Ins. Co., 901 A.2d 106, 116 (Del. 2006) (quoting

Dunlap v. State Farm Fire & Cas. Co., 878 A.2d 434, 442 (Del. 2005) (alteration and

omission in original)).

---

[17]In fact, plaintiffs do not even mention the breach of contract claim in their brief
opposing defendants' motion to dismiss. (See D.I. 13)

"In order to plead successfully a breach of an implied covenant of good faith and

fair dealing, the plaintiff must allege a specific implied contractual obligation, a breach

of that obligation by the defendant, and resulting damage to the plaintiff." Fitzgerald v.

Cantor, Civ. A. No. 16297-NC, 1998 WL 842316, at *1 (Del. Ch. Nov. 10, 1998) (citing

Moore Bus. Forms, Inc. v. Cordant Holdings Corp., Civ. A. No. 13911, at 13 (Del. Ch.

Nov. 2, 1995)). Upon reviewing the allegations set forth in the amended complaint, it

appears to the court that the "specific implied contractual obligation[s]" upon which

plaintiffs' claim for breach of the implied covenant of good faith and faith dealing relies

are the concepts of "reasonableness" and "fairness." (See, e.g., D.I. 8 at 11 ¶ 3, 14 ¶

3) Indeed, plaintiffs summarize their claim as follows:

> [Plaintiffs'] allegations are that Wachovia created unreasonable loan
> conditions specifically designed to defeat [p]laintiffs' contract. The
> allegation against the [d]efendants is that they had a duty to treat
> [p]laintiffs fairly and they failed to do so, thereby providing [p]laintiffs with
> the dilemma of either losing their deposit of $40,000.00 and the
> opportunity to purchase the homes that they chose to purchase or
> complying with the unreasonable requirements of the bank.

(D.I. 13 at 17) Plaintiffs, therefore, have identified implied contractual obligations, have

alleged a breach of those obligations by defendants, and have alleged damages, in the

form of money and man-hours spent on fulfilling defendants' allegedly unreasonable

requirements. (D.I. 8, passim)

Stated generally,

> the implied covenant requires "a party in a contractual relationship to
> refrain from arbitrary or unreasonable conduct which has the effect of
> preventing the other party to the contract from receiving the fruits" of the
> bargain. Thus, parties are liable for breaching the covenant when their
> conduct frustrates the "overarching purpose" of the contract by taking

16

advantage of their position to control implementation of the agreement's terms.[<sup>18</sup>]

<u>Dunlap</u>, 878 A.2d at 442 (footnotes omitted).  Plaintiffs have alleged just such a

situation, wherein defendants, taking advantage of the fact that plaintiffs needed to buy

all three houses in order to complete their deal with Aigner, erected unreasonable

hurdles that plaintiffs were forced to clear before they could receive the mortgages for

which they had contracted.[19]  Under the forgiving standard of review set forth in Fed. R.

Civ. P. 12(b)(6), pursuant to which the court must take plaintiffs' allegations as true and

view all reasonable inferences in plaintiffs' favor, the court finds that plaintiffs have

---

[18]Presumably, the "overarching purpose" of plaintiffs' financing agreement with defendants was for plaintiffs to acquire mortgages, at which point plaintiffs would be able to enjoy the fruits of their bargain (i.e., the financial ability to complete their contract with Aigner).

[19]Defendants argue that "plaintiffs can have no claim for breach of contract or breach of the covenant of good faith and fair dealing based on repairs they made to the properties because all of them signed mortgages in which they expressly promised to 'promptly repair the Property if damaged.'"  (D.I. 12 at 22, citing <u>id.</u>, exs. B-D at ¶ 7)  It is true that

[e]xisting contract terms control, . . . such that implied good faith cannot be used to circumvent the parties' bargain, or to create a "free-floating duty . . . unattached to the underlying legal document."  Thus, one generally cannot base a claim for breach of the implied covenant on conduct authorized by the terms of the agreement.

<u>Dunlap</u>, 878 A.2d at 441 (footnotes omitted) (second omission in original).  The mortgage clause to which defendants cite, however, does not define the term "damage," nor does it describe how such a determination (i.e., that a property is damaged and must be repaired) is made.  (<u>See</u> D.I. 12, exs. B-D at ¶ 7)  This leaves open the possibility (however slight) that defendants could unfairly or unreasonably label plaintiffs' property as "damaged" and require plaintiffs to make otherwise unnecessary repairs; the court is not prepared, at such an early stage in the litigation, to find that such conduct would be protected from a breach of implied covenant of faith and fair dealing claim because it was "authorized by the terms of the agreement." <u>Dunlap</u>, 878 A.2d at 441.

17

stated a claim for breach of the implied covenant of good faith and fair dealing sufficient
to withstand defendants' motion to dismiss. The motion, therefore, is denied with
respect to this claim.

### 3. Tortious interference with contractual relations

Delaware courts recognize a cause of action for tortious interference with
contractual relations. See Gill v. Del. Park, LLC, 294 F. Supp. 2d 638, 645 (D. Del.
2003) (citing Irwin & Leighton, Inc. v. W.M. Anderson Co., 532 A.2d 983, 992 (Del. Ch.
1987). A plaintiff must prove the existence of the following five elements to make a
claim for tortious interference: "(1) a contract, (2) about which defendant knew and (3)
an intentional act that is a significant factor in causing the breach of such contract (4)
without justification (5) which causes injury." Irwin & Leighton, Inc., 532 A.2d at 992
(citing Restatement (Second) of Torts § 766[20]). Defendants contend that plaintiffs have
failed to state a claim for tortious interference with contractual relations because Aigner
never breached his contract with plaintiffs. (D.I. 12 at 19) In response, plaintiffs argue
that they are actually pursuing a cause of action under the Restatement (Second) of
Torts § 766A, which addresses intentional interference with another's performance of
his own contract, and which does not require that the contract in question have been
breached.[21] (D.I. 13 at 15) Defendants contend that such a theory of liability "has

---

[20]"One who intentionally and improperly interferes with the performance of a
contract (except a contract to marry) between another and a third person by inducing or
otherwise causing the third person not to perform the contract, is subject to liability to
the other for the pecuniary loss resulting to the other from the failure of the third person
to perform the contract." Restatement (Second) of Torts § 766.

[21]Under § 766A,

18

never been adopted by any Delaware state court, nor have Delaware courts given any indication that they would be inclined to treat it favorably." (D.I. 12 at 20)

In Gemini Physical Therapy & Rehabilitation., Inc. v. State Farm Mutual. Automobile Insurance Co., 40 F.3d 63 (3d Cir. 1994), the United States Court of Appeals for the Third Circuit predicted that the Pennsylvania Supreme Court would not recognize § 766A as a cause of action under Pennsylvania law. In so holding, the court "reasoned . . . that causing the performance of a contract to be more costly 'as an element of proof is too speculative and subject to abuse to provide a meaningful basis for a cause of action.'" Id. at 66 (quoting Price v. Sorrell, 784 P.2d 614 (Wyo. 1989)). Defendants suggest that the Delaware Supreme Court would reach a similar conclusion regarding the viability of § 766A under Delaware law and, therefore, that plaintiffs' claim under this theory of liability should be dismissed. (D.I. 12 at 20)

Plaintiffs contend that Delaware Superior Court Pattern Jury Instruction 12.7 supports their claim that Delaware law contemplates a cause of action under § 766A. The relevant instruction provides, inter alia, that "[o]ne who intentionally and improperly induces or otherwise intentionally prevents another from performing a contract with a third party or makes the performance of the contract more costly is responsible to the other party for the loss suffered as a result of the prevention or interference with the

---

> [o]ne who intentionally and improperly interferes with the performance of a contract (except a contract to marry) between another and a third person, by preventing the other from performing the contract or **causing his performance to be more expensive or burdensome**, is subject to liability to the other for the pecuniary loss resulting to him.

Restatement (Second) of Torts § 766A (emphasis added).

19

contract." Del. P.J.I. Civ. § 12.7 (rev. Aug. 15, 2006). None of the cases cited as authority by the instruction, however, actually involve the type of tortious interference claim covered by § 766A. See id. Likewise, the jury pattern instruction references only §§ 766 and 767 of the Restatement, not § 766A. Bearing in mind that the pattern jury instructions themselves warn that they "are merely advisory," and that "practitioner[s] should not use [them] without also reviewing the applicable statutes, court rules, and case law," id., the court finds P.J.I. Civ. § 12.7 to be unpersuasive to the analysis at hand.

In light of the Third Circuit's decision in Gemini and the fact that no state court in Delaware has ever recognized a cause of action under § 766A,[22] the court will grant defendants' motion to dismiss as it pertains to plaintiffs' claims for toritous interference with contractual relations.

## V. CONCLUSION

Based on the foregoing analysis, defendants' motion to dismiss (D.I. 11) is granted in part and denied in part. An appropriate order shall issue.

---

[22]The only court to have discussed § 766A in the context of Delaware law has been the United States District Court for the District of Delaware. However, in Nelson v. Fleet National Bank, 949 F. Supp. 254 (D. Del. 1996), the court did not follow the Third Circuit's predictive analysis outlined in Gemini. Therefore, the reasoning of the case is neither persuasive nor particularly relevant to the facts at bar.

20