## IN THE UNITED STATES DISTRICT COURT

## FOR THE DISTRICT OF DELAWARE

|  |  |
|---|---|
| TOLANO ANDERSON, et al.,<br><br>　　　　　　Plaintiffs,<br><br>　　v.<br><br>WACHOVIA MORTGAGE CORPORATION<br>*and* WACHOVIA CORPORATION,<br><br>　　　　　　Defendants. | )<br>)<br>)<br>)　　C.A. No. 06 CV 00567 (SLR)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>) |

---

### OPENING BRIEF OF DEFENDANTS WACHOVIA MORTGAGE CORPORATION AND WACHOVIA CORPORATION IN SUPPORT OF THEIR MOTION TO STRIKE PORTIONS OF THE ERRATA SHEET FOR PLAINTIFF LLOYD WHEATLEY'S OCTOBER 31, 2007 DEPOSITION

---

*Of Counsel*
Elizabeth K. Ainslie
Stephen A. Fogdall
Schnader Harrison Segal & Lewis LLP
1600 Market Street, Suite 3600
Philadelphia, PA 19103
(215) 751-2000

Michael J. Barrie (#4684)
Schnader Harrison Segal & Lewis LLP
824 N. Market Street
10th Floor, Suite 1001
Wilmington, DE 19801-3011
(302) 888-4554

*Counsel for Defendants Wachovia Mortgage Corporation*
*and Wachovia Corporation*

December 5, 2007

# TABLE OF CONTENTS

TABLE OF AUTHORITIES ............................................................................... ii

STATEMENT OF THE NATURE AND STAGE OF THE PROCEEDING .................... 1

SUMMARY OF THE ARGUMENT ................................................................... 2

CONCISE STATEMENT OF FACTS ............................................................... 3

ARGUMENT ............................................................................................. 9

CONCLUSION .......................................................................................... 12

CERTIFICATE OF SERVICE

## TABLE OF AUTHORITIES

### FEDERAL CASES

*Durkin Contracting, Inc. v. City of Newark*, 2006 U.S. Dist. LEXIS 68221
    (D. Del. Sept. 22, 2006) ...................................................................................... 10, 11

*Garcia v. Pueblo Country Club*, 299 F.3d 1233 (10th Cir. 2002) .................................... 10

*Greenway v. Int'l Paper Co.*, 144 F.R.D. 322 (W.D. La. 1992)........................................ 10

*Rios v. Welch*, 856 F. Supp. 1499 (D. Kan. 1994) ............................................................ 10

*S.E.C. v. Parkersburg Wireless, L.L.C.*, 156 F.R.D. 529 (D.D.C. 1994).......................... 10

*Thorn v. Sundstrand Aerospace Corp.*, 207 F.3d 383 (7th Cir. 2000).............................. 10

*Wigg v. Sioux Falls Sch. Dist.*, 274 F. Supp. 2d 1084 (D.S.D. 2003)............................... 10

### STATE CASES

*In re Asbestos Litigation,* 2006 Del. Super. LEXIS 483 (Del. Super. Ct.
    Nov. 28, 2006) ................................................................................................................11

### FEDERAL RULES

Federal Rule of Civil Procedure 30(e) ......................................................................... 9, 10

## STATEMENT OF THE NATURE AND STAGE OF THE PROCEEDING

### A.    Nature of the Proceeding

Plaintiffs have brought this action under 42 U.S.C. § 1981 alleging that Wachovia Mortgage Corporation ("Wachovia") insisted on unreasonable loan conditions before it would give them loans for the purchase of three properties on North DuPont Highway, in Dover, Delaware.  Some of these conditions involved making repairs to the properties that plaintiffs say they should not have had to make until after their loans closed.  Plaintiffs, who are African American, allege that Wachovia imposed these supposedly unreasonable conditions because "the Silver Lake area," where the homes are located, "has no minorities."  Deposition of Lloyd Wheatley ("Wheatley Dep.") at 136:5-8, attached as Exhibit A.  Plaintiffs say that Wachovia was responding to pressure from "the community" to deny plaintiffs' loans.  Wheatley Dep. at 135:3-14; *see also* 114:1-115:17.  Plaintiffs make no attempt to explain how "pressure" from "the community" could have had any impact on Wachovia's loan-approval process, when all of the underwriting and other decision-making on their loans took place in Waterbury, Connecticut, by people who could not have cared one whit what "the community" of Silver Lake thought.[1]

---

[1]    Plaintiffs provide absolutely no objective support for their assertion that Silver Lake is "has no minorities."  Moreover, the objective data contradicts that assertion.  According to the last census, the census block in which plaintiffs homes are located (Block 1000, Block Group 1, Census Tract 409) had 29.6 percent African American residents, significantly above the national average of 12.8 percent.  *See* Dover, Delaware Census Data attached as Exhibit B.  Figure 1 of Exhibit B shows the percentage of African American residents in Dover,
*...Continued*

**B.     Stage of the Proceeding**

This motion arises out plaintiff Lloyd Wheatley's attempt to alter his sworn deposition testimony by changing his answers on his errata sheet.  In his deposition, Mr. Wheatley conceded that the appraisal of his property prior to its purchase identified significant concerns affecting the livability of the home, including a potential leak in the roof, a lack of heat on the second floor, and what appeared to be asbestos in the basement.  Standard underwriting guidelines require that conditions affecting the livability of a home must be repaired before the lender can make a loan for the purchase of that property.  So Mr. Wheatley's own testimony showed that the repairs to his property were reasonable.  The Court should bar Mr. Wheatley's attempt to rescind his admissions by striking the portions of the errata sheet containing these improper alterations.

## SUMMARY OF THE ARGUMENT

1.     A deposition is not a take home examination.  A plaintiff cannot contradict clear answers to unambiguous questions simply because he regrets giving those answers.

---

*Continued from previous page*
Delaware by census block, using varying shades of green to show the differing percentages.  (See the legend to the left of Figure 1 for an explanation.)  Figure 2 of Exhibit B is a more detailed picture of the census block in which plaintiffs' homes are located (shown in Green; the red dot marks the approximate location of the homes).  These maps may be obtained at http://factfinder.census.gov.

2.      Such alterations make the errata sheet a "sham affidavit" that cannot be used to create a disputed issue of material fact.

## CONCISE STATEMENT OF FACTS

On June 22, 2004, the Wheatleys met with a Wachovia loan originator, J.D. Hogsten, to apply for a loan for the purchase of a home at 584 North DuPont Highway in Dover, Delaware.[2]  The loan for which the Wheatleys applied was the type of loan (a purchase money mortgage) that lenders like Wachovia generally sell to Fannie Mae.[3]  Accordingly, the Wheatleys signed a Mortgage Loan Application Agreement containing the following condition:

> I understand that delays and problems in processing and closing loans may occur without any fault on the part of lenders such as Wachovia.  Congress may change applicable laws while my loan is in process.  In addition, agencies such as . . . the Federal National Mortgage Association ("FNMA" or "Fannie Mae") . . . may limit or terminate their market activity, which would adversely affect the ability of mortgage lenders such as Wachovia to sell loans.  *I understand that my loan must mean the standards of one or more of these organizations* . . . .

Mortgage Loan Application Agreement, attached as Exhibit C, at bates-labeled page WHEAT00032 (emphasis added).

---

[2]    Because this motion relates to Mr. Wheatley's improper changes to his deposition testimony, we focus in this Statement of Facts on the Wheatleys and omit mention of the other plaintiffs.

[3]    The Federal National Mortgage Association, or "Fannie Mae," is a "government sponsored entity" that purchases home mortgages on the secondary market, thereby supplying lenders with funds to make additional such loans.

In fact, the loan the Wheatleys sought to obtain could *not* meet Fannie Mae standards because the "as is" appraisal for the property indicated that it was not livable.

Wachovia's underwriting guidelines state:

> [A]n appraisal may be based on the "as is" condition of the property if minor conditions that *do not affect the livability* of the property exist -- such as minor deferred maintenance -- as long as the appraiser's opinion of value reflects the existence of these conditions. *The underwriter must review carefully the appraisal for a property appraised in an "as is" condition to ensure that the property does not have any physical deficiencies or conditions that would affect its livability.* If there are none, Wachovia Mortgage Corporation does not need to require minor repairs to be completed before it delivers the mortgage to [Fannie Mae].

Wachovia Underwriting Guidelines, attached as Exhibit D, at bates-labeled page WACH000004.[4]

As Mr. Wheatley acknowledged in his deposition, the property he and his wife purchased had been "vacant for a while" and "there was no living person in the home." Wheatley Dep. at 55:17-20. The home "wasn't in the best pristine or livable conditions." *Id.* Indeed, the appraisal for the property noted several concerns, including:

---

[4]   This guideline tracks the language of the Fannie Mae Selling Guide in effect at the time the Wheatleys purchased their home. *See* Fannie Mae's 2002 Selling Guide, XI, 202: Status of Construction, attached as Exhibit E, at the bullet point beginning "For *existing construction* . . . ." Available at http://www.allregs.com/efnma.

- "[A] lack of heat in subject property on 2nd floor";

- "It does appear some work is needed on wood shake roof but *assumed* not to have any leakage";

- "It does appear some of the piping in basement is wrapped with asbestos."

Appraisal of Daniel A. Gladden, attached as Exhibit F, at bates-labeled page WHEAT000058 (emphasis added).

Because of the concerns the appraiser noted, Wachovia initially denied the Wheatleys' loan application. *See* Adverse Action Notice, attached as Exhibit G; *see also* documentation for the denial attached as Exhibit H. But once the Wheatleys agreed to make repairs, and certifications were obtained from a roofing contractor (to address the appraiser's comments about the roof) and an insulation specialist (to address the appraiser's concerns about asbestos in the basement), *see* Exhibits I and J, Wachovia agreed to make the loan, albeit it at an 80% loan-to-value rather than the 90% loan for which the Wheatleys had originally applied.[5]

In his deposition, Mr. Wheatley candidly admitted that the concerns noted in the appraisal directly affected the livability of the property, meaning that Wachovia could not make the loan until the repairs were made. *See* Exhibits D and E. It is these admission that Mr. Wheatley now seeks to negate with his errata sheet. Because the context of Mr. Wheatley's altered testimony is important for appreciating the magnitude

---

[5]    The lower loan-to-value ratio was required because the loan would not be marketable to purchasers such as Fannie Mae and would have to be retained in Wachovia's own portfolio.

of his changes, we quote the exchange in full, marking the original answers that he now

seeks to change in bold:

Q.     And [the appraiser] goes on to say: "Condition adjustments also
       reflect the lack of heat in the subject property on 2nd floor."

A.     Uh-huh.

Q.     He is saying there was no heat on the second floor of the property
       at 584 North DuPont Highway.

A.     That's correct.

Q.     You recall that being the case?

A.     Uh-huh.

Q.     Did you do anything to see to it that there would be heat on the
       second floor once you moved in?

A.     Uh-huh.  Electric baseboard heaters were installed, two of them,
       the entire upstairs bedroom.

Q.     Do you feel that was unreasonable, to make that improvement --

A.     No.

Q.     -- to the second floor?

A.     Not at all.

Q.     And would you agree that putting in heaters on the second floor
       because there was no heat on that floor would be an important part
       of making that home livable?

A.     Yes.

Q.     And making that home into move in condition?

A.     Yes.  Yep.

Q.     Just reading from that same page --

A.     Uh-huh.

Q.     -- the appraiser goes on to say: "Landing area 2nd level needs
       finished floor covering."  Do recall that?

6

A.    Uh-huh.

Q.    Did you make that repair?

A.    Yes.

Q.    "It does appear that some work is needed on wood shake roof but assumed not to have any leakage."

A.    Uh-huh.

Q.    Do you see that?

A.    Yes.

Q.    Do you agree that a lender reading a statement like that might have a concern about the condition of the roof if that language is in the appraisal?

A.    Uh-huh.

Q.    And you understand that when the lender is lending you money for your property to purchase that property, that that property is the lender's collateral, that property is the lender's protection in the event there's a default on the loan?

A.    Yes.

Q.    And do you agree that it would make sense for the lender to want to ensure that the collateral for the loan is in livable condition?

**A.    Yes.**

Q.    Do you recall at some point Wachovia said they needed a letter from a contractor so that they would have assurance that the roof didn't leak?

A.    Yes.

Q.    And did you feel that that was unreasonable?

**A.    No.**

Wheatley Dep. at 58:9-61:5.

Even when his own attorney questioned him, Mr. Wheatley continued to acknowledge the reasonableness of these repairs:

> [A]fter . . . the appraiser . . . appraised the property *and there were some items in the house that were a concern that we talked about in the earlier part of the deposition* -- and as it were*, they were legitimate concerns, I guess, of anybody if they were going to be used or collateralizing the property as a collateral instrument . . . .*

Wheatley Dep. at 122:14-21 (emphasis added).

Moreover, as Mr. Wheatley explained in response to his attorney's questions, his complaint about these repairs was *not* that they were unnecessary or inappropriate (indeed, he conceded the opposite), but simply that the house had appraised for its purchase price and so he did not see the "reason" to make the repairs at that time. Instead, he wanted to make them at his leisure:

> [T]he property appraised for its value and the fact that we told J.D. that we plan on repairing and fixing up the entire house later on as time and money would permit through the duration of however long we wanted to live there, I didn't see the -- you know, what was the immediate reason to require all this extensive repair when the house appraised at its value of the loan?

Wheatley Dep. at 127:10-18.

Similarly, Mr. Wheatley testified:

> [W]e explained to J.D. that we don't think it's necessary to do this now, we plan on doing other custom upgrades as time allowed us to do it and finances allowed us to do it.

Wheatley Dep. at 54:17-21.

In short, although Mr. Wheatley expressed some unhappiness about the timing of the repairs and other requirements, he never once testified that the *repairs or requirements themselves* were inappropriate or unreasonable.[6]

In effort to undo his admissions, Mr. Wheatley now submits an errata sheet, attached as Exhibit J, which completely reverses -- without any explanation -- his answers to two questions:  (1) "[D]o you agree that it would make sense for the lender to want to ensure that the collateral for the loan is in livable condition?" (deposition answer: *yes*; errata sheet answer: *no*); and (2) "[D]id you feel that that [Wachovia's asking for a contractor's certification that the roof did not leak] was unreasonable?" (deposition answer:  *no*; errata sheet answer:  *yes*).  *See* Exhibit K at lines 14 and 15.

There is absolutely no justification for Mr. Wheatley's alteration of his sworn testimony.  The Court should strike the two lines of Mr. Wheatley's errata sheet (lines 14 and 15) on which these altered answers occur.

## ARGUMENT

Although Federal Rule of Civil Procedure 30(e) allows a deponent to make corrections to his deposition transcript, that rule does not give a plaintiff free reign to rewrite his testimony after the fact.  As one court has aptly explained:

---

[6]    While Mr. Wheatley may have personally felt that Wachovia should have given him a loan without having to make these repairs, the bottom line is that these requirements were mandated by Fannie Mae guidelines, which Mr. Wheatley expressly agreed his loan would have to satisfy.  *See* Exhibit C at WHEAT000382.

9

The purpose of Rule 30(e) is obvious. Should the reporter make a substantive error, *i.e.*, he reported "yes" but I said "no," or a formal error, *i.e.*, he reported the name to be "Lawrence Smith" but the proper name is "Laurence Smith," then corrections by the deponent would be in order. *The Rule cannot be interpreted to allow one to alter what was said under oath. If that were the case, one could merely answer the questions with no thought at all then return home and plan artful responses.* Depositions differ from interrogatories in that regard. *A deposition is not a take home examination.*

*Greenway v. Int'l Paper Co.*, 144 F.R.D. 322, 325 (W.D. La. 1992) (emphasis added).[7]

Courts in Delaware apply the same reasoning. *See, e.g., Donald M. Durkin Contracting, Inc. v. City of Newark*, No. 04-163, 2006 U.S. Dist. LEXIS 68221, *12-*17 (D. Del. Sept. 22, 2006). In *Durkin*, the defendant's Rule 30(b)(6) witness submitted errata sheets attempting to "clarify" her deposition testimony. *Durkin*, 2006 U.S. Dist. Lexis 68221 at *12-*13. The court held that the "errata sheets exceed the scope of the type of revisions contemplated by the Rule and serve only to improperly alter what was testified under oath." *Id.* at *16-*17. The court concluded that these alterations "constitute[d] an attempt to create sham issues of fact," and struck the

---

[7]    *See also Garcia v. Pueblo Country Club*, 299 F.3d 1233, 1242 (10th Cir. 2002); *Thorn v. Sundstrand Aerospace Corp.*, 207 F.3d 383, 389 (7th Cir. 2000) ("we also believe, by analogy to the cases which hold that a subsequent affidavit may not be used to contradict the witness's deposition . . . that a change of substance which actually contradicts the transcript is impermissible unless it can plausibly be represented as the correction of an error in transcription, such as dropping a 'not.'"); *Wigg v. Sioux Falls Sch. Dist.*, 274 F. Supp. 2d 1084, 1091 (D.S.D. 2003); *Rios v. Welch*, 856 F. Supp. 1499, 1502 (D. Kan. 1994) ("a plaintiff is not permitted to virtually rewrite portions of a deposition . . . simply by invoking the benefits of Rule 30(e)"); *S.E.C. v. Parkersburg Wireless, L.L.C.*, 156 F.R.D. 529, 535 (D.D.C. 1994) (noting modern trend in which courts do not allow a party "to make any substantive change she so desires" in deposition testimony).

changes. *Id.* at \*14; *see also In re Asbestos Litig.,* 2006 Del. Super. LEXIS 483, at \*18-\*21 (Del. Super. Ct. Nov. 28, 2006) (same).

Theses cases apply perfectly here. Mr. Wheatley "previously responded to *unambiguous questions* with *clear answers* that negate the existence of a genuine issue of material fact" on the question whether the repairs he made to his property were appropriate to ensure its livability, per Wachovia's (and Fannie Mae's) underwriting guidelines. *In re Asbestos Litig.,* 2006 Del. Super. LEXIS 483 at \*18 (emphasis in original). Mr. Wheatley "cannot thereafter create a fact issue by submitting an affidavit [or an errata sheet] which contradicts the earlier deposition testimony, without an *adequate explanation.*" *Id.* (emphasis in original).

Mr. Wheatley offers no such explanation for these alterations. Nor can he. The errata sheet is nothing more that "an attempt to create sham issues of fact" after Mr. Wheatley's concession at his deposition that the repairs and other requirements relating to his property were reasonable. Lines 14 and 15 of the errata sheet should be stricken.

## CONCLUSION

For these reasons, defendants Wachovia Mortgage Corporation and Wachovia Corporation hereby respectfully ask that the Court strike lines 14 and 15 of the errata sheet to plaintiff Lloyd Wheatley's October 31, 2007 deposition.

Respectfully submitted,

/s/ Michael J. Barrie
_____

| | |
|---|---|
| *Of Counsel* | Michael J. Barrie (#4684) |
| Elizabeth K. Ainslie | Schnader Harrison Segal & Lewis LLP |
| Stephen A. Fogdall | 824 N. Market Street |
| Schnader Harrison Segal & Lewis LLP | 10th Floor, Suite 1001 |
| 1600 Market Street, Suite 3600 | Wilmington, DE 19801-3011 |
| Philadelphia, PA 19103 | (302) 888-4554 |
| (215) 751-2000 | |

*Counsel for Defendants Wachovia Mortgage Corporation
and Wachovia Corporation*

Dated:  December 5, 2007

# EXHIBIT A

1      IN THE UNITED STATES DISTRICT COURT

2       FOR THE DISTRICT OF DELAWARE

3          - - -

4  TOLANO ANDERSON,    : CIVIL ACTION
   et al.,         :

5     Plaintiffs,  :
             :

6    vs.    :
             :

7  WACHOVIA MORTGAGE   :
  CORPORATION and    :

8  WACHOVIA CORPORATION, :
     Defendants.  : NO. 06 CV 00567 (SLR)

9

        - - -

10

     Wednesday, October 31, 2007

11

        - - -

12

13     Oral Deposition of LLOYD J. WHEATLEY

14  taken at Grady & Hampton, P.A., 6 North

15  Bradford Street, Dover, Delaware, commencing

16  at 10:00 a.m., before Susan Marie Migatz, a

17  Federally Approved Registered Merit Reporter,

18  Certified Realtime Reporter, and Notary Public

19  in and for the Commonwealth of Pennsylvania.

20

        - - -

21

22  VERITEXT NATIONAL COURT REPORTING COMPANY
     1845 Walnut Street, 15th Floor

23      Philadelphia, PA  19103
     (215) 241-1000  (888) 777-6690

24

Page 2

```
1   APPEARANCES:
2
        GRADY & HAMPTON, P.A.
3       BY:  JOHN S. GRADY, ESQ.
        6 North Bradford Street
4       Dover, Delaware 19904
        Phone:  302-678-1265
5       E-mail: unavailable
6           Representing the Plaintiffs
7
        SCHNADER, HARRISON, SEGAL & LEWIS, LLP
8       BY:  STEPHEN A. FOGDALL, ESQ.
        1600 Market Street, Suite 3600
9       Philadelphia, PA 19103
        Phone:  215-751-2581
10      E-mail: sfogdall@schnader.com
11          Representing the Defendant
12
13              - - -
    ALSO PRESENT:
14
        AUDRIA L. WHEATLEY
15
16              - - -
17
18
19
20
21
22
23
24
```

Page 4

```
1            E X H I B I T S
2   NUMBER       DESCRIPTION       MARKED
3   L. Wheatley 10 Membership Interest
                Redemption Agreement,
4               5/25/05, Pages 000341-
                348
5
    L. Wheatley 11 Form 1040 U.S. Individual
6               Income Tax Return 2001,
                Pages 000017-44
7
    L. Wheatley 12 Form 1040 U.S. Individual
8               Income Tax Return 2002
9   L. Wheatley 13 Form 1040 U.S. Individual
                Income Tax Return 2003
10
    L. Wheatley 14 Form 1040 U.S. Individual
11              Income Tax Return 2004,
                Pages 000047-67
12
    L. Wheatley 15 Form 1040 U.S. Individual
13              Income Tax Return 2005,
                Pages 000070-91
14
15              - - -
16
17
18
19
20
21
22
23
24
```

Page 3

```
1           I N D E X
2   WITNESS NAME            PAGE
3   LLOYD J. WHEATLEY
4     By Mr. Fogdall
5           - - -
6          E X H I B I T S
7   NUMBER      DESCRIPTION     MARKED
8   L. Wheatley 1  Agreement of Sale for
                584 North DuPont Highway,
9               6/18/04, Pages 000217-219
10  L. Wheatley 2  Photocopy of Check
                No. 994, Page WHEAT000069
11
    L. Wheatley 3  U.S. Census Bureau
12              American FactFinder,
                10/31/07
13
    L. Wheatley 4  Letter, 9/17/07, from
14              Wheatley, Pages PLS000232-
                234
15
    L. Wheatley 5  Uniform Residential Loan
16              Application, 8/3/04, Pages
                WHEAT000170-177
17
    L. Wheatley 6  Interest Rate Agreement,
18              8/2/04, Page WHEAT000187
19  L. Wheatley 7  Invoices and receipts re:
                584 N. DuPont Highway,
20              Pages PLS000243-251
21  L. Wheatley 8  Appraisal as of 7/7/04,
                Pages WHEAT000054-64
22
    L. Wheatley 9  Settlement Statement,
23              10/20/05, Pages 000419-
                420
24
```

Page 5

```
1            LLOYD J. WHEATLEY, 138 King
2   Henry Court, Dover, Delaware 19901,
3   after having been first duly sworn,
4   was examined and testified as follows:
5              - - -
6            EXAMINATION
7              - - -
8   BY MR. FOGDALL:
9       Q.    Mr. Wheatley, good morning.
10      A.    Good morning.
11      Q.    I told you a moment ago that my
12  name is Stephen Fogdall and I represent
13  Wachovia Corporation and Wachovia Mortgage
14  Corporation --
15      A.    Okay.
16      Q.    -- in a lawsuit brought by you
17  and your wife and four other individuals, and
18  the testimony that you're going to give today
19  is part of that lawsuit.
20      A.    Okay.
21      Q.    Now, the lawsuit concerns three
22  properties on North DuPont Highway:  580 North
23  DuPont Highway, 582 North DuPont Highway, and
24  592, I believe --
```

2 (Pages 2 to 5)

Page 6

1     A.    No; 584.
2     Q.    584.  Thank you for correcting
3  me, sir.
4          Of those three properties, it's
5  584 North DuPont Highway that you ultimately
6  purchased; is that correct?
7     A.    Correct.
8     Q.    Now, how did you come to hear
9  about that property being available for
10  purchase?
11    A.    I heard about the property
12  through Mr. Anderson, Tolano Anderson.  He saw
13  the property had a sign out front for sale and
14  he approached us about the possibility of
15  buying it.
16    Q.    Do you know if at that time
17  Mr. Anderson had already spoken with the
18  seller of the properties about purchasing
19  them?
20    A.    No.
21    Q.    So your understanding was he
22  talked to you about purchasing them before
23  talking to the seller about --
24    A.    That's my understanding.

Page 7

1     Q.    So at the time that he first
2  spoke to you about purchasing that property,
3  Mr. Anderson, at least to your knowledge, was
4  not aware that the seller was insisting that
5  all three of those properties be sold
6  together?
7     A.    No.  That came afterwards.
8     Q.    Okay.
9     A.    Okay?  That came afterwards.
10  But initially, from what I understand, they
11  were sold or in the process of being
12  purchased, that fell through with the original
13  or the other people, the seller.  Then he put
14  it back on the market and then the Andersons
15  saw it, and then we were asked about it then.
16    Q.    So do you recall the date,
17  roughly, when Mr. Anderson first talked to you
18  about buying the properties?
19    A.    No.  It had to be in the summer
20  of 2004.
21    Q.    Okay.  When did you first hear
22  about the seller's demand that all three
23  properties be purchased at the same time?
24    A.    We met with Peter Aigner, who

Page 8

1  was the seller, at 584 North DuPont Highway on
2  the back porch, it had to be somewhere in May,
3  I'm going to say, and that was the summer of
4  2004, somewhere in that range, and at that
5  time, that's when the deal had to be an
6  all-or-nothing deal.
7     Q.    And was that --
8     A.    There were some price
9  negotiations going on, the price was reduced
10  from the original requested price, and then
11  based upon that he said all these have to be
12  sold at one time.  He was doing some
13  investment in another venture that he had to
14  have all of the funds at one time.
15    Q.    Do you recall if that's the
16  same day on which you signed the Agreement of
17  Sale for that property, 584 North DuPont
18  Highway?
19    A.    No, that isn't.
20    Q.    Okay.
21    A.    That was done in the lawyer's
22  office, his attorney.
23    Q.    Okay.  Let me show you --
24    A.    I can't recall if we signed it

Page 9

1  there or not.  But I remember signing papers
2  at the attorney's office when all six of us
3  were together with the seller and his
4  attorney.
5     Q.    So let me show you that, sir.
6  That's what I believe to be the Agreement of
7  Sale for 584 North DuPont Highway, the
8  property you purchased.  Does that look
9  familiar to you?
10    A.    Uh-huh.
11          Wait a minute.
12          No. 10.
13    Q.    What's that?
14    A.    No. 10 in this Agreement is
15  where he talks about not receiving back the
16  money.  That was part of what we agreed to if
17  you read that.
18    Q.    Well, let me understand you
19  correctly.  You are talking about Paragraph
20  No. 10 here on the third page of the Agreement
21  of Sale.  First of all, this is the Agreement
22  of Sale for that property; correct?
23    A.    Yes, it is.
24    Q.    And that is your signature?

3 (Pages 6 to 9)

Page 10

1    A.    Yes, it is.
2    Q.    And that's your wife's
3  signature?
4    A.    Yes, it is.
5    Q.    And you are talking about
6  Paragraph No. 10 --
7    A.    Uh-huh.
8    Q.    -- which the paragraph is
9  titled "Purchaser's Default," and it reads:
10  "If PURCHASER shall, for some reason not
11  excused hereunder, fail or refuse to perform
12  PURCHASER'S obligations to SELLER" -- and here
13  "PURCHASER" is you and your wife and "SELLER"
14  is Mr. Aigner --
15    A.    Peter Aigner.
16    Q.    -- "and SELLER shall not also
17  be in default, SELLER shall retain all moneys
18  paid hereunder on account of the Purchase
19  Price, whereupon all rights and obligations
20  hereunder shall cease and determine."
21        Now, isn't that really talking
22  about the fact that if the sale doesn't go
23  through, you would forfeit your downpayment?
24    A.    That's correct.

Page 11

1    Q.    That's not specifically talking
2  about the seller's requirement that all three
3  properties be sold at the same time?
4    A.    It doesn't say that, but they
5  all were done together, all three of us
6  together, at the same time.
7    Q.    Okay. Do you agree with me
8  that there is nothing in this Agreement of
9  Sale that indicates that all three properties
10  had --
11    A.    I agree with that.
12    Q.    -- to be purchased at the same
13  time?
14    A.    That's correct. It's not in
15  there.
16    Q.    One thing, before we
17  continue --
18    A.    Uh-huh.
19    Q.    -- because there's a written
20  record being made of your testimony and the
21  questions that I ask and the answers that you
22  give --
23    A.    Yes.
24    Q.    -- it's important, I will do

Page 12

1  the best I can not to interrupt you when you
2  are answering a question, and I will ask you
3  not to interrupt me when I'm asking a
4  question. That way the transcript will read
5  more cleanly at a later time.
6    A.    Okay.
7    Q.    I notice as we've started
8  there's been a little bit of interrupting back
9  and forth, both on my part and on your part.
10  So I will do my best not to do that and I will
11  ask you to do the same.
12    A.    Absolutely.
13    Q.    You will notice that this
14  Agreement of Sale is signed on the 18th of
15  June 2004. So you're saying that's about a
16  month after you first met with Mr. Aigner and
17  discussed the purchase of the properties?
18    A.    I didn't say a month after
19  Aigner.
20    Q.    I thought you said --
21    A.    I said it was Anderson.
22    Q.    I thought you said you met on
23  the back porch of 584 North DuPont Highway in
24  May of '04.

Page 13

1    A.    That was the end of May. It
2  wasn't a month later. What is that? A couple
3  days.
4    Q.    You didn't give me a date in
5  May. You just said May of 2004.
6    A.    Okay.
7    Q.    So 18, 19, 20 days before
8  this --
9    A.    Right.
10    Q.    -- you first met with
11  Mr. Aigner to discuss the purchase of the
12  property?
13    A.    Yes.
14    Q.    And at that time Mr. Aigner
15  made a verbal insistence that all three
16  properties had to be sold at the same time?
17    A.    Yes.
18    Q.    And Mr. Aigner also insisted
19  that if the purchase of any one of the
20  properties didn't go through, you'd lose the
21  downpayment for all of the properties?
22    A.    Yes.
23    Q.    Do you recall what the
24  downpayment was, the total downpayment, for

4 (Pages 10 to 13)

Page 14

1  the three properties?
2      A.    Yes.
3      Q.    And it was what?
4      A.    $40,000.
5      Q.    And you split that three ways?
6      A.    $13,333.33, which is in each
7  contract.
8      Q.    Okay. And is this a photocopy
9  of the check by which you paid your share of
10 the downpayment to Mr. Aigner?
11     A.    Yes.
12     Q.    You'll notice that the check is
13 drawn on your business account, Limousine
14 Unlimited --
15     A.    Uh-huh.
16     Q.    -- not a personal account in
17 your own name.
18     A.    Correct.
19          - - -
20          (Whereupon the documents were
21     marked, for identification purposes,
22     as Exhibits L. Wheatley 1 and 2.)
23          - - -
24

Page 15

1  BY MR. FOGDALL:
2      Q.    Now, the property 584 North
3  DuPont Highway that you purchased, you've
4  alleged in the Complaint, in your Complaint,
5  that that property is located in a white
6  neighborhood, I believe is the term you used
7  in the Complaint. Is that right?
8      A.    Yes.
9      Q.    And you've said that you've had
10 previous mortgages from Wachovia that were in
11 racially-mixed neighborhoods or predominantly
12 minority neighborhoods; is that correct?
13     A.    Not exactly. That wasn't
14 stated properly. It's Anderson who owns the
15 property. I had a property that was from
16 their predecessors, which was Delaware Trust.
17 So I never purchased any properties under
18 Wachovia. So that was misstated that I had
19 any dealings. If you want to grandfather in
20 the deal from Delaware Trust, which was bought
21 in 1988, the bank changed twice since then
22 before it became Wachovia, so Wachovia was the
23 third bank that was there. It says Delaware
24 Trust.

Page 16

1      Q.    What was the property?
2      A.    35 North New Street, Dover,
3  Delaware.
4      Q.    Did you ever live at that
5  property?
6      A.    No. It's a rental property,
7  investment.
8      Q.    So the entire time you have
9  lived in Dover, is this correct, you've lived
10 at 138 King's Court?
11     A.    King Henry Court? No.
12     Q.    Well, the address you gave at
13 the start of the deposition was what?
14     A.    138 King Henry Court.
15     Q.    King Henry Court, okay. And
16 how long have you lived there?
17     A.    This is the fifth year.
18     Q.    But you lived there before you
19 purchased that property on North DuPont
20 Highway; correct?
21     A.    That's correct.
22     Q.    Would you characterize that
23 neighborhood as a white neighborhood?
24     A.    Which neighborhood?

Page 17

1      Q.    The neighborhood in which 138
2  King Henry Court is located.
3      A.    No.
4      Q.    Mr. Anderson yesterday at his
5  deposition testified that the area surrounding
6  Silver Lake is a white neighborhood and he
7  felt that because he and his wife and you all,
8  the other four plaintiffs, had, quote, crossed
9  the line into that white neighborhood, that as
10 a result there was a lot of trouble during the
11 loan closing process. Do you agree with that?
12     A.    Yes.
13     Q.    And do you agree with his
14 statement that the community surrounding
15 Silver Lake is a white community?
16     A.    Yes.
17     Q.    Have you ever seen census data
18 for that area to confirm that it is a white
19 community?
20     A.    No.
21     Q.    I am going to show you a map
22 that I downloaded from the U.S. Census Bureau
23 this morning that shows the area around Silver
24 Lake and color-codes it according to the

5 (Pages 14 to 17)

Page 18

1  percentage of the population that is
2  African-American, and you can see from that
3  map that it's not a white community. It's a
4  mixed community. Would you agree?
5      A.    Let me get the triangulation on
6  what I'm looking at. This is McKee Road.
7  This is North DuPont Highway. That's College
8  Road. So what is --
9          MR. GRADY: Well, I think
10         there's a slight unintentional
11         misrepresentation of the testimony
12         yesterday. The testimony yesterday
13         only was that the immediate houses
14         surrounding Silver Lake were white.
15         There was no suggestion that this
16         area, which is all in green over here,
17         was all white.
18         THE WITNESS: No.
19 BY MR. FOGDALL:
20     Q.    Do you see where the property
21 at 584 North DuPont Highway is located? And I
22 obtained this from Google this morning showing
23 the location of that property, which would
24 be -- and I will show you on this map, the

Page 19

1  census map -- I am just going to put a dot or
2  see if you agree with me, the 584 North DuPont
3  Highway property would be located right about
4  here, and I am just going to put a red dot.
5  Would you agree with that?
6      A.    Right where?
7      Q.    Right about there. Would you
8  agree with that?
9      A.    I can't see what that street
10 is. This is North State Street. Where is
11 Division?
12     Q.    This is Division Street.
13 Here's North DuPont Highway. And according to
14 that pointer from Google maps, your property
15 should be right about here.
16     A.    That's correct.
17     Q.    Okay.
18     A.    Oh, you know what? You're
19 right. Just by what you just gave me, let me
20 show you. Well, can I borrow your pen?
21     Q.    Sure.
22         MR. GRADY: Do you want another
23         copy of this?
24         THE WITNESS: Can we make a

Page 20

1      copy of it.
2  BY MR. FOGDALL:
3      Q.    You can write on this.
4      A.    That's why I wanted to make
5  sure we knew where we were. This would be
6  correct and that is true, this area right here
7  between Saulsbury Road is predominantly
8  minority.
9          This part north of -- here's
10 North State Street. Commerce Bank sits right
11 here by Pizza Hut. Anything north of this,
12 this piece right here -- it's kind of
13 deceiving what you're showing here -- this is
14 Delaware State University College right here.
15 It's a historical black college and that's why
16 it's probably showing up as African-American.
17         But the actual location which
18 is south of North DuPont Highway, which is
19 right here and it's showing this light green,
20 this is the Capitol School District. Okay?
21 But on this waterfront, from here all the way
22 around here -- and there's a condominium unit
23 that sits about right here -- on this
24 waterfront -- and I think that's what your

Page 21

1  question was -- there are no minorities that
2  own any property there where that red line is.
3      Q.    Can you put an X where your 584
4  is?
5      A.    Sure. Most probably it's
6  somewhere right around here.
7      Q.    Okay. And you can see that
8  that location where you've marked the X is in
9  a part of the map that's color-coded as having
10 somewhere between 24.9% and 44.9%
11 African-American residents.
12     A.    According to this, yes. But on
13 this location specifically where you are
14 asking to mark at, there are no minorities
15 that own any property on that waterfront.
16     Q.    So you are saying specifically
17 along the waterfront, waterfront homes around
18 Silver Lake --
19     A.    In this section, south of North
20 State Street, this red area that we're talking
21 about.
22     Q.    -- are only owned by white
23 owners, homeowners?
24     A.    To the best of my knowledge.

6 (Pages 18 to 21)

1     Q.   Do you have any evidence to
2 support that statement, or what is that
3 statement based on?
4     A.   Based on my living here 20
5 years and knowing the demographics of this
6 community and town. I've been here over 20
7 years and there are zones for reconstruction
8 that are right now on the City Council. And
9 if I can look at this map, where this is
10 zoomed in at, there's an omission. I don't
11 see them. New Street, Governors Avenue, south
12 side of New Street, Water Street, I don't see
13 any of those on there, and those are within a
14 few blocks of here.
15     MR. GRADY: Well, if I may,
16     this is Division Street.
17     THE WITNESS: That's Division.
18     So it has to be this way. This
19     section here is omitted. So where
20     this is zoomed in at is not giving you
21     the full picture of Dover and its
22     demographics.
23 BY MR. FOGDALL:
24     Q.   But it's giving you the full

1 picture of Silver Lake.
2     A.   Yes, it is. And then if you
3 notice up here, this pale shaded area is near
4 the 0.0% to 7.7%, there are no minorities
5 that's living on the east side -- or the west
6 side of North DuPont Highway, none, in this
7 whole area. In fact, this is not even a color
8 in here. This is white. They didn't even
9 make the shade in the data. See this section
10 right here?
11     Q.   But whether, in fact, every
12 single home that's located on the waterfront
13 of Silver Lake is owned by a white homeowner,
14 in fact, the area surrounding Silver Lake is
15 not an all-white area --
16     A.   Well --
17     Q.   -- according to the Census
18 Bureau's demographic data; is that correct?
19     A.   According to the Census Bureau
20 data, yes.
21     Q.   Okay.
22     MR. FOGDALL: Just go ahead and
23     mark this.
24     - - -

1     (Whereupon the document was
2     marked, for identification purposes,
3     as Exhibit L. Wheatley 3.)
4     - - -
5     THE WITNESS: What is the date
6     of that census, by the way? You say
7     you just downloaded it.
8 BY MR. FOGDALL:
9     Q.   In the deposition, you are the
10 witness, so you answer questions and I ask
11 them.
12     MR. GRADY: Just for the
13     record, the document says the "Data
14     Set" is "Census 2000 Summary File."
15 BY MR. FOGDALL:
16     Q.   Mr. Wheatley, do you have any
17 reason to think that data from 2003 or 2004,
18 when you bought the property at 584 North
19 DuPont Highway, would be substantially
20 different --
21     A.   No.
22     Q.   -- from the 2000 census data?
23     A.   No.
24     Q.   Mr. Wheatley, I'm going to show

1 you a letter which, from looking at it, it
2 appears that you wrote it, in which on my
3 reading you have outlined your reasons for
4 alleging that conduct by Wachovia in this case
5 caused your business to suffer. Do you
6 recognize that document?
7     A.   Yes.
8     Q.   I would like to ask you a few
9 questions about this letter. You say here --
10 and I will just read from the letter here --
11 in the second paragraph on the first page:
12 "In August of 2004 it was estimated that our
13 closing cost for 584 N. DuPont would be
14 approximately $9,000.00. The location on
15 Route #13 in Dover would double as our home
16 based business as well. When we were suddenly
17 faced with the higher demands of Wachovia,
18 only after they switched our loan from a
19 non-verification loan to a verification loan
20 and probed into our financial holdings..."
21     Can you explain the basis for
22 that statement? What do you mean they probed
23 into your financial holdings?
24     A.   Well, for the non-income

7 (Pages 22 to 25)

Page 26

1  verification loan that was originally
2  suggested by J. D. Hogsten, it would be, as he
3  indicated to us, where they don't check any of
4  your finances, you don't have to prove any
5  kind of income, anything like that. It's
6  called a non-income verification loan.
7      Q.    Okay. You are saying when you
8  first met with Mr. Hogsten about purchasing
9  this property, you are saying he suggested to
10  you that the loan should be done as a no
11  income verification loan?
12     A.    And began the process where we
13  gave him a downpayment or an application fee,
14  and that should be in the record that was
15  drawn out of Wachovia Mortgage somewhere, 12,
16  13 hundred dollars. Check the number in the
17  record to make sure that's accurate. And
18  that's what we were given, a non-income
19  verification loan.
20     Q.    Do you recall when that was?
21     A.    The date of the paperwork.
22     Q.    Do you have an application for
23  that loan that you are talking about?
24     A.    I believe we do.

Page 27

1      Q.    You have it in your possession?
2      A.    I believe we do. In fact, it
3  should have been sent with you in the 584
4  file, the entire file.
5      Q.    Well, I am asking you if you
6  have it. If you do have it --
7      A.    It should be in the file.
8      Q.    Then I will ask that it be
9  produced.
10     A.    It should be in the file.
11  Whatever was in that file --
12     Q.    Are you saying that it should
13  be in the file that was produced by your
14  counsel?
15     A.    Yes.
16     Q.    Okay. I will represent to you
17  that it is not there.
18     A.    What is the account -- I guess
19  I can't ask you a question.
20     Q.    So I will ask you if you do
21  have it, I will put the request on the record
22  that you provide it to counsel and then
23  counsel can provide it to me.
24     A.    Let me finish answering this

Page 28

1  question. Okay? What J. D. did with that
2  loan, it got terminated and got reverted into
3  an income verification loan. So where the
4  paperwork is, I don't know where it may be at
5  this point. But to the best of my knowledge I
6  signed papers for the original loan, which was
7  a non-income verification, in his office.
8      Q.    Okay. You are saying you
9  signed an application for a loan that would
10  have been a non-income verification loan?
11     A.    Yes.
12     Q.    What happened to that loan
13  application?
14     A.    I don't know where it is.
15     Q.    Right now I am not asking you
16  about what happened to the physical loan
17  application. What happened? That loan was
18  not approved; is that what you're saying?
19     A.    It got transitioned and
20  changed. It got transitioned and changed to a
21  verification loan.
22     Q.    And when --
23     A.    Because you've got to
24  understand, the loan officer, he was the one

Page 29

1  making the suggestion of the packages and the
2  best way to go based on what we came to the
3  table with as a qualified buyer. So I don't
4  know all the packages he had at his disposal
5  at the time. But the one he did have at his
6  immediate disposal was a non-income
7  verification loan based on the fact that I was
8  self-employed.
9      Q.    At what point did you first
10  hear that the loan would be switched to what
11  you are calling a verification loan?
12     A.    Probably I'm going to guess a
13  couple of weeks thereafter.
14     Q.    Do you remember roughly what
15  the date would have been of that transition
16  that you are talking about?
17     A.    No.
18     Q.    Who first told you that the
19  loan would be switched from a non-income
20  verification loan to what you're calling a
21  verification loan?
22     A.    J. D. Hogsten.
23     Q.    And what did he say was the
24  explanation for that?

8 (Pages 26 to 29)

Page 30

1 　　A.　He didn't have one.
2 　　Q.　He just said that's what was
3 going to happen?
4 　　A.　He was going to change it.
5 　　Q.　Did you ask him why?
6 　　A.　Yes.
7 　　Q.　And what did he say?
8 　　A.　That I think this is a better
9 package for you.
10 　　Q.　What was your understanding of
11 what the verification loan would entail?
12 　　A.　It would have required that we
13 put down 20%.
14 　　　　I misstated. It was 15%, 15%.
15 　　Q.　So you're saying J. D. Hogsten
16 told you that your loan was going to be
17 switched to an income verification loan and as
18 a result you would have to pay, instead of --
19 　　A.　15%.
20 　　Q.　Instead of what?
21 　　A.　Instead of 15%, it would go to
22 10%. 90/10.
23 　　Q.　I am confused. Your original
24 downpayment was 5% of the price of the

Page 31

1 property; correct?
2 　　A.　Is that what 13,000 comes out
3 to be?
4 　　Q.　I'm asking you. Is that
5 correct?
6 　　A.　I need a calculator so I can
7 check it out. Do you have a calculator?
8 　　　　MR. GRADY: If counsel would
9 　　like me to get a calculator, we can
10 　　get a calculator.
11 　　　　THE WITNESS: I need a
12 　　calculator.
13 BY MR. FOGDALL:
14 　　Q.　I will represent to you that
15 13,000-some-odd dollars is 5% of the purchase
16 price of the property.
17 　　A.　What was the purchase price?
18 　　Q.　You don't recall the purchase
19 price of your property?
20 　　A.　$267,000.00 was the purchase
21 price.
22 　　Q.　I will represent to you that
23 your downpayment of 13,000-and-some-odd
24 dollars was 5%.

Page 32

1 　　A.　That doesn't sound right.
2 　　　　THE WITNESS: Do you have a
3 　　calculator?
4 BY MR. FOGDALL:
5 　　Q.　We are going to keep going.
6 　　　　MR. GRADY: Counsel is taking
7 　　the deposition.
8 BY MR. FOGDALL:
9 　　Q.　Originally you were saying you
10 were paying a 5% downpayment.
11 　　A.　No.
12 　　Q.　You are disagreeing with that.
13 　　A.　No.
14 　　Q.　What's your recollection of the
15 amount to put down?
16 　　A.　Let me say it again. It was an
17 85/15 loan, a non-income verification loan
18 from Wachovia.
19 　　Q.　And what was the downpayment
20 that you were going to be required to make?
21 　　A.　Whatever 15% is of the lended
22 value.
23 　　Q.　So your understanding is your
24 original downpayment was going to be 15% of

Page 33

1 the --
2 　　A.　Purchase value.
3 　　Q.　Okay. And then what happened?
4 　　A.　J. D. changed it.
5 　　Q.　And then what did your
6 downpayment become?
7 　　A.　The downpayment was based on
8 the loan package that was being offered. Now
9 that it was an income verification loan, then
10 it would be a 90/10 loan or 10% down, 90%
11 would be financed of the purchase price.
12 　　Q.　So your actual downpayment was
13 less under what you're calling the
14 verification loan?
15 　　A.　Exactly.
16 　　Q.　It was going to be a lower
17 downpayment?
18 　　A.　A lower downpayment, exactly.
19 　　Q.　Originally it was a 15%
20 downpayment and then it went down to 10?
21 　　A.　Correct.
22 　　Q.　Okay.
23 　　A.　Sorry if it sounds confusing,
24 but that's what it was.

9 (Pages 30 to 33)

Page 34

1    Q.    All right. What else was
2  involved in the transition from the no income
3  verification loan to the verification loan?
4    A.    We had to provide two years of
5  income tax returns and then they could verify
6  our income.
7    Q.    You are saying you provided two
8  years of income tax returns to Wachovia?
9    A.    Yes.
10    Q.    And those two years were what?
11    A.    2002 and 2003.
12    Q.    Did you provide anything else
13  besides those two years of returns?
14    A.    Our bank statements,
15  savings/checking accounts, all of our business
16  records, every account we had at Wachovia.
17    Q.    And according to your letter,
18  you're saying that among those materials that
19  you provided to Wachovia as part of this new
20  loan package, that somehow Wachovia became
21  aware of $35,000.00 to $40,000.00 that, quote,
22  they saw in our financial account; is that
23  correct?
24    A.    Yes.

Page 35

1    Q.    And on what document that you
2  submitted as part of this new loan package
3  would those assets, the $35,000.00 to
4  $40,000.00, have been reflected?
5    A.    They were not submitted in any
6  part of the package. Once again, they saw
7  those when they looked into our accounts going
8  into the verification loan. That means they'd
9  have to verify the buyer actually has the
10  income or the credibility to purchase the
11  house.
12         So there were no bank
13  statements or anything given to you. So that
14  wasn't given to you at all. Wachovia has
15  those, and they would do that with any
16  verification loan, I would think.
17    Q.    So are you talking about, the
18  $35,000.00 to $40,000.00, are those part of
19  your business? Is that assets that your
20  business would have held?
21    A.    No. Let me clarify that. The
22  business and myself file one tax return. So
23  it's not the business funds.
24    Q.    Okay.

Page 36

1    A.    They're all my funds. I report
2  them as total income to the Internal Revenue
3  Service. I'm responsible for the gross
4  profits and pay taxes based on that number.
5  So they may sit in an individual account
6  because we keep them as far as to try to not
7  commingle the funds the best as possible. But
8  in the final equation all the funds are mine.
9    Q.    Are you saying that the
10  $35,000.00 to $40,000.00 that Wachovia
11  supposedly saw in your financial accounts, is
12  that reflected on your tax returns that you
13  submitted?
14    A.    No. Once again, for the third
15  time, no. This information and documentation
16  is in the statements of our savings and
17  checking accounts that Wachovia checked during
18  the income verification loan. Just look at
19  the loan.
20    Q.    So you are saying that it's in
21  your personal savings account --
22    A.    That's correct.
23    Q.    -- or your personal checking
24  account?

Page 37

1    A.    That's correct, the personal
2  savings/checking and business accounts.
3    Q.    Okay.
4    A.    I own them all, plus the stocks
5  and bonds. I own them all.
6    Q.    So what I'm asking you is:
7  Where would I have to go, what paperwork would
8  I have to look at specifically, in order to
9  verify this statement that there were
10  $35,000.00 to $40,000.00 of assets in the
11  paperwork that you submitted that Wachovia saw
12  and wanted to get their hands on?
13    A.    I'll say this for the fourth --
14         MR. GRADY: Wait a minute.
15         If you don't mind, since we
16    have some time limits, I think I can
17    help.
18         Are these also Wachovia
19    accounts?
20         THE WITNESS: Yes. That's what
21    I keep telling him. He is not
22    accepting that.
23  BY MR. FOGDALL:
24    Q.    It's not that I'm not accepting

10 (Pages 34 to 37)

Page 38

1  it. It's that I need something more to help
2  me track down what you are saying.
3  Are you saying I'd find that in
4  personal accounts that you hold or business
5  accounts?
6  A.  Both, the personal savings,
7  personal checking, business savings, business
8  checking.
9  Q.  So I'd have to add up the funds
10  in all of your accounts and then I'd arrive at
11  a figure of $35,000.00 to $40,000.00?
12  A.  Yes.
13  Q.  Okay. Thank you. That was not
14  clear before.
15  And you're saying that you
16  didn't have to submit any of this paperwork
17  under the original loan package that you were
18  going to apply for?
19  A.  That's correct. It was a
20  non-income verification loan.
21  Q.  All right. I have here a
22  Uniform Residential Loan Application signed by
23  you dated August 3, 2004. Is that what you're
24  calling the application for the -- well, let

Page 39

1  me ask you first, do you recognize that
2  application?
3  A.  Let me take a look.
4  MR. GRADY: What's the number
5  on that?
6  THE WITNESS: The number on
7  this loan application?
8  MR. GRADY: Yes. 000170.
9  Thank you.
10  THE WITNESS: Where did you see
11  the date on here? Is it on the last
12  page?
13  BY MR. FOGDALL:
14  Q.  If you go where you signed it,
15  right there, 3 August '04. Do you recall
16  filling out that application?
17  A.  Uh-huh. Yeah.
18  Q.  Do you recall whether that is
19  the application for the no-income verification
20  loan you first talked about?
21  A.  I don't know --
22  Q.  You don't recall?
23  A.  -- what this one is. No, I
24  don't recall. He didn't sign it. Hogsten's

Page 40

1  signature is not even on here.
2  I don't know which one this one
3  is. But that case number, that 6940176, it
4  seems like it's a different number. I
5  remembered there were two different numbers to
6  the loans.
7  Q.  Okay.
8  A.  We signed that one, though, to
9  answer your question.
10  Q.  Okay. When you signed this
11  Interest Rate Agreement on the same date, 3
12  August '04, do you recall whether that was in
13  conjunction with the no income verification
14  loan, the first loan you talked about, or
15  whether this was in conjunction with the new
16  loan, the new package that Mr. Hogsten said
17  you should go with?
18  A.  This is the rate lock? This is
19  the second one. The first one we signed was
20  in June.
21  Q.  Okay. So do you see the
22  interest rate here is 6.625% that you're
23  agreeing to?
24  A.  Uh-huh.

Page 41

1  Q.  Now, do you recall whether that
2  interest rate is lower than the interest rate
3  you would have agreed to if you had gone with
4  the no income verification loan?
5  A.  No.
6  Q.  You don't recall?
7  A.  No. I don't know.
8  Q.  Do you recall signing this?
9  A.  Yes.
10  - - -
11  (Whereupon the documents were
12  marked, for identification purposes,
13  as Exhibits L. Wheatley 4 through 6.)
14  - - -
15  BY MR. FOGDALL:
16  Q.  In the next sentence in this
17  letter we have been discussing, again reading
18  from Exhibit 4, you then say: "Wachovia was
19  quick to lend us an additional $50,000.00 Home
20  Equity Loan 2nd mortgage..." Now, tell me
21  about that. What are you referring to there?
22  A.  Excuse me. I need to keep
23  these on.
24  What I'm talking about here is

11 (Pages 38 to 41)

Page 42

1  when we actually had to pay that higher
2  downpayment, which was beyond what was
3  disclosed to me in the original document, this
4  has to address the fact that we were short
5  with money. We talked to Deanne Wicks in
6  Wachovia Bank and I expressed to her that our
7  cash reserve was gone, our capital was used up
8  in the initial loan, and so she helped process
9  a second mortgage on 584 North DuPont Highway.
10 And that was about a week or two after the
11 initial purchase.
12    Q.    Okay. So you are saying a week
13 or two after the purchase of 584 North DuPont
14 Highway closed --
15    A.    Uh-huh.
16    Q.    -- you then got a second
17 mortgage from Wachovia to pay yourself back
18 for your expenses that you incurred in
19 connection with the closing?
20    A.    That's correct; and some other
21 loans associated with fixing the house up.
22    Q.    So what did that $50,000.00
23 that you borrowed that you are talking about
24 go to? How did that break down?

Page 43

1     A.    That got disseminated, to the
2  best of my knowledge, there was some loans
3  between the Andersons and we had some credit
4  cards, some other contractual stuff was done,
5  trees were cut down and removed, dirt was
6  brought in, debt consolidation, personal debt
7  consolidation.
8     Q.    So how much of that was in
9  connection with the purchase of 584 North
10 DuPont Highway? How much of the $50,000.00
11 went to expenses in connection with that
12 purchase?
13    A.    With the initial purchase of
14 this $50,000.00?
15    Q.    Yes.
16    A.    None. The money for the
17 purchase of the original loan came from all of
18 our money.
19    Q.    No. I am asking you about the
20 $50,000.00 home equity loan.
21    A.    Uh-huh.
22    Q.    How much of that $50,000.00
23 went to reimbursing you for costs that you
24 have alleged you have incurred in connection

Page 44

1  with your purchase of the 584 North DuPont
2  Highway property?
3     A.    Oh, I see. Okay. Not much.
4  Probably $800.00.
5     Q.    Okay. So $800.00 of the
6  $50,000.00 went to costs that you incurred in
7  connection with -- I'm sorry; I am going to
8  have to strike that.
9           Let's take it one piece at a
10 time. The $50,000.00, you used that to pay
11 back some loans from the Andersons?
12    A.    Not all the $50,000.00; a
13 portion of it. I had a $50,000.00 home
14 equity --
15    Q.    Do you recall how much that
16 was?
17    A.    Yes: about $24,000.00 or so,
18 you know. It's in the documents.
19    Q.    I am asking if you remember.
20    A.    Yeah. It's in the documents.
21 It was about $24,500.00, something like that.
22    Q.    So that takes care of about
23 half of the $50,000.00. What did the other
24 half go to?

Page 45

1     A.    It was my personal use to use
2  the way I wanted to. I debt consolidated
3  personal loans. We purchased some stuff,
4  furniture, items for the house.
5     Q.    Okay.
6     A.    I mean, I didn't spend the
7  whole $50,000.00 if that's what your question
8  is. It was an equity line.
9     Q.    You have alleged in the
10 Complaint, the Amended Complaint -- this is at
11 Paragraph 79 -- that you spent approximately
12 $50,000.00 in home improvements during the
13 process leading up to the closing of the
14 purchase of 584 North DuPont Highway. You
15 spent, according to the Complaint, $50,000.00
16 on home improvements.
17    A.    Okay.
18    Q.    Is that correct?
19    A.    Yeah; and the numbers are, if I
20 can add them up -- can I borrow your pen?
21    Q.    Well, first --
22    A.    Yes, the answer to your
23 question is yes.
24    Q.    Let me show you this. First

12 (Pages 42 to 45)

Page 46

1   let me ask you, so the $50,000.00 home equity
2   loan that you are talking about in this
3   letter, you are saying that wasn't used to
4   reimburse you for what you're calling the
5   $50,000.00 in expenses that you say you
6   incurred for home improvements?
7       A.   A portion of it was.
8       Q.   Okay.
9       A.   A portion of this number was a
10  portion of that number.
11      Q.   All right. I am going to show
12  you some documents that I assume you provided
13  to your counsel, which he has provided to me,
14  which I take to be invoices and receipts that
15  purport to document the expenses you incurred
16  doing home improvements in connection with the
17  closing of the purchase of the property, and
18  you can see the top of the page there, the
19  first page, says "584 N. DuPont Highway." I
20  take that to mean that this is purporting to
21  document the expenses in connection with the
22  improvements to that property.
23      A.   Uh-huh. Okay. Yeah, that's
24  correct.

Page 47

1       Q.   Okay. And you see the total
2   there is given as $11,535.21.
3       A.   Uh-huh.
4       Q.   But in the Complaint you have
5   alleged that you spent $50,000.00 in home
6   improvements.
7       A.   Well, this is incomplete. Let
8   me show you what's missing.
9            THE WITNESS: Can I borrow your
10  pen?
11           MR. GRADY: Well, ask him. I
12  don't know whether he wants this
13  marked up or not.
14           THE WITNESS: Okay.
15           MR. GRADY: It's his
16  deposition.
17           I guess he is offering to write
18  some stuff and if you want him to do
19  it, he will do it, or I can give him
20  some sheets of paper.
21  BY MR. FOGDALL:
22      Q.   You can go ahead and write on
23  that.
24      A.   You want me to write on it?

Page 48

1       Q.   Sure.
2       A.   What's missing is $26,500.00 in
3   personal loans for helping to repair, excavate
4   the land, tree removal. And then it was
5   $16,800.00, this was Wheatley's money. This
6   became a part of the HELOC, home equity line
7   of credit. You add that number up -- 5, 3,
8   18, 12, 13, 14 -- $54,835.21.
9       Q.   Okay. So you are saying there
10  was 26,000-and-some-odd dollars in expenses
11  that you owed the Andersons totally separate
12  from the expenses that are documented here --
13      A.   Yes.
14      Q.   -- that were initially
15  reflected on this paper --
16      A.   That's correct.
17      Q.   -- before you added this new
18  information?
19      A.   Yes, that's correct.
20      Q.   Okay. And no part of this
21  $26,000.00 to the Andersons is included in the
22  initial $11,500.00 that was on there?
23      A.   That's correct. And it could
24  be misleading to see that. That's a huge

Page 49

1   discrepancy in number.
2       Q.   And the $26,000.00 was for what
3   exactly?
4       A.   It was just loans we had back
5   and forth. They helped us out. We had taxes
6   that were due for the business. We did other
7   stuff at the house. All of it directly, I
8   can't recall each and every item that was
9   there. But the total money was being
10  accounted for and kept track of to be paid
11  back. This is the best loan you can get from
12  friends because it's zero interest.
13      Q.   But if you're telling me that
14  at least some of this $26,000.00 that you paid
15  back to the Andersons was for expenses you
16  incurred in connection with your business or
17  taxes for your business --
18      A.   At the house, at the house.
19  The house was also our business. We actually
20  interviewed and hired people from there as
21  well. It was money being lent back and forth
22  between the three of us to help each other
23  during this time of, would you say, kind of a
24  crazy demand to repair and fix up a seller's

13 (Pages 46 to 49)

Page 50

1   house before we buy it.
2       Q.   So you're telling me that all
3   of this money here, the $11,535.21, the
4   26,000-some-odd for Mr. Anderson and his wife,
5   and then the 16,000 --
6       A.   And additional personal cash of
7   my wife and I.
8       Q.   -- and all of that
9   54,800-some-odd dollars was money that you
10  were forced to spend because of something that
11  someone at Wachovia did?
12      A.   Yes.
13      Q.   Is that correct?  Every single
14  dollar of that $54,000?
15      A.   Yes.
16      Q.   And so someone at Wachovia told
17  you to spend money in connection with your
18  business?
19      A.   No.
20      Q.   Okay.  So how does expenses in
21  relation to your business, even if it was run
22  out of your home, how does that relate to
23  something that somebody at Wachovia did?
24      A.   Okay.  I'm glad you asked that.

Page 51

1   Just like you asked previous to this how do
2   you find the $35,000.00 to $40,000.00 in our
3   financial accounts, the financial accounts
4   were at Wachovia.  Our banking was at
5   Wachovia.  Our funds was at Wachovia.
6            So the fact that I'm
7   transacting the business myself personally in
8   and out of my house is one and the same.  So
9   the fact that they didn't know or didn't tell
10  me to spend money out of my business, I don't
11  have to go and report to them and ask their
12  permission if I can use my funds to spend it
13  toward something I need to do that's related
14  to the business or my personal self.
15           I'm responsible for the funds
16  totally.  That's how it's reported on the
17  Internal Revenue Service, my tax returns
18  reflect that, and there's no separation of
19  funds for business or personal.  It's all one.
20           That's why there's no 1120.
21  There's a Schedule C that's attached to a 1040
22  filed by the Internal Revenue Service.  So
23  what I use as discretion and for my best
24  judgment to pay bills that are necessary out

Page 52

1   of my own funds, I don't need to ask the bank
2   do they think I should do that or can I do
3   that.
4       Q.   Are you saying that you spent
5   the $54,835.21 because of something that --
6       A.   Yes.
7       Q.   Don't interrupt me.
8       A.   Okay.
9       Q.   Are you saying that you spent
10  the $54,835.21 because J. D. Hogsten told you
11  to spend that money?
12      A.   Yes.
13      Q.   Okay.  He required you to spend
14  every single dollar of this sum and you did?
15      A.   Yes.
16      Q.   What specifically did he ask
17  you or what specifically are you alleging that
18  he demanded you do to improve your home?
19      A.   Specifically what to do?
20      Q.   Yes.
21      A.   He didn't tell us specifically
22  what to do.  He said, and I quote, it has to
23  be move in condition, and from the way it is
24  now and the condition that it is now, it's not

Page 53

1   move in.  The move in condition was a
2   requirement for the loan to be processed and
3   go through.
4       Q.   Okay.
5       A.   Now, it cost us that amount of
6   money to do what he demanded that we do to
7   move in the house.
8       Q.   So the only --
9       A.   So if he had not asked us that
10  and told us to go fix the house to move in
11  condition -- okay? -- after it appraised for
12  its value that it was being sold for, we
13  wouldn't have spent the money.
14      Q.   Okay.  Let's break that down.
15  First of all --
16      A.   Let's do that.
17      Q.   -- first of all, the only thing
18  that Mr. Hogsten said to you was the house has
19  to be in move in condition; correct?
20      A.   Uh-huh.
21      Q.   And you then interpreted what
22  that meant and went out and spent $54,000.00?
23      A.   No.
24      Q.   He didn't tell you specifically

14 (Pages 50 to 53)

Page 54

1  what you needed to do to get the home into
2  move in condition?
3      A.   No.
4      Q.   Correct?
5      A.   That's correct.
6      Q.   So how did you go about
7  deciding what you felt you needed to do to get
8  the home into move in condition?
9      A.   Well, the house had been empty
10 and vacant for several months, to the best of
11 my knowledge, and it had to have the utilities
12 turned on. It had to have cable put in,
13 phones. Those are in the documentation you
14 have for 548 in this piece that you submitted.
15 The carpet had to be done. Flooring was put
16 in.
17          And, by the way, we explained
18 that to J. D., that we don't think it's
19 necessary to do this now, we plan on doing
20 other custom upgrades as time allowed us to do
21 it and finances allowed us to do it.
22     Q.   Okay. What needed to be done
23 to the flooring? You said repairs had to be
24 done to the flooring.

Page 55

1      A.   Well, it didn't have to be.
2  There was no really repairs. You can look in
3  the appraisal report.
4      Q.   Well, tell me what you are
5  talking about when you said something had to
6  be done to the flooring.
7      A.   There's nothing had to be done
8  to the flooring. We just put carpet and tile
9  on the floor to make it to our liking.
10     Q.   You put tile on the floor to
11 make it to your liking?
12     A.   Yeah, carpet on the floor to
13 our liking.
14     Q.   And there was no tile on the
15 floor before that?
16     A.   There was. There was old,
17 worn -- the house was vacant. It was vacant
18 for a while. So there was no living person in
19 the home. So it wasn't in the best pristine
20 or livable conditions.
21     Q.   And you are saying that you
22 would have done this, you would have put new
23 tile in and carpeting in, once you moved in,
24 you just didn't want to do it before then.

Page 56

1      A.   Correct. And there was no
2  reason to do it. The house appraised for the
3  selling price.
4      Q.   Were there any other
5  improvements that you did to the property to
6  bring it into move in condition?
7      A.   Yes. We removed trees, put in
8  some soil.
9      Q.   Okay. But Mr. Hogsten never
10 said anything to you about having to remove
11 trees?
12     A.   No.
13     Q.   Okay. Other than these things
14 that we've talked about, anything else?
15     A.   No.
16     Q.   Now, you said that the property
17 at 584 North DuPont Highway was appraised for
18 the purchase price --
19     A.   Uh-huh.
20     Q.   -- before all of these repairs
21 were made to the property.
22     A.   That's correct.
23          - - -
24          (Whereupon the document was

Page 57

1  marked, for identification purposes,
2  as Exhibit L. Wheatley 7.)
3          - - -
4  BY MR. FOGDALL:
5      Q.   I am going to show you what
6  appears to be an appraisal for the property at
7  584 North DuPont Highway dated as of July 7,
8  2004, by a Mr. Daniel Gladden, and you will
9  see on the second page of the appraisal the
10 property is valued at $267,000.
11     A.   Yes.
12     Q.   Now, is this the appraisal that
13 you're referring to where the property was
14 appraised at the purchase price?
15     A.   Yes.
16     Q.   So you have seen that before?
17     A.   Yes.
18     Q.   This appraisal.
19          All right. If you could turn
20 to the fifth page in -- and the pages have
21 been labeled by my office so WHEAT000058 --
22 there's a long paragraph titled "Summary of
23 Market Data" that describes the condition of
24 the property.

15 (Pages 54 to 57)

1      A.    Uh-huh.
2      Q.    Do you see where it says there
3  that in looking for comparable sales to do the
4  appraisal, the appraiser says that "All
5  sales," meaning comparable sales, "are
6  superior to subject," meaning 584 North DuPont
7  Highway, "in terms of condition"?
8      A.    Uh-huh.
9      Q.    And he goes on to say:
10  "Condition adjustments also reflect the lack
11  of heat in subject property on 2nd floor."
12      A.    Uh-huh.
13      Q.    He is saying there was no heat
14  on the second floor of the property at 584
15  North DuPont Highway.
16      A.    That's correct.
17      Q.    You recall that being the case?
18      A.    Uh-huh.
19      Q.    Did you do anything to see to
20  it that there would be heat on the second
21  floor once you moved in?
22      A.    Uh-huh. Electric baseboard
23  heaters were installed, two of them, the
24  entire upstairs bedroom.

1      Q.    Do you feel that that was
2  unreasonable, to make that improvement --
3      A.    No.
4      Q.    -- to the second floor?
5      A.    Not at all.
6      Q.    And would you agree that
7  putting in heaters on the second floor because
8  there was no heat on that floor would be an
9  important part of making that home livable?
10      A.    Yes.
11      Q.    And making that home into move
12  in condition?
13      A.    Yes. Yep.
14      Q.    Just reading on that same
15  page --
16      A.    Uh-huh.
17      Q.    -- the appraiser goes on to
18  say: "Landing area 2nd level needs finished
19  floor covering." Do you recall that?
20      A.    Uh-huh.
21      Q.    Did you make that repair?
22      A.    Yes.
23      Q.    "It does appear some work is
24  needed on wood shake roof but assumed not to

1  have any leakage."
2      A.    Uh-huh.
3      Q.    Do you see that?
4      A.    Yes.
5      Q.    Do you agree that a lender
6  reading a statement like that might have a
7  concern about the condition of the roof if
8  that language is in the appraisal?
9      A.    Uh-huh.
10      Q.    And you understand that when
11  the lender is lending you money for your
12  property to purchase that property, that that
13  property is the lender's collateral, that
14  property is the lender's protection in the
15  event there's a default on the loan?
16      A.    Yes.
17      Q.    And do you agree that it would
18  make sense for the lender to want to ensure
19  that the collateral for the loan is in livable
20  condition?
21      A.    Yes.
22      Q.    Do you recall at some point
23  Wachovia said they needed a letter from a
24  contractor so that they would have assurance

1  that the roof didn't leak?
2      A.    Yes.
3      Q.    And did you feel that that was
4  unreasonable?
5      A.    No.
6      Q.    Just continuing on a little bit
7  farther down the page, the appraiser
8  continues: "Apparent lack of heat on 2nd
9  floor represents functional obsolescence.
10  Subject property fronts N. DuPont Highway
11  which is a heavily travelled road much of the
12  time and in my opinion represents locational
13  obsolescence."
14      A.    Locational obsolescence, what
15  does he mean?
16      Q.    I didn't write it.
17      A.    I don't know what it means.
18      Q.    But you agree that North DuPont
19  Highway is a fairly busy highway?
20      A.    Yes.
21      Q.    And in the area where 584 North
22  DuPont Highway is located, there are a fair
23  number of commercial properties surrounding
24  the home that you purchased?

16 (Pages 58 to 61)

Page 62

1      A.     Not surrounding. They're
2    across the street.
3      Q.     There's a fair number of
4    businesses on that stretch of highway?
5      A.     Yes.
6      Q.     And on the side of the highway
7    on which the 584 North DuPont Highway property
8    is located, there are also businesses on that
9    side of the highway?
10     A.     Yes.
11     Q.     On either side?
12     A.     Yes; but not 584. 584 had
13   residences adjacent, directly adjacent,
14   abutting against its property. But outside of
15   those residences, probably two or three doors
16   down, there are commercial buildings there.
17   So I just want to clarify that it is not right
18   next to the property, no. There are
19   residences next to it.
20     Q.     Then continuing on, the
21   appraiser writes: "It does appear some of the
22   piping in basement is wrapped with
23   asbestos..."
24     A.     Yes.

Page 63

1      Q.     Was that correct?
2      A.     Well, he said it appears. No,
3    we didn't have it. In fact, he made the
4    comment that I'm not an environmentalist so I
5    don't know, it appears to be that. But that's
6    not what it wound up being to the best of my
7    knowledge.
8      Q.     Do you recall having an
9    inspector come out and look at the piping in
10   the basement --
11     A.     No.
12     Q.     -- to ensure that it was safe?
13     A.     No.
14     Q.     You don't recall that?
15     A.     I don't recall that, no.
16     Q.     Okay.
17     A.     I don't know if Peter done
18   that. He was the seller at the time. We
19   didn't own the house. So I don't know what
20   Peter may or may not have done at that point
21   in that particular case, no.
22     Q.     You don't have a recollection
23   of a contractor coming out and inspecting the
24   pipe --

Page 64

1      A.     No.
2      Q.     -- to ensure that the
3    insulation was safe?
4      A.     I wasn't there about that, no.
5    I can't answer that.
6      Q.     Okay.
7      Q.     I want to go on to the next
8    paragraph in this letter.
9      A.     Okay.
10     Q.     And just to identify this, I
11   should have done this when we first started
12   talking about the letter, but my office has
13   identified it with the number PLS000232
14   through 234, so that will help us in talking
15   about it.
16     Q.     So right now we are on Page
17   PLS000233. I am reading from this first full
18   paragraph on that page. You say:
19   "Dr. Wilkens then bought the property from us
20   at the original cost in 2004 to help us from
21   being financially ruined and losing our
22   business. No Profit was realized from the
23   sale." Can you tell me about that?
24     A.     What specifically?

Page 65

1      Q.     Well, start with Dr. Wilkins
2    buying the property you are saying at the
3    original cost. Is that correct?
4      A.     It was near the cost of what it
5    was last year. I think it was 267. He bought
6    it at 275, something like that.
7      Q.     So, in fact, he did not buy it
8    at the original cost in 2004.
9      A.     Right.
10     Q.     He bought it for --
11     A.     A little bit more.
12     Q.     -- more.
13     A.     275. What's the difference of
14   that? Like 8,000. That's what it was. 267
15   plus our closing costs, and the initial offer
16   was like 8,000. So if you add it together, it
17   was like 275,000. That's where the number
18   came from. So that would have been the
19   original cost. That makes it correct then.
20   It was 275,000.
21     Q.     I am going to show you the
22   settlement statement in connection with the
23   purchase of 584 North DuPont Highway by
24   Dr. Wilkins.

17 (Pages 62 to 65)

Page 66

1    A.    Sure.
2    Q.    This is dated 10/20/2005.
3    A.    Okay.
4    Q.    Does that square with your
5 recollection --
6    A.    Yes.
7    Q.    -- that you sold the property
8 to him in October 2005?
9    A.    Yes.
10    Q.    Again, just to refresh your
11 recollection, it does indicate that the price
12 for the property, when you sold it to
13 Dr. Wilkins --
14    A.    Uh-huh.
15    Q.    -- was $275,333.00.
16    A.    Right.
17        MR. FOGDALL:  Let's go ahead
18 and mark that.
19        - - -
20    (Whereupon the document was
21 marked, for identification purposes,
22 as Exhibit L. Wheatley 9.)
23        - - -
24

Page 67

1 BY MR. FOGDALL:
2    Q.    Now, at some point while you
3 were in the process of purchasing the three
4 properties that you and the other plaintiffs
5 purchased, at some point you all got together
6 and agreed to form a company called Tri-Core.
7    A.    Uh-huh.
8    Q.    Do you recall why you did that?
9    A.    Yes.  We were doing that, it
10 was actually an idea of having a business
11 venture together, investments of stocks and
12 real estate acquisitions.
13    Q.    Do you recall signing an
14 agreement between yourselves, all of the
15 plaintiffs in this case signing an agreement,
16 early in July?
17        Let me correct that.  I will
18 get the agreement and then that way we will
19 have the date correct.
20    A.    Okay.
21    Q.    I am going to show you the
22 Operating Agreement for Tri-Core.  It was
23 marked at Mr. Anderson's deposition yesterday.
24 That's why it has the exhibit sticker with his

Page 68

1 name on it.
2    A.    Sure.
3    Q.    I am going to show it to you.
4 You can see I misspoke a minute ago.  You
5 actually signed the document, all of you, on
6 November 6, 2004.
7    A.    That's correct.
8    Q.    Do you recall that?
9    A.    That's correct.
10    Q.    What I was thinking of is that
11 earlier in the document it indicates that the
12 company itself, Tri-Core, was formed on
13 July 8, 2004.
14    A.    That's not correct.
15    Q.    It says that in the document,
16 Paragraph 2.01.
17    A.    Now go to the second page,
18 which would be Paragraph 2 -- it should be
19 Paragraph 2 -- was being discussed, Paragraph
20 2.06 in the same document.  That's what she
21 was referring to.  The attorney was referring
22 to Paragraph 2.06 of the same document.
23    Q.    I am going to have to ask you
24 to explain that to me.

Page 69

1    A.    Sure.
2    Q.    How does Paragraph 2.06 --
3    A.    What it says is that "The
4 company's initial Registered Office is at the
5 office of its Registered Agent at 138 King
6 Henry Court Street, Dover, DE 19904, and the
7 name of its initial Registered Agent at that
8 address is Lloyd Wheatley.  The Registered
9 Office and Registered Agent may be changed
10 from time to time by filing the address of the
11 new Registered Office and/or the name of the
12 new Registered Agent with the Secretary of
13 State of Delaware..."  So I was the registered
14 agent.
15    Q.    But I am asking you, that's not
16 contradicting the statement on the previous
17 page that the company itself was created in
18 July 2004?
19    A.    No.
20    Q.    Okay.  You agree with that,
21 that the company was created in July 2004?
22    A.    Yes.  But there's articles and
23 all and its whole formation wasn't until
24 November.  It was just discussed and

18 (Pages 66 to 69)

Page 70

1    conceptualized in July, but nothing was
2    thought out as to all of the documents you
3    have until November.  That was about five
4    months later.
5        Q.    Okay.
6        A.    As it was being formulated,
7    there was give-and-take between people, add
8    this, take that out, let's not do that, and
9    that kind of thing.
10       Q.    Do you see Schedule B of the
11   Agreement lists you and the other
12   plaintiffs --
13       A.    Sure.
14       Q.    -- and your properties --
15       A.    Right.
16       Q.    -- and describes them as your
17   Initial Capital Contribution?
18       A.    That's correct.  That was the
19   plan.
20       Q.    And here in Paragraph 8.01,
21   under "Capital Contributions," it reads:
22   "Each Member must contribute the property set
23   forth in the attached Schedule B" -- which we
24   just looked at --

Page 71

1        A.    Sure.
2        Q.    -- "as his or her share of the
3    Initial Capital Contribution.  Said properties
4    are company property..."
5        A.    Uh-huh.
6        Q.    So this paragraph indicates
7    that you were pledging your properties to the
8    company.
9        A.    That's what would have happened
10   in the original, in the thought of forming the
11   company for its assets.  But it never came to
12   fruition.
13       Q.    Did you ever inform Wachovia
14   that you were entering into this Agreement
15   with the other plaintiffs?
16       A.    No.  This was after we
17   purchased the homes.  We purchased the homes
18   in August.  This was ratified and done in
19   November.
20       Q.    You created the company back in
21   July 2004 according to --
22       A.    Correct.
23       Q.    Did you ever tell Wachovia that
24   you were in the process of creating this

Page 72

1    company?
2        A.    No.
3        Q.    And did you ever tell Wachovia
4    that you were contemplating transferring the
5    properties to a business entity?
6        A.    At the time of purchasing those
7    properties, no.
8        Q.    Okay.
9        A.    It didn't -- no.
10       Q.    Now, in May of 2005, I
11   believe -- so this would have been several
12   months before Dr. Wilkins purchased your
13   property at 548 North DuPont Highway -- you
14   and your wife sold your share in Tri-Core to
15   the other members of the company, Mr. and
16   Mrs. Anderson and Mr. and Mrs. Wilkins.
17       A.    Yes.
18       Q.    Do you recall that?
19       A.    Yes.
20       Q.    And I will show you a document
21   called "Membership Interest Redemption
22   Agreement."
23       A.    I remember it.
24       Q.    You remember that?

Page 73

1        A.    Let me see it real quick.
2        Yes.
3        Q.    So you sold your interest in
4    Tri-Core before you actually sold title to the
5    property to Dr. Wilkins?
6        A.    Uh-huh.
7        THE WITNESS:  Should I be
8    saying yes?
9        THE COURT REPORTER:  You should
10   be.
11       THE WITNESS:  I just happened
12   to ask that question.  I'm sorry.
13   BY MR. FOGDALL:
14       Q.    Okay.  Do you see here on the
15   second page of the Redemption Agreement, under
16   "Consideration," it states:  "In consideration
17   for the Withdrawing Member's cooperation" --
18   and the "Withdrawing Member" is you and your
19   wife --
20       A.    Yes.
21       Q.    -- "In consideration for the
22   Withdrawing Member's cooperation and
23   participation in the refinancing of Company's
24   assets" -- "Company" being Tri-Core -- "the

19 (Pages 70 to 73)

Page 74

1  Company agrees to redeem the Withdrawing
2  Member's Interest and distribute to the
3  Withdrawing Member $22,000..." Do you recall
4  being paid $22,000 in May 2005?
5      A.    No.
6      Q.    You don't recall that. So this
7  is inaccurate?
8      A.    I don't recall that amount
9  given to us. I think we were talking about
10  some liquidity and profits of the company if
11  it had any, but it didn't have any assets, it
12  didn't have any profit, any assets that could
13  be liquefied or paid, that I can recall.
14      Q.    You don't recall one way or the
15  other, though, whether you received this
16  $22,000 when you --
17      A.    No, I don't recall that at all.
18      Q.    -- left the company?
19      A.    Unh-unh.
20      Q.    This is going back now to the
21  Operating Agreement for Tri-Core that we were
22  talking about earlier, and do you see here on
23  Page 15 of the Operating Agreement -- and it's
24  Bates-labeled 000375 -- this is under

Page 75

1  Paragraph 8.02(a): "Each Member is required
2  to make additional Capital Contributions of
3  $2,000 monthly to meet the expenses of the
4  company..."
5      A.    Right.
6      Q.    Do you recall that?
7      A.    Yes.
8      Q.    Do you recall making those
9  $2,000 payments?
10      A.    No. The company had no assets.
11  It didn't have an account or anything. It
12  never came to fruition. And partly the reason
13  why we withdrew was because the company wasn't
14  doing any of its goals and objectives. So we
15  just withdrew from the company and just
16  focused on our business because it was already
17  up and running.
18           This was all ideas, it was a
19  good thought and a possibility, but during
20  that time frame none of that ever came to
21  fruition so it never happened. Nobody did any
22  of that.
23      Q.    But you agree that by signing
24  the contract --

Page 76

1      A.    Yes.
2      Q.    -- amongst yourselves --
3      A.    Yes.
4      Q.    -- you were all --
5      A.    Obligated to do that.
6      Q.    -- obligated to pay $2,000 a
7  month?
8      A.    Absolutely.
9      Q.    You agree with that?
10      A.    Yes.
11      Q.    In the Membership Interest
12  Redemption Agreement, under Paragraph 2,
13  "Withdrawal," it reads: "Upon completion of
14  the sale, assignment, and transfer of the
15  Interest to the Company as set forth herein,
16  the Withdrawing Member shall withdraw from the
17  Company as Member, Manager and Registered
18  Agent on the Effective Date; however, the
19  Withdrawing member's obligation to pay $2,000
20  per month to cover the mortgage note and other
21  expenses associated with the maintaining the
22  property contributed to the company will
23  continue until the completion of the
24  refinancing."

Page 77

1           So even though you were
2  withdrawing from the company, you still had --
3      A.    Uh-huh.
4      Q.    -- at least for a time the
5  obligation to pay $2,000 per month.
6      A.    But it was never done. There
7  was nothing ever done with that, none of that.
8  So it becomes moot. No one followed any of
9  that. Whatever Tri-Core is doing today, I
10  don't know.
11           But from that time frame for a
12  year, in fact two years that I can recall,
13  there was no income tax returns, no business
14  license ever purchased, and none of that stuff
15  ever happened. So it's a moot subject.
16      Q.    Did you ever tell Wachovia that
17  you and the other plaintiffs were agreeing to
18  take on the additional obligation of paying
19  $2,000 a month to Tri-Core so that Wachovia
20  could take that into account in its credit
21  assessment of you and the other plaintiffs?
22      A.    As I stated earlier, that
23  agreement wasn't binding until November of
24  '04. The purchases of Wachovia's properties

20 (Pages 74 to 77)

Page 78

1  were in July and August of '04, which was two
2  to three months before any of this ever came
3  to being.
4       So we can't well tell them in
5  May, June, July, and August of something that
6  was going to happen in the future that was
7  still being ratified and discussed to even
8  know what those things were. So, no, we
9  couldn't tell them something that we didn't
10  know that we were going to be doing --
11       Q.  But you and the other --
12       A.  -- or suggest to be doing.
13       Q.  You and the other plaintiffs
14  had discussions about Tri-Core --
15       A.  Yes.
16       Q.  -- before you purchased the
17  three properties.
18       A.  In June.
19       Q.  Did you have discussions about
20  the fact that Tri-Core might involve you all
21  assuming some additional financial obligations
22  to the business?
23       A.  No. There was no discussion of
24  financial obligations until after the

Page 79

1  purchases in September-October. In fact, I
2  think you have in part of your evidentiary
3  file another piece of misfiled paper from
4  September of '04, which was the month after
5  August. It shouldn't even have been in there.
6  It has nothing to do with Wachovia, absolutely
7  nothing.
8       Q.  I am not sure what you are
9  talking about.
10       A.  Well, you should have one in
11  there. I saw it.
12       MR. GRADY:  I think it's the
13       document you referred to yesterday at
14       yesterday's deposition.
15       MR. FOGDALL:  Which is what?
16       MR. GRADY:  The notes.
17       THE WITNESS:  The notes from
18       September '04.
19       MR. GRADY:  From Tri-Core.
20       THE WITNESS:  From Tri-Core.
21       You don't have them?
22  BY MR. FOGDALL:
23       Q.  Why do you think that the
24  meeting notes for Tri-Core are irrelevant?

Page 80

1       A.  Because it was misfiled in 584
2  North DuPont Highway's mortgage application
3  folder and it has nothing to do with 584.
4       Q.  Even though it relates to the
5  properties that you purchased and that are
6  collateral for the loans that Wachovia gave
7  you?
8       A.  No. They were after August.
9  Those minutes were September. September is
10  the month after August. What you are
11  suggesting --
12       Q.  I am not suggesting anything.
13  I am asking questions.
14       A.  What I am trying to clarify --
15       Q.  I am asking questions. We have
16  reached the point where it's not productive
17  anymore.
18       MR. GRADY:  Listen, he will ask
19       you the questions. Simply answer the
20       questions that he is asking.
21       THE WITNESS:  Okay.
22  BY MR. FOGDALL:
23       Q.  This is another document that
24  was discussed at Mr. Anderson's deposition

Page 81

1  yesterday. It's titled "Preformation
2  Agreement." Do you recall ever seeing that?
3       A.  Yes.
4       Q.  When was the first time you saw
5  this?
6       A.  This had to be somewhere in
7  October or so, that I can recall, of '04.
8       Q.  All right. Going on to the
9  next paragraph of the letter that's Bates
10  Range PLS000232 to 234, you state: "During
11  2004 & 2005 time frame, we lost the
12  opportunity to purchase Two Ten passenger
13  White Limousines (approximately $20,000.00
14  each) and advance the required auto insurance
15  of $1.5 Million liability coverage..."
16  Explain what you're saying there.
17       A.  What we're saying there is that
18  if we had not used our cash reserves that was
19  in our accounts, we would have taken the money
20  and reinvested it into Limousine Unlimited and
21  purchased two automobiles, and with that you
22  have to put the required commercial insurance
23  on the vehicles to operate it by law.
24       Q.  Okay. Now, this is a pretty

21 (Pages 78 to 81)

Page 82

1  broad time frame, 2004-2005.
2      A.   Uh-huh.
3      Q.   When did you have the
4  opportunity to purchase these white
5  limousines?
6      A.   We haven't.  That is to date.
7      Q.   No.  You said you lost the
8  opportunity, so obviously you had an
9  opportunity, you are saying, to purchase them
10  and you didn't do it.
11      A.   Right.
12      Q.   So when was it that you had
13  that opportunity to purchase them?
14      A.   Oh, when was it?
15      Q.   Yes.
16      A.   It would have been
17  October-November of '04 to spring, April-May,
18  of '05.  Does that answer the question?
19      Q.   And you are saying that you
20  couldn't purchase the limousines because why?
21      A.   We didn't have any cash
22  reserves on hand.
23      Q.   And you blame that on Wachovia?
24      A.   Yes.

Page 83

1      Q.   All right.  I have here your
2  tax return for 2004 and I have kept it in the
3  order that it was given to me.
4      A.   Sure.
5      Q.   So the actual Form 1040 is
6  several pages in this document.  The first
7  page is -- this is numbering that was provided
8  by Mr. Grady's office -- 000047.  The actual
9  Form 1040 starts on Page 000053.
10          Now, 2004 is the year in which
11  you bought these properties?
12      A.   That's correct.
13      Q.   And this is your tax return for
14  that year, so it would have been filed in
15  2005.
16      A.   Yes.
17      Q.   But it reflects income that
18  your business generated in 2004, the year you
19  bought the properties?
20      A.   Yes.
21      Q.   Okay.  Now, I also have here
22  your income tax returns for 2001, 2, and 3,
23  and the one for 2001 is labeled by Mr. Grady's
24  office, the ones for 2 and 3 are not.  I got

Page 84

1  them yesterday and he didn't have a chance to
2  label them with numbers.  So we are not going
3  to have the luxury of being able to identify
4  specific pages of your 2002 and 2003 tax
5  returns through a number system provided by
6  Mr. Grady's office, but we'll make do.
7          2001 tax return, going to the
8  statement of profit and loss for your
9  business, this is on Page 000034 as numbered
10  by Mr. Grady.  In fact, let's do this.  While
11  we are going to talk about these, let's go
12  ahead and mark them first.
13          - - -
14          (Whereupon the documents were
15          marked, for identification purposes,
16          as Exhibits L. Wheatley 11 through 14
17          inclusive.)
18          - - -
19  BY MR. FOGDALL:
20      Q.   So we have marked your 2001 tax
21  return as Wheatley Exhibit 11 and I am turning
22  to I guess it's four pages in to the Profit or
23  Loss from Business statement, and this
24  indicates that it's the profit or loss from

Page 85

1  Limousine Unlimited, your limousine business,
2  and this shows, according to your 2001 tax
3  return, that your gross income for the
4  business was $61,784, you had $78,206 in
5  expenses, and so that led to a negative
6  $17,931 net profit for the business.
7      A.   Uh-huh.
8      Q.   Is that correct?
9      A.   Uh-huh.
10      Q.   Do you recall that being the
11  case?
12      A.   Yes.
13      Q.   All right.  Now, in 2002, again
14  turning to the Profit or Loss from Business
15  statement, this just says "Lloyd J. Wheatley"
16  at the top and "Transportation."  It doesn't
17  actually provide the name Limousine Unlimited.
18  But I'm assuming it's the same business,
19  Limousine Unlimited.
20      A.   It is.
21      Q.   Okay.  Now, here in 2002 your
22  gross income for the business actually was
23  significantly higher.  In 2001 it was $61,784.
24  In 2002 it was $194,946.

22 (Pages 82 to 85)

VERITEXT NATIONAL COURT REPORTING COMPANY
(215) 241-1000    (888) 777-6690

Page 86

1     A.   Uh-huh.
2     Q.   Had you just started the
3  business in 2001?
4     A.   No.
5     Q.   Okay.  In any case, 2002 was a
6  better year than 2001, more income from the
7  business.
8     A.   Yes.
9     Q.   But then you have expenses.
10  Again, this is reading from the 2002 profit
11  and loss statement.  Your expenses were
12  $194,442.  Unfortunately, I don't have a page
13  number that I can refer to, but we are looking
14  at, again, four pages in on Wheatley No. 12.
15        So in 2002, once you take into
16  account the $194,442 in expenses, you end up
17  with a net profit of $504.  So it's a little
18  better --
19     A.   A little better.
20     Q.   -- than a negative 17,000 from
21  the year before.
22     A.   Yes.
23     Q.   Okay.  In 2003 -- and this is
24  again, I guess, five pages in -- for your 2003

Page 87

1  tax return, we have the Profit or Loss from
2  Business statement, and here again your gross
3  income went up from the year before, from
4  2002.  You reported $240,925 in gross income.
5     A.   Uh-huh.
6     Q.   And you reported $231,636 in
7  total expenses.
8     A.   Yes.
9     Q.   So that gives us a net profit
10  of $9,289.
11     A.   Uh-huh.
12     Q.   And then in 2004, the year you
13  bought the property, 584 North DuPont
14  Highway --
15     A.   Uh-huh.
16     Q.   -- that same statement, Profit
17  or Loss from Business, for that year -- and
18  this does have a number provided by
19  Mr. Grady's office, it's 000055 -- shows that
20  in 2004 your gross income was $211,800 --
21  well, let's walk through it.
22        You had your gross receipts for
23  the business of $245,489.
24     A.   Yes.

Page 88

1        MR. GRADY:  I'm sorry; what was
2  that number again?
3        MR. FOGDALL:  $245,489.
4        MR. GRADY:  Thank you.
5  BY MR. FOGDALL:
6     Q.   Then you had to subtract out
7  cost of goods sold, which was $33,689.  And
8  elsewhere in this document you break that
9  down.
10        You have here, using the number
11  provided by Mr. Grady's office, on Page
12  000057, you show vehicle operating costs
13  $33,689, so that's reflected here, that same
14  number, on "Cost of goods sold," Line 4.
15        So you subtract that from the
16  gross receipts and you get a gross income of
17  $211,800 of gross income.
18     A.   Right.
19     Q.   Then you have expenses of
20  $176,982, and you end up with a net profit of
21  $34,818.
22     A.   Uh-huh.
23     Q.   So that's the best year so far,
24  2004.

Page 89

1     A.   Yep, it looks like it.
2     Q.   You went from a negative 17 in
3  2001 up to a positive 34,818 in 2004.  That's
4  the year that you bought the property at 584
5  North DuPont Highway.
6     A.   That's correct.
7     Q.   And that's $34,818 of net
8  profit on top of the wages that the business
9  paid you.  See here on Line 26 --
10     A.   Uh-huh.
11     Q.   -- the business paid you
12  $58,412 in wages?
13     A.   No, that's not my wages.
14     Q.   Oh, okay.  Whose wages are
15  those?
16     A.   Those are the employees' wages.
17     Q.   Are your wages included in that
18  at all?
19     A.   No.  I'm the owner.  I don't
20  have a paycheck for wages.  So I file the
21  total gross income and losses as my income and
22  loss.  All of those wages that you see in the
23  Schedule C are employees that work for us.
24  Those are not my personal -- owners don't have

23 (Pages 86 to 89)

Page 90

1 a paycheck. You should have in there a
2 self-employment attachment to the tax form
3 that shows my actual taxes paid by the 15%
4 ratio of the net profits, at one-half percent
5 of the net profits.
6    Q.   So you are saying your salary
7 is paid out of this $34,818 net profit?
8    A.   No. I'm responsible for it.
9    Q.   Well, do you collect wages from
10 Limousine Unlimited?
11    A.    No. As an owner, under the law
12 as an owner, and then being a single member
13 owner and filing under the Schedule C and
14 1040, I don't draw a check. There's a
15 self-employment form that is attached to it
16 that should be somewhere on that. A
17 self-employment tax form should be on there.
18 Can I see the document?
19    Q.   Yes.
20    MR. FOGDALL:  Let's go off the
21    record for a second.
22        - - -
23       (Discussion off the record.)
24        - - -

Page 91

1 BY MR. FOGDALL:
2    Q.    During the few moments that we
3 were off the record, Mr. Wheatley, you showed
4 me this self-employment tax statement, which
5 is also part of your 2004 tax return, which
6 shows, again, the net profit, it says $34,818,
7 and you explained to me that in essence what
8 you're doing there is you're reporting that
9 number to the IRS as the number that you
10 personally take away from the business at the
11 end of the day after paying all your expenses?
12    A.   Yes.
13    Q.    So then if you could explain
14 something to me then, in some of your earlier
15 years, your tax returns, you show, for
16 example, 2001 -- this is Page 1 of Wheatley
17 Exhibit 11 -- you report wages of $50,787 on
18 the first page.
19    A.   Yes.
20    Q.    But your net profit from the
21 business was negative $17,931. So where does
22 the $50,787 in wages come from if you've got a
23 negative $17,931 net profit?
24    A.    That's my wife Audria's income.

Page 92

1    Q.   Okay. So that's her wages,
2 your wife's wages?
3    A.    Yes. And ours for the Schedule
4 C is reported on Line 12 of the 1040.
5    Q.    Okay. Thank you for clarifying
6 that.
7       So going back and looking at
8 these four years, 2001 to 2004, if the year in
9 which you bought the property is the best
10 year, it's better than the three preceding
11 years, how did buying the property impact your
12 business?
13    A.    Well, how it impacted the
14 business is that we had about that amount of
15 money in cash reserves that we built up, as
16 you saw, through the years. The company was
17 profitable in 2002, 2003, and up to 2004, so
18 we had cash reserves set aside that we used
19 for reinvestment purposes.
20      We didn't use that money for
21 reinvestment purposes in 2005, which was to
22 purchase the two ten-passenger limos, because
23 we used the money in 584 North DuPont Highway
24 to repair and fix it up after it appraised for

Page 93

1 its sale price, which was a demand by the bank
2 which was not in the actual purchase agreement
3 and nor did it ever appear in the purchase
4 agreement that we had to do all those repairs
5 necessary to get the loan. So it was a
6 discriminatory act.
7    Q.    So you are saying in previous
8 years you had profit that you reinvested into
9 the business, but the profit that you made in
10 2004 you weren't able to reinvest into the
11 business?
12    A.    That's correct.
13    Q.    Okay.
14    A.    It was spent on renovations,
15 modifications, upgrades of 584 above the
16 purchase price after it was appraised for the
17 actual sale price of $267,000, and there
18 wasn't a requirement in the loan from Wachovia
19 to do any of that and have it in move in
20 condition. That was solely the discretion and
21 said by J. D. Hogsten, which later to be found
22 out it was not necessary to be done. All the
23 the money, all the time, and all the effort we
24 had to do was nothing to do with the sale

24 (Pages 90 to 93)

Page 94

1    price of the house.
2        Q.    So you are telling me that this
3    $34,818 net profit that's reported on your
4    2004 tax return, you're saying you used that
5    $34,818 --
6        A.    No.
7        Q.    -- instead of being able to use
8    it to purchase limos --
9        A.    No.
10       Q.    -- or whatever other
11   reinvestment you would do, you had to use it
12   on the house?
13       A.    No. This was at the end of
14   2004. There were monies and profits which you
15   showed me in 2002 and 2003. There was monies
16   that was profited from the company and put
17   into our savings and banking accounts. And
18   where --
19       Q.    Where --
20       A.    Let me continue if I can
21   explain.
22       Q.    Can you find that on your 2002
23   and 2003 tax returns?
24       A.    Yes, absolutely.

Page 95

1        Q.    Where you took that money
2    and --
3        A.    Sure. What you have to look at
4    is depreciation. Okay? In this other
5    expenses, Line 27, right here, some of that is
6    depreciation. And where do we have it?
7        Q.    Are you talking about Line 48?
8        A.    Yeah.
9        Q.    Other expenses?
10       A.    Yeah. In that number is
11   depreciation. And in that number that
12   depreciation is not money.
13           Here it is right here. This
14   $44,899, which is not numbered -- you have to
15   number this page for the record --
16       Q.    Well, we will just count. This
17   is seven pages in. It's on the seventh page
18   of the document.
19       A.    Of the 2003 tax return.
20       Q.    Okay. And you're saying?
21       A.    The depreciation, $44,899, is
22   an accounting line item. It's not real money.
23   That is the depreciation of the hardened
24   assets, which were the other equipment and

Page 96

1    vehicles and things that we own. So it's an
2    orthodox methodology of accounting writeoff,
3    but it doesn't represent real money. That
4    money should be added back to the bottom line
5    of the net. So that's the real net profit
6    number.
7        Q.    You are saying this $44,899
8    represents reinvestment by you in the
9    business?
10       A.    No. You need to add that to
11   the bottom line of the Schedule C and those
12   two numbers are the total profits of the year.
13       Q.    Okay.
14       A.    And out of that I apportion and
15   set money aside for cash reserves in the
16   company. Usually I set aside 12 to
17   14 percent. I will set that aside --
18       Q.    Okay.
19       A.    -- for emergencies and
20   reinvestment.
21       Q.    So you are saying to really get
22   the sense of the profitability of the business
23   in a given year, you have to take the net
24   profit, which is reflected here on Line 31 --

Page 97

1        A.    Of the Schedule C.
2        Q.    -- and you have to add that to
3    what's listed here as depreciation, the
4    $44,899. If you add those two together, then
5    you get a better sense of the profitability of
6    the business.
7        A.    Yes.
8        Q.    Is that fair to say?
9        A.    Yes. That's exactly what it
10   is.
11       Q.    So doing that here, how would
12   we do that here?
13       A.    We would find the line for
14   depreciation.
15       Q.    You go ahead and look for it.
16       A.    Here it is right here. You
17   would take that $52,900 and add it to that
18   number.
19       Q.    Okay. So $52,986, $34,818, and
20   you still end up with -- I do have a
21   calculator --
22       A.    That's why I said, I rely on it
23   very strongly.
24           MR. FOGDALL: Off the record.

25 (Pages 94 to 97)

Page 98

1           - - -
2           (Discussion off the record.)
3           - - -
4    BY MR. FOGDALL:
5        Q.    While we were off the record, I
6    used my calculator to add together Line 31 of
7    your 2004 tax return, which was reported as
8    $34,818 in net profit, and I added that to the
9    figure given for depreciation of $52,986, and
10   we came up with $87,806. And you're saying
11   that's a better reflection of the
12   profitability of the business in that year
13   because the $52,986 was effectively a reserve
14   or money that was reinvested into your
15   business?
16       A.    No. That's a line item
17   writeoff that's an accounting methodology
18   accepted in business practice of depreciating
19   hardened assets of the company and that number
20   is not real money. It's an expense writeoff
21   for legalization of the Internal Revenue
22   Service. But it's not used for depreciation;
23   it's actually part of the profits.
24       Q.    Okay. So are you saying then

Page 99

1    that the profits of the business in 2004 were
2    in fact $87,806?
3        A.    Yes.
4        Q.    All right.
5        A.    In real cash, say it that way,
6    in cash dollars.
7        Q.    So we have just discussed the
8    fact that in real cash terms the profit from
9    your limousine business in 2004 was $87,806;
10   correct?
11       A.    Yes.
12       Q.    Now, why couldn't you use some
13   of that $87,806 to buy the limousines that you
14   wanted to buy?
15       A.    Because that $87,806 was used
16   to pay for the mortgage at 138 King Henry
17   Court and 584 North DuPont Highway and all of
18   our expenses in both houses.
19       Q.    Okay. Let's go to your 2005
20   tax return.
21           - - -
22           (Whereupon the document was
23           marked, for identification purposes,
24           as Exhibit L. Wheatley 15.)

Page 100

1           - - -
2           THE WITNESS: If I can add one
3    other thing?
4           MR. FOGDALL: Off the record.
5           - - -
6           (Discussion off the record.)
7           - - -
8    BY MR. FOGDALL:
9        Q.    Go ahead. You wanted to say
10   something else in connection with the $87,806?
11       A.    And we helped pay for our
12   daughter's education and college.
13       Q.    Okay. Now turning to your 2005
14   tax return, this is labeled by Mr. Grady's
15   office starting at 000070 and the actual
16   Profit or Loss from Business statement is on
17   000077.
18           Now, in 2005 on this statement
19   you report at the end of the day $4,847 on
20   Line 31, but in the depreciation column you
21   have $79,857.
22       A.    Uh-huh.
23       Q.    So doing what we did for 2004,
24   we would add $79,857 to $4,847?

Page 101

1        A.    Right.
2           MR. FOGDALL: Let's go off the
3    record again.
4           - - -
5           (Discussion off the record.)
6           - - -
7    BY MR. FOGDALL:
8        Q.    So doing now for 2005 the same
9    process that we went through for 2004, we have
10   added your net profit that's reported as
11   $4,847, we have added that to your
12   depreciation figure of $79,857, and we have
13   come up with $84,704, which is only about
14   $3,000 less than the profit for the year
15   before.
16       A.    Yes; but it's a loss.
17       Q.    It sounds like a much smaller
18   loss than what you are saying was really
19   caused to your business because of the
20   expenses you incurred in connection with
21   purchasing that property, 584 North DuPont
22   Highway.
23       A.    I'm sorry; is that --
24           MR. GRADY: Is that a question?

26 (Pages 98 to 101)

Page 102

BY MR. FOGDALL:
Q. It's a question. Do you agree with that, that $3,000 is a lot less than $50,000?
A. Yes.
Q. And you still made $84,704 in 2005.
A. Yes.
Q. Would you describe your business as struggling in 2005 if it's making $84,704?
A. Yes.
Q. Even though that's only $3,000 less than the year before when it made $87,806?
A. Yes.
Q. So would you characterize your business as struggling in 2004 when it made $87,806?
A. No.
Q. So even though you still made in the mid-$80,000 range in 2005, suddenly you're struggling as a business.
A. Yes.

Page 103

Q. Well, I will just leave that where it is.
MR. FOGDALL: Okay. Let's take a break for lunch.
MR. GRADY: Okay.
- - -
(Whereupon there was a luncheon recess in the proceedings from 12:15 p.m. to 1:10 p.m.)
- - -
BY MR. FOGDALL:
Q. We're back on the record.
Mr. Wheatley, you testified earlier that your original downpayment under the no income verification loan was going to be 15% and when you were switched to what you're calling the income verification loan, then the downpayment went down to 10%.
A. Yes.
Q. At some point you did end up making a 20% downpayment.
A. Yes.
Q. So in the end the total downpayment that you made was 20% of the price

Page 104

of the property.
A. Yes.
Q. Now, tell me how that came about.
A. Okay. We went to the first closing that was to be the 10% and there was some objections Wachovia had mentioned about the property. The papers weren't sent to Gary Dodge's office for the day of the closing.
Q. Let me stop you right there. You are talking about the first closing which would have been August 6, 2004. Does that sound right to you?
A. It sounds right.
Q. Okay. So you were at the closing on August 6, 2004.
A. Right.
Q. Continue.
A. We were at the closing and the papers were never sent from Wachovia and the closing didn't occur that day.
Q. What papers were you expecting to get from Wachovia?
A. That would be from the mortgage

Page 105

processing center of Wachovia. I guess they e-mail it down to the attorney's office or fax it. I don't know how it actually arrives.
Q. Now, did you have an understanding of where that paperwork would be coming from? Would it be coming from someplace in Dover or would it be coming from somewhere outside the State of Delaware?
A. Outside the State of Delaware.
Q. Okay.
A. I recall that was the mortgage application processing center.
Q. Okay. Does Connecticut sound familiar?
A. That's correct.
Q. Okay.
A. You're correct, Connecticut.
Q. So you were expecting paperwork to get sent to your attorney's office for the closing from one of Wachovia's centers up in Connecticut --
A. Yes.
Q. -- and that doesn't occur?
A. That doesn't occur.

27 (Pages 102 to 105)

VERITEXT NATIONAL COURT REPORTING COMPANY
(215) 241-1000    (888) 777-6690

Page 106

1    Q.    What's your understanding of
2  why that didn't occur?
3    A.    Apparently someone called
4  Allstate Insurance and made a statement about
5  the roof. Allstate called us and made an
6  inquiry about the roof and we had to have a
7  contractor go out and check the roof, which we
8  did.
9    Q.    Do you know who that person was
10 that contacted the insurer?
11   A.    The Allstate insurance?
12   Q.    Yes.
13   A.    No. I don't know who that was.
14   Q.    Okay. So the paperwork didn't
15 arrive. When were you first told, as you
16 recall, about the increase in the downpayment
17 from 10% to 20%?
18   A.    The day of the actual closing,
19 the second one.
20   Q.    So you are saying you weren't
21 told about that on August 6, 2004?
22   A.    No.
23   Q.    When your purchase of the
24 property finally closed, it was on August 13,

Page 107

1  2004; right?
2    A.    Is that what it is? Yes.
3    Q.    And you are saying that's the
4  first time you heard about the downpayment was
5  going to be 20% instead of 10%?
6    A.    That's correct.
7    Q.    And how were you informed about
8  the increased downpayment?
9    A.    I was informed about that by --
10 let me get this right -- on August 6, the
11 original closing -- let me get this right --
12 J. D. was on vacation and he was in the Outer
13 Banks in South Carolina, I don't know which
14 weekend, but it was during that conversation
15 that he was on a speaker phone at Gary Dodge's
16 office, myself, Attorney Dodge, Mr. Aigner,
17 and Mr. Anderson were all present, and in that
18 conversation he stated something about the
19 roof at the house couldn't be done on that day
20 and so it looks like the deal is done, you're
21 not going to be able to do anything, because I
22 won't be back until Monday.
23   Q.    Did he talk about the
24 downpayment during that conversation?

Page 108

1    A.    Not at all.
2    Q.    So I am asking you --
3    A.    Not at all.
4    Q.    -- how you first came to hear
5  about the increase in the downpayment from 10%
6  to 20%.
7    A.    Okay. That was when his
8  supervisor, the first one in the record that
9  was the regional manager, he got information
10 and then came back and told me that there
11 would be an increase in the downpayment.
12   Q.    So that came from him. Do you
13 recall at all the name of this person?
14   A.    It's in the record. I can't
15 remember.
16   Q.    Let's look in the Complaint.
17   A.    It's in the record.
18   Q.    I think you do name a name in
19 the Complaint.
20   A.    There were two.
21         MR. FOGDALL: Let's go off the
22   record for one moment.
23                - - -
24         (Discussion off the record.)

Page 109

1                - - -
2  BY MR. FOGDALL:
3    Q.    We're back on the record. Let
4  me direct your attention to Paragraph 61 of
5  your Amended Complaint that says: "On
6  August 12, 2004, Destefano informed Wheatley
7  that Wachovia was unable to obtain the PMI for
8  his home and that the only way around that
9  situation was to pay 20%..."
10   A.    There you go.
11   Q.    So that's the first time you
12 were told about the 20% downpayment, and your
13 recollection is that someone named Destefano
14 told you about that?
15   A.    Yes.
16   Q.    Okay. Now, do you believe that
17 Mr. Hogsten was involved in that in some way,
18 involved in the increased downpayment or
19 causing --
20   A.    Yes.
21   Q.    -- you to be required to pay an
22 increased downpayment?
23   A.    Yes.
24   Q.    You think that came from

28 (Pages 106 to 109)

Page 110

```
1    Mr. Hogsten?
2        A.   Yes.
3        Q.   And why do you think that?
4        A.   Because Mr. Destefano was not
5   aware this entire transaction was going on
6   here down in Dover and he was called as a
7   means to intervene after Hogsten made the kind
8   of sarcastic kind of remark that we can't do
9   nothing about it because he's not going to be
10  there and so nothing's going to happen until
11  he comes back on Monday and that would be too
12  late.
13           So we called his supervisor and
14  then he was not aware of actually what was
15  going on, so he had to speak to J. D. Hogsten
16  to be apprised of what the situation was so he
17  could make a better and intelligent decision.
18       Q.   Okay. So let me see if I
19  understand this. During the conference call
20  on August 6, 2004, that J. D. Hogsten
21  participated in, he said something like the
22  deal can't go forward because I'm on vacation,
23  nothing can happen until I'm back, and then
24  according to your recollection you called
```

Page 111

```
1   Destefano and said what's the deal here, and
2   Destefano then, you're presuming, spoke to
3   J. D. Hogsten and at that point then came back
4   to you and said you're going to have to pay a
5   20% downpayment?
6        A.   Yes.
7        Q.   And that's why you infer that
8   J. D. Hogsten is the one behind the increase
9   in the downpayment?
10       A.   Yes, because now there was a
11  different loan.
12       Q.   Do you believe that J. D.
13  Hogsten has the authority in his position at
14  Wachovia to increase someone's downpayment or
15  require that the downpayment be higher?
16       A.   I don't know. He sure acted in
17  that manner by his tone, and his actual words
18  were you can't do nothing about it until I get
19  back. And we were also informed that he is
20  the one who decides which loan is the best
21  package. I guess that's what he does to make
22  a living. And from that he would determine
23  the qualifications of the buyers and I guess
24  what amount of commission he's looking for for
```

Page 112

```
1   what loan he presents. I'm sure they have
2   more than one product. So it's up to him as
3   the loan officer, I would imagine.
4        Q.   But do you have an
5   understanding that there's other people that
6   work at Wachovia who might have more control
7   over the requirements that a borrower has to
8   satisfy in order to get a loan?
9        A.   Yes.
10       Q.   And do you have an
11  understanding that J. D. Hogsten may simply be
12  communicating those requirements to you and
13  not imposing them himself?
14       A.   It's possible, yes.
15       Q.   Aside from the increased
16  downpayment from 10% to 20% and the
17  improvements that you made to your home before
18  the purchase closed, what other conditions
19  were imposed on you that you feel were unfair,
20  or were there any other conditions that you
21  feel were unfair aside from those two that we
22  just talked about?
23       A.   That's the fixing of the home?
24       Q.   And then the 20% downpayment
```

Page 113

```
1   instead of the 10% downpayment.
2        A.   Well, the vision of the company
3   and what we wanted to do Limousine Unlimited
4   dealt with a lot of marketing and
5   advertisement for that exposure on Route 13.
6   There were several businesses around. We
7   weren't able to move forward on any of that.
8        Q.   Well, let me refocus you a
9   little bit. I am not talking about things
10  that happened to you that you blame on
11  Wachovia. What I am asking about are
12  conditions that you feel you were forced to
13  satisfy --
14       A.   I'm sorry. Okay.
15       Q.   -- in order to get the loan.
16  Are there any other conditions that you feel
17  were unfair or shouldn't have been imposed on
18  you?
19       A.   No.
20       Q.   Okay. So the only two are the
21  increase in the downpayment from 10% to 20%
22  and the improvements that you made to the
23  home?
24       A.   Uh-huh.
```

29 (Pages 110 to 113)

Page 114

1    Q.    Now, why do you believe that
2  the increased downpayment and the improvements
3  that you made to the home, why is it that you
4  allege that those conditions were imposed
5  because of your race?
6         Or let me ask you a different
7  question. Do you believe that those
8  conditions were imposed, do you believe you
9  had to do those things because you're
10 African-American?
11   A.    Yes.
12   Q.    Okay. Why do you believe that?
13   A.    Well, why I believe that is,
14 one, we've purchased homes before, never had
15 an issue or problem about lending. We never
16 had a problem or issue about after a property
17 is independently appraised for its value, that
18 it should be purchased for that value,
19 wherever it is. And in this case, to have the
20 demands of repairing and fixing up, making the
21 property as move in condition when it already
22 appraised at its sale price, is beyond the
23 scope of the loan.
24        It wasn't written anywhere in

Page 115

1  any part of the agreement of Wachovia. They
2  haven't been able to produce anything that
3  says that that's a requirement of Wachovia.
4  That's discriminatory in itself.
5         So once you establish the
6  discrimination or discriminatory, then you
7  have to look at, well, why is he being
8  discriminating.
9         And from his statement, J. D.,
10 his statement was that I'm getting a lot of
11 pressure and there are people who do not want
12 you all to buy these properties. So once he
13 made that statement to us, then it became
14 apparent that there's something about us that
15 makes people not want us to buy these
16 properties. The only thing I can look at is
17 I'm black.
18   Q.    Okay. Let's break that down.
19 First, you said you bought other homes in the
20 past and you didn't have to make repairs to
21 those homes in order to get the loans.
22   A.    Correct.
23   Q.    But here there was some work
24 that you did do to the property. But why do

Page 116

1  you think that if you got loans in the past
2  without doing repairs to the property, whereas
3  here there were some repairs that you did, in
4  and of itself, how does that show that you had
5  to do that because you're African-American?
6    A.    Because of the statements that
7  J. D. made to both my wife and I in his office
8  that there are people who do not want you all
9  buying these homes in that area.
10   Q.    Okay.
11   A.    I'm getting a lot of pressure.
12   Q.    And that's what he said, he
13 said there are people who do not want you
14 buying a home in that area --
15   A.    That's correct.
16   Q.    -- and I'm getting a lot of
17 pressure?
18   A.    Yes.
19   Q.    Did he tell you who he was
20 getting pressure from?
21   A.    No; and we inquired and asked
22 him that specifically on two occasions.
23   Q.    And when he said, you are
24 alleging, that there are people that do not

Page 117

1  want you moving into that area --
2    A.    Uh-huh.
3    Q.    -- did he tell you what people
4  he meant?
5    A.    No, no.
6    Q.    Was Mr. Anderson in the room
7  when Mr. Hogsten made the statement that
8  you're saying he made that there are people
9  that don't want you moving into that area?
10   A.    No.
11   Q.    Mr. Anderson wasn't there?
12   A.    No.
13   Q.    Was Mr. Wilkins or Mrs. Wilkins
14 there?
15   A.    No.
16   Q.    I should have asked, was
17 Mrs. Anderson there?
18   A.    No.
19   Q.    So it was just you and your
20 wife and Mr. Hogsten?
21   A.    Yes.
22   Q.    Do you recall when this took
23 place, when you are saying Mr. Hogsten said
24 these things to you?

30 (Pages 114 to 117)

Page 118

1     A.   It was when we signed on
2  August 4 -- whatever the date is of that
3  paperwork. We signed that in his office on
4  that day.
5     Q.   This would be --
6     A.   The loan, the one you have
7  that's dated August 4.
8     Q.   You are talking about what we
9  have marked as Wheatley No. 5. You are saying
10 on the date you signed that would have been
11 the date that he made that statement?
12    A.   Yes.
13       MR. GRADY:  What's the date on
14    that?
15       MR. FOGDALL:  Mr. and
16    Mrs. Wheatley signed it on the 3rd of
17    August.
18       THE WITNESS:  The 3rd of
19    August. I'm sorry; I said it was the
20    4th. It was the 3rd.
21       MR. FOGDALL:  2004.
22       I think that's all the
23    questions that I have for you, sir.
24    Thank you very much.

Page 119

1        MR. GRADY:  I have some to
2     clarify a few things.
3        THE WITNESS:  You're welcome.
4  BY MR. GRADY:
5     Q.   I will start with where we left
6  off just for a few clarifications.
7        Counsel has asked you what
8  problems or what concerns you've had and there
9  was some earlier testimony about the fact that
10 very late in the day, I think for
11 settlement -- and correct me if I'm wrong, but
12 very late in the day -- you were required
13 suddenly to get a roofing appraisal, a
14 statement from a roofer that there was nothing
15 wrong with the roof.
16    A.   Yes.
17    Q.   Did you have any problem with
18 either the timing of that or the
19 reasonableness of that?
20    A.   Yes.
21    Q.   What was your problem?
22    A.   Well, again, the house
23 appraised for the value that it was and the
24 problem that I had was that someone apparently

Page 120

1  called the Allstate Insurance office and we
2  got an alarming phone call from them accusing
3  us of something wrong with the roof and, you
4  know, they pulled their insurance.
5        So we had to actually get
6  another insurance company and not tell them a
7  thing and have them come out and look at the
8  property, which they did. They took
9  photographs and walked through the house and
10 inspected it and looked at the roof and said
11 here's your certificate of insurance.
12    Q.   There wasn't any problem with
13 the roof?
14    A.   Not at all.
15    Q.   You've already indicated that
16 you don't know who made that phone call to
17 Allstate.
18    A.   No.
19    Q.   Is that correct?
20    A.   Yes.
21    Q.   So it wasn't you?
22    A.   No. We were the recipients of
23 the call.
24    Q.   It wasn't anyone that you know.

Page 121

1  Did anybody from the bank indicate who made
2  the call?
3     A.   Yes. Hogsten pointed and said
4  that the lady at the loan processing center
5  had the package and it was something she read
6  in the appraisal, which we talked about
7  earlier.
8     Q.   Did he indicate whether or not
9  she actually called Allstate?
10    A.   No, he didn't indicate whether
11 or not she actually did it. But he just said
12 they called from up there. It wasn't that he
13 did it.
14    Q.   All right. Now, you also, I
15 think, indicated that you were concerned about
16 some of the treatment that you've had. From
17 your point of view, if you had been white, do
18 you think you would have got the same
19 treatment that you got in this mortgage
20 application?
21    A.   No.
22    Q.   And why do you say that?
23    A.   Because there wouldn't have
24 been any outside force or pressure and you

31 (Pages 118 to 121)

Page 122

1 wouldn't have to have the loan officer feeling
2 under duress or pressured by people of not
3 letting you buy this property because they
4 don't want you to have it. I don't think that
5 ever would have came up.
6     Q.    We've heard I think from you
7 and we've heard yesterday a number of
8 occasions where J. D. indicated that under
9 certain circumstances the deal was off.
10     A.    Yes.
11     Q.    Could you tell us again what
12 your recollection is of those circumstances
13 when he was saying something like that?
14     A.    Well, after Daniel Gladden, the
15 appraiser, had appraised the property and
16 there were some items in the house that were a
17 concern that we talked about in the early part
18 of the deposition -- and as it were, they were
19 legitimate concerns, I guess, of anybody if
20 they were going to be using or collateralizing
21 the property as a collateral instrument --
22 but, again, as I gave J. D. the example in his
23 office, my example to him was if I was to buy
24 a farmhouse or a property that's a farm and it

Page 123

1 had a dilapidated building on it, but the
2 property was being sold for X amount of
3 dollars and it got appraised by an independent
4 appraiser for that amount, what difference
5 does it make what the building shape is in?
6 If I demolish the building and put another
7 building on it, it doesn't change the fact
8 that it was appraised for the sale price.
9         And under the Fair Lending
10 that's what it should be. It should be based
11 on what the independent appraiser has and not
12 necessarily what somebody thinks it ought to
13 be.
14         So outside of that, he
15 immediately told us that there is no way
16 you're going to be able to repair and fix
17 these things in the house before it gets to
18 closing.
19         But Mr. Aigner assisted and
20 said, well, I will give you the keys to the
21 location and we will allow you to go in and
22 make the repairs. We were very uncomfortable
23 with that because the individual was still the
24 seller. We didn't own the property. And so

Page 124

1 we had to do a lot of decision-making about
2 whether to invest a large sum of money in a
3 place that we hadn't purchased yet.
4     Q.    Did you feel it was
5 unreasonable that J. D. was making you put all
6 these repairs in the house even though you
7 didn't own the house?
8     A.    Yes.
9         MR. FOGDALL: Objection to the
10     form of the question.
11         MR. GRADY: Okay. I'll
12     rephrase it.
13 BY MR. GRADY:
14     Q.    Did you think it was reasonable
15 or unreasonable that you had to make repairs
16 when you didn't even own the property?
17     A.    That's correct. We shouldn't
18 have been making repairs in anybody's house
19 that we don't own.
20     Q.    Okay. Now, we have prepared
21 and we have given to counsel before we came
22 here drafts of Answers to Interrogatories
23 which have not been signed but which they will
24 sign shortly, and in those documents there was

Page 125

1 a question about this $50,000.00 of loss that
2 is alleged in the Complaint.
3     A.    Is this the business?
4     Q.    No, no. There is an allegation
5 in the Complaint that there was $50,000.00 put
6 in to improve the house which we are
7 complaining about, and in the proposed Answer
8 which we have given to counsel we attached
9 certain expenses and we also said -- and I am
10 asking if this is correct or not -- that the
11 other costs were from unpaid labor by
12 Wheatleys, Hunters, Shields, Van Thomas, and
13 the Andersons. Was there, in fact, any other
14 unpaid labor or can you explain that?
15     A.    Yes. That's in the
16 documentation that I gave of the $24,500.00
17 and part of that was from the HELOC. We paid
18 out $24,500.00 and then --
19     Q.    So did some of these people
20 actually get paid later on?
21     A.    No, we didn't pay them
22 anything.
23     Q.    Okay. So they weren't paid
24 anything?

32 (Pages 122 to 125)

Page 126

1  A.  They weren't paid anything.
2  Q.  So they just did this because
3  they were friends?
4  A.  Yes. But their worth is worth
5  something.
6  Q.  We didn't put a dollar value on
7  their worth.
8  A.  (Witness shakes head.)
9  Q.  Okay.
10  A.  I don't know of labor being
11  free in America yet but slavery.
12  Q.  I take it you put labor in.
13  A.  Yes. For three weeks my wife
14  and I worked in there.
15  Q.  All right. Now, I guess going
16  back to this roof thing at one point in time,
17  there was a question by counsel whether it was
18  reasonable or unreasonable for somebody to ask
19  about the roof being repaired. Do you recall
20  that?
21  A.  Yes.
22  Q.  And I think you indicated,
23  well, it was okay to ask about the roof being
24  repaired.

Page 127

1  A.  Yes.
2  Q.  The way it was actually done
3  and in light of the fact of the condition of
4  the roof, did you have any problem with that
5  whole process as the way it turned out in your
6  case?
7  A.  Yes.
8  Q.  And what was your problem with
9  that?
10  A.  Again, the property appraised
11  for its value and the fact that we told J. D.
12  that we plan on repairing and fixing up the
13  entire house later on as time and money would
14  permit through the duration of however long we
15  wanted to live and be there, I didn't see
16  the -- you know, what was the immediate reason
17  to require all this extensive repair when the
18  house was appraised at its value of the loan?
19  Q.  There was a question by counsel
20  of you about what J. D. was actually requiring
21  of you with respect to these repairs --
22  A.  Uh-huh.
23  Q.  -- and I think you indicated
24  that J. D. said that it was supposed to be in

Page 128

1  move in condition.
2  A.  Yes.
3  Q.  I guess the question is, well,
4  how did you know what repairs would be
5  necessary to satisfy J. D.?
6  A.  We didn't. We just had to make
7  the house look in a condition of what you
8  would want to live in given the standard of
9  our personal self and just running water,
10  electricity, phone --
11  Q.  Okay. So did --
12  A.  -- bedding, linen.
13  Q.  Well, did J. D. ever in the
14  course of this, after these initial statements
15  that he made, ever check to see if it was in
16  move in condition or not move in condition?
17  A.  No.
18  Q.  So I guess you are telling us
19  that you made all these repairs just to make
20  J. D. happy, but there was no actual
21  confirmation of whether you had made him
22  happy?
23  A.  Yes, there was.
24  Q.  All right. Well, tell us about

Page 129

1  that.
2  A.  The appraiser came back,
3  Mr. Gladden came back, for a second appraisal.
4  Is that what --
5  Q.  I don't know. We're asking.
6  We are asking you for your memory.
7  A.  Yes. He came back for a second
8  walkthrough and he was astonished. He was
9  just astonished. In fact, he said, I don't
10  want to put a value on it because in fact it
11  would do such above and beyond what the value
12  already was appraised that he said that I
13  can't change the value to any more than what
14  it already was. He said but it looks nice in
15  here. He was the independent person to come
16  through and I guess he conveyed that or
17  reported that back to the bank.
18  Q.  Okay. Now, I think from
19  recalling these documents that the final
20  application which we saw, which was signed
21  August 3, August 4, August 5, which in the
22  scheme of things sounds a little late in the
23  day, do you know any reason why you had to
24  sign that so late or when we are talking about

33 (Pages 126 to 129)

Page 130

1  these different procedures, different
2  applications, do you know if you signed
3  anything earlier or how come you signed this
4  thing in August, if you know?
5          MR. FOGDALL: Objection to the
6      form of the question.
7          MR. GRADY: All right.
8  BY MR. GRADY:
9      Q.   You can answer that.
10          MR. FOGDALL: Off the record
11      for a second.
12              - - -
13          (Discussion off the record.)
14              - - -
15  BY MR. GRADY:
16      Q.   Let me see if I can clarify it.
17  First of all, I am going to ask you if you
18  remember some of this testimony. If you
19  don't, just tell me. But I'm going to clarify
20  it.
21          There was testimony and there
22  was a document produced in all these documents
23  of an application showing your income and
24  expenses and all that kind of stuff and it was

Page 131

1  dated in August.
2      A.   Uh-huh.
3      Q.   Do you know if that's the first
4  time you filled out something like that, if
5  you remember?
6      A.   That's the second time. Yes,
7  we filled one out before.
8      Q.   Okay. Now, if I were to
9  represent to you that I don't think any of us
10  have ever seen any earlier document, again,
11  this is to help us clarify, do you believe
12  there was something before that?
13      A.   Yes.
14      Q.   And when was that?
15      A.   That had to be in June or July.
16  It would be somewhere in June or July. It was
17  the end of June I think we went in there. So
18  it had to be July, somewhere in July and
19  August, because that's how it came from a
20  non-income verification loan, which it started
21  out in that process, and got switched to an
22  income verification loan.
23      Q.   Okay.
24      A.   And then it went back to this

Page 132

1  last-minute thing on the 13th that I don't
2  understand --
3      Q.   All right.
4      A.   -- to a non-income verification
5  loan. And this happened in like a 75-day --
6  what was it?
7      Q.   Just wait a minute. I don't
8  want you answering questions that aren't out
9  there.
10          You talked about the first
11  settlement and the second settlement. Was
12  Mr. Dodge present at both settlements or was
13  he at one or the other or do you recall?
14      A.   He wasn't at either of them.
15  He was on the phone on the first one. The
16  second one --
17      Q.   I'm sorry; the attorney. There
18  was an attorney, Gary Dodge, and there was
19  another attorney that I think some of the
20  papers reflect was at one of the settlements.
21  Do you recall if it was the same attorney both
22  times or not?
23      A.   I don't recall.
24      Q.   It was Mr. Dodge's office?

Page 133

1      A.   Yes.
2      Q.   Now, at the time of the second
3  settlement, there was some testimony that you
4  were required very late in the day to increase
5  the downpayment; right? That's your
6  testimony?
7      A.   Yes.
8      Q.   And if you hadn't done that,
9  what would have happened?
10      A.   If we hadn't have done that,
11  then the deal would have been off and to the
12  best of our knowledge the $40,000 downpayment
13  would have been forfeited. That would have
14  been argumented I guess in the end, but that's
15  what our understanding and belief was. And
16  all the repairs and things we had done to the
17  house, the seller would just get it by
18  default.
19      Q.   Okay.
20      A.   So we had no recourse of --
21      Q.   So where did you actually get
22  that money from?
23      A.   Out of our bank account. I
24  went to Wachovia, got a bank's cashier's

34 (Pages 130 to 133)

Page 134

```
1    check, and brought it back to the office
2    within 20 minutes to a half an hour.
3        Q.    That was all in the same day?
4        A.    That was all in the same day.
5        Q.    Now, do you believe if you were
6    white you would have gotten the same
7    treatment?
8        A.    No.
9        Q.    And why do you say that?
10       A.    Well, first of all, I'm already
11   a qualified applicant. There wouldn't have
12   been no issue about people not wanting you to
13   buy. There had to be some inference behind or
14   motivation behind the behavior of Wachovia
15   acting the way they did after maybe a slip of
16   the tongue, a Freudian slip, or whatever, but
17   it came out of J. D.'s mouth and from that
18   time and at that point somewhere in July and
19   August, things turned south quickly to just
20   insulting treatment, objections, last-minute
21   objections. It was more things that had to be
22   done at the last minute. Nobody knew about
23   it, they hadn't heard anything until you get
24   there. And it bordered on harassment at one
```

Page 135

```
1    point when you think of that. But it was just
2    one thing after another.
3        Q.    All right. Now, you testified
4    that J. D. made this statement to you --
5        A.    Uh-huh.
6        Q.    -- something to the point that
7    someone was putting pressure on him not to
8    approve the loan; right?
9        A.    Uh-huh.
10       Q.    Now, did you interpret that as
11   a racist statement?
12           MR. FOGDALL: Objection to the
13       form of the question.
14           THE WITNESS: I can answer it?
15   BY MR. GRADY:
16       Q.    Yes. I guess we want to know,
17   forget my other question, how did you
18   interpret his statement?
19           MR. FOGDALL: Let me clarify
20       the objection. I believe it misstates
21       what Mr. Wheatley said Mr. Hogsten
22       said. That's my objection.
23           MR. GRADY: All right.
24           THE WITNESS: How did I
```

Page 136

```
1    interpret that is that there were
2    individuals that were from that
3    community, which we understood, the
4    three of us that were purchasing in
5    the Silver Lake area, it was all owned
6    by nonminorities, and there is a whole
7    community that's there that has no
8    minorities.
9            So the best we could attain and
10   believe through my knowledge -- and
11   like I said, from any property we
12   purchased in the State of Delaware and
13   outside of the State, we've never had
14   an issue of anything like that.
15   BY MR. GRADY:
16       Q.    I guess J. D. made the
17   statement.
18       A.    Uh-huh.
19       Q.    I'm asking how you interpreted
20   that statement to mean. It sounds like from
21   what you said before that --
22       A.    That blacks cannot buy in this
23   area and we don't want you there because
24   you're blacks.
```

Page 137

```
1        Q.    That's how you interpreted the
2    statement?
3        A.    That's how I interpreted it.
4        Q.    When you talked about some of
5    the repairs that you did, you indicated that
6    you worked with the soil, worked with some
7    trees, and I guess the question is: Why did
8    you think it was necessary to do that kind of
9    work before settlement?
10       A.    The insurance company asked
11   that we trim the trees back some. They had a
12   lot of growth around the building and the
13   State Farm insurance agent said, you know, I
14   think you need to cut that back, we don't want
15   that near the buildings. So we did that.
16       Q.    So that was a State Farm
17   request rather than a J. D. Hogsten request?
18       A.    Right.
19       Q.    How big an item was the trees
20   and the soil?
21       A.    How big an item?
22       Q.    How much did it cost, if you
23   recall?
24       A.    I don't recall.
```

35 (Pages 134 to 137)

Page 138

1    Q.    Was it a couple hundred dollar
2  item? was it 500? 5,000?
3    A.    No. It was a couple hundred
4  dollars to trim the trees.
5    Q.    All right. Now, you testified
6  that on August 3 you distinctly recall J. D.
7  making the statement about --
8    A.    Well, I believe it was cleared
9  up to be the 4th --
10    Q.    Or whatever that date was.
11    A.    -- from the paperwork.
12    Q.    Was there any time before that?
13  Was there any time you heard from J. D?
14        MR. FOGDALL: The question
15    isn't quite clear to me.
16        MR. GRADY: The issue, of
17    course, is if it's clear to the
18    witness, but I will be happy to
19    restate it.
20        MR. FOGDALL: Okay. Thank you.
21  BY MR. GRADY:
22    Q.    My question is: You have
23  indicated around August 3, 4, whatever it was,
24  J. D. made a statement to you which we

Page 139

1  discussed and you interpreted. Were there any
2  similar statements or statements like that
3  prior to that time?
4    A.    Yeah. When we got into this
5  wrangling about the two loans and why it was
6  being changed, his comment to me at the time
7  in his office was you people don't understand
8  the loan process. And, you know, again, I'm a
9  tolerant individual, but when I start hearing
10  terms like that, that's what starts making me
11  trigger, at least for me, being in this world
12  a little longer than I think J. D. was, that
13  that's starting to sound kind of like code
14  messages and words, and I really didn't like
15  it. You don't use a statement you people
16  don't understand as if we're ignorant or can't
17  understand how to make a financial loan
18  decision. It's pretty simple. It's numbers
19  on paper.
20    Q.    Well, what's the code message?
21    A.    Well, you people is inferring
22  my people or me, us people, who I'm
23  representing the Afrocentric race, are not
24  competent enough to understand what's going on

Page 140

1  here, I guess, you know. That's how I take it
2  whenever I hear stuff like that.
3        MR. GRADY: All right. That's
4    all I have.
5        MR. FOGDALL: I have no other
6    questions.
7        MR. GRADY: We'll read.
8        - - -
9    (Witness excused.)
10        - - -
11    (Whereupon the deposition
12  adjourned at 1:55 p.m.)
13        - - -
14
15
16
17
18
19
20
21
22
23
24

Page 141

1        C E R T I F I C A T E
2    I hereby certify that the witness was
3  duly sworn by me and that the deposition is a
4  true record of the testimony given by the
5  witness.
6
7
8    _____
     Susan Marie Migatz, RMR, CRR
9    Delaware Certificaiton No. 254
     Dated:
10
11    (The foregoing certification of this
12  transcript does not apply to any reproduction
13  of the same by any means, unless under the
14  direct control and/or supervision of the
15  certifying shorthand reporter.)
16
17
18
19
20
21
22
23
24

36 (Pages 138 to 141)

Page 142

INSTRUCTIONS TO WITNESS

1
2
3      Please read your deposition over
4  carefully and make any necessary corrections.
5  You should state the reason in the appropriate
6  space on the errata sheet for any corrections
7  that are made.
8      After doing so, please sign the errata
9  sheet and date it.
10      You are signing same subject to the
11  changes you have noted on the errata sheet,
12  which will be attached to your deposition.
13      It is imperative that you return the
14  original errata sheet to the deposing attorney
15  within thirty (30) days of receipt of the
16  deposition transcript by you.  If you fail to
17  do so, the deposition transcript may be deemed
18  to be accurate and may be used in court.
19
20
21
22
23
24

Page 144

ACKNOWLEDGEMENT OF DEPONENT

1
2      I, LLOYD J. WHEATLEY, do hereby
3  certify that I have read the foregoing pages
4      to      and that the same is a correct
5  transcription of the answers given by me to
6  the questions therein propounded, except for
7  the corrections or changes in form or
8  substance, if any, noted on the attached
9  Errata Sheet.
10  _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _
11  DATE            SIGNATURE
12
13  Subscribed and sworn to before me this
14  _ _ _ _ _ _ day of _ _ _ _ _ _ _ _ _ , 200_.
15
16  My commission expires: _ _ _ _ _ _ _ _ _ _ _
17
18
19
20  _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _
21  Notary Public
22
23
24

Page 143

1      - - - - - - - -
2      E R R A T A
3      - - - - - - - -
4  PAGE    LINE        CHANGE
5  _ _ _   _ _ _   _ _ _ _ _ _ _ _ _ _ _ _ _ _
6  _ _ _   _ _ _   _ _ _ _ _ _ _ _ _ _ _ _ _ _
7  _ _ _   _ _ _   _ _ _ _ _ _ _ _ _ _ _ _ _ _
8  _ _ _   _ _ _   _ _ _ _ _ _ _ _ _ _ _ _ _ _
9  _ _ _   _ _ _   _ _ _ _ _ _ _ _ _ _ _ _ _ _
10  _ _ _  _ _ _   _ _ _ _ _ _ _ _ _ _ _ _ _ _
11  _ _ _  _ _ _   _ _ _ _ _ _ _ _ _ _ _ _ _ _
12  _ _ _  _ _ _   _ _ _ _ _ _ _ _ _ _ _ _ _ _
13  _ _ _  _ _ _   _ _ _ _ _ _ _ _ _ _ _ _ _ _
14  _ _ _  _ _ _   _ _ _ _ _ _ _ _ _ _ _ _ _ _
15  _ _ _  _ _ _   _ _ _ _ _ _ _ _ _ _ _ _ _ _
16  _ _ _  _ _ _   _ _ _ _ _ _ _ _ _ _ _ _ _ _
17  _ _ _  _ _ _   _ _ _ _ _ _ _ _ _ _ _ _ _ _
18  _ _ _  _ _ _   _ _ _ _ _ _ _ _ _ _ _ _ _ _
19  _ _ _  _ _ _   _ _ _ _ _ _ _ _ _ _ _ _ _ _
20  _ _ _  _ _ _   _ _ _ _ _ _ _ _ _ _ _ _ _ _
21  _ _ _  _ _ _   _ _ _ _ _ _ _ _ _ _ _ _ _ _
22  _ _ _  _ _ _   _ _ _ _ _ _ _ _ _ _ _ _ _ _
23  _ _ _  _ _ _   _ _ _ _ _ _ _ _ _ _ _ _ _ _
24  _ _ _  _ _ _   _ _ _ _ _ _ _ _ _ _ _ _ _ _

Page 145

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24

37 (Pages 142 to 145)

# EXHIBIT B

# Dover, Delaware Census Information



**Figure 1: Percentage of Persons who are Black or African American**



**Figure 2: Block 1000, Block Group 1 on Census Track 409**

# EXHIBIT C

Wheatley
6995009

# MORTGAGE LOAN
## APPLICATION AGREEMENT

DATE: <u>06/22/2004</u>

Applicant <u>Lloyd J Wheatley</u>                    and <u>Audria L Wheatley</u>
(hereinafter "I") request a residential mortgage loan in the amount of $ <u>240,000.00</u>
Collateral for the loan will be the property at the address: <u>584 North Dupont Hwy</u>
City & State: <u>Dover</u>                    , <u>DE</u>                         . In consideration of the agreement by
("Wachovia") to take and process my loan application,
I hereby acknowledge and agree (for myself and for any co-applicants not signing this agreement) to the following matters, terms, and conditions:

1. **Uniform Residential Loan Application.** I agree to provide to Wachovia all information necessary to fully and accurately complete Wachovia's Uniform Residential Loan Application (the "Application") form for myself and such other person whose credit will be used as a basis for loan qualification, and to provide information requested concerning a spouse if his or her liabilities must be considered because I reside in a community property state, the secured property is in a community property state, or I am relying on other property in a community property state as a basis for repayment of the loan. I authorize Wachovia to receive and use information it needs to underwrite my loan, including any accounts or loans I may have with a Wachovia affiliate. I agree to sign the completed Uniform Residential Loan Application form confirming that the information is accurate and complete. I understand that Wachovia has no obligation to underwrite, make a credit decision, or approve a loan until Wachovia has received a fully satisfactory and signed Uniform Residential Loan Application. I understand that acceptance into a particular loan program is not guaranteed.

2. **Settlement services.** I certify that I have been given the opportunity to select settlement service providers in connection with my loan unless a particular settlement service provider is required by Wachovia (as allowed by applicable federal or state law). If Wachovia requires the use of a particular settlement service provider or refers me to a particular settlement service provider that is an affiliate, I certify that I have received from Wachovia an Affiliated Business Arrangement Disclosure Statement. Wachovia reserves the right to approve all settlement service providers chosen by me. If I do not notify Wachovia of my selection for Closing Agent/Attorney, Title Insurance, or Hazard Insurance/Flood Insurance within two days of receipt of my application, Wachovia is authorized to designate those settlement service providers.

3. **Agreement concerning interest rate and discount points.** Although any officer or employee of Wachovia may receive <u>requests</u> for a "lock-in" of the interest rate or discount points that will be charged on my loan, no Wachovia officer or employee has authority <u>orally</u> to make a binding legal commitment to such rate or points, or to make an oral modification of any written agreement with respect thereto. THE INTEREST RATE AND DISCOUNT POINTS CHARGED ON MY LOAN WILL BE NEGOTIATED AT PREVAILING MARKET RATES ON OR ABOUT THE DATE MY LOAN IS CLOSED, UNLESS OTHERWISE AGREED IN WRITING BY WACHOVIA. The interest rate and <u>discount</u> points shown on my loan application are estimates for loan underwriting purposes only, and the appearance of such terms on my application does not <u>lock in</u> or commit Wachovia to make a loan to me on those terms. An agreement or lock-in of the interest rate or discount points on my loan will be effective and binding upon Wachovia only when given separately from my loan application <u>in writing</u> and signed by an officer or authorized employee of Wachovia. I acknowledge that the form of such agreement currently issued by Wachovia with respect to interest rates and discount points is attached hereto.

4. **Fees due at time of application.** The following is a disclosure of some of the fees which I will be charged in connection with my application for a mortgage loan and provides information on these charges and an explanation of the circumstances under which some or all of these charges may be refunded.
   A. Total fees payable at the time of application:
   Application Fee                $ <u>60</u>      **This fee is non-refundable. This fee does <u>not apply</u> to FHA/VA loans, loans secured by property in IA, NY, or to loans of $50,000 or less secured by property in PA).**
   Credit report fee (estimated): $ <u>15</u>      This fee includes one single or joint credit report. Additional credit reports may be required, e.g. for each non-spouse applicant.
   Appraisal fee (estimated):     One Family - $ <u>335</u>   per appraisal
   Two-Four Family - $ _____ per appraisal
   Other - $ _____           per streamlined appraisal
   More than one appraisal may be required.
   Flood certification fee:       $ <u>14.00</u>
   Costs of the third party fees such as additional credit reports or the appraisal are estimated on the basis of prior experience. If the actual cost of third party fees are more than the fees paid at application, I will pay the actual cost.
   B. Refund of fees:
   Fees shown in paragraph A are not refundable except as provided below:
   - I may withdraw my application, with no penalty or payment of additional fees, at any time before accepting a commitment or before my application is denied; however, I will not be entitled to receive a refund of the application fee, if applicable, nor a refund of any third party expenses which have been incurred.
   - If my application is neither approved nor denied within 30 days after receipt of a completed application and I was not substantially at fault for the delay in making the decision and within that time I decide to withdraw my application, Wachovia will refund all fees listed in Paragraph A <u>except</u> the application fee, if applicable, and any actual third-party fee that Wachovia has paid or committed to pay to others. For property in New Jersey only: If through no substantial fault of mine, Wachovia has not issued a commitment or denial within the number of days indicated on the Addendum to Application, Wachovia will refund all fees paid, including application, appraisal, credit report and other fees Wachovia has paid or committed to pay to others.

ORIGINAL - Wachovia          2ND COPY - Applicant

Page 1 of 3

WHEAT000381

- If my application is denied or if Wachovia makes a counteroffer for reasons (other than bona fide underwriting considerations) which were known or should have been known from the facts contained in the initial application form, Wachovia will refund the fees listed in Paragraph A except the application fee, if applicable. (A "counteroffer" occurs when a commitment is issued for a loan at different terms than for the loan for which I applied or for a loan at a higher interest rate, discount points or commitment fee.)
- If required by federal or state law.
Within seven days of receipt of a written request for a refund, Wachovia will send me refunds to which I am entitled. A refund of any float down or any extended lock fee is available only if the terms of the written Interest Rate Agreement and/or Addendum so provide.

5. **Estimated time for Wachovia to respond to my application.** Upon receipt of a completed application, Wachovia estimates that it will be able to either approve or deny my application within 30 days. If after a review of my application, Wachovia determines that additional time will be required to make a decision on my loan, Wachovia will advise me of this in writing.

6. **Loan approval.** It is understood that signing this Agreement does not constitute approval of my loan application. Any approval of the loan will be by written commitment issued contemporaneously with the instructions to close the loan given to the closing agent/attorney. No other indication, either written or oral, may be construed as an approval of or commitment to make a loan. I understand that I will be notified of the action taken on my application. I hereby authorize Wachovia to notify my Real Estate Agent in the event I cannot be contacted by phone within a reasonable time.

7. **Agreement regarding closing date.** In the event my loan is not closed for any reason within the time period specified in any "lock-in," commitment, or other agreement, I agree, to the extent I am permitted to do so by applicable law, that Wachovia shall have no liability to me or anyone claiming through me except for matters within Wachovia's immediate and exclusive control where there is gross negligence or willful misconduct by Wachovia.

8. **Audit/Quality Control review.** I understand that Wachovia maintains an ongoing quality control review program and that my loan application and/or my loan may be selected for pre-closing and/or post-closing audit, reverification, and review.

9. **Broker agreement.** Subject to applicable law, Wachovia, at its option and without further notice to me, is authorized to take and process my loan application as a mortgage loan broker, and in such event may not be lending its own funds. If acting as a broker, Wachovia will process my loan application for submission to another lending institution in the business of making or purchasing residential mortgages ("Lender"). Accordingly, Wachovia will process my application according to Lender's policy and procedures, as interpreted by Wachovia. All loan approvals will be in writing and issued by Lender. Wachovia is not an agent for Lender and is not authorized to act for or bind Lender in any manner, and any "lock-in" with Lender shall be an obligation of Lender and not of Wachovia. My application will be submitted to Lender when, in the opinion of Wachovia, all information necessary for Lender to render a credit decision has been gathered. Once the application has been submitted to Lender, Lender may approve, decline, or suspend the application for further processing or additional information. Lender's decision will be final. If Lender is unable or unwilling, for any reason, to close and fund my loan, Wachovia shall have no liability or obligation as a result thereof.

10. **Escrows or impounds.** My loan documents will provide for escrow/impound payments, subject to applicable federal or state law, which will be used for payment of all property, and other taxes or assessments, hazard insurance premiums, and, if required on my loan, mortgage and/or other insurance premiums. I will acknowledge that each month I will pay the pro-rata portion of the amounts estimated for escrow items payable in the coming year. This amount must be included in my total monthly mortgage payment.

11. **Property inspection.** I understand that Wachovia does not guarantee the property is free of defects. I further understand that an appraiser has no duty to inspect for or report mechanical or structural defects in the property to me. To ensure the house will be satisfactory in all respects and all equipment will operate properly, a thorough inspection of the property with particular attention to plumbing, heating, electrical, and roofing by me or a reputable inspection firm is recommended.

12. **Appraisal report request.** As part of the review of my loan application, Wachovia may obtain an appraisal or an alternative type of property valuation. In some situations, the acceptability of the property as collateral for the loan may be confirmed by a property valuation model and/or an exterior-only inspection, or by some other means that is not an appraisal of the property. I understand that any appraisal alternative obtained by Wachovia is for lending purposes only and should not be relied upon to protect my interests in the transaction (for example, to confirm the purchase price of the property). I acknowledge that, if I prefer, I may request an appraisal in lieu of an appraisal alternative. The cost to me for an appraisal may be greater than the cost of an appraisal alternative. I have the right to a copy of the appraisal report (if any) obtained in connection with my application for credit, provided that, if required, I have paid for or am willing to pay for the appraisal. I can get a copy of this report by writing to Wachovia at the address listed below. For property in all states EXCEPT Arizona and Rhode Island: Wachovia must receive my request in writing no later than ninety (90) days after I am notified about the action taken on my credit application. If I withdraw my application, I must make a written request for a copy of the appraisal report within ninety (90) days of the withdrawal.

13. **Agreement regarding general industry matters.** I understand that delays and problems in processing and closing loans may occur without any fault on the part of lenders such as Wachovia. Congress may change applicable laws while my loan is in process. In addition, agencies such as the Government National Mortgage Association ("GNMA" or "Ginnie Mae"), the Federal Housing Administration ("FHA"), and the Department of Veterans Affairs ("VA") may announce changes or limits affecting the ability of lenders to close and market loans. It is also possible that loan purchasers such as the Federal National Mortgage Association ("FNMA" or "Fannie Mae") and the Federal Home Loan Mortgage Corporation ("FHLMC" or "Freddie Mac") may limit or terminate their market activity, which would adversely affect the ability of mortgage lenders such as Wachovia to sell loans. I understand that my loan must meet the standards of one or more of these organizations, and I will execute standard documents and corrections at your request for the purpose of meeting those standards. If any event, announcement, change in market conditions, or other occurrence beyond Wachovia's immediate control adversely affects Wachovia's ability to process, close, or market my loan, I agree that Wachovia shall have no obligation to close my loan and shall have no liability in the event I fail to obtain other financing (whether or not Wachovia shall attempt to help me find other financing). In case of any such occurrence, I will not be refunded any fees paid to Wachovia for actual expenses incurred, including without limitation, fees for an appraisal and a credit report.

WHEAT000382

Wheatley
6995009

14. **Sharing information.** Wachovia shares loan payment history and experience with affiliates through a central information system and Wachovia is also permitted by the Fair Credit Reporting Act to share other customer information with its affiliates. Wachovia will never share other information with any non-affiliated third party for any reason other than those already stated in my account or mortgage application agreement. Sharing information with its affiliates can be used to improve Wachovia's services to me. However, I have the right to direct that Wachovia not share this information with its affiliates, other than information about its own transactions and experience with me. To exercise this right, I may contact Wachovia at 1-866-642-9405.

After my loan has closed, I still have the right to request that Wachovia restrict information sharing among its affiliates by calling 1-866-642-9405 or by sending a request including my name, address and social security number to: **Wachovia, P.O. Box 11726, Roanoke, VA 24022-1726.** (The request must be mailed in a separate envelope and should not be included in any other correspondence. Each customer has the right to direct Wachovia not to share information other than transaction or experience information about them with Wachovia affiliates. Each customer, including each joint owner, may separately choose to ask Wachovia restrict information sharing with affiliates. Customers who request that Wachovia restrict information sharing may do so only for themselves, and may not do so for anyone else, including joint account owners. Wachovia will process any request received as quickly as possible.)

I authorize Wachovia to share information from my mortgage loan application file with affiliates for the purpose of offering and introducing additional Wachovia credit and other products and services. I certify that I have been advised of my rights to restrict the sharing of information other than information about my Wachovia accounts or loan payment history.

15. **Omissions, false/misleading statements.** I certify that the information provided to Wachovia on my application and during the application process is true and correct as of the date set forth opposite my signature on this Agreement or if supplied later, then on such later date and acknowledge my understanding that any intentional or negligent misrepresentation of the information contained in the Application or otherwise may result in civil liability and/or criminal penalties, including, but not limited to, fine or imprisonment or both under the provisions of Title 18, United States Code, Section 1001, et seq. and liability for monetary damages to Wachovia, its agents, successors and assigns, insurers, and any other person who may suffer any loss due to reliance upon any misrepresentation which I have made.

Branch / Servicenter Address:

_____    _____  6/23/04
                                   Applicant's Signature            Date
                                                                    Lloyd J Wheatley

_____    _____  6/23/04
                                   Applicant's Signature            Date
                                                                    Audria L Wheatley

WHEAT000383

# EXHIBIT D

## Underwriting Guidelines: Conforming

☻ Feedback

### Archived Copy of PUGO for 7/30/04 - 8/12/04

### Appraisals
### Single Family Residence/PUDs
### Analysis of *URAR FNMA Form 1004/FHLMC Form 70*

#### Subject

This section must clearly identify the subject property. The appraiser must provide a complete property address and legal description; a post office box number is not acceptable. If the legal description is lengthy, it should be attached as an addendum to the report.

The appraiser must identify the property rights appraised as "fee simple" or "leasehold." In addition, if the property is a Planned Unit Development (PUD) unit or a condominium unit for Housing and Urban Development/Department of Veterans Affairs (HUD/VA) only, the appraiser must indicate the property type, the amount of Homeowners Association (HOA) dues, and the project name.

Either of the following must be set forth as stated in the sales contract:

- Sales price, contract date, and loan charges paid by the property seller
- Financing and sales concessions made by the property seller

#### Neighborhood

The neighborhood analysis must contain:

- An accurate description of the subject neighborhood
- Factors that influence the market value and marketability in the neighborhood

If there are unfavorable factors in the analysis, the appraiser must address the impact of those factors on value and marketability.

**WACH000001**

#### PUD Section

This section should be completed on all PUD units. The information in this section is very limited and does **not** replace the *PUD Appraiser's*

*Certification* form that Wachovia Mortgage Corporation requires for PUD project approval.

## Site

This section must accurately describe the physical characteristics of the site, the site improvements, and available utilities. It must also fully analyze any location factors affecting marketability.

The property site's size, shape, and topography should be generally conforming and acceptable in the market area. It should also have competitive improvements and amenities. The subject property use must conform to applicable zoning restrictions and must be the highest and best use for the property. Utilities must meet community standards.

## Description of Improvements

The report must contain an accurate description of the improvements and any factors that may affect the market value or marketability of the subject. The property must be habitable as a year-round residence.

Dwellings with unusual layouts, peculiar floor plans, or inadequate equipment or amenities generally have limited market appeal. When the subject property does not conform to other neighborhood properties in terms of type, design, age, materials, and so on, the appraiser must evaluate the effect the nonconformance has on the subject's value and marketability.

## Comments Section

Any additional features, necessary repairs or modernization, or physical, functional, or external inadequacies must be reported in the comments section.

The appraiser should note any energy-efficient items and must address any adverse environmental conditions that are present in the improvements, on the site, or in the vicinity of the subject property.

WACH000002

## Cost Approach

The cost approach measures value as a cost of reproduction. The reliability of this approach depends on valid reproduction cost estimates, proper depreciation estimates, and accurate site values.

The cost approach can be a good indicator of value on new or newly renovated properties. However, as the age of a property increases, the

reliability of the cost approach may decrease if depreciation estimates become subjective.

Appraisal reports that rely solely on the cost approach for the market value estimate are unacceptable.

Back to Top

## Sales Comparison Analysis

The sales comparison approach to value is generally the most reliable approach to value. Greater emphasis is placed on this approach when reviewing the appraisal report. For more detail, refer to Sales Comparison Approach.

## Income Approach

The income approach is seldom applicable in areas that consist primarily of owner-occupied properties since adequate rental data generally does not exist for those areas. However, in neighborhoods where there is a substantial rental market, it can be an important approach to value.

When the property being appraised is a single-family property that will be used for investment property, the appraiser must complete this section (in addition to the *Single-Family Comparable Rent Schedule, FNMA Form 1007*).

An appraisal report that relies solely on the income approach as an indicator of market value is not acceptable.

## Reconciliation

The reconciliation process that leads to the estimate of market value is an ongoing process throughout the appraiser's analysis. The reconciliation must contain any conditions of the appraisal on which the final estimate of value is based.

In the final reconciliation, the appraiser must reconcile:

- Reasonableness and reliability of each approach to value
- Reasonableness and validity of the indicated values and the available data

**WACH000003**

The appraiser then must select and report the approach or approaches that were given the most weight.

The rationale in the final reconciliation must be consistent with the

PUGO - Appraisals Single Family Residence/PUDS Analysis of URAR FNMA Form 1004... Page...

Case 1:06-cv-00567-SLR    Document 41-5    Filed 12/05/2007    Page 5 of 5

comments, conclusions, and assumptions stated throughout the appraisal report. The report must include the date of the value estimate and the estimate of market value as well as the appraiser's name, signature, and state license or certification number.

## Condition of Property

For existing construction, an appraisal may be based on the "as is" condition of the property if minor conditions that do not affect the livability of the property exist—such as minor deferred maintenance—as long as the appraiser's opinion of value reflects the existence of these conditions. The underwriter must review carefully the appraisal for a property appraised in an "as is" condition to ensure that the property does not have any physical deficiencies or conditions that would affect its livability. If there are none, Wachovia Mortgage Corporation does not need to require minor repairs to be completed before it delivers the mortgage to the investor.

When there are incomplete items or conditions that **do** affect the livability of the property—such as a partially completed addition or renovation—or physical deficiencies that could affect the soundness or structural integrity of the improvements, the property must be appraised subject to completion of the specific alterations or repairs. In such cases, Wachovia Mortgage Corporation must obtain a certificate of completion from an appraiser before it delivers the mortgage to the investor. The certification does not need to include photographs of the property unless those that accompanied the original appraisal report are no longer representative of the completed property.

Generally, the original appraiser should complete any required certification of completion; however, Wachovia Mortgage Corporation may use a substitute appraiser. In such cases, the substitute appraiser must review the original appraisal and certify that the original appraiser's description of the property was accurate and the opinion of market value was reasonable on the date of the original appraisal report. Wachovia Mortgage Corporation should note in its files why the original appraiser was not used.

Back to Top

Page updated 08/12/2004
Today is: Wednesday, 08/29/2007 - 03:37:11 PM

**WACH000004**

# EXHIBIT E

**XI, 202: Status of Construction (06/30/02)**

Generally, we require the improvements for the subject property to have been completed when the mortgage is delivered to us. However, we do make some exceptions to this and, in such cases, an appraisal report should be developed in accordance with the following criteria:

- For *new* or *proposed construction*, an appraisal may be based on either plans and specifications or an existing model home, if the lender obtains a certification of completion before it delivers the mortgage to us. This certification should be completed by the appraiser, state that the improvements were completed in accordance with the requirements and conditions in the original appraisal report, and be accompanied by photographs of the completed improvements.

  When the completion of certain items that are included as part of the sales contract—such as landscaping, a driveway, or a sidewalk—or other minor items that do not affect the ability to obtain an occupancy permit has to be postponed for some reason, the lender may deliver the mortgage before these postponed items are completed if it represents and warrants that the postponed improvements will be completed within 180 days after the date of the mortgage note. The appraisal report must show both the cost of completing the postponed items and the "as completed" value of the property after completion of the postponed improvements, although no dollar-for-dollar adjustments should be made. The cost of completing any minor improvements must not represent more that 2% of the "as completed" appraised value of the property.

  - The lender must establish a "completion escrow" for the postponed improvements, by withholding from the purchase proceeds funds equal to 120% of the estimated cost for completing the improvements. However, if the contractor or builder offers a guaranteed "fixed price" contract for completion of the improvements, the funds in the "completion escrow" only need to equal the full amount of the contract price.

  - The lender and the borrower must enter into an escrow agreement that determines how the lender will manage and disburse funds from the escrow account. Once a certificate of completion is obtained, the lender must release the final draw from the escrow account (which should include any funds in excess of the amount needed to pay for completion of the postponed items). The final title report must not show any outstanding mechanic's liens or take any exceptions to the postponed improvements or the escrow agreement. If the final title report is issued before the completion of the improvements, the lender must obtain an endorsement to the title policy that ensures the priority of our lien.

- For *existing construction*, an appraisal may be based on the "as is" condition of the property if minor conditions that do not affect the livability of the property exist—such as minor deferred maintenance—as long as the appraiser's opinion of value reflects the existence of these conditions. The lender must review carefully the appraisal for a property appraised in an "as is" condition to assure that the property does not have any physical deficiencies or conditions that would affect its livability. If there are none, the lender does not need to require minor repairs to be completed before it delivers the mortgage to us.

  When there are incomplete items or conditions that do affect the livability of the property—such as a partially completed addition or renovation—or physical deficiencies that could affect the soundness or structural integrity of the improvements, the property must be appraised subject to completion of the specific alterations or repairs. In such cases, the lender must obtain a certificate of completion from an appraiser before it delivers the mortgage to us. The certification does not need to include photographs of the property unless those that accompanied the original appraisal

report are no longer representative of the completed property.

Generally, the original appraiser should complete any required certification of completion; however, the lender may use a substitute appraiser. In such cases, the substitute appraiser must review the original appraisal and certify that the original appraiser's description of the property was accurate and the opinion of market value was reasonable on the date of the original appraisal report. The lender should note in its files why the original appraiser was not used.

# EXHIBIT F

Ln#6995009
File No. 8316933791

## APPRAISAL OF



### LOCATED AT:

584 N. Dupont Highway
Dover, De.  19901

### FOR:

Wachovia Mortgage Corporation
1 Jefferson Square Waterbury, Ct.06706

### BORROWER:

Wheatley, Lloyd and Audria

### AS OF:

July 7, 2004

### BY:

Daniel A Gladden



EXHIBIT
L. Wheatley 8
10/31/07

WHEAT000054

Ln#6995009
File No. 8316933791

Wachovia Mortgage Corporation
1 Jefferson Square Waterbury, Ct.06706

File Number: 8316933791

In accordance with your request, I have personally inspected and appraised the real property at:

584 N. Dupont Highway
Dover, De. 19901

The purpose of this appraisal is to estimate the market value of the subject property, as improved. The property rights appraised are the fee simple interest in the site and improvements.

In my opinion, the estimated market value of the property as of   July 7, 2004          is:

$267,000
Two Hundred Sixty-Seven Thousand Dollars

The attached report contains the description, analysis and supportive data for the conclusions, final estimate of value, descriptive photographs, limiting conditions and appropriate certifications.

Daniel A. Gladden
Daniel A Gladden

WHEAT000055

# FannieMae

## Desktop Underwriter Quantitative Analysis Appraisal Report

Ln#6995009
File No.: 8316933791

THIS SUMMARY APPRAISAL REPORT IS INTENDED FOR USE BY THE LENDER/CLIENT FOR A MORTGAGE FINANCE TRANSACTION ONLY.

**SUBJECT**

| Field | Value |
|---|---|
| Property Address | 584 N. Dupont Highway | City Dover | State De. | Zip Code 19901 |

Legal Description See assessor's parcel #

Assessor's Parcel No. 2-05-06809-01-1901-000  Tax Year 2003  R.E.Taxes $ 1097.00  Special Assessments $ none

Borrower Wheatley, Lloyd and Audria    Current Owner Aigner, Peter J.    Occupant: [ ] Owner [ ] Tenant [X] Vacant

Neighborhood or Project Name non development    Project Type [ ] PUD [ ] Condominium    HOA$ none /Mo.

Sales Price $ 266,667  Date of Sale 6-18-04  Description$ amount of loan charges/concessions to be paid by seller none known

Property rights appraised [x] Fee Simple [ ] Leasehold  Map Reference 06809    Census Tract 409

**NEIGHBORHOOD**

Note: Race and the racial composition of the neighborhood are not appraisal factors.

| | | | | Property values | [X] Increasing | [ ] Stable | [ ] Declining |
|---|---|---|---|---|---|---|---|
| Location | [X] Urban | [ ] Suburban | [ ] Rural | Demand/supply | [ ] Shortage | [X] In balance | [ ] Over supply |
| Built up | [X] Over 75% | [ ] 25-75% | [ ] Under 25% | Marketing time | [ ] Under 3 mos. | [X] 3-6 mos. | [ ] Over 6 mos. |
| Growth rate | [ ] Rapid | [X] Stable | [ ] Slow | | | | |

Single family housing PRICE $(000) / AGE (yrs): 70 Low / 10; 350 High / 150

Condominium housing PRICE $(000) / AGE (yrs): 115 Low / 11; 210 High / 21

Predominant 200 / 70 | Predominant 163 / 19

Neighborhood boundaries See Attached Addendum

**SITE**

Dimensions 95x176    Site area .56 acres    Shape irregular

Specific zoning classification and description C1A

Zoning compliance [X] Legal [ ] Legal nonconforming (Grandfathered use); [ ] Illegal, attach description [ ] No zoning

Highest and best use of subject property as improved (or as proposed per plans and specifications): [X] Present use [ ] Other use, attach description.

| Utilities | Public | Other | | Public | Other | Off-site improvements | Type | Public | Private |
|---|---|---|---|---|---|---|---|---|---|
| Electricity | [X] | | Water | [X] | | Street | asphalt | [x] | |
| Gas | [X] | | Sanitary sewer | [X] | | Alley | none | | |

Are there any apparent adverse site conditions (easements, encroachments, special assessments, slide areas, etc.)? [ ] Yes [X] No  If Yes, attach description.

**IMPROVEMENTS**

Source(s) used for physical characteristics of property: [X] Interior and exterior inspection [ ] Exterior inspection from street [ ] Previous appraisal files

[ ] MLS [ ] Assessment and tax records [ ] Prior Inspection [ ] Property owner [ ] Other (Describe):

No. of Stories 2  Type (Det./Att.) det.  Exterior Walls stuc,brk,wd  Roof Surface wd shakes  Manufactured Housing [ ] Yes [X] No

Does the property generally conform to the neighborhood in terms of style, condition, and construction materials? [x] Yes [X] No  If No, attach description.

Are there any apparent physical deficiencies or conditions that would affect the soundness or structural integrity of the improvements or the livability of the property?
[ ] Yes [X] No  If Yes, attach description.

Are there any apparent adverse environmental conditions (hazardous wastes, toxic substances, etc.) present in the improvements, on the site, or in the immediate vicinity of the subject property? [ ] Yes [X] No  If Yes, attach description.

I researched the subject market area for comparable listings and sales that are the most similar and proximate to the subject property.

My research revealed a total of 3  sales ranging in sales price from $ 242,500 to $ 303,000.

My research revealed a total of 0 in mls  listings ranging in list price from $ 0 to $ 0.

The analysis of the comparable sales below reflects market reaction to significant variations between the sales and the subject property.

**SALES COMPARISON ANALYSIS**

| FEATURE | SUBJECT | SALE 1 | +(-) $ Adjustment | SALE 2 | +(-) $ Adjustment | SALE 3 | +(-) $ Adjustment |
|---|---|---|---|---|---|---|---|
| | 584 N. Dupont Highway | 10 Manor Dr. | | 530 American Ave. | | 215 American Ave. | |
| Address | Dover | Dover, De. | | Dover, De. | | Dover, De. | |
| Proximity to Subject | | 3.5 miles+- | | .80 miles+- | | .80 miles+- | |
| Sales Price | $ 266,667 | $ 275,000 | | $ 242,500 | | $ 303,000 | |
| Price/Gross Liv. Area | $ 86.02 ☑ | $ 106.34 ☑ | | $ 91.17 ☑ | | $ 111.60 ☑ | |
| Data & Verif. Sources | | MLS | | MLS | | MLS | |
| VALUE ADJUSTMENTS | DESCRIPTION | DESCRIPTION | +(-) $ Adjustment | DESCRIPTION | +(-) $ Adjustment | DESCRIPTION | +(-) $ Adjustment |
| Sales or Financing | | conv | | va. | | conv. | |
| Concessions | | no concess | | no concess | | no concess | |
| Date of Sale/Time | 6-18-04 | 9-26-03 | | 8-15-03 | | 4-16-04 | |
| Location | Urban-hv trv rd | Sub- less hv trv rd | -13,750 | urban-less hv trv rd | -12,125 | urban-less hv trv rd | -15,150 |
| Site | .56 acres | .30 acres | 1,300 | .41 acres | 750 | .39 acres | 850 |
| View | Gd-lakefront | Gd-lake front | | Avg-no water | 30,000 | Avg-no water | 30,000 |
| Design (Style) | 2 sty contemp | Ranch | | Cape cod | | Cape cod | |
| Actual Age (Yrs.) | 50 yrs estimated | 50 yrs. | | 25 yrs. | -5,000 | 56 yrs. | |
| Condition | fair to avg. | Avg. | -10,000 | Avg. | -10,000 | V.Good | -20,000 |
| Above Grade | Total / Bdrms / Baths  7 / 3 / 4.00 | Total / Bdrms / Baths  9 / 3 / 3.00 | 1,500 | Total / Bdrms / Baths  8 / 4 / 3.00 | 1,500 | Total / Bdrms / Baths  10 / 5 / 3.00 | 1,500 |
| Room Count | | | | | | | |
| Gross Living Area | 3,100 Sq. Ft. | 2586-mls Sq. Ft. | 10,300 | 2660-mls Sq. Ft. | 8,800 | 2715-mls Sq. Ft. | 7,700 |
| Basement and Finished | small bsmt | no bsmt | 1,000 | full bsmt | -5,000 | part Bsmt | -2,500 |
| Rooms Below Grade | | unfin. | | Rec rm | -3,000 | unfin. | |
| Garage/Carport | 1car att. | none | 2,500 | 2 car att. | -2,500 | 2 car att. | -2,500 |
| | dock,dk,lgenc,pa | 2 dks,dock,fy | 4,000 | scr porch | 5,000 | dk,pat,fy,sprink sy | 4,000 |
| | no cent ac,fp | Cent ac,2 fps | -5,500 | Cent ac,2 fps | -5,500 | cent ac,fp,lngpool | -8,000 |
| Net Adj. (total) | | [+] [X] [-] $ | 8,650 | [X][+] [-] $ | 2,925 | [+] [X] [-] $ | 4,100 |
| Adjusted Sales Price | | Gross: 18.1% | | Gross: 36.8% | | Gross: 30.4% | |
| of Comparables | | Net: -3.1% $ | 266,350 | Net: 1.2% $ | 245,425 | Net: -1.4% $ | 298,900 |
| Date of Prior Sales | 3-26-04,5-29-03 | unk. | | unk. | | 9-1-95 | |
| Price of Prior Sales | $ unk,unk | $ | unk. | $ | unk. | $ | 148,500 |

Analysis of any current agreement of sale, option, or listing of the subject property and analysis of the prior sales of subject and comparables:  See Attached...

Summary of sales comparison and value conclusion: See Attached...

This appraisal is made [X] "as-is", or [ ] subject to completion per plans and specifications on the basis of a hypothetical condition that the improvements have been completed, or

[ ] subject to the following repairs, alterations or conditions:

BASED ON AN [ ] EXTERIOR INSPECTION FROM THE STREET OR AN [X] INTERIOR AND EXTERIOR INSPECTION, I ESTIMATE THE MARKET VALUE, AS DEFINED,
OF THE REAL PROPERTY THAT IS THE SUBJECT OF THIS REPORT TO BE $ 267,000, AS OF July 7,2004.

1OCH.

PAGE 1 OF 3
Produced using ACI software, 800.234.8727 www.aciweb.com

Fannie Mae Form 2055 9-96

WHEAT000056

Ln#6995009

## Desktop Underwriter Quantitative Analysis Appraisal Report
File No.: 8316933791

**PUD**

**Project Information for PUDs (if applicable)--Is the developer/builder in control of the Home Owners' Association (HOA)?** ☐ Yes ☐ No

Provide the following information for PUDs only if the developer/builder is in control of the HOA and the subject property is an attached dwelling unit:

| | | |
|---|---|---|
| Total number of phases _____ | Total number of units _____ | Total number of units sold _____ |
| Total number of units rented _____ | Total number of units for sale _____ | Data Source(s) _____ |

Was the project created by the conversion of existing buildings into a PUD? ☐ Yes ☐ No  If yes, state date of conversion: _____

Does the project contain any multi-dwelling units? ☐ Yes ☐ No  Data Source: _____

Are the common elements completed? ☐ Yes ☐ No  If No, describe status of completion: _____

Are any common elements leased to or by the Home Owners' Association? ☐ Yes ☐ No  If yes, attach addendum describing rental terms and options.

Describe common elements and recreational facilities: _____

**CONDOMINIUM**

**Project Information for Condominiums (if applicable)--Is the developer/builder in control of the Home Owners' Association (HOA)?** ☐ Yes ☐ No

Provide the following information for all Condominium Projects:

| | | |
|---|---|---|
| Total number of phases _____ | Total number of units _____ | Total number of units sold _____ |
| Total number of units rented _____ | Total number of units for sale _____ | Data Source(s) _____ |

Was the project created by the conversion of existing buildings into a condominium? ☐ Yes ☐ No  If yes, date of conversion: _____

Project Type: ☐ Primary Residence ☐ Second Home or Recreational ☐ Row or Townhouse ☐ Garden ☐ Midrise ☐ Highrise ☐ _____

Condition of the project, quality of construction, unit mix, etc.: _____

Are the common elements completed? ☐ Yes ☐ No  If No, describe status of completion: _____

Are any common elements leased to or by the Home Owners' Association? ☐ Yes ☐ No  If yes, attach addendum describing rental terms and options.

Describe common elements and recreational facilities: _____

**PURPOSE OF APPRAISAL:** The purpose of this appraisal is to estimate the market value of the real property that is the subject of this report based on a quantitative sales comparison analysis for use in the mortgage finance transaction.

**DEFINITION OF MARKET VALUE:** The most probable price which a property should bring in a competitive and open market under all conditions requisite to a fair sale, the buyer and seller, each acting prudently, knowledgeably and assuming the price is not affected by undue stimulus. Implicit in this definition is the consummation of a sale as of a specified date and the passing of title from seller to buyer under conditions whereby: (1) buyer and seller are typically motivated; (2) both parties are well informed or well advised, and each acting in what he considers his own best interest; (3) a reasonable time is allowed for exposure in the open market; (4) payment is made in terms of cash in U.S. dollars or in terms of financial arrangements comparable thereto; and (5) the price represents the normal consideration for the property sold unaffected by special or creative financing or sales concessions* granted by anyone associated with the sale.

* Adjustments to the comparables must be made for special or creative financing or sales concessions. No adjustments are necessary for those costs which are normally paid by sellers as a result of tradition or law in a market area; these costs are readily identifiable since the seller pays these costs in virtually all sales transactions. Special or creative financing adjustments can be made to the comparable property by comparisons to financing terms offered by a third party institutional lender that is not already involved in the property or transaction. Any adjustment should not be calculated on a mechanical dollar for dollar cost of the financing or concession but the dollar amount of any adjustment should approximate the market's reaction to the financing or concessions based on the appraiser's judgment.

### STATEMENT OF LIMITING CONDITIONS AND APPRAISER'S CERTIFICATION

**CONTINGENT AND LIMITING CONDITIONS:** The appraiser's certification that appears in the appraisal report is subject to the following conditions:

1. The appraiser will not be responsible for matters of a legal nature that affect either the property being appraised or the title to it. The appraiser assumes that the title is good and marketable and, therefore, will not render any opinions about the title. The property is appraised on the basis of it being under responsible ownership.

2. The appraiser has provided any required sketch in the appraisal report to show approximate dimensions of the improvements and the sketch is included only to assist the reader of the report in visualizing the property and understanding the appraiser's determination of its size.

3. The appraiser will not give testimony or appear in court because he or she made an appraisal of the property in question, unless specific arrangements to do so have been made beforehand.

4. The appraiser has noted in the appraisal report any adverse conditions (such as, but not limited to, needed repairs, the presence of hazardous wastes, toxic substances, etc.) observed during the inspection of the subject property or that he or she became aware of during the normal research involved in performing the appraisal. Unless otherwise stated in the appraisal report, the appraiser has no knowledge of any hidden or unapparent conditions of the property or adverse environmental conditions (including the presence of hazardous wastes, toxic substances, etc.) that would make the property more or less valuable, and has assumed that there are no such conditions and makes no guarantees or warranties, expressed or implied, regarding the condition of the property. The appraiser will not be responsible for any such conditions that do exist or for any engineering or testing that might be required to discover whether such conditions exist. Because the appraiser is not an expert in the field of environmental hazards, the appraisal report must not be considered as an environmental assessment of the property.

5. The appraiser obtained the information, estimates, and opinions that were expressed in the appraisal report from sources that he or she considers to be reliable and believes them to be true and correct. The appraiser does not assume responsibility for the accuracy of such items that were furnished by other parties.

6. The appraiser will not disclose the contents of the appraisal report except as provided for in the Uniform Standards of Professional Appraisal Practice.

7. The appraiser must provide his or her prior written consent before the lender/client specified in the appraisal report can distribute the appraisal report (including conclusions about the property value, the appraiser's identity and professional designations, and references to any professional appraisal organizations or the firm with which the appraiser is associated) to anyone other than the borrower; the mortgagee or its successors and assigns; the mortgage insurer; consultants; professional appraisal organizations; any state or federally approved financial institution; or any department, agency, or instrumentality of the United States or any state or the District of Columbia; except that the lender/client may distribute the report to data collection or reporting service(s) without having to obtain the appraiser's prior written consent. The appraiser's written consent and approval must also be obtained before the appraisal can be conveyed by anyone to the public through advertising, public relations, news, sales, or other media.

8. The appraiser has based his or her appraisal report and valuation conclusion for an appraisal that is subject to completion per plans and specifications on the basis of a hypothetical condition that the improvements have been completed.

9. The appraiser has based his or her appraisal report and valuation conclusion for an appraisal that is subject to completion, repairs, or alterations on the assumption that completion of the improvements will be performed in a workmanlike manner.

Produced using ACI software, 800.234.8727 www.aciweb.com

WHEAT000057

ADDENDUM

| | |
|---|---|
| Borrower: Wheatley, Lloyd and Audra | File No.: 8316933791 |
| Property Address: 584 N. Dupont Highway | Case No.: Ln#6995009 |
| City: Dover | State: De. | Zip: 19901 |
| Lender: Wachovia Mortgage Corporation | |

**Neighborhood Boundaries**
N. State Street to the west,E. Division Street to the south,and N. Dupont Highway to the north and east.Neighborhood comprised of mainly mixed styles of detached single family units and commercial properties.Most of the properties fronting N. Dupont Highway appear to be commercial properties.

**Analysis of Current Agreements**
Public records evidenced in mls indicate subject last sold on 3-26-04 but consideration not provided and sold prior to that on 5-29-03 but consideration not provided.Agreement of sale provided to appraiser indicates subject property is currently under contract for $266666.67.County records indicate sale 3 previously sold on 9-1-95 for $146500.It is unknown when sales 1 and 2 sold prior to dates reflected in the sales comparison analysis.

**Summary of Market Data**
The above comparables indicate a value range from $245425 to $298900.All sales have reportedly settled.Sale 1 being a lake front property would be best sale,thus receiving the most weight.All sales are located on roads with lighter traffic volumes and adjusted accordingly under location headings.All sales are superior to subject in terms of condition.All sales have smaller lots than subject and adjusted accordingly.Condition adjustments also reflect the lack of heat in subject property on 2nd floor.Amenities of subject limited comparable sales,thus forcing the use of 2 sales exceeding 6 months of age,2 sales exceeding adjustment guidelines,and 1 sale exceeding 1 mile from the subject.Sales utilized are believed to be the best available as of the effective date.Square footage totals for sales obtained from mls and assumed to be accurate.Comp photos indicated in this report are dated mls(trend)digital photos.An interior inspection was made.It does appear most of the windows have been updated.Some interior paint needed.Landing area 2nd level needs finished floor covering.It does appear some work is needed on wood shake roof but assumed not to have any leakage.Little finished flooring missing in 1 bath 1st level and it does appear some tile work is needed in same bath due to long narrow tile wainscoting crack.Asphalt floor tiles in closet 1st level and mud room appear to need replacing.CTC est to be between $2500 and $3500.NOTE-appraiser is not a contractor.Appears to be in a fair to avg overall state of repair.Rear decking approx 308 SF:Appears to have a dock:Portable stg bldg-no value assigned.Side patio appears to be in a fair state of repair-no value assigned.Small basement approx 10.75x13.5:Rear conc patio approx 11x11.5:FP in LR:Enclosed rear porch approx 20.5x15-few tiles missing and a few drop ceiling panels have stains.Apparent lack of heat on 2nd floor represents functional obsolescence.Subject property fronts N. Dupont Highway which is a heavily travelled road much of the time and in my opinion represents locational obsolescence.Subject property appears to be waterfront on Silver Lake at rear but amount of frontage unknown.Plot plan/survey not provided to appraiser.Assumed not to have any physical deficiencies adversely affecting the structural integrity of the subject property.It does appear some of the piping in bsmt is wrapped with asbestos,however appraiser is not a hazardous waste expert,toxic sustance expert,asbestos expert, or an environmental expert and any additional information regarding possible asbestos in basement should be obtained from certified expert.If it found by a certified expert, the apparent asbestos in basement is deemed an adverse environmental condition, the estimated market value indicated in this report could be adversely affected.For the purposes of this appraisal, it is assumed subject property does not contain any adverse environmental conditions.All systems assumed to operate adequately.Assumed not to have any termite infestation problems or any other type of wood destroying insect infestation problems.Basement assumed not to have any water seepage problems.Basement appeared dry at time of appraisal inspection.Assumed to be free of any leakage.Assumed not to have any special assessments or slide areas.Assumed not to have any adverse easements or encroachments.Plot plan/survey not provided to appraiser.It is assumed all required permits have been obtained prior to any renovating.Subject property appears to conform to the neighborhood in terms of construction materials but appears to be unique to the neighborhood in terms of its style.Subject property appears to be below average in terms of condition to other properties in subject neighborhood.Sellers disclosure not provided to appraiser.

Addendum Page 1 of 1

**WHEAT000058**



Ln#6995009

## Desktop Underwriter Quantitative Analysis Appraisal Report    File No.: 8316933791

**APPRAISER'S CERTIFICATION:** The Appraiser certifies and agrees that:

1. I performed this appraisal by (1) personally inspecting from the street the subject property and neighborhood and each of the comparable sales (unless I have otherwise indicated in this report that I also inspected the interior of the subject property); (2) collecting, confirming, and analyzing data from reliable public and/or private sources; and (3) reporting the results of my inspection and analysis in this summary appraisal report. I further certify that I have adequate information about the physical characteristics of the subject property and the comparable sales to develop this appraisal.

2. I have researched and analyzed the comparable sales and offerings/listings in the subject market area and have reported the comparable sales in this report that are the best available for the subject property. I further certify that adequate comparable market data exists in the general market area to develop a reliable sales comparison analysis for the subject property.

3. I have taken into consideration the factors that have an impact on value in my development of the estimate of market value in the appraisal report. I further certify that I have not any apparent or known adverse conditions in the subject improvements, on the subject site, or on any site within the immediate vicinity of the subject property of which I am aware, have considered these adverse conditions in my analysis of the property value to the extent that I had market evidence to support them, and have commented about the effect of the adverse conditions on the marketability of the subject property. I have not knowingly withheld any significant information from the appraisal report and I believe, to the best of my knowledge, that all statements and information in the appraisal report are true and correct.

4. I stated in the appraisal report only my own personal, unbiased, and professional analysis, opinions, and conclusions, which are subject only to the contingent and limiting conditions specified in this form.

5. I have no present or prospective interest in the property that is the subject of this report, and I have no present or prospective personal interest or bias with respect to the participants in the transaction. I did not base, either partially or completely, my analysis and/or estimate of market value in the appraisal report on the race, color, religion, sex, age, marital status, handicap, familial status, or national origin of either the prospective owners or occupants of the subject property or of the present owners or occupants of the properties in the vicinity of the subject property or on any other basis prohibited by law.

6. I have no present or contemplated future interest in the subject property, and neither my current or future employment nor my compensation for performing this appraisal is contingent on the appraised value of the property.

7. I was not required to report a predetermined value or direction in value that favors the cause of the client or any related party, the amount of the value estimate, the attainment of a specific result, or the occurrence of a subsequent event in order to receive my compensation and/or employment for performing the appraisal. I did not base the appraisal report on a requested minimum valuation, a specific valuation, or the need to approve a specific mortgage loan.

8. I estimated the market value of the real property that is the subject of this report based on the sales comparison approach to value. I further certify that I considered the cost and income approaches to value, but, through mutual agreement with the client, did not develop them, unless I have noted otherwise in this report.

9. I performed this appraisal as a limited appraisal, subject to the Departure Provision of the Uniform Standards of Professional Appraisal Practice that were adopted and promulgated by the Appraisal Standards Board of The Appraisal Foundation and that were in the place as of the effective date of the appraisal (unless I have otherwise indicated in this report that the appraisal is a complete appraisal, in which case, the Departure Provision does not apply).

10. I acknowledge that an estimate of a reasonable time for exposure in the open market is a condition in the definition of market value. The exposure time associated with the estimate of market value for the subject property is consistent with the marketing time noted in the Neighborhood section of this report. The marketing period concluded for the subject property at the estimated market value is also consistent with the marketing time noted in the Neighborhood section.

11. I personally prepared all conclusions and opinions about the real estate that were set forth in the appraisal report. I further certify that no one provided significant professional assistance to me in the development of this appraisal.

**SUPERVISORY APPRAISER'S CERTIFICATION:** If a supervisory appraiser signed the appraisal report, he or she certified and agrees that: I directly supervise the appraiser who prepared the appraisal report, have examined the appraisal report for compliance with the Uniform Standards of Professional Appraisal Practice, agree with the statements and conclusions of the appraiser, agree to be bound by the appraiser's certifications numbered 5 through 7 above, and am taking full responsibility for the appraisal and the appraisal report.

| APPRAISER: | SUPERVISORY APPRAISER (ONLY IF REQUIRED): |
|---|---|
| Signature: _David A. Kent_ | Signature: _____ |
| Name: Daniel A Gladden | Name: _____ |
| Company Name: D.A. Gladden RE&Appraisal Assoc Inc. | Company Name: _____ |
| Company Address: 1469 S Governors Ave,Dover, De.19904 | Company Address: _____ |
| Date of Report/Signature: 7/12/2004 | Date of Report/Signature: _____ |
| State Certification #: X2-0000032 | State Certification #: _____ |
| or State License #: ___ | or State License #: _____ |
| State: De. | State: _____ |
| Expiration Date of Certification or License: 10-31-05 | Expiration Date of Certification or License: _____ |

**ADDRESS OF PROPERTY APPRAISED:**
584 N. Dupont Highway
Dover, De. 19901

APPRAISED VALUE OF THE SUBJECT PROPERTY $ 267,000
EFFECTIVE DATE OF APPRAISAL/INSPECTION 7/7/2004

**LENDER/CLIENT:**
Name: _____
Company Name: Wachovia Mortgage Corporation
Company Address: 1 Jefferson Square Waterbury,Ct.06706

**SUPERVISORY APPRAISER:**
SUBJECT PROPERTY
☐ Did not inspect subject property
☐ Did inspect exterior of subject property from street
☐ Did inspect interior and exterior of subject property
COMPARABLE SALES
☐ Did not inspect exterior of comparable sales from street
☐ Did inspect exterior of comparable sales from street

Produced using ACI software, 800.234.8727 www.aciweb.com
D.A. Gladden R.E. and Appraisal

Fannie Mae Form 2055 9-96

10CH.

WHEAT000059

## DIMENSION LIST ADDENDUM

| | |
|---|---|
| Borrower: Wheatley, Lloyd and Audria | File No.: 8316933791 |
| Property Address: 584 N. Dupont Highway | Case No.: Ln#6995009 |
| City: Dover | State: De.    Zip: 19901 |
| Lender: Wachovia Mortgage Corporation | |

| GROSS BUILDING AREA (GBA) | 3,100 |
| GROSS LIVING AREA (GLA) | 3,100 |

| Area(s) | Area | % of GBA |
|---|---|---|
| Living | 3,100 | 100.00 |
| Level 1 | 2,058 | 66.39 |
| Level 2 | 1,042 | 33.61 |
| Level 3 | | |
| Other | | |
| Basement | | |
| Garage | | |

### Area Measurements / Area Type

| Measurements | Factor | Total | Level 1 | Level 2 | Level 3 | Other | Bsmt. | Garage |
|---|---|---|---|---|---|---|---|---|
| 18.00 x 34.00 | x 1 | 612.00 | X | | | | | |
| 11.50 x 31.50 | x 1 | 362.25 | X | | | | | |
| 1.50 x 27.50 | x 1 | 41.25 | X | | | | | |
| 22.50 x 36.00 | x 1 | 810.00 | X | | | | | |
| 9.00 x 14.50 | x 1 | 130.50 | X | | | | | |
| 6.00 x 17.00 | x 1 | 102.00 | X | | | | | |
| 6.00 x 13.50 | x 1 | 81.00 | | X | | | | |
| 20.00 x 46.00 | x 1 | 920.00 | | X | | | | |
| 1.00 x 4.50 | x 1 | 4.50 | | X | | | | |
| 4.50 x 8.00 | x 1 | 36.00 | | X | | | | |

This form was produced by the ACI Development RapidForms system (800) 234-8727

WHEAT000060

SUBJECT PROPERTY PHOTO ADDENDUM

| | |
|---|---|
| Borrower: Wheatley, Lloyd and Audria | File No.: 8316933791 |
| Property Address: 584 N. Dupont Highway | Case No.: Ln#6995009 |
| City: Dover | State: De.    Zip: 19901 |
| Lender: Wachovia Mortgage Corporation | |



**FRONT VIEW OF
SUBJECT PROPERTY**

Appraised Date: July 7, 2004
Appraised Value: $ 267,000



**REAR VIEW OF
SUBJECT PROPERTY**



**STREET SCENE**

**WHEAT000061**

COMPARABLE PROPERTY PHOTO ADDENDUM

| | |
|---|---|
| Borrower: Wheatley, Lloyd and Audria | File No.: 8316933791 |
| Property Address: 584 N. Dupont Highway | Case No.: Ln#6995009 |
| City: Dover | State: De. Zip: 19901 |
| Lender: Wachovia Mortgage Corporation | |



**COMPARABLE SALE #1**

10 Manor Dr.
Dover, De.
Sale Date: 9-26-03
Sale Price: $ 275,000



**COMPARABLE SALE #2**

530 American Ave.
Dover, De.
Sale Date: 8-15-03
Sale Price: $ 242,500



**COMPARABLE SALE #3**

215 American Ave.
Dover, De.
Sale Date: 4-16-04
Sale Price: $ 303,000

**WHEAT000062**

**LOCATION MAP**

| Borrower: Wheatley, Lloyd and Audria | | File No.: 8316933791 | |
|---|---|---|---|
| Property Address: 584 N. Dupont Highway | | Case No.: Ln#6995009 | |
| City: Dover | State: De. | | Zip: 19901 |
| Lender: Wachovia Mortgage Corporation | | | |



WHEAT000063

| Borrower: Wheatley, Lloyd and Audria | File No.: 8316933791 | |
| Property Address: 584 N. Dupont Highway | Case No.: Ln#6995009 | |
| City: Dover | State: De. | Zip: 19901 |
| Lender: Wachovia Mortgage Corporation | | |



SKETCH ADDENDUM

WHEAT000064

# EXHIBIT G

## N(_)ICE OF ACTION TAK(_)

6995009
WHEATLEY

To:    **LLOYD J WHEATLEY and AUDRIA L WHEATLEY**          Date __July__      __22__  __2004__

138 KING HENRY COURT                                    Action Taken Date ___07/22/04___
DOVER, DE 19904

Dear    **LLOYD J WHEATLEY and AUDRIA L WHEATLEY**

Based upon your Mortgage Application for a Loan in the Amount of $___240,000.00___ for _360_ years/months, we must inform you that:

☐ **Notice of Incomplete Application**
We are unable to make a decision on your Application because it is missing the following information:
_____
_____
Please furnish this information to us on or before _____ at the address listed below or we will be unable to give your Application further consideration.

☐ **Notice of Withdrawn Application or Application Approved but not Accepted**
This Notice confirms your recent decision to withdraw your application for a mortgage loan. We would be happy to assist you in the future with any mortgage financing needs.

☐ **Notice of Counteroffer**
We are unable to offer you credit on the terms that you requested, but can offer you credit on the following terms:
_____
If this offer is acceptable to you, please notify us on or before _____ at the address listed below.
Our principal reasons for denying your original request are indicated below.
Applicants for loans secured by New Jersey property only: If you locked with a float down option, contact our office to advise if you would like the float down fee applied at closing or refunded.

☐ **Notice of Credit Denial.** We are unable to approve your application. Our principal reasons are indicated below:

| | |
|---|---|
| ☐ No credit file. | ☐ Unable to grant credit under the terms requested. |
| ☐ Insufficient credit references | ☐ Income insufficient for amount of credit requested, |
| ☐ Limited credit experience. | ☐ Unable to verify income. |
| ☐ Unable to verify credit references. | ☐ Temporary residence. |
| ☐ Garnishment, attachment, foreclosure, repossession | ☐ Length of residence. |
|    collection action or judgement. | ☐ Unable to verify residence. |
| ☐ Excessive obligations in relation to income. | ☐ Application denied by: |
| ☐ Unacceptable payment record on previous mortgage/rent. |    ☐ FHA     ☐ VA |
| ☐ Lack of cash reserves. |    ☐ Private Mortgage   ☐ Private |
| ☐ Delinquent past/present credit obligations with others. |      Insurance Company   Investor |
| ☐ Bankruptcy. | ☐ Insufficient liquid assets to close the loan. |
| ☐ Unacceptable type of credit references provided. | ☒ Value or type of collateral not sufficient. |
| ☐ Poor credit performance with us. | ☐ Unacceptable property. |
| ☐ Unable to verify employment. | ☐ Unacceptable appraisal. |
| ☐ Length of employment. | ☐ Other, Specify: _____ |
| ☐ Temporary or irregular employment. | _____ |
| ☐ No tangible net benefit to applicant(s). | _____ |

**DISCLOSURE OF USE OF INFORMATION OBTAINED FROM AN OUTSIDE SOURCE IF USED IN MAKING CREDIT DECISION.**

☐ Our credit decision was based in whole or in part on information that was received from an outside source other than a consumer reporting agency. Under the Fair Credit Reporting Act, you have the right to make a written request no later than 60 days after you receive this notice, for disclosure of the nature of this information.

☐ In evaluating your application, a consumer credit reporting agency provided us with information that in whole or part influenced our decision. The credit reporting agency played no part in our decision other than to provide us with the credit information about you, and is unable to provide you with specific reasons for our decision. If you have any questions regarding your credit report, please contact the agency directly at the address shown below:
Name of agency that provided report _____ Address _____
Toll free telephone number _____

Under the Fair Credit Reporting Act, you are entitled to receive a free copy of your credit report from the agency that provided us with the credit information about you, provided that you make written request of the credit reporting agency within 60 days of your receipt of this notice. You may also dispute with the consumer reporting agency the accuracy or completeness of any information contained in your consumer report furnished by that agency.

**CALIFORNIA ONLY:** You have the right to obtain within 60 days a free copy of the credit report from the consumer credit reporting agency identified above and from any other consumer credit reporting agency which compiles and maintains files on consumers on a nationwide basis. You also have the right under California Civil Code Section 1785.16 to dispute the accuracy or completeness of any information in a consumer credit report furnished by the consumer credit reporting agency.

**VA Loan -** If this was an application for assumption of a VA-guaranteed loan, you may appeal the decision to the Department of Veterans Affairs office of jurisdiction within 30 days of the date of this notice.

If you have any questions about this notice, or if you believe that we did not possess information that would affect the basis for the action taken, that the credit reporting agency is in error, or if you wish to further explain your credit history, please contact the (representative/ branch manager/reviewer) listed below:

Name of creditor: Wachovia                  Address: **1 JEFFERSON SQUARE**
By:    **MARIA BELO**                                **WATERBURY, CT 06706**
Telephone: __866-203-4733__       __866-203-4733__

NOTICE
The Federal Equal Credit Opportunity Act and comparable provisions of Massachusetts law, if applicable, prohibits creditors from discriminating against credit applicants on the basis of race, color, religion, national origin, sex, marital-status, age (provided that the applicant has the capacity to enter into a binding contract); because all or part of the applicant's income derives from any public assistance program; or because the applicant has in good faith exercised any right under the Consumer Credit Protection Act. The Federal Agency that administers compliance with this law concerning this creditor is the Comptroller of the Currency, Customer Assistance Group, 1301 McKinney Street, Suite 3450, Houston, Texas 77010-9050. The state agency that administers compliance with the Massachusetts state law is the Massachusetts Commission Against Discrimination, One Ashburton Plaza, Boston, Massachusetts 02108.

**WHEAT000299**

# EXHIBIT H

6995009
WHEATLEY

AIR LENDING ANALYSIS TOOL

Applicant Name __LLOYD J WHEATLEY and AUDRIA L WHEATLEY__                    Loan # __6995009__
Loan Officer/AE/MLC __JAMES HOGSTEN__          Origination RC __0805983__     Loan Amt. $ __240,000.00__
Product __FNSI30FEX/ 30Yr Fixed Conform Stated Inc__     Broker (if applicable) _____

*The purpose of this Fair Lending Analysis Tool is to ensure that all applicants are offered equal opportunity to provide additional information or explanation regarding their application, to lead the preparer in considering all alternatives and compensating factors to arrive at an appropriate outcome, and to fully document the file regarding compensating factors and reasons for deviations/exceptions to Wachovia Mortgage Corporation's underwriting standard.*

### ***Mark ALL reasons for denial/exception/approved deviation to policy***

☐ **CREDIT**

☐ 1. **Credit History** – Poor credit history, excessive inquiries, maxed out credit. Fully document credit explanation(s) in the loan file.
Credit Report:  Number of Delinquencies: _____30 days _____60 days _____90 days _____Unpaid Collections _____Outstanding Judgments
Bankruptcy: _____Year filed _____Year released   Foreclosure: ___/___/___ (date)
Delinquent Mortgage/Rental payments – Fully document slow mortgage payment history in the loan file.
Previous 12-month history: _____30 days _____60 days _____90 days _____Current past due amount
Previous 24-month history: _____30 days _____60 days _____90 days
Overall housing payment history: _____Acceptable _____Unacceptable
FICO Loan Score _____ Product minimum FICO score _____(if applicable)
Brief Explanation for poor credit _____
_____
_____
_____
Were derogatory credit circumstances beyond the applicant's control or due to unforeseen circumstances? _____Yes _____No    _____Acceptable _____Unacceptable

☐ 2. **Lack of Credit History** – Consider and document non-traditional types of credit, e.g. rent, utility, telephone, cable TV, day care, recorded cash payments, etc. as alternative credit history. _____Acceptable _____Unacceptable (Reason: _____)

☐ 3. **Qualifying Ratios Exceed Guidelines** - HTI_____ DTI_____ Product Guideline: HTI_____ DTI_____
Can debts be consolidated or paid off to reduce monthly payments? _____Yes _____No
Are assets available to pay off debt to reduce monthly payments? _____Yes _____No
Is there additional income not used to qualify the borrower? _____Yes _____No  Source: _____

☐ 4. **Lack of Funds to Close** – Ask about other assets, loans or gifts. _____Available (Source _____) _____Unavailable
Reserves waived? _____Yes _____No

☐ 5. **Income/Employment** – Document explanation for gaps in income stream. Reason: _____
Other income/employment issues _____    _____Acceptable _____Unacceptable
_____    _____Acceptable _____Unacceptable

☐ 6. **Lack of sufficient verification(s).** Verification could not be obtained for: _____Income _____Assets _____Other (describe: _____)
Times attempted and methods of attempts: _____

Other Credit Issues (Explain): _____
_____
_____

☐ **PRODUCT**

☐ 8. **LTV/CLTV/HCLTV exceeds product limits.** _____LTV _____CLTV _____HCLTV
_____Product LTV _____Product CLTV _____Product HCLTV
Was borrower offered another product to solve LTV/CLTV/HCLTV problem? _____Yes _____No
If the borrower did not accept another product, give reasons why: _____

☐ 9. **MI waived** – Reason: _____

☐ 10. **Number of financed properties per borrower exceeds maximum.** _____Number of properties/loans _____Number per Product Guideline

☐ 11. **Unacceptable cash out.** _____Cash out exceeds product maximum _____Amount of Cash Out _____Product Limit
_____Cash out not allowed on occupancy type _____Cash out not allowed on product _____Cash out not allowed per LTV _____Cash out max. LTV

☐ 12. **Other Product Issues (Explain)** _____

☒ **COLLATERAL**

☒ 13. **Property Issues** - _____Unacceptable property type: _____ _____Condo/PUD approval waived
_____Unacceptable property condition: _____ Can property condition be corrected? _____Yes _____No
Is a rehab product available? _____Yes _____No

☒ 14. **Appraisal Issues (Explain):** Pier in Tear (w-c) no heat on second level ✓
Restrict in stral

Possible Solutions: _____Additional Comparable(s) _____Second Appraisal _____AVM _____Discuss with appraiser; explain results: _____

Field review appraisal waived? _____Yes

☐ 15. **Other Collateral Issues (Explain):** _____
_____

☐ **AUS INFORMATION**

☐ 16. **AUS Recommendation:** _____Refer/Eligible _____Refer Ineligible _____EAI _____EAII _____EAIII _____RWC4 _____RWC
_____Out of Scope _____Caution _____Refer _____LP A- Offering _____Not eligible for LP submission

☐ **FEE/PRICE VARIANCE (Attach Fee/Price Variance Form)**
_____Marketable Loan _____Fee Variance _____Price Variance  Explanation: _____
_____Portfolio Loan (Wealth products only) _____Fee Variance _____Price Variance  Explanation: _____

FO

'4170  rev 08  (01/03)  [41701]                    Page 1 of 2

**WHEAT000312**

**COMPENSATING FACTORS --** Check appropriate boxes below to indicate the applicable compensating factor(s) taken into consideration for an approval or the compensating factor(s) which were considered prior to declination. Use the "Other" section to list additional compensating factors.

☐ 1. Significant equity in subject property. _____ LTV _____ Product LTV

☐ 2. Excellent credit history: _____ FICO loan score _____ Product minimum FICO score _____ Number of tradelines with no delinquent payments

☐ 3. Significant cash savings/reserves: $_____ Liquid or liquidable assets $_____ Liquid or liquidable reserves

☐ 4. Demonstrated ability to save (Explain): _____

☐ 5. Income stability. Has applicant maintained or increased his/her income level through steady employment? ___ Yes _____ Number of years in profession
Additional information regarding employment: _____

☐ 6. Potential/expected higher earnings (Explain and quantify): _____

☐ 7. Net Worth indicates ability to repay: $_____ Net Worth $_____ Loan Amount

☐ 8. Energy Efficient property (Explain): _____

☐ 9. Proven ability to carry high debt structure while maintaining an excellent credit history (Explain/Quantify): _____

☐ 10. Payment on proposed mortgage compared to previous mortgage/rent payment. $_____ Proposed $_____ Previous
Explain, compare or contrast: _____
☐ 11. Additional income which was not used to qualify (even if not stable): _____ Short term employment (even if not stable) _____ Commission/overtime
_____ Second job/part time _____ Social Security, retirement, VA benefits _____ Alimony/child support _____ Unearned income (dividends, interest, annuities)
_____ Welfare payments, unemployment _____ Trailing co-borrower income _____ Other income (explain): _____
$_____ Verified Amount $_____ Unverified Amount. Note: All non-taxable income should be grossed up.

☐ 12. Low Qualifying Ratios or High Residual Income: _____ HTI Ratio _____ DTI Ratio _____ Guideline HTI Ratio _____ Guideline DTI Ratio
$_____ Residual Income

☐ 13. AUS Recommendation: _____ Approve/Eligible _____ Approve/Ineligible _____ Accept _____ Accept Plus

☐ 14. Significant Wachovia Relationship (Explain): _____

☐ 15. Other (Explain/Quantify): _____

**COUNSELING:** *Fully document all advice/counseling given, all efforts to attempt to qualify borrower, counteroffers made, other products considered, additional documentation requested.*

Counter Offer: _____ None _____ Results _____ Date _____
Counter Offer: _____ Results _____ Date _____
_____
_____
_____
_____
_____

**LOAN DECISION:** ☑ Denied    ☐ Approved with deviation to policy which does not affect marketability
Underwriter Name: **COLLEEN FAZZINO (PMI)**    Employee Number **A228717**
Underwriter Signature: _____    Date **07/22/04**

**SECOND REVIEW (Required on all denied loans; FLAT must be fully documented):** ☑ Denied ☐ Approved
**Applicant was given the opportunity of providing additional information: ✓ Yes _____ No   If no, explain: _____
**Compensating factors were considered: ✓ Yes _____ No   If no, explain: _____
Second Reviewer Name: Lennon    Employee Number A229820
Second Reviewer Signature: _____    Date 7.22.04

**LOANS RECOMMENDED FOR EXCEPTION:** Concur with denial? ☐ Yes ☐ No   Recommend for exception? ☐ Yes ☐ No
Investor Relations Analyst Name: _____
Investor Relations Analyst Signature: _____    Employee Number _____    Date _____

**EXCEPTION APPROVAL** --I have considered the loan characteristics and authorize that the loan be approved and held in the portfolio of Wachovia
National Bank. I have also considered this loan decision in the context of Fair Lending laws and have fully documented the compensating factors or reasons for the
accommodation which would make it unlikely that there exists an applicant similarly situated (financially) who would be denied.

Wachovia Banking Relationships: ☐ No ☐ Yes   Number of years _____ Deposits: $_____ Credit: $_____
Additional compensating factors or reasons for accommodation/approval (if any): _____
_____
_____
_____

Authorization:
Exception Officer Name: _____
Exception Officer Signature: _____    Employee Number _____    Date _____
Exception Sign Off Authority: $_____
Delegated Exception Sign Off Authority $_____    Delegated From: _____    Date: _____

244170  rev 08  (01/03)  [41702]                    Page 2 of 2

# EXHIBIT I

32 Velvet Circle
Dover Delaware 19904

# THOMAS HOME REPAIR

August 10, 2004

Mr. Lloyd Wheatly
584 North Dupont Highway 19901

Dear Mr. Wheatly

After careful inspection of your property, I find that there's no sign of damage to your roof nor is there any evidence inside indicating that there is or have been a leak anywhere. It is my best opinion that the roof won't need any type of repair done to it for at least a couple of years or more.

Sincerely,

*Mr. Ven C. Thomas*

Mr. Ven C. Thomas Sr.
Owner
License No. 1998205185

*HONESTY • INTEGRITY • QUALITY*

| APPRAISER: | | | SUPERVISORY APPRAISER / INSPECTOR (ONLY IF REQUIRED): | | |
|---|---|---|---|---|---|
| Signature *David A. Kloss* | | | Signature | | ☐ Did  ☐ Did Not |
| Name Daniel A. Gladden | | | Name | | Inspect Property |
| Date Report Signed 08/04/2004 | | | Date Report Signed | | |
| State Certification # X2-0000032 | | State De. | State Certification # | | State |
| Or State License # | | State | Or State License # | | State |

FHLMC 442 Rev. 6/78

D.A. Gladden R.E. and Appraisal

WHEAT000053

# EXHIBIT J

Comfort Provider of Delaware

04, Aug 3

To Whom it may concern ,

This letter is in regards to the inspection of the basement insulation at the residence of 584 N. Dupn at Hwy Dover DE 19901.

The pipe insulation in the basement area was encapsulated at time of inspection.

Thank you.

Lauren Leto
cc: Mark Sabenn

P.O. Box 267 • Hcrtly, Delaware 19953 • phone: 302.492.1335 • fax: 302.492.8367
e-mail: staff@airdoctorx.com • web site: www.airdoctorx.com

*"Prescription without diagnosis is malpractice"*

WHEAT000066

# EXHIBIT K

Page 143

```
 1              - - - - - - -

 2              E R R A T A

 3              - - - - - - -

 4    PAGE      LINE              CHANGE

 5    _07_      _13_    "AND" the SELLER

 6    _26_      _21_    The DATE "ON" the PAPERWORK.

 7    _27_      _03_    With to "to"

 8    _32_      _21_    OF THE "SALE"

 9    _42_      _04_    HAS to "WAS"

10    _48_      _24_    SEE to "SAY"

11    _49_      _11_    Add word "IS" From Friends

12    _52_      _12_    Yes to "NO"

13    _55_      _16_    There was to "They were"

14    _66_      _21_    "YES" to "NO"

15    _61_      _05_    "NO" to "YES"

16    _69_      _22_    THERE'S to "THE"

17    _72_      _9_     It to "we"  NO to "KNOW"

18    _75_      _16_    INSERT: "EXISTING BUSINESS"

19    _94_      _6_     "NO. A PORTION OF IT."

20    _94_      _9_     NO to "Yes"

21    _94_      _13_    No to "Yes"

22    _107_     _20_    DONE to "OFF"

23    _ _ _     _ _ _   - - - - - - - - - - -

24    _ _ _     _ _ _   - - - - - - - - - - -
```

Page 144

1          ACKNOWLEDGEMENT OF DEPONENT

2             I, LLOYD J. WHEATLEY, do hereby

3     certify that I have read the foregoing pages

4     1 to 144 and that the same is a correct

5     transcription of the answers given by me to

6     the questions therein propounded, except for

7     the corrections or changes in form or

8     substance, if any, noted on the attached

9     Errata Sheet.

10    _11/28/07_   _____

11    DATE                    SIGNATURE

12

13    Subscribed and sworn to before me this

14    _28th_ day of _November_ , 200_7_.

15

16    My commission expires: _April 13, 2009_ _ _

17

18

19

20    _____

21    Notary Public

22

23

24