# IN THE UNITED STATES DISTRICT COURT

# FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| TOLANO ANDERSON, et al., | ) | |
| | ) | |
| Plaintiffs, | ) | C. A. No. 06 CV 00567 (SLR) |
| | ) | |
| v. | ) | |
| | ) | |
| WACHOVIA MORTGAGE CORPORATION | ) | |
| and WACHOVIA CORPORATION, | ) | |
| | ) | |
| Defendants. | ) | |

## <u>MEMORANDUM IN OPPOSITION TO DEFENDANTS'</u>
## <u>MOTION TO STRIKE PORTIONS OF THE ERRATA SHEET</u>

GRADY & HAMPTON, LLC

John S. Grady (I.D. 009)
6 North Bradford St.
Dover, DE 19904
(302) 678-1265
*Attorneys for Plaintiffs*

DATED:    December 13, 2007

TABLE OF CONTENTS

INTRODUCTION ........................................................................................................... 1

STATEMENT OF FACTS .............................................................................................. 2

ARGUMENT.................................................................................................................... 5

I.     RULE 30(e) ALLOWS A DEPONENT TO MAKE CORRECTIONS TO HIS TRANSCRIPT INCLUDE SUBSTANTIVE CHANGES. ..................................... 5

CONCLUSION.................................................................................................................. 7

TABLE OF AUTHORITIES

## <u>Cases</u>

*Donald M. Durkin Contracting Company v. City of Newark*,

2006 WL 2724882 (D. Del.) ............................................................................. 5

*Innovative Marketing and Technology, LLC, v. Norm Thompson Outfitters, Inc.*,

171 F.R.D. 203 (W. D. Tex. 1997) .................................................................... 5

*Thorn v. Sundstrand Aero Corp.*, 207 F.3d 383 (7th Cir. 2000).......................................... 5

INTRODUCTION

Defendants' motion is entitled "Motion to Strike Portions of the Errata Sheet." Throughout the brief, which has been filed by Defendants in support of that motion, there are comments and arguments addressing the general viability of the case. Plaintiffs are compelled to respond to those allegations, even though they are not a subject matter of this motion. Plaintiffs object to Defendants incorporating arguments intended to argue the merits of their case under the guise of a motion to strike portions of the errata sheet.

For example, Defendants argue that the community of Silver Lake where Plaintiffs are purchasing the African-American residents are significantly above the national average of 12.8%. The admissibility and reliability of the Delaware census data, which Defendants have produced, is not an issue in this motion. The Plaintiffs will, at a proper time and place, respond to the Defendants' concerns. Plaintiffs have reviewed the Delaware Census Data map which the Defendants have produced. The map, as interpreted by Defendants, will be challenged as not an accurate representation of the racial make up in this case. For example, the map suggests, and Defendants argue, that an area of green proceeding around Silver Lake to the area where Plaintiffs reside is a black neighborhood. In fact, if one proceeds north crossing Silver Lake the area shown as green is basically commercial. Plaintiffs allege that virtually all the residential houses which actually back up on Silver Lake were owned by whites.

STATEMENT OF FACTS

Defendants in its brief suggest at pages 3 and 4 that the loan for which Wheatley applied (a purchase money mortgage) was one that lenders generally sell to Fannie Mae. A purchase money mortgage is a term of art, which for those who are involved with real estate know is a mortgage held by the seller. This was clearly not a purchase money mortgage. Furthermore, as the deposition of Colleen Fazzino, the underwriter, clearly indicates (and as Wheatley states), there were two applications. The first application by Wheatley was processed as a 10% down mortgage. That kind of mortgage would normally be sold to a national association like Fannie Mae. That mortgage was turned down by the underwriter on July 17, 2004. (Fazzino, p. 29, Exh. 20)

Wheatley then applied for a second loan. The Defendants, in its brief at pages 3 and 4 and exhibit 6, refer to the application for the first loan, suggesting that the conditions of the first loan were the same conditions as the second loan.

On or about July 27, Wheatley applied for a second line loan. (Fazzino, p. 46-47) The underwriter eventually approved this second loan, which required 20% down. This second loan application, however, was not dependant upon the condition of the home. There were three exceptions to the normal loan process. (Fazzino, p. 108-109, Exh. 17 at 2, 21 and 27) There was an exception to the appraisal, the cancelled check and the assets. In fact, the underwriter testified that she did not even know if the property had been repaired. (Fazzino, p. 53) The underwriter stated at her deposition that the loan would have been approved notwithstanding any concerns about the roof, asbestos or even the second floor issue and whether or not there was heating. (Fazzino, p. 123-125) This loan, the underwriter states, would not be sold to Fannie Mae. (Fazzino, p. 124)

Defendants have, in their statement of facts, failed to differentiate between the issues of the first loan and the second loan and the exceptions which were ultimately incorporated into their loan. They have suggested in their brief that the concern for repairs was because the loan had to be sold to Fannie Mae. The loan that was ultimately approved was not sold to Fannie Mae. Because the loan was done as an exception, the borrower was not required to satisfy "any more property condition or employment or asset condition." (Fazzino, p. 121) (Admittedly, Ms. Fazzino's testimony on these issues may appear to be slightly different when examined by her counsel – Fazzino, pp. 110-113. Her answers on direct are not always consistent with her answers on cross-examination.)

It is unclear from Wheatley's deposition if Wheatley himself was familiar with all of the nuisances of the loan application process.

At his deposition, he was asked some general questions about whether it was relevant that the property be improved. At page 60 of his deposition, Wheatley was asked whether it would make sense for the lender to want to ensure that the collateral for the loan is in livable condition and his answer was yes. (Wheatley, p. 60, lines 17 through 21) On his errata sheet, he changed that answer to no. On pages 60-61, Wheatley was also asked if it was reasonable to have a letter from a contractor that the roof did not leak. He said it was not unreasonable.

It is noteworthy that in his deposition, he modified that very answer. The following transcription took place at the same deposition:

> Q.     Alright. Alright. Now I guess going back to this roof thing at one point in time, there was a question by counsel whether it was reasonable or unreasonable for somebody to ask about the roof being repaired. Do you recall that?

3

A.     Yes.

Q.     I think you indicated, well it was okay to ask about the roof being repaired.

A.     Yes.

Q.     The way it was actually done and in light of the fact of the condition of the roof, did you have any problem with that whole process as the way it turned out in your case?

A.     Yes.

Q.     What was your problem with that?

A.     Again the property appraised for its value and the fact that we told J.D. that we planned on repairing and fixing up the entire house later on as time and money would permit for the duration of however long we wanted to live and be there, I didn't see the – you know what was the immediate reason to require all of this extensive repair when the house was appraised at the value of the loan?

Wheatley deposition pages 126 and 127 through line 21.  The appraisal referred to was dated July 7, 2004.  (WHEAT0054)  The requests for repairs were generally <u>after</u> the approval – some on the very day of the first scheduled settlement.

Wheatley did submit an errata sheet changing his answer at 60 line 5 from yes to no and page 61 line 5 from no to yes.  The obvious intent was that those responses standing alone were not accurate.  The errata sheet of the out-of-state court reporter provided for a <u>change</u>, but did not provide for the <u>reason</u> for the change.  It is interesting that the Delaware court reporter errata sheet does provide for <u>reasons</u> for the change. (See attached Exh. 4)  Wheatley did not provide any reasons for the change – undoubtedly because there was no line on the errata sheet for the reasons for the change.

## ARGUMENT

**I.    RULE 30(e) ALLOWS A DEPONENT TO MAKE CORRECTIONS TO HIS TRANSCRIPT INCLUDE SUBSTANTIVE CHANGES.**

Rule 30(e) provides as follows:

Review by Witness: Changes. Signing. If requested by the deponent or a party before completion of a deposition, the deponent shall have 30 days after being notified by the officer that the transcript or recording is available in which to review the transcript or recording and, if there are any changes in form or substance, to sign a statement reciting such changes and the reasons given by the deponent for making them…

Wheatley has made changes to the deposition. Arguably, he should have provided an explanation. An explanation probably would have been something to the effect that "See pages 125 and 126 of my deposition for a more complete response."

The commentary found in Moore's Federal Rules (2006) Section 30.7 states:

Because Rule 30(e) especially permits changes to deposition testimony as to "form or substance", the deponent is entitled to make any change in the testimony, even if the change completely contradicts the earlier statement. See 7 Moore's Federal Practice §30.60(3) Matthew Bender, 3rd ed. See *Innovative Marketing and Technology, LLC, v. Norm Thompson Outfitters, Inc.*, 171 F.R.D. 203, 205 (W. D. Tex. 1997).

The commentator's note that other courts have said that there should be some restrictions on that, citing *Thorn v. Sundstrand Aero Corp.*, 207 F.3d 383, 389 (7th Cir. 2000).

Defendants cite the case of *Donald M. Durkin Contracting Company v. City of Newark*, 2006 WL 2724882 (D. Del.), where the court held that the change in the errata sheet by the witness was improper and constituted an intent to create a sham issue of fact.

In this case, Wheatley, in making his modifications, was not attempting to create a sham issue of fact. In fact, Wheatley, in his same deposition, had already attempted to clarify what he meant previously. Wheatley would request the opportunity to modify his

5

changes which he had made by adding the language "see for a full explanation pages 126 and 127 of my deposition."

Wheatley had already attempted in his deposition to modify his answer. (Unfortunately, there was no space provided on the errata sheet for <u>reasons</u> for the change.)  The uncorrected answer stated above does not conform to Wheatley's deposition or the Complaint.  The deposition questions at issue do not refer to the timing or the reasonableness of the repair for the first versus the second loan application.

CONCLUSION

For the reasons stated herein, Plaintiffs respectfully request that the Court deny Defendants' motion and in the alternative permit Wheatley to modify his answers to lines 14 and 15 of the errata sheet and to add "see for a full explanation pages 126 and 127 of the deposition."

GRADY & HAMPTON, LLC

_____/S/____John S. Grady_____
John S. Grady (I.D. #009)
6 North Bradford St.
Dover, DE 19904
(302) 678-1265
*Attorneys for Plaintiffs*

DATED:        December 13, 2007

1                    IN THE UNITED STATES DISTRICT COURT
                        FOR THE DISTRICT OF DELAWARE

2

3

_____

4   TOLAND ANDERSON, et al.,        )
          Plaintiffs,               )
5                                   )
              vs.                   )
6                                   ) C.A. No. 06 CV 00567 (SLR)
   WACHOVIA MORTGAGE CORPORATION    )
7   and WACHOVIA CORPORATION,       )
          Defendants.               )
8   _____)

9

10

11

12

13

          DEPOSITION OF:       COLLEEN FAZZINO
14
          DATE:                DECEMBER 6, 2007
15
          HELD AT:             WACHOVIA MORTGAGE CORPORATION
16                             ONE JEFFERSON SQUARE
                               WATERBURY, CT
17

18

19

20

21

               BRANDON SMITH REPORTING SERVICE, LLC
22        44 Capitol Avenue              Six Landmark Square
          Hartford, CT 06106             4th Floor
23        (860) 549-1850                 Stamford, CT  06901
          (800) 852-4589                 (800) 852-4589
24

25          Reporter:  Tiffany V. Pratt, LSR #00128

```
 1
 2      APPEARANCES:
 3
        REPRESENTING THE PLAINTIFFS (Via Phone):
 4
            Grady & Hampton, LLC
 5          6 North Bradford Street
            Dover, DE  19904
 6          (302) 678-1265
            By:  John S. Grady, Esq.
 7
        REPRESENTING THE DEFENDANTS:
 8
            Schnader, Harrison, Segal & Lewis, LLP
 9          1600 Market Street, Suite 3600
            Philadelphia, PA  19103-7213
10          (215) 751-2581
            By:  Stephen A. Fogdall, Esq.
11
        ALSO PRESENT:
12
            Mr. Tolano Anderson (Via Phone)
13
14
15
16
17
18
19
20
21
22
23
24
25
```

```
1                        INDEX
2  WITNESS:                                  PAGE:
3  COLLEEN FAZZINO
4
        Direct Examination by Mr. Grady          5
5       Cross-Examination by Mr. Fogdall        75
        Redirect Examination by Mr. Grady      113
6
7  _____
8                  FAZZINO EXHIBITS
                 (for identification)
9
10 EXHIBIT:                                   PAGE:
11      1      Retail Loan Approval, Anderson      79
12      2      Appraisal, Anderson                 79
13      3      Mortgage Loan Committment, Anderson 79
14      4      Copy of down payment Check Number 994  80
15      5      Uniform Residential Loan Application,
               WHEAT000319-326                     84
16
        6      Credit report, WHEAT000348-368      84
17
        7      Notice of Action Taken, WHEAT000308 87
18
        8      Fair Lending Analysis; WHEAT000314-315  87
19
        9      Retail Loan Approval; Fair Lending
20             Analysis Tool, WHEAT000296-297      87
21      10     Notice of Action Taken dated 7/22/04,
               WHEAT000299                         95
22
        11     Underwriting Guidelines:  Conforming.
23             WACH000001-19                       95
24      12     Appraisal, WHEAT000331-342          95
25  (Index continued)
```

```
 1   EXHIBIT:                                               PAGE:

 2     13      Uniform Residential Loan Application

               WHEAT000170-177                               101

 3

       14      Underwriting Guidelines: Product-Specific      101

 4

       15      Handwritten notes, WHEAT000230                104

 5

       16      Internal document documenting reason for

 6             exception, WHEAT000150                        107

 7     17      Retail Loan Approval, Wheatley, loan

               number ending 0176                           109

 8

       18      Letter dated 8/3/04 from Air Doctor X,

 9             WHEAT000066                                   113

10     19      Letter dated 8/10/04 from Thomas Home

               Repair, WHEAT000053                           113

11

12

13

14

15

16

17     _____

18     (Reporter's Note:  All exhibits for identification were

       retained by the Court Reporter, copied and distributed with

19     transcripts.)

20

21

22

23

24

25
```

```
 1              (Deposition commenced:  10:30 a.m.)

 2

 3              COLLEEN FAZZINO, called as a

 4         witness, having been first duly sworn by

 5         a Notary Public in and for the State of Connecticut,

 6         was examined and testified as follows:

 7

 8              D I R E C T   E X A M I N A T I O N

 9

10   BY MR. GRADY:

11       Q    My name is John Grady.  I represent the

12   Andersons, the Wheatleys and the Wilkins.  I'm going to be

13   asking you some questions today, and if there are any of

14   the questions which are not clear, please let me know;

15   otherwise, I'll assume that you understand the questions.

16   Okay?

17       A    Yes.

18       Q    First, since we're doing this deposition by

19   telephone, I would like to let you know that Mr. Anderson

20   is sitting here with me.  And could you tell me who's in

21   the room with you?

22              MR. FOGDALL:  Mr. Grady, besides the

23   witness, Ms. Fazzino, the court reporter is here, and I'm

24   here.  This is Steve Fogdall.

25              MR. GRADY:  Okay.  Thank you.
```

```
 1    BY MR. GRADY:

 2         Q    All right.  Colleen Fazzino?

 3         A    Yes.

 4         Q    Am I saying that right?

 5         A    Yes.

 6         Q    All right.  Could you tell me your present

 7    address?

 8         A    My home address?

 9         Q    Home address and your work address.

10              MR. FOGDALL:  Well, if you're -- can we

11    agree that her work address is sufficient?

12              MR. GRADY:  Sure.  That's fine.

13         A    Wachovia Mortgage Corporation, One Jefferson

14    Square, Waterbury, Connecticut.

15    BY MR. GRADY:

16         Q    Okay.  And what is your position there?

17         A    Right now I'm a team leader.

18         Q    What was your position in the period of June to

19    August 2004?

20         A    I was a contract underwriter.

21         Q    Describe your responsibilities as a contract

22    underwriter.

23         A    I apologize.  I couldn't hear you.

24         Q    What were your job responsibilities as a contract

25    underwriter?
```

1       A       To underwrite approximately five loans per day in

2   accordance with investor Wachovia and investor PMI

3   guidelines.

4       Q       And who was your employer at that time?

5       A       PMI Mortgage Company.

6       Q       What was the relationship between PMI Mortgage

7   Company and Wachovia?

8       A       PMI provided a service to Wachovia in the form of

9   contract underwriting.

10      Q       Okay.  How was PMI paid?

11      A       I honestly don't know.

12      Q       Did you work for other banks besides --

13      A       Not at the same time.

14      Q       All your work was with Wachovia?

15      A       At that time period, yes.

16      Q       And just tell me generally, what did you do as an

17  underwriter with respect to a residential loan?

18      A       I would first determine the product that the

19  borrower applied for, and then I would review the

20  application to ensure it met those guidelines.  I would

21  then underwrite the loan, make applicable conditions, and

22  then once the conditions started coming in, I would sign

23  off on them to get that loan clear to close.

24      Q       Who had the last word with respect to a Wachovia

25  loan?

1          MR. FOGDALL:  Objection to the form of the

2     question.

3     BY MR. GRADY:

4          Q    You can answer the question unless for some

5     reason you don't understand it.

6          MR. FOGDALL:  Do you understand the

7     question?

8          A    I understand the -- it really would depend on the

9     circumstances.  If the loan had some -- some issues or

10    questions, at times I would go to a Wachovia manager and

11    ask is this okay, do you think it's all right, would the

12    loan stay marketable.  Other loans, there were no

13    questions, and I could just approve them, and I would have

14    the last say, but I was not able to decline a loan by

15    myself.  I always needed a second signature.

16         Q    If theoretically you thought there was a problem

17    with a loan, but the Wachovia people said they wanted to

18    make the loan anyway, could they do that?

19         A    Yes, they could.

20         Q    And tell me how long you were in this position of

21    underwriter.

22         A    I don't have the exact dates, but it was probably

23    around four years.

24         Q    And could you just tell me a little bit about

25    your education?  Did you go to college?

```
 1        A     No, I have not.

 2        Q     When did you graduate from high school?

 3              MR. FOGDALL:  You can answer that

 4    question.

 5        A     1976.

 6    BY MR. GRADY:

 7        Q     Can you just kind of briefly run through your

 8    work experience?

 9        A     Okay.  Well, I've been in the mortgage industry

10    for over twenty years.  I've held various positions

11    including processing, underwriting, supervising, and I did

12    have a very short, about five months, in sales.

13        Q     Did you always work for PMI Mortgage?

14        A     No.

15        Q     What other companies did you work for?

16        A     I have worked for PMI Mortgage Company on two

17    separate occasions, one being here.  I've also worked for

18    People's Bank, Webster Bank, Norwest, Greenwich Financial,

19    First Federal, which was then turned into Webster,

20    Washington Mutual and Wachovia.

21        Q     So you're working for Wachovia right now?

22        A     Correct.

23        Q     How long did you work for PMI Mortgage?

24        A     Altogether?

25        Q     Well --
```

```
 1          A     Or just this last time?

 2          Q     Just this last time.

 3          A     Again, I don't have the exact dates, but I'm

 4     thinking it was around four years.

 5          Q     How long have you been working for Wachovia?

 6          A     About three years.

 7          Q     When did you start?

 8          A     I apologize.  I don't have those dates.

 9          Q     Okay.  Well, we're talking about these

10     transactions in the summer of 2004, and you were working

11     for PMI Mortgage then; is that correct?

12          A     Correct.

13          Q     And then it sounds like shortly afterwards you

14     went to work for Wachovia?

15          A     When I worked for PMI Mortgage during this time

16     period, I was located at Wachovia Mortgage.

17          Q     Where was that?  In Connecticut?

18          A     In Waterbury.

19          Q     We're talking about -- as I understand from the

20     attorney in this case and maybe some other paperwork, you

21     were the one who was the underwriter in the loan

22     application of Mr. Anderson and Mr. Wheatley; is that

23     right?

24          A     That is correct.

25          Q     I'm going to first talk about the Anderson
```

1    transaction.  We may be referring you to some paperwork

2    which hopefully you have in front of you.  If not, we'll

3    try to work around it.  We tried to send some

4    identification of documents up to counsel before the start.

5              The paperwork that I have suggests that

6    Mr. Anderson first applied for this mortgage in June 2004.

7    Just assume that's correct.  Now, we've had deposition

8    testimony from Mr. Hogsten that he completed an application

9    and sent it up, I guess, to you.  Is that correct?

10             MR. FOGDALL:  Objection to the form of the

11   question.  Mischaracterizes --

12             MR. GRADY:  I'm just trying to get the

13   background correct.

14   BY MR. GRADY:

15       Q    Did you receive an application and review it for

16   Mr. Anderson?

17       A    The application was received by Wachovia

18   Mortgage.  It would first go to a processor.  She would

19   basically set it up, put it together, and then I would

20   review it and underwrite it.

21       Q    Who did the -- so what does a processor do?

22       A    The processor's function is mainly to gather all

23   of the information needed for an underwriting decision, and

24   that would include credit, income and assets, ordering the

25   appraisal, ordering the flood, and then as these items come

1   in, they would give it to the underwriter for review.

2       Q    The processor orders the credit check?

3       A    Correct.

4       Q    Orders the appraisal?

5       A    Correct.

6       Q    Do you know who the processor was in this case?

7       A    I'd have to look it up.

8       Q    Is there anything available that you might

9   have -- if not, it's okay.  Is there anything available

10  that you have which would indicate who the processor was?

11      A    Let me -- in this case it appears -- this is

12  Mr. Anderson.

13      Q    Right.

14      A    It appears that there may have been two, but it

15  appears it ended with Maria Belo.

16      Q    So she got the paperwork initially, and she

17  ordered the credit report, she ordered the appraisal.  What

18  else did she order?

19      A    A flood cert.

20      Q    Okay.  And then that document -- then tell me

21  what came to you after that.

22      A    Basically, what would happen is the underwriter,

23  and me in this case, we would get a skeleton file.  So we

24  would really only have forms that we can print off our

25  system which would include the application with all the

1    borrower's information.  As an underwriter, I would receive

2    that, and I would review it for product specificness, add

3    any conditions and then give it back to the processor to

4    issue the commitment.

5        Q    All right.  Do you have any recollection of this

6    loan transaction other than through the paperwork?

7        A    Not really.

8        Q    Probably -- okay.  All right.  This paperwork

9    was -- do you have any recollection of the first thing that

10   you did when you got this application?

11       A    Well, the very first thing that I would typically

12   do is look at the product.

13       Q    All right.

14       A    Because that's going to tell me everything that I

15   need to do.  And then I would go to our system, and I would

16   print those guidelines, and I would go from there.

17       Q    The product in this case is a house?

18       A    No, no, no.  The product -- the type of loan.

19       Q    Type of loan?

20       A    Right, you know, what loan did my borrower apply

21   for.

22       Q    In this case, what kind of loan did he apply

23   for?

24       A    It looks like it was a three-year arm.

25       Q    With just interest?

```
 1        A    What do you mean just interest?  No, no, no.

 2   Principal and interest, a three-year adjustable rate

 3   mortgage.

 4        Q    Okay.  And at that point in time, did you have

 5   any information about the condition of the house?

 6        A    No.

 7        Q    Whose responsibility is it to make some

 8   determination about the condition of the house?

 9             MR. FOGDALL:  Objection to the form of the

10   question.

11   BY MR. GRADY:

12        Q    If you know.

13             MR. FOGDALL:  If you can answer the

14   question, go ahead and try to answer it.

15        A    It would be the -- once the appraisal is

16   received, it would be the underwriter's responsibility to

17   review that appraisal.

18   BY MR. GRADY:

19        Q    So it sounds like, correct me if I'm wrong, that

20   in this case, Maria Belo would have ordered the appraisal,

21   but when the appraisal comes in, it comes to you, and it's

22   your responsibility to review it?

23        A    Correct.

24        Q    In this case, there are at least allegations that

25   certain work had to be done by the -- about the house.
```

1      Assuming those allegations are correct, who in this chain

2      would be the one responsible for making those

3      determinations?

4                    MR. FOGDALL:  Objection to the form of the

5      question.

6          A    Are you asking me who made the allegations?

7      BY MR. GRADY:

8          Q    No.  I'm asking you -- really what I want to know

9      is, if you know, who told Mr. Anderson -- who was

10     responsible for telling Mr. Anderson that the house had to

11     be fixed up?

12         A    In this case in reviewing the file --

13                   MR. FOGDALL:  Objection to the form of the

14     question.  Go ahead and answer.

15         A    In this case in reviewing the file, it didn't

16     appear that there were any issues with the property.

17     BY MR. GRADY:

18         Q    Issues with the property.  Okay.  Let's go back a

19     little bit.

20                   In reviewing your file, can you tell us

21     approximately when you first got the package from -- I

22     guess from Delaware.

23         A    Did you ask me a question?

24         Q    Yes.

25         A    Can you repeat that?

1      Q      Sure.   Approximately when did you get some

2   information from Delaware about this loan application?

3                  MR. FOGDALL:   Objection to the form of the

4   question.

5      A      I don't know when the loan was received by our

6   processing area, but according to my notes in the file, I

7   approved him on July 10, 2004.

8   BY MR. GRADY:

9      Q      And is that -- was there any conditions on that

10  approval?

11     A      There were several, numerous conditions, yes.

12     Q      What were the conditions?

13     A      That the appraiser had to be approved by

14  Wachovia, that we needed a satisfactory appraisal

15  supporting a minimum value of $266,666.   It had to be an

16  interior, exterior, fully executed sales contract with a

17  sales price of $266,666, a flood certification.   Should I

18  go on?

19     Q      What document are you reading from?

20     A      We called it a 110.   I don't know what you would

21  call it.   It's an underwriting sheet where you just list

22  conditions.

23                  MR. FOGDALL:   For the record, the witness is

24  reading from a document entitled "Retail Loan Approval,"

25  which, Mr. Grady, you should have a copy of with a Bates

1    number in the Anderson range.  I can't tell you as I sit

2    here what that number would be, but it would be in the

3    Anderson range of documents.

4              MR. GRADY:  It's a document I've probably

5    seen.

6              MR. FOGDALL:  It's called Retail Loan

7    Approval.

8    BY MR. GRADY:

9        Q    Now, I guess, correct me if I'm wrong, you've

10   made this conditional approval even before you got the

11   appraisal?

12       A    Correct.

13       Q    Now, in this case, we have an appraisal dated

14   August 2, 2004 which has a Bates number of 1 on it.

15       A    What do you mean a base number of 1?

16       Q    The bottom of it is 00001.

17             MR. FOGDALL:  Give me a minute, and I'll

18   locate that document for the witness.  Let's go off the

19   record for a second.

20             MR. GRADY:  Sure.

21             (Off the record briefly.)

22             MR. FOGDALL.  The witness has the document,

23   Mr. Grady.

24   BY MR. GRADY:

25       Q    This appraisal is dated August 2004?

1        A    Yes.

2        Q    Now --

3                MR. FOGDALL:  Give me a minute.  Are you

4    able to verify that?  I don't think that's on the page

5    you're looking at.

6                THE WITNESS:  Right here.

7                MR. GRADY:  On the bottom of the page,

8    August 2, 2004.  Do you see that?

9                MR. FOGDALL:  For the record, I think

10   there's a signature page which has a different date.  This

11   is the -- the page that's Bates numbered 000003 is

12   actually dated August 5, 2004.  I just wanted to make that

13   clarification.

14   BY MR. GRADY:

15       Q    The date of the appraisal is August 2, but it

16   does have another date.  I guess my question is to you:  Do

17   you have any recollection of any discussions about the

18   whole appraisal process in the case of Mr. Anderson?

19       A    No.

20       Q    You might not, but I'll just give you an example.

21   Do you know if there were any problems in getting the

22   appraisal?  Do you know, was there any discussions about

23   why the appraisal was in August when he had originally

24   applied in June or anything like that?

25       A    No.

```
1          Q     From your point of view, the appraisal just

2    arrived in August; is that correct?

3          A     Yes.

4          Q     Now, between the July 10 date that you supplied

5    earlier, that loan document, and the August date, was there

6    any activity going on with respect to this loan

7    application?

8          A     Well --

9                MR. FOGDALL:  Objection to the form of the

10   question.

11         A     I'm sure the processor was working on it, but I

12   would not have been included in that.

13   BY MR. GRADY:

14         Q     Okay.  What would the processor be doing?

15               MR. FOGDALL:  Objection, lack of

16   foundation.  Go ahead and answer if you can.

17         A     Again, the processor would be processing the

18   loan, gathering the information required for me to sign off

19   on the conditions, make my decision and get the loan

20   cleared to close.

21   BY MR. GRADY:

22         Q     All right.  As I understand it, you were not

23   involved at all in any talk, conversation, requirements or

24   anything like that about making any repairs to the

25   building; is that correct?
```

1          A     I was not involved at all, correct.

2          Q     All right.  I take it that the person who -- if

3     there were any of those kinds of things made, would that be

4     made by the processor?

5                MR. FOGDALL:  Objection, lack of foundation

6     and form.  Go ahead and answer if you can.

7          A     I don't know.

8     BY MR. GRADY:

9          Q     Well, are you -- in your experience, are there

10    ever situations as it concerned about the house, any need

11    for repairs?  Has that ever happened before?

12         A     In general underwriting, if there are any

13    property concerns, repairs, that would be handled by the

14    underwriter.

15         Q     The underwriter, but in this case --

16         A     There aren't any.

17         Q     Let me move on.  All right.  After you got the

18    appraisal back in August, August 2, 2004, or whenever you

19    got it, approximately August 3, whatever date it was, what

20    was the next step that you took?

21         A     When the processor gave me the loan with the

22    appraisal, I reviewed it.  It was good.  The value was

23    there, and I approved the appraisal, signed off on it.

24         Q     Did you have any contact at all with Mr. Hogsten

25    in this transaction?

```
 1              MR. FOGDALL:  Objection.  By this

 2   transaction, you mean specifically relating to the

 3   Anderson loan?

 4              MR. GRADY:  Yes.

 5      A    If I did, I honestly don't remember.

 6   BY MR. GRADY:

 7      Q    Do you recall having any conversations with the

 8   processor?  That's Ms. Belo.

 9      A    I don't remember if I -- I'm sure I did, you

10   know, going back and forth, you know, Here's the

11   conditions.  Okay, thanks.  Here's the file.

12      Q    Are you aware of the role in this whole process

13   of what would be Mr. Hogsten, because he was the person who

14   originally takes in the loan information.  What's his

15   responsibility in this whole process?

16              MR. FOGDALL:  Objection, lack of

17   foundation.  Go ahead and answer if you can.

18      A    Loan officers are required to go get us loans,

19   review products with borrowers and pricing.

20   BY MR. GRADY:

21      Q    By products, you mean the terms of the loan?

22      A    Right.

23      Q    How about with respect to the condition of the

24   houses?

25      A    What is your question?
```

```
1          Q     Does the loan processor have any responsibility

2     with respect to determine whether the house needs repairs

3     or doesn't need repairs?

4                     MR. FOGDALL:  Objection to the form of the

5     question.  Go ahead and answer if you can.

6          A     You're asking me if the loan processor has --

7     BY MR. GRADY:

8          Q     Right.

9          A     -- if the loan processor has anything to do

10    with --

11         Q     I'm talking about Mr. Hogsten.  I might read

12    these names wrong.  Mr. Hogsten, what's he called?

13         A     Loan officer.

14         Q     Loan officer.  Okay.  Mr. Hogsten, does he have

15    any responsibility in the system to determine whether a

16    house needs repairs or doesn't need repairs?

17         A     No.

18                    MR. FOGDALL:  Objection to the form of the

19    question and lack of foundation.  Go ahead and answer if

20    you can.

21         A     No.

22    BY MR. GRADY:

23         Q     So from your understanding and working in the

24    system, he simply takes the information in just different

25    possibilities of what the product could be, the different
```

1   loan arrangements, and he sends that on to the processor?

2        A    Correct.

3        Q    And the processor sends it out for an appraisal

4   and does some other things you talked about?

5        A    Correct.

6        Q    If the processor thinks the property needs --

7   strike that.

8             Does the processor make any determinations about

9   whether or not there should be some repairs made to the

10  building?

11            MR. FOGDALL:  Objection to the form of the

12  question.  Go ahead and answer if you can.

13       A    No.

14  BY MR. GRADY:

15       Q    And theoretically, you, in your position, could

16  make some determinations about the condition of the

17  building if you felt that was warranted?

18       A    Yes, theoretically, yes.

19       Q    But in this case of Anderson, you didn't?

20       A    Correct.

21       Q    All right.  Let's look at a couple of documents.

22  I have at Bates 000111 Mortgage Loan Commitment.  I'm

23  sorry.  That's the wrong person.  I take that back.  Let me

24  say that again.  000105 is the mortgage loan commitment.

25  Do you have that in front of you, or can you get that?

```
 1                    MR. FOGDALL:  Yes, we can track that down.

 2     Now, that's not in the package you faxed this morning; is

 3     that right?

 4                    MR. GRADY:  I don't think so.

 5                    MR. FOGDALL:  Give me one moment.  Off the

 6     record.

 7                    (Off the record briefly.)

 8                    MR. FOGDALL:  The witness has the document,

 9     Mr. Grady.

10                    MR. GRADY:  Thank you.

11     BY MR. GRADY:

12         Q    This is the Mortgage Loan Committment?

13         A    Yes.

14         Q    Dated 7/14/04?  Do you see that?

15         A    Yes.

16         Q    Just a while ago we just had some testimony about

17     another document dated July 10, 2004.  That was the

18     approval document.  This committment document, does it

19     include in it all the conditions?

20         A    Yes, only conditions that the borrower would need

21     to satisfy.

22                    MR. FOGDALL:  And I'm going to object, lack

23     of foundation.  She can answer the questions about this

24     document.

25
```

```
 1   BY MR. GRADY:

 2       Q    Now, you have that in front of you?

 3       A    Yes.

 4            MR. FOGDALL:  When you say "that,"

 5   Mr. Grady, you mean the July 10 document she was talking

 6   about earlier?

 7            MR. GRADY:  No, the July 14 Mortgage Loan

 8   Committment.  The document that we're talking about.

 9            MR. FOGDALL:  All right.

10   BY MR. GRADY:

11       Q    Are there any conditions in this document about

12   repairs to the house or anything like that?

13            MR. FOGDALL:  Objection, lack of

14   foundation.  Go ahead and answer if you can.

15       A    There is a condition for satisfactory appraisal

16   supporting a minimum value of $266,666.

17       Q    I'm just looking for that page.  Can you point

18   out where that is?

19            MR. FOGDALL:  Mr. Grady, the Bates number

20   for that page is 109.

21            MR. GRADY:  Thank you.  I'm just going

22   through some documents just to --

23   BY MR. GRADY:

24       Q    Let's move over to Mr. Wheatley.  Some of the

25   documents which we sent to you -- there were actually two
```

1    applications filled out by Mr. Wheatley.  Is that your

2    understanding?  Do you have any recollection of that?

3         A    Yes.

4         Q    I'm talking about the first application,

5    the -- correct me if I'm wrong, but I assume the process is

6    apparently the same, that --

7         A    Correct.

8         Q    -- Hogsten would take some information from

9    Mr. Wheatley, informing the product, send it the processor.

10   The processor would send it to you as the underwriter?

11        A    Correct.

12        Q    Is that how the process worked on Wheatley?

13        A    Correct.

14        Q    Do you have any specific recollections with

15   respect to the Wheatley transaction?

16                  MR. FOGDALL:  Go ahead and answer the

17   question.

18        A    With reference to what?

19   BY MR. GRADY:

20        Q    Sometimes witnesses, for example, will say, I

21   don't even remember those people at all, or they'll say,

22   oh, yeah, I remember that case.  I'm asking you if this is

23   a case you might remember other than the documents.

24        A    No, I don't remember.

25        Q    Nothing in particular.  Just the documents.

1    Okay.  With respect to Wheatley -- just a minute, we

2    have -- we have a document at WHEAT 314, 315.  Can your

3    counsel get that document?

4                    MR. FOGDALL:  Yes.  Can we go off the

5    record for one minute?

6                    MR. GRADY:  Sure.

7                    (Off the record briefly.)

8                    MR. FOGDALL:  The witness just wants to

9    clarify something that she said in her -- in answer to

10   either the last question or the one before that.  You had

11   asked whether she had any independent recollection of the

12   Wheatley transaction besides what -- besides the documents

13   themselves, and she had indicated that she did not.  And

14   just to clarify, that was in reference to the first

15   Wheatley loan application.  She has indicated to me that

16   she does have some independent recollection independent of

17   the documents with respect to the second Wheatley loan

18   application.  So that answer pertained to the first

19   application.

20                   MR. GRADY:  Okay.  Fine.  Thank you for the

21   clarification.

22                   MR. FOGDALL:  Okay.  So we can keep going.

23   Thank you, Mr. Grady.

24                   MR. GRADY:  Go ahead.  We're back to 3 --

25   what did I say, 314?

```
1                    MR. FOGDALL:  Yes.

2                    MR. GRADY:   314 and WHEAT 315.

3    BY MR. GRADY:

4         Q     Do you have those documents in front of you?

5         A     Yes.

6         Q     It appears as if the date -- it appears on page

7    315 that the application was denied.  Do you see that?

8         A     The borrower's original request was denied.

9         Q     Do you know why that was denied?

10        A     Why was it denied?

11        Q     Yes.

12        A     His FICO score did not meet the minimum product

13   requirement.

14        Q     What score?

15        A     FICO.

16        Q     F-I-C-O?

17        A     Correct.

18        Q     That's basically some sort of credit check?

19        A     It's a credit score.

20        Q     Does that have anything to do with the condition

21   of the house?

22        A     No.

23        Q     Are you aware -- well, in your considerations of

24   this original loan application by Wheatley, did you make

25   any of your evaluations or opinions based upon the
```

1    condition of the house?

2        A    Can you ask that again?

3        Q    When you considered Wheatley's first application,

4    in your consideration, in your thinking process or in your

5    evaluation process, was the condition of the house an

6    issue?

7        A    Oh, just a minute.  When the appraisal came in,

8    yes, there were property concerns.

9        Q    As of July 17 when the decision was made to deny

10   the application, was the appraisal in by then?

11           MR. FOGDALL:  Objection to the form of the

12   question.  Go ahead and answer.

13       A    It must have been.  Oh, wait, July 17?

14       Q    Yes.

15       A    Is that a reference to the counteroffer?

16       Q    Well, it looks -- there's some notes above there.

17   There are some notes on page 315 about a reference to a

18   counteroffer.  Do you see that?

19       A    Yes.

20       Q    Counteroffer to -- it's hard to read.

21       A    Well, that's the product code.  This counteroffer

22   was specifically product.  It had nothing to do with the

23   property.

24       Q    If we can get WHEAT 317 in front of you?

25       A    I have it.

1        Q      A document entitled "Uniform Underwriting and

2    Transmittal Summary"?

3        A      Yes.

4        Q      On this page, 317, I'm trying to find the date.

5    Would this be the first application?  Can you look at

6    that?

7        A      This isn't an application.

8        Q      This is the first transaction?

9        A      This is the first transaction, correct.

10       Q      And there are some credit scores down on the

11   bottom where it says Underwriter Comments.  Do you see

12   that?

13       A      Yes.

14       Q      Below that it says, denied due to property

15   condition?

16       A      Right.

17       Q      And it says, unable to exception per TH?

18       A      Yes.

19       Q      Tell me about the significance of these credit

20   scores first.

21       A      Okay.  The initial product that the borrower

22   applied for was a no ratio loan.

23       Q      What does that mean?

24       A      Meaning that we would not be calculating ratios,

25   because income is not being provided.  We would only have

1     the employer information.  When the loan came in, that

2     product has a specific FICO requirement at the time of 700

3     due to his LTV being over 75 percent.  Because he didn't

4     qualify for that, I knew he would qualify for the stated

5     income loan.

6          Q     He would or would not?

7          A     He would not qualify for the no ratio, but he

8     would qualify for the stated income loan.  A FICO score of

9     681 was okay for the stated income.

10         Q     What does that mean?

11         A     We're talking about two different products.  The

12    no ratio product had a FICO requirement of 700.  The stated

13    income product had a lower FICO requirement, and I don't

14    remember what it was, but 681 was sufficient.

15         Q     What -- can you define what a stated income loan

16    means?

17         A     A stated income loan is where the borrower is

18    providing us the employment information and basically

19    stating what his income is.  We will not verify how much he

20    makes, but we will verify that he is working where he said;

21    we will verify assets, credit and everything else.

22         Q     Just for clarity, because I'm not a banker,

23    explain again the difference between that and the no ratio

24    loan.

25         A     The no ratio loan, I am not seeing any kind of

 1    income.  It is not disclosed.  That area on the application

 2    is blank.

 3         Q    If you have a good enough credit score, then you

 4    can get that kind of loan?

 5         A    Correct.

 6         Q    So what you're saying, it looks like his credit

 7    score was adequate for the stated income loan, correct?

 8         A    Correct.

 9         Q    Okay.  And then it says denied due to property

10    condition.  What does that mean?

11         A    When I denied the loan, I went into -- I was in a

12    habit of trying to make comments, and I went into this

13    particular screen, and I just updated it, explained why the

14    loan was being declined in case I was ever asked.

15         Q    I guess you're being asked?

16         A    Yeah.

17         Q    What was the problem with the property?

18         A    I have noted property in fair condition, no heat

19    on second level, asbestos in basement.

20         Q    Where are you getting those notes from?

21         A    Your document 312.

22         Q    Bear with me here.  WHEAT 312?

23         A    Correct.

24         Q    There are several piles.  We're just trying to

25    get the right pile here.  We might have to come back to

1    that, because I don't see it.

2              All right.  What's the top of that page?

3              MR. FOGDALL:  If you give the witness a

4    chance, she'll point out to you the language that she's

5    referring to on that page.  We're talking about WHEAT

6    312.

7              MR. GRADY:  I can't find WHEAT 312.

8              MR. FOGDALL:  You can't find WHEAT 312.

9    Okay.

10             MR. GRADY:  So I'm -- I'm asking her to

11   identify what's on the top of it.

12        A    Fair Lending Analysis Tool.

13   BY MR. GRADY:

14        Q    Well, can you tell me any more about how you got

15   that information about the property?

16        A    From the appraisal.

17        Q    From the appraisal?

18        A    Correct.

19        Q    The appraisal is -- the appraisal, I have it at

20   007?

21             MR. FOGDALL:  We can pull that.  Give us a

22   second.  There's a couple of different versions of the

23   Wheatley appraisal in the documents you've identified.

24   Give me a minute, and I'll find the 007 document you're

25   referring to.  This is 07 through, I think, 11, right?

```
 1                    MR. GRADY:  Yes.

 2                    MR. FOGDALL:  Okay.  We've got it.

 3      BY MR. GRADY:

 4          Q    I'm going to ask you a few questions about.  Just

 5      to go back a bit, document 317 which we were talking about?

 6          A    Yes.

 7          Q    I don't see any date on that.  Is there any way

 8      you could tell me when that was done?

 9          A    Well, I can tell you that this particular

10      document is printed several times throughout the process.

11          Q    Okay.

12          A    Any time anything changes, the underwriter is

13      required to keep an updated file.

14          Q    Okay.

15          A    So based on the comments, I would say that this

16      was -- the last one printed when the loan was declined.

17          Q    There's a reference in here to a Daniel Gladden

18      appraisal.  Can we assume that it's after July 7?

19          A    No.  Once we know who the appraiser is, that

20      information gets put in the system.

21          Q    What's your best estimate of what the date of

22      this would be?

23          A    I would say the day I declined the loan, July 22.

24          Q    All right.

25                    MR. FOGDALL:  And the witness got the
```

 1    July 22, 2004 date from WHEAT000299.

 2    BY MR. GRADY:

 3        Q    Okay.  Going back to 007, it is the appraisal of

 4    Mr. Gladden --

 5                MR. FOGDALL:  I'm sorry to interrupt you,

 6    Mr. Grady.  I think the witness wants to add something.

 7        A    I would prefer to refer to WHEAT000331, because

 8    it's easier to read.  The fax is very small.

 9        Q    331?

10        A    331 through 342.

11        Q    I've got that.  That's okay.

12                MR. FOGDALL:  You do have that?

13                MR. GRADY:  Yes.

14    BY MR. GRADY:

15        Q    Okay.  Now, the appraisal, correct me if I'm

16    wrong, the appraisal appears to be for $267,000; is that

17    right?

18        A    The value came in at 267, correct.

19        Q    That amount would have been sufficient for the

20    loan; is that correct?

21        A    Not necessarily.  It's the underwriter's

22    responsibility to not just look at the bottom-line number.

23        Q    Now, there were some comments made by the

24    appraiser down at 00337?

25        A    Correct.

1      Q      Were you relying upon any of those comments in

2  your decision to turn down -- to deny the loan because of

3  the condition of the property?

4      A      Yes.

5      Q      At that time, was there any discussion or any

6  talk that if these problems were resolved, that the loan

7  could be reinstated?

8      A      For this particular file, I don't remember any

9  conversations.

10      Q      What's the policy that if there's a problem with

11  conditions like this, if a person fixes the problems, can

12  the loan go forward?

13      A      If that is the only problem on the loan, yes.

14      Q      At this point in time, which was approximately

15  July 20 when the loan was turned down, I understand from

16  our earlier conversation, Wheatley would have qualified

17  financially for a statement income loan?

18            MR. FOGDALL:  Objection to the form of the

19  question.  Go ahead and answer if you can.

20      A      Based on the information that I had in the file

21  at that time, that answer would be yes.  All of the

22  conditions had not been received.

23  BY MR. GRADY:

24      Q      One of the concerns you then had was the comments

25  on the appraisal about the condition of the house?

1       A    Yes.

2       Q    Did you communicate that to anybody, if you

3  recall, for example, to Mr. Hogsten?

4       A    Typically, the loan officer would be notified of

5  any issues with the file, but I don't -- I'm sure I did,

6  but I don't remember.

7       Q    How about the processor?

8       A    No.  That would really be more me.

9       Q    The processor at that point in time was not as

10 much in the loop?

11      A    With this issue, correct.

12      Q    Going -- well, let me go back.  Would you have

13 made a condition of the loan for someone to simply make the

14 repairs rather than to denying the loan?

15      A    Can you repeat the question?

16      Q    Well, now that it was in your responsibility and

17 authority, could you have said that the -- that you would

18 approve the loan if these repairs were made?

19      A    Yes.

20           MR. FOGDALL:  Objection to the form of the

21 question.  Go ahead and answer.

22      A    Yes.

23 BY MR. GRADY:

24      Q    And how come you didn't do that?

25           MR. FOGDALL:  Objection to the form of the

1    question.  Go ahead and answer.

2        A    I apologize.  I don't remember this loan.

3    BY MR. GRADY:

4        Q    Okay.

5        A    I don't.

6        Q    Okay.  But in any event, it seems like you didn't

7    take that course; you just rejected the loan?

8        A    I don't remember what happened on this loan.

9        Q    Let me --

10       A    Can I add something to that?

11            MR. FOGDALL:  Mr. Grady, the witness wants

12   to add something.

13   BY MR. GRADY:

14       Q    Sure.

15       A    My job is to approval loans.  So I'm really -- I

16   really wasn't placed at Wachovia to decline loans.  So

17   loans really were not declined unless there were, you know,

18   valid reasons and reasons that you were not able to

19   overturn.  But, again, I apologize, again, I don't remember

20   the specifics of this particular file.

21       Q    Give me a minute.  Would you turn to WHEAT 292?

22       A    I don't have that.

23            MR. FOGDALL:  Give us a minute.  Give me

24   one second.  I'll find it.

25       A    I got it.

```
 1                    MR. FOGDALL:  Let me give you this copy.

 2                    MR. FOGDALL:  What is WHEAT 292, Mr. Grady?

 3                    MR. GRADY:  WHEAT 292.

 4                    MR. FOGDALL:  Is there an identifier on the

 5     document?

 6                    MR. GRADY:  These are handwritten notes.

 7                    MR. FOGDALL:  Give me one second.  I've got

 8     it.  Okay.  We've got it.

 9          A    I have it.

10     BY MR. GRADY:

11          Q    Is that your handwriting?

12          A    No.

13          Q    Do you know whose handwriting it is?

14          A    No.

15          Q    All right.  Does the loan officer at this point

16     in time, does he have the authority to tell the borrower

17     that if certain repairs are made to the building, then a

18     loan can be approved?

19                    MR. FOGDALL:  Objection to the form of the

20     question.  Go ahead and answer if you can.

21          A    I don't know what authority the loan officer

22     would have.

23     BY MR. GRADY:

24          Q    All right.  A second application was completed by

25     Mr. Wheatley.  Are you aware of that?
```

```
1          A     Yes.

2          Q     The first --

3                MR. FOGDALL:  Mr. Grady, we lost most of

4     that question.

5          Q     We're at the -- the last comment was about the

6     second application, you heard that?

7          A     Yes.

8          Q     Now, the first application -- there were

9     actually -- in our discussions, there were two different

10    possibilities.  The first possibility was what was called a

11    no ratio loan, and the second possibility was a stated

12    income loan.  Do you recall that?

13         A     On the first loan, yes.

14         Q     Do you know how much money would be required for

15    each of those loans as a down payment?

16         A     It would depend on the product and what the

17    borrower wanted.  If you're asking me if 10 percent down is

18    sufficient?

19         Q     Yes.

20         A     It would be, yes.

21         Q     For either one of those loans?

22         A     Yes, assuming the borrower qualified.

23         Q     All right.  Now we're back to the second loan,

24    the second loan application.

25         A     Okay.
```

```
 1        Q    And the second loan application, do you have any

 2   recollection of the circumstances of the second loan

 3   application?

 4              MR. FOGDALL:  Objection to the form of the

 5   question.  Go ahead and answer if you can.

 6        A    My recollection, without looking at the file, was

 7   that there was a lot of going back and forth with JD, but

 8   it wasn't until I reviewed the file that I remembered the

 9   specifics.

10   BY MR. GRADY:

11        Q    Was it back and forth a conversation between you

12   and JD?

13        A    Correct.

14        Q    At this point in time, was the processor

15   involved, if you know?

16        A    No.

17        Q    Conversations were mainly between you and JD?

18        A    Yes.

19        Q    So the second -- well, I think there was a

20   reference in some of the other documents about a

21   possibility of an exception being made.  Do you recall

22   anything like that?

23        A    Well, I don't recall it, but after reviewing the

24   file, there was an exception made on the second Wheatley

25   loan.
```

1    Q    Exception on the second Wheatley loan?

2    A    Uh-huh.

3    Q    So the second loan, I'll ask you to turn to --

4              MR. FOGDALL:  Mr. Grady, are you still

5    there?

6              MR. GRADY:  I'm still there.  I'm just

7    checking this document.

8              MR. FOGDALL:  Understood.

9              MR. GRADY:  The document is WHEAT 296.

10              MR. FOGDALL:  Okay.  We'll find it.  Give

11   us a second.  You said 296?

12              MR. GRADY:  WHEAT 296 and 297.

13              MR. FOGDALL:  Off the record for a second.

14              (Off the record briefly.)

15              MR. FOGDALL:  We have it.

16   BY MR. GRADY:

17    Q    Okay.  This document in front of me is called

18   "Retail Loan Approval"?

19    A    Yes.

20    Q    I'm looking for a date on this document, but I

21   don't really see it.  Maybe -- is there any date when this

22   was approved?

23    A    If you look at WHEAT 297, on the very, very

24   bottom under my signature, there is a date, but it is not

25   legible.

```
 1        Q    I see it.  Okay.  All right.  Tell me what

 2   exactly was approved, which of these different kind of

 3   loans.

 4        A    The stated.  The no ratio was crossed off, and

 5   underneath it, the stated income product code is

 6   handwritten in.

 7        Q    Where is that?

 8        A    WHEAT 296 on the top.

 9        Q    And --

10        A    Do you see it?

11        Q    No, I don't.

12        A    Okay.  On the very top.

13        Q    Very top where it says Retail Loan Approval?

14        A    And go down and six or seven lines.

15        Q    Program name.  Looks like something's crossed

16   out?

17        A    That's the ratio.  That's crossed out.

18        Q    Then there's another word written in?

19        A    That's the product code for the stated income

20   loan.

21        Q    Okay.  That -- what does that say?

22        A    FNSI30FEX.

23        Q    That line says Purchase, Construction Permanent,

24   and then handwritten stuff, and you just explained what

25   that was; is that right?
```

```
 1         A     Correct.

 2         Q     This was an approval for what kind of loan?

 3         A     For a stated income loan.

 4         Q     Stated income loan.  And should there have been a

 5   10-percent requirement for that?

 6         A     It was approved at a stated income loan with

 7   10 percent down subject to credit, income and assets,

 8   credit, employment and assets.

 9         Q     Credit, employment --

10         A     -- and asset verification and appraisal and some

11   other miscellaneous things.

12         Q     Are all those comments on this document

13   someplace?

14         A     I'm sorry?

15         Q     Are all those conditions on this document

16   someplace?

17         A     Yes, they are, WHEAT 296 and 297.  Everything is

18   there.

19         Q     Now, with respect to the appraisal, at that point

20   in time, were there any issues about the condition of the

21   property?

22         A     At the time of underwriting, I have condition for

23   an appraisal, so I did not have one to look at.

24         Q     But were you still operating off of the old

25   appraisal with the old comments about the conditions?
```

1    A    I honestly don't remember if the appraisal was in

2    here when I got it.  I'm thinking it was not, otherwise I

3    wouldn't have approved the loan.  We would have had an

4    issue then.

5    Q    Well, the appraisal that we talked about before

6    at, I think, WHEAT 331 was dated July 7?

7    A    Yes.

8    Q    And this approval we're talking about, I can't

9    read the -- do you have any idea what this date is on the

10   bottom which we can't read?

11   A    The date of what?

12   Q    On WHEAT 297.

13   A    No, I can't read it.  It didn't get imaged very

14   well.

15   Q    Do you think we're talking about the first loan

16   or the second loan, first application or second

17   application?

18              MR. FOGDALL:  It appears as though

19   WHEAT 296 to 297 pertains to the first Wheatley loan

20   application.  It's got the number 6995009.

21              MR. GRADY:  Okay.  That's the first

22   application.  We've already talked about the first

23   application.  We understand -- there's a little confusion

24   here about which application it was.

25

1  BY MR. GRADY:

2      Q     All right.  Let's move to the second application,

3  see if we can get the proper paperwork for the second

4  application.

5          The second application -- what kind of loan are

6  we talking about for the second application?  Are we

7  still --

8              MR. FOGDALL:  Would you like the witness to

9  refer to that application?

10              MR. GRADY:  Okay.

11              MR. FOGDALL:  Would that be helpful to you

12  to answer that question?

13              THE WITNESS:  Yes, I would need to look at

14  that.

15              MR. GRADY:  Okay.  Just a minute.  I've got

16  a document at 293, and it's dated -- it's called Submitted

17  Loan Report dated -- wait a minute.

18              MR. FOGDALL:  Mr. Grady?

19              MR. GRADY:  Yes.

20              MR. FOGDALL:  The second loan application

21  that the Wheatleys filled out begins at WHEAT000170 and

22  goes to 000177, if you have that.

23              MR. GRADY:  I do, but --

24  BY MR. GRADY:

25      Q     That's the loan application, 00170.  Okay.  Do

1    you have that in front of you?

2         A     Yes, I do.

3         Q     And what was the product which this second loan

4    application was being considered?

5         A     This document does not tell me what the product

6    is.

7         Q     I think I'm going to -- what about WHEAT 187?

8         A     Yes, okay.  I have it.

9               MR. FOGDALL:  Just to clarify, the second

10   loan application does, in fact, reflect the product code

11   for the loan product that the Wheatleys were applying for,

12   and that's on WHEAT000174.  It's the same product code

13   that's reflected on WHEAT000187.

14   BY MR. GRADY:

15        Q     Okay.  So we'll go back.  So what is the

16   product?

17        A     It's the stated income fixed rate loan.

18        Q     That should have been a 10-percent down payment;

19   is that right?

20              MR. FOGDALL:  Objection to the form of the

21   question.  Go ahead and answer it.

22        A     For what they initially applied for based on the

23   loan amount and the sales price, this would reflect the

24   90-percent loan.

25

```
 1    BY MR. GRADY:

 2         Q     This document, 170 document, has a date on it.

 3    It looks like August 2 or August 3.  There's a couple

 4    different dates on page 00176, right?  Do you see that?

 5    I'm on 00176.

 6         A     What was the question?

 7         Q     Would you agree there's a date -- it looks like

 8    Wheatley's signature is August 3?

 9         A     Yes.

10         Q     And there's a date next to Hogsten, August the

11    2nd?

12         A     Correct, yes.

13         Q     Could you tell me, this document, would it then

14    be sent to the processor, or would it be sent directly to

15    you?

16         A     No, it would go directly to the processor with

17    the rest of the file.

18         Q     Do you know what steps the processor took with

19    this document?

20         A     No.

21         Q     This document was then -- was it then sent to

22    you?

23         A     The loans are uploaded electronically, and then

24    the hard file, which would be this document and some other

25    documents, are usually overnighted after.
```

1      Q      But you would get it?

2      A      Not with a signature initially.

3      Q      Without a signature, but you got it around that

4    time, August 3, August 4?

5      A      I don't know when I received it.  I don't have

6    that exact -- I don't know.  I did get it, but I don't know

7    what the date was.

8      Q      Okay.  And at that point in time, what steps did

9    you take with respect to this second loan application?

10     A      Again, I would look at the product.  I would

11   ensure that the borrower qualifies for that product.  I

12   would underwrite the loan, and usually there's nothing in

13   the file, and apply any conditions that I would need to

14   ensure the marketability of the loan, sign off on the

15   approval, give the file back to the processor.  She would

16   issue a commitment.

17     Q      Okay.  I guess I'm asking you:  Do you have any

18   recollection what you actually did in this second

19   application?

20     A      At what point?

21     Q      After you got the -- after you got the

22   application.

23     A      I just explained what I would do.

24     Q      I understand that, that's your process, but I'm

25   asking you -- and we can look at some more documents to

```
 1   move it along.  I'm trying to figure out what steps you

 2   took next.  If you don't remember specifically, then we can

 3   see if we can find some documents and take it step-by-step.

 4       A    Okay.  Then I don't remember.

 5       Q    Do you have any recollection of talking to

 6   Mr. Hogsten about the -- at all about the second

 7   application?

 8       A    Yes, but not when I initially underwrote it.

 9       Q    All right.  We'll move a little out of order.

10   Would you turn to WHEAT 230?

11            MR. FOGDALL:  Give us a second.  Okay.  We

12   have it.

13   BY MR. GRADY:

14       Q    These are more handwritten notes.  Do you know

15   whose handwritten notes these are?

16       A    This is mine.

17       Q    All right.  This might help you then recall what

18   was happening in that time period, correct?

19       A    Correct.

20       Q    The notes are a little bit hard to read, not

21   because of your handwriting, but in the process of getting

22   things copied, but maybe you can read what it says on

23   8/4?

24       A    Reviewed with Emo, E-m-o, rush file, underwrite

25   file 8/3 p.m., does not conform to guideline, reviewed with
```

```
 1    Terri its exception, cannot insure, exception denied, too

 2    many layers of risk, property condition and style, source

 3    of assets to close, etc.

 4         Q    All right.  Who is Emo?

 5         A    Emo was my manager at the time, Elaine Orsini.

 6         Q    Then it says does not conform to great line?

 7         A    Guideline.

 8         Q    What's the word?

 9         A    Does not conform to guideline.

10         Q    Why doesn't it conform?  What was the problem?

11         A    Well, there were several issues.  Some were

12    assets.  We were unable to verify his employment.  Again,

13    because he was a stated income, we're not going to verify

14    the numbers, but we do need to verify that he is

15    self-employed through a CPA.

16         Q    What was the problem with that?

17         A    He didn't have one.

18         Q    No CPA?

19         A    Correct.

20         Q    Was there any question that he was

21    self-employed?

22         A    We would need to have confirmed that through a

23    CPA, and he did not have one.

24         Q    He didn't have one, does that mean he

25    automatically gets denied?
```

```
 1        A     Yeah, or we can verify income.

 2        Q     The next thing says --

 3        A     Spoke with JD at great length several times.

 4        Q     I'm sorry.  I'm still on the first one.

 5        A     Oh.

 6        Q     Reviewed something or other about the

 7   exception?

 8        A     Reviewed with Terri its exception.

 9        Q     Who is Terri?

10        A     Terri was the operations officer at the time, and

11   she had exception-lending authority.

12        Q     Okay.  The exception was denied.  Why was it

13   denied?

14        A     Based on my comments, because we were unable to

15   insure the file, meaning he did not have 20 percent down,

16   and due to the layers of risk with the file.

17        Q     What were the layers of risk?

18        A     The property condition and the assets, as well as

19   the unable to verify the employment.

20        Q     Do you know if the property condition was

21   repaired by that time?

22        A     No.

23        Q     You didn't know one way or the other?

24        A     No.

25        Q     Did you check with anybody?
```

```
 1                    MR. FOGDALL:  Objection to the form of the

 2       question.  Go ahead and answer if you can.

 3            A    I would -- that's information that I would be

 4       notified of.  Somebody would be telling me.  I wouldn't be

 5       calling every day saying, Is it done, is it done.

 6       BY MR. GRADY:

 7            Q    Were you getting that by Mr. Hogsten?

 8            A    If the property had been repaired, the

 9       underwriter should have been notified, and that would have

10       been me.

11            Q    Nobody ever informed you?

12            A    Not of all of the repairs, no, and that would not

13       have rectified the other issues with the file.

14            Q    The other issue was this problem with the CPA?

15            A    As well as the assets.

16            Q    What was the problem with the assets?

17            A    The product that he was in required him to have

18       10 percent of his own funds in the transaction as well as

19       satisfy an asset test as well as having sufficient funds to

20       close.

21            Q    And do you recall what specifically was the

22       problem?

23            A    We were unable to verify the 10-percent own

24       funds.

25            Q    You were unable to verify the 10-percent --
```

```
1          A       -- own funds, borrower's own funds in the

2     transaction.

3          Q       He had money in the bank?

4          A       I would have to review the file to answer that

5     question.

6          Q       So unable to --

7                  MR. FOGDALL:  I think the witness is saying

8     she needs a document in order to answer your questions.

9                  MR. GRADY:  I don't think we have such a

10    document, to tell you the truth.

11                 MR. FOGDALL:  What document would be

12    helpful to you to answer the questions?

13                 THE WITNESS:  My 110.

14                 MR. FOGDALL:  Which is what?

15                 THE WITNESS:  Which is called the Retail

16    Loan Approval.

17                 MR. FOGDALL:  Just give her a moment,

18    Mr. Grady.

19                 MR. GRADY:  Okay.

20                 MR. FOGDALL:  Is this the document that

21    you're talking about?

22                 THE WITNESS:  Yes.

23                 MR. FOGDALL:  What she's referring to is

24    the document that we faxed to you this morning.  You

25    should have this somewhere in your file Bates labeled.
```

```
 1    The document that I have in front of me is not Bates

 2    labeled, but when I get back to my office in Philadelphia,

 3    I will track down the Bates number for this document.

 4    It's a two-page document, Retail Loan Approval.  This is

 5    what she's referring to that she needs to help her answer

 6    your questions.  You should have that.  I faxed it to you

 7    this morning.

 8    BY MR. GRADY:

 9         Q    And the document is called a Retail Loan

10    Approval?

11         A    Yes.

12         Q    One of 3?

13              MR. FOGDALL:  It should be two pages.  What

14    do you have in front of you?

15              MR. GRADY:  I recall my secretary gave me

16    one page.

17              MR. FOGDALL:  If you need me, I can fax it

18    to you again.

19    BY MR. GRADY:

20         Q    Actually, let's just talk about the page we have.

21    Okay?

22         A    Okay.

23         Q    You were talking about a problem being unable to

24    have 10 percent of his own funds, and then you were talking

25    about his other assets, I think.
```

1          A      Right.   This page is telling me why it was an

2    exception.

3                     MR. FOGDALL:   Wait.   We don't know yet,

4    Mr. Grady, what page you have.   You say you have one page.

5    What does your page look like?

6                     MR. GRADY:   The page I have is the page you

7    faxed me this morning.

8                     MR. FOGDALL:   I understand that.   I faxed

9    you multiple pages.   If you only have one, we need to know

10   which one you have.

11                    MR. GRADY:   It says on the top Retail Loan

12   Approval.

13                    MR. FOGDALL:   All right.   She has that in

14   front of her.

15   BY MR. GRADY:

16         Q      The bottom says page 1 of 3?

17         A      Correct.

18         Q      You have that document, right?

19         A      Yes.

20         Q      And tell me what on this document -- how this

21   helps you refresh your recollection about the asset

22   problem.

23         A      This is the list of conditions that I would

24   always go off of.   So this document is telling me why the

25   loan was an exception, and condition number 21, I have

1    written on "Exception" with my initials, and that's copy of

2    cancelled check for earnest money deposit of $13,333, and

3    then line 27 I also have written, Exception, verification

4    of 10 percent borrower own funds in transaction and

5    borrower satisfy asset test.

6          Q    Now, with respect to this copy of cancelled

7    check, did he produce that?

8          A    I would like to review that.

9          Q    When you say exception, does that mean a negative

10   factor or a positive factor?

11              MR. FOGDALL:  Are you saying that you need

12   to review the cancelled check?

13              THE WITNESS:  Yes.

14   BY MR. GRADY:

15         Q    Going back to -- before that, I'm trying to

16   figure out what you meant when you completed this form at

17   line 21.

18         A    I needed to verify the amount of the down payment

19   the borrower made and the source of those funds.

20         Q    And it says, Copy of cancelled check for earnest

21   money deposited, and then it's written next to it 13,335.

22   Are you telling me you had to verify that information?

23         A    Yes.

24              MR. FOGDALL:  Objection to the form of the

25   question.

```
 1   BY MR. GRADY:

 2        Q    And then on number 27 it says you had to verify

 3   10 percent of borrower funds, etc.?

 4        A    Correct.

 5        Q    Were you able to verify those things?  Do you

 6   recall?

 7        A    Based on the document in front of me, I was not

 8   able to verify those.

 9        Q    Do you have a date on this document?

10        A    That would be on the page that you don't have,

11   and it does not appear to be dated.

12        Q    All right.  Let's go back to WHEAT 230.

13        A    Okay.

14        Q    The 8/5 notes, what do they say?

15        A    Spoke with JD at great length, several times,

16   explained problems several times.

17        Q    Do you have any recollection of what the

18   substance of the conversations were?

19        A    I don't.

20        Q    The next one says -- just read -- just go down,

21   8/5, 8/5.  You have two more of them.

22        A    Okay.  Conference call with Emo, Terri and JD,

23   cannot do exception.  I put "the," but I think I meant,

24   Then Terri, Emo and Joe call.  Joe will check with Chet at

25   80 percent.
```

```
 1        Q     Why would you check about 80 percent?

 2        A     We were unable to insure the loan due to the

 3   layering of risk, so we wanted to do the loan; we wanted to

 4   do the loan at 80 percent, which would have been a

 5   compensating factor, and we would have been able to do it

 6   hopefully at that point as an exception at 80.

 7        Q     The next one, the next 8/5?

 8        A     Conference call, Terri, Emo, Joe.  Terri will do

 9   exception, but only at 80.  File to close 8/6,

10   counteroffered per LO.  Borrower will get seller second.

11        Q     What does that mean, borrower will get seller

12   second?

13        A     That the other 10 percent will be in the form of

14   a loan from the seller to the borrower.

15        Q     Did you have any reason to think the seller would

16   do that?

17        A     It happens sometimes.

18        Q     All right.  8/6?

19        A     P.m., received call, loan did not close.

20        Q     Do you know why it didn't close?

21        A     No.  I'm sure I did at the time, but I didn't

22   write it down.

23        Q     8/10, want to read that one?

24        A     JD called in, borrower will liquidate investments

25   to avoid subordinate financing.
```

1        Q      What does that mean?

2        A      That the borrower will not be getting subordinate

3    financing; he has other assets he plans on liquidating to

4    take the place of that 10 percent.

5        Q      Do you know if this money was already in Wachovia

6    Bank?

7                    MR. FOGDALL:  Objection to the form of the

8    question, lack of foundation.  Go ahead and answer if you

9    can.

10       A      At the time I did not know where it was coming

11   from.

12   BY MR. GRADY:

13       Q      All right.  And the second 8/10?

14       A      Borrower called.  There aren't any other assets.

15       Q      Did you actually talk to Mr. Wheatley?

16       A      I don't think so.  Typically, that would be our

17   processor's responsibility.

18       Q      The borrower probably called somebody else?

19       A      Right, and I just noted it.

20       Q      8/11?

21       A      LO is pursuing 90 percent again.  Sent Emo

22   80 percent max.  Reviewed with Terri, exception officer,

23   80 percent max.  LO never discussed subordinate financing

24   with borrower.

25       Q      The next 8/11?

```
 1         A     Spoke with Joe, voiced concern regarding last

 2   minute rush again.

 3         Q     All right.  The next?

 4         A     6:30 p.m., borrower's friend called in looking

 5   for information.  Did not give.

 6         Q     8/12?

 7         A     Spoke with Joe, will liquidate coin collection.

 8         Q     Who is Joe?

 9         A     I'm sorry?

10         Q     Who is Joe?

11         A     Joe is JD's manager.

12         Q     What's his last name?

13         A     Skoranski.

14         Q     And there's a reference to liquidate a coin

15   collection.  Does that mean the borrower is going to

16   liquidate his coin collection?

17         A     Yes.

18         Q     Okay.  And I guess Joe is relating that?

19         A     Correct.

20         Q     8/12, the next one?

21         A     Spoke with Joe several more times, no -- I meant

22   not -- pursuing gift, will get from actor Will Smith.  He's

23   family.

24         Q     That's another source of getting the money?

25         A     Yes.
```

1    Q    All right.  The next one, 8/12.

2    A    Spoke with Joe.  Will get gift.  Not from who.

3    Q    The next one?

4    A    Received gift donor.  Reviewed with Terri,

5    exception officer.  Conference call between me, Terri and

6    Joe.  Must close today, even though it is now 2:30 p.m.

7    Q    What's the significance of the state of affairs

8    at that point in time?

9    A    We have to hurry up; this borrower is going to

10   closing; we need to get that package there.

11   Q    What's the status of the exception?

12   A    I -- I would have to look at another document to

13   see, to correspond that date with this date.

14   Q    In the notes I have, it says see give something,

15   review with Terri, exception officer?

16   A    Officer.

17   Q    But you -- your note doesn't reflect what she had

18   to say?

19   A    On this document, no.

20   Q    All right.  8/12 it says -- what does that say?

21   A    Re-underwrote file again.  Gave to processor for

22   closing.

23   Q    All right.  In this process, at anytime did you

24   say that you needed to get a statement from a roofer

25   concerning the condition of the roof of the house?

1      A    I would have to review the file.  I don't

2   remember.

3      Q    Is that something that you would do, or is it

4   something that someone else would do?

5      A    All conditions come from the underwriter.

6      Q    All right.  There are other documents.  I don't

7   specifically recall any document like that, but we'll see

8   if we can move on a little bit.

9          Okay.  Let me go back.  My recollection is that

10   this went to settlement on the 13th, assuming that's

11   correct.  Do you recall any conversations with Hogsten

12   through -- as I recollect, he testified he was on vacation

13   on the 13th.  Do you happen to recall any conversations

14   with him where he might have been on vacation about this

15   whole matter?

16      A    I remember speaking with him about the loan.  I

17   don't remember when, and I don't -- other than what's noted

18   in the last document, and I don't remember him being on

19   vacation, no.

20      Q    Is it your recollection that the loan finally

21   went through at the 20-percent loan?

22      A    Yes.

23      Q    And if we can assume that the property was fixed

24   up at that time, as of the date of the final settlement,

25   then I take it what you're saying is that the reason you

1    couldn't have the 10-percent loan was because -- I take it

2    back.  Tell me why you couldn't go back to the 10-percent

3    loan at that point in time after the property was fixed up.

4        A    I was not made aware the property was fixed up,

5    but assuming it had been fixed, we still would have had the

6    issue with verifying the employment and the assets.

7        Q    The problem with the employment was his failure

8    to have a CPA?

9        A    Yes.  I needed a CPA to confirm his

10   self-employment, the type of self-employment and the length

11   of self-employment.

12       Q    Income tax returns wouldn't be sufficient for

13   that?

14       A    This was a stated income loan.  I can't look at

15   those.

16       Q    That's that issue we talked about.  And the other

17   issue was the assets.  Why was it -- let me rephrase it,

18   but, again, why was it that the assets weren't

19   sufficient?

20       A    Based on my recollection regarding the down

21   payment, that was on a business account, and I would have

22   needed the CPA to confirm that withdrawal of those funds

23   would not negatively impact the business and that the

24   borrower had access to those funds.

25       Q    Did anybody in this process have access to check

1    Mr. Wheatley's funds in Wachovia Bank?

2         A     Yes, we can verify his accounts at Wachovia.

3         Q     Do you know if anybody did that?

4         A     Without looking at the file, I'm assuming we did.

5               MR. GRADY:  I'm going to -- if you don't

6    mind, I'm going to take a five-minute break.  And I guess

7    I can call back in five minutes.  Is that all right?

8               MR. FOGDALL:  We can just put you on hold.

9               MR. GRADY:  Okay.

10         (Off the record:  12:13 p.m. to 12:17 p.m.)

11   BY MR. GRADY:

12        Q     Let me turn to WHEAT 150.

13        A     Okay.

14        Q     Do you have that in front of you?

15        A     Yes, I do.

16        Q     This is a document dated 8/6/04?

17        A     Yes.

18        Q     I know it's a little bit hard to read.  What's

19   the significance of this document?

20        A     This is page 2 of an internal document we use

21   whenever the underwriter is either declining a loan, making

22   a deviation or doing an exception.  This page 2 in

23   particular has the signatures that are required and then

24   possibly any pertinent comments.

25        Q     Does it make an exception?  Is it approved or not

1    approved?

2         A    Yes.   The signature on the very bottom,

3    Terri Hamm, she is the exception officer, and she did sign

4    off on it.

5         Q    What exactly is the exception?

6         A    The exception was for the property, the

7    employment and the assets.

8         Q    Is that for the 10-percent loan or the 20-percent

9    loan?

10        A    The exception was based on the approval of an

11   80-percent loan-to-value file.

12        Q    Was there ever any consideration between then and

13   the very end of going back to a 10-percent loan?

14        A    Consideration from whom?

15        Q    From you, I guess, as the underwriter in your --

16        A    No.

17        Q    You were always on track with 20 percent from

18   this point on?

19        A    Correct.

20        Q    Now, we have another document which is called

21   WACH 001.  Do you have that in front of you?

22        A    Not yet.

23             MR. FOGDALL:  She' got it.

24   BY MR. GRADY:

25        Q    Okay.  Now, your counsel has also given us a

1    document also just this morning also called -- it's called

2    "Underwriting Guidelines: Product-Specific," and the WACH 1

3    document says "Underwriting Guidelines: Conforming."

4         A    Yes.

5         Q    Do you have those documents in front of you?

6         A    Yes.

7                   MR. FOGDALL:  She does.  Now, the document

8    I sent this morning should have had 12 pages.  Is that

9    what you have there, 12 pages?

10                  MR. GRADY:  Yes.

11   BY MR. GRADY:

12        Q    What's the difference in these two documents?

13        A    The document entitled Underwriting Guidelines is

14   product specific, specific to the loan, the terms and the

15   product that the borrower was getting.  The underwriting

16   guidelines are more generalized.

17        Q    Now, in the course of this transaction, did you

18   rely upon either one of these documents?

19        A    Yes.

20        Q    Which one did you rely upon?

21        A    Both.

22        Q    Are these guidelines that you're generally pretty

23   familiar with and familiar with enough that you don't have

24   to look at them every day, or is it something that you sort

25   of check every day?

1        A    No, you're right, I do not need to look at them

2    every day.

3        Q    From your point of view, both of these documents

4    would be involved in the evaluation of the loan

5    applications of both Wheatley and Anderson?

6        A    Yes.

7                MR. FOGDALL:  Let me clarify that.  The

8    document, the 12-page document that I sent you this

9    morning applies to the Wheatley product -- the Wheatley

10   loan.

11               MR. GRADY:  But not the Anderson?

12               MR. FOGDALL:  Is that correct?

13               THE WITNESS:  I would have to check which

14   product he applied for.

15   BY MR. GRADY:

16       Q    All right.  Turn to WHEAT000069.

17               MR. FOGDALL:  Give us one second.  Off the

18   record.

19               (Off the record briefly.)

20               MR. FOGDALL:  She has it in front of her.

21   BY MR. GRADY:

22       Q    This appears to be a check from Mr. Wheatley to

23   Mr. Aigner, who was the seller?

24               MR. FOGDALL:  Objection to the form of the

25   question, mischaracterizes the document.  Go ahead and

1    answer the question.

2         A    Can you repeat that again?

3              MR. GRADY:  I don't think it does

4    mischaracterize.

5              MR. FOGDALL:  I think it does.  The check

6    is drawn on funds of Limousine Unlimited, LLC.  So to that

7    extent, it mischaracterizes the document.  You can answer

8    the question if you're able.

9    BY MR. GRADY:

10        Q    Do you have the document in front of you?

11        A    Yes, I do.

12        Q    All right.  In the course of your request for

13   verification of information, did this document come to your

14   attention?

15        A    Yes, it did.

16        Q    Do you know approximately when it did?

17        A    No, I don't.

18        Q    I guess it was in August?  Do you know?

19        A    It was during -- during the processing and

20   underwriting of the file.

21        Q    All right.  But this is some information you

22   would have needed to demonstrate where some of the money

23   was coming from?

24        A    This would have been in reference to verifying

25   the down payment was made.

1       Q    All right.  Turn to WHEAT 301.

2                     (Off the record briefly.)

3                MR. FOGDALL:  She has it in front of her.

4  BY MR. GRADY:

5       Q    Can you tell me what was going on at the time you

6  wrote this e-mail?

7       A    I'm not sure which Wheatley file this e-mail

8  pertains to, but I'm basically asking JD to change the

9  product so I can approve the loan.

10      Q    This is dated 7/20/04.  Does that help you?

11      A    No.

12      Q    And the product still has not changed.  The

13  product was the original financing, which we talked about

14  in the beginning of this deposition; is that correct?

15      A    I had a hard time hearing you.

16      Q    The product that we're referring to --

17      A    Yeah.

18      Q    -- is that the product that we were discussing at

19  the beginning of the deposition?

20      A    Yes, the no ratio.

21      Q    No ratio, or there was another one also being

22  discussed at the beginning.

23      A    And we counteroffered to a stated.

24      Q    Why did you have to get this off your desk?

25      A    Well, because I can't just hold files.

```
 1        Q      You need something to be done.  Okay.

 2               Do you recall what JD's reaction was to this?

 3        A      Without reviewing the file, no.

 4        Q      Do you recall if you were getting any other

 5   e-mails from JD?

 6        A      I don't recall any.

 7        Q      Did you normally communicate with him by

 8   telephone or by e-mail?

 9        A      E-mail.

10        Q      You talked about a concern having a CPA confirm

11   employment.  Is there any other way that you're permitted

12   to confirm employment other than a CPA?

13        A      I also needed the CPA to help me with the asset

14   situation.

15        Q      There were two issues, one was the employment,

16   and the other one was the asset?

17        A      Right.

18        Q      Let's talk about the employment.  Could you

19   verify employment with some assistance other than a CPA?

20        A      Depending on the product, in some cases

21   possibly.

22        Q      How about in this case?

23        A      I'd have to review the file again.

24        Q      Did you make any specific conditions about the

25   repair of the Wheatley house by -- what I mean is, any
```

 1    certain work had to be done or -- I guess I'm trying to ask

 2    you about what exactly Wheatley had to do to meet your

 3    concerns about the house.

 4                    MR. FOGDALL:  Objection to the form of the

 5    question.  There's been no testimony relating to

 6    conditions or work that Mr. Wheatley had to do to meet

 7    Ms. Fazzino's approval.  If you can answer the question,

 8    go ahead and answer it.

 9        A    Okay.  Can you ask the question again?  I

10    apologize.

11    BY MR. GRADY:

12        Q    Okay.  In your testimony, you indicated that, at

13    least early on, one of the reasons for turning down

14    Wheatley was because of the need for repairs as pointed out

15    in the appraisal?

16                    MR. FOGDALL:  Objection to the form of

17    the --

18    BY MR. GRADY:

19        Q    Do you recall that?

20                    MR. FOGDALL:  Objection to the form of the

21    question, mischaracterizes the witness' prior testimony.

22    Go ahead and answer the question if you can.

23        A    Are you referring to the first loan?

24    BY MR. GRADY:

25        Q    Yes.

1        A      The first loan was declined due to property.

2        Q      Right.  And then my question is:  Did you as the

3    underwriter ever make any specific and direct directions to

4    anybody as to any repairs that Wheatley had to do?

5               MR. FOGDALL:  Objection to the form of the

6    question.  Go ahead and answer it if you can.

7        A      I don't remember asking anyone to make any

8    repairs, no.  That's not something that I would do.

9    BY MR. GRADY:

10       Q      Is it your testimony that at the beginning to the

11   end between August 6 and August 13, you didn't know if the

12   repairs had been made on Wheatley's house or not?

13              MR. FOGDALL:  Objection to the form of the

14   question.  Go ahead and answer.

15       A      Without -- again, without reviewing the file, I

16   was not made aware that all of the repairs were completed,

17   and I don't remember if any were.  I have nothing in front

18   of me to review.

19              MR. GRADY:  All right.  I think that's all we

20   have.  I'd like to thank you for your time and patience.

21   Your counsel has a right to ask you some questions now if

22   he wishes.

23              MR. FOGDALL:  Yes, I will ask some

24   questions.  Why don't we take a five-minute break, and

25   then we'll do that.

```
 1              MR. GRADY:  Okay.

 2         (Off the record:  12:25 p.m. to 12:49 p.m.)

 3              (Off-the-record discussion.)

 4              MR. GRADY:  A few more questions.

 5    BY MR. GRADY:

 6       Q    Turn to WHEAT 300.

 7              MR. FOGDALL:  You know what?  I -- let me

 8    see if I can track that down.  I'm tempted, though -- I've

 9    been organizing these documents in the way I want to

10    question about them, and you did tender the witness.  I'm

11    tempted to say we should go ahead and do my questions, and

12    you can follow-up at the end.  I don't want to be

13    difficult, Mr. Grady, but I would prefer to do it that way.

14              MR. GRADY:  It doesn't matter to me.

15              MR. FOGDALL:  All right.

16              MR. GRADY:  Want to go with yours?  I

17    understand the difficulty being organized.

18              MR. FOGDALL:  I just don't want to mess up

19    the organization that I've got here.

20              MR. GRADY:  Okay.  Go with yours, and I'll

21    come back.

22              MR. FOGDALL:  Okay.  I appreciate it.

23

24

25
```

```
1              C R O S S - E X A M I N A T I O N

2

3    BY MR. FOGDALL:

4        Q    This is my opportunity to ask follow-up questions

5    to clarify things that came up when Mr. Grady was

6    questioning you.  Let's begin with the Anderson loan.  Now,

7    you indicated that this Retail Loan Approval which was

8    dated July 10, 2004, if I understood it correctly, this

9    document reflected the conditions that the Andersons would

10   have to satisfy in order to obtain their loan?  Did I

11   understand that correctly?

12       A    Yes.

13       Q    That's correct?

14       A    Yes, that is correct.

15       Q    And you did mark here satisfactory appraisal

16   supporting minimum value of $266,666?

17       A    Yes, I did.

18       Q    Having that appraisal was a condition for the

19   Andersons to obtain a loan in this case?

20       A    Yes, it was.

21       Q    And as of July 10, 2004, do you know if an

22   appraisal for the property the Andersons sought to purchase

23   had been complete?

24       A    I do not know.

25       Q    Actually, Mr. Grady, when he was asking you about
```

1    the Anderson transaction, he showed you the appraisal for

2    the Anderson property, which --

3        A    Right.

4        Q    -- which we saw was dated August 5, 2004?

5        A    Yes.

6        Q    And that's at the plain Bates label 00003.  So

7    that would indicate on the date that you filled out the

8    Retail Loan Approval, there had not yet been a satisfactory

9    appraisal of the Anderson property; is that correct?

10       A    Correct.

11       Q    So am I correct in understanding that when you

12   were approving the Andersons for a loan, that was subject

13   to the ultimate completion of a satisfactory appraisal?

14       A    Yes.

15       Q    And Mr. Grady also discussed with you this

16   mortgage loan committment document which is Bated labeled

17   000105 to 110.  And you discussed with him that on page 109

18   of that document, one of the conditions listed was

19   satisfactory appraisal supporting minimum value of

20   $266,666, correct?

21       A    Yes.

22       Q    So, again, that indicates that it was a condition

23   of the Andersons obtaining their loan that they have such a

24   satisfactory appraisal?

25       A    Yes.

1      Q    And you did, in fact, ultimately receive the

2   appraisal that we just discussed that's dated August 5,

3   2004, correct?

4      A    Yes.

5      Q    And I believe you indicated when Mr. Grady was

6   questioning you that based on your review of this

7   appraisal, the 8/5/04 appraisal, you were not aware of any

8   concerns about the condition of the property as reflected

9   in that appraisal, correct?

10     A    Correct.

11     Q    Would you have any awareness of the condition of

12   the property before this appraisal was completed, the

13   8/5/04 appraisal?

14     A    No.

15     Q    So if there had been repairs that were needed to

16   that property or other issues with its condition, you

17   wouldn't be aware of those, because they weren't reflected

18   in the appraisal?

19     A    Correct.

20     Q    Because the appraisal -- strike that.

21          MR. GRADY:  Objection to this.  This is

22   your witness, and I think these are leading questions.  I

23   object to these leading questions.  If you want me to

24   continue to object, I'll continue to object, but I know

25   that you do intend to use this deposition further, and I

1    think I'd like to make it clear on the record that they

2    are leading, and I'm objecting to the leading questions,

3    and you can continue, but objections are -- if you want,

4    I'll make them question-by-question.  If you want me to

5    make a general objection, you can keep on going on.

6              MR. FOGDALL:  I won't stipulate to a

7    general objection.

8              MR. GRADY:  All right.

9              MR. FOGDALL:  So I'll have to ask you to

10   object as you feel is appropriate.

11   BY MR. FOGDALL:

12        Q    If there had been repairs that were needed to the

13   Anderson property and if they had been completed before

14   this appraisal was finished, would that be reflected in the

15   appraisal?

16        A    Depending on the -- no.  Every once in a while an

17   appraiser will say, you know, recently renovated, but in

18   this case, the appraisal said nothing.

19        Q    And at one point, Mr. Grady asked you if there

20   were issues with the condition of the Anderson property,

21   and I believe that you said that there weren't any.  Can

22   you explain what you meant by that?  You said there weren't

23   any issues with the condition of the Anderson property?

24        A    At the time that I underwrote the loan, I had no

25   knowledge that there was any issues or problems or concerns

1     with the property.  When the appraisal came in, I reviewed

2     the appraisal in its entirety, and it did not reflect

3     anything.

4               MR. FOGDALL:  Okay.  Let's go ahead and

5     mark this as 1 through 3.  We're going to mark those three

6     documents as 1 through 3.

7               MR. GRADY:  Can you specify --

8               MR. FOGDALL:  Yes.  The Retail Loan

9     Approval will be 1.  The appraisal will be 2, and the

10    mortgage loan committment will be 3.

11              (Exhibit 1 marked for identification;

12    Retail Loan Approval, Anderson.)

13              (Exhibit 2 marked for identification;

14    Appraisal, Anderson.)

15              (Exhibit 3 marked for identification;

16    Mortgage Loan Committment, Anderson.)

17    BY MR. FOGDALL:

18        Q     Let's turn to the Wheatley loan.  The first

19    document I want to show you relating to the Wheatley loan

20    is this document WHEAT00069.  Can you identify what that

21    document is?

22        A     It's a down payment check written on the business

23    account to the seller.

24        Q     So those are funds drawn on Mr. Wheatley's

25    business account?

1      A    Yes.

2      Q    Those are his business funds?

3      A    Yes.

4                MR. GRADY:  Let's mark that as number 4.

5                (Exhibit 4 marked for identification; Copy

6      of down payment Check Number 994.)

7      BY MR. FOGDALL:

8      Q    All right.  The next document I want to show you

9      is -- can you recognize this document?

10     A    This is a mortgage loan application.

11     Q    And for the record, this is WHEAT000319 to 326.

12     Can you tell from looking at it which of the two Wheatley

13     loan applications this is?

14     A    I would have to reference the account number on

15     top.

16     Q    The account number is 6995009.  Do you recall

17     that that is the account number for the first Wheatley loan

18     application?

19     A    Yes, it is.

20     Q    And do you see on page WHEAT000323 there's a

21     product code indicated?  What does that say?

22     A    FNNR30FEX, which means it is a conforming no

23     ratio loan.

24     Q    So that indicates Mr. Wheatley and his wife were

25     applying for a no ratio loan?

```
 1        A     Yes.

 2        Q     Now I want to show you one of the documents that

 3   we provided to Mr. Grady this morning by fax.  This is a

 4   12-page document entitled "Underwriting Guidelines:

 5   Product-specific," and then further down it says

 6   "Conforming Investor Expanded Criteria Fixed Rate

 7   Products."  What does that mean?

 8        A     These are underwriting guidelines specific to

 9   that product.

10        Q     Specific to fixed rate products?

11        A     The expanded criteria fixed rate product.

12        Q     Now, am I correct in understanding that -- if we

13   go to page 7 of this document, it says no ratio program.

14   Do you see that?

15        A     Yes.

16        Q     So am I correct in understanding that beginning

17   on page 7, this document is giving us underwriting criteria

18   that apply to a no ratio loan?

19        A     Yes.

20        Q     And so these would apply to this first loan

21   application that the Wheatleys --

22        A     Yes.

23        Q     -- filled out?

24        A     Yes.

25        Q     And do you see in here on any page of this
```

1    document the credit score that is -- the minimum credit

2    score that is required for a no ratio loan?

3         A    Yes, it is on page 8 of 12.  It's on the bottom,

4    and the minimum required FICO score is based on the LTV.

5    Any LTV over 75 would require a 700 FICO score.

6         Q    And in this case, what was the ratio for

7    the -- what was the loan to value of the Wheatleys -- of

8    the loan the Wheatleys were initially applying for?

9         A    Ninety percent.

10        Q    So that would be above the 75-percent

11   threshold?

12        A    Correct.

13        Q    And, therefore, what FICO score would they need

14   to have?

15        A    700.

16        Q    And now I'll show you, this is a document which

17   I don't believe Mr. Grady asked you about today.  It's

18   WHEAT000348 to 000368.

19             MR. FOGDALL:  Mr. Grady, do you have that

20   in front of you or can you get it?

21             MR. GRADY:  I have -- I don't know why I

22   haven't got 348 immediately in front of me, but I have 349

23   to 369 immediately in front of me.

24             MR. FOGDALL:  You don't have 348?

25             MR. GRADY:  I might have had it separately,

1    but --

2                  MR. FOGDALL:  It was one of documents that

3    actually you identified in the --

4                  MR. GRADY:  I think that's why I just have

5    the one page, the 348, and all the rest of it I have with

6    my other stuff.  Let me see if I can find 348 that goes

7    with it, and if I can't, I would suggest you simply go

8    forward.

9                  MR. FOGDALL:  Okay.  I can fax it down to

10   you if you'd like me to.

11                 MR. GRADY:  I think we're all right.

12                 MR. FOGDALL:  Okay.

13   BY MR. FOGDALL:

14       Q    Do you recognize what this document is, the

15   document that begins WHEAT000348?

16       A    It's a credit report for Lloyd and Audria

17   Wheatley.

18       Q    And are you able to determine from looking at

19   this what Mr. Wheatley's FICO score would have been?

20       A    Yes.

21       Q    And where is that?

22       A    Each borrower has three FICO's, and it's

23   underwriting policy to take the middle FICO for each and

24   then the lower of the two.

25       Q    So the middle FICO for Mr. Wheatley was what?

1    A    681.

2            MR. FOGDALL:  We're going to mark that as

3    5.

4            (Exhibit 5 marked for identification;

5    Uniform Residential Loan Application, WHEAT000319-326.)

6            (Exhibit 6 marked for identification; Credit

7    report, WHEAT000348-368.)

8    BY MR. FOGDALL:

9    Q    Now I'm going to show you -- so before we move

10    on, I was about to put a new document in front of you, but

11    before we do that, just to clarify this, so Mr. Wheatley,

12    when he originally applied for his loan, had too low a FICO

13    score for the no ratio program?

14    A    Yes, he did.

15    Q    And now, this document WHEAT000308 dated

16    July 17, 2004, what is this document?

17    A    This is a document that is basically

18    counteroffering the borrower a no ratio loan to a stated

19    loan.

20    Q    Okay.  And Mr. Grady asked you about this

21    document, WHEAT 314 to 315, in connection with the document

22    308.  So I'm going to put both of them in front of you.

23    And tell me now what this new document represents.

24    A    The new document, WHEAT 314 and 315, is an

25    internal document that the underwriters will use to

1    basically explain why they're doing what they're doing.

2         Q    Okay.  And on 315, WHEAT 315, you have checked

3    here denied?

4         A    Right.  His original loan request for the no

5    ratio product is being denied.  However, we are offering

6    him another product.

7         Q    Okay.  So in one sense the loan is being denied,

8    but in another sense he's being offered a different -- a

9    loan being on a different term?

10        A    Correct.

11        Q    And again all of this is as of July 17, 2004,

12   correct?

13        A    Yes.

14        Q    Okay.  So it appears that at this point a

15   decision is made to offer the Wheatleys an alternative loan

16   product, which is the stated income loan product?

17        A    Yes.

18        Q    And that's consistent with this product code here

19   on WHEAT000315?

20        A    Yes.

21        Q    FNSI30FEX?

22        A    Yes.

23        Q    And just to make it clear, what does FN refer

24   to?

25        A    FannieMae.

```
1          Q     SI refers to what?

2          A     Stated income.

3          Q     30FEX?

4          A     30 is the term, FEX is the expanded approval

5     criteria.

6          Q     All right.  And then I'll show you WHEAT 296 to

7     297.  And what is that?

8          A     WHEAT 296 to 297 is the underwriting form that I

9     would use to list all my conditions.

10         Q     So did you prepare WHEAT 296 to 297, that

11    document, which is titled "Retail Loan Approval," did you

12    prepare this once the counteroffer was made to the

13    Wheatleys to do a stated income loan instead of a no ratio

14    loan?

15         A     Yes, it was done in connection.

16         Q     So is it correct to say that the Retail Loan

17    Approval sheet WHEAT 296 to 297, that that encapsulates the

18    conditions that the Wheatleys would have to satisfy to get

19    the stated income loan that was now being offered to

20    them?

21         A     Yes.

22         Q     And, again, line 2 of this Retail Loan Approval

23    says what?

24         A     Satisfactory appraisal supporting minimum value

25    of $266,667, and it needed to be an interior/exterior
```

```
 1    appraisal.

 2         Q    So, again, there's a requirement that the

 3    Wheatleys have to satisfy of obtaining a satisfactory

 4    appraisal for their home?

 5         A    Correct.

 6         Q    The home they wanted to purchase?

 7         A    Correct.

 8              MR. FOGDALL:  The Notice of Action Taken

 9    will be 7.  The Fair Lending Analysis Tool will be 8, and

10    the Retail Loan Approval will be 9.

11              (Exhibit 7 marked for identification; Notice

12    of Action Taken, WHEAT000308.)

13              (Exhibit 8 marked for identification; Fair

14    Lending Analysis; WHEAT000314-315.)

15              (Exhibit 9 marked for identification; retail

16    Loan Approval; Fair Lending Analysis Tool,

17    WHEAT000296-297.)

18    BY MR. FOGDALL:

19         Q    Earlier counsel asked you about this document

20    beginning with WHEAT000331.  What is that document?

21         A    This is the Uniform Appraisal Report.

22         Q    So this is the appraisal for the Wheatley

23    property?

24         A    Yes, it is.

25         Q    And can you see on page WHEAT00335, what's the
```

1    date on that?

2         A     July 12, 2004.

3         Q     Now, if the appraisal is dated July 12, 2004,

4    would it generally take a few days for the appraisal to

5    make its way to you once it's sent to Wachovia?

6         A     Definitely, at least a few days.

7         Q     How long typically?

8         A     Depending on the appraiser, it could take

9    anywhere from 72 hours to a week.

10        Q     So you might not receive this document until,

11   say, July 20, 2004?

12        A     Yes.  And this document is going to go to the

13   processor.  Then she needs to give it to me.

14        Q     So it's likely that this document came to you

15   after July 17, 2004?

16        A     Yes.

17        Q     So once you received this appraisal, what did you

18   do with it?

19        A     I reviewed the appraisal in its entirety, and I

20   believe this is when I noticed that there were some

21   property issues.

22        Q     Now let me show you this.  This is WHEAT000299.

23   What is this?

24        A     This is a Notice of Action Taken.  This is a form

25   indicating that the property -- that the borrowers' loan

1    was denied due to value or type of collateral not being

2    sufficient.

3        Q    So it looks like the chronology went something

4    like this:  The Wheatleys applied for their loan as a

5    no ratio loan, correct?

6        A    Yes.

7        Q    You then checked their credit report, and

8    Mr. Wheatley's credit rating was not high enough for a

9    no ratio product?

10       A    Correct.

11       Q    So Wachovia counteroffered to a stated income

12   loan?

13       A    Yes.

14       Q    Then the appraisal came in, and you looked it

15   over, correct?

16       A    Correct, yes.

17       Q    And you noted the concerns mentioned in the

18   appraisal, and these concerns are documented on page

19   WHEAT000337?

20       A    Yes.

21       Q    You saw those concerns?

22       A    Yes.

23       Q    And it became clear to you that -- what became

24   clear to you at that point?

25       A    That this loan -- this property, I should say,

1    had some health and safety issues and would not be

2    marketable.

3        Q    So as of July 22, 2004, Wachovia denied the loan

4    as counteroffered, correct?

5        A    Denied the loan based on the property.

6        Q    Okay.  All right.  Now I want to discuss with you

7    a set of documents that Mr. Grady had before you earlier

8    today.  This is WACH00001 to 19.  And what does this

9    document represent?

10       A    These are general appraisal guidelines that would

11   really pertain to mostly all products as far -- as long as

12   it's a conforming loan.

13       Q    And let me draw your attention back to the

14   product-specific guidelines for the fixed rate product that

15   we discussed earlier.  Can you read the language here near

16   the top of the page, page 1 of 12?  There's some language

17   that begins "NOTE:."  What does that say?

18       A    "For additional underwriting topics not included

19   in this section, Conforming Investor Underwriting

20   Guidelines apply."

21       Q    What does that mean?

22       A    Basically, it means that all general underwriting

23   guidelines would apply as well as any product-specific

24   underwriting guidelines.

25       Q    Is it fair to say that the language you just read

1    in the product-specific guidelines is telling you that the

2    guidelines reflected in the document WACH1 to WACH19 also

3    apply --

4         A    Yes.

5         Q    -- to the fixed rate product?

6         A    Yes.

7         Q    All right.  So the guidelines, again, the

8    guidelines WACH1 to 19, they would apply to both the

9    no ratio product --

10        A    Yes.

11        Q    -- that the Wheatleys wanted to apply for

12    initially and the stated income product that they were

13    counteroffered?

14        A    Yes.

15        Q    All right.  Now let's turn to page WACH4.  Could

16    you just read this first paragraph under Condition of

17    Property on WACH4?

18        A    "Condition of Property.  For existing

19    construction" --

20        Q    And when you read, naturally we read quite a bit

21    faster than we speak.

22        A    Okay.

23        Q    So go a little slow so the court reporter can get

24    it all down.

25        A    For existing construction, an appraisal may be

1    based on the "as is" condition of the property if minor

2    conditions do not affect the livability of the product

3    exists -- such as minor deferred maintenance -- as long as

4    the appraiser's opinion of value reflects the existence of

5    these conditions.  The underwriter must review carefully

6    the appraisal for a property appraised in an "as is"

7    condition to ensure that the property does not have any

8    physical deficiencies or conditions that would affect its

9    livability.  If there are none, Wachovia Mortgage

10    Corporation does not need to require minor repairs to be

11    completed before it delivers the mortgage to the

12    investor.

13        Q    And when you were reading just now, I believe you

14    read the first sentence, an appraisal may be based on the

15    "as is" condition of the property if minor conditions that

16    do not affect the livability of the product exist, but the

17    language actually is property.

18        A    Did I say product?

19        Q    I believe you did.

20        A    Okay.  It should have been property.

21        Q    Based on your review of the appraisal for the

22    Wheatley property that's dated as of July 7, 2004, when you

23    received this appraisal and reviewed it, in your view did

24    it satisfy the condition that you just read from the

25    underwriting guidelines?

1       A     No, it did not.

2       Q     Why not?

3       A     Due to the health and safety issues.

4       Q     All right.  Let's look specifically at the

5    appraisal and the concerns noted in it.  Well, before we do

6    that -- I do want to come back to that.  Actually, let's

7    stick with the appraisal.  So this is -- reading from

8    WHEAT000337, do you see here this sentence about a third of

9    the way down, the paragraph that's titled Summary of Market

10   Data?

11      A     Starting with "it"?

12      Q     "It does appear."

13      A     Yes.

14      Q     What does that say?

15      A     It does appear work is needed on wood shake roof

16   but assumed not to have any leakage.

17      Q     Reading that as an underwriter, would that

18   language cause you some concern?

19      A     Yes.

20      Q     If the appraiser says that he assumes that

21   there's no leakage, is that good enough to satisfy an

22   underwriter?

23      A     No.  He's not a licensed roofer.

24      Q     And do you see here a little bit further up that

25   page beginning with condition adjustment, what does that

1   say?

2       A    Condition adjustments also reflect lack of heat

3   in subject property on second floor.

4       Q    And do you see a little bit further down the page

5   again, apparent lack -- what does that sentence say?

6       A    Apparent lack of heat on second floor represents

7   functional obsolescence.

8       Q    When you see that in an appraisal, does that

9   indicate to you that the property is livable or

10  unlivable?

11      A    Lack of heat would render that property

12  unlivable.

13      Q    And what about the concern here about the wood

14  shake roof?  Is that enough to raise concern about the

15  livability of the property?

16      A    Yes, because I need to confirm that there's no

17  leaking, and that if there is damage, it needs to be

18  repaired so it doesn't get worse.

19      Q    And then a little bit further down here, this is

20  maybe two-thirds of the way down the paragraph, "it does

21  appear," what does that say?

22      A    It does appear some of the piping in basement is

23  wrapped with asbestos, however appraiser is not a hazardous

24  waste expert, toxic substance expert, asbestos expert or

25  environmental expert, and any additional information

1    regarding possible asbestos in basement should be obtained

2    from a certified expert.

3        Q    As an underwriter reading that, did that cause

4    you concern about the livability of the property?

5        A    Yes, it did.

6        Q    Based on your review of this appraisal, what did

7    you conclude about the livability of the property?

8        A    It was not acceptable or satisfactory.

9            MR. FOGDALL:  Okay.  Let's go ahead and

10   mark these.  So the Notice of Action Taken dated July 22,

11   2004 will be marked as 10.  The Underwriting Guidelines:

12   Conforming, that set of documents will be marked as 11,

13   and the appraisal will be marked as 12.

14           (Exhibit 10 marked for identification;

15   Notice of Action Taken dated 7/22/04, WHEAT000299.)

16           (Exhibit 11 marked for identification;

17   Underwriting Guidelines:  Conforming, WACH000001-19.)

18           (Exhibit 12 marked for identification;

19   Appraisal, WHEAT000331-342.)

20   BY MR. FOGDALL:

21       Q    Now I want to show you another document.  It's

22   WHEAT 170 to 177.  Do you recognize what this is?

23       A    Yes.  It's a residential loan application.

24       Q    Based on your review of that application, are you

25   able to tell which of the two applications that is for the

1   Wheatleys?

2          A     Yes.   There's a number on the top right corner.

3          Q     What is it?

4          A     6940176.

5          Q     Am I correct in thinking that's the second loan

6   application --

7          A     Yes, it is.

8          Q     -- that the Wheatleys completed?

9          A     Yes, it is.

10         Q     Help me with the chronology here.   The original

11  loan application got counteroffered to a stated income

12  product, but then it had to be denied because of the

13  condition of the property, correct?

14         A     Correct.

15         Q     But the Wheatleys were then given the opportunity

16  to apply for another loan?

17         A     Yes.

18         Q     And that's what this second loan application

19  represents?

20         A     Yes.

21         Q     And can you read on page WHEAT000174, there's a

22  product code indicated there.   What is that?

23         A     FNSI30FEX, the stated income product.

24         Q     So again the Wheatleys are applying for a stated

25  income product?

1        A     Yes, they are.

2        Q     And is a stated income product an income

3   verification product?

4        A     No.   Income is not verified; however, employment

5   is.

6              MR. FOGDALL:  Mr. Grady, were you trying to

7   say something there?

8              MR. GRADY:  No, I wasn't.

9              MR. FOGDALL:  We heard some noise, and I

10  just wanted to make sure the connection is working.

11  BY MR. FOGDALL:

12       Q     All right.  So we're looking at -- let's turn now

13  back to a document we were discussing earlier.  It's the

14  Underwriting Guidelines: Product Specific, that document

15  that refers specifically to fixed rate products.  Now, on

16  page 1 of 12, it says "Stated Income Program."  What does

17  that represent?

18       A     Those are the product-specific guidelines for the

19  stated income program.

20       Q     Okay.  And earlier we talked about how, starting

21  on page 7 of this document, are underwriting guidelines for

22  the no ratio program?

23       A     Correct.

24       Q     So the first seven pages then or the first six

25  and a half pages relate to a stated income program?

```
 1        A     Yes.

 2        Q     These are the guidelines for the stated income

 3   program?

 4        A     Yes.

 5        Q     Okay.  Now, can you read here on page 2 of 12 of

 6   the fixed rate products guidelines, this is again page 2,

 7   beginning with the paragraph Employment?

 8        A     "Employment:  Although the actual stated amount

 9   of income is not verified, our investors do require that

10   the stated income makes sense in relation to the source of

11   income that was indicated on the application.  Income must

12   be reasonable and consistent with the source of income,

13   assets and credit profile."

14        Q     What does that mean?

15        A     Basically, it means that the amount of income the

16   borrower states has to make sense with his whole overall

17   profile, his spending habits, his savings, everything.

18        Q     And the language referring to "our investors

19   require that the stated income makes sense," what does "our

20   investors" refer to?

21        A     This loan would be sold on the secondary market,

22   and how I underwrite the loan must conform to how the

23   investor wants it.

24        Q     And the investor would be who?

25        A     FannieMae.
```

1      Q    Now, moving on to page 4 of 12, again we're

2    staying here with the fixed rate products underwriting

3    guidelines.  Read here for down payment.

4      A    "Down payment:  Minimum 10% must be from

5    borrowers own funds including equity from other

6    properties."

7      Q    What does that mean, "minimum 10% must be from

8    borrowers own funds"?

9      A    The borrower must have 10 percent of his own

10   money, his own personal accounts in the transaction.

11      Q    Okay.  We'll come back to that.  Now, moving on

12   to page 5 of 12, there's some language beginning "Asset

13   Test:."  First of all, just generally explain what this

14   part of the underwriting guidelines pertains to, and then

15   we can get into specifics.

16      A    The asset test is a product-specific guideline,

17   and it basically means that whenever a borrower is in the

18   stated income product, he has to satisfy the asset test

19   which would support the amount of income that he stated he

20   earned monthly.

21      Q    Reading here, this is again page 5 of 12, can you

22   read the sentence beginning "in addition" and then stopping

23   at -- it's actually two sentences.  The first sentence is

24   "in addition," and the second sentence ends with "business

25   on the Schedule C."  Can you read those two sentences?

1        A    In addition, equity in property owned (whether

2    liquidated via sale or through utilization of an equity

3    line), and funds from a business (other than Schedule C) do

4    not provide any kind of validation of the income stream and

5    would not be considered acceptable in terms of meeting --

6    in terms of meeting the purpose of the asset test.  When

7    using the assets of a Schedule C business to meet the asset

8    test, the CPA must confirm that the borrower files the

9    business on Schedule C.

10       Q    Okay.  So if a person applying for a loan has a

11   business, his own business, and he files the profits and

12   losses for that business when he files his federal income

13   tax returns, he files the profits and losses for that

14   business on a Schedule C, this guideline would relate to a

15   person like that, correct?

16       A    Yes.

17       Q    So what does it mean when the guidelines talk

18   about the CPA must confirm that the borrower files the

19   business on a Schedule C?

20       A    The CPA would be confirming that, one, he's

21   self-employed, how long he's self-employed, and what type

22   of self-employment he is, meaning a sole proprietor, a

23   corporation, an LLC.

24       Q    Is the CPA also confirming that the profits and

25   losses of the business are filed on Schedule C?

1          A     Yes.

2          Q     And so if a person applying for a loan does his

3     own taxes, does his own tax forms, doesn't use a CPA to do

4     the taxes for his business, would that person be able to

5     satisfy this guideline?

6          A     No.

7          Q     And is it your understanding that Mr. Wheatley

8     could not satisfy this guideline?

9          A     Correct.  I was told he did not have a CPA.

10               MR. FOGDALL:  Let's go ahead and mark these

11    as 13 for the loan application and 14 for the fixed rate

12    products guidelines.

13               (Exhibit 13 marked for identification;

14    Uniform Residential Loan Application; WHEAT000170-177.)

15               (Exhibit 14 marked for identification;

16    Underwriting Guidelines: Product-Specific.)

17    BY MR. FOGDALL:

18         Q     Mr. Grady discussed this document with you today

19    as well?  It's WHEAT000230.

20         A     Yes.

21         Q     And you indicated this was your handwriting.

22    What is this document?

23         A     This was known as the comments log, and it would

24    be in the file.

25         Q     And what does that mean, the comments log?

1      A    You know, anything that the underwriter or

2   processor would note, anything that they felt that was

3   necessary on this log.

4      Q    You indicated earlier that the notes on this log

5   indicate discussions between you and JD and some other

6   individuals about how to make the Wheatley loan work?

7      A    Yes.

8      Q    Again, in general terms, what were those

9   discussions about?

10      A    They're pretty much surrounding why we were not

11   able to do the loan at 90 percent, but what we could do for

12   the borrower and getting the exception done and where the

13   secondary financing or that other 10 percent was coming

14   from.

15      Q    Is it fair to say the discussions reflected on

16   this comments log pertained more to the issues about

17   verification of Mr. Wheatley's assets and so on and not

18   about the condition -- not so much about the condition of

19   the property?

20      A    Correct.

21      Q    Now, you read an entry on this comments log dated

22   8/5, and I believe if you could just read that again, spoke

23   with --

24      A    Spoke with JD at great length several times

25   explained problems several times.

1       Q       What does that mean?

2       A       Well, it's a note that I made just documenting

3   myself that I did speak with JD more than once about the

4   problems I had on this file.

5       Q       Why did you have to speak to JD?

6       A       Well, he was a loan officer.

7       Q       Was JD having a hard time accepting what you were

8   telling him about the problems with the loan?

9       A       Yes.

10      Q       What do you mean by that?

11      A       JD and I had several conversations, which were

12  disagreements, about what I could and could not do on the

13  loan.

14      Q       Are you saying that JD really wanted the loan to

15  go through?

16      A       Yes.

17              MR. GRADY:  Objection, leading.

18  BY MR. FOGDALL:

19      Q       Is that correct?

20      A       It is correct.  JD -- the reason I did these

21  notes as specific as I did was because JD was really

22  beating me up with this, so I felt it necessary to -- I was

23  really frustrated.

24      Q       What do you mean he was beating you up?

25      A       He was calling me and he was arguing with me

1    about what I could and couldn't do.

2        Q    Because he wanted the loan approved?

3        A    Because he wanted the loan approved.

4        Q    Do you see earlier -- a little bit later on this

5    same document, there is the entry dated 8/11, and it looks

6    like this is after you've discussed the problems and have

7    indicated the loan would have to be done at 80 percent

8    instead of 90 percent.  Can you read the entry dated

9    8/11?

10        A    LO is pursuing 90 percent again.

11        Q    What does that mean?

12        A    That mean he pretty much is disregarding anything

13    that I've told him for the entire time I've had -- you

14    know, when we discovered the problem, and he is again

15    going back to the beginning where, Come on, let's do a

16    90 percent.

17        Q    He's trying to get the loan done at 90 percent?

18        A    Yes.

19            MR. FOGDALL:  Okay.  Let's go ahead and

20    mark this as 15.

21            (Exhibit 15 marked for identification;

22    Handwritten notes, WHEAT000230.)

23    BY MR. FOGDALL:

24        Q    Just for identification purposes what is this

25    document, WHEAT 150?

1        A    This is page 2 of what we call "the flat."  It's

2    an internal document that we would use to document why we

3    were doing an exception.

4        Q    Down here at the bottom of the page it's signed

5    by Terri Hamm?

6        A    Yes.

7        Q    Who was Terri Hamm?

8        A    Terri Hamm was the operations -- I forget her

9    title -- operations something, but she was basically the

10   exceptions officer.  So it was basically her decision

11   whether we could do this loan as an exception.

12       Q    And ultimately the decision about whether the

13   loan would be 80 percent or 90 percent, whose decision was

14   that ultimately?

15       A    Hers.

16       Q    Terri Hamm's?

17       A    Terri Hamm's.

18       Q    To your knowledge, has Terri Hamm ever been to

19   Delaware?

20       A    I don't know.  I don't know.

21       Q    Have you ever been to Dover, Delaware?

22       A    No.

23       Q    To your knowledge, have you ever had any contact

24   with residents who live near Silver Lake in Dover,

25   Delaware?

1      A     No.

2      Q     To clarify that question, to your knowledge have

3  you ever had any contact with residents near Silver Lake

4  other than one of the plaintiffs in this case?

5      A     No.

6      Q     Because you did, in fact, have some contact with,

7  I believe, Mr. Anderson in this case; isn't that correct?

8      A     Someone did call me.

9      Q     Do you know who that person was?

10      A     Unless I wrote it down, I don't.

11      Q     I can direct your attention to the line.  It's an

12  entry dated 8/11, 6:30 p.m.

13      A     Borrower friend called in looking for

14  information, did not give.

15      Q     Do you recall who that friend was?

16      A     I don't.

17      Q     You say here that you did not give this person

18  the information they were looking for?

19      A     Correct.

20      Q     Now, why not?

21      A     It's confidential.

22      Q     It's confidential why?

23      A     I would never, nor would anyone, discuss one

24  borrower's loan with another borrower.

25      Q     Because the information related to Mr. Wheatley

1    and Mrs. Wheatley, you couldn't discuss it with this person

2    who was calling you?

3         A    Correct.

4         Q    Are you aware of the demographic makeup of the

5    neighborhoods around Silver Lake in Dover, Delaware?

6         A    No.

7         Q    Has anybody ever discussed with you the

8    demographic makeup of the neighborhoods around Silver Lake

9    in Dover, Delaware?

10        A    No.

11        Q    Did James Hogsten, JD Hogsten, did he at any time

12   discuss with you the race of either Mr. and Mrs. Anderson

13   or Mr. and Mrs. Wheatley?

14        A    No.

15        Q    Did he ever discuss with you the race of Mr. and

16   Mrs. Wilkins?

17        A    No.

18             MR. FOGDALL:  Let's go ahead and mark

19   Wheatley 150 as 16.

20             (Exhibit 16 marked for identification;

21   Internal document documenting reason for exception,

22   WHEAT000150.)

23   BY MR. FOGDALL:

24        Q    Now, this is another document we discussed

25   earlier today.  Can you tell me what this is?  It's not

1    Bates labeled, but describe it as best you can.

2         A    This is the Retail Loan Approval sheet for the

3    Wheatley loan.  It's an internal underwriting sheet, and

4    the loan number ends in 0176, and it basically lists all

5    the conditions that I would need.

6         Q    What loan application does this document relate

7    to?

8         A    This is the second loan, 176.  Yes, this is the

9    second loan.  And this appears to be the final 110.

10        Q    And you have here, see the E that's circled?

11        A    Yes.

12        Q    What does that mean?

13        A    That's an internal procedure we used to do, just

14   to know -- anyone that goes in the file knows this file is

15   an exception.

16        Q    Okay.  And does this document reflect the basis

17   for the exception that was made for the Wheatley loan?

18        A    Yes, it does.

19        Q    Where does it reflect that?

20        A    Line 2.  I did not sign off on the condition.

21   Insted I wrote exception and initialed it, and that was for

22   a satisfactory appraisal.

23        Q    What does that mean?  That there was not a

24   satisfactory appraisal?

25        A    Correct, yes.  Line 21, again I wrote exception

1    and initialed it, copy of cancelled check for earnest money

2    deposit in the amount of $13,333.

3        Q    And that was an exception why?

4        A    Because it was written on a business account,

5    and, again, I couldn't speak with the CPA.

6            And then line 27, verification of 10 percent

7    borrower own funds in transaction and borrower satisfying

8    asset test, and I did not sign off on it.  I wrote

9    exception and initialed it.

10       Q    So the loan was made to the Wheatleys despite all

11   of these problems?

12       A    Yes.

13       Q    Now, when a loan is made as an exception, can

14   that loan be sold on the secondary market?

15       A    No.  We would retain it.

16       Q    So FannieMae would not buy that loan?

17       A    Correct.  They would not even know about it.

18           MR. FOGDALL:  Let's mark this as 17.

19           (Exhibit 17 marked for identification;

20   Retail Loan Approval, Wheatley, loan number ending 0176.)

21   BY MR. FOGDALL:

22       Q    Okay.  I'm going to show you two more

23   documents.  Can you identify these?  The first one here

24   dated August 3, '04, what is that?

25       A    It's a letter from a company called Air Doctor X,

1    heating and air conditioners.  It's WHEAT00066.

2        Q     What is this document?

3        A     It's a letter that says, This letter is in

4    regards to the inspection of the basement insulation at the

5    residence of 584 North Dupont Highway.  The pipe insulation

6    in basement area was encapsulated at time of inspection.

7        Q     And the 584 North Dupont highway is whose

8    property?

9        A     That's our subject property for Mr. Wheatley.

10       Q     The language you just read about the pipe

11   insulation in the basement was encapsulated at time of

12   inspection, what does that mean?

13       A     That means that when he went out on August 3, the

14   asbestos was encapsulated.

15       Q     The asbestos around the pipes in the basement of

16   Mr. Wheatley's house --

17       A     Right.

18       Q     -- of 584 North Dupont Highway?

19       A     Correct.

20       Q     And what does that mean that it's encapsulated?

21       A     It would mean to me that that problem has been

22   taken care of.

23       Q     So the -- in other words, the concern flagged in

24   the appraisal relating to asbestos, this inspection is

25   enough to satisfy that concern --

```
1          A    Yes.

2          Q    -- that the asbestos is not dangerous?

3          A    Yes.

4          Q    But in your view, is it necessary to have an

5    inspection like this done based on language in the

6    appraisal?

7          A    What kind of -- an inspection from the Air

8    Doctor?

9          Q    Yes.

10         A    Yes.  Oh, definitely.

11         Q    So this inspection was absolutely required?

12         A    Yes.  The appraisal noted a very serious safety

13   and health issue.  This inspection will take care of it.

14         Q    Now, the appraisal also talked about problems

15   with the roof, the wood shake roof?

16         A    Correct.

17         Q    And how the appraiser assumed there wasn't a

18   leak?

19         A    Right.

20         Q    But you still felt that was troubling?

21         A    Right.

22         Q    What is this document here now I'm showing you?

23         A    It's from a company called Thomas Home Repair.

24   It's WHEAT000053.  It's dated August 10, 2004, and it says,

25   Dear Mr. Wheatley, after careful inspection of your
```

1    property, I find that there is no sign of damage to your

2    roof, nor is there any evidence inside indicating there is

3    or have been a leak anywhere.  It is my best opinion that

4    the roof won't need any type of repair done to it for at

5    least a couple of years more.

6        Q    Again, that's dated August 10, 2004?

7        A    Yes.

8        Q    Which is -- am I correct in understanding that

9    that's three days before the Wheatleys' purchase of the

10   property at 584 Dupont Highway closed?

11       A    I believe so, yes.

12       Q    Again, this was prompted by the language in the

13   appraisal?

14       A    Absolutely.

15       Q    But having this in the file satisfied you and

16   Wachovia that there was --

17       A    Yes.

18       Q     -- not a concern about the roof?

19       A    Right.  Yes.

20       Q    Okay.  But still it was necessary to have this

21   inspection done?

22       A    Right.  Our investors would be looking for this

23   type of documentation.

24       Q    When you say our investors would be looking for

25   that, why is that?

1      A    To ensure any health and safety issues have been

2  eliminated.

3      Q    You're saying FannieMae would be looking for this

4  type of documentation?

5      A    Correct.

6              MR. FOGDALL:  Let's mark these as 18 and 19.

7              (Exhibit 18 marked for identification;

8  Letter dated 8/3/04 from Air Doctor X, WHEAT000066.)

9              (Exhibit 19 marked for identification;

10  Letter dated 8/10/04 from Thomas Home Repair, WHEAT000053.)

11             MR. FOGDALL:  All right that's all the

12  questions that I have.  Mr. Grady, do you have any

13  additional questions?

14             MR. GRADY:  Yes.

15

16             R E D I R E C T   E X A M I N A T I O N

17

18  BY MR. GRADY:

19      Q    Could you look at WHEAT 300?

20             MR. FOGDALL:  Remind me what WHEAT 300

21  is.

22             MR. GRADY:  Home mortgage disclosure.

23             MR. FOGDALL:  Give me a minute.

24             (Off the record briefly.)

25             MR. GRADY:  Since we're marking exhibits,

1   we've had a lot of exhibits marked, there's a little

2   problem with being 200 miles away.  Can we at some point

3   in time make a copy of this document and mark it as the

4   next exhibit or just -- unless you have suggestions, but

5   I'd like to get some of these exhibits marked.  Can we do

6   that?

7              MR. FOGDALL:  Yes.  Do you --

8              MR. GRADY:  We can talk about this, or I

9   can just send exhibits to the court reporter, whichever

10  way you want to do it.  I just want to make sure before we

11  leave this whole subject of the exhibits, we have some

12  understanding of how we're operating.  I don't mind just

13  sending them to the court reporter, but, I like I say, we

14  have to kind of come to some closure on what we're going

15  to do with the rest of the exhibits.

16             MR. FOGDALL:  You're right.  I don't think

17  at this point we're going to be able to go back through as

18  we sit here and identify all the documents that you talked

19  about with the witness when you were questioning her

20  unless you made a list of them.  Then we can refer to that

21  and collect them.  I tried to do that as you were going

22  along, but I confess I didn't do a 100-percent complete

23  job of that.  So I don't know that I can reconstruct all

24  the documents that you showed her.  Given that, I'm

25  comfortable with, after you get the transcript, going

1    through it and identifying the documents that you

2    discussed with her and then having those marked after the

3    fact.

4                    MR. GRADY:  All right.  That's fine.  Let's

5    keep going.

6                    MR. FOGDALL:  Mr. Grady, we'll just number

7    them sequentially, then, with the exhibits that we marked

8    just now when I was questioning her.

9                    MR. GRADY:  You finished with number 19.

10   I'll start with number 20.  Okay?

11                   MR. FOGDALL:  Okay.

12   BY MR. GRADY:

13       Q    You have WHEAT 300 in front of you?

14       A    Yes.

15       Q    This document I guess starting with line 13 and

16   14 refers to ethnicity and race?

17       A    Yes.

18       Q    Do you see that?

19       A    Yes.

20       Q    And this is Mr. Wheatley's document, I believe.

21   And it's has -- applicant race has a 3.  Do you see that?

22       A    Yes.

23       Q    What does 3 stand for?

24       A    I have to be honest with you, the inputting of

25   the information on this form was the responsibility of the

1   processor, so I'd have to go back and look it up.  This was

2   done on a different system.

3        Q    Whose signature is down there?

4        A    That is my signature.

5        Q    You just signed off on this?

6        A    I did.

7        Q    Did you know when you were processing this whole

8   thing that Mr. Wheatley was black?

9        A    No, I did not.

10       Q    Or that Mr. Anderson was black?

11       A    No.

12       Q    So you had no idea?

13       A    It's really not relevant.

14       Q    I'm just asking you if you knew.

15       A    No, I did not.

16       Q    Okay.  But when you signed off on this, did you

17  know what the 3 meant, the race?

18       A    To be honest with you, no.  I never really

19  paid -- as an underwriter, you're required to know so many

20  guidelines and review so many documents, as you can see

21  with all these exhibits, that something like that just

22  really didn't, I didn't have to worry about it.

23       Q    Do you know why this requirement is on the form?

24       A    I'm sorry?

25            MR. FOGDALL:  Objection.

1    BY MR. GRADY:

2        Q     Do you know why the form asks for race?

3               MR. FOGDALL:  Objection to form and

4    foundation.  Go ahead and answer if you can.

5        A     I know that all mortgage companies do compile

6    this information, and it is reported to the federal

7    government in some way, shape or form.

8        Q     Do you know if there were documents prepared that

9    go out to the federal government?

10              MR. FOGDALL:  Objection to the form of the

11   question.  If you understand it, go ahead and try to

12   answer it.

13       A     That is not done in this building, so I don't

14   know how they do it or when they do it.

15   BY MR. GRADY:

16       Q     Let me go back to some of your testimony.  You

17   talked about -- you talked about the appraisal of

18   Mr. Wheatley's property.  Do you recall that?

19       A     Yes.

20       Q     And you testified that there were several

21   concerns that you saw in the appraisal?

22       A     Correct.

23       Q     Among others, there might have been the roof,

24   asbestos and heating on the second floor?

25       A     The lack of heat on the second floor.

1      Q    Now, and you also testified that when the second

2    loan -- second application was approved, there was an

3    exception made, and one of the exceptions was that you were

4    not requiring an appraisal.  Did I get that right?

5    A    No, you misunderstood that.

6    Q    What was the exception about the appraisal?

7    A    The exception was on the property, not the

8    appraisal.  The exception for Mr. Wheatley was due to

9    basically layering of risk, which included the property

10    condition, the employment and the assets.

11    Q    Let me just go back a minute.  The document which

12    we've referred to, I think it was not one of the original

13    documents, and you referred to line 21 -- line 2, line 21

14    and line 27?

15    A    That's the Retail Loan Approval sheet.

16         MR. FOGDALL:  We marked it as Exhibit 17.

17    BY MR. GRADY:

18    Q    On that one, I think that might have been one of

19    the documents that was sent later, or I don't have the

20    first page.  But in any event, the first thing you refer to

21    is line 2?

22    A    Yes.

23    Q    That was an exception, right?

24    A    Line 2 is telling me that the property is part of

25    the exception, yes.

1        Q    Are you telling me that that loan, the second

2    loan application was still conditioned on a proper

3    appraisal?

4        A    Yes.

5        Q    Now, we only have one appraisal I've seen in this

6    file.  That's the July 2004 appraisal.  Are you aware of

7    any other appraisals?

8        A    No.

9        Q    The appraisal that we have appraises the value of

10    the property, but it cites certain problems with the

11    property; is that correct?

12        A    Yes, it is.

13        Q    Now, am I correct -- okay.  Did you specifically

14    ask anybody to go back and re-appraise the property or

15    re-examine the property to see if any of these problems had

16    been corrected?

17        A    I don't remember doing that.

18        Q    In any event, you're not aware of any paperwork

19    that reflects that, are you?

20        A    No.  Well, no.

21        Q    Do you know if the appraiser ever went back to

22    the property after his initial July appraisal?

23        A    I don't know if he did.  He may have, but I don't

24    know.  When the appraisal came in and I noted the issues,

25    that would have been communicated to the loan officer.

1    What transpired after that, I don't know.

2        Q    And you have testified that you got some kind of

3    document dealing with the asbestos issue; is that

4    correct?

5        A    Yes.

6        Q    You got a document dealing with the roof issue?

7        A    Yes.

8        Q    You got a document dealing with the heating on

9    the second floor?

10       A    I do not have a document on that.

11       Q    So -- and I think you testified that was a

12   serious problem?

13       A    Yes.

14       Q    Why did you approve of the loan without some sort

15   of verification about the heating on the second floor?

16              MR. FOGDALL:  Objection to the form of the

17   question.  Go ahead and answer if you can.

18       A    The loan was done as an exception.

19   BY MR. GRADY:

20       Q    What does that mean?

21       A    The loan was done as an exception meaning we

22   would not be selling that loan; it was flagged as an

23   exception loan.  And the borrower was asked to sign a hold

24   harmless agreement at closing regarding all of the property

25   concerns.

1      Q     If it was done as an exception, does that mean

2  that you weren't requiring --

3      A     That we would not require the borrower to satisfy

4  any more property conditions or employment or asset

5  conditions.

6      Q     You mean you weren't requiring the borrower to

7  necessarily make all the repairs that are identified in the

8  July appraisal?

9      A     Yes.

10     Q     So if that's the case -- did you specifically ask

11  the borrower to get a statement about the condition of the

12  roof?

13     A     I don't believe I ever spoke with Mr. Wheatley.

14     Q     Did you ask -- did you tell JD Hogsten or anybody

15  that the borrower has to get a statement about the

16  condition of the roof?

17     A     I don't remember the conversation; however, when

18  an appraisal comes in, if there are issues, I will

19  communicate what those issues are, and the borrower would

20  have or the loan officer would have the ability to try to

21  correct that.

22     Q     As I understand it, it wasn't necessary to

23  correct these problems to process this loan?

24            MR. FOGDALL:  Objection to the form of the

25  question, serious mischaracterization of the witness'

1   testimony.

2   BY MR. GRADY:

3       Q    You can answer that.

4               MR. FOGDALL:  If you're able to answer

5   that, go ahead.

6       A    In order to maintain the salability of this loan

7   and give the borrower the loan amount that he initially

8   requested, all of these items would have had to have been

9   corrected.

10  BY MR. GRADY:

11      Q    I thought -- correct me if I'm wrong.  I thought

12  the whole purpose of the exception was he didn't have to

13  necessarily --

14              MR. FOGDALL:  You completely misunderstood

15  her testimony.  That was not her testimony.

16              MR. GRADY:  We'll go back.  Let her answer

17  the question, not have counsel answer the question, if you

18  don't mind.

19              MR. FOGDALL:  I didn't answer the question.

20  I objected to your question, because it mischaracterized

21  her testimony, which is a perfectly appropriate objection.

22  Go ahead and ask your question.

23  BY MR. GRADY:

24      Q    We can agree that you didn't make any

25  verification of the issue of no heat on the second floor;

1      isn't that correct?

2                    MR. FOGDALL:  Objection to the form of the

3      question.

4          A    As far as I know, that loan closed without heat

5      on the second floor as an exception loan at an 80 percent

6      LTV.

7      BY MR. GRADY:

8          Q    And this loan, as I understand it, was a loan

9      that was going to be kept by Wachovia; is that correct?

10         A    Yes.

11         Q    In your testimony, you talked about it being

12     necessary to have these different repairs done, because the

13     investors would be concerned about it?

14         A    Correct.

15         Q    What investors are you talking about?

16         A    FannieMae.

17         Q    Why would FannieMae be involved?

18         A    FannieMae is where we sell our loans or other

19     investors that use the same guidelines.

20         Q    I thought you said you were not going to sell

21     this loan?

22         A    The original loan request at 90 percent would

23     have gone to an investor of FannieMae or FannieMae.  We

24     were not able to sell the loan with the property in the

25     state that it was in in our inability to verify the asset

1    conditions as well as the employment.

2        Q    So this particular loan FannieMae wouldn't have

3    been involved in; is that correct?

4        A    The exception loan?

5        Q    Yes.

6            MR. FOGDALL:  Objection to the form of the

7    question.  If you understand the question, you can try to

8    answer it.

9        A    Okay.  If the loan is made an exception, it would

10   not be sent to FannieMae.  Due to the property condition,

11   the employment and the asset situations, we were not able

12   to sell this loan; therefore, it was made an exception at

13   80 percent.

14   BY MR. GRADY:

15       Q    Even if you hadn't received any documentation

16   about the status of the roof, would you agree that this

17   loan could have still gone through as an exception at a

18   20 percent loan?

19           MR. FOGDALL:  Objection to the form of the

20   question.  It's based on a misunderstanding of the

21   witness' testimony about what making an exception

22   involves.

23   BY MR. GRADY:

24       Q    Would you please answer the question?

25       A    Could you ask it again?  I'm not following what

1    you're asking.

2                MR. GRADY:  I ask the court reporter to

3    read that question back.

4                (The question on page 124, line 15,

5                was read by the Court Reporter.)

6        A    Yes, because you have to remember that this

7    exception was due to layering of risk.  It wasn't just the

8    property, and it wasn't just the employment.  It was the

9    property and the employment and the assets.  That is what

10   rendered the loan an exception.

11   BY MR. GRADY:

12       Q    Could the loan also have gone through if you

13   hadn't gotten the statement about the asbestos?

14       A    Gone through as what?  As an exception or a

15   marketable loan?

16       Q    An exception.

17       A    It would still have gone through as an exception

18   as long as the borrowers agreed to sign a hold harmless

19   agreement at closing.

20       Q    To the best of your knowledge, did these

21   borrowers in this case sign a hold harmless agreement?

22       A    Yes, I believe that they did.  It's signed off

23   on -- I'm sorry.  It says at closing.  There's no initials,

24   so I'm assuming they did.

25               MR. GRADY:  We have a document which you

 1    identified as the Underwriting Guidelines:

 2    Product-Specific document.  I'm not sure if I have the

 3    number.  This is one of the ones without any Bates numbers

 4    on it.  Could you put that in front of the witness,

 5    please?

 6              MR. FOGDALL:  All right.  This is

 7    Exhibit 14.  She has it.

 8    BY MR. GRADY:

 9        Q    Now, Exhibit 14 at page 2?

10        A    Yes.

11        Q    It states that the -- in the middle under

12    Employment, that the borrower must have two years of

13    continuous self-employment in the same line of business in

14    the same location?

15        A    Yes.

16        Q    There's no suggestion on this page that that has

17    to be verified by a CPA, is there?

18        A    On this page, no there is not.

19        Q    On page 5, is it correct that the CPA is supposed

20    to make some verification about the assets?

21        A    Typically, if a borrower is using business

22    accounts, business assets, we would need some type of

23    verification from the CPA to ensure the withdrawal will not

24    negatively impact the business, as that will affect future

25    earnings, and that he has access to those funds.

```
 1          Q      Are there any other types of verification of

 2   self-employment other than the CPA?

 3          A      To verify the employment?

 4          Q      Yes.

 5          A      Sometimes we can go with a business license.

 6   It's really on a case-by-case.

 7          Q      In this case, there's been some discussion in

 8   different depositions that with respect to the Anderson

 9   loan, there was initially an appraisal person who went out

10   to the facility who did not ultimately make an appraisal.

11   Do you have any knowledge at all about the circumstances of

12   that or have you ever heard of that even?

13          A      No, I haven't.

14          Q      From your point of view, the first time you saw

15   an appraisal on the Anderson property was when the document

16   which has been produced first came to you, which was the

17   Anderson appraisal?

18          A      Correct.

19          Q      Just to clarify several things, in the event you

20   had never gotten that statement about the roof, would this

21   loan have been able to go through anyway?

22          A      As a what?

23          Q      As an exception 20 percent loan?

24          A      You know, that would have been up to the

25   exception officer, because any time an exception officer
```

1    approves a loan as an exception, any deviations, she or he

2    must be made aware of.

3        Q    When the exception officer approved this loan,

4    was there any condition that the roof had to be

5    reexamined?

6              MR. FOGDALL:  Objection, object to the form

7    and lack of foundation.  Go ahead an answer if you can.

8        A    I would think not, because we had them sign a

9    hold harmless.

10   BY MR. GRADY:

11       Q    All right.  In this case, there have been several

12   references to a uniform residential loan application.  Do

13   you recall generally those references?

14             MR. FOGDALL:  Objection to the form.

15       A    Not really.  We've talked about a lot.

16   BY MR. GRADY:

17       Q    All right.  Turn to WHEAT 170.

18             MR. FOGDALL:  Off the record for a second.

19                (Off the record briefly.)

20             MR. FOGDALL:  Okay.  She has it.

21   BY MR. GRADY:

22       Q    In the course of processing this loan, is this a

23   document that you would have seen?

24       A    Yes.

25       Q    Turn to page 172?

1       A       Uh-huh.

2       Q       The document that I have identifies the race of

3   the applicant?

4       A       Yes, it does.

5       Q       Is that something that you would have an

6   opportunity to look at when you processed this?

7       A       Yes, if I looked at it.

8               MR. GRADY:  All right.  I think we're

9   finished.

10              To clarify on the record, after I get a

11  transcript back, I'm going to identify all the exhibits

12  that have not previously been identified, and maybe I'll

13  confer with counsel, but the goal will be to send them to

14  the court reporter with exhibit numbers on them.

15              MR. GRADY:  Okay.  Now, this WHEAT 300,

16  were you intending to have that marked today?  You asked

17  the witness about it at the start of your second round of

18  questions.

19              MR. GRADY:  Not necessarily.

20              MR. FOGDALL:  Understood.

21              MR. GRADY:  No, I'll just include that with

22  the other documents, if that's okay to you.

23              MR. FOGDALL:  Yes.

24              MR. GRADY:  With that, we'll sign off.

25  Anything else, Counsel?

```
 1                    MR. FOGDALL:  I have no more questions.

 2      Take care, Mr. Grady.

 3

 4                    (Deposition concluded:  2:18 p.m.)

 5

 6

 7

 8

 9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

1                           JURAT

2

3

4

5

6                _____

                          COLLEEN FAZZINO

7

8

9

10

11                Subscribed to and sworn before me on this

12    _____ of _____ 2007.

13

14                _____

15

16    My commission Expires:

17

18

19

20

21

22

23

24

25

```
1                          ERRATA SHEET

2   Page  Line    From                    To

3   _____

4   _____

5   _____

6   _____

7   _____

8   _____

9   _____

10  _____

11  _____

12  _____

13  _____

14  _____

15  _____

16  _____

17  _____

18  _____

19  _____

20  _____          _____

      Date                   COLLEEN FAZZINO

21  Sworn to before me this _____ day

    of _____, 2007.

22                           _____

                             Notary Public

23

    My commission Expires:_____

24

25
```

```
 1                    C E R T I F I C A T I O N
 2   STATE OF CONNECTICUT:
     COUNTY OF HARTFORD:
 3
 4        I, TIFFANY V. PRATT, a Notary Public duly commissioned
     and qualified in and for the State of Connecticut, do
 5   hereby certify that pursuant to Notice there came before me
     on the 6th of November, 2007, the following named person,
 6   to wit: COLLEEN FAZZINO, who was previously duly sworn to
     testify to the truth and nothing but the truth; that she
 7   was thereupon examined upon her oath; that the examination
     was reduced to writing by computer under my supervision and
 8   that this transcript is a true record of the testimony
     given by said witness.
 9
10        I further certify that I am neither attorney nor
     counsel for, nor related to, nor employed by any of the
11   parties to the action in which this deposition was taken,
     and further, that I am not a relative or employee of any
12   attorney or counsel employed by the parties hereto, or
     financially interested in the outcome of this action.
13
          In witness whereof I have hereunto set my hand
14
          this 7th day of December, 2007.
15
16
17        _____
                    Tiffany V. Pratt
18                  Notary Public
19
20   My Commission expires
          July 31, 2010
21
22
23
24
25
```

```
 1                BRANDON SMITH REPORTING SERVICE, LLC
                           44 Capitol Avenue
 2                    Hartford, Connecticut   06106
                           (860) 549-1850
 3

 4

 5    December 7, 2007

 6

 7    Stephen A. Fogdall, Esq.
      Schnader, Harrison, Segal & Lewis, LLP
 8    1000 Market Street, Suite 3800
      Philadelphia, PA  19103-7213
 9

      Dear Mr. Fogdall,
10
      Enclosed please find your copy of the deposition transcript
11    of COLLEEN FAZZINO taken on December 6, 2007.
12    The original jurat and errata sheets are also enclosed.
      Please note that the witness is allowed 30 days to read and
13    sign the deposition as the rules provide.
14    Please return only the original notarized jurat and errata
      sheets to Attorney Grady.  Thank you for your prompt
15    attention to this matter.
16    If you have any questions, please feel free to call me.
17    Sincerely yours,
18
19    Tiffany V. Pratt, LSR 00128
      Brandon Smith Reporting Service, LLC
20

21

22

23

24

25
```

# EXHIBIT B

# LOAN APPROVAL

Person to Contact ___MARIA BELO___
Borrower Name(s) ___LLOYD J WHEATLEY and AUDRIA L WHEATLEY___
Property Address 584 NORTH DUPONT HWY          DOVER, DE  19901          Lot # ___21533°___
Interest Rate __6.625__ %  Term __360__ months  Base Loan Amount $ __240,000.00__   Total Loan Amount $ ~~240,000.00~~
LTV __90.000__ %  CLTV __90.000__ %  Sales Price $ __266,667.00__   Appraised Value $ _____
Occupancy: ☒ Owner Occupied   ☐ Non Owner Occupied   ☐ Second Home
Program Name 30Yr Fixed Conform Stated Inc          ☐ SF ☐ 2-4 ☐ PUD ☐ Condo ☐ Lot
☒ Purchase   ☐ Const. Perm          TnSi30F2r
☐ Refinance ☐ Limited Cash Out ☐ Cash Out ☐ Streamline ☐ Enhanced Streamline ☐ No Cash Out ☐ Cash Out for Home Improvement

The captioned loan has been approved subject to the following items being submitted at or prior to closing:

| Cleared By: | At Closing: | Prior to Closing By: Other   U/W | |
|---|---|---|---|

### APPRAISAL/PROPERTY

- ☐ Appraiser to be approved by WMC.
- 2. ☐   ☐ ☒ Satisfactory appraisal supporting minimum value of $ __266,667__.
  - DU/LP: ☒ Interior/Exterior   ☐ Exterior only ☐ 2055 ☐ 2065 ☐ 2075 ☐ 2070
- 3. ☐   ☐ ☐ Fully executed sales contract with sales price of $ __266,667__
- 4. ☐   ☐ ☐ Appraiser's certification of satisfactory completion/repair ☐ with photos.
- 5. ☐   ☐ ☐ Appraiser re-certification of value (expired appraisal) supporting original value.
- 6. ☐   ☐ ☐ Appraiser required inspection by licensed contractor/municipality:
  - ☐ Termite ☐ Soil Treatment ☐ Well ☐ Septic ☐ Other _____
- 7 ☐   ☐ ☐
- 8. ☐   ☐
- 9. ☐   ☐ ☐ Life of loan flood certification.
- 10. ☐   ☐ ☐ Residential Construction Unit only: ☐ Plans and specs ☐ Builder approval ☐ Warranty Deed
  - ☐ Cost breakdown $ _____   ☐ Owner supplied bids for _____
  - at a cost of $ _____
- 11. ☐   ☐ ☐ Comparable Rent Schedule supporting fair market rent of $ _____
  - ☐ Form 216/Operating Income Statement   ☐ Manufactured Housing Certification
- 12. ☐   ☐ Other:
  - a) _____
  - b) _____
  - c) _____

### CREDIT 602

- 13. ☐   ☐ ☐ Evidence of payment in full and/or release of:

- 14. ☐   ☐ ☐ Explanation of inquiry(s) with no new debt.
- 15. ☐   ☐ ☐ Copies of canceled checks for previous 12 consecutive months of payments for:

- 16. ☐   ☐ ☐ Legally binding: ☐ divorce decree ☐ separation agreement ☐ property settlement.
- 17. ☐   ☐ ☐ Satisfactory 12 months' rental/mortgage payment history.
- 18. ☐   ☐ ☐ Other:
  - a) written letter Re occpancy (in file)
  - b) _____
  - c) Fully Executed Hold Harmless Agreement From
    Borrower Re: Encapsulated

### SOURCE OF FUNDS                Asbestos Prop Condition

- 19. ☐   ☐ ☐ Proof of sale of _____ evidenced by:
  - ☐ Executed closing statement with net proceeds of no less than $ _____
  - ☐ Relocation equity statement with net proceeds of not less than $ _____
  - ☐ _____
- 20. ☐   ☐ ☐ Evidence of receipt of $ _____ from:
  - ☐ Liquidation of _____
  - ☐ Gift funds/transfer from _____ (donor)
  - ☐ _____
- 21. ☐   ☐ ☐ Copy of canceled check for earnest money deposit. $ 3,333
- 22. ☐   ☐ ☐ Amount of earnest money deposit approved $ _____
- 23. ☐   ☐ ☐ Maximum seller contribution $ ~~40,000~~  6% or Actual O&S Costs
  - Per sales contract, seller to pay $ ~~0~~ (TBD) towards closing costs.
- ☐   ☐ ☐ Copy of executed Note from Acceptable Lender for subordinate financing for
  - $ 26,667 with payment no greater than $ _____ and term no less than 52,586
- 25. ☐   ☐ ☐ Maximum approved funds borrower can bring to settlement $ ~~13,000~~ (TBD)
- 26. ☐   ☐ ☐ ___ nths' most recent statement(s), supporting $ _____ from _____
  - ___ source of any large increase is required.
- 27. ☐   ☐ ☐ Other:
  - a) Use of 10% Borrow Funds in transaction
  - b) Prove Sol's Asset Test
  - c) _____

240110 (rev07 01/04) (1101)          Page 1 of 3          D B

EXHIBIT I.D.
17
TP
12-6-07 Fazzino

EATLEY

| Cleared By: | At Closing: | Prior to Closing by: Other U/W | |
|---|---|---|---|

### INCOME/EMPLOYMENT

| | 28. ☐ | ☐ | ☐ Executed: ☐ Federal Tax Return(s) for _____ (year) ☐ Personal ☐ Business |
| | | | ☐ Satisfactory YTD P&L ☐ Satisfactory YTD Balance Sheet  Supporting minimum monthly net income of $ _____ from _____ (source) |
| | 29. ☐ | ☐ | ☐ Executed IRS form 4506. |
| | 30. ☐ | ☐ | ☐ IRS W-2's for _____ (year) ☐ Borrower ☐ Co-Borrower |
| | 31. ☐ | ☐ | ☐ BORROWER satisfactory ☐ written VOE ☐ paystub(s) for☐ current ☐ prev employment supporting minimum gross monthly income of $ _____ |
| | | | ☐ CO-BORROWER satisfactory ☐ written VOE ☐ paystub(s) for ☐ current ☐ previous employment supporting minimum gross monthly income of $ _____ |
| | 32. ☐ | ☐ | ☐ Satisfactory verbal verification of employment to be performed within 30 days prior to closing for _____ Borrower ☐ Co-Borrower   *Stated* |
| | 33. ☐ | ☐ | ☐ Other: _____ |
| | | | a) _____ |
| | | | b) _____ |
| | | | c) _____ |

### GENERAL CONDITIONS

*@closing*

| | 34. ☑ | ☐ | ☐ Executed final application. |
| | 35. ☑ | ☐ | ☐☒No cash out at closing ☐ Limited cash out at closing: _____ % or $_____ |
| | | | ☐ Cash out at closing |
| | 36. ☐ | ☐ | ☐ Existing subordinate lien with _____ in the amount of $_____ must re-subordinate. |
| | 37. ☐ | ☐ | ☐ Funds for closing may not be from new subordinate financing. |
| | 38. ☐ | ☐ | ☐ Title may not disclose any subordinate financing. |
| | 39. ☑ | ☐ | ☐ Maximum interest rate allowed _7.625_ %. |
| | 40. ☐ | ☐ | ☐ Loan approval expiration date: _10|30|04_ |
| | 41. ☐ | ☐ | ☐ Maximum housing expense of $ _____ . Document expiration date: _10|31|04_ |
| | 42. ☐ | ☐ | ☐ _____ll approval certificate from _____ for _____ % coverage. |
| | 43. ☐ | ☐ | ☐ Executed FLAT by approved exception officer. |
| | 44. ☐ | ☐ | ☐ Satisfactory evidence of ☐ permanent residency status ☐ non-permanent residency status. |
| | 45. ☐ | ☐ | ☐ Approval by private investor. |
| | 46. ☐ | ☐ | ☒ Verification of final information can change loan risk classification and additional documentation may be required. |
| | 47. ☐ | ☐ | ☒ Fitech/MLS Data Entry Verification: |
| | | | Eligibility: ☒ FNMA ONLY (B) ☐ FHLMC ONLY (A) ☐ Both ☐ N/A |
| | | | DU/LP Special Feature Codes: ☒127 ☐213 ☐214 ☐361 ☐Other: _443_ |
| *MB* | 48. ☐ | ☒ | ☐ All WMC Disclosures and Initial Application signed by all borrowers. |
| | 49. ☐ | ☐ | ☐ Right of Rescission |
| *MB* | 50. ☐ | ☒ | ☐ Other: _Patriot Act_ |

### GOVERNMENT CONDITIONS

| | 51. ☐ | ☐ | ☐ Borrower must pay at least 3% ($ _____ ) of sales price towards down-payment and/or allowable closing costs (excluding prepaids and discount points). |
| | 52. ☐ | ☐ | ☐ Allowable seller contribution to be applied towards discount, then prepaids, then closing costs. |
| | 53. ☐ | ☐ | ☐ Borrower may pay maximum discount of _____ %. |
| | 54. ☐ | ☐ | ☐ Inspection report for: ☐ repairs ☐ completion, by ☐ Appraiser ☐ Compliance Inspector |
| | 55. ☐ | ☐ | ☐ VA only: Maximum seller contribution of 4% excluding common and customary closing costs. |
| | 56. ☐ | ☐ | ☐ Refinance only: The following may be financed: ☐ Discounts $ _____ |
| | | | ☐ Prepaids $ _____ . |
| | 57. ☐ | ☐ | ☐ Appraisal contingencies (new construction only): |
| | | | ☐ Certificate of Occupancy ☐ County Code Inspections ☐ Manufacturers' Warranties |
| | | | ☐ Carpet Identification ☐ Insulation Certificate ☐ Not inspected acknowledgment |
| | | | ☐ Energy efficient construction/builder certification ☐ Solders & flux certification |
| | | | ☐ 1-year warranty plan ☐ 10-year warranty plan |
| | 58. ☐ | ☐ | ☐ VA IRRRL only: Refinance comparison proposal. |
| | 59. ☐ | ☐ | ☐ Active duty certification to be checked on VA 1820. |
| | 60. ☐ | ☐ | ☐ VA only: fully completed and executed Request for Eligibility (VA 1880) |
| | 61. ☐ | ☐ | ☐ Other: _____ |

☐ DU   ☐ LP   ☐ ACE   DU/LP Decision: ☐ A/E ☐ A/I ☐ R/E ☐ R/I ☐ R/C ☐ O/S ☐ A   ☐ R   ☐ C   ☐ A-

Validator _____ Date _____

Loan approved by: _____

WMC Underwriter _____ Date _____   Second signature, if required _____ Date _____

# EXHIBIT C

RC# 0805983

6995009
WHEATLEY

# Uniform Underwriting and Transmittal Summary

## I. Borrower and Property Information

Borrower Name  LLOYD J WHEATLEY    SSN ███████
Co-Borrower Name  AUDRIA L WHEATLEY    SSN ███████080
Property Address  584 NORTH DUPONT HWY  DOVER, DE  19901

**Property Type**
- [x] 1 Unit
- [ ] 2-4 Units
- [ ] Condominium
- [ ] PUD   [ ] Co-Op
- [ ] Manufactured Housing
  - [ ] Single Wide  [ ] Multiwide

**Project Classification**
- [ ] A/III Condo   [ ] E PUD   [ ] 1 Co-op
- [ ] B/II Condo   [ ] F PUD   [ ] 2 Co-op
- [ ] C/I  Condo
- Project Name _____

**Occupancy Status**
- [x] Primary Residence
- [ ] Second Home
- [ ] Investment Property

**Additional Property Information**
Number of Units  1
Sales Price  $  266,667.67
Appraised Value  $  267,000.00

**Property Rights**
- [x] Fee Simple
- [ ] Leasehold

## II. Mortgage Information

**Loan Type**
- [x] Conventional
- [ ] FHA
- [ ] VA
- [ ] USDA/RHS

**Amortization Type**
- [x] Fixed Rate - Monthly Payments
- [ ] Fixed Rate - Biweekly Payments
- [ ] Balloon
- [ ] ARM (type) _____
- [ ] Other (specify) _____

**Loan Purpose**
- [x] Purchase
- [ ] Cash- Out Refinance
- [ ] Limited Cash-Out Refinance (Fannie)
- [ ] No Cash-Out Refinance (Freddie)
- [ ] Home Improvement
- [ ] Construction to Permanent

**Lien Position**
- [x] First Mortgage
- Amount of Subordinate Financing
- $ _____
- (If HELOC, include balance and credit limit)
- [ ] Second Mortgage

**Note Information**
Original Loan Amount $  240,000.00
Initial P & I Payment  $  1,556.64
Initial Note Rate  6.750 %
Loan Term (in months)  360

**Mortgage Originator**
- [x] Seller
- [ ] Broker
- [ ] Correspondent
Broker/Correspondent Name and Company Name:

**Buydown**
- [ ] Yes
- [x] No
Terms _____

**If Second Mortgage**
Owner of First Mortgage
- [ ] Fannie Mae   [ ] Freddie Mac
- [ ] Seller/Other
Original Loan Amount of First Mortgage
$ _____

## III. Underwriting Information

Underwriter's Name  COLLEEN FAZZINO  (PMI)
Appraiser's Name/License #  DANIEL A. GLADDEN/X2-0000032
Appraisal Company Name  GREENLINK

**Present Housing Payment:**  $  1,561.00

| Stable Monthly Income | Borrower | Co-Borrower | Total |
|---|---|---|---|
| Base Income | $ 18,333.00 | $ | $ 18,333.00 |
| Other Income | $ | $ | $ |
| Positive Cash Flow (subject property) | $ | $ | $ |
| Total Income | $ 18,333.00 | $ | $ 18,333.00 |

**Proposed Monthly Payments**
Borrower's Primary Residence
First Mortgage P & I  $  1,556.64
Second Mortgage P & I  $
Hazard Insurance  $  40.17
Taxes  $  97.83
Mortgage Insurance  $  132.00
HOA Fees  $
Lease/Ground Rent  $
Other  $
Total Primary Housing Expense  $  1,826.64

**Qualifying Ratios**
Primary Housing Expense/Income  9.964 %
Total Obligations/Income  32.104 %
Debt-to-Housing Gap Ratio (Freddie) ____ %

**Loan-to-Value Ratios**
LTV  90.000 %
CLTV/TLTV  90.000 %
HCLTV/HTLTV  90.000 %
PCLTV  90.000 %

**Other Obligations**
Negative Cash Flow (subject property)  $
All Other Monthly Payments  $  4,059.00
Total All Monthly Payments  $  5,885.64

**Qualifying Rate**
- [x] Note Rate  6.750 %
- [ ] ____% Above Note Rate  6.750 %
- [ ] ____% Below Note Rate  6.750 %
- [ ] Bought Down Rate ____ %
- [ ] Other ____ %

**Level of Property Review**
- [x] Exterior/Interior
- [ ] Exterior Only
- [ ] No Appraisal
Form Number: 2055

**Borrower Funds to Close**
Required  $  30,858.09
Verified Assets  $

**Risk Assessment**
- [ ] Manual Underwriting
- [x] AUS
  - [x] DU  [ ] LP  [ ] Other _____
  - AUS Recommendation  APPROVE/ELIGIBLE
  - DU Case ID/LP AUS Key #  693452875
  - LP Doc Class (Freddie) _____
Representative Credit/Indicator Score  681

**Escrow(T&I)**
- [ ] Yes  [x] No

Source of Funds  Checking/Savings
No. of Months Reserves _____
Interested Party Contributions ____ %

Community Lending/Affordable Housing Initiative  [ ] Yes  [x] No
Home Buyers/Homeownership Education Certificate in file  [ ] Yes  [x] No

**Underwriter Comments**
CREDIT SCORE-B1-681 , B2-696 , B3-0 , B4-0  LOAN SCORE-681
CREDIT SOURCE-B1-EX , B2-EQ  LOAN SOURCE-EX
DENIED DUE TO PROPERTY CONDITION    SPECIAL FEATURE CODES
UNABLE TO DO EXCEPTION PER TH    Code 1 127 Code 3    Code 5
Code 2 180 Code 4    Code 6 443

WMC PMI VARIANCE CODE    001
ELIGIBILITY CODE = FNMA

## IV. Seller, Contract, and Contact Information

Seller Name _____
Seller Address _____

Seller No. _____  Investor Loan No. _____
Seller Loan No. _____
Master Commitment No. _____
Contract No. _____

Contact Name _____
Contact Title _____
Contact Phone Number _____  Ext. ____
Contact Signature _____
Date _____

Freddie Mac Form 1077  01/04

Fannie Mae Form 1008  01/04

**WHEAT000317**

EXHIBIT
20
Fazzino 12-6-07

# EXHIBIT D

## Corbett ⓦ Wilcox

The Team to Trust in Court Reporting
230 North Market Street, Wilmington, DE 19801
phone (302)571-0510 fax (302) 571-1321
15 East North Street, Dover, DE 19901
phone (302)734-3534 fax (302) 734-3552

Corbett & Wilcox is not affiliated with Wilcox & Fetzer, Court Reporters

---

### Errata Sheet

Attach to the deposition of: J.D.Hoosten

In the Matter of: Anderson v Wachovia

Date of Deposition: Friday, November 02, 2007     Reporter: Robert Wilcox, Sr.

**Instructions:** After reading the transcript of your deposition, please note any changes or corrections and the reasons therefore on this errata sheet. Please *sign* and *date* the errata sheet and *return a copy to our offices. Attach the original errata to the original transcript.* Thank You.

| Page & Line | Change/Correction | Reason |
|---|---|---|
| 2/L22 | Seeneytown Road | misspelled |
| 26/L11 | Mullens | typo |
| 28/L7 | he couldn't | typo |
| 28/L12 | Mullens | typo |
| 30/L12 | Underwriting | typo |
| 33/L23 | Mullens | typo |
| 38/L18 | Private Mortgage Insurance | typo |
| 65/L11 | 8th .125 | typo |
| 88/L2 | Laws | typo |
| 100/L9 | Moores Lake | typo |
| | | |
| | | |
| | | |
| | | |

I have read the foregoing transcript of my deposition and, except for any corrections or change noted above, I hereby subscribe to the transcript as an accurate record of the statements made by me.

Date: Dec 7, 2007    Signature: _James D Hoosten_

Sworn to and subscribed before me this 7th day of Dec. 20 07

Notary _____

JAMES M. PALMER
Notary Public
State of Delaware
My Commission Expires on Nov 5, 2009

# EXHIBIT E

Not Reported in F.Supp.2d, 2006 WL 2724882 (D.Del.)

Motions, Pleadings and Filings

Only the Westlaw citation is currently available.

United States District Court,
D. Delaware.
DONALD M. DURKIN CONTRACTING, INC., Plaintiff
v.
CITY OF NEWARK, et al., Defendants
and
CITY OF NEWARK, et al., Third-Party Plaintiff
v.
DONALD M. DURKIN CONTRACTING, INC., and Federal Insurance Company, Third-Party Defendants
No. CVIA 04-163 GMS.
Sept. 22, 2006.

Katharine L. Mayer, McCarter & English, LLP, James S. Green, Seitz, Van Ogtrop & Green, P.A., Wilmington, DE, Paul A. Logan, Powell, Trachtman, Logan, Carrle & Lombardo, P.C., King of Prussia, PA, David T. Bolger, pro hac vice, Patrick R. Kingsley, David M. Burkholder, Stradley, Ronon, Stevens & Young, LLP, Malvern, PA, for Plaintiff/Third-Party Defendants.

Paul Cottrell, Victoria Kathryn Petrone, Tighe, Cottrell & Logan, P.A., Wilmington, DE, for Defendants/Third-Party Plaintiffs.

*MEMORANDUM*

SLEET, J.

I. INTRODUCTION

*\*1* Presently before the court is Federal Insurance Company's motion for reconsideration (D.I.136) of the court's April 5, 2006 Order denying summary judgment. Also pending are several related motions in limine (D.I.163, 165, 190). For the reasons that follow, the court will grant the motion for reconsideration and will reconsider, *sua sponte,* related aspects of its September 2, 2004 Order that denied the plaintiff's motion for partial summary judgment. In doing so, the court grants summary judgment to Federal Insurance Company ("Federal"). Durkin's motion for partial summary judgment is granted in part and denied in part.

II. FACTUAL BACKGROUND

In the summer of 2000, the City of Newark ("City") contracted with URS Corporation ("URS") "for professional services related to the design and construction administration" of a water-supply reservoir. (D.I. 98 ¶ 1.) In April of 2002, the City also contracted with Durkin to perform the actual construction (hereinafter, the "Construction Contract"). Federal provided a Performance Bond (the "Bond") to the City in connection with work to be performed by Durkin. Everything was proceeding more-or-less as expected until late 2003, when Durkin claims to have discovered defects in URS' design. From there, the relationship among the parties deteriorated, and the City eventually terminated Durkin by a letter dated February 3, 2004. In response, Durkin initiated the present action on March 16, 2004, naming as defendants the City, the mayor of Newark, certain members of the Newark City Council, and URS.

With respect to terminating Durkin, the City had contractual obligations under both the Bond and the Construction Contract. Under the terms of Section 15.2 of the Construction Contract between the City and Durkin, the City was required to provide Durkin and its surety, Federal, with seven days written notice of its intention to terminate Durkin for default. (D.I.122, Ex. A, Att.B, Sec.15.2.) The Bond also set forth a series of procedural steps that the City had to take before Federal became obligated under the Performance Bond:

If there is no Owner Default, the Surety's obligation under the Bond shall arise after:

3.1 The Owner has notified the Contractor and the Surety ... that the Owner is considering declaring a Contractor Default and has requested and attempted to arrange a conference with the Contractor and the Surety to be held not later than fifteen days after receipt of such notice to discuss methods of performing the Construction Contract. If the Owner, the Contractor and the Surety agree, the Contractor shall be allowed a reasonable time to perform the Construction Contract, but such an agreement shall not waive the Owner's right, if any, subsequently to declare a Contractor Default; and

3.2 The Owner has declared a Contractor Default and formally terminated the Contractor's right to complete the contract. Such Contractor Default shall not be declared earlier than twenty days after the Contractor and the Surety have received notice as provided in Subparagraph 3.1....

*2* (D.I.122, Ex. A, Att.A.)

The City claims that its letter of November 21, 2003 satisfied the seven-day notice requirement of Section 15.2 of the Construction Contract, as well as its obligation under Paragraph 3.1 of the Bond. The pertinent portion of that letter reads:

On behalf of the City of Newark, Delaware, I am writing to inform you that we are now considering declaring Donald M. Durkin Contracting, Inc. (DMD) in default of Newark Municipal Contract No. 02-02, pertaining to Construction of a Municipal Water Supply Reservoir. This precautionary letter has become necessary following DMD's failure to present a response to a means and methods for continuation of the project in accordance with our contract.

(D.I.122, Ex. A, Att. C.)

After the November 21 letter, Durkin, Federal and the City had a series of communications and interactions, which failed to resolve the ongoing disputes. Finally, the City voted to terminate Durkin. It is undisputed that the City terminated Durkin via a letter dated February 3, 2004, which stated:

Pursuant to the terms of the Contract and the Construction Performance Bond, the City of Newark declares a Contractor default and hereby formally terminates Donald M. Durkin Contracting, Inc.'s ("Durkin") right to complete the contract for the Construction of the City of Newark Water Supply Reservoir. The termination is for cause due to Durkin's refusal to complete the Work. This Default has been declared after notifying both the Surety and Durkin and attending a conference with the Surety and Durkin as the Bond requires.

(D.I.122, Ex. A, Att.F.)

The City of Newark sent another letter to Durkin and Federal, on February 4, 2004, offering to extend the effective date of termination for an additional seven days.

III. PROCEDURAL BACKGROUND

Durkin moved for partial summary judgment on June 29, 2004 (D.I.36). On September 2, 2004, the court issued an Order (D.I.63) denying Durkin's motion for partial summary judgment (the "September 2 Order"). On March 14, 2006, Federal filed a motion for summary judgment (D.I.122). On March 22-23, 2006, Ms. Carol Houck was deposed as the 30(b)(6) designee of the City. On March 24, 2006, the City filed its Answer to Federal's motion for summary judgment (D.I.126). Ms. Houck's deposition continued on March 28, 2006, and again on March 30, 2006. On March 31, 2006, Federal filed a Reply Brief to the City's March 24 Answer, relying for the first time on testimony from Ms. Houck's March 28 deposition. On April 5, 2006, the court issued a Memorandum and Order (D.I.132) denying Federal's motion for summary judgment (the "April 5 Order"). On April 17, 2006, Federal filed a motion for reconsideration (D.I.136) of the court's April 5 Order. Four days after Federal filed its motion for reconsideration, which expressly relies in part on the **deposition** testimony of Ms. Houck, Ms. Houck executed an **errata sheet** for her March 23 **deposition**, "clarifying" statements she made under oath. On May 2, 2006, Ms. Houck executed an **errata sheet** for her March 28 **deposition**, further "clarifying" statements made under oath. On May 3, 2006, the City filed its Answer to Federal's Motion for Reconsideration, in which it relied upon the **errata sheets** to rebut Federal's position.

*3 In conjunction with the pretrial conference held before the court on September 5, 2006, Durkin and Federal filed motions in limine (D.I.163, 165, 190), which have helped to bring into sharper focus the issues raised in the previous motions for summary judgment.

## IV. STANDARDS OF REVIEW

### A. Exclusion of Evidence

A court has broad discretion to admit or exclude evidence under the Federal Rules of Evidence. *Gumbs v. Int'l Harvester, Inc.,* 718 F.2d 88, 97 (3d Cir.1983). Motions to exclude evidence are committed to the court's discretion. *See In re Paoli R.R. Yard PCB Litig.,* 35 F.3d 717, 749 (3d Cir.1994) (on a motion to exclude proffered expert testimony, the trial court's inquiry is a flexible one, and its decision to admit or exclude expert testimony is reviewed under an "abuse of discretion" standard) (internal citations omitted). "[W]hen the district court's exclusionary evidentiary rulings with respect to scientific opinion testimony will result in a summary or directed judgment," the Court of Appeals will give those rulings "a 'hard look' to determine if a district court has abused its discretion in excluding evidence as unreliable." *Id.* at 750.

### B. Reconsideration

As a general rule, motions for reconsideration should be granted only "sparingly." *Tristrata Tech., Inc. v. ICN Pharms., Inc.,* 313 F.Supp.2d 405, 407 (D.Del.2004); *Karr v. Castle,* 768 F.Supp. 1087, 1090 (D.Del.1991). In this district, these types of motions are granted only if it appears that the court has patently misunderstood a party, has made a decision outside the adversarial issues presented by the parties, or has made an error not of reasoning, but of apprehension. *See, e.g., Shering Corp. v. Amgen, Inc.,* 25 F.Supp.2d 293, 295 (D.Del.1998); *Brambles USA, Inc. v. Blocker,* 735 F.Supp. 1239, 1240 (D.Del.1990) (citing *Above the Belt, Inc. v. Mel Bonhannan Roofing, Inc.,* 99 F.R.D. 99 (E.D.Va.1983)); *see also Karr,* 768 F.Supp. at 1090 (citing same). Motions for reconsideration should not be used to rehash arguments already briefed. *See Quaker Alloy Casting v. Gulfco Indus., Inc.,* 123 F.R.D. 282, 288 (N.D.Ill.1988) ("This Court's opinions are not intended as mere first drafts, subject to revision and reconsideration at a litigant's pleasure."). However, a court should reconsider a prior decision if it overlooked facts or precedent that reasonably would have altered the result. *Weissman v. Fruchtman,* 124 F.R.D. 559, 560 (S.D.N.Y.1989).

A court may grant a motion for reconsideration "if the moving party shows: (1) an intervening change in the controlling law; (2) the availability of new evidence that was not available when the court issued its order; or (3) the need to correct a manifest injustice." *Max's Seafood Café v. Quinteros,* 176 F.3d 669, 677 (3d Cir.1999).

### C. Summary Judgment

A grant of summary judgment is appropriate "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." FED. R. CIV. P. 56(c); *Biener v. Calio,* 361 F.3d 206 (3d Cir.2004). In reviewing summary judgment decisions, the Third Circuit views all evidence and draws all inferences in the light most favorable to the non-movant, affirming if no reasonable jury could find for the non-movant. *See Whiteland Woods, L.P. v. Twp. of West Whiteland,* 193 F.3d 177, 180 (3d Cir.1999). Thus, a trial court should only grant summary judgment if it determines that no "reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 248, 106 S.Ct. 2505, 2510, 91 L.Ed.2d 202 (1986).

*4 If a moving party has demonstrated the absence of a genuine issue of material fact-meaning that no reasonable jury could find in the nonmoving party's favor based on the record as a whole-concerns regarding the credibility of witnesses cannot defeat summary judgment. Instead, the nonmoving party must "present affirmative evidence in order to defeat a properly supported motion for summary judgment." *Liberty Lobby,* 477 U.S. at 256-57, 106 S.Ct. at 2514 (citation omitted). Thus, summary judgment is particularly appropriate where, notwithstanding issues of credibility, the nonmoving party has presented no evidence or inferences that would allow a reasonable mind to rule in its favor. In this situation, it may be said that the record as a whole points in one direction and the dispute is not "genuine." *Matsushita Elec. Indus. Co., Ltd. v.*

2006 WL 2724882

_Zenith Radio Corp.,_ 475 U.S. 574, 586, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986), 475 U.S. 574, 106 S.Ct. 1348, 1355-56, 89 L.Ed.2d 538 (1986).


V. DISCUSSION


A. Motions In Limine


1. Federal's Motion In Limine to Exclude the **Deposition Errata Sheets** of Carol Houck

Federal moves to exclude from admission into evidence at trial the **errata sheets** for the **deposition** of Ms. Carol Houck, the City's designated 30(b)(6) witness. Federal argues that the **errata sheets** provide a narrative substitute for Ms. Houck's sworn testimony and are, therefore, an attempt on the part of the City to create a sham fact issue. Specifically, Federal contends that Ms. Houck admitted in her March 28 **deposition** that the November 21 letter from the City to Durkin and Federal did not constitute notice under the terms of the Construction Contract. In her May 2 **errata sheet** , Ms. Houck writes: "my reply on line 9 is incorrect if it suggests that the November 21, 2003 letter was not the seven-day notice letter."

In response, the City argues that Ms. Houck was deposed over four days "in a random and confusing manner...." In arguing that Ms. Houck's **errata sheet** clarifications were appropriate, the City quotes from Ms. Houck's **errata sheet** regarding her third day of testimony, in which she states:

Once again during my **deposition** there were repeated references to various exhibits, out of order and with, I believe, the intent to confuse. I have now had the opportunity to review the **deposition** and further clarify that it is my belief that the letter of November 21, 2003 (Exhibit 20) served to ... provide notice of Default and termination to both the Surety (Bond) and Durkin (Contract) ...

(D.I. 137, Ex. A, Page 2.)

Corrections to deposition testimony are governed by Rule 30(e) of the Federal Rules of Civil Procedure. Rule 30(e) corrections are treated as affidavits. _Burns v. Board of County Comm'rs of Jackson County,_ 330 F.3d 1275, 1282 (10th Cir.2003). In _Franks v. Nimmo,_ the Tenth Circuit set forth a test for analyzing whether a party's affidavit constitutes an attempt to create sham issues of fact. 796 F.2d 1230 (10th Cir.1986)). Factors relevant to the existence of a sham fact issue include whether the affiant was cross-examined during her earlier testimony, whether the affiant had access to the pertinent evidence at the time of her earlier testimony or whether the affidavit was based on newly discovered evidence, and whether the earlier testimony reflects confusion which the affidavit attempts to explain. _Franks,_ 796 F.2d at 1237 (citing _Camfield Tires, Inc. v. Michelin Tire Corp.,_ 719 F.2d 1361, 1364-65 (8th Cir.1983); _Perma Research & Dev. Co. v. The Singer Co.,_ 410 F.2d 572, 578 (2d Cir.1969)).

**\*5** Here, Ms. Houck's earlier testimony occurred during a deposition, at which counsel for both the City and Federal were present and able to question the witness. Ms. Houck was not just a fact witness testifying on her personal knowledge; she was also the City's 30(b)(6) designee, and as such, had an affirmative obligation to be prepared on the noticed topics so that she could give complete, knowledgeable, and binding answers on behalf of the party. _See Ierardi v. Lorillard, Inc.,_ Civ. A. No. 90-7049, 1991 WL 158911, at \*1 (E.D.Pa. Aug.3, 1991). Ms. Houck's corrections were not based on new evidence, but concerned documents and actions about which she was obviously well acquainted. In her May 2 errata sheet, Ms. Houck does take issue with the manner in which she was deposed and states that she felt that counsel intended to confuse her. Notably, however, she stops short of saying she was in fact confused. Instead, Ms. Houck, after further review of her testimony, "clarifies" her answers by providing a substitute narrative for an appreciable portion of her deposition. The court can find no indication of confusion in the deposition transcript. In addition, it does not appear that Ms. Houck's attorney recognized any either. There is nothing in the record that suggests any attempt to rehabilitate Ms. Houck during, or immediately after the deposition, or otherwise clarify her statements until after Federal filed its motion for reconsideration.[FN1] Moreover, not only do Ms. Houck's errata sheet "clarifications" alter her answers on key issues in the case, they posit alternative theories and defenses that the City now appears to be preparing to advance at trial-an issue that the court will address below in a related motion in limine.

FN1. In _Franks,_ the Tenth Circuit also found noteworthy the timing of the disputed affidavit in

concluding that the conflict between the earlier testimony and the affidavit raised only a sham issue. There, it was offered only after summary judgment had been granted against the party offering the conflicting affidavit. *Franks, 796 F.2d at 1237.*

The court recognizes that *Fed.R.Civ.P. 30(e)* allows a deponent to make changes to **deposition** testimony in form or substance. Nevertheless, the court finds that Ms. Houck's **errata sheets** exceed the scope of the type of revisions contemplated by the Rule and serve only to improperly alter what was testified under oath. As has been aptly acknowledged by the Tenth Circuit, a **deposition** is not a take home exam. *See Garcia v. Pueblo Country Club,* 299 F.3d 1233, 1242 (10th Cir.2002) (quoting *Greenway v. Int'l Paper Co.,* 144 F.R.D. 322, 325 (W.D.La.1992)). The **errata sheet** "clarifications" in this case are akin to a student who takes her in-class examination home, but submits new answers only after realizing a month later that the import of her original answers could possibly result in a failing grade. The court is troubled by the timing of Ms. Houck's errata sheets as well as their use in the City's responsive briefing on Federal's motion for reconsideration. Nor can the court ignore the fact that Ms. Houck was the City's 30(b)(6) designee, intimately familiar with the facts and issues in this case. Accordingly, the court holds that the errata sheets constitute a sham fact issue under *Franks* and, as such, the errata sheets shall not be admitted as evidence at trial.


2. Durkin's Motion Regarding the Judicial Admission of the City of Newark Providing Prior Written Notice of Intent to Terminate the Contract

**\*6** A party's assertion of fact in a pleading is a judicial admission by which it normally is bound throughout the course of the proceeding. *Schott Motorcycle Supply, Inc. v. Am. Honda Motor Co., Inc.,* 976 F.2d 58, 61 (1st Cir.1992) (quoting *Bellefonte Re Insurance Co. v. Argonaut Insurance Co.,* 757 F.2d 523, 528 (2d Cir.1985)). If factual matters in issue have been judicially admitted, they are binding on the tendering party. *See, e.g., Parilla v. IAP Worldwide Services, VI, Inc.,* 368 F.3d 269, 275 (3d Cir.2004) (internal citations omitted). An admission in a pleading is a judicial admission, which is binding on the litigant. *See, e.g., Consol. Rail Corp. v. Providence & Worcester Co.,* 540 F.Supp. 1210, 1220 n. 12 (D.Del.1982) (citing *Giannone v. United States Steel Corp.,* 238 F.2d 544, 547 (3d Cir.1956)).

With this principle in mind, Durkin moves in limine to preclude the City from arguing or attempting to present any evidence that controverts the City's prior contentions in pleadings that its November 21, 2003 letter from Carl Luft to Durkin and Federal represented the required seven-day written notice to Durkin of the City's intention to terminate the Construction Contract. Durkin contends that the City has maintained throughout this litigation that the November 21 letter gave written notice of its intent to terminate Durkin as required by the Construction Contract. Durkin points to the City's Answer, Counterclaim, and responsive briefs to the following motions: Durkin's Motion for Declaratory Judgment, Durkin's Motion for Partial Summary Judgment, and Federal's Motion for Summary Judgment, as examples of this affirmative representation. The City does not dispute this contention. Durkin contends that this consistently pled position is a judicial admission to which the City must be held. The court agrees.

In response to Durkin's motion, the City states: "It is uncontested that Newark's position is that its November 21, 2003 letter provided the requisite seven-day notice required by the Construction Contract termination provision." As to why this consistently pled assertion would not be a judicial admission, the City suggests that the doctrine of judicial admission conflicts with *Rule 8(e)(2) of the Federal Rules of Civil Procedure.* The City argues that *Rule 8(e)(2)* allows a party to set forth inconsistent, alternative and hypothetical pleadings. The City, however, did not *plead* the alternative defense it now seeks to be permitted to argue at trial. Additionally, in the City's Counterclaim, it admits that its November 21 letter constituted written notice of its intent to terminate Durkin. (D.I. 7, Counterclaim ¶ 19.)

Although the City pleads that it "further offered to suspend Durkin's termination if it would, in writing, agree to complete construction of the reservoir according to the design," (D.I. 7, Counterclaim ¶ 21), the court can not find an averment by the City that sets forth the contention that the letter dated February 4, 2004, could also satisfy the notice provision of Section 15 of the Construction Contract. Further, the City's reference to a suspension of Durkin's termination in its Counterclaim was not made in the context of an alternative or hypothetical pleading. *See Schott Motorcycle Supply,* 976 F.2d at 61 (citing 5 Wright & Miller, *Federal Practice and Procedure* § 1282 at 525 (2d ed.1990) (generally an alternative claim is drafted in the form of "either-or" and a hypothetical claim is in the form of "if-then")).

**\*7** It would be patently unfair and judicially inefficient to allow the City's defense to be a moving target, after the parties and the Court have relied upon the City's admissions. *See Soo Line R. Co. v. St. Louis*

*Southwestern Ry. Co.,* 125 F.3d 481, 483 (7th Cir.1997) (holding that at summary judgment "judicial efficiency demands that a party not be allowed to controvert what it has already unequivocally told a court by the most formal and considered means possible."); *Keller v. U.S.,* 58 F.3d 1194, 1198 n. 8 (7th Cir.1995) ("Judicial admissions are formal concessions in the pleadings, or stipulations by a party or its counsel, that are binding upon the party making them. They may not be controverted at trial or on appeal. Indeed, they are 'not evidence at all but rather have the effect of withdrawing a fact from contention.' ' (citations omitted)).

The notice requirement of the Construction Contract is one of the central issues in this case, and as a factual matter now judicially admitted by the City, it is binding. The court will, therefore, preclude the City from arguing or presenting evidence at trial that any other writing constituted the seven-day notice required by the Construction Contract.[FN2]

> [FN2]. Federal also moves in limine to exclude the February 4 letter and any reference thereto (D.I.165). Federal's argument appears to be most concerned with the possibility that the City may try to use the February 4th letter as alternative proof that the City provided Durkin with a seven-day notice required by the Construction Contract, in the event that the November 21st letter is deemed insufficient to constitute notice under the Construction Contract. For the reasons stated above, the City is limited to the judicial admission that the November 21st letter constituted notice under the Construction Contract. The court, therefore, need not preclude *any* reference to the February 4th letter at trial to assuage Federal's concern. Simply put, it would be impermissible for the City to argue, in the alternative, that the February 4th letter satisfies the notice requirement under the Construction Contract in light of its judicial admission; however, the Court reserves judgment as to whether the letter may be admissible for some other purpose.

### B. Motion for Reconsideration

Recognizing that motions for reconsideration are granted only sparingly, the court finds that Federal's motion presents one of those rare occasions. Because Ms. Houck's deposition had not commenced before Federal filed its opening brief in support of its motion for summary judgment, the substance of Ms. Houck's testimony was first introduced in Federal's reply brief. Since the City did not have an opportunity to respond to the use of Ms. Houck's deposition in Federal's reply brief, the court properly disregarded the deposition testimony in its initial consideration of Federal's motion for summary judgment. Accordingly, the court believes it appropriate to reconsider its April 5 Order, now that the issue has been fully briefed with all parties having the opportunity to address the import of Ms. Houck's deposition testimony. *See Chase Manhattan Bank v. Iridium Africa Corp.,* No. Civ. A. 00-564 JJF, 2004 WL 1588295, at *1 (D.Del. July 08, 2004) ("[A] court should reconsider a prior decision if it overlooked facts or precedent that reasonably would have altered the result."); *see also Pell v. E.I. Dupont de Nemours & Co. Inc.,* 231 F.R.D. 186, 189 (D.Del.2005) (granting motion for reconsideration where evidence was not addressed in the parties' opening and answering briefs). The court's April 5 Order was premised, in part, on what appeared to be a factual dispute as to whether the City satisfied the provision of the Construction Contract that required the City to give notice of its intent to terminate the contract. That appearance of a factual dispute dissipates when considering the deposition testimony of the City's 30(b)(6) designee, along with the court's rulings on the motions in limine, and the pleadings.

*\*8* In addition, the court's September 2 Order was premised, in part, on the conclusion that a genuine issue of material fact existed with respect to satisfaction of the seven-day notice requirement in the Construction Contract. Given the court's holding above concerning the Houck deposition, the court believes it appropriate to reconsider its September 2 Order, *sua sponte.* The September 2 Order was issued over a year prior to the April 5 Order, on similar grounds, and without the consideration of the deposition testimony of the City's 30 (b)(6) witness.

### C. Motion for Summary Judgment on the Notice of Termination Issue

The court concludes that, given the City's admission as to the date of the notice of termination, there is no evidentiary basis upon which a reasonable jury could find in favor of the City. Moreover, the City's own 30(b) (6) witness admitted that the November 21 letter was not the required seven-day notice to Durkin and Federal, of the City's intent to terminate.

The court is not persuaded by the City's argument that Ms. Houck's **deposition** testimony taken together with her **errata sheets** presents evidence of a genuine issue of material fact that should preclude summary judgment. Instead, the court is guided by the Tenth Circuit's reasoning in *Franks.* The Court of Appeals in *Franks* stated, "that the utility of summary judgment as a procedure for screening out sham fact issues would be greatly undermined if a party could create an issue of fact merely by submitting an affidavit contradicting his own prior testimony." *Franks,* 796 F.2d at 1237 (citing *Camfield Tires,* 719 F.2d at 1365).

The plain language of the Construction Contract, the Bond and the November 21 letter make clear that, even absent the sworn deposition testimony of Ms. Houck, a reasonable jury could not find in favor of the non-movant City. It appears that the City attempted to follow the conditions of the Bond almost to the letter, but ignored a critical requirement imposed by the Construction Contract. That requirement included an additional procedural step prior to termination that the Bond did not; that is, seven-day notice to Durkin and Federal of its intent to terminate. As Federal and Durkin separately point out in their briefs, the November 21 letter neither formally declares Durkin in default, nor does it contain the word "terminate." Indeed, it even states that it is a "precautionary letter."

The City argues that the November 21 letter simultaneously satisfied the conditions of the Bond and the conditions of the Construction Contract. Putting aside the fact that the language of the November 21 letter is deficient on its face in declaring Durkin in default or providing a seven-day notice of termination, the City's position might be tenable if the parties to the two contracts were separate, non-overlapping and otherwise unaware of the obligations in both contracts. In this instance, however, it appears that Federal and Durkin were at all times aware of the obligations imposed in both the Construction Contract and the Bond. It is clear that the "considering declaring" provision of the Bond functions to initiate a conflict-resolution process that could potentially obviate a declaration of default.[FN3] Further, the parties proceeded to carry out these steps ostensibly to resolve the conflicts. For these reasons, it is unreasonable to suggest that the November 21 letter was notice under Paragraph 3.1 of the Bond, and at the same time, notice under Section 15.2 of the Construction Contract. The procedural requirements of Paragraph 3.1 are expressly before a declaration of default and the requirement of Section 15.2 of the Construction Contract must necessarily be a declaration of default or intent to terminate.

> FN3. This conclusion is supported by the last provision in paragraph 3.1: If the Owner, the Contractor and the Surety agree, the Contractor shall be allowed a reasonable time to perform the Construction Contract, but such an agreement shall not waive the Owner's right, if any, subsequent to declare a Contractor Default.

**\*9** Where the record, taken as a whole, could not lead a rational trier of fact to find for the non-moving party, there is no genuine issue for trial." *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.,* 475 U.S. 574, 587, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986); *Fed. Sav. & Loan, Inc. v. Krajl,* 968 F.2d 500, 503 (5th Cir.1992). On the pleadings and exhibits alone, the court holds that it seems unlikely that a reasonable jury could find for the City on the notice of termination issue. Where there may have been some appearance of a genuine issue on the pleadings before, the deposition testimony of the City's 30(b)(6) witness puts the issue to rest. Thus, taking into consideration the judicial admissions, the admissions of the City's 30(b)(6) witness, and the written record of pleadings and exhibits, the court concludes that a reasonable jury could not find for the non-movant City on the notice issue.

As such, the court will vacate its September 2 Order [FN4] and April 5 Order, and will grant summary judgment to Federal and partial summary judgment to Durkin, with respect to the failure to provide seven-day notice to terminate as required by the Construction Contract.

> FN4. The City correctly notes in its Answer to Durkin's Motion for Partial Summary Judgment that Durkin also seeks summary judgment on the issue of whether Newark had actual cause to terminate the Construction Contract. The Court does not grant such relief in this Order. Partial summary judgment in favor of Durkin is limited to the allegation that the City did not satisfy the notice requirement of the Construction Contract before terminating Durkin. Summary judgment is not, however, granted as to the allegation that City lacked the proper legal and factual basis for terminating Durkin or, in the City's view, that Durkin failed to perform. That dispute is not appropriately resolved on summary judgment with this record.

VI. CONCLUSION

For the aforementioned reasons, the court will grant Federal's motion for summary judgment and will grant in part and deny in part Durkin's motion for partial summary judgment on the notice of termination issue.

*ORDER*

For the reasons stated in the court's Memorandum Opinion of this same date, IT IS HEREBY ORDERED that:

1. Federal's Motion for Reconsideration (D.I.136) is GRANTED.

2. Federal's *Motion in Limine* (D.I.163) to exclude the errata sheets of Ms. Carol Houck is GRANTED.

3. Federal's *Motion in Limine* (D.I.165) to exclude the "February 4 Letter" is GRANTED in part and DENIED in part.

4. Durkin's *Motion in Limine* (D.I.190) regarding the judicial admission of the City of Newark is GRANTED.

5. The Court's September 2, 2004 Order denying plaintiff's partial summary judgment (D.I.63) is VACATED.

6. The Court's April 5, 2006 Order denying summary judgment (D.I.132) is VACATED.

7. Federal's Motion for Summary Judgment (D.I.122) is GRANTED.

8. Durkin's Motion for Partial Summary Judgment (D.I.36) is GRANTED in part and DENIED in part.

D.Del.,2006.
Donald M. Durkin Contracting, Inc. v. City of Newark
Not Reported in F.Supp.2d, 2006 WL 2724882 (D.Del.)


Motions, Pleadings and Filings (Back to top)

• 2006 WL 3290247 (Verdict and Settlement Summary) (Oct. 5, 2006)
• 2006 WL 1813932 (Trial Motion, Memorandum and Affidavit) Answering Brief of Defendants City of Newark, its Mayor and Council in Opposition to Third-Party Defendant Federal Insurance Company's Motion for Reconsideration and Reargument (May 3, 2006) 📄 Original Image of this Document (PDF)
• 2006 WL 1182431 (Trial Motion, Memorandum and Affidavit) Answering Brief of Defendants City of Newark, its Mayor and Council in Opposition to Third-Party Defendant Federal Insurance Company's Motion for Summary Judgment (Mar. 24, 2006) 📄 Original Image of this Document (PDF)
• 2005 WL 2385642 (Trial Motion, Memorandum and Affidavit) Answer of Donald M. Durkin Contracting, Inc. to the Motion for Protective Order by the City of Newark (Jul. 25, 2005) 📄 Original Image of this Document (PDF)
• 1:04cv00163 (Docket) (Mar. 16, 2004)
• 2004 WL 3778009 (Trial Motion, Memorandum and Affidavit) Motion of Third-Party Defendant, Federal Insurance Company, for Summary Judgment (2004) 📄 Original Image of this Document (PDF)
• 2004 WL 3778010 (Trial Motion, Memorandum and Affidavit) Opening Brief of Third-Party Defendant, Federal Insurance Company, in Support of its Motion for Summary Judgment (2004) 📄 Original Image of this Document (PDF)
• 2004 WL 3778011 (Trial Motion, Memorandum and Affidavit) Reply Brief of Third-Party Defendant, Federal Insurance Company, in Support of its Motion for Summary Judgment (2004) 📄 Original Image of this Document (PDF)
• 2004 WL 3822695 (Trial Motion, Memorandum and Affidavit) Opening Brief of Third-Party Defendant, Federal Insurnace Company, in Support of its Motion for Reconsideration and Reargument (2004) 📄 Original Image of this Document (PDF)
• 2004 WL 4056030 (Trial Motion, Memorandum and Affidavit) Reply Brief of Third-Party Defendant, Federal Insurance Company, in Support of its Motion for Reconsideration and Reargument (2004) 📄 Original Image of this Document (PDF)

END OF DOCUMENT

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.