## IN THE UNITED STATES DISTRICT COURT

## FOR THE DISTRICT OF DELAWARE

|  |  |  |
|---|---|---|
| TOLANO ANDERSON, et al., | ) | |
| | ) | |
| Plaintiffs, | ) | C.A. No. 06 CV 00567 (SLR) |
| | ) | |
| v. | ) | |
| | ) | |
| WACHOVIA MORTGAGE CORPORATION | ) | |
| *and* WACHOVIA CORPORATION, | ) | |
| | ) | |
| Defendants. | ) | |
| | ) | |
| | ) | |

_____

### APPENDIX OF EXHIBITS TO THE ANSWERING BRIEF OF DEFENDANTS WACHOVIA MORTGAGE CORPORATION AND WACHOVIA CORPORATION IN OPPOSITION TO PLAINTIFFS' MOTION TO COMPEL DISCOVERY

_____

*Of Counsel*
Elizabeth K. Ainslie
Stephen A. Fogdall (admitted *pro hac vice*)
Schnader Harrison Segal & Lewis LLP
1600 Market Street, Suite 3600
Philadelphia, PA 19103
(215) 751-2000

Michael J. Barrie (#4684)
Schnader Harrison Segal & Lewis LLP
824 N. Market Street
10th Floor, Suite 1001
Wilmington, DE 19801-3011
(302) 888-4554

*Counsel for Defendants Wachovia Mortgage Corporation*
*and Wachovia Corporation*

December 21, 2007

# TABLE OF CONTENTS

**Exhibit**                                                                          **Page**

Dover, Delaware Zoning Map .........................................................................B-1

Photographs of Plaintiffs' Homes ...............................................................B-3

Dover, Delaware Census Information ..........................................................B-4

Transcript of Lloyd Wheatley's Deposition Testimony ..............................B-5

Transcript of Colleen Fazzino's Deposition Testimony............................B-42

Transcript of Tolano Anderson's Deposition Testimony ..........................B-76

Declaration of Dave Miller........................................................................B-126

Transcript of James Hogsten's Deposition Testimony..............................B-129

Plaintiffs' Amended Complaint.................................................................B-159

GreenLink LLC Appraisal Order Documents ..........................................B-177

Appraisal of Wheatley Property ...............................................................B-182

Wachovia Underwriting Guidelines for Appraisals .................................B-193

Fannie Mae 2002 Single Family Selling Guide, Part XI, Chapter 2, § 202 ...............B-202

Wachovia Product-Specific Underwriting Guidelines for Fixed Rate Products .........B-204

Fannie Mae 2002 Single Family Selling Guide, Part X, Chapter 6, § 603.................B-216

Wachovia Underwriting Guidelines for Sources of Funds.........................B-217

Underwriter's Notes for Wilkins Loan ......................................................B-224

Wilkins' Credit Card Statement Reflecting Payment of $13,333.00 Deposit ............B-226

Fannie Mae 2002 Single Family Selling Guide, Part X, Chapter 6, § 603.17............B-227

Wilkins' Promissory Note for Loan Secured By Automobile...................B-228

Wilkins' Credit Card Statement Reflecting Payoff of Charge for Deposit ................B-229

Fannie Mae 2002 Single Family Selling Guide, Part X, Chapter 6, § 603.15............B-230

Exception Sign-off for Wheatley Loan .....................................................B-231

Wheatleys' First Loan Application............................................................B-232

Wheatleys' Second Loan Application .......................................................B-240



# Legend

Dover Parcels
Dover Boundary

**Zoning**
A Agriculture
C-1 Neighborhood Commercial
C-1A Limited Commercial
C-2 Central Commercial
C-2A Limited Central Commercial
C-3 Service Commercial
C-4 Highway Commercial
CPO Commercial Professional Office
SC-1 Neighborhood Shopping Center
SC-2 Community Shopping Center
SC-3 Regional Shopping Center
RC Recreational and Commercial
IO Institutional and Office
M Manufacturing
IPM Industrial Park Manufacturing
IPM-2 Industrial Park Manufacturing- Technology Center
R-7 One Family Residence
R-8 One Family Residence
R-10 One Family Residence
R-15 One Family Residence
R-20 One Family Residence
RG-1 General Residence
RG-2 General Residence
RG-3 Group Housing
RG-4 Multistory Apartments
RG-5 Mid Rise Apartments
RGO General Residence and Office
RM-1 Medium Density Residence
RM-2 Medium Density Residence
MPH Mobile Home Park
TND Traditional Neighborhood Design
COZ-1 Corridor Overlay Zone
H Historic District
**Airport Environs Overlay Zone (AEOZ)**
65 Noise Zone A
70 Noise Zone B
75 Noise Zone C
80 Noise Zone D
CZ Crash Zone
APZ I and APZ II Accident Potential Zones I & II
**Property addresses are labeled.**

B-2



**Looking East across Silver Lake:**
**Anderson property, with surrounding businesses and condominiums**



**Looking West across North DuPont Highway:**
**The Anderson, Wheatley and Wilkins properties**

# Dover, Delaware Census Information



**Figure 1:  Percentage of Persons who are Black or African American**



**Figure 2:  Block 1000, Block Group 1 on Census Track 409**

1        IN THE UNITED STATES DISTRICT COURT

2          FOR THE DISTRICT OF DELAWARE

3                - - -

4   TOLANO ANDERSON,      : CIVIL ACTION
    et al.,            :

5        Plaintiffs,  :

                       :

6        vs.           :

                       :

7   WACHOVIA MORTGAGE    :
    CORPORATION and     :

8   WACHOVIA CORPORATION, :
        Defendants.  : NO. 06 CV 00567 (SLR)

9

                - - -

10

            Wednesday, October 31, 2007

11

                - - -

12

13        Oral Deposition of LLOYD J. WHEATLEY

14   taken at Grady & Hampton, P.A., 6 North

15   Bradford Street, Dover, Delaware, commencing

16   at 10:00 a.m., before Susan Marie Migatz, a

17   Federally Approved Registered Merit Reporter,

18   Certified Realtime Reporter, and Notary Public

19   in and for the Commonwealth of Pennsylvania.

20

                - - -

21

22   VERITEXT NATIONAL COURT REPORTING COMPANY
        1845 Walnut Street, 15th Floor

23        Philadelphia, PA  19103
        (215) 241-1000  (888) 777-6690

24

Page 2

1  APPEARANCES:
2
   GRADY & HAMPTON, P.A.
3  BY: JOHN S. GRADY, ESQ.
   6 North Bradford Street
4  Dover, Delaware 19904
   Phone: 302-678-1265
5  E-mail: unavailable
6       Representing the Plaintiffs
7
   SCHNADER, HARRISON, SEGAL & LEWIS, LLP
8  BY: STEPHEN A. FOGDALL, ESQ.
   1600 Market Street, Suite 3600
9  Philadelphia, PA 19103
   Phone: 215-751-2581
10 E-mail: sfogdall@schnader.com
11      Representing the Defendant
12
          - - -
13
   ALSO PRESENT:
14
   AUDRIA L. WHEATLEY
15
16        - - -
17
18
19
20
21
22
23
24

Page 4

1            E X H I B I T S
2  NUMBER      DESCRIPTION       MARKED
3  L. Wheatley 10 Membership Interest
               Redemption Agreement,
4              5/25/05, Pages 000341-
               348
5
   L. Wheatley 11 Form 1040 U.S. Individual
6              Income Tax Return 2001,
               Pages 000017-44
7
   L. Wheatley 12 Form 1040 U.S. Individual
8              Income Tax Return 2002
9  L. Wheatley 13 Form 1040 U.S. Individual
               Income Tax Return 2003
10
   L. Wheatley 14 Form 1040 U.S. Individual
11             Income Tax Return 2004,
               Pages 000047-67
12
   L. Wheatley 15 Form 1040 U.S. Individual
13             Income Tax Return 2005,
               Pages 000070-91
14
           - - -
15
16
17
18
19
20
21
22
23
24

Page 3

1            I N D E X
2  WITNESS NAME              PAGE
3  LLOYD J. WHEATLEY
4  By Mr. Fogdall
5          - - -
6          E X H I B I T S
7  NUMBER      DESCRIPTION       MARKED
8  L. Wheatley 1  Agreement of Sale for
               584 North DuPont Highway,
9              6/18/04, Pages 000217-219
10 L. Wheatley 2  Photocopy of Check
               No. 994, Page WHEAT000069
11
   L. Wheatley 3  U.S. Census Bureau
12             American FactFinder,
               10/31/07
13
   L. Wheatley 4  Letter, 9/17/07, from
14             Wheatley, Pages PLS000232-
               234
15
   L. Wheatley 5  Uniform Residential Loan
16             Application, 8/3/04, Pages
               WHEAT000170-177
17
   L. Wheatley 6  Interest Rate Agreement,
18             8/2/04, Page WHEAT000187
19 L. Wheatley 7  Invoices and receipts re:
               584 N. DuPont Highway,
20             Pages PLS000243-251
21 L. Wheatley 8  Appraisal as of 7/7/04,
               Pages WHEAT000054-64
22
   L. Wheatley 9  Settlement Statement,
23             10/20/05, Pages 000419-
               420
24

Page 5

1            LLOYD J. WHEATLEY, 138 King
2       Henry Court, Dover, Delaware 19901,
3       after having been first duly sworn,
4       was examined and testified as follows:
5            - - -
6            EXAMINATION
7            - - -
8  BY MR. FOGDALL:
9       Q.   Mr. Wheatley, good morning.
10      A.   Good morning.
11      Q.   I told you a moment ago that my
12 name is Stephen Fogdall and I represent
13 Wachovia Corporation and Wachovia Mortgage
14 Corporation --
15      A.   Okay.
16      Q.   -- in a lawsuit brought by you
17 and your wife and four other individuals, and
18 the testimony that you're going to give today
19 is part of that lawsuit.
20      A.   Okay.
21      Q.   Now, the lawsuit concerns three
22 properties on North DuPont Highway:  580 North
23 DuPont Highway, 582 North DuPont Highway, and
24 592, I believe --

2 (Pages 2 to 5)

Page 6

1       A.    No; 584.
2       Q.    584. Thank you for correcting
3  me, sir.
4            Of those three properties, it's
5  584 North DuPont Highway that you ultimately
6  purchased; is that correct?
7       A.    Correct.
8       Q.    Now, how did you come to hear
9  about that property being available for
10  purchase?
11      A.    I heard about the property
12  through Mr. Anderson, Tolano Anderson. He saw
13  the property had a sign out front for sale and
14  he approached us about the possibility of
15  buying it.
16      Q.    Do you know if at that time
17  Mr. Anderson had already spoken with the
18  seller of the properties about purchasing
19  them?
20      A.    No.
21      Q.    So your understanding was he
22  talked to you about purchasing them before
23  talking to the seller about --
24      A.    That's my understanding.

Page 7

1       Q.    So at the time that he first
2  spoke to you about purchasing that property,
3  Mr. Anderson, at least to your knowledge, was
4  not aware that the seller was insisting that
5  all three of those properties be sold
6  together?
7       A.    No. That came afterwards.
8       Q.    Okay.
9       A.    Okay? That came afterwards.
10  But initially, from what I understand, they
11  were sold or in the process of being
12  purchased, that fell through with the original
13  or the other people, the seller. Then he put
14  it back on the market and then the Andersons
15  saw it, and then we were asked about it then.
16      Q.    So do you recall the date,
17  roughly, when Mr. Anderson first talked to you
18  about buying the properties?
19      A.    No. It had to be in the summer
20  of 2004.
21      Q.    Okay. When did you first hear
22  about the seller's demand that all three
23  properties be purchased at the same time?
24      A.    We met with Peter Aigner, who

Page 8

1  was the seller, at 584 North DuPont Highway on
2  the back porch, it had to be somewhere in May,
3  I'm going to say, and that was the summer of
4  2004, somewhere in that range, and at that
5  time, that's when the deal had to be an
6  all-or-nothing deal.
7       Q.    And was that --
8       A.    There were some price
9  negotiations going on, the price was reduced
10  from the original requested price, and then
11  based upon that he said all these have to be
12  sold at one time. He was doing some
13  investment in another venture that he had to
14  have all of the funds at one time.
15      Q.    Do you recall if that's the
16  same day on which you signed the Agreement of
17  Sale for that property, 584 North DuPont
18  Highway?
19      A.    No, that isn't.
20      Q.    Okay.
21      A.    That was done in the lawyer's
22  office, his attorney.
23      Q.    Okay. Let me show you --
24      A.    I can't recall if we signed it

Page 9

1  there or not. But I remember signing papers
2  at the attorney's office when all six of us
3  were together with the seller and his
4  attorney.
5       Q.    So let me show you that, sir.
6  That's what I believe to be the Agreement of
7  Sale for 584 North DuPont Highway, the
8  property you purchased. Does that look
9  familiar to you?
10      A.    Uh-huh.
11           Wait a minute.
12           No. 10.
13      Q.    What's that?
14      A.    No. 10 in this Agreement is
15  where he talks about not receiving back the
16  money. That was part of what we agreed to if
17  you read that.
18      Q.    Well, let me understand you
19  correctly. You are talking about Paragraph
20  No. 10 here on the third page of the Agreement
21  of Sale. First of all, this is the Agreement
22  of Sale for that property; correct?
23      A.    Yes, it is.
24      Q.    And that is your signature?

3 (Pages 6 to 9)

1     A.   Yes, it is.
2     Q.   And that's your wife's
3  signature?
4     A.   Yes, it is.
5     Q.   And you are talking about
6  Paragraph No. 10 --
7     A.   Uh-huh.
8     Q.   -- which the paragraph is
9  titled "Purchaser's Default," and it reads:
10 "If PURCHASER shall, for some reason not
11 excused hereunder, fail or refuse to perform
12 PURCHASER'S obligations to SELLER" -- and here
13 "PURCHASER" is you and your wife and "SELLER"
14 is Mr. Aigner --
15    A.   Peter Aigner.
16    Q.   "and SELLER shall not also
17 be in default, SELLER shall retain all moneys
18 paid hereunder on account of the Purchase
19 Price, whereupon all rights and obligations
20 hereunder shall cease and determine."
21         Now, isn't that really talking
22 about the fact that if the sale doesn't go
23 through, you would forfeit your downpayment?
24    A.   That's correct.

1     Q.   That's not specifically talking
2  about the seller's requirement that all three
3  properties be sold at the same time?
4     A.   It doesn't say that, but they
5  all were done together, all three of us
6  together, at the same time.
7     Q.   Okay. Do you agree with me
8  that there is nothing in this Agreement of
9  Sale that indicates that all three properties
10 had --
11    A.   I agree with that.
12    Q.   -- to be purchased at the same
13 time?
14    A.   That's correct. It's not in
15 there.
16    Q.   One thing, before we
17 continue --
18    A.   Uh-huh.
19    Q.   -- because there's a written
20 record being made of your testimony and the
21 questions that I ask and the answers that you
22 give --
23    A.   Yes.
24    Q.   -- it's important, I will do

1  the best I can not to interrupt you when you
2  are answering a question, and I will ask you
3  not to interrupt me when I'm asking a
4  question. That way the transcript will read
5  more cleanly at a later time.
6     A.   Okay.
7     Q.   I notice as we've started
8  there's been a little bit of interrupting back
9  and forth, both on my part and on your part.
10 So I will do my best not to do that and I will
11 ask you to do the same.
12    A.   Absolutely.
13    Q.   You will notice that this
14 Agreement of Sale is signed on the 18th of
15 June 2004. So you're saying that's about a
16 month after you first met with Mr. Aigner and
17 discussed the purchase of the properties?
18    A.   I didn't say a month after
19 Aigner.
20    Q.   I thought you said --
21    A.   I said it was Anderson.
22    Q.   I thought you said you met on
23 the back porch of 584 North DuPont Highway in
24 May of '04.

1     A.   That was the end of May. It
2  wasn't a month later. What is that? A couple
3  days.
4     Q.   You didn't give me a date in
5  May. You just said May of 2004.
6     A.   Okay.
7     Q.   So 18, 19, 20 days before
8  this --
9     A.   Right.
10    Q.   -- you first met with
11 Mr. Aigner to discuss the purchase of the
12 property?
13    A.   Yes.
14    Q.   And at that time Mr. Aigner
15 made a verbal insistence that all three
16 properties had to be sold at the same time?
17    A.   Yes.
18    Q.   And Mr. Aigner also insisted
19 that if the purchase of any one of the
20 properties didn't go through, you'd lose the
21 downpayment for all of the properties?
22    A.   Yes.
23    Q.   Do you recall what the
24 downpayment was, the total downpayment, for

4 (Pages 10 to 13)

Page 14

1  the three properties?
2      A.    Yes.
3      Q.    And it was what?
4      A.    $40,000.
5      Q.    And you split that three ways?
6      A.    $13,333.33, which is in each
7  contract.
8      Q.    Okay.  And is this a photocopy
9  of the check by which you paid your share of
10 the downpayment to Mr. Aigner?
11     A.    Yes.
12     Q.    You'll notice that the check is
13 drawn on your business account, Limousine
14 Unlimited --
15     A.    Uh-huh.
16     Q.    -- not a personal account in
17 your own name.
18     A.    Correct.
19              - - -
20         (Whereupon the documents were
21     marked, for identification purposes,
22     as Exhibits L. Wheatley 1 and 2.)
23              - - -
24

Page 15

1  BY MR. FOGDALL:
2      Q.    Now, the property 584 North
3  DuPont Highway that you purchased, you've
4  alleged in the Complaint, in your Complaint,
5  that that property is located in a white
6  neighborhood, I believe is the term you used
7  in the Complaint.  Is that right?
8      A.    Yes.
9      Q.    And you've said that you've had
10 previous mortgages from Wachovia that were in
11 racially-mixed neighborhoods or predominantly
12 minority neighborhoods; is that correct?
13     A.    Not exactly.  That wasn't
14 stated properly.  It's Anderson who owns the
15 property.  I had a property that was from
16 their predecessors, which was Delaware Trust.
17 So I never purchased any properties under
18 Wachovia.  So that was misstated that I had
19 any dealings.  If you want to grandfather in
20 the deal from Delaware Trust, which was bought
21 in 1988, the bank changed twice since then
22 before it became Wachovia, so Wachovia was the
23 third bank that was there.  It says Delaware
24 Trust.

Page 16

1      Q.    What was the property?
2      A.    35 North New Street, Dover,
3  Delaware.
4      Q.    Did you ever live at that
5  property?
6      A.    No.  It's a rental property,
7  investment.
8      Q.    So the entire time you have
9  lived in Dover, is this correct, you've lived
10 at 138 King's Court?
11     A.    King Henry Court?  No.
12     Q.    Well, the address you gave at
13 the start of the deposition was what?
14     A.    138 King Henry Court.
15     Q.    King Henry Court, okay.  And
16 how long have you lived there?
17     A.    This is the fifth year.
18     Q.    But you lived there before you
19 purchased that property on North DuPont
20 Highway; correct?
21     A.    That's correct.
22     Q.    Would you characterize that
23 neighborhood as a white neighborhood?
24     A.    Which neighborhood?

Page 17

1      Q.    The neighborhood in which 138
2  King Henry Court is located.
3      A.    No.
4      Q.    Mr. Anderson yesterday at his
5  deposition testified that the area surrounding
6  Silver Lake is a white neighborhood and he
7  felt that because he and his wife and you all,
8  the other four plaintiffs, had, quote, crossed
9  the line into that white neighborhood, that as
10 a result there was a lot of trouble during the
11 loan closing process.  Do you agree with that?
12     A.    Yes.
13     Q.    And do you agree with his
14 statement that the community surrounding
15 Silver Lake is a white community?
16     A.    Yes.
17     Q.    Have you ever seen census data
18 for that area to confirm that it is a white
19 community?
20     A.    No.
21     Q.    I am going to show you a map
22 that I downloaded from the U.S. Census Bureau
23 this morning that shows the area around Silver
24 Lake and color-codes it according to the

5 (Pages 14 to 17)

VERITEXT NATIONAL COURT REPORTING COMPANY
(215) 241-1000    (888) 777-6690

1  percentage of the population that is
2  African-American, and you can see from that
3  map that it's not a white community. It's a
4  mixed community. Would you agree?
5       A.    Let me get the triangulation on
6  what I'm looking at. This is McKee Road.
7  This is North DuPont Highway. That's College
8  Road. So what is --
9            MR. GRADY: Well, I think
10           there's a slight unintentional
11           misrepresentation of the testimony
12           yesterday. The testimony yesterday
13           only was that the immediate houses
14           surrounding Silver Lake were white.
15           There was no suggestion that this
16           area, which is all in green over here,
17           was all white.
18           THE WITNESS: No.
19 BY MR. FOGDALL:
20      Q.    Do you see where the property
21 at 584 North DuPont Highway is located? And I
22 obtained this from Google this morning showing
23 the location of that property, which would
24 be -- and I will show you on this map, the

1  census map -- I am just going to put a dot or
2  see if you agree with me, the 584 North DuPont
3  Highway property would be located right about
4  here, and I am just going to put a red dot.
5  Would you agree with that?
6       A.    Right where?
7       Q.    Right about there. Would you
8  agree with that?
9       A.    I can't see what that street
10 is. This is North State Street. Where is
11 Division?
12      Q.    This is Division Street.
13 Here's North DuPont Highway. And according to
14 that pointer from Google maps, your property
15 should be right about here.
16      A.    That's correct.
17      Q.    Okay.
18      A.    Oh, you know what? You're
19 right. Just by what you just gave me, let me
20 show you. Well, can I borrow your pen?
21      Q.    Sure.
22           MR. GRADY: Do you want another
23           copy of this?
24           THE WITNESS: Can we make a

1  copy of it.
2  BY MR. FOGDALL:
3       Q.    You can write on this.
4       A.    That's why I wanted to make
5  sure we knew where we were. This would be
6  correct and that is true, this area right here
7  between Saulsbury Road is predominantly
8  minority.
9            This part north of -- here's
10 North State Street. Commerce Bank sits right
11 here by Pizza Hut. Anything north of this,
12 this piece right here -- it's kind of
13 deceiving what you're showing here -- this is
14 Delaware State University College right here.
15 It's a historical black college and that's why
16 it's probably showing up as African-American.
17           But the actual location which
18 is south of North DuPont Highway, which is
19 right here and it's showing this light green,
20 this is the Capitol School District. Okay?
21 But on this waterfront, from here all the way
22 around here -- and there's a condominium unit
23 that sits about right here -- on this
24 waterfront -- and I think that's what your

1  question was -- there are no minorities that
2  own any property there where that red line is.
3       Q.    Can you put an X where your 584
4  is?
5       A.    Sure. Most probably it's
6  somewhere right around here.
7       Q.    Okay. And you can see that
8  that location where you've marked the X is in
9  a part of the map that's color-coded as having
10 somewhere between 24.9% and 44.9%
11 African-American residents.
12      A.    According to this, yes. But on
13 this location specifically where you are
14 asking to mark at, there are no minorities
15 that own any property on that waterfront.
16      Q.    So you are saying specifically
17 along the waterfront, waterfront homes around
18 Silver Lake --
19      A.    In this section, south of North
20 State Street, this red area that we're talking
21 about.
22      Q.    -- are only owned by white
23 owners, homeowners?
24      A.    To the best of my knowledge.

6 (Pages 18 to 21)

Page 22

1    Q.    Do you have any evidence to
2  support that statement, or what is that
3  statement based on?
4    A.    Based on my living here 20
5  years and knowing the demographics of this
6  community and town. I've been here over 20
7  years and there are zones for reconstruction
8  that are right now on the City Council. And
9  if I can look at this map, where this is
10  zoomed in at, there's an omission. I don't
11  see them. New Street, Governors Avenue, south
12  side of New Street, Water Street, I don't see
13  any of those on there, and those are within a
14  few blocks of here.
15    MR. GRADY:  Well, if I may,
16    this is Division Street.
17    THE WITNESS:  That's Division.
18    So it has to be this way. This
19    section here is omitted. So where
20    this is zoomed in at is not giving you
21    the full picture of Dover and its
22    demographics.
23  BY MR. FOGDALL:
24    Q.    But it's giving you the full

Page 23

1  picture of Silver Lake.
2    A.    Yes, it is. And then if you
3  notice up here, this pale shaded area is near
4  the 0.0% to 7.7%, there are no minorities
5  that's living on the east side -- or the west
6  side of North DuPont Highway, none, in this
7  whole area. In fact, this is not even a color
8  in here. This is white. They didn't even
9  make the shade in the data. See this section
10  right here?
11    Q.    But whether, in fact, every
12  single home that's located on the waterfront
13  of Silver Lake is owned by a white homeowner,
14  in fact, the area surrounding Silver Lake is
15  not an all-white area --
16    A.    Well --
17    Q.    -- according to the Census
18  Bureau's demographic data; is that correct?
19    A.    According to the Census Bureau
20  data, yes.
21    Q.    Okay.
22    MR. FOGDALL:  Just go ahead and
23    mark this.
24        - - -

Page 24

1    (Whereupon the document was
2    marked, for identification purposes,
3    as Exhibit L. Wheatley 3.)
4        - - -
5    THE WITNESS:  What is the date
6    of that census, by the way?  You say
7    you just downloaded it.
8  BY MR. FOGDALL:
9    Q.    In the deposition, you are the
10  witness, so you answer questions and I ask
11  them.
12    MR. GRADY:  Just for the
13    record, the document says the "Data
14    Set" is "Census 2000 Summary File."
15  BY MR. FOGDALL:
16    Q.    Mr. Wheatley, do you have any
17  reason to think that data from 2003 or 2004,
18  when you bought the property at 584 North
19  DuPont Highway, would be substantially
20  different --
21    A.    No.
22    Q.    -- from the 2000 census data?
23    A.    No.
24    Q.    Mr. Wheatley, I'm going to show

Page 25

1  you a letter which, from looking at it, it
2  appears that you wrote it, in which on my
3  reading you have outlined your reasons for
4  alleging that conduct by Wachovia in this case
5  caused your business to suffer. Do you
6  recognize that document?
7    A.    Yes.
8    Q.    I would like to ask you a few
9  questions about this letter. You say here --
10  and I will just read from the letter here --
11  in the second paragraph on the first page:
12  "In August of 2004 it was estimated that our
13  closing cost for 584 N. DuPont would be
14  approximately $9,000.00. The location on
15  Route #13 in Dover would double as our home
16  based business as well. When we were suddenly
17  faced with the higher demands of Wachovia,
18  only after they switched our loan from a
19  non-verification loan to a verification loan
20  and probed into our financial holdings..."
21    Can you explain the basis for
22  that statement? What do you mean they probed
23  into your financial holdings?
24    A.    Well, for the non-income

7 (Pages 22 to 25)

1  verification loan that was originally
2  suggested by J. D. Hogsten, it would be, as he
3  indicated to us, where they don't check any of
4  your finances, you don't have to prove any
5  kind of income, anything like that. It's
6  called a non-income verification loan.
7      Q.    Okay. You are saying when you
8  first met with Mr. Hogsten about purchasing
9  this property, you are saying he suggested to
10  you that the loan should be done as a no
11  income verification loan?
12      A.    And began the process where we
13  gave him a downpayment or an application fee,
14  and that should be in the record that was
15  drawn out of Wachovia Mortgage somewhere, 12,
16  13 hundred dollars. Check the number in the
17  record to make sure that's accurate. And
18  that's what we were given, is a non-income
19  verification loan.
20      Q.    Do you recall when that was?
21      A.    The date of the paperwork.
22      Q.    Do you have an application for
23  that loan that you are talking about?
24      A.    I believe we do.

1      Q.    You have it in your possession?
2      A.    I believe we do. In fact, it
3  should have been sent with you in the 584
4  file, the entire file.
5      Q.    Well, I am asking you if you
6  have it. If you do have it --
7      A.    It should be in the file.
8      Q.    Then I will ask that it be
9  produced.
10      A.    It should be in the file.
11  Whatever was in that file --
12      Q.    Are you saying that it should
13  be in the file that was produced by your
14  counsel?
15      A.    Yes.
16      Q.    Okay. I will represent to you
17  that it is not there.
18      A.    What is the account -- I guess
19  I can't ask you a question.
20      Q.    So I will ask you if you do
21  have it, I will put the request on the record
22  that you provide it to counsel and then
23  counsel can provide it to me.
24      A.    Let me finish answering this

1  question. Okay? What J. D. did with that
2  loan, it got terminated and got reverted into
3  an income verification loan. So where the
4  paperwork is, I don't know where it may be at
5  this point. But to the best of my knowledge I
6  signed papers for the original loan, which was
7  a non-income verification, in his office.
8      Q.    Okay. You are saying you
9  signed an application for a loan that would
10  have been a non-income verification loan?
11      A.    Yes.
12      Q.    What happened to that loan
13  application?
14      A.    I don't know where it is.
15      Q.    Right now I am not asking you
16  about what happened to the physical loan
17  application. What happened? That loan was
18  not approved; is that what you're saying?
19      A.    It got transitioned and
20  changed. It got transitioned and changed to a
21  verification loan.
22      Q.    And when --
23      A.    Because you've got to
24  understand, the loan officer, he was the one

1  making the suggestion of the packages and the
2  best way to go based on what we came to the
3  table with as a qualified buyer. So I don't
4  know all the packages he had at his disposal
5  at the time. But the one he did have at his
6  immediate disposal was a non-income
7  verification loan based on the fact that I was
8  self-employed.
9      Q.    At what point did you first
10  hear that the loan would be switched to what
11  you are calling a verification loan?
12      A.    Probably I'm going to guess a
13  couple of weeks thereafter.
14      Q.    Do you remember roughly what
15  the date would have been of that transition
16  that you are talking about?
17      A.    No.
18      Q.    Who first told you that the
19  loan would be switched from a non-income
20  verification loan to what you're calling a
21  verification loan?
22      A.    J. D. Hogsten.
23      Q.    And what did he say was the
24  explanation for that?

8 (Pages 26 to 29)

Page 30

1    A.    He didn't have one.
2    Q.    He just said that's what was
3  going to happen?
4    A.    He was going to change it.
5    Q.    Did you ask him why?
6    A.    Yes.
7    Q.    And what did he say?
8    A.    That I think this is a better
9  package for you.
10   Q.    What was your understanding of
11  what the verification loan would entail?
12   A.    It would have required that we
13  put down 20%.
14       I misstated.  It was 15%, 15%.
15   Q.    So you're saying J. D. Hogsten
16  told you that your loan was going to be
17  switched to an income verification loan and as
18  a result you would have to pay, instead of --
19   A.    15%.
20   Q.    Instead of what?
21   A.    Instead of 15%, it would go to
22  10%.  90/10.
23   Q.    I am confused.  Your original
24  downpayment was 5% of the price of the

Page 31

1  property; correct?
2    A.    Is that what 13,000 comes out
3  to be?
4    Q.    I'm asking you.  Is that
5  correct?
6    A.    I need a calculator so I can
7  check it out.  Do you have a calculator?
8       MR. GRADY:  If counsel would
9    like me to get a calculator, we can
10   get a calculator.
11      THE WITNESS:  I need a
12   calculator.
13  BY MR. FOGDALL:
14   Q.    I will represent to you that
15  13,000-some-odd dollars is 5% of the purchase
16  price of the property.
17   A.    What was the purchase price?
18   Q.    You don't recall the purchase
19  price of your property?
20   A.    $267,000.00 was the purchase
21  price.
22   Q.    I will represent to you that
23  your downpayment of 13,000-and-some-odd
24  dollars was 5%.

Page 32

1    A.    That doesn't sound right.
2       THE WITNESS:  Do you have a
3    calculator?
4  BY MR. FOGDALL:
5    Q.    We are going to keep going.
6       MR. GRADY:  Counsel is taking
7    the deposition.
8  BY MR. FOGDALL:
9    Q.    Originally you were saying you
10  were paying a 5% downpayment.
11   A.    No.
12   Q.    You are disagreeing with that.
13   A.    No.
14   Q.    What's your recollection of the
15  amount to put down?
16   A.    Let me say it again.  It was an
17  85/15 loan, a non-income verification loan
18  from Wachovia.
19   Q.    And what was the downpayment
20  that you were going to be required to make?
21   A.    Whatever 15% is of the lended
22  value.
23   Q.    So your understanding is your
24  original downpayment was going to be 15% of

Page 33

1  the --
2    A.    Purchase value.
3    Q.    Okay.  And then what happened?
4    A.    J. D. changed it.
5    Q.    And then what did your
6  downpayment become?
7    A.    The downpayment was based on
8  the loan package that was being offered.  Now
9  that it was an income verification loan, then
10  it would be a 90/10 loan or 10% down, 90%
11  would be financed of the purchase price.
12   Q.    So your actual downpayment was
13  less under what you're calling the
14  verification loan?
15   A.    Exactly.
16   Q.    It was going to be a lower
17  downpayment?
18   A.    A lower downpayment, exactly.
19   Q.    Originally it was a 15%
20  downpayment and then it went down to 10?
21   A.    Correct.
22   Q.    Okay.
23   A.    Sorry if it sounds confusing,
24  but that's what it was.

9 (Pages 30 to 33)

Page 34

1    Q.    All right. What else was
2  involved in the transition from the no income
3  verification loan to the verification loan?
4    A.    We had to provide two years of
5  income tax returns and then they could verify
6  our income.
7    Q.    You are saying you provided two
8  years of income tax returns to Wachovia?
9    A.    Yes.
10    Q.    And those two years were what?
11    A.    2002 and 2003.
12    Q.    Did you provide anything else
13  besides those two years of returns?
14    A.    Our bank statements,
15  savings/checking accounts, all of our business
16  records, every account we had at Wachovia.
17    Q.    And according to your letter,
18  you're saying that among those materials that
19  you provided to Wachovia as part of this new
20  loan package, that somehow Wachovia became
21  aware of $35,000.00 to $40,000.00 that, quote,
22  they saw in our financial account; is that
23  correct?
24    A.    Yes.

Page 35

1    Q.    And on what document that you
2  submitted as part of this new loan package
3  would those assets, the $35,000.00 to
4  $40,000.00, have been reflected?
5    A.    They were not submitted in any
6  part of the package. Once again, they saw
7  those when they looked into our accounts going
8  into the verification loan. That means they'd
9  have to verify the buyer actually has the
10  income or the credibility to purchase the
11  house.
12        So there were no bank
13  statements or anything given to you. So that
14  wasn't given to you at all. Wachovia has
15  those, and they would do that with any
16  verification loan, I would think.
17    Q.    So are you talking about, the
18  $35,000.00 to $40,000.00, are those part of
19  your business? Is that assets that your
20  business would have held?
21    A.    No. Let me clarify that. The
22  business and myself file one tax return. So
23  it's not the business funds.
24    Q.    Okay.

Page 36

1    A.    They're all my funds. I report
2  them as total income to the Internal Revenue
3  Service. I'm responsible for the gross
4  profits and pay taxes based on that number.
5  So they may sit in an individual account
6  because we keep them as far as to try to not
7  commingle the funds the best as possible. But
8  in the final equation all the funds are mine.
9    Q.    Are you saying that the
10  $35,000.00 to $40,000.00 that Wachovia
11  supposedly saw in your financial accounts, is
12  that reflected on your tax returns that you
13  submitted?
14    A.    No. Once again, for the third
15  time, no. This information and documentation
16  is in the statements of our savings and
17  checking accounts that Wachovia checked during
18  the income verification loan. Just look at
19  the loan.
20    Q.    So you are saying that it's in
21  your personal savings account --
22    A.    That's correct.
23    Q.    -- or your personal checking
24  account?

Page 37

1    A.    That's correct, the personal
2  savings/checking and business accounts.
3    Q.    Okay.
4    A.    I own them all, plus the stocks
5  and bonds. I own them all.
6    Q.    So what I'm asking you is:
7  Where would I have to go, what paperwork would
8  I have to look at specifically, in order to
9  verify this statement that there were
10  $35,000.00 to $40,000.00 of assets in the
11  paperwork that you submitted that Wachovia saw
12  and wanted to get their hands on?
13    A.    I'll say this for the fourth --
14      MR. GRADY: Wait a minute.
15      If you don't mind, since we
16  have some time limits, I think I can
17  help.
18      Are these also Wachovia
19  accounts?
20      THE WITNESS: Yes. That's what
21  I keep telling him. He is not
22  accepting that.
23  BY MR. FOGDALL:
24    Q.    It's not that I'm not accepting

10 (Pages 34 to 37)

Page 38

1   it. It's that I need something more to help
2   me track down what you are saying.
3        Are you saying I'd find that in
4   personal accounts that you hold or business
5   accounts?
6        A.   Both, the personal savings,
7   personal checking, business savings, business
8   checking.
9        Q.   So I'd have to add up the funds
10  in all of your accounts and then I'd arrive at
11  a figure of $35,000.00 to $40,000.00?
12       A.   Yes.
13       Q.   Okay. Thank you. That was not
14  clear before.
15       And you're saying that you
16  didn't have to submit any of this paperwork
17  under the original loan package that you were
18  going to apply for?
19       A.   That's correct. It was a
20  non-income verification loan.
21       Q.   All right. I have here a
22  Uniform Residential Loan Application signed by
23  you dated August 3, 2004. Is that what you're
24  calling the application for the -- well, let

Page 39

1   me ask you first, do you recognize that
2   application?
3        A.   Let me take a look.
4        MR. GRADY:  What's the number
5   on that?
6        THE WITNESS:  The number on
7   this loan application?
8        MR. GRADY:  Yes. 000170.
9   Thank you.
10       THE WITNESS:  Where did you see
11  the date on here? Is it on the last
12  page?
13  BY MR. FOGDALL:
14       Q.   If you go where you signed it,
15  right there, 3 August '04. Do you recall
16  filling out that application?
17       A.   Uh-huh. Yeah.
18       Q.   Do you recall whether that is
19  the application for the no-income verification
20  loan that you first talked about?
21       A.   I don't know --
22       Q.   You don't recall?
23       A.   -- what this one is. No, I
24  don't recall. He didn't sign it. Hogsten's

Page 40

1   signature is not even on here.
2        I don't know which one this one
3   is. But that case number, that 6940176, it
4   seems like it's a different number. I
5   remembered there were two different numbers to
6   the loans.
7        Q.   Okay.
8        A.   We signed that one, though, to
9   answer your question.
10       Q.   Okay. When you signed this
11  Interest Rate Agreement on the same date, 3
12  August '04, do you recall whether that was in
13  conjunction with the no income verification
14  loan, the first loan you talked about, or
15  whether this was in conjunction with the new
16  loan, the new package that Mr. Hogsten said
17  you should go with?
18       A.   This is the rate lock? This is
19  the second one. The first one we signed was
20  in June.
21       Q.   Okay. So do you see the
22  interest rate here is 6.625% that you're
23  agreeing to?
24       A.   Uh-huh.

Page 41

1        Q.   Now, do you recall whether that
2   interest rate is lower than the interest rate
3   you would have agreed to if you had gone with
4   the no income verification loan?
5        A.   No.
6        Q.   You don't recall?
7        A.   No. I don't know.
8        Q.   Do you recall signing this?
9        A.   Yes.
10            - - -
11       (Whereupon the documents were
12       marked, for identification purposes,
13       as Exhibits L. Wheatley 4 through 6.)
14            - - -
15  BY MR. FOGDALL:
16       Q.   In the next sentence in this
17  letter we have been discussing, again reading
18  from Exhibit 4, you then say: "Wachovia was
19  quick to lend us an additional $50,000.00 Home
20  Equity Loan 2nd mortgage..." Now, tell me
21  about that. What are you referring to there?
22       A.   Excuse me. I need to keep
23  these on.
24       What I'm talking about here is

11 (Pages 38 to 41)

Page 42

1   when we actually had to pay that higher
2   downpayment, which was beyond what was
3   disclosed to me in the original document, this
4   has to address the fact that we were short
5   with money. We talked to Deanne Wicks in
6   Wachovia Bank and I expressed to her that our
7   cash reserve was gone, our capital was used up
8   in the initial loan, and so she helped process
9   a second mortgage on 584 North DuPont Highway.
10   And that was about a week or two after the
11   initial purchase.
12       Q.   Okay. So you are saying a week
13   or two after the purchase of 584 North DuPont
14   Highway closed --
15       A.   Uh-huh.
16       Q.   -- you then got a second
17   mortgage from Wachovia to pay yourself back
18   for your expenses that you incurred in
19   connection with the closing?
20       A.   That's correct; and some other
21   loans associated with fixing the house up.
22       Q.   So what did that $50,000.00
23   that you borrowed that you are talking about
24   go to? How did that break down?

Page 43

1       A.   That got disseminated, to the
2   best of my knowledge, there was some loans
3   between the Andersons and we had some credit
4   cards, some other contractual stuff was done,
5   trees were cut down and removed, dirt was
6   brought in, debt consolidation, personal debt
7   consolidation.
8       Q.   So how much of that was in
9   connection with the purchase of 584 North
10   DuPont Highway? How much of the $50,000.00
11   went to expenses in connection with that
12   purchase?
13       A.   With the initial purchase of
14   this $50,000.00?
15       Q.   Yes.
16       A.   None. The money for the
17   purchase of the original loan came from all of
18   our money.
19       Q.   No. I am asking you about the
20   $50,000.00 home equity loan.
21       A.   Uh-huh.
22       Q.   How much of that $50,000.00
23   went to reimbursing you for costs that you
24   have alleged you have incurred in connection

Page 44

1   with your purchase of the 584 North DuPont
2   Highway property?
3       A.   Oh, I see. Okay. Not much.
4   Probably $800.00.
5       Q.   Okay. So $800.00 of the
6   $50,000.00 went to costs that you incurred in
7   connection with -- I'm sorry; I am going to
8   have to strike that.
9            Let's take it one piece at a
10   time. The $50,000.00, you used that to pay
11   back some loans from the Andersons?
12       A.   Not all the $50,000.00; a
13   portion of it. I had a $50,000.00 home
14   equity --
15       Q.   Do you recall how much that
16   was?
17       A.   Yes: about $24,000.00 or so,
18   you know. It's in the documents.
19       Q.   I am asking if you remember.
20       A.   Yeah. It's in the documents.
21   It was about $24,500.00, something like that.
22       Q.   So that takes care of about
23   half of the $50,000.00. What did the other
24   half go to?

Page 45

1       A.   It was my personal use to use
2   the way I wanted to. I debt consolidated
3   personal loans. We purchased some stuff,
4   furniture, items for the house.
5       Q.   Okay.
6       A.   I mean, I didn't spend the
7   whole $50,000.00 if that's what your question
8   is. It was an equity line.
9       Q.   You have alleged in the
10   Complaint, the Amended Complaint -- this is at
11   Paragraph 79 -- that you spent approximately
12   $50,000.00 in home improvements during the
13   process leading up to the closing of the
14   purchase of 584 North DuPont Highway. You
15   spent, according to the Complaint, $50,000.00
16   on home improvements.
17       A.   Okay.
18       Q.   Is that correct?
19       A.   Yeah; and the numbers are, if I
20   can add them up -- can I borrow your pen?
21       Q.   Well, first --
22       A.   Yes, the answer to your
23   question is yes.
24       Q.   Let me show you this. First

12 (Pages 42 to 45)

Page 46

1  let me ask you, so the $50,000.00 home equity
2  loan that you are talking about in this
3  letter, you are saying that wasn't used to
4  reimburse you for what you're calling the
5  $50,000.00 in expenses that you say you
6  incurred for home improvements?
7      A.    A portion of it was.
8      Q.    Okay.
9      A.    A portion of this number was a
10  portion of that number.
11     Q.    All right.  I am going to show
12  you some documents that I assume you provided
13  to your counsel, which he has provided to me,
14  which I take to be invoices and receipts that
15  purport to document the expenses you incurred
16  doing home improvements in connection with the
17  closing of the purchase of the property, and
18  you can see the top of the page there, the
19  first page, says "584 N. DuPont Highway."  I
20  take that to mean that this is purporting to
21  document the expenses in connection with the
22  improvements to that property.
23     A.    Uh-huh.  Okay.  Yeah, that's
24  correct.

Page 47

1      Q.    Okay.  And you see the total
2  there is given as $11,535.21.
3      A.    Uh-huh.
4      Q.    But in the Complaint you have
5  alleged that you spent $50,000.00 in home
6  improvements.
7      A.    Well, this is incomplete.  Let
8  me show you what's missing.
9            THE WITNESS:  Can I borrow your
10  pen?
11           MR. GRADY:  Well, ask him.  I
12  don't know whether he wants this
13  marked up or not.
14           THE WITNESS:  Okay.
15           MR. GRADY:  It's his
16  deposition.
17           I guess he is offering to write
18  some stuff and if you want him to do
19  it, he will do it, or I can give him
20  some sheets of paper.
21  BY MR. FOGDALL:
22     Q.    You can go ahead and write on
23  that.
24     A.    You want me to write on it?

Page 48

1      Q.    Sure.
2      A.    What's missing is $26,500.00 in
3  personal loans for helping to repair, excavate
4  the land, tree removal.  And then it was
5  $16,800.00, this was Wheatley's money.  This
6  became a part of the HELOC, home equity line
7  of credit.  You add that number up -- 5, 3,
8  18, 12, 13, 14 -- $54,835.21.
9      Q.    Okay.  So you are saying there
10  was 26,000-and-some-odd dollars in expenses
11  that you owed the Andersons totally separate
12  from the expenses that are documented here --
13     A.    Yes.
14     Q.    -- that were initially
15  reflected on this paper --
16     A.    That's correct.
17     Q.    -- before you added this new
18  information?
19     A.    Yes, that's correct.
20     Q.    Okay.  And no part of this
21  $26,000.00 to the Andersons is included in the
22  initial $11,500.00 that was on there?
23     A.    That's correct.  And it could
24  be misleading to see that.  That's a huge

Page 49

1  discrepancy in number.
2      Q.    And the $26,000.00 was for what
3  exactly?
4      A.    It was just loans we had back
5  and forth.  They helped us out.  We had taxes
6  that were due for the business.  We did other
7  stuff at the house.  All of it directly, I
8  can't recall each and every item that was
9  there.  But the total money was being
10  accounted for and kept track of to be paid
11  back.  This is the best loan you can get from
12  friends because it's zero interest.
13     Q.    But if you're telling me that
14  at least some of this $26,000.00 that you paid
15  back to the Andersons was for expenses you
16  incurred in connection with your business or
17  taxes for your business --
18     A.    At the house, at the house.
19  The house was also our business.  We actually
20  interviewed and hired people from there as
21  well.  It was money being lent back and forth
22  between the three of us to help each other
23  during this time of, would you say, kind of a
24  crazy demand to repair and fix up a seller's

13 (Pages 46 to 49)

1  house before we buy it.
2      Q.    So you're telling me that all
3  of this money here, the $11,535.21, the
4  26,000-some-odd for Mr. Anderson and his wife,
5  and then the 16,000 --
6      A.    And additional personal cash of
7  my wife and I.
8      Q.    -- and all of that
9  54,800-some-odd dollars was money that you
10  were forced to spend because of something that
11  someone at Wachovia did?
12     A.    Yes.
13     Q.    Is that correct?  Every single
14  dollar of that $54,000?
15     A.    Yes.
16     Q.    And so someone at Wachovia told
17  you to spend money in connection with your
18  business?
19     A.    No.
20     Q.    Okay.  So how does expenses in
21  relation to your business, even if it was run
22  out of your home, how does that relate to
23  something that somebody at Wachovia did?
24     A.    Okay.  I'm glad you asked that.

1  Just like you asked previous to this how do
2  you find the $35,000.00 to $40,000.00 in our
3  financial accounts, the financial accounts
4  were at Wachovia.  Our banking was at
5  Wachovia.  Our funds was at Wachovia.
6          So the fact that I'm
7  transacting the business myself personally in
8  and out of my house is one and the same.  So
9  the fact that they didn't know or didn't tell
10  me to spend money out of my business, I don't
11  have to go and report to them and ask their
12  permission if I can use my funds to spend it
13  toward something I need to do that's related
14  to the business or my personal self.
15          I'm responsible for the funds
16  totally.  That's how it's reported on the
17  Internal Revenue Service, my tax returns
18  reflect that, and there's no separation of
19  funds for business or personal.  It's all one.
20          That's why there's no 1120.
21  There's a Schedule C that's attached to a 1040
22  filed by the Internal Revenue Service.  So
23  what I use as discretion and for my best
24  judgment to pay bills that are necessary out

1  of my own funds, I don't need to ask the bank
2  do they think I should do that or can I do
3  that.
4      Q.    Are you saying that you spent
5  the $54,835.21 because of something that --
6      A.    Yes.
7      Q.    Don't interrupt me.
8      A.    Okay.
9      Q.    Are you saying that you spent
10  the $54,835.21 because J. D. Hogsten told you
11  to spend that money?
12     A.    Yes.
13     Q.    Okay.  He required you to spend
14  every single dollar of this sum and you did?
15     A.    Yes.
16     Q.    What specifically did he ask
17  you or what specifically are you alleging that
18  he demanded you do to improve your home?
19     A.    Specifically what to do?
20     Q.    Yes.
21     A.    He didn't tell us specifically
22  what to do.  He said, and I quote, it has to
23  be move in condition, and from the way it is
24  now and the condition that it is now, it's not

1  move in.  The move in condition was a
2  requirement for the loan to be processed and
3  go through.
4      Q.    Okay.
5      A.    Now, it cost us that amount of
6  money to do what he demanded that we do to
7  move in the house.
8      Q.    So the only --
9      A.    So if he had not asked us that
10  and told us to go fix the house to move in
11  condition -- okay? -- after it appraised for
12  its value that it was being sold for, we
13  wouldn't have spent the money.
14     Q.    Okay.  Let's break that down.
15  First of all --
16     A.    Let's do that.
17     Q.    -- first of all, the only thing
18  that Mr. Hogsten said to you was the house has
19  to be in move in condition; correct?
20     A.    Uh-huh.
21     Q.    And you then interpreted what
22  that meant and went out and spent $54,000.00?
23     A.    No.
24     Q.    He didn't tell you specifically

14 (Pages 50 to 53)

1  what you needed to do to get the home into
2  move in condition?
3      A.   No.
4      Q.   Correct?
5      A.   That's correct.
6      Q.   So how did you go about
7  deciding what you felt you needed to do to get
8  the home into move in condition?
9      A.   Well, the house had been empty
10  and vacant for several months, to the best of
11  my knowledge, and it had to have the utilities
12  turned on. It had to have cable put in,
13  phones. Those are in the documentation you
14  have for 548 in this piece that you submitted.
15  The carpet had to be done. Flooring was put
16  in.
17          And, by the way, we explained
18  that to J. D., that we don't think it's
19  necessary to do this now, we plan on doing
20  other custom upgrades as time allowed us to do
21  it and finances allowed us to do it.
22      Q.   Okay. What needed to be done
23  to the flooring? You said repairs had to be
24  done to the flooring.

1      A.   Well, it didn't have to be.
2  There was no really repairs. You can look in
3  the appraisal report.
4      Q.   Well, tell me what you are
5  talking about when you said something had to
6  be done to the flooring.
7      A.   There's nothing had to be done
8  to the flooring. We just put carpet and tile
9  on the floor to make it to our liking.
10      Q.   You put tile on the floor to
11  make it to your liking?
12      A.   Yeah, carpet on the floor to
13  our liking.
14      Q.   And there was no tile on the
15  floor before that?
16      A.   There was. There was old,
17  worn -- the house was vacant. It was vacant
18  for a while. So there was no living person in
19  the home. So it wasn't in the best pristine
20  or livable conditions.
21      Q.   And you are saying that you
22  would have done this, you would have put new
23  tile in and carpeting in, once you moved in,
24  you just didn't want to do it before then.

1      A.   Correct. And there was no
2  reason to do it. The house appraised for the
3  selling price.
4      Q.   Were there any other
5  improvements that you did to the property to
6  bring it into move in condition?
7      A.   Yes. We removed trees, put in
8  some soil.
9      Q.   Okay. But Mr. Hogsten never
10  said anything to you about having to remove
11  trees?
12      A.   No.
13      Q.   Okay. Other than these things
14  that we've talked about, anything else?
15      A.   No.
16      Q.   Now, you said that the property
17  at 584 North DuPont Highway was appraised for
18  the purchase price --
19      A.   Uh-huh.
20      Q.   -- before all of these repairs
21  were made to the property.
22      A.   That's correct.
23          - - -
24          (Whereupon the document was

1      marked, for identification purposes,
2  as Exhibit L. Wheatley 7.)
3          - - -
4  BY MR. FOGDALL:
5      Q.   I am going to show you what
6  appears to be an appraisal for the property at
7  584 North DuPont Highway dated as of July 7,
8  2004, by a Mr. Daniel Gladden, and you will
9  see on the second page of the appraisal the
10  property is valued at $267,000.
11      A.   Yes.
12      Q.   Now, is this the appraisal that
13  you're referring to where the property was
14  appraised at the purchase price?
15      A.   Yes.
16      Q.   So you have seen that before?
17      A.   Yes.
18      Q.   This appraisal.
19          All right. If you could turn
20  to the fifth page in -- and the pages have
21  been labeled by my office so WHEAT000058 --
22  there's a long paragraph titled "Summary of
23  Market Data" that describes the condition of
24  the property.

15 (Pages 54 to 57)

1     A.   Uh-huh.
2     Q.   Do you see where it says there
3  that in looking for comparable sales to do the
4  appraisal, the appraiser says that "All
5  sales," meaning comparable sales, "are
6  superior to subject," meaning 584 North DuPont
7  Highway, "in terms of condition"?
8     A.   Uh-huh.
9     Q.   And he goes on to say:
10  "Condition adjustments also reflect the lack
11  of heat in subject property on 2nd floor."
12     A.   Uh-huh.
13     Q.   He is saying there was no heat
14  on the second floor of the property at 584
15  North DuPont Highway.
16     A.   That's correct.
17     Q.   You recall that being the case?
18     A.   Uh-huh.
19     Q.   Did you do anything to see to
20  it that there would be heat on the second
21  floor once you moved in?
22     A.   Uh-huh.  Electric baseboard
23  heaters were installed, two of them, the
24  entire upstairs bedroom.

1     Q.   Do you feel that that was
2  unreasonable, to make that improvement --
3     A.   No.
4     Q.   -- to the second floor?
5     A.   Not at all.
6     Q.   And would you agree that
7  putting in heaters on the second floor because
8  there was no heat on that floor would be an
9  important part of making that home livable?
10     A.   Yes.
11     Q.   And making that home into move
12  in condition?
13     A.   Yes. Yep.
14     Q.   Just reading on that same
15  page --
16     A.   Uh-huh.
17     Q.   -- the appraiser goes on to
18  say: "Landing area 2nd level needs finished
19  floor covering." Do you recall that?
20     A.   Uh-huh.
21     Q.   Did you make that repair?
22     A.   Yes.
23     Q.   "It does appear some work is
24  needed on wood shake roof but assumed not to

1  have any leakage."
2     A.   Uh-huh.
3     Q.   Do you see that?
4     A.   Yes.
5     Q.   Do you agree that a lender
6  reading a statement like that might have a
7  concern about the condition of the roof if
8  that language is in the appraisal?
9     A.   Uh-huh.
10     Q.   And you understand that when
11  the lender is lending you money for your
12  property to purchase that property, that that
13  property is the lender's collateral, that
14  property is the lender's protection in the
15  event there's a default on the loan?
16     A.   Yes.
17     Q.   And do you agree that it would
18  make sense for the lender to want to ensure
19  that the collateral for the loan is in livable
20  condition?
21     A.   Yes.
22     Q.   Do you recall at some point
23  Wachovia said they needed a letter from a
24  contractor so that they would have assurance

1  that the roof didn't leak?
2     A.   Yes.
3     Q.   And did you feel that that was
4  unreasonable?
5     A.   No.
6     Q.   Just continuing on a little bit
7  farther down the page, the appraiser
8  continues: "Apparent lack of heat on 2nd
9  floor represents functional obsolescence.
10  Subject property fronts N. DuPont Highway
11  which is a heavily travelled road much of the
12  time and in my opinion represents locational
13  obsolescence."
14     A.   Locational obsolescence, what
15  does he mean?
16     Q.   I didn't write it.
17     A.   I don't know what it means.
18     Q.   But you agree that North DuPont
19  Highway is a fairly busy highway?
20     A.   Yes.
21     Q.   And in the area where 584 North
22  DuPont Highway is located, there are a fair
23  number of commercial properties surrounding
24  the home that you purchased?

16 (Pages 58 to 61)

Page 62

1    A.    Not surrounding. They're
2  across the street.
3    Q.    There's a fair number of
4  businesses on that stretch of highway?
5    A.    Yes.
6    Q.    And on the side of the highway
7  on which the 584 North DuPont Highway property
8  is located, there are also businesses on that
9  side of the highway?
10    A.    Yes.
11    Q.    On either side?
12    A.    Yes; but not 584. 584 had
13  residences adjacent, directly adjacent,
14  abutting against its property. But outside of
15  those residences, probably two or three doors
16  down, there are commercial buildings there.
17  So I just want to clarify that it is not right
18  next to the property, no. There are
19  residences next to it.
20    Q.    Then continuing on, the
21  appraiser writes: "It does appear some of the
22  piping in basement is wrapped with
23  asbestos..."
24    A.    Yes.

Page 63

1    Q.    Was that correct?
2    A.    Well, he said it appears. No,
3  we didn't have it. In fact, he made the
4  comment that I'm not an environmentalist so I
5  don't know, it appears to be that. But that's
6  not what it wound up being to the best of my
7  knowledge.
8    Q.    Do you recall having an
9  inspector come out and look at the piping in
10  the basement --
11    A.    No.
12    Q.    -- to ensure that it was safe?
13    A.    No.
14    Q.    You don't recall that?
15    A.    I don't recall that, no.
16    Q.    Okay.
17    A.    I don't know if Peter done
18  that. He was the seller at the time. We
19  didn't own the house. So I don't know what
20  Peter may or may not have done at that point
21  in that particular case, no.
22    Q.    You don't have a recollection
23  of a contractor coming out and inspecting the
24  pipe --

Page 64

1    A.    No.
2    Q.    -- to ensure that the
3  insulation was safe?
4    A.    I wasn't there about that, no.
5  I can't answer that.
6    Q.    Okay.
7    Q.    I want to go on to the next
8  paragraph in this letter.
9    A.    Okay.
10    Q.    And just to identify this, I
11  should have done this when we first started
12  talking about the letter, but my office has
13  identified it with the number PLS000232
14  through 234, so that will help us in talking
15  about it.
16    Q.    So right now we are on Page
17  PLS000233. I am reading from this first full
18  paragraph on that page. You say:
19  "Dr. Wilkens then bought the property from us
20  at the original cost in 2004 to help us from
21  being financially ruined and losing our
22  business. No Profit was realized from the
23  sale." Can you tell me about that?
24    A.    What specifically?

Page 65

1    Q.    Well, start with Dr. Wilkins
2  buying the property you are saying at the
3  original cost. Is that correct?
4    A.    It was near the cost of what it
5  was last year. I think it was 267. He bought
6  it at 275, something like that.
7    Q.    So, in fact, he did not buy it
8  at the original cost in 2004.
9    A.    Right.
10    Q.    He bought it for --
11    A.    A little bit more.
12    Q.    -- more.
13    A.    275. What's the difference of
14  that? Like 8,000. That's what it was. 267
15  plus our closing costs, and the initial offer
16  was like 8,000. So if you add it together, it
17  was like 275,000. That's where the number
18  came from. So that would have been the
19  original cost. That makes it correct then.
20  It was 275,000.
21    Q.    I am going to show you the
22  settlement statement in connection with the
23  purchase of 584 North DuPont Highway by
24  Dr. Wilkins.

17 (Pages 62 to 65)

1    A.   Sure.
2    Q.   This is dated 10/20/2005.
3    A.   Okay.
4    Q.   Does that square with your
5  recollection --
6    A.   Yes.
7    Q.   -- that you sold the property
8  to him in October 2005?
9    A.   Yes.
10   Q.   Again, just to refresh your
11 recollection, it does indicate that the price
12 for the property, when you sold it to
13 Dr. Wilkins --
14   A.   Uh-huh.
15   Q.   -- was $275,333.00.
16   A.   Right.
17        MR. FOGDALL:  Let's go ahead
18 and mark that.
19        - - -
20        (Whereupon the document was
21 marked, for identification purposes,
22 as Exhibit L. Wheatley 9.)
23        - - -
24        .

1  BY MR. FOGDALL:
2    Q.   Now, at some point while you
3  were in the process of purchasing the three
4  properties that you and the other plaintiffs
5  purchased, at some point you all got together
6  and agreed to form a company called Tri-Core.
7    A.   Uh-huh.
8    Q.   Do you recall why you did that?
9    A.   Yes.  We were doing that, it
10 was actually an idea of having a business
11 venture together, investments of stocks and
12 real estate acquisitions.
13   Q.   Do you recall signing an
14 agreement between yourselves, all of the
15 plaintiffs in this case signing an agreement,
16 early in July?
17        Let me correct that.  I will
18 get the agreement and then that way we will
19 have the date there.
20   A.   Okay.
21   Q.   I am going to show you the
22 Operating Agreement for Tri-Core.  It was
23 marked at Mr. Anderson's deposition yesterday.
24 That's why it has the exhibit sticker with his

1  name on it.
2    A.   Sure.
3    Q.   I am going to show it to you.
4  You can see I misspoke a minute ago.  You
5  actually signed the document, all of you, on
6  November 6, 2004.
7    A.   That's correct.
8    Q.   Do you recall that?
9    A.   That's correct.
10   Q.   What I was thinking of is that
11 earlier in the document it indicates that the
12 company itself, Tri-Core, was formed on
13 July 8, 2004.
14   A.   That's not correct.
15   Q.   It says that in the document,
16 Paragraph 2.01.
17   A.   Now go to the second page,
18 which would be Paragraph 2 -- it should be
19 Paragraph 2 -- was being referred, Paragraph
20 2.06 in the same document.  That's what she
21 was referring to.  The attorney was referring
22 to Paragraph 2.06 of the same document.
23   Q.   I am going to have to ask you
24 to explain that to me.

1    A.   Sure.
2    Q.   How does Paragraph 2.06 --
3    A.   What it says is that "The
4  company's initial Registered Office is at the
5  office of its Registered Agent at 138 King
6  Henry Court Street, Dover, DE 19904, and the
7  name of its initial Registered Agent at that
8  address is Lloyd Wheatley.  The Registered
9  Office and Registered Agent may be changed
10 from time to time by filing the address of the
11 new Registered Office and/or the name of the
12 new Registered Agent with the Secretary of
13 State of Delaware..."  So I was the registered
14 agent.
15   Q.   But I am asking you, that's not
16 contradicting the statement on the previous
17 page that the company itself was created in
18 July 2004?
19   A.   No.
20   Q.   Okay.  You agree with that,
21 that the company was created in July 2004?
22   A.   Yes.  But there's articles and
23 all and its whole formation wasn't until
24 November.  It was just discussed and

18 (Pages 66 to 69)

Page 70

1  conceptualized in July, but nothing was
2  thought out as to all of the documents you
3  have until November. That was about five
4  months later.
5      Q.   Okay.
6      A.   As it was being formulated,
7  there was give-and-take between people, add
8  this, take that out, let's not do that, and
9  that kind of thing.
10     Q.   Do you see Schedule B of the
11 Agreement lists you and the other
12 plaintiffs --
13     A.   Sure.
14     Q.   -- and your properties --
15     A.   Right.
16     Q.   -- and describes them as your
17 Initial Capital Contribution?
18     A.   That's correct. That was the
19 plan.
20     Q.   And here in Paragraph 8.01,
21 under "Capital Contributions," it reads:
22 "Each Member must contribute the property set
23 forth in the attached Schedule B" -- which we
24 just looked at --

Page 71

1      A.   Sure.
2      Q.   -- "as his or her share of the
3  Initial Capital Contribution. Said properties
4  are company property..."
5      A.   Uh-huh.
6      Q.   So this paragraph indicates
7  that you were pledging your properties to the
8  company.
9      A.   That's what would have happened
10 in the original, in the thought of forming the
11 company for its assets. But it never came to
12 fruition.
13     Q.   Did you ever inform Wachovia
14 that you were entering into this Agreement
15 with the other plaintiffs?
16     A.   No. This was after we
17 purchased the homes. We purchased the homes
18 in August. This was ratified and done in
19 November.
20     Q.   You created the company back in
21 July 2004 according to --
22     A.   Correct.
23     Q.   Did you ever tell Wachovia that
24 you were in the process of creating this

Page 72

1  company?
2      A.   No.
3      Q.   And did you ever tell Wachovia
4  that you were contemplating transferring the
5  properties to a business entity?
6      A.   At the time of purchasing those
7  properties, no.
8      Q.   Okay.
9      A.   It didn't -- no.
10     Q.   Now, in May of 2005, I
11 believe -- so this would have been several
12 months before Dr. Wilkins purchased your
13 property at 548 North DuPont Highway -- you
14 and your wife sold your share in Tri-Core to
15 the other members of the company, Mr. and
16 Mrs. Anderson and Mr. and Mrs. Wilkins.
17     A.   Yes.
18     Q.   Do you recall that?
19     A.   Yes.
20     Q.   And I will show you a document
21 called "Membership Interest Redemption
22 Agreement."
23     A.   I remember it.
24     Q.   You remember that?

Page 73

1      A.   Let me see it real quick.
2           Yes.
3      Q.   So you sold your interest in
4  Tri-Core before you actually sold title to the
5  property to Dr. Wilkins?
6      A.   Uh-huh.
7           THE WITNESS: Should I be
8  saying yes?
9           THE COURT REPORTER: You should
10 be.
11          THE WITNESS: I just happened
12 to ask that question. I'm sorry.
13 BY MR. FOGDALL:
14     Q.   Okay. Do you see here on the
15 second page of the Redemption Agreement, under
16 "Consideration," it states: "In consideration
17 for the Withdrawing Member's cooperation" --
18 and the "Withdrawing Member" is you and your
19 wife --
20     A.   Yes.
21     Q.   -- "In consideration for the
22 Withdrawing Member's cooperation and
23 participation in the refinancing of Company's
24 assets" -- "Company" being Tri-Core -- "the

19 (Pages 70 to 73)

1  Company agrees to redeem the Withdrawing
2  Member's Interest and distribute to the
3  Withdrawing Member $22,000..." Do you recall
4  being paid $22,000 in May 2005?
5      A.    No.
6      Q.    You don't recall that. So this
7  is inaccurate?
8      A.    I don't recall that amount
9  given to us. I think we were talking about
10 some liquidity and profits of the company if
11 it had any, but it didn't have any assets, it
12 didn't have any profit, any assets that could
13 be liquefied or paid, that I can recall.
14     Q.    You don't recall one way or the
15 other, though, whether you received this
16 $22,000 when you --
17     A.    No, I don't recall that at all.
18     Q.    -- left the company?
19     A.    Unh-unh.
20     Q.    This is going back now to the
21 Operating Agreement for Tri-Core that we were
22 talking about earlier, and do you see here on
23 Page 15 of the Operating Agreement -- and it's
24 Bates-labeled 000375 -- this is under

1  Paragraph 8.02(a): "Each Member is required
2  to make additional Capital Contributions of
3  $2,000 monthly to meet the expenses of the
4  company..."
5      A.    Right.
6      Q.    Do you recall that?
7      A.    Yes.
8      Q.    Do you recall making those
9  $2,000 payments?
10     A.    No. The company had no assets.
11 It didn't have an account or anything. It
12 never came to fruition. And partly the reason
13 why we withdrew was because the company wasn't
14 doing any of its goals and objectives. So we
15 just withdrew from the company and just
16 focused on our business because it was already
17 up and running.
18           This was all ideas, it was a
19 good thought and a possibility, but during
20 that time frame none of that ever came to
21 fruition so it never happened. Nobody did any
22 of that.
23     Q.    But you agree that by signing
24 the contract --

1      A.    Yes.
2      Q.    -- amongst yourselves --
3      A.    Yes.
4      Q.    -- you were all --
5      A.    Obligated to do that.
6      Q.    -- obligated to pay $2,000 a
7  month?
8      A.    Absolutely.
9      Q.    You agree with that?
10     A.    Yes.
11     Q.    In the Membership Interest
12 Redemption Agreement, under Paragraph 2,
13 "Withdrawal," it reads: "Upon completion of
14 the sale, assignment, and transfer of the
15 Interest to the Company as set forth herein,
16 the Withdrawing Member shall withdraw from the
17 Company as Member, Manager and Registered
18 Agent on the Effective Date; however, the
19 Withdrawing member's obligation to pay $2,000
20 per month to cover the mortgage note and other
21 expenses associated with the maintaining the
22 property contributed to the company will
23 continue until the completion of the
24 refinancing."

1            So even though you were
2  withdrawing from the company, you still had --
3      A.    Uh-huh.
4      Q.    -- at least for a time the
5  obligation to pay $2,000 per month.
6      A.    But it was never done. There
7  was nothing ever done with that, none of that.
8  So it becomes moot. No one followed any of
9  that. Whatever Tri-Core is doing today, I
10 don't know.
11           But from that time frame for a
12 year, in fact two years that I can recall,
13 there was no income tax returns, no business
14 license ever purchased, and none of that stuff
15 ever happened. So it's a moot subject.
16     Q.    Did you ever tell Wachovia that
17 you and the other plaintiffs were agreeing to
18 take on the additional obligation of paying
19 $2,000 a month to Tri-Core so that Wachovia
20 could take that into account in its credit
21 assessment of you and the other plaintiffs?
22     A.    As I stated earlier, that
23 agreement wasn't binding until November of
24 '04. The purchases of Wachovia's properties

20 (Pages 74 to 77)

Page 78

1   were in July and August of '04, which was two
2   to three months before any of this ever came
3   to being.
4           So we can't well tell them in
5   May, June, July, and August of something that
6   was going to happen in the future that was
7   still being ratified and discussed to even
8   know what those things were. So, no, we
9   couldn't tell them something that we didn't
10  know that we were going to be doing --
11  Q.    But you and the other --
12  A.    -- or suggest to be doing.
13  Q.    You and the other plaintiffs
14  had discussions about Tri-Core --
15  A.    Yes.
16  Q.    -- before you purchased the
17  three properties.
18  A.    In June.
19  Q.    Did you have discussions about
20  the fact that Tri-Core might involve you all
21  assuming some additional financial obligations
22  to the business?
23  A.    No. There was no discussion of
24  financial obligations until after the

Page 79

1   purchases in September-October. In fact, I
2   think you have in part of your evidentiary
3   file another piece of misfiled paper from
4   September of '04, which was the month after
5   August. It shouldn't even have been in there.
6   It has nothing to do with Wachovia, absolutely
7   nothing.
8   Q.    I am not sure what you are
9   talking about.
10  A.    Well, you should have one in
11  there. I saw it.
12         MR. GRADY:  I think it's the
13  document you referred to yesterday at
14  yesterday's deposition.
15         MR. FOGDALL:  Which is what?
16         MR. GRADY:  The notes.
17         THE WITNESS:  The notes from
18  September '04.
19         MR. GRADY:  From Tri-Core.
20         THE WITNESS:  From Tri-Core.
21  You don't have them?
22  BY MR. FOGDALL:
23  Q.    Why do you think that the
24  meeting notes for Tri-Core are irrelevant?

Page 80

1   A.    Because it was misfiled in 584
2   North DuPont Highway's mortgage application
3   folder and it has nothing to do with 584.
4   Q.    Even though it relates to the
5   properties that you purchased and that are
6   collateral for the loans that Wachovia gave
7   you?
8   A.    No. They were after August.
9   Those minutes were September. September is
10  the month after August. What you are
11  suggesting --
12  Q.    I am not suggesting anything.
13  I am asking questions.
14  A.    What I am trying to clarify --
15  Q.    I am asking questions. We have
16  reached the point where it's not productive
17  anymore.
18         MR. GRADY:  Listen, he will ask
19  you the questions. Simply answer the
20  questions that he is asking.
21         THE WITNESS:  Okay.
22  BY MR. FOGDALL:
23  Q.    This is another document that
24  was discussed at Mr. Anderson's deposition

Page 81

1   yesterday. It's titled "Preformation
2   Agreement." Do you recall ever seeing that?
3   A.    Yes.
4   Q.    When was the first time you saw
5   this?
6   A.    This had to be somewhere in
7   October or so, that I can recall, of '04.
8   Q.    All right. Going on to the
9   next paragraph of the letter that's Bates
10  Range PLS000232 to 234, you state: "During
11  2004 & 2005 time frame, we lost the
12  opportunity to purchase Two Ten passenger
13  White Limousines (approximately $20,000.00
14  each) and advance the required auto insurance
15  of $1.5 Million liability coverage..."
16  Explain what you're saying there.
17  A.    What we're saying there is that
18  if we had not used our cash reserves that was
19  in our accounts, we would have taken the money
20  and reinvested it into Limousine Unlimited and
21  purchased two automobiles, and with that you
22  have to put the required commercial insurance
23  on the vehicles to operate it by law.
24  Q.    Okay. Now, this is a pretty

21 (Pages 78 to 81)

Page 82

1  broad time frame, 2004-2005.
2      A.    Uh-huh.
3      Q.    When did you have the
4  opportunity to purchase these white
5  limousines?
6      A.    We haven't. That is to date.
7      Q.    No. You said you lost the
8  opportunity, so obviously you had an
9  opportunity, you are saying, to purchase them
10  and you didn't do it.
11      A.    Right.
12      Q.    So when was it that you had
13  that opportunity to purchase them?
14      A.    Oh, when was it?
15      Q.    Yes.
16      A.    It would have been
17  October-November of '04 to spring, April-May,
18  of '05. Does that answer the question?
19      Q.    And you are saying that you
20  couldn't purchase the limousines because why?
21      A.    We didn't have any cash
22  reserves on hand.
23      Q.    And you blame that on Wachovia?
24      A.    Yes.

Page 83

1      Q.    All right. I have here your
2  tax return for 2004 and I have kept it in the
3  order that it was given to me.
4      A.    Sure.
5      Q.    So the actual Form 1040 is
6  several pages in this document. The first
7  page is -- this is numbering that was provided
8  by Mr. Grady's office -- 000047. The actual
9  Form 1040 starts on Page 000053.
10      Now, 2004 is the year in which
11  you bought these properties?
12      A.    That's correct.
13      Q.    And this is your tax return for
14  that year, so it would have been filed in
15  2005.
16      A.    Yes.
17      Q.    But it reflects income that
18  your business generated in 2004, the year you
19  bought the properties?
20      A.    Yes.
21      Q.    Okay. Now, I also have here
22  your income tax returns for 2001, 2, and 3,
23  and the one for 2001 is labeled by Mr. Grady's
24  office, the ones for 2 and 3 are not. I got

Page 84

1  them yesterday and he didn't have a chance to
2  label them with numbers. So we are not going
3  to have the luxury of being able to identify
4  specific pages of your 2002 and 2003 tax
5  returns through a number system provided by
6  Mr. Grady's office, but we'll make do.
7      2001 tax return, going to the
8  statement of profit and loss for your
9  business, this is on Page 000034 as numbered
10  by Mr. Grady. In fact, let's do this. While
11  we are going to talk about these, let's go
12  ahead and mark them first.
13      - - -
14      (Whereupon the documents were
15      marked, for identification purposes,
16      as Exhibits L. Wheatley 11 through 14
17      inclusive.)
18      - - -
19  BY MR. FOGDALL:
20      Q.    So we have marked your 2001 tax
21  return as Wheatley Exhibit 11 and I am turning
22  to I guess it's four pages in to the Profit or
23  Loss from Business statement, and this
24  indicates that it's the profit or loss from

Page 85

1  Limousine Unlimited, your limousine business,
2  and this shows, according to your 2001 tax
3  return, that your gross income for the
4  business was $61,784, you had $78,206 in
5  expenses, and so that led to a negative
6  $17,931 net profit for the business.
7      A.    Uh-huh.
8      Q.    Is that correct?
9      A.    Uh-huh.
10      Q.    Do you recall that being the
11  case?
12      A.    Yes.
13      Q.    All right. Now, in 2002, again
14  turning to the Profit or Loss from Business
15  statement, this just says "Lloyd J. Wheatley"
16  at the top and "Transportation." It doesn't
17  actually provide the name Limousine Unlimited.
18  But I'm assuming it's the same business,
19  Limousine Unlimited.
20      A.    It is.
21      Q.    Okay. Now, here in 2002 your
22  gross income for the business actually was
23  significantly higher. In 2001 it was $61,784.
24  In 2002 it was $194,946.

22 (Pages 82 to 85)

Page 86

1    A.   Uh-huh.
2    Q.   Had you just started the
3  business in 2001?
4    A.   No.
5    Q.   Okay. In any case, 2002 was a
6  better year than 2001, more income from the
7  business.
8    A.   Yes.
9    Q.   But then you have expenses.
10  Again, this is reading from the 2002 profit
11  and loss statement. Your expenses were
12  $194,442. Unfortunately, I don't have a page
13  number that I can refer to, but we are looking
14  at, again, four pages in on Wheatley No. 12.
15      So in 2002, once you take into
16  account the $194,442 in expenses, you end up
17  with a net profit of $504. So it's a little
18  better --
19    A.   A little better.
20    Q.   -- than a negative 17,000 from
21  the year before.
22    A.   Yes.
23    Q.   Okay. In 2003 -- and this is
24  again, I guess, five pages in -- for your 2003

Page 87

1  tax return, we have the Profit or Loss from
2  Business statement, and here again your gross
3  income went up from the year before, from
4  2002. You reported $240,925 in gross income.
5    A.   Uh-huh.
6    Q.   And you reported $231,636 in
7  total expenses.
8    A.   Yes.
9    Q.   So that gives us a net profit
10  of $9,289.
11    A.   Uh-huh.
12    Q.   And then in 2004, the year you
13  bought the property, 584 North DuPont
14  Highway --
15    A.   Uh-huh.
16    Q.   -- that same statement, Profit
17  or Loss from Business, for that year -- and
18  this does have a number provided by
19  Mr. Grady's office, it's 000055 -- shows that
20  in 2004 your gross income was $211,800 --
21  well, let's walk through it.
22      You had your gross receipts for
23  the business of $245,489.
24    A.   Yes.

Page 88

1      MR. GRADY: I'm sorry; what was
2  that number again?
3      MR. FOGDALL: $245,489.
4      MR. GRADY: Thank you.
5  BY MR. FOGDALL:
6    Q.   Then you had to subtract out
7  cost of goods sold, which was $33,689. And
8  elsewhere in this document you break that
9  down.
10      You have here, using the number
11  provided by Mr. Grady's office, on Page
12  000057, you show vehicle operating costs
13  $33,689, so that's reflected here, that same
14  number, on "Cost of goods sold," Line 4.
15      So you subtract that from the
16  gross receipts and you get a gross income of
17  $211,800 of gross income.
18    A.   Right.
19    Q.   Then you have expenses of
20  $176,982, and you end up with a net profit of
21  $34,818.
22    A.   Uh-huh.
23    Q.   So that's the best year so far,
24  2004.

Page 89

1    A.   Yep, it looks like it.
2    Q.   You went from a negative 17 in
3  2001 up to a positive 34,818 in 2004. That's
4  the year that you bought the property at 584
5  North DuPont Highway.
6    A.   That's correct.
7    Q.   And that's $34,818 of net
8  profit on top of the wages that the business
9  paid you. See here on Line 26 --
10    A.   Uh-huh.
11    Q.   -- the business paid you
12  $58,412 in wages?
13    A.   No, that's not my wages.
14    Q.   Oh, okay. Whose wages are
15  those?
16    A.   Those are the employees' wages.
17    Q.   Are your wages included in that
18  at all?
19    A.   No. I'm the owner. I don't
20  have a paycheck for wages. So I file the
21  total gross income and losses as my income and
22  loss. All of those wages that you see in the
23  Schedule C are employees that work for us.
24  Those are not my personal -- owners don't have

23 (Pages 86 to 89)

Page 90

1  a paycheck. You should have in there a
2  self-employment attachment to the tax form
3  that shows my actual taxes paid by the 15%
4  ratio of the net profits, at one-half percent
5  of the net profits.
6      Q.   So you are saying your salary
7  is paid out of this $34,818 net profit?
8      A.   No. I'm responsible for it.
9      Q.   Well, do you collect wages from
10  Limousine Unlimited?
11      A.   No. As an owner, under the law
12  as an owner, and then being a single member
13  owner and filing under the Schedule C and
14  1040, I don't draw a check. There's a
15  self-employment form that is attached to it
16  that should be somewhere on that. A
17  self-employment tax form should be on there.
18  Can I see the document?
19      Q.   Yes.
20          MR. FOGDALL:  Let's go off the
21  record for a second.
22            - - -
23          (Discussion off the record.)
24            - - -

Page 91

1  BY MR. FOGDALL:
2      Q.   During the few moments that we
3  were off the record, Mr. Wheatley, you showed
4  me this self-employment tax statement, which
5  is also part of your 2004 tax return, which
6  shows, again, the net profit, it says $34,818,
7  and you explained to me that in essence what
8  you're doing there is you're reporting that
9  number to the IRS as the number that you
10  personally take away from the business at the
11  end of the day after paying all your expenses?
12      A.   Yes.
13      Q.   So then if you could explain
14  something to me then, in some of your earlier
15  years, your tax returns, you show, for
16  example, 2001 -- this is Page 1 of Wheatley
17  Exhibit 11 -- you report wages of $50,787 on
18  the first page.
19      A.   Yes.
20      Q.   But your net profit from the
21  business was negative $17,931. So where does
22  the $50,787 in wages come from if you've got a
23  negative $17,931 net profit?
24      A.   That's my wife Audria's income.

Page 92

1      Q.   Okay. So that's her wages,
2  your wife's wages?
3      A.   Yes. And ours for the Schedule
4  C is reported on Line 12 of the 1040.
5      Q.   Okay. Thank you for clarifying
6  that.
7          So going back and looking at
8  these four years, 2001 to 2004, if the year in
9  which you bought the property is the best
10  year, it's better than the three preceding
11  years, how did buying the property impact your
12  business?
13      A.   Well, how it impacted the
14  business is that we had about that amount of
15  money in cash reserves that we built up, as
16  you saw, through the years. The company was
17  profitable in 2002, 2003, and up to 2004, so
18  we had cash reserves set aside that we used
19  for reinvestment purposes.
20          We didn't use that money for
21  reinvestment purposes in 2005, which was to
22  purchase the two ten-passenger limos, because
23  we used the money in 584 North DuPont Highway
24  to repair and fix it up after it appraised for

Page 93

1  its sale price, which was a demand by the bank
2  which was not in the actual purchase agreement
3  and nor did it ever appear in the purchase
4  agreement that we had to do all those repairs
5  necessary to get the loan. So it was a
6  discriminatory act.
7      Q.   So you are saying in previous
8  years you had profit that you reinvested into
9  the business, but the profit that you made in
10  2004 you weren't able to reinvest into the
11  business?
12      A.   That's correct.
13      Q.   Okay.
14      A.   It was spent on renovations,
15  modifications, upgrades of 584 above the
16  purchase price after it was appraised for the
17  actual sale price of $267,000, and there
18  wasn't a requirement in the loan from Wachovia
19  to do any of that and have it in move in
20  condition. That was solely the discretion and
21  said by J. D. Hogsten, which later to be found
22  out it was not necessary to be done. All the
23  the money, all the time, and all the effort we
24  had to do was nothing to do with the sale

24 (Pages 90 to 93)

Page 94

1  price of the house.
2      Q.    So you are telling me that this
3  $34,818 net profit that's reported on your
4  2004 tax return, you're saying you used that
5  $34,818 --
6      A.    No.
7      Q.    -- instead of being able to use
8  it to purchase limos --
9      A.    No.
10     Q.    -- or whatever other
11 reinvestment you would do, you had to use it
12 on the house?
13     A.    No.  This was at the end of
14 2004.  There were monies and profits which you
15 showed me in 2002 and 2003.  There was monies
16 that was profited from the company and put
17 into our savings and banking accounts.  And
18 where --
19     Q.    Where --
20     A.    Let me continue if I can
21 explain.
22     Q.    Can you find that on your 2002
23 and 2003 tax returns?
24     A.    Yes, absolutely.

Page 95

1      Q.    Where you took that money
2  and --
3      A.    Sure.  What you have to look at
4  is depreciation.  Okay?  In this other
5  expenses, Line 27, right here, some of that is
6  depreciation.  And where do we have it?
7      Q.    Are you talking about Line 48?
8      A.    Yeah.
9      Q.    Other expenses?
10     A.    Yeah.  In that number is
11 depreciation.  And in that number that
12 depreciation is not money.
13            Here it is right here.  This
14 $44,899, which is not numbered -- you have to
15 number this page for the record --
16     Q.    Well, we will just count.  This
17 is seven pages in.  It's on the seventh page
18 of the document.
19     A.    Of the 2003 tax return.
20     Q.    Okay.  And you're saying?
21     A.    The depreciation, $44,899, is
22 an accounting line item.  It's not real money.
23 That is the depreciation of the hardened
24 assets, which were the other equipment and

Page 96

1  vehicles and things that we own.  So it's an
2  orthodox methodology of accounting writeoff,
3  but it doesn't represent real money.  That
4  money should be added back to the bottom line
5  of the net.  So that's the real net profit
6  number.
7      Q.    You are saying this $44,899
8  represents reinvestment by you in the
9  business?
10     A.    No.  You need to add that to
11 the bottom line of the Schedule C and those
12 two numbers are the total profits of the year.
13     Q.    Okay.
14     A.    And out of that I apportion and
15 set money aside for cash reserves in the
16 company.  Usually I set aside 12 to
17 14 percent.  I will set that aside --
18     Q.    Okay.
19     A.    -- for emergencies and
20 reinvestment.
21     Q.    So you are saying to really get
22 the sense of the profitability of the business
23 in a given year, you have to take the net
24 profit, which is reflected here on Line 31 --

Page 97

1      A.    Of the Schedule C.
2      Q.    -- and you have to add that to
3  what's listed here as depreciation, the
4  $44,899.  If you add those two together, then
5  you get a better sense of the profitability of
6  the business.
7      A.    Yes.
8      Q.    Is that fair to say?
9      A.    Yes.  That's exactly what it
10 is.
11     Q.    So doing that here, how would
12 we do that here?
13     A.    We would find the line for
14 depreciation.
15     Q.    You go ahead and look for it.
16     A.    Here it is right here.  You
17 would take that $52,900 and add it to that
18 number.
19     Q.    Okay.  So $52,986, $34,818, and
20 you still end up with -- I do have a
21 calculator --
22     A.    That's why I said, I rely on it
23 very strongly.
24            MR. FOGDALL:  Off the record.

25 (Pages 94 to 97)

Case 1:06-cv-00567-SLR    Document 48-5    Filed 12/21/2007    Page 5 of 25

1         ---
2         (Discussion off the record.)
3         ---
4    BY MR. FOGDALL:
5         Q.    While we were off the record, I
6    used my calculator to add together Line 31 of
7    your 2004 tax return, which was reported as
8    $34,818 in net profit, and I added that to the
9    figure given for depreciation of $52,986, and
10   we came up with $87,806. And you're saying
11   that's a better reflection of the
12   profitability of the business in that year
13   because the $52,986 was effectively a reserve
14   or money that was reinvested into your
15   business?
16        A.    No. That's a line item
17   writeoff that's an accounting methodology
18   accepted in business practice of depreciating
19   hardened assets of the company and that number
20   is not real money. It's an expense writeoff
21   for legalization of the Internal Revenue
22   Service. But it's not used for depreciation;
23   it's actually part of the profits.
24        Q.    Okay. So are you saying then

1    that the profits of the business in 2004 were
2    in fact $87,806?
3         A.    Yes.
4         Q.    All right.
5         A.    In real cash, say it that way,
6    in cash dollars.
7         Q.    So we have just discussed the
8    fact that in real cash terms the profit from
9    your limousine business in 2004 was $87,806;
10   correct?
11        A.    Yes.
12        Q.    Now, why couldn't you use some
13   of that $87,806 to buy the limousines that you
14   wanted to buy?
15        A.    Because that $87,806 was used
16   to pay for the mortgage at 138 King Henry
17   Court and 584 North DuPont Highway and all of
18   our expenses in both houses.
19        Q.    Okay. Let's go to your 2005
20   tax return.
21        ---
22        (Whereupon the document was
23        marked, for identification purposes,
24        as Exhibit L. Wheatley 15.)

1         ---
2         THE WITNESS:  If I can add one
3    other thing?
4         MR. FOGDALL:  Off the record.
5         ---
6         (Discussion off the record.)
7         ---
8    BY MR. FOGDALL:
9         Q.    Go ahead. You wanted to say
10   something else in connection with the $87,806?
11        A.    And we helped pay for our
12   daughter's education and college.
13        Q.    Okay. Now turning to your 2005
14   tax return, this is labeled by Mr. Grady's
15   office starting at 000070 and the actual
16   Profit or Loss from Business statement is on
17   000077.
18        Now, in 2005 on this statement
19   you report at the end of the day $4,847 on
20   Line 31, but in the depreciation column you
21   have $79,857.
22        A.    Uh-huh.
23        Q.    So doing what we did for 2004,
24   we would add $79,857 to $4,847?

1         A.    Right.
2         MR. FOGDALL:  Let's go off the
3    record again.
4         ---
5         (Discussion off the record.)
6         ---
7    BY MR. FOGDALL:
8         Q.    So doing now for 2005 the same
9    process that we went through for 2004, we have
10   added your net profit that's reported as
11   $4,847, we have added that to your
12   depreciation figure of $79,857, and we have
13   come up with $84,704, which is only about
14   $3,000 less than the profit for the year
15   before.
16        A.    Yes; but it's a loss.
17        Q.    It sounds like a much smaller
18   loss than what you are saying was really
19   caused to your business because of the
20   expenses you incurred in connection with
21   purchasing that property, 584 North DuPont
22   Highway.
23        A.    I'm sorry; is that --
24        MR. GRADY:  Is that a question?

26 (Pages 98 to 101)

VERITEXT NATIONAL COURT REPORTING COMPANY
(215) 241-1000   (888) 777-6690

Page 102

```
 1  BY MR. FOGDALL:
 2     Q.    It's a question.  Do you agree
 3  with that, that $3,000 is a lot less than
 4  $50,000?
 5     A.    Yes.
 6     Q.    And you still made $84,704 in
 7  2005.
 8     A.    Yes.
 9     Q.    Would you describe your
10  business as struggling in 2005 if it's making
11  $84,704?
12     A.    Yes.
13     Q.    Even though that's only $3,000
14  less than the year before when it made
15  $87,806?
16     A.    Yes.
17     Q.    So would you characterize your
18  business as struggling in 2004 when it made
19  $87,806?
20     A.    No.
21     Q.    So even though you still made
22  in the mid-$80,000 range in 2005, suddenly
23  you're struggling as a business.
24     A.    Yes.
```

Page 103

```
 1     Q.    Well, I will just leave that
 2  where it is.
 3           MR. FOGDALL:  Okay.  Let's take
 4  a break for lunch.
 5           MR. GRADY:  Okay.
 6                      - - -
 7           (Whereupon there was a luncheon
 8  recess in the proceedings from
 9  12:15 p.m. to 1:10 p.m.)
10                      - - -
11  BY MR. FOGDALL:
12     Q.    We're back on the record.
13           Mr. Wheatley, you testified
14  earlier that your original downpayment under
15  the no income verification loan was going to
16  be 15% and when you were switched to what
17  you're calling the income verification loan,
18  then the downpayment went down to 10%.
19     A.    Yes.
20     Q.    At some point you did end up
21  making a 20% downpayment.
22     A.    Yes.
23     Q.    So in the end the total
24  downpayment that you made was 20% of the price
```

Page 104

```
 1  of the property.
 2     A.    Yes.
 3     Q.    Now, tell me how that came
 4  about.
 5     A.    Okay.  We went to the first
 6  closing that was to be the 10% and there was
 7  some objections Wachovia had mentioned about
 8  the property.  The papers weren't sent to Gary
 9  Dodge's office for the day of the closing.
10     Q.    Let me stop you right there.
11  You are talking about the first closing which
12  would have been August 6, 2004.  Does that
13  sound right to you?
14     A.    It sounds right.
15     Q.    Okay.  So you were at the
16  closing on August 6, 2004.
17     A.    Right.
18     Q.    Continue.
19     A.    We were at the closing and the
20  papers were never sent from Wachovia and the
21  closing didn't occur that day.
22     Q.    What papers were you expecting
23  to get from Wachovia?
24     A.    That would be from the mortgage
```

Page 105

```
 1  processing center of Wachovia.  I guess they
 2  e-mail it down to the attorney's office or fax
 3  it.  I don't know how it actually arrives.
 4     Q.    Now, did you have an
 5  understanding of where that paperwork would be
 6  coming from?  Would it be coming from
 7  someplace in Dover or would it be coming from
 8  somewhere outside the State of Delaware?
 9     A.    Outside the State of Delaware.
10     Q.    Okay.
11     A.    I recall that was the mortgage
12  application processing center.
13     Q.    Okay.  Does Connecticut sound
14  familiar?
15     A.    That's correct.
16     Q.    Okay.
17     A.    You're correct, Connecticut.
18     Q.    So you were expecting paperwork
19  to get sent to your attorney's office for the
20  closing from one of Wachovia's centers up in
21  Connecticut --
22     A.    Yes.
23     Q.    -- and that doesn't occur?
24     A.    That doesn't occur.
```

27 (Pages 102 to 105)

Page 106

1    Q.   What's your understanding of
2  why that didn't occur?
3        A.   Apparently someone called
4  Allstate Insurance and made a statement about
5  the roof. Allstate called us and made an
6  inquiry about the roof and we had to have a
7  contractor go out and check the roof, which we
8  did.
9        Q.   Do you know who that person was
10  that contacted the insurer?
11       A.   The Allstate insurance?
12       Q.   Yes.
13       A.   No. I don't know who that was.
14       Q.   Okay. So the paperwork didn't
15  arrive. When were you first told, as you
16  recall, about the increase in the downpayment
17  from 10% to 20%?
18       A.   The day of the actual closing,
19  the second one.
20       Q.   So you are saying you weren't
21  told about that on August 6, 2004?
22       A.   No.
23       Q.   When your purchase of the
24  property finally closed, it was on August 13,

Page 107

1  2004; right?
2        A.   Is that what it is? Yes.
3        Q.   And you are saying that's the
4  first time you heard about the downpayment was
5  going to be 20% instead of 10%?
6        A.   That's correct.
7        Q.   And how were you informed about
8  the increased downpayment?
9        A.   I was informed about that by --
10  let me get this right -- on August 6, the
11  original closing -- let me get this right --
12  J. D. was on vacation and he was in the Outer
13  Banks in South Carolina, I don't know which
14  weekend, but it was during that conversation
15  that he was on a speaker phone at Gary Dodge's
16  office, myself, Attorney Dodge, Mr. Aigner,
17  and Mr. Anderson were all present, and in that
18  conversation he stated something about the
19  roof at the house couldn't be done on that day
20  and so it looks like the deal is done, you're
21  not going to be able to do anything, because I
22  won't be back until Monday.
23       Q.   Did he talk about the
24  downpayment during that conversation?

Page 108

1        A.   Not at all.
2        Q.   So I am asking you --
3        A.   Not at all.
4        Q.   -- how you first came to hear
5  about the increase in the downpayment from 10%
6  to 20%.
7        A.   Okay. That was when his
8  supervisor, the first one in the record that
9  was the regional manager, he got information
10  and then came back and told me that there
11  would be an increase in the downpayment.
12       Q.   So that came from him. Do you
13  recall at all the name of this person?
14       A.   It's in the record. I can't
15  remember.
16       Q.   Let's look in the Complaint.
17       A.   It's in the record.
18       Q.   I think you do name a name in
19  the Complaint.
20       A.   There were two.
21            MR. FOGDALL: Let's go off the
22       record for one moment.
23                    - - -
24            (Discussion off the record.)

Page 109

1                    - - -
2  BY MR. FOGDALL:
3        Q.   We're back on the record. Let
4  me direct your attention to Paragraph 61 of
5  your Amended Complaint and that says: "On
6  August 12, 2004, Destefano informed Wheatley
7  that Wachovia was unable to obtain the PMI for
8  his home and that the only way around that
9  situation was to pay 20%..."
10       A.   There you go.
11       Q.   So that's the first time you
12  were told about the 20% downpayment, and your
13  recollection is that someone named Destefano
14  told you about that?
15       A.   Yes.
16       Q.   Okay. Now, do you believe that
17  Mr. Hogsten was involved in that in some way,
18  involved in the increased downpayment or
19  causing --
20       A.   Yes.
21       Q.   -- you to be required to pay an
22  increased downpayment?
23       A.   Yes.
24       Q.   You think that came from

28 (Pages 106 to 109)

Page 110

1  Mr. Hogsten?
2      A.   Yes.
3      Q.   And why do you think that?
4      A.   Because Mr. Destefano was not
5  aware this entire transaction was going on
6  here down in Dover and he was called as a
7  means to intervene after Hogsten made the kind
8  of sarcastic kind of remark that we can't do
9  nothing about it because he's not going to be
10  there and so nothing's going to happen until
11  he comes back on Monday and that would be too
12  late.
13      So we called his supervisor and
14  then he was not aware of actually what was
15  going on, so he had to speak to J. D. Hogsten
16  to be apprised of what the situation was so he
17  could make a better and intelligent decision.
18      Q.   Okay. So let me see if I
19  understand this. During the conference call
20  on August 6, 2004, that J. D. Hogsten
21  participated in, he said something like the
22  deal can't go forward because I'm on vacation,
23  nothing can happen until I'm back, and then
24  according to your recollection you called

Page 111

1  Destefano and said what's the deal here, and
2  Destefano then, you're presuming, spoke to
3  J. D. Hogsten and at that point then came back
4  to you and said you're going to have to pay a
5  20% downpayment?
6      A.   Yes.
7      Q.   And that's why you infer that
8  J. D. Hogsten is the one behind the increase
9  in the downpayment?
10      A.   Yes, because now there was a
11  different loan.
12      Q.   Do you believe that J. D.
13  Hogsten has the authority in his position at
14  Wachovia to increase someone's downpayment or
15  require that the downpayment be higher?
16      A.   I don't know. He sure acted in
17  that manner by his tone, and his actual words
18  were you can't do nothing about it until I get
19  back. And we were also informed that he is
20  the one who decides which loan is the best
21  package. I guess that's what he does to make
22  a living. And from that he would determine
23  the qualifications of the buyers and I guess
24  what amount of commission he's looking for for

Page 112

1  what loan he presents. I'm sure they have
2  more than one product. So it's up to him as
3  the loan officer, I would imagine.
4      Q.   But do you have an
5  understanding that there's other people that
6  work at Wachovia who might have more control
7  over the requirements that a borrower has to
8  satisfy in order to get a loan?
9      A.   Yes.
10      Q.   And do you have an
11  understanding that J. D. Hogsten may simply be
12  communicating those requirements to you and
13  not imposing them himself?
14      A.   It's possible, yes.
15      Q.   Aside from the increased
16  downpayment from 10% to 20% and the
17  improvements that you made to your home before
18  the purchase closed, what other conditions
19  were imposed on you that you feel were unfair,
20  or were there any other conditions that you
21  feel were unfair aside from those two that we
22  just talked about?
23      A.   That's the fixing of the home?
24      Q.   And then the 20% downpayment

Page 113

1  instead of the 10% downpayment.
2      A.   Well, the vision of the company
3  and what we wanted to do Limousine Unlimited
4  dealt with a lot of marketing and
5  advertisement for that exposure on Route 13.
6  There were several businesses around. We
7  weren't able to move forward on any of that.
8      Q.   Well, let me refocus you a
9  little bit. I am not talking about things
10  that happened to you that you blame on
11  Wachovia. What I am asking about are
12  conditions that you feel you were forced to
13  satisfy --
14      A.   I'm sorry. Okay.
15      Q.   -- in order to get the loan.
16  Are there any other conditions that you feel
17  were unfair or shouldn't have been imposed on
18  you?
19      A.   No.
20      Q.   Okay. So the only two are the
21  increase in the downpayment from 10% to 20%
22  and the improvements that you made to the
23  home?
24      A.   Uh-huh.

29 (Pages 110 to 113)

1    Q.    Now, why do you believe that
2  the increased downpayment and the improvements
3  that you made to the home, why is it that you
4  allege that those conditions were imposed
5  because of your race?
6          Or let me ask you a different
7  question.  Do you believe that those
8  conditions were imposed, do you believe you
9  had to do those things because you're
10  African-American?
11    A.    Yes.
12    Q.    Okay.  Why do you believe that?
13    A.    Well, why I believe that is,
14  one, we've purchased homes before, never had
15  an issue or problem about lending.  We never
16  had a problem or issue about after a property
17  is independently appraised for its value, that
18  it should be purchased for that value,
19  wherever it is.  And in this case, to have the
20  demands of repairing and fixing up, making the
21  property as move in condition when it already
22  appraised at its sale price, is beyond the
23  scope of the loan.
24          It wasn't written anywhere in

1  any part of the agreement of Wachovia.  They
2  haven't been able to produce anything that
3  says that that's a requirement of Wachovia.
4  That's discriminatory in itself.
5          So once you establish the
6  discrimination or discriminatory, then you
7  have to look at, well, why is he being
8  discriminating?
9          And from his statement, J. D.,
10  his statement was that I'm getting a lot of
11  pressure and there are people who do not want
12  you all to buy these properties.  So once he
13  made that statement to us, then it became
14  apparent that there's something about us that
15  makes people not want us to buy these
16  properties.  The only thing I can look at is
17  I'm black.
18    Q.    Okay.  Let's break that down.
19  First, you said you bought other homes in the
20  past and you didn't have to make repairs to
21  those homes in order to get the loans.
22    A.    Correct.
23    Q.    But here there was some work
24  that you did do to the property.  But why do

1  you think that if you got loans in the past
2  without doing repairs to the property, whereas
3  here there were some repairs that you did, in
4  and of itself, how does that show that you had
5  to do that because you're African-American?
6    A.    Because of the statements that
7  J. D. made to both my wife and I in his office
8  that there are people who do not want you all
9  buying these homes in that area.
10    Q.    Okay.
11    A.    I'm getting a lot of pressure.
12    Q.    And that's what he said, he
13  said there are people who do not want you
14  buying a home in that area --
15    A.    That's correct.
16    Q.    -- and I'm getting a lot of
17  pressure?
18    A.    Yes.
19    Q.    Did he tell you who he was
20  getting pressure from?
21    A.    No; and we inquired and asked
22  him that specifically on two occasions.
23    Q.    And when he said, you are
24  alleging, that there are people that do not

1  want you moving into that area --
2    A.    Uh-huh.
3    Q.    -- did he tell you what people
4  he meant?
5    A.    No, no.
6    Q.    Was Mr. Anderson in the room
7  when Mr. Hogsten made the statement that
8  you're saying he made that there are people
9  that don't want you moving into that area?
10    A.    No.
11    Q.    Mr. Anderson wasn't there?
12    A.    No.
13    Q.    Was Mr. Wilkins or Mrs. Wilkins
14  there?
15    A.    No.
16    Q.    I should have asked, was
17  Mrs. Anderson there?
18    A.    No.
19    Q.    So it was just you and your
20  wife and Mr. Hogsten?
21    A.    Yes.
22    Q.    Do you recall when this took
23  place, when you are saying Mr. Hogsten said
24  these things to you?

30 (Pages 114 to 117)

Page 118

1    A.    It was when we signed on
2  August 4 -- whatever the date is of that
3  paperwork. We signed that in his office on
4  that day.
5    Q.    This would be --
6    A.    The loan, the one you have
7  that's dated August 4.
8    Q.    You are talking about what we
9  have marked as Wheatley No. 5. You are saying
10  on the date you signed that would have been
11  the date that he made that statement?
12    A.    Yes.
13    MR. GRADY: What's the date on
14  that?
15    MR. FOGDALL: Mr. and
16  Mrs. Wheatley signed it on the 3rd of
17  August.
18    THE WITNESS: The 3rd of
19  August. I'm sorry; I said it was the
20  4th. It was the 3rd.
21    MR. FOGDALL: 2004.
22    I think that's all the
23  questions that I have for you, sir.
24  Thank you very much.

Page 119

1    MR. GRADY: I have some to
2  clarify a few things.
3    THE WITNESS: You're welcome.
4  BY MR. GRADY:
5    Q.    I will start with where we left
6  off just for a few clarifications.
7    Counsel has asked you what
8  problems or what concerns you've had and there
9  was some earlier testimony about the fact that
10  very late in the day, I think for
11  settlement -- and correct me if I'm wrong, but
12  very late in the day -- you were required
13  suddenly to get a roofing appraisal, a
14  statement from a roofer that there was nothing
15  wrong with the roof.
16    A.    Yes.
17    Q.    Did you have any problem with
18  either the timing of that or the
19  reasonableness of that?
20    A.    Yes.
21    Q.    What was your problem?
22    A.    Well, again, the house
23  appraised for the value that it was and the
24  problem that I had was that someone apparently

Page 120

1  called the Allstate Insurance office and we
2  got an alarming phone call from them accusing
3  us of something wrong with the roof and, you
4  know, they pulled their insurance.
5    So we had to actually get
6  another insurance company and not tell them a
7  thing and have them come out and look at the
8  property, which they did. They took
9  photographs and walked through the house and
10  inspected it and looked at the roof and said
11  here's your certificate of insurance.
12    Q.    There wasn't any problem with
13  the roof?
14    A.    Not at all.
15    Q.    You've already indicated that
16  you don't know who made that phone call to
17  Allstate.
18    A.    No.
19    Q.    Is that correct?
20    A.    Yes.
21    Q.    So it wasn't you?
22    A.    No. We were the recipients of
23  the call.
24    Q.    It wasn't anyone that you know.

Page 121

1  Did anybody from the bank indicate who made
2  the call?
3    A.    Yes. Hogsten pointed and said
4  that the lady at the loan processing center
5  had the package and it was something she read
6  in the appraisal, which we talked about
7  earlier.
8    Q.    Did he indicate whether or not
9  she actually called Allstate?
10    A.    No, he didn't indicate whether
11  or not she actually did it. But he just said
12  they called from up there. It wasn't that he
13  did it.
14    Q.    All right. Now, you also, I
15  think, indicated that you were concerned about
16  some of the treatment that you've had. From
17  your point of view, if you had been white, do
18  you think you would have got the same
19  treatment that you got in this mortgage
20  application?
21    A.    No.
22    Q.    And why do you say that?
23    A.    Because there wouldn't have
24  been any outside force or pressure and you

31 (Pages 118 to 121)

VERITEXT NATIONAL COURT REPORTING COMPANY
(215) 241-1000   (888) 777-6690

B-35

Page 122

1  wouldn't have to have the loan officer feeling
2  under duress or pressured by people of not
3  letting you buy this property because they
4  don't want you to have it. I don't think that
5  ever would have came up.
6      Q.    We've heard I think from you
7  and we've heard yesterday a number of
8  occasions where J. D. indicated that under
9  certain circumstances the deal was off.
10     A.    Yes.
11     Q.    Could you tell us again what
12  your recollection is of those circumstances
13  when he was saying something like that?
14     A.    Well, after Daniel Gladden, the
15  appraiser, had appraised the property and
16  there were some items in the house that were a
17  concern that we talked about in the early part
18  of the deposition -- and as it were, they were
19  legitimate concerns, I guess, of anybody if
20  they were going to be using or collateralizing
21  the property as a collateral instrument --
22  but, again, as I gave J. D. the example in his
23  office, my example to him was if I was to buy
24  a farmhouse or a property that's a farm and it

Page 123

1  had a dilapidated building on it, but the
2  property was being sold for X amount of
3  dollars and it got appraised by an independent
4  appraiser for that amount, what difference
5  does it make what the building shape is in?
6  If I demolish the building and put another
7  building on it, it doesn't change the fact
8  that it was appraised for the sale price.
9          And under the Fair Lending
10 that's what it should be. It should be based
11 on what the independent appraiser has and not
12 necessarily what somebody thinks it ought to
13 be.
14         So outside of that, he
15 immediately told us that there is no way
16 you're going to be able to repair and fix
17 these things in the house before it gets to
18 closing.
19         But Mr. Aigner assisted and
20 said, well, I will give you the keys to the
21 location and we will allow you to go in and
22 make the repairs. We were very uncomfortable
23 with that because the individual was still the
24 seller. We didn't own the property. And so

Page 124

1  we had to do a lot of decision-making about
2  whether to invest a large sum of money in a
3  place that we hadn't purchased yet.
4      Q.    Did you feel it was
5  unreasonable that J. D. was making you put all
6  these repairs in the house even though you
7  didn't own the house?
8      A.    Yes.
9          MR. FOGDALL: Objection to the
10 form of the question.
11         MR. GRADY: Okay. I'll
12 rephrase it.
13 BY MR. GRADY:
14     Q.    Did you think it was reasonable
15 or unreasonable that you had to make repairs
16 when you didn't even own the property?
17     A.    That's correct. We shouldn't
18 have been making repairs in anybody's house
19 that we don't own.
20     Q.    Okay. Now, we have prepared
21 and we have given to counsel before we came
22 here drafts of Answers to Interrogatories
23 which have not been signed but which they will
24 sign shortly, and in those documents there was

Page 125

1  a question about this $50,000.00 of loss that
2  is alleged in the Complaint.
3      A.    Is this the business?
4      Q.    No, no. There is an allegation
5  in the Complaint that there was $50,000.00 put
6  in to improve the house which we are
7  complaining about, and in the proposed Answer
8  which we have given to counsel we attached
9  certain expenses and we also said -- and I am
10 asking if this is correct or not -- that the
11 other costs were from unpaid labor by
12 Wheatleys, Hunters, Shields, Van Thomas, and
13 the Andersons. Was there, in fact, any other
14 unpaid labor or can you explain that?
15     A.    Yes. That's in the
16 documentation that I gave of the $24,500.00
17 and part of that was from the HELOC. We paid
18 out $24,500.00 and then --
19     Q.    So did some of these people
20 actually get paid later on?
21     A.    No, we didn't pay them
22 anything.
23     Q.    Okay. So they weren't paid
24 anything?

32 (Pages 122 to 125)

Page 126

```
1        A.    They weren't paid anything.
2        Q.    So they just did this because
3   they were friends?
4        A.    Yes. But their worth is worth
5   something.
6        Q.    We didn't put a dollar value on
7   their worth.
8        A.    (Witness shakes head.)
9        Q.    Okay.
10       A.    I don't know of labor being
11  free in America yet but slavery.
12       Q.    I take it you put labor in.
13       A.    Yes. For three weeks my wife
14  and I worked in there.
15       Q.    All right. Now, I guess going
16  back to this roof thing at one point in time,
17  there was a question by counsel whether it was
18  reasonable or unreasonable for somebody to ask
19  about the roof being repaired. Do you recall
20  that?
21       A.    Yes.
22       Q.    And I think you indicated,
23  well, it was okay to ask about the roof being
24  repaired.
```

Page 127

```
1        A.    Yes.
2        Q.    The way it was actually done
3   and in light of the fact of the condition of
4   the roof, did you have any problem with that
5   whole process as the way it turned out in your
6   case?
7        A.    Yes.
8        Q.    And what was your problem with
9   that?
10       A.    Again, the property appraised
11  for its value and the fact that we told J. D.
12  that we plan on repairing and fixing up the
13  entire house later on as time and money would
14  permit through the duration of however long we
15  wanted to live and be there, I didn't see
16  the -- you know, what was the immediate reason
17  to require all this extensive repair when the
18  house was appraised at its value of the loan?
19       Q.    There was a question by counsel
20  of you about what J. D. was actually requiring
21  of you with respect to these repairs --
22       A.    Uh-huh.
23       Q.    -- and I think you indicated
24  that J. D. said that it was supposed to be in
```

Page 128

```
1   move in condition.
2        A.    Yes.
3        Q.    I guess the question is, well,
4   how did you know what repairs would be
5   necessary to satisfy J. D.?
6        A.    We didn't. We just had to make
7   the house look in a condition of what you
8   would want to live in given the standard of
9   our personal self and just running water,
10  electricity, phone --
11       Q.    Okay. So did --
12       A.    -- bedding, linen.
13       Q.    Well, did J. D. ever in the
14  course of this, after these initial statements
15  that he made, ever check to see if it was in
16  move in condition or not move in condition?
17       A.    No.
18       Q.    So I guess you are telling us
19  that you made all these repairs just to make
20  J. D. happy, but there was no actual
21  confirmation of whether you had made him
22  happy?
23       A.    Yes, there was.
24       Q.    All right. Well, tell us about
```

Page 129

```
1   that.
2        A.    The appraiser came back,
3   Mr. Gladden came back, for a second appraisal.
4   Is that what --
5        Q.    I don't know. We're asking.
6   We are asking you for your memory.
7        A.    Yes. He came back for a second
8   walkthrough and he was astonished. He was
9   just astonished. In fact, he said, I don't
10  want to put a value on it because in fact it
11  would do such above and beyond what the value
12  already was appraised that he said that I
13  can't change the value to any more than what
14  it already was. He said but it looks nice in
15  here. He was the independent person to come
16  through and I guess he conveyed that or
17  reported that back to the bank.
18       Q.    Okay. Now, I think from
19  recalling these documents that the final
20  application which we saw, which was signed
21  August 3, August 4, August 5, which in the
22  scheme of things sounds a little late in the
23  day, do you know any reason why you had to
24  sign that so late or when we are talking about
```

33 (Pages 126 to 129)

Page 130

```
1    these different procedures, different
2    applications, do you know if you signed
3    anything earlier or how come you signed this
4    thing in August, if you know?
5              MR. FOGDALL: Objection to the
6         form of the question.
7              MR. GRADY: All right.
8    BY MR. GRADY:
9         Q.   You can answer that.
10             MR. FOGDALL: Off the record
11        for a second.
12                    - - -
13             (Discussion off the record.)
14                    - - -
15   BY MR. GRADY:
16        Q.   Let me see if I can clarify it.
17   First of all, I am going to ask you if you
18   remember some of this testimony. If you
19   don't, just tell me. But I'm going to clarify
20   it.
21             There was testimony and there
22   was a document produced in all these documents
23   of an application showing your income and
24   expenses and all that kind of stuff and it was
```

Page 131

```
1    dated in August.
2         A.   Uh-huh.
3         Q.   Do you know if that's the first
4    time you filled out something like that, if
5    you remember?
6         A.   That's the second time. Yes,
7    we filled one out before.
8         Q.   Okay. Now, if I were to
9    represent to you that I don't think any of us
10   have ever seen any earlier document, again,
11   this is to help us clarify, do you believe
12   there was something before that?
13        A.   Yes.
14        Q.   And when was that?
15        A.   That had to be in June or July.
16   It would be somewhere in June or July. It was
17   the end of June I think we went in there. So
18   it had to be July, somewhere in July and
19   August, because that's how it came from a
20   non-income verification loan, which it started
21   out in that process, and got switched to an
22   income verification loan.
23        Q.   Okay.
24        A.   And then it went back to this
```

Page 132

```
1    last-minute thing on the 13th that I don't
2    understand --
3         Q.   All right.
4         A.   -- to a non-income verification
5    loan. And this happened in like a 75-day --
6    what was it?
7         Q.   Just wait a minute. I don't
8    want you answering questions that aren't out
9    there.
10             You talked about the first
11   settlement and the second settlement. Was
12   Mr. Dodge present at both settlements or was
13   he at one or the other or do you recall?
14        A.   He wasn't at either of them.
15   He was on the phone on the first one. The
16   second one --
17        Q.   I'm sorry; the attorney. There
18   was an attorney, Gary Dodge, and there was
19   another attorney that I think some of the
20   papers reflect was at one of the settlements.
21   Do you recall if it was the same attorney both
22   times or not?
23        A.   I don't recall.
24        Q.   It was Mr. Dodge's office?
```

Page 133

```
1         A.   Yes.
2         Q.   Now, at the time of the second
3    settlement, there was some testimony that you
4    were required very late in the day to increase
5    the downpayment; right? That's your
6    testimony?
7         A.   Yes.
8         Q.   And if you hadn't done that,
9    what would have happened?
10        A.   If we hadn't have done that,
11   then the deal would have been off and to the
12   best of our knowledge the $40,000 downpayment
13   would have been forfeited. That would have
14   been argumented I guess in the end, but that's
15   what our understanding and belief was. And
16   all the repairs and things we had done to the
17   house, the seller would just get it by
18   default.
19        Q.   Okay.
20        A.   So we had no recourse of --
21        Q.   So where did you actually get
22   that money from?
23        A.   Out of our bank account. I
24   went to Wachovia, got a bank's cashier's
```

34 (Pages 130 to 133)

Page 134

1  check, and brought it back to the office
2  within 20 minutes to a half an hour.
3      Q.    That was all in the same day?
4      A.    That was all in the same day.
5      Q.    Now, do you believe if you were
6  white you would have gotten the same
7  treatment?
8      A.    No.
9      Q.    And why do you say that?
10     A.    Well, first of all, I'm already
11 a qualified applicant.  There wouldn't have
12 been no issue about people not wanting you to
13 buy.  There had to be some inference behind or
14 motivation behind the behavior of Wachovia
15 acting the way they did after maybe a slip of
16 the tongue, a Freudian slip, or whatever, but
17 it came out of J. D.'s mouth and from that
18 time and at that point somewhere in July and
19 August, things turned south quickly to just
20 insulting treatment, objections, last-minute
21 objections.  It was more things that had to be
22 done at the last minute.  Nobody knew about
23 it, they hadn't heard anything until you get
24 there.  And it bordered on harassment at one

Page 135

1  point when you think of that.  But it was just
2  one thing after another.
3      Q.    All right.  Now, you testified
4  that J. D. made this statement to you --
5      A.    Uh-huh.
6      Q.    -- something to the point that
7  someone was putting pressure on him not to
8  approve the loan; right?
9      A.    Uh-huh.
10     Q.    Now, did you interpret that as
11 a racist statement?
12         MR. FOGDALL:  Objection to the
13     form of the question.
14         THE WITNESS:  I can answer it?
15 BY MR. GRADY:
16     Q.    Yes.  I guess we want to know,
17 forget my other question, how did you
18 interpret his statement?
19         MR. FOGDALL:  Let me clarify
20     the objection.  I believe it misstates
21     what Mr. Wheatley said Mr. Hogsten
22     said.  That's my objection.
23         MR. GRADY:  All right.
24         THE WITNESS:  How did I

Page 136

1  interpret that is that there were
2  individuals that were from that
3  community, which we understood, the
4  three of us that were purchasing in
5  the Silver Lake area, it was all owned
6  by nonminorities, and there is a whole
7  community that's there that has no
8  minorities.
9          So the best we could attain and
10 believe through my knowledge -- and
11 like I said, from any property we
12 purchased in the State of Delaware and
13 outside of the State, we've never had
14 an issue of anything like that.
15 BY MR. GRADY:
16     Q.    I guess J. D. made the
17 statement.
18     A.    Uh-huh.
19     Q.    I'm asking how you interpreted
20 that statement to mean.  It sounds like from
21 what you said before that --
22     A.    That blacks cannot buy in this
23 area and we don't want you there because
24 you're blacks.

Page 137

1      Q.    That's how you interpreted the
2  statement?
3      A.    That's how I interpreted it.
4      Q.    When you talked about some of
5  the repairs that you did, you indicated that
6  you worked with the soil, worked with some
7  trees, and I guess the question is:  Why did
8  you think it was necessary to do that kind of
9  work before settlement?
10     A.    The insurance company asked
11 that we trim the trees back some.  They had a
12 lot of growth around the building and the
13 State Farm insurance agent said, you know, I
14 think you need to cut that back, we don't want
15 that near the buildings.  So we did that.
16     Q.    So that was a State Farm
17 request rather than a J. D. Hogsten request?
18     A.    Right.
19     Q.    How big an item was the trees
20 and the soil?
21     A.    How big an item?
22     Q.    How much did it cost, if you
23 recall?
24     A.    I don't recall.

35 (Pages 134 to 137)

Page 138

1    Q.    Was it a couple hundred dollar
2  item? was it 500? 5,000?
3    A.    No.  It was a couple hundred
4  dollars to trim the trees.
5    Q.    All right.  Now, you testified
6  that on August 3 you distinctly recall J. D.
7  making the statement about --
8    A.    Well, I believe it was cleared
9  up to be the 4th --
10    Q.    Or whatever that date was.
11    A.    -- from the paperwork.
12    Q.    Was there any time before that?
13  Was there any time you heard from J. D?
14    MR. FOGDALL:  The question
15    isn't quite clear to me.
16    MR. GRADY:  The issue, of
17    course, is if it's clear to the
18    witness, but I will be happy to
19    restate it.
20    MR. FOGDALL:  Okay.  Thank you.
21  BY MR. GRADY:
22    Q.    My question is:  You have
23  indicated around August 3, 4, whatever it was,
24  J. D. made a statement to you which we

Page 140

1  here, I guess, you know.  That's how I take it
2  whenever I hear stuff like that.
3    MR. GRADY:  All right.  That's
4  all I have.
5    MR. FOGDALL:  I have no other
6  questions.
7    MR. GRADY:  We'll read.
8    - - -
9    (Witness excused.)
10    - - -
11    (Whereupon the deposition
12  adjourned at 1:55 p.m.)
13    - - -
14
15
16
17
18
19
20
21
22
23
24

Page 139

1  discussed and you interpreted.  Were there any
2  similar statements or statements like that
3  prior to that time?
4    A.    Yeah.  When we got into this
5  wrangling about the two loans and why it was
6  being changed, his comment to me at the time
7  in his office was you people don't understand
8  the loan process.  And, you know, again, I'm a
9  tolerant individual, but when I start hearing
10  terms like that, that's what starts making me
11  trigger, at least for me, being in this world
12  a little longer than I think J. D. was, that
13  that's starting to sound kind of like code
14  messages and words, and I really didn't like
15  it.  You don't use a statement you people
16  don't understand as if we're ignorant or can't
17  understand how to make a financial loan
18  decision.  It's pretty simple.  It's numbers
19  on paper.
20    Q.    Well, what's the code message?
21    A.    Well, you people is inferring
22  my people or me, us people, who I'm
23  representing the Afrocentric race, are not
24  competent enough to understand what's going on

Page 141

1    C E R T I F I C A T E
2    I hereby certify that the witness was
3  duly sworn by me and that the deposition is a
4  true record of the testimony given by the
5  witness.
6
7
8    _____
      Susan Marie Migatz, RMR, CRR
9    Delaware Certificaiton No. 254
      Dated:
10
11    (The foregoing certification of this
12  transcript does not apply to any reproduction
13  of the same by any means, unless under the
14  direct control and/or supervision of the
15  certifying shorthand reporter.)
16
17
18
19
20
21
22
23
24

36 (Pages 138 to 141)

Page 142

## INSTRUCTIONS TO WITNESS

1
2
3      Please read your deposition over
4  carefully and make any necessary corrections.
5  You should state the reason in the appropriate
6  space on the errata sheet for any corrections
7  that are made.
8      After doing so, please sign the errata
9  sheet and date it.
10     You are signing same subject to the
11 changes you have noted on the errata sheet,
12 which will be attached to your deposition.
13     It is imperative that you return the
14 original errata sheet to the deposing attorney
15 within thirty (30) days of receipt of the
16 deposition transcript by you. If you fail to
17 do so, the deposition transcript may be deemed
18 to be accurate and may be used in court.
19
20
21
22
23
24

Page 144

## ACKNOWLEDGEMENT OF DEPONENT

1
2      I, LLOYD J. WHEATLEY, do hereby
3  certify that I have read the foregoing pages
4      to    and that the same is a correct
5  transcription of the answers given by me to
6  the questions therein propounded, except for
7  the corrections or changes in form or
8  substance, if any, noted on the attached
9  Errata Sheet.
10 _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _
11 DATE          SIGNATURE
12
13 Subscribed and sworn to before me this
14 _ _ _ _ _ _ day of _ _ _ _ _ _ _ _ _ , 200_.
15
16 My commission expires: _ _ _ _ _ _ _ _ _ _
17
18
19
20 _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _
21 Notary Public
22
23
24

Page 143

```
        - - - - - - - -
1
2       E R R A T A
3       - - - - - - - -
4  PAGE   LINE      CHANGE
5  _ _ _   _ _ _   _ _ _ _ _ _ _ _ _ _ _ _ _
6  _ _ _   _ _ _   _ _ _ _ _ _ _ _ _ _ _ _ _
7  _ _ _   _ _ _   _ _ _ _ _ _ _ _ _ _ _ _ _
8  _ _ _   _ _ _   _ _ _ _ _ _ _ _ _ _ _ _ _
9  _ _ _   _ _ _   _ _ _ _ _ _ _ _ _ _ _ _ _
10 _ _ _   _ _ _   _ _ _ _ _ _ _ _ _ _ _ _ _
11 _ _ _   _ _ _   _ _ _ _ _ _ _ _ _ _ _ _ _
12 _ _ _   _ _ _   _ _ _ _ _ _ _ _ _ _ _ _ _
13 _ _ _   _ _ _   _ _ _ _ _ _ _ _ _ _ _ _ _
14 _ _ _   _ _ _   _ _ _ _ _ _ _ _ _ _ _ _ _
15 _ _ _   _ _ _   _ _ _ _ _ _ _ _ _ _ _ _ _
16 _ _ _   _ _ _   _ _ _ _ _ _ _ _ _ _ _ _ _
17 _ _ _   _ _ _   _ _ _ _ _ _ _ _ _ _ _ _ _
18 _ _ _   _ _ _   _ _ _ _ _ _ _ _ _ _ _ _ _
19 _ _ _   _ _ _   _ _ _ _ _ _ _ _ _ _ _ _ _
20 _ _ _   _ _ _   _ _ _ _ _ _ _ _ _ _ _ _ _
21 _ _ _   _ _ _   _ _ _ _ _ _ _ _ _ _ _ _ _
22 _ _ _   _ _ _   _ _ _ _ _ _ _ _ _ _ _ _ _
23 _ _ _   _ _ _   _ _ _ _ _ _ _ _ _ _ _ _ _
24 _ _ _   _ _ _   _ _ _ _ _ _ _ _ _ _ _ _ _
```

Page 145

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24

37 (Pages 142 to 145)

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE


TOLAND ANDERSON, et al.,          )
    Plaintiffs,               )
                              )
        vs.                   )
                              ) C.A. No. 06 CV 00567 (SLR)
WACHOVIA MORTGAGE CORPORATION     )
and WACHOVIA CORPORATION,         )
    Defendants.               )
                              )


DEPOSITION OF:    COLLEEN FAZZINO

DATE:    DECEMBER 6, 2007

HELD AT:    WACHOVIA MORTGAGE CORPORATION
    ONE JEFFERSON SQUARE
    WATERBURY, CT


BRANDON SMITH REPORTING SERVICE, LLC
44 Capitol Avenue    Six Landmark Square
Hartford, CT 06106    4th Floor
(860) 549-1850    Stamford, CT  06901
(800) 852-4589    (800) 852-4589


Reporter:  Tiffany V. Pratt, LSR #00128

49edcf86-bab4-439f-b80f-0909b3428ce3

Page 2

```
 1
 2   APPEARANCES:
 3
     REPRESENTING THE PLAINTIFFS (Via Phone):
 4
     Grady & Hampton, LLC
 5   6 North Bradford Street
     Dover, DE  19904
 6   (302) 678-1265
     By: John S. Grady, Esq.
 7
     REPRESENTING THE DEFENDANTS:
 8
     Schnader, Harrison, Segal & Lewis, LLP
 9   1600 Market Street, Suite 3600
     Philadelphia, PA  19103-7213
10   (215) 751-2581
     By: Stephen A. Fogdall, Esq.
11
     ALSO PRESENT:
12
     Mr. Tolano Anderson (Via Phone)
13
14
15
16
17
18
19
20
21
22
23
24
25
```

Page 4

```
 1   EXHIBIT:                                    PAGE:
 2   13   Uniform Residential Loan Application
          WHEAT000170-177              101
 3
     14   Underwriting Guidelines: Product-Specific  101
 4
     15   Handwritten notes, WHEAT000230     104
 5
     16   Internal document documenting reason for
 6        exception, WHEAT000150        107
 7   17   Retail Loan Approval, Wheatley, loan
          number ending 0176           109
 8
     18   Letter dated 8/3/04 from Air Doctor X,
 9        WHEAT000066                  113
10   19   Letter dated 8/10/04 from Thomas Home
          Repair, WHEAT000053          113
11
12
13
14
15
16
17
18   (Reporter's Note:  All exhibits for identification were
     retained by the Court Reporter, copied and distributed with
19   transcripts.)
20
21
22
23
24
25
```

Page 3

```
 1              INDEX
 2   WITNESS:                PAGE:
 3   COLLEEN FAZZINO
 4
     Direct Examination by Mr. Grady        5
 5   Cross-Examination by Mr. Fogdall      75
     Redirect Examination by Mr. Grady    113
 6
 7
 8        FAZZINO EXHIBITS
          (for identification)
 9
10   EXHIBIT:                PAGE:
11   1   Retail Loan Approval, Anderson       79
12   2   Appraisal, Anderson            79
13   3   Mortgage Loan Committment, Anderson    79
14   4   Copy of down payment Check Number 994   80
15   5   Uniform Residential Loan Application,
         WHEAT000319-326          84
16
     6   Credit report, WHEAT000348-368      84
17
     7   Notice of Action Taken, WHEAT000308     87
18
     8   Fair Lending Analysis; WHEAT000314-315   87
19
     9   Retail Loan Approval; Fair Lending
20       Analysis Tool, WHEAT000296-297     87
21   10  Notice of Action Taken dated 7/22/04,
         WHEAT000299               95
22
     11  Underwriting Guidelines:  Conforming.
23       WACH000001-19             95
24   12  Appraisal, WHEAT000331-342        95
25   (Index continued)
```

Page 5

```
 1        (Deposition commenced:  10:30 a.m.)
 2
 3        COLLEEN FAZZINO, called as a
 4   witness, having been first duly sworn by
 5   a Notary Public in and for the State of Connecticut,
 6   was examined and testified as follows:
 7
 8      D I R E C T   E X A M I N A T I O N
 9
10   BY MR. GRADY:
11      Q   My name is John Grady.  I represent the
12   Andersons, the Wheatleys and the Wilkins.  I'm going to be
13   asking you some questions today, and if there are any of
14   the questions which are not clear, please let me know;
15   otherwise, I'll assume that you understand the questions.
16   Okay?
17      A   Yes.
18      Q   First, since we're doing this deposition by
19   telephone, I would like to let you know that Mr. Anderson
20   is sitting here with me.  And could you tell me who's in
21   the room with you?
22      MR. FOGDALL:  Mr. Grady, besides the
23   witness, Ms. Fazzino, the court reporter is here, and I'm
24   here.  This is Steve Fogdall.
25      MR. GRADY:  Okay.  Thank you.
```

49edcf86-bab4-439f-b80f-0909b3428ce3

Page 6

BY MR. GRADY:

2  Q  All right. Colleen Fazzino?

3  A  Yes.

4  Q  Am I saying that right?

5  A  Yes.

6  Q  All right. Could you tell me your present

7  address?

8  A  My home address?

9  Q  Home address and your work address.

10    MR. FOGDALL: Well, if you're -- can we

11  agree that her work address is sufficient?

12    MR. GRADY: Sure. That's fine.

13  A  Wachovia Mortgage Corporation, One Jefferson

14  Square, Waterbury, Connecticut.

15  BY MR. GRADY:

16  Q  Okay. And what is your position there?

17  A  Right now I'm a team leader.

18  Q  What was your position in the period of June to

19  August 2004?

20  A  I was a contract underwriter.

21  Q  Describe your responsibilities as a contract

22  underwriter.

23  A  I apologize. I couldn't hear you.

24  Q  What were your job responsibilities as a contract

25  underwriter?

Page 7

1  A  To underwrite approximately five loans per day in

2  accordance with investor Wachovia and investor PMI

3  guidelines.

4  Q  And who was your employer at that time?

5  A  PMI Mortgage Company.

6  Q  What was the relationship between PMI Mortgage

7  Company and Wachovia?

8  A  PMI provided a service to Wachovia in the form of

9  contract underwriting.

10  Q  Okay. How was PMI paid?

11  A  I honestly don't know.

12  Q  Did you work for other banks besides --

13  A  Not at the same time.

14  Q  All your work was with Wachovia?

15  A  At that time period, yes.

16  Q  And just tell me generally, what did you do as an

17  underwriter with respect to a residential loan?

18  A  I would first determine the product that the

19  borrower applied for, and then I would review the

20  application to ensure it met those guidelines. I would

21  then underwrite the loan, make applicable conditions, and

22  then once the conditions started coming in, I would sign

23  off on them to get that loan clear to close.

24  Q  Who had the last word with respect to a Wachovia

25  loan?

Page 8

1    MR. FOGDALL: Objection to the form of the

2  question.

3  BY MR. GRADY:

4  Q  You can answer the question unless for some

5  reason you don't understand it.

6    MR. FOGDALL: Do you understand the

7  question?

8  A  I understand the -- it really would depend on the

9  circumstances. If the loan had some -- some issues or

10  questions, at times I would go to a Wachovia manager and

11  ask is this okay, do you think it's all right, would the

12  loan stay marketable. Other loans, there were no

13  questions, and I could just approve them, and I would have

14  the last say, but I was not able to decline a loan by

15  myself. I always needed a second signature.

16  Q  If theoretically you thought there was a problem

17  with a loan, but the Wachovia people said they wanted to

18  make the loan anyway, could they do that?

19  A  Yes, they could.

20  Q  And tell me how long you were in this position of

21  underwriter.

22  A  I don't have the exact dates, but it was probably

23  around four years.

24  Q  And could you just tell me a little bit about

25  your education? Did you go to college?

Page 9

1  A  No, I have not.

2  Q  When did you graduate from high school?

3    MR. FOGDALL: You can answer that

4  question.

5  A  1976.

6  BY MR. GRADY:

7  Q  Can you just kind of briefly run through your

8  work experience?

9  A  Okay. Well, I've been in the mortgage industry

10  for over twenty years. I've held various positions

11  including processing, underwriting, supervising, and I did

12  have a very short, about five months, in sales.

13  Q  Did you always work for PMI Mortgage?

14  A  No.

15  Q  What other companies did you work for?

16  A  I have worked for PMI Mortgage Company on two

17  separate occasions, one being here. I've also worked for

18  People's Bank, Webster Bank, Norwest, Greenwich Financial

19  First Federal, which was then turned into Webster,

20  Washington Mutual and Wachovia.

21  Q  So you're working for Wachovia right now?

22  A  Correct.

23  Q  How long did you work for PMI Mortgage?

24  A  Altogether?

25  Q  Well --

## Page 10

1    A    Or just this last time?

2    Q    Just this last time.

3    A    Again, I don't have the exact dates, but I'm

4    thinking it was around four years.

5    Q    How long have you been working for Wachovia?

6    A    About three years.

7    Q    When did you start?

8    A    I apologize. I don't have those dates.

9    Q    Okay. Well, we're talking about these

10    transactions in the summer of 2004, and you were working

11    for PMI Mortgage then; is that correct?

12    A    Correct.

13    Q    And then it sounds like shortly afterwards you

14    went to work for Wachovia?

15    A    When I worked for PMI Mortgage during this time

16    period, I was located at Wachovia Mortgage.

17    Q    Where was that? In Connecticut?

18    A    In Waterbury.

19    Q    We're talking about -- as I understand from the

20    attorney in this case and maybe some other paperwork, you

21    were the one who was the underwriter in the loan

22    application of Mr. Anderson and Mr. Wheatley; is that

23    right?

24    A    That is correct.

25    Q    I'm going to first talk about the Anderson

## Page 11

1    transaction. We may be referring you to some paperwork

2    which hopefully you have in front of you. If not, we'll

3    try to work around it. We tried to send some

4    identification of documents up to counsel before the start.

5        The paperwork that I have suggests that

6    Mr. Anderson first applied for this mortgage in June 2004.

7    Just assume that's correct. Now, we've had deposition

8    testimony from Mr. Hogsten that he completed an application

9    and sent it up, I guess, to you. Is that correct?

10        MR. FOGDALL: Objection to the form of the

11    question. Mischaracterizes --

12        MR. GRADY: I'm just trying to get the

13    background correct.

14    BY MR. GRADY:

15    Q    Did you receive an application and review it for

16    Mr. Anderson?

17    A    The application was received by Wachovia

18    Mortgage. It would first go to a processor. She would

19    basically set it up, put it together, and then I would

20    review it and underwrite it.

21    Q    Who did the -- so what does a processor do?

22    A    The processor's function is mainly to gather all

23    of the information needed for an underwriting decision, and

24    that would include credit, income and assets, ordering the

25    appraisal, ordering the flood, and then as these items come

## Page 12

1    in, they would give it to the underwriter for review.

2    Q    The processor orders the credit check?

3    A    Correct.

4    Q    Orders the appraisal?

5    A    Correct.

6    Q    Do you know who the processor was in this case?

7    A    I'd have to look it up.

8    Q    Is there anything available that you might

9    have -- if not, it's okay. Is there anything available

10    that you have which would indicate who the processor was?

11    A    Let me -- in this case it appears -- this is

12    Mr. Anderson.

13    Q    Right.

14    A    It appears that there may have been two, but it

15    appears it ended with Maria Belo.

16    Q    So she got the paperwork initially, and she

17    ordered the credit report, she ordered the appraisal. What

18    else did she order?

19    A    A flood cert.

20    Q    Okay. And then that document -- then tell me

21    what came to you after that.

22    A    Basically, what would happen is the underwriter,

23    and me in this case, we would get a skeleton file. So we

24    would really only have forms that we can print off our

25    system which include the application with all the

## Page 13

1    borrower's information. As an underwriter, I would receive

2    that, and I would review it for product specificness, add

3    any conditions and then give it back to the processor to

4    issue the commitment.

5    Q    All right. Do you have any recollection of this

6    loan transaction other than through the paperwork?

7    A    Not really.

8    Q    Probably -- okay. All right. This paperwork

9    was -- do you have any recollection of the first thing that

10    you did when you got this application?

11    A    Well, the very first thing that I would typically

12    do is look at the product.

13    Q    All right.

14    A    Because that's going to tell me everything that I

15    need to do. And then I would go to our system, and I would

16    print those guidelines, and I would go from there.

17    Q    The product in this case is a house?

18    A    No, no, no. The product -- the type of loan.

19    Q    Type of loan?

20    A    Right, you know, what loan did my borrower apply

21    for.

22    Q    In this case, what kind of loan did he apply

23    for?

24    A    It looks like it was a three-year arm.

25    Q    With just interest?

49edcf86-bab4-439f-b80f-0909b3428ce3

Page 14

1    A    What do you mean just interest? No, no, no.

2    Principal and interest, a three-year adjustable rate

3    mortgage.

4    Q    Okay. And at that point in time, did you have

5    any information about the condition of the house?

6    A    No.

7    Q    Whose responsibility is it to make some

8    determination about the condition of the house?

9        MR. FOGDALL: Objection to the form of the

10    question.

11    BY MR. GRADY:

12    Q    If you know.

13        MR. FOGDALL: If you can answer the

14    question, go ahead and try to answer it.

15    A    It would be the -- once the appraisal is

16    received, it would be the underwriter's responsibility to

17    review that appraisal.

18    BY MR. GRADY:

19    Q    So it sounds like, correct me if I'm wrong, that

20    in this case, Maria Belo would have ordered the appraisal,

21    but when the appraisal comes in, it comes to you, and it's

22    your responsibility to review it?

23    A    Correct.

24    Q    In this case, there are at least allegations that

25    certain work had to be done by the -- about the house.

Page 15

1    Assuming those allegations are correct, who in this chain

2    would be the one responsible for making those

3    determinations?

4        MR. FOGDALL: Objection to the form of the

5    question.

6    A    Are you asking me who made the allegations?

7    BY MR. GRADY:

8    Q    No. I'm asking you -- really what I want to know

9    is, if you know, who told Mr. Anderson -- who was

10    responsible for telling Mr. Anderson that the house had to

11    be fixed up?

12    A    In this case in reviewing the file --

13        MR. FOGDALL: Objection to the form of the

14    question. Go ahead and answer.

15    A    In this case in reviewing the file, it didn't

16    appear that there were any issues with the property.

17    BY MR. GRADY:

18    Q    Issues with the property. Okay. Let's go back a

19    little bit.

20        In reviewing your file, can you tell us

21    approximately when you first got the package from -- I

22    guess from Delaware.

23    A    Did you ask me a question?

24    Q    Yes.

25    A    Can you repeat that?

Page 16

1    Q    Sure. Approximately when did you get some

2    information from Delaware about this loan application?

3        MR. FOGDALL: Objection to the form of the

4    question.

5    A    I don't know when the loan was received by our

6    processing area, but according to my notes in the file, I

7    approved him on July 10, 2004.

8    BY MR. GRADY:

9    Q    And is that -- was there any conditions on that

10    approval?

11    A    There were several, numerous conditions, yes.

12    Q    What were the conditions?

13    A    That the appraiser had to be approved by

14    Wachovia, that we needed a satisfactory appraisal

15    supporting a minimum value of $266,666. It had to be an

16    interior, exterior, fully executed sales contract with a

17    sales price of $266,666, a flood certification. Should I

18    go on?

19    Q    What document are you reading from?

20    A    We called it a 110. I don't know what you would

21    call it. It's an underwriting sheet where you just list

22    conditions.

23        MR. FOGDALL: For the record, the witness is

24    reading from a document entitled "Retail Loan Approval,"

25    which, Mr. Grady, you should have a copy of with a Bates

Page 17

1    number in the Anderson range. I can't tell you as I sit

2    here what that number would be, but it would be in the

3    Anderson range of documents.

4        MR. GRADY: It's a document I've probably

5    seen.

6        MR. FOGDALL: It's called Retail Loan

7    Approval.

8    BY MR. GRADY:

9    Q    Now, I guess, correct me if I'm wrong, you've

10    made this conditional approval even before you've got the

11    appraisal?

12    A    Correct.

13    Q    Now, in this case, we have an appraisal dated

14    August 2, 2004 which has a Bates number of 1 on it.

15    A    What do you mean a base number of 1?

16    Q    The bottom of it is 00001.

17        MR. FOGDALL: Give me a minute, and I'll

18    locate that document for the witness. Let's go off the

19    record for a second.

20        MR. GRADY: Sure.

21        (Off the record briefly.)

22        MR. FOGDALL: The witness has the document,

23    Mr. Grady.

24    BY MR. GRADY:

25    Q    This appraisal is dated August 2004?

Page 18

1    A   Yes.

2    Q   Now --

3        MR. FOGDALL: Give me a minute. Are you

4  able to verify that? I don't think that's on the page

5  you're looking at.

6        THE WITNESS: Right here.

7        MR. GRADY: On the bottom of the page,

8  August 2, 2004. Do you see that?

9        MR. FOGDALL: For the record, I think

10 there's a signature page which has a different date. This

11 is the -- the page that's Bates numbered 000003 is

12 actually dated August 5, 2004. I just wanted to make that

13 clarification.

14 BY MR. GRADY:

15   Q   The date of the appraisal is August 2, but it

16 does have another date. I guess my question is to you: Do

17 you have any recollection of any discussions about the

18 whole appraisal process in the case of Mr. Anderson?

19   A   No.

20   Q   You might not, but I'll just give you an example.

21 Do you know if there were any problems in getting the

22 appraisal? Do you know, was there any discussions about

23 why the appraisal was in August when he had originally

24 applied in June or anything like that?

25   A   No.

Page 19

1    Q   From your point of view, the appraisal just

2  arrived in August; is that correct?

3    A   Yes.

4    Q   Now, between the July 10 date that you supplied

5  earlier, that loan document, and the August date, was there

6  any activity going on with respect to this loan

7  application?

8    A   Well --

9        MR. FOGDALL: Objection to the form of the

10 question.

11   A   I'm sure the processor was working on it, but I

12 would not have been included in that.

13 BY MR. GRADY:

14   Q   Okay. What would the processor be doing?

15       MR. FOGDALL: Objection, lack of

16 foundation. Go ahead and answer if you can.

17   A   Again, the processor would be processing the

18 loan, gathering the information required for me to sign off

19 on the conditions, make my decision and get the loan

20 cleared to close.

21 BY MR. GRADY:

22   Q   All right. As I understand it, you were not

23 involved at all in any talk, conversation, requirements or

24 anything like that about making any repairs to the

25 building; is that correct?

Page 20

1    A   I was not involved at all, correct.

2    Q   All right. I take it that the person who -- if

3  there were any of those kinds of things made, would that be

4  made by the processor?

5        MR. FOGDALL: Objection, lack of foundation

6  and form. Go ahead and answer if you can.

7    A   I don't know.

8  BY MR. GRADY:

9    Q   Well, are you -- in your experience, are there

10 ever situations as it concerned about the house, any need

11 for repairs? Has that ever happened before?

12   A   In general underwriting, if there are any

13 property concerns, repairs, that would be handled by the

14 underwriter.

15   Q   The underwriter, but in this case --

16   A   There aren't any.

17   Q   Let me move on. All right. After you got the

18 appraisal back in August, August 2, 2004, or whenever you

19 got it, approximately August 3, whatever date it was, what

20 was the next step that you took?

21   A   When the processor gave me the loan with the

22 appraisal, I reviewed it. It was good. The value was

23 there, and I approved the appraisal, signed off on it.

24   Q   Did you have any contact at all with Mr. Hogsten

25 in this transaction?

Page 21

1        MR. FOGDALL: Objection. By this

2  transaction, you mean specifically relating to the

3  Anderson loan?

4        MR. GRADY: Yes.

5    A   If I did, I honestly don't remember.

6  BY MR. GRADY:

7    Q   Do you recall having any conversations with the

8  processor? That's Ms. Belo.

9    A   I don't remember if I -- I'm sure I did, you

10 know, going back and forth, you know, Here's the

11 conditions. Okay, thanks. Here's the file.

12   Q   Are you aware of the role in this whole process

13 of what would be Mr. Hogsten, because he was the person who

14 originally takes in the loan information. What's his

15 responsibility in this whole process?

16       MR. FOGDALL: Objection, lack of

17 foundation. Go ahead and answer if you can.

18   A   Loan officers are required to go get us loans,

19 review products with borrowers and pricing.

20 BY MR. GRADY:

21   Q   By products, you mean the terms of the loan?

22   A   Right.

23   Q   How about with respect to the condition of the

24 houses?

25   A   What is your question?

49edcf86-bab4-439f-b80f-0909b3428ce3

Page 22

1    Q   Does the loan processor have any responsibility
2    with respect to determine whether the house needs repairs
3    or doesn't need repairs?
4         MR. FOGDALL: Objection to the form of the
5    question. Go ahead and answer if you can.
6    A   You're asking me if the loan processor has --
7    BY MR. GRADY:
8    Q   Right.
9    A   -- if the loan processor has anything to do
10   with --
11   Q   I'm talking about Mr. Hogsten. I might read
12   these names wrong. Mr. Hogsten, what's he called?
13   A   Loan officer.
14   Q   Loan officer. Okay. Mr. Hogsten, does he have
15   any responsibility in the system to determine whether a
16   house needs repairs or doesn't need repairs?
17   A   No.
18        MR. FOGDALL: Objection to the form of the
19   question and lack of foundation. Go ahead and answer if
20   you can.
21   A   No.
22   BY MR. GRADY:
23   Q   So from your understanding and working in the
24   system, he simply takes the information in just different
25   possibilities of what the product could be, the different

Page 23

1    loan arrangements, and he sends that on to the processor?
2    A   Correct.
3    Q   And the processor sends it out for an appraisal
4    and does some other things you talked about?
5    A   Correct.
6    Q   If the processor thinks the property needs --
7    strike that.
8         Does the processor make any determinations about
9    whether or not there should be some repairs made to the
10   building?
11        MR. FOGDALL: Objection to the form of the
12   question. Go ahead and answer if you can.
13   A   No.
14   BY MR. GRADY:
15   Q   And theoretically, you, in your position, could
16   make some determinations about the condition of the
17   building if you felt that was warranted?
18   A   Yes, theoretically, yes.
19   Q   But in this case of Anderson, you didn't?
20   A   Correct.
21   Q   All right. Let's look at a couple of documents.
22   I have at Bates 000111 Mortgage Loan Commitment. I'm
23   sorry. That's the wrong person. I take that back. Let me
24   say that again. 000105 is the mortgage loan commitment.
25   Do you have that in front of you, or can you get that?

Page 24

1         MR. FOGDALL: Yes, we can track that down.
2    Now, that's not in the package you faxed this morning; is
3    that right?
4         MR. GRADY: I don't think so.
5         MR. FOGDALL: Give me one moment. Off the
6    record.
7         (Off the record briefly.)
8         MR. FOGDALL: The witness has the document,
9    Mr. Grady.
10        MR. GRADY: Thank you.
11   BY MR. GRADY:
12   Q   This is the Mortgage Loan Committment?
13   A   Yes.
14   Q   Dated 7/14/04? Do you see that?
15   A   Yes.
16   Q   Just a while ago we just had some testimony about
17   another document dated July 10, 2004. That was the
18   approval document. This committment document, does it
19   include in it all the conditions?
20   A   Yes, only conditions that the borrower would need
21   to satisfy.
22        MR. FOGDALL: And I'm going to object, lack
23   of foundation. She can answer the questions about this
24   document.
25

Page 25

1    BY MR. GRADY:
2    Q   Now, you have that in front of you?
3    A   Yes.
4         MR. FOGDALL: When you say "that,"
5    Mr. Grady, you mean the July 10 document she was talking
6    about earlier?
7         MR. GRADY: No, the July 14 Mortgage Loan
8    Committment. The document that we're talking about.
9         MR. FOGDALL: All right.
10   BY MR. GRADY:
11   Q   Are there any conditions in this document about
12   repairs to the house or anything like that?
13        MR. FOGDALL: Objection, lack of
14   foundation. Go ahead and answer if you can.
15   A   There is a condition for satisfactory appraisal
16   supporting a minimum value of $266,666.
17   Q   I'm just looking for that page. Can you point
18   out where that is?
19        MR. FOGDALL: Mr. Grady, the Bates number
20   for that page is 109.
21        MR. GRADY: Thank you. I'm just going
22   through some documents just to --
23   BY MR. GRADY:
24   Q   Let's move over to Mr. Wheatley. Some of the
25   documents which we sent to you -- there were actually two

49edcf86-bab4-439f-b80f-0909b3428ce3

Page 26

1  applications filled out by Mr. Wheatley. Is that your
2  understanding? Do you have any recollection of that?
3    A   Yes.
4    Q   I'm talking about the first application, ·
5  the -- correct me if I'm wrong, but I assume the process is
6  apparently the same, that --
7    A   Correct.
8    Q   -- Hogsten would take some information from
9  Mr. Wheatley, informing the product, send it the processor.
10  The processor would send it to you as the underwriter?
11    A   Correct.
12    Q   Is that how the process worked on Wheatley?
13    A   Correct.
14    Q   Do you have any specific recollections with
15  respect to the Wheatley transaction?
16        MR. FOGDALL: Go ahead and answer the
17  question.
18    A   With reference to what?
19  BY MR. GRADY:
20    Q   Sometimes witnesses, for example, will say, I
21  don't even remember those people at all, or they'll say,
22  oh, yeah, I remember that case. I'm asking you if this is
23  a case you might remember other than the documents.
24    A   No, I don't remember.
25    Q   Nothing in particular. Just the documents.

Page 27

1  Okay. With respect to Wheatley -- just a minute, we
2  have -- we have a document at WHEAT 314, 315. Can your
3  counsel get that document?
4        MR. FOGDALL: Yes. Can we go off the
5  record for one minute?
6        MR. GRADY: Sure.
7        (Off the record briefly.)
8        MR. FOGDALL: The witness just wants to
9  clarify something that she said in her -- in answer to
10  either the last question or the one before that. You had
11  asked whether she had any independent recollection of the
12  Wheatley transaction besides what -- besides the documents
13  themselves, and she had indicated that she did not. And
14  just to clarify, that was in reference to the first
15  Wheatley loan application. She has indicated to me that
16  she does have some independent recollection independent of
17  the documents with respect to the second Wheatley loan
18  application. So that answer pertained to the first
19  application.
20        MR. GRADY: Okay. Fine. Thank you for the
21  clarification.
22        MR. FOGDALL: Okay. So we can keep going.
23  Thank you, Mr. Grady.
24        MR. GRADY: Go ahead. We're back to 3 --
25  what did I say, 314?

Page 28

1        MR. FOGDALL: Yes.
2        MR. GRADY: 314 and WHEAT 315.
3  BY MR. GRADY:
4    Q   Do you have those documents in front of you?
5    A   Yes.
6    Q   It appears as if the date -- it appears on page
7  315 that the application was denied. Do you see that?
8    A   The borrower's original request was denied.
9    Q   Do you know why that was denied?
10    A   Why was it denied?
11    Q   Yes.
12    A   His FICO score did not meet the minimum product
13  requirement.
14    Q   What score?
15    A   FICO.
16    Q   F-I-C-O?
17    A   Correct.
18    Q   That's basically some sort of credit check?
19    A   It's a credit score.
20    Q   Does that have anything to do with the condition
21  of the house?
22    A   No.
23    Q   Are you aware -- well, in your considerations of
24  this original loan application by Wheatley, did you make
25  any of your evaluations or opinions based upon the

Page 29

1  condition of the house?
2    A   Can you ask that again?
3    Q   When you considered Wheatley's first application,
4  in your consideration, in your thinking process or in your
5  evaluation process, was the condition of the house an
6  issue?
7    A   Oh, just a minute. When the appraisal came in,
8  yes, there were property concerns.
9    Q   As of July 17 when the decision was made to deny
10  the application, was the appraisal in by then?
11        MR. FOGDALL: Objection to the form of the
12  question. Go ahead and answer.
13    A   It must have been. Oh, wait, July 17?
14    Q   Yes.
15    A   Is that a reference to the counteroffer?
16    Q   Well, it looks -- there's some notes above there.
17  There are some notes on page 315 about a reference to a
18  counteroffer. Do you see that?
19    A   Yes.
20    Q   Counteroffer to -- it's hard to read.
21    A   Well, that's the product code. This counteroffer
22  was specifically product. It had nothing to do with the
23  property.
24    Q   If we can get WHEAT 317 in front of you?
25    A   I have it.

Page 30

1    Q    A document entitled "Uniform Underwriting and
2  Transmittal Summary"?
3    A    Yes.
4    Q    On this page, 317, I'm trying to find the date.
5  Would this be the first application? Can you look at
6  that?
7    A    This isn't an application.
8    Q    This is the first transaction?
9    A    This is the first transaction, correct.
10   Q    And there are some credit scores down on the
11  bottom where it says Underwriter Comments. Do you see
12  that?
13   A    Yes.
14   Q    Below that it says, denied due to property
15  condition?
16   A    Right.
17   Q    And it says, unable to exception per TH?
18   A    Yes.
19   Q    Tell me about the significance of these credit
20  scores first.
21   A    Okay. The initial product that the borrower
22  applied for was a no ratio loan.
23   Q    What does that mean?
24   A    Meaning that we would not be calculating ratios,
25  because income is not being provided. We would only have

Page 31

1  the employer information. When the loan came in, that
2  product has a specific FICO requirement at the time of 700
3  due to his LTV being over 75 percent. Because he didn't
4  qualify for that, I knew he would qualify for the stated
5  income loan.
6    Q    He would or would not?
7    A    He would not qualify for the no ratio, but he
8  would qualify for the stated income loan. A FICO score of
9  681 was okay for the stated income.
10   Q    What does that mean?
11   A    We're talking about two different products. The
12  no ratio product had a FICO requirement of 700. The stated
13  income product had a lower FICO requirement, and I don't
14  remember what it was, but 681 was sufficient.
15   Q    What -- can you define what a stated income loan
16  means?
17   A    A stated income loan is where the borrower is
18  providing us the employment information and basically
19  stating what his income is. We will not verify how much he
20  makes, but we will verify that he is working where he said;
21  we will verify assets, credit and everything else.
22   Q    Just for clarity, because I'm not a banker,
23  explain again the difference between that and the no ratio
24  loan.
25   A    The no ratio loan, I am not seeing any kind of

Page 32

1  income. It is not disclosed. That area on the application
2  is blank.
3    Q    If you have a good enough credit score, then you
4  can get that kind of loan?
5    A    Correct.
6    Q    So what you're saying, it looks like his credit
7  score was adequate for the stated income loan, correct?
8    A    Correct.
9    Q    Okay. And then it says denied due to property
10  condition. What does that mean?
11   A    When I denied the loan, I went into -- I was in a
12  habit of trying to make comments, and I went into this
13  particular screen, and I just updated it, explained why the
14  loan was being declined in case I was ever asked.
15   Q    I guess you're being asked?
16   A    Yeah.
17   Q    What was the problem with the property?
18   A    I have noted property in fair condition, no heat
19  on second level, asbestos in basement.
20   Q    Where are you getting those notes from?
21   A    Your document 312.
22   Q    Bear with me here. WHEAT 312?
23   A    Correct.
24   Q    There are several piles. We're just trying to
25  get the right pile here. We might have to come back to

Page 33

1  that, because I don't see it.
2        All right. What's the top of that page?
3        MR. FOGDALL: If you give the witness a
4  chance, she'll point out to you the language that she's
5  referring to on that page. We're talking about WHEAT
6  312.
7        MR. GRADY: I can't find WHEAT 312.
8        MR. FOGDALL: You can't find WHEAT 312.
9  Okay.
10       MR. GRADY: So I'm -- I'm asking her to
11  identify what's on the top of it.
12   A    Fair Lending Analysis Tool.
13  BY MR. GRADY:
14   Q    Well, can you tell me any more about how you got
15  that information about the property?
16   A    From the appraisal.
17   Q    From the appraisal?
18   A    Correct.
19   Q    The appraisal is -- the appraisal, I have it at
20  007?
21       MR. FOGDALL: We can pull that. Give us a
22  second. There's a couple of different versions of the
23  Wheatley appraisal in the documents you've identified.
24  Give me a minute, and I'll find the 007 document you're
25  referring to. This is 07 through, I think, 11, right?

49edcf86-bab4-439f-b80f-0909b3428ce3

Page 34

1     MR. GRADY: Yes.
2     MR. FOGDALL: Okay. We've got it.
3  BY MR. GRADY:
4     Q  I'm going to ask you a few questions about. Just
5  to go back a bit, document 317 which we were talking about?
6     A  Yes.
7     Q  I don't see any date on that. Is there any way
8  you could tell me when that was done?
9     A  Well, I can tell you that this particular
10 document is printed several times throughout the process.
11    Q  Okay.
12    A  Any time anything changes, the underwriter is
13 required to keep an updated file.
14    Q  Okay.
15    A  So based on the comments, I would say that this
16 was -- the last one printed when the loan was declined.
17    Q  There's a reference in here to a Daniel Gladden
18 appraisal. Can we assume that it's after July 7?
19    A  No. Once we know who the appraiser is, that
20 information gets put in the system.
21    Q  What's your best estimate of what the date of
22 this would be?
23    A  I would say the day I declined the loan, July 22.
24    Q  All right.
25    MR. FOGDALL: And the witness got the

Page 35

1  July 22, 2004 date from WHEAT000299.
2  BY MR. GRADY:
3     Q  Okay. Going back to 007, it is the appraisal of
4  Mr. Gladden --
5     MR. FOGDALL: I'm sorry to interrupt you,
6  Mr. Grady. I think the witness wants to add something.
7     A  I would prefer to refer to WHEAT000331, because
8  it's easier to read. The fax is very small.
9     Q  331?
10    A  331 through 342.
11    Q  I've got that. That's okay.
12    MR. FOGDALL: You do have that?
13    MR. GRADY: Yes.
14 BY MR. GRADY:
15    Q  Okay. Now, the appraisal, correct me if I'm
16 wrong, the appraisal appears to be for $267,000; is that
17 right?
18    A  The value came in at 267, correct.
19    Q  That amount would have been sufficient for the
20 loan; is that correct?
21    A  Not necessarily. It's the underwriter's
22 responsibility to not just look at the bottom-line number.
23    Q  Now, there were some comments made by the
24 appraiser down at 00337?
25    A  Correct.

Page 36

1     Q  Were you relying upon any of those comments in
2  your decision to turn down -- to deny the loan because of
3  the condition of the property?
4     A  Yes.
5     Q  At that time, was there any discussion or any
6  talk that if these problems were resolved, that the loan
7  could be reinstated?
8     A  For this particular file, I don't remember any
9  conversations.
10    Q  What's the policy that if there's a problem with
11 conditions like this, if a person fixes the problems, can
12 the loan go forward?
13    A  If that is the only problem on the loan, yes.
14    Q  At this point in time, which was approximately
15 July 20 when the loan was turned down, I understand from
16 our earlier conversation, Wheatley would have qualified
17 financially for a statement income loan?
18    MR. FOGDALL: Objection to the form of the
19 question. Go ahead and answer if you can.
20    A  Based on the information that I had in the file
21 at that time, that answer would be yes. All of the
22 conditions had not been received.
23 BY MR. GRADY:
24    Q  One of the concerns you then had was the comments
25 on the appraisal about the condition of the house?

Page 37

1     A  Yes.
2     Q  Did you communicate that to anybody, if you
3  recall, for example, to Mr. Hogsten?
4     A  Typically, the loan officer would be notified of
5  any issues with the file, but I don't -- I'm sure I did,
6  but I don't remember.
7     Q  How about the processor?
8     A  No. That would really be more me.
9     Q  The processor at that point in time was not as
10 much in the loop?
11    A  With this issue, correct.
12    Q  Going -- well, let me go back. Would you have
13 made a condition of the loan for someone to simply make the
14 repairs rather than to denying the loan?
15    Q  Can you repeat that question?
16    Q  Well, now that it was in your responsibility and
17 authority, could you have said that the -- that you would
18 approve the loan if these repairs were made?
19    A  Yes.
20    MR. FOGDALL: Objection to the form of the
21 question. Go ahead and answer.
22    A  Yes.
23 BY MR. GRADY:
24    Q  And how come you didn't do that?
25    MR. FOGDALL: Objection to the form of the

Page 38

1  question. Go ahead and answer.
2      A  I apologize. I don't remember this loan.
3  BY MR. GRADY:
4      Q  Okay.
5      A  I don't.
6      Q  Okay. But in any event, it seems like you didn't
7  take that course; you just rejected the loan?
8      A  I don't remember what happened on this loan.
9      Q  Let me --
10     A  Can I add something to that?
11         MR. FOGDALL: Mr. Grady, the witness wants
12  to add something.
13  BY MR. GRADY:
14     Q  Sure.
15     A  My job is to approval loans. So I'm really -- I
16  really wasn't placed at Wachovia to decline loans. So
17  loans really were not declined unless there were, you know,
18  valid reasons and reasons that you were not able to
19  overturn. But, again, I apologize, again, I don't remember
20  the specifics of this particular file.
21     Q  Give me a minute. Would you turn to WHEAT 292?
22     A  I don't have that.
23         MR. FOGDALL: Give us a minute. Give me
24  one second. I'll find it.
25     A  I got it.

Page 39

1          MR. FOGDALL: Let me give you this copy.
2          MR. FOGDALL: What is WHEAT 292, Mr. Grady?
3          MR. GRADY: WHEAT 292.
4          MR. FOGDALL: Is there an identifier on the
5  document?
6          MR. GRADY: These are handwritten notes.
7          MR. FOGDALL: Give me one second. I've got
8  it. Okay. We've got it.
9      A  I have it.
10  BY MR. GRADY:
11     Q  Is that your handwriting?
12     A  No.
13     Q  Do you know whose handwriting it is?
14     A  No.
15     Q  All right. Does the loan officer at this point
16  in time, does he have the authority to tell the borrower
17  that if certain repairs are made to the building, then a
18  loan can be approved?
19         MR. FOGDALL: Objection to the form of the
20  question. Go ahead and answer if you can.
21     A  I don't know what authority the loan officer
22  would have.
23  BY MR. GRADY:
24     Q  All right. A second application was completed by
25  Mr. Wheatley. Are you aware of that?

Page 40

1      A  Yes.
2      Q  The first --
3          MR. FOGDALL: Mr. Grady, we lost most of
4  that question.
5      Q  We're at the -- the last comment was about the
6  second application, you heard that?
7      A  Yes.
8      Q  Now, the first application -- there were
9  actually -- in our discussions, there were two different
10  possibilities. The first possibility was what was called a
11  no ratio loan, and the second possibility was a stated
12  income loan. Do you recall that?
13     A  On the first loan, yes.
14     Q  Do you know how much money would be required for
15  each of those loans as a down payment?
16     A  It would depend on the product and what the
17  borrower wanted. If you're asking me if 10 percent down is
18  sufficient?
19     Q  Yes.
20     A  It would be, yes.
21     Q  For either one of those loans?
22     A  Yes, assuming the borrower qualified.
23     Q  All right. Now we're back to the second loan,
24  the second loan application.
25     A  Okay.

Page 41

1      Q  And the second loan application, do you have any
2  recollection of the circumstances of the second loan
3  application?
4          MR. FOGDALL: Objection to the form of the
5  question. Go ahead and answer if you can.
6      A  My recollection, without looking at the file, was
7  that there was a lot of going back and forth with JD, but
8  it wasn't until I reviewed the file that I remembered the
9  specifics.
10  BY MR. GRADY:
11     Q  Was it back and forth a conversation between you
12  and JD?
13     A  Correct.
14     Q  At this point in time, was the processor
15  involved, if you know?
16     A  No.
17     Q  Conversations were mainly between you and JD?
18     A  Yes.
19     Q  So the second -- well, I think there was a
20  reference in some of the other documents about a
21  possibility of an exception being made. Do you recall
22  anything like that?
23     A  Well, I don't recall it, but after reviewing the
24  file, there was an exception made on the second Wheatley
25  loan.

49edcf86-bab4-439f-b80f-0909b3428ce3

Page 42

1    Q    Exception on the second Wheatley loan?
2    A    Uh-huh.
3    Q    So the second loan, I'll ask you to turn to --
4         MR. FOGDALL: Mr. Grady, are you still
5    there?
6         MR. GRADY: I'm still there. I'm just
7    checking this document.
8         MR. FOGDALL: Understood.
9         MR. GRADY: The document is WHEAT 296.
10        MR. FOGDALL: Okay. We'll find it. Give
11   us a second. You said 296?
12        MR. GRADY: WHEAT 296 and 297.
13        MR. FOGDALL: Off the record for a second.
14        (Off the record briefly.)
15        MR. FOGDALL: We have it.
16   BY MR. GRADY:
17   Q    Okay. This document in front of me is called
18   "Retail Loan Approval"?
19   A    Yes.
20   Q    I'm looking for a date on this document, but I
21   don't really see it. Maybe -- is there any date when this
22   was approved?
23   A    If you look at WHEAT 297, on the very, very
24   bottom under my signature, there is a date, but it is not
25   legible.

Page 43

1    Q    I see it. Okay. All right. Tell me what
2    exactly was approved, which of these different kind of
3    loans.
4    A    The stated. The no ratio was crossed off, and
5    underneath it, the stated income product code is
6    handwritten in.
7    Q    Where is that?
8    A    WHEAT 296 on the top.
9    Q    And --
10   A    Do you see it?
11   Q    No, I don't.
12   A    Okay. On the very top.
13   Q    Very top where it says Retail Loan Approval?
14   A    And go down and six or seven lines.
15   Q    Program name. Looks like something's crossed
16   out?
17   A    That's the ratio. That's crossed out.
18   Q    Then there's another word written in?
19   A    That's the product code for the stated income
20   loan.
21   Q    Okay. That -- what does that say?
22   A    FNSI30FEX.
23   Q    That line says Purchase, Construction Permanent,
24   and then handwritten stuff, and you just explained what
25   that was; is that right?

Page 44

1    A    Correct.
2    Q    This was an approval for what kind of loan?
3    A    For a stated income loan.
4    Q    Stated income loan. And should there have been a
5    10-percent requirement for that?
6    A    It was approved at a stated income loan with
7    10 percent down subject to credit, income and assets,
8    credit, employment and assets.
9    Q    Credit, employment --
10   A    -- and asset verification and appraisal and some
11   other miscellaneous things.
12   Q    Are all those comments on this document
13   someplace?
14   A    I'm sorry?
15   Q    Are all those conditions on this document
16   someplace?
17   A    Yes, they are, WHEAT 296 and 297. Everything is
18   there.
19   Q    Now, with respect to the appraisal, at that point
20   in time, were there any issues about the condition of the
21   property?
22   A    At the time of underwriting, I have condition for
23   an appraisal, so I did not have one to look at.
24   Q    But were you still operating off of the old
25   appraisal with the old comments about the conditions?

Page 45

1    A    I honestly don't remember if the appraisal was in
2    here when I got it. I'm thinking it was not, otherwise I
3    wouldn't have approved the loan. We would have had an
4    issue then.
5    Q    Well, the appraisal that we talked about before
6    at, I think, WHEAT 331 was dated July 7?
7    A    Yes.
8    Q    And this approval we're talking about, I can't
9    read the -- do you have any idea what this date is on the
10   bottom which we can't read?
11   A    The date of what?
12   Q    On WHEAT 297.
13   A    No, I can't read it. It didn't get imaged very
14   well.
15   Q    Do you think we're talking about the first loan
16   or the second loan, first application or second
17   application?
18        MR. FOGDALL: It appears as though
19   WHEAT 296 to 297 pertains to the first Wheatley loan
20   application. It's got the number 6995009.
21        MR. GRADY: Okay. That's the first
22   application. We've already talked about the first
23   application. We understand -- there's a little confusion
24   here about which application it was.
25

Page 46

BY MR. GRADY:

1  BY MR. GRADY:

2   Q   All right. Let's move to the second application,

3  see if we can get the proper paperwork for the second

4  application.

5       The second application -- what kind of loan are

6  we talking about for the second application? Are we

7  still --

8       MR. FOGDALL: Would you like the witness to

9  refer to that application?

10      MR. GRADY: Okay.

11      MR. FOGDALL: Would that be helpful to you

12  to answer that question?

13      THE WITNESS: Yes, I would need to look at

14  that.

15      MR. GRADY: Okay. Just a minute. I've got

16  a document at 293, and it's dated -- it's called Submitted

17  Loan Report dated -- wait a minute.

18      MR. FOGDALL: Mr. Grady?

19      MR. GRADY: Yes.

20      MR. FOGDALL: The second loan application

21  that the Wheatleys filled out begins at WHEAT000170 and

22  goes to 000177, if you have that.

23      MR. GRADY: I do, but --

24  BY MR. GRADY:

25   Q   That's the loan application, 00170. Okay. Do

Page 47

1  you have that in front of you?

2   A   Yes, I do.

3   Q   And what was the product which this second loan

4  application was being considered?

5   A   This document does not tell me what the product

6  is.

7   Q   I think I'm going to -- what about WHEAT 187?

8   A   Yes, okay. I have it.

9       MR. FOGDALL: Just to clarify, the second

10  loan application does, in fact, reflect the product code

11  for the loan product that the Wheatleys were applying for,

12  and that's on WHEAT000174. It's the same product code

13  that's reflected on WHEAT000187.

14  BY MR. GRADY:

15   Q   Okay. So we'll go back. So what is the

16  product?

17   A   It's the stated income fixed rate loan.

18   Q   That should have been a 10-percent down payment;

19  is that right?

20      MR. FOGDALL: Objection to the form of the

21  question. Go ahead and answer it.

22   A   For what they initially applied for based on the

23  loan amount and the sales price, this would reflect the

24  90-percent loan.

25

Page 48

1  BY MR. GRADY:

2   Q   This document, 170 document, has a date on it.

3  It looks like August 2 or August 3. There's a couple

4  different dates on page 00176, right? Do you see that?

5  I'm on 00176.

6   A   What was the question?

7   Q   Would you agree there's a date -- it looks like

8  Wheatley's signature is August 3?

9   A   Yes.

10   Q   And there's a date next to Hogsten, August the

11  2nd?

12   A   Correct, yes.

13   Q   Could you tell me, this document, would it then

14  be sent to the processor, or would it be sent directly to

15  you?

16   A   No, it would go directly to the processor with

17  the rest of the file.

18   Q   Do you know what steps the processor took with

19  this document?

20   A   No.

21   Q   This document was then -- was it then sent to

22  you?

23   A   The loans are uploaded electronically, and then

24  the hard file, which would be this document and some other

25  documents, are usually overnighted after.

Page 49

1   Q   But you would get it?

2   A   Not with a signature initially.

3   Q   Without a signature, but you got it around that

4  time, August 3, August 4?

5   A   I don't know when I received it. I don't have

6  that exact -- I don't know. I did get it, but I don't know

7  what the date was.

8   Q   Okay. And at that point in time, what steps did

9  you take with respect to this second loan application?

10   A   Again, I would look at the product. I would

11  ensure that the borrower qualifies for that product. I

12  would underwrite the loan, and usually there's nothing in

13  the file, and apply any conditions that I would need to

14  ensure the marketability of the loan, sign off on the

15  approval, give the file back to the processor. She would

16  issue a commitment.

17   Q   Okay. I guess I'm asking you: Do you have any

18  recollection what you actually did in this second

19  application?

20   A   At what point?

21   Q   After you got the -- after you got the

22  application.

23   A   I just explained what I would do.

24   Q   I understand that, that's your process, but I'm

25  asking you -- and we can look at some more documents to

49edcf86-bab4-439f-b80f-0909b3428ce3

Page 50

1  move it along. I'm trying to figure out what steps you
2  took next. If you don't remember specifically, then we can
3  see if we can find some documents and take it step-by-step.
4      A   Okay. Then I don't remember.
5      Q   Do you have any recollection of talking to
6  Mr. Hogsten about the -- at all about the second
7  application?
8      A   Yes, but not when I initially underwrote it.
9      Q   All right. We'll move a little out of order.
10  Would you turn to WHEAT 230?
11          MR. FOGDALL:  Give us a second. Okay. We
12  have it.
13  BY MR. GRADY:
14      Q   These are more handwritten notes. Do you know
15  whose handwritten notes these are?
16      A   This is mine.
17      Q   All right. This might help you then recall what
18  was happening in that time period, correct?
19      A   Correct.
20      Q   The notes are a little bit hard to read, not
21  because of your handwriting, but in the process of getting
22  things copied, but maybe you can read what it says on
23  8/4?
24      A   Reviewed with Emo, E-m-o, rush file, underwrite
25  file 8/3 p.m., does not conform to guideline, reviewed with

Page 51

1  Terri its exception, cannot insure, exception denied, too
2  many layers of risk, property condition and style, source
3  of assets to close, etc.
4      Q   All right. Who is Emo?
5      A   Emo was my manager at the time, Elaine Orsini.
6      Q   Then it says does not conform to great line?
7      A   Guideline.
8      Q   What's the word?
9      A   Does not conform to guideline.
10      Q   Why doesn't it conform? What was the problem?
11      A   Well, there were several issues. Some were
12  assets. We were unable to verify his employment. Again,
13  because he was a stated income, we're not going to verify
14  the numbers, but we do need to verify that he is
15  self-employed through a CPA.
16      Q   What was the problem with that?
17      A   He didn't have one.
18      Q   No CPA?
19      A   Correct.
20      Q   Was there any question that he was
21  self-employed?
22      A   We would need to have confirmed that through a
23  CPA, and he did not have one.
24      Q   He didn't have one, does that mean he
25  automatically gets denied?

Page 52

1      A   Yeah, or we can verify income.
2      Q   The next thing says --
3      A   Spoke with JD at great length several times.
4      Q   I'm sorry. I'm still on the first one.
5      A   Oh.
6      Q   Reviewed something or other about the
7  exception?
8      A   Reviewed with Terri its exception.
9      Q   Who is Terri?
10      A   Terri was the operations officer at the time, and
11  she had exception-lending authority.
12      Q   Okay. The exception was denied. Why was it
13  denied?
14      A   Based on my comments, because we were unable to
15  insure the file, meaning he did not have 20 percent down,
16  and due to the layers of risk with the file.
17      Q   What were the layers of risk?
18      A   The property condition and the assets, as well as
19  the unable to verify the employment.
20      Q   Do you know if the property condition was
21  repaired by that time?
22      A   No.
23      Q   You didn't know one way or the other?
24      A   No.
25      Q   Did you check with anybody?

Page 53

1          MR. FOGDALL:  Objection to the form of the
2  question. Go ahead and answer if you can.
3      A   I would -- that's information that I would be
4  notified of. Somebody would be telling me. I wouldn't be
5  calling every day saying, Is it done, is it done.
6  BY MR. GRADY:
7      Q   Were you getting that by Mr. Hogsten?
8      A   If the property had been repaired, the
9  underwriter should have been notified, and that would have
10  been me.
11      Q   Nobody ever informed you?
12      A   Not of all of the repairs, no, and that would not
13  have rectified the other issues with the file.
14      Q   The other issue was this problem with the CPA?
15      A   As well as the assets.
16      Q   What was the problem with the assets?
17      A   The product that he was in required him to have
18  10 percent of his own funds in the transaction as well as
19  satisfy an asset test as well as having sufficient funds to
20  close.
21      Q   And do you recall what specifically was the
22  problem?
23      A   We were unable to verify the 10-percent own
24  funds.
25      Q   You were unable to verify the 10-percent --

## Page 54

1    A    -- own funds, borrower's own funds in the
2    transaction.
3    Q    He had money in the bank?
4    A    I would have to review the file to answer that
5    question.
6    Q    So unable to --
7         MR. FOGDALL: I think the witness is saying
8    she needs a document in order to answer your questions.
9         MR. GRADY: I don't think we have such a
10   document, to tell you the truth.
11        MR. FOGDALL: What document would be
12   helpful to you to answer the questions?
13        THE WITNESS: My 110.
14        MR. FOGDALL: Which is what?
15        THE WITNESS: Which is called the Retail
16   Loan Approval.
17        MR. FOGDALL: Just give her a moment,
18   Mr. Grady.
19        MR. GRADY: Okay.
20        MR. FOGDALL: Is this the document that
21   you're talking about?
22        THE WITNESS: Yes.
23        MR. FOGDALL: What she's referring to is
24   the document that we faxed to you this morning. You
25   should have this somewhere in your file Bates labeled.

## Page 55

1    The document that I have in front of me is not Bates
2    labeled, but when I get back to my office in Philadelphia,
3    I will track down the Bates number for this document.
4    It's a two-page document, Retail Loan Approval. This is
5    what she's referring to that she needs to help her answer
6    your questions. You should have that. I faxed it to you
7    this morning.
8    BY MR. GRADY:
9    Q    And the document is called a Retail Loan
10   Approval?
11   A    Yes.
12   Q    One of 3?
13        MR. FOGDALL: It should be two pages. What
14   do you have in front of you?
15        MR. GRADY: I recall my secretary gave me
16   one page.
17        MR. FOGDALL: If you need me, I can fax it
18   to you again.
19   BY MR. GRADY:
20   Q    Actually, let's just talk about the page we have.
21   Okay?
22   A    Okay.
23   Q    You were talking about a problem being unable to
24   have 10 percent of his own funds, and then you were talking
25   about his other assets, I think.

## Page 56

1    A    Right. This page is telling me why it was an
2    exception.
3         MR. FOGDALL: Wait. We don't know yet,
4    Mr. Grady, what page you have. You say you have one page.
5    What does your page look like?
6         MR. GRADY: The page I have is the page you
7    faxed me this morning.
8         MR. FOGDALL: I understand that. I faxed
9    you multiple pages. If you only have one, we need to know
10   which one you have.
11        MR. GRADY: It says on the top Retail Loan
12   Approval.
13        MR. FOGDALL: All right. She has that in
14   front of her.
15   BY MR. GRADY:
16   Q    The bottom says page 1 of 3?
17   A    Correct.
18   Q    You have that document, right?
19   A    Yes.
20   Q    And tell me what on this document -- how this
21   helps you refresh your recollection about the asset
22   problem.
23   A    This is the list of conditions that I would
24   always go off of. So this document is telling me why the
25   loan was an exception, and condition number 21, I have

## Page 57

1    written on "Exception" with my initials, and that's copy of
2    cancelled check for earnest money deposit of $13,333, and
3    then line 27 I also have written, Exception, verification
4    of 10 percent borrower own funds in transaction and
5    borrower satisfy asset test.
6    Q    Now, with respect to this copy of cancelled
7    check, did he produce that?
8    A    I would like to review that.
9    Q    When you say exception, does that mean a negative
10   factor or a positive factor?
11        MR. FOGDALL: Are you saying that you need
12   to review the cancelled check?
13        THE WITNESS: Yes.
14   BY MR. GRADY:
15   Q    Going back to -- before that, I'm trying to
16   figure out what you meant when you completed this form at
17   line 21.
18   A    I needed to verify the amount of the down payment
19   the borrower made and the source of those funds.
20   Q    And it says, Copy of cancelled check for earnest
21   money deposited, and then it's written next to it 13,335.
22   Are you telling me you had to verify that information?
23   A    Yes.
24        MR. FOGDALL: Objection to the form of the
25   question.

Page 58

1 BY MR. GRADY:
2    Q  And then on number 27 it says you had to verify
3 10 percent of borrower funds, etc.?
4    A  Correct.
5    Q  Were you able to verify those things?  Do you
6 recall?
7    A  Based on the document in front of me, I was not
8 able to verify those.
9    Q  Do you have a date on this document?
10    A  That would be on the page that you don't have,
11 and it does not appear to be dated.
12    Q  All right.  Let's go back to WHEAT 230.
13    A  Okay.
14    Q  The 8/5 notes, what do they say?
15    A  Spoke with JD at great length, several times,
16 explained problems several times.
17    Q  Do you have any recollection of what the
18 substance of the conversations were?
19    A  I don't.
20    Q  The next one says -- just read -- just go down,
21 8/5, 8/5.  You have two more of them.
22    A  Okay.  Conference call with Emo, Terri and JD,
23 cannot do exception.  I put "the," but I think I meant,
24 Then Terri, Emo and Joe call.  Joe will check with Chet at
25 80 percent.

Page 59

1    Q  Why would you check about 80 percent?
2    A  We were unable to insure the loan due to the
3 layering of risk, so we wanted to do the loan; we wanted to
4 do the loan at 80 percent, which would have been a
5 compensating factor, and we would have been able to do it
6 hopefully at that point as an exception at 80.
7    Q  The next one, the next 8/5?
8    A  Conference call, Terri, Emo, Joe.  Terri will do
9 exception, but only at 80.  File to close 8/6,
10 counteroffered per LO.  Borrower will get seller second.
11    Q  What does that mean, borrower will get seller
12 second?
13    A  That the other 10 percent will be in the form of
14 a loan from the seller to the borrower.
15    Q  Did you have any reason to think the seller would
16 do that?
17    A  It happens sometimes.
18    Q  All right.  8/6?
19    A  P.m., received call, loan did not close.
20    Q  Do you know why it didn't close?
21    A  No.  I'm sure I did at the time, but I didn't
22 write it down.
23    Q  8/10, want to read that one?
24    A  JD called in, borrower will liquidate investments
25 to avoid subordinate financing.

Page 60

1    Q  What does that mean?
2    A  That the borrower will not be getting subordinate
3 financing; he has other assets he plans on liquidating to
4 take the place of that 10 percent.
5    Q  Do you know if this money was already in Wachovia
6 Bank?
7        MR. FOGDALL:  Objection to the form of the
8 question, lack of foundation.  Go ahead and answer if you
9 can.
10    A  At the time I did not know where it was coming
11 from.
12 BY MR. GRADY:
13    Q  All right.  And the second 8/10?
14    A  Borrower called.  There aren't any other assets.
15    Q  Did you actually talk to Mr. Wheatley?
16    A  I don't think so.  Typically, that would be our
17 processor's responsibility.
18    Q  The borrower probably called somebody else?
19    A  Right, and I just noted it.
20    Q  8/11?
21    A  LO is pursuing 90 percent again.  Sent Emo
22 80 percent max.  Reviewed with Terri, exception officer,
23 80 percent max.  LO never discussed subordinate financing
24 with borrower.
25    Q  The next 8/11?

Page 61

1    A  Spoke with Joe, voiced concern regarding last
2 minute rush again.
3    Q  All right.  The next?
4    A  6:30 p.m., borrower's friend called in looking
5 for information.  Did not give.
6    Q  8/12?
7    A  Spoke with Joe, will liquidate coin collection.
8    Q  Who is Joe?
9    A  I'm sorry?
10    Q  Who is Joe?
11    A  Joe is JD's manager.
12    Q  What's his last name?
13    A  Skoranski.
14    Q  And there's a reference to liquidate a coin
15 collection.  Does that mean the borrower is going to
16 liquidate his coin collection?
17    A  Yes.
18    Q  Okay.  And I guess Joe is relating that?
19    A  Correct.
20    Q  8/12, the next one?
21    A  Spoke with Joe several more times, no -- I meant
22 not -- pursuing gift, will get from actor Will Smith.  He's
23 family.
24    Q  That's another source of getting the money?
25    A  Yes.

49edcf86-bab4-439f-b80f-0909b3428ce3

## Page 62

1  Q  All right. The next one, 8/12.

2  A  Spoke with Joe. Will get gift. Not from who.

3  Q  The next one?

4  A  Received gift donor. Reviewed with Terri,

5  exception officer. Conference call between me, Terri and

6  Joe. Must close today, even though it is now 2:30 p.m.

7  Q  What's the significance of the state of affairs

8  at that point in time?

9  A  We have to hurry up; this borrower is going to

10 closing; we need to get that package there.

11 Q  What's the status of the exception?

12 A  I -- I would have to look at another document to

13 see, to correspond that date with this date.

14 Q  In the notes I have, it says see give something,

15 review with Terri, exception officer?

16 A  Officer.

17 Q  But you -- your note doesn't reflect what she had

18 to say?

19 A  On this document, no.

20 Q  All right. 8/12 it says -- what does that say?

21 A  Re-underwrote file again. Gave to processor for

22 closing.

23 Q  All right. In this process, at anytime did you

24 say that you needed to get a statement from a roofer

25 concerning the condition of the roof of the house?

## Page 63

1  A  I would have to review the file. I don't

2  remember.

3  Q  Is that something that you would do, or is it

4  something that someone else would do?

5  A  All conditions come from the underwriter.

6  Q  All right. There are other documents. I don't

7  specifically recall any document like that, but we'll see

8  if we can move on a little bit.

9      Okay. Let me go back. My recollection is that

10 this went to settlement on the 13th, assuming that's

11 correct. Do you recall any conversations with Hogsten

12 through -- as I recollect, he testified he was on vacation

13 on the 13th. Do you happen to recall any conversations

14 with him where he might have been on vacation about this

15 whole matter?

16 A  I remember speaking with him about the loan. I

17 don't remember when, and I don't -- other than what's noted

18 in the last document, and I don't remember him being on

19 vacation, no.

20 Q  Is it your recollection that the loan finally

21 went through at the 20-percent loan?

22 A  Yes.

23 Q  And if we can assume that the property was fixed

24 up at that time, as of the date of the final settlement,

25 then I take it what you're saying is that the reason you

## Page 64

1  couldn't have the 10-percent loan was because -- I take it

2  back. Tell me why you couldn't go back to the 10-percent

3  loan at that point in time after the property was fixed up.

4  A  I was not made aware the property was fixed up,

5  but assuming it had been fixed, we still would have had the

6  issue with verifying the employment and the assets.

7  Q  The problem with the employment was his failure

8  to have a CPA?

9  A  Yes. I needed a CPA to confirm his

10 self-employment, the type of self-employment and the length

11 of self-employment.

12 Q  Income tax returns wouldn't be sufficient for

13 that?

14 A  This was a stated income loan. I can't look at

15 those.

16 Q  That's that issue we talked about. And the other

17 issue was the assets. Why was it -- let me rephrase it

18 but, again, why was it that the assets weren't

19 sufficient?

20 A  Based on my recollection regarding the down

21 payment, that was on a business account, and I would have

22 needed the CPA to confirm that withdrawal of those funds

23 would not negatively impact the business and that the

24 borrower had access to those funds.

25 Q  Did anybody in this process have access to check

## Page 65

1  Mr. Wheatley's funds in Wachovia Bank?

2  A  Yes, we can verify his accounts at Wachovia.

3  Q  Do you know if anybody did that?

4  A  Without looking at the file, I'm assuming we did.

5      MR. GRADY: I'm going to -- if you don't

6  mind, I'm going to take a five-minute break. And I guess

7  I can call back in five minutes. Is that all right?

8      MR. FOGDALL: We can just put you on hold.

9      MR. GRADY: Okay.

10     (Off the record: 12:13 p.m. to 12:17 p.m.)

11 BY MR. GRADY:

12 Q  Let me turn to WHEAT 150.

13 A  Okay.

14 Q  Do you have that in front of you?

15 A  Yes, I do.

16 Q  This is a document dated 8/6/04?

17 A  Yes.

18 Q  I know it's a little bit hard to read. What's

19 the significance of this document?

20 A  This is page 2 of an internal document we use

21 whenever the underwriter is either declining a loan, making

22 a deviation or doing an exception. This page 2 in

23 particular has the signatures that are required and then

24 possibly any pertinent comments.

25 Q  Does it make an exception? Is it approved or not

49edcf86-bab4-439f-b80f-0909b3428ce3

Page 66

1  approved?

2    A   Yes. The signature on the very bottom,

3  Terri Hamm, she is the exception officer, and she did sign

4  off on it.

5    Q   What exactly is the exception?

6    A   The exception was for the property, the

7  employment and the assets.

8    Q   Is that for the 10-percent loan or the 20-percent

9  loan?

10    A   The exception was based on the approval of an

11  80-percent loan-to-value file.

12    Q   Was there ever any consideration between then and

13  the very end of going back to a 10-percent loan?

14    A   Consideration from whom?

15    Q   From you, I guess, as the underwriter in your --

16    A   No.

17    Q   You were always on track with 20 percent from

18  this point on?

19    A   Correct.

20    Q   Now, we have another document which is called

21  WACH 001. Do you have that in front of you?

22    A   Not yet.

23    MR. FOGDALL: She' got it.

24  BY MR. GRADY:

25    Q   Okay. Now, your counsel has also given us a

Page 67

1  document also just this morning also called -- it's called

2  "Underwriting Guidelines: Product-Specific," and the WACH

3  document says "Underwriting Guidelines: Conforming."

4    A   Yes.

5    Q   Do you have those documents in front of you?

6    A   Yes.

7    MR. FOGDALL: She does. Now, the document

8  I sent this morning should have had 12 pages. Is that

9  what you have there, 12 pages?

10    MR. GRADY: Yes.

11  BY MR. GRADY:

12    Q   What's the difference in these two documents?

13    A   The document entitled Underwriting Guidelines is

14  product specific, specific to the loan, the terms and the

15  product that the borrower was getting. The underwriting

16  guidelines are more generalized.

17    Q   Now, in the course of this transaction, did you

18  rely upon either one of these documents?

19    A   Yes.

20    Q   Which one did you rely upon?

21    A   Both.

22    Q   Are these guidelines that you're generally pretty

23  familiar with and familiar with enough that you don't have

24  to look at them every day, or is it something that you sort

25  of check every day?

Page 68

1    A   No, you're right, I do not need to look at them

2  every day.

3    Q   From your point of view, both of these documents

4  would be involved in the evaluation of the loan

5  applications of both Wheatley and Anderson?

6    A   Yes.

7    MR. FOGDALL: Let me clarify that. The

8  document, the 12-page document that I sent you this

9  morning applies to the Wheatley product -- the Wheatley

10  loan.

11    MR. GRADY: But not the Anderson?

12    MR. FOGDALL: Is that correct?

13    THE WITNESS: I would have to check which

14  product he applied for.

15  BY MR. GRADY:

16    Q   All right. Turn to WHEAT000069.

17    MR. FOGDALL: Give us one second. Off the

18  record.

19    (Off the record briefly.)

20    MR. FOGDALL: She has it in front of her.

21  BY MR. GRADY:

22    Q   This appears to be a check from Mr. Wheatley to

23  Mr. Aigner, who was the seller?

24    MR. FOGDALL: Objection to the form of the

25  question, mischaracterizes the document. Go ahead and

Page 69

1  answer the question.

2    A   Can you repeat that again?

3    MR. GRADY: I don't think it does

4  mischaracterize.

5    MR. FOGDALL: I think it does. The check

6  is drawn on funds of Limousine Unlimited, LLC. So to that

7  extent, it mischaracterizes the document. You can answer

8  the question if you're able.

9  BY MR. GRADY:

10    Q   Do you have the document in front of you?

11    A   Yes, I do.

12    Q   All right. In the course of your request for

13  verification of information, did this document come to your

14  attention?

15    A   Yes, it did.

16    Q   Do you know approximately when it did?

17    A   No, I don't.

18    Q   I guess it was in August? Do you know?

19    A   It was during -- during the processing and

20  underwriting of the file.

21    Q   All right. But this is some information you

22  would have needed to demonstrate where some of the money

23  was coming from?

24    A   This would have been in reference to verifying

25  the down payment was made.

Page 70

1    Q   All right. Turn to WHEAT 301.
2        (Off the record briefly.)
3        MR. FOGDALL: She has it in front of her.
4    BY MR. GRADY:
5    Q   Can you tell me what was going on at the time you
6    wrote this e-mail?
7    A   I'm not sure which Wheatley file this e-mail
8    pertains to, but I'm basically asking JD to change the
9    product so I can approve the loan.
10   Q   This is dated 7/20/04. Does that help you?
11   A   No.
12   Q   And the product still has not changed. The
13   product was the original financing, which we talked about
14   in the beginning of this deposition; is that correct?
15   A   I had a hard time hearing you.
16   Q   The product that we're referring to --
17   A   Yeah.
18   Q   -- is that the product that we were discussing at
19   the beginning of the deposition?
20   A   Yes, the no ratio.
21   Q   No ratio, or there was another one also being
22   discussed at the beginning.
23   A   And we counteroffered to a stated.
24   Q   Why did you have to get this off your desk?
25   A   Well, because I can't just hold files.

Page 71

1    Q   You need something to be done. Okay.
2        Do you recall what JD's reaction was to this?
3    A   Without reviewing the file, no.
4    Q   Do you recall if you were getting any other
5    e-mails from JD?
6    A   I don't recall any.
7    Q   Did you normally communicate with him by
8    telephone or by e-mail?
9    A   E-mail.
10   Q   You talked about a concern having a CPA confirm
11   employment. Is there any other way that you're permitted
12   to confirm employment other than a CPA?
13   A   I also needed the CPA to help me with the asset
14   situation.
15   Q   There were two issues, one was the employment,
16   and the other one was the asset?
17   A   Right.
18   Q   Let's talk about the employment. Could you
19   verify employment with some assistance other than a CPA?
20   A   Depending on the product, in some cases
21   possibly.
22   Q   How about in this case?
23   A   I'd have to review the file again.
24   Q   Did you make any specific conditions about the
25   repair of the Wheatley house by -- what I mean is, any

Page 72

1    certain work had to be done or -- I guess I'm trying to ask
2    you about what exactly Wheatley had to do to meet your
3    concerns about the house.
4        MR. FOGDALL: Objection to the form of the
5    question. There's been no testimony relating to
6    conditions or work that Mr. Wheatley had to do to meet
7    Ms. Fazzino's approval. If you can answer the question,
8    go ahead and answer it.
9    A   Okay. Can you ask the question again? I
10   apologize.
11   BY MR. GRADY:
12   Q   Okay. In your testimony, you indicated that, at
13   least early on, one of the reasons for turning down
14   Wheatley was because of the need for repairs as pointed out
15   in the appraisal?
16       MR. FOGDALL: Objection to the form of
17   the --
18   BY MR. GRADY:
19   Q   Do you recall that?
20       MR. FOGDALL: Objection to the form of the
21   question, mischaracterizes the witness' prior testimony.
22   Go ahead and answer the question if you can.
23   A   Are you referring to the first loan?
24   BY MR. GRADY:
25   Q   Yes.

Page 73

1    A   The first loan was declined due to property.
2    Q   Right. And then my question is: Did you as the
3    underwriter ever make any specific and direct directions to
4    anybody as to any repairs that Wheatley had to do?
5        MR. FOGDALL: Objection to the form of the
6    question. Go ahead and answer it if you can.
7    A   I don't remember asking anyone to make any
8    repairs, no. That's not something that I would do.
9    BY MR. GRADY:
10   Q   Is it your testimony that at the beginning to the
11   end between August 6 and August 13, you didn't know if the
12   repairs had been made on Wheatley's house or not?
13       MR. FOGDALL: Objection to the form of the
14   question. Go ahead and answer.
15   A   Without -- again, without reviewing the file, I
16   was not made aware that all of the repairs were completed,
17   and I don't remember if any were. I have nothing in front
18   of me to review.
19       MR. GRADY: All right. I think that's all we
20   have. I'd like to thank you for your time and patience.
21   Your counsel has a right to ask you some questions now if
22   he wishes.
23       MR. FOGDALL: Yes, I will ask some
24   questions. Why don't we take a five-minute break, and
25   then we'll do that.

Page 74

1    MR. GRADY: Okay.

2    (Off the record: 12:25 p.m. to 12:49 p.m.)

3    (Off-the-record discussion.)

4    MR. GRADY: A few more questions.

5 BY MR. GRADY:

6    Q   Turn to WHEAT 300.

7    MR. FOGDALL: You know what? I -- let me

8 see if I can track that down. I'm tempted, though -- I've

9 been organizing these documents in the way I want to

10 question about them, and you did tender the witness. I'm

11 tempted to say we should go ahead and do my questions, and

12 you can follow-up at the end. I don't want to be

13 difficult, Mr. Grady, but I would prefer to do it that way.

14    MR. GRADY: It doesn't matter to me.

15    MR. FOGDALL: All right.

16    MR. GRADY: Want to go with yours? I

17 understand the difficulty being organized.

18    MR. FOGDALL: I just don't want to mess up

19 the organization that I've got here.

20    MR. GRADY: Okay. Go with yours, and I'll

21 come back.

22    MR. FOGDALL: Okay. I appreciate it.

23

24

25

Page 75

1    C R O S S - E X A M I N A T I O N

2

3 BY MR. FOGDALL:

4    Q   This is my opportunity to ask follow-up questions

5 to clarify things that came up when Mr. Grady was

6 questioning you. Let's begin with the Anderson loan. Now,

7 you indicated that this Retail Loan Approval which was

8 dated July 10, 2004, if I understood it correctly, this

9 document reflected the conditions that the Andersons would

10 have to satisfy in order to obtain their loan? Did I

11 understand that correctly?

12    A   Yes.

13    Q   That's correct?

14    A   Yes, that is correct.

15    Q   And you did mark here satisfactory appraisal

16 supporting minimum value of $266,666?

17    A   Yes, I did.

18    Q   Having that appraisal was a condition for the

19 Andersons to obtain a loan in this case?

20    A   Yes, it was.

21    Q   And as of July 10, 2004, do you know if an

22 appraisal for the property the Andersons sought to purchase

23 had been complete?

24    A   I do not know.

25    Q   Actually, Mr. Grady, when he was asking you about

Page 76

1 the Anderson transaction, he showed you the appraisal for

2 the Anderson property, which --

3    A   Right.

4    Q   -- which we saw was dated August 5, 2004?

5    A   Yes.

6    Q   And that's at the plain Bates label 00003. So

7 that would indicate on the date that you filled out the

8 Retail Loan Approval, there had not yet been a satisfactory

9 appraisal of the Anderson property; is that correct?

10    A   Correct.

11    Q   So am I correct in understanding that when you

12 were approving the Andersons for a loan, that was subject

13 to the ultimate completion of a satisfactory appraisal?

14    A   Yes.

15    Q   And Mr. Grady also discussed with you this

16 mortgage loan committment document which is Bated labeled

17 000105 to 110. And you discussed with him that on page 109

18 of that document, one of the conditions listed was

19 satisfactory appraisal supporting minimum value of

20 $266,666, correct?

21    A   Yes.

22    Q   So, again, that indicates that it was a condition

23 of the Andersons obtaining their loan that they have such a

24 satisfactory appraisal?

25    A   Yes.

Page 77

1    Q   And you did, in fact, ultimately receive the

2 appraisal that we just discussed that's dated August 5,

3 2004, correct?

4    A   Yes.

5    Q   And I believe you indicated when Mr. Grady was

6 questioning you that based on your review of this

7 appraisal, the 8/5/04 appraisal, you were not aware of any

8 concerns about the condition of the property as reflected

9 in that appraisal, correct?

10    A   Correct.

11    Q   Would you have any awareness of the condition of

12 the property before this appraisal was completed, the

13 8/5/04 appraisal?

14    A   No.

15    Q   So if there had been repairs that were needed to

16 that property or other issues with its condition, you

17 wouldn't be aware of those, because they weren't reflected

18 in the appraisal?

19    A   Correct.

20    Q   Because the appraisal -- strike that.

21    MR. GRADY: Objection to this. This is

22 your witness, and I think these are leading questions. I

23 object to these leading questions. If you want me to

24 continue to object, I'll continue to object, but I know

25 that you do intend to use this deposition further, and I

Page 78

1  think I'd like to make it clear on the record that they
2  are leading, and I'm objecting to the leading questions,
3  and you can continue, but objections are -- if you want,
4  I'll make them question-by-question. If you want me to
5  make a general objection, you can keep on going on.
6      MR. FOGDALL: I won't stipulate to a
7  general objection.
8      MR. GRADY: All right.
9      MR. FOGDALL: So I'll have to ask you to
10  object as you feel is appropriate.
11  BY MR. FOGDALL:
12    Q  If there had been repairs that were needed to the
13  Anderson property and if they had been completed before
14  this appraisal was finished, would that be reflected in the
15  appraisal?
16    A  Depending on the -- no. Every once in a while an
17  appraiser will say, you know, recently renovated, but in
18  this case, the appraisal said nothing.
19    Q  And at one point, Mr. Grady asked you if there
20  were issues with the condition of the Anderson property,
21  and I believe that you said that there weren't any. Can
22  you explain what you meant by that? You said there weren't
23  any issues with the condition of the Anderson property?
24    A  At the time that I underwrote the loan, I had no
25  knowledge that there was any issues or problems or concerns

Page 79

1  with the property. When the appraisal came in, I reviewed
2  the appraisal in its entirety, and it did not reflect
3  anything.
4      MR. FOGDALL: Okay. Let's go ahead and
5  mark this as 1 through 3. We're going to mark those three
6  documents as 1 through 3.
7      MR. GRADY: Can you specify --
8      MR. FOGDALL: Yes. The Retail Loan
9  Approval will be 1. The appraisal will be 2, and the
10  mortgage loan committment will be 3.
11      (Exhibit 1 marked for identification;
12  Retail Loan Approval, Anderson.)
13      (Exhibit 2 marked for identification;
14  Appraisal, Anderson.)
15      (Exhibit 3 marked for identification;
16  Mortgage Loan Committment, Anderson.)
17  BY MR. FOGDALL:
18    Q  Let's turn to the Wheatley loan. The first
19  document I want to show you relating to the Wheatley loan
20  is this document WHEAT00069. Can you identify what that
21  document is?
22    A  It's a down payment check written on the business
23  account to the seller.
24    Q  So those are funds drawn on Mr. Wheatley's
25  business account?

Page 80

1    A  Yes.
2    Q  Those are his business funds?
3    A  Yes.
4      MR. GRADY: Let's mark that as number 4.
5      (Exhibit 4 marked for identification; Copy
6  of down payment Check Number 994.)
7  BY MR. FOGDALL:
8    Q  All right. The next document I want to show you
9  is -- can you recognize this document?
10    A  This is a mortgage loan application.
11    Q  And for the record, this is WHEAT000319 to 326.
12  Can you tell from looking at it which of the two Wheatley
13  loan applications this is?
14    A  I would have to reference the account number on
15  top.
16    Q  The account number is 6995009. Do you recall
17  that that is the account number for the first Wheatley loan
18  application?
19    A  Yes, it is.
20    Q  And do you see on page WHEAT000323 there's a
21  product code indicated? What does that say?
22    A  FNNR30FEX, which means it is a conforming no
23  ratio loan.
24    Q  So that indicates Mr. Wheatley and his wife were
25  applying for a no ratio loan?

Page 81

1    A  Yes.
2    Q  Now I want to show you one of the documents that
3  we provided to Mr. Grady this morning by fax. This is a
4  12-page document entitled "Underwriting Guidelines:
5  Product-specific," and then further down it says
6  "Conforming Investor Expanded Criteria Fixed Rate
7  Products." What does that mean?
8    A  These are underwriting guidelines specific to
9  that product.
10    Q  Specific to fixed rate products?
11    A  The expanded criteria fixed rate product.
12    Q  Now, am I correct in understanding that -- if we
13  go to page 7 of this document, it says no ratio program.
14  Do you see that?
15    A  Yes.
16    Q  So am I correct in understanding that beginning
17  on page 7, this document is giving us underwriting criteria
18  that apply to a no ratio loan?
19    A  Yes.
20    Q  And so these would apply to this first loan
21  application that the Wheatleys --
22    A  Yes.
23    Q  -- filled out?
24    A  Yes.
25    Q  And do you see in here on any page of this

Page 82

1  document the credit score that is -- the minimum credit
2  score that is required for a no ratio loan?
3      A  Yes, it is on page 8 of 12. It's on the bottom,
4  and the minimum required FICO score is based on the LTV.
5  Any LTV over 75 would require a 700 FICO score.
6      Q  And in this case, what was the ratio for
7  the -- what was the loan to value of the Wheatleys -- of
8  the loan the Wheatleys were initially applying for?
9      A  Ninety percent.
10     Q  So that would be above the 75-percent
11 threshold?
12     A  Correct.
13     Q  And, therefore, what FICO score would they need
14 to have?
15     A  700.
16     Q  And now I'll show you, this is a document which
17 I don't believe Mr. Grady asked you about today. It's
18 WHEAT000348 to 000368.
19         MR. FOGDALL: Mr. Grady, do you have that
20 in front of you or can you get it?
21         MR. GRADY: I have -- I don't know why I
22 haven't got 348 immediately in front of me, but I have 349
23 to 369 immediately in front of me.
24         MR. FOGDALL: You don't have 348?
25         MR. GRADY: I might have had it separately,

Page 83

1  but --
2          MR. FOGDALL: It was one of documents that
3  actually you identified in the --
4          MR. GRADY: I think that's why I just have
5  the one page, the 348, and all the rest of it I have with
6  my other stuff. Let me see if I can find 348 that goes
7  with it, and if I can't, I would suggest you simply go
8  forward.
9          MR. FOGDALL: Okay. I can fax it down to
10 you if you'd like me to.
11         MR. GRADY: I think we're all right.
12         MR. FOGDALL: Okay.
13 BY MR. FOGDALL:
14     Q  Do you recognize what this document is, the
15 document that begins WHEAT000348?
16     A  It's a credit report for Lloyd and Audria
17 Wheatley.
18     Q  And are you able to determine from looking at
19 this what Mr. Wheatley's FICO score would have been?
20     A  Yes.
21     Q  And where is that?
22     A  Each borrower has three FICO's, and it's
23 underwriting policy to take the middle FICO for each and
24 then the lower of the two.
25     Q  So the middle FICO for Mr. Wheatley was what?

Page 84

1      A  681.
2          MR. FOGDALL: We're going to mark that as
3  5.
4          (Exhibit 5 marked for identification;
5  Uniform Residential Loan Application, WHEAT000319-326.)
6          (Exhibit 6 marked for identification; Credit
7  report, WHEAT000348-368.)
8  BY MR. FOGDALL:
9      Q  Now I'm going to show you -- so before we move
10 on, I was about to put a new document in front of you, but
11 before we do that, just to clarify this, so Mr. Wheatley,
12 when he originally applied for his loan, had too low a FICO
13 score for the no ratio program?
14     A  Yes, he did.
15     Q  And now, this document WHEAT000308 dated
16 July 17, 2004, what is this document?
17     A  This is a document that is basically
18 counteroffering the borrower a no ratio loan to a stated
19 loan.
20     Q  Okay. And Mr. Grady asked you about this
21 document, WHEAT 314 to 315, in connection with the document
22 308. So I'm going to put both of them in front of you.
23 And tell me now what this new document represents.
24     A  The new document, WHEAT 314 and 315, is an
25 internal document that the underwriters will use to

Page 85

1  basically explain why they're doing what they're doing.
2      Q  Okay. And on 315, WHEAT 315, you have checked
3  here denied?
4      A  Right. His original loan request for the no
5  ratio product is being denied. However, we are offering
6  him another product.
7      Q  Okay. So in one sense the loan is being denied,
8  but in another sense he's being offered a different -- a
9  loan being on a different term?
10     A  Correct.
11     Q  And again all of this is as of July 17, 2004,
12 correct?
13     A  Yes.
14     Q  Okay. So it appears that at this point a
15 decision is made to offer the Wheatleys an alternative loan
16 product, which is the stated income loan product?
17     A  Yes.
18     Q  And that's consistent with this product code here
19 on WHEAT000315?
20     A  Yes.
21     Q  FNSI30FEX?
22     A  Yes.
23     Q  And just to make it clear, what does FN refer
24 to?
25     A  FannieMae.

Page 86

1    Q    SI refers to what?

2    A    Stated income.

3    Q    30FEX?

4    A    30 is the term, FEX is the expanded approval

5    criteria.

6    Q    All right.  And then I'll show you WHEAT 296 to

7    297.  And what is that?

8    A    WHEAT 296 to 297 is the underwriting form that I

9    would use to list all my conditions.

10    Q    So did you prepare WHEAT 296 to 297, that

11    document, which is titled "Retail Loan Approval," did you

12    prepare this once the counteroffer was made to the

13    Wheatleys to do a stated income loan instead of a no ratio

14    loan?

15    A    Yes, it was done in connection.

16    Q    So is it correct to say that the Retail Loan

17    Approval sheet WHEAT 296 to 297, that that encapsulates the

18    conditions that the Wheatleys would have to satisfy to get

19    the stated income loan that was now being offered to

20    them?

21    A    Yes.

22    Q    And, again, line 2 of this Retail Loan Approval

23    says what?

24    A    Satisfactory appraisal supporting minimum value

25    of $266,667, and it needed to be an interior/exterior

Page 87

1    appraisal.

2    Q    So, again, there's a requirement that the

3    Wheatleys have to satisfy of obtaining a satisfactory

4    appraisal for their home?

5    A    Correct.

6    Q    The home they wanted to purchase?

7    A    Correct.

8         MR. FOGDALL:  The Notice of Action Taken

9    will be 7.  The Fair Lending Analysis Tool will be 8, and

10    the Retail Loan Approval will be 9.

11         (Exhibit 7 marked for identification; Notice

12    of Action Taken, WHEAT000308.)

13         (Exhibit 8 marked for identification; Fair

14    Lending Analysis; WHEAT000314-315.)

15         (Exhibit 9 marked for identification; retail

16    Loan Approval; Fair Lending Analysis Tool,

17    WHEAT000296-297.)

18    BY MR. FOGDALL:

19    Q    Earlier counsel asked you about this document

20    beginning with WHEAT000331.  What is that document?

21    A    This is the Uniform Appraisal Report.

22    Q    So this is the appraisal for the Wheatley

23    property?

24    A    Yes, it is.

25    Q    And can you see on page WHEAT00335, what's the

Page 88

1    date on that?

2    A    July 12, 2004.

3    Q    Now, if the appraisal is dated July 12, 2004,

4    would it generally take a few days for the appraisal to

5    make its way to you once it's sent to Wachovia?

6    A    Definitely, at least a few days.

7    Q    How long typically?

8    A    Depending on the appraiser, it could take

9    anywhere from 72 hours to a week.

10    Q    So you might not receive this document until,

11    say, July 20, 2004?

12    A    Yes.  And this document is going to go to the

13    processor.  Then she needs to give it to me.

14    Q    So it's likely that this document came to you

15    after July 17, 2004?

16    A    Yes.

17    Q    So once you received this appraisal, what did you

18    do with it?

19    A    I reviewed the appraisal in its entirety, and I

20    believe this is when I noticed that there were some

21    property issues.

22    Q    Now let me show you this.  This is WHEAT000299.

23    What is this?

24    A    This is a Notice of Action Taken.  This is a form

25    indicating that the property -- that the borrowers' loan

Page 89

1    was denied due to value or type of collateral not being

2    sufficient.

3    Q    So it looks like the chronology went something

4    like this:  The Wheatleys applied for their loan as a

5    no ratio loan, correct?

6    A    Yes.

7    Q    You then checked their credit report, and

8    Mr. Wheatley's credit rating was not high enough for a

9    no ratio product?

10    A    Correct.

11    Q    So Wachovia counteroffered to a stated income

12    loan?

13    A    Yes.

14    Q    Then the appraisal came in, and you looked it

15    over, correct?

16    A    Correct, yes.

17    Q    And you noted the concerns mentioned in the

18    appraisal, and these concerns are documented on page

19    WHEAT000337?

20    A    Yes.

21    Q    You saw those concerns?

22    A    Yes.

23    Q    And it became clear to you that -- what became

24    clear to you at that point?

25    A    That this loan -- this property, I should say,

Page 90

1  had some health and safety issues and would not be
2  marketable.
3      Q   So as of July 22, 2004, Wachovia denied the loan
4  as counteroffered, correct?
5      A   Denied the loan based on the property.
6      Q   Okay. All right. Now I want to discuss with you
7  a set of documents that Mr. Grady had before you earlier
8  today. This is WACH00001 to 19. And what does this
9  document represent?
10     A   These are general appraisal guidelines that would
11  really pertain to mostly all products as far -- as long as
12  it's a conforming loan.
13     Q   And let me draw your attention back to the
14  product-specific guidelines for the fixed rate product that
15  we discussed earlier. Can you read the language near
16  the top of the page, page 1 of 12? There's some language
17  that begins "NOTE:." What does that say?
18     A   "For additional underwriting topics not included
19  in this section, Conforming Investor Underwriting
20  Guidelines apply."
21     Q   What does that mean?
22     A   Basically, it means that all general underwriting
23  guidelines would apply as well as any product-specific
24  underwriting guidelines.
25     Q   Is it fair to say that the language you just read

Page 91

1  in the product-specific guidelines is telling you that the
2  guidelines reflected in the document WACH1 to WACH19 also
3  apply --
4      A   Yes.
5      Q   -- to the fixed rate product?
6      A   Yes.
7      Q   All right. So the guidelines, again, the
8  guidelines WACH1 to 19, they would apply to both the
9  no ratio product --
10     A   Yes.
11     Q   -- that the Wheatleys wanted to apply for
12  initially and the stated income product that they were
13  counteroffered?
14     A   Yes.
15     Q   All right. Now let's turn to page WACH4. Could
16  you just read this first paragraph under Condition of
17  Property on WACH4?
18     A   "Condition of Property. For existing
19  construction" --
20     Q   And when you read, naturally we read quite a bit
21  faster than we speak.
22     A   Okay.
23     Q   So go a little slow so the court reporter can get
24  it all down.
25     A   For existing construction, an appraisal may be

Page 92

1  based on the "as is" condition of the property if minor
2  conditions do not affect the livability of the product
3  exists -- such as minor deferred maintenance -- as long as
4  the appraiser's opinion of value reflects the existence of
5  these conditions. The underwriter must review carefully
6  the appraisal for a property appraised in an "as is"
7  condition to ensure that the property does not have any
8  physical deficiencies or conditions that would affect its
9  livability. If there are none, Wachovia Mortgage
10  Corporation does not need to require minor repairs to be
11  completed before it delivers the mortgage to the
12  investor.
13     Q   And when you were reading just now, I believe you
14  read the first sentence, an appraisal may be based on the
15  "as is" condition of the property if minor conditions that
16  do not affect the livability of the product exist, but the
17  language actually is property.
18     A   Did I say product?
19     Q   I believe you did.
20     A   Okay. It should have been property.
21     Q   Based on your review of the appraisal for the
22  Wheatley property that's dated as of July 7, 2004, when you
23  received this appraisal and reviewed it, in your view did
24  it satisfy the condition that you just read from the
25  underwriting guidelines?

Page 93

1      A   No, it did not.
2      Q   Why not?
3      A   Due to the health and safety issues.
4      Q   All right. Let's look specifically at the
5  appraisal and the concerns noted in it. Well, before we do
6  that -- I do want to come back to that. Actually, let's
7  stick with the appraisal. So this is -- reading from
8  WHEAT000337, do you see here this sentence about a third of
9  the way down, the paragraph that's titled Summary of Market
10  Data?
11     A   Starting with "it"?
12     Q   "It does appear."
13     A   Yes.
14     Q   What does that say?
15     A   It does appear work is needed on wood shake roof
16  but assumed not to have any leakage.
17     Q   Reading that as an underwriter, would that
18  language cause you some concern?
19     A   Yes.
20     Q   If the appraiser says that he assumes that
21  there's no leakage, is that good enough to satisfy an
22  underwriter?
23     A   No. He's not a licensed roofer.
24     Q   And do you see here a little bit further up that
25  page beginning with condition adjustment, what does that

## Page 94

1  say?

2     A    Condition adjustments also reflect lack of heat

3  in subject property on second floor.

4     Q    And do you see a little bit further down the page

5  again, apparent lack -- what does that sentence say?

6     A    Apparent lack of heat on second floor represents

7  functional obsolescence.

8     Q    When you see that in an appraisal, does that

9  indicate to you that the property is livable or

10  unlivable?

11     A    Lack of heat would render that property

12  unlivable.

13     Q    And what about the concern here about the wood

14  shake roof? Is that enough to raise concern about the

15  livability of the property?

16     A    Yes, because I need to confirm that there's no

17  leaking, and that if there is damage, it needs to be

18  repaired so it doesn't get worse.

19     Q    And then a little bit further down here, this is

20  maybe two-thirds of the way down the paragraph, "it does

21  appear," what does that say?

22     A    It does appear some of the piping in basement is

23  wrapped with asbestos, however appraiser is not a hazardous

24  waste expert, toxic substance expert, asbestos expert or

25  environmental expert, and any additional information

## Page 95

1  regarding possible asbestos in basement should be obtained

2  from a certified expert.

3     Q    As an underwriter reading that, did that cause

4  you concern about the livability of the property?

5     A    Yes, it did.

6     Q    Based on your review of this appraisal, what did

7  you conclude about the livability of the property?

8     A    It was not acceptable or satisfactory.

9         MR. FOGDALL: Okay. Let's go ahead and

10  mark these. So the Notice of Action Taken dated July 22,

11  2004 will be marked as 10. The Underwriting Guidelines:

12  Conforming, that set of documents will be marked as 11,

13  and the appraisal will be marked as 12.

14         (Exhibit 10 marked for identification;

15  Notice of Action Taken dated 7/22/04, WHEAT000299.)

16         (Exhibit 11 marked for identification;

17  Underwriting Guidelines: Conforming, WACH000001-19.)

18         (Exhibit 12 marked for identification;

19  Appraisal, WHEAT000331-342.)

20  BY MR. FOGDALL:

21     Q    Now I want to show you another document. It's

22  WHEAT 170 to 177. Do you recognize what this is?

23     A    Yes. It's a residential loan application.

24     Q    Based on your review of that application, are you

25  able to tell which of the two applications that is for the

## Page 96

1  Wheatleys?

2     A    Yes. There's a number on the top right corner.

3     Q    What is it?

4     A    6940176.

5     Q    Am I correct in thinking that's the second loan

6  application --

7     A    Yes, it is.

8     Q    -- that the Wheatleys completed?

9     A    Yes, it is.

10     Q    Help me with the chronology here. The original

11  loan application got counteroffered to a stated income

12  product, but then it had to be denied because of the

13  condition of the property, correct?

14     A    Correct.

15     Q    But the Wheatleys were then given the opportunity

16  to apply for another loan?

17     A    Yes.

18     Q    And that's what this second loan application

19  represents?

20     A    Yes.

21     Q    And can you read on page WHEAT000174, there's a

22  product code indicated there. What is that?

23     A    FNSI30FEX, the stated income product.

24     Q    So again the Wheatleys are applying for a stated

25  income product?

## Page 97

1     A    Yes, they are.

2     Q    And is a stated income product an income

3  verification product?

4     A    No. Income is not verified; however, employment

5  is.

6         MR. FOGDALL: Mr. Grady, were you trying to

7  say something there?

8         MR. GRADY: No, I wasn't.

9         MR. FOGDALL: We heard some noise, and I

10  just wanted to make sure the connection is working.

11  BY MR. FOGDALL:

12     Q    All right. So we're looking at -- let's turn now

13  back to a document we were discussing earlier. It's the

14  Underwriting Guidelines: Product Specific, that document

15  that refers specifically to fixed rate products. Now, on

16  page 1 of 12, it says "Stated Income Program." What does

17  that represent?

18     A    Those are the product-specific guidelines for the

19  stated income program.

20     Q    Okay. And earlier we talked about how, starting

21  on page 7 of this document, are underwriting guidelines for

22  the no ratio program?

23     A    Correct.

24     Q    So the first seven pages then or the first six

25  and a half pages relate to a stated income program?

49edcf86-bab4-439f-b80f-0909b3428ce3

Page 98

1    A    Yes.

2    Q    These are the guidelines for the stated income

3 program?

4    A    Yes.

5    Q    Okay. Now, can you read here on page 2 of 12 of

6 the fixed rate products guidelines, this is again page 2,

7 beginning with the paragraph Employment?

8    A    "Employment: Although the actual stated amount

9 of income is not verified, our investors do require that

10 the stated income makes sense in relation to the source of

11 income that was indicated on the application. Income must

12 be reasonable and consistent with the source of income,

13 assets and credit profile."

14    Q    What does that mean?

15    A    Basically, it means that the amount of income the

16 borrower states has to make sense with his whole overall

17 profile, his spending habits, his savings, everything.

18    Q    And the language referring to "our investors"

19 require that the stated income makes sense," what does "our

20 investors" refer to?

21    A    This loan would be sold on the secondary market,

22 and how I underwrite the loan must conform to how the

23 investor wants it.

24    Q    And the investor would be who?

25    A    FannieMae.

Page 99

1    Q    Now, moving on to page 4 of 12, again we're

2 staying here with the fixed rate products underwriting

3 guidelines. Read here for down payment.

4    A    "Down payment: Minimum 10% must be from

5 borrowers own funds including equity from other

6 properties."

7    Q    What does that mean, "minimum 10% must be from

8 borrowers own funds"?

9    A    The borrower must have 10 percent of his own

10 money, his own personal accounts in the transaction.

11    Q    Okay. We'll come back to that. Now, moving on

12 to page 5 of 12, there's some language beginning "Asset

13 Test:." First of all, just generally explain what this

14 part of the underwriting guidelines pertains to, and then

15 we can get into specifics.

16    A    The asset test is a product-specific guideline,

17 and it basically means that whenever a borrower is in the

18 stated income product, he has to satisfy the asset test

19 which would support the amount of income that he stated he

20 earned monthly.

21    Q    Reading here, this is again page 5 of 12, can you

22 read the sentence beginning "in addition" and then stopping

23 at -- it's actually two sentences. The first sentence is

24 "in addition," and the second sentence ends with "business

25 on the Schedule C." Can you read those two sentences?

Page 100

1    A    In addition, equity in property owned (whether

2 liquidated via sale or through utilization of an equity

3 line), and funds from a business (other than Schedule C) do

4 not provide any kind of validation of the income stream and

5 would not be considered acceptable in terms of meeting --

6 in terms of meeting the purpose of the asset test. When

7 using the assets of a Schedule C business to meet the asset

8 test, the CPA must confirm that the borrower files the

9 business on Schedule C.

10    Q    Okay. So if a person applying for a loan has a

11 business, his own business, and he files the profits and

12 losses for that business when he files his federal income

13 tax returns, he files the profits and losses for that

14 business on a Schedule C, this guideline would relate to a

15 person like that, correct?

16    A    Yes.

17    Q    So what does it mean when the guidelines talk

18 about the CPA must confirm that the borrower files the

19 business on a Schedule C?

20    A    The CPA would be confirming that, one, he's

21 self-employed, how long he's self-employed, and what type

22 of self-employment he is, meaning a sole proprietor, a

23 corporation, an LLC.

24    Q    Is the CPA also confirming that the profits and

25 losses of the business are filed on Schedule C?

Page 101

1    A    Yes.

2    Q    And so if a person applying for a loan does his

3 own taxes, does his own tax forms, doesn't use a CPA to do

4 the taxes for his business, would that person be able to

5 satisfy this guideline?

6    A    No.

7    Q    And is it your understanding that Mr. Wheatley

8 could not satisfy this guideline?

9    A    Correct. I was told he did not have a CPA.

10          MR. FOGDALL: Let's go ahead and mark these

11 as 13 for the loan application and 14 for the fixed rate

12 products guidelines.

13          (Exhibit 13 marked for identification;

14 Uniform Residential Loan Application; WHEAT000170-177.)

15          (Exhibit 14 marked for identification;

16 Underwriting Guidelines: Product-Specific.)

17 BY MR. FOGDALL:

18    Q    Mr. Grady discussed this document with you today

19 as well? It's WHEAT000230.

20    A    Yes.

21    Q    And you indicated this was your handwriting.

22 What is this document?

23    A    This was known as the comments log, and it would

24 be in the file.

25    Q    And what does that mean, the comments log?

Page 102

1    A   You know, anything that the underwriter or
2    processor would note, anything that they felt that was
3    necessary on this log.
4    Q   You indicated earlier that the notes on this log
5    indicate discussions between you and JD and some other
6    individuals about how to make the Wheatley loan work?
7    A   Yes.
8    Q   Again, in general terms, what were those
9    discussions about?
10   A   They're pretty much surrounding why we were not
11   able to do the loan at 90 percent, but what we could do for
12   the borrower and getting the exception done and where the
13   secondary financing or that other 10 percent was coming
14   from.
15   Q   Is it fair to say the discussions reflected on
16   this comments log pertained more to the issues about
17   verification of Mr. Wheatley's assets and so on and not
18   about the condition -- not so much about the condition of
19   the property?
20   A   Correct.
21   Q   Now, you read an entry on this comments log dated
22   8/5, and I believe if you could just read that again, spoke
23   with --
24   A   Spoke with JD at great length several times
25   explained problems several times.

Page 103

1    Q   What does that mean?
2    A   Well, it's a note that I made just documenting
3    myself that I did speak with JD more than once about the
4    problems I had on this file.
5    Q   Why did you have to speak to JD?
6    A   Well, he was a loan officer.
7    Q   Was JD having a hard time accepting what you were
8    telling him about the problems with the loan?
9    A   Yes.
10   Q   What do you mean by that?
11   A   JD and I had several conversations, which were
12   disagreements, about what I could and could not do on the
13   loan.
14   Q   Are you saying that JD really wanted the loan to
15   go through?
16   A   Yes.
17        MR. GRADY:  Objection, leading.
18   BY MR. FOGDALL:
19   Q   Is that correct?
20   A   It is correct.  JD -- the reason I did these
21   notes as specific as I did was because JD was really
22   beating me up with this, so I felt it necessary to -- I was
23   really frustrated.
24   Q   What do you mean he was beating you up?
25   A   He was calling me and he was arguing with me

Page 104

1    about what I could and couldn't do.
2    Q   Because he wanted the loan approved?
3    A   Because he wanted the loan approved.
4    Q   Do you see earlier -- a little bit later on this
5    same document, there is the entry dated 8/11, and it looks
6    like this is after you've discussed the problems and have
7    indicated the loan would have to be done at 80 percent
8    instead of 90 percent.  Can you read the entry dated
9    8/11?
10   A   LO is pursuing 90 percent again.
11   Q   What does that mean?
12   A   That mean he pretty much is disregarding anything
13   that I've told him for the entire time I've had -- you
14   know, when we discovered the problem, and he is again
15   going back to the beginning where, Come on, let's do a
16   90 percent.
17   Q   He's trying to get the loan done at 90 percent?
18   A   Yes.
19        MR. FOGDALL:  Okay.  Let's go ahead and
20   mark this as 15.
21        (Exhibit 15 marked for identification;
22   Handwritten notes, WHEAT000230.)
23   BY MR. FOGDALL:
24   Q   Just for identification purposes what is this
25   document, WHEAT 150?

Page 105

1    A   This is page 2 of what we call "the flat."  It's
2    an internal document that we would use to document why we
3    were doing an exception.
4    Q   Down here at the bottom of the page it's signed
5    by Terri Hamm?
6    A   Yes.
7    Q   Who was Terri Hamm?
8    A   Terri Hamm was the operations -- I forget her
9    title -- operations something, but she was basically the
10   exceptions officer.  So it was basically her decision
11   whether we could do this loan as an exception.
12   Q   And ultimately the decision about whether the
13   loan would be 80 percent or 90 percent, whose decision was
14   that ultimately?
15   A   Hers.
16   Q   Terri Hamm's?
17   A   Terri Hamm's.
18   Q   To your knowledge, has Terri Hamm ever been to
19   Delaware?
20   A   I don't know.  I don't know.
21   Q   Have you ever been to Dover, Delaware?
22   A   No.
23   Q   To your knowledge, have you ever had any contact
24   with residents who live near Silver Lake in Dover,
25   Delaware?

49edcf86-bab4-439f-b80f-0909b3428ce3

Page 106

1    A   No.

2    Q   To clarify that question, to your knowledge have

3  you ever had any contact with residents near Silver Lake

4  other than one of the plaintiffs in this case?

5    A   No.

6    Q   Because you did, in fact, have some contact with,

7  I believe, Mr. Anderson in this case; isn't that correct?

8    A   Someone did call me.

9    Q   Do you know who that person was?

10    A   Unless I wrote it down, I don't.

11    Q   I can direct your attention to the line. It's an

12  entry dated 8/11, 6:30 p.m.

13    A   Borrower friend called in looking for

14  information, did not give.

15    Q   Do you recall who that friend was?

16    A   I don't.

17    Q   You say here that you did not give this person

18  the information they were looking for?

19    A   Correct.

20    Q   Now, why not?

21    A   It's confidential.

22    Q   It's confidential why?

23    A   I would never, nor would anyone, discuss one

24  borrower's loan with another borrower.

25    Q   Because the information related to Mr. Wheatley

Page 107

1  and Mrs. Wheatley, you couldn't discuss it with this person

2  who was calling you?

3    A   Correct.

4    Q   Are you aware of the demographic makeup of the

5  neighborhoods around Silver Lake in Dover, Delaware?

6    A   No.

7    Q   Has anybody ever discussed with you the

8  demographic makeup of the neighborhoods around Silver Lake

9  in Dover, Delaware?

10    A   No.

11    Q   Did James Hogsten, JD Hogsten, did he at any time

12  discuss with you the race of either Mr. and Mrs. Anderson

13  or Mr. and Mrs. Wheatley?

14    A   No.

15    Q   Did he ever discuss with you the race of Mr. and

16  Mrs. Wilkins?

17    A   No.

18    MR. FOGDALL: Let's go ahead and mark

19  Wheatley 150 as 16.

20    (Exhibit 16 marked for identification;

21  Internal document documenting reason for exception,

22  WHEAT000150.)

23  BY MR. FOGDALL:

24    Q   Now, this is another document we discussed

25  earlier today. Can you tell me what this is? It's not

Page 108

1  Bates labeled, but describe it as best you can.

2    A   This is the Retail Loan Approval sheet for the

3  Wheatley loan. It's an internal underwriting sheet, and

4  the loan number ends in 0176, and it basically lists all

5  the conditions that I would need.

6    Q   What loan application does this document relate

7  to?

8    A   This is the second loan, 176. Yes, this is the

9  second loan. And this appears to be the final 110.

10    Q   And you have here, see the E that's circled?

11    A   Yes.

12    Q   What does that mean?

13    A   That's an internal procedure we used to do, just

14  to know -- anyone that goes in the file knows this file is

15  an exception.

16    Q   Okay. And does this document reflect the basis

17  for the exception that was made for the Wheatley loan?

18    A   Yes, it does.

19    Q   Where does it reflect that?

20    A   Line 2. I did not sign off on the condition.

21  Insted I wrote exception and initialed it, and that was for

22  a satisfactory appraisal.

23    Q   What does that mean? That there was not a

24  satisfactory appraisal?

25    A   Correct, yes. Line 21, again I wrote exception

Page 109

1  and initialed it, copy of cancelled check for earnest money

2  deposit in the amount of $13,333.

3    Q   And that was an exception why?

4    A   Because it was written on a business account,

5  and, again, I couldn't speak with the CPA.

6    And then line 27, verification of 10 percent

7  borrower own funds in transaction and borrower satisfying

8  asset test, and I did not sign off on it. I wrote

9  exception and initialed it.

10    Q   So the loan was made to the Wheatleys despite all

11  of these problems?

12    A   Yes.

13    Q   Now, when a loan is made as an exception, can

14  that loan be sold on the secondary market?

15    A   No. We would retain it.

16    Q   So FannieMae would not buy that loan?

17    A   Correct. They would not even know about it.

18    MR. FOGDALL: Let's mark this as 17.

19    (Exhibit 17 marked for identification;

20  Retail Loan Approval, Wheatley, loan number ending 0176.)

21  BY MR. FOGDALL:

22    Q   Okay. I'm going to show you two more

23  documents. Can you identify these? The first one here

24  dated August 3, '04, what is that?

25    A   It's a letter from a company called Air Doctor X,

## Page 110

1  heating and air conditioners. It's WHEAT00066.

2     Q   What is this document?

3     A   It's a letter that says, This letter is in

4  regards to the inspection of the basement insulation at the

5  residence of 584 North Dupont Highway. The pipe insulation

6  in basement area was encapsulated at time of inspection.

7     Q   And the 584 North Dupont highway is whose

8  property?

9     A   That's our subject property for Mr. Wheatley.

10    Q   The language you just read about the pipe

11 insulation in the basement was encapsulated at time of

12 inspection, what does that mean?

13    A   That means that when he went out on August 3, the

14 asbestos was encapsulated.

15    Q   The asbestos around the pipes in the basement of

16 Mr. Wheatley's house --

17    A   Right.

18    Q   -- of 584 North Dupont Highway?

19    A   Correct.

20    Q   And what does that mean that it's encapsulated?

21    A   It would mean to me that that problem has been

22 taken care of.

23    Q   So the -- in other words, the concern flagged in

24 the appraisal relating to asbestos, this inspection is

25 enough to satisfy that concern --

## Page 111

1     A   Yes.

2     Q   -- that the asbestos is not dangerous?

3     A   Yes.

4     Q   But in your view, is it necessary to have an

5  inspection like this done based on language in the

6  appraisal?

7     A   What kind of -- an inspection from the Air

8  Doctor?

9     Q   Yes.

10    A   Yes. Oh, definitely.

11    Q   So this inspection was absolutely required?

12    A   Yes. The appraisal noted a very serious safety

13 and health issue. This inspection will take care of it.

14    Q   Now, the appraisal also talked about problems

15 with the roof, the wood shake roof?

16    A   Correct.

17    Q   And how the appraiser assumed there wasn't a

18 leak?

19    A   Right.

20    Q   But you still felt that was troubling?

21    A   Right.

22    Q   What is this document here now I'm showing you?

23    A   It's from a company called Thomas Home Repair.

24 It's WHEAT000053. It's dated August 10, 2004, and it says,

25 Dear Mr. Wheatley, after careful inspection of your

## Page 112

1  property, I find that there is no sign of damage to your

2  roof, nor is there any evidence inside indicating there is

3  or have been a leak anywhere. It is my best opinion that

4  the roof won't need any type of repair done to it for at

5  least a couple of years more.

6     Q   Again, that's dated August 10, 2004?

7     A   Yes.

8     Q   Which is -- am I correct in understanding that

9  that's three days before the Wheatleys' purchase of the

10 property at 584 Dupont Highway closed?

11    A   I believe so, yes.

12    Q   Again, this was prompted by the language in the

13 appraisal?

14    A   Absolutely.

15    Q   But having this in the file satisfied you and

16 Wachovia that there was --

17    A   Yes.

18    Q   -- not a concern about the roof?

19    A   Right. Yes.

20    Q   Okay. But still it was necessary to have this

21 inspection done?

22    A   Right. Our investors would be looking for this

23 type of documentation.

24    Q   When you say our investors would be looking for

25 that, why is that?

## Page 113

1     A   To ensure any health and safety issues have been

2  eliminated.

3     Q   You're saying FannieMae would be looking for this

4  type of documentation?

5     A   Correct.

6         MR. FOGDALL: Let's mark these as 18 and 19.

7         (Exhibit 18 marked for identification;

8  Letter dated 8/3/04 from Air Doctor X, WHEAT000066.)

9         (Exhibit 19 marked for identification;

10 Letter dated 8/10/04 from Thomas Home Repair, WHEAT000053.)

11        MR. FOGDALL: All right that's all the

12 questions that I have. Mr. Grady, do you have any

13 additional questions?

14        MR. GRADY: Yes.

15

16        R E D I R E C T   E X A M I N A T I O N

17

18 BY MR. GRADY:

19    Q   Could you look at WHEAT 300?

20        MR. FOGDALL: Remind me what WHEAT 300

21 is.

22        MR. GRADY: Home mortgage disclosure.

23        MR. FOGDALL: Give me a minute.

24        (Off the record briefly.)

25        MR. GRADY: Since we're marking exhibits,

Page 114

1  we've had a lot of exhibits marked, there's a little
2  problem with being 200 miles away. Can we at some point
3  in time make a copy of this document and mark it as the
4  next exhibit or just -- unless you have suggestions, but
5  I'd like to get some of these exhibits marked. Can we do
6  that?
7       MR. FOGDALL: Yes. Do you --
8       MR. GRADY: We can talk about this, or I
9  can just send exhibits to the court reporter, whichever
10  way you want to do it. I just want to make sure before we
11  leave this whole subject of the exhibits, we have some
12  understanding of how we're operating. I don't mind just
13  sending them to the court reporter, but, I like I say, I
14  have to kind of come to some closure on what we're going
15  to do with the rest of the exhibits.
16       MR. FOGDALL: You're right. I don't think
17  at this point we're going to be able to go back through as
18  we sit here and identify all the documents that you talked
19  about with the witness when you were questioning her
20  unless you made a list of them. Then we can refer to that
21  and collect them. I tried to do that as you were going
22  along, but I confess I didn't do a 100-percent complete
23  job of that. So I don't know that I can reconstruct all
24  the documents that you showed her. Given that, I'm
25  comfortable with, after you get the transcript, going

Page 115

1  through it and identifying the documents that you
2  discussed with her and then having those marked after the
3  fact.
4       MR. GRADY: All right. That's fine. Let's
5  keep going.
6       MR. FOGDALL: Mr. Grady, we'll just number
7  them sequentially, then, with the exhibits that we marked
8  just now when I was questioning her.
9       MR. GRADY: You finished with number 19.
10  I'll start with number 20. Okay?
11       MR. FOGDALL: Okay.
12  BY MR. GRADY:
13   Q   You have WHEAT 300 in front of you?
14   A   Yes.
15   Q   This document I guess starting with line 13 and
16  14 refers to ethnicity and race?
17   A   Yes.
18   Q   Do you see that?
19   A   Yes.
20   Q   And this is Mr. Wheatley's document, I believe.
21  And it's has -- applicant race has a 3. Do you see that?
22   A   Yes.
23   Q   What does 3 stand for?
24   A   I have to be honest with you, the inputting of
25  the information on this form was the responsibility of the

Page 116

1  processor, so I'd have to go back and look it up. This was
2  done on a different system.
3   Q   Whose signature is down there?
4   A   That is my signature.
5   Q   You just signed off on this?
6   A   I did.
7   Q   Did you know when you were processing this whole
8  thing that Mr. Wheatley was black?
9   A   No, I did not.
10   Q   Or that Mr. Anderson was black?
11   A   No.
12   Q   So you had no idea?
13   A   It's really not relevant.
14   Q   I'm just asking you if you knew.
15   A   No, I did not.
16   Q   Okay. But when you signed off on this, did you
17  know what the 3 meant, the race?
18   A   To be honest with you, no. I never really
19  paid -- as an underwriter, you're required to know so many
20  guidelines and review so many documents, as you can see
21  with all these exhibits, that something like that just
22  really didn't I, I didn't have to worry about it.
23   Q   Do you know why this requirement is on the form?
24   A   I'm sorry?
25       MR. FOGDALL: Objection.

Page 117

1  BY MR. GRADY:
2   Q   Do you know why the form asks for race?
3       MR. FOGDALL: Objection to form and
4  foundation. Go ahead and answer if you can.
5   A   I know that all mortgage companies do compile
6  this information, and it is reported to the federal
7  government in some way, shape or form.
8   Q   Do you know if there were documents prepared that
9  go out to the federal government?
10       MR. FOGDALL: Objection to the form of the
11  question. If you understand it, go ahead and try to
12  answer it.
13   A   That is not done in this building, so I don't
14  know how they do it or when they do it.
15  BY MR. GRADY:
16   Q   Let me go back to some of your testimony. You
17  talked about -- you talked about the appraisal of
18  Mr. Wheatley's property. Do you recall that?
19   A   Yes.
20   Q   And you testified that there were several
21  concerns that you saw in the appraisal?
22   A   Correct.
23   Q   Among others, there might have been the roof,
24  asbestos and heating on the second floor?
25   A   The lack of heat on the second floor.

Page 118

1   Q   Now, and you also testified that when the second

2   loan -- second application was approved, there was an

3   exception made, and one of the exceptions was that you were

4   not requiring an appraisal. Did I get that right?

5   A   No, you misunderstood that.

6   Q   What was the exception about the appraisal?

7   A   The exception was on the property, not the

8   appraisal. The exception for Mr. Wheatley was due to

9   basically layering of risk, which included the property

10  condition, the employment and the assets.

11  Q   Let me just go back a minute. The document which

12  we've referred to, I think it was not one of the original

13  documents, and you referred to line 21 -- line 2, line 21

14  and line 27?

15  A   That's the Retail Loan Approval sheet.

16      MR. FOGDALL: We marked it as Exhibit 17.

17  BY MR. GRADY:

18  Q   On that one, I think that might have been one of

19  the documents that was sent later, or I don't have the

20  first page. But in any event, the first thing you refer to

21  is line 2?

22  A   Yes.

23  Q   That was an exception, right?

24  A   Line 2 is telling me that the property is part of

25  the exception, yes.

Page 119

1   Q   Are you telling me that that loan, the second

2   loan application was still conditioned on a proper

3   appraisal?

4   A   Yes.

5   Q   Now, we only have one appraisal I've seen in this

6   file. That's the July 2004 appraisal. Are you aware of

7   any other appraisals?

8   A   No.

9   Q   The appraisal that we have appraises the value of

10  the property, but it cites certain problems with the

11  property; is that correct?

12  A   Yes, it is.

13  Q   Now, am I correct -- okay. Did you specifically

14  ask anybody to go back and re-appraise the property or

15  re-examine the property to see if any of these problems had

16  been corrected?

17  A   I don't remember doing that.

18  Q   In any event, you're not aware of any paperwork

19  that reflects that, are you?

20  A   No. Well, no.

21  Q   Do you know if the appraiser ever went back to

22  the property after his initial July appraisal?

23  A   I don't know if he did. He may have, but I don't

24  know. When the appraisal came in and I noted the issues,

25  that would have been communicated to the loan officer.

Page 120

1   What transpired after that, I don't know.

2   Q   And you have testified that you got some kind of

3   document dealing with the asbestos issue; is that

4   correct?

5   A   Yes.

6   Q   You got a document dealing with the roof issue?

7   A   Yes.

8   Q   You got a document dealing with the heating on

9   the second floor?

10  A   I do not have a document on that.

11  Q   So -- and I think you testified that was a

12  serious problem?

13  A   Yes.

14  Q   Why did you approve of the loan without some sort

15  of verification about the heating on the second floor?

16      MR. FOGDALL: Objection to the form of the

17  question. Go ahead and answer if you can.

18  A   The loan was done as an exception.

19  BY MR. GRADY:

20  Q   What does that mean?

21  A   The loan was done as an exception meaning we

22  would not be selling that loan; it was flagged as an

23  exception loan. And the borrower was asked to sign a hold

24  harmless agreement at closing regarding all of the property

25  concerns.

Page 121

1   Q   If it was done as an exception, does that mean

2   that you weren't requiring --

3   A   That we would not require the borrower to satisfy

4   any more property conditions or employment or asset

5   conditions.

6   Q   You mean you weren't requiring the borrower to

7   necessarily make all the repairs that are identified in the

8   July appraisal?

9   A   Yes.

10  Q   So if that's the case -- did you specifically ask

11  the borrower to get a statement about the condition of the

12  roof?

13  A   I don't believe I ever spoke with Mr. Wheatley.

14  Q   Did you ask -- did you tell JD Hogsten or anybody

15  that the borrower has to get a statement about the

16  condition of the roof?

17  A   I don't remember the conversation; however, when

18  an appraisal comes in, if there are issues, I will

19  communicate what those issues are, and the borrower would

20  have or the loan officer would have the ability to try to

21  correct that.

22  Q   As I understand it, it wasn't necessary to

23  correct these problems to process this loan?

24      MR. FOGDALL: Objection to the form of the

25  question, serious mischaracterization of the witness'

1  testimony.
2  BY MR. GRADY:
3    Q  You can answer that.
4       MR. FOGDALL:  If you're able to answer
5  that, go ahead.
6    A  In order to maintain the salability of this loan
7  and give the borrower the loan amount that he initially
8  requested, all of these items would have had to have been
9  corrected.
10  BY MR. GRADY:
11    Q  I thought -- correct me if I'm wrong.  I thought
12  the whole purpose of the exception was he didn't have to
13  necessarily --
14       MR. FOGDALL:  You completely misunderstood
15  her testimony.  That was not her testimony.
16       MR. GRADY:  We'll go back.  Let her answer
17  the question, not have counsel answer the question, if you
18  don't mind.
19       MR. FOGDALL:  I didn't answer the question.
20  I objected to your question, because it mischaracterized
21  her testimony, which is a perfectly appropriate objection.
22  Go ahead and ask your question.
23  BY MR. GRADY:
24    Q  We can agree that you didn't make any
25  verification of the issue of no heat on the second floor;

1  isn't that correct?
2       MR. FOGDALL:  Objection to the form of the
3  question.
4    A  As far as I know, that loan closed without heat
5  on the second floor as an exception loan at an 80 percent
6  LTV.
7  BY MR. GRADY:
8    Q  And this loan, as I understand it, was a loan
9  that was going to be kept by Wachovia; is that correct?
10    A  Yes.
11    Q  In your testimony, you talked about it being
12  necessary to have these different repairs done, because the
13  investors would be concerned about it?
14    A  Correct.
15    Q  What investors are you talking about?
16    A  FannieMae.
17    Q  Why would FannieMae be involved?
18    A  FannieMae is where we sell our loans or other
19  investors that use the same guidelines.
20    Q  I thought you said you were not going to sell
21  this loan?
22    A  The original loan request at 90 percent would
23  have gone to an investor of FannieMae or FannieMae.  We
24  were not able to sell the loan with the property in the
25  state that it was in in our inability to verify the asset

1  conditions as well as the employment.
2    Q  So this particular loan FannieMae wouldn't have
3  been involved in; is that correct?
4    A  The exception loan?
5    Q  Yes.
6       MR. FOGDALL:  Objection to the form of the
7  question.  If you understand the question, you can try to
8  answer it.
9    A  Okay.  If the loan is made an exception, it would
10  not be sent to FannieMae.  Due to the property condition,
11  the employment and the asset situations, we were not able
12  to sell this loan; therefore, it was made an exception at
13  80 percent.
14  BY MR. GRADY:
15    Q  Even if you hadn't received any documentation
16  about the status of the roof, would you agree that this
17  loan could have still gone through as an exception at a
18  20 percent loan?
19       MR. FOGDALL:  Objection to the form of the
20  question.  It's based on a misunderstanding of the
21  witness' testimony about what making an exception
22  involves.
23  BY MR. GRADY:
24    Q  Would you please answer the question?
25    A  Could you ask it again?  I'm not following what

1  you're asking.
2       MR. GRADY:  I ask the court reporter to
3  read that question back.
4       (The question on page 124, line 15,
5       was read by the Court Reporter.)
6    A  Yes, because you have to remember that this
7  exception was due to layering of risk.  It wasn't just the
8  property, and it wasn't just the employment.  It was the
9  property and the employment and the assets.  That is what
10  rendered the loan an exception.
11  BY MR. GRADY:
12    Q  Could the loan also have gone through if you
13  hadn't gotten the statement about the asbestos?
14    A  Gone through as what?  As an exception or a
15  marketable loan?
16    Q  An exception.
17    A  It would still have gone through as an exception
18  as long as the borrowers agreed to sign a hold harmless
19  agreement at closing.
20    Q  To the best of your knowledge, did these
21  borrowers in this case sign a hold harmless agreement?
22    A  Yes, I believe that they did.  It's signed off
23  on -- I'm sorry.  It says at closing.  There's no initials,
24  so I'm assuming they did.
25       MR. GRADY:  We have a document which you

Page 126

1  identified as the Underwriting Guidelines:
2  Product-Specific document. I'm not sure if I have the
3  number. This is one of the ones without any Bates numbers
4  on it. Could you put that in front of the witness,
5  please?
6      MR. FOGDALL: All right. This is
7  Exhibit 14. She has it.
8  BY MR. GRADY:
9      Q    Now, Exhibit 14 at page 2?
10     A    Yes.
11     Q    It states that the -- in the middle under
12  Employment, that the borrower must have two years of
13  continuous self-employment in the same line of business in
14  the same location?
15     A    Yes.
16     Q    There's no suggestion on this page that that has
17  to be verified by a CPA, is there?
18     A    On this page, no there is not.
19     Q    On page 5, is it correct that the CPA is supposed
20  to make some verification about the assets?
21     A    Typically, if a borrower is using business
22  accounts, business assets, we would need some type of
23  verification from the CPA to ensure the withdrawal will not
24  negatively impact the business, as that will affect future
25  earnings, and that he has access to those funds.

Page 127

1      Q    Are there any other types of verification of
2  self-employment other than the CPA?
3      A    To verify the employment?
4      Q    Yes.
5      A    Sometimes we can go with a business license.
6  It's really on a case-by-case.
7      Q    In this case, there's been some discussion in
8  different depositions that with respect to the Anderson
9  loan, there was initially an appraisal person who went out
10  to the facility who did not ultimately make an appraisal.
11  Do you have any knowledge at all about the circumstances of
12  that or have you ever heard of that even?
13     A    No, I haven't.
14     Q    From your point of view, the first time you saw
15  an appraisal on the Anderson property was when the document
16  which has been produced first came to you, which was the
17  Anderson appraisal?
18     A    Correct.
19     Q    Just to clarify several things, in the event you
20  had never gotten that statement about the roof, would this
21  loan have been able to go through anyway?
22     A    As a what?
23     Q    As an exception 20 percent loan?
24     A    You know, that would have been up to the
25  exception officer, because any time an exception officer

Page 128

1  approves a loan as an exception, any deviations, she or he
2  must be made aware of.
3      Q    When the exception officer approved this loan,
4  was there any condition that the roof had to be
5  reexamined?
6      MR. FOGDALL: Objection, object to the form
7  and lack of foundation. Go ahead an answer if you can.
8      A    I would think not, because we had them sign a
9  hold harmless.
10  BY MR. GRADY:
11     Q    All right. In this case, there have been several
12  references to a uniform residential loan application. Do
13  you recall generally those references?
14     MR. FOGDALL: Objection to the form.
15     A    Not really. We've talked about a lot.
16  BY MR. GRADY:
17     Q    All right. Turn to WHEAT 170.
18     MR. FOGDALL: Off the record for a second.
19     (Off the record briefly.)
20     MR. FOGDALL: Okay. She has it.
21  BY MR. GRADY:
22     Q    In the course of processing this loan, is this a
23  document that you would have seen?
24     A    Yes.
25     Q    Turn to page 172?

Page 129

1      A    Uh-huh.
2      Q    The document that I have identifies the race of
3  the applicant?
4      A    Yes, it does.
5      Q    Is that something that you would have an
6  opportunity to look at when you processed this?
7      A    Yes, if I looked at it.
8      MR. GRADY: All right. I think we're
9  finished.
10         To clarify on the record, after I get a
11  transcript back, I'm going to identify all the exhibits
12  that have not previously been identified, and maybe I'll
13  confer with counsel, but the goal will be to send them to
14  the court reporter with exhibit numbers on them.
15     MR. GRADY: Okay. Now, this WHEAT 300,
16  were you intending to have that marked today? You asked
17  the witness about it at the start of your second round of
18  questions.
19     MR. GRADY: Not necessarily.
20     MR. FOGDALL: Understood.
21     MR. GRADY: No, I'll just include that with
22  the other documents, if that's okay to you.
23     MR. FOGDALL: Yes.
24     MR. GRADY: With that, we'll sign off.
25  Anything else, Counsel?

49edcf86-bab4-439f-b80f-0909b3428ce3

Page 130

1        MR. FOGDALL:  I have no more questions.
2   Take care, Mr. Grady.
3
4        (Deposition concluded:  2:18 p.m.)
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25

Page 131

1                    JURAT
2
3
4
5
6   _____
             COLLEEN FAZZINO
7
8
9
10
11   Subscribed to and sworn before me on this
12   _____ of _____, 2007.
13
14        _____
15
16   My commission Expires:
17
18
19
20
21
22
23
24
25

Page 132

1                    ERRATA SHEET
2   Page Line    From              To
3   _____
4   _____
5   _____
6   _____
7   _____
8   _____
9   _____
10  _____
11  _____
12  _____
13  _____
14  _____
15  _____
16  _____
17  _____
18  _____
19  _____
20  _____      _____
     Date                COLLEEN FAZZINO
21  Sworn to before me this _____ day
    of _____, 2007.
22        _____
                    Notary Public
23
    My commission Expires: _____
24
25

Page 133

1                C E R T I F I C A T I O N
2   STATE OF CONNECTICUT:
    COUNTY OF HARTFORD:
3
4        I, TIFFANY V. PRATT, a Notary Public duly commissioned
    and qualified in and for the State of Connecticut, do
5   hereby certify that pursuant to Notice there came before me
    on the 6th of November, 2007, the following named person,
6   to wit: COLLEEN FAZZINO, who was previously duly sworn to
    testify to the truth and nothing but the truth; that she
7   was thereupon examined upon her oath; that the examination
    was reduced to writing by computer under my supervision and
8   that this transcript is a true record of the testimony
    given by said witness.
9
10       I further certify that I am neither attorney nor
    counsel for, nor related to, nor employed by any of the
11  parties to the action in which this deposition was taken,
    and further, that I am not a relative or employee of any
12  attorney or counsel employed by the parties hereto, or
    financially interested in the outcome of this action.
13
         In witness whereof I have hereunto set my hand
14  this 7th day of December, 2007.
15
16
17       _____
                 Tiffany V. Pratt
18                Notary Public
19
20  My Commission expires
     July 31, 2010
21
22
23
24
25

49edcf86-bab4-439f-b80f-0909b3428ce3

Page 1

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF DELAWARE

- - -

TOLANO ANDERSON,          :   CIVIL ACTION
et al.,                   :
          Plaintiffs,     :
                          :
vs.                       :
                          :
WACHOVIA MORTGAGE         :
CORPORATION and           :
WACHOVIA CORPORATION,     :
          Defendants.     :   NO. 06 CV 00567 (SLR)

- - -

Tuesday, October 30, 2007

- - -

Oral Deposition of TOLANO D. ANDERSON

taken at Grady & Hampton, P.A., 6 North

Bradford Street, Dover, Delaware, commencing

at 10:45 a.m., before Susan Marie Migatz, a

Federally Approved Registered Merit Reporter,

Certified Realtime Reporter, and Notary Public

in and for the Commonwealth of Pennsylvania.

- - -

VERITEXT NATIONAL COURT REPORTING COMPANY
1845 Walnut Street, 15th Floor
Philadelphia, PA  19103
(215) 241-1000   (888) 777-6690

## Page 2

```
 1   APPEARANCES:
 2
       GRADY & HAMPTON, P.A.
 3     BY: JOHN S. GRADY, ESQ.
       6 North Bradford Street
 4     Dover, Delaware 19904
       Phone:  302-678-1265
 5     E-mail: unavailable
 6         Representing the Plaintiffs
 7
       SCHNADER, HARRISON, SEGAL & LEWIS, LLP
 8     BY: STEPHEN A. FOGDALL, ESQ.
       1600 Market Street, Suite 3600
 9     Philadelphia, PA 19103
       Phone:  215-751-2581
10     E-mail: sfogdall@schnader.com
11         Representing the Defendants
12
          - - -
13
     ALSO PRESENT:
14
       CATHY ANDERSON
15
16        - - -
17
18
19
20
21
22
23
24
```

## Page 3

```
 1            I N D E X
 2   WITNESS                    PAGE
 3   TOLANO D. ANDERSON
 4     By Mr. Fogdall        5
 5          - - -
 6         E X H I B I T S
 7   NUMBER      DESCRIPTION      MARKED
 8   T. Anderson 1  Agreement of Sale for
         580 North DuPont Highway,
 9       6/18/04, Pages 000334-336  20
10   T. Anderson 2  Operating Agreement of
         Tri-Core, LLC, Page
11       000360-389 with attached
         schedules           21
12
       T. Anderson 3  Preformation Agreement,
13       Pages 000352-355     25
14   T. Anderson 4  Amended Complaint    40
15   T. Anderson 5  Map          59
16   T. Anderson 6  Uniform Residential
         Loan Application,
17       6/27/04, Pages
         ANDER000136-145     78
18
       T. Anderson 7  Mortgage Loan
19       Commitment, 7/14/04,
         Pages 000105-110     132
20
       T. Anderson 8  Invoices and receipts,
21       Pages PLS000235-242  141
22   T. Anderson 9  Appraisal as of 8/2/04,
         Pages ANDER000057-70  153
23
24
```

## Page 4

```
 1         E X H I B I T S
 2   NUMBER      DESCRIPTION      MARKED
 3   T. Anderson 10  Document entitled
         "TriCore Mtg 3Sep04"   170
 4
     T. Anderson 11  Membership Interest
 5       Redemption Agreement,
         5/25/05, Pages
 6       000341-348         192
 7          - - -
 8
 9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
```

## Page 5

```
 1         TOLANO D. ANDERSON, 580 North
 2   DuPont Highway, Dover, Delaware 19901,
 3   after having been first duly sworn,
 4   was examined and testified as follows:
 5          - - -
 6         EXAMINATION
 7          - - -
 8   BY MR. FOGDALL:
 9     Q.   Mr. Anderson, good morning.
10     A.   Good morning.
11     Q.   I told you before the
12   deposition began that my name is Stephen
13   Fogdall.
14         I represent Wachovia
15   Corporation and Wachovia Mortgage Corporation
16   in a lawsuit brought by yourself, your wife,
17   and four other individuals here in Delaware
18   and the testimony you are giving today is part
19   of that lawsuit.
20         Now, you are aware that you are
21   under oath just as if you were giving
22   testimony in a court of law; correct?
23     A.   Correct.
24     Q.   And you are aware that there is
```

2 (Pages 2 to 5)

Page 6

1  a court reporter here taking down a record of
2  the questions that I ask you and the answers
3  that you give, and because of that there's a
4  few things that have to be kept in mind.
5      First of all, it's important
6  that before you answer a question that I ask
7  you, that you make sure that you've understood
8  it, because if you answer the question and it
9  turns out you haven't understood it, someone
10  reading the transcript later is going to
11  assume that you did understand it.
12      So if there is anything I say
13  in a question that I ask that you don't
14  understand, just stop me and ask for
15  clarification and I will do my best to
16  clarify, if I can. I can't promise you that I
17  will be able to clarify, but I will do my
18  best. Is that acceptable to you?
19      A.    Yes.
20      Q.    It's also important, because a
21  record is being made of our conversation here
22  today, that you and I not interrupt one
23  another, because if we do, it's hard to read
24  the transcript later. It makes for a messy

Page 7

1  record. So I will do my best not to interrupt
2  you when you're speaking and I will ask you to
3  do the same for me. Is that acceptable to
4  you?
5      A.    Yes.
6      Q.    Thank you.
7          Sir, where do you currently
8  reside?
9      A.    580 North DuPont Highway,
10  Dover, Delaware.
11      Q.    And how long have you lived
12  there?
13      A.    June, I believe it was
14  approximately June, of '05.
15      Q.    Of '05.
16      A.    Uh-huh.
17      Q.    When did you actually purchase
18  that property, 580 North DuPont Highway?
19      A.    I believe it was approximately
20  August-September of '04.
21      Q.    So you purchased it in August
22  '04 and then moved in in June '05. Why the
23  delay in moving in?
24      A.    I was on active duty, the

Page 8

1  United States Army, and I was extended and
2  that caused me to change my plans to relocate.
3      Q.    Where were you living during
4  that period that you were on active duty?
5      A.    At 301 Bugle Court, Odenton,
6  Maryland 21113.
7      Q.    Did Mrs. Anderson live with you
8  at 301 Bugle Court in Maryland or did she live
9  here at 580 North DuPont Highway?
10      A.    She lived with me at that
11  address.
12      Q.    Okay. Who was living in the
13  580 North DuPont Highway address during that
14  period, from August '04 to June '05?
15      A.    No one.
16      Q.    No one, okay.
17          All right. Let's talk about
18  how you came to purchase the property that
19  we're discussing here, 580 North DuPont
20  Highway.
21          You had an initial meeting with
22  Mr. Aigner; is that correct? How do you
23  pronounce his name, by the way? I'll spell it
24  for the record. The name is Peter Aigner,

Page 9

1  A-I-G-N-E-R, but I'm not sure how to pronounce
2  the last name.
3      A.    Aigner.
4      Q.    So you do say it. I wasn't
5  sure if the G was silent or not.
6          I have here an Agreement of
7  Sale between you and Mr. Aigner and it's dated
8  18 June 2004. Do you recognize that?
9      A.    That looks like our Agreement
10  of Sale.
11      Q.    Okay. It's dated June 18,
12  2004, but when was the first time that you had
13  discussions with Mr. Aigner about purchasing
14  this property, if you recall?
15      A.    I wouldn't remember the exact
16  date, but I believe it was the date of the
17  Agreement of Sale.
18      Q.    Okay. How did you --
19      A.    Well, I mean, as far as us
20  meeting.
21      Q.    In other words, you met him in
22  person for the first time on the 18th of June
23  2004?
24      A.    I'm not certain that was the

3 (Pages 6 to 9)

Page 10

1  date, but approximately in that time frame.
2      Q.   Did you have discussions with
3  him over the phone before then?
4      A.   Yes.
5      Q.   How did you come to be aware
6  that Mr. Aigner wanted to sell these
7  properties? I mean the 580 North DuPont
8  Highway and the two other properties that are
9  at issue in the lawsuit. How did you learn
10 that he wanted to sell them?
11     A.   He had a for sale sign in the
12 front yard.
13     Q.   So you just saw the sign and
14 called him up?
15     A.   Yes.
16     Q.   Why were you interested in this
17 particular property?
18     A.   My wife has always wanted a
19 waterfront property and she saw the sign, told
20 me let's go look at it, and that's why I
21 wanted it, well, for her, you know.
22     Q.   It is a nice property. I drove
23 past it on my way in here and it is a nice
24 setting there on the lake.

Page 11

1          Did you know at the time, when
2  you were first interested in this property and
3  you called Mr. Aigner, that he also wanted to
4  sell the two other properties or were you not
5  aware of that at that time?
6      A.   When I first called him, I only
7  wanted to buy the one property.
8      Q.   So when you called him, your
9  intention was just to purchase 580 North
10 DuPont Highway, but he then told you that
11 there were the two other properties and that
12 he really wanted to sell all three of them
13 together?
14     A.   Yes.
15     Q.   During that initial
16 conversation with him did he insist to you
17 that he would not sell just one individual
18 property, he was only going to sell the three
19 properties together, the 580, 584, and 592
20 North DuPont Highway?
21     A.   Yes.
22     Q.   Okay.
23     A.   We asked him just to buy the
24 one house and he refused. He said I'm selling

Page 12

1  all three.
2      Q.   Okay. Did he explain to you at
3  that time why he was insisting on this?
4      A.   Yes.
5      Q.   And what was his reason?
6      A.   He was preparing for a real
7  estate transaction and he had what he
8  described as a 1031 tax exchange, I believe is
9  the right term, and that because of some, I
10 guess, inheritance issues in his family and so
11 forth and so on, that it was to their benefit
12 to sell all properties at the same time and to
13 reinvest and he only had a certain time frame
14 that he had to do that.
15     Q.   Okay. There is a reference in
16 this Agreement of Sale that we're discussing.
17 It's on the third page. It's Paragraph 15.
18 The title of the paragraph is "Section 1031 of
19 the Code." But am I correct in understanding
20 that he is referring in that paragraph to his
21 desire to do the 1031 exchange that you've
22 just described?
23     A.   That's correct. And in
24 addition, you know, he stated and restated

Page 13

1  that all three properties had to be purchased
2  or sold or he was going to sell all three or
3  all the transactions would be void.
4      Q.   Okay.
5      A.   It was all or nothing
6  basically.
7      Q.   Now, looking through this
8  Agreement between you and Mr. Aigner --
9          - - -
10         (Brief interruption.)
11         - - -
12         MR. FOGDALL: Let's go off the
13 record.
14         - - -
15         (Short recess.)
16         - - -
17 BY MR. FOGDALL:
18     Q.   I think we finished off with
19 you were saying that in this conversation that
20 you had with Mr. Aigner, he had insisted, I
21 think you said more than once, on his refusal
22 to sell an individual property and that all
23 three properties had to be purchased or none
24 could be.

                              4 (Pages 10 to 13)

Page 14

```
 1          I think you also mentioned,
 2  before we went off the record, that he said
 3  that the deposit that you would pay for these
 4  properties, you'd lose that whole deposit if
 5  the transaction didn't go through. Were you
 6  saying that before we went off the record, or
 7  maybe I just --
 8      A.   I didn't actually say that, but
 9  that is correct.
10      Q.   Okay.
11      A.   The Agreement of Sale was
12  signed based on nonrefundable and that if any
13  of the transactions didn't go through, then
14  that money would be forfeited. And his
15  attorney also reiterated that. At the signing
16  of the contract his attorney was there and she
17  reiterated both of those statements.
18      Q.   And his attorney was whom?
19      A.   Her name is Beth Miller, I
20  believe.
21      Q.   Is she at Schmittinger and
22  Rodriguez?
23      A.   We met at the Schmittinger
24  Rodriguez office.
```

Page 15

```
 1      Q.   But were they representing him
 2  or you in this transaction?
 3      A.   They were representing
 4  Mr. Aigner.
 5      Q.   Okay.
 6      A.   They produced the Agreement of
 7  Sale and we signed it in their office.
 8      Q.   You are saying an attorney at
 9  Schmittinger and Rodriguez drafted this
10  Agreement that we're talking about?
11      A.   Right, yes.
12      Q.   Can I ask you a question? When
13  you looked through this Agreement, it doesn't
14  actually say that the properties have to be
15  sold together. It's written as if all that
16  was at issue was the 580 North DuPont Highway
17  property. Is that a fair statement?
18      A.   It doesn't actually say it that
19  I can find in the Sales Agreement. However,
20  with it being stated and reiterated numerous
21  times prior to, during, and after the signing
22  of the Agreement of Sale as a specific
23  condition and having that stated by his
24  attorney before we signed that would confirm
```

Page 16

```
 1  that we were aware of that fact. I actually
 2  thought it was written in here, but it was so
 3  clear at that time, it was just, you know...
 4      Q.   So it may just be that it was
 5  an oral understanding or a verbal
 6  understanding that you all had with him that
 7  he was insisting on this. Would you like to
 8  look through that Agreement right now to see
 9  whether it is written in the Agreement that
10  the properties had to be sold together?
11      A.   No.
12      Q.   Okay.
13      A.   I would like to state that it
14  might be possible that there is a document to
15  that effect with his attorney, with
16  Mrs. Miller. I don't recall if there was
17  another document signed. But it was so
18  specific, there may have been a document that
19  we signed at that time when we gave them the
20  deposits.
21      Q.   You are saying there may be a
22  separate written agreement between you and
23  your wife and maybe the other four plaintiffs
24  and Mr. Aigner stating his condition that the
```

Page 17

```
 1  properties had to be sold together?
 2      A.   What I'm stating is that there
 3  may have been a document that his attorney
 4  produced at that time confirming that we
 5  understood this and I just can't be certain,
 6  but it was so specific at the time, there may
 7  be something to that effect in existence.
 8      Q.   But are you saying do you
 9  recall signing an agreement like that or are
10  you just saying that there was a written
11  document that reflected his desire that all
12  the properties be sold at the same time?
13      A.   No. The oral statements were
14  clear. The requirements were clear. I just
15  can't recall if we signed a statement to that
16  effect.
17      Q.   Understood.
18          I will take this back. Thanks
19  very much.
20          Now, when did you first have
21  discussions with the other plaintiffs, I mean
22  the Wheatleys and the Wilkinses, about all of
23  you joining together to purchase these
24  properties?
```

5  (Pages 14 to 17)

Page 18

1     A.    At some point prior to the
2   signing of the Agreement of Sale and after my
3   discussions with Mr. Aigner. I don't remember
4   the specific date. But I called both
5   individuals to see if they would be interested
6   in buying a house on the waterfront.
7     Q.    Had you had discussions with
8   them before ever meeting Mr. Aigner about the
9   desirability of you all purchasing property
10  together or did it occur to you to discuss
11  this with them because of Mr. Aigner's
12  insistence on selling all three properties
13  together?
14    A.    I think it occurred to me
15  because Dr. Wilkins, one of my friends, was
16  interested, when he retired from the military,
17  of moving out to Delaware.
18    Q.    You are saying he had that
19  interest --
20    A.    Yes.
21    Q.    -- before the events in this
22  lawsuit took place?
23    A.    Right.
24    Q.    Okay.

Page 19

1     A.    And I don't recall what
2   prompted me initially to call Mr. Wheatley
3   other than the fact that we were friends, we
4   go to church together, and I thought that
5   maybe he would be interested and he was.
6     Q.    If Mr. Wheatley hadn't been
7   interested, presumably you would have tried to
8   find somebody else to join with you in
9   purchasing these properties so that the sale
10  could go through.
11    A.    I think my intent at that time
12  was to try to wear Mr. Aigner down --
13    Q.    Okay.
14    A.    -- to sell just the one house.
15  You know, I had no inclination to get involved
16  with all three, nor did I know if Dr. Wilkins
17  or Mr. Wheatley or anyone else I knew had the
18  intent or desire. I was just throwing it out
19  there. But my intent was actually to really
20  get Mr. Aigner to change his mind.
21    Q.    But in the end he didn't and
22  you did discuss it with Mr. Wilkins and
23  Mr. Wheatley and their wives and they agreed
24  to purchase these properties along with you?

Page 20

1     A.    Right. And also I mentioned it
2   to several other people that I know as well to
3   see if anyone would be interested.
4     Q.    Okay. When did you and the
5   other plaintiffs make the decision to form the
6   Tri-Core company that is involved in some way
7   in these transactions?
8     A.    I don't recall exactly when,
9   but it was at some point in time before the
10  actual purchases of the property.
11    Q.    I am going to show you another
12  document.
13          MR. FOGDALL: Before we do
14          that, would you mind marking that as
15          No. 1?
16            - - -
17          (Whereupon the document was
18          marked, for identification purposes,
19          as Exhibit T. Anderson 1.)
20            - - -
21  BY MR. FOGDALL:
22    Q.    One thing that I meant to
23  discuss with you right at the start but we
24  sort of jumped into things and so I didn't do

Page 21

1   that, I just want to note for the record that
2   Mrs. Anderson is participating in the
3   deposition and that's fine, she is entitled to
4   do that under the local rules, at least on my
5   reading of the local rules.
6          The only thing I ask is if
7   there is a question that I ask that
8   Mrs. Anderson is better able to answer if she
9   has more knowledge about the question, that we
10  just put that question aside and we come back
11  to it when we do her deposition later today
12  rather than having you both answer questions
13  at the same time as part of this deposition.
14          All right. I'm going to show
15  you what is the Operating Agreement for
16  Tri-Core, LLC. Just look through that and
17  tell me if you recognize it.
18    A.    It appears to be our Operating
19  Agreement.
20    Q.    If you go to the last page
21  there, you should see your signature and
22  Mrs. Anderson's signature --
23    A.    Yes.
24    Q.    -- along with the signatures of

6 (Pages 18 to 21)

Page 22

1  the other plaintiffs.
2      A.    Uh-huh.
3      Q.    I will just direct your
4  attention to one page of this Operating
5  Agreement for now.  This is Paragraph 2.01.
6  It's on Page 5 of the Agreement and the Bates
7  labeling that Mr. Grady has provided for this
8  document is 000365.
9          But right there, Paragraph 2.01
10  indicates that on July 8, 2004, your attorney,
11  Ms. Alston, organized the Tri-Core entity.
12  Does that square with your recollection?
13      A.    Well, I'd have to agree with
14  it.  That's what it says.  So I would concur
15  with that.
16      Q.    That same paragraph refers to
17  Articles of Organization, which is, I take it,
18  something different from the Operating
19  Agreement.  Do you recall seeing a document
20  labeled "Articles of Organization" for this
21  Tri-Core company?
22      A.    I do recall a document which
23  may be the Articles of Organization.  It's a
24  document that had to be filled out in order to

Page 23

1  organize or to establish the LLC and there was
2  a fee attached with it.
3      Q.    This was something that was
4  filed with the State of Delaware?
5      A.    Right.  It has a State seal on
6  it.
7          MR. GRADY:  Just off the
8  record.
9          - - -
10          (Discussion off the record.)
11          - - -
12          MR. FOGDALL:  Mr. Grady was
13  just indicating that he thinks his
14  office may have produced these
15  Articles of Organization that we're
16  discussing and I am not sure that's
17  correct.  I am going to go back and
18  look through the materials that he
19  sent and then I will follow up with
20  him if that's not the case.
21  BY MR. FOGDALL:
22      Q.    Now, we took a break a short
23  while ago and someone brought over some
24  additional pages that are associated with this

Page 24

1  Operating Agreement.  There's a Schedule A, a
2  Schedule B, and a Schedule C, and then in
3  addition there are updated Schedules A and C,
4  which we'll get to.
5          So I think what I would like to
6  do is so the record is clear, I would like to
7  attach these five pages, the three original
8  schedules, A, B, and C, and then the updated
9  schedules, A and C, to the back of the
10  Operating Agreement so it's all one document.
11  Is that acceptable to you?
12      A.    Yes.
13      Q.    Then we can refer to it all
14  together.
15          Now, before we go further with
16  this document, why did you and the other
17  plaintiffs decide to form the Tri-Core
18  company?
19      A.    We decided to form the company
20  primarily to protect our interests.  We had
21  been given such a hard time by the bank and we
22  had some concerns and we were looking at the
23  value of what we had there with the waterfront
24  property and we decided to form a corporation

Page 25

1  that would keep the value of what were
2  purchasing all together for the current time
3  and then for the future.
4      Q.    Okay.  I want to come back to
5  that.  You've said that you decided to form
6  the Tri-Core company to protect your interests
7  because of a hard time that you were given by
8  the bank and I want to come back to that.
9          But before we do that, there's
10  another document which I received from your
11  attorney, Mr. Grady, which is called a
12  Preformation Agreement.  This is not signed by
13  anyone.  But I believe from reading it that it
14  is in some way related to the Operating
15  Agreement that we're talking about.  Would you
16  mind looking it over and tell me if you
17  recognize it?
18      A.    Yes, it looks like a document
19  that I have seen before.
20      Q.    Do you know if there is a
21  version of this document that was signed by
22  you and the other plaintiffs?
23      A.    No, no, I don't have any
24  recollection nor do I have a copy of a signed

7 (Pages 22 to 25)

Page 26

1  document like this.
2      Q.   Okay. What is your
3  understanding of the meaning of the phrase
4  there at the top of the page "Preformation
5  Agreement"?
6      A.   I would say "preformation"
7  could be defined as something that's done
8  prior to the actual formation; in other words,
9  an organization of something to be formed.
10     Q.   So in this case it would be an
11 agreement between you and the other plaintiffs
12 prior to the formation of Tri-Core, so an
13 agreement prior to July 8, 2004?
14     A.   Yes.
15     Q.   Do you have a recollection of
16 how much prior to July 8, 2004, you were
17 discussing this Preformation Agreement with
18 the other plaintiffs?
19     A.   I don't have a recollection of
20 how much prior to that date or this date we
21 were discussing it, but we clearly talked
22 about it and discussed it so...
23     Q.   Did you have any discussions
24 with the other plaintiffs about forming

Page 27

1  Tri-Core before you entered into discussions
2  with Wachovia to finance the purchases of the
3  properties?
4      A.   Not that I recall. We have
5  other corporations, all designed to limit our
6  liability for whatever reason, so I can't
7  recall at what point in time we began
8  discussing it, but clearly prior to the
9  formation or the creation of this document and
10 the development of and the signing of the
11 Operating Agreement. So clearly we talked
12 about it in advance.
13     Q.   What I am trying to get at is
14 whether, from the very start of your
15 discussions with the other plaintiffs joining
16 together to purchase these three properties,
17 did you contemplate that you would create a
18 company that would hold the properties?
19     A.   We talked about lots of
20 different scenarios and possibilities and, you
21 know, you might call it brainstorming, but we
22 discussed numerous possible things that could
23 happen with the property in the future. And
24 based upon what we at that time initially

Page 28

1  thought was harassment from the bank, we were
2  thinking, you know, let's protect our
3  interests and let's protect ourselves from any
4  liabilities and just make sure that what we
5  are doing can't be disintegrated by what was
6  going on.
7      Q.   But it sounds like you had at
8  least some discussions with the other
9  plaintiffs about forming the Tri-Core company
10 or forming some company to hold these
11 properties before you experienced the
12 harassment that you've alleged in the
13 Complaint. Is that correct?
14     A.   I don't think so. I mean, I
15 don't have the dates in front of me. I mean,
16 we talked about a lot of different things,
17 including being neighbors and all the things
18 that that entails and rebuilding the boat
19 docks and just any number of things.
20     One of the things we talked
21 about was making sure that one of us didn't
22 decide to sell their property to someone else
23 that we didn't want to be neighbors with. So
24 we decided let's make a commitment to one

Page 29

1  another and we did that kind of within the
2  corporation that, you know, all right, no one
3  outside of our group can sell their
4  properties. We didn't want our property
5  values to go down by getting some gay to go in
6  there -- I'm sorry -- some individual in there
7  that we didn't want to be neighbors with.
8      Q.   Okay. If we can turn to the
9  three schedules that you brought in during
10 that break that we have now attached to the
11 Operating Agreement, looking at the first
12 schedule, this indicates that the members of
13 your LLC are going to be you and your wife and
14 then the four other plaintiffs, the Wheatleys
15 and the Wilkinses; is that correct?
16     A.   Yes.
17     Q.   Then on the next page, Schedule
18 B, which is titled "Tri-Core, LLC Initial
19 Contribution," can you explain what this
20 schedule is describing?
21     A.   What that schedule is
22 describing in my best recollection is we were
23 using this as a way of establishing our intent
24 not to allow another person to come in and

8  (Pages 26 to 29)

Page 30

1   purchase one of the properties from one of the
2   neighbors. We were more or less our own
3   homeowners association, if you will. So that
4   was our intent there when we did this.
5       Q.   This column here, which
6   indicates 33-1/3% for you and your wife and
7   then the other four plaintiffs, what's the
8   significance of those percentages?
9       A.   One of the things that we were
10  thinking in terms of the corporation was how
11  it was going to be owned and so we said, well,
12  we all have equal share in the LLC, and so
13  that shows an equal share and equal interest
14  in each one, which really coincides with the
15  address located just to the left of the
16  interest values. In other words, we assumed
17  that within this group each person's home
18  would have the same value.
19      Q.   The idea here is that all three
20  properties would be held by the Tri-Core
21  company and then the three couples, you and
22  your wife, the Wheatleys, and the Wilkinses,
23  would then all have an equal share of the
24  total assets of the company?

Page 31

1       A.   No, no.
2       Q.   Okay.
3       A.   No, that's not correct. What
4   it is is establishing that each person in
5   their individual home had a value in the
6   company that we were creating to protect our
7   collective interests. In other words, we had
8   to assign, you know, interest in the
9   organization that we were forming to protect
10  our interests.
11          So Tri-Core didn't hold any
12  property. We talked about it. We talked
13  about, hey, you know, is there things that we
14  can do to maybe even protect us more. And we
15  never did anything with it. We talked about a
16  lot of stuff.
17          But in this particular case
18  these interests correspond with the addresses
19  which correspond to the names of the
20  individuals that own them.
21      Q.   You are saying these
22  percentages indicate that each of these
23  properties would be deemed to contribute
24  33-1/3% toward the value of Tri-Core?

Page 32

1       A.   No, because Tri-Core didn't
2   have any value. Tri-Core didn't have any
3   value or assets. These percentages basically
4   represented what we assumed each home was
5   worth or would be of value to.
6           So, for example, Tri-Core was
7   created, but Tri-Core didn't do anything.
8   Tri-Core was our attempt to protect our
9   interests and keep these properties
10  together --
11      Q.   Okay.
12      A.   -- so that we didn't have
13  issues with people getting involved and trying
14  to undermine what we were doing, buying the
15  homes and so forth. We had been experiencing
16  that to a degree and we realized, oh, well,
17  let's form a corporation. And these
18  interests, if you look at the purchase
19  agreements, each of them are approximately
20  one-third of what the total sale price was.
21  So we just established that as a number.
22      Q.   What you are referring to there
23  just now is that when you purchased the three
24  properties from Mr. Aigner, the entire price

Page 33

1   of the three properties together was
2   $800,000.00 and the price of the individual
3   properties was divided three ways to equal
4   $266,667.67, I guess. Does that square with
5   your recollection?
6       A.   I think that is correct.
7       Q.   So then is it fair to say that
8   essentially what you're doing here with these
9   percentages is you're saying each of these
10  three properties is considered to have the
11  same value?
12      A.   We considered them to have
13  approximately the same value.
14      Q.   Okay. Earlier in the
15  Agreement, when the Agreement first talks
16  about the significance of Schedule B -- I'm
17  sorry; it's not the first time the Agreement
18  talks about Schedule B. What I'm referring to
19  here is actually Paragraph 8.01, which is on
20  the Bates-stamped Page 000375. It's Page 15
21  of the Operating Agreement.
22          Just looking at this Paragraph
23  8.01, would you mind just reading that out
24  loud so it's in the record that the court

9 (Pages 30 to 33)

Page 34

1  reporter is taking?
2      A.   It says: "Each Member must
3  contribute the property set forth in attached
4  Schedule B as his or her share of the Initial
5  Capital Contribution. Said properties are
6  company property and will be transferred to
7  the name of the company as soon as practical.
8  Practicability shall be determined by the
9  managers upon the advice of qualified
10  accountants and tax counsel."
11      Q.   Okay. From what you just read
12  there, it says "said properties are company
13  property." What does that mean, that the
14  properties are company property?
15      A.   I think one of the ideas that
16  we talked about got incorporated in this
17  article of the Operating Agreement, one of
18  numerous discussions of possibilities and how
19  we can protect our interests and so forth and
20  so on. This says: "Said properties are
21  common property and will be" -- I'm sorry; I
22  can't mumble.
23          Yeah, that's what that was. We
24  had talked about that as a possibility, a way

Page 35

1  to keep anyone from coming in and undermining
2  or, you know, basically trying to take, steal,
3  or otherwise, you know, interrupt what we were
4  doing there so...
5      Q.   Earlier you said that Tri-Core
6  had no assets. What I'm wondering is whether
7  that paragraph that you just read, at least at
8  the time it was written, reflected an intent
9  that Tri-Core would hold those three
10  properties.
11      A.   It's something that we talked
12  about. As far as intent, Tri-Core from its
13  inception until just last month, so
14  approximately three years, did absolutely
15  nothing, including this. We didn't hold any
16  assets, didn't do anything.
17          It just was an idea, it was a
18  thought, it was a concept that we had to
19  protect our interests. It was a concept of
20  different ways that we could keep, quite
21  frankly, Wachovia and what we thought may have
22  been, you know, some of the bank's interests
23  from getting in and either disrupting or
24  trying to undermine or keep us from acquiring

Page 36

1  or keeping the properties.
2          So ultimately speaking, the
3  ideas/concepts/discussions concerning Tri-Core
4  captured in this article, this was one of
5  numerous scenarios that we presented. But as
6  you will obviously see, Tri-Core and none of
7  those scenarios, none of the ideas, none of
8  the concepts, none of the contributions, none
9  of the other ideas that we had, including
10  this, ever came to fruition. The company
11  basically dissolved.
12      Q.   On that same page that we're
13  discussing Bates-labeled 000375, this is now
14  Paragraph 8.02, it says: "Each Member is
15  required to make additional Capital
16  Contributions of $2,000 monthly to meet the
17  expenses of the company..." Did that occur?
18  Did you and the other plaintiffs contribute
19  $2,000 a month pursuant to that paragraph?
20      A.   We attempted to bring any of
21  these concepts together. Unfortunately, I
22  mean, it was one of many ideas that didn't
23  happen. You know, that was just another one
24  of the ideas, the concepts, that we came up

Page 37

1  with to contribute and to keep things under
2  one umbrella and keep any kind of interference
3  out of the way. But, unfortunately, it didn't
4  work out, just like any of the other ideas.
5      Q.   The $2,000 a month that this
6  paragraph refers to, that's actually greater
7  than your individual mortgage payments;
8  correct? Your mortgage payments on these
9  properties were less than $2,000?
10      A.   I know my mortgage payment was
11  less than $2,000 for sure.
12      Q.   Okay. As you sit here, you
13  don't know if the mortgage payments of the
14  other two couples, the Wheatleys or the
15  Wilkinses, was less than $2,000?
16      A.   I can't confirm that.
17      Q.   Okay. The Operating Agreement
18  talks about members and it talks about
19  managers, and I will show you where. This is
20  Section 1.27 in the "Definitions" at the start
21  of the Agreement. It says: "'Manager' means
22  one or more managers. Specifically, 'Manager'
23  means those names listed on Exhibit B..."
24          Now, does that mean that each

10  (Pages 34 to 37)

Page 38

1  member of the company was also a manager or
2  were only some of the members managers?
3     A.   I have no idea.
4     Q.   You don't know.
5     A.   No.  I mean, this in terms of
6  definitions is all boilerplate as far as
7  corporations are concerned, including the
8  following articles.  So I will just reiterate
9  that Tri-Core was a concept of one of many
10  ideas that did not come to fruition.  We had
11  plans and thoughts and ideas and numerous, you
12  know, I guess considerations.  We were
13  basically scrambling to try to protect
14  ourselves, and this was one of those ideas.
15  And it didn't go anywhere, just like Tri-Core
16  didn't go anywhere.
17        The harassment and
18  discrimination that the bank executed against
19  us was so intense that one of the partners in
20  the company basically lost everything and he
21  had to withdraw from our little group, which
22  is one of the things we were trying to
23  protect, as well as lose his property.
24        So Tri-Core had a lot of ideas

Page 39

1  and thoughts and concepts, but Tri-Core never
2  did anything.  So it was a thought, plan, and
3  idea, but just like we had several others
4  which didn't go anywhere either.
5     Q.   So here on Page 13 of the
6  Agreement, Bates-labeled 000373, Section 6.11,
7  "Salaries," it says: "Each Manager may be
8  reimbursed for all reasonable expenses
9  incurred in managing the Company.  The
10  salaries and other compensation of the
11  Managers will be fixed from time to time by
12  the vote or written consent of at least a
13  majority of the Membership Interests."  Was
14  anyone paid a salary by Tri-Core?
15     A.   No.  I mean, Tri-Core didn't
16  have any assets.  Tri-Core didn't pay any
17  salaries.  I personally believe that is
18  another boilerplate standard, you know,
19  definition of salaries and how salaries are
20  distributed.  But, no, Tri-Core didn't pay any
21  salaries because Tri-Core didn't have any
22  assets or money.  It was a thought, an idea.
23        Quite frankly, we formed, you
24  know, several corporations to protect our

Page 40

1  interests in other ventures.  We have one
2  corporation, an LLC, which we established,
3  that we've had for eight years.  It has never
4  been used.  It has never executed any
5  properties.  It has never done any business.
6  But it exists for the potential of being able
7  to protect us and our interests and limit our
8  liabilities.
9     Q.   Now you are talking about a
10  different LLC than Tri-Core.  You are not
11  talking about Tri-Core right now.  You are
12  talking about another limited liability
13  company that you've established.
14     A.   One of others.
15     Q.   Okay.  I would like to discuss
16  that with you, but later on.
17     A.   Okay.
18     Q.   I would like to put that off
19  for now.
20        I want to discuss now with you
21  some of the allegations that are stated in
22  your Amended Complaint.  You remember there
23  was an original Complaint that you all filed
24  and then shortly thereafter you filed an

Page 41

1  Amended Complaint which added some allegations
2  to the lawsuit.  I have brought a copy of the
3  Amended Complaint with me and I will show it
4  to you as I would like to discuss it.
5        Here it is.  Just look that
6  over just to refamiliarize yourself.
7        Let me direct your attention to
8  the first page of it.  Paragraph 3 states that
9  you and the Wheatleys had eight mortgages with
10  Wachovia before the mortgages at issue in the
11  lawsuit and I would like to discuss that with
12  you.
13        But before we get to the
14  details of those eight mortgages, I just want
15  to focus on the last sentence of that
16  paragraph, which says: "The previous
17  mortgages were all in predominantly minority
18  or racially-mixed neighborhoods."  Did I read
19  that correctly?
20     A.   At the end of Paragraph 3, yes.
21     Q.   Yes.  I want to come back to
22  that.  Now let's move to Paragraph 4, which
23  describes the three properties that are at
24  issue in the lawsuit, 580, 584, and 592 North

11  (Pages 38 to 41)

Page 42

1  DuPont Highway. The last sentence of that
2  paragraph says that those homes "were all
3  adjacent to each other and were all in a white
4  neighborhood in Dover, Delaware."
5        Now, what is the basis for
6  describing the neighborhood as a white
7  neighborhood as opposed to any other type of
8  neighborhood? Why describe it as a white
9  neighborhood?
10     A.    It's described as a white
11  neighborhood because that's the racial makeup
12  of the Silver Lake community. Also, to bring
13  emphasis to the fact that our previous
14  transactions with Wachovia in minority
15  neighborhoods didn't present any problems or
16  issues, but when we moved to an all-white
17  neighborhood, all of a sudden every issue and
18  every problem and every possible roadblock was
19  presented to us in a very demeaning,
20  degrading, and derogatory manner.
21     Q.    What I first want to get at is:
22  What is your basis for alleging that the
23  community these three homes are in is an
24  all-white community? Are you aware of

Page 43

1  statistics that support that statement?
2      A.    I am aware of the makeup of my
3  neighborhood --
4      Q.    How --
5      A.    -- from personal experience,
6  from being here, from over the past ten years
7  being familiar with not only the Silver Lake
8  community but the residences of that community
9  and the subdivisions associated with Silver
10  Lake. It's no secret. I mean, everyone will
11  tell you that it's a very affluent and, you
12  know, almost exclusively -- I don't want to
13  dwell on the whole point, but it's just a
14  white neighborhood. It's a Caucasian-owned
15  and operated community.
16     Q.    But you are not aware of
17  objective statistical evidence showing that
18  the neighborhood is a predominantly white
19  neighborhood, you are just talking about your
20  impression of the neighborhood from being
21  familiar with it over the years; correct?
22     A.    No. I'm talking about having
23  visited and personally interacted with people
24  that live in the neighborhood, in the

Page 44

1  community, that own property there. And so my
2  firsthand knowledge is that there's no
3  minorities, none that I could find personally
4  in the ten years that I've been involved with
5  real estate and investing and living and
6  commuting around and to and from Dover, I
7  mean. And that is consistent with the
8  knowledge of people that I know have lived
9  here their entire lives, 40, 50, 60 years.
10        So it's not an impression. We
11  have physically visited all the areas that
12  adjoin Silver Lake. We've talked to people.
13  We've been interested in living in this
14  community for a long time. It's very rare
15  that property becomes available on the lake.
16  But we have not ever come across any nonwhite
17  people living on the lake, on the lakefront.
18     Q.    But you are not aware of any
19  demographic data showing the ethnic breakdown
20  of the neighborhood that these three homes are
21  in?
22     A.    I am not aware of any census or
23  statistical breakdown document nor do I
24  believe any such document exists indicating

Page 45

1  the racial makeup of people living in that
2  community.
3      Q.    Okay.
4      A.    I would just like to reiterate
5  that, you know, having visited and interacted
6  with and personally been involved with the
7  neighborhood, as well as people around it,
8  that there's no question that it is an
9  all-white neighborhood.
10        I think another thing I should
11  add to that is that my experience, my personal
12  experience, in dealing with people in that
13  community made it pretty clear that it was
14  pretty much desired that it remain that way.
15     Q.    What are you defining as the
16  community that we are discussing? Do you mean
17  the homes and businesses along North DuPont
18  Highway on that stretch where these properties
19  lie or do you mean something broader than
20  that?
21     A.    What I'm referring to are
22  homeowners whose property lines directly
23  contact Silver Lake, lakefront properties,
24  waterfront properties, the entire community on

12  (Pages 42 to 45)

Page 46

1  Silver Lake in the City of Dover.
2      Q.    You are referring to the
3  community around Silver Lake which you've
4  alleged to be an all-white community; correct?
5      A.    Yes.
6      Q.    Okay.  Now, in the preceding
7  paragraph we discussed, you mentioned these
8  prior mortgages that you and the Wheatleys had
9  with Wachovia and you said that those were all
10  in predominantly minority or racially-mixed
11  neighborhoods.  What neighborhoods are those
12  eight prior mortgages in?
13      A.    How would you like to identify
14  them?
15      Q.    Well, first, since the
16  paragraph doesn't break it down between you
17  and the Wheatleys, maybe just talk about the
18  ones that are your mortgages, and I can ask
19  the Wheatleys about theirs tomorrow.
20      A.    Okay.
21      Q.    So of those eight, what are
22  your mortgages?
23      A.    In the West Dover community I
24  have a Wachovia mortgage located at 20 Carver

Page 47

1  Road, 26 Carver Road --
2      Q.    You are saying those are two
3  separate properties, 20 and 26?
4      A.    Every property I will name are
5  individual tax parcels.
6      Q.    Okay.  And that's in West
7  Dover?
8      A.    Yes.
9      Q.    Okay.
10      A.    30 Carver Road.
11      Q.    Are 20 and 26 Carver Road
12  homes --
13      A.    Yes, they are.
14      Q.    -- which you rent?
15      A.    20 Carver Road is a home.
16      Q.    Do you rent it to tenants?
17      A.    Yes, I do.
18      Q.    And 26?
19      A.    26 Carver Road is a garage,
20  which I do rent.
21      Q.    It's a garage.  Is it connected
22  with 20?
23      A.    Yes.  It's a separate property.
24      Q.    But it's used by --

Page 48

1      A.    No, it's not.
2      Q.    It's not.
3      A.    No.  I rent it separately.
4      Q.    To somebody who wants to park
5  their car there?
6      A.    Right, or work on their car or
7  whatever.
8      Q.    Okay.  You are saying it's a
9  garage in the sense of like a repair shop --
10      A.    Right.
11      Q.    -- for cars?
12      A.    Yes.
13      Q.    Okay.  Then you said 30 Carver
14  Road, I think?  Did I catch that, 30?
15      A.    Yes, 30 Carver Road.
16      Q.    What type of property is that?
17      A.    It's a home, single-family
18  home.
19      Q.    Which you rent?  Is it
20  currently rented?
21      A.    Yes.
22      Q.    Does Wachovia currently hold a
23  mortgage on all three of these properties?
24      A.    Yes.

Page 49

1          Give me just a moment, please.
2          Okay.  Yes.
3      Q.    Any others besides these three?
4      A.    There is a second home
5  located -- they're actually on the same tax
6  parcel as 20 Carver Road.  It's 20-1/2.
7      Q.    Oh, okay.
8      A.    So it's two homes on one tax
9  parcel on that one.  Okay?
10      Q.    Okay.
11      A.    Then the other two are on
12  separate tax parcels.
13      Q.    So far we have four.
14      A.    That's correct.
15      Q.    Any more beyond those four?
16      A.    Yes.  I have a Wachovia
17  mortgage for a farm located at 1143 Sorghum
18  Mill Road.
19      Q.    Okay.  That's a property that I
20  have some documents related to.  That was back
21  in maybe 2002 --
22      A.    That sounds right.
23      Q.    -- and Mr. Hogsten, J. D.
24  Hogsten, who is mentioned in the Complaint,

13 (Pages 46 to 49)

Page 50

```
 1    was the loan officer for that transaction?
 2        A.    Yes.
 3        Q.    Is there a home on that farm or
 4    is it just a lot?
 5        A.    It's just a lot.
 6        Q.    Okay.
 7        A.    It's a farm, I mean, you know.
 8        Q.    Does somebody actually farm it?
 9        A.    Yes.
10        Q.    Okay.
11        A.    And it is in the Lebanon area.
12        Q.    Okay.
13        A.    Also I have a Wachovia mortgage
14    for a fourplex.
15        Q.    Where is that?
16        A.    The addresses are 2, 4, 2A, and
17    4A Forrest, F-O -- I think it's two Rs --
18    R-R-E-S-T, Avenue, Dover. That's in the
19    downtown area.
20        Q.    Okay. Now, are those rental
21    properties?
22        A.    Yes.
23        Q.    Tenants live there?
24        A.    Yes. We have it rented out
```

Page 51

```
 1    right now for offices.
 2        Q.    Okay. What type of business or
 3    what type of businesses have their offices
 4    there?
 5        A.    Counseling office.
 6        Q.    Okay. Any other properties
 7    besides these?
 8        A.    Uh-huh.
 9        Q.    Any other business properties?
10        A.    This is a threeplex. Okay?
11    It's 135, 133, and 131 South Bradford Street.
12        Q.    Is that kind of right around
13    the corner?
14        A.    Yes.
15        Q.    Okay. So businesses rent that
16    out?
17        A.    I have one business and two
18    apartments. 135 is a business and then 133
19    and 131 are apartments.
20        Q.    Any others?
21        A.    Yes.
22        Q.    Okay.
23        A.    I no longer have this mortgage
24    with Wachovia, but 627 West Division Street.
```

Page 52

```
 1    That's a business.
 2        Q.    Are you saying you paid off the
 3    loan for that property?
 4        A.    Yes. I no longer have a
 5    mortgage.
 6        Q.    Okay.
 7        A.    It was -- I forget what the
 8    term was. But, anyway, there's no longer a
 9    mortgage.
10        Q.    Okay.
11        A.    Also 629 West Division Street,
12    the same thing, a business. I think that's a
13    total, if I'm not mistaken, of nine
14    mortgages/loans that I've done with Wachovia
15    prior to the purchase of my house on Silver
16    Lake.
17        Q.    Okay.
18        A.    Nine properties total involved.
19        Q.    So this list we've just gone
20    through, is it now complete or are there any
21    others? Do you want to look it over?
22        A.    Yes.
23        Q.    My handwriting is terrible,
24    but...
```

Page 53

```
 1        A.    Yes, those are all of my
 2    mortgage transactions with Wachovia Bank with
 3    the exception of 580 North DuPont Highway.
 4        Q.    Okay. Then the 301 Bugle Court
 5    home that we talked about at the start of your
 6    deposition, that's in Maryland; right?
 7        A.    Yes.
 8        Q.    Was that financed through
 9    Wachovia, if you recall?
10              If you don't recall, you can
11    look it and tell your --
12        A.    The mortgage was sold so many
13    times, I just can't recall if Wachovia ever
14    held that mortgage. I just can't recall.
15        Q.    Okay. If you recall at some
16    point, just let Mr. Grady know and he can pass
17    that information on to me.
18              But other than 580 North DuPont
19    Highway, the properties that you've just gone
20    through that were financed through Wachovia,
21    they're not properties that you were
22    purchasing to make a home for yourself, they
23    were either purchased as rental properties or
24    they're business properties; is that correct?
```

14 (Pages 50 to 53)

Page 54

1    A.    The 1143 Sorghum Mill Road was
2  a property that I was planning at one point to
3  make a home.
4    Q.    You were intending to build on
5  that property?
6    A.    I thought about it. That was
7  the one of those. The others, no. I mean,
8  other than having lived in some of those
9  properties, I have not intended to live there
10  permanently.
11    Q.    You didn't purchase them as
12  your residence?
13    A.    Right.
14    Q.    Okay. Is it Sorghum Mill Road?
15    A.    Yes.
16    Q.    That property, 1143 Sorghum
17  Mill Road in Lebanon, you're saying that is in
18  a predominantly minority neighborhood?
19    A.    Yes.
20    Q.    And, again, what's that based
21  on?
22    A.    It's based on my experience in
23  knowing the neighbors and knowing the makeup
24  of the individuals both in the adjacent

Page 55

1  trailer park and the adjacent homes on Sorghum
2  Mill Road.
3    Q.    So, again, it's based on
4  personal experience living there, or not
5  living there because you didn't live there,
6  but personal experience in your dealings with
7  that neighborhood and not objective
8  demographic data showing the breakdown by race
9  of the people that live there?
10    A.    I'm not aware of any
11  statistical data or document that identifies
12  the races of the individuals; just by
13  firsthand knowledge knowing who my neighbors
14  are there.
15    Q.    Okay. So just going down the
16  list here, not by individual properties but
17  just by neighborhood, you've got properties in
18  West Dover, you've got the property on Sorghum
19  Mill Road in Lebanon, you've got properties on
20  Forrest Avenue, which is in Dover. Is it
21  nearby here or how close to this area is it?
22    A.    Forrest? Is that the one we're
23  talking about?
24    Q.    Yes, the fourplex.

Page 56

1    A.    It's in downtown. It's just
2  off of Lockerman Street.
3    Q.    So this is right downtown.
4    A.    Right.
5    Q.    And then the threeplex is also
6  downtown?
7    A.    Downtown.
8    Q.    And then the 627 and 629?
9    A.    West Dover.
10    Q.    West Dover. Where are they in
11  relation to where we are right now?
12    A.    Straight down this street.
13    Q.    So they also are downtown?
14    A.    Yes.
15    Q.    So you've got properties in
16  downtown Dover, a property in Lebanon, and
17  property in West Dover. But would you
18  describe downtown Dover as a predominantly
19  minority neighborhood? The neighborhood we're
20  in right now, would you describe that as
21  predominantly minority?
22    A.    This office is just outside of
23  a predominantly minority and somewhat
24  depressed area. One block over from here you

Page 57

1  have a predominantly black, very low-income
2  depressed area. So this office is situated
3  here next to the college, but even the college
4  students are restricted from going one block
5  over into the area that's predominantly
6  minority as well as poor.
7    Q.    Okay.
8    A.    So to answer your question, the
9  position that this office sits in compared to
10  even my properties, which are not too far from
11  here, there's a very clear line.
12    Q.    Are you able to, if you can,
13  draw a map showing where we are right now and
14  where these three properties you identified
15  that are in downtown Dover, where they are in
16  relation to the location we're at right now?
17  Are you able to do that so I have a sense of
18  when you are saying that there's a sharp line,
19  you go a block over and you're in a
20  predominantly minority neighborhood, I want to
21  be able to picture what you're talking about?
22    MR. GRADY: Well, I certainly
23    don't want to interfere. I guess you
24    can draw, if you are able, the

15 (Pages 54 to 57)

Page 58

1    streets: State Street, Bradford
2    Street, Governors Avenue, New Street,
3    Queen Street. The truth of the matter
4    is it's block by block. That's real.
5    And I assure you, if you talk about
6    it, it's different. Within a couple
7    blocks away some are almost all
8    minority and some are almost all
9    white.
10        I mean, I guess it's a fair
11    question to say, well, can somebody
12    draw the streets. If you can, if you
13    know and can identify them, that's
14    okay.
15    BY MR. FOGDALL:
16        Q.    If you are able to do that.
17        MR. GRADY: If you are able to
18    do it. If you are not able to do it,
19    then just tell counsel. Tell him what
20    you can do and what you can't do. We
21    are not expecting you to have all the
22    answers to everything.
23        THE WITNESS: I believe I
24    could, but I would prefer to just mark

Page 59

1    an actual street map because there may
2    be information left out or whatnot.
3    BY MR. FOGDALL:
4        Q.    Oh, I understand.
5        A.    I'd hate to make a mistake.
6        Q.    No. I understand. I do. I
7    don't happen to have a street map.
8        MR. FOGDALL: Can we go off the
9    record for a second?
10            - - -
11        (Discussion off the record.)
12            - - -
13        (Short recess.)
14            - - -
15    BY MR. FOGDALL:
16        Q.    Mr. Grady has had a map made of
17    the location we're in and the surrounding
18    areas and, Mr. Anderson, would you mind just
19    putting like an A next to that dot? Or I will
20    do it here. I am going to put an A next to
21    that dot. This marks the location where we're
22    at right now, Mr. Grady's office.
23        The properties that you
24    purchased that are at issue in the lawsuit,

Page 60

1    are those on this map, North DuPont
2    Highway? -- because they should be because
3    here's Silver Lake.
4        A.    My house is located right here.
5        Q.    So I am going to put B there.
6    That's the 580 North DuPont Highway property
7    that's involved in this lawsuit.
8        A.    Yes.
9        Q.    Then if you could just show me
10    where the other downtown properties that you
11    have Wachovia mortgages on are, which are West
12    Dover Street, South Bradford Street, and
13    Forrest Avenue, if you can find them on here.
14        A.    The one on South Bradford
15    Street is located approximately there.
16        Q.    Let's mark that C.
17        A.    The one on Forrest is located
18    approximately there.
19        Q.    We will mark that D.
20        A.    The ones on Division Street are
21    located here and here.
22        Q.    We will mark those E. And I am
23    just going to make a note over here that A is
24    John Grady's office and B is 580 North DuPont

Page 61

1    Highway.
2        C is what? That's C there.
3        A.    That's 131 through 135 South
4    Bradford.
5        Q.    I'll write Anderson property
6    131 through 1 --
7        A.    35.
8        Q.    What's the rest of it?
9        A.    South Bradford.
10        Q.    And then D is?
11        A.    2 and 4 Forrest Street.
12        Q.    I'm writing Anderson property 2
13    through 4, but there's 2A and 4A as well.
14        A.    Right.
15        Q.    I'm just going to write 2
16    through 4 if that's acceptable to you. And
17    the street is?
18        A.    Forrest with two Rs.
19        Q.    Forrest Avenue?
20        A.    Street.
21        Q.    Street or Avenue?
22        A.    Street.
23        Q.    Forrest Street.
24        Then the last one is E, which

16 (Pages 58 to 61)

Page 62

1  is another one of your properties?
2      A.    That's 629 and 627 West
3  Division Street.
4      Q.    And you are saying --
5      A.    And the Carver Road properties
6  are located here.
7      Q.    Okay.  I am going to mark that
8  F.  So F equals and I'm just going to write
9  Anderson properties on Carver Road to
10  simplify.
11          Are there any other properties
12  that fall on this map that you have
13  identified?  We might as well have them all on
14  here.
15      A.    The only ones that we have
16  identified are Wachovia properties.
17      Q.    Of all of these properties that
18  we've identified, you are saying only B, only
19  580 North DuPont Highway, is in a white
20  neighborhood?
21      A.    All the other neighborhoods are
22  mixed minority or predominantly -- well,
23  almost exclusively black.
24      Q.    But you were saying that

Page 63

1  Location A, which is Mr. Grady's office, that
2  is in an all-white pocket, but that if you
3  just go one block over, then you're in a
4  minority neighborhood.  Could you just mark on
5  there the division that you were talking about
6  or the line, the block that you were referring
7  to?  You are saying here you are in an
8  all-white neighborhood if you are standing on
9  Location A.
10      A.    I am not using the term
11  "neighborhood" per se.
12      Q.    Okay.
13      A.    I mean, this is the Wesley
14  College block.  So Wesley College, it's
15  not a minority based or historically black
16  college or anything like that.  But Wesley
17  College and the properties directly
18  surrounding Wesley College would represent an
19  area that's racially different than the other
20  areas that my properties are located in.
21      Q.    So you are saying if you
22  drew a circle around Location A, which is on
23  the Wesley College block, then are you saying
24  it's an all-white sort of location within a

Page 64

1  surrounding minority neighborhood?
2      A.    No.  It's kind of hard to
3  explain.  There was just a revitalization,
4  downtown revitalization, study done and that
5  was done for the City of Dover, and one of the
6  issues there was the racially divided
7  communities within the downtown area and the
8  impact that that has on community and
9  businesses and so forth and so on.
10      Q.    Okay.
11      A.    So this is well known as a
12  racially and sometimes potentially dangerous
13  and/or depressed area.  So those lines are
14  mixed in here.  But for people who are
15  familiar with it, it's very clear.
16      Q.    So just to go back to something
17  that Mr. Grady said that I think he said off
18  the record, he said in downtown Dover it's
19  block by block, meaning some blocks might be
20  predominantly white and other blocks might be
21  predominantly minority.  Is that a fair
22  statement or is that consistent with what
23  you've said just now?
24      A.    I guess in some instances it

Page 65

1  could be block by block.  There is an area,
2  for example, here to the north that would not
3  be considered a minority area, but then
4  there's an area here, for example, that's
5  almost exclusively minority, I mean.  So if
6  you want to call it block by block, there's
7  mixed areas, but there's very clear divisions
8  of --
9      Q.    I'm sorry to interrupt, but
10  just because this is one instance where as
11  we're talking about it, the things you are
12  saying pointing at the map are clear to me,
13  but when somebody reads the transcript later,
14  it won't be clear, so if we can just go back,
15  you drew a circle here, which I am going to
16  draw around this area, and you described that
17  as predominantly minority; correct?
18      A.    Yes, I would say so.
19      Q.    So I am just going to write M
20  for predominantly minority.  Okay?  And we
21  won't get technical about what predominantly
22  minority means.  I assume when you use that
23  phrase, what you mean is more than half the
24  people living there are minorities.  Is that a

17 (Pages 62 to 65)

Page 66

1  fair statement or a fair way to characterize
2  predominantly minority or would it be more
3  like 80% or 90% or even 100%?
4      A.    I mean, I don't know if I
5  really want to characterize it in terms of
6  percentages.
7      Q.    Okay.
8      A.    But if you get in your car and
9  take a drive, you'll know exactly what I'm
10 saying. Okay?
11     Q.    Okay. So when you say
12 predominantly minority, you don't want to be
13 pinned down in terms of the actual percentage
14 of people living there who would be
15 characterized as minority?
16     A.    I just don't think you can
17 simplify it the way that you're trying to
18 circle the block that's minority and the block
19 that's all white. This is complex and it's
20 been studied for years here, how to overcome
21 the racial divisions within downtown, both
22 from the residential and the business
23 standpoint. And I've worked with the City of
24 Dover as well as with the Dover Police

Page 67

1  Department, the Community Development Group
2  for Dover, the Downtown Dover Development
3  Corporation, and other organizations designed
4  specifically to resolve the racial and
5  economic differences within the area where my
6  properties are located.
7      Q.    So would you say then that this
8  entire area of downtown Dover, if I drew a
9  circle here around this whole downtown area up
10 to the edge of Silver Lake here, would you
11 agree or would you say that that was
12 predominantly minority?
13     A.    No.
14     Q.    You would not.
15     A.    No.
16     Q.    Okay. How would you describe
17 the area as a whole, or can it not be
18 described as a whole?
19     A.    I think the easiest way is
20 to -- you can't group the whole downtown --
21         MR. GRADY: Just wait. Can I
22     say this off the record?
23         - - -
24     (Discussion off the record.)

Page 68

1         - - -
2  BY MR. FOGDALL:
3      Q.    Again, I am just trying to get
4  some clarity in terms of what we're
5  representing on this map. Let's go back to
6  where we've located the 580 North DuPont
7  Highway property that's at issue in the
8  lawsuit which you have said is in an all-white
9  neighborhood.
10         How would we draw the
11 boundaries of the all-white neighborhood that
12 Location B, 580 North DuPont Highway, is in?
13 Would it just be around Silver Lake like this?
14     A.    Uh-huh.
15     Q.    Is that fair?
16     A.    Well, it's fair to state that
17 waterfront property on Silver Lake constitutes
18 the Silver Lake community. Okay?
19     Q.    Okay. So by Silver Lake
20 community you mean waterfront property on
21 Silver Lake and you are describing that as all
22 white?
23     A.    Yes, 360 degrees. I am not
24 talking about just this part or that part. I

Page 69

1  am basically saying that for homeowners on
2  Silver Lake.
3      Q.    So I am just going to draw this
4  circle around Silver Lake and I am going to
5  just put a W, and you are saying that
6  neighborhood is, you said, an all-white
7  neighborhood as you've described it. Okay?
8  Is that fair?
9      A.    Yes.
10     Q.    But then we've got your
11 properties located in downtown Dover and here
12 I guess I'm still having a little bit of
13 trouble. You're saying we really have to look
14 at it street by street, that some streets
15 could be characterized as black and others
16 would be characterized as white; is that
17 accurate?
18     A.    I think that that is accurate,
19 just as it is with any other city, probably
20 the city that you're from as well. There are
21 streets that you don't go down or that you
22 would not be comfortable going down because of
23 crime or whatever factors, maybe because of
24 the racial makeup. It's a fact of every city

VERITEXT NATIONAL COURT REPORTING COMPANY
(215) 241-1000   (888) 777-6690

B-93

Page 70

```
 1   in America, you have racial division lines.
 2          Now, this is a matter of public
 3   record with the City of Dover.  You can go
 4   pull the plans and look at where they have
 5   studied how from Governors Street going west
 6   is an area of minority businesses, minority
 7   residences, and there's a clear demarcation.
 8   And it's a clear fact.  It's been studied,
 9   it's been looked at as far as the main
10   downtown business area here.
11          Q.   So Governors Street going west.
12   And I am just going to draw where we have our
13   key, is it fair to say that going up is north?
14   Help me with the directions here.  Which way
15   is west on this map?
16          A.   That way is west.
17          Q.   So I am just going to say that
18   this is north.  So you are saying that west of
19   Governors Street, according to the City of
20   Dover studies of the area, is a
21   predominantly --
22          MR. GRADY:  Wait.  I am going
23   to interrupt you.  If you can imagine
24   this thing, over here is east.  It's
```

Page 72

```
 1          Q.   Okay.  Is that the name of the
 2   company or the organization that authored the
 3   study or is that the names of two people,
 4   Hyatt and Palma?
 5          A.   I think it's both.
 6          Q.   Okay.
 7          A.   All I know is that the City of
 8   Dover paid a lot of money to have it done.
 9          Q.   And they came in and studied
10   the racial breakdown of the --
11          A.   They were studying the economic
12   redevelopment or the economic whatever you
13   call that, the economic improvement and
14   economic empowerment and the redevelopment of
15   downtown Dover as an economic center.  One of
16   those aspects that they studied was the racial
17   factor.
18          Q.   What year was this, do you
19   recall?
20          A.   I believe it was 2005.  I
21   believe it was 2005.
22          Q.   Okay.
23          A.   Now, the reason -- may I?
24          Q.   Yes, go ahead.
```

Page 71

```
 1   north, east, south, west,
 2   approximately.
 3          MR. FOGDALL:  Fair enough.
 4          MR. GRADY:  So really it's
 5   north this way.
 6          MR. FOGDALL:  All right.
 7          THE WITNESS:  What I'm saying
 8   is there was a study that my wife and
 9   I participated in where they brought
10   in minority business owners, minority
11   residents as a part of the downtown
12   study specifically, and the name of
13   the organization that did the study
14   was Hyatt-Palma.
15   BY MR. FOGDALL:
16          Q.   I want to write this down
17   because this is something I would like to look
18   at myself.
19          A.   Sure.
20          Q.   All right.  So the name of the
21   study is?
22          A.   Hyatt-Palma.
23          Q.   How do you spell that?
24          A.   I'm not sure.
```

Page 73

```
 1          A.   The reason I'm bringing that up
 2   is because we were brought in with other
 3   minorities to discuss this issue, which is a
 4   problem which is an issue in the City of
 5   Dover, both from the aspects of perceptions as
 6   well as safety as well as economics, and there
 7   is a clear demarcation of areas that have
 8   racial issues and that's one of the things
 9   that was looked at, and my wife and I were
10   both in that meeting.
11          Q.   Okay.  Is it fair to say then
12   that what this study determined was that --
13          A.   I don't know the results of the
14   study.
15          Q.   Okay.  But it was discussed in
16   the study that west of Governors Avenue is
17   predominantly minority.  Is it also fair to
18   say that east of Governors Boulevard or
19   Governors Avenue -- I guess that's Governors
20   Boulevard, isn't it? -- east of Governors
21   Boulevard is more of a white neighborhood or a
22   white area?
23          A.   It's fair to say that the
24   further east you go, because it becomes more
```

19 (Pages 70 to 73)

1  of a nonminority area. But, remember, the
2  focus on that particular aspect was along the
3  Lockerman corridor.
4      Q.    What do you mean by "the
5  Lockerman corridor"?
6      A.    This is Lockerman Street.
7  That's the main street through downtown Dover.
8      Q.    So you are saying your
9  properties at the location we've marked C,
10  that's actually east of Governors Boulevard,
11  but you'd still characterize it as being in a
12  minority area?
13      A.    Yes.
14      Q.    Because it's on the Lockerman
15  corridor; is that correct?
16      A.    No, that's not correct.
17      Q.    Okay.
18      A.    I would say the demarcation, I
19  mean, of what appears to be a racially divided
20  area, I mean, there's that transition area and
21  I think where we're at is kind of in that
22  transition area.
23      Q.    When you're saying where we're
24  at, you mean the location marked C?

1      A.    Yes, because no one can say
2  that no minorities are east of Governors and
3  there's no white people west of Governors.
4  That's ridiculous.
5      Q.    Okay.
6      A.    What I'm stating is that all of
7  my properties are in minority or mixed areas
8  and I have properties other than these and
9  I've bought properties all over the country
10  and I understand and know that the normal
11  practices and the normal procedures and the
12  areas that you buy properties in, just as a
13  matter of knowledge and experience, that when
14  you move or try to purchase property in white
15  areas or predominantly white areas, there's
16  certain challenges and issues that come up.
17      In this particular case, when
18  we moved out of the minority areas to buy our
19  house on Silver Lake, all of the
20  practices/policies/procedures/guidelines which
21  we've been through I think 25 closings before,
22  25 real estate transactions, we're very clear
23  about what the requirements are, and all of
24  that changed when we crossed what we call the

1  line. When we crossed that line to buy
2  property on Silver Lake in this town,
3  everything changed.
4      Q.    Now, the locations of those
5  properties, those three properties on Silver
6  Lake that are at issue in the lawsuit, that
7  stretch of highway there is a predominantly
8  commercial stretch of highway, isn't it?
9  There's a fair number of businesses located on
10  that stretch of highway.
11      A.    Right.
12      Q.    Is that correct?
13      A.    Uh-huh.
14      Q.    In fact, if you drive down that
15  stretch of highway, there are the three
16  properties and they're sort of surrounded by
17  businesses?
18      A.    Well, there's other homes
19  located adjacent to us and there's other
20  properties located on either side of those
21  businesses as well.
22      Q.    Okay. But there are numerous
23  businesses along that stretch of highway;
24  correct?

1      A.    Yes.
2      Q.    All right. I appreciate your
3  help on the map. That was very helpful.
4  Let's move on to some other topics.
5      Before we do that, I am going
6  to ask you, do you have a copy of the
7  Hyatt-Palma study that we talked about?
8      A.    No, I sure don't.
9      Q.    Have you ever seen a copy?
10      A.    I know that copies were
11  produced, but we elected not to purchase one.
12      Q.    And your involvement in this --
13  and I don't want to spend too much more time
14  on this, but just very quickly -- your
15  involvement in this was as a property owner,
16  an owner of businesses in the area? Why were
17  you involved in the study?
18      A.    They involved property owners
19  in the downtown area.
20      Q.    Okay.
21      A.    And I was specifically involved
22  in that aspect because I'm black.
23      Q.    All right. You have now
24  touched on this several times during the

20 (Pages 74 to 77)

Page 78

1  course of the deposition.  You have talked
2  about harassment that you experienced when you
3  crossed the line and purchased property on
4  Silver Lake.  I now want to talk about those
5  allegations that you've made, that the bank
6  harassed you during the course of this
7  transaction.
8          First I want to ask you, I have
9  here your Uniform Residential Loan
10  Application.
11         MR. FOGDALL:  Actually, first,
12  can we stop?  Let's go off the record
13  for a second?
14             - - -
15         (Discussion off the record.)
16             - - -
17         (Whereupon the documents were
18  marked, for identification purposes,
19  as Exhibits T. Anderson 2 through 6
20  inclusive.)
21             - - -
22  BY MR. FOGDALL:
23     Q.    We have just marked as Exhibit
24  No. 6 your Uniform Residential Loan

Page 79

1  Application, which is dated June 25, 2004, I
2  believe.  Let me just confirm that.
3          Actually, let me correct that.
4  Your signature is on the application here.
5  This is Bates-labeled by my office
6  ANDER000124.  It indicates that it was signed
7  on June 27, 2004.  Does that square with your
8  recollection?
9     A.    I concur with the date that's
10  on there.
11    Q.    And the Agreement of Sale
12  between you and Mr. Aigner was dated about a
13  week, nine days before that, June 18, 2004.
14  Had you had any discussions with Wachovia
15  about financing this transaction on the date
16  the Agreement of Sale with Mr. Aigner was
17  signed?
18          I guess what I'm asking, just
19  to refocus my question, between June 18, when
20  you signed the Agreement of Sale with
21  Mr. Aigner, and June 27, when you applied for
22  your mortgage loan from Wachovia, had you had
23  any discussions with Wachovia before the
24  June 27 date on which you signed this

Page 80

1  application?
2     A.    I'm certain we had a discussion
3  with them because we obviously went to signing
4  the application.
5     Q.    Was it before you signed the
6  Agreement of Sale with Mr. Aigner or after?
7     A.    I can't recall.  I believe once
8  we had an Agreement of Sale -- you know, wait
9  a minute, wait a minute.
10          I believe I talked to the bank
11  prior to actually signing the Agreement of
12  Sale.  Yeah, yeah, I did certainly talk with
13  them before I had the Agreement of Sale.
14    Q.    Okay.  But you were already
15  aware of Mr. Aigner's insistence on selling
16  all three properties together as a package
17  before you had any discussions with Wachovia
18  about financing the transaction?
19    A.    I knew of Mr. Aigner's intent.
20  I wasn't settled on it.  But I knew what his
21  intent was and my intent was to just buy the
22  one home.  So, you know, I know that I had
23  some discussions with the bank prior to
24  signing the Agreement of Sale wanting to know

Page 81

1  basically what kind of terms and conditions
2  and interest rates are out there, what's the
3  market doing right now, and I know I discussed
4  that with the bank prior to actually signing
5  the Agreement.
6     Q.    Now, on the date you signed the
7  Agreement of Sale, June 18, 2004, was it your
8  intent at that time that you were only going
9  to purchase this one property or had you by
10  this point accepted Mr. Aigner's demand that
11  all three properties had to be sold together?
12    A.    There was no question at that
13  point.
14    Q.    Okay.
15    A.    There was no question.  He made
16  it clear, his attorney made it clear, and they
17  made us acknowledge that we understood that if
18  it wasn't all three, then the whole deal was
19  going to be canceled.
20    Q.    Okay.  So you had accepted that
21  demand by Mr. Aigner, that all three
22  properties be sold together, before you
23  applied for your loan from Wachovia?
24    A.    Rephrase the question.

21 (Pages 78 to 81)

Page 82

1    Q.    Well, I am just noticing that
2  the Agreement of Sale is dated June 18 and you
3  said by that point you had accepted
4  Mr. Aigner's demand --
5    A.    Uh-huh.
6    Q.    -- that you purchase all three
7  properties, that you weren't going to just be
8  able to purchase the one --
9    A.    Uh-huh.
10   Q.    -- 580 North DuPont Highway.
11   A.    I think --
12   Q.    Let me just finish the
13 question. That date precedes the date of the
14 application. The date of the application is
15 June 27, 2004. So you had accepted his demand
16 before you applied for the loan.
17   A.    I think, to clarify, I didn't
18 accept his demand to purchase all three
19 properties. All three of us agreed to
20 purchase properties individually. I didn't
21 agree to buy all three properties. I made an
22 agreement. So just as a point of
23 clarification there.
24   Q.    Okay. Understood. A better

Page 83

1  way to put it would be to say that the three
2  couples, you and your wife, the Wheatleys, and
3  the Wilkinses, had collectively accepted
4  Mr. Aigner's demand that you purchase all
5  three properties --
6    A.    That's correct.
7    Q.    -- before you actually applied
8  for the loan from Wachovia?
9    A.    Based on the date of the
10 Agreement and the date that this is signed,
11 then I would agree.
12        However, I would also state
13 that between the date of the Agreement of Sale
14 or prior to the date of the Agreement of Sale,
15 I did have discussions with the bank
16 concerning the purchase of the property. So
17 that means at some point prior to the date
18 that I signed this, you know, the applications
19 were filled out and we met or at least
20 discussed with the bank terms, conditions, and
21 so forth and so on.
22        So prior to the date that this
23 was signed, there was that interaction with
24 the bank for me personally, and I know the

Page 84

1  other parties contacted the bank as well.
2        So I just want to add that that
3  was where we had been through this process
4  with an application on numerous occasions
5  before and my personal opinion is that from
6  the time I entered into this agreement with
7  the bank, you know, I believe they had an
8  obligation to do for me what they did in the
9  past, which was treat me fairly, process the
10 application, grant the loan if I'm approved,
11 all of the things that you, know, once I
12 signed this on the date that we discussed,
13 nothing should have changed. Everything that
14 we had been doing and dealt with before they
15 had an obligation to continue to do, which is,
16 you know, I think fair and reasonable.
17        So, you know, the date that I
18 signed this and the date that I signed this
19 document here, they are what they are. The
20 bank's obligation to treat me fairly based
21 upon my agreement with them in this document I
22 think was a major problem.
23   Q.    Okay. We'll walk through the
24 allegations you've made about the loan process

Page 85

1  here. But you agree with me that you and the
2  other plaintiffs accepted Mr. Aigner's demand
3  that you buy all three properties and that you
4  would risk losing the downpayment that you
5  made, the $40,000 downpayment that you made,
6  you accepted that demand from Mr. Aigner
7  entirely independently of any dealings that
8  you had with Wachovia?
9    A.    No, no.
10   Q.    Okay.
11   A.    When I spoke with Wachovia from
12 the very beginning, I identified that this
13 was what Mr. Aigner's intent was, that all
14 three properties would have to be purchased,
15 because we were putting up our deposits at
16 that time and that's how I know that I talked
17 to them prior to signing this and I said I
18 want to make sure, you know, what are the
19 rates, what's the debt service going to be,
20 what's the amortization schedule.
21        I went through all these
22 details and I specified to them that I had to
23 have all of this information up front because
24 of what the seller was requiring and I told

22  (Pages 82 to 85)

Page 86

1   them specifically that this is an
2   all-or-nothing transaction and I'm going to
3   lose my deposit as well as my partners if
4   there's any issues. And based upon the
5   response that I got at that time, we agreed to
6   go forward with the signing of the contract.
7       Q.    But the Agreement between you
8   and the other plaintiffs and Mr. Aigner,
9   Wachovia is not a party to that agreement;
10  correct?
11      A.    When you say "a party," I mean,
12  they were aware of it and they understood the
13  condition.
14      Q.    But it's a purchase and sale
15  between you and the other plaintiffs and
16  Mr. Aigner. It's his property and he is
17  selling it to you.
18      A.    Right. I entered into this
19  Agreement of Sale based on the information
20  that I was provided by the bank --
21      Q.    But Wachovia --
22      A.    -- prior to the signing of the
23  Agreement of Sale and prior to the signing of
24  the loan application.

Page 87

1       Q.    But Wachovia didn't require all
2   three of you to purchase the properties
3   together, that was Mr. Aigner that required
4   that; correct?
5       A.    That was not a bank
6   stipulation.
7       Q.    Okay. And it also was not a
8   requirement by Wachovia that you would lose
9   the entire $40,000 deposit that you made if
10  one of the sales didn't go through, that was
11  Mr. Aigner's requirement; correct?
12      A.    That was not a stipulation that
13  the bank made. Mr. Aigner, these were his
14  requirements. The bank was made fully aware
15  of them and understood them, as well as giving
16  me the assurances that they did in terms of
17  their prescreening those of us that were
18  involved.
19          In other words, we tried to
20  identify any problems that would cause an
21  issue that we would lose our money. So we
22  provided information to the bank and had
23  Mr. Hogsten look and see was there any credit
24  issues, and I guess they pulled up a credit

Page 88

1   report and all this. So once he agreed that
2   there was no issues that would prevent a deal
3   like this from transpiring, then we kind of
4   just went forward after that.
5       Q.    And you are saying that these
6   assurances that you just referred to, the
7   discussions you had with Mr. Hogsten about the
8   demands that Mr. Aigner had made, you are
9   saying you had those discussions with
10  Mr. Hogsten before you signed the Uniform
11  Residential Loan Application on June 27 --
12      A.    Yes.
13      Q.    -- 2004?
14      A.    Yes.
15      Q.    Those discussions that you had
16  about Mr. Aigner's demands where you were
17  informing people at Wachovia about those
18  demands, were those discussions just with
19  Mr. Hogsten or were there other people at
20  Wachovia involved as well?
21      A.    I had a discussion concerning
22  these requirements with a Ms. Deanne Wicks.
23      Q.    Before the Residential Loan
24  Application was signed, you had a discussion

Page 89

1   with her, with Ms. Wicks?
2       A.    Yes.
3       Q.    Okay.
4       A.    And the reason I recall that is
5   because Mr. Hogsten was not available and I
6   had previous dealings with Mrs. Wicks on other
7   real estate ventures. So the reason I can
8   recall that is that Mr. Hogsten stated to me
9   after the fact, after we had signed -- no.
10  Wait a minute.
11          Prior to signing this
12  Agreement, because we were going to his
13  office, he stated to me that in the future
14  make sure that I only deal with him because
15  now he has to share his commission with Deanne
16  Wicks.
17      Q.    Now, you said that on your
18  prior mortgages from Wachovia you worked with
19  Ms. Wicks. How do you spell her name, by the
20  way?
21      A.    W-I-C-K-S.
22      Q.    Okay. You said on your prior
23  mortgages from Wachovia you had worked with
24  her. Do you have an understanding that she

23 (Pages 86 to 89)

Page 90

```
 1   doesn't work for Wachovia Mortgage
 2   Corporation; in other words, that there are
 3   actually different Wachovia entities and your
 4   prior mortgages through Wachovia might have
 5   actually been through a different company than
 6   Wachovia Mortgage Corporation?  Is that an
 7   understanding that you have or not?
 8      A.   My understanding is that
 9   Ms. Wicks works for Wachovia Bank.  Her office
10   is located in Wachovia Bank.  Every time I've
11   met with her has been in the Wachovia Bank
12   office, just as Mr. Hogsten's office is
13   located in the same bank.
14      Q.   Okay.  But do you have an
15   understanding that even though they might be
16   working in the same building, they work for
17   different companies?
18      A.   I don't have that
19   understanding.  If that's the case, then
20   that's not to my understanding.  It's not to
21   my knowledge.
22      Q.   Okay.
23      A.   I do know that Mrs. Wicks' card
24   and Mr. Hogsten's card both say Wachovia Bank.
```

Page 91

```
 1      Q.   Okay.
 2      A.   Their name plates, their office
 3   mark, everything, you know.
 4      Q.   Okay.
 5      A.   So if they're separate
 6   companies, it's transparent to me.
 7      Q.   All right.  Let's turn back to
 8   the Complaint.
 9         MR. FOGDALL:  Let's go off the
10      record for a second.
11             - - -
12      (Discussion off the record.)
13             - - -
14   BY MR. FOGDALL:
15      Q.   So walk me through the
16   chronology here as you recall it.  You said as
17   soon as you filled out this Uniform
18   Residential Loan Application, you felt that
19   you started to be treated unfairly; is that
20   correct?
21      A.   No, I don't think I stated
22   that.
23      Q.   Okay.  When was the first
24   incident that you object to during the course
```

Page 92

```
 1   of this loan process?
 2      A.   Object to?  Just clarify for
 3   me.
 4      Q.   What would be the first
 5   incident that you would think of as harassment
 6   in connection with the loan process we're
 7   talking about here?
 8      A.   Okay.  First of all, let me
 9   clarify.  I used the term "harassment"
10   earlier.  I would like to actually clarify
11   that I intended to use the term
12   "discrimination."  I initially perceived it as
13   harassment until it crossed over into an area
14   that we've concluded is discrimination based
15   on our race.
16         So the first time I saw an
17   indication of a major problem was on the day
18   that I was scheduled to meet with the
19   appraiser at the property.
20      Q.   Okay.  Let's stop right there.
21   I want to ask you, I used the word
22   "harassment" because that had been the word
23   you had used earlier in the deposition --
24      A.   Sure.
```

Page 93

```
 1      Q.   -- and now you clarified that
 2   to say what you mean is discrimination.  But
 3   why call it discrimination instead of
 4   harassment?  I mean, why do you feel that it
 5   was based on the fact that you're black and
 6   not just some other basis?
 7      A.   Okay.  Are we still on the
 8   record?
 9      Q.   We are on the record.
10      A.   Okay.  I believe that this is
11   racial discrimination because all of my
12   previous interactions, which is probably two
13   dozen real estate transactions, has given me a
14   base of knowledge.  When I --
15      Q.   I am going to interrupt,
16   respectfully.  The transactions you are
17   talking about are not just in Dover but are
18   nationally?  We are talking transactions in
19   other places in the country where you've been?
20      A.   Yes.
21      Q.   Okay.  So based on that
22   knowledge base, continue.
23      A.   Based on that knowledge base
24   and the fact that in all of my previous
```

24 (Pages 90 to 93)

Page 94

1   transactions with Wachovia Bank, they were
2   consistent with their standards and
3   requirements prior to us moving and trying to
4   purchase a house in a white neighborhood.
5          There was never an issue.
6   There was never a problem.  There is no
7   problem with our credit.  There is no problem
8   with our credibility.  There was no problem
9   with any real estate transaction until we
10  crossed the line into an all-white
11  neighborhood and then we are facing every
12  possible obstacle, and it was blatant and
13  certainly unreasonable.
14         Q.    But just so I'm clear, your
15  basis for characterizing what happened as
16  discrimination is simply that the property at
17  issue here, 580 North DuPont Highway, is in a
18  white neighborhood and the other properties
19  you financed through Wachovia were in mixed or
20  minority neighborhoods?
21         A.    That is a part of it; yes.
22         Q.    What other evidence do you have
23  to support the allegation that what happened
24  here was discrimination?

Page 95

1          A.    I believe, in addition to those
2   two items, that the requirements that were
3   placed upon us by the bank were outside of the
4   bank's rules, regulations, and guidelines;
5   outside of their policy; and I believe that we
6   were selectively treated that way and forced
7   to adhere to those decisions and that if we
8   were not black, then we would not have been
9   forced to meet those requirements.
10         Q.    So the basis for describing
11  what happened as discrimination is a
12  combination of the location of the property
13  you were purchasing as compared with the other
14  properties that you financed through Wachovia
15  and the conditions that you feel you had to
16  comply with in order to get the loan?
17         A.    And in addition to those are my
18  experience in real estate and my experience as
19  a black man having experienced racial
20  prejudice and discrimination throughout my
21  life and the way that we were treated, the
22  certain disdain and the certain disrespect
23  that was exhibited against us and the
24  callousness and the way all of that unfolded,

Page 96

1   the disregard that we had not previously
2   experienced with this bank but we had
3   experienced racial discrimination in other
4   real estate transactions.
5          So it was relatively easy to
6   identify the problem once the bank started
7   doing things that were so far outside of any
8   policy or regulation or reasonable
9   expectation.
10         Q.    Do you have any other basis
11  besides what we've just discussed for
12  characterizing what happened as
13  discrimination?
14         A.    Yes.
15         Q.    Okay.
16         A.    Having discussions with other
17  minorities concerning their experiences and
18  other nonminorities based on their
19  experiences.
20         Q.    When you say "their
21  experiences," what do you mean specifically?
22         A.    Just in general talking to
23  people about their experiences in doing real
24  estate transactions.  That helps to clarify

Page 97

1   what's required and what's not required.
2          Certainly we have a lot of
3   experience in the real estate arena dealing
4   with lending institutions, but as a sanity
5   check, talking with other minorities and
6   nonminorities based on how we were treated,
7   what had transpired, and what we have come to
8   expect from a reputable lending institution,
9   those were also added into our determination
10  that it was racial discrimination.
11         Q.    And these discussions with
12  other minority borrowers that you just
13  referred to, were their experiences related to
14  purchasing homes in the Dover area, in this
15  community?
16         A.    I mean, we're talking about
17  people from both here locally and abroad.
18         Q.    So some of them were people who
19  were purchasing homes here in the Dover area?
20         A.    Yes.
21         Q.    And these were people who
22  financed their purchases through Wachovia?
23         A.    No.
24         Q.    Did you have discussions with

25 (Pages 94 to 97)

1  any minority borrowers about their experiences
2  purchasing homes in the Dover community that
3  were financed through Wachovia?
4        A.    So far we have not.  We are in
5  the process.  Through associates and so forth,
6  you know, we've heard some of the stories, so
7  we're working through finding the people so
8  that we can compare our experience with theirs
9  based upon the areas that they intended to buy
10  their homes and what transpired in that
11  situation concerning Wachovia Bank.
12        Q.    Okay.
13        A.    As well as nonminorities, you
14  know.
15        Q.    But as of today you haven't had
16  any discussions with other minority home
17  buyers who have complained about dealings with
18  Wachovia Bank?
19        Or I should clarify that:  who
20  complained about dealings with Wachovia
21  Mortgage Company?
22        A.    Outside of the other people
23  that are involved with this lawsuit, no.
24        Q.    Okay.

1        A.    I would add that my attorney
2  and I are interested in obtaining information
3  from Wachovia Bank concerning their lending
4  practices with let's just say a cross-section
5  of clients so that we can have a direct
6  comparison.  Ultimately we believe we'll find
7  that comparison directly.  But it would
8  certainly be appreciated if we could get
9  specific documentation for other minorities
10  and nonminorities.
11        Q.    Well, I am going to have to
12  stop you there because that's a litigation
13  matter and that's something that has to be
14  worked out between counsel.
15        A.    Okay.  My apologies.
16        MR. GRADY:  Are we finished
17      this area?  Can we break now?  I want
18      you to finish this area.
19        MR. FOGDALL:  Off the record.
20        - - -
21        (Discussion off the record.)
22        - - -
23  BY MR. FOGDALL:
24        Q.    Any other basis for

1  characterizing what happened in this lawsuit
2  as discrimination?
3        A.    I think in addition to my life
4  experience of dealing with discrimination and
5  so forth, I was also trained by the U.S. Army
6  as an equal opportunity officer that taught us
7  how to identify discrimination, how to
8  categorize that discrimination, and then how
9  to resolve discrimination issues and then how
10  to report them.  So we were specifically
11  trained on how to assess and analyze
12  situations of discrimination based on race,
13  religion, sex, and age.
14  .     Through the military training
15  and that whole process, which I served in that
16  capacity, I gained a base of knowledge to be
17  able to put things in perspective.  And when
18  you are dealing in areas where there is --
19  because no one is trying to deny that racial
20  prejudice and racial discrimination exists, so
21  when you are looking in areas that we are in
22  real estate, we found that across the board
23  very easy to identify when it jumps out like
24  this.

1        Q.    But I'm talking about in this
2  case as opposed to across the board or other
3  areas where you've had dealings.  Just in this
4  case, is there anything else about what
5  happened here that leads you to say that it
6  was discrimination?
7        A.    I would say that to add to our
8  determination that this was racial in nature,
9  I haven't broken down the reasons within, you
10  know, why our experience, our assessment of
11  the situation is, but I think that based on
12  our experience and my training and the base of
13  knowledge as well as all the other things that
14  we talked about, including but certainly not
15  limited to the way that we were treated and
16  the actions that were taken against us, I
17  would have to say that there are subparts to
18  the reasoning as to why.
19        But if you want just the main
20  reasons why I believe this is racial
21  discrimination, those five items, five or so
22  items, pretty much indicate why I believe
23  there's racial discrimination, and there are
24  other parts to that as well.

26  (Pages 98 to 101)

Page 102

1  Q.  Subparts within what you've
2  just said?
3  A.  Yes.
4  Q.  Not additional bases, but more
5  specific reasons within what you've just
6  described for thinking that this was
7  discrimination?
8  A.  Also based upon comments and
9  statements that have been made by various
10 friends, associates, strangers, and persons
11 concerning us, black people, actually owning
12 property on Silver Lake.
13 Q.  Now are you talking about
14 comments and statements by somebody at
15 Wachovia?
16 A.  I would say both individuals at
17 Wachovia and not at Wachovia.
18 Q.  Well, but would you agree with
19 me that the individuals who are not at
20 Wachovia wouldn't really be relevant to
21 determining whether Wachovia had discriminated
22 against you and it's the people at Wachovia
23 that would be the relevant people to talk
24 about?

Page 103

1  A.  I think that the people not at
2  Wachovia represent a reasonable sampling of
3  the truth of what exists in this community,
4  what exists in this particular society here in
5  Dover. I think that their opinions are
6  relevant because they're credible, respectable
7  people.
8      The fact of the atmosphere in
9  this area and the people that live here that
10 know and understand where the lines are in
11 this community and where the breakdowns and so
12 forth are in the race relations and so forth
13 in Dover, I think that their comments are
14 relevant based on that.
15 Q.  Okay. What I want to know
16 is -- and I know, Mr. Grady, you want to take
17 a break, I want to finish this up -- who at
18 Wachovia made comments or statements that you
19 are referring to now?
20 A.  I can't remember the one
21 gentleman's name. I can't quite place him.
22 I'm going to have to reflect. I wasn't
23 expecting to go this route. But in a
24 conversation with Deanne Wicks.

Page 104

1  Q.  Okay. What did she say or --
2  A.  I mean, I'm going to reflect
3  and be very specific, so it may take a while
4  for me to just collect the specifics of that.
5      The reason I say that is
6  because of, you know, obviously my concern for
7  Deanne Wicks and her employment and her
8  employer. I want to be very specific about
9  that, so I want to take my time and answer
10 that with specificity.
11     MR. GRADY:  Can we let him
12 think about it over the break? I
13 won't talk to him about it.
14     MR. FOGDALL:  Okay. Why don't
15 we go ahead and take the break and
16 then we'll pick it up?
17     MR. GRADY:  Take a break and
18 you can think about it.
19     I'm not going to talk to him
20 about it.
21     MR. FOGDALL:  That's fair.
22     MR. GRADY:  All right. 45
23 minutes.
24     - - -

Page 105

1      (Whereupon there was a luncheon
2  recess in the proceedings from
3  1:10 p.m. to 2:00 p.m.)
4      - - -
5  BY MR. FOGDALL:
6  Q.  Mr. Anderson, before the break
7  we were discussing comments that you said
8  Ms. Deanne Wicks had spoken to you at some
9  point, so let's return to that and why don't
10 you continue with that testimony?
11 A.  Okay. I was in a conversation
12 with Ms. Wicks and in the process of that
13 conversation she made a comment or a statement
14 to the effect of, you know, "There are a lot
15 of people that are not happy with you all
16 purchasing homes on Silver Lake."
17 Q.  When did that conversation take
18 place?
19 A.  That conversation took place --
20 we had filled out all the applications, so it
21 was after we had filled out all of the loan
22 applications, but we had not gone to
23 settlement. It was within that time frame.
24 Q.  You don't remember more

27 (Pages 102 to 105)

Page 106

1  specifically than that what date it was?
2      A.   The specific date?
3      Q.   Yes.
4      A.   No, I don't recall.
5      Q.   Okay.
6      A.   And so I commented something to
7  the effect of, "Yeah, I know," and that
8  comment was based on my experience at kind
9  of -- there was already a little -- you know,
10 I had been throughout the community and talked
11 to people and whatnot, so there was already an
12 obvious resistance to me even inquiring about
13 property in other areas on Silver Lake.  So I
14 just said, "Yeah, yeah, I know."
15          And she followed up by stating
16 that, you know, "Silver Lake is an exclusive
17 lily white community and now here you guys
18 come."
19          And we kind of smiled and
20 talked a little bit and it was like, "Yeah," I
21 stated, you know, "it's really a shame that it
22 comes to that, but we've experienced this type
23 of thing in other areas" and so forth and so
24 on "and we've been exposed to discrimination

Page 107

1  and racism and, you know, people have
2  problems, that's really sad."
3          And then she commented that,
4  "Yeah, you guys, once you get done with the
5  transaction, you should get in your boat and
6  just drive around the lake and just wave at
7  your neighbors," and she used a hand gesture
8  like this.
9          And we just kind of laughed and
10 I said, "Yeah, you know, people with hangups
11 like that, with racial problems and whatnot,
12 the world will never be rid of them."
13          Then we went on to whatever our
14 other discussion was.  But that was the
15 dialogue.
16     Q.   And you're saying the rest of
17 that conversation doesn't provide any basis
18 for your thinking that there was
19 discrimination here, it's only the part of the
20 conversation that we've just talked about that
21 is suggestive --
22     A.   Right, yeah.
23     Q.   Okay.  So let's go back to the
24 start of that conversation and what she said

Page 108

1  at the very start.
2          MR. FOGDALL:  And maybe if the
3  court reporter could read back the
4  first part of Mr. Anderson's answer so
5  we can get word for word what was said
6  there.
7              - - -
8          (The court reporter read the
9  record as follows:
10         "QUESTION:  I was in a
11 conversation with Ms. Wicks and in the
12 process of that conversation she made
13 a comment or a statement to the effect
14 of, 'You know, there are a lot of
15 people that are not happy with you all
16 purchasing homes on Silver Lake.'")
17             - - -
18 BY MR. FOGDALL:
19     Q.   Okay.  "There are a lot of
20 people who are not happy with you purchasing
21 homes on Silver Lake," you can't tell from
22 that statement who she was referring to by the
23 people who were unhappy; correct?
24     A.   No.  It was obvious who she was

Page 109

1  referring to.
2      Q.   Who was she referring to?
3      A.   She was referring to white
4  people that live in and around or on Silver
5  Lake.
6      Q.   So she wasn't specifically
7  referring to anyone at Wachovia who would be
8  unhappy with you moving there?
9      A.   That is something that we're
10 not certain of, what her perception was as far
11 as people within their organization, the
12 hierarchy there at the bank.  We don't know
13 for sure but we suspect based upon, you know,
14 future actions that people inhouse and
15 certainly people in the community had issues
16 with us purchasing property there.
17     Q.   But nothing specifically in the
18 conversation that you had with Ms. Wicks that
19 we're talking about referred to people at
20 Wachovia and people at Wachovia being unhappy
21 with you purchasing these properties?
22     A.   She didn't name anyone at
23 Wachovia and she didn't specify anyone at
24 Wachovia, but the implication is that, you

28  (Pages 106 to 109)

Page 110

1    know, there are people that are not happy.
2    And as far as I'm concerned, that could be
3    inhouse and out of house.
4        Q.    So the answer is, no, though,
5    that she didn't specifically refer to anyone
6    at Wachovia being unhappy with you moving into
7    the properties on Silver Lake?
8        A.    She referred to people. She
9    did not say that it was not. She did not
10   exclude people at Wachovia. But she didn't
11   specify people at Wachovia.
12       Q.    Okay. Aside from this
13   conversation that you had with Ms. Wicks, are
14   there any other conversations that you had
15   with people at Wachovia that are part of the
16   basis for why you would characterize what
17   happened here as discrimination?
18       A.    I don't have enough
19   recollection at this time based on another
20   conversation I had with the gentleman, nor do
21   I have his name, so at this point I'd have to
22   say no.
23       Q.    Okay.
24       A.    Unless I can --

Page 111

1        Q.    You think there might have been
2    a gentleman at Wachovia with whom you had a
3    conversation?
4        A.    Right.
5        Q.    And that person is not J. D.
6    Hogsten?
7        A.    Correct.
8        Q.    Okay.
9        A.    It was a Caucasian gentleman
10   that no longer works at the bank. You know,
11   it's been so long ago, I just can't remember.
12   But when people make comments, sometimes you
13   just make a note of those comments, and so I'm
14   going to go back and look at some things and
15   look at what I was doing at that time and try
16   to recall the person, and maybe something will
17   refresh my memory on what transpired.
18            But I would simply say there
19   was no doubt that people in the Silver Lake
20   community were not happy with us being there.
21   There was also no doubt, based upon the bank's
22   actions, that somehow that influence or that
23   sentiment was being conveyed through the bank
24   to us in order to prevent us from purchasing

Page 112

1    the properties.
2        Q.    Okay. The conversation that
3    you had with the gentleman that you can't
4    specifically recall, you don't recall anything
5    about the conversation, what was said?
6        A.    Since I can't be specific
7    enough to have it on the record, I would
8    prefer to wait until I can --
9        Q.    Well, do you have notes or some
10   other materials that you could refer to to
11   refresh your recollection about this
12   conversation with the gentleman that you can't
13   recall?
14       A.    I'm going to go back and look
15   at what I was doing during that time frame
16   that would have had me in contact with him as
17   opposed to Mrs. Wicks or Mr. Hogsten and see
18   if I can find some kind of documentation to
19   show what was transpiring there.
20       Q.    Okay. But as you sit here, you
21   can't recall any documentation that you could
22   look at to refresh --
23       A.    No.
24       Q.    -- your recollection about this

Page 113

1    other conversation?
2        A.    No.
3        Q.    So aside from the conversation
4    with Ms. Wicks and this possible other
5    discussion with the gentleman you can't
6    recall, there are no other comments by people
7    at Wachovia that lead you to think that there
8    was discrimination here?
9            MR. GRADY:  I'd object to that.
10   He has been saying all along that all
11   of the treatment he got, which
12   included things were being said to
13   him, that they all in totality,
14   including conversations. If you are
15   talking about any direct racial
16   statements, that's different.
17           MR. FOGDALL:  I am talking
18   about comments that were made.
19           MR. GRADY:  We are talking
20   about the whole incident.
21           MR. FOGDALL:  We have to break
22   it down one by one.
23   BY MR. FOGDALL:
24       Q.    So I want to know whether there

29 (Pages 110 to 113)

Page 114

1  are any other comments/conversations, besides
2  the one with Ms. Wicks that we just discussed
3  and the one with the gentleman that you can't
4  recall, that lead you to think there was
5  discrimination. Then we can get to the other
6  events that you talked about in your
7  Complaint.
8       A.    Other than conversations with
9  J. D. and other people associated with the
10 actual transaction, there was no one else at
11 Wachovia that I had further discussions, no
12 one that's employed by Wachovia.
13      Q.    So are you saying then that
14 statements by J. D. Hogsten led you to think
15 that there was discrimination here?
16      A.    Absolutely.
17      Q.    What comments?
18      A.    And that's kind of what leads
19 us into the whole thing, both his tone, the
20 words that he used -- and I am going to get
21 into that -- and the things that he did.
22            It was very subtle in some
23 cases. When, for example -- let me give you
24 an example -- I believe J. D. used the phrase

Page 115

1  "you people," in a normal conversation you
2  wouldn't necessary think too much about it,
3  but in the context of all that was being done
4  to us at the time, a reference to "you people"
5  is us black people, because we were the people
6  that were trying to secure the loan, we were
7  the people that he was referring to.
8            And then the statements that he
9  would make in reference to us people in terms
10 of what he is or is not going to do or is or
11 will not allow us to do and what he's going to
12 make us do.
13      Q.    When J. D. Hogsten used the
14 phrase "you people," what was the rest of the
15 sentence that he spoke that had those words in
16 it?
17      A.    I think, to the best of my
18 recollection, it would be something to the
19 effect of, you know, "you people don't
20 understand how the process works" or "you
21 people don't know how the procedures" or words
22 to that effect, indicating that we didn't
23 understand the banking process, indicating
24 that we didn't understand to the degree that

Page 116

1  what we interpreted that as is that there was
2  a perception that we lacked the intellect to
3  comprehend the banking process.
4            Once again, it's subtle, but
5  this is my reality. Having been through
6  processes in the past, you just get an
7  understanding and a feel for what is and what
8  is not racially motivated.
9            But you have to understand
10 also, nobody just jumps out with expletives or
11 just using really overt means of displaying,
12 you know, their racial prejudices/biases, and
13 when discrimination occurs, it occurs in a
14 manner that's easily disguisable.
15            So when I'm referring to
16 comments and statements, you know, we pick up
17 and understand these things. And the reality
18 of the situation is that people in real
19 estate, people in the banking institutions,
20 and people like us that buy real estate and
21 want to live in nice areas, we understand the
22 reality of the situation is that there's
23 discrimination, and that's why we know that
24 there is equal lending requirements, there is

Page 117

1  equal opportunity employment requirements. We
2  know there are restrictions to blue lining and
3  black lining in real estate. So we understand
4  why those rules exist.
5            So, you know, that's about it
6  as far as the terminology. But the things
7  that were done and how they were done actually
8  adds to that.
9       Q.    Okay. So when J. D. Hogsten
10 said things like "you people don't understand
11 the process," do you recall when that
12 specifically occurred?
13      A.    I don't recall specifically.
14 It was when we were being required by
15 Mr. Hogsten to do repairs to the house or to
16 do maintenance and other items to the house
17 prior to going to settlement.
18      Q.    Okay. Let's talk about that,
19 the repairs that you are saying he required
20 you to do. Let's start with, which you
21 touched on earlier, the initial time that an
22 appraiser went out to your property to try to
23 appraise it. Let's start with that.
24      A.    Okay.

30 (Pages 114 to 117)

Page 118

1    Q.    Why don't you tell me about
2  that incident?
3    A.    I was contacted by the
4  appraiser by telephone and we scheduled a
5  meeting at the property.  I got permission
6  from the seller to meet the appraiser there
7  and let him go through the property and do his
8  evaluation.
9    Q.    Pardon me.  Do you remember
10 what day this was?
11   A.    I do not remember what day it
12 was.
13   Q.    Early in July; is that fair to
14 say?
15   A.    I just would assume that it's
16 in the bank report or something.  I don't
17 remember the date.
18   Q.    Okay.
19   A.    So when I arrived at the
20 property, I saw the appraiser's vehicle and
21 then I saw another vehicle and I thought that
22 was strange.  So I parked my truck and I
23 walked down the hill to the house, and as I
24 approached the house, I looked in the door and

Page 119

1  it surprised me because the door was open and
2  I hadn't arrived yet to open the door.  And
3  when I peered through the door, I saw
4  Mr. Hogsten and the appraiser standing in a
5  corner having a conversation.
6         So I leaned into the door and,
7  you know, I introduced myself, and
8  immediately, you know, it appeared to me that
9  their body actions appeared to me to indicate
10 that they did not want it to appear that they
11 were having a conversation.  You know,
12 basically they disengaged.
13        And at that point Mr. Hogsten
14 approached me and he said, you know, he said,
15 "T, let me talk to you for a minute"; and he
16 walks me over under the deck and he says, he
17 says, "I'm not going to be able to assign any
18 value to this property."
19        And so I laughed and I asked
20 him what he was talking about.
21        And he said, "Well," he said,
22 "this guy here is the appraiser and, you know,
23 we don't see where there's any value in this
24 property whatsoever."

Page 120

1         And I laughed again not knowing
2  whether he was serious.
3         And he says, "You know, it just
4  doesn't look to me like we're going to be able
5  to go forward here."
6         So I believe I commented that
7  that's ridiculous and I cited the square
8  footage of the property, the location of the
9  property, and the land that the property sat
10 on, and I said, "At a minimum the property is
11 worth..." and I gave a value.  I don't
12 remember what that was.
13        He said, "Yeah, well, you know,
14 there's just some things that would have to,
15 you know" -- "things that would have to be
16 done in order for this property" -- I can't
17 remember.  I don't want to -- oh, he said,
18 "There are things that would have to be
19 done" -- he said, "There are things that would
20 have to be done and since you don't own the
21 property, I know that won't be possible, so I
22 think we're done here."
23        Q.    Okay.  Did he tell you what
24 things needed to be done that couldn't be

Page 121

1  done?
2         A.    He did not specify at that
3  time.  At that time he did not.
4         Q.    Okay.
5         A.    And then he stated to me that
6  "There's no way we're going to be able to find
7  comparables to this property."
8         And at that time the appraiser
9  approached and he basically said the same
10 thing as far as the comparables.  He said,
11 "There's no way, I can't find comps anywhere
12 within a mile, within 5 miles, or anywhere in
13 the region that would allow me to assess the
14 value of this property.  Therefore, an
15 appraisal can't be done."
16        Now, knowing by experience that
17 that was incorrect, I asked him to explain.  I
18 said, "That's ridiculous.  Why don't you
19 explain that again?"  I wanted to make sure I
20 was hearing him clearly.
21        And he went through the process
22 again -- I won't repeat it -- of stating, you
23 know, that he could not find any value in the
24 property.

31 (Pages 118 to 121)

Page 122

1    Q.    Now, the seller, Mr. Aigner,
2  had not been living in this property; correct?
3    A.    No.
4    Q.    Had anyone been living in the
5  property?
6    A.    There was no one living in the
7  property at the time when we purchased it.
8    Q.    Do you know how long that
9  property had remained unoccupied?
10    A.    No, I don't.
11    Q.    Were there some repairs needed
12  to that property?
13    A.    Yes.
14    Q.    Like what?
15    A.    There had been, I guess, a
16  broken water pipe that had drained down to the
17  basement or something and it had been repaired
18  and everything, but there was some drywall
19  that needed to be repaired, and the basement
20  needed to be cleaned out. It needed some
21  paint in one of the bedrooms and it needed
22  some carpet replaced. I mean, it needed some
23  work, you know.
24          It needed work consistent with

Page 123

1  buying a house and then moving in and fixing
2  it up, you know, something that we have been
3  involved with, you know, for years, even with
4  Wachovia buying homes in similar condition.
5    Q.    Did J. D. Hogsten or the
6  appraiser say if those repairs were done, then
7  it could be appraised?
8    A.    No, they did not. I asked
9  them, "Well, what can I do to fix the
10  situation?" or whatever.
11    Q.    Okay.
12    A.    And J. D. stated again,
13  "There's no value here. There's no value.
14  This property has no value."
15          And at that point or around
16  that time frame I was picking up on something
17  between him and the appraiser. I mean, their
18  conversation, their eye contact, and their
19  interaction with me indicated to me, okay,
20  something's not right, something's not right
21  here.
22          I said, "Well, I'll tell you
23  what. Let me contact another appraiser and
24  have him provide the comparables to the

Page 124

1  property," because I had already done my
2  research so I knew that what he was telling me
3  wasn't true.
4          And J. D. stated words to the
5  effect of, "Well, you know, you can do what
6  you want, but there's really no value here so
7  there's no need for us to continue so, you
8  know, I guess we're done here." That was his
9  final words to me, was "I guess we're done
10  here."
11          And I stepped back and just
12  pondered for a moment what they were saying.
13  And then he and the appraiser, I don't
14  remember if they high-fived or if they shook
15  hands, but there was some sort of an
16  interaction between him and the appraiser.
17          And then J. D. says to the
18  appraiser, "So who's buying lunch today, you
19  or me?"
20          And the appraiser says, "This
21  one will be on me. It will be on me this
22  time."
23          And J. D. says, "Cool. Where
24  are we going to go?" And they were walking

Page 125

1  away so I couldn't hear the rest of the
2  conversation at that point. And they got in
3  their vehicles and they both left.
4    Q.    And then what happened?
5    A.    I locked the door and I left.
6    Q.    But at some point, according to
7  the Complaint, you asked another appraiser,
8  Mr. Kaplin, I believe --
9    A.    Yes.
10    Q.    -- to provide some comparable
11  properties.
12    A.    Yes. I can't remember if it
13  was the next day or -- I'm pretty sure it was
14  the next day or the day after that I asked
15  Mr. Kaplin by telephone, I said, "Can you get
16  me comps for this house I'm trying to buy?"
17          He said, "Sure, no problem."
18          And just a few minutes later he said, "I've
19  got them. What do you want me to do with
20  them?"
21    Q.    But how familiar was he with
22  the house at 580 North DuPont Highway? Did he
23  go and personally examine the house before
24  providing these comparables?

32  (Pages 122 to 125)

Page 126

1    A.    He was familiar with the
2 property only in that he had either listed the
3 property or worked with a listing agent for
4 the property in the past. So he was familiar
5 enough with it when I was talking with him.
6 He knew exactly what house I was talking
7 about. He was involved with some transaction
8 on it in the past that didn't work out years
9 prior or something.
10    Q.    To your knowledge, had he ever
11 done an appraisal on that property before?
12    A.    No. To my knowledge -- I'm
13 sorry. I don't know.
14    Q.    Okay. So you asked him to find
15 some comparable properties --
16    A.    Yes.
17    Q.    -- and he provided you with
18 some documentation?
19    A.    Yes. He asked me some
20 questions about the property, you know, sales
21 price and square footage and so forth and so
22 on, waterfront and so forth.
23    Q.    Okay.
24    A.    And he said, "I have it." He

Page 127

1 said, "Where do you want me to send it?"
2    And I said something to the
3 effect "Was it hard to find comps?"
4    He goes, "Well, you know,
5 there's comps available. There's none on
6 Silver Lake, but there's a property here up in
7 Smyrna on a lake." There was one in Dover, I
8 think, Moore's Lake. You know, the properties
9 that he sent me were --
10    Q.    Are you saying the one in Dover
11 was on Moore's Lake?
12    A.    I believe it was.
13    Q.    And then the one in Smyrna, was
14 that a lake property, too?
15    A.    Yeah. All the comps that he
16 sent were waterfront.
17    Q.    Okay. What other comps do you
18 remember besides Smyrna?
19    A.    There was one right over here
20 on Mirror Lake. I believe that comp showed it
21 as water value because there's public property,
22 you know, the park is between the water and
23 the house.
24    Q.    Was there any others besides

Page 128

1 these three?
2    A.    I can't recall. I recall there
3 was maybe four or five comps that he sent to
4 me. I thanked him for them and I immediately
5 called J. D. Hogsten and told him that I had
6 comps.
7    He was very surprised and he
8 said -- well, he asked a question. I don't
9 remember the specifics. But it was, you know,
10 "What do you mean you have comps?"
11    And I said, "Well, let me send
12 them to you."
13    So he gave me his fax number
14 and I faxed them directly to him.
15    Q.    Okay. Do you have like
16 evidence that you faxed these to him, a fax
17 confirmation or anything like that?
18    A.    No, other than I talked to him
19 after I sent the fax and he confirmed that he
20 had received it and that he had forwarded it
21 to the appraiser.
22    Q.    Okay. But you didn't retain
23 these documents yourself, you discarded them?
24    A.    I just don't recall what I did

Page 129

1 with them at that point.
2    Q.    You don't have them now?
3    A.    I don't have copies of them
4 now.
5    Q.    You gave me three different
6 properties, one in Smyrna, one on Moore's
7 Lake, one on Mirror Lake, and then I think you
8 said you think there were a couple others but
9 you can't recall the details about them?
10    A.    I can't recall. It's been
11 years.
12    Q.    Okay.
13    A.    I didn't focus on the comps. I
14 gave them to him to give to his appraiser.
15    Q.    And what did Mr. Hogsten do
16 once you sent these materials to him?
17    A.    He acknowledged receiving them
18 and that he had forwarded them on to his
19 appraiser. So what he did from that point
20 with them I don't know.
21    Q.    All right. Now, when did you
22 have discussions with Mr. Hogsten about doing
23 repairs to the property, the 580 North DuPont
24 Highway property, to make it acceptable so

33 (Pages 126 to 129)

Page 130

1 that a loan could be issued? Did Mr. Hogsten
2 specify repairs that were needed after this
3 meeting with the appraiser that you've talked
4 about where they went to lunch afterwards?
5      A.   He didn't direct us to do any
6 repairs at that time.
7      Q.   When did he do that?
8      A.   Let's see.
9           I believe it was during the
10 week of the appraisal or the immediate week
11 following when I tried to follow up on what
12 was the status of the appraisal. That's when
13 J. D. brought up a comment about us doing
14 repairs to the property.
15      Q.   By the appraisal you are
16 talking about --
17      A.   The meeting.
18      Q.   -- the meeting where the
19 appraiser came out and said he couldn't do an
20 appraisal and then Mr. Hogsten and him then
21 went to lunch, and you are saying that week or
22 the week after J. D. Hogsten said to you that
23 X, Y, and Z had to be done to the property?
24      A.   Yes.

Page 131

1      Q.   Okay.
2      A.   Here's how that unfolded. I
3 asked J. D. for the status of the appraisal.
4      Q.   Okay.
5      A.   He again stated that he didn't
6 see any value in the property and then he
7 stated if he was going to give the property
8 any value, it would have to be placed in move
9 in condition. That's the term that he used.
10 He said, "It needs to be in move in
11 condition."
12      Q.   And what he was telling you
13 there is in order for it to be capable of
14 appraisal, certain repairs have to be made to
15 it; in other words, this was part of putting
16 the property in a condition where it could be
17 appraised?
18      A.   No. He said that he didn't
19 know what the status of the appraisal was at
20 that time.
21      Q.   Okay.
22      A.   The appraisal based on the
23 comps that I provided was ongoing. I called
24 for an update on how it was going, what's the

Page 132

1 status, have you got a report back yet.
2      Q.   Okay.
3      A.   Sometimes appraisers will call
4 in with their estimate of value and so on and
5 so forth.
6           So he said, "I don't know, but
7 before I" -- that's him, J. D. -- "would
8 assign any value to the property, it would
9 have to be put into move in condition."
10      Q.   Okay. I want to talk about
11 that more. But, first of all, let's take a
12 look at this. This is the commitment letter
13 that Wachovia issued to you and your wife.
14 It's dated 7/14, but you and your wife signed
15 it on the 26th of July '04. Does that look
16 familiar to you?
17      A.   It appears to be the loan
18 commitment that we received.
19      Q.   All right.
20           - - -
21           (Whereupon the document was
22           marked, for identification purposes,
23           as Exhibit T. Anderson 7.)
24           - - -

Page 133

1 BY MR. FOGDALL:
2      Q.   So the commitment letter that
3 you have just identified, do you see where in
4 Addendum A to the commitment letter -- using
5 the Bates labeling Mr. Grady's office
6 provided, this is 000110, it's the final page
7 of the document, but -- it indicates that the
8 following will be required before a loan can
9 be issued by Wachovia, and the No. 1
10 requirement is "Satisfactory appraisal
11 supporting minimum value of $266,666.00."
12 That's the No. 1 requirement that has to be
13 met before a loan can be issued.
14           So you were told in this
15 commitment letter that there would have to be
16 a satisfactory appraisal before you could get
17 a loan.
18           Now, did Mr. Hogsten ever
19 explain to you that a satisfactory appraisal
20 might require that repairs be made to the
21 property, that a satisfactory appraisal
22 couldn't be done until certain repairs were
23 made?
24      A.   No. What Mr. Hogsten conveyed

34 (Pages 130 to 133)

Page 134

1  to me was that he was dictating what would be
2  required in order for this loan to proceed
3  because I challenged him, I questioned him on
4  it. So he made it very clear that, you know,
5  yes, an appraisal had to be done.
6          But I explained to him, I said,
7  "Okay, I've been through a hundred appraisals.
8  You've got the comps. You know the property,
9  you know the land values. You know the value
10 per square foot." I said, "J. D., what's the
11 problem?"
12         And he said, "Well, I have to
13 determine if there's a value there."
14         So to me he was overstepping
15 the appraiser by, number one, indicating that
16 there was no value to be appraised; and,
17 number two, indicating, at least in my
18 opinion, that even if there was an appraisal,
19 he was going to dictate the conditions.
20     Q.    But as of this date that this
21 commitment letter was issued, there was not,
22 in fact, a satisfactory appraisal yet done;
23 correct? Is that correct or not?
24     A.    Well, I don't know if the bank

Page 135

1  had an appraisal report. I requested it
2  numerous times. I never got the appraisal
3  report. So I don't know when the bank got it.
4  They may have had it back from the appraiser
5  at this date.
6      Q.    Okay.
7      A.    So I don't know.
8      Q.    Do you know the name of the
9  original appraiser that went out to your
10 property that day that we talked about?
11     A.    I do not.
12     Q.    You don't recall. Are you
13 aware that when a satisfactory appraisal
14 ultimately was obtained, it was by a different
15 appraiser?
16     A.    Yes.
17     Q.    Okay.
18     A.    Because I stated that the
19 relationship/the interaction between the loan
20 officer and the appraiser in my opinion was
21 inappropriate, I said, but as long as you
22 understand that I'm not comfortable with the
23 way things unfolded out at the property -- and
24 I told J. D., I said, "I've never seen a loan

Page 136

1  officer come to a property that I was
2  purchasing and I've never seen a loan officer
3  meet with an appraiser at the property," and I
4  believe at that time I indicated that the
5  appraiser should be selected out of a pool of
6  appraisers.
7          So what I was indicating is
8  that it appeared to me that he had a personal
9  relationship with the appraiser which
10 concerned me and that if that report was going
11 to be completed, I wanted to receive a copy of
12 it.
13     Q.    Okay. You are not yourself an
14 appraiser of properties.
15     A.    I am not an appraiser.
16     Q.    Okay.
17     A.    I am experienced in the value
18 of properties because I've purchased so many,
19 but I am not a licensed appraiser.
20     Q.    You are not an appraiser. And,
21 I'm sorry, we're limited in our time, so there
22 are times when I am going to have to cut you
23 off.
24     A.    That's fine.

Page 137

1      Q.    So you understand that simply
2  because you've provided properties that you
3  believe are comparable properties to this
4  property, the 580 North DuPont Highway
5  property, the mere fact that you provided
6  those doesn't mean that those are reliable
7  comparable sales that can be used to do an
8  appraisal; isn't that right?
9      A.    No. As a matter of fact, the
10 comps that were used were valid comparables,
11 no matter whether an appraiser pulled them or
12 not. The discretion of the appraiser is
13 whether or not to use those comps in his
14 report, but they were certainly valid.
15     Q.    Okay. So what did J. D.
16 Hogsten tell you had to be done to the
17 property, what repairs?
18     A.    He told me that he wanted this
19 house made in complete move in condition. He
20 said he wanted the basement finished. I
21 believe he said that he wanted the house to be
22 painted and he wanted -- I remember those two
23 items specifically.
24         But here's the interesting

35 (Pages 134 to 137)

Page 138

```
 1   part, is after he told me he wanted the
 2   basement finished and there was some drywall
 3   that he indicated didn't you see the drywall
 4   was messed up there, and then he said the
 5   house needed to be painted, then he said he's
 6   not going to allow -- he said he's not going
 7   to allow -- how did he say it?
 8          He said he's not going to allow
 9   us to move forward unless we did the things
10   that he was requiring us to do and he knew
11   that because we don't own the property it was
12   impossible for us to do the repairs, and
13   that's when he said the second time, "So I
14   guess we're done here."
15      Q.   Okay. But I thought you said
16   he said we're done here during the day when
17   the appraiser first came out to the property,
18   and you are saying he said it a second time?
19      A.   Yes.
20      Q.   Okay.
21      A.   When I asked for the appraisal
22   and we went through that whole process and he
23   mentioned the repairs that he felt needed to
24   be done, he wouldn't let the process go
```

Page 139

```
 1   forward, he said, "And since we don't have the
 2   ability to do the repairs because we don't own
 3   the property," he said, "I guess we're done
 4   here." That was a second separate incident.
 5      Q.   But you did end up doing the
 6   repairs?
 7      A.   Yes. We had to contact the
 8   seller in New York and get an agreement with
 9   him in writing to give us access to the
10   properties to do the repairs prior to
11   settlement because J. D. would not allow it to
12   go to settlement unless we could.
13      Q.   By the way, do you have an
14   address for the seller in New York? You just
15   said he lived in New York. Do you know where?
16      A.   I don't have his address.
17      Q.   Okay. That's fine. So
18   continue with your answer.
19      A.   Okay. So the seller ultimately
20   agreed. And you've got to remember that
21   during this same time frame Mr. Wheatley is
22   being told the same thing about his property.
23      Q.   I don't want you to --
24      A.   Okay.
```

Page 140

```
 1      Q.   We will get to Mr. Wheatley
 2   tomorrow. And I don't mean to interrupt you,
 3   but it's just he is a different witness than
 4   you, so I want to just stick with what you
 5   know about.
 6      A.   Okay.
 7          MR. GRADY: Is there a
 8   question?
 9   BY MR. FOGDALL:
10      Q.   I think I interjected something
11   while you were answering. I had asked you
12   about repairs that you said J. D. Hogsten
13   required you to make and I asked you what he
14   required you to do, and I think at that point
15   you were answering and I think I cut you off
16   with the question about Mr. Aigner.
17          MR. GRADY: I think he said he
18   had to contact the seller to do the
19   repairs.
20          MR. FOGDALL: That's what it
21   was.
22   BY MR. FOGDALL:
23      Q.   So you got the seller's
24   permission to go on the property to make the
```

Page 141

```
 1   repairs.
 2      A.   Yes.
 3      Q.   Okay. Now, I have here some
 4   invoices and receipts that I received from
 5   your lawyer that I think you have put together
 6   to document the expenses that you are alleging
 7   you incurred and that you say were
 8   unreasonable. Can you just look through these
 9   and tell me if that's really what those are?
10      A.   It does appear that that's what
11   they are.
12      Q.   Okay. Now, if we can just turn
13   to the third page of this document -- and this
14   is Bates labeling that my office supplied --
15   PLS000237, the range of the entire document is
16   PLS000235 to 242, but here we have it looks
17   like a proposal that Drywall Associates put
18   together of the work that they could do on
19   your property, the 580 North DuPont Highway
20   property, and it includes work for hanging
21   drywall, retaping the high ceiling seam,
22   putting in some insulation and the total it
23   looks like comes to around $3,700.
24          And that work ultimately was
```

36 (Pages 138 to 141)

Page 142

1  done, I assume, because this is part of the
2  expenses that you are seeking damages for in
3  the lawsuit. So I assume this work was
4  actually performed.
5      A.    Yes.
6      Q.    But do you think this work was
7  unreasonable to have done, to hang drywall and
8  finish drywall in the basement, hang drywall
9  and finish ceiling in living room, hang
10  drywall and finish wall and ceiling in
11  bedroom? Was that not work that should be
12  done?
13      A.    No, it wasn't. The property
14  was well worth what we were paying for it.
15  J. D. knew that I was a contractor or that I
16  was very familiar with doing that type of work
17  and I explained to him that after we move in,
18  we're going to do things specifically the way
19  my wife wants it done in terms of paint colors
20  and this and that, I mean, partition the
21  basement and make rooms and so forth.
22          I said, "I don't want to do
23  that stuff now." I said, "The house is worth
24  what it is. So just like every other deal,

Page 143

1  let's go to settlement and I'll fix it up the
2  way I want to later."
3      Q.    So in terms of the amount of
4  money that you would have spent repairing the
5  property after you moved in, you would have
6  spent this amount, if not more, to get the
7  property into the condition that you would
8  have wanted it to be in?
9      A.    No.
10      Q.    You would have spent less than
11  that?
12      A.    I would have spent less.
13  Here's the thing you have to remember that's
14  not included there. I was in the military on
15  active duty at this time so I'm having to take
16  time off from work to do work in this house
17  that Mr. Hogsten is requiring that should have
18  never been required for us to do, and the
19  stuff that he was requiring us to do was in my
20  opinion what he wanted us to do for the
21  specific reason that he didn't think we had
22  the capacity to do it or to do it within the
23  time frame.
24          And here's another statement

Page 144

1  that he made. He said, "There's no way you're
2  going to be able to do the stuff I'm telling
3  you." After we got the agreement from the
4  seller to actually do the work, his next
5  comment was, "There's no way you're going to
6  be able to do it within the time frame we have
7  before settlement so it's just not going to
8  happen." That was his statement to me.
9          And I told him -- and we were
10  in his office -- I said, "J. D., you know me,
11  you know my capability." I said, "If I had
12  the time and the resources, I could get all of
13  this done easily within that time frame." And
14  I said, "But you're wrong for making us do
15  it."
16      Q.    Well, first of all, I thought
17  Drywall Associates did the work, not you.
18      A.    That's right, they did.
19      Q.    So why did you have to take
20  time off work to do this work if Drywall
21  Associates was doing it?
22      A.    Well, I guess we can't get into
23  this, but I had to be there when they were
24  doing this work and they were also doing work

Page 145

1  for the other house, Mr. Wheatley, because the
2  same requirements were put on him. So, in
3  other words, to manage the work that they were
4  doing and to do some of the other work that
5  Mr. Hogsten had required of us to do.
6      Q.    Okay.
7      A.    And as you can see, it was
8  ridiculous, the requirements that were placed
9  upon us prior to settlement.
10      Q.    Well, I can't tell from this
11  that it's ridiculous.
12      A.    But you can't tell that it's
13  not.
14      Q.    Because I asked you before if
15  repairs were needed to the property and you
16  did say that repairs were needed and you
17  talked about drywall needing to be replaced,
18  and that seems to be what's being discussed
19  here. So I can't tell from this that it would
20  be ridiculous to do these repairs.
21      A.    I think that it's not
22  reasonable to require repairs or any work to
23  be done on a property prior to the acquisition
24  of the property. There's no basis for that

37 (Pages 142 to 145)

Page 146

1    demand to be placed upon us when we do not own
2    the property. And I made that clear to
3    Mr. Hogsten. And I demanded of him his
4    regulations, policies, and guidelines that
5    gave him the authority to make us do the
6    repairs, which he did not provide.
7         Q.    I want to ask you about some
8    other components of these expenses that you're
9    claiming in the invoices that we're discussing
10   here.
11        On the second page, which is
12   PLS000236, there's a line item for $7,465.00,
13   but it's not broken down what that represents.
14   It just says "House at Silver Lake; Labor and
15   materials for work completed..." Do you
16   recall what that number is? Is it something
17   in addition to the work that's on the next
18   page that we were discussing a moment before?
19        A.    No. It's the work that was
20   being done on both houses simultaneously.
21        Q.    Okay.
22        A.    When they bid the job, this
23   number was a bid for the work being done on
24   Wheatley's house and on my house.

Page 147

1         Q.    Okay. So the $7,465.00, that
2    includes this work here that's discussed on
3    the proposal relating to your property. It's
4    not that there's $3,000.00 of repairs that
5    were needed as discussed on PLS000237 and then
6    in addition to that 7,465 more dollars that
7    were needed. This 7,000-some-odd dollars on
8    PLS000236 encompasses what was done as
9    discussed on this next page; is that right?
10        A.    This was the total bid for them
11   working on both properties.
12        Q.    Okay.
13        A.    The actual price attributed to
14   580, which is my house, was the $4,615.00,
15   which is when you add this cost and that cost
16   I believe is the $4,600.00.
17        Q.    It's not going to hit 4,000.
18   But, okay, I get the general idea.
19        A.    I think it was this number
20   here. That was a different cost if they did
21   the actual acoustical. But we ended up going
22   with this number for the ceiling. So I
23   believe those two. I'm not 100% sure. But
24   there was not a separate $7,465.00.

Page 148

1         Q.    Okay. Then, in addition, it
2    looks like from Page PLS000238 there was a new
3    air conditioning unit installed?
4         A.    Yes.
5         Q.    The address here is your 301
6    Bugle Court, Maryland, address.
7              Oh, here, the "Job Name" being
8    580 North DuPont Highway. So that shows it
9    was installed in that property, the 580 North
10   DuPont Highway property.
11        A.    Right.
12        Q.    Now, was the original air
13   conditioner not working?
14        A.    The original air conditioner
15   was there, but when J. D. was stating things
16   that needed to be done, it was just a barrage
17   of requirements, and as I recall, he was
18   making comments about, you know, you need to
19   put new light fixtures -- even though there
20   were light fixtures in there -- you need new
21   HVAC, you need a new water heater, you need
22   this and that.
23             Those things were there, but I
24   found myself making repairs and replacing

Page 149

1    things in order to satisfy him so he would let
2    the deal go to closing so we would not lose
3    our deposit.
4              So the unit that was there,
5    what I would have done is I would have taken
6    the time to evaluate the system, decide
7    whether or not I wanted to use it if it was
8    adequate for the house and so forth and so on,
9    which it was sized properly. But we didn't
10   have time for any of that. We had just a
11   matter of days literally to get everything
12   done. So we just jumped through hoops. We
13   bought stuff. We hired people. We worked
14   ourselves into the wee hours of the night
15   taking time off work totally unnecessarily.
16        Q.    But according to this then, you
17   installed a new air conditioning unit; you
18   replaced drywall in the basement, the living
19   room, bedrooms on the first floor. Where does
20   it say you changed the light fixtures?
21        A.    We didn't.
22        Q.    You didn't do that.
23        A.    Well, I think you might see
24   receipts in here for light fixtures from

38 (Pages 146 to 149)

Page 150

1 Lowe's or Home Depot.
2      Q.    Okay. But you didn't actually
3 install those?
4      A.    Yeah, we put new light fixtures
5 up.
6      Q.    I thought you just said you
7 didn't do that.
8      A.    No. We did put new light
9 fixtures in I believe the living room, the
10 dining room, and the upstairs hall.
11     Q.    Now, you mentioned that a water
12 pipe had broken at one point and flooded the
13 basement of the property; is that right?
14     A.    Yeah.
15     Q.    The 580 property.
16     A.    At some point in time that had.
17 But Mr. Aigner had already started fixing it
18 so...
19     Q.    But there were problems
20 lingering as a result of that broken water
21 pipe. I think you said the drywall in the
22 basement needed to be replaced.
23     A.    Yeah. Well, the drywall that
24 was there had already been removed, so it

Page 151

1 needed to be replaced if you wanted to, you
2 know, replace the drywall. It's a basement.
3      My main issue was if I wanted
4 to have an unfinished basement to use for
5 recreational purposes, that's my right. I
6 don't have to finish a basement for live-in
7 condition purposes. It's a basement. And I
8 didn't have that option.
9      Q.    So there was no drywall on the
10 walls in the basement?
11     A.    No.
12     Q.    Was there drywall on the walls
13 on the first floor?
14     A.    Yes.
15     Q.    There was drywall.
16     A.    Well, where the pipe had been
17 broken, there was a piece of drywall that was
18 missing there. And then I think in the
19 bedroom there was --
20     Q.    So the pipe that was broken was
21 on the first floor?
22     A.    Right. It was above the
23 basement, yes.
24     Q.    Okay. Was there any other

Page 152

1 drywall missing on the first floor?
2      A.    I don't know if we replaced or
3 patched drywall in the bedroom on the first
4 floor on the living room wall. But, you know,
5 I mean, relatively minor stuff if you can take
6 care of it at your leisure, which is no big
7 deal.
8      The issue there was being
9 forced to do it, which, you know, no matter
10 which way you slice it, you know, they would
11 never produce for me the documents stating
12 that they had the right to require those
13 repairs so...
14     Q.    Okay. So you did do these
15 repairs.
16     A.    Right.
17     Q.    Now, there are a couple things
18 that I'm not clear about in the Complaint. In
19 Paragraph 25 of the Complaint -- and we will
20 use the copy that was marked -- you say:
21 "After the appraisals were approved, Hogsten
22 told Anderson that in order for the sale to be
23 completed, he would require Anderson's home to
24 be put into 'move in' condition..." Now, what

Page 153

1 do you mean "the appraisals were approved"?
2 approved by whom?
3      A.    The requirements to build out
4 the property, to fit it out, were made before
5 the appraisals were done after the bank had
6 received their appraisal -- well, when I
7 assumed they had received their appraisal --
8 and then after the appraiser, who did the
9 final report, that was actually used by the
10 bank for this settlement.
11     Q.    Okay. Let's turn to that
12 because I'm having a hard time squaring that
13 with what the appraisal itself says. This is
14 the appraisal that was done for your property.
15 It's dated as of August 2, 2004. Does that
16 look familiar to you?
17     A.    Yeah, this looks like my
18 appraisal.
19     Q.    Okay. And that's dated as of
20 August 2, 2004, but that's not the actual date
21 of the appraisal. That's just the as-of date.
22 The date it was signed -- pardon me, it's
23 right here -- by our identification numbers is
24 on ANDER000061, it's signed by Alan Jeffers,

39 (Pages 150 to 153)

1    the appraiser, on 8/5/2004: "Date of
2    Report/Signature: 08/05/2004."
3        A.    Okay.
4        Q.    And that's the day before your
5    loan closed, your purchase of these properties
6    closed.
7        A.    Okay.
8        Q.    But hadn't all of the repairs
9    that Mr. Hogsten asked you to do all been
10   completed by that point?
11       A.    There were things -- let me
12   think here.
13            I think there were some things,
14   relatively minor things, light fixtures, you
15   know, window cleaning and so forth and so on,
16   we were right up to the wire with the
17   appraiser coming in, that my recollection is
18   that we were just hustling to get all of these
19   things done and that there may have been a few
20   things that were left, minor things, that
21   hadn't been done prior to this time.
22            But what we knew was that
23   Mr. Hogsten would be coming back after they
24   received this report to verify that all of the

1    stuff that he required of us to be done was
2    actually completed; not just the appraiser's
3    evaluation, but Mr. Hogsten's evaluation that
4    everything was to his satisfaction.
5        Q.    But when would Mr. Hogsten have
6    done that if the closing was the next day?
7        A.    Well, this is the date that
8    they signed the report. They probably faxed
9    it over the same day. Mr. Hogsten's intention
10   to come out there and to preapprove what was
11   done to his liking, this was as of the 2nd of
12   August, so there was a few days right there.
13            And Mr. Hogsten made it clear
14   that he was going to be -- his statement was
15   that they were going to be watching us.
16            And I asked him, "Well, who's
17   they?"
18            He said they were going to be
19   watching us to make sure we were doing all the
20   things that he was requiring or that were
21   being required.
22            We perceived it initially as a
23   threat, but we knew that he was coming to
24   check up on the stuff that had to be done

1    because he required it.
2        Q.    Okay. So you are saying
3    Mr. Hogsten said to you he would be watching
4    you or they?
5        A.    Pardon me.
6        Q.    That's okay. Who did he say
7    would be watching you?
8        A.    He said they would.
9        Q.    They?
10       A.    They.
11       Q.    But are you telling me now that
12   you took that to mean that he was personally
13   going to come out and make sure that all the
14   repairs were done on the property?
15       A.    It appeared pretty specific
16   that he was going to personally ensure that
17   the things that he had required of us were
18   done before he would actually allow us to go
19   to the settlement table. So the assumption
20   was that he was going to personally verify
21   that.
22            And his statement that they
23   were going to be watching me, here's the back
24   drop for him making that comment. I was

1    resisting having to do these things in the
2    first place and I was using comparisons to
3    other properties with them that did need
4    repairs as well, and I said "You didn't
5    require it on this one and you didn't require
6    it" -- I named the properties and I said
7    specifically "You didn't require it on this
8    one, it needed repairs," so I said, "Why are
9    you making me do repairs on this one prior to
10   purchase?"
11       Q.    Wait, wait, wait. You are
12   saying you had other dealings with Mr. Hogsten
13   where he didn't require you to make repairs?
14       A.    With Wachovia, where the
15   properties needed repairs, we weren't required
16   to make the repairs prior to settlement. And
17   I would specifically name the properties and
18   I'm like, "So what's the big deal now? Why
19   are we being forced to spend all this money
20   and time and energy to do these repairs?" with
21   him implying that, first of all, you can't do
22   it because you don't own it, so we're done
23   here, and then stating that, well, you can't
24   get it done in the amount of time based on

40  (Pages 154 to 157)

Page 158

1    what I'm requiring you to do so now we're done
2    here, and then I'm going to be watching you or
3    we're going to be watching you.
4        Q.    You said they, I think you said
5    they.
6        A.    They.    And on numerous
7    occasions during that time frame, as we were
8    discussing it, he would state, "I'm getting a
9    lot of pressure on this property.    I'm getting
10   a lot of pressure on this transaction."
11               He asked me on at least two
12   occasions, "You're not recording this
13   conversation, are you?"
14       Q.    Well, but do you think when he
15   said I'm getting pressure, do you think he
16   really meant I'm getting pressure from you?
17       A.    Absolutely not.
18       Q.    This was an important
19   transaction, you have made that clear, and you
20   certainly had a number of conversations with
21   him about it during the time that these events
22   were unfolding.    Do you think he just meant,
23   look, I'm getting a lot of pressure on this
24   thing?    Maybe he felt like he was under

Page 159

1    pressure to get the deal done for you.
2        A.    No, sir.    I don't think that
3    that's what he was saying because he would say
4    things like "They are really pressuring me on
5    this deal."    He said, "I'm under a lot of
6    heat."    He used that term, "a lot of heat."
7    "I'm under a lot of pressure."    He said, "I
8    don't think this is going to work.    I don't
9    think we're going to be able to do it."    And
10   he was using every opportunity he could to
11   disqualify us on the deal.
12               And I said, "J. D., I have a
13   commitment.    What are you doing?"
14               "Oh, oh, I'm just getting so
15   much pressure.    Hey, you're not recording this
16   conversation, are you?"
17               But to finish that sentence,
18   you know, I would ask, "Well, who is
19   pressuring you?"    So there was no question of
20   who he meant by who's pressuring you, what's
21   the big deal, what's the problem.    I already
22   knew, man, we're buying on Silver Lake.    I
23   sensed what was really going on.    But he just
24   kept saying, "I don't know, T, I don't think

Page 160

1    we're going to be able to do this deal and I'm
2    getting a lot of pressure and a lot of heat on
3    this deal."
4        So we knew initially that there
5    would be some issues or resistance, but what
6    we found out was that the bank was making us
7    do repairs that they shouldn't have been
8    allowed to do, in normal circumstances
9    wouldn't be allowed to do; then to try to do
10   all those repairs in that time frame; and then
11   all of these other issues with the appraisal
12   and it just went on, sir, so...
13       Q.    You are aware that oftentimes
14   when a lending institution like Wachovia
15   issues a loan, it will then sell that loan on
16   the secondary market to an entity like Fannie
17   Mae?    You are aware of that; correct?
18       A.    Yes.
19       Q.    And you are aware that Fannie
20   Mae has requirements that the loans have to
21   satisfy, including requirements that the
22   property that's the collateral for the loan
23   has to satisfy?
24       A.    Uh-huh.

Page 161

1        Q.    So could Mr. Hogsten have meant
2    that he was under pressure because the loan
3    couldn't be sold to Fannie Mae unless it met
4    certain guidelines and he needed to make sure
5    or somebody needed to make sure that that
6    happened?
7        A.    If we had not been through this
8    scenario on numerous occasions before with
9    numerous banks, including Wachovia, and hadn't
10   had the experience that we had, I could
11   probably agree with that.    But under the
12   circumstances, no, sir.    I believe that what
13   J. D. Hogsten ran into was a situation where
14   people did not want this deal to go through
15   and he was being pressured to cause it to
16   collapse.
17       Q.    But you don't have any evidence
18   of that, that's just your inference from the
19   statement that he said he was getting
20   pressure?
21       A.    Not that alone.    When I asked
22   J. D. to prove to me his authority to require
23   these renovations, he responded by asking me,
24   you know, if I was recording the conversation

1  and questions to that effect and saying,
2  "Well, look, you know, it's our policy.
3  That's just the way it is." You know, maybe
4  that was one of those cases where he said "You
5  people don't understand how this works" and so
6  forth.
7        I actually called above his
8  head to find out if I could get those policies
9  as well and was informed that those are
10  internal policies only and were not available
11  to the public, because I knew that it was
12  being fabricated in order to keep us from
13  getting this deal done.
14        And at the same time the
15  derogatory manner in which he was -- I mean,
16  I'm telling you what was said. I'm not
17  telling you the tone that was being used and
18  I'm not telling you the disrespect and
19  disdain. I mean, it turned into an absolute
20  mess.
21     Q.   Okay. Let's go back to
22  Paragraph 25 because I didn't finish talking
23  to you about that paragraph. That was the
24  paragraph we read that said that after the

1  appraisals were approved, Hogsten told
2  Anderson in order for the sale to be
3  completed, certain repairs had to be made, and
4  I asked you what do you mean by approved.
5        Did you mean after this
6  appraisal was approved, the repairs were
7  required? By "this appraisal" I mean the one
8  that's as of August 2, 2004, that we were
9  discussing a short while ago.
10     A.   No, I don't think that's the
11  case because I don't believe that appraisal
12  had to be approved. I mean, the bank had to
13  accept the appraisal. What I believe that is
14  referring to can't be specifically that
15  document because we were being required prior
16  to that document being completed.
17     Q.   Okay. Let me ask you about a
18  different paragraph which I think fits with
19  this one and then maybe that will help
20  clarify. This is Paragraph 34 of the
21  Complaint on the next page. It says: "After
22  the second appraisal for the Anderson property
23  was completed, the appraisal value was still
24  the same as the sale price."

1        Now, I am trying to understand
2  that paragraph. Is this the second appraisal
3  that's being referred to in that paragraph?
4     A.   That I believe is the second
5  appraisal. I believe, I believe that the
6  property appraised with the first appraiser.
7  I requested and never received a copy of that
8  report.
9     Q.   But that appraisal never took
10  place because the appraiser told you he
11  couldn't do it.
12     A.   No. The appraiser told me he
13  couldn't do it because there were no comps
14  available. Once we provided the comps and
15  Mr. Hogsten told me he provided them to the
16  appraiser, then that appraisal was in process.
17     Q.   You believe that once you
18  supplied those comps to the appraiser, that
19  that constituted an appraisal, and so that if
20  this is the second appraisal, that would have
21  been the first appraisal, when you supplied
22  what you are calling comparable properties to
23  that other appraisal?
24     A.   No. We all understand what an

1  appraisal consists of.
2     Q.   No, I don't. If this is the
3  second appraisal, I want to know what the
4  first appraisal is that's implied by that
5  paragraph.
6     A.   Paragraph 34 says: "After the
7  second appraisal for the Anderson property was
8  completed, the appraisal value was still the
9  same as the sale price."
10     Q.   So that --
11     A.   There is an assumption on my
12  part that the first appraisal was completed
13  but not produced. I don't have the appraisal.
14  I requested it. I was told that the appraisal
15  was ongoing, it was in process. But it was
16  never produced after the fact, indicating to
17  me that the property appraised at the sale
18  price or above.
19        But when I provided the comps
20  and it was provided to the appraiser, I was
21  told, okay, the appraisal is ongoing. When I
22  checked on the status of the appraisal, I was
23  told the appraisal wasn't completed. I asked
24  for a copy of that first appraisal. I never

42 (Pages 162 to 165)

Page 166

1  got it.
2        When they sent the second
3  appraiser out, the second appraiser's comment
4  was -- and I will be very specific -- "So
5  what's the problem here?"
6    Q.   Well, hold it.
7    A.   So, you know...
8    Q.   But back up.  First of all, you
9  are saying according to this paragraph there
10 was a first appraisal that was done that also
11 appraised the property for the purchase price,
12 and I take it that's what you're referring to
13 here in Paragraph 21 of the Complaint, which
14 says: "Another independent appraiser did come
15 out to appraise the property adjacent to
16 DuPont Highway for $267,000 which was the
17 purchase price."  Now, when did that take
18 place?
19   A.   Okay.  The first appraisal was
20 initiated.  Okay?  That's when I met the
21 appraiser out there.
22   Q.   This is the one where
23 Mr. Hogsten was there --
24   A.   With J. D., right.

Page 167

1    Q.   -- and then they went to lunch.
2    A.   That's what I'm referring to as
3  the first appraisal.
4    Q.   And you are saying that that
5  appraisal resulted in an appraisal of 580
6  North DuPont Highway?
7    A.   I don't know.  I requested the
8  appraisal.  I never got a copy of it.  But I
9  was told it was in process.
10   Q.   So, in fact, you don't know if
11 Paragraph 21 of the Complaint is correct.
12   A.   Can I read it, please?
13   Q.   You are just assuming that
14 there is an appraisal.
15   A.   Yes.  As it states here, I
16 asked Mr. Hogsten for another appraiser,
17 someone impartial, to come out and complete
18 the appraisal.  I was very uncomfortable with
19 the first appraiser and I had not received a
20 copy of his report.  According to Mr. Hogsten,
21 it was being done, but I never saw it.  So I
22 asked for another appraiser.
23   Q.   Okay.  So then you are saying
24 another appraiser came out --

Page 168

1    A.   Yes.
2    Q.   -- and appraised the property
3  for $267,000?
4    A.   Uh-huh.
5    Q.   Now, is that this appraisal?
6    A.   I believe that is because there
7  was just the one initiated and then that
8  appraisal which was completed.
9    Q.   Okay.  So there's only two
10 appraisals, there's this one here that's in
11 front of us dated as of August 2, 2004, and
12 then there's the one that was initiated when
13 the appraiser came out to the property and
14 Mr. Hogsten was there and the two of them went
15 to lunch afterwards.  Those are the only two
16 appraisals.
17   A.   That's correct.
18   Q.   And you don't know whether or
19 not the first appraisal was ever completed?
20   A.   No.  All I know is that it was
21 started, but whether or not it was completed,
22 I believe I asked that question but didn't get
23 an answer.  I believe the information was
24 concealed.

Page 169

1    Q.   But you don't know one way or
2  the other whether or not that appraisal was
3  ever finished?
4    A.   No, I do not.
5        MR. FOGDALL:  All right.  Let's
6        go off the record for a second.
7            - - -
8        (Discussion off the record.)
9            - - -
10       (Whereupon the documents were
11       marked, for identification purposes,
12       as Exhibits T. Anderson 8 and 9.)
13           - - -
14 BY MR. FOGDALL:
15   Q.   I just have a few followup
16 questions and then we'll be done.
17   A.   Okay.
18   Q.   First of all, I think we talked
19 about the fact that you've only had one other
20 loan through Wachovia where you dealt with
21 Mr. Hogsten and that was the Sorghum Mill Road
22 property in Lebanon, Delaware.  Is that
23 correct?
24   A.   To the best of my recollection,

43 (Pages 166 to 169)

Page 170

1  yes.
2      Q.   And in that transaction did you
3  have any complaints about Mr. Hogsten?
4      A.   No.
5      Q.   Okay.  I want to show you a
6  document which I have some guesses about what
7  it might be just from looking at it, but I
8  don't know.  I was hoping you could recognize
9  it and tell me what it is.
10      A.   It's notes from a meeting that
11  we had, one of the Tri-Core meetings.  We just
12  sat down and had conversations and took notes.
13  These are the notes from that meeting, things
14  that we talked about.
15      Q.   How many other Tri-Core
16  meetings were there besides this one?
17      A.   We'd talk on the phone maybe
18  occasionally, you know, since Dr. Wilkins
19  lives in Kansas and Wheatley and I were on
20  different shifts, so we'd meet and talk
21  whenever we'd have an opportunity to.  But
22  since the company, the organization, the group
23  wasn't doing anything or going anywhere, it
24  just petered out into nothing basically.

Page 171

1      Q.   Do you have notes from any
2  other meetings besides this one?
3      A.   Other than some stuff that I
4  may have, you know, just personal stuff, you
5  know.  But as far as the corporation is
6  concerned, no.  This was right pretty close to
7  the beginning, after all the preformation and
8  all of that other stuff, and I didn't do any
9  like formal, you know -- actually, this isn't
10  even formal.  This is just I think our
11  attorney told us that we had to -- I guess it
12  was our original meeting or something like
13  that and she gave us a format or something.
14  But it never really happened so we just blew
15  it off basically.
16      Q.   Who wrote these notes that you
17  have in front of you?
18      A.   You know, from reading it, it
19  looks like I may have compiled this, because
20  Wilkins wouldn't have been here and it refers
21  to Lloyd in the second person, so it wouldn't
22  have been him.  So it's been over two years.
23  I really can't recall for sure.  But just from
24  appearances it looks like it may have been

Page 172

1  something I compiled.
2      Q.   Okay.  Thanks very much.
3          MR. FOGDALL:  Let's go ahead
4  and mark this.
5              - - -
6          (Whereupon the document was
7      marked, for identification purposes,
8      as Exhibit T. Anderson 10.)
9              - - -
10  BY MR. FOGDALL:
11      Q.   The first line here says:
12  "$2000/month total outlay per couple until
13  further notice."  That's consistent with what
14  we discussed in the Operating Agreement, I
15  think, that each couple would pay $2,000 a
16  month?
17      A.   Uh-huh.
18      Q.   And how long did that take
19  place, how many months?
20      A.   I don't recall it ever taking
21  place or getting started.
22      Q.   You don't think this ever
23  happened?
24      A.   Unh-unh.  I don't have any

Page 173

1  recollection of that.  I think we talked about
2  it and we talked about everything on there.
3  We talked about that as well, I'm sure.
4  It was a concept because we had all been hurt
5  so much financially through what the bank was
6  requiring us to do that, you know, a lot of
7  this is how we're going to recover, what are
8  we going to do, how are we going to protect
9  our interests and so forth.  So there were a
10  lot of things talked about, but...
11      Q.   Okay.  But here it says:
12  "Agree to pay mortgages individually and place
13  'extra' aside."
14      A.   Yeah.
15      Q.   What's that referring to?
16      A.   That was just one of the
17  concepts that we had talked about because we
18  were so strapped financially from having to
19  fix up these houses that Wheatley was running
20  out of money so I would help him or I would do
21  some work for him or get some friends to help
22  me, and he would borrow money from Rich and
23  then I would help and Rich would give me some
24  money to buy material.

44  (Pages 170 to 173)

Page 174

1    So we were just basically
2  trying to keep our head above water. So
3  everyone had to make sure they made their
4  mortgage and anything that anybody had left
5  over we needed to help one another with.
6  That's pretty much the gist of it.
7    Q.    But if Mr. Wheatley was
8  financially strapped, wouldn't it have been a
9  hardship on him to have to pay more than his
10  mortgage payment every month?
11    A.    Oh, sure. That's why it didn't
12  happen. Like I said, it's another concept
13  that we talked about, how can we recover from
14  having to put out all of this money.
15    Q.    Okay. Moving down here a few
16  lines, there are the words "HELOC" -- which I
17  assume means a home equity line of credit?
18    A.    Right.
19    Q.    -- "to be used to reimburse
20  $24,500 cash from Andersons and $16,808 cash
21  from Wheatleys." Do you recall who took out
22  this home equity line of credit that's
23  referred to here?
24    A.    Wheatley took out a line of

Page 175

1  credit on his property. He owed us some
2  money. He owed Rich some money. And the bank
3  had required him, you know, right at
4  settlement, like it was getting real close,
5  they said, "Oh, we're going to need another
6  10% down." I'm trying to think how that whole
7  thing unfolded.
8    But, anyway, he was short. He
9  had several different accounts and investments
10  and the bank wouldn't let him use his
11  investment accounts because they were with
12  Wachovia. So at the end of the whole story,
13  to try and recover he took out a HELOC and
14  tried to settle the playing field.
15    Q.    So the $50,000 home equity line
16  of credit was taken out by Mr. Wheatley?
17    A.    Right.
18    Q.    And then from that $50,000,
19  $24,500 went to you and Mrs. Anderson to
20  reimburse you for some expenses?
21    A.    Yes.
22    Q.    Okay. What were the $24,500 of
23  expenses?
24    A.    We paid almost I would say the

Page 176

1  majority -- I can't remember specifically, but
2  probably the majority -- if not all, of those
3  subcontractors that were fixing up the house.
4  Some work we did ourselves on that property.
5  He owed us for we did a lot of work down there
6  and for assisting with some of the subs.
7    I think he had a problem with
8  his company and we loaned him, oh, my God, a
9  nice chunk of money. His limo business was
10  getting in trouble because he had overextended
11  himself by having to do all the repairs and so
12  we loaned him some money for that. He was
13  just scrapping to stay alive.
14    Q.    How much of the $24,500
15  represents expenses that you incurred during
16  the closing of these loans or leading up to
17  the closing of these loans?
18    A.    I'd have to go back and look.
19  I think just Wheatley's, you know, time and
20  materials was like $12,000.
21    Q.    Well, but he is getting
22  $16,808, it looks like, from the $50,000 and
23  you're getting $24,500. So is some of that
24  $24,500 reimbursing you for money you gave him

Page 177

1  to help his property go to closing?
2    A.    Yeah.
3    Q.    Okay.
4    A.    But that has nothing to do with
5  that $16,000 and change there. That was just
6  money he was going to use to try to -- you
7  know, he was pretty much in a lot of debt. He
8  used that HELOC to cover a lot of his debt
9  that he -- you know, he lost his disposable
10  income to do the repairs and all.
11    Q.    But you don't recall
12  specifically what this was?
13    A.    It was a combination of things
14  and we were talking and wheeling and dealing.
15  You know, I can't remember with specificity.
16    Q.    Did you lend or give
17  Mr. Wheatley and Mrs. Wheatley some money to
18  help them put their downpayment on their
19  property?
20    A.    Well, we loaned them a lot of
21  money. I don't know for sure. I know he was
22  buying a limo or trying to buy a limo. I knew
23  he had some debt that had come up. And I
24  didn't get into the details of why he needed

45 (Pages 174 to 177)

1  to borrow the money.
2      But we were concerned with two
3  things: one, his business collapsing; and,
4  number two, his ability to pay for the house
5  because he was in transition to move from his
6  house to the other house but he was trying to
7  carry both mortgages. So, you know, we loaned
8  him a chunk of money and we got our money back
9  then.
10      Q.    Do you see this page here?
11  This is materials that your lawyer, Mr. Grady,
12  produced to us. Do you recall how we looked
13  at some receipts and invoices in connection
14  with 580 North DuPont Highway, which is your
15  property?
16      A.    Right.
17      Q.    Here are some invoices and
18  receipts connected with 584 North DuPont
19  Highway, which is Mr. and Mrs. Wheatley's
20  property.
21      A.    Uh-huh.
22      Q.    And we're given a total here of
23  expenses of $11,535.21. Now, did you lend
24  Mr. Wheatley any money or Mrs. Wheatley any

1      Q.    Okay. Is there something you
2  wanted to add?
3      A.    Just it seems to me like there
4  had been an accident or something like that
5  during that time frame as well and that just
6  may have been a factor with him just really,
7  you know -- I mean, the extra stuff plus his
8  business and then the bank making him fix the
9  house.
10      Q.    What kind of accident are you
11  talking about?
12      A.    I don't know if it was or not.
13  I just remember something in that time frame,
14  him telling me that he had these situations
15  with his business and so forth and so on. And
16  it dawned on me, that's why I kind of gasped,
17  that maybe there was something. But his
18  business was hurting and about to collapse --
19  well, maybe about to collapse. But he also
20  was afraid of losing the house that he had
21  just purchased, which ultimately he did.
22      Q.    Okay. But you said a couple
23  things there. You talked about an accident.
24  Do you mean like an injury that he suffered

1  money to help them make that payment?
2      A.    Yes.
3      Q.    And is some of that reflected
4  in this $24,500?
5      A.    Yes.
6      Q.    Did you lend him the entire
7  amount that he needed to pay for all these
8  materials and supplies and so on?
9      A.    I don't think I lent him all of
10  it.
11      Q.    Okay.
12      A.    But we're talking about a lot
13  of money. I mean, the repairs that were
14  needed there, what he had to pay for was a lot of
15  was for sweat equity. We put a lot of
16  personal work into that house that he had to
17  repay us for.
18      Q.    He paid you for work that you
19  personally did on his house?
20      A.    Right.
21      Q.    Okay.
22      A.    And also recruiting other
23  people to help do the work and kind of help
24  and make sure things got done.

1  that prevented him from working?
2      A.    No. I think that it was like
3  one of his limos or one of his vans, you know,
4  it had gotten hit or something and he needed
5  to fix it or something, you know, an accident.
6      Q.    Okay. Then you said his
7  business was about to collapse. You mean
8  around this time it was about to collapse?
9      A.    Yeah. Well, he was in
10  transition. He was moving into I guess the
11  limousine business and the competition was
12  really, really high and he was hurting. And
13  he was in that transition and he needed money
14  that he had to spend on the house and so we
15  were trying to help him out.
16      Q.    Okay. Let's just finish up
17  with this exhibit and then we can call it a
18  day.
19      A.    Okay.
20      Q.    The next line talks about
21  "Commercial Conversion." What's that refer
22  to?
23      A.    It was just one of the
24  thoughts, one of the concepts that we had of

Page 182

1  what we could do if -- you know, we were sort
2  of rocked back on our heels by this whole
3  thing that the bank had put us through and so
4  we were thinking about, man, maybe we should
5  just try to do something with this property
6  and, man, get it refinanced away from these
7  yahoos -- I'm sorry -- get it refinanced away
8  from Wachovia and maybe try to do something
9  commercially with the properties. And we
10  kicked it around and then we dropped it.
11    Q.   It does say a little bit
12  farther down on the page that you decided to
13  lease properties. I assume that you mean you
14  decided to lease the three properties that are
15  at issue here.
16    A.   That's what it's referring to,
17  yes.
18    Q.   And did you do that?
19    A.   No. We didn't do any -- I
20  mean, these are things we talked about and we
21  made a decision and then we thought about it
22  and then we went back and changed our mind and
23  we'd discuss it later and then we'd change our
24  mind. We were scrambling for some kind of

Page 183

1  safety net or something, you know.
2    Q.   So in that stretch from August
3  '04 to June '05, when you said you were on
4  active duty, you didn't lease the property out
5  during that time?
6    A.   No. It's never been leased.
7  None of them have ever been leased. I know
8  that Wilkins and Wheatley have never leased
9  them, no.
10    Q.   But it looks like you incurred
11  a fair amount of expenses. At least that's
12  what it looks like from the discussion here:
13  "Decided (recently) to use HELOC cash that was
14  earmarked for Andersons" -- which I assume
15  means the $24,500 referred to in here --
16    A.   Probably, yeah.
17    Q.   -- "to pay furnishing expenses.
18  Should be reimbursed with leases.
19    "- 3 couches, 3 love seats, 3
20  dining rooms sets, 8 dish sets, 10 full size
21  beds," and so on, "3 mid size T.V.'s with
22  basic cable..." So you did incur some
23  expenses there. What was the purpose of that?
24    A.   Well, when we were thinking

Page 184

1  about, you know, leasing the property -- now,
2  once again, this concept or whatnot was one of
3  those things we talked about but never came to
4  pass. I mean, we walked through the whole,
5  you know, how do we -- what we figured was
6  that the bank was going to try to dissolve the
7  deal after the fact because J. D. had told me
8  and Wheatley after the fact that we're going
9  to be watching you. So we couldn't figure out
10  what that was. We perceived it as a threat.
11    So we were kind of kicking
12  around all these different ideas that we would
13  look at maybe if we ever decided to refinance
14  away from Wachovia or, you know, maybe some
15  ideas we were planning on at that time that we
16  just didn't execute them so...
17    Q.   Okay. Again, just to clarify,
18  he didn't say we are going to be watching you,
19  he said they are going to be watching you; is
20  that right?
21    A.   He did say they.
22    Q.   Okay.
23    A.   And he said, "Don't be
24  surprised if someone from the bank comes and

Page 185

1  knocks on your door."
2    Q.   Now, are you sure what he
3  really said was don't be surprised if someone
4  from an entity like Fannie Mae?
5    A.   Unh-unh. He was very specific.
6  He said, "They're going to be watching you"
7  and he said, "Don't be surprised if someone
8  from the bank comes and knocks on your door.
9  I'm telling you, T, you better really watch
10  yourself."
11    And I got offended. I said,
12  "So what are you saying, that somebody is
13  going to be looking over my shoulder?" I got
14  a little upset with him.
15    And he said, "Well, I can't
16  really say. I just need you to know that, you
17  know, you better be careful."
18    Q.   Well, are you saying that you
19  took that to be that he personally was
20  threatening you or was he just kind of looking
21  out for you?
22    A.   No, because he would ask me am
23  I recording the conversation and then when I
24  would ask him questions, he would say, "Well,

47  (Pages 182 to 185)

Page 186

1  why? Are you recording this?" So he was
2  saying it in a way that I perceived to be a
3  threat either from him or someone at the bank.
4        But, you know, my wife was very
5  upset when he said it and we talked about it
6  after the fact and it was totally uncalled
7  for. But it also let us know that we could
8  expect some subsequent or after-the-fact
9  scrutiny in order to dissolve what we had done
10 after the fact. So, you know, we fully
11 expected it. And I am not the only one that
12 he told that to, either. So you will hear
13 that again.
14     Q.   There were more people in the
15 room when he said it?
16     A.   At different times.
17     Q.   One other thing I wanted to ask
18 you about this. It says here you're starting
19 to get a business plan together for Citizens
20 Bank, which I guess you had considered as a
21 way to finance the commercial conversion
22 that's being discussed here.
23     A.   Right.
24     Q.   And you say: "We planned to do

Page 187

1  this within three months so we can pledge the
2  assets to Tri-Core."
3      A.   Yes.
4      Q.   Now, at some point you did, in
5  fact, transfer your properties to Tri-Core.
6      A.   I guess maybe six weeks or so
7  ago. It's not the same company. I mean,
8  Wheatley lost the house so, you know, we
9  bought him out and he just kind of went into
10 recovery mode.
11     At this point I would say that
12 any plans or ideas that we had just dissolved
13 with the company. So three years passed and
14 we finally came around to say, you know what,
15 let's try to resurrect this thing. You know,
16 like I said, three years later we decided,
17 yeah, let's, you know, try to group this thing
18 together, which is what we did.
19     Q.   So --
20     A.   But --
21     Q.   Go ahead; I'm sorry.
22     A.   But I'm saying, these concepts,
23 ideas, thoughts, and whatnot, we're
24 brainstorming, you know, what about this and

Page 188

1  what about that, and we're running all these
2  things, and these notes reflect some of those
3  thoughts and whatnot, all of which, as you can
4  see, just went by the wayside. But the
5  company just sat dormant for three years and
6  then we decided to take what was left of it
7  and, you know...
8      Q.   So what happened to the
9  Wheatley property after? Did you and your
10 wife and the Wilkinses buy that property
11 together or did only Mr. Wilkins purchase the
12 Wheatley property?
13     A.   Mr. Wilkins purchased the
14 property, but we helped. I mean, we knew what
15 was going on. He didn't have enough money to
16 really carry the whole thing. He hadn't
17 gotten promoted to colonel yet. So we
18 realized that, you know, someone else is going
19 to buy it because Wheatley is going to
20 default, so we kind of chipped in, you know.
21 We're just basically working it out together,
22 you know. But I was stretched, too, as a
23 result of all of this. So that's what our
24 plan was to recover, and he bought the place

Page 189

1  and we have protected ourselves that way.
2      Q.   As a result now, the two of
3  you, you and your wife and the Wilkinses --
4      - - -
5      (Brief interruption.)
6      - - -
7      MR. GRADY: Just a minute.
8      - - -
9      (Short recess.)
10     - - -
11 BY MR. FOGDALL:
12     Q.   But between you and the
13 Wilkinses, whereas before you had a 33%
14 interest, each of you, in the company, now you
15 each have a 50% interest in the company?
16     A.   Yeah. I mean, I'm not on the
17 mortgage or the deed for the property there.
18     Q.   Okay.
19     A.   Well, I wasn't for the two
20 years, two and a half years that Wilkins owned
21 it and whatnot. But it's been all grouped up
22 now so...
23     Q.   Then did you have plans for the
24 Wheatley property? I mean, what happened to

48 (Pages 186 to 189)

Page 190

1  that property?
2      A.  We didn't have plans.  All we
3  knew is that we had to protect ourselves once
4  he said he can't stand under the weight of
5  this anymore.  So nothing was ever done.  I
6  mean, you know, we never had any intention,
7  plans, and ideas.  It was never leased out.
8  It was never rented.  You know, we just were
9  trying to decide what to do, but we found
10  ourselves -- I mean, he went to Iraq, I was
11  still on active duty, and so, you know, time
12  just went.
13      Q.  But the property, the house,
14  doesn't exist anymore; correct?
15      A.  No, no.  It's been partially
16  demolished, yeah.
17      Q.  Did you have plans, business
18  plans, to put that land to use?
19      A.  Yeah.  I wanted to create an
20  office.  I wanted to put an office there.  So
21  we'll see how that works.
22      Q.  What type of office? just a
23  general business?
24      A.  Yeah.  Well, you know, a

Page 191

1  regular commercial office that could be used
2  for any purpose, you know.  It leaves, you
3  know, my house intact.  It doesn't affect it.
4      Q.  Just two more questions and I
5  will do my best to keep it to two.
6          I am a little confused about
7  the timing of the buyout of the Wheatley
8  property.  The Complaint says it took place
9  six months after the transaction closed.  Does
10  that square with your recollection?
11      A.  It didn't seem to me like it
12  was six months because he was struggling
13  through the whole time frame and it probably
14  was around five or six months.  Whatever the
15  document says.  There's closing documents with
16  Wilkins.  That sounds about right.
17      Q.  Well, that's my question.
18  Maybe this is something that we can just
19  discuss with Mr. Wheatley tomorrow at his
20  deposition.
21          But the closing documents that
22  you just referred to indicate that the actual
23  purchase of the property by Mr. Wilkins was in
24  October of '05.  But according to this

Page 192

1  Membership Interest Redemption Agreement, the
2  Wheatleys' interest in Tri-Core was bought out
3  in May of 2005, several months before the
4  closing of the purchase of the Wheatley
5  property by the Wilkinses.  So there seems to
6  be a time lag there between those two events.
7      A.  Yeah.  I don't really recall.
8  I know that from the onset Wheatley was
9  struggling and he had to get a line of credit
10  to keep his head above water and he knew he
11  was going to lose the house and we knew that
12  him losing the house, we no longer had a basis
13  for what we were using to protect our
14  interest, which was, you know, the whole
15  Tri-Core concept.
16          So he was, you know -- I don't
17  know the word, but he was withdrawn from the
18  corporation and his property was purchased,
19  and those did not happen at the same time.
20  However, I think one of them coincided with
21  Wilkins' coming through town or something like
22  that and the other one happened whenever it
23  transpired.
24      Q.  Do you recall the Wheatleys

Page 193

1  being given $22,000 in exchange for their
2  interest in Tri-Core, according to this
3  May 25, 2005, Redemption Agreement?
4      A.  I don't recall them being given
5  $22,000.
6      Q.  Okay.
7      A.  I know that the Wheatley
8  property in that time frame had appreciated
9  and that the sale price was higher than his
10  purchase price, and that may represent the
11  difference in what we had to pay him for the
12  property.  Our motive at that point was to
13  keep anyone else from buying it and he was
14  going to go with the max money because he was
15  hurt.  So we were like "Whatever you're asking
16  is what we're paying."  So that's how that
17  unfolded.
18          - - -
19          (Whereupon the document was
20          marked, for identification purposes,
21          as Exhibit T. Anderson 11.)
22          - - -
23          MR. FOGDALL:  Okay.  That's all
24  the questions that I have.

49 (Pages 190 to 193)

Page 194

```
 1        MR. GRADY:  We'll read.
 2           - - -
 3        (Witness excused.)
 4           - - -
 5        (Whereupon the deposition
 6     adjourned at 4:15 p.m.)
 7           - - -
 8
 9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
```

Page 196

INSTRUCTIONS TO WITNESS

```
 1
 2
 3        Please read your deposition over
 4     carefully and make any necessary corrections.
 5     You should state the reason in the appropriate
 6     space on the errata sheet for any corrections
 7     that are made.
 8        After doing so, please sign the errata
 9     sheet and date it.
10        You are signing same subject to the
11     changes you have noted on the errata sheet,
12     which will be attached to your deposition.
13        It is imperative that you return the
14     original errata sheet to the deposing attorney
15     within thirty (30) days of receipt of the
16     deposition transcript by you.  If you fail to
17     do so, the deposition transcript may be deemed
18     to be accurate and may be used in court.
19
20
21
22
23
24
```

Page 195

```
 1        C E R T I F I C A T E
 2        I hereby certify that the witness was
 3     duly sworn by me and that the deposition is a
 4     true record of the testimony given by the
 5     witness.
 6
 7
 8     _____
 9     Susan Marie Migatz, RMR, CRR
       Delaware Certification No. 254
       Dated:  November 8, 2007
10
11        (The foregoing certification of this
12     transcript does not apply to any reproduction
13     of the same by any means, unless under the
14     direct control and/or supervision of the
15     certifying shorthand reporter.)
16
17
18
19
20
21
22
23
24
```

Page 197

```
 1        - - - - - - - -
 2        E R R A T A
 3        - - - - - - - -
 4     PAGE   LINE        CHANGE
 5     ___    ___    _____
 6     ___    ___    _____
 7     ___    ___    _____
 8     ___    ___    _____
 9     ___    ___    _____
10     ___    ___    _____
11     ___    ___    _____
12     ___    ___    _____
13     ___    ___    _____
14     ___    ___    _____
15     ___    ___    _____
16     ___    ___    _____
17     ___    ___    _____
18     ___    _-_    _____
19     ___    ___    _____
20     ___    ___    _____
21     ___    ___    _____
22     ___    ___    _____
23     ___    ___    _____
24
```

50 (Pages 194 to 197)

# IN THE UNITED STATES DISTRICT COURT

## FOR THE DISTRICT OF DELAWARE

TOLANO ANDERSON, et al.,                )
                                        )
                    Plaintiffs,         )        C.A. No. 06 CV 00567 (SLR)
                                        )
            v.                          )
                                        )
WACHOVIA MORTGAGE CORPORATION           )
*and* WACHOVIA CORPORATION,             )
                                        )
                    Defendants.         )
                                        )

---

### DECLARATION OF DAVE MILLER

---

STATE OF DELAWARE       :
                        : ss.
COUNTY OF SUSSEX        :

      I, Dave Miller, being duly sworn according to law, declare that the following statements are true and correct to the best of my knowledge, information and belief:

      1.    I am president of All-Span, Inc., a company that manufactures light gauge steel truss systems for construction projects, located at 9347 All Span Drive, Bridgeville, Delaware 19933.

2.     In May 2004, I and some other partners were interested in purchasing the properties located at 580, 584 and 592 North DuPont Highway, in Dover, Delaware as investment properties, possibly to convert them to a commercial use.

3.     · We reached an agreement with the seller, Peter Aigner, to purchase all three properties for a total of $750,000.00.

4.     The agreement fell through in June 2004 because we were unable to get financing for the transaction.

5.     I am Caucasian.

6.     I do not have a specific recollection of the condition of the properties located at 584 and 592 North DuPont Highway.

7.     However, I do recall that the home at 580 North DuPont Highway had extensive damage from a broken water pipe.

8.     The water had damaged the drywall on the first floor and in the basement.

9.     Several pieces of drywall were missing from the walls on the first floor.

10.    The floor tiles were peeling back in some places.

11.    The insulation had been damaged by the water in many places and would have to be replaced.

2

12.    Mold appeared to be developing in some places due to dampness from the water.

13.    It appeared that the water had even affected some of the electrical sockets and I thought the wiring in the walls might have been damaged.

14.    My conclusion as a potential purchaser was that the drywall, insulation and possibly the wiring on the first floor and in the basement of the house would have to be completely gutted and replaced.

I declare under penalty of perjury that the foregoing is true and correct.

Executed on December _18_, 2007

Dave Miller

Page 1

# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF DELAWARE

TOLANO ANDERSON, et al.,           )
                                   )
          Plaintiffs,              )
                                   )
v.                                 )    Civil Action No.
                                   )       95-306-JJF
WACHOVIA MORTGAGE CORPORATION      )
and WACHOVIA CORPORATION,          )
                                   )
          Defendants.              )

          Deposition of JAMES D. HOGSTEN taken pursuant to notice at the offices of Grady & Hampton, LLC, 6 North Bradford Street, Dover, Delaware, beginning at 9:20 p.m. on Friday, November 2, 2007, before Robert W. Wilcox, Sr., Registered Merit Reporter and Notary Public.

APPEARANCES:

          JOHN S. GRADY, ESQ.
          Grady & Hampton, LLC
             6 North Bradford Street
             Dover, Delaware  19904
             for the Plaintiffs,

          STEPHEN A. FOGDALL, ESQ.
          Schnader, Harrison, Segal & Lewis, LLP
             1600 Market Street - Suite 3600
             Philadelphia, Pennsylvania  19103
             for the Defendants.

   ALSO PRESENT:  TOLANO D. ANDERSON
                  LLOYD J. WHEATLEY

                CORBETT & WILCOX
   230 N. Market Street - Wilmington, Delaware 19801
                   (302) 571-0510

          Corbett & Wilcox is not affiliated with

          Wilcox & Fetzer, Court Reporters

Page 2

1    JAMES D. HOGSTEN,
2    the witness herein, having first been
3    duly sworn on oath, was examined and
4    testified as follows:
5    BY MR. GRADY:
6    Q.  Mr. Hogsten, good morning.  My name is John
7    Grady.
8    A.  Good morning.
9    Q.  I represent the plaintiffs in this case.  I'm
10   going to be asking you some questions today.  If any of
11   my questions are not clear, let me know and we'll try
12   to make them clear.
13   A.  Okay.
14   Q.  Otherwise, I'll assume that we understand each
15   other.  Have you been deposed before?  Are you familiar
16   with this process?
17   A.  No.
18   Q.  All right.  We've got your name.  Give me your
19   address.
20   A.  My home address?
21   Q.  Home address.
22   A.  2216 Ceeneytown Road, Dover, Delaware 19904.
23   Q.  How long have you lived in Dover?
24   A.  In Delaware?

Page 3

1    Q.  Dover.
2    A.  In Dover forty-one years, excluding four years
3    of college, I guess.
4    Q.  All right.  Well, we don't usually ask people
5    how old they are.  How old are you?
6    A.  44.
7    Q.  So most of your life?  Most of your life in
8    Dover?
9    A.  Mm-hmm.
10   Q.  Right?
11   A.  I beg your pardon?
12   Q.  Most of your life in Dover?
13   A.  Yes, sir.
14   Q.  Did you go to school at Dover High?
15   A.  Yes.
16   Q.  So you're familiar with Silver Lake?
17   A.  Yes.
18   Q.  Have you ever been skiing on Silver Lake?
19   A.  No, can't say that I have.
20   Q.  Have you ever been fishing over that way?
21   A.  No, can't say that I have either.
22   Q.  All right.  Who is your employer?
23   A.  Wachovia Mortgage Corporation.
24   Q.  How long have you been employed by Wachovia

Page 4

1    Mortgage Corporation?
2    A.  Approximately fifteen years.
3    Q.  And who were you employed by before that?
4    A.  The Delaware State Housing Authority.
5    Q.  Is that most of your professional career?
6    A.  Yes, sir.
7    Q.  Now, in this lawsuit we're going to be
8    discussing Wachovia and Wachovia Mortgage Corporation.
9    All right.  Are you familiar with the difference?
10   A.  Yes, sir.
11   Q.  All right.  So you say you've been with
12   Wachovia Mortgage Corporation for fifteen years; right?
13   A.  Approximately, yes.
14   Q.  Now, in the history of the evolution of banks
15   around Dover, Wachovia, who did they take over?
16   A.  I'll start when I -- when I started it was
17   Delaware Trust.
18   Q.  Delaware Trust.  So when you're talking about
19   fifteen years ago, are you talking about Delaware
20   Trust?
21   A.  Yes, sir.
22   Q.  That's what I thought.  So Delaware Trust, you
23   worked for them.  And then who took them over?
24   A.  That would be -- well, Meridian Bank.

Page 5

1    Q.  Meridian.
2    A.  But they didn't change the name in Delaware.
3    It remained Delaware Trust.
4    Q.  I see.
5    A.  And then CoreStates Bank took over Wachovia.
6    I'm sorry.  CoreStates Bank took over Meridian Bank.
7    Q.  Okay.
8    A.  First Union took over CoreStates Bank.  And
9    then First Union purchased Wachovia but retained
10   Wachovia's name as the holding company.
11   Q.  I think I have that.  And how long has
12   Wachovia had a presence, with that big name Wachovia,
13   here in Dover?
14   A.  I'm really not sure.  I can't answer the
15   question exactly.
16   Q.  Five or six years or more than that?
17   A.  Yes, approximately.  I'm not really sure.
18   Q.  That's okay.
19   A.  Two or three years.
20   Q.  All right.  Now, we're going to, I guess,
21   follow a couple procedural matters here.  We're not
22   going to make big issues about them, but we ought to
23   discuss them.  The last notice of deposition which we
24   sent, we asked you to bring with you the entire file,

## Page 6

1 the Andersons, Wheatleys and Wilkins, in connection
2 with the loans that are the subject of this suit and
3 bring with you all bank regulations related to the
4 mortgages of plaintiffs. And I understand from your
5 counsel that you didn't bring anything with you today,
6 that the only thing that's been brought are the
7 documents which have already been sent, which are
8 substantial, but you didn't bring anything else with
9 you. Is that right?
10       MR. FOGDALL: Mr. Hogsten, I'll just ask
11 you not to answer that question. I think that's a
12 question more appropriately directed to counsel.
13 Counsel and I have had a conversation about this issue,
14 and Wachovia's position is that's a request that would
15 be appropriately directed to a 30(b)(6) witness, but
16 not to Mr. Hogsten in his personal capacity.
17       MR. GRADY: All right.
18 BY MR. GRADY:
19    Q. But the long and short is you didn't bring
20 anything with you today?
21    A. That's correct.
22    Q. Okay.
23       MR. GRADY: I guess we ought to mark this
24 as Hogsten 1.

## Page 7

1       (Hogsten Deposition Exhibit No. 1 was
2 marked for identification.)
3 BY MR. GRADY:
4    Q. Secondly, before your dep -- this may be
5 directed more to counsel, too, but let me put this on
6 the record. Before your deposition I had sent out what
7 are called interrogatories and requests for production,
8 and I was advised that the interrogatories would be
9 produced yesterday, which I had agreed that they could
10 be produced late, and when they were produced from my
11 point of view I had thought that I would rely upon them
12 in asking some of the questions which I'm going to ask
13 you today. There were almost just about universal
14 objections of one sort or another to all of the
15 interrogatories. From my point of view, legal point of
16 view, this is not your concern so much, that all those
17 objections were legally insufficient and that in the
18 event that I feel prejudiced by those answers I guess I
19 will take whatever actions I think are appropriate,
20 which may include filing something with the court
21 indicating that I thought that those answers should
22 have been certainly more complete than they were. We
23 do plan to go forward with your deposition today.
24 We'll have to just see what happens. Again, in my

## Page 8

1 point of view the answers were wholly inadequate. I
2 just wanted to put that on the record.
3       MR. FOGDALL: And I'll say something in
4 response. First, as to the timing of our responses to
5 your discovery requests, you and I both agreed that we
6 would have additional time to put together our
7 responses. And you also sent me documents the day
8 before Mr. Anderson's deposition.
9       MR. GRADY: Just so it's clear, I don't
10 have any objection to the timing because it was an
11 agreement by counsel.
12       MR. FOGDALL: Okay.
13       MR. GRADY: No objection to the timing.
14 It was the substance of the answer that I'm objecting
15 to.
16       MR. FOGDALL: And I understand your
17 position. In response I would say that plaintiffs'
18 interrogatories fall into three categories. They
19 either (a) seek information contained in documents
20 already produced by Wachovia or (b) they seek
21 admissions from Wachovia or (c) they seek statistical
22 data related to Wachovia's loan approval rates by race
23 both in Delaware and nationally.
24       And as to the first category Wachovia

## Page 9

1 under the rules is not obligated to extract information
2 from documents for plaintiffs. As to the second
3 category Wachovia is not going to answer
4 interrogatories the sole purpose of which is to seek
5 admissions. If counsel wants to serve a request for
6 admissions, Wachovia will respond appropriately. As to
7 the third category, the statistical data that
8 plaintiffs seek isn't relevant to the case.
9       MR. GRADY: All right. I think we've made
10 the record on both sides.
11       Off the record.
12       (A brief discussion was had off the
13 record.)
14 BY MR. GRADY:
15    Q. And I guess, since we're putting things on the
16 record, we'll just put on the record that I've supplied
17 counsel with two checks signed by Mr. Wheatley, dated
18 8/13/2004 and 8/6/2004, and I've also supplied him with
19 a document entitled "Notice of Action Taken," which
20 refers to a loan number 6995009, which will be
21 discussed in the course of the deposition.
22       All right. We just had a little
23 interruption and a little background information. We
24 talked about the banks. Now, the Wachovia bank that

4  (Pages 10 to 13)

Page 10

1   you work at, what office do you work out of?
2       A.   I currently work out of the office on 100
3   North DuPont Highway.
4       Q.   And have you been there very long?  Have you
5   always worked out of that office?
6       A.   No.
7       Q.   Where did you work before?
8       A.   That would be 101 West Loockerman Street.
9       Q.   So you moved over to the DuPont Highway when
10  they closed the Loockerman Street branch?
11      A.   Yes, sir.
12      Q.   All right.  We're talking about a time period
13  particularly 2004.  So in 2004 could you tell us, I
14  guess, what your title was to begin with?
15      A.   In 2004 I was a mortgage consultant.
16      Q.   What were your job responsibilities?
17      A.   To originate mortgage loans, first mortgage
18  loans, for residential properties.
19      Q.   Did you do any mortgage loans at all for
20  commercial properties?
21      A.   No.
22      Q.   And tell me what authority you had in
23  connection with approving loans.
24      A.   No authority.

Page 11

1       Q.   No authority at all.  Tell me, I guess maybe
2   in a little more detail, how the process is.  When
3   somebody came in and -- I assume they would talk to you
4   usually?
5       A.   If someone wanted a loan, they would come in,
6   we'd discuss their credentials, and I'd try to put
7   together a game plan, as best I could, to meet that
8   customer's need.
9       Q.   And then what would happen?
10      A.   I'd have them sign papers, disclosural papers,
11  and I would forward those original documents to a
12  service center, either -- depending on the type of
13  loan, it would either be in Waterbury, Connecticut,
14  Jacksonville, Florida or Raleigh, North Carolina.
15      Q.   You send the papers to these different service
16  centers and then what would happen next?
17      A.   They would be processed and underwritten.
18      Q.   Did you make any recommendations with these
19  papers?
20      A.   What I would do is I would put a scenario, a
21  brief e-mail typically is what we did, of how I
22  structured the deal.
23      Q.   Okay.
24      A.   And I turned it in and had the underwriter

Page 12

1   take a look at it based on what was on the application.
2       Q.   Did you have authority to sort of screen out
3   some of these applications?  Some you just wouldn't
4   send at all, thought the person just clearly was not
5   eligible, or did you send everything on to the
6   underwriters?
7       A.   Well, it depends on the stage, but once
8   they've signed the papers, yes.
9       Q.   Once they've signed the papers everything
10  goes?
11      A.   Everything goes to the service center.
12      Q.   What kind of papers would they sign?
13      A.   It would be the application, good faith
14  estimate of closing costs, disclosural-type things such
15  as authorization to pull credit, check job history.
16  Those types of things.
17      Q.   Was any payment required with the application?
18      A.   Yes.
19      Q.   What was the payment?
20      A.   At the time -- I'm not sure.  I think it was
21  around $400 --
22      Q.   All right.
23      A.   -- at the time.  It's changed since then.
24      Q.   But they had to pay something?

Page 13

1       A.   Yes.
2       Q.   If they didn't pay something, nothing would
3   happen; is that right?
4       A.   Yes, that's correct.
5       Q.   So I guess the idea is they would make a
6   payment and you would make a good faith effort to
7   process the loan?
8       A.   Yes.
9           MR. FOGDALL:  A late objection.  I'm
10  sorry, but I'll object to the form of the question, the
11  unclarity of the words "good faith effort to process
12  the loan."
13          MR. GRADY:  All right.
14      Q.   Procedurally this is the way it's going to
15  work in this deposition.  Sometimes your counsel is
16  going to make objections, and he's just making
17  objections and he's going to let you answer.  If he's
18  really upset, you'll know it.  All right?  But short of
19  that, if there's a pause, we can probably go on.
20          Paperwork would be sent to the servicing
21  center and then they would -- well, I guess at this
22  early stage would there be any evaluations being made
23  about the value of the property?  How would you know?
24  Would you need an agreement of sale?  If somebody came

Page 14

1  in and asked for a $200,000 loan, for example, would
2  you say, well, how much is the house worth? How would
3  that fit into the scenario?
4      A.  Typically I have a sales agreement.
5      Q.  Okay.
6      A.  I make the deal assuming that the house is
7  going to appraise for what it's going to appraise for.
8      Q.  Then it goes to the service center; right?
9      A.  Yes, sir.
10     Q.  What's the service center do?
11     A.  They process it, send it to an underwriter for
12  review, they order an appraisal, and set it up for
13  closing.
14     Q.  Is the underwriter part of the bank or is that
15  independent?
16     A.  Part of the mortgage company.
17     Q.  I'm sorry. I'll be careful in my language
18  here. It's part of the underwriter, another part of
19  the mortgage company?
20     A.  Yes, sir.
21     Q.  All right. Now, these properties we're
22  talking about are located at I believe the address is
23  something like 580, 582, 584 North DuPont Highway. I
24  might be off a little bit, but approximately. Were you

Page 15

1  familiar with that general location?
2      A.  Yes.
3      Q.  All right. And these houses all backed up on
4  Silver Lake?
5      A.  That's correct.
6      Q.  And are you familiar with let's say starting
7  with Division Street and going around over to I guess
8  where Silver Lake goes toward the General Assembly and
9  comes back, that general area?
10     A.  I'm not sure I understand your question.
11     Q.  Are you familiar with the houses that back up
12  on Silver Lake?
13     A.  Yes.
14     Q.  Would you agree most of those -- people who
15  reside there are non-minority?
16     A.  I have no idea.
17     Q.  No idea. In your time living in Dover you
18  have no idea of the racial complexity of the housing
19  around Silver Lake?
20     A.  No, sir.
21     Q.  Do you know what the racial complexity of the
22  housing is on let's say Kirkwood Street?
23     A.  I'm not sure.
24     Q.  How about New Street, New Street between

Page 16

1  Loockerman and Division.
2      A.  I'm really not sure.
3      Q.  All right. How about on South Governors
4  Avenue between division And Loockerman?
5      A.  I'm really not sure.
6      Q.  Not to familiar with the racial makeup of the
7  neighborhoods in Dover?
8      A.  I mean, as far as a percentage, is that what
9  you're asking me? I'm not really sure.
10     Q.  I'm just asking if you generally know whether
11  they are predominantly white, predominantly black, if
12  you know.
13     A.  I don't know really. I mean, I know that
14  there are some lower income families that live there
15  from my time at the State Housing Authority.
16     Q.  Well --
17     A.  And are they minority? I would have to say
18  yes just from my experience.
19     Q.  These houses bordering on Silver Lake, have
20  you ever done any mortgages for any of those houses
21  over there before?
22     A.  I don't think I have. Chatham Cove, that's
23  condominium. I think I've done some in that
24  condominium complex there. A couple there.

Page 17

1      Q.  Wouldn't you agree that the area bordering
2  Silver Lake is predominantly a white area?
3          MR. FOGDALL: Objection. Asked and
4  answered.
5          MR. GRADY: You can answer.
6      A.  I'm really not sure.
7      Q.  I'm going to be asking you some questions
8  today about the applications of Anderson, Wheatley and
9  Wilkins. As you can see, we have a stack of documents
10  produced by your office. If as we go through these
11  things you believe there are some papers that might --
12  that you might recognize in those papers, please let me
13  know, and we'll make them available to you. Okay?
14         Let's start with Mr. Anderson. Well,
15  before you came here did you review any documents or
16  any paperwork?
17     A.  Are you talking today?
18     Q.  Well, in the last -- since the lawsuit has
19  been filed.
20     A.  Yes.
21     Q.  What have you reviewed?
22     A.  The complaint.
23     Q.  Okay. Anything else?
24     A.  Application.

6 (Pages 18 to 21)

| Page 18 | Page 20 |
|---|---|
| 1  Q. Of all the people? | 1  MR. FOGDALL: Objection to the form of the |
| 2  A. Yes. | 2  question. |
| 3  Q. Is there like a file that you looked at? | 3  A. Would they be available today? I mean, I'm |
| 4  A. No. | 4  not sure I understand your question. |
| 5  Q. No file. Your counsel has produced a lot of | 5  Q. Today. |
| 6  documents in this case. Have you seen any of those | 6  A. No. |
| 7  documents? | 7  Q. How long do you keep them? |
| 8  A. The complaint. | 8  A. I usually keep them until the deals settle. |
| 9  Q. We've got a stack of documents several inches | 9  Once they settle I purge them from my e-mail box |
| 10  thick, has Anderson on it, almost 300 pages. Have you | 10  typically. |
| 11  seen any of this prior to today? | 11  Q. All right. |
| 12  A. I'm really not sure. I don't believe so. | 12  A. I mean, it might be thirty days after or |
| 13  Q. Generally I'm just trying to find out -- this | 13  something like that, but I generally don't keep that. |
| 14  looks like a lot of documents in the Anderson case. | 14  It's overloading your systems. |
| 15  A. Yes, sir. | 15  Q. Do you have any recollection of when |
| 16  Q. On these cases do you keep a file in your | 16  Mr. Anderson first came in to see you? |
| 17  office? | 17  A. Yes. You're talking about this particular |
| 18  A. What I do is the originals go to the service | 18  loan? |
| 19  center. I keep a copy of the application and my | 19  Q. We're talking this particular loan, yes. |
| 20  registration lock form so that I know what the pricing | 20  That's the question. Your answer is yes? |
| 21  is. | 21  A. Yes. |
| 22  Q. Say it again. Registration lock form, what is | 22  Q. Do you remember approximately when he came in |
| 23  that? | 23  A. Time of day? Is that your question? |
| 24  A. It's a form that tells me what program I have | 24  Q. No. Approximate date. |

| Page 19 | Page 21 |
|---|---|
| 1  them in, what interest rate they're locked in at. | 1  A. I don't remember. |
| 2  Q. Okay. | 2  Q. Would the date of his application, if there is |
| 3  A. And then just my cover sheet to the service | 3  a document with date of application, that would |
| 4  center with a couple notes maybe. | 4  probably be the first day he was there; is that right? |
| 5  Q. All right. Do you have any handwritten | 5  A. Close to that date. Typically what I do is I |
| 6  documents? | 6  get the information with my clients over the phone |
| 7  A. Do I have them currently? | 7  first so that when they come in we're not wasting a lot |
| 8  Q. No. Did you normally? If you had a meeting | 8  of time, you know, with me typing the application into |
| 9  with somebody, when people come back and forth? | 9  the system and that kind of thing. |
| 10  A. Yes. | 10  Q. All right. |
| 11  Q. So if you had a file, you would keep them in | 11  A. So I typically handwrite it and then when he |
| 12  the file? | 12  comes in, then I have everything printed out and ready |
| 13  A. If I had a file, yes, mm-hmm. | 13  to go. |
| 14  Q. All right. Do you keep phone messages? | 14  Q. All right. You think this was June? |
| 15  A. Do I keep phone messages? No, not | 15  A. Yes, I believe so. |
| 16  necessarily. | 16  Q. June 2004. And had you had a prior experience |
| 17  Q. How about e-mails? | 17  with Mr. Anderson? |
| 18  A. Do I keep them as in -- I'm not sure I | 18  A. Yes. |
| 19  understand the question. | 19  Q. How many? One prior or more than one? |
| 20  Q. During the course of processing a file would | 20  A. One. |
| 21  there be e-mails between you and the service center, | 21  Q. One prior. And what was the prior experience? |
| 22  for example? | 22  A. Mr. Anderson purchased a piece of ground, a |
| 23  A. Yes. | 23  lot loan. I'm sorry. I believe it was twenty acres. |
| 24  Q. Are they available? | 24  Q. All right. |

Page 22

1    A. And I did a lot loan for him.
2    Q. Is that considered residential?
3    A. Yes.
4    Q. Now, when Mr. Anderson applied in
5 approximately June 2004, do you recall your initial
6 meeting with him?
7    A. Yes.
8    Q. What do you recall?
9    A. Mr. Anderson had entered into an agreement
10 with a gentleman to purchase a property on DuPont
11 Highway.
12    Q. Okay.
13    A. There was three properties involved total and
14 they all had to settle at the same time.
15    Q. Did he explain why?
16    A. Because he gave I believe it was $40,000 as a
17 deposit and if they all didn't all three settle they
18 would have lost the deposit.
19    Q. All right. So I take it then, Mr. Anderson
20 would have completed an application.
21    A. Yes.
22    Q. Right?
23    A. Mm-hmm. Mr. and Mrs. Anderson.
24    Q. When you met, did you meet with both of them?

Page 23

1    A. I don't remember, but I do know that she was
2 part of the application.
3    Q. She would have to sign it?
4    A. Yes.
5    Q. I'm not sure I'll do as well as your counsel
6 with these documents, but we'll see how we do. Now,
7 I've got a document that's been identified previously
8 as Anderson 000278, which is a uniform residential loan
9 application. Is that the application we're talking
10 about or is this something different?
11    A. I'm not sure I understand your question.
12    Q. I'm showing you what's referred to as a
13 residential loan application.
14    A. Yes.
15    Q. Is this what Mr. Anderson would fill in at
16 that first meeting?
17    A. Typically what I do is I ask the questions. I
18 fill them in for him. But then he would sign.
19    Q. It would be this document?
20    A. Yes.
21    Q. Okay. The document that's been produced is
22 all typed. Do you type it as someone is sitting there?
23    A. Not typically, no.
24    Q. So you would do it by hand?

Page 24

1    A. Yes.
2    Q. And then is it signed by hand?
3    A. No.
4    Q. Then does somebody type it up?
5    A. I type it up.
6    Q. You type it up and then they sign it. So this
7 takes a bit of time, this whole process. This is like
8 an hour meeting? How long does it take? Do you have
9 any recollection of how long it took, the initial
10 meeting with Mr. Anderson?
11    A. I don't.
12    Q. You don't do this in five or ten minutes, do
13 you?
14    A. No.
15    Q. It's maybe an hour?
16    A. To type in an application?
17    Q. To meet with them, type in the application,
18 whatever you have to do that first meeting. It sounds
19 like it's a substantial meeting.
20    A. I really don't recall, but on average, I mean,
21 they usually take about anywhere from half an hour to
22 an hour. I don't remember exactly.
23    Q. All right. This document which I have in
24 front of me is dated 6/27/04, signed by you and signed

Page 25

1 by the Andersons. So this would seem to be the
2 document that started the process.
3    A. Yes, sir.
4    Q. So after you started the process was your next
5 step to send the documents to the service center?
6    A. Yes.
7    Q. Okay. And would the next step be -- well,
8 there's been some discussion in this case about an
9 appraisal or meeting for an appraisal. Do you and the
10 service center work together with respect to this
11 appraisal?
12    A. The only thing I do is I send the package of
13 documents, disclosures, to the service center. The
14 service center then orders the appraisal through
15 GreenLink.
16    Q. Through who?
17    A. GreenLink.
18    Q. GreenLink. Tell me about GreenLink.
19    A. GreenLink is a company that is a national
20 company that helps facilitate appraisals.
21    Q. So they are independent people?
22    A. Independent of Wachovia Mortgage?
23    Q. Right.
24    A. Yes.

| Page 26 | Page 28 |
|---|---|
| 1    Q.  Okay.  So the package goes to the service<br>2 center.  In this case it was Connecticut?<br>3    A.  Yes.<br>4    Q.  And somebody in Connecticut orders an<br>5 appraisal?<br>6    A.  Yes.<br>7    Q.  Okay.  Do you recall in this Anderson case who<br>8 that appraisal person was?<br>9    A.  Yes.<br>10    Q.  What was his name?<br>11    A.  John Mullins.<br>12    Q.  John Mullins.  And at some point in time was<br>13 there a meeting?  Let me go back.  Tell me what<br>14 happened next with respect to the appraisal.<br>15    A.  The service center ordered the appraisal.  I<br>16 got a call when they were going to go out and inspect<br>17 the property from the appraiser to meet him at the<br>18 property.  So I went out and met Mr. Anderson and the<br>19 appraiser at the property.<br>20    Q.  Is that your normal procedure, to go out and<br>21 meet somebody at the site?<br>22    A.  No.<br>23    Q.  How come you did it this time?<br>24    A.  The appraiser had some concerns about the | 1 give you any reason for doing that?<br>2    A.  When he called me?<br>3    Q.  Yes.<br>4    A.  No.<br>5    Q.  But when you got there, that's when he told<br>6 you he had some issues about livability?<br>7    A.  That and how he could appraise the property in<br>8 its current condition.<br>9    Q.  All right.  And was Mr. Anderson also there?<br>10    A.  Yes.<br>11    Q.  So from your recollection did you tell -- Let<br>12 me go back.  Did Mr. Mullins say he could not appraise<br>13 the property?<br>14    A.  He couldn't appraise it.<br>15    Q.  All right.  So did you tell Mr. Anderson that<br>16 therefore you couldn't process the loan?<br>17    A.  I told Mr. Anderson we were going to have<br>18 problems getting a sufficient appraisal unless there<br>19 was some, you know, renovations to the property to get<br>20 a decent appraisal.<br>21    Q.  That was your decision; is that correct?<br>22    MR. FOGDALL:  Objection to the form of the<br>23 question.<br>24    A.  Say the question again. |

| Page 27 | Page 29 |
|---|---|
| 1 property.<br>2    Q.  Had he already been there before?<br>3    A.  I don't know.<br>4    Q.  What were his concerns?<br>5    A.  It had to do with livability and the property<br>6 lacked a lot of things that you would need in a house<br>7 to have -- to be able to live in it.<br>8    Q.  Did the appraiser communicate this to you over<br>9 the telephone?<br>10    A.  No.<br>11    Q.  How did you know about it?  Did he stop by and<br>12 tell you?<br>13    A.  No.  He called me and said "Meet me at the<br>14 property."<br>15    Q.  The issues about livability, when did you find<br>16 out about that?<br>17    A.  When I got to the property he said that<br>18 there's -- "We have issues with the property."  And we<br>19 all three took a look at the property inside and out.<br>20    Q.  But had he seen the property beforehand?<br>21    A.  I don't know.<br>22    Q.  I guess the question is why, since it's<br>23 unusual, as I understand it, for you to be called.<br>24 When he asked you to come visit him at the site, did he | 1    Q.  You said that you were going to have some<br>2 problems with the appraisal unless there were<br>3 renovations; is that right?<br>4    A.  Yes.<br>5    Q.  And from your experience why couldn't the<br>6 property be appraised as is?<br>7    MR. FOGDALL:  Objection.<br>8    A.  From my experience, if I submitted an<br>9 appraisal with the property in that condition, the loan<br>10 would have been turned down for property collateral.<br>11    Q.  Why do you say that?<br>12    A.  It has to be a livable property.  You must be<br>13 able to habit the property.<br>14    Q.  And you thought the property was unhabitable?<br>15    A.  Yes.<br>16    Q.  Is that based on your experience or any<br>17 particular rules or regulations?<br>18    A.  Those are Fannie Mae guidelines.<br>19    Q.  Now, some documents have been produced --<br>20 maybe it's not the Fannie Mae guidelines.  But the<br>21 documents that have been produced are documents called<br>22 "Underwriting Guidelines."  Let me put that in front of<br>23 you.  This has a number WACH000001.  Is this the<br>24 document you're talking about is or is this something |

James D. Hogsten

9 (Pages 30 to 33)

Page 30

1  different? Are these the Fannie Mae guidelines or are
2  they different than this? Why don't we go back. Have
3  you ever seen this document before?
4      A.  No.
5          MR. FOGDALL:  Just a minute. First of
6  all, he's not an underwriter. Underwriting is handled
7  by other individuals. If you want to give Mr. Hogsten
8  the opportunity to look through those pages and ask him
9  if he recognizes what they are, you can do that.
10         MR. GRADY:  Let me go back.
11  BY MR. GRADY:
12     Q.  I've got this document called "Underlying
13  Guidelines: Conforming," Wachovia 1, I guess. Have you
14  ever seen these before?
15     A.  Yes.
16     Q.  Do you use these in your regular practice?
17     A.  Yes.
18     Q.  All right. In your dealings with Mr. Anderson
19  did these documents come into play?
20     A.  Yes.
21     Q.  All right. Now, you said the loan would be
22  turned down in your opinion if the property wasn't
23  habitable; is that correct?
24     A.  That's correct.

Page 31

1      Q.  What was it about Mr. Anderson's property that
2  made it not habitable?
3      A.  There was no drywall. There was no heat,
4  electricity. There was mold in the property. Just
5  from my visual look. We weren't there very long, so
6  that's just from my recollection.
7      Q.  Did Mr. Anderson suggest to you that he could
8  find someone who would appraise the property?
9      A.  Yes.
10     Q.  And did he eventually do that?
11     A.  Did he eventually do what?
12     Q.  Did he find someone who could appraise the
13  property, give you the name of another appraiser?
14     A.  He did mention a name.
15     Q.  Do you remember what it was?
16     A.  Karl Kaplan.
17     Q.  Okay. And did Karl Kaplan come out and do an
18  appraisal?
19     A.  I don't know.
20     Q.  Did Karl Kaplan supply you with any
21  comparables?
22     A.  No.
23     Q.  Did Mr. Anderson supply you with any
24  comparables?

Page 32

1      A.  He supplied me with comparables, yes.
2      Q.  Now, we know in this case at some point in
3  time there was an appraisal; correct?
4      A.  Yes.
5      Q.  We're probably talking about sometime the end
6  of June, beginning of July when you had this meeting
7  out there with the appraisal; is that correct?
8      A.  Yes.
9      Q.  Okay. So what was the next step that you took
10  to get an appraisal?
11     A.  My next step was to talk to Mr. Anderson about
12  what the property was going to need to get an appraisal
13  done, as far as drywall, heating, electrical, make it
14  livable, so that we could appraise it sufficiently.
15  What happened was he made the repairs and then we sent
16  the appraiser out there and they appraised the
17  property.
18     Q.  Now, my recollection is in this case that the
19  settlement was something like August the 6th. Does
20  that sound about right?
21     A.  Yes.
22     Q.  And the appraisal, the one that's dated, is
23  dated August 2nd. Does that sound about right to
24  you?

Page 33

1      A.  Yes.
2      Q.  You recall that. So what was going on between
3  let's say the beginning of July and August the 2nd with
4  respect to the repairs? Were you involved in reviewing
5  repairs or --
6      A.  No.
7      Q.  Who made the determination that the repairs
8  were adequate for the appraiser to come out?
9      A.  I discussed with Mr. Anderson what needed to
10  be done, and he called me and said "The repairs are
11  done. Send the appraiser out." And that's what I did.
12     Q.  When was that approximately?
13     A.  The first week in August, I believe.
14     Q.  Right around this August 7 date?
15     A.  Yes, sir.
16     Q.  And who was the appraiser who came out this
17  time?
18     A.  I don't remember.
19     Q.  All right.
20     A.  I didn't order the appraisal. I called my
21  processor and my processor ordered through GreenLink.
22  So I wouldn't know who the appraiser would be at this
23  time. I knew that John Mullins was not going to do the
24  appraisal.

Page 34

1    Q.  How come?
2    A.  Because he had saw the property.
3    Q.  Why wouldn't he go back after the repairs were
4  done?
5    A.  I don't know.
6    Q.  Did you talk to him?
7    A.  I talked to him at the time we met at the
8  property.
9    Q.  It looks like from some of the documents
10  produced an Alan Jeffers did the appraisal.  Does that
11  ring a bill to you?
12    A.  No.
13    Q.  You weren't involved with Alan Jeffers at all?
14    A.  No, sir.
15    Q.  Tell me again.  Did you ever tell Mr. Anderson
16  that the property had to be in move-in condition or
17  something to that effect?
18    A.  Yes.
19    Q.  When did you tell him that?
20    A.  It was probably after the meeting at the
21  property.  I do remember it was over the phone.
22    Q.  So that would have been early on?
23    A.  It was probably July, the first part of July.
24    Q.  Did you tell Mr. Anderson right around that

Page 35

1  first time period or even that initial meeting at the
2  house that you didn't think that you would be able to
3  give him the loan, the deal was -- he couldn't get his
4  loan because of the condition of the house, anything
5  like that?
6    A.  Nope.  I'm sorry.  No.
7    Q.  All right.  Did you have a meeting sometime
8  with Mr. Anderson when you told Mr. Anderson something
9  to the effect that you were really getting a lot of
10  pressure to turn this loan down?
11    A.  No.
12    Q.  Nothing like that?
13    A.  No.
14    Q.  Did you tell Mr. Wheatley something like that
15  in connection with his application?
16    A.  No.
17    Q.  No?
18    A.  No.
19    Q.  Have you been made aware prior to coming in
20  here today that both Mr. Anderson and Mr. Wheatley
21  suggested that you had made such a statement?
22    MR. FOGDALL:  Objection.
23    A.  Yes.
24    Q.  All right.

Page 36

1    A.  I want to address that.  The pressure -- this
2  is the only thing I can think of.  The pressure part of
3  this was when I was dealing with these three loans that
4  had to settle or they were going to lose their deposit.
5  The pressure was getting all to the settlement table
6  all at the same time with the factors of the properties
7  and dealing with what guidelines I had to deal with
8  through the mortgage company.  So the pressure was from
9  the underwriter.  The pressure was from Mr. Anderson
10  because he was the spokesman for all three of the loan
11  applications and getting -- you know, returning his
12  phone calls or getting phone calls every day about it.
13  That's the pressure, if there's any pressure I can
14  think of, we were talking about.
15    Q.  But your testimony is you weren't getting any
16  pressure from anybody from the community --
17    A.  No, sir.
18    Q.  -- about this loan?
19    A.  No, sir.
20    Q.  Did Mr. Anderson or Mr. Wheatley ever ask you
21  specifically who the pressure was coming from?
22    A.  I don't recall them asking me that, no.
23    Q.  When you told Mr. Anderson that you had to do
24  all these repairs, did you specify what repairs he had

Page 37

1  to do?
2    A.  I suggested, you know, it has to be livable.
3  So I suggested you have to redo the drywall and you
4  have to make sure the heater and electrical and light
5  fixtures are working, any broken glass has to be
6  repaired, the mold needed to be removed.  Just general
7  things that normal properties need to have to function
8  as a living unit.
9    Q.  All right.  In your job as a loan officer
10  would you consider that part of your responsibility, to
11  advise people generally that property has to be in a
12  certain condition before they can get an appraisal?
13    MR. FOGDALL:  Objection to the form of the
14  question.
15    A.  I make suggestions.  Typically, no.  Typically
16  the property is appraised and it is what it is.  But,
17  again, there was three deals that were on the table and
18  I was trying to accommodate.
19    Q.  It was your understanding that if one of these
20  deals fell through, then all of them might fall
21  through?
22    A.  Yes.
23    Q.  Now, with respect to Anderson, besides this
24  issue of the building, was there any issue at all with

Page 38

1  respect to his credit?

2      A.  No.

3      Q.  Do you remember what kind of loan was being

4  processed?  For example, was it conventional?  Was

5  it --

6      A.  Conventional.  I believe it was a five-year

7  interest-only ARM, ARM meaning adjustable rate

8  mortgage.

9      Q.  And what would happen after the five years?

10      A.  It would adjust, LIBOR plus 225 basis points.

11      Q.  LIBOR?

12      A.  LIBOR index.  That's twelve months LIBOR index

13  plus 225 basis points.

14      Q.  225 basis points means 2.25 percent?

15      A.  Yes.  I'm sorry.

16      Q.  That's all right.  The court reporter probably

17  wanted to know what that was.

18          In Mr. Anderson's transaction there was a

19  requirement of a PMI, private mortgage?

20      A.  I don't recall, but -- I don't remember.  It

21  could have, yes.

22      Q.  I have a document signed at settlement

23  indicating it looks like it was a PMI disclosure.

24      A.  Yes.

Page 39

1      Q.  PMI means?

2      A.  Private mortgage insurance.

3      Q.  That's required when there's a smaller

4  downpayment, typically?

5      A.  Yes.

6      Q.  Theoretically, because there's a smaller

7  downpayment, the bank would be a little more at risk,

8  so there's this insurance?  It's like credit insurance;

9  is that correct?

10      A.  Yes.

11      Q.  I put in front of you the underwriting

12  guidelines.  You said you're familiar with them; is

13  that right?

14      A.  Yes.

15      Q.  Could you identify in there what provisions

16  that you were relying upon that would require these

17  repairs that you were telling me about to be done

18  before the appraisal?

19          MR. FOGDALL:  Objection.  Lacks

20  foundation.

21          MR. GRADY:  All right.

22      A.  It would be in there under livability.

23      Q.  Take a look.

24          MR. FOGDALL:  I'm going to object to the

Page 40

1  questioning.  I've identified for you the individual

2  that did the underwriting for both Mr. Wheatley's loan

3  and Mr. Anderson's loan, and I've indicated to you that

4  this individual is available to be deposed.  So to that

5  extent questions about underwriting guidelines should

6  be directed to that individual.  If Mr. Hogsten is able

7  to answer your question to the best of his ability, he

8  can go ahead and attempt to do so, but I will object to

9  attempts to admit his answer into evidence.

10          MR. GRADY:  All right.

11          MR. FOGDALL:  Go ahead.

12          MR. GRADY:  Answer.

13      A.  It's in here under --

14      Q.  What are these numbers?  WACH000002.  Tell me

15  what it says.

16      A.  It says "Description of Improvements, Site."

17  It's right in there.

18      Q.  You're referring to the WACH000002 where it

19  talks about the site, s-i-t-e.  Why don't you just read

20  for the record what sentences you think are

21  appropriate?

22      A.  Again, it's a general -- I really don't

23  underwrite appraisals.  What I did for Mr. Anderson is

24  tell him what is normally done, and an underwriter

Page 41

1  would then make the decision as to what if anything

2  would be done.  I really don't know.

3      Q.  We'll go back.  When I asked you earlier, I

4  asked you earlier if you were familiar with this

5  document which I guess we should mark.

6      A.  If I can explain.  This is really not a

7  document.

8      Q.  Okay.  What is it?

9      A.  It is for this particular deposition, but this

10  is actually an on-line.  It's an on-line manual that is

11  used by underwriters, and I can reference it for my own

12  use to get deals approved.  But day to day I don't use

13  this day to day to do my job.  I reference it so that I

14  know and understand how I can get loans approved.  So

15  from my experience over fifteen years, a property is

16  not livable, I know the bank would have a problem --

17  I'm sorry.  The mortgage company would have a problem

18  in financing properties that were not livable.

19      Q.  But this document is a Wachovia document, is

20  it, or is it not?

21      A.  This is an on-line manual that changes every

22  fifteen days.

23      Q.  But it's an on-line manual of Wachovia?

24      A.  Well, it's underlying guidelines of not only

Page 42

1  Wachovia, but Fannie Mae. Fannie Mae is where the
2  funding comes from.
3      Q. All right.
4          MR. GRADY: I guess we should mark this
5  No. 2.
6          (Hogsten Deposition Exhibit No. 2 was
7  marked for identification.)
8          THE WITNESS: Those are Fannie Mae
9  guidelines that Wachovia sells their loans to Fannie
10 Mae.
11 BY MR. GRADY:
12     Q. Did you ever tell Mr. Anderson that you were
13 concerned about the underwriting guidelines or the
14 Fannie Mae guidelines or anything like that and that
15 because of those guidelines there would be a problem
16 getting an appraisal until the property was in livable
17 condition?
18     A. Yes.
19     Q. What did you tell him?
20     A. I told him that, you know, basically it has
21 to -- you have to have heat, electricity, drywall,
22 light fixtures, basically had to be in move-in
23 condition.
24     Q. All right.

Page 43

1      A. Because, again, I don't make the decision.
2  What I was trying to do is help them get what they
3  wanted, was those three deals settled at the same time.
4      Q. I want to ask you some questions about the
5  complaint. I'll put that in front of you.
6          I've put in front of you what in this case
7  is the amended complaint. I'm going to make some
8  references to some of the paragraphs and ask you your
9  understanding of those things. Okay?
10     A. Yes.
11     Q. When you met with the original person who was
12 coming out to appraise, Mr. Mullins, had you ever met
13 him before?
14     A. Yes.
15     Q. How well did you know him?
16     A. I consider him a friend.
17     Q. Does he do a number of appraisals for
18 Wachovia?
19     A. Yes.
20     Q. He's like a regular person?
21     A. Yes.
22     Q. Okay. After the meeting did you go out to
23 lunch with him?
24     A. Yes.

Page 44

1      Q. Did you tell Anderson that you could not -- do
2  you recall the appraiser talking to Anderson?
3      A. No. He was there, but I don't remember him
4  engaged in conversation.
5      Q. All right. There's a reference in the
6  complaint at paragraph 26 that Dr. Wilkins met with
7  you, the allegation is, and you referred to Anderson's
8  home as nothing more than a pile of bricks and sticks
9  and you could not assign any value to it at all. Do
10 you recall any such statement?
11     A. I believe when Mr. Wilkins was there
12 Mr. Anderson was there, too.
13     Q. Okay. I guess the question is --
14     A. And I don't remember exactly if that's how it
15 was said.
16     Q. Do you recall discussing Anderson's property?
17     A. With Dr. Wilkins?
18     Q. Right.
19     A. No, I don't.
20     Q. Did you ever say that it was nothing but a
21 pile of sticks and bricks?
22     A. I don't remember saying it to Dr. Wilkins.
23     Q. Do you remember saying it to Anderson?
24     A. Yes.

Page 45

1      Q. You did say it to Anderson?
2      A. Yes. But that was a reference from the
3  appraiser, John Mullins. So I was repeating what John
4  Mullins said to me.
5      Q. And did you say you couldn't assign any value
6  to it at all?
7      A. No. He couldn't assign any value to it.
8      Q. All right.
9      A. That was the appraiser. That wasn't me.
10 That's when I went to Mr. Anderson and I said to get
11 the deal to the settlement table you're going to have
12 to make it livable.
13     Q. All right.
14     A. Because, again, there was that $40,000 deposit
15 which relates into the pressure.
16     Q. At paragraph 33 there's a statement that you
17 met on or about July 23rd with Anderson and you said
18 there was still not enough value in the property. Do
19 you recall that meeting, any such meeting like that?
20     A. No. I don't remember.
21     Q. Do you recall making any comments about the
22 Anderson property in front of a Mr. and Mrs. Anthony
23 Wallace?
24     A. I don't remember any negative comments other

Page 46

1  than I saw Mr. Wallace in the bank and I just said "I'm
2  working on some deals with T." I don't remember being
3  negative about it.
4      Q.  Okay.
5      A.  I just said we were working on something.  I
6  didn't really say anything specific.
7      Q.  Looking at paragraph 40, there's an allegation
8  that Anderson asked you about the bank's policy
9  regarding warranties and such matters.  Do you recall
10 Mr. Anderson asking you that?
11     A.  Yes.
12     Q.  What was your response to that?
13     A.  There are on-line underwriting guidelines.
14     Q.  So you didn't give him any --
15     A.  No, sir.
16     Q.  Didn't give him any response or any
17 substantive response?
18     A.  That's correct.
19     Q.  Weren't you generally familiar with these
20 underwriting guidelines?
21     A.  Yes.
22     Q.  Why didn't you tell him what they were?
23     A.  I did.  I told him they were livable, the
24 property had to be livable.

Page 47

1      Q.  He says that you referred Anderson to a female
2  loan officer to answer his questions about the bank's
3  policies.  Do you recall that?
4      A.  I don't recall referring, but, yes, there was
5  an underwriter, female underwriter.  Not a loan
6  officer.
7      Q.  Was she at the bank here?
8      A.  No.
9      Q.  She was in Connecticut?
10     A.  Mm-hmm.  Yes.
11     Q.  What was her name?
12     A.  Colleen Fazzino.
13     Q.  P-i --
14     A.  That's F-i-z-z-i-n-o, I think.
15         MR. FOGDALL:  It might be F-a-z-z-i-n-o.
16     Q.  Was it in your view unusual that you were
17 requesting of Anderson to make all these repairs to the
18 house even when Anderson didn't own the property?
19     A.  That's correct.
20     Q.  So it was unusual.  And were you aware that he
21 would have to get some permission from the owner?
22     A.  Yes.
23     Q.  At some point in time during this process,
24 let's say in June and July, did you think this thing

Page 48

1  was going to fall apart?
2      A.  I had my doubts.
3      Q.  Did you express your doubts to Anderson?
4      A.  Yes.
5      Q.  What did you tell him?
6      A.  I said the time frame to complete these three
7  transactions is going to be really tough to get to the
8  settlement table by the time -- by the contractual
9  agreement.  Something to that effect.
10     Q.  Did you think Anderson was capable of making
11 all these repairs?
12     A.  He assured me he could.
13     Q.  Did you think he could?
14     A.  Beg your pardon?
15     Q.  Did you think he could?
16     A.  I didn't see why not.  I had no reason not to
17 believe Mr. Anderson.
18     Q.  There's a reference at paragraph 48.  It says
19 that Anderson contacted you -- this sounds like at the
20 time of the Wheatley settlement -- and you indicated
21 that there were no closing papers because there was a
22 need from a certified contractor saying that the roof
23 on the Wheatley home did not have any leaks.  Do you
24 recall anything like that?

Page 49

1      A.  Yes.
2      Q.  What's your recollection?
3      A.  It was a requirement from the underwriter and
4  I just communicated that to Mr. Anderson.
5      Q.  Was that a written requirement?
6      A.  It was a phone call, and she said that there
7  was problems with the property.  And I assume we're
8  talking about Mr. Wheatley's property.
9      Q.  Yes.  It's Anderson's conversation, but
10 Mr. Wheatley's property.
11     A.  I'm sorry.
12     Q.  That's okay.
13     A.  Yes.  I received a phone call.  The reason why
14 we dealt in phone calls was because there was a time
15 frame that we had to get these loans settled.  There
16 was some pressure there to get these loans settled
17 because they didn't want to lose their deposit.  So the
18 underwriter called me and said there's issues with the
19 roof and the property and that we're going to need a
20 structural -- not a structural.  I'm sorry.  A roofing
21 cert because the appraiser had made mention of a
22 possible deficiency.
23     Q.  The Wheatley property at that time had already
24 been appraised for the purchase price; right?

14 (Pages 50 to 53)

Page 50

1    A.  Yes.
2    Q.  So that had been a month before or several
3  weeks before anyway?  The Wheatley appraisal.
4    A.  I don't remember.  But typically, yes, that's
5  how it works.
6    Q.  I guess how come somebody was calling up
7  basically the day of, the day before the settlement and
8  suddenly they needed this statement from the
9  contractor?
10    A.  I can't answer the question.  I don't know.
11    Q.  Well, did you tell Wheatley at the time that
12  there couldn't be any settlement until you got this
13  statement from the contractor?
14    A.  I don't remember.  But normal course of action
15  is, yes, I would have called him and said we're having
16  problems, until this is resolved we won't be able to do
17  the settlement papers.
18    Q.  And you were aware if they didn't have
19  settlement on that day with Wheatley it could foul up
20  everything for these people?
21    A.  Yes, sir.  May I also say one other thing?
22    Q.  Sure.
23    A.  Mr. Anderson kind of talked to me just every
24  day about all three properties and all three deals.  So

Page 51

1  some of it, when you say did you tell Mr. Wheatley,
2  some of it mixed, I believe I did tell Mr. Wheatley,
3  but I did talk to Mr. Anderson a lot more than the
4  other two about these three transactions.
5    Q.  We're going to move along.  Some of these
6  situations kind of overlap between Anderson and
7  Wheatley, but we're trying to concentrate on Anderson.
8  We're going to move, I believe, to Mr. Wheatley.  Wait
9  a minute.  I do have a few more things.
10      Anderson looks like got a commitment on
11  this mortgage on 7/14/04.  That's Anderson 261.  I
12  assume it was -- let me back up.  The document that I
13  have, that was produced, doesn't seem to be signed.  Do
14  you have any recollection -- I'll put that in front of
15  you.  Do you have any recollection if that's about the
16  time he got his mortgage commitment?  This first page
17  is kind of hard to read, but if you turn to the second
18  page it looks like the same stuff.
19    A.  Yes.
20    Q.  Does that sound about right, about when he got
21  his commitment?
22    A.  Yes.
23    Q.  Even though it's not signed?
24      MR. FOGDALL:  Can we go off the record for

Page 52

1  a second, please?
2      MR. GRADY:  This document is not signed.
3      MR. FOGDALL:  Can we go off the record for
4  a second, please?
5      MR. GRADY:  Sure.
6      (A brief discussion was had off the
7  record.)
8      MR. GRADY:  Counsel has indicated that
9  there's probably -- he thinks he's virtually certain
10  that within these documents there is a signed
11  commitment letter probably for the same date.
12      MR. FOGDALL:  Yes.
13      MR. GRADY:  Okay.
14      MR. FOGDALL:  Although I don't know that
15  the Andersons signed the document on the date, on the
16  commitment date.  In other words, there's a commitment
17  date I believe on the first page and then there's a
18  date when they would have signed it.  I don't know that
19  they are the same date.
20      MR. GRADY:  These are approximate dates.
21  Okay.
22  BY MR. GRADY:
23    Q.  My question is:  Is there anything in the
24  commitment that any kind of repairs have to be

Page 53

1  completed or anything like that?  There's nothing like
2  that in here, is there?
3    A.  Satisfactory appraisals supporting the value
4  of two-sixty-six-sixty-six.
5    Q.  So the appraisal from your point of view
6  includes repairs; right?  The commitment was dependent
7  upon an appraisal?
8    A.  Satisfactory appraisal, yes.
9    Q.  Did you ever tell Mr. Anderson, have a
10  conversation with him that he shouldn't be discussing
11  this transaction with Deanna Wicks?
12    A.  Yes.
13    Q.  When was that?  Approximately.  Was that early
14  on?
15    A.  The summer of '04, sometime between July and
16  settlement.  I do remember telling him that.
17    Q.  Why did you say that?
18    A.  Because Dee Wicks is a consumer lender or
19  banker.  She does commercial loans, commercial banking,
20  consumer loans.  And their underwriting guidelines and
21  programs are different than residential lending.  And I
22  didn't want to misconstrue anything between what I said
23  and what she says.
24    Q.  Would there be anything about sharing

Page 54

1  commissions with her?
2      A.  Yes.  I would have got a lesser commission if
3  he would have gone to her first.  But he called me
4  directly.
5      Q.  All right.  Toward the end or even after this
6  transaction was over did you ever make a comment to
7  Anderson something to the effect that you better be
8  careful, we're watching you?
9          MR. FOGDALL:  Objection.  Mischaracterizes
10  his prior testimony.  You can answer if you can.
11      A.  What I said was that this is going to be your
12  primary residence.  If the loan is audited -- maybe I
13  didn't say that.  Maybe I didn't say if the loan is
14  audited.  But I did say that what will happen is you
15  have to make sure it's your primary residence because
16  if they detect that it's not your primary residence as
17  you say it is, then there's penalties.  I think I
18  relayed those penalties to him.  And I said that, you
19  know, if it's going to be your primary residence, you
20  have to change your driver's license, you have to file
21  your tax returns from that address.  I didn't say he
22  was going to be watched per se, but I did say you have
23  to watch out.
24      Q.  Do you think that that was at the end of this

Page 55

1  transaction, do you recall?
2      A.  Yes, it was.
3      Q.  Maybe even after it was over?
4      A.  I don't believe it was after it was over, no.
5      Q.  Right toward the end.
6      A.  And the other reason why I said that is
7  because if Fannie Mae detects any red flags or
8  whatever, they can call the loan due then and there.
9  That's a demand note.  That's the reason why I told
10  him.
11      Q.  In your experience on the job do people
12  sometimes go to settlement and make some repairs after
13  the settlement, some substantial repairs after the
14  settlement?
15      A.  Not substantial, no.
16      Q.  Minor repairs, but not substantial repairs?
17      A.  Well, there are occasions where you have
18  weather-related items such as a driveway that needs to
19  be replaced, if that's part of the contract.  You can
20  do what they call an escrow holdback.  But when it
21  affects the habitability of the property you can't do
22  any of those escrow holdbacks.  From my experience.
23      Q.  Right.  Thanks.  Did you talk to anybody
24  from -- well, you indicated you had talked to this one

Page 56

1  lady.  Is it Colleen Fazzino?  What's her first name?
2      A.  Colleen.
3      Q.  She was the one you were dealing with from
4  underwriting about this property?
5      A.  That's correct.
6      Q.  We're going to move along to Mr. Wheatley.  As
7  I say, there might be some overlap.
8          MR. GRADY:  Off the record.
9          (A brief discussion was had off the
10  record.)
11          (A brief recess was taken.)
12          - - - - -
13      JAMES D. HOGSTEN, resumes
14      THE WITNESS:  When you asked me had I ever
15  been deposed, I had been deposed because I saw a person
16  get hit by an automobile.  So I got called in as a
17  witness for that person.  So I apologize for saying
18  that I didn't.  I just got caught off guard.  I was
19  thinking work versus personal.
20          MR. GRADY:  We wouldn't have even found
21  out.
22      THE WITNESS:  It was kind of burning in me
23  the whole time when I said that.
24          MR. GRADY:  All right.

Page 57

1  BY MR. GRADY:
2      Q.  We're moving along towards Mr. Wheatley.  We
3  talked about having a loan application with
4  Mr. Anderson on or about 6/27/04; right?
5      A.  Yes.
6      Q.  Did Mr. Wheatley come in about the same time?
7      A.  In June, yes, about the same time.
8      Q.  Now, we've been through Mr. Wheatley's
9  deposition just the other day.  I can represent to you
10  that the documents that we received don't have a June
11  application.  In fact, we've got records indicating two
12  different application numbers.
13          MR. GRADY:  Let me mark as Hogsten 3 a
14  document dated July 22, 2004.
15          (Hogsten Deposition Exhibit No. 3 was
16  marked for identification.)
17  BY MR. GRADY:
18      Q.  I'm just saying this sort of by introduction.
19  I want to ask you what you recall about this.  This
20  document which I've put in front of you is a document
21  which I'll represent has a number on it.  We have some
22  other document papers that have a different number.
23  Okay?
24      A.  Okay.

16 (Pages 58 to 61)

Page 58

1    Q.  Now, with that in mind, can you tell us if
2  your recollection is Mr. Wheatley filled out some sort
3  of application in or around in June?
4    A.  He did, yes.
5    Q.  Okay.  Now, I'll represent we don't have that,
6  that document.  It wasn't produced.  We have document
7  in the batch for Anderson.  We don't have a document
8  like that in Wheatley.  But you're saying that there
9  was one?
10   A.  Yes.
11   Q.  And that document along with some other
12  paperwork would have been sent to the underwriters?
13   A.  That's correct.
14   Q.  You also indicated that normally when you send
15  this up to the underwriters you send an e-mail or some
16  message or something indicating what's the deal, what's
17  the arrangement, what your recommendations are or
18  something like that; correct?
19   A.  Yes.
20   Q.  What was the deal with the original
21  application with Wheatley?  What kind of loan?
22   A.  Well, originally we talked and -- he has a
23  business.  We just came to an agreement it would
24  probably be a better, an easier way of getting the loan

Page 59

1  to closing by doing a no income verification program.
2    Q.  Tell me what that is.
3    A.  It's called our no ratio.  It's through Fannie
4  Mae.  It's where you don't put any income on the
5  application at all.  We verify his employment by either
6  two years business license or a CPA, a third party,
7  verifying that he's been in business at the same
8  location for two years.
9    Q.  Okay.
10   A.  Those are the Fannie Mae guidelines.
11   Q.  All right.
12   A.  So I submitted that as a no ratio.
13   Q.  And how much money would you have to put down
14  how much could you borrow with that type of
15  arrangement?
16   A.  Typically the minimum is 10 percent down.
17   Q.  So that's 90/10, 90 mortgage, 10 percent --
18   A.  Yes.
19   Q.  So, again, you met with Mr. Wheatley and
20  probably Mrs. Wheatley?  Did his wife sign the papers,
21  too?
22   A.  I believe so, yes.  I don't recall talking to
23  her, but I did talk --
24   Q.  You don't recall.  The paperwork was sent to

Page 60

1  Connecticut also?
2    A.  Yes, mm-hmm.
3    Q.  All right.  And what happened next?
4    A.  I think we approved him based on his credit
5  rating.  Again, it was subject to the appraisal.
6    Q.  Okay.  Now, in Wheatley's case his appraisal
7  came through.  Wheatley is at 584.  It looks like his
8  appraisal was approved July 7, 2004.  That's what it
9  says.
10   A.  I don't know that it was approved.  It was
11  received.
12   Q.  Okay.  "Approved" might not have been the
13  perfect word.  The appraisal was completed?
14   A.  Completed and received, yes.
15   Q.  July 7, 2004.  Now, prior to that time were
16  there any discussions between you and Wheatley about
17  fixing his building up?
18   A.  No.
19   Q.  No discussions.  Had you seen his building
20  before you got the appraisal back?
21   A.  Only from the outside.
22   Q.  And --
23   A.  And I didn't receive the appraisal.  It goes
24  directly to the service center.  The underwriter is the

Page 61

1  one who would receive and review it.
2    Q.  Okay.  And what were you told by the service
3  center about the appraisal?
4    A.  That it needed some repair.
5    Q.  Now, the appraisal that came in -- did you
6  actually see the appraisal?
7    A.  I may have.  I don't recall, but I may have.
8  Just to be able to explain the situation --
9    Q.  Okay.
10   A.  -- to mainly Mr. Anderson and then
11  Mr. Wheatley.
12   Q.  Well, you're certainly welcome to look at the
13  appraisal, but it appears that the appraisal was
14  $267,000, which was the purchase price, notwithstanding
15  all these different problems.  Is that correct from
16  your review?
17       MR. FOGDALL:  May I see the document
18  first, please?  Don't answer the question yet.
19       I'll object to questioning to the extent
20  that this is at least in my eyes not the complete
21  appraisal that was produced to your office.  But the
22  witness can answer questions based on it subject to
23  that objection.
24       MR. GRADY:  Wait a minute.  Well, if

Page 62

1    there's a problem, I'd like to know what the problem
2    is. I thought this was the same appraisal we've been
3    dealing with. Are you representing that it's
4    different?
5         MR. FOGDALL: The pages that are there are
6    not different than the pages in the appraisal that was
7    produced, but there are, I believe, a couple of
8    additional pages in the copy that was produced to you.
9    I don't know that it would affect the answers to your
10   questions, so --
11        THE WITNESS: I can answer that. It
12   probably won't.
13        MR. GRADY: All right. I'm not trying to
14   make an issue.
15        THE WITNESS: There are some other
16   disclosural things that come behind that.
17   BY MR. GRADY:
18        Q. So you're familiar with it?
19        A. Yes.
20        Q. I'm not suggesting -- I'm just saying here's
21   the appraisal that I have. In the midst of all these
22   papers it's conceivable there's a page extra or minus.
23   This document indicates some concerns on the last page
24   of it and this document on its face appears to make the

Page 63

1    appraisal notwithstanding those concerns. And I guess
2    I'm asking you how you and your people evaluated this
3    appraisal.
4         MR. FOGDALL: Objection.
5         MR. GRADY: You can answer.
6         A. I didn't evaluate the appraisal. I have to --
7    when my underwriter says these are my concerns about
8    the appraisal, I have to go to my clients and tell them
9    these are the problems. So I'm not the one that says
10   this has to be done and this has to be done.
11        Q. Okay. So based upon this appraisal you talked
12   with Mr. Wheatley; is that correct?
13        A. Yes, I believe so.
14        Q. What did you tell Mr. Wheatley?
15        A. There was deficiencies in the house. There's
16   no heat in I believe the second floor. The roof seemed
17   to be in need of repair.
18        Q. Let me just see this document.
19        A. I didn't reference that document to talk to
20   Mr. Wheatley. I spoke to an underwriter who says we
21   have issues here and these are the issues.
22        Q. Did you actually go to the premises with
23   Mr. Wheatley?
24        A. No.

Page 64

1         Q. You indicated to Mr. Wheatley that based upon
2    the underwriter's information there were some problems
3    that had to be repaired?
4         A. Yes.
5         Q. And you gave an example of no heat on the
6    second floor and your recollection is maybe the roof?
7         A. Yes.
8         Q. Anything else?
9         A. I don't remember. There may be a question as
10   to the running water. I'm just not -- I don't
11   remember.
12        Q. So how was it left between you and
13   Mr. Wheatley and his mortgage?
14        A. That we needed to get the repairs done per
15   Fannie Mae guidelines. And then he said he wasn't in
16   the position to do that.
17        Q. So what did you tell him?
18        A. So I said, well, let me see if we can do an
19   escrow holdback, which entails me going back to the
20   underwriter and saying this is what we want to do after
21   settlement, can we do that.
22        Q. What did he say?
23        A. The only time we can't do that is when it
24   affects habitability. And if it's an issue with

Page 65

1    heating a second floor that has bedrooms where you're
2    living or a roof that may or may not leak or have
3    issues, then the answer was no. So what I did was,
4    because I knew all three deals had to settle, I went
5    to, you know, my boss and said can we get an exception
6    to the policy.
7         Q. Right.
8         A. And what happens is when you go for an
9    exception, whether they make that exception or not,
10   they will only do 80 percent financing and typically
11   there is an interest rate add-on of .8125 or half a
12   percent to the points for the cost of doing a mortgage
13   exception.
14        Q. All right. So did you communicate that to
15   Wheatley?
16        A. I believe I did.
17        Q. And when was that?
18        A. After I found out that there was issues with.
19        Q. That would have been in July?
20        A. It was more -- yes, it was late July.
21        Q. We know in fact that Wheatley did a lot of
22   repairs. Were you aware of that as this thing was
23   going on?
24        A. No, I didn't.

18 (Pages 66 to 69)

Page 66

1    Q.  When was the first time you found out that he
2  was making any repairs?
3    A.  Well, I knew he had to have the repairs, it
4  had to be livable, to pass the appraiser's.  But I
5  didn't have a list of what exactly needed to be done
6  other than what the underwriter told me.
7    Q.  Did you have any other meetings with Wheatley
8  in let's say July?
9    A.  Yes.  What happened was also with the
10  exception, because I initially took the loan as a no
11  income or no ratio, the bank -- I'm sorry.  The
12  mortgage company would only entertain an exception if
13  he stated what his income was.
14    Q.  All right.  We've been given this document
15  marked as Hogsten 3, which it indicates -- well, maybe
16  you can tell me how you interpret that document and the
17  little block that's filled in.
18      MR. FOGDALL:  Objection.  Lack of
19  foundation.
20    A.  This is our typical notice of action.
21    Q.  Right.
22    A.  And this normally tells you that your credit
23  application has been denied.  And what this means is
24  for value or type of collateral not sufficient.

Page 67

1    Q.  That's dated July?
2    A.  22nd.
3    Q.  So how does this fit in with the whole scheme
4  of what's going on?
5    A.  Again, I presented to Mr. Wheatley that it had
6  to be livable and these were the issues that...
7    Q.  Did Mr. Wheatley have to make another loan
8  application?
9    A.  Yes.  Because of the need for an exception,
10  that means -- exception means that your loan doesn't
11  meet guidelines.  So we're going outside the
12  guidelines.  And we have to have an exception officer
13  sign off on the exception.  Okay.  So what happened was
14  I communicated what the deficiencies of the property
15  were and in the meantime they were, I guess, I assume,
16  working on getting them fixed.  And then I had to take
17  another application because the only way they could
18  entertain an exception is by stating Mr. Wheatley's
19  income on an application.
20    Q.  Now, the records that we have, it looks like
21  there's another application dated 8/2/04, which is
22  found at Wheatley 194, and it has a number which says
23  6940176.  Now, can you explain to me -- I guess I have
24  a couple questions.  No. 1, why was the application

Page 68

1  dated August, just a couple days before the settlement?
2    A.  Because to get the exception done I had to
3  change the loan from a no ratio where we do not put
4  income on the application to a new application that
5  stated his income.
6    Q.  Am I correct that the thinking was at that
7  time that he could do this new application process
8  without making any improvements on the house?
9    A.  No.
10    Q.  No?  He had to still make it livable?
11    A.  Yes.
12    Q.  Okay.  Now, this application -- we should mark
13  this one.
14      MR. GRADY:  Let's mark the first page.
15  The documents I have don't seem to be signed.  I take
16  that back.  Here's one where the document is signed.
17  No. Mark that as the next number.  This is a mortgage
18  loan application 8/2/04.
19      (Hogsten Deposition Exhibit No. 4 was
20  marked for identification.)
21  BY MR. GRADY:
22    Q.  This loan, it says on it it's for $240,000.
23  Do you see that?
24    A.  Mm-hmm.

Page 69

1    Q.  Now, we know when the deal finally went
2  through it wasn't for $240,000.
3    A.  That's correct.
4    Q.  So, I guess, what happened between 8/2 and the
5  final transactions?
6    A.  We made -- we submitted the file for an
7  exception.
8    Q.  All right.
9    A.  Exceptions are only granted at 80 percent loan
10  to value.  This loan was at 90 percent.  So what we did
11  was we counteroffered from 90 to 80.  And that's why
12  the difference is.
13    Q.  But the 240,000 looks like the original
14  amount.  Wasn't the original loan for 240?
15    A.  Yes.
16    Q.  So, I guess, my question is why did you put
17  240 on this document on 8/2.
18      MR. FOGDALL:  Objection.  Lacks
19  foundation.
20    A.  I don't know.  I don't know the answer.  I
21  mean, I know what transpired, but I don't know why that
22  says 240 on it.
23      MR. FOGDALL:  And also for the sake of
24  clarity what counsel has put before the witness is not

Page 70

1 in fact the Wheatleys' loan application. It's a
2 document entitled "Loan Application Agreement."
3     THE WITNESS: That's correct.
4     MR. GRADY: All right.
5     MR. FOGDALL: It does not appear to be
6 executed.
7     MR. GRADY: Thanks for the clarification.
8 I don't recall seeing the other document. Well, let's
9 see if we can find -- how about this document? I'll
10 put this document in front of you. Mark this one as
11 the next document. This is Wheatley 187.
12     (Hogsten Deposition Exhibit No. 5 was
13 marked for identification.)
14 BY MR. GRADY:
15     Q. This document is "Interest Rate Agreement"
16 dated August 2. Looks like it's signed August 3 by the
17 Wheatleys. That document also has reference to a
18 $240,000 loan at 6.625 percent. This is about the same
19 time as the other document we had in front of us. It
20 appears that we're still talking about a $240,000 loan;
21 right?
22     A. Yes.
23     Q. Do you have any explanation for that?
24     A. He applied for a $240,000 loan, and that's

Page 71

1 what we were trying to do, and apparently we
2 counteroffered him to 80 percent after the underwriter
3 reviewed all the documents.
4     Q. I thought the problem arose when the
5 underwriter got the initial appraisal and then, correct
6 me if I'm wrong, I thought your testimony was because
7 of that the original application which had been filed
8 wasn't going to work. Is that right?
9     A. There may have been some other things. I
10 don't recall what the underwriter...
11     Q. Well, the original application, which was a
12 90/10, was denied for all practical purposes and he had
13 to make a new application; isn't that correct?
14     A. That's correct.
15     Q. And the new application I thought you said had
16 to be based upon this exception rule. Is that correct?
17     A. No, not at the time.
18     Q. When did the exception rule come into play?
19     A. When he wasn't approved based on the value of
20 the -- the collateral was not approved.
21     Q. Was that July 22nd?
22     A. For the first loan, yes.
23     Q. And then we don't seem to have in this file
24 the first application at all. Was there another

Page 72

1 application filled out around August the 2nd?
2     A. Yes.
3     Q. Was that for a $240,000 loan?
4     A. I'm not 100 percent sure, but, yes, it appears
5 to be. I assume that represents 90 percent of the
6 purchase price approximately.
7     Q. We know at the very end it turned out to be
8 only an 80 percent loan or something like that.
9     A. That is correct.
10     Q. How did that happen?
11     A. The only way the mortgage company was going
12 to -- because it didn't meet Fannie Mae guidelines. So
13 we had to apply for a request, an exception to policy.
14     Q. When was the first time -- I'm sorry.
15     A. So the only way you can get an exception is if
16 the loan to value is 80 percent, which means a 20
17 percent downpayment, and then there's an increase in
18 interest rate.
19     Q. But at that time that was very close -- was
20 that between August 6th and August the 13th?
21     A. It was, yes.
22     Q. Well, at that time wasn't his place all fixed
23 up?
24     A. I don't know.

Page 73

1     Q. Well, right around that time at the very end
2 wasn't somebody asking for this certificate from the
3 contractor; right?
4     A. The underwriter was.
5     Q. That was supplied somewhere along the line;
6 right?
7     A. I don't remember it, but I assume it did, yes.
8     Q. Well, wasn't the underwriter aware that all
9 these other repairs had been made?
10     MR. FOGDALL: Objection. Lacks
11 foundation.
12     A. I don't know.
13     Q. Let's put it this way: You were aware that
14 Mr. Wheatley was upset at the very end of this
15 transaction when suddenly he had to come up with the 20
16 percent?
17     A. Yes, sir.
18     Q. Would you agree at that point in time -- I
19 guess my question is: Weren't you aware that these
20 repairs were done?
21     A. I don't know. No, I wasn't aware.
22     Q. But if the repairs had been done as they had
23 been done in Mr. Anderson's case --
24     A. Mm-hmm.

20 (Pages 74 to 77)

Page 74

1   Q.  -- Mr. Wheatley would have been entitled,
2   don't you think, to -- only required to put down 10
3   percent?
4           MR. FOGDALL: Objection. Lacks
5   foundation.
6   A.  What I don't remember, there may have been
7   some other factors in the file that the underwriter had
8   to list on the exception that didn't meet guidelines.
9   I don't remember what they were.
10  Q.  You don't remember what they were.
11          MR. WHEATLEY: Mr. Grady, am I allowed to
12  hand you a sidebar for a second?
13          MR. GRADY: We can take a break before we
14  end and do that. We would normally do that.
15  BY MR. GRADY:
16  Q.  There was supposed to be a settlement on
17  August the 6th, as I understand.
18  A.  Yes.
19  Q.  And that settlement didn't take place for
20  Mr. Wheatley; correct?
21  A.  That's correct.
22  Q.  In your understanding why didn't it take
23  place?
24  A.  He didn't meet all the underwriting

Page 75

1   conditions.
2   Q.  Was it more than this business about the roof?
3   Was there something else?
4   A.  I don't remember.
5   Q.  When did Mr. Wheatley find out that settlement
6   wasn't going to go through?
7   A.  I don't remember that either. I know it was
8   close to the settlement because all the transactions
9   were done one right after the other. I did communicate
10  to him that there were problems and that I couldn't --
11  I hadn't received the exception signoff.
12  Q.  Is that a document, the exception signoff?
13  A.  Yes.
14  Q.  We have the full file. Would that be in there
15  someplace?
16  A.  Yes.
17          MR. FOGDALL: Off the record for one
18  minute.
19          (A brief discussion was had off the
20  record.)
21          MR. GRADY: Counsel off the record
22  identified Wheatley 150 as a document which he believes
23  might have come from underwriting.
24  BY MR. GRADY:

Page 76

1   Q.  Can you take a look at that document? Is that
2   right?
3   A.  What was your question?
4   Q.  Did that document come from underwriting?
5           MR. FOGDALL: Objection. Lacks
6   foundation.
7   A.  It comes from the Waterbury service center,
8   not necessarily an underwriter.
9   Q.  It comes from Waterbury. Can I take a look at
10  that again, please? It's pretty hard to read, to tell
11  you the truth. Well, I'll ask you to look at it.
12  Maybe it will refresh your recollection as to what
13  somebody might have told you from Connecticut about
14  what the problems were. If it doesn't refresh your
15  recollection we'll move on, but it might.
16  A.  This is the exception and you have to have two
17  signatures -- well, a signature from a person, I don't
18  remember what they called them then, but they call them
19  now credit administration, which is a person that
20  represents -- because we're holding it in portfolio.
21  Once it's an exception it's in the bank's portfolio.
22  Because the bank is the holding company, it has to go
23  to Charlotte to credit administration for signature
24  recommending the exception. Okay. Once that's done,

Page 77

1   it's then faxed to an exception officer who then agrees
2   with the exception and signs off on it. And in the
3   recommendation the things that they look for to grant
4   the exception -- and I don't know why. I don't
5   remember exactly why. It doesn't really state why on
6   here they wouldn't make the loan on the credit side. I
7   know the main thing was the property.
8           But, anyway, what they do on this is they
9   put a lot of factors, compensating factors, to make the
10  exception, such as his banking relationship with
11  deposits. He's a five star customer. One of the
12  requirements was he had to put the additional 10
13  percent down, which came from a business account.
14  Typical guidelines are when you do that you have to
15  have a third party verify that when he does that -- you
16  have to have a third party verify it would not
17  adversely affect his business. And on here it says we
18  were unable to obtain that since the borrower doesn't
19  have a CPA. So then they counteroffered from a 90
20  percent loan to value to an 80 percent loan to value
21  and it says here not eligible for max financing due to
22  property uniqueness.
23          MR. GRADY: I'll ask you to mark that one,
24  too.

Page 78

1          (Hogsten Deposition Exhibit No. 6 was
2    marked for identification.)
3    BY MR. GRADY:
4        Q.   The appraisal that we have -- let's go back to
5    that for a minute -- which I gave to you, which appears
6    to be an appraisal of Mr. Gladden, do you have any --
7    this appraisal was dated 7 -- the signature is 7/12.
8    The amount is for $267,000.  Do you know if Mr. Gladden
9    ever went back to the property after the repairs were
10   done to notify anybody, either you or people in
11   Connecticut or anybody, that the work had been done?
12       A.   I don't remember, but that's normal course of
13   action, sending the appraiser back after the repairs
14   were made.
15       Q.   Was there ever any problem with the credit of
16   Mr. Wheatley?
17       A.   I don't know.  I mean, his credit was good if
18   you're asking me that.
19       Q.   Good credit.
20       A.   But certain guidelines -- certain underwriting
21   guidelines for certain programs require certain level
22   of credit score.  So when you ask me that question, I'm
23   not sure what his credit score was at that time.  I
24   don't remember.

Page 79

1        Q.   I guess from your memory I'm asking and -- the
2    issue, as I understand it, was the house rather than
3    his credit.
4        A.   Yes.  His credit was good.  I don't know that
5    there was an issue there.
6        Q.   I'll just ask this question one more time and
7    then move on.  Maybe we've asked it before even.  But
8    the question is:  If the property was fixed up after
9    the initial appraisal and those property concerns were
10   taken away, why wouldn't he just be eligible for the 10
11   percent deal then?
12           MR. FOGDALL:  Objection.  Lacks
13   foundation.
14       A.   I don't know.
15       Q.   Well, you were the loan officer.
16           MR. FOGDALL:  Objection.
17       A.   Mortgage consultant.
18       Q.   Mortgage consultant.  Did the people from
19   Connecticut ever communicate to you about -- did you
20   ever communicate to the people with Connecticut and
21   say, well, now that the place is --
22       A.   I believe I did.  I mean, the thing was there
23   was -- it was kind of fast action going, the three
24   properties and three deals at the same time, and I

Page 80

1    believe that those repairs were made and the appraiser
2    went out there to inspect.  That's the normal course of
3    action.  They wouldn't have produced any settlement
4    papers if that's the case.
5        Q.   Right.
6        A.   I physically don't do that part of it.  So the
7    bank or the mortgage company in Waterbury service
8    center does that part of it.
9        Q.   But nobody from Connecticut ever told you that
10   now the repairs are made we can go back to the 90/10
11   deal?
12       A.   No, they never told me that.
13       Q.   So the 80/20 deal, was that primarily because
14   of still the concern of the house?
15           MR. FOGDALL:  Objection.  Lacks
16   foundation.
17       A.   I don't know.  I assume so, but I don't know
18   for sure.
19       Q.   Okay.  At the time of the second settlement,
20   that was August the 13th -- let me go back.  Before the
21   August the 13th settlement did you ever tell
22   Mr. Wheatley that you didn't think this deal was going
23   to go through?
24       A.   I told him I had some doubts, yes.

Page 81

1        Q.   When was that?
2        A.   It was the first part of August.
3        Q.   All right.  After the first deal problem?
4        A.   Yes.
5        Q.   Before the August 6th date?
6        A.   Yes.
7        Q.   All right.  So we'll move along to August the
8    13th.
9        A.   It would have had to be because I wasn't in
10   town.
11       Q.   You were on vacation during some of this
12   period.  When were you on vacation?
13       A.   I think it was during that week they were
14   settling in August.
15       Q.   The first settlement or the second settlement?
16       A.   The second.
17       Q.   August 13th?
18       A.   Yes.
19       Q.   The second settlement was August the 13th.
20   You were on vacation.  In the middle of the settlement
21   did you get a phone call?
22       A.   Yes.
23       Q.   And who called you?
24       A.   Mr. Wheatley.

22 (Pages 82 to 85)

Page 82

1    Q. What was the substance of the conversation?
2    A. To the effect that, you know, we were working
3 on the deal at 90 percent loan to value, and it was 80,
4 you know, we were at settlement and papers aren't
5 right. I tried to talk through them. But I also told
6 him that I was in North Carolina and not at my desk and
7 I didn't have everything in front of me to be able to
8 talk exactly what we were looking at. I did try to
9 call the service center to try to get it worked out,
10 but he was, you know, obviously angry and so I did the
11 best I could to try to help him.
12    Q. Who did you speak to at the service center?
13    A. I don't remember.
14    Q. What was the substance of the conversation?
15    A. Probably the underwriter and my processor.
16    Q. What was the substance of that conversation?
17    A. I was trying to see if there was anything else
18 I could do to accommodate the client.
19    Q. Did you tell Wheatley that if you didn't get
20 the money the deal was off?
21    A. Yes. Communicated to me from my underwriter.
22    Q. The underwriter told you that?
23    A. Yes.
24    Q. Do we know that underwriter's name? Is it the

Page 83

1 same person we talked about before? Do you recall?
2    A. I don't recall. I may have talked to Terri
3 Hamm who was -- at the time she was the -- what was her
4 title? Facilities manager, I guess. I'm not sure what
5 her title was. But she was the boss let's say for lack
6 of a better term.
7    Q. All right. Eventually Wheatley went out and
8 got the extra money?
9    A. Yes.
10    Q. And the deal went through. Did Wheatley have
11 to pay a second application fee?
12    A. I don't remember. I wouldn't think so. When
13 we collect the application fee, typically it's for the
14 cost of the appraisal. He may have had to pay not the
15 appraisal fee, but an updated credit report. I don't
16 remember, though.
17    Q. Okay.
18    A. To be honest.
19    Q. There was an issue with respect to Wheatley
20 about whether or not he could, I guess -- if he got to
21 90/10 he would have to have a PMI.
22    A. That's correct.
23    Q. But as it turned out for all the reasons we've
24 been talking about that got scratched?

Page 84

1    A. Didn't have to have PMI because of 80 percent
2 loan to value.
3    Q. No PMI. After this transaction was over are
4 you aware that Wheatley was then given a loan, a second
5 I think they were calling them HELOC. That's home
6 equity loan?
7    A. HELOC is home equity line of credit. I was
8 not aware.
9    Q. Were you aware of that or involved in that?
10    A. No.
11    Q. Did you ever recommend to Wheatley that he get
12 that?
13    A. Yes.
14    Q. And did you think he would be eligible for it?
15    A. I wasn't sure.
16    Q. Well, why did you recommend it?
17    A. I thought it was a solution. See, I don't do
18 home equity lines of credits, meaning me in my capacity
19 at Wachovia. My counterpart, Deanna Wicks, they do
20 home equity loans and home equity lines of credit. So
21 I suggested maybe after settlement to recoup the monies
22 that you had due, go in and ask for a line of credit to
23 pay yourself back. That's with the bank, which I'm
24 with the mortgage company.

Page 85

1    Q. This loan with Wheatley, was this an ARM also?
2 Do you know? Do you remember?
3    A. I don't believe. No, it was not.
4       MR. FOGDALL: Which loan do you mean?
5       MR. GRADY: The major loan we've been
6 talking about.
7       THE WITNESS: Because we didn't make a
8 loan. The application was the first application of the
9 loan. 30 years fixed.
10       MR. FOGDALL: I had understood your
11 question to be about the HELOC.
12       MR. GRADY: No. We went back to the
13 other.
14       MR. FOGDALL: All right.
15 BY MR. GRADY:
16    Q. Put that complaint in front of you again,
17 please. Were you aware that a Mr. Destefano was
18 involved in this transaction at all?
19    A. No.
20    Q. How about a Mr. S-k-o-w-r-o-n-s-k-i? This is
21 paragraph 65.
22    A. Destefano. I'm sorry. Well, Joe Skowronski
23 is my immediate supervisor. And his immediate
24 supervisor is Chet Destefano.

Page 86

1    Q. The allegation in paragraph 65 was that
2 Mr. Skowronski intervened and approved release of the
3 loan documents. Is that correct?
4    A. I don't know.
5    Q. Do you know if he got involved at all?
6    A. I don't know.
7    Q. How about Mr. Destefano?
8    A. Destefano?
9    Q. Destefano.
10    A. Again, I don't know.
11    Q. Okay.
12    A. I think because I was on vacation is what it
13 was. I don't know that they got involved, but...
14    Q. Let's move along to the Wilkins. The Wilkins,
15 did they actually come in to meet with you?
16    A. Yes.
17    Q. Around June 2006?
18    A. Yes.
19    Q. Okay. And they filled out --
20    A. Maybe in July. But right around the same time
21 period.
22    Q. And they came in and completed the
23 applications, I guess.
24    A. Yes.

Page 87

1    Q. Was there any problem with their property?
2    A. Not that I'm aware of.
3    Q. No repairs needed?
4    A. Not that I can remember, no.
5    Q. Okay. And theirs went through really pretty
6 smoothly?
7    A. Yes.
8    Q. Did you have any contact with them after the
9 initial contact?
10    A. Yes.
11    Q. When was that?
12    A. Throughout the process. I assist my processor
13 in collecting conditions. So I may have called them,
14 you know, for homeowners insurance or whatever.
15    Q. I think there's a statement in the complaint,
16 amended complaint, that you wanted to verify
17 Dr. Wilkins' -- that the funds used for deposit was his
18 money and to show its source. Paragraph 30.
19    A. Okay.
20    Q. Is that correct?
21    A. Yes.
22    Q. Why did you do that?
23        MR. FOGDALL: Objection.
24    A. It's standard underwriting guidelines that we

Page 88

1 have to verify funds. It's part of money laundering
2 loss.
3    Q. Did you do this for Anderson and Wheatley,
4 too?
5    A. Yes.
6    Q. You say standard procedure?
7    A. Let me clarify. Underwriters verify the
8 funds. In other words, I produce documentation that
9 would clear an underwriting condition.
10    Q. Right.
11    A. Okay? So a bank statement with Dr. Wilkins'
12 and his wife's name on it is typically what we do to
13 verify funds for closing.
14    Q. All right.
15    A. Now, Mr. Wheatley and Mr. Anderson had
16 accounts with Wachovia, whereas Dr. Wilkins I don't
17 believe did. So I didn't have to necessarily request a
18 bank statement since it was in the bank itself.
19    Q. In these early application papers did
20 somebody -- did Wheatley and Anderson sign off that you
21 would have access to review any of their accounts?
22    A. I don't know.
23    Q. I don't either. I'm asking you.
24    A. They sign a disclosure that says that I have

Page 89

1 authorization to check certain things like income and
2 assets.
3    Q. Would that include their accounts at Wachovia?
4    A. Yes.
5    Q. Okay.
6    A. I believe it's in the -- it's in my last page,
7 addendum to application.
8    Q. Okay. I recall seeing it.
9    A. And it's under "Sharing of Information."
10    Q. Okay. Did Dr. Wilkins ever indicate to you
11 his concern about how things were being handled?
12    A. No.
13    Q. No. Did you ever indicate to him that you
14 thought there was a possibility that these deals might
15 fall through?
16    A. No. For his particular transaction for the
17 most part I talked to Mr. Anderson. Mr. Anderson was
18 local. Dr. Wilkins was in the midwest. I'm not really
19 sure where he was.
20    Q. He's in Kansas now anyway. My recollection is
21 Anderson had some sort of power of attorney for
22 Wilkins, some sort of authorization.
23    A. I don't know. As far as getting access to the
24 properties and dealing with the transaction itself, I

24 (Pages 90 to 93)

Page 90

1  spoke a lot with Mr. Anderson. And then when I needed
2  to clear conditions, I called Dr. Wilkins, when I
3  needed his bank statement.
4      Q.  Let me represent to you that the initial
5  paperwork completed by Wheatley does not appear to be
6  in the packet that we received. Do you know of any
7  reason why that might have been thrown away or gotten
8  rid of during the process?
9      A.  No.
10     Q.  Would that normally be kept?
11     A.  I assume so, yes.
12     Q.  Did you ever suggest to Mr. Anderson that he
13 would do better with a commercial or making use of his
14 property as a commercial property rather than as a
15 residential property?
16     A.  No. I did say from talking to an appraiser
17 that it's worth more as a commercial property than a
18 residential property because the property is located in
19 a predominantly commercial area. But I was just
20 repeating what an appraiser told me.
21     Q.  Who told you that?
22     A.  David Gladden, who is not the same Gladden
23 that did the --
24     Q.  A different Gladden?

Page 91

1      A.  It's a brother. It's his brother. But I
2  wasn't talking to him specifics. It was more just in
3  general.
4          MR. FOGDALL: Off the record for a second.
5          (A brief discussion was had off the
6  record.)
7          (A brief recess was taken.)
8          - - - - -
9          JAMES D. HOGSTEN, resumes
10 BY MR. GRADY:
11     Q.  Did you have any conversations at any time
12 with Mr. Anderson when you asked him if he was
13 recording the conversations that were going on?
14     A.  No. I don't recall that.
15     Q.  For example, did you say, "Well, Mr. Anderson,
16 are you recording this"? Did you ever say anything
17 like that?
18     A.  No, not that I can remember.
19     Q.  All right. When you went to meet the
20 appraiser on the Anderson property early on, at the
21 very beginning, did you clear that with anybody at the
22 bank or did you have to tell anybody at the bank, or is
23 that something you would just do?
24     A.  I just got a phone call from the appraiser to

Page 92

1  meet him at the property.
2      Q.  So you just went?
3      A.  I just went, yes.
4      Q.  Do you have any business dealings with
5  Mr. Mullins?
6      A.  No.
7      Q.  Just social?
8      A.  I've been a lender. Not a lender. I've been
9  a mortgage consultant for a number of years, and in the
10 business and being from Dover, you know, there's
11 occasion you're going to run into people. And I just
12 befriended Mr. Mullins just as a friend, acquaintance.
13     Q.  Do you have a card with you?
14     A.  I do.
15     Q.  Could I take a look?
16     A.  (The witness complied with counsel's request.)
17     Q.  On this card you're called a mortgage banker
18 leader.
19     A.  I got promoted.
20     Q.  That's more recent, then.
21     A.  Yes.
22     Q.  Congratulations.
23     A.  I don't know if it's anything to be
24 congratulated over. Off the record.

Page 93

1      Q.  There was some testimony earlier about these
2  comps which Mr. Anderson had.
3      A.  Yes.
4      Q.  Did he supply them to you?
5      A.  Yes.
6      Q.  Did you supply them to Mr. Mullins?
7      A.  No.
8      Q.  How come?
9      A.  I sent them to the underwriter. Not to the
10 underwriter. I'm sorry. I beg your pardon. My
11 processor, Maria Belo, who then forwarded them on to
12 the appraiser, which I assume was John Mullins.
13     Q.  How do you know she did that?
14     A.  I asked her to.
15     Q.  Okay.
16     A.  I assume they were done.
17     Q.  And do you know what he did with them?
18     A.  No.
19     Q.  What was the reason you never followed up with
20 Mr. Mullins?
21     A.  Mr. Mullins rejected doing the appraisal.
22     Q.  He just wouldn't do it, period?
23     A.  Yes. He decided not to accept the work or
24 whatever.

Page 94

1    Q.  We talked about the Wheatley repairs.  Were
2  you involved with Mr. Anderson about the Wheatley
3  repairs?  Did you report back and forth to him or did
4  you talk to him?
5    A.  I did talk to him about certain things that
6  needed to be done to the property, yes.
7    Q.  Do you recall if Anderson told you that the
8  Wheatley repairs were finished?
9    A.  I don't specifically remember, but I would
10  assume they would be because there was no way we could
11  go to settlement without those being done.  I don't
12  remember specifically talking to him about them being
13  done.
14    Q.  But the appraiser had to go back, is that
15  correct, on the Wheatley?
16    A.  Yes, absolutely.
17    Q.  Do you recall talking to Mr. Gladden at all
18  about that?
19    A.  I didn't talk to Mr. Gladden at all.  Dave
20  Gladden is different than Dan Gladden because Dave
21  Gladden is another person I know.  They are brothers
22  and they do appraisals.  But I didn't talk to either
23  one specifically about this house.
24    Q.  Okay.  Do you recall if there was a problem or

Page 95

1  issue about the PMI on the Wheatley house at either the
2  first or second settlement, August 6th or August 13th?
3    A.  The only thing I could remember about that is
4  we had to do a bank exception.  I'm sorry.  Yes.  Bank
5  exception to hold the loan in portfolio.  And when you
6  do that we only can do 80 percent financing.  And the
7  conversation between Mr. Anderson and myself was the
8  reason that is is because we're unable to get PMI
9  insurance on bank exception loans.  They don't meet
10  Fannie Mae guidelines.  So he asked me for PMI
11  guidelines or the number to the PMI companies, and I
12  didn't know where to even begin with that.
13    Q.  Who else in your office does work like you?
14    A.  No one.
15    Q.  No one?  You're the only one?
16    A.  Mm-hmm.
17    Q.  So you do all the residential mortgages for
18  Wachovia in Kent County?
19    A.  Yes.
20    Q.  In Dover anyway?
21    A.  Yes.
22    Q.  But is it broader than that?  Is it all of
23  Kent County?
24    A.  Well, back in 2004 I don't remember, but I did

Page 96

1  for the most part the whole State of Delaware back at
2  that time.  There might have been one other person.
3  But I think it was just me at that time.
4    Q.  How many residential loan applications did you
5  do back in 2004 let's say in a month?
6    A.  2004.  Boy!  That was a pretty busy time.  But
7  probably between twenty -- fifteen and twenty loans.
8    Q.  A month?
9    A.  A month.  Maybe a little more, twenty-five.
10  Summertime, it's not as busy in the summertime than it
11  would be in other parts.
12    Q.  Just approximately?
13    A.  Approximately.
14    Q.  That would be new applications and, of course,
15  you're also processing the other applications as
16  they're already there?
17    A.  Yes.
18      MR. FOGDALL:  Off the record.
19      (A brief discussion was had off the
20  record.)
21  BY MR. GRADY:
22    Q.  I'm just about done here.  I'm sure counsel
23  has a few questions for you.  At least he said he did.
24  Let's collect the exhibits.

Page 97

1      MR. GRADY:  That's all I have.
2      MR. FOGDALL:  I do have a few questions
3  for you, Mr. Hogsten.
4  BY MR. FOGDALL:
5    Q.  You mentioned earlier that once you've
6  received the loan application from the borrower, such
7  as the borrowers in this case, you then forward the
8  originals of the documents to the service center in
9  Connecticut and you retain at least for a time a copy
10  of that paperwork.
11    A.  Some of the paperwork.
12    Q.  Okay.  What would you retain copies of?
13    A.  I keep a copy of my loan registration that
14  tells me what the interest rate is.  I keep a copy of
15  the application that has all the pertinent information
16  such as income, assets, phone numbers.  And I keep a
17  copy of my -- I call it a write-up, but it's just a
18  registration cover letter.  And I stick it in a file.
19    Q.  Okay.  And in your ordinary practice how long
20  do you retain those documents, those copies, for?
21    A.  Once the loan settles, within the next 30 days
22  I purge them from my files.  I just put them in our
23  shred.
24    Q.  And that's standard practice?

| Page 98 | Page 100 |
|---|---|

**Page 98**

1  A. Yes.

2  Q. Did you adhere to that practice with respect

3  to the loans at issue in this case?

4  A. Yes.

5  Q. At one point plaintiffs' counsel showed you

6  documents that he described as underwriting guidelines

7  and you looked them over. Counsel asked you if you

8  used the guidelines. Is that correct? Would it be

9  fair to say that you use these guidelines in the course

10  of your work?

11  A. I refer to them. I don't use them as part of

12  ·my work. But I use them -- I refer to them as I'm

13  speaking with clients.

14  Q. Okay. And why do you do that?

15  A. Because I have to have an underwriter sign off

16  and approve the loan application. So I have to have an

17  understanding of what the guidelines are.

18  Q. So to the extent you refer to these

19  guidelines, it's simply to keep abreast of the

20  underwriting process so that you can be more aware of

21  what the underwriter is doing and --

22  A. What they are going to request.

23  MR. GRADY: Objection to the leading.

24  MR. FOGDALL: You can answer the question.

**Page 99**

1  THE WITNESS: Yes. I use them in the

2  sense that to get a loan approved I'm going to need to

3  understand these guidelines because that's what an

4  underwriter is going to refer to when I submit a file.

5  BY MR. FOGDALL:

6  Q. But you don't do any underwriting on the

7  loans?

8  A. No, sir.

9  Q. And you don't have any authority to approve or

10  deny a loan?

11  MR. GRADY: Objection. Leading.

12  MR. FOGDALL: You can answer the question.

13  A. That is correct.

14  Q. At one point counsel for the plaintiffs asked

15  you if Mr. Anderson had forwarded to you copies of

16  purportedly comparable sales that Mr. Kaplan had

17  provided to Mr. Anderson, and you said that he had.

18  A. Yes.

19  Q. Were these sales in fact comparable sales to

20  the property at issue?

21  A. I didn't believe so, no.

22  Q. Why not?

23  A. Because the properties that he submitted were

24  sales from properties that were located some distance

**Page 100**

1  away.

2  Q. Do you recall how far away?

3  A. Approximately five to ten miles, somewhere

4  around there.

5  Q. Was there anything else about these other

6  sales that led you to feel that they weren't truly

7  comparable to the property at issue?

8  A. It was in a different location, different --

9  it was more residential area moreso than where these

10  particular properties were located.

11  Q. And how would you describe the area in which

12  these properties are located?

13  A. Commercial in nature.

14  Q. Okay. And a couple of times during the course

15  of your testimony you mentioned feeling some pressure

16  because you were worried that plaintiffs in this case

17  would lose a $40,000 deposit if this deal didn't go

18  through; is that right?

19  A. That is correct.

20  Q. And you felt pressure because you really

21  wanted the deal to go through for them?

22  MR. GRADY: Objection. Leading.

23  A. Yes.

24  Q. Is that correct?

**Page 101**

1  A. That is correct, yes.

2  Q. And you didn't want to undermine this deal;

3  correct?

4  MR. GRADY: Objection. Leading.

5  A. That is correct.

6  Q. And I think you mentioned at one point that

7  you're paid on commission.

8  A. Yes.

9  Q. So if the deal didn't go through, you wouldn't

10  get paid; correct?

11  A. That is correct.

12  Q. And so it would be against your interests to

13  try to undermine the deal; correct?

14  MR. GRADY: Objection. Leading.

15  A. That is correct.

16  Q. At one point counsel for plaintiffs asked you

17  whether if plaintiffs had had a conversation with

18  Deanna Wicks that would mean that you would get less of

19  a commission. Do you recall that?

20  A. Yes.

21  Q. And correct me if I'm wrong. I believe you

22  said that that would only be the case if plaintiffs had

23  contacted Deanna Wicks before contacting you. Is that

24  right?

Page 102

1    A.  That is correct.

2    Q.  But in fact they contacted you first, not

3   Ms. Wicks?

4    A.  That's correct.

5    Q.  And so in fact their discussions with

6   Ms. Wicks would not lead you to have to share your

7   commission with her?

8         MR. GRADY:  Objection.  Leading.

9    A.  That's correct.

10    Q.  Now, at one point counsel for plaintiffs asked

11   you if it was unusual that repairs were being made to

12   the properties before the transaction closed, before

13   the purchase closed, and I believe you said that it was

14   unusual.

15    A.  Yes, that is correct.

16    Q.  Okay.  Can you explain why it was unusual?

17    A.  Unusual in that -- to the extent of the

18   repairs needed.  Typically the loans that I have

19   originated, the property might have some minor cosmetic

20   items to them that don't affect the marketability of

21   the property.  In other words, you know, if the bank

22   should take back the property for any reason, they

23   would need to know that it's going to be a marketable

24   property.

Page 103

1    Q.  Just so I understand, you're saying it was

2   unusual that these repairs were going on because in

3   your experience it's unusual that a property requires

4   this degree of repair?

5         MR. GRADY:  Objection.  Leading.

6   BY MR. FOGDALL:

7    Q.  Is that correct?

8    A.  That's correct.

9    Q.  Just so I understand, in this case the reason

10   why the repairs were required before the transactions

11   closed was because the condition of the properties

12   affected their livability; correct?

13    A.  That is correct.

14    Q.  So if they had just been minor cosmetic

15   repairs it might not have been necessary to require

16   that they be completed before the sale went through?

17    A.  That's correct.

18         MR. GRADY:  If you'd like, I'll just make

19   a general objection regarding your questions.  I don't

20   particularly want to interrupt you, but I'll just keep

21   objecting otherwise.

22         MR. FOGDALL:  You're free to object.

23         MR. GRADY:  Okay.

24   BY MR. FOGDALL:

Page 104

1    Q.  Is that correct?

2    A.  That is correct.

3    Q.  But if the condition of the property affects

4   its habitability or livability, those repairs have to

5   be made before the loan can be approved?

6         MR. GRADY:  Objection.  Leading.

7   BY MR. FOGDALL:

8    Q.  Correct?

9    A.  That is correct.

10    Q.  Now, at one point counsel for plaintiffs asked

11   you if you made a statement to Mr. Wheatley to the

12   effect that they would be watching him or watching him

13   and the other plaintiffs.  Do you recall him asking you

14   about that?

15    A.  Can you repeat the question?

16    Q.  At one point counsel for plaintiffs asked you

17   if you had made a statement to Mr. Anderson or the

18   other plaintiffs about that they quote unquote might be

19   watching him.  Do you recall --

20    A.  Yes.

21    Q.  -- counsel asking you about that?

22    A.  Yes.

23    Q.  And I think what you responded was that you

24   might have said something like, well, they might check

Page 105

1   on the loan at some point or something like that, I

2   can't recall your exact words, but --

3         MR. GRADY:  Objection.  Leading.

4   BY MR. FOGDALL:

5    Q.  Do you recall giving that response to counsel?

6    A.  Yes.

7    Q.  Now, who is "they" when you made that

8   statement?  Who did you mean by "they"?

9    A.  I meant the representatives from Fannie Mae.

10   Fannie Mae is where we get the funding for conforming

11   loans.  And if there's a red flag in any, you know --

12   and I don't know why there would be.  But if there's a

13   red flag, then they can audit the file.  And if they

14   audit the file, then they can check the property and

15   they can do a lot of things.

16    Q.  At one point you also said they could call the

17   loan due?

18    A.  Yes.

19    Q.  They could accelerate payment on the loan so

20   that the entire amount is due immediately?

21    A.  That's correct.

22    Q.  This is not Wachovia that would be doing this;

23   this would be Fannie Mae that would be requiring this?

24         MR. GRADY:  Objection.  Leading.

Page 106

1 BY MR. FOGDALL:
2     Q. Is that correct?
3     A. That's correct.
4     Q. A couple of times you mentioned during your
5 testimony that when a loan is done as an exception, as
6 in the case of the Wheatley's loan, that the loan is
7 then held in portfolio. What does that mean?
8     A. That means the bank holds it as part of its
9 mortgage portfolio. They own the loan. They service
10 the loan. They keep the loan.
11     Q. And does that mean that then the loan would
12 not be sold to Fannie Mae?
13     A. That is correct.
14     Q. So when the Wheatleys first sat down to apply
15 for a loan, the intention was that it would be a loan
16 that could be sold to Fannie Mae; correct?
17     A. That is correct.
18     Q. But at some point it became clear that it
19 would be impossible to do a loan for them that would be
20 such that it could be sold to Fannie Mae; correct?
21     MR. GRADY: Objection. Leading.
22 BY MR. FOGDALL:
23     Q. Correct?
24     A. I believe so, yes.

Page 107

1     Q. Nevertheless, the bank went ahead and did an
2 exception so that they could obtain a loan?
3     MR. GRADY: Objection. Leading.
4 BY MR. FOGDALL:
5     Q. Correct?
6     A. Yes.
7     Q. There was one point where you mentioned -- I
8 believe it was when you were reviewing documentation
9 related to the exception -- that the bank -- the
10 exception that Wachovia ultimately made for the
11 Wheatleys so that they could obtain a loan, I believe
12 it was when we were discussing that documentation you
13 also mentioned that there might have been an issue
14 about the Wheatleys using assets from their business in
15 order to fund at least part of the downpayment. Do you
16 recall that?
17     A. Yes.
18     Q. And you said that normally when that's done,
19 when a borrower uses money from their business,
20 Wachovia requires that a third party verify something
21 about those funds. What is that that they require?
22     A. They require a letter from a CPA, a third
23 party, that says that the funds used in this
24 transaction will not adversely affect the transaction

Page 108

1 or adversely affect his business.
2     Q. And here that couldn't be done because at the
3 time that the loan was made Mr. Wheatley prepared his
4 own tax returns? Is that your understanding?
5     A. Yes.
6     Q. For later tax returns he might have had an
7 accountant prepare them, but at this time his tax
8 returns were prepared by himself?
9     A. That's correct.
10     MR. GRADY: Objection. Leading.
11     Q. And we've talked about the fact during the
12 course of your testimony that the Wheatleys' loan was
13 done as a no income verification loan.
14     A. Yes.
15     Q. But here we're talking about an issue with
16 verifying funds used for the downpayment.
17     A. That's correct.
18     Q. So even though a loan is a no income
19 verification loan, there might still be a requirement
20 that certain assets be verified?
21     A. Yes.
22     MR. GRADY: Objection. Leading.
23     Q. Is that correct?
24     A. That is correct.

Page 109

1     Q. And why is that?
2     A. For this particular loan 10 percent is the
3 minimum downpayment. These are the guidelines for a no
4 ratio and stated income loan, that the funds have to be
5 of the borrower's own funds. And by verifying that we
6 need a 30-day or 60-day bank statement verifying
7 sufficient funds for not only downpayment but closing
8 costs.
9     Q. So a no income verification loan means that
10 income won't be verified, but other assets that you
11 might not characterize as income might have to be
12 verified?
13     MR. GRADY: Objection. Leading.
14     A. Yes, that is correct.
15     Q. Okay. At any point was Mr. and Mrs. Wheatley
16 put into an income verification loan program?
17     A. No.
18     Q. All right. Now, counsel asked you earlier in
19 your deposition about a couple of documents, first this
20 one marked Hogsten 3, which at the top says "Notice of
21 Action Taken." It's dated July 22, '04. This is an
22 indication that the Wheatleys' original application for
23 a loan was denied. And that was in part due to
24 problems with the collateral, problems with the

James D. Hogsten

Page 110

1    property?

2        A.  Yes.

3            MR. GRADY: Objection. Leading.

4        Q.  And then counsel showed you this document

5    which was marked Hogsten 5, and it's entitled "Interest

6    Rate Agreement," and it was signed by the Wheatleys on

7    the 3rd of August, 2004.

8        A.  Yes.

9        Q.  And it indicates that the value of the loan

10   that the Wheatleys were applying for now was 90 percent

11   of the value of the property, the appraised value. I'm

12   sorry. 90 percent of the purchase price?

13       A.  Of the purchase price, yes.

14       Q.  Of the purchase price. So my understanding

15   from sitting here and seeing you review these documents

16   is that as of August 3rd, '04 you sat down with the

17   Wheatleys and you personally were still hoping or

18   intending that they get a loan in a 90 percent

19   loan-to-value ratio?

20       A.  Yes.

21       Q.  And so you and they sat down and they prepared

22   paperwork for that, for a new loan, after the original

23   one had been denied?

24           MR. GRADY: Objection. Leading.

Page 111

1        Q.  You forwarded those documents to the service

2    center in Connecticut and at that point you learned

3    that the loan-to-value ratio -- at some point after

4    that you learned that the loan-to-value ratio would

5    have to be 80 percent, not 90 percent?

6        A.  Yes, that's correct.

7            MR. GRADY: Objection.

8        Q.  So at the time this document was signed,

9    Hogsten 5, you hadn't become aware of the requirement

10   that the loan-to-value ratio be 80 percent?

11       A.  I fully thought that we would be able to get

12   the 90 percent.

13       Q.  And the requirement that the loan-to-value

14   ratio be 80 percent, that did not come from you;

15   correct?

16       A.  That's correct.

17       Q.  One last question. Two more questions.

18   Sorry. First of all, Deanna Wicks didn't work for

19   Wachovia Mortgage Corporation; is that right?

20       A.  That's correct.

21       Q.  Who does she work for?

22       A.  Wachovia National Bank.

23       Q.  And she does not do -- well, let me ask you

24   this way: How does her work differ from your work?

Page 112

1        A.  She is a financial specialist that handles

2    consumer credit, assets, home equity loans and lines,

3    and commercial loans and mortgages.

4        Q.  And commercial loans and mortgages would

5    include mortgages on rental properties where the owner

6    is the landlord, is going to lease those properties out

7    to other tenants and isn't going to live there himself?

8        A.  No. Commercial properties would be where --

9    commercial mortgages would be where you buy a building

10   and you rent to tenants who have businesses that run

11   out of the building. Whereas a residential could

12   borrow -- you could lend to people who are residing.

13   Whether it's an owner-occupied or nonowner-occupied

14   borrower, it has to go around residential. Somebody

15   has to reside in the property.

16       Q.  This really is my last question. At one point

17   counsel asked you if you had had a conversation with

18   Mr. Anderson about the property being more valuable as

19   a commercial property. Do you recall that?

20       A.  Yes.

21       Q.  And were you suggesting that Mr. Anderson

22   abandon his desire to purchase the property based on

23   the fact that it might be more valuable as a commercial

24   property?

Page 113

1        A.  No.

2        Q.  Were you suggesting to Mr. Anderson that he

3    could purchase the property and then use it as a

4    commercial property?

5            MR. GRADY: Objection. Leading.

6        A.  No. No, I didn't.

7        Q.  Okay. You didn't say that to Mr. Anderson?

8        A.  No. I just said that the property would be

9    worth more as a commercial property.

10       Q.  But you weren't intending that he abandon his

11   plans based on that?

12           MR. GRADY: Objection. Leading.

13       A.  No.

14       Q.  That's correct?

15       A.  That's correct.

16           MR. FOGDALL: That's all the questions I

17   have.

18           MR. GRADY: That's it. Your counsel is

19   going to tell you he wants you to read this transcript.

20           MR. FOGDALL: Yes. He'll read and sign.

21   You'll have 30 days to do that.

22           MR. GRADY: That's it.

23           (The deposition concluded at 12:43 p.m.

24   this same day.)

Page 114

1          - - - - -
2
3                INDEX TO TESTIMONY
4
   JAMES D. HOGSTEN              PAGE
5
     Examination by Mr. Grady        2
6    Examination by Mr. Fogdall     97
7          - - - - -
8            INDEX TO EXHIBITS
9  HOGSTEN DEPOSITION EXHIBIT NO.       PAGE
10  1 ............................................. 7
    2 ............................................. 42
11  3 ............................................. 57
    4 ............................................. 68
12  5 ............................................. 70
    6 ............................................. 78
13
           - - - - -
14
15
16
17
18
19
20
21
22
23
24

Page 115

1
2
3
4
5       REPLACE THIS PAGE
6       WITH THE ERRATA SHEET
7       AFTER IT HAS BEEN
8       COMPLETED AND SIGNED
9       BY THE DEPONENT.
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24

Page 116

State of Delaware   )
                    )
New Castle County   )
         CERTIFICATE OF REPORTER
      I, Robert W. Wilcox, Sr., Registered Merit
Reporter and Notary Public, do hereby certify that
there came before me on the 2nd day of November, 2007,
the deponent herein, JAMES D. HOGSTEN, who was duly
sworn by me and thereafter examined by counsel for the
respective parties; that the questions asked of said
deponent and the answers given were taken down by me in
Stenotype notes and thereafter transcribed into
typewriting under my direction.
      I further certify that the foregoing is a true
and correct transcript of the testimony given at said
examination of said witness.
      I further certify that I am not counsel,
attorney, or relative of either party, or otherwise
interested in the event of this suit.




            Robert W. Wilcox, Sr., RMR, CLR
            Delaware CSR No. 133-PS




DATED:  November 8, 2007

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF DELAWARE

TOLANO ANDERSON, et al.,                    )
                                            )
                 Plaintiffs,                )    C. A. No. 06 CV 00567 (SLR)
                                            )
v.                                          )
                                            )
WACHOVIA MORTGAGE CORPORATION               )
and WACHOVIA CORPORATION,                   )
                                            )
                 Defendants.                )

## AMENDED COMPLAINT

1.    Plaintiffs are all African Americans.

2.    At all times pertinent and for several years previous, Plaintiffs Tolano Anderson, Cathy Anderson, Lloyd Wheatley, and Audria Wheatley all had bank accounts at Wachovia Bank.

3.    Prior to June 2004, Plaintiffs Tolano Anderson,(hereafter referred to as Anderson) Cathy Anderson, Lloyd Wheatley (hereafter referred to as Wheatley), and Audria Wheatley  between them had approximately eight (8) mortgages at Wachovia Bank.  The previous mortgages were all in predominantly minority or racially-mixed neighborhoods.

4.    On or about June 2004, Plaintiff Tolano Anderson contacted J. D. Hogsten, (hereafter referred to as Hogsten) a loan officer for Defendants Wachovia, and told him that the Andersons, Wilkins, and Wheatleys planned to purchase three (3) homes located on Silver Lake whose addresses are 580 North DuPont Highway, 584 [DuPont North] North Dupont Highway, 592 North DuPont Highway from Mr. Jack Aigner.  The homes

B-159

in question were all adjacent to each other and were all in a white neighborhood in Dover, Delaware. The homes backed up to Silver Lake in Dover, Delaware.

5.    The Andersons and the Wheatleys intended to use their purchased homes as a primary residence; the Wilkins intended to use their purchased home as a secondary residence.

6.    Anderson explained to Hogsten that all three (3) homes had to be purchased. And that if one home was not purchased, all of them would collectively lose the $40,000.00 non refundable deposit, of which each had put in $13,333.33. The seller was planning to use the funds from the proceeds to invest in a 1031 exchange and for this reason it was important for him that all three properties be sold at the same time.

7.    With that in mind, Hogsten advised Anderson how to proceed with the purchases and assured him that the bank understood that the sale was an individual sale, although the Andersons, Wilkins, and Wheatleys would all take title separately to three (3) different properties.

8.    Shortly thereafter, Anderson contacted Hogsten to discuss further financial plans, however, Hogsten was unavailable. So, Anderson spoke to Ms. Deanne Wilks and asked that she give the information to Hogsten.

9.    Wachovia Corporation is a large institutional bank which provides, among other things, mortgage services to its customers and to its applicants. The Andersons and Wheatleys were ongoing customers of the bank. Wachovia Mortgage Corporation is a subsidiary of Wachovia Corporation.

10.    Anderson explained to Hogsten that throughout the transaction he would be the key person to receive all the information for the Andersons, Wilkins, and Wheatleys.

2

11.    After the agreement of sale was signed and a deposit was put down, Hogsten advised Anderson that an appraisal will be needed for all the properties.

12.    Shortly thereafter, Anderson met with an appraiser assigned to appraise his home sent by Hogsten.

13.    At the time, it appeared to Anderson that Hogsten and the appraiser appeared to know each other well.  In fact, after the meeting the appraiser and Hogsten went out to lunch.

14.    Almost immediately upon meeting with the appraiser, Anderson was told by the appraiser that he could not appraise the house because there was some damage to the basement.

15.    Upon information of belief, the appraiser at that time refused to appraise the house upon the request of Hogsten, who had his own undisclosed reasons for undermining the aforesaid purchase.

16.    Hogsten then told Anderson that it would be impossible to have an appraisal because it was impossible to find comparable homes and, as a result, the bank would not be able to make the loan.

17.    Upon information of belief, Hogsten's comment that it was impossible to find other comparables was, in fact, a ruse and a second attempt to undermine the transaction of the Plaintiffs.

18.    Anderson thereafter contacted Carl Kaplin, another appraiser, who advised him that there were other comparables and, in [fact,] approximately ten (10) minutes time, faxed him several other comparable homes.

19.    Thereafter, Anderson advised J. D. Hogsten that there were comparables [and faxed them to him].

20.    Thereafter, Anderson asked Hogsten for another impartial appraiser for his property.

21.    Another independent appraiser did come out to appraise the property adjacent to DuPont Highway for $267,000 which was the purchase price.

22.    Shortly thereafter, a commitment letter was provided to Wilkins and Anderson.

23.    Hogsten had advised Anderson that he was not going to make enough money on this transaction because Anderson had contacted to Deanne Wilks on one occasion and because of that contact with Anderson, he had to split his commission with her.

24.    Upon information of belief, Hogsten had no intention of permitting the transaction to be completed, knowing at the time that it would cost Plaintiffs $40,000 in the loss of the deposit.

25.    After the appraisals were approved, Hogsten told Anderson that in order for the sale to be completed, he would require Anderson's home to be put into "move in" condition, even though it had been appraised for a total purchase price in the condition that it was in.

26.    On or about July 2, 2004, Dr. and Mrs. Wilkins met with Hogsten in his Wachovia office.  In the conversation, Hogsten informed the couple that the home being purchased by the Andersons was "nothing more than a pile of sticks and bricks and he could assign no value to it at all".

27.    The statement by Hogsten was further evidence of his seeking to undermine the entire transaction.

4

28.    Shortly thereafter, Hogsten informed Anderson that the property had significant value as a potential commercial property.  Hogsten asked Anderson if he would change the transaction from residential to commercial and Anderson said he did not wish to do so.

29.    Shortly thereafter, the Wilkins home appraisal was completed.  The home appraised at a value exceeding the sales price.

30.    After Mr. Hogsten informed Dr. Wilkins that he was now required to prove that the funds used for the deposit was his money and show its source.

31.    This is not normal customary practice of the bank.

32.    On or about July 23, 2004, Hogsten informed Dr. Wilkins that he was required to provide documentation proving that his deposit on the home was his own money.  This again, is not customary procedure of the bank.

33.    On or about July 23, 2004, Hogsten informed Anderson that the purchase of his property could not go through.  He said that there was not enough value in the property.  At that time, Anderson advised Mr. Hogsten that the required work was nearly complete and was ready for an impartial appraiser's assessment.  On that same day, Hogsten made additional negative comments about the pending transactions to Mr. & Mrs. Anthony Wallace, who were there at the bank on another matter.

34.    After the second appraisal for the Anderson property was completed, the appraisal value was still the same as the sales price.

35.    On or about July 2004, the appraisal for the Wheatley property was completed.  The value of the appraisal exceeded the sales price.

5

36.    Despite the fact that the Wheatley property appraised above the sales price, Hogsten informed Wheatley that he was now required to complete upgrades on the property to ensure that everything was in move in condition prior to settlement.

37.    Wheatley explained that as a buyer he did not want to waste thousands of dollars upgrading the house prior to settlement because he is planning custom upgrades after the settlement. He also explained that he did not have access to the home and was not able to complete upgrades to sell his house prior to settlement. Despite the request by Wheatley, Hogsten refused to lift the bank's requirement.

38.    This was another attempt by Hogsten to undermine the sale of the properties.

39.    In order to assist Wheatley, Anderson intervened in the matter.

40.    Anderson questioned Hogsten about the bank's policy concerning appraisals, repairs, warranties, and such matters. Hogsten refused to answer his questions. Hogsten referred Anderson to a female loan officer to answer his question about the bank's policy.

41.    Anderson contacted the loan officer who told him that the bank's policies on issues of appraisals, repairs and warranties are confidential and are not available to the public. She said that the criteria used by Wachovia in such matters are for internal office use only and she could not discuss the matter.

42.    Wheatley thereafter requested of the owner access to the house so that upgrades demanded by the bank could be completed. The owner agreed.

43.    Wheatley then informed Hogsten that the required work had been completed.

44.    Hogsten sent the appraiser back to the house to conduct another appraisal. Once again, the appraisal said that the house was valued in excess of the sales price.

45.     All three (3) homes were finally scheduled for settlement on or about August, 2004.

46.     The Anderson and Wilkins settlements were completed.     However, the Wheatley documents were not forwarded to the closing attorney by Wachovia.

47.     Even though the settlements of Anderson and Wilkins had been completed, Anderson and Wilkins were concerned because, unless the third property was settled, as per the agreement of sale, Plaintiffs could still lose the nonrefundable deposit of $40,000 and their original plan of owning and controlling the three properties would be threatened.

48.     When Anderson learned that the settlement papers had not been sent to the office of the closing attorney, he immediately contact Hogsten and was informed that Wachovia could not send the closing papers because it needed a letter from a certified contractor saying that the roof on the Wheatley home did not have any leaks.  This was another attempt to undermine the transactions.

49.     Anderson reminded Hogsten that if all three (3) properties did not settle that day, all the sales would be voided and they would lose over $40,000 in nonrefundable deposits.  Hogsten did not care.

50.     Anderson informed Hogsten that this new requirement about the certified letter from the contractor was unacceptable.

51.     Mr. Hogsten then stated that without the letter there would be no settlement and that it appeared the whole deal was off.

52.     The Seller, angered by the banks' actions, made a phone call to arrange for his personal contractor to fax a letter per Hogsten's request.

53.    When Anderson informed Hogsten that the letter was in route, Hogsten stated that the bank also wanted an additional fifteen percent (15%) down payment from Wheatley before it would be sending the closing documents. This was another attempt by Hogsten to undermine the transactions.

54.    Anderson told Hogsten that this was an unexpected surprise and Wheatley was not prepared for the change.

55.    Hogsten suggested that the Seller reduce the sale price. The Seller declined.

56.    Hogsten then said that Wheatley would have to come up with the twenty percent (20%) of the purchase or the deal was off. This transaction all took place at the settlement office of the attorney

57.    At that point, the Seller, in view of what he perceived as improper conduct by the bank, agreed not to void the entire transactions because he felt that the bank's actions were unreasonable.

58.    At that point, the Plaintiffs nevertheless, would still be subject to a $40,000 loss of their deposit, if all three (3) transactions did not go forward.

59.    Thereafter, Wheatley did obtain the twenty percent (20%) down payment from joint accounts. By doing so, he was informed by Hogsten that if they pay the twenty percent (20%) they would not have enough cash resolve to qualify for the loan. This was another attempt by Hogsten to undermine the transactions.

60.    The settlement date was scheduled for Wheatley was cancelled <u>by Wachovia</u>.

61.    On August 12, 2004, Destefano informed Wheatley that Wachovia was unable to obtain the PMI for his home and that the only way around that situation was to pay twenty percent (20%) down and eliminate the PMI requirement.

62. Anderson [attempted to contact] contacted without any success a Mr. Skowronski and Mr. Destefano from Wachovia about the reasons for denying the PMI. [This was another attempt to undermine the transaction.]

63. Settlement was now scheduled for August 13, 2004.

64. Wachovia now stated that a twenty percent (20%) down payment was required; however, at this time, Hogsten was on vacation at the Outer Banks.

65. Mr. Aigner, the Seller, called Mr. Destefano at Wachovia and informed him that he was aware of the bank's inappropriate conduct and that the scheduled settlement was being sabotaged. Mr. Skowronski intervened and approved the release of the loan documents and the settlement was finally completed on August 13, 2004.

66. Upon information of belief, the numerous requests for appraisals, house improvements, and changes in developments, and other last-minute requirements imposed upon the Andersons and the Wheatleys were a violation of internal rules and regulations of the Defendants.

67. Similarly situated whites were not required to meet all the requirements imposed upon the Plaintiffs to be eligible for a mortgage.

68. A week or two before the August 6, 2004, settlement, Hogsten told Wheatley that he would be watched. During the week of August 16, 2004, Hogsten contacted Anderson and told he had better be careful because the Bank would be watching him. Anderson interpreted this as a veiled threat by the Bank that the Andersons would be subject to an unusually high degree of scrutiny.

## COUNT ONE

### The Andersons

69.    Plaintiff Anderson incorporates by reference, paragraphs 1 through 68.

70.    Requirements made upon all the Plaintiffs to complete the settlement were designed to discourage and undermine the settlement and stop the purchase of the aforesaid homes, and interfere with the agreement of sale between the Andersons and the Sellers.

71.    In similar situations, whites are not required to go through all of the appraisals, home improvements, and financial requirements imposed upon the Andersons.

72.    The conduct of the bank violated 42 U.S.C. §1981 which prohibits racial discrimination in [contractual matters] the terms and conditions of a contract.

73.    The conduct of the Defendants constituted a [tortuous] tortious interference with the contractual rights and business opportunities of the Andersons with the Seller[s].

74.    The conduct of the Defendants constituted a breach of contract for a mortgage and the covenant of good faith and fair dealing in the contract to provide financing.

75.    The conduct of the Defendants constituted a violation of Plaintiff's rights pursuant to 15 U.S.C. §1691 and 12 C.F.R. Part 202 in that Defendants was discriminating against Plaintiffs.

76.    As a result of the Defendants' conduct, the Andersons suffered the following damage.

    a. The humiliation, inconvenience and aggravation throughout the transactions.

    b. The cost of approximately $15,000.00 plus numerous man hours to refinish their home in a manner which    they would not have done except for the

10

unreasonable requirement of the Bank even after the home had already been appraised for the value of the property.

[WHEREFORE, the Andersons request that this Court award them general compensatory damages, for the inconvenience, humiliation, contractual damages for $15,000.00 plus additional labor that was put in the house that would not have otherwise been necessary and which was of no value to the Andersons, plus punitive damages, and attorney's fees and costs.]

WHEREFORE, the Andersons request compensation for the following cause of actions:

1. 42 U.S.C. §1981: Humiliation, inconvenience, and aggravation throughout the transactions, the costs of approximately $15,000.00, plus numerous man hours to refinish the home in a manner which they would not have done except for the unreasonable requirement of the bank even after the home had already been appraised for the value of the property plus attorney's fees and punitive damages and costs.

2. Tortious interference with contractual rights and business opportunities, the costs of approximately $15,000.00, plus the value of numerous man hours to refinish the home in a manner which they would not have done except for the unreasonable requirement of the bank even after the home had already been appraised for the value of the property and punitive damages and costs.

3. Breach of contract for a mortgage and the covenant of good faith and fair dealings, the costs of approximately $15,000.00 plus the value of numerous man hours to refinish the home in a manner which they would not have done except for the

unreasonable requirement of the bank even after the home had already been appraised for the value of the property and punitive damages and costs.

4.    Rights pursuant to 15 U.S.C. §1691:    The costs of approximately $15,000.00 plus the value of numerous man hours to refinish the home in a manner which they would not have done except for the unreasonable requirement of the bank even after the home had already been appraised for the value of the property plus the statutory compensation of $10,000.00 pursuant to 15 U.S.C. §1691e(d) and attorney's fees and costs.

## COUNT TWO

### The Wheatleys

77.    Plaintiffs Wheatley incorporate by reference paragraphs 1 through 68.

78.    The requirement of the refurbishing of the home and the additional down payment put a strain on the Wheatley's other business transactions which Hogsten was aware of.    After six (6) months, the Wheatleys were forced to sell which cost them approximately $3,500.00 in transfer taxes.

79.    The Wheatley's did meet the home improvement requirements and spent approximately $50,000.00, which they could not afford and which they did not intend to do, to improve their house and which they would not have otherwise spent.

80.    Because of all the unanticipated funds Wheatley had to put into the house, he did not have those funds available for his business.    Wheatley estimates that he lost another $50,000.00 in his business because of the unreasonable requirements of the bank.

81.    The conduct of the bank violated 42 U.S.C. §1981 which prohibits racial discrimination in [contractual matters] the terms and conditions of a contract.

12

82.    The conduct of the Defendants constituted a [tortuous] tortious interference with the contractual rights and business opportunities of the Wheatleys with the Seller.

83.    The conduct of the Defendants constituted a breach of the contract for a mortgage and the covenant of good faith and fair dealing in the contract to provide financing.

84.    The conduct of the Defendants constituted a violation of Wheatley's rights pursuant to 15 U.S.C. §1691 and 12 C.F.R. Part 202 in that Defendants [was] were discriminating against the Wheatleys.

[WHEREFORE, the Wheatleys request this Court award them general compensatory damages for:

a. The humiliation and inconvenience and aggravation throughout the transactions.

b. To compensate them for the damages incurred which will remain necessary for making repairs which were not needed and should not have been required by the appraisal in the amount of $50,000 plus the additional cost of prematurely selling their property which cost them $3,500.00, plus at least $50,000.00 in loss of business opportunities, plus the loss of the increase in value of their home had they been able to keep it, plus the loss of the use of $40,000.00 which was required as a down payment, plus punitive damages and attorney's fees.]

WHEREFORE, the Wheatleys request this Court award them compensation for the following cause of actions:

13

1.    42 U.S.C. §1981:    Humiliation,  inconvenience,  and  aggravation
throughout the transactions.  The cost for making repairs which were not needed and
should not have been required by the appraisal in the amount of $50,000 plus the
additional cost of prematurely selling their property which cost them $3,500.00, plus at
least $50,000.00 in loss of business opportunities, plus the loss of the increase in value of
their home had they been able to keep it, plus the loss of the use of approximately
$40,000.00 which was required as a down payment, plus punitive damages and attorney's
fees and costs.

2.    Tortious interference with contractual rights and business opportunities.
The cost for making repairs which were not needed and should not have been required by
the appraisal in the amount of $50,000 plus the additional cost of prematurely selling
their property which cost them $3,500.00, plus at least $50,000.00 in loss of business
opportunities, plus the loss of the increase in value of their home had they been able to
keep it, plus the loss of the use of approximately $40,000.00 which was required as a
down payment, plus punitive damages and costs.

3.    Breach of contract for a mortgage and the covenant of good faith and fair
dealings, plus the cost for making repairs which were not needed and should not have
been required by the appraisal in the amount of $50,000 plus the additional cost of
prematurely selling their property which cost them $3,500.00, plus at least $50,000.00 in
loss of business opportunities, plus the loss of the increase in value of their home had
they been able to keep it, plus the loss of the use of approximately $40,000.00 which was
required as a down payment, plus punitive damages and costs.

4.    Rights pursuant to 15 U.S.C. §1691: The cost for making repairs which were not needed and should not have been required by the appraisal in the amount of $50,000 plus the additional cost of prematurely selling their property which cost them $3,500.00, plus at least $50,000.00 in loss of business opportunities, plus the loss of the increase in value of their home had they been able to keep it, plus the loss of the use of approximately $40,000.00 which was required as a down payment, plus punitive damages, plus the statutory compensation of $10,000.00 pursuant to 15 U.S.C. §1691e(d) and attorney's fees and costs.

## COUNT THREE

### The Wilkins

85.    Plaintiffs Richard Wilkins and Brenda Wilkins incorporate by reference, paragraphs 1 through 68.

86.    The Wilkins entered into an agreement of sale for the purchase of three (3) homes with their friends, the Andersons and the Wheatleys, in order to own waterfront property on Silver Lake.

87.    The transaction was a joint effort depending upon all three individuals obtaining mortgage approval for the purchase of these properties.

88.    Upon the signing of the original contract, the Wilkins were confident that all three would be able to obtain financing from a reasonable lender.

[89.    The conduct and treatment of the Andersons and the Wheatleys up until August 13, 2004 subjected them to possible loss of the funds.]

89.    Because of the problems incurred in the financing of the three house, it was necessary for the Wilkins to take at least three trips from their home in Kansas to

Delaware in order to deal directly with Hogsten and Wachovia.  The cost of these unnecessary trips was approximately $5,400.00.

90.    Furthermore, within a period of 6 months' time, because Wheatley was unable to continue to run his business and maintain his mortgage payments (because his funds had been significantly depleted by the requirements of the bank), the Wilkins purchased the Wheatley home, which cost them approximately $36,000.00 in out-of-pocket funds, some for transfer taxes, attorney's fees, and some for a necessary down payment.  Had the Wilkins not been treated the way they had been and had the Wilkins been permitted to have a smaller down payment, the Wilkins would not have felt required to purchase the Wheatley home.  The Wilkins were also concerned that if another individual purchased the Wheatley home the property might have been used for commercial purposes, thereby devaluing the Wilkins' home and the Andersons' home.

91.    They also experienced aggravation, inconvenience and humiliation in dealing with Wachovia Bank.

92.    The conduct of the bank violated 42 U.S.C. §1981 which prohibits racial discrimination in [contractual matters] the terms and conditions of a contract.

93.    The conduct of the Defendants constituted a [tortuous] tortious interference with the contractual rights and business opportunities of the Wilkins with the Seller[s].

94.    The conduct of the Defendants constituted a breach of contract for a mortgage and the covenant of good faith and fair dealing in the contract to provide financing.

95.    The conduct of the Defendants constituted a violation of Plaintiff's rights pursuant to 15 U.S.C. §1691 and 12 C.F.R. Part 202 in that Defendants was discriminating against Plaintiffs.

[95.   As a result of the conduct of the Defendants, the Wilkins the humiliation, inconvenience and aggravation of being treated in an inferior manner in connection with the mortgage application.

     a.   The humiliation, inconvenience and aggravation of being treated in an inferior manner in connection with the mortgage application.]

WHEREFORE, the Wilkins request compensation for the following causes of action:

    1.    42 U.S.C. §1981:    Humiliation, inconvenience, and aggravation throughout the transactions, the costs of approximately $5,400.00 for 3 unnecessary trips to Delaware, plus the additional costs to purchase the Wheatleys' home, plus attorney's fees and costs.

    2.    Tortious interference with contractual rights and business opportunities. the costs of approximately $5,400.00 for three unnecessary trips to Delaware, plus the additional costs to purchase the Wheatleys' home, plus punitive damages and costs.

    3.    Breach of contract for a mortgage and the covenant of good faith and fair dealings, the costs of approximately $5,400.00 for three unnecessary trips to Delaware, plus the additional costs to purchase the Wheatleys' home, plus punitive damages and costs.

    4.    Rights pursuant to 15 U.S.C. §1691: The costs of approximately $5,400.00 for three unnecessary trips to Delaware, plus the additional costs to purchase the Wheatleys' home, plus the statutory compensation of $10,000.00 pursuant to 15 U.S.C. §1691e(d) and attorney's fees and costs.

17

GRADY & HAMPTON, LLC

_____ /S/____ John S. Grady_____
John S. Grady (I.D. 009)
6 North Bradford St.
Dover, DE 19904
(302) 678-1265
*Attorneys for Plaintiffs*

DATED:      October 3, 2006

18



## GreenLink LLC

**REAL ESTATE INFORMATION SERVICES**

12854 Kenan Drive, Suite 201
Jacksonville, Florida 32258
904/288-6000    877/247-0099
Fax # 904/288-6002

### Appraisal Appointment Time

| | | | |
|---|---|---|---|
| Loan ID: | 6995799 | Date: | 07/06/2004 |
| | | **Borrower's Name and Address :** | |
| Order No.: | 8316972129 | CATHY  ANDERSON | |
| Account No.: | 8300008518 | TOLANO  ANDERSON | |
| Client: | Wachovia Mortgage Corporation | 580 NORTH DUPONT | |
| Attention: | ROSEMARY CIULLO | HIGHWAY | |
| Client Address: | 1 Jefferson Square, 1st Floor | Dover, DE 19901 | |
| | Attn: Philly South Team | County:   KENT | |
| | Mail Code: CT-7451 | | |
| | Waterbury, CT 06706 | | |

Appraisal Appointment Date & Time:  07/02/2004 05:00 PM

We request the information contained herein to be held confidential.

B-177

ANDER000076

# Waterbury Service Center
## Attn: Philly South Team

**Client ID: 8300008518**
1 Jefferson Square, 1st Floor
Waterbury, CT 06706

| Ordered By | Product | | Borrower | Vendor: |
| Loan ID | County | | Property Address | Vendor Phone: |
| Order ID | | | Property City, State, Zip | |

ROSEMARY CIULL    421 Drive-By Appraisal FNMA 2055 w/interior

6996739    KENT

8316972129



TOLANO ANDERSON

580 NORTH DUPONT HIGHWAY

DOVER, DE 19901

MULLENS VALUATION
SERVICES LLC

3023668565

REDACTED

*Date of Order:* 06/29/2004

*Wednesday, June 30, 2004*

*Page 1 of 2*

**B-178**

ANDER000077

| Ordered By | Product | | Borrower | Vendor: |
|---|---|---|---|---|
| Loan ID | County | | Property Address | Vendor Phone: |
| Order ID | | | Property City, State, Zip | |

REDACTED

Date of Order:   06/29/2004

*Wednesday, June 30, 2004*

*Page 2 of 2*

B-179

ANDER000078

## Please Confirm Order Information:

## Client Information

| | |
|---|---|
| Last Name: | CIULLO |
| First Name: | ROSEMARY |
| Phone: | (203) 578-8298 |
| Extension: | |
| Client ID: | 8300008518 |
| Site ID: | WPADE . |
| Email Address: | |

## Products Ordered

| | |
|---|---|
| Appraisal Product: | Drive-By Appraisal FNMA 2055 w/Interior |
| Title Service: | None |
| Closing Service: | None |
| Miscellaneous Service(s): | |

## General Order Information

### Borrower Name

| | |
|---|---|
| Last: | ANDERSON |
| First: | TOLANO |
| Middle: | |
| SSN: | -- |
| Home Phone: | (302) 270-3506 |
| Work Phone: | |
| Extension: | |
| Best Time to Call: | |

### Co-Borrower Name

| | |
|---|---|
| Last: | ANDERSON |
| First: | CATHY |
| Middle: | |
| SSN: | — |
| Home Phone: | (302) 270-3506 |
| Work Phone: | |
| Extension: | |
| Property Address: | 580 NORTH DUPONT HIGHWAY |
| City: | DOVER |
| State: | DE |
| Zip: | 19901 |
| Zip Plus: | |
| County: | KENT |

## Loan Information

| | |
|---|---|
| Loan Number: | 6995799 |
| Loan Amount: | $253300 |
| Loan Type: | Purchase |
| Revolving Loan: | |

http://www.greenlinkweb.com/pls/vam_www/submit_order_page                6/29/2004

ANDER000079

| | |
|---|---|
| Fixed Rate: | Unknown |
| NY Consolidation: | Unknown |
| Power of Attorney: | Unknown |
| Does Owner Live at Address? | Yes |
| Years: | |
| Months: | |
| Current Mortgage Holder: | |

## Title/Appraisal Order Information

| | |
|---|---|
| Sale Price: | $266666 |
| Closing Date: | 07/17/2004 |
| Legal Description: | |
| Tax or Parcel ID Number: | |
| Buyer's Agent Name: | MR. ANDERSON |
| Phone: | (302) 270-3506 |
| Seller's Agent Name: | |
| Phone: | |

## Miscellaneous

State Specific Requirments:

Cancel |    Submit | Selecting Cancel will return client to Order Screen

ANDER000080

Ln#6995009
File No. 8316933791

# APPRAISAL OF



## LOCATED AT:

584 N. Dupont Highway
Dover, De.  19901

## FOR:

Wachovia Mortgage Corporation
1 Jefferson Square Waterbury, Ct.06706

## BORROWER:

Wheatley, Lloyd and Audria

## AS OF:

July 7, 2004

## BY:

Daniel A Gladden

B-182

WHEAT000054

Ln#6995009
File No. 8316933791

Wachovia Mortgage Corporation
1 Jefferson Square Waterbury, Ct.06706

File Number:  8316933791

In accordance with your request, I have personally inspected and appraised the real property at:

584 N. Dupont Highway
Dover, De.  19901

The purpose of this appraisal is to estimate the market value of the subject property, as improved.
The property rights appraised are the fee simple interest in the site and improvements.

In my opinion, the estimated market value of the property as of   July 7, 2004           is:

$267,000
Two Hundred Sixty-Seven Thousand  Dollars

The attached report contains the description, analysis and supportive data for the conclusions,
final estimate of value, descriptive photographs, limiting conditions and appropriate certifications.

Daniel A. Gladden

B-183

WHEAT000055

# FannieMae

Ln#6995009
File No.: 8316933791

## Desktop Underwriter Quantitative Analysis Appraisal Report

THIS SUMMARY APPRAISAL REPORT IS INTENDED FOR USE BY THE LENDER/CLIENT FOR A MORTGAGE FINANCE TRANSACTION ONLY.

**SUBJECT**

| | |
|---|---|
| Property Address 584 N. Dupont Highway | City Dover    State De.    Zip Code 19901 |
| Legal Description See assessor's parcel # | County Kent |
| Assessor's Parcel No. 2-05-06809-01-1901-000 | Tax Year 2003    R.E.Taxes $ 1097.00    Special Assessments $ none |
| Borrower Wheatley, Lloyd and Audria    Current Owner Aigner, Peter J. | Occupant: ☐ Owner  ☐ Tenant  ☒ Vacant |
| Neighborhood or Project Name non development | Project Type  ☐ PUD  ☐ Condominium  HOA$ none /Mo. |
| Sales Price $ 266,667    Date of Sale 6-18-04    Description% amount of loan charges/concessions to be paid by seller none known |
| Property rights appraised  ☒ Fee Simple  ☐ Leasehold    Map Reference 06809    Census Tract 409 |

**NEIGHBORHOOD**

Note: Race and the racial composition of the neighborhood are not appraisal factors.

| Location | ☒ Urban | ☐ Suburban | ☐ Rural | Property values | ☒ Increasing | ☐ Stable | ☐ Declining |
|---|---|---|---|---|---|---|---|
| Built up | ☒ Over 75% | ☐ 25-75% | ☐ Under 25% | Demand/supply | ☐ Shortage | ☒ In balance | ☐ Over supply |
| Growth rate | ☐ Rapid | ☒ Stable | ☐ Slow | Marketing time | ☒ Under 3 mos. | ☐ 3-6 mos. | ☐ Over 6 mos. |

Single family housing / Condominium/Coop

| PRICE $(000) | AGE (yrs) | PRICE $(000) | AGE (yrs) |
|---|---|---|---|
| 70 Low | 10 | 115 Low | 11 |
| 350 High | | 210 High | 21 |
| Predominant | | Predominant | |
| 200 | 70 | 163 | 19 |

Neighborhood boundaries See Attached Addendum

**SITE**

| Dimensions 95x176 | Site area .56 acres | Shape Irregular |
|---|---|---|

Specific zoning classification and description C1A

Zoning compliance  ☒ Legal  ☐ Legal nonconforming (Grandfathered use)  ☐ Illegal, attach description  ☐ No zoning

Highest and best use of subject property as improved or as proposed per plans and specifications):  ☒ Present use  ☐ Other use, attach description.

| Utilities | Public | Other | | Public | Other | | Type | Public | Private |
|---|---|---|---|---|---|---|---|---|---|
| Electricity | ☒ | | Water | ☒ | | Street | asphalt | ☒ | |
| Gas | | | Sanitary sewer | ☒ | | Alley | none | | |

Off-site Improvements Type

Are there any apparent adverse site conditions (easements, encroachments, special assessments, slide areas, etc.)  ☐ Yes  ☒ No   If Yes, attach description.

**IMPROVEMENTS**

Source(s) used for physical characteristics of property:  ☒ Interior and exterior inspection  ☐ Exterior inspection from street  ☐ Previous appraisal files
☐ MLS  ☐ Assessment and tax records  ☐ Prior Inspection  ☐ Property owner  ☐ Other (Describe):

No. of Stories 2    Type (Det./Att.) det.    Exterior Walls stuc,brk,wd    Roof Surface wd shakes    Manufactured Housing ☐ Yes ☒ No

Does the property generally conform to the neighborhood in terms of style, condition, and construction materials? ☒ Yes ☐ No  If No, attach description.

Are there any apparent physical deficiencies or conditions that would affect the soundness or structural integrity of the improvements or the livability of the property?
☐ Yes ☒ No   If Yes, attach description.

Are there any apparent adverse environmental conditions (hazardous wastes, toxic substances, etc.) present in the improvements, on the site, or in the immediate vicinity of
the subject property?  ☐ Yes ☒ No   If Yes, attach description.

**SALES COMPARISON ANALYSIS**

I researched the subject market area for comparable listings and sales that are the most similar and proximate to the subject property.

My research revealed a total of 3    sales ranging in sales price from $ 242,500 to $ 303,000.

My research revealed a total of 0 in mls    listings ranging in list price from $ 0 to $ 0.

The analysis of the comparable sales below reflects market reaction to significant variations between the sales and the subject property.

| FEATURE | SUBJECT | SALE 1 | +(-)$ Adjustment | SALE 2 | +(-)$ Adjustment | SALE 3 | +(-)$ Adjustment |
|---|---|---|---|---|---|---|---|
| Address | 584 N. Dupont Highway Dover | 10 Manor Dr. Dover, De. | | 530 American Ave. Dover, De. | | 215 American Ave. Dover, De. | |
| Proximity to Subject | | 3.5 miles+- | | .80 miles+- | | .80 miles+- | |
| Sales Price | $ 266,667 | $ 275,000 | | $ 242,500 | | $ 303,000 | |
| Price/Gross Liv. Area | $ 86.02 Ø | $ 106.34 Ø | | $ 91.17 Ø | | $ 111.60 Ø | |
| Data & Verif. Sources | | MLS | | MLS | | MLS | |
| VALUE ADJUSTMENTS | DESCRIPTION | DESCRIPTION | +(-)$ Adjustment | DESCRIPTION | +(-)$ Adjustment | DESCRIPTION | +(-)$ Adjustment |
| Sales or Financing Concessions | conv | conv. no concess | | va. no concess | | conv. no concess | |
| Date of Sale/Time | 6-18-04 | 9-26-03 | | 8-15-03 | | 4-16-04 | |
| Location | Urban-hv trv rd | Sub- less hv trv rd | -13,750 | urban-less hv tr rd | -12,125 | urban-less hv tr rd | -15,150 |
| Site | .56 acres | .30 acres | 1,300 | .41 acres | 750 | .39 acres | 850 |
| View | Gd-lakefront | Gd-Lake front | | Avg-no water | 30,000 | Avg-no water | 30,000 |
| Design (Style) | 2 sty contemp | Ranch | | Cape cod | | Cape cod | |
| Actual Age (Yrs.) | 50 yrs estimated | 50 yrs. | | 25 yrs. | -5,000 | 56 yrs. | |
| Condition | fair to avg | Avg. | -10,000 | Avg. | | V.Good | -20,000 |
| Above Grade | Total 7 / Bdrms 3 / Baths 4.00 | Total 9 / Bdrms 3 / Baths 3.00 | 1,500 | Total 8 / Bdrms 4 / Baths 3.00 | 1,500 | Total 10 / Bdrms 5 / Baths 3.00 | 1,500 |
| Room Count | 3,100 Sq. Ft. | 2586-mls Sq. Ft. | 10,300 | 2660-mls Sq. Ft. | 8,800 | 2715-mls Sq. Ft. | 7,700 |
| Gross Living Area | | | | | | | |
| Basement and Finished Rooms Below Grade | small bsmt unfin. | no bsmt unfin. | 1,000 | full bsmt Rec rm | -5,000 -3,000 | part Bsmt unfin | -2,500 |
| Garage/Carport | 1car att. | 2 car att. | 2,500 | 2 car att. | -2,500 | 2 car att. | -2,500 |
| | dock,dk,lgenc,pa | 2 dks,dock,fy | 4,000 | scr porch | 5,000 | dk,pat,fy,sprink sy | 4,000 |
| | no cent ac,fp | Cent ac,2 fps | -5,500 | Cent ac,2 fps | -5,500 | cent ac,fp,lngpool | -8,000 |
| Net Adj. (total) | | ☐ + ☒ - $ 8,650 | | Gross: 36.8% | | ☐ + ☒ - $ 2,925 | |
| Adjusted Sales Price of Comparables | | Gross: 18.1% Net: -3.1% $ 266,350 | | Net: 1.2% $ 245,425 | | Gross: 30.4% Net: -1.4% $ 298,900 | |
| Date of Prior Sales | 3-26-04,5-29-03 | unk. | | unk. | | 9-1-95 | |
| Price of Prior Sales | unk,unk. | unk. $ | | unk. $ | | $ 148,500 | |

Analysis of any current agreement of sale, option, or listing of the subject property and analysis of the prior sales of subject and comparables:  See Attached...

Summary of sales comparison and value conclusion:  See Attached...

This appraisal is made  ☒ "as-is," or  ☐ subject to completion per plans and specifications on the basis of a hypothetical condition that the improvements have been completed, or
☐ subject to the following repairs, alterations or conditions:

BASED ON AN  ☐ EXTERIOR INSPECTION FROM THE STREET OR AN ☒ INTERIOR AND EXTERIOR INSPECTION, I ESTIMATE THE MARKET VALUE, AS DEFINED,
OF THE REAL PROPERTY THAT IS THE SUBJECT OF THIS REPORT TO BE $ 267,000    , AS OF July 7,2004 .

Produced using ACI software, 800.234.8727 www.aciweb.com

10CH.

WHEAT000056

Ln#6995009

## Desktop Underwriter Quantitative Analysis Appraisal Report
File No.: 8316933791

**Project Information for PUDs (if applicable)--Is the developer/builder in control of the Home Owners' Association (HOA)?**  ☐ Yes ☐ No

Provide the following information for PUDs only if the developer/builder is in control of the HOA and the subject property is an attached dwelling unit:

Total number of phases _____   Total number of units _____   Total number of units sold _____

Total number of units rented _____   Total number of units for sale _____   Data Source(s) _____

Was the project created by the conversion of existing buildings into a PUD?  ☐ Yes ☐ No  If yes, state date of conversion: _____

Does the project contain any multi-dwelling units?  ☐ Yes ☐ No  Data Source: _____

Are the common elements completed?  ☐ Yes ☐ No If No, describe status of completion: _____

Are any common elements leased to or by the Home Owners' Association?  ☐ Yes ☐ No  If yes, attach addendum describing rental terms and options.

Describe common elements and recreational facilities: _____

**Project Information for Condominiums (if applicable)--Is the developer/builder in control of the Home Owners' Association (HOA)?**  ☐ Yes ☐ No

Provide the following information for all Condominium Projects:

Total number of phases _____   Total number of units _____   Total number of units sold _____

Total number of units rented _____   Total number of units for sale _____   Data Source(s) _____

Was the project created by the conversion of existing buildings into a condominium?  ☐ Yes ☐ No  If yes, date of conversion: _____

Project Type:  ☐ Primary Residence  ☐ Second Home or Recreational  ☐ Row or Townhouse  ☐ Garden  ☐ Midrise  ☐ Highrise ☐ _____

Condition of the project, quality of construction, unit mix, etc.: _____

Are the common elements completed?  ☐ Yes ☐ No If No, describe status of completion: _____

Are any common elements leased to or by the Home Owners' Association?  ☐ Yes ☐ No  If yes, attach addendum describing rental terms and options.

Describe common elements and recreational facilities: _____

**PURPOSE OF APPRAISAL:** The purpose of this appraisal is to estimate the market value of the real property that is the subject of this report based on a quantitative sales comparison analysis for use in the mortgage finance transaction.

**DEFINITION OF MARKET VALUE:** The most probable price which a property should bring in a competitive and open market under all conditions requisite to a fair sale, the buyer and seller, each acting prudently, knowledgeably and assuming the price is not affected by undue stimulus. Implicit in this definition is the consummation of a sale as of a specified date and the passing of title from seller to buyer under conditions whereby: (1) buyer and seller are typically motivated; (2) both parties are well informed or well advised, and each acting in what he considers his own best interest; (3) a reasonable time is allowed for exposure in the open market; (4) payment is made in terms of cash in U.S. dollars or in terms of financial arrangements comparable thereto; and (5) the price represents the normal consideration for the property sold unaffected by special or creative financing or sales concessions* granted by anyone associated with the sale.

* Adjustments to the comparables must be made for special or creative financing or sales concessions.  No adjustments are necessary for those costs which are normally paid by sellers as a result of tradition or law in a market area; these costs are readily identifiable since the seller pays these costs in virtually all sales transactions.  Special or creative financing adjustments can be made to the comparable property by comparisons to financing terms offered by a third party institutional lender that is not already involved in the property or transaction.  Any adjustment should not be calculated on a mechanical dollar for dollar cost of the financing or concession but the dollar amount of any adjustment should approximate the market's reaction to the financing or concessions based on the appraiser's judgment.

### STATEMENT OF LIMITING CONDITIONS AND APPRAISER'S CERTIFICATION

**CONTINGENT AND LIMITING CONDITIONS:** The appraiser's certification that appears in the appraisal report is subject to the following conditions:

1. The appraiser will not be responsible for matters of a legal nature that affect either the property being appraised or the title to it. The appraiser assumes that the title is good and marketable and, therefore, will not render any opinions about the title.  The property is appraised on the basis of it being under responsible ownership.

2. The appraiser has provided any required sketch in the appraisal report to show approximate dimensions of the improvements and the sketch is included only to assist the reader of the report in visualizing the property and understanding the appraiser's determination of its size.

3. The appraiser will not give testimony or appear in court because he or she made an appraisal of the property in question, unless specific arrangements to do so have been made beforehand.

4. The appraiser has noted in the appraisal report any adverse conditions (such as, but not limited to, needed repairs, the presence of hazardous wastes, toxic substances, etc.) observed during the inspection of the subject property or that he or she became aware of during the normal research involved in performing the appraisal.  Unless otherwise stated in the appraisal report, the appraiser has no knowledge of any hidden or unapparent conditions of the property or adverse environmental conditions (including the presence of hazardous wastes, toxic substances, etc.) that would make the property more or less valuable, and has assumed that there are no such conditions and makes no guarantees or warranties, expressed or implied, regarding the condition of the property.  The appraiser will not be responsible for any such conditions that do exist or for any engineering or testing that might be required to discover whether such conditions exist.  Because the appraiser is not an expert in the field of environmental hazards, the appraisal report must not be considered as an environmental assessment of the property.

5. The appraiser obtained the information, estimates, and opinions that were expressed in the appraisal report from sources that he or she considers to be reliable and believes them to be true and correct.  The appraiser does not assume responsibility for the accuracy of such items that were furnished by other parties.

6. The appraiser will not disclose the contents of the appraisal report except as provided for in the Uniform Standards of Professional Appraisal Practice.

7. The appraiser must provide his or her prior written consent before the lender/client specified in the appraisal report can distribute the appraisal report (including conclusions about the property value, the appraiser's identity and professional designations, and references to any professional appraisal organizations or the firm with which the appraiser is associated) to anyone other than the borrower; the mortgagee or its successors and assigns; the mortgage insurer; consultants; professional appraisal organizations; any state or federally approved financial institution; or any department, agency, or instrumentality of the United States or any state or the District of Columbia; except that the lender/client may distribute the report to data collection or reporting service(s) without having to obtain the appraiser's prior written consent.  The appraiser's written consent and approval must also be obtained before the appraisal can be conveyed by anyone to the public through advertising, public relations, news, sales, or other media.

8. The appraiser has based his or her appraisal report and valuation conclusion for an appraisal that is subject to completion per plans and specifications on the basis of a hypothetical condition that the improvements have been completed.

9. The appraiser has based his or her appraisal report and valuation conclusion for an appraisal that is subject to completion, repairs, or alterations on the assumption that completion of the improvements will be performed in a workmanlike manner.

Produced using ACI software, 800.234.8727 www.aciweb.com

Fannie Mae Form 2055 9-96

10CH.

B-185

WHEAT000057

## ADDENDUM

| | |
|---|---|
| | File No.: 8316933791 |
| Borrower: Wheatley, Lloyd and Audria | Case No.: Ln#6995009 |
| Property Address: 584 N. Dupont Highway | |
| City: Dover | State: De. | Zip: 19901 |
| Lender: Wachovia Mortgage Corporation | |

**Neighborhood Boundaries**
N. State Street to the west,E. Division Street to the south,and N. Dupont Highway to the north and east.Neighborhood comprised of mainly mixed styles of detached single family units and commercial properties.Most of the properties fronting N. Dupont Highway appear to be commercial properties.

**Analysis of Current Agreements**
Public records evidenced in mls indicate subject last sold on 3-26-04 but consideration not provided and sold prior to that on 5-29-03 but consideration not provided.Agreement of sale provided to appraiser indicates subject property is currently under contract for $266666.67.County records indicate sale 2 previously sold on 9-1-95 for $148500.It is unknown when sales 1 and 2 sold prior to dates reflected in the sales comparison analysis.

**Summary of Market Data**
The above comparables indicate a value range from $245425 to $298900.All sales have reportedly settled.Sale 1 being a lake front property would be best sale,thus receiving the most weight.All sales are located on roads with lighter traffic volumes and adjusted accordingly under location headings.All sales are superior to subject in terms of condition.All sales have smaller lots than subject and adjusted accordingly.Condition adjustments also reflect the lack of heat in subject property on 2nd floor.Amenities of subject limited comparable sales,thus forcing the use of 2 sales exceeding 6 months of age,2 sales exceeding adjustment guidelines,and 1 sale exceeding 1 mile from the subject.Sales utilized are believed to be the best available as of the effective date.Square footage totals for sales obtained from mls and assumed to be accurate.Comp photos indicated in this report are dated mls(trend)digital photos.An interior inspection was made.It does appear most of the windows have been updated.Some interior paint needed.Landing area 2nd level needs finished floor covering.It does appear some work is needed on wood shake roof but assumed not to have any leakage.Little finished flooring missing in 1 bath 1st level and it does appear some tile work is needed in same bath due to long narrow tile wainscotting crack.Asphalt floor tiles in closet 1st level and mud room appear to need replacing.CTC est to be between $2500 and $3500.NOTE-appraiser is not a contractor.Appears to be in a fair to avg overall state of repair.Rear decking approx 308 SF:Appears to have a dock:Portable stg bldg-no value assigned.Side patio appears to be in a fair state of repair-no value assigned.Small basement approx 10.75x13.5:Rear conc patio approx 11x11.5:FP in LR:Enclosed rear porch approx 20.5x15-few tiles missing and a few drop ceiling panels have stains.Apparent lack of heat on 2nd floor represents functional obsolescence.Subject property fronts N. Dupont Highway which is a heavily travelled road much of the time and in my opinion represents locational obsolescence.Subject property appears to be waterfront on Silver Lake at rear but amount of frontage unknown.Plot plan/survey not provided to appraiser.Assumed not to have any physical deficiencies adversely affecting the structural integrity of the subject property.It does appear some of the piping in bsmt is wrapped with asbestos,however appraiser is not a hazardous waste expert,toxic sustance expert,asbestos expert, or an environmental expert and any additional information regarding possible asbestos in basement should be obtained from certified expert.If it found by a certified expert, the apparent asbestos in basement is deemed an adverse environmental condition, the estimated market value indicated in this report could be adversely affected.For the purposes of this appraisal, it is assumed subject property does not contain any adverse environmental conditions.All systems assumed to operate adequately.Assumed not to have any termite infestation problems or any other type of wood destroying insect infestation problems.Basement assumed not to have any water seepage problems.Basement appeared dry at time of appraisal inspection.Assumed to be free of any leakage.Assumed not to have any special assessments or slide areas.Assumed not to have any adverse easements or encroachments.Plot plan/survey not provided to appraiser.It is assumed all required permits have been obtained prior to any renovating.Subject property appears to conform to the neighborhood in terms of construction materials but appears to be unique to the neighborhood in terms of its style.Subject property appears to be below average in terms of condition to other properties in subject neighborhood.Sellers disclosure not provided to appraiser.

WHEAT000058

Ln#6995009
File No: 8316933791

**Desktop Underwriter Quantitative Analysis Appraisal Report**

**APPRAISER'S CERTIFICATION:** The Appraiser certifies and agrees that:

1. I performed this appraisal by (1) personally inspecting from the street the subject property and neighborhood and each of the comparable sales (unless I have otherwise indicated in this report that I also inspected the interior of the subject property); (2) collecting, confirming, and analyzing data from reliable public and/or private sources; and (3) reporting the results of my inspection and analysis in this summary appraisal report. I further certify that I have adequate information about the physical characteristics of the subject property and the comparable sales to develop this appraisal.

2. I have researched and analyzed the comparable sales and offerings/listings in the subject market area and have reported the comparable sales in this report that are the best available for the subject property. I further certify that adequate comparable market data exists in the general market area to develop a reliable sales comparison analysis for the subject property.

3. I have taken into consideration the factors that have an impact on value in my development of the estimate of market value in the appraisal report. I further certify that I have noted any apparent or known adverse conditions in the subject improvements, on the subject site, or on any site within the immediate vicinity of the subject property of which I am aware, have considered these adverse conditions in my analysis of the property value to the extent that I had market evidence to support them, and have commented about the effect of the adverse conditions on the marketability of the subject property. I have not knowingly withheld any significant information from the appraisal report and I believe, to the best of my knowledge, that all statements and information in the appraisal report are true and correct.

4. I stated in the appraisal report only my own personal, unbiased, and professional analysis, opinions, and conclusions, which are subject only to the contingent and limiting conditions specified in this form.

5. I have no present or prospective interest in the property that is the subject of this report, and I have no present or prospective personal interest or bias with respect to the participants in the transaction. I did not base, either partially or completely, my analysis and/or estimate of market value in the appraisal report on the race, color, religion, sex, age, marital status, handicap, familial status, or national origin of either the prospective owners or occupants of the subject property or of the present owners or occupants of the properties in the vicinity of the subject property or on any other basis prohibited by law.

6. I have no present or contemplated future interest in the subject property, and neither my current or future employment nor my compensation for performing this appraisal is contingent on the appraised value of the property.

7. I was not required to report a predetermined value or direction in value that favors the cause of the client or any related party, the amount of the value estimate, the attainment of a specific result, or the occurrence of a subsequent event in order to receive my compensation and/or employment for performing the appraisal. I did not base the appraisal report on a requested minimum valuation, a specific valuation, or the need to approve a specific mortgage loan.

8. I estimated the market value of the real property that is the subject of this report based on the sales comparison approach to value. I further certify that I considered the cost and income approaches to value, but, through mutual agreement with the client, did not develop them, unless I have noted otherwise in this report.

9. I performed this appraisal as a limited appraisal, subject to the Departure Provision of the Uniform Standards of Professional Appraisal Practice that were adopted and promulgated by the Appraisal Standards Board of The Appraisal Foundation and that were in the place as of the effective date of the appraisal (unless I have otherwise indicated in this report that the appraisal is a complete appraisal, in which case, the Departure Provision does not apply).

10. I acknowledge that an estimate of a reasonable time for exposure in the open market is a condition in the definition of market value. The exposure time associated with the estimate of market value for the subject property is consistent with the marketing time noted in the Neighborhood section of this report. The marketing period concluded for the subject property at the estimated market value is also consistent with the marketing time noted in the Neighborhood section.

11. I personally prepared all conclusions and opinions about the real estate that were set forth in the appraisal report. I further certify that no one provided significant professional assistance to me in the development of this appraisal.

**SUPERVISORY APPRAISER'S CERTIFICATION:** If a supervisory appraiser signed the appraisal report, he or she certified and agrees that: I directly supervise the appraiser who prepared the appraisal report, have examined the appraisal report for compliance with the Uniform Standards of Professional Appraisal Practice, agree with the statements and conclusions of the appraiser, agree to be bound by the appraiser's certifications numbered 5 through 7 above, and am taking full responsibility for the appraisal and the appraisal report.

| APPRAISER: | SUPERVISORY APPRAISER (ONLY IF REQUIRED): |
|---|---|
| Signature: _Daniel A. Kent_ | Signature: _____ |
| Name: Daniel A Gladden | Name: _____ |
| Company Name: D.A. Gladden RE&Appraisal Assoc Inc. | Company Name: _____ |
| Company Address: 1469 S Governors Ave,Dover, De.19904 | Company Address: _____ |
| | |
| Date of Report/Signature: 7/12/2004 | Date of Report/Signature: _____ |
| State Certification #: X2-0000032 | State Certification #: _____ |
| or State License #: _____ | or State License #: _____ |
| State: De. | State: _____ |
| Expiration Date of Certification or License: 10-31-05 | Expiration Date of Certification or License: _____ |

**ADDRESS OF PROPERTY APPRAISED:**
584 N. Dupont Highway
Dover, De. 19901

APPRAISED VALUE OF THE SUBJECT PROPERTY $ 267,000
EFFECTIVE DATE OF APPRAISAL/INSPECTION 7/7/2004

**LENDER/CLIENT:**
Name: _____
Company Name: Wachovia Mortgage Corporation
Company Address: 1 Jefferson Square Waterbury,Ct.06706

**SUPERVISORY APPRAISER:**
SUBJECT PROPERTY
☐ Did not inspect subject property
☐ Did inspect exterior of subject property from street
☐ Did inspect interior and exterior of subject property
COMPARABLE SALES
☐ Did not inspect exterior of comparable sales from street
☐ Did inspect exterior of comparable sales from street

PAGE 3 OF 3
Produced using ACI software, 800.234.8727 www.aciweb.com
D.A. Gladden R.E. and Appraisal

Fannie Mae Form 2055 9-96

10CH.

WHEAT000059

DIMENSION LIST ADDENDUM

| | | |
|---|---|---|
| Borrower: Wheatley, Lloyd and Audria | File No.: 8316933791 | |
| Property Address: 584 N. Dupont Highway | Case No.: Ln#6995009 | |
| City: Dover | State: De. | Zip: 19901 |
| Lender: Wachovia Mortgage Corporation | | |

| GROSS BUILDING AREA (GBA) | 3,100 | |
|---|---|---|
| GROSS LIVING AREA (GLA) | 3,100 | |

| Area(s) | Area | % of GBA |
|---|---|---|
| Living | 3,100 | 100.00 |
| Level 1 | 2,058 | 66.39 |
| Level 2 | 1,042 | 33.61 |
| Level 3 | | |
| Other | | |
| Basement | | |
| Garage | | |

| Area Measurements | | | | Area Type | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|
| Measurements | Factor | Total | | Level 1 | Level 2 | Level 3 | Other | Bsmt. | Garage | |
| 18.00 x 34.00 | x 1 | = | 612.00 | X | | | | | | |
| 11.50 x 31.50 | x 1 | = | 362.25 | X | | | | | | |
| 1.50 x 27.50 | x 1 | = | 41.25 | X | | | | | | |
| 22.50 x 36.00 | x 1 | = | 810.00 | X | | | | | | |
| 9.00 x 14.50 | x 1 | = | 130.50 | X | | | | | | |
| 6.00 x 17.00 | x 1 | = | 102.00 | X | | | | | | |
| 6.00 x 13.50 | x 1 | = | 81.00 | | X | | | | | |
| 20.00 x 46.00 | x 1 | = | 920.00 | | X | | | | | |
| 1.00 x 4.50 | x 1 | = | 4.50 | | X | | | | | |
| 4.50 x 8.00 | x 1 | = | 36.00 | | X | | | | | |

This form was produced on the ACI Development RapidForms system (800) 334-8727

B-188

WHEAT000060

## SUBJECT PROPERTY PHOTO ADDENDUM

| | | |
|---|---|---|
| Borrower: Wheatley, Lloyd and Audria | File No.: 8316933791 | |
| Property Address: 584 N. Dupont Highway | Case No.: Ln#6995009 | |
| City: Dover | State: De. | Zip: 19901 |
| Lender: Wachovia Mortgage Corporation | | |



**FRONT VIEW OF
SUBJECT PROPERTY**

Appraised Date: July 7, 2004
Appraised Value: $ 267,000



**REAR VIEW OF
SUBJECT PROPERTY**



**STREET SCENE**

B-189

WHEAT000061

**COMPARABLE PROPERTY PHOTO ADDENDUM**

| | | | |
|---|---|---|---|
| Borrower: Wheatley, Lloyd and Audria | | File No.: 8316933791 | |
| Property Address: 584 N. Dupont Highway | | Case No.: Ln#6995009 | |
| City: Dover | State: De. | | Zip: 19901 |
| Lender: Wachovia Mortgage Corporation | | | |



**COMPARABLE SALE #1**

10 Manor Dr.
Dover, De.
Sale Date: 9-26-03
Sale Price: $ 275,000



**COMPARABLE SALE #2**

530 American Ave.
Dover, De.
Sale Date: 8-15-03
Sale Price: $ 242,500



**COMPARABLE SALE #3**

215 American Ave.
Dover, De.
Sale Date: 4-16-04
Sale Price: $ 303,000

WHEAT000062

**LOCATION MAP**

| | |
|---|---|
| Borrower: Wheatley, Lloyd and Audria | File No.: 8316933791 |
| Property Address: 584 N. Dupont Highway | Case No.: Ln#6995009 |
| City: Dover | State: De.    Zip: 19901 |
| Lender: Wachovia Mortgage Corporation | |



B-191

WHEAT000063

| Borrower: Wheatley, Lloyd and Audria | File No.: 8316933791 | |
| Property Address: 584 N. Dupont Highway | Case No.: Ln#6995009 | |
| City: Dover | State: De. | Zip: 19901 |
| Lender: Wachovia Mortgage Corporation | | |

SKETCH ADDENDUM



WHEAT000064

PUGO - Appraisals Single Family Residence/PUDs Analysis of URAR FNMA Form...

Case 1:06-cv-00567-SLR    Document 48-11    Filed 12/21/2007    Page 18 of 25

# Underwriting Guidelines: Conforming

🔲 Feedback

## Archived Copy of PUGO for 7/30/04 - 8/12/04

## Appraisals
## Single Family Residence/PUDs
## Analysis of *URAR FNMA Form 1004/FHLMC Form 70*

### Subject

This section must clearly identify the subject property. The appraiser must provide a complete property address and legal description; a post office box number is not acceptable. If the legal description is lengthy, it should be attached as an addendum to the report.

The appraiser must identify the property rights appraised as "fee simple" or "leasehold." In addition, if the property is a Planned Unit Development (PUD) unit or a condominium unit for Housing and Urban Development/Department of Veterans Affairs (HUD/VA) only, the appraiser must indicate the property type, the amount of Homeowners Association (HOA) dues, and the project name.

Either of the following must be set forth as stated in the sales contract:

- Sales price, contract date, and loan charges paid by the property seller
- Financing and sales concessions made by the property seller

### Neighborhood

The neighborhood analysis must contain:

- An accurate description of the subject neighborhood
- Factors that influence the market value and marketability in the neighborhood

If there are unfavorable factors in the analysis, the appraiser must address the impact of those factors on value and marketability.

**WACH000001**

### PUD Section

This section should be completed on all PUD units. The information in this section is very limited and does **not** replace the *PUD Appraiser's*

B-193

*Certification* form that Wachovia Mortgage Corporation requires for PUD project approval.

## Site

This section must accurately describe the physical characteristics of the site, the site improvements, and available utilities. It must also fully analyze any location factors affecting marketability.

The property site's size, shape, and topography should be generally conforming and acceptable in the market area. It should also have competitive improvements and amenities. The subject property use must conform to applicable zoning restrictions and must be the highest and best use for the property. Utilities must meet community standards.

## Description of Improvements

The report must contain an accurate description of the improvements and any factors that may affect the market value or marketability of the subject. The property must be habitable as a year-round residence.

Dwellings with unusual layouts, peculiar floor plans, or inadequate equipment or amenities generally have limited market appeal. When the subject property does not conform to other neighborhood properties in terms of type, design, age, materials, and so on, the appraiser must evaluate the effect the nonconformance has on the subject's value and marketability.

## Comments Section

Any additional features, necessary repairs or modernization, or physical, functional, or external inadequacies must be reported in the comments section.

The appraiser should note any energy-efficient items and must address any adverse environmental conditions that are present in the improvements, on the site, or in the vicinity of the subject property.

**WACH000002**

## Cost Approach

The cost approach measures value as a cost of reproduction. The reliability of this approach depends on valid reproduction cost estimates, proper depreciation estimates, and accurate site values.

The cost approach can be a good indicator of value on new or newly renovated properties. However, as the age of a property increases, the

reliability of the cost approach may decrease if depreciation estimates become subjective.

Appraisal reports that rely solely on the cost approach for the market value estimate are unacceptable.

Back to Top

## Sales Comparison Analysis

The sales comparison approach to value is generally the most reliable approach to value. Greater emphasis is placed on this approach when reviewing the appraisal report. For more detail, refer to Sales Comparison Approach.

## Income Approach

The income approach is seldom applicable in areas that consist primarily of owner-occupied properties since adequate rental data generally does not exist for those areas. However, in neighborhoods where there is a substantial rental market, it can be an important approach to value.

When the property being appraised is a single-family property that will be used for investment property, the appraiser must complete this section (in addition to the *Single-Family Comparable Rent Schedule, FNMA Form 1007*).

An appraisal report that relies solely on the income approach as an indicator of market value is not acceptable.

## Reconciliation

The reconciliation process that leads to the estimate of market value is an ongoing process throughout the appraiser's analysis. The reconciliation must contain any conditions of the appraisal on which the final estimate of value is based.

In the final reconciliation, the appraiser must reconcile:

- Reasonableness and reliability of each approach to value
- Reasonableness and validity of the indicated values and the available data

WACH000003

The appraiser then must select and report the approach or approaches that were given the most weight.

The rationale in the final reconciliation must be consistent with the

comments, conclusions, and assumptions stated throughout the appraisal report. The report must include the date of the value estimate and the estimate of market value as well as the appraiser's name, signature, and state license or certification number.

## Condition of Property

For existing construction, an appraisal may be based on the "as is" condition of the property if minor conditions that do not affect the livability of the property exist—such as minor deferred maintenance—as long as the appraiser's opinion of value reflects the existence of these conditions. The underwriter must review carefully the appraisal for a property appraised in an "as is" condition to ensure that the property does not have any physical deficiencies or conditions that would affect its livability. If there are none, Wachovia Mortgage Corporation does not need to require minor repairs to be completed before it delivers the mortgage to the investor.

When there are incomplete items or conditions that **do** affect the livability of the property—such as a partially completed addition or renovation—or physical deficiencies that could affect the soundness or structural integrity of the improvements, the property must be appraised subject to completion of the specific alterations or repairs. In such cases, Wachovia Mortgage Corporation must obtain a certificate of completion from an appraiser before it delivers the mortgage to the investor. The certification does not need to include photographs of the property unless those that accompanied the original appraisal report are no longer representative of the completed property.

Generally, the original appraiser should complete any required certification of completion; however, Wachovia Mortgage Corporation may use a substitute appraiser. In such cases, the substitute appraiser must review the original appraisal and certify that the original appraiser's description of the property was accurate and the opinion of market value was reasonable on the date of the original appraisal report. Wachovia Mortgage Corporation should note in its files why the original appraiser was not used.

Back to Top

Page updated 08/12/2004
Today is: Wednesday, 08/29/2007 - 03:37:11 PM

**WACH000004**

🔘 Feedback

## Archived Copy of PUGO for 7/30/04 - 8/12/04

### Appraisals
### Miscellaneous Property Concerns
### Properties Affected by Environmental Hazards

#### Properties Affected by Environmental Hazards

The appraiser is not considered to be an expert in the field of environmental hazards. The typical residential real estate appraiser is neither expected nor required to be an expert in this specialized field. However, the appraiser has a responsibility to note in the appraisal report any adverse conditions that were observed during the inspection of the subject property or information that he or she became aware of through the normal research involved in performing an appraisal. Refer to Adfinet, Part XI, Chapter 3, Section 307 for requirements for properties affected by environmental hazards.

> **NOTE:** The Adfinet website is a source of underwriting guidelines for the Federal National Mortgage Association (FNMA), Department of Veterans Affairs (VA), and Federal Housing Administration (FHA):
>
> 1. Create a personal User ID and Password for Adfinet by clicking on the register button.
> 2. Complete the form and a temporary password will be provided in an email.
> 3. Locate the Properties Affected by Environmental Hazards page.

Page updated 08/12/2004
Today is: Friday, 08/31/2007 - 03:12:08 PM

**WACH000005**

Home
Fannie Mae Single Family
2002 Selling Guide
Part XI: Property and Appraisal Guidelines (06/30/02)
XI, Chapter 3: Special Appraisal Considerations (06/30/02)

↑ Up One Level

XI, Chapter 3: Special Appraisal Considerations (06/30/02)
XI, 301: Units in Condominium Projects (06/30/02)
XI, 302: Units in PUD Projects (06/30/02)
XI, 303: Units in Cooperative Projects (06/30/02)
XI, 304: Factory-Built Housing (04/30/02)
XI, 305: Community Living Group Homes (04/30/02)
XI, 306: Mixed-Use Properties (05/06/99)
XI, 307: Properties Affected by Environmental Hazards (06/30/02)
XI, 308: Urban Properties (03/20/95)
XI, 309: Affordable Housing Program Properties (03/20/95)
XI, 310: Properties in Special Assessment or Community Facilities Districts (03/20/95)
XI, 311: Properties Subject to Leasehold Interests (06/30/02)
XI, 312: Leaseholds Held by Community Land Trusts (06/30/02)
XI, 313: Energy-Efficient Properties (06/30/02)

**WACH000006**

Fannie Mae Single Family
  2002 Selling Guide
    Part XI: Property and Appraisal Guidelines (06/30/02)
      XI, Chapter 3: Special Appraisal Considerations (06/30/02)
        XI, 307: Properties Affected by Environmental Hazards (06/30/02)

WACH000007

If the real estate broker, the property seller, the property purchaser, or any other party to the mortgage transaction informs the lender that an environmental hazard exists in or on the property or in the vicinity of the property, the lender must disclose that information to the appraiser and note the individual mortgage file accordingly. (We also require the lender to disclose such information to the borrower, and to comply with any state or local environmental laws regarding disclosure.)

When the appraiser has knowledge of any hazardous condition (whether it exists in or on the subject property or on any site within the vicinity of the property)—such as the presence of hazardous wastes, toxic substances, asbestos—containing materials, urea-formaldehyde insulation, radon gas, etc.—he or she must note the hazardous condition in the appraisal report and comment on any influence that the hazard has on the property's value and marketability (if it is measurable through an analysis of comparable market data as of the effective date of the appraisal) and make appropriate adjustments in the overall analysis of the property's value.

We do not consider the appraiser to be an expert in the field of environmental hazards. The typical residential real estate appraiser is neither expected nor required to be an expert in this specialized field. However, the appraiser has a responsibility to note in the appraisal report any adverse conditions that were observed during the inspection of the subject property or information that he or she became aware of through the normal research involved in performing an appraisal.

In rare situations, a particular environmental hazard may have a significant effect on the value of the subject property, although the actual effect is not measurable because the hazard is so serious or so recently discovered that an appraiser cannot arrive at a reliable opinion of market value because there is no comparable market data (such as sales, contract sales, or active listings) available to reflect the effect of the hazard. In such cases, the mortgage will not be eligible for delivery to us.

We will purchase or securitize a mortgage secured by a property that is affected by an environmental hazard if the effect of the hazard is measurable through an analysis of comparable market data as of the effective date of the appraisal and the appraiser reflects in the appraisal report any adverse effect that the hazard has on the value and marketability of the subject property or indicates that the comparable market data reveals no buyer resistance to the hazard. To illustrate: We are frequently asked to address the eligibility of mortgages secured by properties that are located in neighborhoods affected by radon gas or the presence of hazardous wastes. In such situations, we expect the appraiser to reflect any adverse effect or buyer resistance that is demonstrated and measurable through the available comparable market data. Therefore, when a property is located in a neighborhood that has a relatively high level of radon gas or is near a hazardous waste site, we expect the appraiser to consider and use comparable market data from the same affected area because the sales prices of settled sales, the contract sales prices of pending sales, and the current asking prices for active listings will reflect any negative effect on the value and marketability of the subject property.

Although our guidelines expressly require the appraiser to include in the appraisal report comments about any influence that an environmental hazard has on the value and marketability of the property and to make appropriate adjustments to the overall analysis of the value of the property, we expect the lender to oversee the performance of the appraisers it employs. The lender must make the final decision about the need for inspections and the adequacy of the property as security for the mortgage requested. We expect the lender to exercise sound judgment in determining the acceptability of the property. For example, since we require the appraiser to comment on the effect of a hazard on the marketability and value of the subject property, the appraiser would have to note when there is market resistance to an area because of environmental hazards or any other conditions that affect well, septic, or public water facilities. When the lender has reason to believe that private well water that is on or available to a property might be contaminated as the result of the proximity of the well to hazardous waste sites, the

WACH000008

lender is exercising sound judgment if it obtains a "well certification" to determine whether the water meets community standards.

B-201

WACH000009

**XI, 202: Status of Construction (06/30/02)**

Generally, we require the improvements for the subject property to have been completed when the mortgage is delivered to us. However, we do make some exceptions to this and, in such cases, an appraisal report should be developed in accordance with the following criteria:

- For *new* or *proposed construction*, an appraisal may be based on either plans and specifications or an existing model home, if the lender obtains a certification of completion before it delivers the mortgage to us. This certification should be completed by the appraiser, state that the improvements were completed in accordance with the requirements and conditions in the original appraisal report, and be accompanied by photographs of the completed improvements.

  When the completion of certain items that are included as part of the sales contract—such as landscaping, a driveway, or a sidewalk—or other minor items that do not affect the ability to obtain an occupancy permit has to be postponed for some reason, the lender may deliver the mortgage before these postponed items are completed if it represents and warrants that the postponed improvements will be completed within 180 days after the date of the mortgage note. The appraisal report must show both the cost of completing the postponed items and the "as completed" value of the property after completion of the postponed improvements, although no dollar-for-dollar adjustments should be made. The cost of completing any minor improvements must not represent more that 2% of the "as completed" appraised value of the property.

  - The lender must establish a "completion escrow" for the postponed improvements, by withholding from the purchase proceeds funds equal to 120% of the estimated cost for completing the improvements. However, if the contractor or builder offers a guaranteed "fixed price" contract for completion of the improvements, the funds in the "completion escrow" only need to equal the full amount of the contract price.

  - The lender and the borrower must enter into an escrow agreement that determines how the lender will manage and disburse funds from the escrow account. Once a certificate of completion is obtained, the lender must release the final draw from the escrow account (which should include any funds in excess of the amount needed to pay for completion of the postponed items). The final title report must not show any outstanding mechanic's liens or take any exceptions to the postponed improvements or the escrow agreement. If the final title report is issued before the completion of the improvements, the lender must obtain an endorsement to the title policy that ensures the priority of our lien.

- For *existing construction*, an appraisal may be based on the "as is" condition of the property if minor conditions that do not affect the livability of the property exist—such as minor deferred maintenance—as long as the appraiser's opinion of value reflects the existence of these conditions. The lender must review carefully the appraisal for a property appraised in an "as is" condition to assure that the property does not have any physical deficiencies or conditions that would affect its livability. If there are none, the lender does not need to require minor repairs to be completed before it delivers the mortgage to us.

  When there are incomplete items or conditions that do affect the livability of the property—such as a partially completed addition or renovation—or physical deficiencies that could affect the soundness or structural integrity of the improvements, the property must be appraised subject to completion of the specific alterations or repairs. In such cases, the lender must obtain a certificate of completion from an appraiser before it delivers the mortgage to us. The certification does not need to include photographs of the property unless those that accompanied the original appraisal

**B-202**

report are no longer representative of the completed property.

Generally, the original appraiser should complete any required certification of completion; however, the lender may use a substitute appraiser. In such cases, the substitute appraiser must review the original appraisal and certify that the original appraiser's description of the property was accurate and the opinion of market value was reasonable on the date of the original appraisal report. The lender should note in its files why the original appraiser was not used.

# Underwriting Guidelines: Product-Specific

 Feedback

## Archived Copy of PUGO for 7/30/04 - 8/12/04

## Conforming Investor Expanded Criteria
## Fixed Rate Products

### Product Profile

> **NOTE:** For additional underwriting topics not included in this section, Conforming Investor Underwriting Guidelines apply.

**Stated Income Program**

- **Investment Properties:** Non-permanent Resident Aliens are not permitted.

- **Non-occupant Co-borrower Transactions:** Total debt ratio of occupant borrower (without Non-occupant Co-borrower) must not exceed 50%. Max LTV/CLTV 90%. Non-occupant Co-borrower income must be verified.

- **Cash Out Transactions:**

  **Non self-employed borrowers:** May remove cash for any purpose.

  **Self-employed borrowers:** May remove cash for any purpose **unless** the loan receives an Expanded Approval (EA) level I recommendation from Desktop Underwriter (DU). If the loan receives an EA I recommendation, cash out will be allowed for consumer debt consolidation and documentation home improvements only.

- **Minimum Credit Score Requirements:**

| Occupancy | Loan Purpose | LTV 75.00 and less<br><br>Credit Score | LTV 75.01 - 90%<br><br>Credit Score Requirement |
| --- | --- | --- | --- |

EXHIBIT
14
12 551 12/19/07

B-204

## Requirement

| | | | |
|---|---|---|---|
| Owner-occupied and Second Home | Purchase, Limited Cash Out Refinance and Cash Out Refinance | 660 | 680 |
| Investment | Purchase and Limited Cash Out Refinance | 660 | 680 |
| Investment | Cash Out Refinance | 680 | N/A |

- **Employment:** Although the actual stated amount of income is not verified, our investors do require that the stated income makes sense in relation to the source of income that was indicated on the application.

Income must be reasonable and consistent with the source of income, assets and credit profile.

**Self-employed borrowers:** Must have two years of continuous self-employment in same line of business in the same location.

**Salaried borrowers:** Must have minimum two years continuous employment with same employer; if not, any employment change must be a clear career advancement.

Verbal Verification of Employment (VVOE) all pertinent data on the VVOE is to be completed. Any data not provided by the employer should be so indicated on the VVOE by writing "provider refused" in the corresponding blank. Every attempt should be made to confirm the borrower's position. Deviations from what is stated on the application should be questioned, and, in the case of material discrepancies, the underwriter should require that the loan be fully documented. For self-employed borrowers and Borrowers employed by relatives the verbal VOE must come from the borrower's accountant **or** other reliable third party documentation which supports the existence of the business for the past two years.

**IRS 4506:** Not required, however, Wachovia Mortgage

B-205

Corporation is responsible for the accuracy of the information and a willful misstatement of income will constitute default by the borrower.

**Passive income:** The **Stated Income Program** allows for the source of the borrower's income to be from non-employment sources including, social security, pension, investments, rental, trust, alimony, and child support. Income can also be derived from a combination of these sources. If the borrower's primary source of income is passive income, a two year history of receipt of passive income is required. Borrower's with less than a two year history of receipt are not eligible for the stated income program.

Although the actual stated amount of income is not verified, our investors do require that the stated income makes sense in relation to the source of income that was indicated on the application. Wachovia Mortgage Corporation also needs to provide documentation supporting a two-year history of receipt of income from these sources. Below are documentation requirements for verifying the source of these various non-employment sources of income:

**Social Security/Retirement:** The borrower should be of retirement age (62 or higher). Amount stated should be reasonable, and would typically not exceed $2000 per month per borrower. Award letter is not required.

**Pension:** The borrower should be of be of retirement age, although there are may be exceptions (government employees, military, and early retirees). Verbal verification from prior employer or pension administrator is required to verify that the borrower is currently receiving pension income.

**Investments:** Interest, dividend and annuity income from investments must be supported by verification of significant assets that were identified on 1003. The assets remaining after funds required for down payment and closing costs are deducted should be sufficient to support continued monthly income. A written

B-206

confirmation from the borrower's accountant, Certified Public Accountant (CPA), financial planner, broker, or private banker is required to verify that the borrower has held the assets for a two-year period and monthly income will continue.

**Rental:** All rental properties owned must be indicated in section VI of the application (Schedule of Real Estate Owned). If the properties are financed, a two year history of ownership can be verified via the credit report or VOM.  If the properties are not financed, the borrowers may provide copies of tax assessments or homeowner's insurance policies covering a two-year period.

**Trusts, alimony, child support:** The trust agreement or divorce decree are required to verify two-year history of receipt of the income and continuance. The amount of income received can be deleted from the document.

**Additional notes:** If the borrower's social security or pension benefits are directly deposited into his/her bank accounts and appear on his/her statement, the amount deposited does not have to be blacked out from the bank statement. Disability income is generally not an acceptable source of income. Please contact Investor Relations to review on a case-by-case basis.

Back to Top

- **Down Payment**: Minimum 10% must be from borrowers own funds including equity from other properties. Remainder may be allowed from other equity, acceptable sources of cash, or secondary financing.
    - o The 10% down payment is required regardless of the amount of the additional down payment from other sources.
    - o For Construction/Permanent loans, a gifted lot is not considered part of the 10% down payment requirements.
- **DU Findings:** Any income conditions on DU Findings for documentation on Stated Income program require

B-207

underwriter/Mortgage Consultant to write "N/A Stated Income program, code ########". When there is a DU finding on loans for investment property that the borrower must have a two-year history of managing rental property, the finding can be ignored completely. However, please be reminded that if the borrower's only source of income is from rental income, the current guidelines within this product for passive income still apply. Additionally, the loan must meet all other documentation and product requirements.

- **Multiple Mortgages:** Second Home or Investment property transactions: applicant is limited to ten 1-4 family financed properties including the applicant's primary residence and subject property

- **Special Feature Code:** For Stated Income loans - 442.

- **Asset Test:** The purpose of the asset test is to assist in determining the viability of the income based on the borrower's ability to accumulate assets consistent with the stated income stream. These assets must be on deposit in a personal account at the time of application either in the form of liquid or liquidable assets (e.g., stocks, bonds). The funds cannot have been recently deposited to the account as evidenced by the lack of large deposits on the asset verification documentation nor can they be from gift funds. In addition, equity in property owned (whether liquidated via sale or through utilization of an equity line), and funds from a business (other than Schedule C) do not provide any kind of validation of the income stream and would not be acceptable in terms of meeting the purpose of the asset test. When using the assets of a Schedule C business to meet the asset test, the CPA must confirm that the borrower files the business on the Schedule C. All other business accounts are unacceptable to meet the asset test. Funds used to meet the asset test may also be used as funds for closing since the asset test is not a reserve requirement, but rather a tool in determining the viability of the income.

The asset test requires that the borrower(s) must have the lesser of four months of stated income **or** $25,000 in liquid or liquidable (e.g. stocks, bonds, cash value of a life insurance policy) assets that are verified. In the event that DU requires a higher amount of assets than the foregoing, the amount required by DU will prevail. The assets must be held in a personal account, or, for Schedule C self-employed borrowers only, business account assets may be included to satisfy the asset test. The asset test

B-208

applies to each borrower individually. Funds may or may not be commingled, however, if funds are **not** commingled, the asset test is based on each individual's personal bank account.

> For example, borrower A earns $2,000/month and borrower B earns $3,000 month. Their funds are not commingled. Borrower A would need to reflect $8,000 in his/her bank account and borrower B would need to reflect $12,000 in his/her bank account. If all the assets to meet the asset test were in one borrower's account, the loan would not be eligible for a stated income product.

For borrowers who do not meet the asset test, the IRS 4506 will not be required and tax returns will not be ordered. Instead, after borrowers have been provided every opportunity to provide asset documentation and still do not meet the asset test of the lesser of four months of stated income or $25,000 in liquid or liquidable verified assets (or the amount required by DU, if higher), a counter offer a full income documentation product will be offered.

Borrowers who are currently residing in the **same** household may show the assets required to meet the asset test in joint or separate accounts. For borrowers who **are not** currently residing in the same household, the asset test is based on each individual's bank account.

> For example, borrower A earns $2,000/month and borrower B earns $3,000/month. If the borrowers currently reside in the same household the $20,000 required to meet the asset test in this scenario could be in either a joint or separate accounts. However, if the borrowers do not currently reside together, borrower A would need to reflect $8,000 in his/her bank account and borrower B would need to reflect $12,000 in his/her bank account.

> > **NOTE:** The Asset Test does not relieve the underwriter from the responsibility of determining the reasonableness of borrower income. The test merely serves as a tool to assist with that determination.

Underwriters will continue to have the opportunity to ask that income be fully documented at any point in the

underwriting process if income does not appear to be reasonable.

- **Automated Valuation Model (AVM):** For cash out refinances with LTVs greater than 80%, Servicenters will be required to order an AVM (automated valuation model) from Wachovia Mortgage Regulatory Compliance Team (regardless of credit score). When an AVM is not obtainable, the borrower must have at least a 720 credit score. If an AVM can not be obtained AND the borrower does not have a 720 credit score, then a field review appraisal will be required. In addition, if the value from the AVM varies by more than 10% of the value on the original appraisal, a field review appraisal will be required.

- **Appraisal:** Loans must have a minimum of a 2055 interior/exterior inspection regardless of the DU recommendation for the appraisal. Fannie Mae 2075, 2065 and 2055 exterior inspection only will not be allowed for Wholesale and Correspondent loans.

Back to Top

## No Ratio Program (No income verification/full asset verification)

Information on the borrower's employment is completed in Section IV of the 1003. However, the Monthly Income portion of Section V of the 1003 is left blank.

- **Non-occupant co-borrowers:** Not allowed.

- **First-time Homebuyers:** Must have a minimum 700 Fair Isaac Company (FICO) score.

- **No Buydowns.**

- **Cash Out transactions:**
  - Salaried and self-employed borrowers may remove cash for any purpose.
  - No nonwarrantable condos, condotels or manufactured housing.

- **Investment Properties:** Non-permanent Resident Aliens are NOT permitted.

- A comparable rent schedule (*Form 1007*) is not required.

B-210

- **Down Payment (No Ratio Program):** Minimum 10% must be from borrowers own funds including equity from other properties. Remainder may be allowed from other equity, acceptable sources of cash, or secondary financing.

- **Reserves (No Ratio Program):**
  o Purchase/Limited Cash Out (LCO) & Credit Score 680-720: 6 months liquid Principal, Interest, Taxes and Insurance (PITI).
  o Purchase/LCO & Credit Score > 720: no reserve requirement.
  o Cash out regardless of Credit Score: 6 months liquid PITI.
  o Non-permanent Resident Aliens regardless of Credit Score: 6 months liquid PITI.

- **Multiple Mortgages:** Second Home or Investment property transactions: applicant is limited to 10 1-4 family financed properties including the applicant's primary residence and subject property.

- **1-Unit Appraisal** (property, second home, and investment property)**:** A 2055 interior/exterior inspection is allowed.

- **Credit Requirements (No Ratio Program):**
  o Minimum 2 years credit history is required on all borrowers.
  o Prior mortgage/rental history with no late pays over 30 days in past 24 months.
  o No judgments, liens, charge-offs, collections, or derogatory public record items in last two years (medical collections < $500 excluded).
  o No Notices of Default (NOD), bankruptcy, or foreclosure.
  o Credit scores required on all loans. For the credit score to be valid, it must be based on at least 3 open tradelines with a minimum 12 months history.

- **Credit Score Requirements (No Ratio Program):**

| Occupancy | Purpose | Number of Units | Minimum FICO LTV<= 75% LTV | Minimum FICO LTV > 75% LTV |
|---|---|---|---|---|
| Owner-occupied | Purchase/Limited Cash out | 1-2 Unit | 680 | 700 |
| | | 3-4 Unit | 700 | 720 |
| | Cash out | 1-2 Unit | 680 | 720 |

B-211

|              |                          |          |     |     |
| ------------ | ------------------------ | -------- | --- | --- |
|              |                          | 3-4 Unit | 700 | N/A |
| Second Home  | Purchase/Limited Cash out | 1 Unit   | 680 | 700 |
|              | Cash out                 | 1 Unit   | 680 | 720 |
| Investment   | Purchase/Limited Cash out | 1-2 Unit | 680 | 720 |
|              |                          | 3-4 Unit | 700 | 720 |
|              | Cash out                 | 1-2 Unit | 680 | N/A |
|              |                          | 3-4 Unit | N/A | N/A |

- **Employment:**

    **Self-employed borrowers:** Must have two years of continuous self-employment in same line of business in the same location.

    **Salaried borrowers:** Must have minimum two years continuous employment with same employer; if not, any employment change must be a clear career advancement.

    **VVOE:** Confirming employment is required. For self-employed borrowers and Borrowers employed by relatives the verbal VOE must come from the borrower's accountant.

    **Passive Income:** The **No Ratio** program allows for the source of the borrower's income to be from non-employment sources including, social security, pension, investments, rental, trust, alimony, and child support. If the borrower's primary source of income is passive income, a two year history of receipt of passive income is required. Borrower's with less than a two year history of receipt are not eligible for the no ratio program.

    **Income can also be derived from a combination of these sources:**

    **Social Security/Retirement:** The borrower should be of retirement age (62 or higher).

    **Pension:** The borrower should be of be of retirement age, although there are may be exceptions (government employees, military, and early retirees). Verbal verification from prior employer or pension administrator is

B-212

required to verify that the borrower is currently receiving pension income.

**Investments:** Interest, dividend and annuity income from investments must be supported by verification of significant assets that were identified on 1003. The assets remaining after funds required for down payment and closing costs are deducted should be sufficient to support continued monthly income. A written confirmation from the borrower's accountant, CPA, financial planner, broker, or private banker is required to verify that the borrower has held the assets for a two-year period and monthly income will continue.

**Rental:** All rental properties owned must be indicated in section VI of the application (Schedule of Real Estate Owned). If the properties are financed, a two year history of ownership can be verified via the credit report or VOM. If the properties are not financed, the borrowers may provide copies of tax assessments or homeowner's insurance policies covering a two-year period.

**Trusts, alimony, child support:** The trust agreement or divorce decree are required to verify two-year history of receipt of the income and continuance. The amount of income received can be deleted from the document.

**Additional Notes:** If the borrower's social security or pension benefits are directly deposited into his/her bank accounts and appear on his/her statement, the amount deposited does not have to be blacked out from the bank statement. Disability income is generally not an acceptable source of income. Please contact Investor Relations to review on a case-by-case basis.

**Special Feature Code:** For No Ratio loans - 443

Back to Top

## Documentation Options in UNI-Form

B-213

UNI-Form users will need to choose the following documentation types in UNI-Form:

- Document Type 3=Stated Income
- Document Type 4=N/A to this product
- Document Type 5=No Income Full Asset - No Ratio
- Document Type 6=N/A to this

**Wholesale and Correspondent Lending Only**

**The following is applicable for the Federal National Mortgage Association (FNMA) FEX Stated Income Products (0170 and 0171):**

- There will continue to be a policy of a maximum of five FEX loans to any single borrower. This applies to Stated Income and No Ratio Loans. Exceptions to this policy must be approved by C.D. Davies.

- There will continue to be a policy of a maximum of 10 financed properties for any borrower when our transaction is for investment property. Exceptions to this guideline can only be approved by Investor Relations.

- Verbal verification of employment , as currently required by this product, will be conducted by the underwriter. Underwriters should independently verify the borrower's work telephone number (via white pages, online directory, etc.) and request information from a reliable source, e.g. a manager, supervisor, HR employee whenever possible.  All attempts to verbally verify employment and to independently verify borrower's work telephone number should be documented in the file.

  **NOTE**: No attempt should be made to confirm or determine the borrower's salary.

- Red flags for misrepresentation and/or fraud are available in the Wachovia Mortgage Corporation Quality Assurance Manual. Exhibit N has examples of red flags. (This online manual is at the Wachovia Mortgage Corporation Intranet Wachovia Mortgage Regulatory Compliance Team home page. Go to Manuals. Click on Quality Assurance Manual.)

- Underwriters should independently verify the telephone number of the business. The borrower usually provides his/her personal work telephone number on the application.

B-214

- A VVOE is required from the accountant of a self-employed borrower. When the borrower is a sole proprietor who does his own accounting, the underwriter should determine the existence of the business via a third party source, such as a copy of the business license, telephone number of the business in local white or yellow pages, confirmation from the Secretary of State, Better Business Bureau or Chamber of Commerce of the existence of the business.

Back to Top

Page updated 08/12/2004
Today is: Wednesday, 12/05/2007 - 06:33:02 PM

**X, 603: Sources of Borrower's Funds (06/30/02)**

The lender must obtain documentation for all sources for the funds that the borrower uses to make the down payment and to pay closing costs. Since a borrower who is a nonpermanent resident alien may maintain assets outside of the United States or may not invest his or her assets with financial institutions in the United States, a lender may consider funds that a nonpermanent resident alien borrower recently deposited in a U. S. depository institution as an acceptable source of funds—as long as there is evidence that the funds were transferred from the country from which the borrower immigrated and it can be established that the funds were the borrower's before the date of the transfer. In this case, the sources of all funds used for closing should be verified just as they would for a borrower who is a U.S. citizen.

Typical sources of funds for a borrower's down payment, closing costs, and financial reserves are discussed in the following sub-Sections.

🌐 Feedback

## Archived Copy of PUGO for 7/30/04 - 8/12/04

## Assets
## Sources of Funds

**NOTE:** Conforming First Mortgage negotiated variances are noted in *purple italicized text*.

### General Information

The borrower must have enough liquid assets to cover the amount of the down payment that must come from his or her own funds. The borrower can use funds received as a gift from a relative or from a church, municipality, or nonprofit organization (low-to-moderate income borrower) to pay his or her share of the closing costs and the prepaid items that have to be paid by the property purchaser and to cover the required cash reserves.

Wachovia Mortgage Corporation investigates any indications of borrowed funds, such as a recently opened account, a recently received large deposit, or an account balance that is considerably greater than the average balance over the previous few months. Wachovia Mortgage Corporation also determines the sources for all funds that are used to pay closing costs. The following sections describe the typical sources.

### Deposits on Sales Contracts - Applications or Registrations

The deposit on the sales contract for the purchase of the security property is an acceptable source of funds for both the down payment and the closing costs. When the deposit is used to make ANY PORTION of the borrower's down payment that must come from his or her own funds, the source of the funds for the deposit must be verified. The receipt of the deposit generally should be verified by a copy of the borrower's canceled check, although a written statement from the holder of the deposit is acceptable.

The source of funds for the deposit may be verified by either a bank statement or a Verification of Deposit (VOD), Form 1006 or 1006S, that indicates that the average balance for the past two months was large enough to include the amount of the deposit. If the deposit check has cleared the bank account, the bank statement should cover the

WACH000013

B-217

period up to and including the date the check cleared the bank account.

*For Conforming First Mortgage Loans ONLY, Wachovia Mortgage Corporation does not require that earnest money deposits be verified if:*

- *Loan to Value/Combined Loan to Value (LTV/CLTV) does not exceed 80%*
- *Home-equity Combined Loan to Value (HCLTV) allowed to conforming standard and Desktop Underwriter (DU) guidelines*
- *Single-family detached dwelling primary residence and second home only*
- *Sufficient funds for closing and earnest money are supported for the last two months or the last two bank statements and the amount of earnest money reflected on the sales contract matches the earnest money reflected on the Housing and Urban Development (HUD-1)*

## Cash-on-Hand

Cash-on-hand is not an acceptable source of funds for the down payment or closing costs.

## Trade Equity

The property seller may take a borrower's existing property (or an asset other than real estate) in trade as part of the down payment, as long as the borrower has made the minimum required cash down payment from his or her own funds and the equity contribution for the traded property is a true-value consideration that is generally supported by a current appraisal. This requirement applies to all transactions that involve property trades, including those that are evidenced by two separate contracts that have the buyer and the seller on one contract reversing roles on the second contract.

The equity contribution is usually determined by subtracting the outstanding mortgage balance of the property being traded, plus any transfer costs, from the lesser of either the property's appraised value or the trade-in value agreed to by both parties. However, when the property being traded is a manufactured home, the equity contribution is determined by subtracting the sum of the outstanding loan balance (if any) and any transfer costs from the lesser of the trade-in value of the manufactured home or the sum of the appraised value for the land being traded (if any) and 90% of the retail value for the manufactured home (based on the National Automobile Dealers Association Manufactured Housing Appraisal Guide).

**WACH000014**

For real property, we require a search of the land records to verify the ownership of the property and to determine whether there are any existing liens on the property. The property seller must provide proof of title transfer and satisfaction of any existing mortgage liens for which the borrower had been liable. The transfer deed must be recorded.

### Rent with Option to Purchase

The portion of a rental payment that exceeds the market rent can be applied to the down payment if there is a valid rental/purchase agreement in effect. The application file must contain a photocopy of the rental/purchase agreement to ensure that Wachovia Mortgage Corporation is able to verify the monthly rental and the specific terms of the lease.

The original term of the lease must have been at least 12 months. The appraiser must develop the market rent figure, in these cases, and Wachovia Mortgage Corporation must obtain copies of canceled checks or money order receipts to document the rental payments for the last 12 months.

### Sweat Equity

Sweat equity is not an acceptable source of funds.

Back to Top

### Loans Secured by Assets

Borrowed funds that are secured by an asset represent a return of equity. Because of this, they may be used for the transaction. Assets that may be used to secure funds include bridge loans, certificates of deposit (CDs), stocks, bonds, automobiles, real estate, life insurance policies, and 401(k) plans.

Wachovia Mortgage Corporation must verify both the terms of the loan and the fact that it is a secured loan.

- Monthly payments for the loan do not have to be included in the debt in qualifying the borrower provided that Wachovia Mortgage Corporation obtains a copy of the applicable loan instrument that shows the borrower's financial asset as collateral for the loan.
- If the borrower intends to use the same asset to satisfy cash reserve requirements, the value of the asset must be reduced by the proceeds of the loan and any related fees as well as any taxes and penalties imposed for early withdrawal of those funds.
- Assets, such as cars and other real estate, to secure loans for

B-219

WACH000015

funds for closing may also be used. In these situations the payment **must be included** in the qualifying ratios.

Examples of unacceptable borrowed funds include signature loans, lines of credit on credit cards, and overdraft protection on checking accounts.

## Sales of Assets

Proceeds received from the sale of the borrower's personal assets may be considered as long as the borrower can provide the following:

- Evidence that he or she owned the asset
- Documentation to support the value of the asset
- Evidence of the transfer of ownership (a copy of a bill of sale or a statement from the purchaser)
- Evidence of the receipt of the purchase proceeds (deposit slip or bank statement)

## Use of Credit Card/Unsecured Line of Credit

*For Conforming First Mortgage Loans ONLY, borrowers may use their credit card to pay for:*

- *Lock-in fees*
- *Float Down fees*
- *Application fees*
- *Credit reports*
- *Appraisals*

*When verifying funds for closing for a borrower who paid these application charges with a credit card, confirm that the borrower has sufficient funds to cover these charges as well as the required down payment and closing costs. However, the borrower will not need to be required to actually payoff these charges at closing.*

## Pooled Savings (Community Savings Funds)

Some communities establish pooled savings arrangements, which may be called community savings funds, to give individuals who customarily use cash for their expenses and do not keep their savings in depository institutions a disciplined way of accumulating funds. Funds from a community savings account or any other type of pooled savings may be used for the down payment if the borrower can provide documentation to evidence his or her regular participation in contributing to the savings fund. Acceptable documentation includes confirmation from the party managing the pooled savings fund, as well as appropriate account information for the borrower's contributions.

WACH000016

The borrower's obligation to continue making ongoing contributions under the pooled savings arrangement should be considered as part of his or her total debt when calculating the debt-to-income ratio.

Back to Top

## Disaster Relief Grant or Loan

State and federal agencies, including the Federal Emergency Management Agency (FEMA), may use grants or loans to provide immediate housing assistance for individuals who are displaced because they have uninsured property losses resulting from a widespread natural disaster that affected their locality. Disaster relief loans, which are generally administered by the Small Business Administration (SBA), are low interest-rate loans that may be either secured or unsecured.

Wachovia Mortgage Corporation may allow a borrower to use a lump-sum disaster relief grant or loan to satisfy the down payment requirement. The property purchaser does not have to make a minimum cash down payment from his or her own funds in order for the disaster relief grant or loan to be credited toward the down payment.

## Employer Assistance

An owner-occupant borrower can use funds provided by his or her employer to pay part of the closing costs or to supplement his or her financial reserves. The borrower generally must use his or her own funds to make the required minimum cash down payment, although that down payment can be supplemented with financial assistance from the borrower's employer. Assistance from the borrower's employer must come directly from the employer; it cannot be provided by a company-affiliated credit union.

For most mortgages, the employer's financial assistance for either closing costs or the down payment may be in the form of a grant; a direct, fully-repayable second mortgage or unsecured loan, a forgivable second mortgage or unsecured loan; or a deferred payment second mortgage or unsecured loan. When the assistance takes the form of a grant or unsecured loan, there are no specific requirements for the terms of the expected repayment. However, when the assistance is a secured second mortgage, it must be structured as the second mortgage component of a Community Seconds transaction, and the first mortgage may be originated as any of the Federal National Mortgage Association (Fannie Mae or FNMA) community lending products or a Flex 97 or Flex 100 mortgage.

**WACH000017**

Wachovia Mortgage Corporation must review the employer's assistance program to verify that the program is an established company program, not just an accommodation developed for an individual employee. Wachovia Mortgage Corporation must also obtain documentation that describes the terms of any loan agreement and other employee assistance being offered to the borrower, such as relocation benefits or gifts, including the employer's written verification of the dollar amount of the assistance. When the employer's assistance is funded before settlement, Wachovia Mortgage Corporation must confirm the borrower's receipt of the funds.

When a secured second mortgage does not require regular payments of either principal and interest or interest only, Wachovia Mortgage Corporation does not need to calculate an equivalent payment for consideration as part of the borrower's monthly debt. In all other instances, the borrower's scheduled payments must be included in the calculation of the Debt-to-Income (DTI).

## Personal Unsecured Loans

Generally, personal unsecured loans are not an acceptable source of funds for the down payment, closing costs, or reserves. Examples of unsecured borrowed funds include signature loans, lines of credit on credit cards, and overdraft protection on checking accounts.

## Anticipated Savings

Wachovia Mortgage Corporation may preliminarily qualify the borrower on the basis that his or her anticipated savings will be sufficient to meet the funds needed for closing. The use of "anticipated savings" does NOT relieve us of the responsibility for verifying that the savings are actually accumulated by the borrower before loan closing. The estimate for "anticipated savings" that the borrower can be expected to save over the time remaining until loan closing must be realistically developed. For example, if the borrower has no previous history of a consistent savings pattern or the ability to reduce or eliminate unnecessary expenses, it is not realistic to estimate that all of his or her pay over a two- or three-month period can (or will) be directed entirely to savings. To determine the potential funds that are available for savings, we should reduce the borrower's expected "after tax" income for the period by his or her existing housing expenses, monthly debt expenses (based on data from the credit report), and expected living expenses (food, transportation, and so on) for that same period.

**WACH000018**

## Cash Value of Life Insurance

The net proceeds from a loan against the cash value (or from the

surrender) of a life insurance policy can be used as a source of funds for the down payment, closing costs, and financial reserves. Wachovia Mortgage Corporation must obtain documentation from the insurance company to verify the specific terms of the loan against the cash value of the policy or the net surrender value of the policy. To document the borrower's receipt of funds from the insurance company, Wachovia Mortgage Corporation may rely on either a copy of the check from the insurer or a copy of the payout statement issued by the insurer.

Payments on a loan secured by the cash value of a borrower's life insurance policy do not have to be considered as long-term debt when qualifying the borrower if any penalty for failure to repay the loan is limited to the surrender of the policy. However, any additional obligation must be factored into the total Debt-to-Income (DTI) ratio or subtracted from the borrower's financial reserves.

Back to Top

Page updated 08/12/2004
Today is: Wednesday, 08/29/2007 - 03:45:01 PM

WACH000019

**FAIR LENDING ANALYSIS TOOL**

| | |
|---|---|
| Applicant Name  RICHARD H WILKINS and BRENDA F WILKINS | Loan #  6996981 |
| Loan Officer/AE/MLC  JAMES HOGSTEN    Origination RC  0805983 | Loan Amt. $  213,300.00 |
| Product  1570J5YIO/ 5Yr ARM 525 Jumbo Alt A I/O    Broker (if applicable) | |

*The purpose of this Fair Lending Analysis Tool is to ensure that all applicants are offered equal opportunity to provide additional information or explanation regarding their application, to lead the preparer in considering all alternatives and compensating factors to arrive at an appropriate outcome, and to fully document the file regarding compensating factors and reasons for deviations/exceptions to Wachovia Mortgage Corporation's underwriting standard.*

### ***Mark ALL reasons for denial/exception/approved deviation to policy***

[X] **CREDIT**

1. **Credit History** – Poor credit history, excessive inquiries, maxed out credit. Fully document credit explanation(s) in the loan file.
   Credit Report:  Number of Delinquencies: _____ 30 days _____ 60 days _____ 90 days _____ Unpaid Collections _____ Outstanding Judgments
   Bankruptcy: _____ Year filed _____ Year released    Foreclosure: __/__/__ (date)
   Delinquent Mortgage/Rental payments – Fully document slow mortgage payment history in the loan file.
   Previous 12-month history: _____ 30 days _____ 60 days _____ 90 days _____ Current past due amount
   Previous 24-month history: _____ 30 days _____ 60 days _____ 90 days
   Overall housing payment history: _____ Acceptable _____ Unacceptable
   FICO Loan Score _____ Product minimum FICO score _____ (if applicable)
   Brief Explanation for poor credit _____
   _____
   _____
   _____ Acceptable _____ Unacceptable
   Were derogatory credit circumstances beyond the applicant's control or due to unforeseen circumstances? _____ Yes _____ No

[ ] 2. **Lack of Credit History** – Consider and document non-traditional types of credit, e.g. rent, utility, telephone, cable TV, day care, recorded cash payments, etc. as alternative credit history. _____ Acceptable _____ Unacceptable (Reason: _____)

[ ] 3. **Qualifying Ratios Exceed Guidelines** – HTI _____ DTI _____    Product Guideline: HTI _____ DTI _____
   Can debts be consolidated or paid off to reduce monthly payments? _____ Yes _____ No
   Are assets available to pay off debts to reduce monthly payments? _____ Yes _____ No
   Is there additional income not used to qualify the borrower? _____ Yes _____ No  Source: _____

[ ] 4. **Lack of Funds to Close** – Ask about other assets, loans or gifts. _____ Available (Source _____) _____ Unavailable
   Reserves waived? _____ Yes _____ No

[ ] 5. **Income/Employment** – Document explanation for gaps in income stream. Reason: _____
   _____ . _____ Acceptable _____ Unacceptable
   Other income/employment issues _____
   _____ Acceptable _____ Unacceptable

[ ] 6. **Lack of sufficient verification(s).** Verification could not be obtained for: _____ Income _____ Assets _____ Other (describe: _____)
   Times attempted and methods of attempts: _____

[X] 7. **Other Credit Issues** (Explain): Borrower used credit card for earnest money deposit ($13,333) on 7-1-04. This amount was repaid on credit card account on 7-30-04, from proceeds of a secured loan dated 7-06-04. Said loan has been added as a liability.

[ ] **PRODUCT**

[ ] 8. **LTV/CLTV/HCLTV exceeds product limits.** _____ LTV _____ CLTV _____ HCLTV
   _____ Product LTV _____ Product CLTV _____ Product HCLTV
   Was borrower offered another product to solve LTV/CLTV/HCLTV problem? _____ Yes _____ No
   If the borrower did not accept another product, give reasons why: _____

[ ] 9. **MI waived** – Reason: _____

[ ] 10. **Number of financed properties per borrower exceeds maximum.** _____ Number of properties/loans _____ Number per Product Guideline

[ ] 11. **Unacceptable cash out.** _____ Cash out exceeds product maximum _____ Amount of Cash Out. _____ Product Limit
   _____ Cash out not allowed on occupancy type _____ Cash out not allowed on product _____ Cash out not allowed per LTV _____ Cash out max. LTV

[ ] 12. **Other Product Issues** (Explain) _____
   _____

[ ] **COLLATERAL**

[ ] 13. **Property Issues** – _____ Unacceptable property type: _____ _____ Condo/PUD approval waived
   _____ Unacceptable property condition: _____  Can property condition be corrected? _____ Yes _____ No
   Is a rehab product available? _____ Yes _____ No

[ ] 14. **Appraisal Issues** (Explain): _____
   Possible Solutions: _____ Additional Comparable(s) _____ Second Appraisal _____ AVM _____ Discuss with appraiser; explain results: _____
   Field review appraisal waived? _____ Yes

[ ] 15. **Other Collateral Issues** (Explain): _____

[ ] **AUS INFORMATION**

[ ] 16. **AUS Recommendation:** _____ Refer/Eligible _____ Refer Ineligible _____ EAI _____ EAII _____ EAIII _____ RWC4 _____ RWC
   _____ Out of Scope _____ Caution _____ Refer _____ LP A- Offering _____ Not eligible for LP submission

[ ] **FEE/PRICE VARIANCE** (Attach Fee/Price Variance Form)
   _____ Marketable Loan _____ Fee Variance _____ Price Variance  Explanation: _____
   _____ Portfolio Loan (Wealth products only) _____ Fee Variance _____ Price Variance  Explanation: _____

F O

244170  rev 08  (01/03) [41701]                    Page 1 of 2

WILK000196

**COMPENSATING FACTORS** – Check appropriate boxes below to indicate the applicable compensating factor(s) taken into consideration for an approval or the compensating factor(s) which were considered prior to declination. Use the "Other" section to list additional compensating factors.

☐ 1. Significant equity in subject property. _____ LTV _____ Product LTV

☐ 2. Excellent credit history: _____ FICO loan score _____ Product minimum FICO score _____ Number of tradelines with no delinquent payments

☐ 3. Significant cash savings/reserves: $_____ Liquid or liquidable assets $_____ Liquid or liquidable reserves

☐ 4. Demonstrated ability to save (Explain):_____

☐ 5. Income stability. Has applicant maintained or increased his/her income level through steady employment? ___Yes _____ Number of years in profession
Additional information regarding employment:_____

☐ 6. Potential/expected higher earnings (Explain and quantify):_____

☐ 7. Net Worth indicates ability to repay: $_____ Net Worth $_____ Loan Amount

☐ 8. Energy Efficient property (Explain):_____

☐ 9. Proven ability to carry high debt structure while maintaining an excellent credit history (Explain/Quantify):_____

☐ 10. Payment on proposed mortgage compared to previous mortgage/rent payment. $_____ Proposed $_____ Previous
Explain, compare or contrast:_____
☐ 11. Additional income which was not used to qualify (even if not stable): _____ Short term employment (even if not stable) _____ Commission/overtime
_____ Second job/part time _____ Social Security, retirement, VA benefits _____ Alimony/child support _____ Unearned income (dividends, interest, annuities)
_____ Welfare payments, unemployment _____ Trailing co-borrower income _____ Other income (explain):
$_____ Verified Amount $_____ Unverified Amount. Note: All non-taxable income should be grossed up.

☐ 12. Low Qualifying Ratios or High Residual Income: _____ HTI Ratio _____ DTI Ratio _____ Guideline HTI Ratio _____ Guideline DTI Ratio
$_____ Residual Income

☐ 13. AUS Recommendation: _____ Approve/Eligible _____ Approve/Ineligible _____ Accept _____ Accept Plus

☐ 14. Significant Wachovia Relationship (Explain):_____

☐ 15. Other (Explain/Quantify):_____

**COUNSELING:** *Fully document all advice/counseling given, all efforts to attempt to qualify borrower, counteroffers made, other products considered, additional documentation requested.*

Counter Offer:_____ Results _____ Date _____
Counter Offer:_____ Results _____ Date _____

_____
_____
_____
_____
_____
_____

**LOAN DECISION:** ☐ Denied    ☐ Approved with deviation to policy which does not affect marketability
Underwriter Name: GEORGE AKERLEY (UG)    Employee Number A220130
Underwriter Signature: _____    Date 08/02/04

**SECOND REVIEW (Required on all denied loans; FLAT must be fully documented):** ☐ Denied ☐ Approved
**Applicant was given the opportunity of providing additional information: _____Yes ___No If no, explain:_____
**Compensating factors were considered: _____Yes ___No If no, explain:_____
Second Reviewer Name: _____    Employee Number _____
Second Reviewer Signature: _____    Date _____

**LOANS RECOMMENDED FOR EXCEPTION:** Concur with denial? ☐ Yes ☐ No  Recommend for exception? ☐ Yes ☐ No
Investor Relations Analyst Name: _____    Employee Number _____
Investor Relations Analyst Signature: _____    Date _____

**EXCEPTION APPROVAL** –*I have considered the loan characteristics and authorize that the loan be approved and held in the portfolio of Wachovia National Bank. I have also considered this loan decision in the context of Fair Lending laws and have fully documented the compensating factors or reasons for the accommodation which would make it unlikely that there exists an applicant similarly situated (financially) who would be denied.*

Wachovia Banking Relationship: ☐ No ☐ Yes  Number of years _____ Deposits: $_____    Credit: $_____
Additional compensating factors or reasons for accommodation/approval (if any): _____
_____
_____
_____
_____

Authorization:
Exception Officer Name: _____    Employee Number _____
Exception Officer Signature: _____    Date _____
Exception Sign Off Authority $_____
Delegated Exception Sign Off Authority $_____    Delegated From: _____    Date: _____

244170  rev 08  (01/03)  [41702]    Page 2 of 2

F O

WILK000197

  **USAA SAVINGS BANK**

| | Statement Closing date | 07/14/04 |
|---|---|---|
| | Previous balance | $4,070.44 |
| | Payments | 4,070.44 |
| | Purchases and Debits | 1,396.75 |
| | Cash advances | 14,799.50 |
| | TOTAL FINANCE CHARGES | 21.44 |
| | New balance | $16,217.69 |
| | Minimum payment due | $324.00 |
| | Payment due date | 08/08/04 |

Account number
Credit limit                    $27,000.00
Available credit                $10,740.00

Questions? Lost or Stolen Cards?
Call Customer Service         1-800-922-9092
in San Antonio                  210-456-8735
Overseas collect                210-461-9097

Or write us at:
P.O. BOX 65020, SAN ANTONIO, TX 78265-5020

Remit payment to: USAA CREDIT CARD SERVICES
10750 MCDERMOTT PWY
SAN ANTONIO, TX 78288-0570

TO AVOID ADDITIONAL FINANCE CHARGES ON
PURCHASES, PAY YOUR ENTIRE NEW BALANCE,
EVEN IF YOU EXPECT TO RECEIVE A CREDIT, BY
THE DUE DATE SHOWN ABOVE. MAILED PAYMENTS
RECEIVED AFTER 12:00 P.M. CENTRAL TIME
WILL BE CREDITED THE NEXT BUSINESS DAY.

## Transactions

| Trans | Post | Card | Reference Number | Description | Amount |
|---|---|---|---|---|---|
| 06/10 | 06/13 | M | 9349987HKJ5QJQH69M | SOUTHWES 5282704975568 DALLAS TX | 276.20 |
| | | | 04/06/28 | WILKINS/RICHARD | |
| | | | 1 WN M | KANSAS CITY     KANSAS CITY | |
| | | | 2 WN M | KANSAS CITY     HOUSTON | |
| 06/13 | 06/15 | M | 7054168HN03SPQWL8M | S & K FAMOUS BRANDS #3 TOPEKA KS | 133.98 |
| 06/14 | 06/16 | M | 7043845HP9HL4LXKAM | AAFES FT RILEY MAIN ST FORT RILEY KS | 58.00 |
| 06/15 | 06/16 | M | 1348382HPAFZRHJ9TM | WM SUPERCENTER   SE2 MANHATTAN KS | 77.51 |
| 06/15 | 06/16 | M | 8045517HP3SLANDZ7M | FT RILEY ITR FORT RILEY KS | 56.00 |
| 06/16 | 06/18 | M | 7854185HS231XHLGVM | COUNTRY INN & SUITES HOUSTON TX | 69.84 |
| 06/17 | 06/20 | M | 234101 9HS87RYTVT2M | KFC #215     11502Q30 EFFINGHAM IL | 10.81 |
| 06/18 | 06/20 | M | 8141601HS4YPNHV1EM | DAVE'S SUPERMARKET SN0 CLEVELAND OH | 20.06 |
| 06/16 | 06/21 | M | 7041019HV09WM4E56DM | PAYLESSSHOESOU00062570 EUCLID OH | 40.79 |
| 06/17 | 06/21 | M | 7848107HW460XMJXL4M | HOLIDAY INN EXPRESS INDEPENDENCE MO | 65.20 |
| 06/21 | 06/22 | M | 1348382HXAG4ZNHV7M | WM SUPERCENTER   SE2 JUNCTION CITY KS | 21.35 |
| 06/22 | 06/23 | M | 1348382HYAG5T5TXXQM | WM SUPERCENTER   SE2 JUNCTION CITY KS | 40.17 |
| 06/26 | 06/28 | M | 1041348J2S6NZQ68EM | JCPENNEY STORE 2178 MANHATTAN KS | 53.64 |
| 06/28 | 06/29 | M | 7045737J42G61E8X8M | O'REILLY#206 JUNCTIN CITY KS | 7.90 |
| 06/29 | 06/30 | M | 1041389J5S6P213V5M | JCPENNEY STORE 2178 MANHATTAN KS | 52.57 |
| 07/01 | 07/01 | M | 8545884J8S2XL16P6M | CONVENIENCE CHECK 8320 SAN ANTONIO TX | 13,333.00 |
| 07/01 | 07/01 | M | 7042791J8F0A58YGAM | BENNIGANS     1431 NORMAL IL | 40.66 |
| 07/02 | 07/05 | M | 7042791JA0PM0648TM | SIGNATURE INN NORMAL NANCY THIEL IL | 61.60 |
| 07/03 | 07/05 | M | 1348382JAAFJ5Y7EPM | WALMART SUPERCENT   SE2 CAMDEN DE | 27.79 |
| 07/07 | 07/08 | M | 1348382JDAFM0WB6BM | WM SUPERCENTER   SE2 MANHATTAN KS | 10.35 |
| 07/06 | 07/08 | M | 8545884JF5ZWM1YNJM | CONVENIENCE CHECK 8321 SAN ANTONIO TX | 466.50 |
| 07/07 | 07/08 | M | 7054188JE035BMTVTM | STAPLES #679 MANHATTAN KS | 38.54 |
| 07/10 | 07/12 | M | 1348382JGAFPVL8GHM | WM SUPERCENTER   SE2 MANHATTAN KS | 22.40 |
| 07/11 | 07/13 | M | 1348382JJAFT0ED2LM | WM SUPERCENTER   SE2 JUNCTION CITY KS | 6.22 |
| 07/13 | 07/14 | M | 1348382JKAFS6W6FZM | WM SUPERCENTER   SE2 MANHATTAN KS | 5.15 |
| 07/12 | 07/14 | M | 9349967JKJ5DNSX96M | SOUTHWES 5282709715568 DALLAS TX | 230.40 |
| | | | 04/05/21 | WILKINS/RICHARD JR | |
| | | | 1 WN M | NASHVILLE     NASHVILLE | |
| | | | 2 WN M | NASHVILLE     BIRMINGHAM | |
| | | | 3 WN M | BIRMINGHAM     NASHVILLE | |
| | | | 4 WN M | NASHVILLE     KANSAS CITY | |
| 07/14 | 07/14 | | | *FINANCE CHARGE* | 21.44 |
| 07/09 | 07/09 | M | 8545884JF9NYW8X8FM | PAYMENT - THANK YOU | - 4,070.44 |

*Clemens Checks*

*earnst money*

Notice: See reverse side for important information.

5550   0002   4WD      1     7   9   040714      Page 1 of 3      1946  7000  0750  01ACS550      78054

B-226

WILK000138

### X, 603.17: Credit Card Financing (07/03/00)

Some borrowers prefer to use a credit card to pay for certain costs that must be paid early in the application process (such as those for "lock-in" fees, credit reports, or appraisal reports). Since these charges do not represent extraordinary amounts (and credit card debt is considered in the borrower's total monthly debt-to-income ratio), we will permit the costs for application "lock-in" fees to be charged to the borrower's credit card—as long as the total amount of such charges does not exceed 1% of the mortgage amount. The actual cost of a credit report or an appraisal—up to $500—can also be charged to the credit card (and does not have to be considered in the 1% limitation). When verifying the funds available for closing for a borrower who paid for these application charges with a credit card, a lender should confirm that the borrower has sufficient funds to cover these charges (as well as other closing costs that he or she will be paying). However, the lender does not have to require the borrower to actually pay off these charges at closing.

| | USAA FEDERAL SAVINGS BANK<br>10750 MCDERMOTT FWY<br>SAN ANTONIO, TX 78288-0544 | Loan Number 16421410 |
| --- | --- | --- |
| | | Date JULY 26, 2004 |
| | | Maturity Date SEPTEMBER 15, 2009 |
| RICHARD H WILKINS<br>118 SCOTT PL APT D<br>FORT RILEY, KS 66442-1111<br>BORROWER'S NAME AND ADDRESS<br>"I" includes each Borrower above, jointly and severally. | LENDER'S NAME AND ADDRESS<br>"You" means the Lender, its successors and assigns. | Loan Amount $ 16000.00 |
| | | Renewal Of  new loan |

TERMS FOLLOWING A BOX ☐ APPLY ONLY IF THE BOX IS CHECKED.

NOTE - For value received, I promise to pay to you, or your order, at your address above, the principal sum of:

SIXTEEN THOUSAND DOLLARS AND 00/100 _____ Dollars $ 16000.00 ,

plus interest from _____ JULY 26, 2004 _____ at the rate of _____ 5.4500 _____ % per year until _____ SEPTEMBER 15, 2009

PAYMENTS - I will pay this note as follows:

(a) ☒ In 60 installment payments. The first payment will be in the amount of $ 307.53 and will be due OCTOBER 15, 2004 .
A payment of $ 307.53 will be due on the 15TH day of each MONTH thereafter.
The final payment of the entire unpaid balance of principal and interest will be due SEPTEMBER 15, 2009

(b) ☐ (other)

INTEREST - Interest accrues on a ACTUAL / 365 basis.
☒ POST-MATURITY INTEREST - Interest will accrue at the rate of 18.00 % per year on the balance of this note not paid at maturity, including maturity by acceleration.

SECURITY - You have certain rights that may affect my property as explained on page 2. This loan ☒ is ☐ is not further secured.

(a) ☐ This loan is secured by _____ , dated _____ .

(b) ☒ Security Agreement - I give you a security interest in the Property described below. The rights I am giving you in this Property and the obligations this agreement secures are defined on page 2 of this agreement.   1999 FORD EXPEDITION VIN 1FMRU1769XLB27622

THE PURPOSE OF THIS LOAN IS - PERSONAL
This Property will be used for personal, family or household purposes, unless otherwise specified above.

| ANNUAL PERCENTAGE RATE<br>The cost of my credit<br>as a yearly rate. | FINANCE CHARGE<br>The dollar amount the<br>credit will cost me. | AMOUNT FINANCED<br>The amount of credit<br>provided to me or on my behalf. | TOTAL OF PAYMENTS<br>The amount I will have paid when<br>I have made all scheduled payments. |
| --- | --- | --- | --- |
| 5.4452 % | $ 2451.54 | $ 16000.00 | $ 18451.54 |
| | | | "•" means an estimate. |

My Payment Schedule will be:

| Number of Payments | Amount of Payments | When Payments Are Due |
| --- | --- | --- |
| 59 | $ 307.53 | MONTHLY DUE STARTING 10/15/2004 |
| 1 | $ 307.27 | FINAL PAYMENT DUE 09/15/2009 |
| | $ | |
| | $ | |

Security - I am giving a security interest in:   ☒ (brief description of other property)
☐ the goods or property being purchased.   1999 FORD EXPEDITION VIN 1FMRU1769XLB27622
☐ my deposit accounts and other rights to the payment of money from you.
☐ collateral securing other loans with you may also secure this loan.

Prepayment - If I pay off this note early, I will not have to pay a penalty.

Filing Fees and Taxes - _____

I can see my contract documents for any additional information about nonpayment, default, any required repayment before the scheduled date, and prepayment refunds and penalties.

CREDIT INSURANCE - Credit life insurance and credit disability insurance are not required to obtain credit, and will not be provided unless I sign and agree to pay the additional costs. I have read and understand the insurance and cost disclosures on the enclosed Credit Protection Information Sheet.

| Type | Premium | Term |
| --- | --- | --- |
| Credit Life | | |
| Credit Disability | | |
| Joint Credit Life | | |

☐ do ☒ do not want credit life insurance.
☐ do ☒ do not want credit disability insurance.
☐ do ☒ do not want joint credit life insurance.
☐ do ☐ do not want_____ insurance.

ITEMIZATION OF AMOUNT FINANCED

| | | |
| --- | --- | --- |
| AMOUNT GIVEN TO ME DIRECTLY | $ | 16000.00 (a) |
| AMOUNT PAID ON MY LOAN ACCOUNT | $ | 0.00 (b) |
| | $ | 0.00 (c) |
| AMOUNTS PAID TO OTHERS ON MY BEHALF: | $ | 0.00 (d) |
| | $ | 0.00 (e) |
| | $ | 0.00 (f) |
| | $ | 0.00 (g) |
| PREPAID FINANCE CHARGE | $ | 0.00 (h) |
| AMOUNT FINANCED (a through f - h) | $ | 16000.00 (i) |
| FINANCE CHARGE (including prepaids) | $ | 2451.54 (j) |

WILK000137

USAA - Account Summary

Account:
**PLATINUM MASTERCARD**
WILKINS,RICHARD H
WILKINS,BRENDA F
118 SCOTT PL APT D
FORT RILEY KS 66442-1111

| | | | |
|---|---|---|---|
| **Statement Balance:** | $16,217.69 | **Current Account Balance:** | $3,043.39 |
| As of Jul 14, 2004 | | **Available Credit:** | $26,956.00 |
| **Last Payment:** | $13,400.00 | **Credit Limit:** | $30,000.00 |
| Received Jul 30, 2004 | | **Minimum Due:** | $324.00 |
| | | As of Jul 14, 2004 | |
| View Statements: | 07/14/2004 ▼ | **Payment Due Date:** | Aug 8, 2004 |
| **Go** | | | PAY |

View statements in PDF with Adobe's free
Acrobat Reader software.

Stop paper statements. Sign up for
Electronic Documents.

Minimum Due and Payment Due Date will be
updated when your statement cycles.

## Most Recent Transactions

| Transaction Date | Posting Date | Description | Amount |
|---|---|---|---|
| Jul 30, 2004 | Jul 30, 2004 | USAA.COM PAYMENT-THANKS | ($13,400.00) |
| Jul 30, 2004 | Jul 30, 2004 | MOVE PROMO BAL FROM CASH | ($5.15) |
| Jul 30, 2004 | Jul 30, 2004 | MOVE PROMO BAL FROM CASH | ($13,346.69) |
| Jul 29, 2004 | Jul 30, 2004 | SIRLOIN STOCKADE | ($11.56) |
| Jul 28, 2004 | Jul 29, 2004 | BOX "N" SHIP | ($28.92) |
| Jul 26, 2004 | Jul 27, 2004 | WM SUPERCENTER SE2 | ($17.20) |
| Jul 24, 2004 | Jul 26, 2004 | WM SUPERCENTER SE2 | ($10.77) |
| Jul 23, 2004 | Jul 25, 2004 | PAPA MURPHY'S # 2 | ($18.22) |
| Jul 22, 2004 | Jul 23, 2004 | USPS 3066480795 | ($15.67) |
| Jul 19, 2004 | Jul 20, 2004 | USPS 3066480795 | ($13.65) |

*credit card repayment*

https://www.bk.usaa.com/inet/gas_bank/BkAccounts

7/31/04

WILK000136

### X, 603.15: Borrowed Funds Secured by an Asset (06/30/02)

Borrowed funds that are secured by an asset represent a return of equity. Because of this, they may be used as a source of funds for the down payment, closing costs, and financial reserves. Assets that may be used to secure funds include automobiles, artwork, collectibles, or financial assets (such as savings accounts, certificates of deposit, stocks, bonds, and 401(k) accounts). The lender must document the terms of the secured loan, verify that the party providing the secured loan is not a party to the sale or financing of the property, and confirm that the funds have been transferred to the borrower. Generally, the lender must consider monthly payments for the loan as debt when qualifying the borrower (and, if the loan does not require monthly payments, the lender generally should calculate an equivalent amount and consider it as debt). However, when the loan is secured by the borrower's financial assets, monthly payments for the loan do not have to be considered as long-term debt when qualifying the borrower. If the same financial asset is also used as part of the borrower's financial reserves, the lender's determination of the adequacy of the borrower's reserves must take into consideration the fact that the value of the asset has been reduced by the proceeds from the secured loan (and any related fees).

A community lending borrower can obtain a "grant-like" secured loan from a nonprofit organization, a state or local government, or a state or local housing finance agency to fund the closing costs or, for a Fannie 3/2 mortgage, to provide the additional 2% of the required cash down payment. The acceptability of funding closing costs or a portion of the down payment for a Fannie 3/2 mortgage with a "grant-like" secured loan will be determined on a case-by-case basis; therefore, specific details on the acceptability of this type of secured financing will be stated in the lender's Master Agreement or individual negotiated contract.

**COMPENSATING FACTORS** — Check appropriate boxes below to indicate the applicable compensating factor(s) taken into consideration for an approval or the compensating factor(s) which were considered prior to declination. Use the "Other" section to list additional compensating factors.

[X] 1. Significant equity in subject property. 79.989 LTV _____ Product LTV _____

[X] 2. Excellent credit history: 631 FICO loan score _____ Product minimum FICO score _____ Number of tradelines with no delinquent payments _____

[ ] 3. Significant cash savings/reserves $_____ Liquid or liquidable assets $_____ Liquid or liquidable reserves _____

[ ] 4. Demonstrated ability to save (Explain): _____

[X] 5. Income stability. Has applicant maintained or increased his/her income level through steady employment? __ Yes CB- B-10 Number of years in profession
Additional information regarding employment: _____

[ ] 6. Potential/expected higher earnings (Explain and quantify): _____

[ ] 7. Net Worth indicates ability to repay: $_____ Net Worth $_____ Loan Amount _____

[ ] 8. Energy Efficient property (Explain): _____

[ ] 9. Proven ability to carry high debt structure while maintaining an excellent credit history (Explain/Quantify): _____

[ ] 10. Payment on proposed mortgage compared to previous mortgage/rental payment. Proposed $_____ Previous _____
Explain, compare or contrast:
[ ] 11. Additional income which was not used to qualify (even if not stable): __ Short term employment (even if not stable) __ Commission/overtime __ Second job/part time __ Social Security, retirement, VA benefits __ Alimony/child support __ Unearned income (dividends, interest, annuities) __ Welfare payments, unemployment __ Trailing co-borrower income __ Other income (explain): _____
$_____ Verified Amount $_____ Unverified Amount. Note: All non-taxable income should be grossed up.

[ ] 12. Low Qualifying Ratios or High Residual Income: _____ HTI Ratio _____ DTI Ratio _____ Guideline HTI Ratio _____ Guideline DTI Ratio _____
$_____ Residual Income

[X] 13. AUS Recommendation: X Approve/Eligible __ Approve/Ineligible __ Accept __ Accept Plus

[X] 14. Significant Wachovia Relationship (Explain): Business Accts As well As personal w/ Wachovia

[X] 15. Other (Explain/Quantify): 5 Star Customer. Est'd total Assets $43,000 +/-

**COUNSELING:** Fully document all advice/counseling given, all efforts to attempt to qualify borrower, counteroffers made, other products considered, additional documentation requested.

Counter Offer: Borr files his own tax Returns -   Results _____ Date _____
Counter Offer: Unable to get Rmt'l inc B/c use of business funds, seller's contractor   Results _____ Date _____
on site during Appraiser's Insp visit
→ Counter from 90% LTV / 80% LTV - Not Eligible for mtg ins due
to property unigueness

**LOAN DECISION:** [X] Denied   [ ] Approved with deviation to policy which does not affect marketability
Underwriter Name: COLOEEN FAZZINO (PMI)   Employee Number: A228717
Underwriter Signature: _____   Date: 08/05/04

**SECOND REVIEW (Required on all denied loans; FLAT must be fully documented):** [X] Denied [ ] Approved
*Applicant was given the opportunity of providing additional information: __ Yes __ No If no, explain: _____
**Compensating factors were considered: ✓ Yes __ No If no, explain: _____   Employee Number: A075129
Second Reviewer Name: _____   Date: 8/6/04
Second Reviewer Signature: JMansfield

**LOANS RECOMMENDED FOR EXCEPTION: Concur with denial?** [X] Yes [ ] No   Recommend for exception? [ ] Yes [ ] No
Investor Relations Analyst Name: Phyllis Riggins   Employee Number: A82626
Investor Relations Analyst Signature: Phyllis Riggi   Date: 8-6-04

**EXCEPTION APPROVAL** — I have considered the loan characteristics and authorize that the loan be approved and held in the portfolio of Wachovia National Bank. I have also considered that loan decision in the context of Fair Lending laws and have fully documented the compensating factors or reasons for the accommodation which would make it unlikely that there exists an applicant similarly situated (financially) who would be denied.

Wachovia Banking Relationships: [ ] No [ ] Yes Number of years _____ Products $_____ Credit $_____
Additional compensating factors or reasons for accommodation/approval (if any): 4th flatlet, better customer, good credit, reality festival = customer experience

Authorization:
Exception Officer Name: Terri Hamm Robt Hamm   Employee Number: FM071306
Exception Officer Signature: _____   Date: 8/9/04
Exception Sign Off Authority: $_____
Delegated Exception Sign Off Authority $_____   Delegated From: _____   Date: _____

244170 rev 08 (01/03) [41702]   Page 2 of 2

WHEAT000150

Co/Sub # __6060__                                                                      6995009
RC # __0805983__                Un..  rm Residential Loan Applicat.. )                WHEATLEY

This application is designed to be completed by the applicant(s) with the Lender's assistance. Applicants should complete this form as "Borrower" or "Co-Borrower" as applicable. Co-Borrower information must also be provided (and the appropriate box checked) when ☐ the income or assets of a person other than the "Borrower" (including the Borrower's spouse) will be used as a basis for loan qualification or ☐ the income or assets of the Borrower's spouse will not be used as a basis for loan qualification, but his or her liabilities must be considered because the Borrower resides in a community property state, the security property is located in a community property state, or the borrower is relying on other property located in a community property state as a basis for repayment of the loan.

## I. TYPE OF MORTGAGE AND TERMS OF LOAN

| Mortgage Applied for: | ☐ VA  ☒ Conventional  ☐ Other: | Agency Case Number | Lender Case No. |
|---|---|---|---|
| | ☐ FHA  ☐ USDA/Rural Housing Service | | 6995009 |

| Amount | Interest Rate | No. of Months | Amortization Type: | ☒ Fixed Rate | Other (explain): |
|---|---|---|---|---|---|
| $ 240,000.00 | 6.750 % | 360 | | ☐ GPM | ☐ ARM (type): |

## II. PROPERTY INFORMATION AND PURPOSE OF LOAN

| Subject Property Address (street, city, state, & zip code) | No.of Units |
|---|---|
| 584 NORTH DUPONT HWY          DOVER, DE  19901 | 1 |

| Legal Description of Subject Property (attach description if necessary) | Year Built |
|---|---|
| | 1966 |

| Purpose of Loan | ☒ Purchase ☐ Construction | ☐ Home Improvement | Property will be: |
|---|---|---|---|
| | ☐ Refinance ☐ Construction-Permanent | ☐ Other (explain): | ☒ Primary Residence  ☐ Secondary Residence  ☐ Investment |

Complete this line if construction or construction-permanent loan.

| Year Lot Acquired | Original Cost | Amount Existing Liens | (a) Present Value of Lot | (b)Cost of Improvements | Total (a + b) |
|---|---|---|---|---|---|
| | $ | $ | $ | $ | $ |

Complete this line if this is a refinance loan.

| Year Acquired | Original Cost | Amount Existing Liens | Purpose of Refinance | Describe Improvements ☐ made ☐ to be made |
|---|---|---|---|---|
| | $ | $ | | Cost: $ |

| Title will be held in what Name(s) | Manner in which Title will be held | Estate will be held in: |
|---|---|---|
| LLOYD J WHEATLEY          AUDRIA L WHEATLEY | JT TENANTS W/RT OF SURVIVORSHIP | ☒ Fee Simple  ☐ Leasehold (show expiration date) |

Source of Down Payment, Settlement Charges and/or Subordinate Financing (explain)

Checking/Savings

## III. BORROWER INFORMATION

| | Borrower | | Co-Borrower |
|---|---|---|---|
| Borrower's Name (include Jr. or Sr. if applicable) | | Co-Borrower's Name (include Jr. or Sr. if applicable) | |
| LLOYD J WHEATLEY | | AUDRIA L WHEATLEY | |

| Social Security Number | Home Phone (incl. area code) | DOB (MM/DD/YYYY) | Yrs.School | Social Security Number | Home Phone(incl. area code) | DOB (MM/DD/YYYY) | Yrs.School |
|---|---|---|---|---|---|---|---|
| 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 | 302-698-9354 | 04/12/1954 | 18 | 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 | 302-698-9354 | 01/08/1954 | 14 |

| ☒ Married ☐ Unmarried (include single, divorced, widowed) | Dependents (not listed by Co-Borrower) no. 1  ages | ☒ Married ☐ Unmarried (include single, divorced, widowed) | Dependents (not listed by Borrower) no.  ages |
|---|---|---|---|
| ☐ Separated | | ☐ Separated | |

| Present Address (street, city, state, zip code) ☒ Own ☐ Rent 2 No.Yrs. 1 Mos. | Present Address (street, city, state, zip code) ☒ Own ☐ Rent 2 No.Yrs. 1 Mos. |
|---|---|
| 138 KING HENRY COURT  DOVER, DE 19904 | 138 KING HENRY COURT  DOVER DE 19904 |

| Mailing Address, if different from Present Address | Mailing Address, if different from Present Address |
|---|---|
| | |

If residing at present address for less than two years, complete the following:

| Former Address (street, city, state, zip code) ☐ Own ☐ Rent __ No.Yrs. | Former Address (street, city, state, zip code) ☐ Own ☐ Rent __ No.Yrs. |
|---|---|
| | |

## IV. EMPLOYMENT INFORMATION

| | Borrower | | Co-Borrower | |
|---|---|---|---|---|
| Name & Address of Employer | ☒ Self Employed | Yrs. on this job | Name & Address of Employer ☐ Self Employed | Yrs. on this job |
| LIMOSINE UNLIMITED  138 KING HENRY COURT  DOVER DE 19904 | | 10 yrs 1 mos  Yrs. employed in this line of work/profession  10 | | Yrs. employed in this line of work/profession |

| Position/Title/Type of Business | Business Phone (incl.area code) | Position/Title/Type of Business | Business Phone (incl. area code) |
|---|---|---|---|
| OWNER/ | 302-697-0999 | | |

If employed in current position for less than two years or if currently employed in more than one position, complete the following:

| Name & Address of Employer ☐ Self Employed | Dates (from - to) | Name & Address of Employer ☐ Self Employed | Dates (from - to) 06/84-05/04 |
|---|---|---|---|
| | Monthly Income | US AIR FORCE | Monthly Income |
| | $ | DOVER DE 19902 | $ 2,225.00 |

| Position/Title/Type of Business | Business Phone (incl.area code) | Position/Title/Type of Business AIRMAN/ | Business Phone (incl.area code) |
|---|---|---|---|

| Name & Address of Employer ☐ Self Employed | Dates (from - to) | Name & Address of Employer ☐ Self Employed | Dates (from - to) |
|---|---|---|---|
| | Monthly Income | | Monthly Income |
| | $ | | $ |

| Position/Title/Type of Business | Business Phone (incl.area code) | Position/Title/Type of Business | Business Phone (incl.area code) |
|---|---|---|---|

| Freddie Mac Form 65/Rev. 01/04 (Amended) | Page 1 of 4 | Fannie Mae Form 1003/Rev. 01/04 (Amended) |
|---|---|---|
| 240122 rev06 (01/04) [1221] | | C F 07/17/04 |

EXHIBIT 5

WHEAT000319

CO/SUB# 6060        RC# 0805983

6995009
WHEATLEY

### V. MONTHLY INCOME AND COMBINED HOUSING EXPENSE INFORMATION

| Gross Monthly Income | Borrower | Co-Borrower | Total | Combined Monthly Housing Expense | Present | Proposed |
|---|---|---|---|---|---|---|
| Base Empl. Income* | $ 18,333.00 | $ | $ 18,333.00 | Rent | $ | |
| Overtime | | | | First Mortgage (P&I) | 1,561.00 | 1,556.64 |
| Bonuses | | | | Other Financing (P&I) | | |
| Commissions | | | | Hazard Insurance | | 40.17 |
| Dividends/Interest | | | | Real Estate Taxes | | 97.83 |
| Net Rental Income | | | | Mortgage Insurance | | 132.00 |
| Other (before completing, see the notice in "describe other income", below) | | | | Homeowner Assn. Dues | | |
| | | | | Other: | | |
| Total | $ 18,333.00 | $ | $ 18,333.00 | Total | $ 1,561.00 | $ 1,826.64 |

* Self-Employed Borrower(s) may be required to provide additional documentation such as tax returns and financial statements.
(TTL Includes Addendum Info. Refer to Page 4)
Describe Other Income  Notice: Alimony, child support, or separate maintenance income need not be revealed if the
Borrower (B) or Co-Borrower (C) does not choose to have it considered for repaying this loan.

| B/C | | Monthly Amount |
|---|---|---|
| | | $ |
| | | |
| | | |

### VI. ASSETS AND LIABILITIES

This Statement and any applicable supporting schedules may be completed jointly by both married and unmarried Co-Borrowers if their assets and liabilities are sufficiently joined so that the Statement can be meaningfully and fairly presented on a combined basis; otherwise separate Statements and Schedules are required. If the Co-Borrower section was completed about a spouse, this Statement and supporting schedules must be completed about that spouse also.

Completed [ X ] Jointly [ ] Not Jointly

| ASSETS Description | Cash or Market Value | Liabilities and Pledged Assets. List the creditor's name, address, and account number for all outstanding debts, including automobile loans, revolving charge accounts, real estate loans, alimony, child support, stock pledges, etc. Use continuation sheet, if necessary. Indicate by (*) those liabilities which will be satisfied upon sale of real estate owned or upon refinancing of the subject property. | Monthly Payt. & Mos. Left to Pay | Unpaid Balance |
|---|---|---|---|---|
| Cash deposit toward purchase held by: | $ | LIABILITIES | $ Payt./Mos. | $ |
| | | Name and address of Company | | |
| List checking and savings accounts below | | SUNTRUST | | |
| Name and address of Bank, S&L, or Credit Union WACHOVIA | | | | |
| | 12,875.00 790.00 740.00 | | | |
| | | Acct. no. 4900004431602012 | 382   50 | 19,204.00 |
| Acct. no. | $ 2,141.00 | Name and address of Company | $ Payt./Mos. | $ |
| Name and address of Bank, S&L, or Credit Union TBD | | WILM TRUST | | |
| | | Acct. no. 100987813020001 | 638   38 | 24,343.00 |
| Acct. no. | $ 10,000.00 | Name and address of Company | $ Payt./Mos. | $ |
| Name and address of Bank, S&L, or Credit Union | | WILM TRUST | | |
| | | Acct. no. 100911125800001 | 434   56 | 24,174.00 |
| Acct. no. | $ | Name and address of Company | $ Payt./Mos. | $ |
| Name and address of Bank, S&L, or Credit Union | | WILM TRUST | | |
| | | Acct. no. 100987776910001 | 279   36 | 10,179.00 |
| Acct. no. | $ | Name and address of Company | $ Payt./Mos. | $ |
| Stocks & Bonds (Company name/number & description) | $ | CITIZENS BANK | | |
| | | Acct. no. 1012998074 | 285   48 | 13,788.00 |
| Life insurance net cash value | $ | Name and address of Company | $ Payt./Mos. | $ |
| Face amount: $ | | | | |
| Subtotal Liquid Assets | $ 26,546.00 | | | |
| Real estate owned (enter market value from schedule of real estate owned) | $ 275,000.00 | Acct. no. | | |
| Vested interest in retirement fund | $ 5,601.00 | Name and address of Company | $ Payt./Mos. | $ |
| Net worth of business(es) owned (attach financial statement) | $ | | | |
| Automobiles owned (make and year) | $ | | | |
| | | Acct. no. | | |
| Other Assets (itemize) | $ | Alimony/Child Support/Separate Maintenance Payments Owed to: | $ | |
| | | Job Related Expense (child care, union dues, etc.) Negative Cash Flow-Rentals | $ -1,561.00 | |
| | | Total Monthly Payments | $ 4,059.00 | |
| Total Assets a. | $ 307,147.00 | Net Worth (a minus b) > | $ -26,559.00 | Total Liabilities b. | $ 333,706.00 |

Freddie Mac Form 65/Rev. 01/04
(Amended)
240122 rev06 (01/04) (1222)

Page 2 of 4

Fannie Mae Form 1003/Rev. 01/04
(Amended)
C F 07/17/04

WHEAT000320

CO/SUB# 6060        RC# 0805983 ·                                                6995009                        WHEATLEY

## VI. ASSETS AND LIABILITIES (cont.)

**Schedule of Real Estate Owned (If additional properties are owned, use continuation sheet.)**

| Property Address (enter S if sold, PS if pending sale, or R if rental being held for income) | ↓ | Type of Property | Present Market Value | Amount of Mortgages & Liens | Gross Rental Income | Mortgage Payments | Insurance, Maintenance Taxes & Misc. | Net Rental Income |
|---|---|---|---|---|---|---|---|---|
| 138 KING HENRY COURT | H | SFR | $ 275,000.00 | $232,040.00 | $ | $ 1,561.00 | | -1,561.00 |
| | | | | | | | | |
| | | | | | | | | |
| | | Totals | $ 275,000.00 | $232,040.00 | $ | $1,561.00 | $ | $ -1,561.00 |

List any additional names under which credit has previously been received and indicate appropriate creditor name(s) and account number(s):

| Alternate Name | Creditor Name | Account Number |
|---|---|---|
| | | |
| | | |

## VII. DETAILS OF TRANSACTION

| | |
|---|---|
| a. Purchase price | $ 266,667.67 |
| b. Alterations, improvements, repairs | |
| c. Land (if acquired separately) | |
| d. Refinance (incl. debts to be paid off) | |
| e. Estimated prepaid items | 2,278.01 |
| f. Estimated closing costs | 4,934.95 |
| g. PMI, MIP, Funding Fee | |
| h. Discount (if Borrower will pay) | |
| i. Total costs (add items a through h) | 273,880.63 |
| j. Subordinate financing | |
| k. Borrower's closing costs paid by Seller | |
| l. Other Credits (explain) | |
| Lender Credits | 2,400.00 |
| Paid in Advance | 400.00 |
| m. Loan amount (exclude PMI, MIP, Funding Fee financed) | 240,000.00 |
| n. PMI, MIP, Funding Fee financed | |
| o. Loan amount (add m & n) | 240,000.00 |
| p. Cash from/to Borrower (subtract j, k, l, & o from i) | 31,080.63 |

## VIII. DECLARATIONS

| | Borrower | | Co-Borrower | |
|---|---|---|---|---|
| If you answer "yes" to any questions a through i, please use continuation sheet for explanation. | Yes | No | Yes | No |
| a. Are there any outstanding judgements against you? | | X | | X |
| b. Have you been declared bankrupt within the past 7 years? | | X | | X |
| c. Have you had property foreclosed upon or given title or deed in lieu thereof in the last 7 years? | | X | | X |
| d. Are you a party to a law suit? | | X | | X |
| e. Have you directly or indirectly been obligated on any loan which resulted in foreclosure, transfer of title in lieu of foreclosure, or judgement? (This would include such loans as home mortgage loans, SBA loans, home improvement loans, educational loans, manufactured (mobile) home loans, any mortgage, financial obligation, bond, or loan guarantee. If "Yes", provide details, including date, name and address of Lender, FHA or VA case number, if any, and reasons for the action.) | | X | | X |
| f. Are you presently delinquent or in default on any Federal debt or any other loan, mortgage, financial obligation, bond, or loan guarantee? If "Yes", give details as described in the preceding question. | | X | | X |
| g. Are you obligated to pay alimony, child support, or separate maintenance? | | X | | X |
| h. Is any part of the down payment borrowed? | | X | | X |
| i. Are you a co-maker or endorser on a note? | | X | | X |
| j. Are you a U.S. citizen? | X | | X | |
| k. Are you a permanent resident alien? | | X | | X |
| l. Do you intend to occupy the property as your primary residence? If "Yes", complete question m below. | X | | X | |
| m. Have you had an ownership interest in a property in the last three years? | X | | X | |
| (1) What type of property did you own—principal residence (PR), second home (SH), or investment property (IP)? | PR | | PR | |
| (2) How did you hold title to the home—solely by yourself, (S), jointly with your spouse (SP), or jointly with another person (O)? | SP | | SP | |

## IX. ACKNOWLEDGEMENT AND AGREEMENT

The undersigned specifically acknowledge(s) and agree(s) that: (1) the loan requested by this application will be secured by a first mortgage or deed of trust on the property described herein; (2) the property will not be used for any illegal or prohibited purpose or use; (3) all statements made in this application are made for the purpose of obtaining  the loan indicated herein; (4) occupation of the property will be as indicated above; (5) verification or reverification of any information contained in the application may be made at any time by the Lender, its agents, successors and assigns, either directly or through a credit reporting agency, from any source named in this application, and the original copy of this application will be retained by the Lender, even if the loan is not approved; (6) the Lender, its agents, successors and assigns will rely  on the information contained in the  application and I/we have a continuing obligation to  amend and/or supplement the information provided in this application if any of the material facts which  I/we have represented herein should change prior to closing; (7) in the event my/our payments on the loan indicated in this application become delinquent, the Lender, its agents,  successors and assigns, may, in addition to all their other rights and remedies, report my/our name(s) and account information to a credit reporting agency; (8) ownership of the loan may be transferred to successor or assign of the Lender without notice to me and/or the administration of the loan account may be transferred to an agent,  successor or assign of the Lender with prior notice to me; (9) the Lender, its agents, successors and assigns make no representations or warranties, express or implied, to the Borrower(s) regarding the property, the condition of the property, or the value of the property. Certification:  I/We certify that the information provided in this application is true and correct as of the date set forth opposite my/our signature(s) on this application and acknowledge my/our  understanding that any  intentional or negligent misrepresentation(s) of the information contained in this application may result in civil liability and/or criminal penalties, including,  but not limited to, fine or imprisonment or both under the provisions of Title 18, United States Code, Section 1001, et seq. and liability for monetary  damages to the Lender, its agents, successors and assigns, insurers and any other person who may suffer any loss-due to reliance upon any misrepresentation which I/we have made on this application.

To help facilitate the funding of terrorism and money laundering activities, Federal law requires all financial institutions to obtain, verify, and record information that identifies each person who opens an account.

| Borrower's Signature | Date | Co-Borrower's Signature | Date |
|---|---|---|---|
| X | | X | |

## X. INFORMATION FOR GOVERNMENT MONITORING PURPOSES

The following information is requested by the Federal Government for certain types of loans related to a dwelling, in order to monitor the Lender's compliance with equal credit opportunity,  fair housing and home mortgage disclosure laws.  You are not  required to furnish this information, but are encouraged to do so. The law provides that  a Lender may discriminate neither on the  basis of this information, nor on whether you choose to furnish it. If you furnish the information, please provide both ethnicity and race. For race, you may check more than one designation. If you do not furnish ethnicity, race, or sex, and you have made this application in person, under Federal regulations, this lender is required to note the information on the basis of visual observation or surname. If you do not wish to furnish the information, please check the box below. (Lender must review the above material to assure that the disclosures satisfy all requirements to which the lender is subject under applicable state law for the particular type of loan applied for.)

| BORROWER | ☐ I do not wish to furnish this information | CO-BORROWER | ☐ I do not wish to furnish this Information |
|---|---|---|---|
| Ethnicity: | ☐ Hispanic or Latino  [X] Not Hispanic or Latino | Ethnicity: | ☐ Hispanic or Latino  [X] Not Hispanic or Latino |
| Race: | ☐ American Indian or Alaskan Native  ☐ Asian  [X] Black or African American | Race | ☐ American Indian or Alaskan Native  ☐ Asian  [X] Black or African American |
| | ☐ Native Hawaiian or Other Pacific Islander  ☐ White | | ☐ Native Hawaiian or Other Pacific Islander  ☐ White |
| Sex: | ☐ Female  [X] Male | Sex: | [X] Female  ☐ Male |

| To be Completed by Interviewer | Interviewer's Name (print or type) | Date Application Received | Name and Address of Interviewer's Employer |
|---|---|---|---|
| This application was taken by: | JAMES HOGSTEN | 06/22/04 | WACHOVIA |
| [X] face-to-face interview | Signature of Interviewer (or Preparer) | | 1200 EAST LANCASTER AVENUE |
| ☐ by mail (delivered) | | | ROSEMONT, PA  19010-9519 |
| ☐ by telephone | Interviewer's Phone Number (incl. area code) | | |
| ☐ internet | 610-648-1850 | | |

Freddie Mac Form 65/Rev. 01/04
(Amended)
240122 rev06 (01/04) (1223)

Page 3 of 4

Fannie Mae Form 1003/Rev. 01/04
(Amended)

B-234

WHEAT000321

CO/SUB# 6060          RC# 080598              6995009      WHEATLEY

## Continuation Sheet/Residential Loan Application

| Use this continuation sheet if you need more space to complete the Residential Loan Application. Mark B for Borrower or C for Co-Borrower. | Borrower: **LLOYD J WHEATLEY** | Agency Case Number: |
|---|---|---|
| | Co-Borrower: **AUDRIA L WHEATLEY** | Lender Case Number: **6995009** |

**Real Estate Loans**

| Company/Lender | Account Number | Balance |
|---|---|---|
| WF HME MRTG | 7080012354247 | 232,040.00 |

**Other Debts**

| Company/Lender | Payment/Months | | Balance |
|---|---|---|---|
| WILM TRUST 100987562370001 | 480 | 21 | 9,978.00 |

**Schedule of add'l REO's**

| Property Address | Prop Status | Prop Type | Present Mkt Value | Amount of Liens | Gross Rental Income | Mortg Paymts | Tax, Ins Misc | Net Rental Income |
|---|---|---|---|---|---|---|---|---|
| | | | | | | | | |

Per California Civil Code 1812.30, the applicant, if married, may apply for separate credit.



I/We fully understand that it is a Federal crime punishable by fine or imprisonment, or both, to knowingly make any false statements concerning any of the above facts as applicable under the provisions of Title 18, United States Code, Section 1001, et seq.

| Borrower's Signature: | Date | Co-Borrower's Signature: | Date |
|---|---|---|---|
| X | | X | |

Freddie Mac Form 65/Rev. 01/04 (Amended)
240122 rev06 (01/04) [1224]

Page 4 of 4

Fannie Mae Form 1003/Rev. 01/04 (Amended)

C F 07/17/04

WHEAT000322

6995009

## Uniform Residential Loan Application

Lloyd J Wheatley and Audria L Wheatley

This application is designed to be completed by the applicant(s) with the Lender's assistance. Applicants should complete this form as "Borrower" or "Co-Borrower", as applicable. Co-Borrower information must also be provided (and the appropriate box checked) when ☐ the income or assets of a person other than the "Borrower" (including the Borrower's spouse) will be used as a basis for loan qualification or ☐ the income or assets of the Borrower's spouse will not be used as a basis for loan qualification, but his or her liabilities must be considered because the Borrower resides in a community property state, the security property is located in a community property state, or the Borrower is relying on other property located in a community property state as a basis for repayment of the loan.

### I. TYPE OF MORTGAGE AND TERMS OF LOAN

| Mortgage Applied for: | ☐ VA  ☒ Conventional  ☐ Other: ☐ FHA  ☐ FmHA | Agency Case Number | Lender Case Number 6995009 |
|---|---|---|---|

| Amount $240,000.00 | Interest Rate 6.750% | No. of Months 360 | Amortization Type: | ☒ Fixed Rate  ☐ GPM | ☐ Other (explain): FNMR30FBX  ☐ ARM (type): |
|---|---|---|---|---|---|

### II. PROPERTY INFORMATION AND PURPOSE OF LOAN

| Subject Property Address (street, city, state, ZIP) 584 North Dupont Hwy Dover DE 19901 | | No. of Units 1 |
|---|---|---|

| Legal Description of Subject Property (attach description if necessary) | Year Built 1966 |
|---|---|

| Purpose of Loan | ☒ Purchase  ☐ Construction  ☐ Refinance  ☐ Construction-Permanent | ☐ Home Improvement  ☐ Other (explain): | Property will be: ☒ Primary Residence  ☐ Secondary Residence  ☐ Investment |
|---|---|---|---|

**Complete this line if construction or construction-permanent loan.**

| Year Lot Acquired | Original Cost $ | Amount Existing Liens $ | (a) Present Value of Lot $ | (b) Cost of Improvements $ | Total (a + b) $ |
|---|---|---|---|---|---|

**Complete this line if this is a refinance loan.**

| Year Acquired | Original Cost $ | Amount Existing Liens $ | Purpose of Refinance | Describe Improvements ☐ made ☐ to be made Cost: $ |
|---|---|---|---|---|

| Title will be held in what Name(s) Wheatley, Lloyd J AND Wheatley, Audria L | Manner in which Title will be held Joint Tenants | Estate will be held in: ☒ Fee Simple ☐ Leasehold (show expiration date) |
|---|---|---|

| Source of Down Payment, Settlement Charges and/or Subordinate Financing (explain) Checking/Savings, , | |
|---|---|

### III. BORROWER INFORMATION

| | Borrower | | | | Co-Borrower | | |
|---|---|---|---|---|---|---|---|

| Borrower's Name (include Jr. or Sr. if applicable) Lloyd J Wheatley | | | | Co-Borrower's Name (include Jr. or Sr. if applicable) Audria L Wheatley | | | |
|---|---|---|---|---|---|---|---|

| Social Security Number 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 | Home Phone (incl. area code) (302)698-9354 | DOB 04/12/1954 | Yrs. School 18 | Social Security Number 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 | Home Phone (incl. area code) (302)698-9354 | DOB 01/08/1954 | Yrs. School 14 |
|---|---|---|---|---|---|---|---|

| ☒ Married ☐ Separated | ☐ Unmarried (include single, divorced, widowed) | Dependents (not listed by Co-Borrower) no. 1  ages 20 | | ☒ Married ☐ Separated | ☐ Unmarried (include single, divorced, widowed) | Dependents (not listed by Borrower) no.  ages | |
|---|---|---|---|---|---|---|---|

| Present Address (street, city, state, ZIP) ☒ Own ☐ Rent 2y1m No. Yrs. 138 King Henry Court Dover, DE 19904 | | | | Present Address (street, city, state, ZIP) ☒ Own ☐ Rent 2y1m No. Yrs. 138 King Henry Court Dover, DE 19904 | | | |
|---|---|---|---|---|---|---|---|

| Mailing Address, if different from Present Address | | | | Mailing Address, if different from Present Address | | | |
|---|---|---|---|---|---|---|---|

**If residing at present address for less than two years, complete the following:**

| Former Address (street, city, state, ZIP) ☐ Own ☐ Rent No. Yrs. | | | | Former Address (street, city, state, ZIP) ☐ Own ☐ Rent No. Yrs. | | | |
|---|---|---|---|---|---|---|---|

### IV. EMPLOYMENT INFORMATION

| | Borrower | | Co-Borrower | |
|---|---|---|---|---|

| Name & Address of Employer ☒ Self Employed Limosine Unlimited 138 King Henry Court Dover, DE 19904 | Yrs. on this job 10y 1m | Name & Address of Employer ☐ Self Employed Retired | Yrs. on this job 0y 2m |
| | Yrs. employed in this line of work/profession 10 | | Yrs. employed in this line of work/profession 20 |
|---|---|---|---|

| Position/Title/Type of Business Owner/ | Business Phone (incl. area code) (302)697-0999 | Position/Title/Type of Business | Business Phone (incl. area code) |
|---|---|---|---|

**If employed in current position for less than two years or if currently employed in more than one position, complete the following:**

| Name & Address of Employer ☐ Self Employed | Dates (from - to) | Name & Address of Employer ☐ Self Employed US Air Force | Dates (from - to) 06/01/1984 - 05/01/2004 |
|---|---|---|---|
| | Monthly Income $ | Dover, DE 19902 | Monthly Income $ 2,225.00 |

| Position/Title/Type of Business | Business Phone (incl. area code) | Position/Title/Type of Business Airman/ | Business Phone (incl. area code) |
|---|---|---|---|

| Name & Address of Employer ☐ Self Employed | Dates (from - to) | Name & Address of Employer ☐ Self Employed | Dates (from - to) |
|---|---|---|---|
| | Monthly Income $ | | Monthly Income $ |

| Position/Title/Type of Business | Business Phone (incl. area code) | Position/Title/Type of Business | Business Phone (incl. area code) |
|---|---|---|---|

240122 (0311)     rev 05 (01/04) [1221]     VMP Mortgage Solutions - (800)521-7291

B-236

WHEAT000323

6995009

Lloyd J Wheatley and Audria L Wheatley

## V. MONTHLY INCOME AND COMBINED HOUSING EXPENSE INFORMATION

| Gross Monthly Income | Borrower | Co-Borrower | Total | Combined Monthly Housing Expense | Present | Proposed |
|---|---|---|---|---|---|---|
| Base Empl. Income* | $ | $ | $ | Rent | | |
| Overtime | | | | First Mortgage (P&I) | 1,569.00 | 1,556.64 |
| Bonuses | | | | Other Financing (P&I) | | |
| Commissions | | | | Hazard Insurance | | 40.17 |
| Dividends/Interest | | | | Real Estate Taxes | | 97.83 |
| Net Rental Income | | | | Mortgage Insurance | | 104.00 |
| Other (before completing, see the notice in "describe other income," below) | | | | Homeowner Assn. Dues | | |
| | | | | Other: | | |
| Total | $ | $ | $ | Total | $ 1,569.00 | $ 1,798.64 |

* Self Employed Borrower(s) may be required to provide additional documentation such as tax returns and financial statements.

| B/C | Describe Other Income   Notice: Alimony, child support, or separate maintenance income need not be revealed if the Borrower (B) or Co-Borrower (C) does not choose to have it considered for repaying this loan. | Monthly Amount |
|---|---|---|
| | | $ |
| | | |

## VI. ASSETS AND LIABILITIES

This Statement and any applicable supporting schedules may be completed jointly by both married and unmarried Co-Borrowers if their assets and liabilities are sufficiently joined so that the Statement can be meaningfully and fairly presented on a combined basis; otherwise separate Statements and Schedules are required. If the Co-Borrower section was completed about a spouse, this Statement and supporting schedules must be completed about that spouse also.

Completed [ X ] Jointly [ ] Not Jointly

| ASSETS | Cash or Market Value | Liabilities and Pledged Assets. List the creditor's name, address and account number for all outstanding debts, including automobile loans, revolving charge accounts, real estate loans, alimony, child support, stock pledges, etc. Use continuation sheet, if necessary. Indicate by (*) those liabilities which will be satisfied upon sale of real estate owned or upon refinancing of the subject property. | | |
|---|---|---|---|---|
| Description | | LIABILITIES | Monthly Pmt. & Mos. Left to Pay | Unpaid Balance |
| Cash deposit toward purchase held by: | | Name and address of Company | $ Pmt./Mos. | $ |
| | | WILM TRUST | 279.00 | 10,179.00 |
| List checking and savings accounts below | | | 36 | |
| Name and address of Bank, S&L, or Credit Union | | | | |
| Wachovia   CKG | | | | |
| | | Acct. no. 100987776910001 | | |
| Acct. no. | $ 2,000.00 | Name and address of Company | $ Pmt./Mos. | $ |
| Name and address of Bank, S&L, or Credit Union | | CITIZENS BANK | 285.00 | 13,788.00 |
| Wachovia   MMKT | | | 48 | |
| | | Acct. no. 1012998074 | | |
| Acct. no. | $ 26,000.00 | Name and address of Company | $ Pmt./Mos. | $ |
| Name and address of Bank, S&L, or Credit Union | | WILM TRUST | 480.00 | 9,978.00 |
| Wachovia   CKG | | | 21 | |
| | | Acct. no. 100987562370001 | | |
| Acct. no. Business | $ 14,000.00 | Name and address of Company | $ Pmt./Mos. | $ |
| Name and address of Bank, S&L, or Credit Union | | WILM TRUST | 434.00 | 24,174.00 |
| Wachovia   CKG | | | 56 | |
| | | Acct. no. 100911125800001 | | |
| Acct. no. | $ 15,000.00 | Name and address of Company | $ Pmt./Mos. | $ |
| Stocks & Bonds (Company name/number & description) | $ | WILM TRUST | 638.00 | 24,343.00 |
| | | | 38 | |
| | | Acct. no. 100987813020001 | | |
| Life insurance net cash value | $ | Name and address of Company | $ Pmt./Mos. | $ |
| Face amount: $ | | SUNTRUST | 382.00 | 19,204.00 |
| Subtotal Liquid Assets | $ 57,000.00 | | 50 | |
| Real estate owned (enter market value from schedule of real estate owned) | $ 275,000.00 | Acct. no. 4900004431602012 | | |
| Vested interest in retirement fund | $ 8,000.00 | Name and address of Company | $ Pmt./Mos. | $ |
| Net worth of business(es) owned (attach financial statement) | $ | WF HME MRTG | 1,561.00 | 232,040.00 |
| Automobiles owned (make and year) | $ | | | |
| | | Acct. no. 7080012354247 | | |
| Other Assets (itemize) | $ | Alimony/Child Support/Separate Maintenance Payments Owed to: | $ | |
| | | Job Related Expense (child care, union dues, etc.) | $ | |
| | | Total Monthly Payments | $ 4,059.00 | |
| Total Assets a. | $ 340,000.00 | Net Worth (a minus b) $ 6,294.00 | Total Liabilities b. | $ 333,706.00 |

240122 (0311)    rev 05 (01/04) [1222]    Page 2 of 4

B-237

WHEAT000324

6995009

Lloyd J Wheatley and Audria L Wheatley

## VI. ASSETS AND LIABILITIES (cont.)

**Schedule of Real Estate Owned** (If additional properties are owned, use continuation sheet.)

| Property Address (enter S if sold, PS if pending sale or R if rental being held for income) | Type of Property | Present Market Value | Amount of Mortgages & Liens | Gross Rental Income | Mortgage Payments | Insurance, Maintenance, Taxes & Misc. | Net Rental Income |
|---|---|---|---|---|---|---|---|
| 138 King Henry Court Dover DE 19904 | Sin | $ 275,000.00 | $ 232,040.00 | $ | $ 1,561.00 | $ | $ |
| | | | | | | | |
| | | | | | | | |
| Totals | | $ 275,000.00 | $ 232,040.00 | $ | $ 1,561.00 | $ | $ |

List any additional names under which credit has previously been received and indicate appropriate creditor name(s) and account number(s):

| Alternate Name | Creditor Name | Account Number |
|---|---|---|
| | | |
| | | |

## VII. DETAILS OF TRANSACTION

| | |
|---|---|
| a. Purchase price | $ 266,667.00 |
| b. Alterations, improvements, repairs | |
| c. Land (if acquired separately) | |
| d. Refinance (incl. debts to be paid off) | |
| e. Estimated prepaid items | 2,707.92 |
| f. Estimated closing costs | 9,164.96 |
| g. PMI, MIP, Funding Fee | |
| h. Discount (if Borrower will pay) | |
| i. Total costs (add items a through h) | 278,539.88 |
| j. Subordinate financing | |
| k. Borrower's closing costs paid by Seller | |
| l. Other Credits (explain) Above Par to Borrower | 2,400.00 |
| m. Loan amount (exclude PMI, MIP, Funding Fee financed) | 240,000.00 |
| n. PMI, MIP, Funding Fee financed | |
| o. Loan amount (add m & n) | 240,000.00 |
| p. Cash from/ to Borrower (subtract j, k, l & o from i) | 36,139.88 |

## VIII. DECLARATIONS

If you answer "Yes" to any questions a through i, please use continuation sheet for explanation.

| | Borrower | | Co-Borrower | |
|---|---|---|---|---|
| | Yes | No | Yes | No |
| a. Are there any outstanding judgments against you? | | x | | x |
| b. Have you been declared bankrupt within the past 7 years? | | x | | x |
| c. Have you had property foreclosed upon or given title or deed in lieu thereof in the last 7 years? | | x | | x |
| d. Are you a party to a lawsuit? | | x | | x |
| e. Have you directly or indirectly been obligated on any loan which resulted in foreclosure, transfer of title in lieu of foreclosure, or judgment? (This would include such loans as home mortgage loans, SBA loans, home improvement loans, educational loans, manufactured (mobile) home loans, any mortgage, financial obligation, bond, or loan guarantee. If "Yes," provide details, including date, name and address of Lender, FHA or VA case number, if any, and reasons for the action.) | | x | | x |
| f. Are you presently delinquent or in default on any Federal debt or any other loan, mortgage, financial obligation, bond, or loan guarantee? If "Yes," give details as described in the preceding question. | | x | | x |
| g. Are you obligated to pay alimony, child support, or separate maintenance? | | x | | x |
| h. Is any part of the down payment borrowed? | | x | | x |
| i. Are you a co-maker or endorser on a note? | | x | | x |
| j. Are you a U.S. citizen? | x | | x | |
| k. Are you a permanent resident alien? | | x | | x |
| l. Do you intend to occupy the property as your primary residence? If "Yes," complete question m below. | x | | x | |
| m. Have you had an ownership interest in a property in the last three years? | x | | x | |
| (1) What type of property did you own -- principal residence (PR), second home (SH), or investment property (IP)? | PR | | PR | |
| (2) How did you hold title to the home -- solely by yourself (S), jointly with your spouse (SP), or jointly with another person (O)? | SP | | SP | |

## IX. ACKNOWLEDGMENT AND AGREEMENT

The undersigned specifically acknowledge(s) and agree(s) that: (1) the loan requested by this application will be secured by a first mortgage or deed of trust on the property described herein; (2) the property will not be used for any illegal or prohibited purpose or use; (3) all statements made in this application are made for the purpose of obtaining the loan indicated herein; (4) occupation of the property will be as indicated above; (5) verification or reverification of any information contained in the application may be made at any time by the Lender, its agents, successors and assigns, either directly or through a credit reporting agency, from any source named in this application, and the original copy of this application will be retained by the Lender, even if the loan is not approved; (6) the Lender, its agents, successors and assigns will rely on the information contained in the application and I/we have a continuing obligation to amend and/or supplement the information provided in this application if any of the material facts which I/we have represented herein should change prior to closing; (7) in the event my/our payments on the loan indicated in this application become delinquent, the Lender, its agents, successors and assigns, may, in addition to all their other rights and remedies, report my/our name(s) and account information to a credit reporting agency; (8) ownership of the loan may be transferred to successor or assign of the Lender without notice to me and/or the administration of the loan account may be transferred to an agent, successor or assign of the Lender with prior notice to me; (9) the Lender, its agents, successors and assigns make no representations or warranties, express or implied, to the Borrower(s) regarding the property, the condition of the property, or the value of the property.

Certification: I/We certify that the information provided in this application is true and correct as of the date set forth opposite my/our signature(s) on this application and acknowledge my/our understanding that any intentional or negligent misrepresentation(s) of the information contained in this application may result in civil liability and/or criminal penalties including, but not limited to, fine or imprisonment or both under the provisions of Title 18, United States Code, Section 1001, et seq. and liability for monetary damages to the Lender, its agents, successors and assigns, insurers and any other person who may suffer any loss due to reliance upon any misrepresentation which I/we have made on this application.

TO HELP FIGHT THE FUNDING OF TERRORISM AND MONEY LAUNDERING ACTIVITIES, FEDERAL LAW REQUIRES ALL FINANCIAL INSTITUTIONS TO OBTAIN, VERIFY AND RECORD INFORMATION THAT IDENTIFIES EACH PERSON WHO OPENS AN ACCOUNT.

| Borrower's Signature | Date | Co-Borrower's Signature | Date |
|---|---|---|---|
| X | 6/22/04 | X | 22 Jun 04 |

## X. INFORMATION FOR GOVERNMENT MONITORING PURPOSES

The following information is requested by the Federal Government for certain types of loans related to a dwelling in order to monitor the lender's compliance with equal credit opportunity, fair housing and home mortgage disclosure laws. You are not required to furnish this information, but are encouraged to do so. The law provides that a lender may not discriminate neither on the basis of this information, nor on whether you choose to furnish it. If you furnish the information, please provide both ethnicity and race. For race, you may check more than one designation. If you do not furnish ethnicity, race, or sex, and you have made this application in person, under Federal regulations, this lender is required to note the information on the basis of visual observation or surname. If you do not wish to furnish the information, please check the box below. (Lender must review the above material to assure that the disclosures satisfy all requirements to which the lender is subject under applicable state law for the particular type of loan applied for.)

| BORROWER | I do not wish to furnish this information. | CO-BORROWER | I do not wish to furnish this information. |
|---|---|---|---|
| **Ethnicity:** | Hispanic or Latino   [x] Not Hispanic or Latino | **Ethnicity:** | Hispanic or Latino   [x] Not Hispanic or Latino |
| **Race:** | American Indian or Alaska Native   Asian   [x] Black or African American | **Race:** | American Indian or Alaska Native   [x] Asian   Black or African American |
| | Native Hawaiian or Other Pacific Islander   White | | Native Hawaiian or Other Pacific Islander   White |
| **Sex:** | Female   [x] Male | **Sex:** | [x] Female   Male |

| To be Completed by Interviewer This application was taken by: | Interviewer's Name (print or type) J.D. Hogston | Date Application Received 06/22/2004 | Name and Address of Interviewer's Employer |
|---|---|---|---|
| [x] face-to-face interview | Signature of Interviewer (or Preparer) | | Wachovia Mortgage Corporation |
| by mail | | | 101 W. Loockerman Street |
| by telephone | Interviewer's Phone Number (incl. area code) (302) 730-5482 | | Dover, DE 19904 |

240122 (0311)        rev 05 (01/04) [1223]        Page 3 of 4

WHEAT000325

6995009

**Continuation Sheet/Residential Loan Application**     Lloyd J Wheatley and Audria L Wheatley

| Use this continuation sheet if you need more space to complete the Residential Loan Application. Mark B for Borrower or C for Co-Borrower. | Borrower:  Lloyd J Wheatley | Agency Case Number: |
|---|---|---|
| | Co-Borrower:  Audria L Wheatley | Lender Case Number:  6995009 |

```
================================
Net Proceeds from Sale of Home(s): 0
================================
```

I/We fully understand that it is a Federal crime punishable by fine or imprisonment, or both, to knowingly make any false statements concerning any of the above facts as applicable under the provisions of Title 18, United States Code, Section 1001, et seq.

| Borrower's Signature: | Date | Co-Borrower's Signature: | Date |
|---|---|---|---|
| X | 6/23/04 | X | 23 Jun 04 |

240122 (0311)     rev 05 (01/04) [1224]     Page 4 of 4

WHEAT000326

Co/Sub # ___6002___  
RC # ___0805983___

6940176
WHEATLEY

# Uniform Residential Loan Application

This application is designed to be completed by the applicant(s) with the Lender's assistance. Applicants should complete this form as "Borrower" or "Co-Borrower" as applicable. Co-Borrower information must also be provided (and the appropriate box checked) when ☐ the income or assets of a person other than the "Borrower" (including the Borrower's spouse) will be used as a basis for loan qualification or ☐ the income or assets of the Borrower's spouse will not be used as a basis for loan qualification, but his or her liabilities must be considered because the Borrower resides in a community property state, the security property is located in a community property state, or the borrower is relying on other property located in a community property state as a basis for repayment of the loan.

## I. TYPE OF MORTGAGE AND TERMS OF LOAN

| Mortgage Applied for: | ☐ VA    ☒ Conventional    ☐ Other: ☐ FHA    ☐ USDA/Rural Housing Service | Agency Case Number | Lender Case No. 6940176 |
|---|---|---|---|

| Amount $ 213,330.00 | Interest Rate 6.625 % | No. of Months 360 | Amortization Type: ☒ Fixed Rate ☐ GPM | Other (explain): ☐ ARM (type): |
|---|---|---|---|---|

## II. PROPERTY INFORMATION AND PURPOSE OF LOAN

| Subject Property Address (street, city, state, & zip code)    584 NORTH DUPONT HWY    DOVER, DE 19901 | No. of Units 1 |
|---|---|

| Legal Description of Subject Property (attach description if necessary) | Year Built 1966 |
|---|---|

| Purpose of Loan ☒ Purchase ☐ Construction ☐ Refinance ☐ Construction-Permanent ☐ Home Improvement ☐ Other (explain): | Property will be: ☒ Primary Residence ☐ Secondary Residence ☐ Investment |
|---|---|

Complete this line if construction or construction-permanent loan.

| Year Lot Acquired | Original Cost $ | Amount Existing Liens $ | (a) Present Value of Lot $ | (b) Cost of Improvements $ | Total (a + b) $ |
|---|---|---|---|---|---|

Complete this line if this is a refinance loan.

| Year Acquired | Original Cost $ | Amount Existing Liens $ | Purpose of Refinance | Describe Improvements ☐ made ☐ to be made    Cost: $ |
|---|---|---|---|---|

| Title will be held in what Name(s)    LLOYD J WHEATLEY    AUDRIA L WHEATLEY | Manner in which Title will be held    JT TENANTS W/RT OF SURVIVORSHIP | Estate will be held in: ☒ Fee Simple ☐ Leasehold (show expiration date) |
|---|---|---|

| Source of Down Payment, Settlement Charges and/or Subordinate Financing (explain)    Checking/Savings |
|---|

## III. BORROWER INFORMATION

| | Borrower | Co-Borrower |
|---|---|---|
| Borrower's Name (include Jr. or Sr. if applicable) | LLOYD J WHEATLEY | AUDRIA L WHEATLEY |
| Social Security Number | 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 | 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 |
| Home Phone (incl. area code) | 302-698-9354 | 302-698-9354 |
| DOB (MM/DD/YYYY) | 04/12/1954 | 01/08/1954 |
| Yrs.School | 18 | 14 |

| Borrower | Co-Borrower |
|---|---|
| ☒ Married ☐ Unmarried (include single, divorced, widowed) ☐ Separated | ☒ Married ☐ Unmarried (include single, divorced, widowed) ☐ Separated |
| Dependents (not listed by Co-Borrower) no. 1 ages | Dependents (not listed by Co-Borrower) no. ages |
| Present Address (street, city, state, zip code) ☒ Own ☐ Rent 2 No.Yrs. 2 Mos.    138 KING HENRY COURT    DOVER, DE 19904 | Present Address (street, city, state, zip code) ☒ Own ☐ Rent 2 No.Yrs. 2 Mos.    138 KING HENRY COURT    DOVER DE 19904 |
| Mailing Address, if different from Present Address | Mailing Address, if different from Present Address |

If residing at present address for less than two years, complete the following:

| Former Address (street, city, zip code) ☐ Own ☐ Rent No.Yrs. | Former Address (street, city, zip code) ☐ Own ☐ Rent No.Yrs. |
|---|---|

## IV. EMPLOYMENT INFORMATION

| | Borrower | | Co-Borrower | |
|---|---|---|---|---|
| Name & Address of Employer | LIMOSINE UNLIMITED 138 KING HENRY COURT DOVER DE 19904 | ☐ Self Employed Yrs. on this job 10 yrs 3 mos Yrs. employed in this line of work/profession 10 | Name & Address of Employer | ☐ Self Employed Yrs. on this job Yrs. employed in this line of work/profession |
| Position/Title/Type of Business | OWNER/ | Business Phone (incl. area code) 302-697-0999 | Position/Title/Type of Business | Business Phone (incl. area code) |

If employed in current position for less than two years or if currently employed in more than one position, complete the following:

| Name & Address of Employer | ☐ Self Employed Dates (from - to) Monthly Income $ | Name & Address of Employer U.S. AIR FORCE DOVER DE 19901 | ☐ Self Employed Dates (from - to) 06/84-05/04 Monthly Income $ 2,225.00 |
|---|---|---|---|
| Position/Title/Type of Business | Business Phone (incl. area code) | Position/Title/Type of Business | Business Phone (incl. area code) |

| Name & Address of Employer | ☐ Self Employed Dates (from - to) Monthly Income $ | Name & Address of Employer | ☐ Self Employed Dates (from - to) Monthly Income $ |
|---|---|---|---|
| Position/Title/Type of Business | Business Phone (incl. area code) | Position/Title/Type of Business | Business Phone (incl. area code) |

## V. MONTHLY INCOME AND COMBINED HOUSING EXPENSE INFORMATION

| Gross Monthly Income | Borrower | Co-Borrower | Total | Combined Monthly Housing Expense | Present | Proposed |
|---|---|---|---|---|---|---|
| Base Empl. Income* | $ 18,333.33 | $ | $ 18,333.33 | Rent | $ | |
| Overtime | | | | First Mortgage (P&I) | 1,569.00 | 1,365.98 |
| Bonuses | | | | Other Financing (P&I) | | |
| Commissions | | | | Hazard Insurance | | 45.83 |
| Dividends/Interest | | | | Real Estate Taxes | | 94.92 |
| Net Rental Income | | | | Mortgage Insurance | | |
| Other (before completing, see the notice in "describe other income," below) | | | | Homeowner Assn. Dues | | |
| | | | | Other: | | |
| Total | $ 18,333.33 | $ | $ 18,333.33 | Total | $ 1,569.00 | $ 1,506.73 |

* Self-Employed Borrower(s) may be required to provide additional documentation such as tax returns and financial statements.
(TTL includes Addendum Info. Refer to Page 4)
Describe Other Income  Notice: Alimony, child support, or separate maintenance income need not be revealed if the
Borrower (B) or Co-Borrower (C) does not choose to have it considered for repaying this loan.

| B/C | | Monthly Amount |
|---|---|---|
| | | $ |
| | | |
| | | |

## VI. ASSETS AND LIABILITIES

This Statement and any applicable supporting schedules may be completed jointly by both married and unmarried Co-Borrowers if their assets and liabilities are sufficiently joined so that the Statement can be meaningfully and fairly presented on a combined basis; otherwise separate Statements and Schedules are required. If the Co-Borrower section was completed about a spouse, this Statement and supporting schedules must be completed about that spouse also.

Completed ☐ Jointly ☐ Not Jointly

| ASSETS Description | Cash or Market Value | Liabilities and Pledged Assets. List the creditor's name, address, and account number for all outstanding debts, including automobile loans, revolving charge accounts, real estate loans, alimony, child support, stock pledges, etc. Use continuation sheet, if necessary. Indicate by (*) those liabilities which will be satisfied upon sale of real estate owned or upon refinancing of the subject property. | | Monthly Payt. & Mos. Left to Pay | Unpaid Balance |
|---|---|---|---|---|---|
| Cash deposit toward purchase held by: | $ | LIABILITIES | | $ Payt./Mos. | $ |
| ATTY | 13,333.00 | Name and address of Company | | | |
| List checking and savings accounts below | | WILM TRUST | | | |
| Name and address of Bank, S&L, or Credit Union WACHOVIA BUSINESS | | | | | |
| | 600.00 | | | | |
| | 10,180.00 | Acct. no. 100911125800001 | | 434   56 | 24,174.00 |
| Acct. no. | $ 6,623.00 | Name and address of Company | | $ Payt./Mos. | $ |
| Name and address of Bank, S&L, or Credit Union WACHOVIA | | SUNTRUST | | | |
| 1010007848212 | 12,816.00 | | | | |
| 3000015475371 | 690.00 | Acct. no. 4900004431602012 | | 382   50 | 19,204.00 |
| 101421475811 | 1,125.00 | Name and address of Company | | $ Payt./Mos. | $ |
| Acct. no. 1010008509071 | $ 11,152.00 | WILM TRUST | | | |
| Name and address of Bank, S&L, or Credit Union GIFT | | | | | |
| | | Acct. no. 100987562370001 | | 480   21 | 9,978.00 |
| Acct. no. | $ 9,500.00 | Name and address of Company WILM TRUST | | $ Payt./Mos. | $ |
| Name and address of Bank, S&L, or Credit Union | | | | | |
| | | Acct. no. 100987813020001 | | 638   38 | 24,343.00 |
| Acct. no. | $ | Name and address of Company WILM TRUST | | $ Payt./Mos. | $ |
| Stocks & Bonds (Company name/number & description) | $ | | | | |
| | | Acct. no. 100987776910001 | | 279   36 | 10,179.00 |
| Life insurance net cash value | $ | Name and address of Company | | $ Payt./Mos. | $ |
| Face amount: $ | | | | | |
| Subtotal Liquid Assets | $ 65,919.00 | | | | |
| Real estate owned (enter market value from schedule of real estate owned) | 275,000.00 | Acct. no. | | | |
| Vested interest in retirement fund | 3,803.00 | Name and address of Company | | $ Payt./Mos. | $ |
| Net worth of business(es) owned (attach financial statement) | $ | | | | |
| Automobiles owned (make and year) | $ | | | | |
| | | Acct. no. | | | |
| | | Alimony/Child Support/Separate Maintenance Payments Owed to: | | $ | |
| Other Assets (itemize) | $ | Job Related Expense (child care, union dues, etc.) Negative Cash Flow-Rentals | | $ -1,561.00 | |
| | | Total Monthly Payments | | $ 4,059.00 | |
| Total Assets a. | $ 344,722.00 | Net Worth (a minus b) | $ 1,516.00 | Total Liabilities b. | $ 333,706.00 |

Freddie Mac Form 65/Rev. 01/04 (Amended)
240122 rev06 (01/04) (1222)
Page 2 of 4
Fannie Mae Form 1003/Rev. 01/04 (Amended)
C F 08/13/04
B-241
WHEAT000171

CO/SUB# 6060

## VI. ASSETS AND LIABILITIES (cont.)

Schedule of Real Estate Owned (If additional properties are owned, use continuation sheet.)

| Property Address (enter S if sold, PS if pending sale, or R if rental being held for income) | √ | Type of Property | Present Market Value | Amount of Mortgages & Liens | Gross Rental Income | Mortgage Payments | Insurance, Maintenance Taxes & Misc. | Net Rental Income |
|---|---|---|---|---|---|---|---|---|
| 138 KING HENRY COURT | R | SFR | $ 275,000.00 | $ 232,040.00 | $ | $ 1,561.00 | | -4,561.00 |
| | | | | | | | | |
| | | | | | | | | |
| | Totals | | $ 275,000.00 | $232,040.00 | $ | $1,561.00 | $ | $ -1,561.00 |

List any additional names under which credit has previously been received and indicate appropriate creditor name(s) and account number(s):

| Alternate Name | Creditor Name | Account Number |
|---|---|---|
| | | |

## VII. DETAILS OF TRANSACTION

| | |
|---|---|
| a. Purchase price | $ 266,667.00 |
| b. Alterations, improvements, repairs | |
| c. Land (if acquired separately) | |
| d. Refinance (incl. debts to be paid off) | |
| e. Estimated prepaid items | 2,977.25 |
| f. Estimated closing costs | 8,853.25 |
| g. PMI, MIP, Funding Fee | |
| h. Discount (if Borrower will pay) | |
| i. Total costs (add items a through h) | 278,497.50 |
| j. Subordinate financing | |
| k. Borrower's closing costs paid by Seller | |
| l. Other Credits (explain) | |
|    Cash deposit held by ATTY | 13,333.00 |
|    Lender Credits | 2,133.30 |
| m. Loan amount (exclude PMI, MIP, Funding Fee financed) | 213,330.00 |
| n. PMI, MIP, Funding Fee financed | |
| o. Loan amount (add m & n) | 213,330.00 |
| p. Cash from/to Borrower (subtract j, k, l, & o from i) | 49,701.20 |

## VIII. DECLARATIONS

| | Borrower | | Co-Borrower | |
|---|---|---|---|---|
| If you answer "yes" to any questions a through i, please use continuation sheet for explanation. | Yes | No | Yes | No |
| a. Are there any outstanding judgements against you? | | X | | X |
| b. Have you been declared bankrupt within the past 7 years? | | X | | X |
| c. Have you had property foreclosed upon or given title or deed in lieu thereof in the last 7 years? | | X | | X |
| d. Are you a party to a law suit? | | X | | X |
| e. Have you directly or indirectly been obligated on any loan which resulted in foreclosure, transfer of title in lieu of foreclosure, or judgement? (This would include such loans as home mortgage loans, SBA loans, home improvement loans, educational loans, manufactured (mobile) home loans, any mortgage, financial obligation, bond, or loan guarantee. If "Yes", provide details, including date, name and address of Lender, FHA or VA case number, if any, and reasons for the action.) | | X | | X |
| f. Are you presently delinquent or in default on any Federal debt or any other loan, mortgage, financial obligation, bond, or loan guarantee? If "Yes", give details as described in the preceding question. | | X | | X |
| g. Are you obligated to pay alimony, child support, or separate maintenance? | | X | | X |
| h. Is any part of the down payment borrowed? | | X | | X |
| i. Are you a co-maker or endorser on a note? | | X | | X |
| j. Are you a U.S. citizen? | X | | X | |
| k. Are you a permanent resident alien? | | X | | X |
| l. Do you intend to occupy the property as your primary residence? If "Yes", complete question m below. | X | | X | |
| m. Have you had an ownership interest in a property in the last three years? | X | | X | |
| (1) What type of property did you own–principal residence (PR), second home (SH), or investment property (IP)? | PR | | PR | |
| (2) How did you hold title to the home–solely by yourself, (S), jointly with your spouse (SP), or jointly with another person (O)? | SP | | SP | |

## IX. ACKNOWLEDGEMENT AND AGREEMENT

The undersigned specifically acknowledge(s) and agree(s) that: (1) the loan requested by this application will be secured by a first mortgage or deed of trust on the property described herein; (2) the property will not be used for any illegal or prohibited purpose or use; (3) all statements made in this application are made for the purpose of obtaining the loan indicated herein; (4) occupation of the property will be as indicated above; (5) verification or reverification of any information contained in the application may be made at any time by the Lender, its agents, successors and assigns, either directly or through a credit reporting agency, from any source named in this application, and the original copy of this application will be retained by the Lender, even if the loan is not approved; (6) the Lender, its agents, successors and assigns will rely on the information contained in the application and I/we have a continuing obligation to amend and/or supplement the information provided in this application if any of the material facts which I/we have represented herein should change prior to closing; (7) in the event my/our payments on the loan indicated in this application become delinquent, the Lender, its agents, successors and assigns, may, in addition to all their other rights and remedies, report my/our name(s) and account information to a credit reporting agency; (8) ownership of the loan may be transferred to successor or assign of the Lender without notice to me and/or the administration of the loan account may be transferred to an agent, successor or assign of the Lender with prior notice to me; (9) the Lender, its agents, successors and assigns make no representations or warranties, express or implied, to the Borrower(s) regarding the property, the condition of the property, or the value of the property. Certification: I/We certify that the information provided in this application is true and correct as of the date set forth opposite my/our signature(s) on this application and acknowledge my/our understanding that any intentional or negligent misrepresentation(s) of this information may result in civil liability and/or criminal penalties, including, but not limited to, fine or imprisonment or both under the provisions of Title 18, United States Code, Section 1001, et seq. and liability for monetary damages to the Lender, its agents, successors and assigns, insurers and any other person who may suffer any loss due to reliance upon any misrepresentation which I/we have made on this application.

To help fight the funding of terrorism and money laundering activities, Federal law requires all financial institutions to obtain, verify, and record information that identifies each person who opens an account.

| Borrower's Signature | Date | Co-Borrower's Signature | Date |
|---|---|---|---|
| X | | X | |

## X. INFORMATION FOR GOVERNMENT MONITORING PURPOSES

The following information is requested by the Federal Government for certain types of loans related to a dwelling, in order to monitor the Lender's compliance with equal credit opportunity, fair housing and home mortgage disclosure laws. You are not required to furnish this information, but are encouraged to do so. The law provides that a Lender may not discriminate neither on the basis of this information, nor on whether you choose to furnish it. If you furnish the information, please provide both ethnicity and race. For race, you may check more than one designation. If you do not furnish ethnicity, race, or sex, and you have made this application in person, under Federal regulations, this lender is required to note the information on the basis of visual observation or surname. If you do not wish to furnish the information, please check the box below. (Lender must review the above material to assure that the disclosures satisfy all requirements to which the lender is subject under applicable state law for the particular type of loan applied for.)

| BORROWER ☐ I do not wish to furnish this information | CO-BORROWER ☐ I do not wish to furnish this information |
|---|---|
| Ethnicity: ☐ Hispanic or Latino ☒ Not Hispanic or Latino | Ethnicity: ☐ Hispanic or Latino ☒ Not Hispanic or Latino |
| Race: ☐ American Indian or Alaskan Native ☐ Asian ☒ Black or African American | Race ☐ American Indian or Alaskan Native ☐ Asian ☒ Black or African American |
| ☐ Native Hawaiian or Other Pacific Islander ☐ White | ☐ Native Hawaiian or Other Pacific Islander ☐ White |
| Sex: ☐ Female ☒ Male | Sex: ☒ Female ☐ Male |

| To be Completed by Interviewer | Interviewer's Name (print or type) | Date Application Received | Name and Address of Interviewer's Employer |
|---|---|---|---|
| This application was taken by: | JAMES HOGSTEN | 08/02/04 | WACHOVIA |
| ☒ face-to-face interview | Signature of Interviewer (or Preparer) | | 1200 EAST LANCASTER AVENUE |
| ☐ by mail (delivered) | | | ROSEMONT, PA 19010-9519 |
| ☐ by telephone | Interviewer's Phone Number (incl. area code) | | |
| ☐ Internet | 610-648-1850 | | |

Freddie Mac Form 65/Rev. 01/04 (Amended)
240122 rev06 (01/04) [1223]

Fannie Mae Form 1003/Rev. 01/04 (Amended)
C F 08/13/04

WHEAT000172

**Continuation Sheet/Residential Loan Application**

| Use this continuation sheet if you need more space to complete the Residential Loan Application. Mark B for Borrower or C for Co-Borrower. | | Agency Case Number: |
|---|---|---|
| Borrower | LLOYD J WHEATLEY | |
| Co-Borrower | AUDRIA L WHEATLEY | Lender Case Number: 6940176 |

**Real Estate Loans**

| Company/Lender | Account Number | Balance |
|---|---|---|
| WF HME MRTG | 7080012354247 | 232,040.00 |

**Other Debts**

| Company/Lender | Payment/Months | | Balance |
|---|---|---|---|
| CITIZENS BANK 1012998074 | 285 | 48 | 13,788.00 |

**Schedule of add'l REO's**

| Property Address | Prop Status | Prop Type | Present Mkt Value | Amount of Liens | Gross Rental Income | Mortg Paymts | Tax, Ins Misc | Net Rental Income |
|---|---|---|---|---|---|---|---|---|

GIFT FUNDS $ 9,500.00    RECD FROM    CATHY ANDERSON
RELATIONSHIP TO BORROWER    COUSIN
ADDRESS    301 BUGLE COURT, ODENTON MC    PHONE NO.    301 362-2946

Per California Civil Code 1812.30, the applicant, if married, may apply for separate credit.

I/We fully understand that it is a Federal crime punishable by fine or imprisonment, or both, to knowingly make any false statements concerning any of the above facts as applicable under the provisions of Title 18, United States Code, Section 1001, et seq.

| Borrower's Signature: | Date | Co-Borrower's Signature: | Date |
|---|---|---|---|
| X | | X | |

Freddie Mac Form 65/Rev. 01/04 (Amended)
240122 rev06 (01/04) [1224]

Page 4 of 4

Fannie Mae Form 1003/Rev. 01/04 (Amended)
C F 08/13/04

B-243

WHEAT000173

6940176

# Uniform Residential Loan Application

Lloyd J Wheatley and Audria L Wheatley

This application is designed to be completed by the applicant(s) with the Lender's assistance. Applicants should complete this form as "Borrower" or "Co-Borrower," as applicable. Co-Borrower information must also be provided (and the appropriate box checked) when ☐ the income or assets of a person other than the "Borrower" (including the Borrower's spouse) will be used as a basis for loan qualification or ☐ the income or assets of the Borrower's spouse will not be used as a basis for loan qualification, but his or her liabilities must be considered because the Borrower resides in a community property state, the security property is located in a community property state, or the Borrower is relying on other property located in a community property state as a basis for repayment of the loan.

## I. TYPE OF MORTGAGE AND TERMS OF LOAN

| Mortgage Applied for: | ☐ VA ☒ Conventional ☐ Other: | Agency Case Number | Lender Case Number |
|---|---|---|---|
| | ☐ FHA ☐ FmHA | | 6940176 |

| Amount | Interest Rate | No. of Months | Amortization Type: | ☒ Fixed Rate ☐ GPM | Other (explain): FNSI30FEX ☐ ARM (type): |
|---|---|---|---|---|---|
| $240,000.00 | 6.625% | 360 | | | |

## II. PROPERTY INFORMATION AND PURPOSE OF LOAN

| Subject Property Address (street, city, state, ZIP) | No. of Units |
|---|---|
| 584 North DuPont Hwy Dover DE 19901 | 1 |
| Legal Description of Subject Property (attach description if necessary) | Year Built |
| | 1966 |

| Purpose of Loan | ☒ Purchase ☐ Construction ☐ Home Improvement ☐ Refinance ☐ Construction-Permanent ☐ Other (explain): | Property will be: ☒ Primary Residence ☐ Secondary Residence ☐ Investment |
|---|---|---|

**Complete this line if construction or construction-permanent loan.**

| Year Lot Acquired | Original Cost | Amount Existing Liens | (a) Present Value of Lot | (b) Cost of Improvements | Total (a + b) |
|---|---|---|---|---|---|
| | $ | $ | $ | $ | $ |

**Complete this line if this is a refinance loan.**

| Year Acquired | Original Cost | Amount Existing Liens | Purpose of Refinance | Describe Improvements ☐ made ☐ to be made |
|---|---|---|---|---|
| | $ | $ | | Cost: $ |

| Title will be held in what Name(s) Wheatley, Lloyd J AND Wheatley, Audria L | Manner in which Title will be held | Estate will be held in: |
|---|---|---|
| | JT W/Right of Survivorship | ☒ Fee Simple ☐ Leasehold (show expiration date) |
| Source of Down Payment, Settlement Charges and/or Subordinate Financing (explain) | | |
| Checking/Savings, , | | |

## III. BORROWER INFORMATION

| Borrower | Co-Borrower |
|---|---|

| Borrower's Name (include Jr. or Sr. if applicable) | Co-Borrower's Name (include Jr. or Sr. if applicable) |
|---|---|
| Lloyd J Wheatley | Audria L Wheatley |

| Social Security Number | Home Phone (incl. area code) | DOB | Yrs. School | Social Security Number | Home Phone (incl. area code) | DOB | Yrs. School |
|---|---|---|---|---|---|---|---|
| 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 | (302)698-9354 | 04/12/1954 | 18 | 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 | (302)698-9354 | 01/08/1954 | 14 |

| ☒ Married ☐ Unmarried (include single, divorced, widowed) ☐ Separated | Dependents (not listed by Co-Borrower) no. 1 ages 20 | ☒ Married ☐ Unmarried (include single, divorced, widowed) ☐ Separated | Dependents (not listed by Borrower) no. ages |
|---|---|---|---|

| Present Address (street, city, state, ZIP) ☒ Own ☐ Rent 2y2m No. Yrs. | Present Address (street, city, state, ZIP) ☒ Own ☐ Rent 2y2m No. Yrs. |
|---|---|
| 138 King Henry Court Dover, DE 19904 | 138 King Henry Court Dover, DE 19904 |

| Mailing Address, if different from Present Address | Mailing Address, if different from Present Address |
|---|---|

**If residing at present address for less than two years, complete the following:**

| Former Address (street, city, state, ZIP) ☐ Own ☐ Rent ____ No. Yrs. | Former Address (street, city, state, ZIP) ☐ Own ☐ Rent 1u1 No. Yrs. |
|---|---|

## IV. EMPLOYMENT INFORMATION

| Borrower | Co-Borrower |
|---|---|

| Name & Address of Employer ☐ Self Employed | Yrs. on this job | Name & Address of Employer ☐ Self Employed | Yrs. on this job |
|---|---|---|---|
| Limosine Unlimited 138 King Henry Court Dover, DE 19904 | 10y 3m | Retired | 0y 2m |
| | Yrs. employed in this line of work/profession 10 | | Yrs. employed in this line of work/profession 20 30 |
| Position/Title/Type of Business | Business Phone (incl. area code) | Position/Title/Type of Business | Business Phone (incl. area code) |
| Owner/ | (302)697-0999 | | |

**If employed in current position for less than two years or if currently employed in more than one position, complete the following:**

| Name & Address of Employer ☐ Self Employed | Dates (from - to) | Name & Address of Employer ☐ Self Employed | Dates (from - to) |
|---|---|---|---|
| | | U.S. Air Force Dover, DE 19901 | 06/01/1984 - 05/01/2004 |
| | Monthly Income | | Monthly Income |
| | $ | | $ 2,225.00 |
| Position/Title/Type of Business | Business Phone (incl. area code) | Position/Title/Type of Business | Business Phone (incl. area code) |

| Name & Address of Employer ☐ Self Employed | Dates (from - to) | Name & Address of Employer ☐ Self Employed | Dates (from - to) |
|---|---|---|---|
| | Monthly Income $ | | Monthly Income $ |
| Position/Title/Type of Business | Business Phone (incl. area code) | Position/Title/Type of Business | Business Phone (incl. area code) |

B-244

240122 (0311)    rev 05 (01/04) [1221]    VMP Mortgage Solutions - (800)521-7291

WHEAT000174

Lloyd J Wheatley and Audria L Wheatley

## V. MONTHLY INCOME AND COMBINED HOUSING EXPENSE INFORMATION

| Gross Monthly Income | Borrower | Co-Borrower | Total | Combined Monthly Housing Expense | Present | Proposed |
|---|---|---|---|---|---|---|
| Base Empl. Income* | $ 18,333.33 | $ | $ 18,333.33 | Rent | $ | |
| Overtime | | | | First Mortgage (P&I) | 1,569.00 | 1,536.75 |
| Bonuses | | | | Other Financing (P&I) | | |
| Commissions | | | | Hazard Insurance | | 45.83 |
| Dividends/Interest | | | | Real Estate Taxes | | 94.92 |
| Net Rental Income | | | | Mortgage Insurance | | 104.00 |
| Other (before completing, see the notice in "describe other income," below) | | | | Homeowner Assn. Dues | | |
| | | | | Other: | | |
| Total | $ 18,333.33 | $ | $ 18,333.33 | Total | $ 1,569.00 | $ 1,781.50 |

* Self Employed Borrower(s) may be required to provide additional documentation such as tax returns and financial statements.

| B/C | Describe Other Income    Notice: Alimony, child support, or separate maintenance income need not be revealed if the Borrower (B) or Co-Borrower (C) does not choose to have it considered for repaying this loan. | Monthly Amount |
|---|---|---|
| | | $ |
| | | |
| | | |

## VI. ASSETS AND LIABILITIES

This Statement and any applicable supporting schedules may be completed jointly by both married and unmarried Co-Borrowers if their assets and liabilities are sufficiently joined so that the Statement can be meaningfully and fairly presented on a combined basis; otherwise separate Statements and Schedules are required. If the Co-Borrower section was completed about a spouse, this Statement and supporting schedules must be completed about that spouse also.

Completed  [X] Jointly   [ ] Not Jointly

| ASSETS Description | Cash or Market Value | Liabilities and Pledged Assets. List the creditor's name, address and account number for all outstanding debts, including automobile loans, revolving charge accounts, real estate loans, alimony, child support, stock pledges, etc. Use continuation sheet, if necessary. Indicate by (*) those liabilities which will be satisfied upon sale of real estate owned or upon refinancing of the subject property. | Monthly Pmt. & Mos. Left to Pay | Unpaid Balance |
|---|---|---|---|---|
| Cash deposit toward purchase held by: | $ | LIABILITIES | | |
| | | Name and address of Company | $ Pmt./Mos. | $ |
| List checking and savings accounts below | | WILM TRUST | 480.00 | 9,978.00 |
| Name and address of Bank, S&L, or Credit Union | | | 21 | |
| Wachovia  CKG | | | | |
| | | Acct. no. 100987562370001 | | |
| | | Name and address of Company | $ Pmt./Mos. | $ |
| Acct. no. | $ 2,000.00 | WILM TRUST | 279.00 | 10,179.00 |
| Name and address of Bank, S&L, or Credit Union | | | 36 | |
| Wachovia  MMKT | | | | |
| | | Acct. no. 100987776910001 | | |
| | | Name and address of Company | $ Pmt./Mos. | $ |
| Acct. no. | $ 26,000.00 | CITIZENS BANK | 285.00 | 13,788.00 |
| Name and address of Bank, S&L, or Credit Union | | | 48 | |
| Wachovia Business  CKG | | | | |
| | | Acct. no. 1012998074 | | |
| | | Name and address of Company | $ Pmt./Mos. | $ |
| Acct. no. | $ 14,000.00 | WILM TRUST | 434.00 | 24,174.00 |
| Name and address of Bank, S&L, or Credit Union | | | 56 | |
| Wachovia Business  CKG | | | | |
| | | Acct. no. 100911125800001 | | |
| | | Name and address of Company | $ Pmt./Mos. | $ |
| Acct. no. | $ 15,000.00 | WILM TRUST | 638.00 | 24,343.00 |
| Stocks & Bonds (Company name/number & description) | $ | | 38 | |
| | | Acct. no. 100987813020001 | | |
| | | Name and address of Company | $ Pmt./Mos. | $ |
| Life insurance net cash value | $ | WF HME MRTG | 1,561.00 | 232,040.00 |
| Face amount: $ | | | | |
| Subtotal Liquid Assets | $ 57,000.00 | | | |
| Real estate owned (enter market value from schedule of real estate owned) | $ 275,000.00 | Acct. no. 7080012354247 | | |
| | | Name and address of Company | $ Pmt./Mos. | $ |
| Vested interest in retirement fund | $ 8,000.00 | SUNTRUST | 382.00 | 19,204.00 |
| Net worth of business(es) owned (attach financial statement) | $ | | 50 | |
| Automobiles owned (make and year) | $ | | | |
| | | Acct. no. 4900004431602012 | | |
| | | Alimony/Child Support/Separate Maintenance Payments Owed to: | $ | |
| Other Assets (itemize) | $ | Job Related Expense (child care, union dues, etc.) | $ | |
| | | Total Monthly Payments | $ 4,059.00 | |
| Total Assets a. | $ 340,000.00 | Net Worth (a minus b) ▶ $ 6,294.00 | Total Liabilities b. | $ 333,706.00 |

WHEAT000175

Lloyd J Wheatley and Audria L Wheatley

## VI. ASSETS AND LIABILITIES (cont.)

**Schedule of Real Estate Owned** (If additional properties are owned, use continuation sheet.)

| Property Address (enter S if sold, PS if pending sale or R if rental being held for income) | Type of Property | Present Market Value | Amount of Mortgages & Liens | Gross Rental Income | Mortgage Payments | Insurance, Maintenance, Taxes & Misc. | Net Rental Income |
|---|---|---|---|---|---|---|---|
| 138 King Henry Court Dover DE 19904 | Sin | $ 275,000.00 | $ 232,040.00 | $ | $ 1,561.00 | $ | $ |
| | | | | | | | |
| | | | | | | | |
| Totals | $ | $ 275,000.00 | $ 232,040.00 | $ | $ 1,561.00 | $ | $ |

List any additional names under which credit has previously been received and indicate appropriate creditor name(s) and account number(s):

| Alternate Name | Creditor Name | Account Number |
|---|---|---|
| | | |
| | | |

---

### VII. DETAILS OF TRANSACTION

| | | |
|---|---|---|
| a. | Purchase price | $ 266,667.00 |
| b. | Alterations, improvements, repairs | |
| c. | Land (if acquired separately) | |
| d. | Refinance (incl. debts to be paid off) | |
| e. | Estimated prepaid items | 2,529.01 |
| f. | Estimated closing costs | 9,184.96 |
| g. | PMI, MIP, Funding Fee | |
| h. | Discount (if Borrower will pay) | |
| i. | Total costs (add items a through h) | 278,380.96 |
| j. | Subordinate financing | |
| k. | Borrower's closing costs paid by Seller | |
| l. | Other Credits (explain) Above Par to Borrower | 2,400.00 |
| m. | Loan amount (exclude PMI, MIP, Funding Fee financed) | 240,000.00 |
| n. | PMI, MIP, Funding Fee financed | |
| o. | Loan amount (add m & n) | 240,000.00 |
| p. | Cash from/ to Borrower (subtract j, k, l & o from i) | 35,980.96 |

### VIII. DECLARATIONS

If you answer "Yes" to any questions a through i, please use continuation sheet for explanation.

| | | Borrower | | Co-Borrower | |
|---|---|---|---|---|---|
| | | Yes | No | Yes | No |
| a. | Are there any outstanding judgments against you? | | x | | x |
| b. | Have you been declared bankrupt within the past 7 years? | | x | | x |
| c. | Have you had property foreclosed upon or given title or deed in lieu thereof in the last 7 years? | | x | | x |
| d. | Are you a party to a lawsuit? | | x | | x |
| e. | Have you directly or indirectly been obligated on any loan which resulted in foreclosure, transfer of title in lieu of foreclosure, or judgment? (This would include such loans as home mortgage loans, SBA loans, home improvement loans, educational loans, manufactured (mobile) home loans, any mortgage, financial obligation, bond, or loan guarantee. If "Yes," provide details, including date, name and address of Lender, FHA or VA case number, if any, and reasons for the action.) | | x | | x |
| f. | Are you presently delinquent or in default on any Federal debt or any other loan, mortgage, financial obligation, bond, or loan guarantee? If "Yes," give details as described in the preceding question. | | x | | x |
| g. | Are you obligated to pay alimony, child support, or separate maintenance? | | x | | x |
| h. | Is any part of the down payment borrowed? | | x | | x |
| i. | Are you a co-maker or endorser on a note? | | x | | x |
| j. | Are you a U.S. citizen? | x | | x | |
| k. | Are you a permanent resident alien? | | x | | x |
| l. | Do you intend to occupy the property as your primary residence? If "Yes," complete question m below. | x | | x | |
| m. | Have you had an ownership interest in a property in the last three years? | x | | x | |
| | (1) What type of property did you own - principal residence (PR), second home (SH), or investment property (IP)? | PR | | PR | |
| | (2) How did you hold title to the home - solely by yourself (S), jointly with your spouse (SP), or jointly with another person (O)? | SP | | SP | |

### IX. ACKNOWLEDGEMENT AND AGREEMENT

The undersigned specifically acknowledge(s) and agree(s) that: (1) the loan requested by this application will be secured by a first mortgage or deed of trust on the property described herein; (2) the property will not be used for any illegal or prohibited purpose or use; (3) all statements made in this application are made for the purpose of obtaining the loan indicated herein; (4) occupation of the property will be as indicated above; (5) verification or reverification of any information contained in the application may be made at any time by the Lender, its agents, successors and assigns, either directly or through a credit reporting agency, from any source named in this application, and the original copy of this application will be retained by the Lender, even if the loan is not approved; (6) the Lender, its agents, successors and assigns will rely on the information contained in the application and I/we have a continuing obligation to amend and/or supplement the information provided in this application if any of the material facts which I/we have represented herein should change prior to closing; (7) in the event my/our payments on the loan indicated in this application become delinquent, the Lender, its agents, successors and assigns, may, in addition to all their other rights and remedies, report my/our name(s) and account information to a credit reporting agency; (8) ownership of the loan may be transferred to successor or assign of the Lender without notice to me; (9) the Lender, its agents, successors and assigns make no representations or warranties, express or implied, to the Borrower(s) regarding the property, the condition of the property, or the value of the property.

Certification: I/We certify that the information provided in this application is true and correct as of the date set forth opposite my/our signature(s) on this application and acknowledge my/our understanding that any intentional or negligent misrepresentation(s) of the information contained in this application may result in civil liability and/or criminal penalties including, but not limited to, fine or imprisonment or both under the provisions of Title 18, United States Code, Section 1001, et seq. and liability for monetary damages to the Lender, its agents, successors and assigns, insurers and any other person who may suffer any loss due to reliance upon any misrepresentation which I/we have made on this application.
TO HELP FIGHT THE FUNDING OF TERRORISM AND MONEY LAUNDERING ACTIVITIES, FEDERAL LAW REQUIRES ALL FINANCIAL INSTITUTIONS TO OBTAIN, VERIFY AND RECORD INFORMATION THAT IDENTIFIES EACH PERSON WHO OPENS AN ACCOUNT.

| Borrower's Signature | Date | Co-Borrower's Signature | Date |
|---|---|---|---|
| | 3 Aug 04 | | 3 Aug 04 |

### X. INFORMATION FOR GOVERNMENT MONITORING PURPOSES

The following information is requested by the Federal Government for certain types of loans related to a dwelling in order to monitor the lender's compliance with equal credit opportunity, fair housing and home mortgage disclosure laws. You are not required to furnish this information, but are encouraged to do so. The law provides that a lender may discriminate neither on the basis of this information, nor on whether you choose to furnish it. If you furnish the information, please provide both ethnicity and race. For race, you may check more than one designation. If you do not furnish ethnicity, race, or sex, and you have made this application in person, under Federal regulations, this lender is required to note the information on the basis of visual observation or surname. If you do not wish to furnish the information, please check the box below. (Lender must review the above material to assure that the disclosures satisfy all requirements to which the lender is subject under applicable state law for the particular type of loan applied for.)

| BORROWER | | | CO-BORROWER | | |
|---|---|---|---|---|---|
| ☐ I do not wish to furnish this information. | | | ☐ I do not wish to furnish this information. | | |
| Ethnicity: | ☐ Hispanic or Latino | ☒ Not Hispanic or Latino | Ethnicity: | ☐ Hispanic or Latino | ☒ Not Hispanic or Latino |
| Race: | ☐ American Indian or Alaska Native | ☐ Asian | ☒ Black or African American | Race: | ☐ American Indian or Alaska Native | ☐ Asian | ☒ Black or African American |
| | ☐ Native Hawaiian or Other Pacific Islander | ☐ White | | ☐ Native Hawaiian or Other Pacific Islander | ☐ White |
| Sex: | ☐ Female | ☒ Male | Sex: | ☒ Female | ☐ Male |

| To be Completed by Interviewer | Interviewer's Name (print or type) | Date Application Received | Name and Address of Interviewer's Employer |
|---|---|---|---|
| This application was taken by: | J.D. Hogsten | 08/02/2004 | Wachovia Mortgage Corporation |
| ☒ face-to-face interview | Signature of Interviewer (or Preparer) | | 101 W. Loockerman Street |
| ☐ by mail | Interviewer's Phone Number (incl. area code) | | Dover, DE 19904 |
| ☐ by telephone | (302) 730-5482 | | |

240122 (0311)   rev 05 (01/04) [1223]   Page 3 of 4

WHEAT000176

6940176

| Continuation Sheet/Residential Loan Application | | Lloyd J Wheatley and Audria L Wheatley | |
|---|---|---|---|
| Use this continuation sheet if you need more space to complete the Residential Loan Application. Mark B for Borrower or C for Co-Borrower. | Borrower: Lloyd J Wheatley | Agency Case Number: | |
| | Co-Borrower: Audria L Wheatley | Lender Case Number: 6940176 | |

```
===================================
Net Proceeds from Sale of Home(s): 0
===================================
```

I/We fully understand that it is a Federal crime punishable by fine or imprisonment, or both, to knowingly make any false statements concerning any of the above facts as applicable under the provisions of Title 18, United States Code, Section 1001, et seq.

| Borrower's Signature: | Date | Co-Borrower's Signature: | Date |
|---|---|---|---|
| X | 3 Aug 04 | X | 3 Aug 04 |

240422 (0311)    Rev 05 (01/04) [1224]    Page 4 of 4    B-247

WHEAT000177

**CERTIFICATE OF SERVICE**

I, Michael J. Barrie, certify that the forgoing Appendix of Exhibits to the

Answering Brief of Defendants Wachovia Mortgage Corporation and Wachovia

Corporation in Opposition to Plaintiffs' Motion to Compel Discovery has been

electronically filed and is available to be viewed and downloaded on the Court's ECF

website.  I further certify that I have served a copy of the Appendix upon the following

by overnight mail:

> John S. Grady, Esquire
> Grady & Hampton, LLC
> 6 North Bradford Street
> Dover, DE 19904

/s/ Michael J. Barrie

December 21, 2007