# IN THE UNITED STATES DISTRICT COURT

# FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| TOLANO ANDERSON, et al., | ) | |
| | ) | |
| Plaintiffs, | ) | C. A. No. 06 CV 00567 (SLR) |
| | ) | |
| v. | ) | |
| | ) | <u>JURY TRIAL DEMANDED</u> |
| WACHOVIA MORTGAGE CORPORATION | ) | |
| and WACHOVIA CORPORATION, | ) | |
| | ) | |
| Defendants. | ) | |

## <u>SECOND AMENDED COMPLAINT</u>

1.      Plaintiffs are all African Americans.

2.      At all times pertinent and for several years previous, Plaintiffs Tolano Anderson, Cathy Anderson, Lloyd Wheatley, and Audria Wheatley all had bank accounts at Wachovia Bank.

3.      Prior to June 2004, Plaintiffs Tolano Anderson,(hereafter referred to as Anderson) Cathy Anderson, Lloyd Wheatley (hereafter referred to as Wheatley), and Audria Wheatley  between them had approximately eight (8) mortgages at Wachovia Bank.  The previous mortgages were all in predominantly minority or racially-mixed neighborhoods.

4.      On or about June 2004, Plaintiff Tolano Anderson contacted J. D. Hogsten, (hereafter referred to as Hogsten) a loan officer for Defendants Wachovia, and told him that the Andersons, Wilkins, and Wheatleys planned to purchase three (3) homes located on Silver Lake whose addresses are 580 North DuPont Highway, 584 North Dupont Highway, 592 North DuPont Highway from Mr. Jack Aigner.  The homes in question

were all adjacent to each other and were all in a white neighborhood in Dover, Delaware. The homes backed up to Silver Lake in Dover, Delaware.

5.    The Andersons and the Wheatleys intended to use their purchased homes as a primary residence; the Wilkins intended to use their purchased home as a secondary residence.

6.    The homes had not been regularly occupied and all needed some repairs. None of the homes appeared to be significantly different in the respective need for repairs.

6. 7.    Anderson explained to Hogsten that all three (3) homes had to be purchased. And that if one home was not purchased, all of them would collectively lose the $40,000.00 non refundable deposit, of which each had put in $13,333.33. The seller was planning to use the funds from the proceeds to invest in a 1031 exchange and for this reason it was important for him that all three properties be sold at the same time.

7. 8.    With that in mind, Hogsten advised Anderson how to proceed with the purchases and assured him that the bank understood that the sale was an individual sale, although the Andersons, Wilkins, and Wheatleys would all take title separately to three (3) different properties.

8. 9.    Shortly thereafter, Anderson contacted Hogsten to discuss further financial plans, however, Hogsten was unavailable. So, Anderson spoke to Ms. Deanne Wilks and asked that she give the information to Hogsten.

9. 10.    Wachovia Corporation is a large institutional bank which provides, among other things, mortgage services to its customers and to its applicants. The Andersons and

Wheatleys were ongoing customers of the bank. Wachovia Mortgage Corporation is a subsidiary of Wachovia Corporation.

~~10.~~ 11.    Anderson explained to Hogsten that throughout the transaction he would be the key person to receive all the information for the Andersons, Wilkins, and Wheatleys.

~~11.~~ 12.    After the agreement of sale was signed and a deposit was put down, Hogsten advised Anderson that an appraisal will be needed for all the properties.

~~12.~~ 13.    Shortly thereafter, Anderson met with an appraiser assigned to appraise his home sent by Hogsten.

~~13.~~ 14.    At the time, it appeared to Anderson that Hogsten and the appraiser appeared to know each other well. In fact, after the meeting the appraiser and Hogsten went out to lunch.

~~14.~~ 15.    Almost immediately upon meeting with the appraiser, Anderson was told by the appraiser that he could not appraise the house because there was some damage to the basement.

~~15.~~ 16.    Upon information of belief, the appraiser at that time refused to appraise the house upon the request of Hogsten, who had his own undisclosed reasons for undermining the aforesaid purchase.

~~16.~~ 17.    Hogsten then told Anderson that it would be impossible to have an appraisal because it was impossible to find comparable homes and, as a result, the bank would not be able to make the loan.

~~17.~~ 18.    Upon information of belief, Hogsten's comment that it was impossible to find other comparables was, in fact, a ruse and a second attempt to undermine the transaction of the Plaintiffs.

19.    The underwriter, Ms. Fazzino, who was responsible for the determination of whether any repairs were made, did not require any repairs to be made for the Anderson property.

~~18.~~ 20.    Anderson thereafter contacted Carl Kaplin, another appraiser, who advised him that there were other comparables and, in approximately ten (10) minutes time, faxed him several other comparable homes.

~~19.~~ 21.    Thereafter, Anderson advised J. D. Hogsten that there were comparables.

~~20.~~ 22.    ~~Thereafter, Anderson asked Hogsten for another impartial appraiser for his property.~~ Hogsten then required Anderson to make repairs on 580 N. Dupont Highway, even though Hogsten knew Anderson may not be able to make the repairs because he did not own the property.  Furthermore, Hogsten was aware that even if Anderson made the repairs, the mortgage might still not be approved.

23.    Anderson received a commitment on July 14, 2004.  The loan was subject to an appraisal supporting a value of $266,000.00.

~~21.~~ 24.    Another independent appraiser did come out to appraise the property adjacent to DuPont Highway for $267,000 which was the purchase price.  That approval was not completed until August 4, 2004.

~~22.    Shortly thereafter, a commitment letter was provided to Wilkins and Anderson.~~

~~23.~~ 25.     Hogsten had advised Anderson that he was not going to make enough money on this transaction because Anderson had contacted to Deanne Wilks on one occasion and because of that contact with Anderson, he had to split his commission with her.

~~24.~~ 26.     Upon information of belief, Hogsten had no intention of permitting the transaction to be completed, ~~knowing at the time~~ not caring that it would cost Plaintiffs $40,000 in the loss of the deposit.

~~25.~~ 27.     ~~After the appraisals were approved,~~ Hogsten told Anderson that in order for the sale to be completed, he would require Anderson's home to be put into "move in" condition, ~~even though it had been appraised for a total purchase price in the condition that it was in~~ and would have to make repairs to the home to Hogsten's satisfaction, even though this was not a requirement of the underwriter.

~~26.~~ 28.     On or about July 2, 2004, Dr. and Mrs. Wilkins met with Hogsten in his Wachovia office.  In the conversation, Hogsten informed the couple that the home being purchased by the Andersons was "nothing more than a pile of sticks and bricks and he could assign no value to it at all".

~~27.~~ 29.     The statement by Hogsten was further evidence of his seeking to undermine the entire transaction.

~~28.~~ 30.     Shortly thereafter, Hogsten informed Anderson that the property had significant value as a potential commercial property.  Hogsten asked Anderson if he would change the transaction from residential to commercial and Anderson said he did not wish to do so.

~~29.~~ 31.    ~~Shortly thereafter,~~ The Wilkins home appraisal was completed on July 13, 2004.  The home appraised at ~~a value exceeding the sales price~~ $267,000.00.

~~30.        After Mr. Hogsten informed Dr. Wilkins that he was now required to prove that the funds used for the deposit was his money and show its source.~~

~~31.        This is not normal customary practice of the bank.~~

32. On or about July 23, 2004, Hogsten informed Dr. Wilkins that he was required to provide documentation proving that his deposit on the home was his own money.  This ~~again,~~ is not customary procedure of the bank.

33.    The Anderson property was not finally appraised until August 2, 2004. The appraisal value was $267,000.00.

~~33.~~ 34.    On or about July 23, 2004, Hogsten informed Anderson that the purchase of his property could not go through.  He said that there was not enough value in the property.  At that time, Anderson advised Mr. Hogsten that the required work was nearly complete and was ready for an impartial appraiser's assessment.  On that same day, Hogsten made additional negative comments about the pending transactions to Mr. & Mrs. Anthony Wallace, who were there at the bank on another matter.

~~34.    After the second appraisal for the Anderson property was completed, the appraisal value was still the same as the sales price.~~

35. On or about July 7, 2004, the ~~appraisal for the~~ Wheatley property ~~was completed~~ appraised for $267,000.00.  ~~The value of the appraisal exceeded the sales price.~~

36. Despite the fact that the Wheatley property appraised above the sales price, Hogsten informed Wheatley that he was now required to complete upgrades on the property to ensure that everything was in move in condition prior to settlement.

37. Wheatley explained that as a buyer he did not want to waste thousands of dollars upgrading the house prior to settlement because he is planning custom upgrades after the settlement. He also explained that he did not have access to the home and was not able to complete upgrades to sell his house prior to settlement. Despite the request by Wheatley, Hogsten refused to lift the bank's requirement.

38. This was another attempt by Hogsten to undermine the sale of the properties.

39. In order to assist Wheatley, Anderson intervened in the matter.

40. Anderson questioned Hogsten about the bank's policy concerning appraisals, repairs, warranties, and such matters. Hogsten refused to answer his questions. Hogsten referred Anderson to a female loan officer to answer his question about the bank's policy.

41. Anderson contacted the loan officer who told him that the bank's policies on issues of appraisals, repairs and warranties are confidential and are not available to the public. She said that the criteria used by Wachovia in such matters are for internal office use only and she could not discuss the matter.

42. Wheatley thereafter requested of the owner access to the house so that upgrades demanded by the bank could be completed. The owner agreed.

43. Wheatley then informed Hogsten that the required work had been completed.

44. ~~Hogsten sent~~ The appraiser <u>came</u> back to the house to conduct another ~~appraisal~~ <u>inspection on August 4, 2004. He wrote that the property was in average overall condition.</u> ~~Once again, the appraisal said that the house was valued in excess of the sales price~~. <u>He verbally told Wheatley that the house was in excellent condition.</u>

45. All three (3) homes were finally scheduled for settlement on or about August <u>6</u>, 2004.

46. The Anderson and Wilkins settlements were completed. However, the Wheatley documents were not forwarded to the closing attorney by Wachovia.

47. Even though the settlements of Anderson and Wilkins had been completed, Anderson and Wilkins were concerned because, unless the third property was settled, as per the agreement of sale, Plaintiffs could still lose the nonrefundable deposit of $40,000 and their original plan of owning and controlling the three properties would be threatened.

48. When Anderson learned that the settlement papers had not been sent to the office of the closing attorney, he immediately contacted Hogsten and was informed that Wachovia ~~could~~ would not send the closing papers because it needed a letter from a certified contractor saying that the roof on the Wheatley home did not have any leaks. This was another attempt to undermine the transactions.

49. Anderson reminded Hogsten that if all three (3) properties did not settle that day, all the sales would be voided and they would lose over $40,000 in nonrefundable deposits. Hogsten did not care.

50. Anderson informed Hogsten that this new requirement about the certified letter from the contractor was unacceptable.

51. Mr. Hogsten then stated that without the letter there would be no settlement and that it appeared the whole deal was off.

52. The Seller, angered by the banks' actions, made a phone call to arrange for his personal contractor to fax a letter per Hogsten's request.

53. When Anderson informed Hogsten that the letter was in route, Hogsten stated that the bank also wanted an additional fifteen percent (15%) down payment from Wheatley

before it would be sending the closing documents.  This was another attempt by Hogsten to undermine the transactions.

54. Anderson told Hogsten that this was an unexpected surprise and Wheatley was not prepared for the change.

55. Hogsten suggested that the Seller reduce the sale price. The Seller declined.

56. Hogsten then said that Wheatley would have to come up with the twenty percent (20%) of the purchase or the deal was off.  This transaction all took place at the settlement office of the attorney

57. ~~At that point,~~ The Seller, in view of what he perceived as improper conduct by the bank, agreed not to void the entire transactions because he felt that the bank's actions were unreasonable.

58. At that point, the Plaintiffs ~~nevertheless,~~ were still concerned that they would still be subject to a $40,000 loss of their deposit, if all three (3) transactions did not go forward.

59. Thereafter, Wheatley did obtain the twenty percent (20%) down payment from ~~joint~~ his own accounts.  By doing so, he was informed by Hogsten that if ~~they pay~~ he paid the twenty percent (20%) from his business accounts ~~they~~ he would not have enough cash ~~resolve~~ reserve to qualify for the loan.  This was another attempt by Hogsten to undermine the transactions.

60. ~~The settlement date was scheduled for Wheatley was cancelled by Wachovia.~~

61. 60.     On August 12, 2004, Destefano informed Wheatley that Wachovia was unable to obtain the PMI for his home and that the only way around that situation was to pay twenty percent (20%) down and eliminate the PMI requirement.

62. 61.     Anderson ~~contacted without any success~~ tried to contact a Mr. Skowronski and Mr. Destefano from Wachovia about the reasons for denying the PMI.

63. 62.     Settlement was now scheduled for August 13, 2004, on the Wheatley home.

64. 63.     Wachovia now stated that a twenty percent (20%) down payment was required~~; however,~~. At this time, Hogsten was on vacation at the Outer Banks.

65. 64.     Mr. Aigner, the Seller, called Mr. Destefano at Wachovia and informed him that he was aware of the bank's inappropriate conduct and that the scheduled settlement was being sabotaged.  Mr. Skowronski intervened and approved the release of the loan documents and the settlement was finally completed on August 13, 2004.

66. 65.     Upon information of belief, the numerous requests for appraisals, house improvements, and changes in developments, and other last-minute requirements imposed upon the Andersons and the Wheatleys were a violation of internal rules and regulations of the Defendants.

67. 66.     Similarly situated whites were not required to meet all the requirements imposed upon the Plaintiffs to be eligible for a mortgage.

68. 67.     A week or two before the August 6, 2004, settlement, Hogsten told Wheatley that he would be watched.  During the week of August 16, 2004, Hogsten contacted Anderson and told he had better be careful because the Bank would be

watching him.   Anderson interpreted this as a veiled threat by the Bank that the Andersons would be subject to an unusually high degree of scrutiny.

## COUNT ONE

### The Andersons

~~69.~~ 68.    Plaintiff Anderson incorporates by reference, paragraphs 1 through ~~68~~ 67.

69.    The Andersons paid a fee at the time of their application for their mortgage on June 24, 2004, which represents a contract between Wachovia Mortgage Corporation and the Andersons that Wachovia would process their mortgage in a fair and non-discriminatory manner.

70.    Requirements made upon all the Plaintiffs in the mortgage application process to complete the settlement were designed to discourage and undermine the settlement and stop the purchase of the aforesaid homes, and interfere with the agreement of sale between the ~~Andersons~~ Plaintiffs and the Sellers.

71.    In similar situations, whites are not required to go through all of the appraisals, home improvements, and financial requirements imposed upon the Andersons in connection with their mortgage application.

72.    The conduct of the bank violated 42 U.S.C. §1981 which prohibits racial discrimination in the terms and conditions of a contract.

73.    J.D. Hogsten created unreasonable repair obligations on the Andersons in connection with their mortgage application.

~~73.~~ 74.    The conduct of the Defendants constituted a tortious interference with the contractual rights and business opportunities of the Andersons with the Seller.

74. 75.    The conduct of the Defendants constituted a breach of contract ~~for a~~ of the mortgage application and the covenant of good faith and fair dealing in the contract to provide financing.

75. 76.    ~~The conduct of the Defendants constituted a violation of Plaintiff's rights pursuant to 15 U.S.C. §1691 and 12 C.F.R. Part 202 in that Defendants was discriminating against Plaintiffs.~~

76. 77.    As a result of the Defendants' conduct, the Andersons suffered the following damage.

    a. The humiliation, inconvenience and aggravation throughout the transactions.

    b. The cost of approximately $15,000.00 plus numerous man hours to refinish their home in a manner which   they would not have done except for the unreasonable requirement of ~~the Bank even after the home had already been appraised for the value of the property~~ Hogsten.

WHEREFORE, the Andersons request compensation for the following cause of actions:

1.    42 U.S.C. §1981:    Breach of 42 U.S.C. §1981, which requires Defendants to process the mortgage application in a non-discriminatory manner. Humiliation, inconvenience, and aggravation throughout the transactions, the costs of approximately $15,000.00, plus numerous man hours to refinish the home in a manner which they would not have done except for the unreasonable requirements of the bank even after the home had already been appraised for the value of the property plus attorney's fees and punitive damages and costs.

2.    Tortious interference with contractual rights and business opportunities, the costs of approximately $15,000.00, plus the value of numerous man hours to refinish the home in a manner which they would not have done except for the unreasonable requirement of the bank even after the home had already been appraised for the value of the property and punitive damages and costs.

3.    Breach ~~of contract for a mortgage~~ of the mortgage application contract and the covenant of good faith and fair dealings, the costs of approximately $15,000.00 plus the value of numerous man hours to refinish the home in a manner which they would not have done except for the unreasonable requirement of the bank even after the home had already been appraised for the value of the property and punitive damages and costs.

~~4.    Rights pursuant to 15 U.S.C. §1691:   The costs of approximately $15,000.00 plus the value of numerous man hours to refinish the home in a manner which they would not have done except for the unreasonable requirement of the bank even after the home had already been appraised for the value of the property plus the statutory compensation of $10,000.00 pursuant to 15 U.S.C. §1691e(d) and attorney's fees and costs.~~

## COUNT TWO

### The Wheatleys

~~77.~~ 78.    Plaintiffs Wheatley incorporate by reference paragraphs 1 through ~~68~~ 67.

~~78.~~ 79.    The requirement of the refurbishing of the home and the additional down payment put a strain on the Wheatley's other business transactions which Hogsten was aware of.  After six (6) months, the Wheatleys were forced to sell the property which cost them approximately $3,500.00 in transfer taxes.

80.     The Wheatleys paid a fee in June 2004 for an application for the mortgage which represents a contract between Wachovia Mortgage Corporation and the Wheatleys to process their mortgage application in a fair and non-discriminatory manner.

81.     The Wheatleys' property was appraised on July 7, 2004, for $266,000.00. The appraiser commented that the property needed repairs and that it was in fair to average overall state of repair.  The appraisal considered the property "as is".

82.     Wheatley did make repairs to the property as required by J.D. Hogsten, (Hogsten generally communicated with Anderson as to what repairs were needed and Anderson told Hogsten what had to be done) despite the fact that the property appraised for the full value.

83.     Despite the fact that the home appraised for the full value and the Wheatleys had good credit with Wachovia, Defendant denied the Wheatleys' mortgage application on July 17, 2004.  Notwithstanding the denial of the application, Wheatley continued to work with Hogsten to find other ways to obtain the financing.

84.     On or before August 4, the appraiser met with Hogsten and told him the home was in excellent condition.

85.     After being turned down once for their mortgage, the Wheatleys re-applied for another mortgage on August 3, 2004, and paid another fee, creating another contract with Wachovia Mortgage Corporation.  This contract also required Wachovia Mortgage Corporation to treat them fairly and in a non-discriminatory manner.

86.     From his communication with the Defendants, Wheatley thought he would be going to settlement on August 6, 2004.

87.     At the August 6 settlement, Wheatley learned for the first time that Wachovia was requesting a report from a roofer that the roof was in good repair.

88.     Wachovia would not proceed to settlement on August 6, 2004, with Wheatley.

89.     On or about August 4, 2004, the appraiser for the Wheatley property submitted a written reporting indicating that the property was in good condition. Despite this report, Wachovia Mortgage refused to consider Wheatley for a standard loan and requiring only a 10% down payment.

90.     Subsequently, Wachovia reprocessed the Wheatley loan from a standard loan to an exception loan.

91.     On or about August 12, 2004, the day before the settlement, Wachovia told Wheatley that he would be required to put down a 20% down payment, which Wheatley ultimately did; however, the added down payment caused a hardship on him and his business.

92.     J.D. Hogsten was aware throughout that if either the Wheatleys or Andersons' mortgage were to be denied it would also jeopardize the Wilkins transaction.

~~79.~~ 93.     ~~The Wheatley's did meet the home improvement requirements and spent approximately $50,000.00~~ $11,000.00, ~~which they could not afford and which they did not intend to do, to improve their house and which they would not have otherwise spent.~~

~~80.~~ 94.     Because of all the unanticipated funds Wheatley had to put into the house, he did not have those funds available for ~~his business~~ other purposes. ~~Wheatley estimates that he lost another $50,000.00 in his business because of the unreasonable requirements of the bank.~~

81. 95.    The conduct of the bank violated 42 U.S.C. §1981 which prohibits racial discrimination in the terms and conditions of a contract.  The Wheatleys, when they paid their application fees, were entitled to be treated fairly and in a non-discriminatory manner.

82. 96.    The conduct of the Defendants constituted a tortious interference with the contractual rights and business opportunities of the Wheatleys with the Seller.

83. 97.    The conduct of the Defendants constituted a breach of the contract for a the mortgage applications and the covenant of good faith and fair dealing in the contract to provide financing.

84.    The conduct of the Defendants constituted a violation of Wheatley's rights pursuant to 15 U.S.C. §1691 and 12 C.F.R. Part 202 in that Defendants [was] were discriminating against the Wheatleys.

WHEREFORE, the Wheatleys request this Court award them compensation for the following cause of actions:

1.    42 U.S.C. §1981:    Breach of 42 U.S.C. § 1981, which requires Wachovia to process the mortgage applications in a non-discriminatory manner. Humiliation, inconvenience, and aggravation throughout the transactions.  The cost for making repairs, which were not needed and should not have been required by the appraisal, in the amount of $50,000 approximately $11,000 plus the additional cost of prematurely selling their property which cost them $3,500.00, plus at least $50,000.00 in loss of business opportunities, plus the loss of the increase in value of their home had they been able to keep it, plus the loss of the use of approximately $40,000.00 which was required as a down payment, plus punitive damages and attorney's fees and costs.

2.      Tortious interference with contractual rights and business opportunities. The cost for making repairs which were not needed and should not have been required by the appraisal in the amount of ~~$50,000~~ approximately $11,000.00, plus the additional cost of prematurely selling their property which cost them $3,500.00, ~~plus at least $50,000.00 in loss of business opportunities~~, plus the loss of the increase in value of their home had they been able to keep it, plus the loss of the use of approximately $40,000.00 which was required as a down payment, plus the loss of the additional funds used as a down payment, plus punitive damages and costs.

3.      Breach of ~~contract for a mortgage~~ the mortgage application contract and the covenant of good faith and fair dealings, plus the cost for making repairs which were not needed and should not have been required by the appraisal in the amount of ~~$50,000~~ approximately $11,000.00, plus the additional cost of prematurely selling their property which cost them $3,500.00, ~~plus at least $50,000.00 in loss of business opportunities~~, plus the loss of the increase in value of their home had they been able to keep it, plus the loss of the additional funds which were required as a down payment, plus the loss of the use of approximately $40,000.00 which was required as a down payment, plus punitive damages and costs.

4.      ~~Rights pursuant to 15 U.S.C. §1691: The cost for making repairs which were not needed and should not have been required by the appraisal in the amount of $50,000 plus the additional cost of prematurely selling their property which cost them $3,500.00, plus at least $50,000.00 in loss of business opportunities, plus the loss of the increase in value of their home had they been able to keep it, plus the loss of the use of approximately $40,000.00 which was required as a down payment, plus punitive~~

~~damages, plus the statutory compensation of $10,000.00 pursuant to 15 U.S.C. §1691e(d)~~ ~~and attorney's fees and costs.~~

## COUNT THREE

### The Wilkins

~~85.~~ 98.     Plaintiffs Richard Wilkins and Brenda Wilkins incorporate by reference, paragraphs 1 through ~~68~~ 67.

~~86.~~ 99.     The Wilkins entered into an agreement of sale for the purchase of ~~three (3)~~ ~~homes with their friends,~~ 592 N. Dupont Highway in June 2004.  At approximately the same time, the Andersons and the Wheatleys, ~~in order to own waterfront property on~~ ~~Silver Lake,~~ entered into an agreement of sale for the adjacent properties at 580 and 584 North Dupont Highway.  The purchase contracts were with Mr. Aigner.  There was an agreement that all three properties had to go to settlement or the deal would be called off.

~~87.~~ 100.     The transaction was a joint effort depending upon all three individuals obtaining mortgage approval for the purchase of these properties.

101.     On or about July 2, 2004, the Wilkins met with Hogsten to obtain financing for 584 N. Dupont Highway.  At that time, Hogsten dealt with them in a condescending and unprofessional manner.  Hogsten referred to the Anderson property as "sticks and brick".  This was meant to convey Hogsten's opinion that the Anderson property was in very poor condition.

102.     The Wilkins paid an application fee.  The Wilkins were entitled to be treated fairly and in a non-discriminatory manner in connection with their mortgage application.

103.    The Wilkins property was not significantly different than the Anderson property and/or Wheatley property.

104.    Comparing the treatment the Wilkins received from the lending institution, the Wilkins could only assign their race as a factor for such unprofessional conduct.

~~88.~~ 105.    Upon the signing of the original contract, the Wilkins were confident that all three would be able to obtain financing from a reasonable lender.

106.    The conduct toward and treatment of the Andersons and the Wheatleys up until August 13, 2004, jeopardized the Wilkins' deposit and purchase of their home.

~~89.~~ 107.    During the years 2004 and 2007, the Wilkins were required to return to Delaware to try to resolve issues created by the way Wachovia treated Anderson and Wheatley.  They incurred total expenses of approximately $12,868.00.

~~90.~~ 108.    Furthermore, within a period of 6 months' time after the Wheatley settlement, because Wheatley was unable to continue to run his business and maintain his mortgage payments (because his funds had been significantly depleted by the requirements of the bank), the Wilkins purchased the Wheatley home, which cost them approximately ~~$36,000.00~~ $28,010.00 in out-of-pocket funds, some for transfer taxes, attorney's fees, and some for a necessary down payment.  Had the Wilkins not been treated the way they had been and had the Wilkins been permitted to have a smaller down payment, the Wheatleys could have kept their home and the Wilkins would not have felt required to purchase the Wheatley home.  The Wilkins were also concerned that if another individual purchased the Wheatley home ~~the property might have been used for commercial purposes, thereby devaluing the Wilkins' home and the Andersons' home~~

they would lose the opportunity to use and enjoy their combined waterfront properties as originally intended.

~~91.~~ 109.    They also experienced aggravation, inconvenience and humiliation in dealing with Wachovia Bank.

~~92.~~ 110.    The conduct of the bank violated 42 U.S.C. §1981 which prohibits racial discrimination in the terms and conditions of a contract.

111.    The Wilkins were informed by Anderson of the problems Anderson and Wheatley were having with Wachovia.

112.    The Wilkins were aware that if the Wheatleys or Andersons were not able to purchase their properties, that would jeopardize their purchase of 592 N. Dupont Highway and their down payment of $13,333.00.

~~93.~~ 113.    The conduct of the Defendants constituted a tortious interference with the contractual rights and business opportunities of the Wilkins with the Seller.

~~94.~~ 114.    The conduct of the Defendants constituted a breach of contract ~~for a mortgage~~ of the mortgage application contract and the covenant of good faith and fair dealing in the contract to provide financing.

~~95.    The conduct of the Defendants constituted a violation of Plaintiff's rights pursuant to 15 U.S.C. §1691 and 12 C.F.R. Part 202 in that Defendants was discriminating against Plaintiffs.~~

WHEREFORE, the Wilkins request compensation for the following causes of action:

1.    42 U.S.C. §1981:    Breach of 42 U.S.C. §1981, which required the Defendants to treat the Andersons, Wilkins and Wheatleys in a non-discriminatory

manner in connection with their mortgage application contract.   Humiliation, inconvenience, and aggravation throughout the transactions, the costs of approximately ~~$5,400.00~~ $12,868.00 ~~for 3 unnecessary trips to Delaware, plus the additional costs to purchase the Wheatleys' home,~~ plus the additional cost and inconvenience to purchase the Wheatley home, plus attorney's fees and costs.

2.    Tortious interference with contractual rights and business opportunities. the costs of approximately ~~$5,400.00 for three unnecessary trips to Delaware, plus~~ $11,000.00 for unnecessary expenses incurred, plus the additional costs to purchase the Wheatleys' home, plus punitive damages and costs.

3.    Breach of ~~contract for a mortgage~~ the mortgage application contract and the covenant of good faith and fair dealings, the costs of approximately ~~$5,400.00 for three unnecessary trips~~ $12,868.00 for unnecessary expenses ~~to Delaware, plus the additional costs to purchase the Wheatleys' home,~~ plus the additional inconvenience and costs to purchase the Wheatley home, plus punitive damages and costs.

~~4.    Rights pursuant to 15 U.S.C. §1691: The   costs   of   approximately $5,400.00 for three unnecessary trips to Delaware, plus the additional costs to purchase the Wheatleys' home, plus the statutory compensation of $10,000.00 pursuant to 15 U.S.C. §1691e(d) and attorney's fees and costs.~~

GRADY & HAMPTON, LLC

_____/S/_____ John S. Grady_____
John S. Grady (I.D. 009)
6 North Bradford St.
Dover, DE 19904
(302) 678-1265
*Attorneys for Plaintiffs*

DATED:   January 22, 2008

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on this 22nd day of January, 2008, a true and correct copy of

the Plaintiffs' **SECOND AMENDED COMPLAINT** was served via CM/ECF Pacer

upon the following:

Stephen A. Fogdall, Esquire       Michael J. Barrie, Esquire
Schnader, Harrison, Segal &       Schnader, Harrison, Segal & Lewis,
Lewis, LLP                        LLP
1600 Market Street, Suite 3600    824 N. Market Street
Philadelphia, PA 19103-7286       10th Floor, Suite 1001
                                  Wilmington, DE 19801


GRADY & HAMPTON, LLC

_____/S/_____ John S. Grady_____
John S. Grady (I.D. 009)
6 North Bradford St.
Dover, DE 19904
(302) 678-1265
*Attorneys for Plaintiffs*