# IN THE UNITED STATES DISTRICT COURT

## FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| TOLANO ANDERSON, et al., | ) | |
| | ) | |
| Plaintiffs, | ) | C.A. No. 06 CV 00567 (SLR) |
| | ) | |
| v. | ) | |
| | ) | |
| WACHOVIA MORTGAGE CORPORATION | ) | |
| *and* WACHOVIA CORPORATION, | ) | |
| | ) | |
| Defendants. | ) | |
| | ) | |

---

## MOTION OF DEFENDANTS WACHOVIA MORTGAGE CORPORATION AND WACHOVIA CORPORATION FOR SUMMARY JUDGMENT

---

Defendants Wachovia Mortgage Corporation and Wachovia Corporation hereby respectfully move this Court to enter summary judgment in their favor and against plaintiffs pursuant to Federal Rule of Civil Procedure 56. The grounds for this motion are set forth in the accompanying brief.

Respectfully submitted,

/s/ Michael J. Barrie
_____

| | |
|---|---|
| *Of Counsel* | Michael J. Barrie  (#4684) |
| Elizabeth K. Ainslie | Schnader Harrison Segal & Lewis LLP |
| Stephen A. Fogdall (admitted *pro hac vice*) | 824 N. Market Street |
| Schnader Harrison Segal & Lewis LLP | 10th Floor, Suite 1001 |
| 1600 Market Street, Suite 3600 | Wilmington, DE 19801-3011 |
| Philadelphia, PA 19103 | (302) 888-4554 |
| (215) 751-2000 | |

*Counsel for Defendants Wachovia Mortgage Corporation*
*and Wachovia Corporation*

Dated:  April 11, 2008

# IN THE UNITED STATES DISTRICT COURT

## FOR THE DISTRICT OF DELAWARE

|  |  |  |
|---|---|---|
| TOLANO ANDERSON, et al., | ) | |
| | ) | |
| Plaintiffs, | ) | C.A. No. 06 CV 00567 (SLR) |
| | ) | |
| v. | ) | |
| | ) | |
| WACHOVIA MORTGAGE CORPORATION | ) | |
| *and* WACHOVIA CORPORATION, | ) | |
| | ) | |
| Defendants. | ) | |
| | ) | |

---

## OPENING BRIEF OF DEFENDANTS WACHOVIA MORTGAGE CORPORATION AND WACHOVIA CORPORATION IN SUPPORT OF THEIR MOTION FOR SUMMARY JUDGMENT

---

*Of Counsel*
Elizabeth K. Ainslie
Stephen A. Fogdall (admitted *pro hac vice*)
Schnader Harrison Segal & Lewis LLP
1600 Market Street, Suite 3600
Philadelphia, PA 19103
(215) 751-2000

Michael J. Barrie (#4684)
Schnader Harrison Segal & Lewis LLP
824 N. Market Street
10th Floor, Suite 1001
Wilmington, DE 19801-3011
(302) 888-4554

*Counsel for Defendants Wachovia Mortgage Corporation
and Wachovia Corporation*

April 11, 2008

# TABLE OF CONTENTS

TABLE OF AUTHORITIES.................................................................................................... iii

STATEMENT OF THE NATURE AND STAGE OF THE PROCEEDINGS ........................... 1

   A.  Nature of the Proceedings.......................................................................................... 1

   B.  Stage of the Proceedings............................................................................................ 2

SUMMARY OF THE ARGUMENT ........................................................................................ 3

CONCISE STATEMENT OF FACTS...................................................................................... 4

   A.  Introduction ............................................................................................................... 4

   B.  The Role of Fannie Mae Guidelines......................................................................... 7

       1.  Fannie Mae Guidelines Regarding Appraisals ............................................. 8

       2.  Fannie Mae Guidelines Regarding Occupancy Status ................................ 13

   C.  The Wheatley Downpayment ................................................................................. 17

   D.  The Wilkinses' Source-of-Funds Issue ................................................................. 19

   E.  Plaintiffs' Post-Closing Assertions........................................................................ 21

ARGUMENT ......................................................................................................................... 24

I.  Plaintiffs Have Absolutely No Evidence of Purposeful Discrimination By Wachovia .......... 24

   A.  Plaintiffs Have No Direct Evidence That Wachovia Discriminated Against Them ........ 24

       1.  "Pressure" ................................................................................................... 25

       2.  "You people" ............................................................................................... 27

       3.  "They will be watching"............................................................................... 30

   B.  Plaintiffs Have No Circumstantial Evidence That Wachovia Discriminated Against
       Them....................................................................................................................... 31

       1.  Plaintiffs Cannot Establish A Prima Facie Case ......................................... 32

       2.  Wachovia Had Legitimate Non-Discriminatory Reasons For Every Action It
           Took.......................................................................................................... 33

      3.   There Is No Evidence of Pretext.................................................................34

II.  Plaintiffs' Claim Under Delaware Law For Breach Of The Implied Covenant of Good
     Faith And Fair Dealing Fails ...............................................................................35

     A.  Plaintiffs' Good Faith And Fair Dealing Claim Is Preempted By The National
         Bank Act .....................................................................................................36

     B.  Plaintiffs' Good Faith And Fair Dealing Claim Is Supported By No Evidence................38

CONCLUSION .......................................................................................................40

CERTIFICATE OF SERVICE

# TABLE OF AUTHORITIES

**Page(s)**

**FEDERAL CASES**

*Alvarado v. Health Net, Inc.,*
1994 U.S. App. LEXIS 9123 (9th Cir. April 19, 1994)................................................28

*Anderson v. Wachovia Mortgage Corp.,*
497 F. Supp. 2d 572 (D. Del. 2007) ................................................................3

*Antonio v. Sygma Network, Inc.,*
458 F.3d 1177 (10th Cir. 2006)................................................................27

*Austin v. Provident Bank,*
2005 U.S. Dist. LEXIS 37113 (N.D. Miss. July 26, 2005) ...................................38

*Brown v. Interbay Funding, LLC,*
417 F. Supp. 2d 573 (D. Del. 2006) ................................................................33

*Clearwater v. Independent School District No. 166,*
231 F.3d 1122 (8th Cir. 2000)................................................................29

*Cooley v. Sterling Bank,*
280 F. Supp. 2d 1331 (M.D. Ala. 2003)................................................................32

*DeHorney v. Bank of America Nat'l Trust & Sav. Ass'n,*
879 F.2d 459 (9th Cir. 1989)................................................................29

*Didzbalis v. Sheridan Transp. Co.,*
2002 U.S. Dist. LEXIS 22378 (S.D.N.Y. Nov. 19, 2002)...................................40

*Fidelity Fed. Sav. Bank v. De la Cuesta,*
458 U.S. 141 (1982) ................................................................37

*General Building Contractors Ass'n v. Pennsylvania,*
458 U.S. 375 (1982) ................................................................3, 24

*Hartsel v. Keys,*
87 F.3d 795 (6th Cir. 1996)................................................................27

*Latimore v. Citibank Fed. Sav. Bank,*
151 F.3d 712 (7th Cir. 1998)................................................................31

*Matthiesen v. Banc One Mortgage Corp.,*
173 F.3d 1242 (10th Cir. 1999)................................................................4, 39

*McDonnell Douglas Corp. v. Green,*
411 U.S. 792 (1973) ................................................................31, 35

*Podell v. Citicorp Diners Club, Inc.,*
 112 F.3d 98, 103 (2d Cir. 1997) ......................................................34

*United States v. Esquivel,*
 88 F.3d 722 (9th Cir. 1996) ...........................................................2

*Watters v. Wachovia Bank, N.A.,*
 127 S. Ct. 1559 (2007) ...............................................................36, 37

*Whitley v. Peer Review Systems, Inc.,*
 221 F.3d 1053 (8th Cir. 2000) ......................................................28

**STATE CASES**

*Aspen Advisors LLC v. United Artists Theatre Co.,*
 861 A.2d 1251 (2004)......................................................................38

*Dunlap v. State Farm Fire & Cas. Co.,*
 878 A.2d 434 (Del. 2005) ...............................................................38

*USH Ventures v. Global Telesystems Group, Inc.,*
 796 A.2d 7 (Del. Super. Ct. 2000).................................................40

**FEDERAL STATUTES**

12 U.S.C. § 21 *et seq.* ..........................................................................4

12 U.S.C. § 24 .....................................................................................37

12 U.S.C. § 371 ...................................................................................37

15 U.S.C. § 1691 ...................................................................................2

42 U.S.C. § 1981 ...............................................................2, 3, 32, 35

**RULES**

Fed. R. Civ. P. 56(e)(2) .....................................................................24

Fed. R. Evid. 201 .................................................................................2

**REGULATIONS**

12 C.F.R. § 34.4.........................................................................4, 37, 38

## STATEMENT OF THE NATURE AND STAGE OF PROCEEDINGS

A.    **Nature of the Proceedings**

Plaintiffs are three African-American couples who allege that Wachovia

Mortgage Corporation "forced" them to accept unreasonable conditions in order to obtain loans

for the purchase of homes on Silver Lake in Dover, Delaware.  The loan conditions at issue are

standard Fannie Mae and Wachovia underwriting requirements:  (1) that any repairs affecting the

livability of the property be made before closing; (2) that business assets used for the down

payment or for closing be verified by a CPA; and (3) that a borrower show the source of his

funds.  Notwithstanding that these are standard underwriting guidelines in the mortgage lending

industry, plaintiffs say that Wachovia only applied them here because of their race.

Plaintiffs assert that Silver Lake is "a Caucasian-owned and operated

community," Deposition of Tolano Anderson ("Anderson Dep.") at 43:14-15, A-107, that "has

no minorities," Deposition of Lloyd Wheatley ("Wheatley Dep.") at 136:5-8, A-185.[1]  Plaintiffs

say that Wachovia imposed the supposedly unreasonable loan conditions in response to

"pressure" from "the Silver Lake community" to deny plaintiffs' loans.  Anderson Dep. at

111:18-112:1, A-124, 158:14-161:16, A-136; Wheatley Dep. at 114:1-115:17, A-180, 135:3-14,

A-185.  Plaintiffs do not explain how "pressure" from "the community" could have had any

impact on Wachovia's loan-approval process, when all of the underwriting and other decision-

---

[1]    Cites to "A-_" are to the two-volume Appendix of Exhibits submitted with this brief.

making on their loans took place in Waterbury, Connecticut, by people who could not have cared

what "the Silver Lake community" thought.[2]

### B.    Stage of the Proceedings

Plaintiffs originally asserted five claims in this action:  (1) a claim under the

Equal Credit Opportunity Act ("ECOA"), 15 U.S.C. § 1691; (2) a claim under 42 U.S.C. § 1981;

(3) a claim under Delaware law for tortious interference with contractual relations; (4) a claim

for breach of contract; and (5) a claim for breach of the implied covenant of good faith and fair

dealing.

Out of these five claims, only two remain.  Plaintiffs voluntarily withdrew their

ECOA claim with prejudice in their brief in response to Wachovia's motion to dismiss their

amended complaint.  *See* D.I. 13 at 22.  This Court dismissed plaintiffs' breach of contract claim

because plaintiffs failed to "identif[y] any express contract provision that was breached."

---

[2]     Plaintiffs provide no objective support for their assertion that Silver Lake "has no minorities."  Moreover, the objective data contradicts that assertion.  According to the last census, of which this Court may take judicial notice, *see United States v. Esquivel,* 88 F.3d 722, 726-27 (9th Cir. 1996) (taking judicial notice of census data under Fed. R. Evid. 201), the census block in which plaintiffs homes are located (Block 1000, Block Group 1, Census Tract 409) had 29.6 percent African American residents, significantly above the national average of 12.8 percent.  *See* Dover, Delaware Census Information, in the Appendix at A-1.  Figure 1 on page A-1 shows the percentage of African-American residents in Dover, Delaware by census block, using varying shades of green to show the differing percentages.  (See the legend to the left of Figure 1 for an explanation.)  Figure 2 is a more detailed picture of the census block in which plaintiffs' homes are located (shown in Green; the red dot marks the approximate location of the homes).

Figure 1 was downloaded directly from the Census Bureau website. http://factfinder.census.gov.  Figure 2 was downloaded from this same source, but to aid the reader we added the text box, the green shading on Census block 1000 and the red dot to mark plaintiffs' homes.

*Anderson v. Wachovia Mortgage Corp.,* 497 F. Supp. 2d 572, 581 (D. Del. 2007).  This Court likewise dismissed plaintiffs' tortious interference with contractual relations claim because the novel theory plaintiffs pled -- "interference with another's performance of his own contract" -- does not exist under Delaware law.  *Id.* at 583-84.  The Court permitted plaintiffs to proceed on their claim under Section 1981 and their claim of breach of the covenant of good faith and fair dealing.

Plaintiffs filed a Second Amended Complaint on January 22, 2008 (D.I. 60).  Wachovia filed an Amended Answer and Affirmative Defenses on February 6, 2008 (D.I. 62).  The parties completed fact discovery on March 7, 2008.  On that same date, the Court held a status conference in which plaintiffs' counsel stated that plaintiffs would not be offering any expert testimony in support of their claims (D.I. 65).

Wachovia now moves for summary judgment.

## SUMMARY OF THE ARGUMENT

1.      The Court should grant summary judgment in Wachovia's favor on plaintiffs' claim under 42 U.S.C. § 1981.  Section 1981 "can be violated only by purposeful discrimination."  *General Building Contractors Ass'n v. Pennsylvania,* 458 U.S. 375, 391 (1982).  Plaintiffs have no evidence that anyone at Wachovia purposefully discriminated against them.

2.      Plaintiffs' theory is that a single Wachovia loan officer in Dover, Delaware engineered all of the issues with plaintiffs' loan applications because he "ran into a

situation where people [in the Silver Lake community] did not want this deal to go through and he was being pressured to cause it to collapse."  Anderson Dep. at 161:12-16. A-136.

3.    There is no evidence that this Dover-based loan officer was under any "pressure" from anyone in "the Silver Lake community" or that he somehow convinced underwriters in Connecticut to make up problems with plaintiffs' loans in response to such pressure.  Indeed, the evidence shows that when problems arose he attempted to intercede with the underwriters on plaintiffs' behalf.

4.    Plaintiffs' claim based the covenant of good faith and fair dealing is equally meritless.  First, that claim is preempted by the National Bank Act, 12 U.S.C. § 21 *et seq.* and related regulations because it would "obstruct, impair, [and] condition a national bank's ability to fully exercise its Federally authorized real estate lending powers."  12 C.F.R. § 34.4.

5.    Second, plaintiffs' good faith and fair dealing claim fails because Wachovia's conduct simply was not "arbitrary" or "unreasonable" in any sense.  Plaintiffs "cannot force [Wachovia] to deviate from its standard practice of relying on FNMA [Fannie Mae] guidelines in order to accommodate [their] particular situation."  *Matthiesen v. Banc One Mortgage Corp.,* 173 F.3d 1242, 1247 (10th Cir. 1999).

## CONCISE STATEMENT OF FACTS

### A.    Introduction

Plaintiffs Tolano and Cathy Anderson, Lloyd and Audria Wheatley, and Dr. Richard and Brenda Wilkins are three African-American couples who purchased three homes on Silver Lake in Dover, Delaware.  The three homes -- 580, 584 and 592 North DuPont Highway --

4

sit side-by-side on a busy thoroughfare in a commercial zone, surrounded by businesses and condominiums. *See* photographs of plaintiffs' homes at A-10 and A-2 to A-4; Dover zoning map at A-12.

In June 2004, each of three plaintiff couples met with a Wachovia loan officer, James "J.D." Hogsten to apply for loans for the three properties. As the loan officer, Hogsten was essentially a liaison between plaintiffs and Wachovia. He took their initial loan applications and forwarded them to the Wachovia service center in Waterbury, Connecticut where an underwriter would be assigned who would make a determination whether to approve the loans, and what the conditions of such approval would be. Hogsten Dep. at 10:12-11:17, A-191; Skowronski Dep. at 19:8-20:15, A-284, 28:13-19:15, A-286. When questions or concerns arose from the underwriter, Hogsten conveyed that information to plaintiffs. Hogsten Dep. at 66:1-6, A-205, 82:19-23, A-209; Skowronski Dep. at 28:13-29:15, A-286; Belo Dep. at 10:8-16, A-304. As a loan officer, Hogsten had no authority to approve or deny plaintiffs' loans and had no role in imposing conditions of approval. Hogsten Dep. at 10:22-24, A-191; Skowronski Dep. at 22:19-20, A-285, 28:22-24, A-286; Belo Dep. at 10:20-22, A-304. Hogsten was, and is, paid purely on commission. If a loan is not approved he does not get paid for his work on that loan. *See* Hogsten Dep. at 101:6-11, A-213; Skowronski Dep. at 58:23-59:10, A-294.

Other individuals at Wachovia mentioned in the pleadings or in discovery are:

- **Colleen Fazzino:** Colleen Fazzino supervises underwriters at Wachovia's Waterbury, Connecticut service center. At the time of the events in this lawsuit, she was a contract underwriter at the Waterbury service center. Fazzino Decl. ¶¶ 1-4, A-15. She was assigned to underwrite the

Andersons' and the Wheatleys' loans. Fazzino Decl. ¶ 11, A-16; Fazzino
Dep. at 6:18-7:5, A-220. As the underwriter, Fazzino -- not Hogsten --
had authority to approve loans and to impose loan conditions prior to
approval. Fazzino Dep. at 7:24-8:15, A-220, 63:35, A-234; Belo Dep. at
10:2-7, 12:15-25, A-304.

•   **George Akerley:** Now a loan officer at First Horizon Home Loans in
Connecticut, George Akerley was, like Colleen Fazzino, a contract
underwriter at Wachovia's Waterbury service center. He was assigned to
do the underwriting for the Wilkins loan. Akerley Decl. ¶ 4, A-62.

•   **Maria Belo:** Maria Belo is a loan processor at the Waterbury service
center. Her role was to function as an intermediary between Hogsten and
the underwriting department and to help the underwriters obtain the
documentation needed to complete the underwriting process. Belo Dep. at
6:23-7:7, 10:2-16, A-304.

•   **Joseph Skowronski:** Joseph Skowronski is Hogsten's supervisor.
Skowronski oversees a team of loan officers like Hogsten in Delaware and
Pennsylvania. *See* Skowronski Dep. at 8:15-11:20, A-281 to A-282.

•   **Terri Hamm:** Terri Hamm was an "exception officer" at the Waterbury
service center. When the Wheatley loan did not satisfy underwriting
guidelines (for reasons discussed below) her authorization was needed to
approve the loan as an "exception" loan. She gave that approval, but at an
80% loan-to-value ratio instead of the 90% loan-to-value ratio the

Wheatleys requested.  Fazzino Dep. at 50:20-52:11, A-231, 59:7-9, A-233, 65:18-66:11, A-234 to A-235; A-466.

Plaintiffs do not allege that *any* of these individual bore any racial animus toward them.  The *only* Wachovia employee that plaintiffs say was biased against them was Hogsten: "*Hogsten* had no intention of permitting the transaction to be completed, not caring that it would cost plaintiffs $40,000.00 in the loss of the deposit."  Second Am. Compl. ¶ 26, A-342 (emphasis added).  They say that Hogsten and Hogsten alone was responsible for the supposedly unreasonable loan conditions about which they complain.  *See, e.g.,* Wheatley Dep. at 109:16-111:11, A-178 to A-179.  They assert that Hogsten personally engineered all of these conditions because the "the Silver Lake community" is "Caucasian-owned and operated" and put "pressure" on Hogsten to undermine plaintiffs' loans:  "J.D. Hogsten ran into a situation where people did not want this deal to go through and he was being pressured to cause it to collapse."  Anderson Dep. at 43:5-15, A-107, 111:18-112:1, A-124, 161:12-16, A-136.

There is no basis to this conspiracy theory, as we now show.

## B.    The Role Of Fannie Mae Guidelines

When a mortgage lender such as Wachovia issues a loan to a residential home buyer, it may sell that loan to the Federal National Mortgage Association, or "Fannie Mae."  As a result, Fannie Mae underwriting guidelines are central in residential lending.[3]  Indeed, each

---

[3]    Fannie Mae will only buy loans that satisfy its underwriting guidelines.  Fazzino Decl. ¶ 9.  For this reason, Wachovia's own underwriting guidelines conform to Fannie Mae's.  Fazzino Dep. at 98:18-25, A-243; Skowronski Dep. at 12:2-11, A-282, Akerley Decl. ¶ 13, A-63.

plaintiff couple in this case signed a Mortgage Loan Application Agreement containing the following condition:

> I understand that delays and problems in processing and closing loans may occur without any fault on the part of lenders such as Wachovia . . . . In addition, agencies such as . . . the Federal National Mortgage Association ("FNMA" or "Fannie Mae") . . . may limit or terminate their market activity, which would adversely affect the ability of mortgage lenders such as Wachovia to sell loans. *I understand that my loan must meet the standards of one or more of these organizations* . . . .

A-382, A-385, A-388 (emphasis added).

Two Fannie Mae guidelines of particular importance in this case relate to: 1) the appraisal of the property the borrower is seeking to buy (which, of course, is the lender's collateral for the loan); and 2) the occupancy status of the borrower. We discuss these, and their application to this case, in turn.

### 1.    Fannie Mae Guidelines Regarding Appraisals

One of plaintiffs' core allegations is that Hogsten personally required the Andersons and the Wheatleys to make repairs to the properties they sought to purchase, and that he did this solely because "people [in the Silver Lake community] did not want this deal to go through and he was being pressured to cause it to collapse." Anderson Dep. 161:12-16, A-136. No evidence supports this.

Plaintiffs do not dispute that the Anderson and Wheatley properties needed repairs. They merely assert that "it's not reasonable to require repairs or any work to be done on a property prior to the acquisition of the property." Anderson Dep. at 145:14-24, A-132. They also assert that there is no "immediate reason" to require repairs when a "house is appraised at its

value of the loan." Wheatley Dep. at 127:8-18, A-183. But, contrary to plaintiffs' arguments,

Fannie Mae guidelines make clear that even where an appraiser has appraised the property at the

value of the loan, a lender cannot necessarily take the appraisal at face value:

> [A]n appraisal may be based on the "as is" condition of the property if
> minor conditions that *do not affect the livability* of the property exist --
> such as minor deferred maintenance -- as long as the appraiser's opinion
> of value reflects the existence of these conditions. *The lender must review
> carefully the appraisal for a property appraised in an "as is" condition to
> ensure that the property does not have any physical deficiencies or
> conditions that would affect its livability.* If there are none, the lender
> does not need to require minor repairs to be completed before it delivers
> the mortgage to us.

Fannie Mae's 2002 Selling Guide, Part XI, Chapter 2, § 202 (emphasis added), attached as

Exhibit E to Fazzino Decl., A-34.[4] This guideline impacted both the Andersons' and the

Wheatleys' properties.

**The Anderson Property:** Mr. Anderson testified that water from a broken pipe

inside the house at 580 North DuPont Highway had damaged the drywall on the first floor and in

the basement. Anderson Dep. at 122:11-23, A-127, 151:12-152:4, A-134. He testified that the

house "needed some work, you know. It needed work consistent with buying a house and then

moving in and fixing it up." Anderson Dep. at 122:22-123:2, A-127.

In fact, the home needed extensive work. As Mr. David Miller explains in his

declaration, he had explored purchasing these three properties just prior to plaintiffs' doing so.

*See* Declaration of Dave Miller, A-93 to A-95, ¶¶ 2-4. He confirms that the Anderson home had

---

[4]     Wachovia's own underwriting guidelines relating to appraisals mirror Fannie Mae's
        guideline nearly word for word. Fazzino Decl. ¶¶ 36-37, A-19.

a broken water pipe that had caused considerable damage on the first floor and in the basement. *Id.* at ¶¶ 7-13. Further, the drywall was missing in several places and the insulation needed to be replaced. *Id.* at ¶¶ 9, 10. Tiles were peeling back from the floor, *id.* at ¶ 10, mold was developing in places, *id.* at ¶ 12, and water appeared to have infiltrated into the electrical sockets, *id.* at ¶ 13. In Mr. Miller's view, all of the drywall and the insulation, and perhaps the wiring, needed to be gutted out and replaced. *Id.* at ¶ 14.

Indeed, the house was in such disrepair that when the independent appraiser, John Mullens, arrived in early July to do the appraisal, he determined that an appraisal would be impossible with the home in that state. *See* Declaration of John Mullens ("Mullens Decl."), A-89 to A-92, ¶ 8, 13; *see also* Hogsten Dep. at 26:12-28:14, A-195. Contrary to plaintiffs' assertions, Mullens makes clear in his declaration that Hogsten never requested that he refuse to do the appraisal, and Mr. Anderson's race played *no role* in his determination that he could not appraise the property. Mullens Decl. ¶¶ 18, 21, A-91, A-92.

Plaintiffs allege that Hogsten handpicked Mullens as the appraiser in an attempt to "undermine" the sale. *See* Second Am. Compl. ¶ 13-16, A-340. Plaintiffs have no evidence to support this allegation. To the contrary, Mullens states in his declaration that he was assigned to do the appraisal by GreenLink LLC, a subsidiary of Wachovia Corporation in Florida. Mullens Decl. ¶¶ 5, 7, A-90.[5]

---

[5]   Likewise, both Hogsten and Maria Belo explained in their depositions that when an appraisal is needed, a loan processor in Wachovia's service center in Waterbury, Connecticut places an order with GreenLink LLC, which then hires an independent appraiser. Hogsten Dep. at 25:7-15, A-194; Belo Dep. at 14:12-19, A-305. In the case of the Anderson loan, Rosemary Ciullo, a loan processor in the Waterbury service center,

*...Continued*

When Mullens refused to do the appraisal, Hogsten suggested to Mr. Anderson that he repair the property. Hogsten Dep. at 28:15-20, A-195 ("I told Mr. Anderson we were going to have problems getting a sufficient appraisal unless there was some, you know, renovations to the property to get a decent appraisal."). Hogsten made this suggestion because he knew that obtaining a satisfactory appraisal would be a condition of the Andersons' loan, *see* Anderson commitment letter at A-435, and, based on his experience, the underwriters in Connecticut would never accept an appraisal for property in such a state. *See* Hogsten Dep. at 29:8-10, A-195 ("From my experience, if I submitted an appraisal with the property in that condition, the loan would have been turned down for property collateral."). Hogsten's supervisor, Joseph Skowronski, testified that it is not uncommon for a loan officer in this type of situation to suggest repairs. Skowronski Dep. at 31:20-32:11, A-287 ("So based on [the condition of the property] it would be suggesting that if you were to continue to go through with this deal, they [the underwriters] are going to require that this be done. So it's letting [the borrower] know ahead of time.").

Anderson did make repairs to the property. In early August 2004, another appraiser inspected the property and was able to complete an appraisal. *See* Anderson appraisal,

---

*Continued from previous page*

placed an order for an appraisal on June 29, 2004. *See* order confirmation, A-418 to A-419. On June 30, 2004 GreenLink assigned Mullens Valuation Services LLC to do the appraisal. *See* appraisal appointment confirmation, A-416 to A-417. So plaintiffs' allegation that Hogsten somehow arranged for Mullens to do the appraisal has no basis in fact.

A-451 to A-464. This appraisal was acceptable to the underwriter Fazzino and the Andersons' loan was approved.[6]

The Wheatley Property:  Like the Andersons, the Wheatleys say that they had to make repairs to their home and have it inspected before Wachovia would give them a loan. They do not dispute that the appraisal for the property noted serious concerns, including:

- "[A] lack of heat in subject property on 2nd floor";

- "It does appear some work is needed on wood shake roof but assumed not to have any leakage";

- "It does appear some of the piping in basement is wrapped with asbestos."

Appraisal of Daniel A. Gladden, in Appendix at A-424 (emphasis added). *See also* Wheatley Dep. at 58:9-61:5, A-166.

Because of these concerns, the underwriter Fazzino initially denied the Wheatleys' loan application. *See* Fazzino Dep. at 32:9-23, A-226; Notice of Action Taken, A-440; Fair Lending Analysis Tool, A-441 to A-442. But once the Wheatleys agreed to make repairs, and certifications were obtained from a roofing contractor (to address the appraiser's comments about the roof) and an insulation specialist (to address the appraiser's concerns about

---

[6]     In their Second Amended Complaint, plaintiffs allege that "[t]he underwriter, Ms. Fazzino, who was responsible for the determination of whether any repairs were made, did not require any repairs to be made for the Anderson property," Second Am. Compl. ¶ 19, A-341. While correct, the allegation is misleading. As Fazzino explains in her declaration, she as the underwriter would only know of the need for repairs if they were mentioned *in the appraisal*. Fazzino Decl. ¶ 39, A-20; Fazzino Dep. at 77:5-14, A-237. Because Mullens refused to do an appraisal, the Anderson property was not appraised until early August 2004, *after* the property had been repaired.

asbestos in the basement), *see* Fazzino Dep. at 109:22-110:22, A-245 to A-246; A-465, A-467, Wachovia agreed to make the loan, albeit it at an 80% loan-to-value ratio rather than the 90% ratio for which the Wheatleys had originally applied.[7]

### 2.     Fannie Mae Guidelines Regarding Occupancy Status

Fannie Mae will purchase loans "secured by a property that is a principal residence, second home, or investment property." Fannie Mae 2002 Selling Guide, Part VII, Chapter 1, § 102.01, attached as Exhibit A to Fazzino Decl., A-24.[8] Fannie Mae imposes different standards depending on which of these three types of property is at issue. *See* A-24; *see also* Fazzino Decl. ¶ 23, A-17; Skowronski Dep. at 67:9-68:9, A-296. Fannie Mae's guidelines further state: "Generally, we will purchase or securitize mortgages that have been made to *natural persons only*. We require that title to the property *be in the name of the individual borrower*(*s*)." Fannie Mae 2002 Selling Guide, Part VII, Chapter 1, § 101, attached as Exhibit D to Fazzino Decl., A-32 (emphasis added).

These requirements mean that a borrower applying for a loan must be completely truthful about how he or she intends to use the property and who -- or what -- will hold title to it. The borrower's intentions directly impact the lending institution's risk in issuing the loan (and

---

[7]     Plaintiffs allegations relating to the Wheatleys' increased downpayment are discussed below at pages 17-19.

[8]     Although Fannie Mae will purchase loans secured by "investment" properties (meaning residential properties owned by a non-occupant, A-24; *see also* Skowronski Dep. at 69:1-10, A-296), Fannie Mae does not purchase loans secured by commercial properties, Wicks Decl. ¶ 7, A-6. The significance of this is discussed below on page 35.

Fannie Mae's risk in purchasing the loan on the secondary market) and the pricing the borrower receives. Fazzino Decl. ¶ 22, A-17; Skowronski Dep. at 68:10-22, A-296.

Plaintiffs in this case were *not* forthcoming about their intentions for the three properties they sought to buy.[9]

Two of the plaintiff couples (the Andersons and the Wheatleys) indicated on their loan applications that they sought to purchase the properties as primary residences. *See* Anderson loan application, A-390; Wheatley loan application, A-400. The third plaintiff couple (the Wilkinses) indicated that they sought their property as a secondary residence. Wilkins loan application, A-408. None of the couples indicated on their loan application that they sought to purchase investment property.

When the underwriter for the Anderson loan -- Colleen Fazzino in Waterbury, Connecticut -- began reviewing the Andersons' loan file, she noticed that the Andersons stated on their loan application that they both worked in Fort Meade, Maryland. Fazzino Decl. ¶ 14, A-16. (Mr. Anderson was on active duty in the Army, stationed at Fort Meade. *Id.* ¶ 16.) Fazzino knew that Forth Meade was over 80 miles from Dover, Delaware, where the property the

---

[9]    The discussion in this section provides context for the proper understanding of certain statements that Hogsten supposedly made to plaintiffs that someone would be "watching" them. As we explain below, contrary to plaintiffs' allegations, Hogsten never "threatened" them by making such statements, but he did emphasize to plaintiffs the importance of accurately representing their intentions for the properties -- which, it turns out, they did not accurately represent. In addition to providing this background, the facts presented in this section also are relevant to certain of Wachovia's affirmative defenses that Wachovia reserves for any trial the Court may order in this matter. *See* Wachovia's Amended Answer and Affirmative Defenses, Third, Fourth and Fifth Affirmative Defenses (D.I. 62), A-372. Wachovia does not seek summary judgment in its favor on these affirmative defenses.

Andersons sought to purchase (supposedly as their primary residence) was located.  *Id.* ¶ 19.  So Fazzino naturally wondered whether the Andersons truly did intend to reside at 580 North DuPont Highway.  *Id.* ¶ 20, A-17.

Following standard procedures, Fazzino required the Andersons to submit a written statement explaining their intent to occupy 580 North DuPont Highway and their plan for commuting to Fort Mead, Maryland.  Fazzino Decl. ¶¶ 25-26, A-17 to A-18.  In response, the Andersons submitted a letter to Wachovia loan processor Maria Belo stating that "Our occupancy of the subject property will commence upon settlement and we will commute via private vehicle to our respective places of employment until such time as employment transfers are complete."  Fazzino Decl. Exhibit C, A-30; Belo Dep. at 66:1-16, A-318.

Because this issue had arisen, Hogsten explained to Mr. Anderson the importance of their actually occupying the property.  Plaintiffs say that Hogsten "threatened" Mr. Anderson and said that "they" would be "watching" him.  Anderson Dep. at 155:18-24, A-135.  But Hogsten was simply trying to convey to plaintiffs that it was a condition of their loans that they actually use the properties as their residences, because Fannie Mae guidelines required this:

> What I said was that this is going to be your primary residence . . . . [Y]ou have to make sure it's your primary residence because if they detect that it's not your primary residence as you say it is, then there's penalties.  I think I relayed those penalties to him.  And I said that, you know, if it's going to be your primary residence, you have to change your driver's license, you have to file your tax returns from that address.  I didn't say he was going to be watched per se, but I did say you have to watch out.
>
> . . .
>
> [I]f Fannie Mae detects any red flags or whatever, they can call the loan due then and there.  That's a demand note.  That's the reason why I told him.

Hogsten Dep. at 54:11-55:10, A-202.

In fact, the Andersons did *not* move into 580 North DuPont Highway "upon settlement" as they promised in their letter to Maria Belo. Instead, they moved in a year and a half later, in May 2006. *See* Deposition of Cathy Anderson at 5:12-23, A-148.[10]

Moreover, at the time they applied for their loans, plaintiffs were in the process of forming a limited liability company, Tri-Core, LLC, that would hold title to the three properties *as investment properties* -- despite that not one of the three plaintiff couples had indicated on their loan applications that they intended to use the properties for investment purposes.[11]

When asked why plaintiffs formed Tri-Core, Anderson explained:

> One of the things we talked about was *making sure that one of us didn't decide to sell their property to someone else that we didn't want to be neighbors with.* So we decided let's make a commitment to one another and we did that kind of within the corporation that you know, all right, no one outside our group can sell their properties. *We didn't want our*

---

[10]    Anderson testified that he and his wife moved in to 580 North DuPont Highway in June 2005, *see* Anderson Dep. at 7:11-14, A-98, but his wife corrected him.

[11]    Plaintiffs formed this company, which they called Tri-Core, LLC, on July 8, 2004, weeks before plaintiffs obtained their loans from Wachovia. Anderson Dep. at 22:3-15; *see also* Operating Agreement of Tri-Core, LLC § 2.01, A-536. The Operating Agreement for this LLC provides that the "company's purpose and business is" to "operate a real estate *investment* company and to engage in all activities necessary, customary or convenient or incident to functioning as such" Operating Agreement § 3.01(a) (emphasis added), A-537. The Operating Agreement further states that "Each Member must contribute the[ir] property [*i.e.,* 580, 584 and 592 North DuPont Highway] . . . as his or her share of the Initial Capital Contribution. Said properties are company property and will be transferred to the name of the company as soon as practical." Operating Agreement § 8.01, A-546; *see also* Operating Agreement Schedule B, A-562.

A "Preformation Agreement" between plaintiffs shows that they intended to form Tri-Core before July 8, 2004, as Mr. Anderson acknowledged. Anderson Dep. at 25:9-26:22, A-102 to A-103; *see also* A-376 to A-377.

> *property values to go down by getting some gay to go in there* -- I'm sorry
> -- some individual in there that we didn't want to be neighbors with.

Anderson Dep. at 28:20-29:7, A-103 (emphasis added).

Plaintiffs never disclosed to Wachovia that they were so concerned about preventing "some gay -- I'm sorry -- some individual" from being their neighbor that they went so far as to secretly pledge their properties to an LLC.  *See* Wheatley Dep. at 71:20-72:7, A-169; Wilkins Dep. at 57:23-58:17, A-267 to A-268.[12]

### C.    The Wheatley Downpayment

Although the Wheatleys were eventually able to address through repairs and inspections most of issues relating to the condition of the property identified in the appraisal, *see supra* pages 12-13, there was one issue that could not be cured.  The Wheatleys wanted to use assets of their limousine business to purchase their home.  *See, e.g.,* A-380.  But the Wheatleys reported their business profits and losses on Schedule C of their personal income tax return, *see* A-579, A-607, A-630, and the underwriting guidelines for their type of loan required that Schedule C profits and losses be verified by a CPA.  *See* Fazzino Decl. ¶¶ 41-42, A-21.  Because

---

[12]    Plaintiffs' pledging their properties to Tri-Core was a breach of their mortgage contracts with Wachovia.  Each mortgage contract provides that "[i]f all or any part of the Property or any Interest in the Property is sold or transferred . . . without Lender's prior written consent, Lender may require immediate payment in full of all sums secured by this Security instrument."  A-482, A-500, A-523.

Mr. Wheatley did not use a CPA for his business, the Wheatleys could not meet this guideline. Fazzino Dep. at 51:10-19, A-231, 99:21-101:9, A-243; Fazzino Decl. ¶¶ 43, 44, A-21.[13]

However, because of the Wheatleys' history with Wachovia -- they were considered five star customers -- Wachovia made an "exception" loan for him, meaning a loan that did not comply with the underwriting guidelines. Fannie Mae will not purchase an exception loan and mortgage insurers generally will not insure them. *See* Fazzino Dep. at 59:1-6, A-233, 123:17-124:13, A-249; Hogsten Dep. at 94:24-95:12, A-212, 106:4-13, A-215; Skowronski Dep. at 53:23-55:23, A-293. Accordingly, Terri Hamm, the officer with authority to approve exception loans at the Waterbury service center, would only approve an exception loan at an 80% loan-to-value ratio (the maximum ratio allowed without obtaining mortgage insurance). Fazzino Dep. at 59:1-6, A-233; Hogsten Dep. at 94:24-95:12, A-212.

Hogsten resisted this change to the Wheatley loan. According to Fazzino, Hogsten was "really beating [her] up" and was "pursuing 90 percent" even after the exception officer Terri Hamm had concluded that the loan would have to go through at 80%. Fazzino Dep. at 103:24-104:16; Fazzino Decl. ¶¶ 46-49, A-21. Fazzino had to "sp[eak] with JD at great length several times" and "explain[] problems several times" because Hogsten had such a difficult time

---

[13]     The guidelines applicable to the Wheatleys' loan provided: "When using the assets of a Schedule C business to meet the asset test, the CPA must confirm that the borrower files the business on the Schedule C." Fazzino Decl. ¶ 42, A-21. The Wheatleys 2001, 2002 and 2003 tax returns indicate that those returns were "Self-Prepared." A-577, A-605, A-627. It appears that the Wheatleys began using a CPA for the business in 2005, after their purchase of 584 North DuPont Highway. Their tax returns for 2004 (which would have been filed in 2005, after the purchase) indicates that it was prepared by Zober & Gary, CPA. *See* A-642. We have redacted Mr. and Mrs. Wheatleys' Social Security Numbers from these returns.

accepting the increase in the Wheatley down payment.  Fazzino Dep. at 102:21-103:16, A-244.

This alone refutes any suggestion that Hogsten harbored any racial animus toward plaintiffs.

### D.    The Wilkinses' Source-of-Funds Issue

The only supposed discriminatory act alleged by the Wilkinses is that they "were

required to prove that the funds used for [their] deposit was [their] money and show its source."

Second Am. Compl. ¶ 32, A-343.  They erroneously assert that "[t]his is not [a] normal

customary practice of the bank."  *Id.*  To the contrary, Fannie Mae guidelines state that "[t]he

lender must obtain documentation for all sources for the funds that the borrower uses to make the

down payment and pay closing costs."  Fannie Mae 2002 Single Family Selling Guide, Part X,

Chapter 6, § 603, attached as Exhibit D to Akerley Decl., A-80.  Likewise, Wachovia's

underwriting guidelines, which conform to Fannie Mae's, state that "[t]he borrower must have

enough liquid assets to cover the amount of the down payment that must come from *his or her*

*own funds*."  Wachovia Underwriting Guidelines, Assets: Sources of Funds (emphasis added);

*see* Akerley Decl. ¶¶ 11-12, A-63.

George Akerley, the underwriter for the Wilkinses' loan, explains in his

declaration that the Wilkinses paid the $13,333.00 earnest money deposit with a convenience

check purchased with their credit card.  *See* Akerley Decl. ¶¶ 7-9, A-62.  A credit card is not an

acceptable source of funds for a deposit or down payment.  Akerley Decl. ¶ 12, A-63, ¶ 18, A-

64.  Both Fannie Mae's and Wachovia's guidelines state that a credit card may only be used for

small items such as lock-in fees, credit reports and appraisal reports.  *Id.*

According to plaintiffs' second amended complaint, the Wilkinses were informed

of this issue on July 23, 2004.  *See* Second Am. Compl. ¶ 32, A-343.  On July 26, 2004, Dr.

Wilkins took out a secured loan and repaid the credit card.  *See* Akerley Decl. ¶¶ 20-23, Exhibits F and G, A-84, A-86.  Because a secured loan is an acceptable source of funds, Akerley deemed the issue resolved and approved the loan.  Akerley Decl. ¶ 26, A-65.[14]

Aside from this single issue relating to the source of the earnest money deposit, Dr. Wilkins testified the Wilkinses' purchase of 592 North DuPont Highway "went pretty smooth."  Wilkins Dep. at 90:4, A-276.  Indeed, he stated that he and his wife were "treated differently" by Hogsten than the Andersons and Wheatleys:

> We didn't have to get things all together.  And, again, those properties were all about the same as far as how they were.  I mean, they had been unoccupied for about the same length of time.  Similar ages, same amount of disrepair, which really was enough so that somebody could just purchase it and fix things up a little bit and move in.  I think that -- looking back, that if J.D. could have found something to try and hinder, he would have.
>
> One of the issues is that my credit was and still is impeccable.  And I don't think he [Hogsten] could do anything.  We had no debt.  I don't think I owed anything at that particular point.  There was nothing that I owed money for, so -- except for just regular monthly-type bills.  My credit was very good.  And a nice salary.  I think it was -- I think he was unable to come up with something.  That's the only reasonable answer that we could come up with as we kind of pondered *why I was treated differently*.

Wilkins Dep. at 90:4-25, A-276 (emphasis added).

---

[14]    When asked at his deposition why he believed that questioning the source of the earnest money deposit was "not customary procedure of the bank," Dr. Wilkins stated that he had "experience with a prior mortgage" and "was not required to . . . prove the source of my deposit."  Wilkins Dep. at 48:5-8, A-265.  But Dr. Wilkins conceded that he had "never used a convenience check for a deposit before."  Wilkins Dep. at 47:23-48:2, 48:21-22, A-265.

This testimony alone defeats plaintiffs' case. If the three properties "were all about the same," and Hogsten simply made up problems with the Andersons' and the Wheatleys' properties, what stopped him from making up a problem with the Wilkinses' property, particularly when "the Silver Lake community" supposedly was putting "pressure" on him to come up with something? Similarly, if the problem with the Wheatleys' use of business funds was simply made up by Hogsten in response to "pressure," what stopped Hogsten from making up some fictional problem with the Wilkinses' credit? Contrary to plaintiffs' arguments, "the only reasonable answer" for "why [the Wilkinses were] treated differently" is that the property they sought to purchase, and the method of financing they sought to use for that transaction, simply did not present the sort of appraisal and underwriting difficulties that the Andersons' and Wheatleys' properties (and the Wheatleys' use of business funds) presented. The only inference to draw is that Hogsten *was not discriminating against plaintiffs*.

### E.    Plaintiffs' Post-Closing Assertions

In their second amended complaint, plaintiffs allege that six months after they purchased the three properties, the Wheatleys were "forced" to sell their property to the Wilkinses because "the additional downpayment put a strain on the Wheatleys' other business transactions." Second Am. Compl. ¶ 79, A-350. Both the Wheatleys and the Wilkinses claim consequential damages as a result of this supposed "forced" sale.[15]

---

[15]    The sale actually took place in October 2005, more than a year after plaintiffs bought their properties, not six months as plaintiffs allege in the second amended complaint. Wheatley Dep. at 65:21-66:9, A-167 to A-168; *see also* A-574 (settlement statement dated 10/21/2005). The Wheatleys withdrew from the Tri-Core business in May 2005. *See* A-566 to A-573; *see also* Wheatley Dep. at 72:10-73:6, A-169.

First, plaintiffs have presented no evidence that the Wheatleys' increased downpayment put any "strain" on the Wheatleys' business.  Mr. Wheatley conceded at his deposition that the Wheatleys' limousine business made a profit of $84,704.00 in 2005 (the year in which they sold 584 North DuPont Highway to the Wilkinses) and a profit of $87,806.00 in 2004 (the year in which they incurred the increased downpayment on the property).  Wheatley Dep. at 98:24-99:3, A-176, 101:8-102:24, A-176 to A-177.  Plaintiffs have offered no expert testimony to support their contention that this mere $3,000.00 difference in profit between 2004 and 2005 represents a "strain" on the Wheatleys' business or was even attributable to the increased downpayment in 2004.  Indeed, after Mr. Wheatley's deposition, plaintiffs' counsel wrote a letter to Wachovia's counsel *withdrawing* the Wheatleys' claim of business losses in light of Mr. Wheatley's deposition testimony.  *See* November 6, 2007 letter from John Grady, in Appendix at A-688.

Second, Mr. Wheatley himself testified that the reason why he and his wife sold 584 North DuPont Highway and withdrew from plaintiffs' Tri-Core enterprise "was because the company wasn't doing any of its goals and objectives.  So we just withdrew from the company and just focused on our business because it was already up and running."  Wheatley Dep. at 75:8-17, A-170.  So, on Mr. Wheatley's own testimony, the Wheatleys were not "forced" to sell at all.

Third, plaintiffs have not even been able to keep their story straight about why the Wilkinses bought the Wheatleys' property.  In their *first* amended complaint, plaintiffs' alleged that the Wilkinses bought the Wheatleys' property because they were "concerned that if another individual purchased the Wheatley home the property might have been used for commercial purposes, thereby devaluing the Wilkins' and the Andersons' home."  Am. Compl. ¶ 90, A-335.

22

The fatal flaw in this story is that using the Wheatleys' property for commercial purposes is precisely what the Andersons and Wilkinses did.  After the Wilkinses bought the Wheatley property, they began tearing down the house because their limited liability company, Tri-Core, had a contract with the VA to turn the property into a clinic.  *See* Wilkins Dep. at 5:6-6:3, A-255, 56:5-23, A-267.[16]  During this process, in April and August 2007, the Wilkinses and the Andersons deeded their properties to the Tri-Core entity.  *See* deeds from the Wilkinses and the Andersons to Tri-Core at A-672 to A-681.[17]

Recognizing the need to change their story, plaintiffs' *second* amended complaint deletes the reference to their supposed concern that "the property might have been used for commercial purposes" and asserts instead that plaintiffs were "concerned that if another individual purchased the Wheatley home . . . they would lose the opportunity to use and enjoy their combined properties *as originally intended*."  Second Am. Compl. ¶ 108, A-356 to A-357 (emphasis added).  Although this allegation effectively concedes that plaintiffs "originally intended" to use their three properties for commercial purposes -- a fact they never disclosed to Wachovia -- it fails to show that the Wilkinses were "forced" to buy the Wheatley property.

---

[16]     A picture of the partially demolished house is in the Appendix at A-4.

[17]     The Wilkinses and Andersons did not satisfy their mortgages to Wachovia until October 2007, after their properties were deeded to Tri-Core.  *See* mortgage satisfaction notices obtained from the Kent County Recorder of Deeds, A-683 to A-686; *see also* Wilkins Dep. at 49:14-51:4, A-265 to A-266.

**ARGUMENT**

To defeat a motion for summary judgment, plaintiffs "may not rely merely on allegations or denials in [their] own pleading," but must "set out specific facts showing that there is a genuine issue for trial." Fed. R. Civ. P. 56(e)(2). They cannot do this.

**I.      Plaintiffs Have Absolutely No Evidence Of Purposeful Discrimination By Wachovia.**

To survive summary judgment, plaintiffs must present sufficient evidence from which a reasonable jury could conclude that Wachovia purposefully discriminated against them in the loan application process. *See, e.g., General Building Contractors Ass'n v. Pennsylvania,* 458 U.S. 375, 391 (1982) ("[Section] 1981 . . . can be violated only by purposeful discrimination."). Plaintiffs have neither direct nor circumstantial evidence of such discrimination. We begin with plaintiffs' failure to produce direct evidence.

**A.      Plaintiffs Have No Direct Evidence That Wachovia Discriminated Against Them.**

When pressed in their depositions to provide direct evidence of Wachovia's supposed discriminatory intent, plaintiffs have pointed to statements by Hogsten that purportedly are probative of discrimination. Specifically:

1)      Hogsten supposedly said, "I'm getting a lot of pressure on this property," or "They are really pressuring me on this deal," Anderson Dep. at 158:6-10, 159:2-5, A-136; Wheatley Dep. at 115:9-17, A-180;

2)      Hogsten supposedly said, "You people don't understand how the process works" or "you people don't understand the loan process," Anderson Dep. at 115:13-116:3, A-125; Wheatley Dep. at 139:4-8, A-186; and

3)      Hogsten supposedly told Mr. Anderson and Mr. Wheatley that "they" were going to be "watching" them.  Anderson Dep. at 155:13-15, A-135.

None of these statements provides any evidence of discrimination.

## 1.     "Pressure"

When asked at his deposition about his feeling "pressure," Hogsten explained:

> The pressure -- this is the only thing I can think of.  The pressure part of this was when I was dealing with these three loans that had to settle or they were going to lose their deposit.  The pressure was getting all to the settlement table all at the same time with the factors of the properties and dealing with what guidelines I had to deal with through the mortgage company.  So the pressure was from the underwriter.  The pressure was from Mr. Anderson because he was the spokesman for all three of the loan applications and getting -- you know, returning his phone calls or getting phone calls every day about it.  That's the pressure, if there's any pressure I can think of, we were talking about.

Hogsten Dep. at 36:1-14, A-197.

Plaintiffs speculate that Hogsten's alleged references to "pressure" were actually about pressure he supposedly was getting from "the Silver Lake community" to undermine plaintiffs' loans.  At his deposition, Anderson said:  "[T]here was no question of who he meant . . . . I already knew, man, we're buying on Silver Lake.  I sensed what was really going on." Anderson Dep. at 159:19-23, A-136.

25

But plaintiffs have not identified a single person from "the Silver Lake community" who even *spoke* to Hogsten about plaintiffs' loan applications, let alone put "pressure" on him to find some way to undermine the transaction.

Moreover, plaintiffs' conspiracy theory simply makes no logical sense.  With the exception of Hogsten's suggestion that Anderson make repairs to 580 North DuPont Highway after Mullens determined he could not do an appraisal, every single allegedly unreasonable "requirement" or "hurdle" that plaintiffs complain about came not from Hogsten and not from "the Silver Lake community," but from the underwriters in Waterbury, Connecticut.  It was the underwriter in Connecticut, Fazzino, not Hogsten, who denied Wheatley's initial loan application due to the condition of the property, and required inspections of the roof and the asbestos in the basement.  It was Fazzino again who flagged the problem with Wheatley's use of business funds and it was the exception officer, Terri Hamm, also in Connecticut, who refused to sign off on the exception for the Wheatley loan unless the down payment were increased to 20%.  Likewise, it was the underwriter for the Wilkins loan, Akerley, who raised the issue about the source of the funds for the Wilkinses' earnest money deposit.  Plaintiffs have no evidence that people in "the Silver Lake community" somehow put "pressure" on these individuals in Connecticut.  Plaintiffs do not even attempt to allege such a connection.

Nor could plaintiffs maintain that Hogsten, acting under pressure from "the Silver Lake community," somehow himself convinced the underwriters in Connecticut to find problems with plaintiffs' loans.  Colleen Fazzino herself testified that Hogsten repeatedly asked her to approve the Wheatley loan at a 90% loan-to-value ratio.  She testified that "JD [Hogsten] was really beating me up" because "he really wanted the loan approved."  Fazzino Dep. at 103:24-104:3, A-244.  And she noted in her "comments log" for the Wheatley loan that even after Terri

26

Hamm had signed off on the Wheatleys' exception at 80%, Hogsten was still advocating on

behalf of the Wheatleys for a 90% loan-to-value ratio. Fazzino Dep. at 104:4-18, A-244;

Fazzino Decl. ¶¶ 48-49, A-21 to A-22 ("LO [*i.e.,* the loan officer, Hogsten] is pursuing 90

percent again").[18]

Furthermore, if the problems with the Anderson and Wheatley loans were simply

invented by Hogsten in response to "pressure" from "the Silver Lake community," then it is a

mystery why Hogsten did not also invent reasons to deny the Wilkinses loan, which, on Dr.

Wilkins' own testimony, he did not. Wilkins Dep. at 90:4-25, A-276. *See supra* page 20.

### 2.    "You people"

The only putative evidence that Hogsten ever said anything along the lines of

"You people don't understand the loan process" is Anderson's and Wheatley's deposition

testimony. Plaintiffs' counsel never asked Hogsten at his deposition whether he made such a

statement. But even if we assume (given the posture of this motion) that Hogsten used the

phrase "you people" at some point in his discussions with plaintiffs, that phrase is not remotely

suggestive of discriminatory animus.

First, unlike Anderson's own statement that "we didn't want our property values

to go down by getting some gay to go in there" -- which, on its face, is a bigoted comment -- a

statement such as "You people don't understand the process" on its face does *not* refer to

---

[18]    *Cf. Hartsel v. Keys,* 87 F.3d 795, 803-04 (6th Cir. 1996) (rejecting inference of
discrimination where same actor who supposedly discriminated against plaintiff also
promoted her and gave her a $13,000 raise); *Antonio v. Sygma Network, Inc.,* 458 F.3d
1177, 1182 (10th Cir. 2006) (rejecting inference of discrimination where same actor both
hired and fired plaintiff).

plaintiffs' race.  *See, e.g., Whitley v. Peer Review Systems, Inc.,* 221 F.3d 1053, 1056 (8th Cir.

2000) (describing defendant's reference to "you people" as "innocuous").  As the Ninth Circuit

explained concerning a similar alleged remark

> Plaintiff contends that 'I don't understand you people' is a racial slur. But, that is not clear.  We cannot know to whom [defendant] was referring:  all of the employees directly under her supervision; all those who want to do, or are doing, marketing analysis; all young women who have not received a college education, or, as [plaintiff] asserts, all Hispanics.

*Alvarado v. Health Net, Inc.,* 1994 U.S. App. LEXIS 9123, *15-*16 (9th Cir. April 19, 1994).

Indeed, plaintiffs themselves concede that they do not know whom Hogsten

would have meant by the alleged references to "you people."  They simply assert that this is how

*they personally* interpret comments like this:

> I'm a tolerant individual, but when I start hearing words like ["you people"], that's what starts making *me* trigger, *at least for me, being in this world a little longer than I think J.D. was*, that that's starting to sound kind of like code messages and words, and I really didn't like it.
>
> . . .
>
> [Y]ou people is inferring my people or me, us people, who I'm representing the Afrocentric race . . . . *That's how I take it* whenever I hear stuff like that.

Wheatley Dep. at 139:8-140:2, A-186 (emphasis added).

Similarly, Anderson said:

> [T]he phrase 'you people,' in a normal conversation you wouldn't necessarily think too much about it, but in the context of all that was being done to us at the time, a reference to 'you people' is us black people, because we were the people that were trying to secure the loan, we were the people that he was referring to.

28

Anderson Dep. at 114:24-115:12, A-125.  Thus, on Anderson's own testimony, his only

"evidence" that Hogsten meant "black people" is that plaintiffs themselves are African-American

and plaintiffs "were the people he was referring to."  There is no support for that leap.

Furthermore, if Hogsten really harbored racial animus toward plaintiffs --

supposedly expressed in the innocuous phrase "you people" -- why would he have advocated

repeatedly on behalf of the Wheatleys to obtain the 90% loan-to-value ratio they desired?  *See*

Fazzino Dep. at 103:24-104:18, A-244; Fazzino Decl. ¶¶ 48-49, A-21 to A-22.  Equally

compelling is the fact that Mr. Anderson had previous dealings with Hogsten and Hogsten never

made any comments that troubled Mr. Anderson.  Indeed, Mr. Anderson testified that he had no

complaints at all about Hogsten in that previous transaction.  Anderson Dep. at 169:18-170:4, A-

138 to A-139.

But even if the Court were to assume that the phase "you people" could somehow

could be taken as an oblique reference to plaintiffs' race or a veiled expression of bias -- an

assumption for which there is no evidence -- that would show nothing.  "Stray remarks . . . by

nondecisionmakers, or statements by decision makers unrelated to the decisional process . . . are

not sufficient to establish a claim of discrimination."  *Clearwater v. Independent School District*

*No. 166,* 231 F.3d 1122, 1126-27 (8th Cir. 2000); *see also DeHorney v. Bank of America Nat'l*

*Trust & Sav. Ass'n,* 879 F.2d 459, 467-68 (9th Cir. 1989) (where defendant allegedly used the

phrase "you people," plaintiff "failed to establish a nexus between the alleged racial slur and the

decision to terminate").  With respect to the issues with the Wheatley property, Hogsten was

plainly a nondecision maker, so his alleged use of the phrase "you people" does not begin to

show that those issues were somehow fabricated out of racial animus.  And while Hogsten did

suggest that Anderson make repairs to 580 North DuPont Highway so that the property could be

appraised, plaintiffs have no evidence of any nexus between that suggestion and Hogsten use of

the supposedly offensive phrase "you people."

In short, Hogsten's purported references to "you people" do not support plaintiffs'

allegations of purposeful discrimination by Wachovia.

3.      **"They will be watching"**

Lastly, plaintiffs contend that Hogsten supposedly "threatened" them by saying

that "they" would be "watching" them.  Anderson Dep. at 156:2-10, A-135, 184:17-21, A-142.

As with the other statements that plaintiffs impute to Hogsten, this is not evidence of

discrimination.

As discussed *supra,* page 15, Hogsten explained at his deposition that he was

simply trying to convey to plaintiffs that it was a condition of their loans that they actually use

the properties as their residences, because Fannie Mae guidelines required this:  "[Y]ou have to

make sure this is your primary residence . . . . [I]f Fannie Mae detects any red fags or whatever,

they can call the loan due then and there.  That's a demand note."  Hogsten Dep. 54:11-55:15, A-

202.

The concerns voiced by Hogsten were well founded:  First, Colleen Fazzino, the

underwriter for the Anderson and Wheatley loans, had raised a question whether the Andersons

really intended to occupy the property given their long commute.  Fazzino Decl. ¶ 20, A-17.

Second, documents produced by plaintiffs strongly suggest that they were intending to use the

properties as investment properties, not as residences.  *See supra* pages 16-17.  Third, plaintiffs

30

never told Wachovia about the limited liability company they formed to hold their properties. Wheatley Dep. at 71:20-72:7, A-169; Wilkins Dep. at 57:23-58:17, A-267 to A-268.

Thus, far from being a "threat," Hogsten's advice to plaintiffs simply was an effort to convey the seriousness of plaintiffs' representations on their mortgage applications that they intended to use the properties as residences, and that not only Wachovia but Fannie Mae would expect plaintiffs to adhere to that promise.

*          *          *

In short, none of the statements that plaintiffs attribute to Hogsten supports their allegations of purposeful discrimination by Wachovia.

**B.    Plaintiffs Have No Circumstantial Evidence That Wachovia Discriminated Against Them.**

Having no direct evidence of purposeful discrimination by Wachovia, plaintiffs must find some circumstantial evidence to fill the gap in their proofs. We assume for the sake of argument that the "burden-shifting" framework first adopted by the Supreme Court in *McDonnell Douglas Corp. v. Green,* 411 U.S. 792 (1973), applies in a case of alleged credit discrimination.[19]  Under this framework,

> the plaintiff must first establish a prima facie case of race discrimination. At the second stage, the burden of production is placed upon defendant to articulate a legitimate non-discriminatory reason for its adverse action. Once the defendant satisfies its burden of production, the plaintiff then has

---

[19]    This assumption is dubious to say the least.  *See Latimore v. Citibank Fed. Sav. Bank,* 151 F.3d 712, 714 (7th Cir. 1998).

the burden of persuading the court that the proffered reason for the defendant's action is a pretext for discrimination.

*Cooley v. Sterling Bank,* 280 F. Supp. 2d 1331, 1339 (M.D. Ala. 2003) (citations omitted).

Plaintiffs cannot succeed at any stage of this analysis: they cannot establish a prima facie case; Wachovia had legitimate non-discriminatory reasons for any alleged adverse actions that it took; and plaintiffs cannot establish that any of these legitimate non-discriminatory reasons were mere pretexts for discrimination.

### 1.    Plaintiffs Cannot Establish A Prima Facie Case.

In the typical case of alleged credit discrimination under Section 1981, the plaintiff has been *denied* a loan.  In these situations, some courts say that the elements of a prima facie case are:

> 1) that the plaintiff is a member of a protected class; 2) that the plaintiff applied for and was qualified for a loan from the defendant; 3) that the loan was rejected despite the plaintiff's qualifications; and 4) that the defendant continued to approve loans for applications outside of the plaintiff's protected class with similar qualifications.

*Cooley,* 280 F. Supp. 2d at 1339.

These elements cannot be met here, of course, because plaintiffs were never denied loans.  To the contrary, each couple received a loan -- indeed, in the case of the Wheatleys, Wachovia made an exception loan just to accommodate them -- and each couple was able to purchase the property they desired.  This alone means that plaintiffs cannot establish a prima facie case of discrimination.

Nor could plaintiffs establish a prima facie case under a modified formulation of these elements that required proof, not that plaintiffs' loans were denied, but that plaintiffs were required to satisfy loan conditions that were not imposed on white borrowers. There is no evidence in the record that Wachovia imposes different appraisal or underwriting conditions on white and nonwhite borrowers. *Cf. Brown v. Interbay Funding, LLC,* 417 F. Supp. 2d 573, 578-79 (D. Del. 2006) (credit discrimination claim under ECOA failed where there was "no evidence of record depicting a different appraisal methodology being applied" to African-American and non-African-American borrowers).

### 2.     Wachovia Had Legitimate Non-Discriminatory Reasons For Every Action It Took.

In addition to failing to establish a prima facie case of credit discrimination, plaintiffs claims fail for the separate reason that Wachovia had legitimate, non-discriminatory reasons for every allegedly unreasonable conditions about which plaintiffs complain.

There can be no dispute that a satisfactory appraisal of 580 North DuPont Highway was a condition of the Andersons receiving their loan. *See* Anderson loan commitment at A-435. There also can be no dispute that Mullens, the appraiser originally assigned by GreenLink to do the appraisal, refused to take on the project when he saw the condition of the property. Mullens Decl. ¶¶ 8, 13, A-90. Contrary to plaintiffs' allegations, Mullens did not refuse to do the appraisal at the request of Hogsten. Mullens Decl. ¶ 21, A-92. Moreover, Hogsten explained in his deposition that his purpose in suggesting repairs was not to *undermine* the loan but just the opposite, to assist the Andersons in consummating it. Hogsten Dep. at 28:15-20, 29:8-10, A-195. This plainly is a legitimate, nondiscriminatory reason for suggesting that the Andersons repair the property.

Likewise, the Wheatleys do not dispute that the appraisal for their property identified serious concerns affecting the livability of the property.  The repairs to the property and the inspections of the roof and the asbestos in the basement that the underwriter Fazzino required were not imposed out of discriminatory animus, but simply out of a concern for the livability of the property.  At his deposition, Mr. Wheatley conceded that it made sense for a lender to want to ensure that the collateral for the loan was in livable condition.  Wheatley Dep. at 60:17-21, A-166.  He changed that answer on his errata sheet, but that alteration does not make Wachovia's concerns about livability any the less legitimate.[20]

Nor is there any thing illegitimate about an underwriting guideline that requires a CPA to verify business assets a borrower intends to use to purchase the property.  Fazzino testified that the Wheatleys' loan had to be done as an exception, not because the Wheatleys are African-American but because their loan did not comply with this guideline.  Fazzino Dep. at 51:10-19, A-231, 99:21-101:9, A-243; Fazzino Decl. ¶¶ 43, 44.

Lastly, Akerley, the underwriter for the Wilkinses' loan, raised an issue about their use of a credit card to pay the earnest money deposit, not because he wanted to harass them, but simply because a credit card is not an acceptable source of funds for a deposit.  Akerley Decl. ¶ 12, A-63, ¶ 18, A-64.

In short, Wachovia had legitimate, non-discriminatory reasons for each action that plaintiffs say was improper.

---

[20]     *Podell v. Citicorp Diners Club, Inc.,* 112 F.3d 98, 103 (2d Cir. 1997) ("[W]hen a party amends his testimony under Rule 30(e), the original answer to the deposition questions will remain part of the record").

### 3.    There Is No Evidence Of Pretext

Plaintiffs have no evidence that any of the legitimate, nondiscriminatory reasons for Wachovia's actions were a mere ruse to cover up an insidious discriminatory purpose. Plaintiffs can assert their personal belief that "the Silver Lake community" did not want them to purchase the properties, but that is not evidence that underwriting decisions made in Waterbury, Connecticut were fabricated to please that community. Likewise, plaintiffs can assert their personal belief that the loan conditions about which they complain were "unfair" or "unreasonable." But that self-serving testimony does not establish pretext.

Nor is there any merit to Mr. Anderson's contention at his deposition that repairs to the properties were not really needed because Wachovia had not required him to make repairs in the past for properties in "racially-mixed neighborhoods." Anderson Dep. at 46:6-52:16, A-108 to A-109, 93:21-94:20, A-119 to A-120, 157:11-158:3, A-135 to A-136. DeeAnn Wicks of Wachovia Bank, N.A. was the loan officer for the Andersons previous loans. Anderson Dep. at 89:17-21, A-118; Wicks Decl. ¶ 3, A-5. As Wicks explains in her declaration, the Andersons' previous loans were handled as commercial loans through Wachovia Bank, N.A., not as residential loans through Wachovia Mortgage Corporation. Wicks Decl. ¶¶ 5, 6, A-6. Commercial loans are not subject to the same appraisal and underwriting guidelines as residential loans and are not sold to Fannie Mae. Wicks Decl. ¶¶ 6, 7.

Thus, the third element of the *McDonnell Douglas* framework, like the first two elements, cannot be met here and plaintiffs' Section 1981 claim fails.

*        *        *

In sum, plaintiffs have neither direct nor circumstantial evidence supporting their allegations of purposeful discrimination by Wachovia.  The Court should enter summary judgment in favor of Wachovia.

## II.    Plaintiffs' Claim Under Delaware Law For Breach Of The Implied Covenant Of Good Faith And Fair Dealing Fails.

Plaintiffs' sole remaining claim is that Wachovia breached the implied covenant of good faith and fair dealing "in the contract to provide financing."  Second Am. Compl. ¶ 75, A-349, ¶ 97, A-353, ¶ 114, A-357.[21]  Plaintiffs' claim should be rejected.

### A.    Plaintiffs' Good Faith And Fair Dealing Claim Is Preempted By The National Bank Act.

Defendant Wachovia Mortgage Corporation, which issued plaintiffs' loans in this case, is an operating subsidiary of Wachovia Bank, National Association, licensed by the Office of the Comptroller of Currency ("OCC").  *See* Amended Answer and Affirmative Defenses ¶ 2.  *See also Watters v. Wachovia Bank, N.A.,* 127 S. Ct. 1559, 1564 (2007) (recognizing that Wachovia Mortgage Corporation is a wholly owned operating subsidiary of Wachovia Bank, N.A. licensed by the OCC).  As such, Wachovia Mortgage Corporation is entitled to be free from

---

[21]    It is unclear what plaintiffs mean by "the contract to provide financing."  It is possible that they mean the Mortgage Loan Application Agreement that each plaintiff couple signed when they applied for their loan.  *See* A-381, A-384, A-387.  Alternatively, plaintiffs may mean the mortgage loan commitments that Wachovia issued to the Andersons and the Wilkinses.  (The Wheatleys never signed a mortgage loan commitment with Wachovia because their initial loan application was denied due to insufficient collateral, and, given the short time frame, their second loan application was not approved until the day their loan closed on August 13, 2004.)

state interference in the exercise of its federally granted lending powers to the same extent as its National Association parent. *Id.* at 1571.

The National Bank Act ("NBA") expressly grants National Association banks (and, under *Watters*, their operating subsidiaries) the power to "make, arrange, purchase or sell loans or extensions of credit secured by liens on interests in real estate." 12 U.S.C. § 371. The NBA also authorizes National Association banks (and their operating subsidiaries) "[t]o exercise . . . all such incidental powers as shall be necessary to carry on the business of banking." 12 U.S.C. § 24 Seventh. Federal regulations promulgated by the OCC under the NBA further provide that "state laws that obstruct, impair, or condition a national bank's ability to fully exercise its Federally authorized real estate lending powers do not apply to national banks." 12 C.F.R. § 34.4(a).[22]

There is no question that plaintiffs' state law claim "obstruct[s], impair[s] [and] condition[s]" Wachovia's exercise of its real estate lending powers. Plaintiffs' core contention is that it is unfair for a lending institution such as Wachovia to impose loan conditions based on Fannie Mae underwriting guidelines. Plaintiffs seek to replace these standard guidelines with plaintiffs' personal guidelines made up by them *ad hoc* to accommodate their own situation. Thus, while their complaint "seems on the surface to seek redress under [Delaware] contract . . . law" in fact "such redress would circumvent preemption by the National Bank Act and the

---

[22]     "Federal regulations have no less pre-emptive effect than federal statutes." *Fidelity Fed. Sav. Bank v. De la Cuesta,* 458 U.S. 141, 153 (1982).

Section 34.4 exempts National Association banks from any "state law limitations concerning" "[t]he ability of a creditor to acquire or obtain private mortgage insurance," "[l]oan-to-value ratios" and "[t]he terms of credit." 12 C.F.R. § 34.4(a)(2), (3) & (4).

aforementioned regulations promulgated by the OCC." *Austin v. Provident Bank,* 2005 U.S. Dist. LEXIS 37113, *15 (N.D. Miss. July 26, 2005) (holding that state law claims including breach of the covenant of good faith and fair dealing and tortious interference with contractual relations were preempted by the NBA and 12 C.F.R. § 34.4(a)).  The NBA bars plaintiffs' claim.

### B.    Plaintiffs' Good Faith And Fair Dealing Claim Is Supported By No Evidence.

Even were it not preempted -- which it is -- plaintiffs' good faith and fair dealing claim still would fail.  The implied covenant of good faith and fair dealing prohibits one party from "taking advantage" of the other, *Dunlap v. State Farm Fire & Cas. Co.,* 878 A.2d 434, 442 (Del. 2005), or engaging in "arbitrary and unreasonable conduct which has the effect of preventing the other party to the contract from receiving the fruits of the contract," *Aspen Advisors LLC v. United Artists Theatre Co.,* 861 A.2d 1251, 1260 (Del. 2004).  Plaintiffs cannot establish such conduct.

As explained throughout this brief, nothing that Wachovia or its employees did in this case was "arbitrary" or "unreasonable."  Everything Wachovia did, it did to comply with standard underwriting guidelines.  Hogsten suggested that Anderson repair the damage from the broken water pipe in 580 North DuPont Highway because he knew the loan would never be approved with the property in that condition -- not because he wanted to undermine the transaction but because he wanted it to go through.  Fazzino denied the Wheatleys' initial loan application because the appraiser identified significant concerns affecting the livability of the property.  While those issues eventually were addressed, the Wheatleys could not satisfy underwriting guidelines requiring that a CPA verify their Schedule C profits and losses.  Thus, the exception officer Terri Hamm required that the loan be issued at an 80% loan-to value ratio

rather than the 90% ratio for which the Wheatleys applied.  Hamm did not do this to be "arbitrary" or "unreasonable," but simply because Wachovia cannot obtain lender's mortgage insurance for an exception loan.  Fazzino Dep. at 59:1-6, A-233, 123:17-124:13, A-249.  Lastly, the underwriter Akerley raised the issue about the Wilkinses' use of a credit card to pay the earnest money deposit, not out of arbitrariness, but because underwriting guidelines do not permit use of a credit card for such payments.

Nor is there any way in which Wachovia was "taking advantage" of plaintiffs. The only "advantage" that Wachovia obtained by "imposing" these supposedly "unreasonable" requirements was an increased assurance that the collateral for plaintiffs' loans was livable and the lower risk of default associated with an 80% loan-to-value ratio as opposed to a 90% loan-to-value.  Indeed, the 80% loan-to-value ratio was *dis*advantageous to Wachovia because it made less money than it would have under a 90% loan-to-value ratio.[23]

Plaintiffs only argument to the contrary is their own self-serving assertions that "it's not reasonable to require repairs or any work to be done on a property prior to the acquisition of the property," Anderson Dep. at 145:21-24, A-132, and that they "didn't see the . . . immediate reason to do all this extensive repair when the house appraised at its value of the loan," Wheatley Dep. at 127:10-18, A-183.  But "plaintiff[s] cannot force [Wachovia] to deviate from its standard practice or relying on the FNMA [Fannie Mae] guidelines in order to accommodate [their] particular situation."  *Matthiesen,* 173 F.3d at 1247.  Moreover, plaintiffs are not appraisers or underwriters and are not qualified to give testimony on what is reasonable

---

[23]     Not only was the principal smaller, but the interest rate Wachovia earned was lower as well.  Compare the Wheatleys' first loan application, A-400 (6.75% interest rate), with the Wheatleys' second loan application, A-408 (6.25% interest rate).

or customary in the mortgage lending industry. *Cf. Didzbalis v. Sheridan Transp. Co.,* 2002 U.S. Dist. LEXIS 22378, *2 (S.D.N.Y. Nov. 19, 2002) ("Generally, expert testimony is necessary for the introduction of custom and practice evidence."). Plaintiffs' counsel has declined to offer any expert testimony in this case despite urging by Wachovia's counsel that, in Wachovia's view, plaintiffs needed such testimony to support their claims. There is no sense in which underwriting practices in the mortgage lending industry are "within the common knowledge of laymen." *USH Ventures v. Global Telesystems Group, Inc.,* 796 A.2d 7, 21 (Del. Super. Ct. 2000). Thus it was "necessary for the Plaintiff[s] to introduce expert testimony in order to establish a prima facie case," *id.,* and they failed to do so.

The Court should reject plaintiffs' good faith and fair dealing claim and enter summary judgment in favor of Wachovia.

## CONCLUSION

For these reasons, defendants Wachovia Mortgage Corporation and Wachovia Corporation hereby respectfully ask that the Court enter summary judgment in their favor.

Respectfully submitted,

/s/ Michael J. Barrie

|  |  |
|---|---|
| | Michael J. Barrie (#4684) |
| *Of Counsel* | Schnader Harrison Segal & Lewis LLP |
| Elizabeth K. Ainslie | 824 N. Market Street |
| Stephen A. Fogdall | 10th Floor, Suite 1001 |
| Schnader Harrison Segal & Lewis LLP | Wilmington, DE 19801-3011 |
| 1600 Market Street, Suite 3600 | (302) 888-4554 |
| Philadelphia, PA 19103 | |
| (215) 751-2000 | |

*Counsel for Defendants Wachovia Mortgage Corporation
and Wachovia Corporation*

Dated: April 11, 2008

## CERTIFICATE OF SERVICE

I, Michael J. Barrie, certify that the forgoing Opening Brief of Defendants Wachovia Mortgage Corporation and Wachovia Corporation in Support of their Motion for Summary Judgment has been electronically filed and is available to be viewed and downloaded on the Court's ECF website.  I further certify that I have served a copy of Volume II of the Appendix upon the following by overnight mail:

John S. Grady, Esquire
Grady & Hampton, LLC
6 North Bradford Street
Dover, DE 19904


/s/ Michael J. Barrie
Dated:  April 11, 2008

**IN THE UNITED STATES DISTRICT COURT**

**FOR THE DISTRICT OF DELAWARE**

|  |  |  |
|---|---|---|
| TOLANO ANDERSON, et al., | ) | |
| | ) | |
| Plaintiffs, | ) | C.A. No. 06 CV 00567 (SLR) |
| | ) | |
| v. | ) | |
| | ) | |
| WACHOVIA MORTGAGE CORPORATION | ) | |
| *and* WACHOVIA CORPORATION, | ) | |
| | ) | |
| Defendants. | ) | |
| | ) | |

_____

**ORDER**

_____

AND NOW, this __ day of _____ , 2007, upon consideration of the

motion of defendants Wachovia Mortgage Corporation and Wachovia Corporation for summary

judgment, it is ORDERED that defendants' motion is GRANTED, and judgment is hereby

entered in favor of defendants and against plaintiffs on all claims.

_____
                                          Sue L. Robinson, U.S.D.J.

**CERTIFICATE OF SERVICE**

I, Michael J. Barrie, certify that the forgoing Opening Brief of Defendants

Wachovia Mortgage Corporation and Wachovia Corporation in Support of their Motion for

Summary Judgment has been electronically filed and is available to be viewed and downloaded

on the Court's ECF website.  I further certify that I have served a copy of Volume II of the

Appendix upon the following by overnight mail:

> John S. Grady, Esquire
> Grady & Hampton, LLC
> 6 North Bradford Street
> Dover, DE 19904


                                         /s/ Michael J. Barrie
Dated:  April 11, 2008