# IN THE UNITED STATES DISTRICT COURT

## FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| TOLANO ANDERSON, et al., | ) | |
| | ) | |
| Plaintiffs, | ) | C.A. No. 06 CV 00567 (SLR) |
| | ) | |
| v. | ) | |
| | ) | |
| WACHOVIA MORTGAGE CORPORATION | ) | |
| and WACHOVIA CORPORATION, | ) | |
| | ) | |
| Defendants. | ) | |

## PLAINTIFFS' ANSWERING BRIEF  IN OPPOSITION TO DEFENDANTS' MOTION FOR SUMMARY JUDGMENT

GRADY & HAMPTON, LLC

John S. Grady (I.D. 009)
6 North Bradford St.
Dover, DE 19904
(302) 678-1265
*Attorneys for Plaintiffs*

DATED:      May 9, 2008

## TABLE OF CONTENTS

STATEMENT OF THE NATURE AND STAGE OF THE PROCEEDINGS ..................... 1

STATEMENT OF FACTS ............................................................................................. 1

SUMMARY OF THE ARGUMENT ................................................................................ 17

ARGUMENT .................................................................................................................. 20

   I.     PLAINTIFFS HAVE DEMONSTRATED *PRIMA FACIE* EVIDENCE OF DISCRIMINATION. ................................................................................... 20

   II.    THERE IS STILL A QUESTION OF FACT WHETHER PLAINTIFFS' ALLEGED NON-DISCRIMINATORY REASONS FOR THIS ADVERSE ACTION WOULD ENTITLE THEM TO SUMMARY JUDGMENT. ............... 30

   III.   PLAINTIFFS HAVE MADE A CLAIM UNDER DELAWARE LAW FOR BREACH OF IMPLIED COVENANT OF GOOD FAITH AND FAIR DEALING. ................................................................................................. 32

   IV.   PLAINTIFFS' GOOD FAITH AND FAIR DEALING CLAIM IS SUPPORTED BY THE EVIDENCE. .......................................................................... 35

CONCLUSION ............................................................................................................... 38

# TABLE OF AUTHORITIES

## Cases

*Anderson v. L. Getty Lobby*, 477 U.S. 242 (1986) ................................................... 20

*Anderson v. Wachovia*, 497 F.Supp.2d 572 (D. Del. 2007) ....................................... 22

*Austin v. The Provident Bank*, 2005 WL 1785285 (N. D. Miss.) ................................. 32, 33, 34

*Beneficial National Bank v. Anderson*, 539 U.S. 1 (2003) ...................................... 19, 32, 33, 34

*Cooper v. Paychex, Incorporated*, 163 F.3d 598 (4th Cir. 1998) ............................... 28

*EEOC v. Alton Packaging Corp.*, 901 F.2d 920 (11th Cir. 1990) ............................... 28

*Fidelity Federal Savings and Loan Association v. De La Cuesta*, 458 U.S. 141 (1982) ............ 34

*Green v. California Court Apartments, LLC*, 2008 WL 681835 p. 5 (W.D. Wash) .................. 28

*Hadfield's Seafood v. Rouser*, 2001 WL 1456795 (Del. Super.) ................................. 21

*Hampton v. Dillard's Department Stores, Inc.*, 247 F.3d 1091 (2001) .......................... 18, 20

*Johnson v. Wachovia Bank, N.A.*, 2006 WL 278549 (D. Md.) ..................................... 34

*Kendrick v. Penske Transportation Services, Inc.*, 220 F.3d 1220 (10th Cir. 2000) .......... 23

*King v. Hardesty*, 517 F.3d 1049 (10th Cir. 2008) .......................................... 18, 28

*Kunda v. Mohlenberg College*, 621 F.2d 532 (3rd Cir. 1980) ................................. 25

*Lattimore v. Central City Federal Savings Bank*, 151 F.3d 712 (7th Cir. 1998) .............. 21

*Mathiesen v. Bank One Mortgage Corp.*, 173 F.3d 1242 (10th Cir. 1999) ...................... 37

*Matsushita Elec. Indust. Co. v. Zenith Radio Corp.*, 475 U.S. 574 (1986) ..................... 20

*McDonnell Douglass v. Green*, 411 U.S. 792 (1973) ........................................... 21, 28

*PAS Communication, Inc. v. Spring Corporation*, 139 F.Supp. 1149 (D. Kan. 2001) .............. 23

*Sheridan v. E.I. duPont and Company*, 1000 F.3d 1061 (1996) .................................. 18, 21

*Stewart v. Rutgers, the State University*, 120 F.3d 426 (3rd Cir. 1997) .................... 18, 20, 25

*Village of Arlington Heights v. Metropolitan Housing Development Corporation*, 429 U.S. 252 (1977).............................................................................................25

*Williams v. Cloverland Farms*, 78 F.Supp.2d 479 (D. Md. 1999).........................................19, 23

## **Statutes**

12 *C.F.R.* §34.3 ..........................................................................................................33, 34

12 *C.F.R.* §34.4 ....................................................................................................33, 34, 35

15 *U.S.C.* §1591(a)(1)...................................................................................................21

42 *U.S.C.* §1981 ...............................................................................................1, 18, 20

**STATEMENT OF THE NATURE AND STAGE OF THE PROCEEDINGS**

This is an action alleging a violation of 42 *U.S.C.* §1981 in connection with contracts for mortgages by the Plaintiffs. There are also State cause of actions for a breach of the mortgage application contract and the covenant of good faith and fair dealing.

The Court, in a memorandum decision dated July 18, 2007, denied in part and granted in part Defendants' motion based upon Plaintiffs' first amended complaint.

Discovery has now been completed. Plaintiffs have filed a second amended complaint. The Defendants have filed a motion for summary judgment asking that the 42 *U.S.C.* §1981 (p. 24 of Defendants' brief) claim and on the breach of the implied covenant claim (page 36 of Defendants' brief) be dismissed.

**STATEMENT OF FACTS**

**The contracts.**

Plaintiffs entered into three contracts with Mr. Aigner to purchase 580, 584 and 592 North Dupont Highway Dover, Delaware – $266,667.00 for each property. The understanding between the buyers and the seller was that the Plaintiffs were required to put down a total $40,000.00 deposit – $13,333 each. The total purchase price for the three properties was $800,000.00. (Anderson pp. 32-33, A-104) It was understood between the buyers and the seller that the seller intended to use the proceeds of the funds for another transaction. The understanding between the buyers and the seller was that in the event that any one of the transactions fell through then the entire transaction would fall. Throughout, each of the Plaintiffs was aware that if any one of the three loan applications failed then they were subject to loss of their deposit. The agreement of sale between the parties did not make reference to this "all or nothing" agreement; however, this information was made known to the loan officer

1

Hogsten. In fact, Mr. Hogsten acknowledged that he was aware of this arrangement and that if one of the transactions should fail, then all three were subject to failure. (Hogsten, p. 22, A-194)(See Anderson pp. 11-13, A-99 for contract arrangements.) (Before the Plaintiffs signed the contract with the seller, they reviewed with Hogsten the "all or nothing" proposition. (Anderson p. 85, A-117) "Once [Hogsten] agreed that there was no issues that would prevent a deal like this from transpiring, then we just went forward after that." (Anderson p. 88, A-118) See also Second Amended Complaint paragraphs 4 and 6 (A-320-321); (Anderson pp. 81-82, 84-85, A-115-117)

**The properties.**

The properties involved were adjacent to each other and all were located backing up to Silver Lake in Dover, Delaware. The property owners on or around Silver Lake are predominantly white. (Amended Complaint para. 4) (A-320-321) Anderson pp. 42-45 (A-107) (Anderson p. 106, quoting Deanna Wicks of Wachovia Bank, who stated "Silver Lake is an exclusive lily white community and now here are you guys." (Anderson pp. 106-107, A-123) Anderson bases his understanding of the demographics on "having visited and interacted with and personally been involved with the neighborhood." (Anderson p. 45, A-107)(See also Anderson p. 69, A-113)(Hill – B-14-15)

In June 2004, Anderson initially met with J.D. Hogsten to apply for a mortgage loan. There was a payment required at the time of the application. With the payment of the application fee, the bank was required to make a good faith effort to process the loan. (Hogsten p. 13, A-191) The Plaintiffs relied upon Hogsten to work for them to obtain the loans that would be suitable for this transaction. None of the Plaintiffs had any special knowledge of the internal workings of the bank. Prior to June 2004, Anderson had processed at least two dozen

prior real estate transactions.  (Anderson p. 93, A-119)  He had also had eight transactions with Wachovia, including at least one transaction with J.D. Hogsten.

Anderson testified that he had never had any problems until he tried to obtain this loan. His previous dealings with Wachovia had been primarily with Deanna Wicks.  From his point of view, she worked for Wachovia Bank the same as Hogsten did.  He had no understanding that they worked for different companies.  Anderson testified that both Ms. Wicks' card and Mr. Hogsten's card both said they worked for Wachovia Bank.  (Anderson 90, A-119)

None of the properties involved had been occupied in June 2004.  According to the affidavit of Scott Schuh, the Wheatley and Wilkins properties were "livable", but the Anderson property had had water damage in the basement.  (B-16)  At the time of the transaction, none of the Plaintiffs was familiar with the Fannie Mae guidelines or the Fannie Mae selling guide. Their experiences in dealing with banks had been personal with respect to their transactions.

**Bank procedures.**

During the course of discovery, the Fannie Mae guidelines were produced and there was deposition testimony by the bank representatives concerning those bank procedures.  No other similar bank documents were produced during discovery.  (The Defendants, in their opening brief, referenced the "Fannie Mae Selling Guide".  The "Fannie Mae Selling Guide" had not been previously referenced or produced in prior discovery.  It should not be considered in this motion.  According to Defendants, Fannie Mae guidelines must be met if the mortgage is being sold.  If the bank keeps the mortgage, there is no need to follow Fannie Mae guidelines. (Fazzino pp. 123-124, A-248)  There is no testimony that Plaintiffs were ever told about Fannie Mae guidelines.

The key players in this case were Mr. Hogsten, Mr. Skowronski, his supervisor, Ms. Bello, the loan processor, and Colleen Fazzino, the underwriter. There is also a reference to a Mr. Akerley, who was only involved in the Wilkins underwriting.

Mr. Hogsten's responsibility was to take the loan applications and forward that information to the loan processor. He had no authority to deny a loan (Bello, p. 10, A-304) and he had no authority to order an appraisal. He had no authority to create any conditions on a mortgage. Although he was generally familiar with the Fannie Mae guidelines, he had no authority to create any conditions based upon those guidelines. He probably was not even familiar with the guidelines that dealt with appraisals. (Skowronski p. 17, A-283) He has nothing to do with the decision making of the loan. (Skowronski p. 28, A-288) Part of his responsibility was to review the information provided by the loan applicant and at least make some initial judgment as to what kind of loan the applicant was requesting and what kind of loan suited his or condition. (Skowronski p. 20, A-284) (Bello p. 11, A-304)

Ms. Bello was the loan processor. She had no authority to grant or deny a loan or set any conditions on the loan. (Bello p. 10, A-304). She generally took instructions from the underwriter. She did order a credit report and appraisal. The appraisal was returned to her. It was not her responsibility to review the substance of the appraisal, but rather to forward it on to the underwriter. (Bello p. 58, A-314) A commitment could be issued even before an appraisal was completed. If that were the case, then the commitment would be subject to a future appraisal. (Bello p. 21-22, A-306)

Colleen Fazzino was the underwriter. She had the authority to accept or reject loans or to create conditions necessary to meet a loan. (Bello p. 10, A-304) Only the underwriter could make a request for repairs to be done on a home. She made no requests for repairs to the

4

Anderson property. (Fazzino pp. 19-20, A-223) or the Wheatley property (Fazzino pp. 72-73, A-236) Hogsten had no authority to make requests or requirements for repairs. (Bello p. 23, A-307). According to Fazzino, an exception could be made to the Fannie Mae guidelines and in fact that is what was finally done in the case of Wheatley. (Fazzino pp. 123-124, A-249) There is no evidence that Wheatley or Anderson were ever told of the exceptions rule.

Mr. Skowronski was the supervisor of Mr. Hogsten. He would, from time to time, interact with individual borrowers to help resolve problems, and if appropriate, to facilitate a loan. He would try to be a problem solver. (Skowronski p. 57-58, A-293)

Terry Hamm's name was mentioned during the Fazzino deposition. Her deposition was not taken and there was no direct testimony from her as to what her responsibilities were. According to Fazzino, she authorized the exception for the Wheatley loan

**The Anderson application.**

Mr. and Mrs. Anderson completed their application on June 27, 2004. After the application was completed, it was sent to Connecticut. Ms. Bello ordered an appraisal from Greenlink, a wholly-owned subsidiary of Wachovia. (A-415)(Bello p. 35, A-310) Mr. James Mullens was contacted to do the appraisal. Mr. Anderson was aware at the time that he signed the contract that there was work that needed to be done on the house. He testified that there was a broken water pipe that had drained down to the basement and that had been repaired. He said there was drywall that needed to be repaired and the basement needed to be cleaned out. He stated that the home needed some paint in one of the bedrooms and needed some carpet replaced. (Anderson p. 122, A-127).

Shortly after signing the contract, Anderson met with Mullens who was to appraise the property. Hogsten was also present at the time. Anderson stated that it was highly unusual in

his experience to have someone from the bank also present at the appraisal.  Hogsten confirmed

that this was not the usual procedure.  (Hogsten p. 26, A-195)  At the time of the appraisal,

Hogsten told Anderson, "I'm not going to be able to assign any value to this property."

(Anderson p. 119, A-120)  Anderson questioned him why an appraisal could not be made;

however, Hogsten simply repeated, "It just doesn't look to me like we're going to be able to go

forward here."  (Anderson p. 120, A-129)  Hogsten told Anderson that there are "things that

would have to be done but since you don't own the property, I know that won't be possible so

then we are done here."  (Anderson p. 120, A-126) Hogsten and the appraiser, Mr. Mullens,

then went out to lunch.  Anderson thought it was unusual that they were so friendly.  (Anderson

pp. 124-125, A-127)

Hogsten went on to say "There's no way we're going to be able to find comparables to

this property."  (Anderson p. 121, A-126)  Anderson then asked Hogsten what he could do to

be able to have the property appraised.  Hogsten's response was, "There is no value here…This

property has no value."  (Anderson p. 123, A-127)

Shortly thereafter, Anderson did contact another appraiser, Mr. Kaplan, and asked him

if he could provide comparables to the house.  Mr. Kaplan did provide comparables and

Anderson supplied them to Hogsten.  (Anderson p. 128, A-128)  Within approximately one

week, Anderson asked Hogsten about the appraisal.  Anderson was told by Hogsten that he did

not see any value in the property and that if he was going to give any value to the property it

would have to be placed into a move-in condition.  (Anderson p. 131, A-129) (Hogsten p. 34,

A-197)

Hogsten told Anderson what repairs had to be made and said that since "we don't have the ability to do the repairs because we don't own the property…I guess we're done here." (Anderson pp. 138-139, A-131)

On or about July 2, 2004, Dr. and Mrs. Wilkins met with Hogsten in connection with their mortgage application.  At that time, Hogsten referred to the Anderson property as a "pile of sticks and bricks that he could assign no value to."  (Wilkins pp. 18-19, A-258)  On July 14, 2004, a commitment letter was issued to the Andersons.  (Anderson p. 132, A-129)  The commitment letter said "satisfactory appraisal supporting minimum value of $266,666" would be required."  (A-435; B-6)  There is no reference or statement on the commitment letter as to the requirement of any kind of repairs, nor is there any reference for a need for the property to meet Fannie Mae guidelines or be put into "move-in" condition.  (A-435)(A-37)

The actual appraisal of Anderson's property was not completed until August 2, 2004. At that time, all of the repair work was essentially done, as per the requirements of Hogsten. (Anderson pp. 154-155, A-135)

During the application process, there were a number of events that occurred which concerned Anderson and for which he has testified in his opinion indicated discriminatory conduct.

Anderson referred to some comments made by Deanna Wicks, another loan officer from Wachovia.  He had indicated that in his experience within the community there had already been some resistance about him inquiring into properties in areas other than Silver Lake.  He said that during the conversation with Deanna Wicks, she said "Silver Lake is an exclusive lily-white community and now here you guys some."  (Anderson p. 106, A-123) Anderson, in that same conversation, said "It is really a shame that it comes to that, but we

have experienced this type of thing in other areas and we've been exposed to discrimination and racism." (Anderson pp. 106-107, A-123)  Mr. Anderson indicated that she was referring to white people who live on and around Silver Lake and he indicated that he was not certain what her perception was as far as people within her organization.  (Anderson, pp. 108-109, A-123) He said that he did not know for sure, but would suspect, based upon future actions, that people in-house and certainly people in the community had issues with them purchasing the property. (Anderson p. 109, A-123)  He said he could not be sure from her statement alone if she was concerned with people in-house or out of house.  He said she did not exclude people at Wachovia, but she did not specify people at Wachovia.  (Anderson p. 110, A-124)

Mr. Anderson also indicated that he was convinced by the treatment from J.D. Hogsten that he was being discriminated against.  As an example, he said J.D. used the phrase "you people".  He said that in normal conversation "you wouldn't necessarily think too much about it, but in the context of all that was being done to us at the time a reference to 'you people' is us black people because we were the people that were trying to secure the loan and we were the people that he was referring to."  (Anderson pp. 114- 115, A-125)  To put it more in context, Anderson said the typical comment would be something like, "You people don't understand how the process works" or "You people don't know how the procedures", or words to that effect.  (Anderson p. 115, A-125)

Anderson was more specific in his concerns about Hogsten with the issue of the repairs and the appraisal.  Anderson told Hogsten that he thought that the property was well-worth what he was paying for it and that he would like to go to settlement and fix it up later.  He further said that if he could fix it up at his own pace it would cost him less because he could do more of the work himself.  (Anderson pp. 142-143, A-132)  In these discussions, Anderson

made it clear to Hogsten that he thought the requirements were onerous. He asked Hogsten the "regulations, policies, and guidelines that gave him the authority to make us do the repairs." (Anderson p. 146, A-133) Hogsten would not give him an answer. Anderson testified that he had other dealings with Wachovia and all the repairs were not necessary for these other transactions. (Anderson p. 157, A-135)

Anderson said that he actually made a phone call within the Wachovia organization to find out what the guidelines were that Hogsten kept referring to, but he was told that they were "internal policies not available to the public." (T-162) He also indicated that the tone of Hogsten's conversations turned disrespectful and disdainful. (Anderson 162, A-137) At the deposition, Anderson said "I'm telling you what was said and I'm not telling you the disrespect and disdain. I mean, it turned into an absolute mess."

Anderson also testified that on numerous occasions Hogsten said "I'm getting a lot of pressure on this property." (Anderson 158, A-136) "There is no way you're going to be able to do it within the time frame we have before settlement so it's not going to happen." (See Anderson p. 156, A-135)(Anderson 144, A-132) Anderson referred to Hogsten's comments as "I'm under a lot of heat", "I'm under a lot of pressure", "I don't think this is going to work", "I don't think we're going to be able to do it" and he was using every opportunity he could to disqualify us on the deal. (Anderson 158-159, A-136) Anderson indicated that he told Hogsten that he had a commitment, but Hogsten's response was "I'm just getting so much pressure" and "Hey, you're not recording this conversation are you?" Anderson testified that he specifically asked Hogsten, "Who is pressuring you?" and Anderson never got an answer. The only response was "I don't think we're going to be able to do this deal. I'm getting a lot of pressure and a lot of heat on this deal." (Anderson pp. 159-160, A-136)

Anderson testified that Hogsten said that he was "going to personally insure that the things that he had required of us were done before he would actually allow us to go to the settlement table." (Anderson p. 156, A-135)

**Fazzino testimony.**

Fazzino testified that after the application was completed by Anderson it would first go to the processor and she would put it together and send it to the underwriter. (Fazzino p. 11, A-221) Fazzino testified that it was the underwriter's responsibility to review the appraisals. She testified that in reviewing the Anderson file it did not appear that there were any issues with the property. (Fazzino p. 15, A-222) She testified that a conditional approval was made even before she received the appraisal. (Fazzino p. 17, A-222) She testified that she had no idea why the appraisal that she received was in August when the original application was in June. She testified that she was not involved in any conversations, requirements or anything like that making any repairs to the building. (Fazzino pp. 19-20, A-223) She said in general that if there are any property concerns or repairs that it would be handled by the underwriter, but in this case there were none. She said that when she received the appraisal back on approximately August 3, she had approved of the transaction. She testified that loan officers such as Mr. Hogsten are required to "get us loans, review products with borrowers and pricing." (Fazzino p. 120, A-223) She said in response to the question, "Mr. Hogsten, does he have any responsibility in the system to determine whether a house needs repairs or doesn't need repairs?" The answer was "No." (Fazzino p. 22, A-224) From her point of view, Mr. Hogsten takes the information. She also said the processor does not make any determinations about repairs. According to Deanna Wicks, Anderson had received loans from Wachovia Bank on 13

different properties.  (A-66)  According to Anderson, those properties were all in either predominantly minority neighborhoods or mixed racial neighborhoods.  (Anderson, A-106)

Fazzino's testimony is not as clear as one would hope; however, when asked if she made any specific and direct directions to anybody as to any repairs that Wheatley had to do, she said "I don't remember asking anyone to make any repairs, no.  That's not something I would do."  (Fazzino p. 73, A-236; See also Fazzino pp. 52-53, A-231)

**Wheatley transaction.**

Wheatley testified that he first met with the seller, Peter Aigner, somewhere in May 2004 and Aigner specifically required that all three properties be purchased at the same time and that the deal had to be an all or nothing deal.  (Wheatley p. 78, A-153)  Wheatley testified that the agreement of sale specifically provided that in the event that there was a default by the buyers the deposit money would be lost.  (Wheatley p. 10, A-154)  Wheatley also testified that there was a lot of trouble during the loan closing because they were purchasing in a white neighborhood.  (Wheatley p. 17, A-155)  Wheatley, in examining the census map produced by Fogdall, testified that in the area where they were purchasing there were only white homeowners.  (Wheatley p. 4, A-156)  He made that statement based upon living within the vicinity for 20 years and knowing the demographics of the community.  (Wheatley p. 27, A-157)  Wheatley testified that when he first met with Hogsten he suggested that the property be purchased as a "no income verification loan."  (Wheatley p. 26, A-158)  Wheatley testified that the original application he signed for was a no income verification loan.  (Wheatley p. 28, A-158)  On July 7, Wheatley's property was appraised for $267,000.00, which was the full purchase price.  (Wheatley p. 57, A-165)  The appraisal report noted some need of repair; however the amount of the appraisal was still $267,000.00 in an "as-is" condition.  (Answer to

Amended Complaint, ¶81, A-368)  In other words, despite the need for repairs, the property was still valued at $267,000.00.  (A-421)  The property was noted to be in "fair to average overall state of repair".  (A-424)

The record reflects that the original loan was denied on July 22, 2004 (Fazzino p. 24, A-227); however, there is nothing to indicate that this was ever communicated to Wheatley. Wheatley's credit score (681) did meet the Fannie Mae guidelines for the stated income program when the loan-to-value was a 75-90% (A-43); however, apparently not for the no ratio program when the loan-to-value was greater than 75%.  (A-49)  Wheatley was referred to have five-star credit.

According to Wheatley, his loan was transitioned and changed into a verification loan. According to Wheatley, he was told of the change of the loan by Hogsten, who told him that it was a better package for him.   (Wheatley p. 28, A-158)(See also Fazzino p. 85, A-239)(Wheatley p. 30, A-159)  According to Wheatley, Hogsten changed the loan from 15% down to an income verification loan 90% to be financed.  He said that he was required to provide two years of tax returns, which would have been for the years 2002 and 2003, and bank statements.  Wheatley said that all of his accounts were with Wachovia.  (Wheatley p. 34, A-160)  He said that on the new loan package his assets did not have to be submitted because they were already in the accounts, which Wachovia already had.  (Wheatley p. 35, A-160)  Wheatley testified that the assets in his accounts were not separately business funds.  From the point of view of the Internal Revenue Service, all of the funds are simply his.  (Wheatley p. 36, A-160)

According to Wheatley, he went to closing on August 6, 2004; however, the papers from Wachovia were not delivered.  At that time, Wheatley was under the impression that the down payment was to be 10%.  (Wheatley p. 104, A-177)  Wheatley testified that someone

called his insurer, Allstate, and made an inquiry about the roof and that he was required to have a contractor go out and inspect the roof, which he did.  According to Anderson, the need for the roof certification was presented on the very day of the first settlement (B-2) even thought the appraisal had been made a month prior on July 7, 2004.  (A-420)  There was nothing wrong with the roof.  Anderson and Wheatley viewed the roof certification as just another attempt to thwart the settlement.

Wheatley testified that for the second closing, August 13, 2004, there was an increase in the down payment from 10% to 20%.  He said that was the first time he had heard about the down payment going from 10% to 20%.  Wheatley testified that on August 12, 2004, he was informed by Mr. DeStefano that Wachovia was unable to obtain a PMI for his home and that the only way to go forward was to put down 20%.  According to Wheatley, there was a change in the loan between August 6 and August 12 and the change in the loan was caused by Hogsten.  (Wheatley pp. 110-111, A-179)  Wheatley testified that in his experience he had never had a problem with a loan after it was appraised.  He said in this case his home was appraised for the full value and yet he still had all kinds of problems with the loan.  (Wheatley p. 114-115, A-180)  According to Anderson, Hogsten told Wheatley on August 6, the day of the closing, that the bank was now requiring a roofing certificate from a contractor.  This problem was rectified only by the seller agreeing to postpone the settlement and obtaining a roofing certificate between August 6 and August 13.  (B-11)

Wheatley also testified that Hogsten had told him that he was getting a lot of pressure about these loans and that there are people "who do not want you all buying these homes in that area."  (Wheatley 116, A-180)  Wheatley said he specifically asked him who was giving him pressure, but Hogsten would not supply the names of the people.  (Wheatley 116-117)

13

Wheatley testified that the house appraised for the full value.  He testified that he had he been white there would not have been any outside force or pressure.  Wheatley testified that Hogsten told him that the deal was off after the appraisal of his home.  (Wheatley p. 122, A-182)  According to Wheatley, Hogsten said that "There was no way you're going to be able repair and fix those things in the house before it gets to closing."  (Wheatley p. 122, A-182)  Wheatley felt that this put him the very difficult position of repairing a property that he did not own.  (Wheatley pp. 122-123, A-182)

Another complaint was that Hogsten unnecessarily required the house to be in move-in condition.  (Wheatley pp. 127-128, A-183)

Wheatley complained that at the time of the second settlement the loan rate had been changed and that if he did not go forward with the settlement he and his friends were subject to losing the down payment and the costs of all the repairs that had been done.  (Wheatley p. 133, A-184)  Wheatley testified that he does not believe that he would have received the treatment he received had he been white.  (Wheatley p. 134, A-185)  According to Wheatley, when Hogsten indicated that he was receiving a lot of pressure on him not to approve the loan, he interpreted that comment that because three minority families were purchasing properties on Silver Lake with all non-minorities there were individuals in the community putting pressure on Hogsten.  He interpreted the statement as "Blacks cannot buy in this area.  We don't want you because you're blacks."  (Wheatley p. 136, A-185)  Wheatley also testified that when the issue of the change of loans was being made the comments by Hogsten of "you people don't understand us" was representative as people of the Afro-centric race.  Wheatley interpreted this as a code:  "you people is inferring my people as me – us people, who I'm representing the

Afro-centric race, are not competent enough to understand what's going on here." (Wheatley p. 140, A-186)

Anderson has supplied in his supplemental affidavit some information not previously asked at his deposition. In his signed statement, Anderson has stated that Hogsten told Anderson that Wheatley would not receive a commitment until Wheatley's property was put into a move-in condition. (B-10, 11) In fact, the record reflects that there is a commitment dated August 6, 2004, but it is not signed. (B-6)

Dr. Wilkins testified that the Wheatleys had planned to move into their home at 584 N. Dupont Highway. They had furniture there, but they had some challenges paying for two mortgages at the same time. (Wilkins p. 69, A-270)

**The Wilkins transaction.**

Dr. Wilkins and his wife signed a mortgage application for the property located at 592 N. Dupont Highway, Dover, Delaware. During their meeting, Hogsten described the Anderson property as a "pile of sticks and bricks". (Wilkins pp. 18-19, A-258) He said all of the homes had been uninhabited for about the same period of time. (Wilkins p. 18, A-258) He testified that the telephone conversations he had with Hogsten subsequently were "derogatory, antagonistic attitude, unprofessional attitude." (Wheatley p. 22, A-259) He said that there were :extra financial burdens put on them by the requirements that J.D. required on the purchase of the properties. Extra monies were spent, a lot more than we had originally planned." (Wilkins pp. 25-26, A-259-260) He testified that when he paid the down payment on the agreement of sale to Mr. Aigner he used a credit card. He testified that that was how he normally did business and he simply paid the credit card off at the end of the month. He said

15

that prior to this time there had never been any problem with that procedure.  (Wilkins p. 47, A-265)

He said that 592 N. Dupont Highway was a second home.  (His mortgage application reflected his intent.  (A-408)  He said that he would stay there when he would come to Dover and that sometimes his daughter would stay there and that there were other people who came and stayed on and off.  (Wilkins p. 70, A-271)  He said that during the NASCAR race time, he did rent out his space to people who were attending the NASCAR race.  He said this was also normal for most of the businesses on North Dupont Highway.  (Wilkins p. 71, A-271)

Wilkins referred to the attitude of Hogsten as semi-pompous.  (Wilkins p. 81, A-273) He was asked to explain at his deposition the allegations of racial discrimination.  He stated that while in the military he had experience with racial discrimination.  He referred to the conduct of J.D. Hogsten as "attitude, unprofessionalism, extra requirements to have the property [repaired] the requirement to have someone that's selling the property and needed to get the property repaired, the difficulties that the Wheatleys and Andersons had when they had previously not had such problems, the comments by J.D. Hogsten that 'you're not gonna get the property repaired so I guess it nixes the deal'".  (Wilkins pp. 82-84, A-274)  He said the extra money that was necessary for the repairs put a strain on all three couples.  He cited by comparison the experience he had with Midcoast Bank when their property was refinanced.  He said it was 180 degrees different.   The loan went "smoothly, non-antagonistic, very professional, courteous, respectful."  (Wilkins p. 87, A-275)  He felt like by comparison "J.D. Hogsten wasn't for us, he was against us."  He said that Hogsten was supposed to be making a profit and that his conduct did not make any sense, which was an indication to him that this was a racial issue.  (Wilkins p. 87, A-275)  He testified that the previous purchases by Anderson

were in predominantly African-American neighborhoods and that the properties in question seemed to have crossed the line into a white neighborhood. He suggested that that was a reason for the negative experiences they had. (Wilkins p. 88, A-275) He said that even though his dealings went smoother than those of Anderson and Wheatley, yet he was affected because of the all-or-none purchase that was required.

## SUMMARY OF THE ARGUMENT

1.    In June 2004, Plaintiffs, all African-Americans, applied for mortgages in connection with the purchase of three adjacent homes on Silver Lake in an all-white neighborhood.

2.    Plaintiff Anderson had extensive previous transactions with Wachovia Bank in obtaining mortgages in either predominantly black or mixed-race neighborhoods. He had no previous problems in obtaining loans.

3.    Plaintiffs primarily dealt with J.D. Hogsten, the loan officer, whose responsibility was to take the information from Plaintiffs, recommend a loan package and forward it to the processor and underwriter.

4.    J.D. Hogsten had no authority to require any kind of repairs by the Plaintiffs on the properties in question as a condition of approval for their mortgages. Yet he repeatedly required Anderson and Wheatley to put the houses they wanted to purchase in "move-in" condition as a requirement of their loan applications.

5.    J.D. Hogsten, almost from the very beginning, created onerous repair conditions on both the Anderson and Wheatley properties, which made it more difficult and more costly for the Plaintiffs to obtain their mortgages.

6.    Hogsten repeatedly made attempts to derail the transaction and when confronted refused to explain to the Plaintiffs why he was making things so difficult, and in fact used the

racially derogatory term of "you people" in his discussions with the Plaintiffs, suggesting that the black Plaintiffs, Anderson and Wheatley, were not intelligent enough to understand what he was talking about.

7.     The evidence in the record supports direct and indirect evidence of racial discrimination. See *Hampton v. Dillard's Department Stores, Inc.*, 247 F.3d 1091, 1101-1102 (10th Cir. 2000) proving racial discrimination case pursuant to §1981; *Sheridan v. E.I. duPont & Company*, 1000 F.3d 1061, 1071-1076 (1996)(proving intentional discrimination); *Stewart v. Rutgers, The State University*, 120 F.2d 426, 434 (3rd Cir. 1997)(evidence of procedural and substantive irregularities can be evidence of intentional discrimination)  See *King v. Hardesty*, 517 F.3d 1049, 1058-1059 (10th Cir. 2008).  (Direct evidence of discrimination sufficient to defeat a motion for summary judgment.)

8.     The Defendants' case relies upon the reliability of Hogsten's testimony.  Hogsten's testimony, at a minimum, is suspect.  He testified that after working at the Delaware State Housing Authority, being a residential mortgage loan processor in Kent County and being reared in Kent County he had no idea of the demographics around Silver Lake or hardly any part of Dover.  His testimony is more than suspect.  A fact finder could reasonably find that his testimony that he was just trying to help the Plaintiffs is not credible.  Furthermore, considering the racial remarks made by Hogsten and considering the fact that the Plaintiffs had never had any problems with mortgages until they attempted to obtain a mortgage in an all-white neighborhood should be sufficient for a jury to find that race was a motivating factor in the conduct of Hogsten.  Wachovia

is responsible for the conduct of Hogsten.  *Williams v. Cloverland Farms*, 78 F.Supp.2d 479, 484.

9.    The Plaintiffs' State law claims are not preempted by the National Bank Act.  This is not a usury case or a case controlled by any federal law.  See *Beneficial National Bank v. Anderson*, 539 U.S. 1 (2003).  The State law claims of Plaintiffs arise out of vanilla common law contractual obligations of treating an individual fairly who contracts with a bank to obtain a mortgage.  See also *Johnson v. Wachovia Bank, N.A.*, 2006 WL 278549 (D. Md.)

10.    There is no need for anymore expert testimony.  Plaintiffs are relying on the admissions of the Defendants as evidence that the standards of Wachovia were violated by Hogsten.

## ARGUMENT

**I.    PLAINTIFFS HAVE DEMONSTRATED *PRIMA FACIE* EVIDENCE OF DISCRIMINATION.**

### A.    Standard of Review.

In the review of a motion for summary judgment, all disputed facts are to be read in a light most favorable to the non-moving party.  All reasonable inferences are to be given to the non-moving party.  *Matsushita Elec. Indust. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986); *Anderson v. L. Getty Lobby*, 477 U.S. 242, 255 (1986); *Stewart v. Rutgers, the State University*, 120 F.3d 426, 431-432 (3rd Cir. 1997).

### B. The elements of a *prima facie* case.

Defendants have argued in their motion to dismiss that Plaintiffs' complaints do not make out a *prima facie* case of violation 42 *U.S.C.* §1981.  The Court denied that motion. Nevertheless, Defendants have raised that issue again in the motion for summary judgment. Much of the central facts have not materially changed since that time.  The Plaintiffs have filed an amended complaint to clarify that they were discriminated against in their contract to obtain fair treatment in the applications for the mortgages.  (Second Amended Complaint ¶¶69, 95, 102; A-348, 353, 357)

As the Plaintiffs argued in their opening brief, citing *Hampton v. Dillard's Department Stores, Inc.*, 247 F.3d 1091, 1101-1102 (2001), the basic elements of a Section 1981 claim are (1) plaintiff must show that plaintiff is a member of a protected class; (2) that defendant had the intention to discriminate on the basis of race; and (3) that the defendant interfered with a protected activity as defined in Section 1981.  In this case, there should be no question that Plaintiffs are members of a protected race.

The second element that the Court must address is whether or not there is sufficient evidence to demonstrate intentional discrimination. The Court, in *Sheridan v. E.I. duPont and Company*, 1000 F.3d 1061, 1071-1076 (1996), reviewed the difficulties and methods in proving intentional discrimination. The court said there will seldom be eyewitness testimony as to the employer's mental process. "Cases charging discrimination are uniquely difficult to prove and often dependent upon circumstantial evidence." One model that has developed through the years is the model of *McDonnell Douglass v. Green*, 411 U.S. 792 (1973). In that model, the plaintiff was only required to demonstrate (1) that he was a member of a racial minority; (2) he applied and was qualified for a job; (3) he was rejected for the position; and (4) the position remained open. Discrimination was inferred from this bare showing. Using the *McDonnell Douglas* model, the burden then shifts to the employer to explain his conduct. If he makes such a showing, the employee has the opportunity to demonstrate the reasons supplied by the employer constituted a pretext. This is not a classic *McDonnell Douglas v. Green* case. In the case of *Lattimore v. Central City Federal Savings Bank*, 151 F.3d 712 (7th Cir. 1998), Judge Posner reviews the *prima facie* case of credit discrimination pursuant to 15 *U.S.C.* §1591(a)(1). In that case, he said that "the Supreme Court has reminded us that *McDonnell Douglas* was not intended to be a single straight jacket into which every discrimination case must be forced into." (p. 714) Judge Jordan, in *Hadfield's Seafood v. Rouser*, 2001 WL 1456795 (Del. Super.) acknowledges that in some cases a different analysis is necessary. In her analysis of a discrimination case in connection with treatment of a customer in a restaurant, Judge Jordan listed her elements as follows: (a) plaintiff was a member of a protected class; (b) refusal of service; and (c) were others treated more favorably. She acknowledges that the third element

of a *prima facie* showing of discrimination, were others treated more favorably, may not necessarily be the best kind in evaluating a discrimination case.  She states:

> Many courts have discussed the difficulty of proving this third element.  It must be wholly unrealistic to require a member of a protected class to identify victims of such outlandishly horrendous service who were not members of a protected class.

## C.     Plaintiffs *prima facie* case.

This Court, in a prior opinion, *Anderson v. Wachovia*, 497 F.Supp.2d 572, 580-581 (D. Del. 2007), concluded that if Plaintiffs were able to prove what they allege in their complaint that that would be sufficient to draw a reasonable inference of intentional racial discrimination. The Defendants in this motion for summary judgment suggest that the Plaintiffs cannot demonstrate evidence of racial discrimination.   Plaintiffs submit that the additional facts brought out in the discovery process substantiate Plaintiffs' claims.

The first allegation of the complaint is that they wanted to obtain mortgages for houses in what they characterize as a white neighborhood.  The Plaintiffs have testified that, in fact, the ring around Silver Lake was predominantly white.  See also affidavit of Mr. Hill  (B-14) The Defendants have attached to their brief a document from the census bureau included in their appendix at A1 entitled "Delaware Census Information".   No one on behalf of the Defendants has testified as to the significance of the census information or the accuracy. Standing alone, it is hearsay.  Hogsten, a long-time resident of Dover, who formerly worked for the State Housing Authority, had no opinion of the demographics.  (Hogsten p. 15, A-192) Plaintiffs have disputed the accuracy of Defendants' interpretation of the data.  The Plaintiffs, based upon their own experience, have challenged the documentation.  According to testimony of Anderson, Deanna Wicks referred to the neighborhood as "lily-white".  At a minimum, there

is an issue of fact as to the demographics of the neighborhood.  At this stage in the proceedings, the issue of fact has to be construed in favor of the non-moving party, the Plaintiffs.

Plaintiffs charge that the treatment they received from Hogsten was racially biased and that Defendants are responsible for the conduct of Hogsten.  See *Williams v. Cloverland Farms*, 78 F.Supp.2d 479, 484 (D. Md. 1999)

## 1.    Disparate treatment – procedural substantive irregularities.

Significant procedural violations and deviations from established practices can be sufficient to demonstrate intentional discrimination.  See *PAS Communication, Inc. v. Spring Corporation*, 139 F.Supp. 1149, 1193 (D. Kan. 2001), and case cited therein *Kendrick v. Penske Transportation Services, Inc.*, 220 F.3d 1220, 1230 (10th Cir. 2000).

Plaintiffs allege that they were required to meet different appraisal, home improvement and financial requirements than similarly situated applicants.  The Plaintiffs in this case cannot produce actual comparisons of other white applicants at Wachovia.  The Defendants objected to all attempts at discovery of any comparative statistics and documentation that might exist (See Fazzino pp. 116-117, A-247)and the Court ruled that it would not permit such discovery.  The Plaintiffs have produced their own testimony of how their treatment was significantly different than their prior experiences at this bank and other banks.  Plaintiffs suggest the reason for the difference in treatment was because three black families were attempting to purchase adjacent properties in what has been described as a "lily white" neighborhood.  Plaintiffs have testified that in their experience that in order to be approved for a loan the property generally had to appraise at the price of the home.  That had been their prior experience with Wachovia and other banks.  In fact, the commitments that Anderson and Wilkins obtained suggested that was the requirement.  (B-18; A-435)  There is nothing in the commitment letter (A-435) or

Fannie Mae guidelines (A-40) that the Plaintiffs homes had to be in a "move-in" state. Mr. Hogsten told Anderson and Wheatley that the loan would not go forward until the houses met move-in condition, which was as approved by him. After the initial appraiser went to the Anderson residence, there was no new appraisal until after Anderson had essentially completed all repairs. According to Anderson, Hogsten told him Wheatley would not get a commitment until Hogsten said the repairs met his standards. (B-10) In fact, there is no evidence whether Wheatley ever received a signed commitment. (B-6) The implementation of the procedures of the bank, with respect to these three black families, was clearly contrary to the procedures of the bank and to all other customers who applied, the majority of whom are undoubtedly white. Unbeknownst to Plaintiffs, Hogsten had no authority to make the requirements with respect to the repairs. Furthermore, the person who may have the authority, Fazzino, never made any such requirements.

From the deposition testimony of Skowronski and Fazzino, it can be inferred that Hogsten completely overstepped his role, thereby frustrating Plaintiffs' attempt to obtain a mortgage. His role was supposed to be to take the information from Plaintiffs for their mortgage application, and forward it to the processor and the underwriter. If more information was needed, he would assist.

Instead, he took every opportunity to prevent Plaintiffs from obtaining a mortgage. When the initial appraiser came out, a friendly acquaintance of Hogsten, and said he could not do an appraisal, Hogsten said the deal was off. Hogsten said there were no comparables. Anderson offered him comparables and Hogsten refused to follow up. There was no new appraisal attempt until the property was repaired to Hogsten's standards. Hogsten told both Anderson and Wheatley that the properties had to be in "move-in" condition. Hogsten told

Anderson repeatedly that the deal could not go through because of all the repairs that had to be made. On the day of the settlement, Hogsten made a new requirement that a roofing certificate had to be produced, even thought the appraisal had been made a month earlier and there was no evidence of any roofing problems. Wheatley could not get a commitment until the property met Hogsten's standards. Hogsten tried to kill the deal at the very end when insisting upon a roof certificate. Only through the intervention of Skowronski and/or DeStefano was the Wheatley mortgage completed. Hogsten, even at that late date, tried to kill the deal. Hogsten knew throughout that the purchase of the Plaintiffs was an all or nothing deal and that Wilkins was subject to lose his property and deposit if the Anderson or Wheatley deals fell through.

Hogsten made all of these conditions on Anderson and Wheatley when he knew that he had no such authority. (Skowronski pp. 12, 24-28, A-285; Fazzino p. 22, A-223) All of these departures from normal procedures can be considered as evidence that race is a factor. *Village of Arlington Heights v. Metropolitan Housing Development Corporation*, 429 U.S. 252, 267 (1977). See also *Stewart v. Rutgers, The State University*, 120 F.2d 426, 434 (3rd Cir. 1997). See *Kunda v. Mohlenberg College*, 621 F.2d 532, 539 (3rd Cir. 1980)(Procedural irregularities considered by the trial court in connection with its finding that the discrimination was intentional.) Plaintiffs suggest that even according to the undisputed testimony, similarly situated whites were not subject to the stringent requirements that Plaintiffs were in this case. Plaintiffs suggest that based upon this record that information is sufficient to again meet the *prima facie* showing of intentional discrimination.

## 2.    Other evidence of discrimination.

The Defendants, in their brief, have selected certain statements from the depositions and then construed them in the light most favorable to the Defendants rather than to the Plaintiffs.

Some of the statements that they have selected do indeed suggest an inference of discrimination. Both Wheatley and Anderson testified that some of those comments are indicative of discriminatory intent. Those comments should not be taken alone, but should be taken along with the other significant undisputable irregularities in this entire process. The most significant irregularity is that Hogsten, for his own reasons, created repair standards which were not part of the commitment letter, nor even part of the Fannie Mae guidelines. The commitment letters said nothing about bringing the property up to move-in condition. The Fannie Mae guidelines are only designed for properties that are to be sold on the market. The bank does not have to comply with Fannie Mae guidelines for loans not being sold. The Plaintiffs were not told that this loan was the kind of loan that would be sold on the market. Even if they had been, the guidelines do not require nearly the stringent requirements as required by Hogsten. The Fannie Mae guidelines talk about how appraisals are done. They suggest that when an appraisal is done and there are partially incomplete additions or renovations the property must be appraised subject to completion of the specific alterations or repairs. (A-46) The appraiser of the Wheatley property noted certain deficiencies, but nevertheless appraised the property for $267,000.00 (A-421) even before any repairs were made. Mr. Schuh, who was acting on behalf of the former owner, has provided an affidavit that the Wheatley property was livable. (B-16) It can be inferred that Hogsten caused the delay in the Anderson appraisal until Anderson had repaired the property according to Hogsten's requirements and would not even permit a commitment letter to be issued for Wheatley until Wheatley's home met Hogsten's repair standards.

      **a.**      **Pressure.**

Anderson testified that Hogsten was getting a lot of pressure on this property and that they were "really pressuring me on this deal". In analyzing the significance of this statement, we cannot simply rely upon Hogsten's testimony in this motion for summary judgment, but rather we must rely upon the testimony of Anderson. (Anderson p. 158, A-136) Anderson said Hogsten told him "I'm under a lot of heat" "I'm under a lot of pressure." "I don't think this is going to work. I don't think we're going to be able to do it." (Anderson pp. 158-160, A-136) Anderson stated that he believed Hogsten was being pressured to "cause it [the deal] to collapse". Anderson perceived the requirements that Hogsten was placed on him as Hogsten's method of responding to the pressure. (Anderson pp. 161-162, A. 136-137)

Anderson testified that because three black couples were buying on Silver Lake there was pressure not to go forward with the transaction. Anderson specifically asked Hogsten who it was that was providing the pressure, but Hogsten refused to answer. It is up to a jury to decide what the significance of that comment was.

### b.    You people – Direct evidence of discrimination.

Plaintiffs, as being part of the black community, undoubtedly have heard whites refer to them in a derogatory sense as "you people." There is no reason at this stage to suggest anything to the contrary. If there is more than one possible meaning to the phrase "you people", that certainly can be argued. At this stage in the proceedings, it is legitimate to consider "you people" as direct evidence of discrimination.

The cases that have addressed "you people" have attempted to put the language in context of the particular facts. Some cases have indicated that a reference to black people as "you people" evidences direct evidence of discrimination. Others, when not related to the claim of discrimination, held the comment not to be not controlling.

27

In *EEOC v. Alton Packaging Corp.*, 901 F.2d 920, 923 (11th Cir. 1990), the court said the comment "you people can't do a thing right" in an employment discrimination case constituted direct evidence of discrimination.

In *Green v. California Court Apartments, LLC*, 2008 WL 681835 p. 5 (W.D. Wash), a housing discrimination case, held that the statement "you people are all the same" satisfied the *prima facie* showing of discrimination.

In *Cooper v. Paychex, Incorporated*, 163 F.3d 598 (4th Cir. 1998), in an unreported opinion, the court, in a racial employment case, said that "you people don't have the technical expertise" was evidence of Reed's racial bias, affirming the lower court decision 960 F.Supp. 966 (E.D. Va.), which was published.

In *Kirt v. Fashion Bug, Inc.*, 495 F.Supp. 957 (N.D. Iowa 2007), the court said that the statement "you people" suggested racially discriminatory intent.  The court dismissed the claim on other grounds.

Direct evidence of discrimination is generally sufficient to defeat a motion for summary judgment.  *King v. Hardesty*, 517 F.3d 1049, 1058-1059 (10th Cir. 2008).  With strong direct evidence of discrimination, the *McDonnell Douglas* analysis is not necessary.

### c.    They will be watching both Wheatley and Anderson.

Hogsten comment that they would be watching Plaintiffs suggested to Plaintiffs that the watch that would be of them would be far more intense than normal.  In light of all the other circumstances going on, it would certainly be reasonable for Plaintiffs to suspect that there was an undue watch being made on them.  Since this is a motion for summary judgment, the Court should not simply accept Hogsten's explanation.

The Defendants attempt to support their position by arguing that the documents produced by Plaintiffs suggest they were intending to use the properties as investment properties. The Plaintiffs, in their depositions, have not only denied this but have provided explanations that they did not intend to use them for investment properties when they were purchased. (Anderson p. 27, A-103)(Wilkins p. 69, A-270; pp. 70-71, A-271) Anderson testified that the reason he did not move in promptly was because he was tied up in the military. (B-12) Wheatley had difficulties selling his home and moving in. Dr. Wilkins testified that the residence was supposed to be a second residence from the beginning. That is what he said on his application. (Wilkins pp. 70-71, A-271)

Anderson testified at his deposition repeatedly that the question of Tri-Core did not really come into question. "Tri-Core didn't have any assets. It was a thought, an idea." The notes in the records about Tri-Core are dated September 3, 2004 – several weeks after the mortgage transaction. (A-529) It is noteworthy that the notes, even at that time, question whether the requirements on properties by Wachovia were discriminatory. (A-530) The undated operating agreement makes reference to the formation date of July 8, 2004. There is no evidence that any action was taken by Tri-Core until after the August settlement.

    **d.      "Gay" or "yahoo".**

The Defendants raise in their brief a comment made by Anderson to which Defendants suggest that Anderson is a bigot and not Wachovia. Anderson has submitted an amended errata sheet in which he states that he did not use the word "gay". (B-3) The word that he used was "yahoo". The court reporter simply got it wrong. If the comment were as outrageous as Defendants suggest it was at the deposition, one would have certainly thought that there would have been a great deal of follow-up at the deposition. A reasonable explanation of what

happened at the deposition is that when Anderson used the word "yahoo" nobody blinked and the deposition went on. Anderson should have picked up this mistake when he reviewed the transcript the first time; however, he failed to do so. He has, at this time, submitted an affidavit indicating that there was a mistake. (B-11) For purposes of summary judgment, Anderson's corrected deposition and his recent affidavit should be controlling.

Defendants argue again that it is inconsistent that Hogsten would be discriminating against Anderson since in his prior dealings Hogsten had never discriminated against him. Plaintiffs have argued throughout that the difference in this transaction is that three black families have attempted, and finally did, purchase property in an all white Silver Lake neighborhood and that situation had never occurred before.

## II. THERE IS STILL A QUESTION OF FACT WHETHER PLAINTIFFS' ALLEGED NON-DISCRIMINATORY REASONS FOR THIS ADVERSE ACTION WOULD ENTITLE THEM TO SUMMARY JUDGMENT.

The Defendants in this case have argued that the alleged unnecessary repairs and the financial restrictions on Wheatley were not discriminatory, but in fact were done for some other non-discriminatory reasons. The Defendants argue in their brief that Wachovia had non-discriminatory reasons for every action it took. Defendants, in its motion for summary judgment, asked the Court to accept the explanations of Hogsten versus the assertions of Anderson. On the contrary, the Court is required at this stage of the proceedings to accept the assertions of Anderson rather than of Hogsten. Defendants argue at page 32 of their brief that Hogsten explained in his deposition that the purpose of suggesting repairs was not to undermine the loan but just the opposite, to assist the Andersons in consummating it. This is hardly an uncontroverted fact. Anderson testified first that he had no idea that he would be required to make any such repairs. Anderson had reason to believe this since it was certainly

not in his commitment and it was not his experience.  The commitments letters that were issued certainly did not state that there were any such requirements.  Anderson specifically asked Hogsten what regulations required this conduct and Hogsten refused to tell him.  Anderson asked Bello and he got the same answer.  Certainly, a question of fact exists as to what the real motive of Hogsten was.  From these facts, one can certainly infer that Hogsten was making the loan application more difficult on three black families who were trying to obtain property on Silver Lake, which is an all-white neighborhood, than he would normally do.  In fact, the testimony from Wachovia is that Hogsten should not have been making any requirements on Anderson or Wheatley about repairs.  (Fazzino p. 22, A-224)  That was not his job and he took that upon himself.  He repeatedly told Anderson and Wheatley that unless they met his own requirements then the loans would be denied.  He suggested on several occasions during the course of the proceedings of the loan process that he would deny the loan.  The final loan of Wheatley was not approved until Anderson or Wheatley asked either Skowronski or DeStefano to intervene.  (A-347, ¶60)

The Defendants refuse to accept for this motion for summary judgment what Wheatley stated in his errata sheet (B-1), that is, that it was unreasonable for him to make these last-minute corrections.  At this stage in the proceedings, the Defendants are required to rely upon what is on the errata sheet.  Furthermore, Wheatley, at his deposition, testified that he did have a problem with the treatment he received. (Wheatley pp. 119-120, A-181)

It is reasonable to infer that the race of Plaintiffs was a substantial factor in the way this entire loan transaction was handled by Hogsten.  Defendants argue that Hogsten "suggested" repairs.  The records must be read in favor of the Plaintiffs at this stage of the proceedings. Hogsten <u>required</u> repairs so the Anderson and Wheatley properties would be in "move-in"

condition.  Even the Fannie Mae guidelines do not require "move-in condition".  A jury can reasonably infer that Hogsten was doing all he could to defeat the mortgage application.

Hogsten's testimony that he had no idea of the racial make-up of Silver Lake or virtually any other part of Dover colors the credibility of his entire testimony.  It is extremely hard to believe that someone who grew up in Dover, went to local schools, worked for the Delaware State Housing Authority, and then worked as a residential loan processor in Kent County for 15 years (Hogsten pp. 2-4, A-18) would have "no idea" of the racial make-up around Silver Lake.  (Hogsten pp. 15-17, A-192)  (Affidavit of Hill, B-14-15)

## III.    PLAINTIFFS HAVE MADE A CLAIM UNDER DELAWARE LAW FOR BREACH OF IMPLIED COVENANT OF GOOD FAITH AND FAIR DEALING.

The Defendants argue that the Delaware claim is preempted by the National Bank Act. Defendants argue in their brief that the regulations issued pursuant to Title 12 provide that "State laws that obstruct, impair or condition a national bank's ability to fully exercise its federally authorized real estate lending powers do not apply to national banks."  Citing 12 *C.F.R.* §34.4(a).

The Defendants rely upon *Austin v. The Provident Bank*, 2005 WL 1785285 (N. D. Miss.).  That case relied upon *Beneficial National Bank v. Anderson*, 539 U.S. 1 (203), which held that a case filed under a state's usury laws is completely preempted by the National Bank Act.  The *Austin* court relied upon 12 *C.F.R.* §34.3.  This is obviously not a usury case. *Beneficial* is not directly on point.  Defendants argue that *Austin v. The Provident Bank*, 2005 WL 1785285 (N. D. Miss.) supports their position that state law claims, including breach of the covenant of good faith and fair dealing, are preempted by the National Bank Act and §34.4(a). The complaint in the *Austin* case alleged 12 specific cause of actions, including a breach of the

covenant of good faith and tortious interference with a contract. The *Austin* court, relying upon *Beneficial National Bank v. Anderson*, said that the *Austin* complaint alleges, *inter alia*, interest rates that were outside the reasonable commercial standards of appropriate risk-based pricing (and)…excessive, improper and fraudulent fees. The *Austin* court said that the complaint never makes use of the term "usury"; however, it clearly seeks remedies for the charge of excessive interest and fees from national banks in connection with real estate loans. It said that with respect to §34.3(12), it appears to preempt claims related to the rates of interest on loans without regard to whether those rates are, *per se* usurious. The court went on to say that other claims seem to be covered by subsection (a)(9), which covers disclosures and credit-related documents. The plaintiff in the *Austin* case claimed that the defendants procured false, fraudulent and inaccurate documentation concerning the mortgage application. The *Austin* plaintiffs also claimed exorbitant fees and expenses in connection with the loans. Based upon the nature of the complaints, the court found that the cause of actions alleged by Austin were preempted. The instant case can be distinguished. The cause of action in the instant case under Delaware state law arises out of an allegation that the bank has a good faith obligation in processing its application contact with the Plaintiffs. The Delaware law implies that in every contract there is a good faith obligation. 12 *C.F.R.* §34.4(b)(1) clearly provides that state laws which are not inconsistent with the real estate lending powers of national banks are not preempted. Among those are contracts. The Delaware common law cause of action of the covenant of good faith does not in any way impair or condition a national bank's ability to fully exercise its federally authorized real estate lending powers. It does not affect the rates of interest and does not affect any of the 14 covenants specified in §34.4. It only applies to the

basic contract in the application process of fair dealing – a provision which Defendants admit is required.

In the case of *Johnson v. Wachovia Bank, N.A.*, 2006 WL 278549 (D. Md.), another court examined the applicability of the National Bank Act to a cause of action brought by the plaintiff for constructive fraud, negligence and a violation of the Maryland Consumer Protection Act.

That court took a more restrictive view of the *Beneficial* decision and of the case of *Fidelity Federal Savings and Loan Association v. De La Cuesta*, 458 U.S. 141, 153 (1982). The court there stated that complete preemption depends upon a clear congressional intent for the state law to be entirely displaced as demonstrated by the statute.

The *Johnson* court acknowledged that it is unquestionable that complete preemption exists in actions where it is alleged that national banks have violated state usury laws, citing *Beneficial National Bank, supra,* and *The Provident Bank*. The Maryland court stated, however, that the Supreme Court in *Beneficial* found that requiring congressional intent for complete preemption not in federal regulations but in sections 85 and 86 of the National Bank Act. The court concluded that a claim such as the one asserted by plaintiff in that case based upon alleged acceptance of forged documents was well within the exceptions created by 12 *C.F.R.* §34.4, which subject national banks to state contract and tort laws are not inconsistent with the real estate lending powers of national banks.

There is no specific discussion in *Austin* of whether or not the breach of the covenant of good faith and fair dealing standing by itself would be grounds for preempting that cause of action. In fact, a fair reading of *Austin* is that one has to look beyond the mere allegations to determine what the core underlying facts really consist of. Plaintiffs would suggest that the

Delaware cause of action is also clearly not inconsistent with the real estate lending powers of national banks.

## IV.   PLAINTIFFS' GOOD FAITH AND FAIR DEALING CLAIM IS SUPPORTED BY THE EVIDENCE.

This Court has already addressed the allegations in the complaint concerning the issue of breach of the implied covenant of good faith and fair dealing in its opinion of July 18, 2007. At that time, the Court ruled that the allegations of the complaint were adequate to withstand the motion to dismiss.  The issue presented in this motion for summary judgment is whether or not after full discovery Plaintiffs' claims are sufficient to survive a summary judgment motion.

The Plaintiffs have alleged, and the Defendants have even agreed, that in connection with the application for a mortgage the Defendants had a duty to at all times treat Plaintiffs fairly.  Plaintiffs have alleged that Defendants' agent, Hogsten, deliberately and intentionally acted beyond his authority in attempting to discourage and prevent Plaintiffs from obtaining their mortgage while he knew that if Plaintiffs were not able to obtain a mortgage they would be subject to a $40,000.00 loss of their down payments and loss of all time and money that they spent in repairing the properties.

The Court, on the motion to dismiss, ruled that the Plaintiffs' allegation that the Defendants took advantage of the fact that the Plaintiffs needed to buy all three houses in order to complete their deal with Aigner and erected unreasonable hurdles before they could receive their contract was sufficient to make out a claim.

In the second amended complaint, Plaintiffs clarified the allegation that the complaint was that the breach of the fair duty was in connection with the contracts to fairly process the mortgage applications.  The deposition and affidavit testimony is still sufficient to defeat Defendants motion.  Plaintiffs have alleged throughout that J.D. Hogsten created unreasonable

repair obligations which were not part of the original application, or part of the commitment. The commitment simply says that the commitment is subject to an appraisal.  There is no language on the commitment or the Fannie Mae guidelines suggesting that certain repairs have to be made to put the home in "move-in" condition.  In fact, Anderson's appraisal process did not proceed until after the repairs had been made at Hogsten's direction.

Wheatley was also in receipt of an appraisal, which was approved for an amount sufficient for the mortgage, notwithstanding some repairs which might have to be made.  The affidavit of Schuh refers to the Wheatley property as "livable".  (B-16)  Then, in a long series of steps, one hurdle after another was raised by Hogsten and Wachovia, including a requirement on the day of the first settlement that Wheatley had to have a certificate for the roof.  Furthermore, Wheatley's loan application kept changing until the very day of the second settlement, where he was suddenly required to produce a 20% down payment instead of a 10% down payment.

The Defendants argue in their brief that Hogsten was simply trying to do the Plaintiffs a favor and that all the other requirements were based upon guidelines (which were neither supplied nor identified to Plaintiffs, despite the fact that Plaintiffs asked about what these potential guidelines were).  There is simply a dispute of fact at this stage of the proceedings and as a result the motion for summary judgment should be denied.

Wachovia clearly was in a far superior position than Plaintiffs in the application process.  Plaintiffs presented their needs to Hogsten.  It was Hogsten who determined what kind of loan program would suit Plaintiffs' needs and he forwarded that program to the processor and the underwriter.  Plaintiffs had no idea what the bank rules were.  They simply assumed that the bank was treating them fairly.  Then, unbeknownst to the Plaintiffs, Hogsten

started to create repair obligations that were never explained to them and were not part of the application process, nor were they required by the guidelines. Plaintiffs have subsequently learned that Hogsten had absolutely no authority to create these requirements. All the information supplied to the underwriter was filtered by Hogsten. It is probably not coincidental that after the first appraiser went out to the property the second appraiser did not go out until Anderson had completed the repairs at Hogsten's request.

Wheatley had some similar and some different problems. The appraiser who appraised Wheatley's property actually appraised it at full value the first time he was there. He noted certain concerns. Wheatley, too, was required to make the property come to the "move-in" standards of Hogsten. Hogsten told Anderson Wheatley's loan would not be approved until he repaired his house to meet Hogsten's "move-in" standards. On many occasions, Hogsten suggested that the deal was over because Plaintiffs could not meet his standards. Plaintiffs had to find a roofer to satisfy Hogsten at the very last minute. Furthermore, Wheatley had to suddenly come up with a 20% mortgage instead of a 10% or 15% mortgage.

Wachovia argues that none of this was either arbitrary or unreasonable. Plaintiffs would suggest that it is a question of fact. Hogsten's and Anderson's testimonies, which might be different, are simply questions of fact. Defendants argue in their brief that they were simply relying upon their standard practice and the Fannie Mae guidelines to accommodate this particular situation. The facts as demonstrated by Plaintiffs' evidence are contrary to that.

*Mathiesen v. Bank One Mortgage Corp.*, 173 F.3d 1242 (10th Cir. 1999) is not helpful to Defendants. Plaintiffs in this case are complaining that Hogsten went beyond any requirements in the Fannie Mae guidelines and made unauthorized repair requirements on Anderson and Wheatley.

## CONCLUSION

Plaintiffs in this action have alleged that J.D. Hogsten, an agent of the Defendants, while working in the course of his employment, has discriminated against them in the mortgage application process.   The theory of the case is that while the black Plaintiffs, especially Anderson and Wheatley, were looking for mortgages in predominantly black or mixed-race neighborhoods there was no problem in the mortgage application process.   When the three black families applied for mortgages for adjacent properties on Silver Lake, suddenly the mortgage requirements became more difficult for them.   J.D. Hogsten, from the very beginning, tried to discourage Plaintiffs from moving into these properties.   Without any authority from the bank, he made requirements for repairs for Anderson and Wheatley, which were costly. Hogsten was aware that the Plaintiffs were subject to losing their mortgages if the transaction did not go forward.   Nevertheless, he personally undertook to require the Plaintiffs to make substantial repairs to properties for which they might not ultimately be able to purchase because there had been no final commitments by the bank to even grant the mortgages.   When they challenged the requirements he said "you people" would not understand.

There is circumstantial and direct evidence of discrimination.   This action is not preempted by the National Bank Act.   The State claims are based upon common law breach of contract claims that in no way conflict with any federal laws.

GRADY & HAMPTON, LLC

_____/S/_____John S. Grady_____
John S. Grady (I.D. 009)
6 North Bradford St.
Dover, DE 19904
(302) 678-1265
DATED:       May 9, 2008              *Attorneys for Plaintiffs*

38

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on this 9th day of May, 2008, a true and correct copy of the

**PLAINTIFFS' ANSWERING BRIEF IN OPPOSITION TO DEFENDANTS'**

**MOTION FOR SUMMARY JUDGMENT and APPENDIX TO PLAINTIFFS'**

**ANSWERING BRIEF IN OPPOSITION TO DEFENDANTS' MOTION FOR**

**SUMMARY JUDGMENT** was served via CM/ECF Pacer upon the following:

Stephen A. Fogdall, Esquire
Schnader, Harrison, Segal &  Lewis, LLP
1600 Market Street, Suite 3600
Philadelphia, PA  19103-7286

Michael J. Barrie, Esquire
Schnader, Harrison, Segal & Lewis, LLP
824 N. Market Street
10th Floor, Suite 1001
Wilmington, DE  19801-3011


GRADY & HAMPTON, LLC

_____/S/____John S. Grady_____
John S. Grady (I.D. 009)
6 North Bradford St.
Dover, DE 19904
(302) 678-1265
*Attorneys for Plaintiffs*