# IN THE UNITED STATES DISTRICT COURT

## FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| TOLANO ANDERSON, et al., | ) | |
| | ) | |
| Plaintiffs, | ) | C.A. No. 06 CV 00567 (SLR) |
| | ) | |
| v. | ) | |
| | ) | |
| WACHOVIA MORTGAGE CORPORATION | ) | |
| and WACHOVIA CORPORATION, | ) | |
| | ) | |
| Defendants. | ) | |

**APPENDIX TO**
**PLAINTIFFS' ANSWERING BRIEF  IN OPPOSITION TO**
**DEFENDANTS' MOTION FOR SUMMARY JUDGMENT**

GRADY & HAMPTON, LLC

John S. Grady (I.D. 009)
6 North Bradford St.
Dover, DE 19904
(302) 678-1265
*Attorneys for Plaintiffs*

DATED:     May 9, 2008

# APPENDIX

1)     Errata sheet of Lloyd Wheatley                                  B-1 – B-2

2)     Errata sheet of Tolano Anderson                              B-3 – B-5

3)     Loan commitment of Lloyd Wheatley                        B-6 – B-9

4)     Affidavit of Tolano Anderson                                   B-10 – B-13

5)     Affidavit of Phil Hill                                                B-14 – B-15

6)     Affidavit of Scott Schuh                                          B-16 – B-17

7)     Loan commitment of Richard Wilkins                       B-18 – B-20

8)     Unreported cases                                                    B-21 – B-53

       *Austin v. The Provident Bank*                     B-21

       *Green v. California Apartments, LLC*           B-26

       *Hadfield's Seafood v. Rouser*                      B-33

       *Johnson v. Wachovia Bank, N.A.*                B-39

       *Cooper v. Paychex, Incorporated*               B-41

Page 143

```
1                   - - - - -
2              E R R A T A
3                   - - - - -
4     PAGE      LINE              CHANGE
5     _07      _13      "And" the Seller
6     _26      _21      The Date "on" The paperwork
7     _27      _03      With to "to"
8     _32      _21      OF The "SALE"
9     _42      _04      HAS to "WAS"
10    _48      _24      See to "SAY"
11    _49      _11      Add word "IS" From Friends
12    _52      _12      Yes to "NO"
13    _55      _16      There was to "They were"
14    _60      _21      "YES" to "NO"
15    _61      _05      "No" to "YES"
16    _64      _22      There's to "The"
17    _72      _9       It to "we" No to "Know"
18    _75      _16      Insert "existing business"
19    _91      _6       "No. A portion of it"
20    _94      _9       No to "Yes"
21    _94      _13      No, to "Yes"
22    107      _20      Done to "Off"
23             - - -
24             - - -
```

Page 144

1            ACKNOWLEDGEMENT OF DEPONENT

2         I, LLOYD J. WHEATLEY, do hereby

3  certify that I have read the foregoing pages

4  1 to 144 and that the same is a correct

5  transcription of the answers given by me to

6  the questions therein propounded, except for

7  the corrections or changes in form or

8  substance, if any, noted on the attached

9  Errata Sheet.

10  _11_/28/_07_ _____

11  DATE                    SIGNATURE

12

13  Subscribed and sworn to before me this

14  _28th_ day of _November_ _ _, 2007

15

16  My commission expires: April 13, 2009 _ _

17

18

19

20

21  Notary Public

22

23

24

Page 197

```
 1                    - - - - - - -
                     A M E N D E D
 2                    E R R A T A

 3                    - - - - - - -

 4     PAGE      LINE              CHANGE

 5      29        5         Strike "gay to go" insert

 6                          "yahoo". I did not pick up this

 7                          error when I first reviewed the

 8                          transcript. I was surprised when

 9                          I saw a reference to the word

10                          "gay" when I read Mr. Fogdall's

11                          brief. I listened to the audio

12                          of the deposition and it

13                          confirmed that the word I had

14                          used was yahoo. I pronounced

15                          the first syllable with a

16                          longer (ā). Webster's has an

17                          alternate pronunciation, yā and

18                          yä. See attached. Yahoo is a slang

19                          word.  I have used it many times

20                          when in the military to describe

21                          a boorish, stupid or crass

22                          person.

23

24
```

Page 198

1      ACKNOWLEDGEMENT OF DEPONENT

2          I, TOLANO D. ANDERSON, do hereby

3      certify that I have read the foregoing pages

4      1 to 194 and that the same is a correct

5      transcription of the answers given by me to

6      the questions therein propounded, except for

7      the corrections or changes in form or

8      substance, if any, noted on the attached

9      Errata Sheet.

10     4-22-08

11     DATE                       SIGNATURE

12

13     Subscribed and sworn to before me this

14     _____ day of _Aprl____ , 2008.

15

16     My commission expires: _____

17                     John S. Grady, Attorney-at-Law
                       Notarial Officer-State of Delaware
18                         Permanent Commission

19

20     _____

21     Notary Public

22

23

24

VERITEXT NATIONAL COURT REPORTING COMPANY
          (215) 241-1000      (888) 777-6690

B-4

# yahoo

2 entries found.

yahoo[1.noun]
yahoo[2,interjection]

Main Entry: **¹ya·hoo** 🔊 🔊
Pronunciation: \'yā-(.)hü, 'yä-\
Function: *noun*
Inflected Form(s): *plural* **yahoos**
Date: 1726

**1** *capitalized* **:** a member of a race of brutes in Swift's *Gulliver's Travels* who have the form and all the vices of humans
**2** [influenced by ²*yahoo*] **:** a boorish, crass, or stupid person
— **ya·hoo·ism** 🔊 \-,i-zəm\ *noun*

# WACHOVIA

## MORTGAGE LOAN COMMITMENT

WACHOVIA MORTGAGE CORPORATION
Street Address: 1 JEFFERSON SQUARE
City/State/Zip: WATERBURY, CT 06706

Phone #:    866-203-4733 x 8085
Fax #:    877-678-5275

| | |
|---|---|
| Loan #:6940176 | Commitment Date: 08/06/04 |
| Borrower(s): Lloyd J Wheatley and Audria L Wheatley | Commitment Expiration Date: 10/22/04 |
| Mailing Address: | Security Property Address: |
| 138 King Henry Court | 584 North Dupont Hwy |
| Dover, DE 19904 | Dover, DE  19901 |

Congratulations! Your mortgage loan application for a first lien mortgage loan in the amount of $213,330.00 is approved by Wachovia Mortgage Corporation (referred to as "Lender"). We will secure this loan by a first mortgage on the property described above. This loan Commitment is subject to the following terms and conditions. Thank you for choosing Wachovia Mortgage Corporation as your mortgage lender.

### TERMS AND CONDITIONS OF YOUR MORTGAGE LOAN

1. **Loan Type:** Conventional
2. **Loan Purpose:** Purchase
3. **Loan Program:** FNSI30FEX
4. **Loan Term:** 360 months
5. **Interest Rate, Points and Fees:**
   Locked (refer to your Lock Agreement for additional terms and conditions)
   Fixed Interest Rate 6.625%    Total Origination Fee 1.0% to be paid by Lender

   Rate Lock expiration date is 09/01/04. Your loan must close and fund by this date.

   Fees: At closing you must pay other fees and charges listed on the HUD-1 Settlement Statement. These fees and charges have been previously disclosed to you in the Good Faith Estimate.

6. **Monthly Payments:** *(applies only if interest rate is locked)* The monthly payment of principal and interest is $1,365.98. (If this is an adjustable-rate mortgage, this is your initial monthly payment of principal and interest.)
   Escrow: In accordance with the terms of your loan documents, monthly escrow payments are required to cover the payment of the estimated annual real estate taxes, special assessments, hazard insurance premiums, and, if applicable, FHA or private mortgage insurance premiums, water rates, sewer charges, and ground rents. These payments are in addition to principal and interest payments. We may also require additional deposits for flood or other insurance, if applicable. Such deposits will be placed in an escrow account. At closing, we will require you to make an initial escrow payment to establish a reserve fund that, when added to your monthly escrow payments, will enable us to pay your future taxes, insurance premiums, and other charges on time. All unpaid and future special assessments must be paid in full prior to or at the closing.

7. **Assumption:** Someone buying your house may not assume your loan.

8. **Late Charge:** If a monthly payment is not received in full within fifteen (15) days after the first day of the month, a late charge of 5.000% will be charged. The late charge will not exceed any state or federal regulated maximum rate.

9. **Prepayment:** The loan may be prepaid without penalty.

10. **Private Mortgage Insurance ("PMI"),** which protects Lender's interest in the case of default is not required as a condition of making this loan.

### TERMS AND CONDITIONS OF THE COMMITMENT

1. **Acceptance:** If you accept this Commitment, we promise to make you the loan, subject to the terms and conditions listed herein. TO INDICATE YOUR ACCEPTANCE OF THIS COMMITMENT, YOU MUST SIGN THE ENCLOSED DUPLICATE COPY, INITIAL ALL ADDENDA, AND RETURN TO WACHOVIA within seven (7) calendar days of the Commitment Date or the date of mailing, whichever is later. If this letter is not executed and returned to Lender within the stated period, Lender will have no further obligation to make you the loan. To the extent this Commitment varies from the Application or other disclosures previously given you, this Commitment shall control.

### ADDITIONAL TERMS AND CONDITIONS

In addition to the requirements outlined above, this Commitment is subject to the terms and conditions set forth in the attachments below:
Additional Terms and Conditions Precedent to Closing--Addendum A

WHEAT000165

## GENERAL PROVISIONS

**Expenses:** You must pay all legal and title expenses in connection with this loan. These include recording fees and taxes, our closing agent's fees, search and title charges, tax set-up charge, title insurance premiums, and survey charges. If this loan does not close, you may be required to pay whatever expenses have been incurred.

**Indemnification:** By accepting this Commitment, you agree to reimburse us for: (a) the payment of any claims for real estate brokerage or other commissions made by any person, corporation, or partnership arising from this transaction, and (b) any expenses incurred by us in the defense of such claims, including reasonable attorney's fees.

**Secondary financing:** No loan may close with secondary financing without our explicit written approval.

**Loan approval:** If you have furnished or subsequently furnish false, misleading, or incomplete information in connection with your application, Lender has the right to rescind loan approval.

**Change in financial status or condition of property :** Any change prior to closing in your employment status or other financial matters affecting underwriting, or any change in or new information regarding the condition of the property, including but not limited to the discovery of asbestos or other hazardous material, can nullify your loan approval. Please notify us immediately of any such changes.

**Modification:** This agreement cannot be changed orally. Any modification requires the written consent of both parties.

**Commitment expiration date:** **IF YOUR LOAN DOES NOT CLOSE AND FUND BY THE COMMITMENT EXPIRATION DATE, WE HAVE NO OBLIGATION TO HONOR THE TERMS OF THIS AGREEMENT.** In addition, your application must be reprocessed (which may include updating credit documents such as the credit report and appraisal) and re-underwritten. A fee will be charged to update your file.

**Refinance transaction:** If this loan is for the refinance of the mortgage on your primary residence, you will not receive the loan proceeds on the day of your closing. Therefore, your loan must close at least three (3) business days prior to the expiration date stated above or the Lender has no obligation to honor the terms of this agreement and **THIS MAY RESULT IN A HIGHER RATE OR MORE POINTS BEING CHARGED ON YOUR LOAN.**

**Assignment:** This Commitment is specific to the parties and cannot be assigned.

**Laws/Regulations:** This Commitment will terminate if any law, rule or regulation governing Lender or the loan would make it unlawful to make you the loan or if such laws/regulations would render the loan uninsurable.

Thanks again for choosing Wachovia as your mortgage lender. We appreciate the opportunity to be of service to you. If you have any questions regarding this commitment letter, please contact: Maria Belo at 866-203-4733 x 8085.

Very truly yours,

**WACHOVIA MORTGAGE CORPORATION**

By: _____

Title: _____

Date: _____

*(This notice of loan commitment is not valid unless signed by an officer of Lender.)*

**IF YOU SIGN THIS COMMITMENT, AND YOU DO NOT CLOSE THIS LOAN IN ACCORDANCE WITH THE DESCRIBED TERMS, YOU MAY LOSE SOME OR ALL OF THE FEES OR CHARGES YOU HAVE PAID.**

I accept and agree to the terms of this Notice of Loan Commitment.

_____        _____
Borrower                                               Borrower


_____        _____
Date                                                    Date

SB

**WHEAT000166**

## ADDENDUM A

6940176

### Additional Terms and Conditions Precedent to Closing

As a condition precedent to closing, the following items are required:

**TITLE TO PROPERTY:** Lender must approve the title to the property and the property must comply with zoning regulations. The following must be delivered to Lender prior to closing:

X    Title Search (Abstract of Title), Commitment or binder must be reviewed and approved by Lender prior to closing.
X    Tax Search and Certificates

**TITLE INSURANCE:** You must provide, at your expense, a lender's title insurance policy which insures our first lien position and which is acceptable to us. Title insurance is also available to protect your interest as owner of the property at an extra charge to you but is not required by us. If you desire such insurance protecting your interest as owner, please advise your closing agent or attorney to arrange for such coverage.

**SURVEY:** If required by the title insurer, in order to afford Lender a first lien position on the security property without exception to matters of survey, you must provide, at your expense, a currently dated instrument survey map acceptable to Lender or the title insurer. The survey must show the lines, easements, and encroachments on to or off of the property. The survey must be certified to: Wachovia Mortgage Corporation, and/or its successors or assigns, and the title company insuring the mortgage. If an existing survey or alternative documentation is used to meet Lender's title policy requirements, the same coverage may not be available to you, as owner. If you desire survey coverage, please advise your closing agent to arrange for such coverage.

**FIRE AND FLOOD INSURANCE:** The following insurance coverage (if checked) are needed at or before closing:

X    Hazard Insurance:   Prior to closing, you must furnish this office with an original hazard insurance policy or a binder
        agreement satisfactory to us. Hazard Insurance coverage must be for the lesser of the amount necessary to obtain
        a "Guaranteed Home Replacement Cost Endorsement," or the loan amount, as long as it equals 80% of the
        insurable value of the improvements. We cannot require you to obtain a policy which exceeds the guaranteed
        replacement cost of the improvements securing the loan. The hazard insurance policy must be from a company
        rated B+(III) or better. If property is a condominium, a copy of the Master Condo Policy is required.
     Flood insurance in at least the amount of the lesser of 100% of the replacement value of the improvements or the
        maximum available under the appropriate National Flood Insurance Administration Program.
     A notice about the flood hazard status of your property and Federal Disaster Relief Assistance is enclosed.

All insurance policies must have a standard mortgagee endorsement naming Wachovia Mortgage Corporation, its successors or assigns as Mortgagee. You must present prior to closing a paid receipt for one year's premium. You must also present the insurance policy for the insurance required as indicated above or if applicable law requires us to accept a binder at closing, the policy must be delivered to us within 30 days after closing. . Additional information regarding our requirements for hazard and flood Insurance is available on the General Insurance Guidelines sheet which was previously provided to you.

**THE FOLLOWING WILL BE REQUIRED:**

### APPRAISAL/PROPERTY

1. Life of loan flood certification

### CREDIT

1. Fully executed Hold Harmless Agreement from borrower regarding encapsulated asbestos and property condition

### SOURCE OF FUNDS

1. Maximum seller contribution $16,000.00 (6%); or actual closing costs. Per sales contract, seller to pay $-0- towards closing costs
2. Maximum approved funds borrower can bring to settlement $52586.00.

### GENERAL CONDITIONS

1. Executed final application.
2. No cash out at closing.
3. Funds for closing may not be from new subordinate financing.
4. Title may not disclose any subordinate financing at closing.
5. Maximum interest rate allowed: 7.625%.
6. Loan approval expiration date: 10/22/2004.
7. Document expiration date: 10/21/2004.
8. Verification of final information can change loan risk classification and additional documentation may be required.

---

Borrower's Initials _____    Date _____

240168 rev 01 (11/01) [0168]

**WHEAT000167**

## ADDENDUM A

6940176

Additional Terms and Conditions Precedent to Closing

As a condition precedent to closing, the following items are required:

**TITLE TO PROPERTY:** Lender must approve the title to the property and the property must comply with zoning regulations. The following must be delivered to Lender prior to closing:

X    Title Search (Abstract of Title), Commitment or binder must be reviewed and approved by Lender prior to closing.
X    Tax Search and Certificates

**TITLE INSURANCE:** You must provide, at your expense, a lender's title insurance policy which insures our first lien position and which is acceptable to us. Title insurance is also available to protect your interest as owner of the property at an extra charge to you but is not required by us. If you desire such insurance protecting your interest as owner, please advise your closing agent or attorney to arrange for such coverage.

**SURVEY:** If required by the title insurer, in order to afford Lender a first lien position on the security property without exception to matters of survey, you must provide, at your expense, a currently dated instrument survey map acceptable to Lender or the title insurer. The survey must show the lines, easements, and encroachments on to or off of the property. The survey must be certified to: Wachovia Mortgage Corporation, and/or its successors or assigns, and the title company insuring the mortgage. If an existing survey or alternative documentation is used to meet Lender's title policy requirements, the same coverage may not be available to you, as owner. If you desire survey coverage, please advise your closing agent to arrange for such coverage.

**FIRE AND FLOOD INSURANCE:** The following checked insurance coverage(s) are needed at or before closing:

X    Hazard Insurance:  Prior to closing, you must furnish this office with an original hazard insurance policy or a binder agreement satisfactory to us. Hazard Insurance coverage must be for the lesser of the amount necessary to obtain a "Guaranteed Home Replacement Cost Endorsement," or the loan amount, as long as it equals 80% of the insurable value of the improvements. We cannot require you to obtain a policy which exceeds the guaranteed replacement cost of the improvements securing the loan. The hazard insurance policy must be from a company rated B+(III) or better.

\_\_    Flood insurance in at least the amount of the lesser of 100% of the replacement value of the improvements or the maximum available under the appropriate National Flood Insurance Administration Program. A notice about the flood hazard status of your property and Federal Disaster Relief Assistance is enclosed.

All insurance policies must have a standard mortgagee endorsement naming Wachovia Mortgage Corporation, its successors or assigns as Mortgagee. You must present prior to closing a paid receipt for one year's premium. You must also present the insurance policy for the insurance required as indicated above or if applicable law requires us to accept a binder at closing, the policy must be delivered to us within 30 days after closing.. Additional information regarding our requirements for hazard and flood insurance is available on the General Insurance Guidelines sheet which was previously provided to you. **Conditions must be received 10 days from the date of the commitment letter or we will be unable to give your application further consideration.**

**THE FOLLOWING WILL BE REQUIRED:**

### APPRAISAL/PROPERTY

1. Borrowers to provide a signed letter stating that they are holding WMC harmless for property condition.
2. Life of loan flood certification.
3. Verify central heat has been installed on 2nd level.

### CREDIT

1. Fully executed Hold Harmless Agreement from borrower regarding encapsulated asbestos.

### SOURCE OF FUNDS

1. Maximum seller contribution **$16,000.00 (6%)**; or actual closing costs.
    Per sales contract, seller to pay **$ -0-** towards closing costs.
2. Copy of executed Note from an acceptable Lender for subordinate financing for **$26,667.00** with payment no greater than **$178.00** and term no less than **30 years**.
3. Maximum approved funds borrower can bring to settlement **$43,000.00**.

### GENERAL CONDITIONS

1. Executed final application.
2. No cash out at closing.
3. Maximum interest rate allowed **7.625%**.
4. Loan approval expiration date: **10/22/04**.
5. Document expiration date: **10/21/04**.
6. Verification of final information can change loan risk classification and additional documentation may be required.

_____    _____    _____
Borrower's Initials    Co-Borrower's Initials    Date

SB

240168 rev 01 (11/01) [0168]

**WHEAT000168**

**IN THE UNITED STATES DISTRICT COURT**

**FOR THE DISTRICT OF DELAWARE**

| | |
|---|---|
| TOLANO ANDERSON, et al., | ) |
| | ) |
| Plaintiffs, | ) C.A. No. 06 CV 00567 (SLR) |
| | ) |
| v. | ) |
| | ) |
| WACHOVIA MORTGAGE CORPORATION | ) |
| and WACHOVIA CORPORATION, | ) |
| | ) |
| Defendants. | ) |

**AFFIDAVIT OF TOLANO ANDERSON**

| | |
|---|---|
| STATE OF DELAWARE | ) |
| | ) |
| COUNTY OF KENT | ) |

TOLANO ANDERSON, having been duly sworn, states as follows:

1.    I am a Plaintiff in the above-captioned case.

2.    The facts contained in the second amended complaint are true and correct.

3.    I was the go-between in most of the dealings with Mr. Hogsten for not only my own home but also for the Wilkins transaction and the Wheatley transaction.

4.    In fact, I had a power of attorney to take care of the Wilkins' matters.

5.    Much of the communications for the need for repair for the Wheatley property were conveyed from Mr. Hogsten to me and I then relayed the information to Mr. Wheatley.

6.    Mr. Hogsten repeatedly indicated that my property and the Wheatley property had to be in move-in condition and that until they were, there would be no settlements.

7.    I asked Hogsten if he would put that in writing or if there were some written document that he could see. Hogsten refused to do so. I also contacted Marie Bellow and asked if she could supply this information. She also refused to do so, indicating that it was company policy not to disclose any such regulations or rules.

8.    Hogsten specifically told me that Wheatley would not get a commitment until the house was repaired to a move-in condition.

9.    On the date of the first settlement, August 6, 2004, I was present for the Wheatley settlement. On that date, Hogsten said that the Wheatley settlement would not go through because there was not a certificate from a roofer that the roof was in good condition.

10.    Hogsten suggested again at that time that this would kill the deal.

11.    Mr. Aigner, the seller, became upset and angry with the bank. Mr. Aigner contacted someone he knew who was a roofer who said he would go to the property and obtain a certificate. He agreed to postpone the Wheatley settlement for one week.

12.    Defendants state, at page 27 of their brief, that I had made a statement that "we don't want our property values to go down by getting some gay to go in there…" The court reporter has inaccurately reported what was said. I have had an opportunity to listen to the audio and the word that was said was "yahoo", not "gay to go". I do not perceive myself as discriminating against any other minority group. I did review the deposition transcript, but I failed to discover the error. I have since submitted an errata sheet which makes this correction. The errata sheet states that it is an amended errata sheet. In fact, I do not believe I initially signed an errata sheet. The court reporter, in her correspondence, has suggested that she had received an errata sheet with no corrections.

2

Later she said that she was mistaken. She did not receive an errata sheet. It is for that reason I identified the errata sheet that was recently sent as an amended errata sheet.

13.    I advised Hogsten, even before he signed the commitment, that the properties that Wheatley, Wilkins and I were purchasing were unoccupied and that they would need some repairs.

14.    I advised Hogsten from the very beginning that I was in the military and that I was scheduled to retire in 2004. Hogsten was aware that when I signed the application papers that I was living in Odenton, Maryland.

15.    At the request of Wachovia, I signed loan documents indicating my intent to move into the home after settlement. The fact that I made these statements did not appear to be sufficient for Wachovia and I was required to submit a separate letter indicating my intent to occupy my home and explain his commuting plan.

16.    Due to the U.S. Army requirements, including operation Enduring Freedom, Operation Iraqi Freedom and the global war on terror, I was not permitted to retire in June 2004. I was re-assigned to an emergency operations center that controlled Army and Marine quick reaction forces conducting counterterrorist operations on the United States east coast from New York to North Carolina. My new assignment required me to be available 24 hours a day 7 days a week and to quickly report to duty during an alert.

17.    These requirements precluded me from moving into my home in Dover, Delaware, and as a result my home was vacant until I was allowed to retire in April 2006. Immediately thereafter, I moved into my home and I have been living there since that time.

18.    Prior to this litigation, I had had little or no knowledge of the Fannie Mae guidelines or the Fannie Mae Selling Guide.

Tolano Anderson

SWORN TO AND SUBSCRIBED before me this ___7TH___ day of ___MAY___, 2008.

Notary Public

PEGEEN C. MORGAN
NOTARY PUBLIC
STATE OF DELAWARE
COMMISSION EXPIRES 07/09/08

4

## IN THE UNITED STATES DISTRICT COURT

## FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| TOLANO ANDERSON, et al., | ) |
| | ) |
| Plaintiffs, | ) C.A. No. 06 CV 00567 (SLR) |
| | ) |
| v. | ) |
| | ) |
| WACHOVIA MORTGAGE CORPORATION | ) |
| and WACHOVIA CORPORATION, | ) |
| | ) |
| Defendants. | ) |

## AFFIDAVIT OF PHIL HILL

| | |
|---|---|
| STATE OF DELAWARE | ) |
| | ) SS |
| COUNTY OF KENT | ) |

1.      I am an insurance agent for State Farm.

2.      From 1993 until recently, my office was located at 738 North Dupont Highway in Dover, Delaware.

3.      I was contacted by Mr. Wheatley in 2004 to obtain insurance for his home at 584 North Dupont Highway, Dover, Delaware, which I did supply to him in time for his settlement.

4.      I have been working in the Dover area since 1986 and I am generally familiar with the demographics around Silver Lake in Dover.

5.      In 2004, the homes bordering Silver Lake in Dover were almost all owned by white families.

6.      It is also well-known within the Dover community that on Kirkwood Street in downtown Dover the neighborhood is almost entirely inhabited by minority families.

7.    Anyone who has ever lived for any period of time in Dover would know that in 2004 Kirkwood Street was a minority street and that the homes around Silver Lake in Dover were almost all owned by white families.

_____
Phil Hill


SWORN TO AND SUBSCRIBED before me this 7th day of _____, 2008.

John S. Grady, Attorney-at-Law
Notarial Officer-State of Delaware
Permanent Commission

_____
Notary Public

# IN THE UNITED STATES DISTRICT COURT

# FOR THE DISTRICT OF DELAWARE

TOLANO ANDERSON, et al.,                )
                                        )
                    Plaintiffs,         )    C.A. No. 06 CV 00567 (SLR)
                                        )
        v.                              )
                                        )
WACHOVIA MORTGAGE CORPORATION           )
and WACHOVIA CORPORATION,               )
                                        )
                    Defendants.         )

## AFFIDAVIT OF SCOTT SCHUH

STATE OF DELAWARE              )
                              )
COUNTY OF KENT                 )

SCOTT SCHUH, having been duly sworn, states as follows:

1.      I was acting on behalf of Peter Aigner in connection with the sale of the properties located at 580, 584 and 592 North Dupont Highway, Dover, Delaware.

2.      Mr. David Miller of All-Span, Inc., approached me concerning the purchase of all the properties.

3.      A contract was signed with Mr. Miller and Mr. Aigner for the purchase of those properties immediately prior to the time of the contract that was subsequently signed with Anderson, Wheatley and Wilkins.

4.      Prior to Miller signing the contract, he had an opportunity to examine the properties and signed a contract in "as-is condition".

5.      The properties at 584 and 592, which I understand to be the Wheatley and Wilkins properties, were definitely livable and had been rented out.  The Anderson property did have water damage that needed to be resolved.

6.   The reason that the transaction with Mr. Miller fell through had nothing to do with the condition of the buildings.  Mr. Miller indicated that he was not able to get financing with the Felton Bank.

_____
Scott Schuh

SWORN TO AND SUBSCRIBED before me this __7__ day of _____,
2008.

_____
Notary Public

# WACHOVIA

## MORTGAGE LOAN COMMITMENT

**WACHOVIA MORTGAGE CORPORATION**
Street Address: 1 JEFFERSON SQUARE
City/State/Zip: WATERBURY, CT 06706

Phone #:  866-203-4733 x 8165
Fax #:    877-678-5275

| | |
|---|---|
| Loan #:6696981 | Commitment Date: 07/16/04 |
| Borrower(s):  Richard H Wilkins and Brenda F Wilkins | Commitment Expiration Date: 10/26/04 |
| Mailing Address: | Security Property Address: |
| 118 Scott Place Apt D | 592 North Dupont Hwy |
| Fort Riley, KS 66442 | Dover, DE  19901 |

Congratulations!  Your mortgage loan application for a first lien mortgage loan in the amount of $213,300.00 is approved by Wachovia Mortgage Corporation (referred to as "Lender"). We will secure this loan by a first mortgage on the property described above. This Loan Commitment is subject to the following terms and conditions.  Thank you for choosing Wachovia Mortgage Corporation as your mortgage lender.

### TERMS AND CONDITIONS OF YOUR MORTGAGE LOAN

1. **Loan Type:** Conventional
2. **Loan Purpose:** Purchase
3. **Loan Program:** 1570JSYIO
4. **Loan Term:** 360 months
5. **Interest Rate, Points and Fees:**
   Locked (refer to your Lock Agreement for additional terms and conditions)
   Fixed Interest Rate 6.250%          Total Origination Fee 1.00% ( 0.50% Paid by Lender and 0.50% Paid by Borrower)

   Rate expiration date is 07/31/04.  Loan must close and fund by this date.

6. **Monthly Payments:** *(applies only if interest rate is locked)* The monthly payment of principal and interest is $1,110.94.  (If this is an adjustable-rate mortgage, this is your initial monthly payment of principal and interest.)

   **Escrow:** In accordance with the terms of your loan documents, monthly escrow payments are required to cover the payment of the estimated annual real estate taxes, special assessments, hazard insurance premiums, and, if applicable, FHA or private mortgage insurance premiums, water rates, sewer charges, and ground rents.  These payments are in addition to principal and interest payments. We may also require additional deposits for flood or other insurance, if applicable.  Such deposits will be placed in an escrow account. At closing, we will require you to make an initial escrow payment to establish a reserve fund that, when added to your monthly escrow payments, will enable us to pay your future taxes, insurance premiums, and other charges on time.  All unpaid and future special assessments must be paid in full prior to or at the closing.

7. **Assumption:** Someone buying your house may not assume your loan.

8. **Late Charge:** If a monthly payment is not received in full within fifteen (15) days after the first day of the month, a late charge of 5.000% will be charged.  The late charge will not exceed any state or federal regulated maximum rate.

9. **Prepayment:** The loan may be prepaid without penalty.

10. **Private Mortgage Insurance ("PMI"),** which protects Lender's interest in the case of default is not required as a condition of making this loan.

### TERMS AND CONDITIONS OF THE COMMITMENT

1. **Acceptance:** If you accept this Commitment, we promise to make you the loan, subject to the terms and conditions listed herein. TO INDICATE YOUR ACCEPTANCE OF THIS COMMITMENT, YOU MUST SIGN THE ENCLOSED DUPLICATE COPY, INITIAL ALL ADDENDA, AND RETURN TO WACHOVIA within seven (7) calendar days of the Commitment Date or the date of mailing, whichever is later.  If this letter is not executed and returned to Lender within the stated period, Lender will have no further obligation to make you the loan.  To the extent this Commitment varies from the Application or other disclosures previously given you, this Commitment shall control.

### ADDITIONAL TERMS AND CONDITIONS

In addition to the requirements outlined above, this Commitment is subject to the terms and conditions set forth in the attachments below:
   Additional Terms and Conditions Precedent to Closing--Addendum A

240172 rev04 (11/03) [2950172] · Multistate Loan Commitment                          Page 1 of 2                    JR

**WILK000159**

B-18

## GENERAL PROVISIONS

**Expenses:** You must pay all legal and title expenses in connection with this loan. These include recording fees and taxes, our closing agent's fees, search and title charges, tax set-up charge, title insurance premiums, and survey charges. If this loan does not close, you may be required to pay whatever expenses have been incurred

**Indemnification:** By accepting this Commitment, you agree to reimburse us for: (a) the payment of any claims for real estate brokerage or other commissions made by any person, corporation, or partnership arising from this transaction, and (b) any expenses incurred by us in the defense of such claims, including reasonable attorney's fees.

**Secondary financing:** No loan may close with secondary financing without our explicit written approval.

**Loan approval:** If you have furnished or subsequently furnish false, misleading, or incomplete information in connection with your application, Lender has the right to rescind loan approval.

**Change in financial status or condition of property :** Any change prior to closing in your employment status or other financial matters affecting underwriting, or any change in or new information regarding the condition of the property, including but not limited to the discovery of asbestos or other hazardous material, can nullify your loan approval. Please notify us immediately of any such changes.

**Modification:** This agreement cannot be changed orally. Any modification requires the written consent of both parties.

**Commitment expiration date:** **IF YOUR LOAN DOES NOT CLOSE AND FUND BY THE COMMITMENT EXPIRATION DATE, WE HAVE NO OBLIGATION TO HONOR THE TERMS OF THIS AGREEMENT.** In addition, your application must be reprocessed (which may include updating credit documents such as the credit report and appraisal) and re-underwritten. A fee will be charged to update your file.

**Refinance transaction:** If this loan is for the refinance of the mortgage on your primary residence, you will not receive the loan proceeds on the day of your closing. Therefore, your loan must close at least three (3) business days prior to the expiration date stated above or the Lender has no obligation to honor the terms of this agreement and **THIS MAY RESULT IN A HIGHER RATE OR MORE POINTS BEING CHARGED ON YOUR LOAN.**

**Assignment:** This Commitment is specific to the parties and cannot be assigned.

**Laws/Regulations:** This Commitment will terminate if any law, rule or regulation governing Lender or the loan would make it unlawful to make you the loan or if such laws/regulations would render the loan uninsurable.

Thanks again for choosing Wachovia as your mortgage lender. We appreciate the opportunity to be of service to you. If you have any questions regarding this commitment letter, please contact: Karen Redondo at 866-203-4733 x 8165 .

Very truly yours,

WACHOVIA MORTGAGE CORPORATION

By: _Kan Redondo_

Title: _fso asso_

Date: _7/19/04_

*(This notice of loan commitment is not valid unless signed by an officer of Lender.)*

**IF YOU SIGN THIS COMMITMENT, AND YOU DO NOT CLOSE THIS LOAN IN ACCORDANCE WITH THE DESCRIBED TERMS, YOU MAY LOSE SOME OR ALL OF THE FEES OR CHARGES YOU HAVE PAID.**

I accept and agree to the terms of this Notice of Loan Commitment.

_____
Borrower

_7-24-04_
Date

_____
Borrower

_7-24-04_
Date

and which is acceptable to us. Title insurance is also available to protect your interest as owner of the property at an extra charge to you but is not required by us. If you desire such insurance protecting your interest as owner, please advise your closing agent or attorney to arrange for such coverage.

**SURVEY:** If required by the title insurer, in order to afford Lender a first lien position on the security property without exception to matters of survey, you must provide, at your expense, a currently dated instrument survey map acceptable to Lender or the title insurer. The survey must show the lines, easements, and encroachments on to or off of the property. The survey must be certified to: Wachovia Mortgage Corporation, and/or its successors or assigns, and the title company insuring the mortgage. If an existing survey or alternative documentation is used to meet Lender's title policy requirements, the same coverage may not be available to you, as owner. If you desire survey coverage, please advise your closing agent to arrange for such coverage.

**FIRE AND FLOOD INSURANCE:** The following checked insurance coverage(s) are needed at or before closing:

X     Hazard Insurance: Prior to closing, you must furnish this office with an original hazard insurance policy or a binder agreement satisfactory to us. Hazard Insurance coverage must be for the lesser of the amount necessary to obtain a "Guaranteed Home Replacement Cost Endorsement," or the loan amount, as long as it equals 80% of the insurable value of the improvements. We cannot require you to obtain a policy which exceeds the guaranteed replacement cost of the improvements securing the loan. The hazard insurance policy must be from a company rated B+(III) or better.

___     Flood insurance in at least the amount of the lesser of 100% of the replacement value of the improvements or the maximum available under the appropriate National Flood Insurance Administration Program.
A notice about the flood hazard status of your property and Federal Disaster Relief Assistance is enclosed.

All insurance policies must have a standard mortgagee endorsement naming Wachovia Mortgage Corporation, its successors or assigns as Mortgagee. You must present prior to closing a paid receipt for one year's premium. You must also present the insurance policy for the insurance required as indicated above or if applicable law requires us to accept a binder at closing, the policy must be delivered to us within 30 days after closing. **Additional information regarding our requirements for hazard and flood insurance is available on the General Insurance Guidelines sheet which was previously provided to you.**

**THE FOLLOWING WILL BE REQUIRED:**

**APPRAISAL/PROPERTY**

1. Satisfactory appraisal supporting minimum value of $266,666.67.

**SOURCE OF FUNDS**

1. Maximum seller contribution N/A.
Per sales contract, seller to pay $ -0- towards closing costs.
2. Copy of executed Note from Wachovia for subordinate financing for $40,000.00 with payment no greater than $235.00 and term no less then 60 months.
3. Maximum approved funds borrower can bring to settlement $TBD.
4. Two months' most recent statement(s), supporting at least $13,000.00 from Borrowers Financial Institution.
Source of any large increase is required.

**INCOME/EMPLOYMENT**

1. Satisfactory verbal verification of employment to be performed within 30 days prior to closing for Borrower.

**GENERAL CONDITIONS**

1. Executed final application, and 1008.
2. No cash out at closing.
3. Funds for closing may not be from new subordinate financing.
4. Title may not disclose any subordinate financing.
5. Maximum interest rate allowed 6.250%.
6. Loan approval expiration date: 10/26/04.
7. Document expiration date: 10/26/04.
8. Verification of final information can change loan risk classification and additional documentation may be required.
9. All WMC Disclosures and Initial Application signed by all borrowers.
10. All conditions must be submitted and satisfied seven days prior to closing.

| | | |
|---|---|---|
| _____ | _____ | 7-24-04 |
| Borrower's Initials | Co-Borrower's Initials | Date |

240168 rev 01 (11/01) [0168]

JR

**WILK000161**

Westlaw.

Not Reported in F.Supp.2d
Not Reported in F.Supp.2d, 2005 WL 1785285 (N.D.Miss.)
**(Cite as: Not Reported in F.Supp.2d, 2005 WL 1785285)**

Austin v. Provident Bank
N.D.Miss.,2005.
Only the Westlaw citation is currently available.
United States District Court,N.D. Mississippi,
Greenville Division.
Mary L. AUSTIN, et al., Plaintiffs,
v.
THE PROVIDENT BANK, et al., Defendants.
**No. Civ.A.4:04 CV 33 P B.**

July 26, 2005.

*MEMORANDUM OPINION*

PEPPER, J.
**\*1** This matter comes before the court upon Plaintiffs'
Motion to Remand [14-1]. Upon due consideration of
the motion and the responses filed thereto the court is
prepared to rule.

I. FACTUAL BACKGROUND

On October 8, 2003 five plaintiffs joined in filing the
instant case in the Circuit Court of Leflore County,
Mississippi levying claims against a national bank
and various Mississippi mortgage broker companies
for alleged predatory lending practices associated
with mortgage loans secured by the plaintiffs' real
property. The Complaint sets forth twelve causes of
action: (1) fraudulent inducement, misrepresentation,
and concealment; (2) cancellation and removal of
clouds from titles; (3) fraudulent conveyance; (4)
rescission and cancellation; (5) injunction; (6)
accounting; (7) unjust enrichment; (8) breach of
fiduciary duty; (9) breach of duty of good faith and
fair dealing; (10) tortious interference with a contract;
(11) violation of the Mississippi Consumer Loan
Broker Act and the Mississippi Mortgage Consumer
Protection Act, <u>Mississippi Code Annotated §§ 81-
19-1</u>*et seq.* and <u>81-18-1</u>*et seq.,* respectively; and (2)
intentional infliction of emotional distress.

In the Complaint, the plaintiffs disclaim any remedies
under federal law, specifically disclaiming any
remedies under, *inter alia,* the National Bank Act.

The plaintiffs' claims surround their basic allegation

that:

> [T]he defendant lender acting in concert and
> conspiracy with the defendant mortgage brokers,
> entered into a deliberate, systematic pattern and
> plan of targeting to disadvantaged individuals in
> need of financing who were, because of their need
> and/or socioeconomic and financial conditions,
> more vulnerable to the defendants' practices, and
> sold to such persons, including these plaintiffs,
> overpriced loans at interest rates which were
> outside the reasonable commercial standards of
> appropriate risk-based pricing, charging excessive,
> improper and fraudulent fees, including broker fees
> and other charges and concealing these excessive
> charges, manipulating generally accepted
> underwriting standards and ratios for
> creditworthiness in order to qualify borrowers,
> including these plaintiffs, for loans in excess of
> their needs or ability to pay unnecessarily
> increasing the amount of the loan beyond the
> borrower's needs and best interests and then falsely
> representing to the plaintiffs/borrowers that such
> charges were reasonable, necessary and appropriate
> charges for obtaining their loans, and/or extending
> loans based on the borrowers' collateral rather than
> their ability to pay.

Complaint, ¶ 15 (emphasis added).

On February 13, 2004, Provident removed this case
to federal court based on its arguments that this court
possesses federal diversity jurisdiction because of
fraudulent misjoinder and joinder (arguments that
have since been abandoned) and federal question
jurisdiction based on the bankruptcy filings of one or
more of the plaintiffs and based upon complete
preemption of the National Bank Act.

**\*2** With respect to federal question jurisdiction, the
plaintiffs argue in their motion to remand that the
court should abstain from exercising bankruptcy
jurisdiction either under the doctrine of mandatory
abstention or discretionary abstention. They argue
further that there is a lack of federal question
jurisdiction because they disclaimed all federal
remedies in their complaint and that, although the
National Bank Act may preempt actions for usury

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d
Not Reported in F.Supp.2d, 2005 WL 1785285 (N.D.Miss.)
**(Cite as: Not Reported in F.Supp.2d, 2005 WL 1785285)**

against national banks, said act does not preempt state tort suits not alleging usury. As the plaintiffs put it in their brief, all usurious interest may be excessive interest but not all excessive interest is usurious.

Provident responds that despite the plaintiff's artful pleading, their basic allegations involve claims for usury. In addition, Provident argues, all of the claims against them involve the real estate lending powers granted to them as a national bank by the National Bank Act and are therefore preempted by that Act. Provident posits that the Office of the Comptroller of the Currency's January 13 2004's regulation found in 12 C.F.R. § 34.4, read in conjunction with the U.S. Supreme Court's ruling in _Beneficial National Bank v.. Anderson,_ 539 U.S. 1 (2003) (holding that the National Bank Act provided exclusive cause of action for usury against national banks), requires a finding that this case is preempted by the National Bank Act even if the case does not specifically allege usury. This is because the instant case alleges, among other things, "interest rates which were outside the reasonable commercial standards of appropriate risk-based pricing, [and] ... excessive, improper and fraudulent fees."According to the defendants, this language in the Complaint is a clever mirage to avoid preemption of the National Bank Act.

### III. DISCUSSION

A. Standards for Remand

The burden is on the party seeking to preserve the court's removal jurisdiction to show that the requirements for removal have been met. _E.g., Sid Richardson Carbon & Gasoline Co. v. Interenergy Resources, Ltd.,_ 99 F.3d 746 (5th Cir.1996). The cases are legion that stand for the proposition that if federal subject matter jurisdiction via removal is doubtful, then the case should be remanded. _E.g., Spillers v. Tillman,_ 959 F.Supp. 364 (S.D.Miss.1997). On considering a motion to remand, a federal court is limited solely to the jurisdictional question of its authority to hear the case._Buchner v. FDIC,_ 981 F.2d 816 (5th Cir.1993).

B. Bankruptcy Jurisdiction

Under 28 U.S.C. § 1334(b), a defendant may remove a case from state court if it arises under, arises in, or is related to a bankruptcy petition. For a case to arise

under Title 11, the claims asserted must be predicated on a right created by Title 11. _See e.g., In re Chargit, Inc.,_ 81 B.R. 243 (Bankr.S.D.N.Y.1987). Cases arising _in_ Title 11 are those not based on any express right of Title 11 but would have no existence outside bankruptcy._Matter of Wood,_ 825 F.2d 90 (5th Cir.1987). Since the instant case is a state tort action filed before the bankruptcy petitions filed by Ray and Willie Mae Weathers and Mary L. Austin, this case clearly neither arises under nor arises in Title 11.

**\*3** A case that neither arises under nor arises in Title 11 can nevertheless be properly removed to federal court under § 1334(b) if it is "related to" a bankruptcy proceeding. Determining whether a proceeding is "related to" Title 11 is significant because the district court (either the district judge or the bankruptcy judge) to whom cases have been referred can exercise jurisdiction over both core and noncore proceedings so long as the proceedings are "related to" the underlying bankruptcy case. _Matter of Wood, supra._The statutes do not define "related to" and the courts have articulated various definitions. The Fifth Circuit Court of Appeals recently held that proceedings "related to" a bankruptcy case include (1) causes of action owned by the debtor which become property of the estate under the Bankruptcy Code, and (2) suits between third parties which have an effect on the bankruptcy estate. _Arnold v. Garlock, Inc.,_ 278 F.3d 426 (5th Cir.2001). Similarly, the Seventh Circuit has held that a case is "related to" a bankruptcy proceeding if the dispute affects the amount of property available for distribution or the allocation of property among creditors. _Matter of Xonics, Inc.,_ 813 F.2d 127 (7th Cir.1987).

The court concludes that the instant case is indeed "related to" the plaintiffs' pending bankruptcy petitions, which most assuredly should have been mentioned as a contingent interest on the petitions, because monies recovered, if any, from this case will be property of their bankruptcy estates. Accordingly, this court does have jurisdiction based on 28 U.S.C. § 1334(b).

_C. Abstention_

The plaintiffs argue that even if the court concludes that it possesses bankruptcy jurisdiction over this case, the court should abstain from exercising that

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d
Not Reported in F.Supp.2d, 2005 WL 1785285 (N.D.Miss.)
**(Cite as: Not Reported in F.Supp.2d, 2005 WL 1785285)**

jurisdiction based upon the doctrines of mandatory or discretionary abstention.

### 1. Mandatory Abstention

Commensurate with 28 U.S.C. § 1334(c)(2), the court's abstention from exercising bankruptcy jurisdiction is mandatory if (1) a party files a timely motion to abstain; (2) the underlying proceeding is based on state law; (3) the proceeding is related to a case under Title 11 but does not arise under or arise in Title 11; (4) the proceeding is one which could not have been brought in federal court absent the bankruptcy proceeding; and (5) the proceeding is one which can be timely adjudicated in state court. E.g., In re S.E. Hornsby & Sons Sand and Gravel Co., Inc., 45 B.R. 988 (Bankr.M.D.La.1985).

Ostensibly, the plaintiffs can establish all elements required for mandatory abstention. However, 28 U.S.C. § 157(b)(4) provides that "[n]on-core proceedings under 157(b)(2)(B) of title 28, United States Code, shall not be subject to the mandatory abstention provisions of section 1334(c)(2)." As discussed above, the underlying case does not arise in or under Title 11, but rather is only "related to" Title 11. A "related to" case, by definition, is a non-core proceeding. Matter of Boughton, 49 B.R. 312, 315 (Bankr.N.D.Ill.1985). Therefore, the doctrine of mandatory abstention is inapplicable to the instant case.

### 2. Discretionary Abstention

**\*4** The doctrine of discretionary abstention can be found in 28 U.S.C. § 1334(c)(1) which states: "Nothing in this section prevents a district court in the interest of justice, or in the interest of comity with State courts or respect for State law, from abstaining from hearing a particular proceeding arising under title 11 or arising in or related to a case under title 11."

Through § 1334(c)(1), Congress intended that concerns of judicial convenience and comity should be met by the discretionary exercise of abstention when appropriate, not by rigid limitations on federal jurisdiction.Matter of Wood, supra.Discretionary abstention may be compelling where a state proceeding sounds in state law and has only a limited connection with the debtor's bankruptcy case. In re

Titan Energy, Inc., 837 F.2d 325 (8th Cir.1988).

Given that the instant case has only a tenuous relationship to the three plaintiffs' pending bankruptcy petitions, the court concludes that it will abstain from exercising its bankruptcy jurisdiction in the interests of justice, comity with Mississippi courts, and respect for Mississippi law.

### D. Federal Question Jurisdiction Based on the National Bank Act

In 2003, the Supreme Court in Beneficial, supra held that a case filed under a state's usury laws is completely preempted by the National Bank Act. 539 U.S. at 11. In January 2004, the Office of the Comptroller of the Currency, who has the authority to issue regulations related to the National Bank Act, issued 12 C.F.R. § 34.3 which provides in relevant part:

> (a) Except where made applicable by Federal law, state laws that obstruct, impair, or condition a national bank's ability to fully exercise its Federally authorized real estate lending powers do not apply to national banks. Specifically, a national bank may make real estate loans under 12 U.S.C. 371 and § 34.3, without regard to state law limitations concerning: ... (3) Loan-to-value ratios; (4) The terms of credit ... (5) The aggregate amount of funds that may be loaned upon the security of real estate; (9) Disclosure and advertising, including laws requiring specific statements, information, or other content to be included in credit application forms, credit solicitations, billing statements, credit contracts, or other credit-related documents; (10) Processing, origination, servicing, sale or purchase of, or investment or participation in, mortgages; ... [and] (12) Rates of interest on loans....

> (b) State laws on the following subject are not inconsistent with the real estate lending powers of national banks and apply to national banks to the extent that they only incidentally affect the exercise of national bank's real estate lending powers: (1) Contracts; [and] (2) Torts;....

In its decision remanding the case of Hines et al. v. Bank of America, et al., Cause Number 2:03CV64, this court held that the Supreme Court's decision in

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d
Not Reported in F.Supp.2d, 2005 WL 1785285 (N.D.Miss.)
**(Cite as: Not Reported in F.Supp.2d, 2005 WL 1785285)**

*Beneficial* that state usury claims are completely preempted by the National Bank Act did not apply to the facts of *Hines* because there was no specific claim of usury. Indeed, the claims asserted in *Hines* were similar to those asserted here. The court in *Hines,* however, did not consider the effect of the OCC's 2004 promulgation of 12 C.F.R. § 34.3.

**\*5** It is difficult to read the basic nucleus of facts giving rise to the twelve claims asserted in the case at bar without noticing the relationship those claims have with § 34.3. Although the Complaint never makes use of the term "usury," nor does it seek redress under a state usury statute like the complaint in *Beneficial,* it clearly seeks remedies for the charge of excessive interest and fees from national banks in connection with real estate loans. With respect to interest, § 34.3(12) appears to preempt claims related to the "rates of interest on loans" without regard to whether those rates are *per se* usurious. The phrase "interest rates which were outside the reasonable commercial standards of appropriate risk-based pricing" clearly falls within the ambit of § 34.3(12)'s "rates of interest on loans."

Other claims also seem covered by § 34.3. For example, subsection (a)(9) covers "disclosures in credit-related documents, including information to be included in credit applications and other credit-related documents."This relates to the plaintiffs' claims that the defendants procured false, fraudulent, and inaccurate documentation concerning the plaintiffs' mortgage loan applications and that the defendants provided the loan closing attorneys with false and/or misleading data from which the loan documents were prepared. Subsection (a)(5) regarding "aggregate amount of funds that may be loaned upon the security of real estate" speaks to the plaintiffs' claim that the defendants extended "loans in excess of their needs or ability to pay unnecessarily increasing the amount of the loan beyond the borrower's needs and best interests."The plaintiffs' claims of exorbitant fees and expenses in connection with the loans, excessive and improper fees falsely represented to the borrowers, and misrepresentations of costs that the plaintiffs would incur to borrow monies to purchase properties fall within the general realm of subsection (a)(4)'s "terms of credit" provision. What is more, 12 C.F.R. § 7.4001's definition of " 'interest' as used in 12 U.S.C. § 85"includes any payment compensating a creditor

or prospective creditor for an extension of credit, [or] making available a line of credit.... It includes, *among other things,* the following fees connected with credit extension or availability: numerical periodic rates, late fees, [etc.]."12 C.F.R. § 7.4001 (emphasis added). It is likely that this definition of "interest" would include some of the fees charged to the plaintiffs that were allegedly excessive.

In general, state regulation is preempted if it will "significantly interfere with the national bank's exercise of its powers."*Barnett Bank of Marion County v. Nelson,* 517 U.S. 25, 33 (1996). While it is true that § 34.3(b) provides that state laws on contracts and torts are not necessarily inconsistent with the real estate lending powers of national banks, thereby avoiding preemption by the National Bank Act, subsection (b) goes on to say that such state law on torts or contracts "apply to national banks to the extent that they only incidentally affect the exercise of" those powers.

**\*6** The wording of the Complaint seems on the surface seek redress under Mississippi contract and tort law-*i.e.,* primarily under fraud. However, allowing redress under these state tort and contract laws for the instant claims would not result in an incidental effect upon the exercise of a national bank's real estate lending powers granted by the National Bank Act, 12 U.S.C. § 85. Rather, such redress would circumvent preemption of the National Bank Act and the aforementioned regulations promulgated by the OCC.[FN1]

> FN1."Federal regulations have no less pre-emptive effect than federal statutes."*Fid. Fed. Sav. & Loan Ass'n v. De la Cuesta,* 458 U.S. 141, 153 (1982)

In order to determine whether a cause of action confers federal question jurisdiction, the court examines the plaintiffs' well-pleaded complaint.*Louisville & Nashville R. Co. v. Mottley,* 211 U.S. 149 (1908). Under the well-pleaded complaint rule, "federal jurisdiction exists only when a federal question is presented on the fact of plaintiff's properly pleaded complaint."*Caterpillar Inc. v. Williams,* 482 U.S. 386, 392 (1987).. However, the well-pleaded complaint rule has exceptions. One exception applies when Congress so completely preempts a particular area that any civil

Not Reported in F.Supp.2d
Not Reported in F.Supp.2d, 2005 WL 1785285 (N.D.Miss.)
**(Cite as: Not Reported in F.Supp.2d, 2005 WL 1785285)**

complaint raising this select group of claims is necessarily federal in character. _Arcana v. Ochsner Health Plan,_ 338 F.3d 433, 437 (5th Cir.2003). One court has noted that "[t]he only statutes that completely preempt state law are the Labor Management Relations Act, the Employee Retirement Security Act, and the National Bank Act."_Amalgamated Gadget v. Mack,_ 2004 WL 549483, * 5 (N.D.Tex.2004) (citing _Beneficial,_ 529 U.S. at 559-60).

Having considered the Supreme Court's decision in _Beneficial_ combined with 12 C.F.R. § 34.3 and the National Bank Act, 12 U.S.C. §§ 85 and 86, the court concludes that the claims asserted by the plaintiffs in the instant case under Mississippi law that relate to Provident's real estate lending powers granted by the National Bank Act are preempted by that Act. Consequently, the court concludes that it possesses federal question jurisdiction over said claims against the national bank. The court will assert supplemental jurisdiction under 28 U.S.C. § 1367 over the remaining claims, in addition to those asserted against the Mississippi mortgage broker defendants.

### III. CONCLUSION

For the reasons discussed above, the court concludes that the Plaintiffs' Motion to Remand [14-1] should be denied. Accordingly, and Order shall issue forthwith, THIS DAY of July 25, 2005.

N.D.Miss.,2005.
Austin v. Provident Bank
Not Reported in F.Supp.2d, 2005 WL 1785285 (N.D.Miss.)

END OF DOCUMENT

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Westlaw.

Slip Copy
Slip Copy, 2008 WL 681835 (W.D.Wash.)
(Cite as: Slip Copy, 2008 WL 681835)

**H** Green v. California Court Apartments, LLC
W.D.Wash.,2008.
Only the Westlaw citation is currently available.
United States District Court, W.D. Washington, at Seattle.
Riccardo GREEN and Imelda Abrego, Plaintiffs,
v.
CALIFORNIA COURT APARTMENTS, LLC, Defendants.
**No. C07-334-MJP.**

March 10, 2008.

Imelda Abrego, Seattle, WA, pro se.
Riccardo Green, Seattle, WA, pro se.
John G. Bergmann, Kristen Dorrity, Helsell Fetterman LLP, Seattle, WA, for Defendant.

ORDER ON DEFENDANT'S MOTION FOR SUMMARY JUDGMENT AND MOTION TO DISMISS FOR FAILURE TO STATE A CLAIM

MARSHA J. PECHMAN, District Judge.
**\*1** This matter comes before the Court on defendant California Court Apartments, LLC's motion for summary judgment and motion to dismiss for failure to state a claim. Having considered Defendant's motion, reply, and surreply (Dkt. Nos. 43, 62, & 70), and the exhibits and declaration attached thereto (Dkt.Nos.44-45), Plaintiffs' response, surreply, exhibits, and declarations (Dkt. Nos. 61 & 65-69, 71), the amended complaint seeking Five Hundred Billion Dollars in damages (Dkt. No. 4), and the balance of the record, the Court GRANTS Defendants' motions and DISMISSES Plaintiffs' case in its entirety WITH PREJUDICE.

**Background**

Riccardo Green and his fiancé, Imelda Abrego, (collectively "Plaintiffs") began occupying an apartment at the California Court Apartments in February 2003. (Schilling Decl. Ex. A, Dkt. No. 44.)Green identifies himself as African-American and Abrego identifies herself as Mexican-American. (Dorrity Decl. Ex. E "Green Dep.," Dkt. No. 44-1, at 26 lines 19-22[hereinafter "Green Dep."]; Pls'

Surreply, Dkt. No. 66, at 145.)Plaintiffs originally signed a six-month lease and continued their tenancy on a month-to-month basis until moving out on September 15, 2004. (Green Dep. at 42 lines 15-17.) From August 2003 to June 2005 Lori Matthews was the apartment manager at the California Court Apartments. (Schilling Decl. at 2.) Matthews's long-term boyfriend, Sam Guasta, moved in with Matthews in February 2004 and aided Matthews in her managerial duties. (*Id.*) Matthews is currently the chair of a local diversity council at a research laboratory in Spokane and serves on the National Diversity Steering Council. (Matthews Dep. at 5.) Dennis Schilling is a part-owner and the managing partner of California Court LP, which owns the California Court Apartments. (*Id.*) During the period in which Plaintiffs occupied an apartment at the California Court Apartments, roughly one-third of the residents were persons of color. (*Id.*)

Plaintiffs allege that Matthews and her boyfriend Guasta committed several racially discriminatory, retaliatory acts against them. (*See* Amend. Compl., Dkt. No. 4, at 1-22.)Plaintiffs state that Matthews made angry remarks to them one evening when she was summoned to make sure Plaintiffs' door-mat was returned to their apartment. (Green Dep. at 32 line 19, 34 line 8, and 34 lines 22-24; Matthews Dep. at 12 line 25, 13 line 1.) Plaintiffs allege that Matthews would periodically threaten to raise the monthly rent and three times threatened to evict them. (Green Dep. at 36 lines 13-15.) Plaintiffs also claim that Matthews once stated "you people are all the same," and that this statement displayed a racial animus. (Amend. Compl. at 8 ¶ 43.)

On June 12, 2004, a flood caused by Plaintiffs' neighbor flooded part of Plaintiffs' apartment. Part-owner Dennis Schilling arrived to inspect the damage and arranged to have the carpets fixed and cleaned. (Schilling Decl. at ¶ 4.) Schilling and Plaintiffs agreed to have the carpets repaired on June 15, so that Plaintiffs could be present. (Green Dep. at 24 line 17; Matthews Dep. at 22 line 13, 23 line 17.) Plaintiffs allege that they waited all day on June 15 and no one arrived to work on the carpet. (Green Dep. at 67.) Matthews, however, claims that the repairman did arrive, but that no one answered the

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Slip Copy
Slip Copy, 2008 WL 681835 (W.D.Wash.)
**(Cite as: Slip Copy, 2008 WL 681835)**

door at Plaintiffs' apartment. (Matthews Dep. at 23, lines 1-23.) A letter from the carpet repairman supports Matthews's version of the facts. (Green Decl., Dkt. No. 19, Ex. 4.) The work was performed three days later on June 18. (Matthews Dep. at 25 line 1; Green Dep. at 71 lines 2-6; Green Decl., Dkt. No. 19, Ex. 4.) Plaintiffs claim that the three-day delay was the result of racial discrimination by Schilling and Matthews. Plaintiffs also claim to have lost wages due to the repair delay. However, in his deposition, plaintiff Green admitted he lost no wages attributable to the repair. (Green Dep. at 13 lines 17-22; pages 14-15.)

**\*2** To compensate Plaintiffs for the inconvenience caused by the water damage, Matthews offered Plaintiffs a $300 rent credit for July. (Green Dep. at 46 lines 18-21; Matthews Dep. Ex. 1.) Matthews was authorized by Schilling to give Plaintiffs this rental discount. Plaintiffs accepted the credit and it was applied to the July rent. (Green Dep. at 47 lines 5-9.; *see* Matthews Dep. Ex. 2.) Plaintiffs do not dispute that they paid $550 in rent for July, reflecting the $300 reduction. (Green Dep. at 52 lines 10-25.) In a letter dated July 6, 2004, Plaintiffs requested a rent reduction directly from Schilling. (Green Decl., Dkt. No. 19, at 12-13.)Schilling responded in a letter dated July 13, 2004, offering "a $400 rent credit for August" to settle all of Plaintiffs' outstanding complaints. (Schilling Decl. Ex. B; Green Decl., Dkt. No. 19, at 24.)Plaintiffs sent a letter sent to Schilling accepting the offer, but the letter was never accepted and was returned to Plaintiffs on August 20, 2004. (Green Decl., Dkt. No. 19, Ex. 10.) Plaintiffs contend that they only owed $450 for August rent, given the $400 rental credit applied to August's rent. However, Schilling maintains that his letter offered only another $100 rent credit, making the total credit $400.

Defendant did not receive August rent from Plaintiffs. Plaintiffs claim to have sent a check directly to Schilling, though they were required by the lease agreement to give the money to the manager. (Schilling Decl. Ex. A at 1; Green Dep. at 45, 50) The parties agree that rent was not paid in August to Matthews and Plaintiffs have not produced any evidence that a check for August rent was deposited. On August 6, after the 5-day grace period elapsed without receipt of payment, Matthews posted a three-day pay or vacate notice to Plaintiffs. (Green

Dep. at 50 lines 15-25.) This was common practice and Matthews did this to several other tenants who did not pay rent. (Matthews Dep. at 32 line 25; at 33 line 3; at 63-64.) Matthews states she only posted pay or vacate and eviction notices to Caucasians, and never to persons of color. Defendant did not evict Plaintiffs in August.

Plaintiffs retained a lawyer, Ronald Gomes, to represent them regarding the tenancy issues. (Green Decl., Dkt. No. 19, Ex. 41.) Gomes wrote to Matthews on August 12, 2004, requesting that she direct all of her communications to him rather than Plaintiffs. (*Id.*) In July and August, 2004, Plaintiffs filed several complaints alleging racial discrimination and retaliation to the U.S. Department of Housing and Urban Development ("HUD") and the Seattle Office of Civil Rights. Plaintiffs' complaint alleged acts of discrimination that began on August 6, 2004, when they received the three-day notice to pay or vacate for failing to pay rent on time. (*Id.*)

By September 6, 2004, Defendant had not received August or September rent from Plaintiffs. (Matthews Dep. at 34 line 3 to 35 line 3; Schilling Decl. at ¶ 7.) Schilling, whose wife Sandra is a member of the Washington bar, prepared a summons and complaint for unlawful detainer. (Schilling Decl. at ¶ 7.) Schilling gave the summons and complaint to Guasta to serve on Plaintiffs.(*Id.*) Guasta attempted to several times to serve Plaintiffs but was unsuccessful until September 11, 2004, when he tapped or lightly hit plaintiff Green with the papers and told him he was served. (Green Dep. at 59-60.) Plaintiffs did not accept the papers. (Guasta Dep. at 9-10.)

**\*3** Plaintiffs mailed Matthews a letter dated August 31, 2004 stating they were giving their 20 day notice of termination of the rental agreement. (Dorrity Decl. Ex. K.) Plaintiffs included an $850 check in the letter.(*Id.*) Plaintiffs claimed that Defendant's acts forced them to move. (*Id.*) On September 16, 2004, Matthews received the letter and applied the check to the unpaid August rent. (Matthews Dep. at 34.) Plaintiffs moved out on September 15, 2004. (*Id.*)

On September 15, 2004 an unknown driver struck Plaintiffs' car, which was parked in front of Plaintiffs' new apartment-five to ten blocks away from the California Court Apartments. (Amend. Compl. at 12 ¶ 70.) Plaintiffs have not submitted any evidence of

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Slip Copy
Slip Copy, 2008 WL 681835 (W.D.Wash.)
**(Cite as: Slip Copy, 2008 WL 681835)**

and admits that he does not know who hit their car. (Green Dep. at 74-9.)

On February 1, 2008, Defendant moved for summary judgment on all claims and moved to dismiss several claims pursuant to Rule 12(b) (6). (Dkt. No. 43.)Plaintiffs filed a response in opposition on February 27, 2008, which was two days late per Rule 7(d)(3); it should have been filed at the latest by February 25, 2008. (Dkt. No. 61.)On February 29, 2008, Defendant filed a reply and requested the Court to strike Plaintiffs' response brief. (Dkt. No. 62.)The parties have exchanged "surreply" briefs. (Dkt. Nos. 66 & 70.)

The Court has jurisdiction over Plaintiffs' civil rights claims pursuant to 28 U.S.C. § 1331 and supplemental jurisdiction over their state law claims pursuant to 28 U.S.C. § 1367.

### Discussion

### I. Motion to Strike Response Brief

In its reply brief, Defendant requests the Court to strike Plaintiffs' response brief because it was filed two days late and lacks plaintiff Abrego's actual signature. In the interests of adjudicating this matter on the merits, the Court accepts the brief, in spite of its defects.

### II. Motion to Dismiss Pursuant to Rule 12(b)(6)

Pursuant to Rule 12(b)(6), Defendant moves to dismiss several of Plaintiffs' claims, including: (1) the claim for damages related to Plaintiffs' car being struck by an unknown driver (Amend. Compl. at 12 ¶ 70), (2) the request that Sandra Schilling be disbarred (*Id.* at 30 ¶ 22), (3) the request for lost wages (*Id.* at 28 ¶ 2), and (4) the request for damages for violation of 42 U.S.C. § 3604(c). The Court construes the pleadings liberally in light of Plaintiffs' pro se status, *see Weilburg v. Shapiro,* 488 F.3d 1202, 1205 (9th Cir.2007), and dismisses all four claims.

The Court dismisses Plaintiffs' claim for damages related to the harm done to their car. Plaintiffs have failed to allege or present any facts that could permit the Court to find that Defendant damaged their car. Moreover, Plaintiffs admit that they cannot

demonstrate who hit the car. (Green Dep. at 75-77.)

Plaintiffs have voluntarily dismissed their request for disbarment of Sandra Schilling. (Pls. Resp in Opp. to SJ, Dkt. No. 61, at 11.)Moreover, Plaintiffs cannot seek Schilling's disbarment. Only the Washington State Supreme Court may discipline, disbar, or suspend Washington bar members. *See Wash. State Bar Ass'n v. State,* 125 Wash.2d 901, 908 n. 10, 890 P.2d 1047 (1995).

**\*4** The Court need not address Plaintiffs' claim for lost wages arising out of the delay in repairing the carpets as a 12(b)(6) issue. That claim appears only in the request for relief at the conclusion of their complaint; it is not an independent cause of action but arises out of Plaintiffs' allegations concerning violations of the Residential Landlord-Tenant Act, RCW 59.18.060 *et seq.*. As those claims are discussed and dismissed below (*see* Section III.B), the request for damages arising out of those claims will likewise fall away.

The Court dismisses Plaintiffs' claim that Defendant's failure to post notice of the Fair Housing Act and Washington's Residential Landlord-Tenant Act is a violation of the Fair Housing Act, 42 U.S.C. § 3604(c).Section 3604(c) requires the plaintiff to show that the defendant made, printed, or published a discriminatory notice, statement or advertisement. 42 U.S.C. § 3604(c). Plaintiffs have alleged Defendant violated section 3604(c) due to a *failure* of publication. Because section 3604(c) does not apply to non-existent publications, Plaintiffs have not stated a claim on which relief may be granted.

### III. Summary Judgment

After considering the evidence in the light most favorable to the non-moving party, the Court must grant summary judgment if there are no "genuine issue[s] of material fact and ... the moving party is entitled to judgment as a matter of law."Fed.R.Civ.P. 56(c). While "some alleged factual dispute between the parties will not defeat" a motion for summary judgment, "disputes over facts that might affect the outcome of the suit ... will properly preclude the entry of summary judgment."*Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 247-48, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). Once a party has moved for summary judgment, the non-moving party must

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Slip Copy
Slip Copy, 2008 WL 681835 (W.D.Wash.)
**(Cite as: Slip Copy, 2008 WL 681835)**

provide sufficient evidence such that a reasonable jury could decide in their favor. *Id.* at 248.

## A. The Fair Housing Act and Washington's Law Against Discrimination

Plaintiffs contend that Defendant violated the Fair Housing Act of 1968, 42 U.S.C. § 3601 *et seq.* and Washington's Law Against Discrimination, RCW 49.60 *et seq.* Defendant responds that both claims must fail because Plaintiffs have shown neither direct evidence of discrimination, nor prima facie evidence of discrimination to satisfy the first step of the three-step *McDonnell Douglas* burden-shifting framework. Alternatively, Defendant asserts that if there is prima facie evidence of discrimination, Defendant has demonstrated valid nondiscriminatory reasons for its actions and that Plaintiffs cannot demonstrate discrimination. Defendant is correct and entitled to summary judgment on both federal and state claims.

The Fair Housing Act makes it unlawful to "discriminate against any person in the terms, conditions, or privileges of sale or rental of a dwelling ... because of race, color, religion, sex, familial status, or national origin."42 U.S.C. § 3604(b). Washington's Law Against Discrimination is interpreted in the same manner as the Fair Housing Act. *See Kees v. Wallenstein,* 161 F.3d 1196, 1199 (9th Cir.1998). The Court's determination of Plaintiffs' Fair Housing Act claims will also decide the outcome of Plaintiffs' Law Against Discrimination claims. *Id.*

**\*5** A plaintiff may bring a claim under the Fair Housing Act on either a disparate treatment or disparate impact theory. *See Harris v. Itzhaki,* 183 F.3d 1043, 1051 (9th Cir.1999). The plaintiff can support a claimed violation of the Fair Housing Act under either theory by demonstrating direct evidence of discrimination. Alternatively, the plaintiff can employ the burden-shifting framework announced by *McDonnell Douglas Corp. v. Green,* 411 U.S. 792, 802, 93 S.Ct. 1817, 36 L.Ed.2d 668 (1973) to demonstrate a violation of the Act.

The *McDonnell Douglas* framework requires a three-step analysis of a claim of discrimination. At step one, the plaintiff must present prima facie evidence of discrimination. This is a low burden: "The requisite degree of proof necessary to establish a

*prima facie* case ... on summary judgment is minimal and does not even need to rise to the level of a preponderance of the evidence."*Wallis v. J.R. Simplot Co.,* 26 F.3d 885, 889 (9th Cir.1994). At step two, the burden shifts to the defendant to show some legitimate, nondiscriminatory reason for the action. *See McDonnell Douglas,* 411 U.S. at 802. The defendant meets this burden by setting forth a legally sufficient explanation. *See Texas Dept. of Cmty. Affairs v. Burdine,* 450 U.S. 248, 255, 101 S.Ct. 1089, 67 L.Ed.2d 207 (1981). At step three, the burden shifts back to the plaintiff to persuade "the court that she has been a victim of intentional discrimination, 'either directly by persuading the court that a discriminatory reason more likely motivated the [defendant] or indirectly by showing that the [defendant's] proffered explanation is unworthy of credence.'"*Harris,* 183 F.3d at 1051 (quoting *Burdine,* 450 U.S. at 256).

The prima facie elements vary somewhat between disparate treatment and disparate impact claims. The prima facie elements of disparate treatment discrimination are: "(1) plaintiff's rights are protected under the [Fair Housing Act]; and (2) as a result of the defendant's discriminatory conduct, plaintiff has suffered a distinct and palpable injury."*Harris,* 183 F.3d at 1051. The prima facie elements of a disparate impact discrimination claim are: "(1) the occurrence of certain outwardly neutral ... practices, and (2) a significantly adverse or disproportionate impact on persons of a particular [type] produced by the [defendant's] facially neutral acts or practices."*Pfaff v. U.S. Dept. of Housing and Urban Dev.,* 88 F.3d 739, 745 (9th Cir.1996) (quoting *Palmer v. United States,* 794 F.2d 534, 538 (9th Cir.1986)). This impact must at least show that " 'the defendant's actions had a discriminatory effect.' "*Id.* (citing *Keith v. Volpe,* 858 F.2d 467, 482 (9th Cir.1988))." 'Discriminatory effect' describes conduct that actually or predictably resulted in discrimination."*Id.* (citing *Keith,* 858 F.2d at 482)).

Because Plaintiffs have not specified the theory under which they bring their Fair Housing Act claims, the Court will analyze the claims under both a disparate treatment and disparate impact theory.

### i. Disparate Treatment

**\*6** Plaintiffs have not presented sufficient direct

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Slip Copy
Slip Copy, 2008 WL 681835 (W.D.Wash.)
**(Cite as: Slip Copy, 2008 WL 681835)**

evidence of discriminatory treatment to sustain their claim. Accepting the facts as Plaintiffs state them, the records shows that Plaintiffs had an unpleasant relationship with Matthews, had their doormat moved, were forced to wait three days longer than promised to have a carpet repaired from water damage, were threatened on occasion with increased rent and eviction, and were evicted. There is no evidence, however, that these acts occurred on account of race, gender, or nationality. There is one ambiguous statement Plaintiffs allege that Matthews made that Plaintiffs claim was racist: "you people are all the same!"(Amend. Compl. at 8 ¶ 43.) However, the statement is not evidence of direct racial discrimination and appears facially neutral. *Cf. Ash v. Tyson Foods, Inc.,* 546 U.S. 454, 456, 126 S.Ct. 1195, 163 L.Ed.2d 1053 (2006) (stating that a Alabama plant manager's use of "boy" when addressing African-American employees was prima facie evidence of discrimination, but not direct evidence).

Under the *McDonnell Douglas* framework, Plaintiffs have established a prima facie case of discrimination. Plaintiffs have shown at least a subjective belief that negative acts were taken against them on account of race. *See Wallis,* 26 F.3d at 889 (burden of proof is below a preponderance of the evidence). It is conceivable that the delay in fixing the carpet was related to his race and that he was evicted solely because of his race. Moreover, Plaintiffs contend that the manager yelled at them for things that were not their fault and that only their race was the basis for her complaints. The statement "you people are all the same," when read in light of the facts Plaintiffs present also satisfies a prima facie showing of discrimination. *See Ash,* 546 U.S. at 456.

Defendant has offered valid, nondiscriminatory reasons for all the of the acts of which Plaintiffs complain. First, Defendant did not move Plaintiffs' door-mat, but did see to it that it was returned promptly upon their request. Second, the carpets in Plaintiffs' apartment were fixed within 6 days of the flooding and part of the delay is attributable to Plaintiffs, who required that they be present for the repair. (*See* Green Decl., Dkt. No. 19, Ex.4.) Third, Matthews's threats of eviction were made because Plaintiffs had failed to pay rent in the manner required by the lease and Schilling did not receive any rental payment from Plaintiffs. Fourth, the

eviction and pay or vacate notices were the result of Plaintiffs' failure to pay rent on time and in the manner in which was required by the lease. The record shows that Schilling worked diligently to respond to Plaintiffs' complaints and offered substantial discounts on rent.

The evidence presented by Plaintiffs to rebut these nondiscriminatory reasons is insufficient to carry their burden. *See Harris,* 183 F.3d at 1051. There is no evidence of intentional discrimination and Plaintiffs have not shown that any of Defendant's explanations are "unworthy of credence." *Id.* Defendant's acts were racially-neutral. *See Burdine,* 450 U.S. at 255-56.

**\*7** The Court dismisses Plaintiffs' claim that Defendant violated the Fair Housing Act through discriminatory, disparate treatment. The Court dismisses Plaintiffs' Washington antidiscrimination claims for the same reasons. *See Kees,* 161 F.3d at 1199.

**ii. Disparate Impact**

Plaintiffs have not established direct evidence or even prima facie evidence of discrimination under a disparate impact theory. Other similarly situated Caucasian tenants at the California Court Apartment were treated no differently from Plaintiffs. Matthews evicted several Caucasian tenants for failure to pay rent and never once evicted a person of color other than Plaintiffs. (Matthews Dep. p 10-11.) During the relevant time period, the California Court Apartment rented to other African-American, Hispanic, and Asian persons and none has accused Defendant of racial discrimination. (Matthews Dep. at 10-11.) There is no evidence that any non-Caucasian tenants were evicted or suffered adverse action by the management at the California Court Apartments. This is not sufficient to show prima facie evidence of "a significantly adverse or disproportionate impact on persons of a particular [type] produced by the [defendant's] facially neutral acts or practices."*Pfaff,* 88 F.3d at 745.

The Court dismisses Plaintiffs' disparate impact claim that Defendant violated the Fair Housing Act. Moreover, the Court dismisses Plaintiffs' Washington anti-discrimination claim for the same reasons. *See Kees,* 161 F.3d at 1199.

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Slip Copy
Slip Copy, 2008 WL 681835 (W.D.Wash.)
**(Cite as: Slip Copy, 2008 WL 681835)**

### iii. Retaliation and Washington's Law Against Discrimination

Because there is no evidence of discrimination, Plaintiffs' claim of retaliation must fail. *See Walker v. City of Lakewood,* 272 F.3d 1114, 1128 (9th Cir.2001) (a claim of retaliation requires a finding of discrimination).

### B. Washington's Residential Landlord-Tenant Act

Plaintiffs allege violations of the Washington Residential Landlord-Tenant Act ("the Act"), RCW 59.18.060, -.230, -.240, -.250, -.352, & - .354. Defendant has not moved for summary judgment on these claim, except insofar as it seeks "dismissal of plaintiffs' claims in their entirety."On its own motion, the Court dismisses these claims under Rule 12(b)(6).*See Omar v. Sea-Land Serv., Inc.,* 813 F.2d 986, 991 (9th Cir.1987)."Such a dismissal may be made without notice where the claimant cannot possibly win relief."*Id.* However, it must appear beyond doubt that the plaintiff can prove no set of facts in support of his claim which would entitle him to relief. *See Weilburg v. Shapiro,* 488 F.3d 1202, 1205 (9th Cir.2007). Having reviewed the entire record, the Court is convinced that Plaintiffs cannot sustain a claim for any violations of the Act.

### i. RCW 59.18.060

Plaintiffs allege that Defendant violated RCW 59.18.060, which lists the statutory duties required of landlords. Generally, the landlord must "keep the premises fit for human habitation."RCW 59.18.060. More specifically, the landlord must keep the common areas reasonably clean, maintain structural components in reasonably good repair, comply with any applicable code, statute, ordinance, or regulation, make repairs, control pests, ensure the living area is weatherproof, keep appliances functioning, notify tenants of fire safety information, inform tenants of risks of mold, and provide the tenant the landlord's name and address. RCW 59.18.060(1)-(13). The complaint and evidence submitted, construed in Plaintiffs' favor, do not allege sufficient facts to support a claim for violations of the Act.

**\*8** Plaintiffs also indirectly allege a violation of

RCW 59.18.070(3), contending that the repair of his carpet took too long. Under this section of the Act, the landlord must fix non-major fixtures or non-hazardous conditions within 10 days. RCW 59.18.070(3). Defendant had 10 days to fix the carpets. The complaint and undisputed facts demonstrate that the leak was fixed within 6 days of the incident. Plaintiffs have not stated a claim under this section of the Act.

### ii. RCW 59.18.230

This section of the Act makes it unlawful for a lease or agreement to require the tenant waive rights under the Act. RCW 59.18.230(1). Plaintiffs do not allege or present any evidence that they were required to waive a right under the Act. Plaintiffs have failed to state a claim on which relief can be granted. The Court dismisses this claim.

### iii. RCW 59.18.240 & -.250

This section of the Act prohibits a landlord from making or threatening retaliatory acts against a tenant who has filed a complaint against the landlord for failing "to substantially comply with any code, statute, ordinance, or regulation governing the maintenance or operation of the premises, if such condition may endanger or impair the health or safety of the tenant."RCW 59.18.240(1). The landlord is also forbidden from retaliating against a tenant who has asserted or enforced his rights under RCW 59.18. Notably, RCW 59.18 does not address discrimination on the basis of race, national origin, or gender. However, RCW 59.18.250 states that there is no presumption that the eviction is a reprisal or retaliatory if "at the time the landlord gives notice of termination of tenancy pursuant to chapter 59.12 RCW the tenant is in arrears in rent ...."RCW 59.18.250.

Plaintiffs have failed to allege or present facts that they filed a complaint with a governmental authority seeking enforcement of the Act or that Schilling was not in compliance with maintenance standards that were a threat to Plaintiffs' safety. Plaintiffs' complaints submitted to the Seattle Office of Civil Rights and the U.S. Department of Housing and Urban Development were in regards to claims of racial discrimination, and insufficient to state a claim under RCW 59.18.240. The Court dismisses these

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Slip Copy
Slip Copy, 2008 WL 681835 (W.D.Wash.)
**(Cite as: Slip Copy, 2008 WL 681835)**

claims pursuant to Rule 12(b)(6).

### iv. RCW 59.18.352 & -.354

Plaintiffs allege that Defendant violated both RCW 59.18.352 and RCW 59.18.354. Plaintiffs have failed to state a claim under both sections. First, RCW 59.18.352 requires that the plaintiff received a threat from another tenant, that the tenant made the threat with a firearm, that the threatening tenant was arrested, and the landlord failed to evict the threatening tenant.RCW 59.18.352(1). Plaintiffs have not alleged or produced facts that they received any threats from another tenant with a firearm and or that an arrest was made. Second, RCW 59.18.354 requires that the plaintiff receive a threat from the landlord, that the landlord made the threat with a firearm or deadly weapon, and that the landlord was arrested as a result. Again, Plaintiffs have made no allegation or showing that the landlord threatened them with a firearm or deadly weapon, or, for that matter, that he threatened them at all. The Court dismisses both claims pursuant to Rule 12(b)(6).

### C. Negligent and Intentional Infliction of Emotional Distress

**\*9** Plaintiffs' complaint alleges that Defendant intentionally and negligently inflicted emotional distress. These claims are without merit. To prove intentional infliction of emotional distress (outrage), the plaintiff must show: "(1) extreme and outrageous conduct; (2) intentional or reckless infliction of emotional distress; and (3) actual result to the plaintiff of severe emotional distress."*Snyder v. Med. Serv. Corp. of E. Washington,* 145 Wash.2d 233, 243, 35 P.3d 1158 (2001) (citation and quotation omitted). To prove negligent infliction of emotional distress, the plaintiff must show duty, breach, causation, and damages. Moreover, the plaintiff must prove he has suffered emotional distress by objective symptomatology, and the emotional distress must be susceptible to medical diagnosis and proved through medical evidence. *Kloepfel v. Bokor,* 149 Wash.2d 192, 197, 66 P.3d 630 (2003).

Plaintiffs have presented insufficient evidence of "extreme and outrageous" conduct to satisfy their burden of proof to support a claim of intentional infliction of emotional distress. *See Snyder,* 145 Wash.2d at 243, 35 P.3d 1158. Plaintiffs' negligent infliction of emotional distress claim is also unsupported by the evidence. Plaintiffs have failed to present any evidence of objective symptomatology or medical evidence of an emotional disorder as a result of Defendant's conduct. *See Kloepfel,* 149 Wash.2d at 197, 66 P.3d 630.

The Court dismisses both claims.

### Conclusion

The Court GRANTS Defendant's motion to dismiss Plaintiffs' claims for damages related to the car accident, disbarment, and violations of 42 U.S.C. § 3604(c). On its own initiative and pursuant to Rule 12(b)(6), the Court DISMISSES Plaintiffs' claims relief under Washington's Residential Landlord-Tenant Act. Having considered the facts in the light most favorable to Plaintiffs, the Court GRANTS Defendant's motion for summary judgment and DISMISSES Plaintiffs' case in its entirety WITH PREJUDICE.

The Clerk is directed to send copies of this order to all counsel of record.

W.D.Wash.,2008.
Green v. California Court Apartments, LLC
Slip Copy, 2008 WL 681835 (W.D.Wash.)

END OF DOCUMENT

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Westlaw.

Not Reported in A.2d
Not Reported in A.2d, 2001 WL 1456795 (Del.Super.)
**(Cite as: Not Reported in A.2d, 2001 WL 1456795)**

H Hadfield's Seafood v. Rouser
Del.Super.,2001.
Only the Westlaw citation is currently available.

UNPUBLISHED OPINION. CHECK COURT
RULES BEFORE CITING.

Superior Court of Delaware.
HADFIELD'S SEAFOOD Appellant,
v.
Doreen and Glen ROUSER, Appellees.
**No. CIV.A.00A-07-008-JRJ.**

Submitted: July 18, 2001.
Decided: Aug. 17, 2001.

Appeal from a decision of the State Human Relations
Commission. Decision Reversed.

Gary W. Aber, Esq., of Heiman, Aber, Goldlust &
Baker, Wilmington, Delaware, for Appellant.
Jeffrey K. Martin, Esq., Wilmington, Delaware, for
Appellees.

ORDER

JURDEN, J.

I. INTRODUCTION

**\*1** Appellees, Doreen and Glenn Rouser, husband
and wife, filed a complaint with the State Human
Relations Commission against Hadfield's Seafood,
Inc., ("Hadfield's") alleging a violation of the
Delaware Equal Accommodations Law, specifically
6 *Del. C.* § 4504(a). The Rousers accused Hadfield's
of withholding service from Appellee Doreen Rouser
based on racial and marital discrimination. A panel of
the State Human Relations Commission ("the Panel")
held a hearing, determined that the actions of a
Hadfield's employee, Mathew Walker ("Walker"),
constituted a violation of 6 *Del. C.* § 4504(a), and
ordered Walker and all other Hadfield's employees to
undergo "sensitivity training." Hadfield's filed a
timely appeal. Because the decision of the Panel is
not supported by substantial evidence, the decision of
the State Human Relations Commission is

REVERSED.

II. FACTS

On the evening of July 7, 1999, Glenn Rouser called
Hadfield's Seafood to place a dinner order for pickup.
He was informed that the kitchen was extremely busy
and that the order would not be ready for about 45
minutes. Glenn and Doreen Rouser arrived at
Hadfield's approximately 50 minutes later. Glenn
Rouser went into the store while his wife waited
outside in their vehicle. Mr. Rouser waited inside
Hadfield's for approximately 20 minutes before
returning to his vehicle and telling his wife he would
rather leave than wait any longer for their dinner
order.

Doreen Rouser then went into the store to check on
the order. When she entered, the cashier behind the
counter called out the name "Glenn," and Doreen
Rouser approached the counter. The cashier, Mathew
Walker, immediately told Doreen Rouser that he
wanted to explain the reason for the delay. Doreen
Rouser said she needed no explanation. Walker
insisted that she listen to his explanation. Doreen
Rouser told him she wanted no explanation and
demanded her food. An argument ensued.

Though the chronology of the "he said-she said" is in
dispute, the Panel determined that it occurred in the
following way: After Doreen Rouser repeatedly
rebuffed Walker's attempts to explain the delay and
then demanded her food, Walker called Rouser
"white trash ." She responded by telling him she
would smack him in the mouth. At this point, the
Panel found "the cashier placed the food down, not
giving it to Mrs. Rouser and responded with the
comment 'Go ahead and hit me.' "

Hearing the commotion, the assistant manager came
to the counter and escorted Walker back into the
kitchen, in accordance with store policy. When the
assistant manager returned to the counter, he
immediately apologized to Rouser and gave her the
food. After arriving home with their dinner order,
Doreen Rouser was so upset that she called the store.
She spoke to the assistant manager who apologized

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in A.2d
Not Reported in A.2d, 2001 WL 1456795 (Del.Super.)
**(Cite as: Not Reported in A.2d, 2001 WL 1456795)**

again. The next day she spoke to the owner, who also apologized.

Contrary to Doreen Rouser's testimony, Walker and several other employees testified that he made the "white trash" comment while Walker was being escorted into the kitchen, not while he was at the counter. Walker claimed it was Doreen Rouser's comments and admitted finger wagging that precipitated the confrontation. In addition to disagreeing about the timing of the "white trash" comment, the parties also disagreed on whether Hadfield's gave the Rousers a discount on their dinner order for the poor service they received.

**\*2** The Panel issued its decision on June 7, 2000. The Panel unanimously found that: (1) Walker had ample opportunity to determine that the Rousers were an interracial couple; (2) the confrontation was prompted by "racial considerations" as evidenced by the remark "white trash;" and (3) Walker's conduct constituted a violation of 6 *Del. C.* § 4504(a).

The Panel said Doreen Rouser was denied the "accommodations, facilities advantages and privileges" of Hadfield's Seafood because of her relationship with her husband who is African-American. The Panel did not find any violation of Glenn Rouser's rights under the statute. The Panel ordered "sensitivity training" for Walker and all employees of Hadfield's.

Hadfield's now appeals the State Human Relations Commission's decision, claiming the Rousers failed to establish a *prima facie* case of discrimination, and, therefore, the Panel's decision is not predicated on substantial evidence.

### III. STANDARD OF REVIEW

This court's role in reviewing a decision of the State Human Relations Commission is limited to determining whether the Commission's decision is supported by substantial evidence and is free from legal error.[FN1] "Substantial evidence means such relevant evidence as a reasonable mind might accept as adequate to support a conclusion."[FN2] In its appellate role, "[t]his Court does not weigh the evidence, determine questions of credibility, or make its own factual findings. It merely determines if the evidence is legally adequate to support the agency's

factual findings."[FN3] If those findings are not supported by substantial evidence, "or are not the product of an orderly and logical deductive process, then the decision under review cannot stand."[FN4]

> FN1. *Quaker Hill Place v. State Human Relations Comm'n,* Del.Super., 498 A.2d 175, 178 (1985) (citing 29 *Del. C.* §§ 10142, 10161(5)).

> FN2. *Domino's Pizza v. Marian Harris and the Human Relations Comm'n,* Del.Super., C.A. No. 99A-12-003, 2000 LEXIS 269, at \*15, Ridgely, P.J. (July 31, 2000).

> FN3. *Id* at \*15.

> FN4. *Quaker Hill Place,* 498 A.2d at 179 (citing *Baker v. Connell,* Del.Supr., 488 A.2d 1303, 1309 (1985)).

### IV. DISCUSSION

The relevant statute, 6 *Del. C.* § 4504(a), provides as follows:

No person being the owner, lessee, proprietor, manager, superintendent, agent or employee of any place of public accommodation, shall directly or indirectly refuse, withhold from or deny to any person, on account of race, age, marital status, creed, color, sex, handicap or national origin, any of the accommodations, facilities, advantages or privileges thereof.[FN5]

> FN5. 6 *Del. C.* § 4504(a).

Hadfield's is a "place of public accommodation," which is defined as "any establishment which caters to or offers goods or services or facilities to, or solicits patronage from, the general public."[FN6] In deciding cases alleging unlawful discrimination, Delaware Courts apply a three-part burden-shifting analysis articulated by the United States Supreme Court in *McDonnell Douglas Corp. v. Green.*[FN7] To prove the allegation, (1) the plaintiff first must set forth a *prima facie* case for discrimination, (2) the defendant then has an opportunity to offer some nondiscriminatory reason for the denial of the public accommodation, (3) if a reason is given, then the

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in A.2d
Not Reported in A.2d, 2001 WL 1456795 (Del.Super.)
**(Cite as: Not Reported in A.2d, 2001 WL 1456795)**

plaintiff has the burden to prove by a preponderance of the evidence that the proffered reason was a pretext for discrimination.[FN8]

> FN6.*6 Del. C.* § 4502(1).

> FN7.411 U.S. 792, 93 S.Ct. 1817, 36 L.Ed.2d 668 (1973).

> FN8.*Id.* at 801-02.

**\*3** Establishing a *prima facie* case is itself a three-part test: "a plaintiff can establish a *prima facie* case by showing that he is a member of a protected class, that he was denied access to a public accommodation, and that non-members of the protected class were treated more favorably."[FN9]

> FN9.*Uncle Willie's Deli v. Whittington,* Del.Super., No. 98A-04-006, 1998 WL 960709, at \*4, Lee, J. (Dec. 31, 1998).

A. First Element: Member of a Protected Class

The Rouser's complaint indicates they believe they were discriminated against because of race (Glenn Rouser is African-American) and marital status (the Rousers are an interracial couple). Marital status, as defined in *6 Del. C.* § 4502(9), seems solely concerned with whether one is married or single and whether the complainant was discriminated against based on that single fact. In the case at bar, the Rousers do not allege that customers at Hadfield's are treated differently based upon their marital status. Nor is there any evidence showing that Walker or anyone on the Hadfield's staff could or did ascertain whether Doreen and Glenn Rouser were married. Setting aside for the moment the racial issue, but assuming *arguendo* that Walker knew that the Rousers were together, as far as the cashier knew, the Rousers may have been unmarried or they may have simply been friends.

Removing marital status from the equation leaves only race as a potential basis of discrimination. What the Rousers allege is that Doreen Rouser's relationship with an African-American man caused Walker to treat her in a manner in which she would not have been treated had she gone to the restaurant with a white man that night. Despite Doreen Rouser's

tenuous membership in a protected class, neither appellants nor appellees view the "protected class" prong as an issue. Because the parties appear to be in agreement that the Rousers met the first prong, and because of the liberal definition [FN10] of "protected class" that the statute embodies, this court will limit its discussion to the second and third prongs of a *prima facie* showing of discrimination.

> FN10."This chapter shall be liberally construed to the end that the rights herein provided for *all people,* without regard to race, age, marital status, creed, color, sex, handicap or national origin, may be effectively safeguarded."*6 Del. C.* § 4501 (emphasis added).

B. Second Element: Refusal of Service

Most Delaware cases cited by the parties involve situations that can easily be characterized as a denial of service. In *Domino's Pizza,* residents of a group home were denied pizza delivery. In *Quaker Hill Place,* an applicant was not permitted to rent an apartment. In *Uncle Willie's,* convenience store customers were told to leave. Because the alleged denial of service in this case is not so blatant, the court will look outside Delaware law for assistance defining "accommodations, facilities, advantages and privileges." [FN11]Though Hadfield's sought to limit the Delaware statute's embrace to the ability to "make and enforce contracts," the actual words of the statute-accommodations, facilities, advantages or privileges-encompass much more than the textbook question of whether someone exchanged goods or services for consideration. "A contract formed between a restaurant and a customer has been found to include all of the accoutrements that are ordinarily provided with a restaurant meal. This includes more than just the food served."[FN12]

> FN11.*Uncle Willie's* at \*3 (the court relied upon federal case law interpreting the Federal Civil Rights Act to aid in its analysis of public accommodations law in Delaware.)

> FN12.*Bethea v. Michael's Family Rest. & Diner,* E.D. Pa., C.A. No. 00-6216, 2001 LEXIS 8665, at \*8, Hutton, J. (June 26, 2001) (internal quotations and citations omitted).

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in A.2d
Not Reported in A.2d, 2001 WL 1456795 (Del.Super.)
**(Cite as: Not Reported in A.2d, 2001 WL 1456795)**

**\*4** The Maryland District Court, in a similar case concerning customer dissatisfaction, discussed the scope of the Delaware statute's federal counterpart:

[L]imiting the right of recovery ... to instances where there was an outright denial of services or of the right to contract for services ... is impractical given contemporary manifestations of discrimination... By encompassing the deprivation of services (rather than simply the denial of services or the right to contract for those services), [courts can protect] against discriminatory conduct by retailers which ... nevertheless impinges on the "benefits, privileges, terms, and conditions of the contractual relationship."[FN13]

> FN13.*Callwood v. Dave & Buster's, Inc.,* D. Md., 98 F.Supp.2d 694, 707 (2000) (citations omitted). See H. Rep. No. 102-40, pt. I, at 92 (1991), reprinted in 1991 U.S.C.C.A.N. at 630 (stating that the list of terms "is illustrative rather than exhaustive," "intended ... to bar all race discrimination in contractual relations."); H. Rep. No. 102-40, pt. II, at 37, reprinted in 1991 U.S.C.C.A.N. at 730-31 (same).

Because withholding "accommodations, facilities, advantages or privileges" can take the form of something less than an "outright denial of service," Hadfield's assertion that the Rousers left with the food and therefore were not denied service must fail. It is true the alleged denial of service was only for a few minutes-and that the delay was caused by a harried cashier trying to explain the wait and a frustrated customer refusing to listen to the explanation. In most situations, an apology or explanation for poor service is a part of the transaction, not in lieu of it, as alleged here.

If used to frustrate the customer, however, a lengthy explanation or apology takes on a different tone, especially when the explanation was repeatedly rebuffed. If Doreen Rouser demanded her food and the cashier refused to give it to her until she permitted him to explain, then the second element of the test was met. The Human Relations Commission evidently found that to be the case, stating "the cashier placed the food down, not giving it to Mrs. Rouser and responded with the comment 'Go ahead

and hit me." ' Admittedly, it is a close call as to whether Walker affirmatively or inadvertently denied service. However, "it is the role of the [Panel], not this Court, to resolve conflicts in testimony and issues of credibility and to decide what weight is to be given to the evidence presented." [FN14]Therefore, substantial evidence exists to support the Panel's finding on the second element of a *prima facie* discrimination case.

> FN14.*Mooney v. Benson Management Co.,* Del.Super., 451 A.2d 839, 841 (1982).

C. Third Element: Were Others Treated More Favorably

The third element of a *prima facie* showing of discrimination is traditionally set out in terms of comparison. Specifically, the court must determine whether nonmembers of the protected class were treated more favorably than members of the protected class. The theory is that "because the classes are similarly situated in most relevant respects except their protected status (e.g., gender or race), there arises a rational inference of discrimination on the basis of status."[FN15]

> FN15.*Callwood,* 98 F.Supp.2d at 707.

Many courts have discussed the difficulty of proving the third element. "[I]t may be wholly unrealistic to require a member of the protected class ... to identify victims of such outlandishly horrendous service who are not members of the protected class...."[FN16]

> FN16.*Callwood,* 98 F.Supp.2d at 706 (citing *Stevens v. Steak n Shake, Inc.,* M.D. Fla., 35 F.Supp.2d 882 (1998) ("Of course, evidence of how the defendant treated others outside the protected group is not always available."); *Hampton v. Dillard Dept. Stores, Inc.,* D. Kan., 985 F.Supp. 1055 (1997) ("Evidence regarding the treatment of others outside the protected group is not present in every case of discrimination ... Moreover, the elements of a *prima facie* case are flexible and are not intended to be rigidly applied.")).

**\*5** In order to alleviate the difficulty of establishing

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in A.2d
Not Reported in A.2d, 2001 WL 1456795 (Del.Super.)
**(Cite as: Not Reported in A.2d, 2001 WL 1456795)**

disparate levels of service, the *Callwood* court restated the third prong as:

(3) they did not enjoy the privileges and benefits of the contracted for experience under factual circumstances which rationally support an inference of unlawful discrimination in that (a) they were deprived of services while similarly situated persons outside the protected class were not deprived of those services, and/or (b) they received services in a markedly hostile manner and in a manner which a reasonable person would find objectively unreasonable.[FN17]

FN17.*Callwood,* 98 F.Supp.2d at 707.

Under the traditional test of subpart (3)(a), the Rousers would be required to compare the treatment Doreen Rouser (a white woman with an African-American husband) received with the treatment of a similarly situated person outside the protected class (a white woman with a white husband) to establish the third element of the *prima facie* case. Neither the Rousers, nor the State Human Relations Panel, were able to substantiate this element.

The addition of subpart (3)(b), however, provides another avenue by which to establish unlawful discrimination. The court assumes the members of the Human Relations Panel meant to avail themselves of this alternative in finding that:

The racial overtones to the disparaging remarks of Mr. Walker, to which he admitted existed, lead the panel to conclude that there were 'racial considerations' that prompted the confrontation.

The Court finds that, despite the less stringent criteria of subpart (3)(b), the Panel's conclusion on this element is not supported by substantial evidence.

Whether the racial remark was made *during* the heated argument (Rouser's testimony) or *after* the heated argument (Walker's testimony) is not significant. The substantial evidence shows it was not race that gave rise to the argument that in turn caused the brief denial of service. Rather, it was the busy night at the restaurant that resulted in an undue delay, that in turn, caused the argument that motivated the racial comment. No one alleged the food was

withheld for 20 minutes in an effort to discourage Glenn Rouser, an African-American, from patronizing the store. Nor did appellees allege that, upon discovering that Doreen Rouser was white, in the midst of the transaction, the cashier refused to serve her. The substantial evidence shows that the dinner order was almost half an hour late. Understandably, Glenn Rouser decided not to wait any longer or reward Hadfield's poor service with his hard-earned money. He was simply a dissatisfied customer who was tired of waiting. His wife, equally unhappy with the wait, went in to check on the order one last time. Upon hearing her husband's name, she approached the counter. Her demeanor at the counter was understandably intolerant. Walker was intolerant as well, as an inexperienced and harried cashier would be on a busy night. The combination was volatile, but the facts indicate it was the argument that led to the racial comment, not the other way around.

**\*6** Under the Panel's reasoning, Walker's single remark was enough to meet the "markedly hostile" threshold necessary for subpart (3)(b) of the third element of a *prima facie* case. The connection, however, between the comment and Doreen Rouser's marriage to an African-American man is far too attenuated. Granted, in choosing his offensive remarks, Walker included the word "white"-a reference to Rouser's race. But Walker could have made the same ignorant comment regardless of whether Doreen Rouser's husband was white or black.

Also working against the inference that Doren Rouser "received services in a markedly hostile manner" is the reaction of management and the repeated apologies offered to the Rousers. As the Court in *Callwood* noted in similar circumstances:

While I do not mean to endorse a tenet of law which would permit a simple apology to absolve the intentional discriminator of responsibility for acts of unlawful discrimination, on this record, I am convinced that in addition to the fairly weak evidence of discrimination offered by the [plaintiffs], the acts of apology and accommodation on the parts of [defendants] ... would dispel any residual suspicion in the minds of reasonable persons that intentional racial discrimination, rather than misjudgment or poor judgment animated the actions of those employees.

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in A.2d
Not Reported in A.2d, 2001 WL 1456795 (Del.Super.)
**(Cite as: Not Reported in A.2d, 2001 WL 1456795)**

The suggestion that the overall treatment of the members of the [plaintiff's] party amounted to a "constructive eviction" is nothing more than a conclusory assertion lacking any evidentiary support.[FN18]

> FN18. *Callwood,* 98 F.Supp.2d at 721.

Like the *Callwood* Court, this Court finds the evidence of discrimination wanting. Having cleared the first two hurdles by the narrowest of margins, the Rousers cannot establish that they received services in a such a "markedly hostile manner" as to give rise to the inference that discrimination was the motivation. On the issue of bias-the factor which sets apart desperately poor service from racially motivated poor service-the facts clearly fall short. While the crude treatment the Rousers received at Hadfield's Seafood, Inc. is hardly an example of good business conduct, it simply does not rise to the level of racial discrimination. Accordingly, I hold that the decision of the Panel is not supported by substantial evidence.

V. CONCLUSION

For the foregoing reasons the decision of the Panel is hereby REVERSED.

IT IS SO ORDERED.

Del.Super.,2001.
Hadfield's Seafood v. Rouser
Not Reported in A.2d, 2001 WL 1456795 (Del.Super.)

END OF DOCUMENT

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.



Not Reported in F.Supp.2d
Not Reported in F.Supp.2d, 2006 WL 278549 (D.Md.)
**(Cite as: Not Reported in F.Supp.2d, 2006 WL 278549)**

Johnson v. Wachovia Bank, N.A.
D.Md.,2006.
Only the Westlaw citation is currently available.
United States District Court,D. Maryland.
Cynthia Dixon JOHNSON
v.
WACHOVIA BANK, N.A.
**No. Civ. JFM-05-2654.**

Feb. 2, 2006.

Alan J. Hoff, Sellman Hoff LLC, Baltimore, MD, for Plaintiff.
Virginia Wood Barnhart, Pope and Hughes PA, Towson, MD, for Defendant.

MEMORANDUM

MOTZ, J.
**\*1** This action arises out of loans taken out by plaintiff's now deceased husband with Wachovia Bank. Plaintiff alleges she did not become aware of the loans until after her husband passed away and that once she questioned Wachovia about them, the bank threatened to repossess her home if she did not refinance the loans in her own name. She alleges that her signature on the deeds of trust supporting the original loans was forged and that Doris Harrison (a Wachovia employee) negligently notarized the deeds.

On the basis of these allegations plaintiff filed suit in the Circuit Court for Baltimore City. She asserted only state law claims for constructive fraud, negligence, fraud, a declaratory judgment, violation of the Maryland Consumer Protection Act, and rescission. Wachovia removed the case to this court. There is no diversity of citizenship between the parties, and Wachovia's removal was on based solely on federal question jurisdiction. Plaintiff has filed a motion to remand. The motion will be granted.<sup>FN1</sup>

> FN1. Plaintiff also seeks costs and attorneys' fees incurred in connection with the removal and remand proceedings. Exercising my discretionary authority under 28 U.S.C. Section 1447(c), I deny that request. I am satisfied that although in the final analysis

the remand motion turns on fundamental principles, the issues presented are not "obvious." *See In re Lowe,* 102 F.3d 731, 733 n. 2 (4th Cir.1996). That is particularly so because actions brought under the National Bank act are one of only three types of cases in which the Supreme Court has applied the complete preemption rule in the removal context.

An action in which the complaint asserts only state law claims on its face may be removed on the basis of federal question jurisdiction only where there is "complete preemption." i.e., where federal law is deemed to entirely subsume state law claims. *See, e.g., Avco Corp. v. Aero Lodge No. 735, Int'l Assoc. of Machinists and Aerospace Workers, et al.,* 390 U.S. 557, 88 S.Ct. 1235, 20 L.Ed.2d 126 (1968) (finding complete preemption by § 301 of the Labor Management Relations Act); *Metropolitan Life Ins. Co. v. General Motor Co.,* 481 U.S. 58, 107 S.Ct. 1542, 95 L.Ed.2d 55 (finding complete preemption with regard to ERISA § 502(a)(1)(B)). Here, Wachovia contends that the state law claims asserted by plaintiff are completely preempted by regulations promulgated by the Office of the Comptroller of the Currency relating to national banks' real estate lending activities.

As an initial matter, it is not clear that regulations, rather than statutes, can establish a basis for complete preemption. It is true, as Wachovia posits, that in *Fidelity Fed. Savings & Loan Ass'n v. de la Cuesta,* 458 U.S. 141, 153, 102 S.Ct. 3014, 73 L.Ed.2d 664 (1982), the Supreme Court stated that "[f]ederal regulations have no less pre-emptive effect than federal statutes."*Fidelity Federal* was not, however, an action removed from state court on complete preemption grounds but one in which the California Court of Appeal had upheld a state law rule of decision against a challenge that it was invalid on the basis of conflict preemption. Cases following *Fidelity Federal* have emphasized that complete preemption depends upon a clear *congressional* intent for the state law to be entirely displaced as demonstrated by the text of the statute. *Metropolitan Life,* 481 U.S. at 65-66;*Beneficial Nat'l Bank v. Anderson,* 539 U.S. 1, 9, 123 S.Ct. 2058, 156 L.Ed.2d 1 (2003); *Lontz v.*

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d
Not Reported in F.Supp.2d, 2006 WL 278549 (D.Md.)
**(Cite as: Not Reported in F.Supp.2d, 2006 WL 278549)**

---

*Tharp,* 413 F.3d 435, 441 (4th Cir.2005).

In any event, assuming that a pervasive federal regulatory scheme could provide a basis for complete preemption, Wachovia has not established that the regulations it cites, 12 C.F.R. §§ 34.3 and 34.4, establish clear congressional intent for an exclusive federal cause of action. Of course, as Wachovia contends, the regulations do establish uniform rules and procedures national banks are required (and entitled) to follow in their lending practices. Moreover, it is unquestionable that complete preemption exists in actions where it is alleged that national banks have violated state usury law.*Beneficial National Bank, supra; Austin v. Provident Bank,* 2005 WL 1785285 (N.D.Miss. July 26, 2005). However, in *Beneficial* the Supreme Court found the required congressional intent for complete preemption not in federal regulations but in sections 85 and 86 of the National Bank Act. As stated by the Court, the first of these sections "sets forth the substantive limits on the rates of interest that national banks may charge."539 U.S., at 9. The second "sets forth the elements of a usury claim against a national bank, provides for a 2-year statute of limitations for such a claim, and prescribes the remedies available to borrowers who are charged higher rates and the procedures governing such a claim."*Id.*

**\*2** In contrast, in the present case no provision of the National Bank Act specifically applies to the question of the safeguards a national bank must follow in assuring that forged documents are not submitted in connection with a real estate loan. Moreover, there is nothing unique about national banks in considering that question. Any financial institution, business entity, or individual is under a duty not to base a commercial transaction upon a forgery, and the standards governing performance of that duty traditionally have been established by state common and statutory law. Therefore, a claim (such as the one asserted by plaintiff in this case) based upon alleged acceptance of forged documents falls well within the exception created by 12 C.F.R. § 34.4 subjecting national banks to state contract and tort laws that "are not inconsistent with the real estate lending powers of national banks."

A separate order is being entered herewith effecting the rulings made in this Memorandum.

ORDER

For the reasons stated in the accompanying memorandum, it is, this 2nd day of February 2006

ORDERED

1. Plaintiff's motion to remand is granted;

2. Plaintiff's request for costs and attorneys' fees is denied; and

3. This action is remanded to the Circuit Court for Baltimore City, Maryland.

D.Md.,2006.
Johnson v. Wachovia Bank, N.A.
Not Reported in F.Supp.2d, 2006 WL 278549 (D.Md.)

END OF DOCUMENT

---

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.



163 F.3d 598
163 F.3d 598, 1998 WL 637274 (C.A.4 (Va.))
**(Cite as: 163 F.3d 598, 1998 WL 637274)**

H Cooper v. Paychex, Inc.
C.A.4 (Va.),1998.
NOTICE: THIS IS AN UNPUBLISHED
OPINION.(The Court's decision is referenced in a
"Table of Decisions Without Reported Opinions"
appearing in the Federal Reporter. Use FI CTA4 Rule
36 for rules regarding the citation of unpublished
opinions.)
      United States Court of Appeals, Fourth Circuit.
          Lloyd M. COOPER, Plaintiff-Appellee,
                            v.
      PAYCHEX, INCORPORATED, Defendant-
                        Appellant.
          Lloyd M. COOPER, Plaintiff-Appellee,
                            v.
      PAYCHEX, INCORPORATED, Defendant-
                        Appellant.
          Lloyd M. COOPER, Plaintiff-Appellant,
                            v.
      PAYCHEX, INCORPORATED, Defendant-
                        Appellee.
           **Nos. 97-1645, 97-1543, 971720.**

              Argued: Dec. 1, 1997.
              Decided: Aug. 31, 1998.

Appeals from the United States District Court for the
Eastern District of Virginia, at Alexandria. James C.
Cacheris, Senior District Judge. (CA-96-54-A)

Harry L. Manion, III, COOLEY, MANION, MOORE
& JONES, L.L.P., Boston, Massachusetts, for
Appellant.
Christine Elizabeth Webber, WASHINGTON
LAWYERS' COMMITTEE FOR CIVIL RIGHTS
AND URBAN AFFAIRS, Washington, D.C., for
Appellee.
ON BRIEF: Timothy D. Speedy, Gregory T. Alvarez,
JACKSON, LEWIS, SCHNITZLER & KRUPMAN,
Morristown, New Jersey, for Appellant. Joseph M.
Sellers, Dann Determan, WASHINGTON
LAWYERS' COMMITTEE FOR CIVIL RIGHTS
AND URBAN AFFAIRS, Washington, D.C.;
William D. Hopkins, Jodi L. Cleesattle, ROSS,
DIXON & MASBACK, L.L.P., Washington, D.C.,
for Appellee.

Before WILKINS, NIEMEYER, and MICHAEL,

Circuit Judges.

OPINION

MICHAEL, Circuit Judge:
**\*1** Lloyd Cooper sued his former employer, Paychex,
Inc., alleging violations of Title VII and 42 U.S.C. §
1981. At trial Cooper's supervisor said that Cooper
was fired due to poor job performance, and Cooper
offered evidence that the supervisor's claim was
merely pretext for racial discrimination. The jury
believed Cooper and gave him a substantial verdict,
including punitive damages. After trial the district
court denied Paychex's motion for judgment as a
matter of law or for a new trial and awarded Cooper
attorneys' fees. On appeal Paychex argues that its
post-trial motions should have been granted because
the court erred by: admitting evidence concerning the
racial bias of Cooper's former secretary; admitting
data on the racial makeup of Paychex's nationwide
employment figures; refusing to give the jury a
"business judgment" instruction; and misstating the
burden of proof in a race discrimination case.
Paychex also contends that the court's grant of
attorneys' fees was excessive and that the jury should
not have been instructed on punitive damages. In
addition, Cooper cross-appeals the amount of fees he
was granted. We find no error in the trial court's jury
instructions or evidentiary decisions or in the amount
of its attorneys' fees award. Therefore, we affirm.

I.

Cooper, an African American sales manager, worked
for Paychex, a national payroll servicing company,
from 1989 until his termination in 1993. Cooper
initially was hired as the Field Sales Manager (FSM)
for Paychex's Washington district, which included
offices in Fairfax, Richmond, and Tidewater,
Virginia. In 1990 Cooper became the District Sales
Manager (DSM) for the Washington district. As
DSM, Cooper was responsible for recruiting, training
and supervising sales representatives. The district's
FSM, Jane Hartsock, assisted him with these tasks.

Cooper was an excellent DSM. He was readily
available to help sales representatives with technical

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

163 F.3d 598

163 F.3d 598, 1998 WL 637274 (C.A.4 (Va.))
**(Cite as: 163 F.3d 598, 1998 WL 637274)**

or sales-related questions, and he had a good working knowledge of both of these aspects of Paychex's business. Cooper also brought a great deal of intensity and commitment to his job. In fact, certain Paychex sales representatives said that Cooper was the best DSM they had worked under during their careers at Paychex. Cooper was therefore a strong leader for the sales team, and he performed well in the area that mattered most to Paychex, meeting sales quotas. Under Cooper's guidance the Washington district achieved 110 percent of its sales quota for the 1993 fiscal year, a 22 percent increase over the prior year. The district continued its success throughout the time Cooper was DSM. In July 1993, for example, the district made 103 percent of its sales quota.

In early 1993 Ed Reid became the Zone Sales Manager (ZSM) of Paychex's Mid-Atlantic Zone, which included the Washington district. As ZSM, Reid supervised every DSM in the Mid-Atlantic Zone, including Cooper. On March 8, 1993, Reid made his first visit as ZSM to the Washington district headquarters in Fairfax. Reid said that one purpose of this visit was to familiarize himself with the district's management and sales personnel. However, Reid did not get around to meeting with DSM Cooper, the leader of the Washington sales team, until after he (Reid) met with other, selected employees in that office, including Cooper's secretary, Tracy Dodd.

**\*2** Meeting with Dodd was the main reason Reid visited the Washington district. Dodd had complained to Paychex's higher management about Cooper's performance, and Reid wanted to investigate her complaints.[FN1] When Reid spoke with Dodd, she criticized Cooper's availability, his timeliness, his intensity and commitment to Paychex, and his technical knowledge of Paychex's product.[FN2] There was, however, ample evidence to allow the jury to conclude that most of Dodd's criticisms of Cooper were baseless. In any event, Reid confronted Cooper that same day. Reid did this without taking time to evaluate Cooper's performance first hand and without consulting nine of the eleven sales representatives in the district about Cooper's performance. When Reid confronted Cooper, he criticized Cooper for, among other things, lacking intensity. In this, Reid's first meeting with Cooper, Reid did not even ask Cooper to assess his own performance, nor did he give Cooper an opportunity to explain the problems alleged about his performance.

FN1. There was evidence that Dodd was prejudiced against African Americans. Dodd admitted at trial that she told racially biased jokes that targeted African Americans and used the term "nigger" to refer to African Americans. In addition, another former Paychex sales representative testified that Dodd had called Cooper a "lazy black ass" behind Cooper's back.

FN2. At trial Reid testified that two other Paychex employees with whom he spoke on March 8 also had complaints about Cooper. But Reid admitted that two other employees, including FSM Hartsock (the only other sales manager in the office), had no complaints whatsoever about Cooper on March 8. Further, Reid admitted that his consultation with sales representatives about Cooper's performance was very limited: most of them were not contacted at all.

About a week later Reid sent Cooper a memorandum, dated March 15, 1993, in which Reid purported to memorialize his comments from their March 8 meeting. Yet, the memorandum contained some criticisms that Reid had not even discussed with Cooper in the March 8 meeting. These new criticisms included the ones Dodd made to Reid on March 8-unavailability, tardiness, and poor technical knowledge. The memo did not offer Reid's basis for these criticisms, however. Also, the memo did not indicate that Reid had performed any further investigation of Cooper's performance after his March 8 visit to the Washington district office.

Cooper attempted immediately to address the criticisms raised in Reid's March 15 memo, both orally and in writing. However, Reid continued to criticize Cooper harshly. About one month after Reid first met with Cooper, Reid warned Cooper in no uncertain terms that "any further infraction" would lead to his termination. This warning, given in a memo dated April 13, did not say what" infraction" Cooper had committed; the memo simply criticized Cooper's handling of a personal dispute between two of the sales representatives. Then, just two weeks later, Reid urged Cooper to resign and accept a severance package. These actions belied Reid's real hostility to Cooper's continued employment with

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

163 F.3d 598

163 F.3d 598, 1998 WL 637274 (C.A.4 (Va.))
**(Cite as: 163 F.3d 598, 1998 WL 637274)**

Paychex.

It was revealed at trial that Reid had admitted in his deposition that he decided to fire Cooper within his first month as Mid-Atlantic ZSM. Reid also admitted that he made this decision without first initiating the customary, formal evaluation of Cooper's performance, which would have taken at least ninety days to complete. At trial, however, Reid told a different story and claimed that he did not decide to terminate Cooper until August 1993.

In mid-July 1993 Reid met with Cooper again to address the concerns he claimed to have about Cooper's performance and to discuss the sales figures for the Richmond and Tidewater offices. Again, Reid documented his recollection of this meeting with a memorandum, dated July 20. In that memo Reid directed Cooper to submit an updated action plan for the Richmond and Tidewater offices by the end of July. According to Reid, Cooper failed to comply with this request and gave no adequate excuse for his failure. Afterwards, Reid said, he decided that Cooper was unable to lead the Washington sales team. Reid fired Cooper on August 6, 1993.

**\*3** Reid claimed that he fired Cooper due to poor performance. However, the record amply supports (and the jury believed) a different story, which is: Reid drummed Cooper out of Paychex because he (Reid) wanted to bring in "his own team"-a team that was all white. Thus, instead of conducting an objective evaluation of Cooper's performance over the customary three-month period, Reid set out immediately to get rid of him. All of Reid's oral and written criticisms of Cooper after March were part of Reid's efforts to cover up his plan to drive Cooper out of the Washington district office and falsify a paper trail to make it look as though Cooper was performing poorly. Reid's strategy was apparent from the way he criticized Cooper's management style from day one, the way he reacted in an unreasonably harsh manner to Cooper's alleged mistakes, and the way he refused to take the time to formally evaluate Cooper's work.

There is other evidence that Reid concocted a scheme to get rid of Cooper and then lied about it. This includes Reid's fabrication of one of the criticisms on which he supposedly relied in terminating Cooper. Reid asserted in his July 20 memorandum to Cooper

that sales representative Mike Kelly had complained about Cooper's management. According to Reid, Kelly said that Cooper had left him in the dark about his sales quota and had failed to properly train him. However, Kelly denied ever making the statements and said that any such statements would be false.

Reid told Cooper in mid-April 1993 that he (Reid) wanted to bring in his own team. However, Reid's reason for wanting to bring in his own team was not business-related, but discriminatory: he wanted to get rid of Cooper because Cooper was African American. This discriminatory animus was evidenced by Reid's statement to Cooper, less than two months after becoming ZSM, that " *you people* don't have the technical expertise to do this job."(emphasis added). Although Reid claimed otherwise, it was clear from the context of the conversation that in referring to "you people," Reid meant African Americans in general. Thus, when Reid said that he wished to bring in his own team, it was clear that Reid did not want any African Americans on that team. And in fact, when Reid brought in his own team, it was all white. After Cooper was fired, Reid promoted Hartsock and Dekowski, both of whom were white, to be the new DSM and FSM, respectively.

Reid's discriminatory attitude was also manifested by comparing the favoritism he showed Keith Holland, a white DSM who got into difficulties, with the antagonism he showed Cooper, an African American, as a result of problems attributed to Cooper. The main problems that Reid attributed to Cooper were unavailability, lack of intensity, tardiness, and poor technical knowledge.[FN3] Holland's problems were far worse. He harassed, lied to, intimidated and threatened his sales staff. Yet, despite the seriousness of the problems with Holland's management style, Reid did not attempt to railroad Holland out of Paychex as he (Reid) did Cooper. Instead, Reid investigated the Holland matter carefully and did not decide how to handle the situation until he spoke to *every* sales representative in Holland's district (unlike in Cooper's case, when Reid threatened Cooper's job soon after hearing complaints from Cooper's secretary). Even then, Holland was offered an opportunity to improve his performance by attending special training programs, a luxury that Cooper was not afforded. Finally, while Reid was instrumental in the decision to retain Holland, he (Reid) terminated Cooper.

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

163 F.3d 598
163 F.3d 598, 1998 WL 637274 (C.A.4 (Va.))
**(Cite as: 163 F.3d 598, 1998 WL 637274)**

FN3. Several Paychex sales representatives testified that these complaints were simply untrue, and the jury apparently believed their testimony rather than Reid's.

**\*4** Statistical data showing that Paychex employed very few minorities also lent some support to the case that Cooper was fired because of his race. In 1993 Paychex employed one African American DSM and forty white DSMs. In 1994 there were no African American DSMs and fifty-one white DSMs at Paychex. In 1995 there was just one African American DSM and there were fifty-two white DSMs. This ratio of African American DSMs to white DSMs was nearly the same as the ratio of African American sales representatives to white sales representatives. In 1993 there were nine African American and 510 white sales representatives, in 1994 there were eleven African American and 564 white sales representatives, and in 1995 there were eight African American and 652 white sales representatives.

After a four-day trial the jury awarded Cooper back pay ($200,272), compensatory damages for emotional distress ($50,000), and punitive damages ($100,000). The court then awarded Cooper attorneys' fees. Paychex moved for judgment as a matter of law and for a new trial on a number of grounds. According to the trial court, Paychex "hurl[ed] at least sixteen objections against the judicial wall with the hope that at least one [would] stick."*Cooper v. Paychex, Inc.,* 960 F.Supp. 966, 969 (E.D.Va.1997). The trial court rejected every one of Paychex's claims. *See id.* at 969-76.Paychex now appeals on essentially the same grounds, and Cooper cross-appeals.

II.

On appeal Paychex offers twelve assignments of error. Of these, seven warrant discussion. First, Paychex claims that the district court committed reversible error by admitting the testimony concerning Dodd's biased remarks about African Americans. The company says it was also error to admit the statistical data showing that the workforce at Paychex was almost entirely white. Next, Paychex asserts that the district court incorrectly stated the law with respect to Cooper's burden of persuasion on the

prima facie case of discrimination and the issue of pretext. Further, Paychex argues that it was entitled to a "business judgment" instruction. Paychex argues that it was entitled to judgment as a matter of law, or at least a new trial, as a result of these five errors because the evidence of discrimination was slim without the inadmissible evidence and the instruction errors compounded the harm from the evidentiary errors. In any event, Paychex says the court should not have instructed the jury on punitive damages. Finally, Paychex claims that the award of attorneys' fees was too high. We reject all of these claims.[FN4]In his cross-appeal Cooper claims that his attorneys' fee award was too low. We disagree and affirm the fee award.

FN4. Paychex also argues that: (1) the district court erred by admitting the findings and conclusions of the Fairfax County Human Rights Commission, which investigated Cooper's race discrimination complaint against Paychex; (2) the court failed to properly instruct the jury that Cooper was required to mitigate his damages; (3) the jury's award of back pay was improper as a matter of law because Cooper failed to mitigate his damages; (4) the jury's award of compensatory damages to Cooper for emotional distress was against the clear weight of the evidence; and (5) the court incorrectly applied Virginia's statutory prejudgment interest rate in calculating prejudgment interest for Cooper.

These claims are meritless for the reasons set forth by the district court. *See Cooper v. Paychex, Inc.,* 960 F.Supp. 966, 970 (E.D.Va.1997) (explaining why the court properly exercised its discretion to admit the Human Rights Commission's report); *id.* at 972 (explaining why the court's mitigation instruction was proper); *id.* at 973 (holding that Cooper's mitigation efforts were not insufficient as a matter of law); *id.* at 973 n. 4 (explaining that Paychex waived its objection to the compensatory damages, and further, holding that the award was supported by the evidence); *id.* at 974 (exercising its discretion to apply the Virginia statutory rate for prejudgment interest in the

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

163 F.3d 598
163 F.3d 598, 1998 WL 637274 (C.A.4 (Va.))
**(Cite as: 163 F.3d 598, 1998 WL 637274)**

absence of a standard federal rate).

### III.

We review a district court's decisions concerning the admission of evidence for an abuse of discretion. *See Benedi v. McNeil-P.P.C., Inc.,* 66 F.3d 1378, 1383 (4th Cir.1995). Of course, we review de novo all legal questions necessary to assess the ultimate question of whether the court abused its discretion.

### A.

**\*5** The testimony that Dodd had previously told racist jokes, used the word "nigger," and referred to Cooper as a"lazy black ass" tended to show that she was biased against African Americans. The district court concluded that this evidence was admissible because Dodd "had a significant impact in the decision to fire" Cooper. *Cooper v. Paychex, Inc.,* 960 F.Supp. 966, 970 (E.D.Va.1977). Paychex argues that Dodd's testimony was inadmissible because Dodd was not involved in the decision to fire Cooper. Dodd's testimony was prejudicial, Paychex says, because there is a danger that the jury imputed her bias to the company. We do not believe that a new trial is required because of the admission of Dodd's testimony. Even if the district court abused its discretion in admitting Dodd's testimony, there was still no reversible error because Paychex was not prejudiced by Dodd's testimony.

First, Cooper's trial counsel did not ask the jury to attribute Dodd's comments to Paychex. In his closing Cooper's counsel only referred to Dodd's comments twice. The first time, he said:

Now, there were two other witnesses who testified about Lloyd's performance at Paychex: One was Tracy Dodd, his secretary, who admittedly did not like him, spied on him, made anonymous calls to headquarters about him, has told racial jokes, has used the word "nigger" and who ... has called Lloyd "a lazy black ass". It's hard to imagine a case with a more obviously biased and prejudiced witness than that. And Tracy Dodd has a very strong motive to lie about Lloyd in order to justify the firing that her smear campaign brought about.

Here, counsel was arguing that Dodd told a false story about Cooper's performance, which Reid used to begin his campaign to terminate Cooper. Counsel's comments therefore supported the legitimate argument that the company's stated reason for firing Cooper, poor performance, was not worthy of belief.

The second time Cooper's counsel mentioned Dodd's racial bias, he referred in passing to her role in the process of Cooper's termination. However, counsel did not attempt to attribute Dodd's bias to Paychex. Counsel merely said:

Are there any other indications in the record that this was a racially discriminatory firing? Beyond the stark contrast in the treatment of Lloyd and Keith, I suggest the record shows plenty. The firing clearly had its genesis in the anonymous sniping and spying campaign launched by Tracy Dodd, whose racism is virtually admitted.

It was carried out by a zone manager who has had little contact with blacks and no lasting friendship; who has never worked with a black DSM other than Lloyd; who didn't know whether there were any blacks in his community when was growing up; who has never had an opinion about the racial diversity in Paychex's management; who looked Lloyd Cooper in the eye and said, you people don't have the technical knowledge and expertise to do this job, so I will bring in my own team.

**\*6** Ed Reid was granted by Paychex the authority to carry out this firing, and, according to his testimony, the company supported his decision.

So, if his motive was racist, Paychex is liable.

Here, Cooper's counsel mentioned Dodd only briefly, and the focus of his argument was to portray *Reid,* not Dodd, as a biased decisionmaker. Although counsel called Dodd "the genesis" of Cooper's firing, counsel firmly stated that Reid had "carried ... out" Cooper's firing. Here, counsel was asking the jury to attribute only Reid's racist motives to Paychex. Dodd's alleged racism, while mentioned, was not offered to the jury as a reason to hold Paychex liable for Cooper's termination.

Second, our review of the district court's instruction on liability reveals that the jury was not told that it

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

163 F.3d 598

163 F.3d 598, 1998 WL 637274 (C.A.4 (Va.))

**(Cite as: 163 F.3d 598, 1998 WL 637274)**

could attribute Dodd's racial bias to Paychex. The court instructed the jury, correctly, that it could only "consider discriminatory or racially stereotyped comments made, or tolerated by those who participated in employment decisions affecting the plaintiff as evidence of Paychex's discriminatory intent."Here there was no evidence that Reid either knew of or tolerated Dodd's racist comments. Further, Cooper's counsel never argued that Dodd participated in the decision to fire Cooper. We therefore can presume that the jury followed this instruction and did not attribute Dodd's racial biases to Paychex.

Finally, there was enough independent evidence of Reid's own racial bias to support the verdict against Paychex. For example, Reid's "*you people* don't have the technical expertise" comment to Cooper demonstrated Reid's bias against African Americans. (Emphasis added.) Reid's bias was also shown by his favorable treatment of a white DSM with poor management skills as compared to his harsh treatment of Cooper, who demonstrated that he was an excellent manager.

Accordingly, even if the district court's admission of the evidence of Dodd's bias was improper, we do not believe that it affected the outcome of the case.

### B.

Paychex also complains that the trial court abused its discretion by admitting statistical data showing the racial composition of Paychex's nationwide sales force. The statistics showed that between 1993 and 1995, the ratio of white to African American sales managers was about one to forty, and the ratio of white to African American sales representatives was about one to fifty. Cooper introduced this statistical data as evidence that Reid's proffered reason for terminating him was merely pretext for discrimination, on the theory that Paychex's poor track record of hiring African Americans was some evidence that his firing had occurred because of his race.

It is well established that "[s]tatistics can provide important proof of employment discrimination" in Title VII cases, both to establish a prima facie case of discrimination and to demonstrate that the employer's proffered reason for its employment decision was pretext for discrimination. *See Carter v. Ball,* 33 F.3d 450, 456 (4th Cir.1994). Paychex, however, contends that Cooper's statistics concerning its employment of African Americans nationwide were irrelevant for two reasons. First, Paychex claims that the statistics did not suggest that Reid fired Cooper with a discriminatory motive because nationwide numbers do not reflect Reid's own employment practices (since Reid only managed the Mid-Atlantic zone). This claim confuses the decisionmaker with the employer. *See Cooper v. Paychex,* 960 F.Supp. 966, 970 (E.D.Va.1997). Reid was the decisionmaker here, but he made the decision to fire Cooper on behalf of the employer, Paychex. It is the employer, not the decisionmaker, whom a plaintiff sues for violating Title VII. Any statistical evidence which tends to suggest that the employer's practices are discriminatory reflects on the question of whether the employer discriminated against a specific employee, regardless of whether those statistics reflect the practices of the specific person who made the decision to terminate that employee. Moreover, we reject Paychex's premise. Evidence suggesting than an employer had a general practice of discrimination *does* reflect on the actual decisionmaker because it suggests that the decisionmaker may have followed the company line in making his decision based on race. *See Estes v. Dick Smith Ford, Inc.,* 856 F.2d 1097, 1103 (8th Cir.1988).

**\*7** Second, Paychex argues that Cooper's data was irrelevant because it did not set forth the racial distribution of the relevant labor pool. Without establishing the number of qualified white and African American candidates for DSM and sales representative positions, Paychex argues, Cooper's evidence of the ratio of whites to African Americans in those positions at Paychex was entirely meaningless to show a pattern of discrimination. We disagree. This circuit has held, on more than one occasion, that a district court did not abuse its discretion by refusing to admit raw employment figures without comparative data on the number of qualified whites and African Americans in the relevant labor pool. *See, e.g., Carter,* 33 F.3d 450 at 456;*Williams v. Cerberonics, Inc.,* 871 F.2d 452, 455 n. 1 (4th Cir.1989). However, we have never held that data concerning the racial makeup of an employer's workforce was irrelevant to the issue of discriminatory intent in the absence of comparative data on the racial makeup of the relevant labor pool. Of course, raw data, such as the number of African Americans working for a particular employer, will be

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

163 F.3d 598

163 F.3d 598, 1998 WL 637274 (C.A.4 (Va.))
**(Cite as: 163 F.3d 598, 1998 WL 637274)**

of little use to a jury if it is not placed in context. *See Williams,* 871 F.2d at 455 n. 1. But we have not set the bar so high that statistical data must be compelling in order to be relevant; the threshold inquiry for relevance is not so stringent. Rather, we have allowed trial courts to exercise their discretion to decide whether the data is placed in sufficient context to be of assistance to the jury. Generally, the presence or absence of comparative data (and the quality of the comparative data) will go to the weight, not the competence, of the evidence.

Here, the statistical evidence showed that Paychex had virtually a lily-white sales force and sales management structure, employing (on average) less than one African American DSM nation-wide between 1993 and 1995. Cooper did not provide comparative labor pool numbers to complement his statistics, so his data was not compelling evidence of discrimination. However, we cannot say that his data was irrelevant. Employment statistics are often admissible as some evidence of discrimination even when they are not enough by themselves to get a plaintiff to a jury on that issue. *See MacDissi v. Valmont Indus., Inc.,* 856 F.2d 1054, 1058 (8th Cir.1988); *cf. e.g., Henson v. Liggett Group, Inc.,* 61 F.3d 270, 276-77 (4th Cir.1995); *Birkbeck v. Marvel Lighting Corp.,* 30 F.3d 507, 511-12 (4th Cir.1994); *Mallory v. Booth Refrigeration Supply Co.,* 882 F.2d 908, 912 (4th Cir.1989).

Therefore, the court did not abuse its discretion by admitting Cooper's statistical data.

Moreover, even if we were inclined to say that the trial court erred by admitting Cooper's statistical data, we are certain that this mistake did not prejudice Paychex. There was independent evidence of pretext (including Reid's harsh treatment of Cooper from day one) and discrimination (including Reid's favoritism of Baltimore DSM Keith Holland and Reid's "you people" comment). This evidence was more than sufficient to get Cooper to a jury. As a result, we conclude that the court neither abused its discretion by denying Paychex a new trial nor erred by denying Paychex judgment as a matter of law due to any errors in admitting evidence.

IV.

**\*8** Next, Paychex challenges three of the district

court's jury instructions. We review a district court's formulation of a jury instruction for an abuse of discretion. *See United States v. Abbas,* 74 F.3d 506, 513 (4th Cir.), *cert. denied,*517 U.S. 1229, 116 S.Ct. 1868, 134 L.Ed.2d 965 (1996). In doing so, we consider whether the instruction, when construed as a whole, "properly informed the jury of the controlling legal principles without misleading or confusing the jury to [the defendant]'s prejudice." *Hartsell v. Duplex Prods., Inc.,* 123 F.3d 766, 775 (4th Cir.1997).

A.

Paychex criticizes two aspects of the trial court's jury instruction on Cooper's burden of proof. Cooper proceeded under the familiar method of proving employment discrimination by circumstantial evidence, set forth in *McDonnell Douglas Corp. v. Green,* 411 U.S. 792, 802-04, 93 S.Ct. 1817, 36 L.Ed.2d 668 (1973). Under *McDonnell Douglas,* a plaintiff first must establish a "prima facie case" of discrimination. When the plaintiff alleges that he was illegally terminated, his prima facie case consists of evidence that (1) he was a member of a protected class (2) who was qualified for his job and performed his job satisfactorily, (3) was fired, and (4) the position was filled by a similarly qualified applicant after his dismissal. *See Karpel v. Inova Health Sys. Servs.,* 134 F.3d 1222, 1228 (4th Cir.1998). Once the plaintiff makes out a prima facie case, the burden of production shifts to the employer, which must articulate a legitimate, nondiscriminatory reason for the adverse employment action. If the employer advances such a reason, the plaintiff must rebut the reason by proving that it was simply pretext for intentional discrimination. *See St. Mary's Honor Ctr. v. Hicks,* 509 U.S. 502, 506-11, 515, 113 S.Ct. 2742, 125 L.Ed.2d 407 (1993).

Paychex challenges the district court's instruction on the second element of the prima facie case. Paychex asked the court to instruct the jury that Cooper must prove he "was qualified for his job and performing his job at a level which met his employer's legitimate expectations."The court opted instead to instruct the jury that Cooper had to prove that he "was satisfactorily performing his job." Paychex argues that this instruction failed to inform the jury that Cooper had to prove he was performing his job to *Paychex's* satisfaction, not just to the jury's own

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

163 F.3d 598

163 F.3d 598, 1998 WL 637274 (C.A.4 (Va.))
**(Cite as: 163 F.3d 598, 1998 WL 637274)**

satisfaction. We disagree.

Paychex is correct, of course, that this court has described the plaintiff's burden using Paychex's proposed language. *See, e.g., O'Connor v. Consolidated Coin Caterers Corp.,* 56 F.3d 542, 546 (4th Cir.1995), *rev'd on other grounds,* 517 U.S. 308, 116 S.Ct. 1307, 134 L.Ed.2d 433 (1996); *Mitchell v. Data Gen. Corp.,* 12 F.3d 1310, 1315 (4th Cir.1993). Further, we agree that Paychex's proposed language more clearly conveys to a jury that it may not impose on a defendant its own view of what constitutes satisfactory employee performance. However, when evaluating jury instructions we do not reverse simply because one instruction might have been a little clearer. *See Nelson v. Green Ford, Inc.,* 788 F.2d 205, 209 (4th Cir.1986). Rather, we affirm so long as the jury instructions, taken as a whole, were correct and understandable. Here, the district court's formulation of Cooper's burden was correct and understandable, since we have often used similar formulations without any indication that a district court must be more clear. *See, e.g., Carter v. Ball,* 33 F.3d 450, 459 (4th Cir.1994); *McNairn v. Sullivan,* 929 F.2d 974, 979 (4th Cir.1991); *Alvarado v. Board of Trustees,* 928 F.2d 118, 122 (4th Cir.1991); *Williams v. Cerberonics, Inc.,* 871 F.2d 452, 455 (4th Cir.1989). Since the instruction informed the jury of the law to apply and the instruction's phrasing was understandable, there was no abuse of discretion.

**\*9** Paychex also complains that the district court did not properly instruct the jury on Cooper's burden with respect to proving pretext. The challenged instruction (with emphasis added) was:

If ... the defendant has produced evidence of a reason other than race for discharging plaintiff, you must find for the defendant unless you find, considering all of the evidence in the case, that the plaintiff has proved that the reason given by the defendant was not the true reason for plaintiff's discharge, *or* that it is more likely than not that, except for the plaintiff's race, he would not have been discharged.

Plaintiff must show that the defendant intentionally discriminated against him. Plaintiff, however, is not required to produce direct evidence of intentional discrimination....

....

The law is violated if the defendant's actions would not have occurred "but for" the plaintiff's race.

According to Paychex, this instruction allowed the jury to find that Paychex violated the law if it found *either* that Paychex's proffered nondiscriminatory reason for terminating Cooper was pretext *or* that Paychex discharged Cooper because of his race. Paychex argues that this is an incorrect statement of the law. In order to hold an employer liable for intentional discrimination, it argues, a jury must find that the employer's proffered nondiscriminatory reason for firing the employee was pretext for discrimination-that is, the jury must find *both* pretext *and* discrimination.

We agree with Paychex's statement of the law but disagree with its interpretation of the relevant jury instruction. Under the *McDonnellDouglas* burden-shifting analysis, an employee retains the ultimate burden of proving that the employer intentionally discriminated against him. *See Hicks,* 509 U.S. at 514-15;*DeJarnette v. Corning Inc.,* 133 F.3d 293, 298 (4th Cir.1998). Thus, although the *McDonnell-Douglas* analysis helps focus the jury's inquiry by placing before it two possible reasons for the employer's adverse employment action, the intent to discriminate and the employer's proffered, legitimate reason, the jury is not required to accept the former just because it rejects the latter. The jury may disbelieve that the employer's proffered reason was its actual reason for firing the plaintiff, but remain unconvinced that the real reason the employer fired the plaintiff was due to unlawful discrimination.[FN5]Since a plaintiff does not prove his case unless the jury *both* rejects the defendant's proffered reason for the adverse employment action *and* accepts that the real reason for the employer's action was discrimination, a court may not inform a jury to decide for the plaintiff if it finds *solely* pretext. A court must inform a jury to find for the plaintiff *only* if it finds both pretext *and* discrimination.

FN5. That is to say, the jury may conclude that the defendant fired the plaintiff for a third (legitimate but not proffered) reason. The jury could so conclude if it found that the employer proffered a false reason for its action, not as a pretext for discrimination but

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

rather to cover up a third (possibly embarrassing but nonetheless legitimate) reason for firing the plaintiff. *Cf. e.g., Holder v. City of Raleigh,* 867 F.2d 823, 827-28 (4th Cir.1989).

**\*10** If the district court had done as Paychex claims, it would have been in error. However, the court's jury instruction focused on the *defendant,* not on the plaintiff. The court did not state at any time that the jury could give the *plaintiff* a verdict if it found pretext but not discrimination. Rather, the court said the converse, that the jury "must find for the defendant unless" it found pretext or discrimination. Of course, if the court had just left it at that, the instruction would have been incomplete. Since this part of the instruction did not tell the jury what to do if it found just pretext, the jury might have been left with the mistaken impression that it could give a verdict to the plaintiff based solely on a finding of pretext. However, the court's instruction did not stop there. The court also explained to the jury that if it found pretext it had to ascertain whether "[p]laintiff ... show[ed] that the defendant intentionally discriminated against him."This instruction adequately informed the jury that it had to find both pretext *and* discrimination in order to find for Cooper.

As if this was not enough, the court also made certain that the jury understood the law by reiterating the bottom line:"the law is violated if the defendant's actions would not have occurred'but for' the plaintiff's race." This additional instruction informed the jury that, despite the burden-shifting aspect of the prima facie case, Cooper retained the ultimate burden of proving that Paychex's proffered reason for firing him was pretext for discrimination. On the whole, the district court's instruction on pretext was correct. Again, there was no abuse of discretion.

### B.

Paychex also challenges the district court's decision not to give a "business judgment" instruction, that is, an instruction to the jury that it could not find for Cooper simply because it disagreed with Reid's reason for firing him. Paychex argues that such an instruction was necessary to ensure that the jury did not substitute its own ideas about fairness and good business practices for Reid's. We disagree.

When scrutinizing the district court's jury instructions in a race discrimination case, we consider whether the instructions "fairly placed before the jury the dispositive question of whether race was a determinative factor in the adverse employment decision."*Fuller v. Phipps,* 67 F.3d 1137, 1144 (4th Cir.1995). If so, we require no further explication of the law. In fact, we discourage repetitive or complex supplemental instructions that may confuse the jury. *Cf. Mullen v. Princess Anne Volunteer Fire Co., Inc.,* 853 F.2d 1130, 1137 (4th Cir.1988). It is true, of course, that a jury may not substitute its own business judgment for that of the employer. *See McNairn,* 929 F.2d at 980;*cf. also Holder v. City of Raleigh,* 867 F.2d 823, 825-26 (4th Cir.1989). However, we do not require a trial court to provide a separate business judgment instruction when it otherwise correctly instructs the jury on the law. Even when a business judgment instruction might be useful, its omission does not provide a basis for undermining the adequacy of the jury charge as a whole so long as the rest of the charge does not lead the jury to believe that it may find for the plaintiff if it disagrees with the employer's business judgment. *See Kelley v. Airborne Freight Corp.,* 140 F.3d 335, 350-51 (1st Cir.1998).

**\*11** Here (as we explained above), the district court properly instructed the jury on the prima facie case and the issue of pretext. The court then reiterated that the jury could give a verdict to Cooper only if Paychex terminated him because of his race. These instructions did not suggest that the jury could find for Cooper simply because it disagreed with Reid's decision to fire Cooper. Rather, these instructions made clear that Cooper could prevail only if he showed that Paychex's proffered reason for his termination was false and the real reason he was fired was his race. The instructions correctly stated the law, and the court was required to do no more than that.[FN6]

> FN6. Paychex urges us to adopt a rule requiring a business judgment instruction whenever the defendant asks for one, even when the district court has correctly instructed the jury that it must find that the plaintiff's race was the "but for" cause of his termination. Only one circuit follows such a rule, *see Stemmons v. Missouri Dep't of*

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

163 F.3d 598

163 F.3d 598, 1998 WL 637274 (C.A.4 (Va.))
**(Cite as: 163 F.3d 598, 1998 WL 637274)**

*Corrections,* 82 F.3d 817, 819 (8th Cir.1996); *Walker v. AT & T Techs.,* 995 F.2d 846, 849-50 (8th cir.1993), and even that circuit has held that the failure to give such an instruction is not necessarily prejudicial error, *see Stemmons,* 82 F.3d at 820.

We need not decide now whether such a rule is warranted. Even if we required such an instruction, the failure to give one here was not prejudicial error. Nothing in the record suggested to the jury that it could find for Cooper merely because it disagreed with Reid's business judgment. Although Cooper challenged Reid's assessment of his performance, Cooper's lawyer used this testimony in his summation solely to show that Paychex's proffered reason for firing Cooper was pretextual. Also, there was substantial evidence and argument about the issue of race. Surely, the jury knew that the issue before it was race, not fairness, so there was no need for a business judgment instruction. *See Stemmons,* 82 F.3d at 820-21 (holding that the failure to give a business judgment instruction was not reversible error, and distinguishing *Walker,* which held that failure to give a business judgment instruction was reversible error, because in *Walker* the trial focused solely on the plaintiff's qualifications and there was no testimony about whether discrimination played a role in the adverse employment decision).

C.

Paychex also complains that the district court should not have instructed the jury on punitive damages. Paychex argues that even if Cooper proved that it fired him because of his race, there was no evidence that Paychex acted with the heightened culpability necessary for an award of punitive damages.

Punitive damages are not warranted in every case of discrimination. *See Stephens v. South Atl. Canners, Inc.,* 848 F.2d 484, 489-90 (4th Cir.1988). Evidence sufficient to reach a jury on the issue of discrimination is not necessarily sufficient to warrant a punitive damages instruction. *See Harris v. L & L Wings, Inc.,* 132 F.3d 978, 982-83 (4th Cir.1997). To warrant such an instruction, under both Title VII and 42 U.S.C. § 1981, the plaintiff must offer evidence which tends to show that defendant acted with "malice, an evil motive, or recklessness or callous indifference to a federally protected right."*Cline v. Wal-Mart Stores, Inc.,* 144 F.3d 294, 306 (4th Cir.1998) (quoting *Stephens,* 848 F.2d at 489).

Paychex argues that Cooper's sole proof of Reid's racial animus was Reid's "you people" remark, which (it contends) was insufficient to prove that Reid acted with malice towards Cooper's right to be free from race discrimination. Paychex further contends that this remark was not known to Paychex, and so Paychex cannot be held liable for it. Here Paychex is wrong as a matter of law and as a matter of fact. First, it is "well settled that a private employer may be held liable for punitive damages in employment discrimination case ... based on the act of supervisory employees."*Patterson v. P.H.P. Healthcare Corp.,* 90 F.3d 927, 942 (5th Cir.1996), *cert. denied,*519 U.S. 1091, 117 S.Ct. 767, 136 L.Ed.2d 713 (1997). As ZSM, Reid was without question a very high-level supervisor. He was exactly the type of corporate "higher management" whose malice or reckless indifference will be attributed directly to the corporate employer through agency theory and will result in the imposition of punitive damages against his employer. *See Reynolds v. CSX Transp., Inc.,* 115 F.3d 860, 869 (11th Cir.1997), *cert. denied,*524 U.S. 947, 118 S.Ct. 2364, 141 L.Ed.2d 732 (1998); *see, e.g., Patterson,* 90 F.3d at 942;*Cline,* 144 F.3d at 299, 306. If Reid acted with malice or reckless indifference, then Paychex was liable for punitive damages.

**\*12** Second, Paychex is wrong that Cooper's only evidence of Reid's malice or reckless indifference was Reid's "you people" statement. Punitive damages may be warranted in discrimination cases when the employer (or its agent) deliberately deceives the court by consciously misrepresenting its true motives for an employment decision. *See Merriweather v. Family Dollar Stores of Indiana, Inc.,* 103 F.3d 576, 582 (7th Cir.1996); *see, e.g., Cline,* 144 F.3d at 306. Here the jury necessarily found that Reid lied when he testified about his reason for firing Cooper. Indeed, the jury must have found that Reid deliberately lied about his reason for firing Cooper throughout this

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

163 F.3d 598
163 F.3d 598, 1998 WL 637274 (C.A.4 (Va.))
**(Cite as: 163 F.3d 598, 1998 WL 637274)**

episode-from March 8, 1993, when he (Reid) first met with Cooper and criticized him for no apparent reason; through mid-March 1993, when he began creating a paper trail to cover his true intent to fire Cooper; through July 1993, when he attributed false criticisms of Cooper to Mike Kelly; and through early 1997, when he testified at trial. Reid's systematic and continuous deceit, including his orchestrated cover-up of his racist motivations and the jury's obvious rejection of his testimony as false, revealed Reid's truly cavalier disregard for Cooper's federal right to be free from race discrimination. Therefore, the district court did not abuse its discretion in instructing the jury on punitive damages.

V.

Finally, Paychex argues that Cooper's request for attorneys' fees was excessive and, therefore, should be denied or substantially reduced. We disagree. As the prevailing party in this civil rights action, Cooper was entitled to an award of attorneys' fees. *See Rum Creek Coal Sales, Inc. v. Caperton,* 31 F.3d 169, 174 (4th Cir.1994); 42 U.S.C. § 2000e-5(k). The district court had the discretion to determine the amount of the fee award, based on the twelve factors set forth in *Johnson v. Georgia Highway Express, Inc.,* 488 F.2d 714, 717-19 (5th Cir.1974).*See Barber v. Kimbrell's Inc.,* 577 F.2d 216, 226 (4th Cir.1978). Cooper requested attorneys' fees and costs in excess of $397,000 for the seven lawyers, one summer associate and five paralegals who assisted in his representation. The trial court carefully considered this request in a detailed, 15-page opinion by applying the factors set forth in *Johnson.See Cooper v. Paychex,* No. 96-54-A, mem. op. at 2-14 (E.D. Va. April 14, 1997). The court awarded Cooper $311,117.50 plus costs. The court concluded that this award was warranted because Paychex's attorneys "played hard ball" throughout the litigation, *id.* at 6, and because Cooper's attorneys received "excellent results in getting [him] awarded back pay, compensatory damages and punitive damages,"*id.* at 12.Further, the court did not simply award Cooper's full request. The court reduced the fee amount for over-staffing or inefficient use of time. *See id.* at 3-8.Overall, the court reduced Cooper's fee request by more than 20 percent, and we cannot say it abused its discretion by not reducing the award any more than that.

*13 Nor can we say that the district court abused its discretion by trimming too much fat from Cooper's fee award. Cooper challenges two specific cuts: (1) the court's reduction, from $360.00 to $280.00, of the hourly fee for his lead counsel (who had 27 years' experience as a litigator), and (2) the court's refusal to award fees for 76 percent of the time his lawyers spent responding to Paychex's motion for summary judgment. The court reduced lead counsel's rate because other, similarly experienced attorneys winning recent civil rights cases in that court had received only $225.00 to $250.00 per hour. *See id.* at 10-11.And, the court awarded fees on only 59.9 hours for Cooper's summary judgment response because it found Cooper's 244.8-hour request to be "extremely excessive." *See id.* at 8.

Cooper argues that the court should have granted his lead counsel at least $325.00 per hour, which Cooper claims is the accepted rate in the Washington, D.C. metro area. For this proposition Cooper cites *Laffey v. Northwest Airlines, Inc.,* 572 F.Supp. 354, 371 (D.D.C.1983), *rev'd in part on other grounds,*746 F.2d 4 (D.C.Cir.1984), which sets forth a rate schedule that (as updated yearly) has been accepted by the District of Columbia Circuit as"a useful starting point" for determining the prevailing fee rate in Washington, *Covington v. District of Columbia,* 57 F.3d 1101, 1109 (D.C.Cir.1995), *cert. denied,*516 U.S. 1115, 116 S.Ct. 916, 133 L.Ed.2d 847 (1996). Of course, a trial court determining what fee to award may take into account a rate schedule like the *Laffey* court did. But it need not do so. We are skeptical about endorsing a fee schedule, since a district court's discretion is already adequately guided by *Johnson.*[FN7]Therefore, we conclude that the trial court did not abuse its discretion by using its own precedents to gauge the going rate for experienced attorneys in civil rights cases.

> FN7. In fact, the *Laffey* rate schedule may be the wrong indicator for attorneys fees in the Eastern District of Virginia. Even if the prevailing rate for senior partners in downtown Washington, D.C. is well above $300.00 per hour, the prevailing rate may be somewhat lower in the suburbs of Washington, like Alexandria, Virginia.

We also reject Cooper's contention that the district

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

163 F.3d 598

163 F.3d 598, 1998 WL 637274 (C.A.4 (Va.))

**(Cite as: 163 F.3d 598, 1998 WL 637274)**

court was wrong to award less than one fourth of the hours his lawyers spent responding to Paychex's summary judgment motion. Although the court slashed this particular line item, on the whole the court granted Cooper nearly 80 percent of what he requested. Even if the court cut too close to the bone on this one item, we cannot say that the overall fee award was an abuse of discretion.

### VI.

As the district court put it, "[t]he outcome of this case turned on the credibility of two witnesses, the plaintiff Lloyd Cooper and Mr. Ed Reid, the man who fired him on behalf of the defendant [Paychex]. The jury obviously believed Cooper more than Reid."*Cooper v. Paychex, Inc.,* 960 F.Supp. 966, 973-74 (E.D.Va.1997). Credibility was a question for the jury, and we will not second guess its verdict. The district court's denial of Paychex's post-trial motions and grant of fees to Cooper are both

**\*14**AFFIRMED.

NIEMEYER, Circuit Judge, dissenting:

Contrary to the asserted position of Paychex, Inc., that it terminated Cooper's employment because of poor job performance, Cooper maintains that it was because he was African-American and that his termination violated Title VII of the Civil Rights Act.

At trial, Cooper was permitted to introduce extensive and highly inflammatory, irrelevant testimony of his secretary, Tracy Dodd, who not only did not care for Cooper but also was a racial bigot. The record demonstrates, however, that Dodd was not the decisionmaker, nor was she consulted when the decision to terminate Cooper's employment was made. Indeed, there was no evidence that Edward Reid, the zone manager who made the decision to terminate Cooper, was even aware of Dodd's racial animus. Dodd's limited role involved her complaints to Reid, made after he became zone manager in 1993, that Cooper came to work late and left early and that he did not prepare monthly reports as necessary.

Yet, Tracy Dodd's testimony was the centerpiece of Cooper's case for racial discrimination. Over objection, Dodd was pressed to testify about her racial prejudice, her having told racially biased jokes, and her having referred to African-Americans as "niggers." Over objection, she reluctantly agreed that

she had referred to Cooper as "an asshole," and another employee was allowed to attribute to Dodd her characterization of Cooper as a "lazy black ass" as well as other racial references about Cooper. During closing argument to the jury, this evidence was again paraded to the jury by Cooper's counsel when he argued as follows:

Now, there were two other witnesses who testified about [Cooper's] performance at Paychex: One was Tracy Dodd, his secretary, who admittedly did not like him, spied on him, made anonymous calls to headquarters about him, has told racial jokes, has used the word "nigger" and who, while smoking with John Gillogly, has called [Cooper] "a lazy black ass." It's hard to imagine a case with a more obviously biased and prejudiced witness than that. And Tracy Dodd has a very strong motive to lie about [Cooper] in order to justify the firing that her smear campaign brought about.

The jury surely transferred this animus to the workplace generally and to Paychex in particular.

In reviewing its decision to admit this evidence of and about Tracy Dodd, the district court justified it on the grounds that Dodd "appears to have had a significant impact on the decision to fire. Accordingly, her testimony was properly admitted."That conclusion by the district court, however, has no support from evidence in the record.

When Dodd's evidence is properly excluded from the jury, then the thinnest of evidence, if any, remains to support a finding of racial animus in Reid's decision to fire Cooper. When Reid became zone manager in March 1993, he began to make some personnel changes, and over the next two years he fired Cooper as well as two other district sales managers, both of whom were white, and he recommended that a third district sales manager, also white, be terminated. In no document or testimony is there any evidence that race was a factor in making these decisions. Indeed, the evidence shows to the contrary that during his period as zone manager, Reid hired three black sales representatives.

**\*15** Cooper testified, however, that Reid wanted to put in his own sales team, all of whom were white. In connection with that effort, Cooper attributed to Reid the following statements:

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

163 F.3d 598
163 F.3d 598, 1998 WL 637274 (C.A.4 (Va.))
**(Cite as: 163 F.3d 598, 1998 WL 637274)**

Mr. Reid said to me that he wanted his own team. Mr. Reid said to me that he didn't think I can bring the team to the next level which has 125 percent quota. Mr. Reid looked me dead in the eye and made a face and said: You people don't have the technical expertise to do this job.

While Cooper took the reference to "you people" to refer to black people, in context it would appear more probably to refer to the team that Reid was replacing with his own personnel.

This remaining bit of testimony, which is ambiguous at most, does not, I respectfully submit, support the jury's aggressive verdict entered in this case, much less its award of punitive damages. The record reveals clearly, in my judgment, that Dodd's testimony was a most prejudicial and unfortunate element in this case, violating Federal Rule of Evidence 403.

Because I conclude that the admission of Dodd's extensive testimony about her prejudice constituted reversible error, I would remand this case for a new trial. Accordingly, I dissent.

C.A.4 (Va.),1998.
Cooper v. Paychex, Inc.
163 F.3d 598, 1998 WL 637274 (C.A.4 (Va.))

END OF DOCUMENT

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.