IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| TOLANO ANDERSON, CATHY ANDERSON, RICHARD WILKINS, BRENDA WILKINS, LLOYD WHEATLEY, and AUDRIA WHEATLEY, | ) ) ) ) ) ) | |
| Plaintiffs, | ) ) | |
| v. | ) ) | Civ. No. 06-567-SLR |
| WACHOVIA MORTGAGE CORPORATION, and WACHOVIA CORPORATION, | ) ) ) ) | |
| Defendants. | ) | |

---

John S. Grady, Esquire, Grady & Hampton, LLC, Dover, Delaware.  Counsel for Plaintiffs.

Michael J. Barrie, Esquire, Schnader Harrison Segal & Lewis LLP, Wilmington, Delaware.  Counsel for Defendants.  Of Counsel:  Elizabeth K. Ainslie, Esquire, and Stephen A. Fogdall, Esquire, Schnader Harrison Segal & Lewis LLP, Philadelphia, Pennsylvania.

---

**MEMORANDUM OPINION**

Dated: April 3 , 2009
Wilmington, Delaware

ROBINSON, District Judge

## I. INTRODUCTION

Plaintiffs Tolano and Cathy Anderson ("the Andersons"), Richard and Brenda

Wilkins ("the Wilkinses"), and Dr. Lloyd and Audria Wheatley ("the Wheatleys")

(collectively, "plaintiffs") filed the action at bar on August 11, 2006, in the Superior Court

of the State of Delaware. (D.I. 1, ex. A) Defendants Wachovia Mortgage Corporation

and Wachovia Corporation (collectively, "Wachovia" or "defendants") removed this suit

to federal court on September 13, 2006. (D.I. 1)

Plaintiffs filed an amended complaint on October 3, 2006, alleging that

defendants are liable for racial discrimination under 42 U.S.C. § 1981 and tortious

interference with contractual relations, breach of contract, and breach of the covenant

of good faith and fair dealing pursuant to the laws of the State of Delaware.[1]  (D.I. 8)

On October 23, 2006, defendants filed a motion to dismiss on the grounds that the

amended complaint failed to state a claim under Fed. R. Civ. P. 12(b)(6) and that

plaintiffs' § 1981 claim is time-barred. (D.I. 10, 11) On July 18, 2007, the court

granted, in part, defendants' motion, dismissing plaintiffs' breach of contract and

tortious interference with contract claims. (D.I. 16 at 15, 20) The court denied

defendants' motion to dismiss plaintiffs' claims for violation of § 1981[2] and breach of the

---

[1] Plaintiffs have withdrawn with prejudice their claims of racial discrimination under 15 U.S.C. § 1691. (D.I. 13 at 22)

[2] At the time, the court lacked sufficient information to determine the appropriate statute of limitations applicable to plaintiffs' § 1981 claims. As neither party has raised this issue in the motion under consideration, the court assumes that the parties agree that plaintiffs' § 1981 claims are not time-barred. (D.I. 16 at 12)

covenant of good faith and fair dealing. (*Id.* at 12, 14, 18)  Plaintiffs filed a second amended complaint on January 22, 2008, to which defendants filed an amended answer on February 6, 2008.

Currently before the court is defendants' motion for summary judgment.  The court has jurisdiction over this matter pursuant to 28 U.S.C. § 1331, and has supplemental jurisdiction over plaintiffs' state law claims under 28 U.S.C. § 1367.  For the reasons stated below, defendants' motion for summary judgment is granted with respect to plaintiffs' claims under 42 U.S.C. § 1981, and with respect to plaintiffs' claims for breach of contract and tortious interference with contractual relations under Delaware law.  Plaintiffs' remaining claim for breach of the implied covenant of good faith and fair dealing pursuant to Delaware law shall be remanded to the Superior Court of the State of Delaware.

## II. BACKGROUND

Plaintiffs are three African American couples who each purchased one of three adjoining residential properties in Dover, Delaware.  Plaintiffs claim that defendants discriminated against them on the basis of race by adding terms and conditions to their mortgage contracts that were not applied to similarly-situated white applicants.  Prior to June 2004, plaintiffs had collectively obtained eight mortgages from defendants for properties in what plaintiffs allege were predominantly minority or racially-mixed neighborhoods.  The majority of these mortgages were commercial in nature, and none were for owner-occupied residences.  (D.I. 60 at ¶ 3; D.I. 67 at A-6, A- 108-10) Plaintiffs had also held bank accounts with Wachovia Bank in the past.  (D.I. 60 at ¶¶ 2) In June 2004, Tolano Anderson contacted J.D. Hogsten ("Hogsten"), a loan officer for

2

defendants, and informed him of plaintiffs' plan to purchase three adjoining properties in Dover from a seller named Jack Aigner ("Aigner"). (*Id.* at ¶ 4) The properties were located in what plaintiffs describe as a "white neighborhood." (*Id.*) Tolano Anderson told Hogsten that plaintiffs had entered into a single contract to purchase all three properties simultaneously and that, if any of the three homes were not purchased, plaintiffs would lose their entire deposit of $40,000. (*Id.* at ¶ 7) Hogsten informed Tolano Anderson that an appraisal was needed for the properties. (*Id.* at ¶ 12)

Plaintiffs allege that Hogsten and the appraiser who was sent to value the Andersons' house "appeared to know each other well." (D.I. 69 at 6) The appraiser, John Mullens, was assigned by GreenLink LLC, a subsidiary of Wachovia Corporation. (D.I. 66 at 10; D.I. 69 at 5). When Mullens arrived, he indicated that the Anderson house could not be valued because there was damage to the basement.[3] (D.I. 60 at ¶ 15) Hogsten informed Tolano Anderson that, because a comparable house could not be found, the appraisal could not be conducted and the Andersons' mortgage could not be completed.[4] (*Id.* at ¶ 17) The property was unoccupied and Tolano Anderson was aware it had water damage that needed to be resolved. (D.I. 60 at ¶ 6; D.I. 67 at A-127, A-134) Hogsten told Anderson that this would create problems going forward and suggested repairs be made. (D.I. 66 at 11; D.I. 69 at 6) Tolano Anderson subsequently contacted another appraiser, Carl Kaplin, who provided him with a list of

---

[3] Plaintiffs allege that, as a result of his own "undisclosed reasons for undermining the purchase," Hogsten had instructed the appraiser not to appraise the Andersons' house. (D.I. 60 at ¶ 16)

[4] According to plaintiffs, this was "a ruse and a second attempt to undermine the transaction of the plaintiffs." (D.I. 60 at ¶ 18)

comparable homes. (D.I. 60 at ¶ 20) On July 20, 2004 defendants issued a commitment letter to the Andersons, which contained a provision requiring "[s]atisfactory appraisal supporting minimum value of $266,666.00." (D.I. 68 at A- 434-35) Tolano Anderson subsequently made repairs to the property as suggested and, on August 2, 2004, the property received a satisfactory appraisal with a valuation of $267,000.00. (D.I. 60 at ¶¶ 22, 77; D.I. 68 at A-451-A-452)

On July 23, 2004, Hogsten informed Richard Wilkins that he and his wife would have to show how they were planning to pay the deposit on their house and prove that the funds were their own.[5] (D.I. 60 at ¶ 32) That same day, Hogsten informed the Andersons that the purchase of their desired property could not be completed because the property was not valuable enough. (*Id.* at ¶ 34) Tolano Anderson informed Hogsten that the required "move in" construction was nearly complete and that the house was ready for its second appraisal. (*Id.*) The second appraisal, completed August 2, 2004, valued the Andersons' house at the purchase price. (*Id.* at ¶ 35; D.I. 68 at A-451)

On July 7, 2004, the Wheatley property was appraised "as-is" at a value of $267,000.00, but noting that work may be needed on the roof, some basement piping may be wrapped in asbestos, and lack of heat on the 2nd floor. (D.I. 60 at ¶ 35; D.I. 68 at A-422, A-424) Hogsten informed Lloyd Wheatley that he would also have to upgrade his house to "move in" condition prior to settlement. (D.I. 60 at ¶ 36; D.I. 66 at A-226, A- 441-42) Lloyd Wheatley responded that he did not want to complete the upgrades

---

[5] Plaintiffs contend that a request such as this was "not [the] normal customary practice of [Wachovia]." (D.I. 8 at ¶¶ 31, 32)

before settlement, as he was planning to do custom work on the house after the property was purchased. (D.I. 60 at ¶ 37)  Wheatley also explained that he had no access to the house and, therefore, could not bring it to "move in" condition; likewise, he stated that he would not be able to complete upgrades on his current home prior to selling it if he had to work on the new property. (Id.)  Despite this, Hogsten did not lift the requirement.[6] (Id.)  Thereafter, Lloyd Wheatley was given access to the property by Aigner and completed the work required by Hogsten. (Id. at ¶¶ 42-43)  An appraiser was dispatched to the Wheatleys' house on August 4, 2004, resulting in an appraised value of $267,000.00. (Id. at ¶ 44; D.I. 68 at A-421)

All three properties were scheduled for settlement in August 2004. (D.I. 60 at ¶ 45)  The Andersons' and Wilkinses' settlements were completed on August 6, 2004. (Id. at ¶46)  The Wheatleys' settlement was postponed, however, because defendants failed to forward to the closing attorney the documents necessary to complete the transaction. (Id.)  Upon inquiry, Hogsten stated that defendants did not send the Wheatleys' paperwork because they needed a letter from a certified contractor confirming that the roof of the Wheatley house did not have any leaks.[7] (Id. at ¶ 48)  In

---

[6] When Tolano Anderson questioned Hogsten about defendants' policies concerning appraisals, repairs, warranties and "such matters," he was referred to a loan officer who told him that these policies were confidential. (D.I. 60 at ¶¶ 40-41; )

[7] Plaintiffs allege that this was another attempt by defendants to undermine their contract with Aigner since, as Hogsten was aware, all three of plaintiffs' houses had to be settled before the sale could go through. (D.I. 60 at ¶ 49)  Plaintiffs also allege that, "a week or two" before the first two houses settled on August 6, 2004, "Hogsten told Wheatley that he would be watched" and that, during the week of August 16, 2004, Hogsten told Tolano Anderson that "he better be careful because [defendants] would be watching him." (Id. at ¶ 67)  According to plaintiffs, "Anderson interpreted this as a veiled threat by [defendants] that the Andersons would be subject to an unusually high

5

order to expedite the sale, Aigner arranged for his personal contractor to fax the required letter to defendants as per Hogsten's demand. (*Id.* at ¶ 52)

The Wheatleys were also required to bringing the total down payment to 20% of the purchase price, before defendants would send the required closing documents. (*Id.* at ¶ 56) "[Tolano] Anderson told Hogsten that this was an unexpected surprise and [that] [Lloyd] Wheatley was not prepared for the change." (*Id.* at ¶ 54) Although the Wheatleys managed to obtain funds for the 20% down payment from joint accounts, Hogsten informed them that they were now unable to qualify for the mortgage because they no longer had sufficient reserves of cash.[8] (*Id.* at ¶ 59) On August 12, 2004, a Mr. Destefano ("Destefano") informed the Wheatleys that defendants were unable to obtain primary mortgage insurance ("PMI") for their house and that the only way to circumvent this problem was to submit a 20% down payment and "eliminate the PMI requirement." (*Id.* at ¶ 60-61)

The Wheatleys' settlement was rescheduled again, this time for August 13, 2004. (*Id.* at ¶ 62) Before that date, Aigner allegedly called Destefano and informed him that "[Aigner] was aware of the [defendants'] inappropriate conduct and that the scheduled settlement was being sabotaged." (*Id.* at ¶ 64) At that point, Skowronski "intervened and approved the release of the loan documents"; the Wheatleys' settlement was then completed, as scheduled, on August 13, 2004. (*Id.*)

_____

degree of scrutiny." (*Id.*)

[8] Plaintiffs allege that this last minute increase in the Wheatleys' required down payment was another attempt by Hogsten to undermine the success of their contract with Aigner. (D.I. 60 at ¶ 59)

6

In order to meet defendants' requirements and finalize their contract with Aigner, the Andersons spent approximately $15,000 plus "numerous man hours." (*Id.* at ¶ 77) According to plaintiffs, by requiring the Wheatleys to upgrade their house to "move in" condition and increase their down payment, a strain was put on the Wheatleys' other business transactions; six months after the closing, the Wheatleys "were forced to sell [their property to the Wilkinses,] which cost them approximately $3,500.00 in transfer taxes." (*Id.* at ¶ 79)

## III. STANDARD OF REVIEW

A court shall grant summary judgment only if "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c). The moving party bears the burden of proving that no genuine issue of material fact exists. *See Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586 n.10 (1986). When determining whether a genuine issue of material fact exists, the court must view the evidence in the light most favorable to the nonmoving party and draw all reasonable inferences in that party's favor. *Wishkin v. Potter*, 476 F.3d 180, 184 (3d Cir. 2007). "Facts that could alter the outcome are 'material,' and disputes are 'genuine' if evidence exists from which a rational person could conclude that the position of the person with the burden of proof on the disputed issue is correct." *Horowitz v. Federal Kemper Life Assurance Co.*, 57 F.3d 300, 302 n.1 (3d Cir. 1995) (internal citations omitted).

If the moving party has demonstrated an absence of material fact, the nonmoving party then "must come forward with 'specific facts showing that there is a

genuine issue for trial.'" *Matsushita,* 475 U.S. at 587 (*quoting* Fed. R. Civ. P. 56(e)). However, a party opposing summary judgment "must present more than just 'bare assertions, conclusory allegations or suspicions' to show the existence of a genuine issue." *Podobnik v. United States Postal Serv.*, 409 F.3d 584, 594 (3d Cir. 2005) (*quoting Celotex Corp. v. Catrett*, 477 U.S. 317, 325 (1986)). Indeed, to survive a motion for summary judgment, plaintiff cannot rely merely on the unsupported allegations of the complaint, and must present more than the "mere existence of a scintilla of evidence" in his favor. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 252 (1986). If the nonmoving party fails to make a sufficient showing on an essential element of its case with respect to which it has the burden of proof, the moving party is entitled to judgment as a matter of law. *See Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986).

## IV. DISCUSSION

Plaintiffs' second amended complaint asserts a claim of racial discrimination under 42 U.S.C. § 1981, and three state law claims under Delaware law: (1) a claim for breach of the implied covenant of good faith and fair dealing; (2) a claim of tortious interference with contractual relations; and (3) a claim for breach of contract. (D.I. 60 at ¶¶ 72-75, 95-97, 110-114). The court dismissed plaintiffs' breach of contract and tortious interference claims that were asserted in plaintiffs' (first) amended complaint. (D.I. 16 at 15, 20).

The breach of contract claim was previously dismissed by this court for failure to identify "any express contract provision that was breached." (*Id.* at 15). Although plaintiffs, in their second amended complaint, now identify their respective mortgage

8

applications as the contracts at issue, they again fail to identify an express contract provision that was breached. (D.I. 60 at ¶¶ 75, 97, 114). Having now had three opportunities to do so, the court will grant summary judgment for defendants on the breach of contract claim.

The court also dismissed the tortious interference claim, holding, as a matter of law, that Delaware would not recognize a cause of action under the Restatement (Second) of Torts § 766A, as claimed by plaintiffs. (D. I. 16 at 20). Plaintiffs have inexplicably resurrected this claim, unmodified, in their second amended complaint. (D.I. 60 at ¶¶ 74, 96, 113). Therefore, the court will also grant summary judgment for defendants on the tortious interference claim.

### A. 42 U.S.C. § 1981

"Title 42 U.S.C. § 1981 guarantees each person, regardless of race or citizenship, freedom from discrimination in the making and enforcing of contracts." *Thomas v. First F.S.B. of Indiana*, Civ. No. H 84-716, 1986 WL 15552, at *2 (N.D. Ind. July 30, 1986) (*citing Runyan v. McCrary*, 427 U.S. 160 (1976); *Johnson v. Railway Express Agency*, 421 U.S. 454, 459 (1976)). Claims of racial discrimination require that plaintiffs establish intentional and purposeful discrimination against them by the defendant, based on their race. *General Building Contractors Association, Inc. v. Pennsylvania*, 458 U.S. 375-76 (1982). To prevail on a discrimination claim under § 1981, intentional discrimination may be proved by direct or indirect evidence. *Duran v. Community First Bancshares, Inc.*, 92 Fed. Appx. 756, 761 (10th Cir 2004) (citation omitted); *Sallion v. SunTrust Bank, Atlanta*, 87 F. Supp. 2d 1323, 1327 (N.D. Ga. 2000). When direct evidence is lacking, circumstantial evidence of discriminatory intent

9

may be established using the *McDonnell Douglas* burden shifting method.  *Balderston v. Fairbanks Morse Engine Div. of Coltec Industries*, 328 F.3d 309, 321 (7th Cir. 2003). However, "[w]hen a plaintiff proves a case of discrimination by direct evidence, application of *McDonnell Douglas* is inappropriate."  *E.E.O.C. v. Alton Packaging Corp.*, 901 F.2d 920, 923 (11th Cir. 1990) (*citing Lee v. Russell County Bd. of Educ.*, 684 F.2d 769, 774 (11th Cir.1982)).

About twenty years ago, "the Supreme Court instructed courts to apply Title VII's 'carefully designed framework of proof' in the context of section 1981 discrimination claims."  *Sallion*, 87 F. Supp. 2d at 1327 n.1 (*citing Patterson v. McLean Credit Union*, 491 U.S. 164, 186 (1989) (superseded by statute on other grounds)).  The Third Circuit has yet to determine whether Title VII employment discrimination case law, including the *McDonnell Douglas* analysis, is a proper framework for use in credit discrimination cases, at least with respect to claims under the Equal Credit Opportunity Act, 15 U.S.C. § 1691 ("ECOA").  *Chiang v. Schafer*, Civil Action No. 2000-04, 2008 WL 3925260, at *21 (D.V.I. Aug. 20, 2008) (*citing Chiang v. Veneman*, 385 F. 3d 256, 267 (3d Cir. 2004) (*Chiang II*)).  However, courts, including the First and Fifth Circuits, have used the *McDonnell Douglas* analysis in ECOA cases.  *Sallion*, 87 F.Supp.2d at 1327 n.1. Generally, it is considered that the *McDonnell Douglas* burden shifting analysis used in Title VII cases applies to motions for summary judgment on claims brought under § 1981.  *Bailey v. Harleysville Nat. Bank & Trust Co.*, No. Civ. A. 04-1541, 2005 WL 2012024, at *5 (E.D. Pa. Aug. 22, 2005) (*citing St. Mary's Honor Ctr. v. Hicks*, 509 U.S. 502 (1993); *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973)).

### 1. Direct Evidence

"'[D]irect evidence of discrimination does not require a fact finder to draw any inferences in order to conclude that the challenged . . . action was motivated at least in part by prejudice against members of the protected group.'" *Arnold v. Marous Bros. Const., Inc.,* 211 Fed. Appx. 377, 380 (6th Cir. 2006) (*quoting Johnson v. Kroger Co.,* 319 F.3d 858, 865 (6th Cir. 2003)). "It is well established that isolated and ambiguous comments are not sufficient to make out a direct-evidence case of . . . discrimination." *Weigel v. Baptist Hosp. of East Tennessee,* 302 F.3d 367, 382 (6th Cir. 2002) (*citing Phelps v. Yale Sec., Inc.,* 986 F.2d 1020, 1025 (6th Cir.1993)).

"In a direct evidence case, the plaintiff must produce direct testimony that the [defendant] acted with discriminatory motive, and must convince the trier of fact to accept the testimony." *E.E.O.C. v. Alton Packaging Corp.,* 901 F.2d 920, 923 (11th Cir. 1990) (*citing Lee v. Russell County Bd. of Educ.,* 684 F.2d 769, 774 (11th Cir.1982)). "[D]irect evidence is 'evidence of conduct or statements that both reflect directly the alleged discriminatory attitude and that bear directly on the contested . . . decision.'" *Bickford v. Denmark Technical College,* 479 F. Supp. 2d 551, 564 (D.S.C. 2007) (*quoting Fuller v. Phipps,* 67 F.3d 1137, 1142 (4th Cir.1995) (abrogated on other grounds)). To constitute direct evidence, a comment must reveal discriminatory animus and be made by a decision maker. *Pruett v. Columbia House Co.,* No. 2:02 CV 00224 RLY WT, 2005 WL 941675, at *15 (S.D. Ind. March 31, 2005 ) (*citing Balderston v. Fairbanks Morse Engine,* 328 F.3d 309, 321 (7th Cir.2003)).

Here, plaintiffs assert that there is direct evidence of discrimination based on

11

Hogsten's alleged use of the phrase "you people." (D. I. 69 at 27) Allegedly, Hogsten

said

> something to the effect of, you know, "you people don't understand how
> the process works" or "you people don't know how the procedures" or
> words to that effect, indicating that we didn't understand the banking
> process, indicating that we didn't understand to the degree that what we
> interpreted that as is that there was a perception that we lacked the
> intellect to comprehend the banking process.

(D.I 67 at A-125) Even assuming that Hogsten used either of the quoted phrases

attributed to him by Anderson, neither phrase can be considered direct evidence of

discrimination.

First, plaintiffs attest to the truth of the alleged statement, noting that "[n]one of

the Plaintiffs had any special knowledge of the internal workings of the bank," and admit

to its ambiguity, stating that, "[i]f there is more than one possible meaning to the phrase

'you people,' that can certainly be argued." (*Id.* at 2; D. I. 69 at 27) Indeed, one could

argue, that in the context of plaintiffs' three residential mortgage applications combined

into a single all-or-nothing real estate transaction, "you people" referred to the plaintiffs

acting together as an economic unit. (D.I. 60 ¶ 7) Such an argument is, in fact,

supported by plaintiffs' brief, again quoting the Anderson deposition: "[I]n the context of

all that was being done to us at the time, a reference to 'you people' is us black people

because we were the people that were trying to secure the loan and we were the

people that he was referring to." (D.I. 69 at 8)

Second, even if it is assumed that the phrase "you people" is direct evidence of

racial animus, plaintiffs admit that Hogsten lacked the decision making authority

required to establish direct evidence of discrimination:

12

Mr. Hogsten's responsibility was to take the loan application and forward that information to the loan processor. He had no authority to deny a loan and he had no authority to order an appraisal. He had no authority to create any conditions on a mortgage. . . . he had no authority to create any conditions based upon [Fannie Mae] guidelines.

(D.I. 69 at 4) (internal citation omitted). For the above reasons, the court finds that the phrase, "you people," is not direct evidence of discrimination under the facts of this case.

## 2. Indirect (Circumstantial) Evidence

Under the *McDonnell Douglas* framework: (1) the plaintiff must first set forth sufficient evidence to establish a prima facie case; (2) the defendant must then set forth a legitimate nondiscriminatory reason for its actions; and (3) the plaintiff must then prove by a preponderance of the evidence that the defendant's reasons were a pretext for discrimination. *Weldon v. Kraft, Inc.,* 896 F.2d 793, 797 (3d Cir. 1990) (citations omitted). However, to withstand a motion for summary judgment in a discrimination case, a plaintiff only need show sufficient evidence to create a genuine issue of material fact as to whether the defendant intentionally discriminated. *Id.*

The defendants must show that "the plaintiff will be unable to introduce either direct evidence of a purpose to discriminate or indirect evidence by showing that the proffered reason is subject to factual dispute". A plaintiff who has made a prima facie showing of discrimination can withstand a summary judgment motion by pointing to "evidence establishing a reasonable inference that the employer's proffered explanation is unworthy of credence."

*Id.*

With respect to discrimination in the granting of credit, the prima facie case necessary to establish a claim with circumstantial evidence under § 1981 is the same as that for claims under ECOA. *JAT, Inc. v. National City Bank of the Midwest,*

13

No. 06-11937, 2008 WL 2397657, at \*4 (E.D. Mich. June 10, 2008) (*citing Hood v. Midwest Sav. Bank*, 95 Fed. Appx. 768, 778 (6th Cir. 2004); *Mencer v. Princeton Square Apartments*, 228 F.3d 631, 634 (6th Cir. 2000)). Asserting that "[t]his is not a classic *McDonnell Douglas v. Green* case," plaintiffs urge this court to follow the analysis in *"Lattimore* [sic] *v. Central City* [sic] *Federal Savings Bank*," which held that "lack of direct competition between applicants in [a] credit context renders [the] analogy to Title VII cases flawed." (D.I. 69 at 21); *Chiang II*, 385 F. 3d at 267 (*citing Latimore v. Citibank Fed. Sav. Bank*, 151 F.3d 712, 713-15 (7th Cir.1998)). *Latimore* was a typical case of alleged discrimination where the defendant failed to grant credit to the plaintiff. *Latimore*, 151 F.3d at 713.

However, courts in the Third Circuit have applied the *McDonnell Douglas* framework, or a modified form of it, in a credit context. *See, e.g., Chiang v. Schafer*, No. 2000-04, 2008 WL 3925260, at \*21 (D.V.I. Aug. 20, 2008) (Slip copy) (using *McDonnell Douglas* analysis in an ECOA case alleging discrimination in the granting of credit); *Visconti v. Veneman*, No. Civ. 01-5409(JBS), 2005 WL 2290295, at \*4 (D.N.J. Sept. 20, 2005). In *Visconti*, plaintiffs claimed that the defendant discriminated against them, not in the granting of credit, but in its efforts at collecting plaintiffs' delinquent debts. *Visconti*, 2005 WL 2290295 at \*1. The *Visconti* court agreed with the *Latimore* court that *McDonnell Douglas* did not apply in its original form but, instead of rejecting it entirely, modified the prima facie case to require a showing that:

(1) Plaintiffs were members of a protected class; (2) Plaintiffs applied for and were extended credit from Defendant; and (3) Defendant treated Plaintiffs differently than others outside of the protected class who were otherwise similarly situated.

14

*Id.* at *4.

As in *Visconti*, plaintiffs here do not allege they were denied credit but, instead, allege that they were treated differently than others outside the protected class who were similarly situated. Plaintiffs, therefore, urge adoption of the following prima facie case:

(1) plaintiffs are members of a protected class; (2) defendant had the intention to discriminate on the basis of race; and (3) defendant interfered with a protected activity as defined in Section 1981.

*See, e.g. Hampton v. Dillard's Department Stores, Inc.*, 247 F.3d 1091, 1101-1102 (10th Cir. 2001). Plaintiffs then propose to further modify the prima facie case by eliminating the second element, based on *Sheridan v. E.I. duPont and Company*, 100 F. 3d 1061, 1071-1076 (3d Cir. 1996). (D.I. 69 at 21) However, the court in *Sheridan* did not remove intent as an element of the prima facie case. Instead, the Third Circuit made clear that the elements of the prima facie case, together with a jury's rejection of defendants' proffered reasons for its actions, are "the threshold findings, beyond which the jury is permitted, but not required, to draw an inference leading it to conclude that there was intentional discrimination." *Id.* at 1066-67. Plaintiffs' proposed showing of proof would, in essence, be void of any comparison of their treatment to that of others outside the protected class who were similarly situated.

The court, therefore, will adopt the prima facie case established in *Visconti* to analyze the indirect evidence. Plaintiffs are clearly members of a protected class and, although the Wheatleys were initially denied credit, all plaintiffs were eventually granted credit by defendants. Therefore, it remains only to determine whether defendants

15

treated plaintiffs differently than others outside of the protected class who were otherwise similarly situated.

Plaintiffs allege that "[s]imilarly situated whites were not required to meet all of the requirements imposed upon the Plaintiffs to be eligible for a mortgage." (D.I. 60 ¶ 66) However, they have not presented any objective evidence of this allegation and readily admit that they "cannot produce actual comparisons of other white applicants at Wachovia." (D.I. 69 at 23) Instead, plaintiffs "have produced their own testimony of how their treatment was significantly different than their prior experiences at this bank and others," notably without citation to the record. (Id.) And, indeed, the record is silent as to any party, including plaintiffs in their prior dealings with the bank, who was similarly situated. Plaintiffs' prior experience with the bank involved mortgages on rental properties, not primary or secondary residences. (D.I. 60 ¶ 5; D.I. 67 at A-108, A-155) Therefore, plaintiffs have failed to provide sufficient evidence to establish a prima facie case.

Even if plaintiffs had carried their burden of proving a prima facie case, defendants have provided legitimate, nondiscriminatory reasons for each alleged act of discriminatory treatment. Plaintiffs claim that defendants discriminated against them by requiring them to make repairs to the Anderson property and upgrade the Wheatley property to "move-in" condition, and that such requests were unreasonable. (D.I. 60 ¶ 22, 36) Defendants explained that Hogsten knew from experience that a satisfactory appraisal would be a condition of the Andersons' loan and that the underwriters would not accept the property in its current condition. (D.I. 66 at 11) Hogsten's supervisor confirmed it is not unusual for a loan officer in this type of situation to suggest repairs.

16

(*Id.*) At the time that Hogsten made the suggestion, the Anderson house had considerable unrepaired water damage. (D.I. 67 at A-90, A94-95) The Wheatleys' loan application was initially denied by the underwriter in Connecticut due to similar concerns: lack of heat on the 2nd floor, asbestos in the basement, and the possibility of roof leaks. (*Id.* at 12).

Wachovia's residential mortgage underwriting guidelines conform to those established by the Federal National Mortgage Association ("Fannie Mae") because Wachovia typically sells such mortgages to Fannie Mae in the secondary market. (D.I. 67 at A-15, A-243) Fannie Mae guidelines, in turn, require that for such mortgages to be considered for purchase, property appraised in "as is" condition requires careful review by the lender to ensure that the property does not have "any physical deficiencies or conditions that would affect its livability." (*Id.* at ¶ 37) Both the Anderson house and the Wheatley house had substantial physical deficiencies that would affect livability. (D.I. 68 at A-424)

Plaintiffs also claim that defendants discriminated against them by requiring Dr. Wilkins to provide documentation "proving that his deposit on the [house] was his own money," and assert that this is contrary to defendants' customary practice. (D.I. 60 ¶ 32). Defendants, in their explanation, again point to Fannie Mae guidelines, which state "[t]he lender must obtain documentation for all sources for the funds that the borrower uses to make the down payment and pay closing costs." (D.I. 67 at A-80) The Wilkinses paid the $13,333.00 earnest money deposit using a convenience check purchased with a credit card. (*Id.* at A-62). However, Fannie Mae guidelines only permit amounts totaling up to 1% of the mortgage amount to be placed on credit cards.

17

(Id. at A-82). Subsequently, the Wilkinses took out a secured loan to repay the credit card debt incurred, thus resolving the issue since a secured loan is an acceptable source of funds under Fannie Mae guidelines. (Id. at A-65, A-84, A-86)

Plaintiffs further claim that defendants discriminated against them by requiring the Wheatleys to make a 20% down payment to obtain their mortgage. (D.I. 60 ¶ 91). Defendants explain that, not only did they not discriminate against the Wheatleys, they extended to them a courtesy by making an exception. The Wheatleys paid their $13,333.34 down payment using a check drawn on their limousine business. (D.I. 68 at A-380) The profits and losses from the Wheatleys' limousine business were reported on their personal tax return under Schedule C. (Id. at A-579, A-607, A-630). Defendants' established guidelines required that "[w]hen using the assets of a Schedule C business to meet the asset test, the CPA must confirm that the borrower files the business on the Schedule C." (D.I. 67 at A-21, A-46) Unfortunately, the Wheatleys did not engage a CPA for their limousine business. (Id. at A-231) This, along with concerns about the property condition and verification of income, ultimately lead to the loan application being rejected under the guidelines. (Id.) Defendants, however, made an "exception" loan to the Wheatleys based on their status as preferred customers. (D.I. 66 at 18; D.I. 67 at A-233) Due to the increased risk caused by the lack of conformity with the guidelines, defendants were only willing to finance 80% of the value of the property, in spite of **Hogsten's** attempts to increase the percentage back to 90%. (D.I. 67 at A-21, A-233)

In summary, defendants have proffered legitimate nondiscriminatory reasons for their actions. Defendants have followed routine business procedures in the evaluation

18

and granting of plaintiffs' mortgage applications, have applied standard guidelines resulting in the various requests for improvements and certifications, and have in fact gone beyond normal procedures to the benefit of plaintiffs. An examination of the record demonstrates consistency among the statements of various employees and contractors of defendants at the time, all supporting defendants' legitimate nondiscriminatory explanations of their actions.

Plaintiffs have failed to point to any evidence establishing a reasonable inference that defendants' proffered explanations are unworthy of credence. They do not point to any inconsistency, other than to question the veracity of Hogsten's statement that he is not familiar with the demographics of the Silver Lake area. (D.I. 69 at 18) Instead, plaintiffs' entire case rests on conclusory allegations.[9]

Therefore, in addition to plaintiffs' failure to establish a prima facie case, the court also finds that defendants have established legitimate nondiscriminatory reasons for their actions which have not been discredited by an objective evidence of record.

## B. Breach of implied covenant of good faith and fair dealing

Having resolved the claim under § 1981, it is proper to remand the remaining claim for breach of the implied covenant of good faith and fair dealing under Delaware law to the Superior Court of the State of Delaware.

## V. CONCLUSION

---

[9]Plaintiffs' frustration with the process is consistent with the complexity of the transaction - the simultaneous, dependent sale of three separate houses to three separate purchasers - and plaintiffs' inexperience with residential (as opposed to commercial) real estate.

19

For the reasons stated, the court will grant defendants' motion for summary judgment on plaintiffs' claim under § 1981, and state law claims for breach of contract and tortious interference.  Plaintiffs' remaining claim for breach of the implied covenant of good faith and fair dealing under Delaware law is remanded to the Superior Court of the State of Delaware.  An appropriate order will issue.

20